IN THE COURT OF APPEALS, FRANKLIN COUNTY, OHIO

TENTH APPELLATE DISTRICT

**FILED**
COURT OF APPEALS

SEP 28 1987

TRUMBULL COUNTY, OHIO
VIOLET CAMPANA WHITMAN, Clerk

STATE OF OHIO,                    :

      Plaintiff-Appellee,        :

  v.                             :    Case No. 3720 and 3745

DANNY LEE HILL,                   :

      Defendant,-Appellant. :

---

### BRIEF OF DEFENDANT-APPELLANT

---

DAVID WATKINS
TRUMBULL COUNTY PROSECUTOR
COURT HOUSE
WARREN, OH 44481

Counsel of Plaintiff-Appellee

ROGER WARNER
TATARU, McINTURFF, WALLACE &
  WARNER
181 East Livingston Avenue
Columbus, OH 43215

Counsel for Defendant-Appellant



EXHIBIT
H

Clerk's copy

COURT OF A...

JUN 9 1986

TRUMBULL COUNTY, C...
VIOLET CAMPANA WHITMAN, C

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 85-CR-317 |
| PLAINTIFF-APPELLEE | ) | COURT OF APPEALS |
| VS. | ) | NO. 3745 |
| DANNY LEE HILL | ) | |
| DEFENDANT-APPELLANT | ) | NOTICE OF APPEAL |
| | ) | |

Notice is hereby given that Danny Lee Hill appeals to the Eleventh District Court of Apeals from the order of the Trumbull County Court of Common Pleas overruling Appellant's Motion to vacate its order denying Appellant's Motion for new trial, entered into this action on May 8, 1986.

JAMES F. LEWIS
Attorney at Law
Office of the Public Defender
Suite 2685, Eastwood Mall
Niles, Ohio  44446
(216) 544-7450/392-5000

___

TRANSCRIPT INFORMATION [APP. R. 9 (B) ]

I have ordered a complete transcript from the Court Reporter and a copy of said order is attached hereto.

6/6/86
Date

JAMES F. LEWIS

\* \* \*

COURT REPORTER ACKNOWLEDGEMENT TO BE COMPLETED BY COURT REPORTER

Date order received        Est. completion date        Est. No. of Pgs.

6/9/86        Not Know        over 1000 pgs.

Date:_____        Signature: Mary Kay Rose

ELEVENTH DISTRICT COURT OF APPEALS

## DOCKETING STATEMENT

(To be attached to and filed with Notice of Appeal)

FILED
JUN 9 1986
TRUMBULL COUNTY, OHIO
VIOLET CAMPANA WHITMAN, C?

(CAPTION - must be complete)

STATE OF OHIO

_____

_____

                    Appellee

    - vs -

DANNY LEE HILL

_____

_____

                    Appellant

(NAME, ADDRESS & PHONE FOR COUNSEL)

James F. Lewis
Office of the Public Defender, Suite 2685
Eastwood Mall, Niles, Ohio 44446
(216) 544-7450 / 392-5000

APPEAL NO. _____

TRIAL COURT NO. 85 CR 317

_____

_____

TYPE OF CASE: (Please indicate)

__A. No transcript of proceedings required;
__B. Length of transcript is such that preparation time will not be a source of delay;
__C. Agreed or narrative statement to be submitted pursuant to App.R.9(C or D);
__D. Record was made in administrative hearing and filed with trial court
__E. All parties to case approve assignment to accelerated calendar;
__F. Criminal cases involving:
    __1. Crim. R.11 challenges
    __2. Postconviction appeals alleging ineffective assistance of counsel
    __3. Challenges to sentencing to revocation of probation or to failure to grant probation
    __4. Crim. R.29 or weight of evidence challenges, especially with lesser crimes
    __5. Routine DUI cases and other minor traffic offenses
    __6. Expungement cases
__G. Civil cases involving:
    __1. Routine administrative appeals
    __2. Actions on account
    __3. Slip and fall
    __4. Civ. R.60(B) motions
    __5. Simple contract cases
    __6. Minor negligence actions
    __7. Property division in divorce cases or post-decree support motions
    __8. Other

PROBABLE ISSUE FOR REVIEW:
                    Trial Court failure to vacate order denying
new trial.
_____

NOTE: Information re Record (and Court Reporter's Certification, if applicable) **MUST** be completed on Notice of Appeal.

    Copy of Judgment Entry being appealed **MUST** be attached to Notice of Appeal.

CERTIFICATE OF SERVICE: I certify that I have mailed or otherwise delivered a copy of this Docketing Statement to all counsel of record or the parties if unrepresented.

DATE 6/6/86                    SIGNATURE _____

TABLE OF CONTENTS
AND
ASSIGNMENTS OF ERROR

**PAGE**

**STATEMENT OF THE CASE**
    Procedural Posture...................................
    Statement of Facts.................................. 1
        Pretrial Suppression Hearing...................... 2
        Guilt Phase...................................... 2
        Mitigation Phase................................. 19
                                                      42

**FIRST ASSIGNMENT OF ERROR**
    The trial court erred in admitting into evidence statements of the Appellant.

**Issues Presented for Review and Argument**
    1. An accused's sixth amendment right to counsel is violated when he is deprived of counsel for custodial interrogation when he does not knowingly, intelligently and voluntarily relinquish a known right due to the misconduct of law enforcement authorities and the defendant being essentially illiterate and being mentally retarded.

        **Authorities**

            Powell v. Alabama (1932), 287 U.S. 45............ 57
            Massiah v. United States (1964), 377 U.S. 201.... 58
            Spano v. New York (1959), 360 U.S. 315........... 58
            Brewer v. Williams (1977), 430 U.S. 387, 401..... 58
            Johnson v. Zerbst (1938), 304 U.S. 458........... 58
            Miranda v. Arizona (1966), 384 U.S. 436, 474..... 59
            Michigan v. Mosley (1975), 423 U.S. 96, 105
              (fn.10)..................................... 59

    2. An accused's statements are not voluntary when such statements were coerced by the sychological tactics of law enforcement officers on a retarded individual who was essentially illiterate and the admission of such statements violates the due process.

        **Authorities**

            State v. Chase (1978), 55 Ohio St. 2d 237,
              (1978).................................... 63
            Rufer v. State (1874), 25 Ohio St. 464, 470...... 63
            Mincey v. Arizona (1977), 437 U.S. 385, 398 ..... 64
            Miller v. Fenton (1985), 106 S.Ct. 445, 449...... 64
            Colorado v. Connelly (1986), ___ U.S. ___,
              40 Cr.L. 3159.............................. 64
            Reck v. Pate (1961), 367 U.S. 433, 442.. ........ 65
            Townsend v. Sain (1962), 372 U.S. 293, 307....... 65
            Blackburn v. Alabama (1960), 361 U.S. 199, 208... 65

i

3. An accused's statements are not admissible unless the State establishes that the procedural safeguards contained in the Miranda warnings were properly given or knowingly, intelligently and voluntarily waived.

**Authorities**

Schneckloth v. Boustamonte (1973), 412 U.S. 218.. 73
Rhode Island v. Innis (1980), 446 U.S. 291
  300-301............................................ 73
Wilson v. United States (D.C. App. 1982), 444
  A.2d 25............................................ 73
Moran v. Burbin (1986), ___ U.S. ___, ___,
  106 S.Ct. 1135.................................... 74
U.S. v. Crouder (1982, 6th Cir.), 691 F.2d 280... 78

4. An accused's Fourth and Fourteenth Amendment rights are violated when an accused is seized from his home through the use of psychological ploys by law enforcement officers upon an accused who is mentally retarded and essentially illiterate.

**Authorities**

The Fourth Amendment of the United States
  Constitution...................................... 81
Hayes v. Florida (1985), ___ U.S. ___, 84
  L.Ed.2d 705....................................... 81
Dunaway v. New York (1979), 442 U.S. 200......... 81
Florida v. Royer (1983), 430 U.S. 490 ........... 82
State v. Fickes (March 29, 1985), Trumbell
  App. No. 3419, unreported......................... 87

5. An accused is denied his right to due process pursuant to he Fourteenth Amendment when he is denied his statutory right to counsel pursuant to R.C. 120.16, 2934.14, and 2935.20.

**Authorities**

R.C. 120.16, 2935.14, 2935.20.................... 89
State v. Scarlett (Sept. 3, 1987), Montgomery
  County App. No. 10378, unreported................ 90
R.C. 120.16, 2935.14, 2935.20.................... 91

6. Noncompliance with R.C. 2935.05 results in an illegal arrest, and any statements and/or evidence derived therefrom should be suppressed.

**Authorities**

R.C. 2935.05, 2935.07............................ 91
State v. Fairbanks (1972), 32 Ohio St.2d 34...... 94
Johnson v. Reddy (1955), 163 Ohio St. 347........ 96
Leger v. Warren (1900), 62 Ohio St. 500.......... 96

7. When statements are made by an accused to law enforcement officers under the impression of receiving leniency or some other benefit, then those statements are inadmissible in any later trial.

**Authorities**
United States v. Geders (C.A. 5th Cir. 1978), 566
   F.2d 1227.................................... 98
State v. Davis (1980), 70 Ohio App. 2d 48......... 99

**SECOND ASSIGNMENT OF ERROR**
The trial court erred in the admission of "other acts" testimony.

**Issues Presented for Argument and Review**
The admission of other crimes, wrongs, acts, or acts into evidence by the trial court violated R.C. 2945.59, Evid. R. 404(B) and the due process clause of the Fourteenth Amendment to the United States Constitution to the prejudice of the Appellant thus requiring reversal.

**Authorities**
State v. DeMarco (1987), 31 Ohio St. 3d 191...... 101
State v. Burson (1974), 38 Ohio St. 2d 157, 158.. 101
State v. Heckter (1969), 19 Ohio St. 2d 167...... 101
State v. Moore (1948), 149 Ohio St. 226, 229..... 102
Brown v. State (     ), 26 Ohio St. 176, 181...... 102
State v. Curry (1975), 43 Ohio St. 2d 66......... 103
R.C. 2945.59.................................... 105

**THIRD ASSIGNMENT OF ERROR**
The trial court improperly admitted certain evidence.

**Issues Presented for Review and Argument**
A trial court must exclude evidence that is either not relative, or its relevance is outweighed by its prejudicial effect or such evidence is solely introduced to influence the court. The effect of the erroneous evidentiary rulings was the denial of Appellant's right to due process and fair and impartial trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

**FOURTH ASSIGNMENT OF ERROR**
The trial court erred in admitting Exhibit 47, a "stick".

**Issues Presented for Review and Argument**
It is error for a trial court to draw an influence from another inference because the foundation of the second inference is so insecure that reliance upon it would result in an inferred fact which is merely speculative in nature.

Authorities
Sobolovitz v. Lubric Oil Co. (1923),
107 Ohio St. 204............................. 111

**FIFTH ASSIGNMENT OF ERROR**
The right to confront witnesses was violated.

**Issues Presented for Review and Argument**
An accused's right to confrontation is violated when a prosecutor consults with an important witness while that witness was subject to recall and was a surprise witness of which defense counsel had no prior knowledge.

Authorities
Pointer v. Texas (1965), 380 U.S. 400............. 113
Alford v. United States (1931), 282 U.S. 687,
at 692.......................................... 113
Smith v. Illinois (1968), 390 U.S. 129............ 113
Davis v. Alaska (1974), 415 U.S. 308.............. 114
State v. Prater (1983), 13 Ohio App. 3d 98........ 114
State v. Banks (April 26, 1986), Franklin County,
App. No. 85AP-391............................. 115

**SIXTH ASSIGNMENT OF ERROR**
The trial court erred in denying the Appellant's motion to include licensed drivers in the pool of licensed drivers.

**Issues Presented for Review and Argument**
It is a denial of an accused's right to a fair cross-section of the community by denying a requst for inclusion in that pool of prospective jurors licensed drivers pursuant to R.C. 2313.08(B) in volation of the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.

Authorities
Duren v. Missouri (1979), 439 U.S. 357........... 116
Ohio Revised Code 2313.06........................ 117
Ohio Revised Code 2313.98........................ 121
People v. Harris (1984), 36 Cal. 3d 36,
679 P.2d 443.................................. 121
In Re Rhymes (Cal. Ct. App. 2d Dist., 1985),
37 Cr.L.2459................................. 121

**SEVENTH ASSIGNMENT OF ERROR**
The trial court erred in allowing the Appellant to waive his right to jury in writing pursuant to Crim. R. 23.

**es Presented for Review and Argument**
It is a violation of an accused right to jury trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 when the court does not determine on the record, specifically addressing an accused, whether he has knowingly, intelligenty, and voluntarily waived his right to a jury trial.

Authorities
State v. Kehoe (1978), Ohio App. 2d 315.......... 122
State v. Morris (1982), 8 Ohio App. 3d 12........ 122
State v. Griffin (1983), 13 Ohio App. 3d 376..... 123

**:HTH ASSIGNMENT OF ERROR**
The trial court erred in denying the Appellant funds to employ an expert witness for a motion hearing.

**sues Presented for Review and Argument**
It is reversible error for a trial court to deny an accused  funds necessary to employ an expert for purposes of a motion for closure of pre-trial hearings that was necessary to preserve a fair and impartial jury pursuant to the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article II, Section 26.

Authorities
People v. Elliot (1960), 54 Cal.2d 498.......... 124
People v. Pratt (1967), 27 App. Div.2d 199,
    278 N.Y.S.2d 89........................... 124
Philadelphia Newspapers, Inc. v. Jerome (1978),
    478 Pa. 484............................... 124
State ex. rel. Chillicothe Gazette, Inc. v.
    Court of Common Pleas (1982), 2 Ohio St.3d 24.. 125
Nebraska Press Assn. v. Stuart (1976), 427
    U.S. 539................................. 125
State of Montana ex. rel. Daniel Paul Smith v.
    District Court (1982), 654 P.2d 682........ 126
R.C. 2929.024.................................. 127
Washington v. Texas (1967), 388 U.S. 14.........
New York Cent. Rd. Co. v. Public Utilities
    Commission (1952), 157 Ohio St. 257,
    (6th Cir. 1972)........................... 129
Gilday v. Board of Elections, 472 F.2d 214...... 129
State ex rel, Wright v. Morrison (1947), 80
    Ohio App. 135............................. 129
Griffin v. Illinois (1956), 351 U.S. 12 ........ 129
Ross v. Moffitt (1974), 417 U.S. 600............ 130
Geders v. United States (1976), 425 U.S. 80..... 130
State v. Hester (1976), 45 Ohio St.2d 71........ 130
State ex rel. Smith v. District Court
    (1982), 654 p.2d 682...................... 131
Ake v. Oklahoma (1985), ____ U.S. ____, 105
    S.Ct. 560................................. 131
ABA Standards 5-1.4 Comm....................... 131

**NINTH ASSIGNMENT OF ERROR**
The admission of Exhibit 3 (a photograph of Raymond Fife) was error.

**Issues Presented for Review and Argument**
The trial court erred and abused its discretion in admitting in a pre-death photograph of the victim. This error violated Appellant's rights under Evid. R. 404, the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16 of the Ohio Constitution.

**Authorities**

White v. State Okla. Cr. 1983), 674 P.2d 31, 36.. 132
Gardner v. Florida (1977), 430 U.S. 349, 358..... 133
Eddings v. Oklahoma (1982), 455 U.S. 104, 118.... 133
Woodson v. North Carolina (1976), 428 U.S. 280,
    305................................................ 133
People v. Ramirez (Ill. 1983), 457 N.E.2d 31..... 133
Vela v. Estelle (5th Cir. 1983), 708 F.2d 954,
    961-963, cert. den. (1984), 79 L.Ed.2d 195..... 134
Brooks v. Kemp (11th Cir. en banc 1985),
    762 F.2d 1383, 1409-1410...................... 134
Adan v. State (Fla. 1984), So. 2d 1195........... 134
Randolph v. State (Fla. 1984), 463 So. 2d 186.... 134
People v. Levitt (Cal. 1984), 156 Cal. App.
    3d 500........................................ 134
Hathaway v. Florida (Fla. 1958), 100 So.
    2d 622, 664.................................. 135

**TENTH ASSIGNMENT OF ERROR**
The Appellee did not give the Appellant complete discovery.

**Issues Presented for Review and Argument**
When the state repeatedly fails to comply with Crim. R. 16, it is violating an accused's right to a fair trial and the effective assistance of counsel.

**Authorities**

State v. Hill (March 25, 1982), Franklin
    County App. No. 81AP-663, unreported........ 136

**ELEVENTH ASSIGNMENT OF ERROR**
Admission of certain photographs was an abuse of discretion.

**Issues Presented for Review and Argument**
It is an abuse of discretion for a trial court to allow into evidence photgraphs of the victim because such photographs were highly prejudicial, gross, and unnecessary and which lacked probative value in

determining the issues involved.  Their admission
violated the Appellant's Fifth, Sixth, and Fourteenth
Amendments to the United States Constitution and
Article I, Sections 10 and 16 of the Ohio Constitution.

### Authorities
State v. Woodards (1966), 6 Ohio St. 2d 14,
  24-25........................................... 138
State v. Luft (Dec. 26, 1978), Franklin
  County App. No. 78AP-302...................... 138
State v. Ward (Feb. 15, 1983), Franklin
  County App. No. 82AP-451..................... 139

## TWELFTH ASSIGNMENT OF ERROR
The state made improper closing arguments at both the
guilt and mitigation phases of this case.

## Issues Presented for Review and Argument
Prosecutorial misconduct during both the guilt and
mitigation phase closing arguments denied Appellant his
right to a fair trial and an impartial fact-finder as
guaranteed by the Fifth, Sixth and Fourteenth
Amendments to the United States Constitution and
Article I, Section 10 and 16 of the Ohio Constitution.

### Authorities
State v. Manago (1974), 38 Ohio St. 2d 233..... 140
State v. Smith (1976), 50 Ohio App. 2d 183..... 140
State v. Woodwards (1966), 6 Ohio St. 2d 14.... 140
State v. Muscatello (1977), 57 Ohio App. 2d
  231, 254, aff'd 55 Ohio St. 2d 201.......... 140
Wither v. United States (6th Cir. 1979),
  602 F.2d 124................................. 140
Cook v. Bordenkircher (6th Cir. 1979), 602
  F.2d 117.................................... 140
Berger v. United States (1934), 295 U.S.
  78, 88...................................... 142
State v. Agner (1972), 30 Ohio App.2d 96....... 144
Tucker v. Zant (11th Cir. 1984), 724 F.2d 882.. 145
Brooks v. Kemp (11th Cir. en banc 1985),
  762 F.2d 1383............................... 145

## THIRTEENTH ASSIGNMENT OF ERROR
The Appellant was denied the effective assistance of
counsel.

## Issue Presented for Review and Argument
When the issue of effective assistance of counsel is
raised that involves matters both within the record and
outside the record the proper avenue for reviewing that
issue should be on post-conviction relief even if
counsel on appeal is not trial counsel.  The
Appellant's right to effective assistance of counsel

was violated pursuant to the Sixth and Fourteenth Amendment rights to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

**Authorities**
State v. Cole (1982), 2 Ohio St. 3d 112........ 146
State v. Smith (1985), 17 Ohio St. 3d 98....... 146
Beasley v. United States (6th Cir. 1974),
    491 F.2d 687................................... 147
State v. Hester (1976), 45 Ohio St. 2d 71...... 147
State v. Lyte (1976), 48 Ohio St. 2d 391,
    396-397....................................... 147
State v. Nabozny (1978), 54 Ohio St. 2d 195.... 147
State v. Clayton (1980), 62 Ohio St. 2d 45..... 147

## FOURTEENTH ASSIGNMENT OF ERROR
It was error for the trial court to sentence Appellant on the kidnapping charge and the kidnapping specification. (TR.150-151)

## Issue Presented for Review and Argument
The trial court erred in entering a judgment of conviction for kidnapping and the other felonies where convictions on both offenses are contrary to 2941.25. Secondly, where an underlying felony count which is also used as a specification for aggravated murder merges then it can not be considered as an additional specification for sentencing purposes.

**Authorities**
R.C. 2941.25...................................... 149
State v. Logan (1979), 60 Ohio St. 2d 126...... 150
State v. Brown (June 8, 1982), Franklin
    County App. No. 81AP-619..................... 150
R.C. 2941.25(B).................................. 150

## FIFTEENTH ASSIGNMENT OF ERROR
The motion for new trial should have been granted. (Tr.d 138, 160-161, 170)

## Issue Presented for Review and Argument
A motion for new trial should note be denied without a full hearing when made pursuant to Crim. R. 33. A denial of such a hearing and the motion violates an accused's Fifth, Sixth and Fourteenth Amendment rights to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution and Crim. R. 33.

**Authorities**
State v. Turner (1983), 10 Ohio App. 3d 328.... 152
Toledo v. Stuart (1983), 11 Ohio App. 3d 292... 152

**SIXTEENTH ASSIGNMENT OF ERROR**
The trial court was improperly prevented by deciding whether death was the appropriate punishment. (Tr.d. 150-151).

**Issue Presented for Review and Argument**
Ohio's mandatory sentencing scheme prevented the panel of three judges from deciding whether death was the appropriate punishment in violation of Appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

**Authorities**

R.C. 2929.03 et seq........................... 154
Lockett v. Ohio (1978), 438 U.S. 586, 601...... 155
Woodson v. North Carolina (1976), 428
    U.S. 1056.................................. 155
Smith v. North Carolina (1982), 459 U.S. 1056.. 155
State v. McDougall (N.C. 1983), 301
    S.E.2d 308, 327............................ 155
State v. Wood (Utah 1982), 648 P.2d 71, 83..... 155
Roberts (Harry) v. Louisiana (1977),
    431 U.S. 633, 637.......................... 155
Barclay v. Florida (1983), 463 U.S. 939........ 155
Zant v. Stephens (1983), 462 U.S. 862.......... 155

**SEVENTEENTH ASSIGNMENT OF ERROR**
The trial court failed to consider all of the evidence in support of mitigating a death sentence.

**Issue Presented for Review and Argument**
A sentence of death must be reversed when a trial court fails to consider all the evidence presented in mitigation. Such a failure violates Appellant's constitutional rights under Lockett v. Ohio and Eddings v. Oklahoma.

**Authorities**

R.C. 2929.03(F)................................ 157
Lockett v. Ohio (1978), 438 U.S. 586........... 157
Eddings v. Oklahoma (1982), 455 U.S. 104....... 157
State v. Maurer (1984), 15 Ohio St. 3d 239,
    cert. denied (1985), U.S. 105 S.Ct. 2714..... 158
Skipper v. South Carolina (1986), 39
    Crim. L. Rptr. 3041........................ 159

**PREFACE TO EIGHTEENTH ASSIGNMENT OF ERROR**

**EIGHTEENTH ASSIGNMENT OF ERROR**
A sentence of death is unconstitutional.

**Issues Presented for Review and Argument**
1. The Ohio death penalty scheme, found in Ohio Revised Code Sections 2903.01 and 2929.02, et. seq., violates

the prohibition against cruel and unusual punishment and equal protection guarantees contained in the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 9 of the Ohio Constitution.

**Authorities**
Robinson v. California (1960), 370 U.S. 660.... 161
Trop v. Dulles (1958), 356 U.S. 86........... 161
Rhodes v. Chapman (1981), 452 U.S. 337......... 161
Furman v. Georgia (1972), 408 U.S. 238......... 161
Wilkerson v. Utah (1898), 99 U.S. 130.......... 162
People v. Anderson (Cal. 1972), 493 P.
   2d 880, cert. denied sub nom California v.
   Anderson (1972), 406 U.S. 958.............. 162
District Attorney for Suffolk District v.
   Watson (Mass. 1980), 411 N.E. 2d 1274....... 162
Gregg v. Georgia (1976), 427 U.S. 153......... 162
Goldberg and Dershowitz, Declaring the Death
   Penalty Unconstitutional, 83 Harv. L. Rev.
   1973.................................... 162
Coker v. Georgia (1977), 443 U.S. 584......... 163
Weems v. United States (1910), 217 U.S. 349.... 163

A. The imposition of the death penalty under Ohio's statutory authority is degrading to the dignity of human beings and cannot be exercised within the limits of contemporary civilized standards................ 165

**Authorities**
People v. Anderson, 493 P.2d at 892........... 165
Commonwealth v. O'Neal (Mass. 1975),
   339 N.E.2d 676 ....................... 165
Mental Suffering Under Sentence of Death:
   A Cruel and Unusual Punishment, 57 Iowa
   L. Rev. 814, 830 (1972)................. 166
The Death Penalty Cases, 56 Calif. L. Rev.
   1268, 1339 (1968)..................... 166
The History of Capital Punishment, 219 (1950).. 166
People v. Anderson, supra; In Re Kemmler
   (1980), 136 U.S. 436.................. 167
Gray v. Lucas (1983), 463 U.S. 1237........... 167
Evans v. Hooper (1982), 456 U.S. 605.......... 167
Glass v. Louisiana (1985), ___ U.S. ___,
   85 L. Ed. 2d 514.................... 167
Autry v. McKasikle (1984), 465 U.S. 1098....... 167
Solesbee v. Balkcom (1950), 339 U.S. 9, 14..... 167
Wainwright v. Ford (1984), ___ U.S. ___, 82
   L. Ed. 2d 911..................... 167
Ford v. Wainwright (1986), ___ U.S. ___, 54
   U.S.L.W. 4799..................... 168
State v. Herman Ray Rucker, No. 82-CR-018
   Wayne County Court of Common Pleas......... 168
Woodson v. North Carolina (1976), 428 U.S. 280. 168

x

B.  The death penalty is arbitrarily, freakishly, and
    discriminatorily inficted, constituting cruel and
    unusual punishment and a denial of equal
    protection under the Eighth and Fourteenth
    Amendments to the United States Constitution and
    Article I, Sections 2 and 9 of the Ohio
    Constitution...................................  168

    **Authorities**
      Furman v. Georgia (1972), 408 U.S. 238.........  168
      Bowers and Pierce, Arbitrariness and Discrimina-
        tion in Post-Furman Capital Statutes, Octo-
        ber 1980, Crime and Delinquency 563.........  168
      Ritter v. Smith (11th Cir. 1984), 752 F.2d
        1505........................................  169
      Gregg v. Georgia (1976), 427 U.S. 153.........  169
      Proffitt v. Florida (1976), 428 U.S. 241......  169
      Jurek v. Texas (1976), 428 U.S. 262...........  169
      Coker v. Georgia (1977), 443 U.S. 584.........  170
      State v. Jenkins (1984), 15 Ohio St.3d 164,
        cert. denied (1985), 473 U.S.__, 87 L.Ed. 2d
        643.........................................  171
      State v. Maurer (1984), 15 Ohio St.3d 259.....  171

C.  The arbitrary and capricious application of the
    death penalty under the Ohio statutory scheme
    persists due to the uncontrolled discretion of
    the prosecutor.................................  172

    Authorities
      Furman v. Georgia (1972), 408 U.S. 238.........  172
      Woodson v. North Carolina (1976), 428 U.S.
        280.........................................  172
      Roberts v. Louisiana (1976), 428 U.S. 325.....  172
      National Commission on Law Observance and En-
        forcement, Report of Prosecution, 19 (1931)..  173
      Vorenberg, Decent Restraint of Prosecutorial
        Power, 94 Harv. L. Rev. 1521 (1981).........  173
      J. Ely, Democracy and Distrust, 97 (1980).......  173
      Hilliard, Capital Punishment in Ohio: Aggravat-
        ing Circumstances, 31 Cleve. St. L. Rev. 495
        (1982)......................................  174
      State v. Flynt (1980), 63 Ohio St.2d 132......  175
      R.C. 309.05...................................  175
      State v. Hopkins (1982), 69 Ohio St.2d 80.....  175
      Enmund v. Florida (1982), 458 U.S. 782.........  175
      Tichnell v. State (Md. 1983), 462 A.2d 1......  176
      Gregg v. Georgia (1976), 427 U.S. 153.........  176
      Zant v. Stephens (1983), 462 U.S. 862, on re-
        mand 716 F.2d 276...........................  176
      Barclay v. Florida (1983), 463 U.S. 939, reh.
        den. 464 U.S. 874...........................  177

xi

2. The Ohio death penalty scheme, as authorized by R.C. 2903.01 and 2929.02 et seq., deprives capitally charged defendants of their lives without due process of law in violation of the guarantees of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution....... 178

A. Where the substantive due process requirements that the least restrictive means of serving a compelling state interest, when fundamental rights are involved, are not met, the death penalty cannot be constitutionally inflicted..... 179

Authorities

Commonwealth v. O'Neal (1975), 327 N.E.2d 662... 179
Roe v. Wade (1973), 410 U.S. 113, reh. den. 410 U.S. 959.................................. 179
Johnson v. Zerbst (1938), 304 U.S. 458.......... 179
Yick Wo v. Hopkins (1886), 118 U.S. 356......... 179
Commonwealth v. O'Neal (1975), 339 N.E.2d 676.... 179
Furman v. Georgia (1972), 408 U.S. 238.......... 179
Marbury v. Madison (1803), 5 U.S. 137.......... 180
City of Euclid v. Heaton (1968), 15 Ohio St.2d 65.................................. 180
State v. Pierre (Utah 1977), 572 P.2d 1338....... 180
Shelton v. Tucker (1960), 364 U.S. 479.......... 180
State v. Dixon (1973), 283 S.2d 1............... 180
Wisconsin v. Yoder (1972), 406 U.S. 205.......... 180
Rudolph v. Alabama (1963), 375 U.S. 889.......... 182

B. The death penalty is neither the least restrictive means of punishment nor an effective means of deterrence................... 182

Authorities

Glasser, Capital Punishment-Deterrent or Stimulus to Murder? Our Unexamined Deaths and Penalties, 10 U. Tol. L. Rev. 417 (1979)................. 183
Bailey, Deterrent Effect of the Death Penalty for Murder in Ohio: A Time Series Analysis, 28 Cleve. St. L. Rev. 51 (1979)............... 183
Bowers and Pierce, The Illusion of Deterrence in Isaac Ehrlich's Research on Capital Punishment, 85 Yale L. J. 187 (1975)........... 183
Sellin, Capital Punishment, 1965, at 135-138..... 183
West, Psychiatric Reflections on the Death Penalty, 45 Amer. J. Orthopsychiatry 689 (1975) 183
Solomon, Capitl Punishment as Suicide and Murder, 45 Amer. J. Orthopsychiatry 701 (1975)......... 184
Assn. of the Bar of the City of New York, Committee on Civil Rights, The Death Penalty: It Should be Abolished (1977)................... 184
Furman v. Georgia, 408 U.S. at 300............. 184
Commonwealth v. O'Neal, 339 N.E.2d at 682........ 184

W. Bowers, Execution in America (1974).......... 184
Forst, The Deterrent Effect of Capital Punishment:
    A Cross-State Analysis of the 1960's, 61 Minn.
    L. Rev. 743 (1977)............................. 184
Zeisel, The Deterrent Effect of Capital
    Punishment:  Facts v. Faith, Sup. Ct. Ref.
    (1976)....................................... 184
Ohio Legisl. Serv. Comm'n., Capital Punishment,
    (1961)....................................... 184
Gregg v. Georgia, 428 U.S. at 185................ 185
Shuman v. Walff (D. Ct. Nev., 1983),
    571 F. Supp. 213............................. 185
O'Neall II, 339 N.E.2d at 685.................... 185
State v. Jenkins (1984), 15 Ohio St. 3d 164,
    cert. denied (1985), 473 U.S. _____, 87 L.Ed.2d
    643.......................................... 185

C.  The societal interest of incarceration of the
    offender can be effectively served by means
    less restrictive than the death penalty.

**Authorities**
Furman v. Georgia, 408 U.S. at 300............... 186
Assn. of the Bar of the City of New York, Committee
    on Civil Rights, The Death Penalty:  It Should
    Be Abolished (1977).......................... 186
Bedau, Death Sentences in New Jersey,
    1907-1960, 19 Rutgers L. Rev. 1 (1964)........ 187

D.  If retribution or revenge is to be
    considered, it can be satisfied by less
    onerous means than death.

**Authorities**
O'Neal II, 339 N.E. 2d at 686.................... 188
Bedau, The Death Penalty in America, 268
    (Rev. Ed. 1967).............................. 188
People v. Anderson, 6 Cal. 3d 638, 100 Cal. Rptr.
    152, 493 P.2d 880, cert. denied (1972), 406
    U.S. 958..................................... 188
Williams v. New York (1949), 337 U.S. 241........ 188

3.  The Fifth and Fourteenth Amendments to the United
    States Constitution and Article I, Section 16 of the
    Ohio Constitutionguarantee fairness in judicial
    proceedings by requiring procedural due process, the
    violation of which will result in unequal protection
    of law, contrary to the guarantees in the Fourteenth
    Amendment and Article I, Section 2, and the
    imposition of cruel and unusual punishment, contrary
    to the Eighth Amendment and Article I, Section 9 of
    the Ohio Constitution.

**Authorities**

Gardner v. Florida (1977), 430 U.S. 349.......... 189
Beck v. Alabama (1980), 447 U.S. 625, 638........ 189
Eddings v. Oklahoma (1982), 455 U.S. 104, 111.... 189
Furman v. Georgia, 408 U.S. at 300............... 189
Lockett v. Ohio (1978), 438 U.S. 586............. 190
Gregg v. Georgia, 438 U.S. at 185................ 190
Spinkellink v. Wainwright (5th Cir. 1978),
   578 F. 2d 582.................................. 190
Woodson v. North Carolina (1976), 428 U.S. 280... 190
Proffit v. Wainwright (11th Cir. 1982),
   685 F.2d 1227 modified 706 F.2d 311; cert.
   denied 464 U.S. 1002.......................... 190
Godfrey v. Georgia, 446 U.S. 420................. 190
Henry v. Wainwright (5th CIr. 1981), 661 F.2d
   56, vacated and remanded, 457 U.S. 1114 (1982). 190
Jurek v. Texas (1976), 428 U.S. 262............. 190
Zant v. Stephens (1983), 462 U.S. 862, on remand
   716 F. 2d 275................................. 190
Pulley v. Harris (1984), 465 U.S. 37............ 191

A.   The Ohio death penalty scheme permits
    imposition of the death penalty on a less
    than adequate showing of culpability by
    failing to require a conscious desire to
    kill, premeditation, or deliberation as the
    culpable mental state....................... 191

**Authorities**

Gregg v. Georgia (1976), 427 U.S. 153........... 191
Coker v. Georgia (1977), 443 U.S. 584........... 191
Lockett v. Ohio (1978), 438 U.S. 586............ 191
Enmund v. Florida (1982), 458 U.S. 782.......... 192
LaFave and Scott, Criminal Law 201 (1972)....... 192
State v. Jenkins (1984), 15 Ohio St. 3d 164..... 193
State v. Mapes (1985), 19 Ohio St. 3d 108....... 193
Robinson v. California (1960), 370 U.S. 660..... 194
Weems v. United States (1910), 217 U.S. 349..... 194
Godfrey v. Georgia, 446 U.S. 420................ 194
Comment, The Constitutionality of Imposing
   the Death Penalty for Felony Murder, 15 Hous.
   L. Rev. 356 (1978)........................... 194
State v. Toth (1977), 52 Ohio St. 2d 206........ 194
R.C. 2903.01(B)................................. 194
R.C. 2929.04(A)................................. 194

B.   The statutes fail to require a stringent
    standard of proof as to guilt and conviction
    before the death sentence may be imposed........ 194

**Authorities**

Woodson v. North Carolina (1976), 428 U.S. 208... 195
Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1,
   (1980)........................................ 195

Green v. Georgia (1979), 422 U.S. 95............ 195
Eddings v. Oklahoma (1982), 455 U.S. 104........ 196
Beck v. Alabama (1980), 447 U.S. 625............ 196
Note, The Impact of a Sliding Scale Approach
   to Due Process on Capital Punishment
   Litigation, 30 Syr. L. Rev. 675 (1979)........ 196
Radin, Cruel Punishment and Respect for Persons:
   Super Due Process for Death, 53 So. Cal. L.
   Rev. 1143 (1980)............................... 196
Gardner v. Florida (1977), 430 U.S. 349.......... 196
In re Winship (1970), 397 U.S. 358............... 197
Morano, A Re-Examination of the Development of
   the Beyond a Reasonable Doubt Rule, 55 Boston
   U.L. Rev. 507 (1975)........................... 198
Gregg v. Georgia (1976), 427 U.S. 153........... 198
Model Penal Code Section 210.6(1)(f)............ 198
State v. Frost (May 2, 1978), Franklin County
   App. No. 77AP-728, unreported................. 199
Cross v. Ledford (1954), 161 Ohio St. 469........ 199
Holland v. United States (1954), 348 U.S. 121.... 199
Scurry v. United States (D.C. Cir. 1965),
   347 F. 2d 468, cert. denied 289 U.S. 883
   (1967)......................................... 199
State v. Crenshaw (1977), 51 Ohio App. 2d 63..... 199
State v. Nabozny (1978), 54 Ohio St. 2d 195...... 199
State v. Senett (1980), 70 Ohio AP. 2d 171....... 199
Thomas v. Arn (6th Cir. 1983), 704 F. 2d 865..... 199
State v. Miller (1977), 49 Ohio St. 2d 198....... 200
Lockett v. Ohio (1978), 438 U.S. 586............. 201
State v. Herman Ray Rucker, No. 82-CR-018
   (Wayne County Common Pleas)................... 201

C.  The Ohio death penalty statutes fail to
    require that the jury consider as a
    mitigating factor pursuant to R.C. 2929.04(B)
    that the evidence fails to preclude doubt as
    to the defendant's guilt.  The fact that
    evidence does not foreclose doubt as to guilt
    must be considered as a relevant mitigating
    factor under R.C. 2929.04(B).................. 202

Authorities
R.C. 2929.04(B)(7).............................. 202
R.C. 2929.03(D)(2).............................. 203
People v. Terry (1964), 395 P. 2d 381........... 204
Spivey v. Zant (5th Cir. 1981), 661 F.2d 464,
   Reh. denied 667 F. 2d 93, cert. denied 458
   U.S. 1111..................................... 204
Woodson v. North Carolina (1976), 228 U.S. 280... 205
Gregg v. Georgia (1976), 427 U.S. 153........... 205
Burr v. Florida (1985), ____U.S.____, 88 L. Ed.
   2d 170........................................ 206
Lockett v. Ohio (1978), 438 U.S. 586............. 206
Eddings v. Oklahoma (1982), 455 U.S. 104........ 206

xv

D. The statutes fail to require the state to prove the absence of any mitigating factors and that death is the only appropriate penalty before the death sentence may be constitutionally imposed.............................. 206

Authorities
R.C. 2929.03(D)(1)................................... 206
R.C. 2901.05........................................ 207
State v. Humphries (1976), 41 Ohio St. 2d 103.... 207
Lockett v. Ohio (1978), 438 U.S. 586............. 208
Woodson v. North Carolina (1976), 428 U.S. 280... 208
Mullaney v. Wilbur (1975), 421 U.S. 684.......... 208
R.C. 2929.03(D)(2).................................. 208
Spivey v. Zant (5th Cir. 1981), 661 F. 2d 464.... 209
Gregg v. Georgia (1976), 427 U.S. 153............ 209
Briley v. Commonwealth (Va. 1980), 273
    S.E. 2d. 48..................................... 209
Gilloon, Capital Punishment and the Burden
    of Proof: The Sentencing Decision, 17 Calif.
    West L. Rev. 316 (1981)........................ 209
Coker v. Georgia (1977), 443 U.S. 584............ 209

E. The Ohio death penalty statute impermissibly mandates imposition of the death penalty upon proof of an aggravating circumstance "outweighing" any evidence in mitigation........ 210

Authorities
Lockett v. Ohio (1978), 438 U.S. 586............. 210
R.C. 2929.04(B)..................................... 210
R.C. 2929.03(D)(2).................................. 210
R.C. 2929.03(D)(3).................................. 210
R.C. 2929.04(C)..................................... 210
Hertz and Weisberg, In Mitigation of the Penalty
    of Death: Lockett v. Ohio and the Capital
    Defendant's Right to Consideration of
    Mitigating Circumstances, 68 Calif. L. Rev.
    317............................................. 211
Eddings v. Oklahoma (1982), 455 U.S. 104........ 212
Giacco v. Pennsylvania (1966), 382 U.S. 399...... 213
McGautha v. California (1981), 402 U.S. 248...... 213
Gardner v. Florida (1977), 430 U.S. 349.......... 213
Renda, The Bitter Fruit of McGautha: Eddings
    v. Oklahoma and the Need for Weighing Method
    Articulation in Capital Sentencing, 20
    American Crim. L. Rev. 63 (1982)............... 213
The Fifth Amendment............................... 213
The Eighth Amendment.............................. 213
The Fourteenth Amendment.......................... 213
Section 9, Article I, Constitution............... 213
Section 16, Article I, Constitution.............. 213
Gregg v. Georgia (1976), 427 U.S. 153............ 214
Furman v. Georgia (1972), 408 U.S. 238........... 214

Fleming v. State (Ga. 1977), 240 S.E. 2d 37...... 214
Hayes v. State (Ga. 1981), 283 S.E. 2d 238...... 214
Stynchcombe v. Floyd (Ga. 1984), 311 S.E. 2d 308. 214
Chenault v. Stynchcombe (5th Cir. 1978),
   581 F. 2d 444................................... 215
Spivey v. Zant (5th Cir. 1981), 661 F. 2d 464.... 215
Goodwin v. Balkcom (11th Cir. 1982), 684 F. 2d
   794, cert. denied 460 U.S. 1098................ 215
Westbrook v. Zant (11th Cir. 1983), 704 F. 2d
   1487.......................................... 215
Tucker v. Zant (11th Cir. 1984), 724 F. 2d 882... 215
Gray v. Lucas (5th Cir. 1982), 677 F. 2d 1086
   cert. denied 461 U.S. 910..................... 215
Prejean v. Blackburn (La. 1983), 570 F. Supp.
   985, aff'd, 743 F. 2d 1091.................... 215
California v. Ramos (1983), 463 U.S. 992......... 215
King v. Mississippi (1983), 461 U.S. 919......... 216
Woodson v. North Carolina (1976), 428 U.S. 280... 216
Smith v. North Carolina (1983), 459 U.S. 1056.... 216
Ford v. Strickland (11th Cir. 1983), 696 F. 2d
   804, cert. denied 464 U.S. 865................ 216
R.C. 2929.03(D)(3)............................... 216
Connor v. State (Ga. 1983), 302 S.E. 2d 266...... 216
Spaziano v. Florida (1984), 468 U.S. 447......... 217

F.    R.C. 2903.01, 2929.022, 2929.03, 2929.04
      and 2929.05 violate the Eighth Amendment
      prohibition against cruel and unusual
      punishment and the Fourteenth Amendment due
      process and equal protection clauses of the
      United States Constitution and Article I,
      Sections 9 and 16 of the Ohio Constitution by
      requiring proof of aggravating circumstances
      in the guilt-determining state of a capital
      trial....................................... 217

      Authorities

Fla. Stat. Section 921.141(1).................... 218
Ga. Code Ann. Section 27-2503(c)................. 218
Zant v. Stephens (1983), 464 U.S. 862, on remand,
   716 F. 2d 276................................. 218
Barclay v. Florida (1983), 463 U.S. 939......... 218
Woodson v. North Carolina (1976), 428 U.S. 280... 218
R.C. 2929.04(A)(7).............................. 219
Furman v. Georgia (1972), 408 U.S. 238.......... 219
State v. Jenkins (1984), 15 Ohio St. 3d 164...... 220
Jurek v. Texas (1976), 428 U.S. 262............. 220
The Eighth Amendment............................ 221
The Fourteenth Amendment........................ 221
Section 9, Article I, Constitution.............. 221
Section 16, Article I, Constitution............. 221

G. R.C. 2929.021, 2929.03 and 2929.05 fail to assure adequate appellate analysis of excessiveness and disproportionality of death sentences...................................... 222

≡ Authorities
R.C. 2929.021............................... 222
R.C. 2929.03................................ 222
R.C. 2929.05................................ 222
Gregg v. Georgia (1976), 427 U.S. 153............. 222
State v. White (Del. 1978), 395 A.2d 1082........ 222
Zant v. Stephens (1983), 464 U.S. 862............ 223
Pulley v. Harris (1984), 465 U.S. 37............. 223
Barclay v. Florida (1983), 463 U.S. 939.......... 223
Lockett v. Ohio (1978), 438 U.S. 586............. 224
Baldus, Pulaski, Woodworth and Kyle,
    Identifying Comparatively Excessive Sentences
    of Death:  A Quantitative Approach, Stan. L.
    Rev. 1 (1980).................................. 225
Woodson v. North Carolina (1976), 428 U.S. 280... 225
McCaskill v. State (Fla. 1977), 344 So. 2d 1276.. 225
Proffitt v. Florida (1983), 428 U.S. 250........ 225

4. By providing for a sentencing hearing before the same jury which convicted the Appellant, the statutes violate the Appellant's right to effective assistance of counsel, to an impartial jury, and to a fair hearing as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5, 10 and 16 of the Ohio Constitution................. 226

Authorities
The Sixth Amendment............................. 226
Section 5, Article I, Constitution.............. 226
Section 10, Article I, Constitution............. 226
McMann v. Richardson (1970), 397 U.S. 759....... 226
Mempa v. Rhay (1967), 389 U.S. 128.............. 228

5. Sections 2929.03 and 2929.04 of the Ohio Revised Code violate the due process and equal protection clause of the Fourteenth Amendment to the United States Constitution:  the cruel and unusual punishment clauses of the Eighth Amendment and Article I, Section 9 of the Ohio Constitution, and the double jeopardy provisions of the Fifth Amendment and Article I, Section 10, of the Ohio Constitution............................... 228

Authorities
R.C. 2929.04(A)(7)............................... 229
R.C. 2903.01.................................... 229
Fourteenth Amendment............................ 230
Section 2, Article I, Constitution.............. 230
State v. Silhan (N.C. 1981), 275 S.E. 2d 450..... 230

Provence v. State (Fla. 1976), 337 So. 2d 738,
    cert. denied (1977), 431 U.S. 696.............. 230
Collins v. Lockart (8th Cir. 1985), 754 F.
    2d 258, cert. denied, ____ U.S.____, 54 U.S.
    L. W. 3375.................................... 230
R.C. 2929.04(A)(1).............................. 231
R.C. 2903.01(B)................................. 231
Skinner v. Oklahoma (1941), 316 U.S. 535....... 231
State v. Jenkins (1984), 15 Ohio St. 3d 164..... 231
Jurek v. Texas (1976), 428 U.S. 262............. 231

6.  The death penalty authorized by sections 2929.02,
    2929.022, 2929.03 and 2929.04 of the revised code of
    Ohio violates the cruel and unusual punishment
    provisions and due process clauses of the state and
    federal constitutions aggravating circumstance of
    aggravated murder in the course of kidnapping in R.C.
    2929.04(A) is overbroad and fails to reasonably justify
    the imposition of a more severe sentence.  (Eighth and
    Fourteenth Amendments, United States Constitution and
    Article I, Sections 9, 10 and 16 of the Ohio
    Constitution.)................................... 232

    Authorities
    Gregg v. Georgia (1976), 428 U.S. 153............ 233
    Proffitt v. Florida (1976), 428 U.S. 242......... 233
    Woodson v. North Carolina (1976), 428 U.S. 280... 233
    Godfrey v. Georgia (1980), 446 U.S. 420.......... 233
    Zant v. Stephens (1983), 462 U.S. 862............ 233
    R.C. 2905.01(A).................................. 234
    R.C. 2905.01.................................... 235
    Enmund v. Florida (1982), 458 U.S. 782........... 235
    People v. Daniels (Cal. 1969), 459 P. 2d 225..... 235
    People v. Levy (N.Y. 1965), 204 N.E.2d 842....... 235
    Model Penal Code, Tent. Draft No. 11,
        Comments to Section 212.1.................... 236
    State v. Logan (1979), 60 Ohio St. 2d 126........ 236
    R.C. 2929.04(A)(7).............................. 236
    In re Early (Cal. 1975), 534 P.2d 1271.......... 237

NINETEENTH ASSIGNMENT OF ERROR
        This Court cannot find that after reviewing all of the
    factors of R.C. 2929.05(A) tha death was the
    appropriate sentence for Danny Lee Hill.

        Issue Presented for Review and Argument
This Court cannot find, pursuant to R.C. 2929.05(A), that (1) the
judgment of guilt of aggravated murder and the specifications was
supported by sufficient evidence, (2) that the aggravating
circumstances outweigh the mitigating factors in the case, (3)
that the sentence of death is appropriate, (4) that the sentence
of death is not excessive or disproportionate to the penalty

imposed in similar cases, and (5) that the trial court properly
weighed the aggravating circumstances and mitigating factors.
Appellant's death sentence was imposed in violation of his rights
to due process and freedom from cruel and unusual punishment.
Fifth, Eighth, and Fourteenth Amendments to the United States
Constitution; Article I, Sections 9 and 16, Ohio Constitution.

Authorities
R.C. 2929.05(A)................................... 238
State v. Eley (1978), 56 Ohio St. 2d 169......... 239
State v. Graven (1978), 54 Ohio St. 2d 114....... 239
Jackson v. Virginia (1979), 443 U.S. 307......... 239
State v. Johnson (1986), 24 Ohio St. 3d 87....... 241
State v. Jenkins (1984), 15 Ohio St. 3d 164...... 241
State v. Maurer (1984), 15 Ohio St. 3d 239....... 241
R.C. 2929.04(B)(3)............................... 242
R.C. 2929.04(B)(4)............................... 242
R.C. 2929.04(B)(6)............................... 242
R.C. 2929.04(B)(7)............................... 242
Smith v. Balkcom (5th Cir. 1981), 660 F. 2d 573.. 242
State v. Buell (1986), 22 Ohio St. 3d 124....... 243
State v. Wood (Utah 1982), 648 P.2d 71.......... 243
People v. Brown (Cal. 1985), 709 P.2d 440,
    cert. granted on another issue (June 2, 1986),
    54 L.W. 3787................................. 243
Gregg v. Georgia (1976), 428 U.S. 153........... 243

## STATEMENT OF THE CASE

### PROCEDURAL POSTURE

This case is before this Court on an appeal as of right from the Trumbull County Court of Common Pleas involving in part, a sentence of death. The Appellant, Danny Lee Hill, was tried before a three judge panel and found guilty of aggravated murder with death specifications as well as kidnapping, rape, aggravated arson, and felonious sexual penetration. This appeal is sought for purposes of reversing the case and remanding it for a new trial. Alternatively, if reversal is not ordered, that the sentence of death be set aside and a life sentence be imposed.

1

## STATEMENT OF FACTS

Since R.C. 2929.05 provides that this Court must independently weigh all of the facts and other evidence presented in this case to determine whether or not a sentence of death is appropriate under the standards set forth in the statute, a full summary of the transcript is given herein.

### PRE-TRIAL SUPPRESSION HEARING

On December 16, 1985, a pre-trial hearing was held on the Appellant's motion to suppress statements he allegedly made to law enforcement officers, orally, on cassette tape, and by videotape.

Sergeant Thomas Stewart of the Warren Police Department testified that the Appellant voluntarily came down to the police station on September 12, 1985 at approximately 7:00 p.m. to discuss information he had on the Raymond Fife homicide. (Tr.S.7-8). Stewart had known the Appellant since he was about six years old because his former partner of eleven years, Morris Hill, was the Appellant's uncle. (Tr.S.8). Appellant stated he had left home on the night in question at approximately 7:00 p.m. Appellant indicated that he saw Maurice Lowery riding on the bike owned by the victim. He described the bike as having rub wheels on it, but could not remember of color. (Tr.S.9-12). Also, Sergeant Stewart testified that the Appellant talked about some of the details of the case; however, the only specific item mentioned in the summary of the oral statements given by the Appellant was the fact that the shorts were tied in a knot and were around the victim's throat. (Tr.S.13-14). While the

2

Appellant mentioned several possible names in connection with this case, it was Sergeant Stewart who brought up the name of Tim Combs. (Tr.S.12). Stewart was unable to find the bike. (Id.). Stewart dropped the Appellant off at home about 8:20 p.m. (Tr.62). A couple of hours subsequent to this interview, Stewart summarized the Appellant's statement in writing consisting of two pages, which he gave to Sergeant Steinbeck later that evening. (Tr.S.15).

At the time, Stewart encountered the Appellant, his information concerning the homicide was limited. He had been to the crime scene on September 10, 1985 with Lieutenant Fisher and talked to the ambulance driver, who told him the victim had been badly beaten up. Stewart did not personally observe the body, or talk to any of the other officers at the scene. (Tr.S.37).

Sergeant Stewart next encountered the Appellant the following Monday, September 16, 1985, at approximately 10:45 a.m. in an interrogation room at the police station. Detective Morris Hill and Sergeant Dennis Steinbeck were with him in an interrogation room. (Tr.S.16). Steinbeck arranged to get the Appellant some food via the jailer and briefly talked to Vera Williams, the Appellant's mother. (Tr.S.17). Stewart indicated he was in the room with Sergeant Steinbeck talking to the Appellant and questioning him in regard to a statement given on the previous Friday in which the Appellant had not indicated his involvement on the crime; however, certain inconsistencies had arisen between what the police had found out over the intervening weekend regarding the Appellant being in the neighborhood an a

3

statement he had given on Friday. (Tr.S.46,48,62). Hill and Steinbeck were in the room with the Appellant who was not talking. (Tr.S.66). The interrogation room was six by six to seven by seven feet. There were no windows or one way mirrors. There was a door, but no communication was allowed to the outside. The door can be locked. Appellant would not talk to Stewart when he entered the room with Hill. (Tr.S.65-66).

Thereafter, the Appellant was left alone with Detective Hill in the interrogation room with he door shut. A short time later, Detective Hill emerged from the room and stated that the Appellant had admitted being at the scene. (Tr.S.17,68). Until this time, the Appellant had maintained that he had no involvement with the homicide nor gave any incriminating statements. He continually portrayed his usual demeanor. However, both Steinbeck and Stewart indicated that when they returned to the interrogation room, they found the Appellant crying and visibly upset. (Tr.S.19,68). At this point, Stewart proceeded to take a tape recorded statement. During the statement, Detective Hill returned to the interrogation room where an off the tape discussion was held. (Tr.S.72) Hill had brought a rights waiver sheet with him. (Tr.S.73). It was decided, evidently by Detective Hill, to make sure what the Appellant's rights were. Detective Hill then read the Appellant his rights (as evidenced by Exhibit 3) and the Appellant signed a waiver at 11:55 a.m. The waiver was read thirty-five minutes after the tape recording commenced. Stewart indicated that the Appellant appeared normal. (Tr.S.19-20).

4

At this time, Stewart did not recall any additional wording which began with, "Further, I have been advised I am not under arrest . . ."; however, the language did appear on the tape. Stewart identified Exhibit 3 as the "old" rights waiver sheet which did not include this additional language noted above. (Tr.S.443). Stewart identified Exhibit 3 as the rights waiver sheet as the one he saw Detective Hill read to Appellant, Appellant looked at and read for himself, the one Appellant signed, and the one that he had witnessed. (Tr.S.19-20). At the end of the tape recorded statement, Stewart informs the Appellant that while he does not know what changes would be filed, Stewart implied truthful cooperation would be better. (Tr.S.88). Then they asked the Appellant for the videotaping. During this entire time, David Watkins was present at the station in another room. The videotaping may have been discussed with the prosecutor at this time. (Tr.S.89-91).

Later, upon being recalled to the stand on Wednesday, December 18, 1985, Sergeant Stewart admitted that he was mistaken, and that was the Appellant's Exhibit "D", a rights waiver sheet that was only located the afternoon before this portion of his testimony, that was actually read to the Appellant and which the Appellant signed, an Stewart witnessed. (Tr.S.446). This "new" rights waiver sheet did include the additional language above. (Id.). Basically, upon Stewart's initial testimony, there were not two rights waiver sheets, but only one rights waiver sheet which was identified as State's Exhibit 3. (Tr.S.74).

The Appellant was informed after the taped statement was completed around 12:30 p.m. that he was being detained. (Tr.S.22). At no time, did either the Appellant or his mother request an attorney. (Tr.S.23). Appellant's mother only stated to Appellant, "tell them the truth". (Id.).

Around 2:00 p.m. a video taped statement was taken, which lasted just over one hour. (Tr.24). Four officer were present during the taping and the Appellant's rights were again read to him. (Id.). Afterwords, Stewart searched Appellant's house. Stewart obtained a permissive search waiver signed by Appellant's mother. (Tr.S.25). Stewart found a pair of grey trousers in the bathroom. (Tr.S.26). He brought the trousers as well as several pairs of underwear and a pair of socks. Stewart gave them to Detective Teeple, who was in charge of all the physical evidence. Then, the detectives took the Appellant out to the scene of the homicide. (Tr.S.28).

At the scene, the Appellant indicated the trial of the victim on his bike, where the victim tried to get away, and where Appellant thought the body last was located. Appellant also showed (where Tim Combs obtained the lighter fluid). (Tr.S.30). Appellant seemed cooperative, and at no time did he ask for an attorney. (Tr.S.30).

On September 19th, a search warrant was requested for blood samples, saliva samples, dental impressions, and photographs of the Appellant's mouth and teeth. The reviewing magistrate limited the warrant to the dental impressions and photographs. This warrant was served and the evidence gathered. (Tr.S.30-31).

Sergeant Dennis Steinbeck testified that his first involvement with the case was on the first night when he took the initial missing person's report. He did not come into contact with the Appellant until Friday, September 13th. Steinbeck indicated that upon reviewing the note from Sergeant Stewart regarding information from the Appellant from the previous evening, Steinbeck decided to further question the Appellant. (Tr.S.117). On Friday morning, approximately 8:30 or 9:00 a.m., Steinbeck went by himself to the Appellant's residence. Evidently, Steinbeck knocked on the door of the residence, received no response, but then, Appellant responded from the second story bedroom window. Steinbeck claimed that the Appellant was willing to go downtown with him upon his request. Appellant got in the front passenger side of the cruiser and was not handcuffed. Later, he was not booked or fingerprinted. (Tr.S.118).

Once downtown, Appellant was placed in a small interrogation room. Appellant was in that particular room and interviewed by Steinbeck for approximately four (4) hours. The starting time for the statement taken from the Appellant was approximately 1:15 p.m. and the ending time was 2:00 p.m. In addition, there is a rights waiver sheet with a time 10:10 a.m., which would indicate that the interrogation started at or near that time. Steinbeck indicated that he read the Appellant his rights from a form and asked Appellant to read it. The Appellant, evidently, had the form in his hand, was looking at it, then signed his name. (Tr.S.121-122,140-141).

7

A short time after the statement was completed, the Appellant's mother arrived at the police station and informed Steinbeck that the Appellant was at home asleep until approximately 7:00 p.m., which was consistent with what the Appellant had just informed him. Thereafter, Steinbeck allowed the Appellant to go home with his mother. However, the statement that was made was not signed by the Appellant. (Tr.S.124,146).

On Monday, September 16, 1985, Steinbeck was assigned Detective Hill to pick up the Appellant.

The purpose for picking up the Appellant or going to his residence was two-fold: first, to obtain the Appellant's signature on the statement he made Friday; and, secondly, to have the Appellant's mother came down and make a formal statement. (Tr.S.126). However, under cross-examination, Steinbeck also indicated that they wanted to further question the Appellant. (Tr.S.154). In fact, at no time, was a formal statement taken from the Appellant's mother. She was moved from room to room within the police department. (Tr.S.160). In addition, the Appellant signed his Friday statement very early upon his arrival that morning. (Tr.S.157).

Detectives Steinbeck and Hill went to the Appellant house and picked up the Appellant around 9:30 - 10:00 a.m. that Monday morning. (Tr.S.126). Defendant told his mother that he did not want to go, but she told him he had to go. (Tr.S.155-156). Both the Appellant and his mother were taken to interview rooms. (Tr.S.127,159). The Appellant was orally advised of his rights by Detective Hill. (Tr.S.127,157). During this interrogation,

8

Detective Hill left the room and Sergeant Stewart came into the room at approximately 10:45 a.m. Steinbeck and Stewart continued to question the Appellant in regard to the statement he had given on Friday and some inconsistencies that appeared to exist because of some statements that the police obtained from Troy Cree, Darren Ball, David Hunter, and Donald Allgood, all of which or some of which placed the Appellant near the scene of the crime at approximately 3:30 and 6:00 p.m. on Tuesday, September 10, 1985. (Tr.S.125,148-150,162-163). Thereafter, Detective Hill returned, and at some juncture Stewart and Steinbeck left the room. (Tr.S.129). Detective Hill was left alone with the Appellant with the door closed. Again, Steinbeck agrees with Stewart that Detective Hill was in the interrogation room alone with the Appellant a little while or maybe a few minutes; however upon their return, the Appellant was crying and was visibly upset which was not the Appellant's condition when they left the room. (Id.). Upon Detective Hill's exiting the room, he indicated that the Appellant admitted being there and that they (meaning Steinbeck and Stewart) should go ahead and further question him. At that juncture, a tape recorder was brought into the room and they proceeded to tape the Appellant's statements in regard to the homicide. (Tr.S.129). Subsequent to the taped statement, a video-taped statement was taken in the line-up room. (Tr.S.131). The Appellant was again advised of his rights. The video taped statement lasted up until 2:38 p.m. (Tr.S.132).

Steinbeck had known the Appellant since he was twelve. He has arrested the Appellant before as a juvenile and on occasion

had the opportunity to read his rights to him. He believed the Appellant had normal intelligence, and was not under the influence of drugs or alcohol. (Tr.S.132-133).

Detective Hill, the Appellant's uncle, testified that originally he was not assigned to the homicide, however, he was assigned to this case on Monday morning, September 16, 1985. (Tr.S.201). He had known the Appellant all of his life, and indicated that, to his knowledge, the Appellant could read and write. (Tr.S.184,190). However, until Appellant got into some juvenile trouble, Detective Hill admitted that he never spent much time with him. (Tr.S.199). Also, he described him as fairly intelligent. (Tr.S.185). Detective Hill is the brother of Appellant's mother. (Tr.S.202). He has arrested his nephew on numerous occasions in the past and has advised him of his rights during some of those occasions. (Tr.S.185).

Detective Hill stated that he went with Detective Steinbeck to the Appellant's house. At that time, Detective Hill indicated that the Appellant did not want to come to the station. He was able to convince his sister that all they wanted her son for was to sign his Friday statement and that they were going to take a statement from her. In actuality the real motive was to get the Appellant downtown for further questioning. (Tr.S.186-187).

Detective Hill also testified that when the Appellant was a juvenile, approximately a year or a year and a half earlier, the Appellant was allegedly involved in the break-in of the Detective's ex-wife's house and his mother's house. After his arrest and transportation to the police station, Detective Hill

admitted that he physically beat the Appellant. He indicated this was at the direction of the Appellant's mother. He also stated that he would not do that now because the Appellant is an adult. (Tr.S.200-201,232-233).

According to Detective Hill, he was left along in the room with the Appellant at the Appellant's request. (Tr.S.192). Detective Hill told the Appellant that he should tell the truth and not be afraid because no one was going to harm him. At that point, the Appellant broke down and admitted that he had been at the scene of the homicide. Detective Hill then left the room and indicated to Steinbeck and Stewart to obtain a statement. (Tr.S.193). Thereafter, the tape recorded session was started. During this taping, Detective Hill returned and had a discussion with Steinbeck and Stewart, and they decided to give the Appellant his rights. (Tr.S.195).

Officer James Teeple testified to the accuracy and authenticity of the video tape recording that was placed in evidence, as well as a copy of the tape recorded statement of the Appellant taken earlier that Monday. (Tr.S.239-240).

Attorney Dennis Watkins, County Prosecutor for Trumbull County, testified that on Sunday, September 15, 1985, he went to the Warren Police Department to consult with some officers concerning the progress that was being made in the investigation. At that time, he met with maybe eight or nine officers, reviewed the evidence that had been gathered until that point, reviewed potential suspects and reviewed any statements from witnesses concerning the Appellant. (Tr.S.273-274).

Mr. Watkins told Sergeant Steinbeck to have the Appellant sign his Friday statement. The Appellant was certainly a suspect, and should be further interrogated about this case and by officers that knew him. (Tr.S.274-276).

Vera Williams, the Appellant's mother, testified that on Friday, September 13, 1985, she went to the Warren Police Department after learning her son was there. (Tr.S.297-298). Upon her arrival, she asked her brother, Detective Hill why the Appellant was at the station. He informed her that the Appellant was being questioned concerning the Fife homicide. Detective Hill said that Appellant not involved, just wanted his testimony. (Tr.S.299). About one hour later, the Appellant was allowed to go home with his mother. (Tr.S.300). Ms. William did state to the police that her son was at home asleep until 7:00 p.m. on the night in question.

On the following Monday, while Ms. Williams was returning from the store, she observed Detectives Hill and Steinbeck. Detective Hill asked her if she wanted to have a ride home which was refused. (Tr.S.300). After her arrival at home, Hill and Steinbeck knocked on her door. At this juncture, Steinbeck indicated that he wanted the Appellant to come down to the station for further questioning. However, the Appellant refused to go. At this point, Detective Hill indicated to her sister that they needed to take her statement that she had given to Detective Steinbeck the previous Friday and have the Appellant sign his Friday statement. Ms. Williams told the Appellant he had to go with the police officers. (Tr.S.301).

12

Upon arrival at the station, the Appellant was placed in one interrogation room, while his mother was placed in the next room. Ms. Williams indicated that she could hear loud voices in the room where the Appellant was, and she could recognize the voices of Detectives Hill and Steinbeck talking to her son in loud and raised voices. (Tr.S.302). After Ms. Williams was left alone for some time in the interrogation room, she became concerned and left the room on her own and went to the interrogation room where the Appellant was located. She unlocked the door and went inside. Once inside, she observed her brother, Detective Hill, with his head down. She asked what the officers were doing with her son. At that point, Detective Hill just indicated that they were going over the statement that the Appellant had given on Friday and that they would be finished in a little while longer. They then escorted Ms. Williams out of the room and placed her in another interrogation room further away from the interrogation room in which her son was being held. (Tr.S.303).

Later, after the taped recorded statement, but before the video taped statement, Ms. Williams asked Detective Hill should she secure the services of an attorney since Detective Hill was indicating that they were going to hold the Appellant. At that point, Detective Hill replied that she should not pay for the services of an attorney, since the court would appoint an attorney for the Appellant when he goes to court in regards to the matters for which he was being held. At this time, Ms. Williams was not told of the actual charges for which he was being detained. (Tr.S.306-307).

13

James L. Freeman, the supervisor of attendance for the Trumbull County School system, testified Exhibit "B" was the permanent record card which includes the official transcript from Goddard High School in Columbus progress report for ninth grade and school year 1983/84, records from Brinkhaven, and all other records of the Appellant from kindergarten through seventh grade and part of ninth grade. (Tr.S.313). The records indicated that his ninth grade grades were all failures. (Tr.S.315-316). The records further indicated that the Appellant had been in special education classes since first grade. (Tr.S.319). The Appellant had had four separate intelligence tests given during this period on which he scored 70 in 1973; 62 in 1975; 49 in 1980; and 63 in 1982. (Tr.S.323-325). These results placed the Appellant's abilities within the educable mentally retarded range. (Tr.S.330).

The Appellant testified that sometime between 8:30 a.m. and 9:00 a.m. on Friday, September 13, 1985, Detective Steinbeck came to his house waking him up. At that time, the Appellant told the detective, through an upstairs window, that he did not want to go to the police station for any further questioning. (Tr.S.356). Detective Steinbeck then simply ordered the Appellant to put his clothes on and to come downstairs and go to the police station, to which the Appellant complied because he does what the police order him to do. (Tr.S.357). Upon his arrival at the police station, the Appellant was placed in one of the interrogation rooms and interrogated by Detective Steinbeck. (Id.). (According to the rights sheet entered as a state's exhibit, and

14

the testimony of Detective Steinbeck, the Appellant may have originally been placed in the interrogation room at approximately 10:00 a.m., and a statement later taken from Appellant which commenced at approximately 1:15 p.m. and last until 2:00 p.m.) The appellant stated that he was in the interrogation from approximately three hours during which time he tried to leave but the door was locked. The Appellant also stated that he told Steinbeck that he wanted to leave. (Tr.S.358).

Although Appellant was shown a Constitutional rights waiver form allegedly read and shown to the Appellant on September 13, 1985, at 10:10 a.m. (Exhibit 9), the Appellant did not recognize the substance of the form; however, he did recognize what appeared to be his signature. (Tr.359-360). In addition, although the Appellant could not read or recognize the typewritten statement prepared by Detective Steinbeck, allegedly on September 13, 1985, the Appellant did recognize that it appeared to have his signature on the form. (Tr.S.374). Concerning questions about his constitutional rights, the Appellant was unable to testify as to what they were. In fact, the Appellant was asked the meaning of Constitutional, voluntary, knowingly, and other related words, and did not recognize, understand, or know the meanings of those words. (Tr.S.366).

The Appellant further testified that on Monday, September 16, 1985, he was asleep in his room when he was told by his mother to put some clothes on and go downtown with Detectives Hill and Steinbeck. (Tr.S.361-362). The Appellant told them he did not want to go downtown, and that he had said all he wanted

15

to to the detectives on Friday.  Upon his arrival downtown, he was placed in a interrogation room.  (Tr.S.362).  The Appellant was under the impression that his mother was coming down to sign a statement.  (Tr.S.363).

Detective Steinbeck initiated the questioning concerning Tim Combs who was charged as a co-defendant.  (Id.).  He was yelling at the Appellant.  (Tr.S.364).  Later, Detective Hill came into the interrogation room and as the door swung open he hit the Appellant in the back of the head.  (Tr.364-365).  The Appellant jumped up as if to "swing" when Detective Hill threw him against the wall.  Detective Hill threatened him and slapped him across the face.  (Tr.365)  Afterwards, he told the police what they wanted to hear.  Later, Detective Teeple put some papers in front of the Appellant and told him to sign, which he did.  When asked why he talked to the police, the Appellant stated because you have to talk to them.  (Tr.367)  He stated he did not even know what an attorney is.  (Id.)

During cross-examination, the Appellant admitted to being at the station before and that it was his signature on certain documents (previous rights sheet waivers) but that he does not remember them.  (Tr.S.372,374).  The Appellant also indicated he could not recall certain events regarding the tape recording or the video tape; however when shown the particular videotape, he did not deny that what was said on the tape was actually said at the time by him.  (Tr.S.387,401).

Dr. Nancy Schmidtgoessling, a highly qualified clinical psychologist, examined the Appellant at great length giving him a

battery of tests.  (Tr.S.459-460,463).  Dr. Schmidtgoessling testified that she gave the Wechler Intelligence Test to the Appellant and that his total I.Q. score was 68.  This score places the Appellant in the mild range of mental retardation, which means his score would be below ninety-eight to ninety-nine percent of the population at large.  On every verbal subtest, the Appellant's score fell within the retarded range with his greatest weakness being practical judgment.  (Tr.S.466).  As for that subtest, the Appellant was moderate retarded.   (Tr.S.467).

Dr. Schmidtgoessling also gave further subtests.  They showed that the Appellant's general fund of knowledge, his vocabulary, ability to calculate, ability to draw similarities (which is a characteristic of abstract thought), and his immediate recall were all in the mild range of retardation. (Tr.S.467).  The Appellant also could not tell the difference between what is essential and what is not essential.  (Tr.S.468).

In the area of academic testing, the Appellant tested below .03.  This score means that the Appellant grade equivalent is below third grade.  Unfortunately, the test cannot measure below this level even though the Appellant does fall below this level. (Tr.S.474).  A review of his educational records are entirely consistent with this finding.  His word recognition was also extremely poor.  (Tr.S.476).  The underlying causes for this problem were numerous with motivation being a factor.  However, since the frustration of inability increased as the Appellant grew older, his motivation obviously would decrease. (Tr.S.477-478).  However, the Appellant was not a malingerer. (Tr.521).

17

Dr. Schmidtgoessling indicated that the Appellant could not read nor recognize a substantial majority of the words on the Constitutional Rights and Waiver form. (Tr.S.480-482). She further testified that she tested the Appellant in regard to verbal word recognition and discovered that he did not recognize, nor the meaning of, again, a substantial majority of the words that are found in the Constitutional Rights and Waiver form. (Id.). For example, the word "Constitutional" is understood by the Appellant to mean institution, being the place where the Appellant was placed in Columbus as a juvenile sometime in the past.  (Tr.S.481).

Finally, Dr. Schmidtgoessling also determined that if the Appellant were made to understand in the most simplest terms, i.e. his constitutional rights, the Appellant's prior conditioning and image of the police and their authority would override anything that he would understand. (Tr.S.483-484). For example, in simple terms, she explained that if anybody were to talk to the Appellant that he was to "shut up" and not talk to them. However, she did ask the Appellant if a police officer came to talk to him, would Appellant talk to the police officer. The Appellant, without hesitation, indicated he would go ahead and talk to the police officer, simply because the man would be a police officer, and people have to talk to a police officer. (Tr.S.483).

In a written opinion, the trial court overruled the motion to suppress statements. (Tr.d.112).

18

### GUILT PHASE

The trial of this case commenced on January 21, 1986, in front of a three judge panel.

The state's first witness was the Appellant's seventeen year old brother, Robert Vaugh, who testified that he saw his brother washing a pair of grey pants on Tuesday night as well as Wednesday and Thursday evening in the upstairs bathroom. (Tr.39-41). He stated that the Appellant was washing out something red, like blood, using a scrub board. (Tr.42-43). On cross, the Appellant's brother admitted the Appellant own three such pairs of pant and he could not be sure if these were the same pants he saw that night. In addition, the witness also washed his pants in the same manner as they did not have a washer or dryer. (Tr.46). He also conceded that the substance could have been many things other than blood. (Tr.50).

Miriam Fife, the deceased's mother, testified that her son returned from school at 2:35 p.m. on that Thursday. (Tr.57). Her son had a boy scout meeting at the Second Christian Church scheduled for 6:30 p.m., but after eating dinner, he set off on his bicycle at 5:15 to see his friend Billy SImmons. (Tr.58-59). The trip normally takes seven to ten minutes to complete. However, Billy Simmons came over to the Fife residence about 6:10 p.m. He had not seen the deceased. (Tr.63,74). On his way to the Fife residence he only saw one person, but did not know who it was. (Tr.83). When the deceased left home, he was wearing grey striped silky shorts, a black T-shirt with Wrangler written on it, white sports sock, and baseball tennis shoes. (Tr.64).

19

The police were called at 8:00 p.m., and the body was discovered at 9:30 p.m. (Tr.64-65).

Raleigh C. Hughes, an emergency medical technician received a phone call from the Warren Fire Department to go to 1821 Jackson Street, S.W. at approximately 9:30 p.m. (Tr.84-85). Upon arrival, numerous civilians were with the body and the area had been trampled down. (Tr.97,115). The boy was non-responsive to treatment and his breathing was heavily labored. (Tr.90). He had vomited all over himself, though the boy's father had wiped up most of it. (Tr.87). He was naked from the waist down with signs of burns on his right cheek. (Tr.88-89). There were numerous other injuries to the body including the groin area being swollen and the rectum area torn. (Tr.89-91). He did not notice any scratching on the left cheek. (Tr.98). He was treated at the scene and taken to the hospital. (Tr.91-92). Mr. Raleigh also indicated that he returned to the scene the next day to assist in locating the missing bicycle. There were approximately one hundred people searching the area the next day. (Tr.98).

Thomas Skoczylas, a patrolman for the Warren Police Department, arrived at the scene that night at approximately 9:40 p.m. (Tr.101). The body was located about two hundred forty to three hundred feet from the corner of Value King in an area of high weeds which had been trampled down. (Tr.102,115). It was also raining that night. (Tr.101). Officer Skoczylas noticed a pair of jockey underwear, a black T-shirt around the throat area, and a pair of socks on the boy, otherwise he was naked. (Tr.103).

20

The underwear and T-shirt appeared burned, but there was no burn area underneath the body.  (Tr.106,114).

James Teeple, a Warren police officer from the crime scene search unit, arranged for a rape kit to be administered.  He took the undershorts and black T-shirt to the Bureau of Criminal Investigation (BCI) and they were unable to check for accelerants.  (Tr.119).  These items then were sent to a laboratory in Columbus and they tested negative for accelerants.  (Tr.120).  Teeple took pictures and examined the scene until 4:30 p.m. the day after thedeceased was found.  (Tr.121).  He had been unable to examine the scene the previous night because of the darkness and rain, and he had not finished other matters until 3:30 a.m.  (Tr.178).  At the scene, on September 11th, Teeple found a blue handkerchief, (which the deceased's father had left there), medical apparatus, bits of charred clothing and trampled grass.  (Tr.179).  The charred clothing was preserved, but not offered into evidence.  (Tr.180).  On Friday, September 13th, the bicycle was found.  (Tr.183).

On Sunday, September 15th, Officer Teeple reviewed a statement made by a witness, Donald Allgood.  As a result, he and some other officers took Allgood out to the area near the Value King where he claimed he saw four boys come out of the brush.  Two of the boys were closing there zippers while a third one tossed something into the brush.  The next day, an area of one hundred by seventy-five feet of brush was cleared.  Six feet from path at a slight angle they found a "stick" which looked like a broom handle which as though it has recently been placed there.

21

(Tr.187-189). It was sent to a laboratory for a determination if any blood was on it, however no test for fingerprints was requested. (Tr.191).

After the Appellant's videotape statement on the sixteenth, Officer Teeple returned to the area behind the Value King. (Tr.136). At that time he located a plastic container which looked burned. Testimony was given that his piece of evidence originally was a bottle of Topco Charcoal Lighter Fluid but the burnt plastic was not compared to the bottle of lighter fluid. (Tr.137,197). When Teeple checked the dumpsters behind the Value King, they were empty. (Tr.198). He did obtain a pair of socks that had brown to red stains on them which belonged to the co-defendant, Timothy Combs. (Tr.141,196). Teeple also obtained, pursuant to search warrants, samples of blood and dental impressions from both defendants. (Tr.146-151). At this point in time the videotaped statement of the Appellant was played. (Tr.168).

Dr. Joseph Sudimack, Jr., the county coroner, stated that the autopsy was performed on September 13 by Dr. Adelman. (Tr.171). The coroner's verdict was that death was caused by cardio-respiratory arrest secondary to asphyxiation and sub-dural hematoma and multiple trauma. (Tr.172-173). He further stated that death could have therefore been caused by asphyxiation the sub-dural hematoma, or the rectal bladder injury and any combination of them. (Tr.174-176).

Sergeant Dennis Steinbeck, assigned to the juvenile division of the Warren Police Department, was the officer that received

22

the initial missing persons report from the Fife family. (Tr.200). At the scene, he obtained some of the physical evidence from Officer Skoczylas. (Tr.201). Steinbeck was told by the ambulance attendant that the decedent had been sexually assaulted. (Tr.228). From these facts and the nature of the crime, Steinbeck already had a number of suspects in mind, including both the Appellant-Defendant and Co-Defendant. (Tr.229). After reviewing the Appellant's statement made Thursday night (the 13th), Steinbeck went to the Appellant's house on Friday between 9:30 to 10:00 a.m. and brought the Appellant down to the station for further questioning. During the entire interrogation of three hours he denied any involvement in the homicide. A statement was taped which included only Appellant's answers, but not the questions. The Appellant's mother did come down and state that he was at home until 7:00 p.m. on the night in question. (Tr.207,260).

On Sunday, Steinbeck was again at the police station. (Tr.209). At this point he reviewed other statements from various witnesses which had come forward. These witnesses stated that they had seen both the Appellant and Timothy Combs at the Value King the afternoon of the homicide. (Id.)

Steinbeck next saw the Appellant the next day when, accompanied by Detective Hill, he went to the Appellant's home and informed him they wanted both he and his mother to come to the station. They wanted the Appellant to sign the statement he had made on Friday, and his mother to make a statement. (Tr.210). Initially, the Appellant refused to go, but his

23

mother told him he had to go to the station. (Tr.211). At the station he signed the prior statement. (Tr.212). The officers then continued to question him for about an hour and a half during which time he repeatedly denied any involvement in the homicide. (Tr.216-217). Suddenly, the Appellant is left alone with his uncle, Detective Hill for a short period of time. (Tr.217). Afterwards, the Appellant makes a taped statement which lasts for about forty minutes. (Tr.218). Later, a videotaped statement is obtained. (Tr.224).

During cross-examination, Steinbeck admits that Timothy Combs was a suspect in this case, but the police made no attempt to contact him until after obtaining the Appellant's statements from September 16. (Tr.231). Steinbeck claimed he had no probable cause to question him despite witnesses placing him at the scene. (Id.). Furthermore, Combs has a history of sexual crimes involving juvenile males around the ages of ten to twelve. (Tr.230). Once Appellant's statement is obtained, Steinbeck went to Combs' school and arrested him. (Tr.237).

Dr. Howard Adelman, the pathologist, did an autopsy on the deceased. His initial observations of the body were multiple injuries visible externally, burned area especially about the fact, multiple contusions, abrasions, lacerations caused by blunt force, ligature mark around the neck, and profuse bleeding from the rectal area. (Tr.349). There were four separate "injuries" that could have caused death either independently or in conjunction with the other causes, namely, the sub-dural hemorrhage, the penetration and perforation of the rectum and

24

urinary bladder, the ligature strangulation, and the burns and the contusions showing the beatings. (Tr.370). An object penetrated the rectal area at least twice which took a great deal of force. (Tr.360). There was a great deal of blood from this injury. (Tr.361). There were second and third degree burns caused either by flame or a hot, molten type of object. (Tr.361-362). There were bite marks found on the penis that appeared to be human. (Tr.363). Dr. Adelman suggested that the police contact Dr. Curtis Mertz for further analysis of this injury. (Tr.364). There was scratches and abrasions on the ankles, thighs and legs, some of which could have been caused by a sharp object. (Tr.366,397). While the deceased was brain dead when brought to the hospital, he remained in a comatose and vegetative state for approximately two days. (Tr.368,370).

Dr. Adelman was allowed, over heated objection, to testify concerning the stick found in the overgrown area that was found. He stated that the plant cells present in the stick were very similar to the plant cells that were found in the tissues of the body. (Tr.378). Secondly, the size of the penetration injury was consistent with the stick in question. (Id.). It was the doctor's contention that while he had no idea of type of wood the stick was, it was of such a nature that the splintered end of the stick would absorb blood. (Tr.403-404). Furthermore, numerous objects could be consistent with the penetration involved here. Wood is wood. (Tr.427).

Concerning the burning, it was limited to the right side of the face, shoulder, and neck area. (Tr.410). The ligature mark

25

which went around the entire neck, could have been caused by a T-shirt being tied around the neck. (Tr.398).

Donald Allgood, a sixteen year old tenth grader, that lives around the corner from the Value King, was walking around with a friend after football practice on September 16, 1985. (Tr.431-432). He saw the Appellant, Tim Combs, and two other youths coming out of the field coming from Value King, walking in a line. First in line was Tim Combs, then the Appellant, followed by the other two. (Tr.434). He did not pay much attention to them but saw the Appellant throw a stick into the woods, which were heavily wooded, using a flick of his wrist. (Tr.437). He saw Tim Combs pull his pants zipper up, and put his head down when noticed by the witness. (Tr.439). While at first did not know their names, he was able to pick out pictures of the Appellant and Tim Combs from a photo array. (Tr.441-442). One of the other boys was Andre McCain. (Tr.450). He also stated that the fourth person was also pulling his zipper up. (Tr.454).

Upon cross-examination, Donald Allgood stated he did not mention the stick on his initial statement on Saturday, the 14th, because he did not think it was important. (Tr.457). In addition, he had not mentioned distances either. He did not remember the stick until Sunday. (Tr.471). He made two separate statements to the police, and reviewed his prior statements with the prosecutor before he took the stand. (Tr.483,488). Furthermore, he never did get a good look at what was thrown. (Tr.461). Donald also stated that the Appellant was wearing blue jeans not the grey trousers previously testified to earlier. (Tr.438).

Sergeant Thomas Stewart of the Warren Police Department first became involved in this case when he saw the Appellant at the police station on September 12, 1985. (Tr.502). Starting around 7:30 p.m. the Appellant made a statement which included facts in it that Sergeant Stewart thought were important. (Tr.511). The Appellant mentioned the underwear found around the boy's neck. (Tr.512). The Appellant also said he had been at home since 7:00 p.m. on the night in question. Stewart did not see the Appellant again until the following Monday. (Tr.514).

On that Monday, Sergeant Stewart was present for both the taped statement and the video taped statement. (Tr.516,522). After the statements were taken, Stewart took the Appellant out to the scene where he was able to point out the location of the bicycle, the area where the deceased was found, the area near Value King where the solvent was, and where he exited the woods. (Tr.530). However, the Appellant initially was hesitant and unsure of things. (Tr.541). The next day, Stewart obtained permission from Mrs. Williams to search her house. (Tr.523). He was looking for grey pants. (Tr.525). He found only one pair, which were in the bathroom, washed and hanging up. The pants were drying. (Tr.526).

Stewart also searched Timothy Combs house pursuant to a previously issued search warrant. (Tr.545). The most significant item found during that search was the pair of socks with the red stains on them. (Tr.545-546). Search warrants were also obtained for dental impressions of both the Appellant and Timothy Combs. (Tr.546).

27

On cross-examination, Stewart denies that he was present when appellant was left alone with Detective Hill. (Tr.574-575). In fact, he had not participated in the interrogation until Detective Hill came out of the room to say that the Appellant now wished to talk. (Tr.575,624). During the taped and videotaped statements, the Appellant was highly suggestive to ideas placed there by the interrogators. (Tr.645). In fact, when the Appellant was at the scene he did not take the officers to a particular area, but instead, just pointed to various general areas. (Tr.669). During the videotape, the Appellant became confused when shown the chalkboard with a diagram of the scene on it. (Tr.672-673).

James Wurster, a criminologist in the trace evidence section of B.C.I., stated that ninety percent of his work involves serology (blood). (Tr.591). Wurster concluded that the blood on Comb's socks could be that of the deceased's. (Tr.603). He found no blood on the grey trousers that Sergeant Stewart removed from the Appellant's home. (Tr.605). However if there had been dried blood on the parts, it could still be detected even if pants had been washed thoroughly. It would take a couple of hours for the blood to dry. (Tr.617).

The "stick" was microscopically examined with particular care given to the areas of discoloration. Chemical tests for blood were negative. (Tr.611). Wurster stated that wood is a porous material and that blood would soak in at the broken end like a sponge. (Tr.612-613). Any blood on such a piece of wood would dry commensurate with its exposure to air. (Tr.613). Even

28

if the stick were wiped off, it would not remove that which was already absorbed. (Tr.614). Furthermore, there was dirt still on the stick that any rain that may have occurred did not wash away. (Tr.620).

A motion in limine to preclude testimony of alleged similar acts under R.C. 2945.59 was again overruled (Tr.683-684). Candyce Jenkins, a twenty-three year old woman, testified that on March 2, 1984, the Appellant came to her house, put his fist through her window and went in the house. (Tr.686,689). The Appellant had a knife, and asked for money. (Tr.689). He told her to take her clothes off, perform oral sex on him, and threatened to kill her if she refused him. (Tr.690). He was in her house for one and a half hours during which time both anal and vaginal sex occurred. (Tr.693,694). The Appellant bit her on the back of the shoulder as well as on one of her breasts. (Tr.694). He subsequently left. (Tr.696). Ms. Jenkins also stated that the Appellant was "high" and she smelled alcohol on his breath. (Tr.698). In addition, Ms. Jenkins was able to secure the knife from the Appellant. (Tr.699). The knife was not used, nor anyone in the household injured by its use. (Tr.700).

Mary Ann Brison testified that on February 9, 1984, on her way to Value King, she was confronted by the Appellant who came up from behind her and threw her on the ground. (Tr.703,705). He punched her in the face, threatened her, and undressed her. (Tr.706). He performed vaginal intercourse for a short period of time. (Tr.707). He wanted money but took her cigarettes and ran

29

away. (Id.) During the incident, the Appellant put the knife away. He was holding a brown paper bag and the smell of alcohol was on his breath. (Tr.711).

Detective Hill, the Appellant's uncle, also related this connection with the investigation of this case. Hill testified that he has known the Appellant his entire life including on a professional basis, but has not had much occasion to talk to him. (Tr.713,729). He claims that the Appellant is intelligent in terms of being street wise, and gets out of trouble all the time. (Tr.714). Detective Hill was first assigned to the case on September 16, 1985 in the morning at which time he was sent to his sister's house to get the Appellant to come to the station. (Tr.715-716). He brought the Appellant back to the station, where the Appellant was interrogated. (Tr.719-723). He states that he was alone with the Appellant for a couple of minutes but did not hit the Appellant. (Tr.722). Detective Hill did admit that he had "whupped" the Appellant once before after the Appellant had denied doing something. (Tr.745-746).

Larry Dehus, an expert witness for the Appellant, is a criminologist. It is his usual practice to testify for the prosecution in criminal cases. (Tr.771). His background includes ten years as a criminologist and a forensic scientist, (which includes arson analysis) and supervisor with the Miami Valley Regional Crime Laboratory in Dayton, Ohio, which is the laboratory serving the police agencies in Dayton and the surrounding counties where he had been involved in hundreds of investigations. (Tr.770).

Mr. Dehus had an opportunity to microscopically examine the "stick" for trace material and tested chemically for traces of blood. (Tr.772). He describes the "stick" as a broken implement, composed of hard wood but porous in nature. He found no traces of blood. (Tr.773).

If the "stick" had blood on it, the blood would have soaked in the porous and which could not have been washed or wiped away. Placing the "stick" in the ground would not have removed the blood from it. (Tr.780). Even invisible traces of blood can be detected on this type of broken wood utilizing this testing procedure. It was his opinion that if the"stick" were used to penetrate a person's body in such a manner that blood had gotten around the "stick", blood would be found on the "stick" even if it rained and attempts were later made to wipe the "stick" clean. (Tr.781). He also examined the foreign bodies removed from the deceased from the slides that were taken. His conclusion was that the foreign bodies were some type of cellular plant material which was not necessarily wood. (Tr.774-776). There really was not enough material present to make a proper identification. (Tr.776).

The third area Mr. Dehus testified about concerned the Topco Charcoal Lighter Fluid and its use on the T-shirt and underwear of the victim. The lighter fluid is composed partly of midrange hydrocarbon components, midrange in terms of volability. (Tr.777-778). If the lighter fluid had been used on the T-shirt and underwear and they incinerated then there should be traces of

31

hydrocarbons on these items. (Tr.778). Even if the items were soaked in water, this procedure would not remove the hydrocarbons. (Tr.778-779).

Mathew Hunter, a sixteen year old youth, saw the Appellant, Timothy Combs, and two other youths together on Jackson Street around 3:00 p.m. on September 10, 1985 walking southwest. (Tr.804). At around 5:00 p.m. that day, Mathew, his brother, and his sister walked over to Value King where they again saw the Appellant and Timothy Combs. (Tr.805,807). The Appellant and Timothy Combs were in the parking lot going towards the store. (Tr.807). Mathew knew who they both were prior to this incident. (Tr.804). The Appellant was wearing grey sweat pants. (Tr.809). When Mathew came out of Value King, the Appellant and Timothy Combs were over by the laundromat. (Tr.807). As Mathew left the store area, he saw the deceased riding his bicycle into the parking lot. (Tr.808). Mathew also saw Maurice Lowery and Donald Allgood in the same area that afternoon riding his bicycle. (Tr.815). He did not see where the deceased went once he passed him. (Tr.823). When asked about Timothy Combs, Mathew stated that he had a reputation as a fag and had once tried to make him pull off his parts and was "feeling on (him)". (Tr.826). At no time did he see Darren Ball or Troy Cree. (Tr.819-820).

Dr. Robert Walton, a dentist, took dental impressions of both the Appellant and Timothy Combs. (Tr.830-832). Dr. Walton stated that the Appellant's teeth had the unusual characteristic of having the upper right maxillary central incisor fractured from the distal incisal edge to approximately three-quarters

32

midincisal. (Tr.832). However, Dr. Walton then states that it is not unusual for a person to have a rotated, chipped tooth. (Tr.832-833). Both the Appellant and Combs have a diastema, which is a separation of the upper front teeth. (Tr.840). This structure of these teeth occurs in approximately fifteen percent of the population. (Tr.833). The dental impressions that were taken of the two individuals are very close to actual representations, but not one hundred percent accurate. (Tr.841).

Darren Ball was going home with Troy Cree after football practice on September 10, 1985, at approximately 5:15 p.m. (Tr.844,858). They were going down one of the trails off Willow behind Value King when they saw Timothy Combs coming from the direction of Value King. (Tr.844,859). After confronting Combs, they walked faster, almost jogging, away from him. Darren told Troy that Combs was a "fagot". (Tr.860). About twenty to thirty seconds later they heard a scream that sounded like a scream from a child. (Tr.847,862). At the time, they were not concerned about the scream. (Tr.867). At no time did they see the deceased, the Appellant, or anyone else in the area that afternoon. (Tr.849,862).

William Carnahan, a sergeant with the Warren Police Department, worked with Detective Teeple in the collection and preservation of the physical evidence in this case. (Tr.870). He was present when Donald Allgood was taken to the scene on Sunday, September 15, 1985, to show the location where Allgood saw something tossed away by the Appellant. (Tr.876-877). As a result, the next day the "stick" was located six feet off the

path and twenty feet off the roadway at an angle underneath leaves and other foliage. (Tr.878,899).

On January 27, 1986, Carnahan made a sketch of the area behind the Value King. (Tr.883). He measured a variety of distances relevant to this case. The shortest distance measured from the corner of the Value King building to the path was 347 feet while the longest was 504 feet. (Tr.84). The distance from the blacktop area behind Value King to the area where the deceased was found was 116 feet. (Tr.885). It was seventy-two (72) feet from the path to the location of the bike, and one hundred thirty-nine (139) feet from the path to the location of the clothing. (Tr.886). There was two hundred seventy-one (271) feet from the bike to the location of the body in a kind of roundabout manner because of existing conditions, but two hundred ten (210) feet measured directly. (Tr.887). It was six hundred ten (610) feet from the edge of the blacktop of the road to the edge of the path. (Tr.889). The plastic container was found one hundred thirty (130) feet around the path from the area of the blacktop path. (Tr.894).

Dr. Curtis Mertz, a local dentist, testified as an expert for the Appellee, State of Ohio, concerning forensic odentology which is primarily the relationship of the law to dentistry. (Tr.910). Part of this field is the study of bite marks which can be used as a means of identification more from the prospective of ruling out someone that including them. (Tr.912). Most cases where bite marks are being utilized for identification purposes result in a finding of insufficient detail to make such a determination. (Tr.915).

34

In examining the deceased's penis, Dr. Mertz concluded that there appeared to be bite marks on it. (Tr.920). He found six indentations as well as areas of ecchymosis which were of insufficient depth to take impressions. (Tr.970). The indentations were also of insufficient depth to take impressions, so Dr. Mertz took photographs of what he observed. (Tr.970-971). Dr. Mertz conceded that by utilizing this method of recording the indentations, anything that was not within the focal plane of the camera would be distorted. (Tr.973). Filming also caused shadows because of the focal object was found. (Tr.972). Furthermore, he admitted that any indentations that were found were affected by any movement of the tissue. (Tr.976). Dr. Mertz also disagreed with an article in the field which suggested that if pictures are used, they should be taken for five days in a row. His disagreement was based that the article only applies to people who are living. (Tr.1008).

He ruled out that the marks were caused by the deceased because the deceased did not have a diastema. (Tr.924). A diastemas is a space or separation between two adjoining teeth. Dr. Mertz told the police that the person that may have caused the bite marks would have a space between two central incisors and a fractured upper right central incisor (#8). (Tr.931). Dr. Mertz was given dental impressions of only the Appellant and Timothy Combs. It was his opinion that the bite marks were caused by the Appellant. (Tr.937). This opinion was not based on the diastema because both the Appellant and Combs have them,

35

but more so because of the Appellant's occlusion (overbite). (Tr.939). However, this conclusion was a judgment decision that is subjective. (Tr.1005,1014).

At this time, the Appellee proffered a statement by its next witness in order for the Court to determine whether the anticipated "other" acts testimony was admissible. The Appellee claimed that they had only received the information concerning this witness the day before the motion. (Tr.1021). While they informed counsel for the Appellant that such a witness may exist, they did not inform him of the exact nature of this testimony nor the name of this witness. (Tr.1018).

Stephen Melius, a seventeen year old eleventh grader, testified that he was incarcerated in the juvenile justice center at the end of January - beginning of February for a period of five days. (Tr.1023,1031). During that time, Melius claims he shared a cell with the Appellant and a "white boy" named Bob. (Tr.1024). During the first night he was there with the Appellant, Melius states that the Appellant made overtures and improper advances towards him requesting both oral and anal sex. (Tr.1025-1026). Melius states that the Appellant made an actual attempt to perform oral sex with him. After Melius pushed his head away, nothing more happened. (Tr.1026).

Upon further examination at a later point in the trial, Melius admitted that he talked to one of the prosecutors in the hallway who told him he may have given some wrong dates. Also, this prosecutor told the witness some of the questions that the Appellant's counsel may ask him. (Tr.1127). Despite this

36

coaching, Melius maintained that the incident he testified to happened in January or February, 1984, that he spent two days with the Appellant in the same cell, and it was prior to the March incident involving Anthony Kirksey. (Tr.1128-1129). Melius also admitted that he had lied to the Court twelve or thirteen times in the past when he told the Court he would not run away and then he ran away. (Tr.1131).

Lawrence Kamoda, the program director for Hillside Hospital, testified that Timothy Combs was a patient at the hospital from August 8, 1985 until his release on September 5, 1985. (Tr.1053-1054).

James Freeman, the supervisor and pupil accounting for the Warren City schools, is the keeper of the records for the school. He testified that the records included his permanent record card, transcript from Goddard High School (Ohio Youth Commission, report card for the 83/84 school year from the Warren City schools, and a progress report from Brinkhaven for the 82/83 school year. (Tr.1058). In addition, the records included four prior psychological tests of the Appellant. (Tr.1058-1060). The records showed that in school year 83/84 all of his grades were failures. (Tr.1061). Since first grade, the Appellant had been in special classes for the educably mentally retarded. (Tr.1062). Records of his attendance at classes also were included. (Id.)

Frank Goodman, the director of student services, special education, for the Warren City schools, testified that the special classes that the Appellant had been attending since first grade, were for those students whose intelligence (I.Q.) quotient

score eighty (80) or below. (Tr.1064-1065). The Appellant's records show that he has always functioned at a grade level lower than the one in which he was placed. (Tr.1067). When the Appellant was six years old his I.Q. was seventy (70), having a mental age of four years six months. In 1975,, his I.Q. was sixty-two correlating to a mental age of five years six months. (Tr.1070). An I.Q. test performed in 1980 resulted in a full-scale I.Q. score of forty-nine (49). (Tr.1072). When the Appellant was just over fifteen (15) years old, his I.Q. score was 63 reflecting a mental age of nine (9) years two months. (Tr.1073). Mr. Goodman did not, however, administer any of these tests. (Tr.1077).

James Teeple took the stand again, and stated that the plastic bag containing a piece of what appears to be burnt cloth found where the body was located, the wrangler T-shirt, and the underwear were all submitted to the arson lab. (Tr.1079-1080). Each item was tested for accelerants. (Tr.1082).

Dan Gelfius testified that he has been a forensic chemist at the Arson Crime Lab for the State of Ohio for over seven years. (Tr.1084). He examined and tested the wrangler T-shirt, the underwear, pieces of cloth located at the scene, and portions of plastic to determine the presence of any accelerants. The T-shirt, underwear, and other pieces of cloth, while burnt, showed no evidence of accelerants. (Tr.1088-1091). The pieces of plastic did reveal traces of hydrocarbons consistent with charcoal lighter fluid. (Tr.1091). While hydrocarbons and water do not mix, the water could displace the hydrocarbons. (Tr.1098).

In order for cotton to burn it is necessary for the material to reach five hundred degrees which would burn someone. (Tr.1101-1102).

Sergeant Steinbeck was again called to the stand. He testified that Timothy Combs stated a tree stick not a broom handle was used on the deceased.

The director of the juvenile court for Trumbull County, James Maderitz, brought in specific housing records of the Juvenile Justice System which are compiled on a daily basis. (Tr.1114-1115). There was only one time in 1984 where it was possible for Stephen Melius to be in the same cell as the Appellant and that was March 22, 1984. (Tr.1116). On March 21, 1984 the Appellant was placed in the same cell as Anthony Kerksey. (Tr.1117). On neither day was the Appellant placed in a cell with two other individuals. (Tr.1119). It is not even clear from the chart whether the Appellant had even spent a night with Stephen Melius. (Tr.1122).

In 1983, there was one other night that the Appellant and Stephen Melius spent in the same cell. It was May 16, 1983, and they were with another juvenile named David Milen. (Tr.1119). There was an alleged incident of rape involving Stephen Melius and Anthony Kirksey which occurred on March 17, 984, one week prior to the time the Appellant and Stephen Melius may have shared the same cell. (Tr.1125).

Dr. Lowell J. Levine, a dentist and full time forensic odontologist, had been involved in hundred's of bite mark cases. (Tr.1134-1139). He has testified in twenty-five to fifty cases.

39

(Tr.1139).  While he has seen bite marks to a penis before, they are not common.  (Id.)  Dr. Levine was originally contacted by the prosecutor to examine evidence in this case.  (Tr.1140). Numerous photographs and the dental models were given to him for study.  (Tr.1142).  In his examinations two problems arose in forming an opinion; the type of tissue (flaccid or erect) and relating the measurements from the photographs to the actual models.  (Tr.1143).  After eight hours he was able to say with a reasonably scientific certainty that one, the marks were human bite marks, two, cannot come to a conclusion if either or both (referring to the Appellant and Timothy Combs) made the marks, and three, cannot rule out Timothy Combs as the individual that caused the bite marks.  (Tr.1145).  A written report summarizing these findings was sent to the State of Ohio.  (Id.)

There was one bite mark that the doctor did not feel belonged to Timothy Combs, but he did not conclude it belonged to the Appellant.  (Tr.1151-1152, 1160-161).  Furthermore, the doctor had only two models for comparison purposes.  (Tr.1152). There also could have been three or four separate acts of biting. (Tr.1154).  Seeing the actual penis would not necessarily be an advantage for making these determinations.  (Tr.1156).

An affidavit under seal from the U.S. Department of Commerce, National Oceanic and Atmospheric Administration showed the official weather data on September 10, 1985, at the Youngstown airport.  The airport is eleven miles from the scene of this homicide.

The last witness to testify at the trial phase of this case was Kendall Thomas, a fourteen year old boy. (Tr.1163). He testified that in the woods between Austin Village Plaza and his home, he was confronted by Timothy Combs, who had a piece of glass in his hand. Combs, while threatening to kill Kendall with the glass, took Kendalls pants down and committed anal intercourse with him. (Tr.1164).

After closing arguments, and five hours of deliberations, rendered a verdict of guilt to count one, aggravated murder, with all specifications except the aggravated robbery specification. The Court also found the Appellant guilty of all other counts except the aggravated robbery count. The Court then set this case for sentencing at a future hearing. (Tr.1274-1275).

## MITIGATION PHASE

On February 26, 1987, a mitigation hearing was held. It was stipulated that the testimony of Frank Goodman and James Freeman concerning the records they had previously presented at the guilt phase would be admissible herein. (Tr.M.4-5).

Vera Williams, the Appellant's mother, testified that Danny was one of four children, with Danny being the second oldest. Each child has a different father. Vera quit school after eighth grade, and can only read and write "a little". (Tr.M.9). Ms. Williams was unable to even remember the birthdays of her children. (Tr.M.13). She then worked for six years at the Goldenburg Hosiery Department; Chicken Market, but has not worked since that time. (Id.)

Danny's father never lived with the family. The oldest child's father did not live with the family either. Mr. Vaugn, the father of the third child, was married to Vera for approximately one year before they were divorced, and he left the family residence. (Tr.M.9-10). Mr. Williams, the father of the youngest of the children, lived with the family for ten years, but he died in early 1985. (Tr.M.10).

Mr. Williams was close to Danny, even though he was not at home much because of his employment. Also, there was a period of time that three of his children lived with the family. Prior to Mr. Williams moving in with Danny's mother, there was no male role model in the home. (Tr.M.11).

Three of her children, including Danny, were slow learners. (Tr.M.13). Danny kept having problems in school because the

42

teachers did not have the extra time for someone like Danny with his special needs. (Tr.M.14). Mr. Williams did not help Danny in his education. (Id.) Danny was enrolled in special classes for the educably mentally retarded. Danny ended up attending Fairhaven School for the Mentally Retarded in Niles for two or three years. (Tr.M.15). While attending this school, the other kids on the school bus teased him so much because of his disabilities that he would get off the school bus before he got to school. (Id.). As a result, Danny had a bad attendance record at school. However, things did improve after the first year. Later on, Danny twice attended Brinkhaven, which is a group home located in a rural setting.

Danny got along with his brothers, but they each had their separate friends. He keeps a special eye on his youngest brother who is seven years old. (Tr.M.23). It seems that Danny would get into more trouble when he was with his friends. (Tr.M.18). While Vera had a hard time disciplining her children, Danny was helpful around the house and as a child, he was very passive and would cry often. (Tr.M.20-21).

Danny has had two injuries to the head. One head injury occurred as he fell backwards off a swing and his head and jaw hit an axe when he was a baby. He was taken to the hospital as a result. (Tr.M.22). Another time occurred when he was struck by a car a year earlier and had to operated on while he was at Brinkhaven. (Tr.M.22). A third occasion also occurred when Danny was struck by a car causing leg and other injuries. (Tr.M.23).

43

On cross-examination, Vera stated that while she repeatedly told Danny that it was wrong for him to steal, once he was outside of her control he would do wrong things. (Tr.M.27-30). Vera testified that Danny had been in Columbus from May of 1984 to May of 1985 and came home after that time. (Tr.M.29).

Vera further testified that she never had a chance to visit with Danny while he was in Columbus. (Tr.M.30). However, when he returned home, he stayed around the house all the time. He helped babysit Damien his younger brother, and Ella's children. (Tr.M.31). Danny also had an eyesight problem, necessitating the use of glasses, but he lost his glasses at Fairhaven. (Tr.M.32). The glasses were never replaced. (Id.).

Mary Robinson, Danny's grandmother, has been married to his grandfather for twenty-five years. They have five children including Vera and Morris. (Tr.M.34). One of these children, Willie, was in an accident that caused brain damage. As a result, Willie still lives at home. (Tr.M.34-35).

Mrs. Robinson's grandchildren include only Vera's children. (Tr.M.36). When Mr. Williams died, Mrs. Robinson stayed at her daughter's house. While she was there, Danny would do everything she asked of him. (Tr.M.37-38). In fact, Danny would take pride at his accomplishments and would seek out attention and affection for completing these chores. Danny seemed to need praise. (Tr.M.38). Danny was very slow and got along best with younger children. He also got along with his uncle Willie. Also, Danny was a follower. (Tr.M.40). Mrs. Robinson would visit Danny at Brinkhaven along with his mother. Danny seemed very proud of his accomplishments there. (Tr.M.41).

44

Mrs. Robinson also stated that Vera was all right at disciplining the children until they got bigger. Part of the difficulty was there was no father figure in the house. Mr. Williams was not the father figure the children needed. (Tr.M.44). Mrs. Robinson also testified that Danny never burglarized her house. (Tr.M.45).

Maurice Cox, a sixteen year old tenth grader, has known Danny for two years. (Tr.M.46-47). Maurice considers himself a close friend of the Appellant that spent considerable time with Danny except when Danny was in Columbus. He never saw Danny fight, and they never got in any trouble. (Tr.M.47-50).

Paula Guildford, a youth counselor for the State of Ohio - Department of Youth Services for sixteen months, worked with Danny as his parole officer. (Tr.M.51). Prior to her work for the Department of Youth Services, Ms. Guildford was in school and worked part-time as a family counselor at the Mahoning County Juvenile Court. (Tr.M.52). She was assigned Danny's case in November of 1984. She directly supervised him upon his release from the Training Center for Youth in Columbus in April of 1985 until August, 1985. She had no personal contact with the Appellant until his release. However, she had monthly contact with his family.

Ms. Guildford's assessment of the home was it would be structured enough for Danny if counseling was followed through and his parole rules followed. (Tr.M.55). However, a return home was the last alternative because Danny was too old for group homes. (Tr.M.55). The counseling recommended for Danny was

45

psychological counseling coupled with employment training from the Bureau of Vocational Rehabilitation (BVR). (Tr.M.56). Danny was supposed to have had counseling at T.C.Y. (Tr.M.57).

Once Danny was released in April, Ms. Guildford saw him at least every other week for somewhere between fifteen and thirty minutes per visit. Based upon her review of his records and her visits with Danny, she felt that Danny was quiet and a person that "could be easily led by others more than a follower". (Tr.M.61). Ms. Guildford referred Danny to BVR, but did not know if that was followed-up since it was the responsibility of the family or individual to see to that follow-up. (Tr.M.62). As for psychological counseling, once Ms. Guildford made the recommendation to an agency, it was up to that agency to contact the youth and make the necessary arrangements. (Id.)

On cross-examination, Ms. Guildford testified that Danny was at TCY for two counts of rape. Furthermore, the records showed that the Appellant was alone during the commission o the offenses. (Tr.M.63).

Diedre L. Poindexter testified that she became Danny's youth counselor on August 5, 1985. (Tr.M.66-68). She met with Danny a number of times and was able to review all of his records. (Tr.M.68-69). Ms. Poindexter felt that Danny needed a very structured program, but there was not one in the area. (Tr.M.69). Therefore, Danny was left at home with the underlying understanding that, since he was over eighteen, if any further problems arose, it would be the problem of the adult system. (Tr.M.70).

46

Ms. Poindexter indicated that Danny was referred to BVR, but he never completed the application. She described Danny as not being very verbal in that you had to "pry" information out of him. (Tr.M.70). Danny was never disrespectful, but just not motivated. For example, Danny participated in a bowling outing, but did not intermingle with the others. In general, Danny was a follower, though the records showed that he did initiate incidents on occasions. (Tr.M.72). Danny seemed to be a depressed youth. (Id.). He had the lowest I.Q. in her group of forty-two and was the slowest. (Tr.M.73).

Mark Brink, the vice-president of Brinkhaven Enterprises, stated that Danny was first referred to the Emmanuel Boys' Home during the summer of 1982. (Tr.M.76). Emmanuel Boys' Home is one of five group homes for youths under eighteen. These homes are in a farm setting with individualized schooling programs for each of the youths in their care. They also have individual and group counseling. (Tr.M.75). They are licensed by the State of Ohio and youths are referred to them either from the local or the Youth Commission. (Tr.M.76).

Danny was at the home until February, 1983. He left because there was a lack of funding for him by the county. (Tr.M.83). Mr. Brink was around Danny eight hours a day, five days a week as a youth worker. They worked very extensively with Danny because of inability to read or write. (Tr.M.78). There was some progress made in his schooling. Danny was given various responsibilities and chores around the farm. If there was incentive for him to do these jobs, then he did them very well,

47

otherwise he had no pride in his work. The type of incentive that was necessary was recognition or appreciation of his work and its progress. (Tr.M.81). The need for praise was not uncommon among the children that were residents at Brinkhaven. (Tr.M.82-83).

Danny was the type of child who wanted to get along with the other children. He would do things for them as favors, if they asked. He basically got along well with the other residents. This need for friendship would get Danny in trouble. If Danny was sent to do some chores with someone who wanted to play around instead of the chores, Danny would follow suit. However, if Danny were with one of the better boys, he would get the chore done and return to the house. He never seemed to take the initiative himself. (Tr.M.84).

Danny was a definite follower. (Tr.M.85). He also was one of the slower boys in the program. (Tr.M.86). He was always trying to please the staff. (Tr.M.86-87). While there was some improvement during his time in the program, he still needed twenty-four hour supervision. This type of supervision could not be maintained at home. (Tr.M.87).

Vanessa Conley, a teacher's aide and former youth leader at TCY, had Danny in her cottage for five or six months starting in April of 1984. (Tr.M.93,95,99). This period of time would include eight hours a day. (Tr.M.102). TCY is for children sent to the Ohio Youth Commission that are emotionally disturbed or mentally unbalanced. (Tr.M.94). Ms. Conley has worked at the institution for seven years. (Tr.M.94).

The children that are placed at TCY are broken down into four groups, hostile (those bigger boys who may cause harm to smaller ones), semi-hostile, small children (usually the small 12 to 14 year olds), and the honor cottage groups. (Tr.M.98). Initially Danny was placed in the hostile group, but he was being beaten up by the older kids, so he was transferred to the semi-hostile group. (Tr.M.100). There was a definite lack of programs or counseling offered to these boys. Each boy was seen by a psychiatrist as they entered, but there was little follow-up. A social worker would be assigned, but she may see a child ten minutes out of every two or three weeks. Also, there is no special training outside of schooling that the boys receive. (Tr.M.100-101).

During the time Danny was under the supervision, Ms. Conley felt she was a mother image for him. They got along well, and Danny would try to protect her. (Tr.M.103). There even was an incident where a student got out of hand and Danny stood up to defend her. (Tr.M.104). He did not pick on the other boys, and obeyed the rules. Basically, he was a follower. (Tr.M.105). Danny did qualify for the honor cottage just before he left TCY. (Tr.M.104).

Danny was very helpful to Ms. Conley in the chores that needed to be done around the cottage. (Tr.M.106). He liked to be praised for his accomplishments. He told her that when he was released he wanted to live with his grandmother because she was strict with him. Danny indicated that he was having problems at home. (Tr.M.107). Ms. Conley did not feel that Danny should

49

have been released when he was because he was not ready.  Even Danny felt that he was not ready for release.  Ms. Conley felt he still needed the structural environment.  (Tr.M.108).

Lloyd Ayers had worked in the Department of Youth Services for thirteen years, four of which were with TCY.  (Tr.M.118).  He was a youth leader on the 7:00 a.m. to 3:00 p.m. for the hostile group.  (Tr.M.120).  Upon Danny's initial arrival, he was placed in the hostile group.  Mr. Ayers believed this was a misplacement because Danny was always getting beaten up by the other boys. Danny was a loner, and very slow, but he always interacted positively with the staff.  Danny was a boy who would not initiate anything, but would be a follower.  Danny was scheduled for AA and drug abuse programs as well as a sex offender program, but he did not get to participate.  (Tr.M.121-124,127).

When it was time for Danny to leave, the team, which is a group of people that have interacted with Danny in his cottage recommended that he remain at TCY and not be released. (Tr.M.127).  However, since social services felt that he should be released, he was.  Mr. Ayers felt that nothing was being done to assist Danny with his problems.  (Id.)

Paul West, another youth leader, had worked at TCY for ten years.  (Tr.M.139).  Mr. West worked with Danny the entire year that Danny was there.  (Tr.M.143).  Danny was assigned to participate in the sex offenders program but due to the waiting list, did not attend until around his last four to six months. (Tr.M.144-145).  Because of institutional policies such as having only one psychiatrist for everybody, Danny may have only seen him four or five times the entire year.  (Tr.M.147).

50

Mr. West described Danny as a follower, and that it was hard for him to make friends. (Tr.M.147-148). Upon his initial arrival, Danny sought out negative peers. After a conference with Danny, he started to turn around his behavior. (Tr.M.148). His stay at TCY was pleasant. He would seek out group leaders. (Tr.M.149). While Danny was originally placed in the hostile group, he was never hostile himself. (Tr.M.150). Danny was basically a loner, and was not a problem at TCY. (Tr.M.152). He did once attempt AWOL, but was brought back. Danny did extra jobs and chores, and was praised or rewarded. (Id.). Mr. West did think Danny was borderline mentally retarded which placed him in about the middle of the hundred and sixty-five boys there. (Tr.M.162).

Cheryl West, spouse of Mr. West, worked at TCY for eight years. She has since retired. (Tr.M.165). She was trained in the field of mental retardation, as a counseling specialist, first aid, and crisis intervention. (Tr.M.175). Danny was one of her students for six months. (Tr.M.165). When Danny was initially in the hostile group, he could not keep up with the others. He was not as hostile as the other kids. Danny was a follower, and the other kids started picking on him. It resulted in Danny being moved to another group. (Tr.M.166). There was even an incident where one of the other boys tried to rape Danny. (Tr.M.167).

Danny was placed in the special learning disabilities classes. He was also signed up for sex education classes. (Tr.M.168). By the time he was allowed to attend the classes, it

51

was only three weeks before Danny was to leave TCY. Danny attended one session only. It was due to a disagreement with the social worker that Danny did not go back for the remaining couple of sessions. The information that was being taught at that time Danny already had been taught. The classes had nothing to do with giving him any help or insight for the acts that placed him at TCY. Not much else was done to help Danny with his problems. (Id.).

Danny was a follower of the older boys, but a leader to the younger ones. (Tr.M.171). He sometimes would try to intimidate the younger kids, but would not follow thru with it. (Id.) He needed a very structured environment and constant supervision. When they released Danny, Ms. West felt that he was not ready to leave. (Tr.M.173).

Dr. Douglas Darnall, a practicing psychologist from Youngstown, did a psychological evaluation of Danny in 1983 for purposes of determining whether he should be bound over to the general division of the common pleas court. (Tr.M.182-183). Dr. Darnall conducted numerous tests on Danny. His verbal I.Q. was 49 with two of the subtests receiving a zero score. He had a performance I.Q. of 69 with a full scale I.Q. of 55. These scores place Danny in the mild range of retardation. (Tr.M.184-187).

As a result of his testing, Dr. Darnell came to certain conclusions. He concluded that Danny would easily misread people and he was poor in judgment. (Tr.M.188-189). Therefore, he would react improperly under stressful situations. (Tr.M.190).

Danny has a suspicious nature and looks at the world in a hostile fashion. (Tr.M.189). He has poor self esteem. (Id.). He operates on impulse and feelings and does not think things through. Danny was highly suggestible or influenced by others. (Tr.M.192). Dr. Darnell found that Danny had a conduct disorder undersocialized aggressive meaning that his problems were behavioral in nature as compared to a mental disorder like psychosis or depression. (Tr.M.193). From an emotional point of view, Danny is a loner. His adaptive functioning was poor. (Tr.M.194). He was passive and would not take the initiative. (Tr.M.196). In other words he was susceptible to being led by others. (Tr.M.197). At the time of his evaluation, it was hard for Danny to form relationships with adults. (Tr.M.200). When asked his recommendations concerning the bindover, Dr. Darnall recommended against bindover because Danny performed well in a structured-supportive environment within limits. He did very well at Brinkhaven - a program for the mild mentally retarded. The Department of Youth Services has no such services. (Tr.M.203-204).

On cross-examination, Dr. Darnall stated that Danny fluctuates between mild retardation and borderline. (Tr.M.209). There are numerous factors that would result in the variance of scores. At time of evaluation, he had thirteen prior offenses but did not know that they were. (Tr.M.215). If aggressive behavior continued past his eighteenth birthday, then Dr. Darnall would examine the possibility of a personality disorder. (Id.). Dr. Darnall did find slight evidence of organic brain damage.

53

(Tr.M.222-223).  He found no evidence of psychosis.  (Tr.M.227). There is no real relationship between his prior offenses and his intellectual level.  (Tr.M.230).  Furthermore, Danny, intellectually, understands right from wrong.  (Tr.M.231).

On re-direct examination, Dr. Darnal indicated that Danny's reading and writing level is on a second or third grade level. (Tr.M.234).  If Danny were to develop good relationships with some adults he would become socialized.  (Tr.M.238).  The same would be true if Danny developed a friendship of a duration longer than six months.  (Tr.M.239).  Praising a person of Danny's condition is an appropriate treatment.  (Tr.M.242).

Nancy Schmidtgoessling, a clinical psychologist, tested both Danny and his mother.  (Tr.M.248-249).  Danny's verbal I.Q. was 69, his performance I.Q. was 60, with his full scale I.Q. being 68.  (Tr.M.252).  This level shows mild range of retardation. (Id.)  She gave him the WRAT-R test which is an academic type of test.  Danny failed markedly below the first percentile.  His scores on the reading were so low, they could not be calculated. On spelling and arithmetic, Danny scored on a very low level on function that there is less than 5% of the population below that level.  (Tr.M.253).  Dr. Schmidtgoessling also gave Danny a Peabody Picture Test which is a receptive vocabulary test.  Danny came out with an estimated I.Q. of 62, which was consistent with the other testing.  (Tr.M.254).

Dr. Schmidtgoessling also interviewed Danny's mother and tested her I.Q.  Danny's mother had a full scale I.Q. test of 63 which also is in the range of mildly retarded.  (Tr.M.256-257).

54

She reviewed the school records of Danny's siblings. (Tr.M.255). There was instability in the home as there was no father figure for Danny's first eight years. (Tr.M.256). After that, there was Mr. Williams who was always at work and an alcohol abuser. It was difficult for a mother, in essence alone, to control four male children, especially as they got older. (Id.)

It was Dr. Schmidtgoessling's conclusion that while Ms. Williams loved her children, they were more than she could handle. A review of the school records of all four children show that they all have exhibited behavioral problems. (Tr.M.258). Children such as these need a structured environment with a lot of one on one contact. (Tr.M.260). These children experience lots of failures and frustrations. (Tr.M.262). Danny exhibits these behavior problems. His moral development is primitive, that is he is precentered, shortsighted, and does things for immediate gratification. (Tr.M.263-264).

Danny is a passive type of person. A passive person tends to mirror his environment. (Tr.M.266). When Danny is in an institutional setting, he can function within socially acceptable levels. However, in his home environment, he mirrored the problems inherent within that environmental setting. (Tr.M.267). In addition, retarded people, such as Danny, are much more limited in their ability to extract themselves from a bad situation. (Tr.M.270).

Douglas Crush testified that he was a psychologist with a speciality in neuropsychology. (Tr.M.296-297). Neuropsychology is the study of the higher cortical functions with the focus on

55

the relationship between brain function and behavior. (Tr.M.297). He examined Danny on February 25, 1986, for approximately five hours. (Tr.M.298). Danny tested a full scale I.Q. of 64, with his verbal I.Q. being 62 and performance I.Q. of 67. (Tr.M.299). Dr. Crush also used the Peabody test which came out with an I.Q. equivalency of 51-58,which converts to a mental age of seven years, three months. That result places him in less than the lowest one percent of the general population over the age of eighteen. (Tr.M.300). These tests mean that Danny falls within the mild retarded range. (Tr.M.301).

Dr. Crush also tested Danny with the Halstead Right Hand battery of tests which are designed to establish relationships between brain functions and ability to carry out those functions. It's a cognitive/thinking test. (Tr.M.301). Danny tested .9, which falls within the severely impaired range. The scale goes from zero to one with one being the most impaired. (Tr.M.302-303).

After hearing closing arguments, the Court rendered its verdict that the Appellant be sentenced to death on the aggravated murder with specifications with concurrent sentences of ten to twenty-five years for kidnapping. life imprisonment for rape, ten to twenty-five years for aggravated arson, and life imprisonment for felonious sexual imposition. (Tr.M.407-408).

## FIRST ASSIGNMENT OF ERROR

The trial court erred in admitting into evidence statements of the Appellant. (Tr.d 112; Tr.S. 1-524.)

1. An accused's sixth amendment right to counsel is violated when he is deprived of counsel for custodial interrogation when he does not knowingly, intelligently and voluntarily relinquish a known right due to the misconduct of law enforcement authorities and the defendant being essentially illiterate and being mentally retarded.

The modern right to counsel had its origin in the historic Scotsboro case, <u>Powell</u> v. <u>Alabama</u>, in which the Supreme Court of the United States held that even at the critical periods prior to a trial, a defendant is entitled to counsel because of the vital importance of such proceedings. (1932), 287 U.S. 45. As the Court pointed out:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he may have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

<u>Id</u>. at 68-69. Thirty-two years later, the Court, in <u>Massiah</u> v. <u>United States</u>, held that once adversary proceedings have been initiated, a defendant has the right to legal

representation when police officers interrogate him. (1964), 377 U.S. 201. The Court cited with approval Justice Douglas' concurrence in Spano v. New York, (1959), 360 U.S. 315, where he stated that to deny counsel at this critical stage may deny him "effective representation by counsel at the only stage when legal aid and advice may help him." 377 U.S. at 204, quoting 360 U.S. at 326.

With the decision in Miranda, many scholars felt Massiah had lost its significance. However, the Court reiterated the Massiah doctrine in Brewer v. Williams, which upheld Massiah by stating unequivocally that "(t)he clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has the right to legal representation when the government interrogates him." 430 U.S. 387, 401. The Court went on to hold that the right to counsel "does not depend on a request by the defendant, and that courts indulge in every reasonable presumption against waiver." Id. at 404 (further citations omitted). Furthermore, the standard for determining whether there was an effective waiver of counsel is stated in Johnson v. Zerbst. Id. The Johnson standard is that a defendant does not waive his constitutional right to counsel unless the State proves an intentional and voluntary relinquishment or abandonment of a known right. (1938), 304 U.S. 458.

However, Miranda does impose one procedural safeguard in relation to the right of counsel: "(I)f the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an

opportunity to confer with the attorney and to have him present during any subsequent questioning." Miranda v. Arizona, (1966), 384 U.S. 436, 474. See also, Michigan v. Mosley, (1975), 423 U.S. 96, 105 (fn.10).

In the instant case, the Appellant, after being brought downtown to the Warren Police Department with his mother, Vera Williams, by Detectives Morris Hill and Dennis Steinbeck, was then separated from his mother and placed in Interrogation Room No. 1, and Vera Williams, the Appellant's mother, was placed in the next interrogation room adjacent to Interrogation Room No. 1. Vera Williams testified that she was placed in and left alone in the interrogation room adjacent to Interrogation Room No. 1, in which Detectives Morris Hill and Dennis Steinbeck were interrogating the Appellant. She overheard Officers Hill and Steinbeck utilizing loud tones of voice and badgering language towards her son. As a result, she left the interrogation room in which she was placed and went next door and opened the door and went into Interrogation Room No. 1. At that point, she saw Detective Morris Hill in the room, along with Detective Steinbeck and her son, Danny Hill. At that point in time, she asked why they were questioning her son in that manner. In response, her brother, Detective Morris Hill, simply indicated that they were finishing up the statement that the Appellant had given previously on Friday, September 13, 1985, and quickly ushered her out and away from the interrogation room where the Appellant was located. At the time, Vera Williams became concerned as to what, in fact, was going on and questioned her brother, Detective

Morris Hill, regarding her intention to secure legal counsel for her son. In response to her statement regarding her intention to secure legal counsel, Detective Morris Hill, her brother, told her that there was no sense in hiring and paying for a lawyer, because the Court would appoint a lawyer for the Appellant free of charge, without expense to her. Thereafter, the officers ushered Vera Williams into anther room located within the police department a further distance away, in order that she would not overhear what was taking place in Interrogation Room No. 1. Subsequently, after Vera Williams had remained alone in another room some distance away from Interrogation Room No. 1, she again became concerned and exited the room and contacted her brother, Detective Morris Hill, who, at that time, indicated that her son would not be going home as he had previously indicated to her. Detective Thomas Stewart testified that after the tape recorded statement was taken, he informed the Appellant that he would be detained at the Warren Police Department and that he was, evidently, formally under arrest at that time. However, Detective Thomas Stewart also indicated that, as a result of his conference with Attorney Dennis Watkins, who was also at the Warren Police Department, after placing him under arrest, of the charges for which he was being held. Also, Officers Hill, Steinbeck and Stewart all testified that they did not inform the Appellant of his right to representation by the County Public Defender at any time during his custodial interrogation and after he was formally placed under arrest after the completion of the tape recorded statement on Monday, September 16, 1985.

60

Subsequently, the Appellant gave a videotape statement in which he was not advised of his Miranda rights nor advised of his right to be represented by the County Public Defender.

From the evidence adduced from Dr. Schmidtgoessling, Mr. Goodman, and Mr. Freeman and the documents introduced regarding the education history and testing performance of the Appellant in regard to the Stanford-Benet and Wechler Intelligence Tests, it is clear that the Appellant is a functional illiterate and considered mild to border-line mentally retarded. Specifically, in 1980 and 1984, the Appellant scored a total of 49 on the Wechler Intelligence Test, which is a broader and more inclusive test than the Stanford-Benet Test, on which the Appellant tested in the low 60's. The Appellant is certainly an easy target for manipulation and suggestion by his own peers, let alone law enforcement officers who are well adept in handling persons such as the Appellant. Obviously, it is one thing to be intelligent enough to understand and comprehend what your rights are and then proceed to make an intelligent choice whether to waive them or not. The Appellant's situation defies imagination in the sense that his problem is three-fold: first, he is unable to verbally recognize and understand the meaning of the words that comprise the Miranda rights; second, he is unable to assimilate the information regardless of its simplistic word transmission to him; and third, he is unable to utilize judgment or reason based upon his automatic pre-conditioned mental reflexes. Thus, the Appellant in the instant case cannot understand or verbally recognize the words which comprise his Constitutional rights,

could not assimilate rights information and its consequences; and even if he had managed to accomplish the foregoing two hurdles, his pre-conditioning in submission to police authority would compel him to talk to the police in any case. Therefore, if the Appellant had no knowledge of the nature of the right to counsel, it is apparent that the Appellant was not able to intelligently or compentently waive that Constitutional right.

With the Appellant confined in Interrogation Room No. 1 and the door being locked and officers present in the room at all times, the Appellant's mother, Vera Williams, after over-hearing the officers badgering and using loud voices with the Appellant in Interrogation Room No. 1, proceeded to find out what the offices were doing to with her son. After she was ushered out of Interrogation Room No. 1 where her son was located, she felt concerned and asked her brother, Detective Morris Hill, about hiring a lawyer to help her son. The response by Detective Morris Hill was to the effect that the Court would appoint a lawyer for her son and she would not have to incur the expense herself. Obviously, that was sufficient to pacify and thwart the mother's effort in regard to securing counsel for her son at that time. This was prior to the giving, by the Appellant, of his tape recorded statement and his video tape statement; thus, the law enforcement authorities were given time to continue their custodial detention of the Appellant and to secure incriminatory statements. Obviously, by thwarting and pursuading the Appellant's mother, Vera Williams, not to hire counsel, the law enforcement officers defeated the purpose of the Miranda warnings

62

and violated the Appellant's Constitutional rights to legal counsel. At the same time, the mother, Vera Williams, was retained in the Police Department and ushered into anther room in which more time was consumed without interruption to law enforcement authorities. In point of fact, even after the tape recorded statement, the arrest of the Appellant, and the video tape statement, the Appellant never appeared in a court of law or before a magistrate until the next day, more than 24 hours from the time he was allegedly arrested.

> 2. An accused's statements are not voluntary when such statements were coerced by the psychological tactics of law enforcement officers on a retarded individual who was essentially illiterate and the admission of such statements violates the due process.

The second basis for the suppression of these statements is that they were involuntary in nature. In State v. Chase, the Ohio Supreme Court reaffirmed two basic principles regarding the admissibility of statements given by a person accused of a crime. 55 Ohio St. 2d 237, 378 N.E.2d 1064 (1978). It is imperative that a statement be voluntary and that voluntariness is a federal question governed by federal standards. As the Court stated:

> Long before Miranda, it was well established that a confession, to be admissible, must be voluntary. As was stated in Rufer v. State (1874), 25 Ohio St. 464, 470, 'Whilst voluntary confessions are always admissible against a prisoner on trial, it is well settled that confessions of guilt made through the influence of hopes or fears, induced by promises or threats of temporal benefit or disadvantage, are wholly inadmissible.' This rule is now a matter of federal constitutional law. Miranda, of course, laid down minimum requirements which the police must observe in conducting

> interrogations.  But, as this Court has held, the question of whether the accused's statements were in fact voluntary is separate from the question of compliance with _Miranda_.  Moreover, formal compliance with the requirements of _Miranda_ does not preclude proof that the statements themselves were involuntary.

_Id_. at 246, 378 N.E.2d at 1070 (further citations omitted).

Similarly, the United States Supreme Court has held that "_any_ criminal trial use against a defendant of his _involuntary_ statement is a denial of due process of law" even though there is ample evidence aside from the confession to support the conviction.  _Mincey_ v. _Arizona_, 437 U.S. 385, 398 (1977). Therefore, any statement attributed to an accused must be "the product of a rational intellect and free will," if such a statement is to be admissible at trial.  _Id_.  (Further citations omitted.)

Furthermore, the Court recently reiterated this position "that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." (1985) ____ U.S ____, ____, 106 S. Ct. 445, 449. The Court has gone on to hold, however, that there must be some type of "state action" to support a claim of a violation of the due process clause.  _Colorado_ v. _Connelly_, (1986), ___ U.S. ___, 40 Cr.L. 3159.

To determine whether a statement is the product of a rational intellect and a free will, and therefore voluntary, certain well-established principles are applicable:

64

(1) Determination of whether a statement is involuntary 'requires more than a mere color-matching of cases.' It requires careful evaluation of all the circumstances of the interrogation. Id. at 401, quoting in part, Reck v. Pate, 367 U.S. 433, 442 (1961). (Footnote omitted.)

(2) If an individual's 'will was overborne' or if his confession was 'not the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. Townsend v. Sain, 372 U.S. 293, 307 (1962). (Footnotes omitted.)

(3) It has been held irrelevant the absence of evidence of improper purpose on the part of the questioning officers. Blackburn v. Alabama, 361 U.S. 199, 208 (1960).

The voluntariness test is designed therefore to bar admission of those confessions which: (a) were of doubtful reliability because of the practices used to obtain them; or (b) were obtained by offensive police practices even if reliability was not in question; or (c) were obtained under circumstances in which the defendant's free choice was significantly impaired, even if the police did not resort to offensive practices. In applying the voluntariness test, the Courts must examine the "totality of the circumstances" surrounding each statement.

In the instant case, we are faced with an accused that is mentally retarded and essentially illiterate. This egregious action that was initiated by law enforcement officers was the ruse of using an uncle who was also a detective for the Warren Police Department to get the Appellant to go down to the police station. It is this same uncle who is left alone in the room

with Appellant  after the Appellant has consistently and emphatically denied any involvement in the homicide during the course of the interrogation; the officers were constantly using a variety of interrogation techniques to wear the Appellant down. This technique includes the use of false information to mislead and confuse the Appellant.

More specifically, the record reveals that the Appellant was in custodial detention on Friday, September 13, 1985 for more than four hours, and in custodial detention on Monday, September 16, 1985 for approximately two and a half hours before the tape recorded statement was taken of the Appellant at approximately 11:30 a.m.  As testified to by the police officers, Officer Dennis Steinbeck continuously questioned the Appellant, Danny Lee Hill, on Friday, September 13, 1985, and Officers Morris Hill, Dennis Steinbeck, and Thomas Stewart, off an on, questioned the Appellant on Monday, September 16, 1985, at the Warren Police Department.  On Monday, September 16, 1985, as verified by the Appellant's mother, Vera Williams, Officers Hill and Steinbeck, for at least the initial hour of interrogation, were yelling and using badgering language to the Appellant.  Also, during the entire four-hour process of interrogation on Friday, September 13, 1985, the Appellant allegedly gave the substance of what appears in the typewritten statement taken by Officer Dennis Steinbeck; however, the Appellant did not give any statement incriminating himself whatsoever until approximately 11:30 a.m. on Monday, September 16, 1985.  The Appellant testified that he was unwilling on both occasions, being Friday, September 13,

1985, to go down to the police department with Officer Dennis Steinbeck, and again on Monday, September 16, 1985, he was unwilling to accompany the officers to the Warren Police Department; however, the Appellant's uncle, Morris Hill, utilizing his relationship with the Appellant's mother, Vera Williams, who is his sister, prompted Vera Williams to come down to the Warren Police Department to give a statement and persuaded her to have the Appellant come along.  Officer Morris Hill testified that he was not involved in the investigation until Monday, September 16, 1985, on which date he was dispatched with Detective Steinbeck to go pick up his nephew based upon the suggestion given by Attorney Dennis Watkins in conversation with Officer Steinbeck on Sunday, September 15, 1985, that a relative or family member should be used in regard to either picking up or interviewing the Appellant.  Detective Morris Hill testified that he had on prior occasions, when the Appellant was a juvenile approximately a year and a half ago, physically beaten the Appellant at the Warren Police Department.  At the time, the Appellant was in the custody of the juvenile officers at the Warren Police Department, and Detective Morris Hill, in the use of his own terminology, gave the Appellant a "whipping".  Officer Hill testified as to his physical statute being approximately 5'10", 230 lbs., 20-inch biceps, and capable of lifting 600 to 700 lbs. of weight.  In turn, the Appellant testified that, in fact, he had been beaten by his uncle, Detective Morris Hill, at the Warren Police Department, when he was a juvenile, and described it as being physically slapped around and the Detective

67

Morris Hill borrowed another officer's belt and struck him with it; thus, the terminology used by Detective Hill in his testimony was appropriately, "I gave him a whipping". Officer Steinbeck and Officer Stewart testified that on Monday, September 16, 1985, up until the time that Detective Morris Hill was left alone with the Appellant in the locked interrogation room, he had not admitted any involvement in the crime nor given any incriminatory statements. At that time, Detective Morris Hill testified that he was left alone with the Appellant and stated to the Appellant, "No one is going to do anything to you," and, "No one is going to harm or hurt you", again to which the Appellant allegedly stated to Detective Morris Hill that he was there at the scene when the assault took place upon Raymond Fife. Officers Steinbeck and Stewart testified that upon exiting the room, Detective Morris Hill stated to them that the Appellant was involved and they should go ahead and question him further. Thereafter, upon the return to the room by Officers Steinbeck and Stewart, the Appellant testified that when Detective Morris Hill was in the room alone with him, he put him up against the wall and slapped him, and that, indeed, he was afraid and fearful of his uncle based upon that conduct and the beating and whipping he had given him on a prior occasion at the Warren Police Department. The Appellant also testified that, at the beginning of the videotape statement which occurred later, Detective Morris Hill, who was sitting to the immediate left of the Appellant, kicked him under the table prior to the commencement of the videotape session. The Appellant also testified that he was unable to read any of

the Constitutional rights forms that were presented to him, and that he was unable to read the alleged typewritten statement taken by Detective Dennis Steinbeck on Friday, September 13, 1985. He also testified that he did not write very well, which was unquestionable borne out by the sample of handwriting taken in court. Appellant introduced the typewritten statement and a Constitutional rights form that were previously secured from the Appellant when he was a juvenile; however, the Appellant was unable to recognize either of the documents and only able to recognize his handwritten signature, which, if the Court will notice, Appellant misspelled his name on the documents. Officer Morris Hill described the Appellant as having normal intelligence. All of the officers indicated that they ever questioned the Appellant regarding his ability to read and write. In fact, Officers Morris Hill, Thomas Stewart, and Dennis Steinbeck testified that during the entire time that they had the Appellant in custodial detention and were interrogation him on Friday, September 13, 1985, on Monday, September 16, 1985, they never asked the Appellant to write anything other than his name, never asked the Appellant to read any of the documents aloud, never questioned the Appellant as to the definition of any words, and never questioned the Appellant as to the meaning of any of the language from the Constitutional rights form or to read the statement taken from the Appellant on Friday. The Appellant testified, upon questioning regarding his constitutional rights, he had no idea what they were and did not understand the meaning of the words, "constitutional", "voluntary", "knowingly", and so

69

forth. The introduction of the school records regarding the Appellant contained a number of Stanford-Benet and Wechler Intelligence Tests which placed the Appellant in the low 60's range for the Stanford-Benets and placed the Appellant at a 49 total I.Q. for the Wechler Test, which was a more comprehensive test than the Stanford-Benet. Dr. Schmidtgoessling testified that the Appellant, although scoring a 68 on her administration of the Wechler Test, had scored the lowest scores on the subtest involving a person's judgment, reasoning and analyzation skills. Additionally, testimony was elicited indicating the fact that the Appellant had been enrolled in special E.M.R. classes during his entire education process and had attended Fairhaven School for the Mentally Retarded. Additionally, during cross examination of the Appellant on the stand, it was evident that in regard to some of the responses to some of the questions propounded to him by the Appellee that he did not understand nor comprehend the context of the questions. His responses were not addressed to the questions on many occasion. Additionally, when he was asked the difference between talking and not talking, he was able to distinguish the difference. However, when the prosecutor asked him that he should not talk and the prosecutor was going to continue to talk, his response was that he would continue to talk instead of not talking. It is obvious from the limited appearance by the Appellant in court that not only does he lack the bare essential verbal skills to understand and comprehend what is being said or told to him, but that he also lacks totally the ability to utilize judgment and reasoning power regarding

what little he does understand. Although the limited capabilities of the Appellant were obviously apparent to counsel and the court immediately, it is incomprehensible how all of the law enforcement officers, including Detective Dennis Steinbeck, Detective Thomas Stewart and the Appellant's uncle, Detective Morris, would classify the Appellant as fairly intelligent and not recognize his true mental capabilities, having been acquainted with the Appellant for such a long period of time. On the other hand, it is entirely possible that the law enforcement officers were, in fact, well aware and cognizant of the Appellant's low mental capabilities and his inability to read and write. As a consequence of the law enforcement authorities being aware of the Appellant's mental deficiencies, they simply took advantage of the same in order to perfunctorily secure his signature on all of the documents required by law and to then pursue their ultimate objective, which would be to investigate and secure incriminatory statements from the Appellant.

Taking into account the "totality of the circumstances", it is apparent that the tape recorded statement and the videotape statement elicited from the Appellant was involuntary in nature and that the Appellee failed to prove by the required standard of preponderance of the evidence that the same was voluntary. The relevant factors of the Appellant's age (being just 18), the Appellant's lack of mental capabilities (placing him in the mild or moderate retarded range), the previous physical abuse imposed upon the Appellant and the abuse imposed upon him during the interrogation on Monday, September 16, 1985, the length of the

71

interrogation process (in total being approximately seven hours), the confinement in the interrogation room with the door locked, lacking freedom of movement, the on and off interrogation by a number of police officers, the fact that the interrogation took place in the Warren Police Department where the Appellant was beaten before, the psychological impact of the threats to a mildly retarded person that Tim Combs was going to blame the homicide on the Appellant, the psychological effect on the Appellant of the promise by Detective Hill that "no one was going to hurt or harm him" certainly leads to the conclusion that the tape recorded statement and videotape statement were involuntarily induced and secured from the Appellant.

> 3. An Accused's statements are not admissible unless the State establishes that the procedural safeguards contained in the Miranda warnings were properly given or knowingly, intelligently and voluntarily waived.

The Appellant's statements were taken in violation of the Appellant's right against self-incrimination. As the <u>Miranda</u> court stated:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point, he has shown that he intends to exercise his Fifth Amendment privilege: any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in custody interrogation operates on the individual to overcome free choice in produce a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the

> individual must have an opportunity to confer
> with an attorney and to have him present
> during any subsequent questioning.

384 U.S. at 473-474.  In addition, the standard established for

the waiver of this right is the same as that of the right of

counsel:  the State has the burden of proving that the defendant

intentionally and voluntarily relinquished or abandoned a known

right.  304 U.S. 438.  <u>See also</u>, <u>Schneckloth</u> v. <u>Boustamonte</u>

(1973), 412 U.S. 218.

The United States Supreme Court has examined the issue of

what constitutes interrogation under <u>Miranda</u> in <u>Rhode Island</u> v.

<u>Innis</u>, which held:

> The <u>Miranda</u> safeguards come into play
> whenever a person in custody is subjected to
> either express questioning or its functional
> equivalent.  That is to say, the term
> "interrogation" under <u>Miranda</u> refers not only
> to express questioning, but also to any words
> or actions on the part of the police (other
> than those normally attendant to arrest and
> custody) that the police should know are
> reasonably likely to elicit an incriminating
> response from the suspect.  The latter
> portion of this definition focuses primarily
> upon the perceptions of the suspect, rather
> than the intent of the police...  A practice
> that the police should know is reasonably
> likely to evoke an incriminating response
> from a suspect thus amounts to interrogation.

(1980), 446 U.S. 291, 300-301 (footnotes omitted).  Citing <u>Innis</u>,

the Court of Appeals for the District of Columbia held, in <u>Wilson</u>

v. <u>United States</u>, that a defendant's statement was not admissible

because he had invoked his right to remain silent which was not

"scrupulously honored" by the police.  (D.C. App. 1982), 444 A.2d

25.  In <u>Wilson</u>, the defendant was arrested in Arlington,

Virginia, and spent the night in jail.  His <u>Miranda</u> rights were

73

read to him that night as well as the next morning when the
police transported him back to the District of Columbia.
Defendant refused to answer questions, but was "curious" about
the charges against him and the supporting evidence.  Though the
defendant did not relinquish his Miranda rights, a continued
dialogue took place between the two officers and the defendant
while they were on their way to the police station.  After
repeated discussions designed to elicit statements from
the defendant, the defendant finally made a statement when
confronted with the fact that the witness against him was his
friend who witnessed the crime.  It was further found that even
though the defendant was inquiring about the evidence against
him, the police were nurturing this conversation and that this
action on their parts constituted an interrogation in violation
of the defendant's Miranda rights.  The Wilson court also held
that the interrogation employed in this case violated the
standards established by the Supreme Court in Michigan v. Mosley
for the proper procedure to be used in a custodial interrogation.
Id. at 29.

The determination of what constitutes a waiver that is
voluntary, knowingly, and intelligently given was stated in Moran
v. Burbine:

> The inquiry has two distinct dimensions.
> First, the relinquishment of the right must
> have been voluntary in the sense that it was
> the product of a free and deliberate choice
> rather than intimidation, coercion or
> deception.  Second, the waiver must have been
> made with a full awareness both of the nature
> of the right being abandoned and the
> consequences of the decision to abandon it.
> Only if the "totality of the circumstances

74

surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

(1986) ____ U.S. ____, ____, 106 S.Ct. 1135 (further citations omitted).

When the Appellant was brought to the Warren Police Department for custodial interrogation on Friday, September 13, 1985, the old constitutional rights form was read and given to the Appellant to sign, which evidently he did. Officer Steinbeck further testified that he did not, at any time, ask the Appellant if he could read or write or ask the Appellant to read the Constitutional rights form aloud nor inquire whether the Appellant understood any of the words or the meaning of anything that was read to him. Thereafter, approximately three and one half hours later, the Appellant gave Officer Steinbeck a verbal statement regarding his whereabouts and the events surrounding September 10, 1985, after the Appellant was taken into custodial detention by Detective Morris Hill and Dennis Steinbeck, the Appellant was taken to the Warren Police Department again and placed in the same Interrogation Room No. 1. evidently, according to the testimony of Detective Morris Hill, he verbally gave the Appellant his rights from memory on arrival at the Warren Police Department. According to the testimony of Detective Hill, he recited, from memory, the four Miranda warnings; however, he did not recite the language of the Waiver of Rights found on the form simply because he had not memorized the same. Evidently, Detective Morris Hill indicated that the Appellant verbally stated at the time that he understood his

rights and waived them verbally.  In addition, Morris Hill also indicated that he did not ask the Appellant whether he could read or write, nor did he ask the Appellant to explain any of the words or what the rights were in order to ensure that the Appellant understood his rights. Additionally, Detective Morris Hill, since he had recited the Miranda warnings from memory, did not include the additional language about not being under arrest which he had not memorized and which was found on the revised rights form, labeled as Appellant's Exhibit "D".  Also, it is interesting to note that although the Appellant was in the same Interrogation Room No. 1 in which on the Friday before Detective Dennis Steinbeck secured the written constitutional rights form signed by the Appellant, that on this occasion, although the forms were in the same desk drawer in the same room, that the written constitutional rights form was not utilized until after the tape recorded statement had begun and later interrupted to get the rights form taken from the same desk signed.  According to the testimony of the Appellant, he did not recall Detective Morris Hill or any other officers verbally giving him his rights when he was initially taken to the Warren Police Department on Monday morning, September 16, 1985.  After commencement of the tape recorded statement of the Appellant, starting at 11:30 a.m, the Appellant, in response to questions propounded by Detectives Steinbeck, Stewart, and Hill, the Appellant gave an incriminatory statement to the effect that he was at the scene of the assault on Raymond Fife.  Thereafter, the tape was interrupted by the officers and Detective Morris Hill proceeded to read to the

Appellant his constitutional rights. As noted earlier, new and additional language regarding the fact that the Appellant was not under arrest and free to leave was added to the basic form of the constitutional rights and they were read straight through in their entirety. Detective Morris Hill, after reading the Constitutional rights, which constituted the top half of the form, simply asked the Appellant if he understood, and he said "Yeah". Then the bottom portion was read in regard to the waiver of the rights and no response was ever elicited from the Appellant; however, he was asked to sign the rights sheet form. In point of fact, as noted earlier, he actually signed two forms at that time, at least according to the officer's revised testimony. As indicated in the tape recording cassette, the officers at no time asked the Appellant whether he could read or write, whether he understood the meaning of any of the words, or the meaning of any of the rights read to him to ensure that the Appellant comprehended and understood what he was doing. In fact, Officer Hill never even hesitated after each of the rights were read to the Appellant to ask the Appellant to respond and did not engage in any dialogue whatsoever to determine whether the Appellant comprehended or understood what he was being told. Therefore, in regard to his custodial detention on Monday, September 16, 1985, the only indication of the administration of the Miranda warnings to the Appellant is given only by Detective Morris Hill, who did the recitation of the rights from memory prior to the Appellant giving any incriminatory statement. The constitutional rights form allegedly given and signed by the

Appellant on Friday, September 13, 1985, would refer to that particular time at which the Appellant was in custodial detention regarding the interrogation of that day. When there is a long break in the interrogation process or a substantial lapse of time between separate custodial interrogations, it is encumbant upon the police authorities to re-advise the Appellant of his rights and the fact that a prior statement and waiver of rights was given three days before to the Appellant is not relevant to the issue of the waiver of rights on Monday, September 16, 1985, Miranda v. Arizona, supra.

In fact, based upon the testimony, the Appellant on Monday, September 16, 1985, indicated to the police, which was acknowledged by the officers, that he told them at his house that he had already given a statement and he did not want to be questioned any further. In the case of U.S. v. Crouder (1982, 6th Cir.), 691 F.2d 280, the Court held that a defendant's statement to police authorities that he did not want to be further questioned or discuss the charges against him and that he had already given a statement to the police earlier is, in fact, an assertion, not a waiver, of his constitutional right to remain silent.

Also, according to the testimony elicited from Messrs. Freeman and Goodman of the Warren City Schools and the records introduced regarding the intelligence tests administered to the Appellant, the Appellant was classified as moderate to mildly retarded and that his achievement level from the records indicated that he had not gone beyond the point of a second grade

level education.  Additionally, Dr. Schmidtgoessling testified that the Appellant was particularly weak and scored the lowest in verbal tests regarding reading, writing, and word recognition and also scored low in the subtests regarding the use of judgment, reason and analyzation.  Dr. Schmidtgoessling further testified that the Appellant had no comprehension or understanding of the words utilized in the constitutional rights form and did not understand the meaning of his Constitutional rights. Based upon the Appellant's lack of ability in judgment, reasoning and analyzation, even if his constitutional rights were translated in the most simple and basic language, his preconditioning and image of police officers and police authority automatically compelled him to speak to them, even if he was told to do otherwise.  In his words, "I must talk to them because they are the police."  It is difficult to believe that Detective Dennis Steinbeck, Detective Thomas Stewart, and the Appellant's uncle, Detective Morris Hill, after having known the Appellant for such a long period of time, were totally unaware of the Appellant's mental capacity and his inability to read and write throughout their long acquaintance with the Appellant.  Additionally, it is obvious that Detectives Hill, Steinbeck and Stewart at no time ever inquired or thought to ask the Appellant if he could read, write, or if he understood anything that he was being read or told to him.  On the other hand, it is apparent from the manner of questioning and the dialogue contained on the tape recorded cassette and the videotape statement of the Appellant that they were aware  the Appellant was subject to suggestion and easily

79

influenced and lead by others. It is obvious from the tape recorded statement and the videotape statement that the officers knowingly utilized very childish and simplistic language and implemented simple psychological ploys to have the Appellant respond. For instance, on the tape recorded statement, the following dialogue occurred between Detective Stewart and the Appellant:

> Q: You know, Danny, it seems like everything we suggest to you, you agree with us, right? Isn't that the way it seems to you?
>
> A: What?
>
> Q: Now, if we suggest something, it seems that you agree with us. In other words, about the cigarette lighter; I suggested he was looking for it, and you agreed with it. Now, if I was to suggest and say that the boy sucked your pee-pee, would you agree to that?

To the average person viewing the videotape statement and listening to the tape recorded statement, it is immediately apparent that the Appellant does not have normal intelligence. Therefore, based upon the manner in which the Appellant was interviewed by Officers Hill, Steinbeck and Stewart and their previous acquaintance with the Appellant over a number of years, and the fact that the Appellant is the nephew of Detective Morris Hill, it is incredulous to believe that these officers did not know the mental capacity and abilities of the Appellant. On the other hand, taking advantage of the ignorance and lack of mental capabilities of the Appellant, they were able to secure the Appellant's signature on all of the documents required and to have him acquiesce in everything that was told to him to presumably protect his rights. Therefore, the officers were not

about to ask the Appellant any pertinent questions regarding his ability to understand the meaning of his Constitutional rights; otherwise, it would have appeared on the tape cassette recording and the videotape for all to know that, in fact, the Appellant did not understand nor intelligently, voluntarily, and knowingly waive his rights.

. In the final analysis, based upon the facts in the instant case, the Appellee failed to establish that the Appellant was properly administered his Miranda rights as required by law and that he knowingly, intelligently, and voluntarily waived the same. Therefore, in absence of such proof, the tape recorded statement and the videotape statement taken from the Appellant, as well as all evidence secured as a result thereof, should have been found inadmissible and excluded from the trial.

4.  An accused's Fourth and Fourteenth Amendment rights are violated when an accused is seized from his home through the use of psychological ploys by law enforcement officers upon an accused who is mentally retarded and essentially illiterate.

The Fourth Amendment of the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, an no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Without judicial authorization or probable cause to arrest, the taking into custody and detention of a person violates the Fourth Amendment absent a valid consent. Hayes v. Florida (1985) ____ U.S. ____, 84 L.Ed.2d 705. See also, Dunaway v. New York (1979),

81

442 U.S. 200. A person is "seized" for Fourth Amendment purposes
if, in view of all the circumstances, a reasonable person would
have believed he was not free to leave. <u>Florida</u> v. <u>Royer</u> (1983),
430 U.S. 490.

In the instant case, Officer Dennis Steinbeck testified that
he went alone to the Appellant's residence and talked to the
Appellant from an upstairs window. He testified that he
requested the Appellant to come downtown for questioning in
regard to the Fife homicide; however, the Appellant testified
that he initially indicated he did not want to go downtown for
any questioning, but that Officer Steinbeck ordered him to put
his clothes on and go downtown. Once downtown, the Appellant was
placed in Interrogation Room No. 1, and he was either with an
officer at all times or the door was locked, and he could
not leave the premises. The Appellant indicated that he tried at
some time when an officer was not present to open the door and
leave, but the door was locked from the outside. Officer Dennis
Steinbeck indicated that he had read Appellant his Miranda rights
and had him sign them upon coming to the station, at
approximately 10:00 a.m. on Friday, September 13, 1985; however,
he did not indicate that he told the Appellant at the time that
he was not under arrest and that he could leave at any time.
Without the typewritten statement taken by Detective Steinbeck
being signed, the Appellant's mother, Vera Williams, came to
the police department and talked briefly to Detective Dennis
Steinbeck and took her son home at approximately 2:00 p.m. on
that Friday, September 13, 1985.

It was determined on Sunday, September 15, 1985, that the Appellant was a suspect in regard to this particular case and that he must be questioned and interrogated further.  It was also determined that it would be helpful if a relative of the family was used to entice the Appellant to come downtown for further questioning and interrogation.  Monday morning, September 16, 1985, Detective Dennis Steinbeck and Detective Morris Hill (Detective Hill who is the uncle of the Appellant and the brother to Appellant's mother, Vera Williams) went to their residence. Once inside their residence, the Appellant indicated after coming down from upstairs that he did not want to go downtown for any further questioning and he returned back upstairs.  At that juncture, Detective Morris Hill, brother of Vera Williams, convinced her son to come downtown for the purpose of taking her statement, and that she should bring along the Appellant in order that he may sign the statement he gave on Friday, September 13th. Both Vera Williams and the Appellant testified that the Appellant went downtown on Monday, September 16th, and he was not to be further questioned in regard to the Fife homicide.  However, upon arriving at the Warren Police Department, the Appellant was placed in Interrogation Room No. 1 and separated from his mother, who was placed in another room next door.  A statement never was taken of Vera Williams and the statement unsigned by Appellant on Friday was signed immediately that morning upon his arrival.  The Appellant further indicated that he asked to go home; however, the officers simply continued to question him and would not let him leave.  As it was put by Detective Morris Hill, it was

83

better to get the Appellant down to the Warren Police Department because then he would be on their "home turf".

Also, it was testified to by the police officers and Attorney Dennis Watkins that, up until the time that the Appellant gave the tape recorded statement, probable cause did not exist regarding the arrest of the Appellant for any criminal activity.

Application of the law to the foregoing facts would indicate that the Appellant was "seized" in the context of the Fourth Amendment and placed in the custody by the physical force and authority of Officer Dennis Steinbeck on Friday, September 13, 1985, and by Officers Morris Hill and Dennis Steinbeck on Monday, September 16th. On both occasions, the Appellant indicated that he did not want to go downtown and rejected the requests by the police officers. On Friday, September 13, 1985, Detective Steinbeck simply ordered the Appellant to come downtown and he acquiesced to that demand and was physically transported and confined in the interrogation room in the Warren Police Department. Thereafter, he was unable to leave the room upon request and the door was locked an he was confined therein. On Monday, September 16, 1985, the Appellant indicated he did not want to go downtown for any further questioning; however, the police officers, by use of Detective Morris Hill, deceived the Appellant as well as his mother, Vera Williams, into being transported by them in the police cruiser to the Warren Police Department by indicating that they were going to take Vera Williams' statement. In truth of fact, no statement was ever

taken from Vera Williams and she was shuffled from room to room in order to occupy her while they were questioning her son. The Appellant also indicated that he wanted to leave and could not because the door was locked from the outside, and that at other times officers were always present with him. Obviously, the restraint and detention of the Appellant was complete on both occasions when the police placed the Appellant in their automobiles, took him to the Warren Police Department and placed him inside the interrogation room, and kept the door locked and officers present questioning the Appellant at all times. On both occasions, the detention took place contrary to the will of the Appellant; however, the Appellant submitted only after the show of physical force and authority utilized by the police authorities.

The nature, extent and scope of intrusion or detention which in this case is complete to the extent that contrary to the Appellant's wishes, he was physically and forcefully removed from the place where he was and confined in a room located within the Warren Police Department and not free and prohibited from leaving. Obviously, the scope and nature and extent of the intrusion and detention is tantamount to a formal arrest. Officers Hill, Steinbeck and Stewart neither indicated nor testified that the Appellant was informed on Friday, September 13th, nor on Monday, September 16th, prior to the time that Morris Hill read his Constitutional rights on the tape recorded statement that Appellant was not under arrest and free to leave. In fact, at the beginning of the tape recorded statement, other than the

references to the Appellant's Constitutional rights, there is no language to the effect that the Appellant is not under arrest and is free to leave at any time.  Also, Detective Morris Hill testified that he verbally gave the Appellant his Constitutional rights on the morning of Monday, September 16, 1985, from memory; therefore, since he was not aware or familiar with the new language, it is obvious that he did not also indicate to the Appellant that he was, at the time, not under arrest and he was free to leave at any time.  Also, it is obvious that the rights form allegedly executed and read to the Appellant on Friday, September 13th, also does not have the additional language regarding the fact that he is not under arrest and is free to leave.

The United States Supreme Court, in examining the issue of investigative detention, states as follows:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments.  Dunaway, 442 U.S., at 212; Florida v. Royer, 420 U.S. 490, 499 (1983) (plurality opinion).  In our view, it continues to be that the lines cross when the police, without probable cause or warrant, forcefully remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.  We would adhere to the view that such seizures, at least where not under judicial supervision, are sufficient like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

86

Hayes at ____, 84 L.Ed 2d 705. In this case, custodial detention occurring on Friday, September 13, 1985, and Monday, September 16, 1985, is well within the definitions and guidelines set forth by the United States Supreme Court in Hayes. See also, State v. Fickes (March 29, 1985), Trumbull App. No. 3419, unreported.

In the instant case, although the Appellant initially rejected the invitation to go to the Warren Police Department by Officers Hill and Steinbeck on Monday, September 16, 1985, the Appellant did decide to accompany his mother who requested that he get dressed and come along to the station. However, it was under the understanding that a statement was to be taken from the mother, Vera Williams, and the Appellant was to sign the statement allegedly given on Friday, September 13, 1985. However, it was specifically understood by both Vera Williams and the Appellant that no questioning was to take place. In addition thereto, it is obvious that in reality the Appellant would not have accompanied the police officers to the Warren Police Department on Monday, September 16, 1985 unless the evasive move was made in regard to the officer's request that the mother, Vera Williams, come to the police department to make a statement. In point of fact, obviously there was no intention to take a statement from Vera Williams and once at the police station, she was simply shuffled from room to room and pacified so that the police would know where she was and what she was doing. The Appellee may well argue that, although the Appellant was reluctant and did not want to come to the police station, initially on Monday, September 16, 1985, it was at the request of

87

his mother that he accompany her and go to the police station, and therefore his trip to the police station was voluntary on his part.  However, it would appear that to adopt such a view in light of the circumstances under which the Appellant was brought to the station, that the use of subterfuge or deception toaccomplish that which cannot be accomplished directly by law enforcement authorities should be rejected by the law and the courts as well.  In other words, if it is illegal to take a suspect into custody and transport him to a police station for investigative purposes without probable cause, it would seem just as illegal to thwart the unwillingness of the suspect to go with the police to the police station by utilizing deception and  subterfuge to accomplish the same end.  For example, if a suspect was unwilling to accompany police officers to a police department for investigative detention and the police lacked the probable cause to initiate a custodial detention or an arrest, then it would be improper for the police to tell the suspect that they have his mother at the police station, and she is being held there until he arrives or that she has requested his presence at the police station where, in fact, she hasn't.  The potential for abuse and the encouragement of falsehood  and deception would be unlimited; therefore, it would be unreasonable to assume that as in the instant case, Appellant, who declined to do so, despite the deception used to lure the mother to the police department and then have the mother ask the Appellant to come along.  The real purpose and motive of the law enforcement authorities became apparent once the Appellant and the mother arrived at the police

department and upon the confinement of the Appellant in the interrogation room, separated from his mother, with the outside door locked and police commencing the interrogation and interviewing of the Appellant, and which represents a seizure and custodial detention of the Appellant without probable cause in violation of the Appellant's Fourth Amendment right, as made applicable to the states by the Fourteenth Amendment. Any and all tape recorded, video tape statements, and any and all physical evidence secured as a result thereof should be suppressed and excluded as evidence from the trial.

    5. An accused is denied his right to due process pursuant to the Fourteenth Amendment when he is denied his statutory right to counsel pursuant to R.C. 120.16, 2934.14, and 2935.20.

Ohio has recognized the importance of the right to counsel by the enactment of R.C. 120.16, 2935.14, and 2935.20. R.C. 120.16 insures that a defendant be informed not only that he has the right to counsel, but that he must also be told upon arrest that he has the right to be represented by the county public defender or assigned counsel if the defendant is indigent. R.C. 2935.14 grants a defendant a specific right to consult with his attorney in private and a violation of the right by a law enforcement officer is punishable by a fine or imprisonment or both. R.C. 2935.20 also grants similar rights with penalties provided for violations. It should be noted that this section provides for communications by telephone.

Once a statutory right to counsel has been enacted by a legislature, a violation of the statute violates the due process clause of the Fourteenth Amendment. The sanction for such

a violation is exclusion of such statement thus obtained. <u>See</u>, <u>State</u> v. <u>Scarlett</u> (Sept. 3, 1987), Montgomery County App. No. 10378, unreported.

Pursuant to R.C. 120.16(F), information as to the right of legal representation by the county public defender should have been given to the Appellant immediately upon his arrest, which was shortly after 12:00 noon on Monday, September 16, 1985. Presumably, that is the time that the Appellant was actually arrested, although Detective Thomas Stewart stated to the Appellant that he was going to be detained, and it was in regard to the Fife homicide. At no time prior to that during the Appellant's interrogation at the Warren Police Department on Monday, September 16, 1985 was he ever informed of his right to legal representation by the County Public Defender or assigned counsel; however, assigned counsel would refer to a county in which an assigned counsel system is in operation. In this county, the public defender system is in place and has the duty and responsibility to represent persons who qualify; however, the statute is even more broad in that it does not require any prequalification of a person's financial status, and that is only to be determined initially by a county public defender. The Trumbull County Public Defender's Office has staff personnel who are in the Warren Municipal Court daily, and they have previously placed the Warren Police Department on notice of the requirements of Ohio Revised Code 120.16 regarding the information that should be given to an arrested person, Exhibits 1 and 2, attached hereto. Therefore, the tape recorded statement and the video

90

tape statement and any and all evidence stemming therefrom should be suppressed and ruled inadmissible because the Appellant did not knowingly and competently waive his right to legal counsel, law enforcement authorities denied the Appellant legal counsel by preventing Appellant's mother from immediately retaining legal counsel, and by failing to inform Appellant to the right of legal representation by the county public defender, pursuant to R.C. 120.16, 2935.14, and 2935.20.

> 6.    Noncompliance with R.C. 2935.05 results in an illegal arrest, and any statements and/or evidence derived therefrom should be suppressed.

The tape recorded statement and the video tape statements should be suppressed and ruled inadmissible as a result of an illegal arrest of the Appellant by virtue of the noncompliance with R.C. 2935.05 and 2935.07.  R.C. 2935.05 entitled, "Affidavit Filed in Case of Arrest Without a Warrant" provides as follows:

> When a person named in Section 2935.03 of the Revised Code has arrested a person without a warrant, he shall without unnecessary delay take the person arrested before a court or magistrate having jurisdiction of the offense, and shall file or cause to be filed an affidavit describing the offense for which the person was arrested.  Such affidavit shall be filed either with the court or magistrate, or with the prosecuting attorney or other attorney charges by law with the prosecution of crimes before court or magistrate and if filed with such attorney, he shall forthwith file with such court or magistrate a complaint based on such affidavit.  (Emphasis added.)

R.C. 2935.07 entitled, "A Person Without a Warrant Shall Be Informed of Cause of Arrest" provides in pertinent part:

When an arrest is made without a warrant by an officer, he shall inform the person arrested of such officer's authority to make the arrest and <u>cause of the arrest</u>. (Emphasis added.)

In the instant case, the Appellant was formally arrested by Detective Thomas Stewart of the Warren Police Department on Monday, September 16, 1985 at approximately 12:30 p.m. According to testimony of Detective Stewart, at approximately 12:30 p.m. on Monday, September 16, 1985, after the tape recorded statement, he stated to the Appellant that the Appellant was going to be "detained" and that the reason for him being detained was "in regard to the Fife homicide." Pursuant to R.C. 2935.05, Detective Stewart, when he placed the Appellant under arrest, at 12:30 p.m. on Monday, September 16, 1985, was required to take the Appellant before a magistrate without unnecessary delay and cause to be filed an affidavit describing the offenses for which the Appellant was arrested. Obviously, as of 12:30 p.m on a Monday, the Municipal Court of Warren and the Court of Common Pleas which had jurisdiction over these matters, were open and accessible to Detective Stewart during the afternoon on Monday, September 16, 1985 and the morning of Tuesday, September 17, 1985. It was not until approximately 1:00 p.m. on Tuesday, September 17, 1985, at which time Officer Stewart caused to be filed affidavits charging the Appellant with particular offense and having him appear before a magistrate. Thus, the Appellant was held incommunicado for more than 24 hours after having been arrested and not brought before a magistrate or affidavits filed

92

specifying the offenses for which the Appellant was originally arrested on Monday, September 16, 1985 at 12:30 p.m.

Additionally, Detective Stewart failed to adequately inform the Appellant of the charges for which he was being detained and arrested. Obviously, Detective Stewart never indicated any particular criminal offense for which the Appellant was being held; however, he just said it was in "regard to the Fife homicide". Additionally, it should be noted that at the time Detective Stewart indicated to the Appellant that he would be detained, he left the room and went to confer with Attorney Dennis Watkins, who is the prosecutor of Trumbull County. If Detective Stewart was in any doubt as to what the charges would be, it seems likely that as a result of the conference with Attorney Watkins at that time, that he would be able to specify the particular offenses for which the Appellant was being held. Clearly, by Monday, September 16, 1985, the office of the Prosecuting Attorney and the Warren Police Department were well aware of the criminal acts which were perpetrated upon the young victim of the crime. The Appellant at that point in time had already indicated the facts regarding the incident on the tape recorded statement. On the other hand, even though the Appellant is mild or borderline mentally retarded and essentially illiterate, it is entirely possible that once Detective Stewart would have indicated to him that he was going to be charged with rape, robbery, felonious sexual penetration, arson, kidnapping, and murder, it is conceivable that something would have clicked in the mind of the Appellant to alert him that these were not

necessarily his friends and they were not looking out for his best interests.  So, in order not to upset the apple cart and to proceed unproblematically into the video tape, it was consciously agreed not to really inform the Appellant of any of the particular and specific offenses for which he was being held and and would be charged.  On the other hand, since the Appellant had previously asked and tried to leave the Interrogation Room No. 1 where he was custodially detained, and such a request was previously ignored and denied earlier, the Detectives, in order to justify and make legal his detention, technically placed him under arrest.  Obviously, the use of the words "technical arrest" refers to the manner in which it was done by utilizing the word "detained" and by failing to inform the Appellant at the time of the specific cause for his detention by specifically and particularly describing the offenses for which he is being held and would be charged.  In the case of State v. Fairbanks, the Supreme Court of Ohio held that for probable cause to exist for an arrest by a police officer, the failure to notify the accused of the cause of his arrest does not render the arrest illegal, if he is notified of the offense with which he is charged soon after he is taken into custody.   (1972), 32 Ohio St.2d 34.   In Fairbanks, the defendant was arrested as a result of probable cause existing when the police officers visibly observed the defendant, who was a convicted felon, throwing away a .22 caliber pistol, which the police recovered, and the police having probable cause regarding the commission of a felony, immediately placed the defendant under arrest and took him to the police

94

department. Soon thereafter, law enforcement authorities caused to be filed a complaint charging the defendant with a crime. In the meantime, while the defendant was under arrest for that particular offense actually physically observed by the police officer, he was questioned in regard to a number of homicide incidents. The defendant unsuccessfully argued that at the time of his arrest, he was not informed of the cause of his arrest; however, the court found that the defendant, after being placed in custody, was very soon thereafter charged with the crime. In the meantime, as a result of his arrest for discarding the .22 caliber weapon, he was also questioned in regard to the homicides for which, at the time, it was debatable whether probable cause existed for his detention; however, the court ruled that the defendant was not prejudiced even though he was not informed of the cause of his immediate arrest when the affidavit charging him with possession of the .22 caliber weapon was filed and warrant issued thereafter upon return to the station. Therefore, the court ruled, basically, that even though the defendant was not technically advised of the cause of his arrest, that technical error was corrected by virtue of the fact that an affidavit and warrant was issued immediately upon return to the police department and there was no prejudice to the defendant.

However, in the instant case, the stiuation is otherwise. Although the law enforcement officers knew at approximately 12:30 p.m., on Monday, September 16, 1985, that there was probable cause for the arrest and made the arrest, they

failed to inform the Appellant of the reason or cause for his arrest. R.C. 2935.07 requires law enforcement authorities to at least specify the nature of the crimes for which the person is arrested. In the instant case, it is apparent from the testimony adduced at the suppression hearing that Detective Stewart, in conjunction with his conferences with the Trumbull County Prosecutor, was well aware of what the charges would be in regard to the arrest that was made of the Appellant at 12:30 p.m. on September 16, 1985. However, it is also apparent that the arresting officer, Detective Stewart, failed to specifically or particularly inform the Appellant of the cause of his arrest by specifying even in a general nature the charges for which the Appellant was arrested and what would be filed against him. To utilize such a ploy of failing to inform the Appellant of the nature and the specific offenses and charges for which he was being arrested, they left the Appellant totally ignorant of the potential consequences regarding any further cooperation and talking with law enforcement authorities.

A person arrested in the State of Ohio without a warrant cannot be held in custody for any longer than is reasonably necessary to obtain a warrant for his detention. Johnson v. Reddy (1955), 163 Ohio St. 347; Leger v. Warren (1900), 62 Ohio St. 500. Additionally, in the case of In re Thompson, the court held:

> Rather than the old inflexible 72 hour rule, this court is suggesting a flexible 12 hour rule. Every suspect, arrested without a warrant without charges having been filed against him, must, within 12 hours of the arrest, be either formally charged, taken

before a magistrate for his initial
appearance and given the opportunity to have
bail set or released.  This rule would apply
whenever the suspect may be arrested -- day
or night, weekday, weekend, or holiday.  Such
is no less than is required by the United
States Constitution and Ohio law.

It is not sufficient that an affidavit be
filed on a warrant issued thereon within the
12 hour period of time.  In addition, to
fully comply with the law, the suspect must
be brought before the judge or magistrate
having jurisdiction of the offense within the
period of time stated above (1974), 4 Ohio
Op. 3d 359, 362.

It is evident that there were no facts and circumstances
that would have prevented Detective Stewart, after arresting the
Appellant, to cause to be filed the appropriate affidavits
and warrants issued and to have the Appellant brought immediately
before a magistrate of court of jurisdiction.  Further, it is
equally apparent that, under the facts and circumstances,
the arresting officer was in a position, after conferring with
the prosecuting attorney and having the evidentiary background of
the case and hearing a statement given by the Appellant, to fully
inform and advise the Appellant of the offenses for which he
was being arrested and would be filed against him, i.e.
rape, kidnapping, arson, felonious sexual penetration, robbery,
and aggravated murder.

7.  When statements are made by an accused to law
enforcement officers under the impression of receiving leniency
or some other benefit, then those statements are inadmissible in
any later trial.

It is submitted to this Court that any statements attributed
to the Appellant which were made to law enforcement officers were
made during the course of plea bargaining negotiations and are

97

therefore inadmissible.  The Appellant was induced to make statements to detectives of the Warren Police Department in the hope (which was encouraged, if not instigated by law enforcement officers) of receiving some leniency or other consideration in this matter.

In _United States_ v. _Geders_, the court had an occasion to express its opinion on the admissibility of statements made by a defendant to an Assistant United States Attorney, during the court of a plea bargaining process. (C.A. 5th Cir. 1978), 566 F.2d 1227.  In reaching the conclusion that the defendant's statements were inadmissible, the court noted that:

> When the government and the defendant discuss criminal activities, each side entertaining the desire to receive a quid pro quo, the government does so at its own risk, the statements made by the Defendant will not be admissible against him at trial.

_Id_. at 1231.  Furthermore, the court answered the contention of the government that plea bargaining had not commenced when the defendant made his statements, noting:

> [T]o hold that statements made by a Defendant during a meeting with government officials are plea related only if the Defendant actually offers to enter a plea could encourage the 'shouted offer to plea 'only' after the horse is out of the barn.' . . . . More importantly, such a holding would elevate form over substance.

_Id_.

No hard and fast standard can be imposed on determining when the plea bargaining process is initiated.  As can be seen from a cursory reading of _Geders_, the commencement of "the plea bargaining process is not to be determined according to

hypertechnical distinctions" since a defendant is not required to "accompany all admissions with a 'preamble explicitly demarcating' the beginning of plea discussions." Id. at 1230. Hence, the commencement of plea bargaining discussions is to be determined liberally in favor of a defendant and most strongly against the State. In State v. Davis, that court reiterated that point in also holding that statements made during plea negotiations may not be introduced into evidence. (1980), 70 Ohio App. 2d 48.

In the case at hand, the Appellant is mentally retarded and essentially illiterate. Repeatedly, detectives from the Warren Policy Department informed the Appellant that Timothy Combs, an eventual co-defendant, was in the next room or on his way down to talk first. In fact, during cross examination, Detective Steinbeck admitted that he told the Appellant that if he talked, he would benefit from it, otherwise Combs would blame him for everything. Therefore, any statements elicited from the Appellant under these circumstances should have been suppressed.

## SECOND ASSIGNMENT OF ERROR

The trial court erred in the admission of "other acts" testimony. (Tr. 683-684; 1021-1022; 1046.)

> The admission of other crimes, wrongs, acts, or acts into evidence by the trial court violated R.C. 2945.59, Evid. R. 404(B) and the due process clause of the Fourteenth Amendment to the United States Constitution to the prejudice of the Appellant thus requiring reversal.

Evid. R. 404(B) provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule of evidence is codified in R.C. 2945.59 which provides:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

The Ohio Supreme Court, per Judge Ford of this district, recently held in its syllabus the following:

> 1. Evidence of other acts of a defendant is admissible pursuant to R.C. 2945.59 only when

*Omitted*

> it tends to show one of the matters
> enumerated in that statute and when it is
> relevant to prove the defendant's guilt of
> the offense in question.
>
> 2. Although violations of the rules of
> evidence during trial, singularly, may not
> rise to the level of prejudicial error, a
> conviction will be reversed where the
> cumulative effect of the errors deprives
> a defendant of the constitutional right to
> a fair trial.

State v. DeMarco (1987), 31 Ohio St. 3d 191. The court cited

with approval the language of State v. Burson:

> Nowhere do the words "like" or "similar"
> appear in the statute. Prosecutors and trial
> courts should be particularly aware that
> evidence of other acts of a defendant is
> admissible only when it "tends to show" one
> of the matters enumerated in the statute and
> only when it is relevant to proof of the
> guilt of the defendant of the offense in
> question. Such evidence is admissible, not
> because it shows the defendant is crime
> prone, or even that he has committed an
> offense similar to the one in question, but
> in spite of such facts.

(1974), 38 Ohio St. 2d 157, 158 (emphasis by court). See also,

State v. Heckter (1969), 19 Ohio St. 2d 167.

R.C. 2945.59 is to be strictly construed against the State.

DeMarco (1987), 31 Ohio St. 3d 191. Trial courts should not only

be very conservative in applying this evidentiary exception, but

they have previously been cautioned against overbroad uses of

this statute to admit otherwise inadmissible evidence. Id.

Therefore, there are three types of scenarios where such

"other acts" evidence may be admissible against a defendant. The

first situation that such evidence may be admissible is to show

proof of motive or intent.   In <u>State</u> v. <u>Moore</u>, the Ohio Supreme

Court stated:

> Such section, permitting the introduction of
> evidence of "like acts or other acts"
> permitted by a defendant, to show an intent
> or motive for committing the offense with
> which he is charged is declaratory of the
> common law perhaps in a broader form.  To be
> admissible, testimony offered under the
> statute must show acts so related to the
> offense for which the defendant is on trial
> that they have a logical connection therewith
> and may reasonably disclose a motive or
> purpose for the commission of such offense.

(1948), 149 Ohio St. 226, 229.  The court explained this legal

principal by citing a quote from <u>Brown</u> v. <u>State</u> where it was

held:

> While the general rule unquestionably is,
> that a distinct crime, in no way connected
> with that upon which the defendant stands
> indicted, cannot be given in evidence against
> him on the trial, this rule is not applicable
> to a case in which it is clearly shown that a
> connection, in the mind of the defendant,
> must have existed between the offense charged
> in the indictment and others of a similar
> nature.  When such connection exists,
> evidence of such other offense is admissible
> not for the purpose of raising a presumption
> of guilt on the hypothesis that a man commits
> one crime will probably commit another, but
> for the purpose of showing a motive or
> purpose prompting the commission of the
> offense laid in the indictment; and being
> competent for this purpose, it could not have
> been properly excluded on the ground that it
> tended to prove the commission of other and
> distinct offenses.  (        ), 26 Ohio St.
> 176, 181.

Clearly, there has been no showing in this case that the

"other acts" that the State sought to prove that the Appellant

had committed show any type of motive for the crime alleged in

the indictment.  The other incidents are not contemporaneous with

or logically connected with the allegations set forth in the indictment.  Neither is the issue of intent addressed by the admission of the "other acts".

Second situation in which this type of evidence may be admitted is that dealing with an attempt by the State to prove absence of mistake or accident on the part of the Appellant in the commission of the allegations.  Such an issue was never raised during the course of the trial, and therefore is not pertinent for discussion here.

The third situation for which such evidence may be admissible is to prove the defendant's scheme, plan or system in doing an act.  One of two factual situations must arise in order for "other acts" testimony to be admissible.  The court addressed these two scenarios in State v. Curry. (1975), 43 Ohio St. 2d 66. In Curry, the court stated that the first situation in which such evidence may be admissible is that:

> In which the "other acts" form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment.  In such cases, it would be virtually impossible to prove that the accused committed the crime charged without also introducing evidence of the other acts. To be admissible pursuant to this sub-category of "scheme, plan or system" evidence, the "other acts" testimony must concern events which are inextricably related to the alleged criminal act.

Id. at 73.  These "incidents" are chronologically and factually separate occurrences.  No evidence was presented at the trial of this matter to show any acts that are intricately related to those acts set forth in the indictment.

Secondly, identity of a perpetrator of a criminal act is the second factual situation for which this type of evidence may be admissible. As stated in <u>Curry</u>:

> One recognized method of establishing that the accused committed the offense set forth in the indictment is to show that he has committed similar crimes within a period of time reasonably near the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and other crimes.

<u>Id</u>. at 74. (further citations omitted). As in the <u>Curry</u> case, identity was not the issue, but what conduct was attributable to the Appellant. Thus, such admissions as herein were not proper under this theory.

Three "other acts" were admitted into evidence against the Appellant. Two of these acts seemed to involve prior allegations of delinquency involving complaints of rape that occurred in February or March of 1984. Such evidence, in the form that it was presented, needs none of the criteria set forth above for the possible admission of such evidence. As for the other situation that was admitted into evidence concerning a possible allegation of "something", the record is very scant as to whether or not anything even occurred never mind any relevancy it has to any of the issues set forth.

Furthermore, Evid. R. 403 states:

> (A) <u>Exclusion Mandatory</u>. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

In the case at hand, not only did the trial court admit this evidence improperly, but allowed the State to argue vehemently and continuously at the horrible nature of the prior acts as the focus of the trial court no longer was on the issues of the indictment, but on the issues of the prior acts. This is further accentuated by the fact that one of the acts introduced into evidence was not even known to the Appellant until during the course of the case which is no proper time to deal with it as a legal issue. While the court stated that it would grant reasonable time for a continuance in order to investigate the situation, this was done so only after such evidence had been heard by the court. As was shown by the evidence presented by the Appellant, the third "other act" was very unclear as to whether it even happened, never mind whether it was even relevant. The prejudicial effect of its admission clearly outweighed any relevance it may have. In addition, the defendant was put in a posture of having to defend himself against the "other act" as well as defending himself against the allegations set forth in the indictment.

This predicament is clearly is what R.C. 2945.59 is designed to prevent. The admission into evidence of these "other acts" seemed to be solely for the purpose of inflaming the three judge panel as the State would continuously argue throughout the trial that the defendant was a "animal", not whether or not he was guilty of the charges set forth in the indictment. The

cumulative effect of each admission and the ramifications of such admission clearly prejudice the Appellant in this matter necessitating nothing short of a reversal in this case.

## THIRD ASSIGNMENT OF ERROR

The trial court improperly admitted certain evidence. Tr.96, 418, 1049.

> A trial court must exclude evidence that is either not relative, or its relevance is outweighed by its prejudicial effect or such evidence is solely introduced to influence the court. The effect of the erroneous evidentiary rulings was the denial of Appellant's right to due process and fair and impartial trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

Evid.R.401 allows for the admission of any relevant evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. This general rule is tempered by Evid.R.403 which states:

Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.

(A) Exclusion mandatory.

Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) Exclusion discretionary.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

1. <u>The Hughes comment</u>.

Following the direct examination of Raleigh C. Hughes, an ambulance attendant that was at the scene of the homicide and saw

the body, was allowed to testify that what he saw was "one of the most gruesome things I've ever seen." (Tr.96). Testimony of this nature had no bearing on the evidence in this case. This comment was illicited to inflame the passion of the three judge panel as part of the continual effort to shift the focus of this case from facts that could be proven to the horrible nature of the crime and the Appellant's character. These type of comments permeate the entire record from opening statement to closing argument. See e.g.; Tr.6, 335, 418, 702, 1168-1170, 1173-1175.

2.  Exhibit 47, the "stick".

Exhibit 47 is a "stick" similar in appearance to a broken off broom handle which was found six feet off the N.E. of the path leading off Willow Drive. (Tr.132). Donald Allgood testified that he saw the Appellant flick something into the brush, but was unsure what it was. (Tr.461). In fact, this information was not even mentioned in this witness' first statement. (Tr.457). Based upon this information, Detective Teeple, along with others, searched a five hundred square foot area. (Tr.131). Exhibit 47 was found in this area. (I.d.)

It was Appellee's contention that this "stick" was the circular and pointed object that penetrated the deceased's rectal area and bladder. (Tr.359). However, Dr. Adelman could not state with any degree of medical certainty that Exhibit 47 was the object. (Tr.408). In fact, he testified that a tree limb would also be consistent with the injury. (I.d.) In terms of the foreign matter that was found in the tissue, Dr. Adelman

testified that it consisted of plant material which was similar in nature to Exhibit 47 or any other piece of wood. (Tr.427). Upon the trial court's questioning, the doctor admitted that the cellular formation he found in the tissue could not be specifically matched with any wooden object in particular. (Tr.428-430). Larry Dehus, a criminologist and forensic science analyst, testified that material found in the tissue could be consistent with things other than wood since other things were made up of cellular plant material. (Tr.774).

James Wurster testified that the stick was tested for blood and the test result was negative. (Tr.611). Mr. Dehus stated that if Exhibit 47 was the object in question, then it was more likely than not that blood should have been detected. (Tr.780). Appellee contended that any blood that was on Exhibit 47 would have washed away in the rain that occurred. This reasoning ignores the fact that the "stick" was covered with dirt and discoloration which should have been washed away under this theory. (Tr.620). Also, there was testimony that if Exhibit 47 was the object, blood would have been absorbed and remained in the "stick". (Tr.780).

Therefore, Exhibit 47 had no probative value in this case and should not have been admitted into evidence. Even if there was any relevance to this exhibit, it was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

3. **Dr. Adelman's testimony concerning asphyxia as a sexual overtone and to enhance sexual orgasms.** (Tr.418).

This testimony by Dr. Adelman was not of any probative issue involved in this case. Furthermore, there was an insufficient basis for this testimony. There was not testimony presented that this scenario ever happened. For these reasons, Appellant's objection to this testimony should have been sustained.

## FOURTH ASSIGNMENT OF ERROR

The trial court erred in admitting Exhibit 47, a "stick."

(Tr.1049).

> It is error for a trial court to draw an influence from anther inference because the foundation of the second inference is so insecure that reliance upon it would result in an inferred fact which is merely speculative in nature.

It is well settled law that:

> An inference of fact cannot be predicated upon another inference, but must be predicated upon a fact supported by evidence.

Sobolovitz v. Lubric Oil Co. (1923), 107 Ohio St. 204.  The court

further elaborated upon permissible inference by stating:

> An influence presupposes a premise from which it is deduced, and, as applied to evidence, the premise is some proven fact.  The inference arises out of a process or reasoning or from common experience, that when certain facts exist, certain other facts usually co-ordinate therewith, but we find no authority for basing an inference upon an inference.

I.d. at 208-209.

The initial inference involving Exhibit 47, is that it is

the "stick" that Donald Osgood saw and to some other object,

assuming he actually saw it at all.  The second inference based

on that inference is that the "stick" is the object that

penetrated the deceased.  It has been earlier discussed that

these serious descrepancies even to he value of this exhibit.  To

further compound this exhibit's lack of value is the stacking of

inference.  As such, Exhibit 47 should never have been admitted

111

into evidence to the prejudice of the Appellant thus depriving him to a fair and impartial trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

## FIFTH ASSIGNMENT OF ERROR

The right to confront witnesses was violated.  (Tr. 1017-1022; 1126-1127.)

> An accused's right to confrontation is violated when a prosecutor consults with an important witness while that witness was subject to recall and was a suprise witness of which defense counsel had no prior knowledge.

The right to cross-examine witnesses is a fundamental right guaranteed by the United States Constitution and applicable to the states.  Pointer v. Texas (1965), 380 U.S. 400.  Likewise, the Ohio Constitution independently provides for the same protection.  See, Section 10, Article I, Ohio Constitution.

The United States Supreme Court has held:

> It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop.  Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.  To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.

Alford v. United States (1931), 282 U.S. 687, at 692 (further citations omitted).  See also, Smith v. Illinois (1968), 390 U.S. 129.

113

In the case at hand, the state called Stephen Melius to the stand suddenly in the middle of the trial without prior disclosure to the Appellant. (Tr.1017-1021). An objection to this witness' testimony was overruled. (Tr.1022). However, trial court stated that it would order that the witness remain in the county and available for further cross-examination. (Id.) After the prosecutor examined this witness, the Appellant did some initial cross-examination. Subsequently, the Appellant was able to investigate this witness' testimony. Upon recalling Stephen Melius to the stand, it was quite apparent that the witness' potential further testimony had been thoroughly reviewed with the prosecutor. (Tr.1126-1127).

The right to confrontation is violated, and reversal is required, when cross-examination is improperly limited in a manner that is equivalent to a denial. Davis v. Alaska (1974), 415 U.S. 308. The issue raised herein is more delineated. It was error for the trial court to effectively deny full cross-examination of a crucial prosecution witness.

This issue is similar to that raised in State v. Prater (1983), 13 Ohio App. 3d 98. In that case, a recess was taken during the course of a cross-examination. Upon resumption of trial, it was clear that the prosecutor had "refreshed" the memory of the key prosecuting witness by reviewing with the witness a transcript of her testimony at the preliminary hearing. This discussion was held despite a court order that the witness not discuss her testimony with anyone during the recess. The court stated:

> quite properly, the prosecutor may prepare his witnesses and review the expected testimony <u>in advance of trial</u>, so as to insure an orderly and coherent presentation of his case.
>
> However, the prosecutor cannot use trial recesses to "coach" or otherwise "rehabilitate" his witnesses <u>before defense counsel has finished his cross-examination</u>.

<u>Id</u>. at 101.  The court, however, did not reverse the case because in reviewing the entire testimony, there was no showing of prejudice.

It is Appellant's contention that the necessary showing of prejudice can be presumed from the facts herein.  The conduct of the prosecutor in the handling of this witness should not be condoned.  This conduct only reinforces the Appellant's contention that the state was attempting to direct the court's attention to collateral materials and not on the factural issues involved in this case.  Such conduct should not be condoned.

The fair administration of justice should likewise be held to condemn this type of procedure.  As stated in <u>Prater</u>, the prosecutor's duty is not to "win the case" but "to see justice is done and the truth elicited".  13 Ohio App. 3d at 101.  In a slightly different context, the court, in <u>State</u> v. <u>Banks</u>, noted that "[t]he trial of a murder case is not a 'game' or a 'battle of wits' between counsel."  (April 26, 1986), Franklin County App. No. 85AP-391, unreported.  Any interference in the effective cross-examination of this witness violated the confrontation clauses of both the United States and Ohio Constitutions.

## SIXTH ASSIGNMENT OF ERROR

The trial court erred in denying the Appellant's motion to include licensed drivers in the pool of prospective jurors. (Tr.d.100).

> It is a denial of an accused's right to a fair cross-section of the community by denying a request for inclusion in that pool of prospective jurors licensed drivers pursuant to R.C. 2313.08(B) in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.

The Appellant is entitled to a jury selected from a jury array which was chosen from a fair cross-section of the community. Duren v. Missouri (1979), 439 U.S.357.

The jury array from which Appellant's jury was selected was drawn from Trumbull County's voter registration list. Appellant contends that this voter registration list does not adequately reflect a fair cross-section of this community.

Reliance on voter registration lists does, as a general proposition, exclude distinct groups from the pool of potential jurors. Two attorneys with experience in this area have stated that:

> The sole use of voter registration lists will result in a prospective juror list on which males, whites, the middle-aged, and the better educated are disproportionately over-represented.

Dogin and Tevelin, Jury System of the Eighties:  Toward a Fairer Cross-Section and Increased Efficiency, Toledo L. Rev. 944 (1980). Census Bureau statistics support this observation. Blacks, for example, were underrepresented by 9.4% on voter registration lists in the November, 1972 elections, and by 11.7% in the November, 1974 election.  Persons of Spanish origin were

116

underrepresented by 38.6% in 1972, and by 43.9% in 1974. Additionally, all age groups from 18 to 34 were underrepresented in both election years, and those who had completed one to three years of high school without graduating were underrepresented by 12.9% in 1972, and 12.7% in 1974. Kairys, Kadane, and Lehoezky, Jury Representatives: "A Mandate for Multiple Source Lists," 65 Cal. L. Rev. 776 (1977). Moreover:

> (A) recent study of federal juries selected solely from voter registration lists confirms that 'systematically underrepresented groups include females, racial minorities, those with less education, younger persons and those with low status occupations.' Corp., 'Federal Grand Juries: How True a Cross-Section of the Community'," 7 The Justice System Journal, No. 2 (1982).

Appellant contends that the groups underrepresented are blacks, poor people, and those with low status jobs, as there is no reason to believe that Trumbell County is substantially different from the rest of the nation in this regard.

Pursuant to the authority of 2313.06 and Ohio Revised Code 2313.08, the pool from which potential jurors are selected is obviously expanded beyond the more confined pool which includes only those electors certified by the Board of Elections pursuant to Ohio Revised Code 2313.06. Obviously, whether an individual is registered to vote or not does not have anything to do with his qualification to serve as a juror. Prior to the revision of Ohio Revised Code 2313.06 and Ohio Revised Code 2313.08, both effective October 1, 1984, the only source for a pool of jurors from which a jury list was complied was from the list of qualified electors compiled by the Board of Elections of each

county.  In the revision of the foregoing statute, it is obvious that legislature intended to expand upon the number of citizens who, although qualified to sit as a juror, were simply not included by virtue of the fact that they were not on the list of qualified electors compiled by the Board of Elections and filed with the Commissioners of Jurors of each county.  As a result, a significant number of people within our community, although qualified as jurors, are not called upon to serve by virtue of the fact that they are systematically excluded by the process of compilation of the jury pool.  Obviously, by exclusively deriving potential jurors from a list and pool of jurors compiled only of qualified electors registered to vote, a significant portion of the community population was excluded from potentially serving on jury service.  However, since the revision of Ohio Revised Code 2313.06 and Ohio Revised Code 2313.08, the list and poll of names from which the venires can be drawn is expanded to more fairly represent the community and to get a cross-section of those who reside within the confines of this county.

In the past, it would appear that the use of the poll list certified by the Board of Elections was exclusively utilized only because of its accessibility and lack of expense in compilation. However, with the advent and use of modern computer systems the compilation of lists of selected groups of individuals is simplified and economical to prepare.  Such is the case regarding the list of licensed drivers within any one county who would be qualified to vote is registered.  Contact with the Bureau of Motor Vehicles by Counsel indicates that within two weeks such a

list is available to Trumbull County in either printed form or as magnetic tape for computer use.  The utilization of such driver license lists as provided by the Bureau of Motor Vehicles does not appear to be difficult to integrate with the current computerized selection process of jury pool lists currently compiled by use of Trumbull County's Auditor's computer system under contract with the Board of Elections.

Out of an approximate population of 240,000 people, there are currently approximately 125,000 registered voters in Trumbull County.  Of the remaining 115,000, some of which would not be qualified electors, such as persons under the age of 18, there is still a significant segment of the population within the community who are excluded from jury service solely because they do not appear on the list of electors from the Board of Elections. By virtue of the exclusive use of poll lists, there is an overrepresentation of white male and female persons of late middle age to elderly; whereas, there is an underrepresentation of both white and black male and female persons from eighteen (18) years old to early middle age.  Therefore, within the large group of persons, although qualified to vote, who are not registered to vote, there exists distinctive subgroups which are not adequately represented on venire in relation to the number of such persons in the community.

Perhaps the exclusion of non-voters containing the distinctive subgroups referred to above was justified in the past based upon the nonavailability and inordinate expense of compiling comprehensive lists; however, as presently constituted,

Ohio Revised Code 2313.06 and Ohio Revised Code 2313.08 authorize and contemplate the drivers license lists be used to draw jury pool lists. At this juncture, the arbitrary refusal to utilize the drivers license lists provided for that purpose, would appear to be unwarranted and a direct infringement upon the Appellant's Sixth Amendment right to have a fair cross section of the community.

In <u>Duren</u>, the Court prescribed the test whereby it could be determined whether the "fair cross section" requirement has been violated:

1. The group alleged to be excluded is a "distinctive" group in the community.

2. Representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such person in the community; and

3. Defender representation is due to systematic exclusion of the group in the jury selection process.

439 U.S. at 364.

Applying the foregoing criteria to the instant case, the group excluded within the community is "distinctive" since it is composed of persons who, although qualified to register to vote, have not, and is comprised of subgroups referred to above. The second criteria is met by virtue of the fact that the foregoing person as a "distinctive" group were not originally included in the pool of potential jurors from which the jury lists were compiled, although they reside within the country. Obviously, these people are not represented in any of the venires drawn from which juries are selected, yet there are a significant number of such persons residing within the community. As for the third

120

criteria, it is equally obvious that this under-representation, which in fact was no representation at all as to non-voters, was due to a systematic exclusion by virtue of the fact that the jury list consisted solely of qualified electors certified by the Board of Elections of the County.

Obviously, with the revision of Ohio Revised Code 2313.06 and 2313.98, legislature intended that the pool of potential jurors be expanded and that a more fair representative cross section of the community be called upon to serve as jurors.

The California Supreme Court has held that the use of voter registration lists for random selection of jury pools was constitutionally invalid. People v. Harris (1984), 36 Cal. 3d 36, 679 P.2d 443.

Ohio Revised Code Section 2313.08(B) allows the jury commission to use either a list of the electors, or a combined list of electors and the list of qualified drivers. The use of the combined voter registration list and the driver's license list would substantially correct the unconstitutionality of the current system. In Re Rhymes (Cal. Ct. App. 2d Dist., 1985) 37 Cr. L. 2459. See also, IV Center for Jury Studies Newsletter 6 (No. 1982) of the National Center for State Courts.

The trial court erred in overruling Appellant's motion, and his conviction and sentence should be reversed.

### SEVENTH ASSIGNMENT OF ERROR

The trial court erred in allowing the Appellant to waive his right to jury in writing pursuant to Crim. R. 23. (Tr.d. 103-104).

> It is a violation of an accused right to jury trial guaranteed by the sixth and fourteenth amendments to the United States Constitution and Article I, Section 10 when the court does not determine on the record, specifically addressing an accused, whether he has knowingly, intelligently, and voluntarily waived his right to a jury trial.

Crim. R. 23 provides that an accused may knowingly, intelligently, and voluntarily waive his right to a jury trial in writing. Furthermore, R.C. 2945.05 provides that such waiver "shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof." It is the Appellant's contention that this waiver should be treated like it was a waiver and plea pursuant to Crim. R. 11(C), especially in light of the special factual situation that existed in this case.

In State v. Kehoe, the syllabus of the court states:

> A jury waiver signed by the defendant's attorney and filed prior to trial in a serious offense case does not constitute a knowing, intelligent and voluntary waiver by the defendant of defendant's constitutional right to trial by jury where there is nothing in the record showing that the defendant received a fully explanation of, and understood, his right to trial by jury. Crim. R. 23(A).

(1978), Ohio App. 2d 315. In State v. Morris, the defendant signed a jury waiver, and was very briefly addressed by the trial court concerning the waiver. (1982), 8 Ohio App. 3d 12. Upon the later challenge of that waiver, the court held:

> While the trial court may pursue a detailed examination of the defendant to satisfy itself that the defendant is fully apprised by his right to a jury trial, such an extended interrogation is not required. The Criminal Rule and the Revised Code are satisfied by a writing signed by the defendant himself and filed with the court. Unlike some jurisdictions, Ohio does not require that the court personally inform the defendant of this right or make direct inquiry of the defendant as to the voluntariness of his waiver.

Id. at 15. (Footnote omitted.) See also, State v. Griffin (1983), 13 Ohio App. 3d 376 in footnote 6 of Morris, the court listed the numerous states where this is required.

In the case at hand, the trial court had already determined that the Appellant was mentally retarded and essentially illiterate. Furthermore, the Appellant's signature on the waiver not only is hardly legible, but appears misspelled. Under the facts of this case, the trial court should have addressed the court personally to determine if such a waiver was signed knowingly, voluntarily and intelligently. Unlike those cases sighted above, this case is a capital case in which all of the Appellant's rights should be scrupulously honored.

(It should be noted at this point that there may be matters contained outside the record going to this issue that will be raised on post-conviction relief if such is necessary. It is raised here, in part, to preserve this issue to further review.)

123

## EIGHTH ASSIGNMENT OF ERROR

The trial court erred in denying the Appellant funds to employ an expert witness for a motion hearing. (Tr.d.80).

> It is reversible error for a trial court to deny an accused funds necessary to employ an expert for purposes of a motion for closure of pre-trial hearings that was necessary to preserve a fair and impartial jury pursuant to the fifth, sixth and fourteenth, of the United States Constitution and Article I, Sections 2, 10 and 16 and Article II, Section 26.

In the context of pretrial proceedings, closure is an effective means of ensuring an impartial jury, and consequently, a fair trial in accordance with the due process considerations, without unduly limiting the First Amendment rights to access.

Several state courts, faced with balancing the competing interests of the right of freedom of the press and the right to trial by impartial jury, have decided strongly in favor of preserving impartiality where the conflict occurs in pretrial proceedings. In People v. Elliot, (1960), 54 Cal.2d 498, the Court observed that closure was a fundamental safeguard to the accused designed to protect the right to an impartial and unbiased jury by preventing dissemination of pretrial testimony either by newspaper or other media. The court in People v. Pratt, (1967), 27 App. Div.2d 199, 278 N.Y.S.2d 89, upheld closure of a pretrial hearing where publication of testimony produced at the hearing produced a reasonable possibility of prejudice. In the case of Philadelphia Newspapers, Inc. v. Jerome, (1978), 478 Pa. 484, held that closure of pretrial hearings did not deny the press any clear right where the public interest in avoiding unfair trials was advanced.

124

The defense carries an evidentiary burden at a pretrial hearing in order to establish the right to closure.  In Ohio, justification for a restraint on the press must be evidenced by:

    (a)  the nature and extent of pretrial news coverage;

    (b)  whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and

    (c)  how effectively a restraining order would operate to prevent the threatened danger.

State ex rel. Chillicothe Gazette, Inc. v. Court of Common Pleas, (1982), 2 Ohio St.3d 24, quoting Nebraska Press Assn. v. Stuart, (1976), 427, U.S. 539.

Appellant requested a hearing in order to present evidence on this issue.  Obviously, such evidence can only be adduced through the use of expert testimony concerning the demography and social behavior of the community and media access thereto.  The only way to develop this type of information and evidence is through the employment of an expert sociologist and social psychologist.

The Supreme Court of Montana has dealt with this precise issue in a very important and highly relevant case.  State of Montana, ex. rel. Daniel Paul Smith v. District Court (1982), 654 p.2d 682.  That court made the following suggestion:

> In determining whether a 'clear and present danger' exists the Court suggests that the following facts might be considered:  (1) empirical evidence regarding the percentage of general population who read newspapers or who listen to other forms of media:  (2) statistics regarding the percentage of media readers/listeners who read or follow homicide or criminal stories; and (3) expert psychological testimony regarding the capacity of an individual to disregard pretrial publicity, which might include

<u>tainted evidence, when making an objective</u>
<u>determination of the facts upon completion of</u>
<u>a trial.</u>

<u>Id</u>. at 688.

Counsel was willing to make the necessary arrangements forthwith to employ said expert in an attempt to meet the burden of proof for the requested orders. The defense lacks only the funds to employ the expert. Various factors militated in favor of granting the defense funds to employ said expert.

Statutory support for appointment of an expert to testify on the issue outlined by the Montana Supreme Court is found in R.C. 2929.024 which provides in part that

> If the court determines that the defendant is indigent and that . . . experts . . . are r e a s o n a b l y   n e c e s s a r y   f o r   t h e proper representation of a defendant charged with aggravated murder at trial . . . the court shall authorize the defendant's counsel to obtain the necessary services for the defendant . . .

The Statute goes on to state that the court shall grant the funds to employ the expert. The new proposed Rule 65 of the Supreme Court Rules of Superintendence for Courts of Common Pleas also supports this proposition.

While it is true that the statute does not specifically provide for appointment at pretrial hearings, such services are nonetheless "reasonably necessary for the proper representation" of a defendant on trial for his life. The defense carries the evidentiary burden at pretrial hearings to establish the necessity of closure. The effect of rulings made at pretrial have as serious an effect upon the final determination of guilt as rulings made during trial. The statute implicity recognizes

that an indigent defendant should be provided at all times with the reasonably necessary means of obtaining proper representation. The decision of the Supreme Court of Montana illustrates that appointment in the circumstances of the case at bar is vitally necessary to the proper representation of a death-penalty defendant.

The goal of the statute is to ensure a fair trial independent of a defendant's economic status. This goal pertains to pretrial hearings as much as to trial itself. An arbitrary limitation based strictly upon statutory language, standing alone and without reference to its underlying purpose, should not thwart this goal. The statute should be construed to apply at pretrial hearings as well as at trial.

The appointment of an expert witness also receives support from the Sixth Amendment and Fourteenth Amendment of the United States Constitution and the Article I, Section 10 of the Ohio Constitution right to have compulsory process for obtaining witnesses in the defendant's favor. As the Supreme Court stated in <u>Washington</u> v. <u>Texas</u>. (1967), 388 U.S. 14.

> The right to offer the testimony of witnesses, . . . is . . . the right to present a defense . . . An accused . . . has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

If a death-penalty defendant is denied presentation of a necessary witness merely for the reason that he cannot afford one, he is in effect deprived of the right to establish a defense on the issue for which the testimony is requested. Here defendant seeks to establish through an expert witness the need

127

for closure of pretrial evidentiary hearings so that an impartial fact-finder can be preserved. The testimony of an expert sociologist or psychologist on the issue of the capacity of an individual to disregard pretrial publicity when making an objective determination of the facts is relevant, material, and necessary to the defense. Where an impartial fact-finder is not certain, the defendant's ability to establish a defense is threatened. Reasonable steps should be taken to ensure that this fundamental element of due process is maintained. As the Montana Court has shown, the appointment of the expert sociologist or psychologist is such a reasonable step.

The Fifth Amendment and the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution guarantee of due process also supports appointment for other reason. The defense is required to meet an evidentiary burden on the issue of closure of pretrial hearings. It would be incongruous with the guarantee of due process to impose this burden on the defendant and simultaneously to deny him the means of meeting this burden merely because of his economic status. Expert psychological or sociological testimony is necessary in order for the defense to meet the <u>Nebraska Press Association</u> burden. Without the aid of such testimony it would be impossible for the defense to produce objective and comprehensive evidence of the sort required to meet its burden. If an expert were not appointed, the burden on the defense would be insurmountable, and the imposition of a burden that by its very nature is impossible to meet violates due process.

Due process requires a fair opportunity to be heard, <u>New York Cent. Rd. Co.</u> v. <u>Public Utilities Commission</u>, (1952) 157 Ohio St. 257, (6th Cir. 1972); a meaningful hearing, <u>Gilday</u> v. <u>Board of Elections</u>, 472 F.2d 214; and hearing in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety, from the standpoint of justice and law, of the step asked to be taken. <u>State ex rel</u>, <u>Wright</u> v. <u>Morrison</u>, (1947). 80 Ohio App. 135.

In the case at bar expert testimony was needed for the Appellant to meet its burden. Expert testimony was available on the critical factual issues involved in closure. Denial of appointment would make a fair, meaningful hearing impossible. Without appointment, the Appellant was denied ample opportunity to make a fairly adequate showing of the propriety of closure from the standpoint of justice. Without the appointment of an expert witness in this case, the motion of due process was improperly denied.

Equal protection considerations of the Fourteenth and Fifth Amendments to the United States Constitution and Article I, Section 2 and Article II, Section 26 of the Ohio Constitution suggest the propriety of appointment of an expert sociologist and/or psychologist in this case. In <u>Griffin</u> v. <u>Illinois</u>, 351 U.S. 12 (1956), the plurality opinion noted that there can be no equal justice where the kind of trial one gets depends on the amount of money he has. While <u>Griffin</u> dealt specifically with the conditioning of appellate review on the availability of a

trial transcript, the principle embodied by the court's statement is essential to a viable and meaningful constitutional principle of equal protection. Equal justice is threatened in the situation where the impartiality of the fact-finder could vary according to the economic status of the defendant and his consequent ability to provide expert testimony on an issue directly determinative of that impartiality.

It may be true that equal protection does not require absolute equality or precisely equal advantages, but the state must assure the indigent defendant an adequate opportunity to present his claims fairly. Ross v. Moffitt, (1974), 417 U.S. 600. Appellant here does not seek all possible advantages, but only the opportunity to present crucial evidence necessary to the fair determination of the issue of closure.

Finally, the Sixth and Fourteenth Amendment of the United States Constitution and the Article I, Section 10 of the Ohio Constitution right to the effective assistance of counsel supports the Appellant's plea for the appointment of an expert witness. It has been recognized that a court order restricting counsel from fully assisting his client may result in a denial of effective assistance. Geders v. United States, (1976) 425 U.S. 80. While the facts of Geders vary from these of the case at bar, the underlying principle is sound. Court orders restricting counsel from fully assisting his client by not providing for appointment of essential witnesses would prevent counsel from meeting the Ohio effective assistance standard of "fair trial" established in State v. Hester. (1976), 45 Ohio St.2d 71.

Counsel should be permitted to call witnesses who alone can give critically relevant and material evidence on issues that go directly to ensuring a fair trial by preserving the impartiality of the fact-finder.

The Montana Court in <u>State ex rel. Smith</u> v. <u>District Court</u> (1982) 654 p.2d 682, also said that empirical evidence regarding the percentage of general population who read newspapers or who listen to other forms of media, and statistics regarding the percentage of media readers/listeners who read or follow homicide or criminal cases are also areas of inquiry needed to entertain a motion of this kind.

In the recent case of <u>Ake</u> v. <u>Oklahoma</u>, the United States Supreme Court reaffirmed the fundamental principal that indigent defendants should be provided the "basic tools of an adequate defense." (1985) _____ U.S. _____, 105 S.Ct. 560. Justice Marshall went on to state:

> We recognize long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

<u>Id</u>. See also; ABA Standards 5-1.4 Comm.

Therefore, the Appellant's motion should have been granted.

131

## NINTH ASSIGNMENT OF ERROR

The admission of Exhibit 3 (a photograph of Raymond Fife) was error.  (Tr.66)

> The trial court erred and abused its discretion in admitting a pre-death photograph of the victim.  This error violated Appellant's rights under Evid. R. 404, the fifth and fourteenth amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

At trial, a pre-death photograph was presented to the court and later admitted into evidence.  This photograph clearly was not relevant and their introduction was solely to inflame and prejudice the court.  The introduction of such photographs is unfair.  <u>White</u> v. <u>State</u> (Okla. Cr. 1983), 674 P.2d 31, 36. Furthermore, the deceased's mother was allowed to testify about the number of members of the family and related matters. Finally, in the closings of both the guilt and mitigations phases of the case, the prosecution was allowed to argue the deceased's good character and his right to live.  (Tr.1167, Tr.M.351).

The law is clear in Ohio that evidence of a person's character is generally not admissible at trial.  Ohio Evidence Rule 404(A)(2) states as follows:

> Character of victim.  Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by the statute enacted by the General Assembly are applicable.

132

The rule is quite clear.  The prosecutor may introduce character traits of the victim only:  1) to rebut a character trait raised by the defendant; or 2) to rebut evidence that the victim was the aggressor.  Neither justification for the evidence applies here.

The United States Supreme Court has consistently held that capital cases must be as free as humanly possible from passion, prejudice or mistake.  Gardner v. Florida (1977), 430 U.S. 349, 358; Eddings v. Oklahoma (1982), 455 U.S. 104, 118 (O'Connor, Jr., concurring).  Because sentences of death are quantitatively different from prison sentences, factors that infect the reliability of the capital process cannot be tolerated.  Woodson v. North Carolina (1976), 428 U.S. 280, 305.  The testimony in the present case interjected the sympathy or passion factor that the United States Supreme Court has consistently held must be eliminated from the capital sentencing process.

Ohio Revised Code Section 2942.041 also reflects the legislature's desire to eliminate sympathy for the victim from jury consideration in a capital case.  Aggravated murder indictments are specifically exempted from the statutory provisions which permit a representative of the victim from making a statement as to the victimization or sentence.

Other states that have considered this question have continuously rejected interjection of sympathy for the victim in the capital litigation process.  The Illinois Supreme Court in People v. Ramirez (Ill. 1983), 457 N.E. 2d 31, held that an offer of irrelevant and inflammatory evidence as to the murder victim's family resulted in reversal.  Testimony by a murder victim's

133

widow at the first stage of a death penalty hearing is error when the fact that the deceased left a widow is immaterial. The court further reasoned:

> It is axiomatic that a defendant's guilt must be established by competent evidence uninfluenced by bias and prejudice, and that, therefore, evidence that a murder victim has left a spouse or children is inadmissible since it does not enlighten the trier of fact as to the guilt or innocence of the defendant or as to the punishment he should receive, but only serves to prejudice and inflame the jury.

See also Vela v. Estelle (5th Cir. 1983), 708 F.2d 954, 961-963, cert. den. (1984), 79 L.Ed.2d 195; Brooks v. Kemp (11th Cir. en banc 1985), 762 F.2d 1383, 1409-1410.

The Florida Supreme Court has adopted a stricter rule. A member of a deceased victim's family may not testify in a homicide trial for purpose of identifying the victim when nonrelated, credible witnesses are available to make such identification. Adan v. State (Fla. 1984), So. 2d 1195; Randolph v. State (Fla. 1984), 463 So. 2d 186. The court had adopted such rule because identification by the victim's family serves only to interject the sympathy factor into trial. Randolph, supra at 189.

California had adopted a similar rule. In People v. Levitt (Cal. 1984), 156 Cal. App. 3d 500, the court stated that the fact a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than the commission of homicide in the first place. Such bereavement is relevant to damages in a civil action but it has no relationship to the proper purposes of sentencing in a criminal case.

134

Attorneys for both the state and the accused have a responsibility to present their evidence in the manner most likely to secure for the accused a trial free from any suggestion which might bring before the jury any matter not germane to the issue of guilt. Hathaway v. Florida (Fla. 1958), 100 So. 2d 622, 664.  The testimony concerning the victim in this case would violate this responsibility.

Once this sympathy factor has been introduced, the courts have been quick to reverse convictions.  In Ramirez, supra, it was sufficient that the prosecutor asked the widow if she was married to the victim at the time of his death.  Therefore, the sympathy testimony in the present case require reversal and that the matter be remanded for a new trial.

In this case, the prosecution goes beyond just the introduction of such testimony, but the repetitive arguing of it throughout the closing arguments at both the guilt and mitigation stages.  This type of conduct merits reversal of this conviction and the granting of a new trial.

## TENTH ASSIGNMENT OF ERROR

The Appellee did not give the Appellant complete discovery. (Tr.d. 21, 28-29, 31, 80, 161).

> When the state repeatedly fails to comply with Crim. R. 16, it is violating an accused's right to a fair trial and the effective assistance of counsel.

Crim. R. 16 provides for the rules governing discovery in a criminal case. Once a discovery request has been made, it is incumbent upon the state do comply with such a request. If such compliance is not forthcoming, an accused must apply to the court for a motion to compel. If the court finds that such an order is well taken then the court may order the state to comply.

In the instant case, the Appellant fully complied with Crim. R. 16 in order to fully obtain that which was discovery. The state failed to provide the discoverable information that (1) Donald Allgood had identified the Appellant from a photo array (Tr.441); (2) the photo array itself (Id.); certain photographs – Exhibits 103-109 (Tr.536-543); the accompanying oral statements of the Appellant (Id.); the testimony of Stephen Melius (Tr.1017); and certain photographs utilized by Dr. Levine (Tr.d.161).

While this Court may not believe that each individual failure to provide full discovery warrants reversal, the combination of these failures does warrant reversal. See State v. Hill (March 25, 1982), Franklin County App. No. 81AP-663, unreported. One oversight might have been unintentional, but six stretches the imagination. Especially prejudicial are the last

two examples.  Stephen Melius' testimony came as a complete surprise in the middle of trial.  The Appellee claimed they only became aware of the witness the day before he took the stand.

The photographs that Dr. Levine testified to having access to for his expert opinion when he was originally hired by the Appellee were not known to the Appellant until January 31, 1986, the day the witness took the stand.  These photographs formed a substantial part of the basis for his testimony.  Dr. Mertz did not refer to them.  The prejudice of their earlier denial is two-fold; first in Dr. Levine's opinion, they are the photographs that led to his testimony that certain bite marks were likely to be the Appellant (though he could not testify to a dental certainty on this issue); and second, other defense experts were not shown these photographs and thus prevented Appellant to fully litigate and research this crucial evidence.  Since it is Appellee's contention that these bite marks were their strongest evidence, then the prejudice to the Appellant in not having them is self-evident.

## ELEVENTH ASSIGNMENT OF ERROR

Admission of certain photographs was an abuse of discretion. (Tr.1049).

> It is an abuse of discretion for a trial court to allow into evidence photographs of the victim because such photographs were highly prejudicial, gross, and unnecessary and which lacked probative value in determining the issues involved. Their admission violated the Appellant's fifth, sixth, and fourteenth amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

The basic premise in Ohio for the admission of photographs was stated in State v. Woodards which held:

> The rule is well settled that photographs and color transparencies are not objectionable so long as they are properly identified, are relevant and competent and are accurate representations of the scene which they purport to portray. Indeed, photographs frequently convey information to the court and jury more accurately than words.
> Although a photograph may be rendered inadmissible by its inflammatory nature, the mere fact that it is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury.
> The real question is whether the probative value of such photographs is outweighed by the danger of prejudice to the defendant.

(1966), 6 Ohio St. 2d 14, 24-25, (further citations omitted).

Indeed, courts have previously recognized that there could be situations where similar types of photographs would be erroneous. State v. Luft (Dec. 26, 1978), Franklin County App. No. 78AP-302. In Luft, the court stated:

> We are neither able to approve of, nor condone, the multitudinous evidentiary use of some 30 such photographs, in that they were

138

> not presented for the purpose of supporting
> any contested issue as to the manner or mode
> of death, nor as to any reasonable scientific
> proof necessary to trial of this cause.
> Therefore, we state that the introduction of
> the photographs was not only unnecessary, but
> bordering upon the erroneous use of such
> evidence.  However, in review of the totality
> of the evidence adduced as to the commission
> of these acts, and the evidence as to
> the guilt of this defendant, we hold the
> introduction of such evidence not to be
> prejudicial.

Id. at 3682.  See also, State v. Ward.  (Feb. 15, 1983), Franklin

County App. No. 82AP-451.

In the case at hand, the photographs are showing the cavity

of the victim along with the "stick" (Exhibit 47).  For the

reasons stated earlier, Exhibit 47 should have excluded from

evidence.  To then allow gruesome, unnecessary, and prejudicial

photographs of the same thing in relation to a cavity of the

victim increases the prejudice to the Appellant.  These

photographs had no probative value to the issues herein.

139

## TWELFTH ASSIGNMENT OF ERROR

The state made improper closing arguments at both the guilt and mitigation phases of this case. (Tr. 1166-1200; Tr.M. 340-354; 395-408.)

> Prosecutorial misconduct during both the guilt and mitigation phase closing arguments denied Appellant his right to a fair trial and an impartial fact-finder as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution and Article I, Section 10 and 16 of The Ohio Constitution.

Closing arguments to the fact-finder are not evidence. State v. Manago. (1974), 38 Ohio St. 2d 233. Though counsel should be allowed some latitude in his remarks to the fact-finder, he should refrain from making "comments that extend to matters outside the record . . . and tend to influence the jury to make a decision based upon matters other than evidence constituting proof of guilt beyond a reasonable doubt." State v. Smith. (1976), 50 Ohio App. 2d 183. (Further citations omitted.) See also, State v. Woodards. (1966), 6 Ohio St. 2d 14. However, where one instance of unfair comment possibly may be cured by the trial court, the cumulative effect of a series of improper comments may be "sufficiently prejudicial to have denied the appellant a fair trial." State v. Muscatello, (1977), 57 Ohio App. 2d 231, 254, aff'd 55 Ohio St. 2d 201.

The Sixth Circuit has also dealt with this issue. In Wither v. United States, the court reversed a conviction because of the improper argument of the Assistant United States Attorney. (6th Cir. 1979), 602 F. 2d 124. See also, Cook v. Bordenkircher (6th Cir. 1979), 602 F. 2d 117. The court stated that it:

140

believes that it has the duty to require the
United States Attorneys in this Circuit to
follow the slogan carved in wood at the
entrance to the office of the Attorney
General of the United States: "The United
States wins its point whenever justice is
done its citizens in the courts." The U.S.
Attorney in the courtroom is much more than
just another lawyer. He speaks to the jury
for the United States of America. His words
carry the weight of his office. The United
States above all parties should never proffer
invidious comparison between races or
argument founded on facts outside of the
record. Such erroneous argument, because of
its source, is much more likely to be
accepted by a jury than is similarly
objectionable argument by a private
practitioner.

Id. The standard by which closing remarks was set forth in

Berger v. United States,

The United States Attorney is the
representative not of an ordinary party to a
controversy, but of a sovereignty whose
obligation to govern impartially is as
compelling as its obligation to govern at
all; and whose interest, therefore, in a
criminal prosecution is not that it shall win
a case, but that justice shall be done. As
such, he is in a peculiar and very definite
sense the servant of the law, the twofold aim
of which is that guilt shall not escape or
innocence suffer. He may prosecute with
earnestness and vigor - indeed, he should do
so. But, while he may strike hard blows, he
is not a liberty to strike foul ones. It is
as much his duty to refrain from improper
methods calculated to produce a wrongful
conviction as it is to use every legitimate
means to bring about a just one.

It is fair to say that the average jury,
in a greater or less degree, has confidence
that these obligations, which so plainly rest
upon served. Consequently, improper
suggestions, insinuations, and, especially,
assertion of personal knowledge are apt to
carry much weight against the accused when
they should properly carry none.

141

..(1934), 295 U.S. 78, 88.  See also, ABA Standards Relating to the Prosecution Function Section 5.1 et seq.

In the instant case, the following remarks were made by the prosecutor:

1. You know, back on September 10th, our community had a little boy, and we've had a lot of little boys in our community, but this 12-year old boy we have not talked about too much. We've dealt with him in an abstraction. He hasn't been here. And the Court is aware of the leaps and bounds and the rights of victims. I'm not trying to ignore the procedural rights of the defendants' in cases, but sometimes we forget and don't pay attention when we talk about Constitutional Rights of the defendant, and we don't, in the balance - how about Raymond Fife's right to live? How about his Constitutional Rights to be here today, to be in school, to celebrate his 13th birthday with his parents (Tr.1167).

2. The question that is to be determined by this Court is whether that man [indicating to the Appellant] and his buddy, Timothy Combs, engaged in a criminal enterprise wherein he destroyed and devoured a little boy on the 10th day of September of 1985 . . . . I can't imagine in my 10 years as being prosecutor that this could happen.  (Tr.1167-1168).

3. Now, one witness that testified, Candyce Jenkins . . . She described the defendant as an "animal".  The other one hatred.  (Tr.1169).

4. . . . .but he [the Appellant] followed him [Timothy Combs] back to the scene of the crime to look for evidence to destroy so they could cover up their heinous, unbelievable, animalistic behavior.  He would make the Marquis deSade proud!  (Tr.1173).

5. Now, we know on September 10th, 1985, the year of our Lord - and I'm going to go through, as I view the evidence - as Mr. Kontos and I see the facts to be and the truth to be.  (Tr.1175).

6. Maybe Mr. Lewis will argue that Raymond wasn't on the bike. It didn't have fingerprints. Well, there's an explanation, you don't necessarily have fingerprints on everything. And rain will affect fingerprints as it will affect blood.  (Tr.1196).

7. Who does this Court feel is more qualified? Mr. Dehus or Mr. Gelfius on the charcoal lighter as to paint

142

thinner and hydrocarbons?  I thought that his testimony was much more credible.  I don't feel Mr. Dehus; it couldn't break down; very unlikely, and I don't think that's the case.  I think that the witness from the Arson Lab who deals strictly with arson is the most credible witness in this case, and that substantiates the State's case.  (Id.).

8. No one wants to testify against his brother, just like Morris Hill didn't want to testify against his nephew. (Tr.1197).

9. Finally, Your Honors, to get this poor, dumb boy who really wouldn't do anything, who tried to sexually attack Mr. Melius, tried to put his mouth in the boy's penis, grabbed his penis, we know he did violently rape Mary Ann Brison in the same wooded area.  Talked about how he talked hateful to her.  We know what he did to Candyce Jenkins; had anal sex, oral sex, vaginal sex, once again, anal sex, had a knife and threatened to cut her vagina out; bit her on the breast.  Seems to be his calling card; the bite.  And when she screamed and yelled that it hurt, he said, "Good!  I want it to hurt."  And that's what this case is about.  This case isn't just about a killing.  This case is about an individual who thrives and relishes on inflicting pain and torture to other human beings.  (Tr.1272).

10. Raymond Fife was a 12-year-old boy; very active and vibrant, who was caught in the middle of a living hell caused by this defendant.  Raymond Fife had no justice while he was living, but he demands justice now even in his absence, and justice demands, Your Honors, and you return a verdict . . .(Tr.1274).

11. The reason that is so clear is because the defense has not shown by or has not substantiated or brought about any mitigating factors in this case, and it's very clear, aggravating circumstances, especially three of them, will clearly outweigh the absence of any mitigation.  (Tr.340).

12. Well, I'd like to cite a few days that they weren't together:  February 8th, 1984, when this defendant raped Mary Ann Brison.  They weren't together March 3rd, 1984, when this defendant raped and brutalized Candyce Jenkins.  They weren't together April 1984 through April 1985 when this defendant was incarcerated. (Tr.342).

13. In addition to that, he says he has difficulty with his motor skills between the right hand and left hand and he's not very good at that.  He didn't have any problem

143

grabbing women that I told you about before. Grabbing
them with his left hand and the knife in the right hand
while he sexually assaulted them. (Tr.348).

14. Now, there was a witness that the State would have
wanted to present in this case, but unfortunately we
could not call him. Raymond Fife. He would have been
able to testify as to what happened that particular day.
He would have been able to tell all of us, including
this defendant, how he felt when he was abducted and
helpless and felt doomed because he had no opportunity
to escape. He would have been able to tell us what it
felt like to be punched and continually kicked; what it
felt like to be strangled so severely that he'd be
gasping for breath. He'd be able to describe the pain
involved and sexual molestation. He'd also be able to
tell you and tell all of us what it would feel like --
the indescribable pain when your flesh is burning and
you're helpless to do anything about it. And finally,
he'd be able to tell us what it would be like to have a
stick rammed up your rectal cavity so deeply and so
severely that it perforates through the rectum and goes
into the urinary bladder. But he's not here to testify
about that thanks to this defendant.

There's some other things that Raymond Fife can't come
here and testify about either. He can't testify about
how he misses his family, about how he misses his
friends in the Scout group, about how he'd like to be
at home having his favorite meal, how he'd like to be
with his father in the backyard feeding the birds, how
he'd like to be able to live and love and share his
love with his family and friends, and he will never be
able to do that because of this defendant; this
manifestation of evil, this anomaly to mankind, this
disgrace to mankind sitting at the end of that table
took care of that! And the most commentary about the
makeup of this defendant is the manner of the death of
Raymond Fife. (Tr.351-353).

It is clear from the above portions of the closing arguments

from both the guilt and mitigation phases of this case that the

Appellee argued improperly. Appellee repeatedly attempted to

inflame the three judge panel. A conviction based on the

inflamation of the fact-finder's fears and passion and not based

solely on the evidence requires reversal. State v. Agner (1972),

30 Ohio App.2d 96.  <u>See</u> <u>also</u> <u>Tucker</u> v. <u>Zant</u> (11th Cir. 1984), 724 F.2d 882, vacated <u>en</u> <u>banc</u> (this point not discussed) (1985), 762 F.2d 1480.

The prosecutor's closing argument invited the fact-finder to compare the relevant worth of the victim and the Appellant.  The value of the victim's life should not be argued to the fact-finder.  <u>Brooks</u> v. <u>Kemp</u> (11th Cir. <u>en</u> <u>banc</u> 1985), 762 F.2d 1383.

Overall, the closing argument contained matters outside the record, the personal beliefs of the prosecutors, inflamatory language designed to inflame the fact-finder, and sympathetic remarks about the victim and his family and other non-aggravating factors.  Each of these types of arguments were improper and violated the Appellant's constitutional rights.

## THIRTEENTH ASSIGNMENT OF ERROR

The Appellant was denied the effective assistance of counsel.

> When the issue of effective assistance of counsel is raised that involves matters both within the record and outside the record the proper avenue for reviewing that issue should be on post-conviction relief even if counsel on appeal is not trial counsel. The Appellant's right to effective assistance of counsel was violated pursuant to the sixth and fourteenth amendment rights to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

It should be noted at the start of this issue that Appellant recognizes that there may or may not be sufficient evidence within the record to show the ineffective assistance of counsel. However, counsel for the Appellant believes that the issue must be raised on appeal so that when matters are brought forth in a post-conviction petition relating matters that are outside the record it can be coupled with the matters stated below without there being an argument that the Appellant has waived this issue by not raising it on a direct appeal. In reviewing the cases of State v. Cole (1982), 2 Ohio St. 3d 112 and State v. Smith (1985), 17 Ohio St. 3d 98, it is unclear whether or not an Appellant must raise ineffective assistance of counsel in his direct appeal when represented by an attorney other than his trial attorney when the basis for the argument includes matters both within the record and outside the record before this court. Therefore, if the evidence raised below is insufficient to establish ineffective assistance of counsel in and of itself, then the Appellant is requesting that he not be barred later from

146

using this same evidence coupled with evidence that is not in the record before this Court to show the ineffective assistance of trial counsel.

The right to counsel under the Sixth Amendment has no meaning unless it includes the right to the effective assistance of counsel. <u>Beasley</u> v. <u>United States</u> (6th Cir. 1974), 491 F.2d 687 and cases cited therein. The standard necessary to show that a defendant had ineffective assistance of counsel is whether he had a fair trial and substantial justice was done. <u>State</u> v. <u>Hester</u> (1976), 45 Ohio St. 2d 71. This analysis must be done on a case-by-case basis. <u>Id</u>. The court established a two-prong test to determine if the <u>Hester</u> rule has been met:

> When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.

<u>State</u> v. <u>Lyte</u> (1976), 48 Ohio St. 2d 391, 396-397.

The burden of proof is initially upon the Appellant to show that he was denied the effective assistance of counsel. <u>State</u> v. <u>Nabozny</u> (1978), 54 Ohio St. 2d 195. It is not enough that counsel may have made "tactical" mistakes during the course of the trial. <u>See</u>, <u>State</u> v. <u>Clayton</u> (1980), 62 Ohio St. 2d 45. However, these decisions do note that guidelines do exist to establish the proper standards that should be employed by counsel

147

in the criminal arena.  <u>See</u> <u>e.g.</u>, <u>ABA Standards Relating to the Prosecution Function and the Defense Function</u> (Approved Draft 1971).

In the instant case, trial counsel for the Appellant was ineffective in that:  (1) counsel should have had hearings on the pre-trial motions that were filed; (2) counsel should have attempted to seat a jury before waiving that right; (3) counsel failed to fully advise the Appellant of his legal rights concerning Appellant's waiver of a jury trial so that he could voluntarily, knowingly and intelligently make such a decision; (4) counsel should have continuously objected to an officer's belief that the Appellant was lying; (5) counsel's failure to timely file a motion for new trial with a hearing; (6) counsel's failure to object to Appellee's improperly closing argument; and (7) counsel's failure to preserve the record or otherwise object on any issue that this Court or any future court deems waived by such omission.

While this Court may not view each of these incidences independently as sufficient to constitute ineffective assistance of counsel, this Court should consider them for their combined effect.  As stated above, Appellant will still maintain that these incidents coupled with matters that will not be in the record do constitute ineffective assistance of counsel, and at the very least, we wish this Court to allow us to preserve that issue for a post-conviction proceeding.

## FOURTEENTH ASSIGNMENT OF ERROR

It was error for the trial court to sentence Appellant on the kidnapping charge and the kidnapping specification. (Tr. 150-151.)

> The trial court erred in entering a judgment of conviction for kidnapping and the other felonies where convictions on both offenses are contrary to R.C. 2941.25. Secondly, where an underlying felony count which is also used as a specification for aggravated murder merges, then it cannot be considered as an additional specification for sentencing purposes.

R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information ay contain counts for all such offenses, but the defendant my be <u>convicted</u> of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

(Emphasis added.)

In interpreting this statute, the Ohio Supreme Court stated in its syllabus:

> In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, when the restraint is

prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions.

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

<u>State</u> v. <u>Logan</u> (1970), 60 Ohio St. 2d 126.

Any kidnapping that may have taken place in the instant case was incidental to the other felonies for which the Appellant was convicted. There was no separate animus present to constitute a separate sentence for kidnapping.

Likewise, in <u>State</u> v. <u>Brown</u>, this court held that:

Pursuant to Crim. R. 32(B), a judgment or conviction must set forth the verdict and the sentence. Because the trial court's entry of judgment included a sentence for both crimes, it is irrelevant that it was provided that the sentences were to be served concurrently; for purposes of R.C. 2941.25, Appellant has been convicted of both offenses, in violation of that section.

(June 8, 1982), Franklin County App. No. 81AP-619, unreported. Therefore, it is irrelevant that the trial court sentenced the Appellant to concurrent sentences of incarceration. It is still not proper pursuant to R.C. 2941.25(B).

Since the kidnapping count should have merged with the other felony counts, it also becomes apparent that the kidnapping specification to the aggravated murder should have merged with the other specifications. Not only does the kidnapping count

merge, but with one less specification on the aggravated murder count, only two specifications should have been considered as aggravated factors. Therefore, at the very least, this case should be remanded for a new sentencing with the above information to be considered.

### FIFTEENTH ASSIGNMENT OF ERROR

The motion for new trial should have been granted. (Tr.d. 138, 160-161, 170.)

> A motion for new trial should not be denied without a full hearing when made pursuant to Crim. R. 33. A denial of such a hearing and the motion violates an accused's Fifth, Sixth and Fourteenth Amendment rights to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution and Crim. R. 33.

In the instant case, trial counsel for the Appellant filed a motion for a new trial pursuant to Crim. R. 33 on February 14, 1986, prior to the mitigation hearing in this case. On March 31, 1986, said motion was summarily overruled. On April 4, 1986, the Appellant's motion for a new trial was renewed with an explanation for the request. A hearing on the motion was scheduled for May 8, 1986. On May 7, 1986, the trial court squashed the Appellant's subpoenas in support of his motion. The next day, the trial court summarily denied the Appellant's motion for a new trial.

Appellant's motion for a new trial included affidavits and a detailed factual and legal basis for the motion. The trial court scheduled a hearing on the motion. Subpoenas were issued to witnesses to support the allegations raised in the motion. The court squashed those subpoenas and then summarily overruled the motion not only without a hearing, but without findings of facts and conclusions of law. This procedure violated the Appellant's constitutional rights under both the United States and Ohio Constitutions. See State v. Turner (1983), 11 Ohio App. 3d 292. Cf. Toledo v. Stuart (]983), ]] Ohio App. 3d 292.

Therefore, this case should be remanded back to the trial court for a hearing on the motion for a new trial.

## SIXTEENTH ASSIGNMENT OF ERROR

The trial court was improperly prevented from deciding whether death was the appropriate punishment. (Tr.d. 150-151).

> Ohio's mandatory sentencing scheme prevented the panel of three judges from deciding whether death was the appropriate punishment in violation of Appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 and 16 of the Ohio Constitution.

Under R.C. 2929.03 et seq., if a three-judge panel finds that the statutory aggravating factors outweigh mitigating factors beyond a reasonable doubt, then the jury is required to impose a death sentence. This mandatory scheme prohibits the three-judge panel from considering whether death is really the appropriate punishment in this case, even if the aggravating circumstances outweigh the mitigating circumstances. The three-judge panel is bound by the weighing process and prohibited from deciding whether nevertheless death is not appropriate. The failure of the statute and the court in this case to permit the three-judge panel to decide whether death was appropriate notwithstanding the weighing result violate Danny Hill's rights against cruel and unusual punishment. These rights are guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 9 and 16 of the Ohio Constitution.

The statute and instruction prevents the sentencer from asking what is the ultimate inquiry: whether death is the appropriate sentence in Danny Hill's case. A three-judge

154

panel must always be free to confront the ultimate question of whether death is the appropriate punishment, even where mitigating factors do not outweigh aggravating factors.  Lockett v. Ohio (1978), 438 U.S. 586, 601 (plurality opinion) (quoting Woodson v. North Carolina (1976), 428 U.S. 280 (opinion of Stewart, J.).  See also, Smith v. North Carolina (1982), 459 U.S. 1056 (Justice Stevens dissenting from denial of certiorari); State v. McDougall (N.C. 1983), 301 S.E.2d 308, 327; State v. Wood (Utah 1982), 648 P.2d 71, 83.

The three-judge panel may wish to vote for life out of a desire for mercy, or it may believe that the death penalty is simply inappropriate for the specific crime that has been committed.  These factors are legitimate components of the sentencing process.  The sentencing process:

> ...must permit consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death.

Lockett, 438 U.S. at 586 (quoting Woodson, 428 U.S. at 304).  See also, Roberts (Harry) v. Louisiana (1977), 431 U.S. 633, 637.

The failure of the Ohio statute and its application to this case to permit the three-judge panel to make an unconstrained determination of the appropriateness of the death sentence violated Danny Hill's rights against cruel and unusual punishment. It prevented the three-judge panel from making the essential constitutional prerequisite of an individualized sentencing determinaton.  Absent an individualized determinaton, the death sentence cannot stand.  Barclay v. Florida (1983), 463 U.S. 939 and Zant v. Stephens (1983), 462 U.S. 862.

155

For these reason, this Court should vacate the death sentence and either remand for re-sentencing to life imprisonment or remand for a new trial.

## SEVENTEENTH ASSIGNMENT OF ERROR

The trial court failed to consider all of the evidence in support of mitigating a death sentence. (Tr.d. 150-151, Tr.M. 1-524.)

R.C. 2929.03(D)(3), in pertinent part, states:

> Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender arguments of counsel, and if applicable, the reports submitted to the court... if, after receiving... the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt... that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender.

R.C. 2929.03(F) requires this finding be set forth in a separate opinion which includes "the reason why the aggravating circumstances... were sufficient to outweigh the mitigating factors." In State v. Maurer (1984), 15 Ohio St. 3d 239, cert. denied (1985), ____U.S.____, 105 S.Ct.2714, rehearing denied (1985), ____U.S.____, 106 S.Ct.15, the Ohio Supreme Court stated in syllabus number three:

> The trial court, when it imposes a sentence of death, shall state in a separate opinion its specific findings as to the existence of any mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reason why these aggravating circumstances were sufficient to outweigh the mitigating factors.

(Emphasis added.) The trial court is required to present for review, in its separate opinion, a meaningful explanation of its weighing procedures in justification of the death penalty.

The court in Maurer emphasized the importance of the trial court's duty to fully explain its findings.

157

In so holding, we do not intend to trivialize the duty of the trial court under R.C. 2929.03(F) to articulate its reasoning or to suggest that such an omission is insignificant. It is not. The failure of a trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances. In a closer case, those perceptions could make a difference in the manner in which a defendant pursues his appeal and in which a reviewing court makes its determination.

Ohio's statutory review procedures were enacted in order to ensure the mandates of <u>Lockett</u> v. <u>Ohio</u> (1978), 438 U.S. 586, and <u>Eddings</u> v. <u>Oklahoma</u> (1982), 455 U.S. 104, are met where death penalties are imposed.  <u>Lockett</u> and <u>Eddings</u> require that imposition of death sentences must include a consideration of the Appellant's character or record and the circumstances of the offense where the defendant presents such evidence.  While <u>Lockett</u> established the absolute right to present mitigation evidence, <u>Eddings</u> went further, stating:

We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in <u>Lockett</u>. Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings offered on his behalf. <u>The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.</u>

455 U.S. at ____.  (Emphasis added.)  (Footnotes omitted.)

158

In its opinion, the three-judge panel did not find any evidence presented in mitigation of sentence as mitigating factors, though it considered numerous factors in possible mitigation.  The court failed to mention and gave no weight to the following evidence Appellant had offered in mitigation:

1. the possible brain damage from various head injuries throughout childhood;
2. the severely low mental age of Danny (seven years, three months); and

3. Danny's good institutional record at Brinkhaven and TCY. (See Skipper v. South Carolina (1986), 39 Crim. L. Rptr. 3041.)

The court thus gave no weight, as a matter of law, to much of the mitigating evidence presented, in direct violation of Eddings.  Eddings requires sentencers to listen to and consider valid and compelling mitigating evidence.  Eddings at 115, fn. 10.

The trial court's failure to consider mitigating evidence was contrary to the teachings of Lockett and Eddings and, therefore, Appellant's sentence must be vacated.

## PREFACE TO EIGHTEENTH ASSIGNMENTS OF ERROR

R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of thedeath penalty, do not meet the prescribed requirements of the fifth, sixth, eighth, and fourteenth amendments to he United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution, and thus are unconstitutional, both on their face and as applies to the defendant.

Most of these arguments were raised and rejected in State v. Jenkins (1984), 15 Ohio St. 3d 164; State v. Maurer (1984), 15 Ohio St. 3d 239; State v. Rogers (1985), 17 Ohio St. 3d 174; (1985), 19 Ohio St. 3d 122; State v. Buell (1986), 22 Ohio St. 3d 124; State v. Williams (1986), 23 Ohio St. 3d 16; State v. Johnson (1986), 24 Ohio St. 3d 87; State v. Barnes (1986), 25 Ohio St. 3d 203; and State v. Brooks (1986), 25 Ohio St. 3d 144; State v. Mapes (1985), 19 Ohio St.3d. 108; State v. Martin.

160

## EIGHTEENTH ASSIGNMENT OF ERROR

A sentence of death is unconstitutional. (Tr.M 407-408, Tr.d 150-151)

1. The Ohio death penalty scheme, found in Ohio Revised Code Sections 2903.01 and 2929.02, et. seq., violates the prohibition against cruel and unusual punishment and equal protection guarantees contained in the eighth and fourteenth amendments to the United States Constitution and Article I, Sections 2 and 9 of the Ohio Constitution.

The Eighth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution explicitly prohibit the infliction of cruel and unusual punishment upon the convicted criminal offender. The Eighth Amendment protections are applicable to the States through the Fourteenth Amendment. Robinson v. California (1960), 370 U.S. 660. The basic concept underlying these prohibitions is the dignity of man. Trop v. Dulles, (1958), 356 U.S. 86. The prohibition against cruel and unusual punishment stands to assure that the state's power to punish will be exercised within the limits of civilized standards. Id. These concepts are not static, but rather "must draw [their] meaning from the evolving standards of decency that mark the progress of a maturing society." Id. at 101. With just three words the Eighth Amendment has imposed the limitation upon all punishments; they cannot be "cruel and unusual." Rhodes v. Chapman, (1981), 452 U.S 337. The meaning of these three words must be interpreted in a flexible and dynamic manner. Id.

When a particular punishment, such as the death penalty, is challenged the task of the courts is to "determine whether the challenged punishment comports with human dignity." Furman v. Georgia, (1972), 408 U.S. 238 (Brennan, J., concurring); Rhodes,

452 U.S. at 361. Such determinations are necessarily imprecise and indefinite. Trop, 356 U.S. at 100-101; Wilkerson v. Utah (1898), 99 U.S. 130. They require careful scrutiny and application of realistic yet humane standards. Rhodes, at 361. These standards must reflect the standards of the age in which the questioned punishment is sought to be inflicted. People v. Anderson, (Cal. 1972), 493 P. 2d 880, cert. denied sub nom, California v. Anderson, (1972), 406 U.S. 958; District Attorney for Suffolk District v. Watson (Mass. 1980), 411 N.E. 2d 1274.

The tremendous responsibility in constitutional interpretation of the meaning of cruel and unusual punishment requires more than deference to a legislative decision. Gregg v. Georgia (1976), 427 U.S. 153.

> The high service rendered by the 'cruel and unusual' punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are even handed, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups.

Furman, 408 U.S. 256 (Douglas, J., concurring). It is firmly established that equal protection of the laws, as guaranteed by the Fourteenth Amendment, is implicit in the protection against cruel and unusual punishment. Furman at 249 (Douglas, J., concurring). A sentence should be considered "unusually" imposed if it is administered arbitrarily or discriminatorily." Id.; Goldberg and Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1973.

In addition to the protection against arbitrarily and discriminatorily administered punishments, the "cruel and unusual" guarantees prohibit not only punishments that are barbaric but also punishments that are "excessive" in relation to the crime committed. Coker v. Georgia (1977), 443 U.S. 584; Weems v. United States (1910), 217 U.S. 349. A punishment is excessive and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. Coker at 592; Gregg at 173. Thus, if the death penalty makes no measurable contribution to acceptable goals of punishment or if it is disproportionate to the offense committed, it is excessive and unconstitutional.

The constitutional guarantees against the infliction of cruel and unusual punishment prohibit severe punishments that are applied arbitrarily or discriminatorily as well as constitutionally "excessive" punishments. Punishments must be in line with human dignity. In Furman, Justice Brennan, in his concurring opinion, summarized the means by which the court can determine if a challenged punishment comports with human dignity, stating:

> The test [is] a cumulative one: If a
> punishment is unusually severe, if there is a
> strong possibility that it is inflicted
> arbitrarily, if it is substantially rejected
> by contemporary society, and if there is no
> reason to believe that it serves any penalty
> purpose more effectively than some less
> severe punishment, then the continued
> infliction of that punishment violates the
> command of the Clause that the state may not

> inflict inhuman and uncivilized punishments upon those convicted of crimes.

408 U.S. at 282.

In Gregg the court considered the numerous opinions of Furman and, in the plurality opinion of the court, authored by Justice Stewart, indicated that any inquiry into the validity of the death penalty as a punishment must include two principles: (1) The punishment must not involve the unnecessary and wanton infliction of pain (citing Furman at 392-393; Wilkerson, 99 U.S. at 136; Weems, 217 U.S. at 381) and (2) The punishment must not be disproportionate to the severity of the crime (citing Trop, 356 U.S. at 100; Weems at 367).  Gregg at 173.

A.   The imposition of the death penalty under Ohio's statutory authority is degrading to the dignity of human beings and cannot be exercised within the limits of contemporary civilized standards.

The concept that the death penalty is not per se unconstitutional does not grant a license to the government to impose the penalty in a manner limited only by the imagination, but rather the mere possibility that the death penalty may be imposed creates a duty to insure that it is not imposed in an uncivilized and unhuman manner that does not comport with human dignity.  Furman at 270.

The Eighth Amendment concept of cruelty is not a prohibition against all suffering but it is a prohibition against inflicting suffering greater than is necessary to serve the legitimate needs underlying a compelling state interest.  Necessarily every

164

punishment contains an element of cruelty.  A convicted defendant who is deprived of his freedom and imprisoned will feel society has been cruel.  Generally, society tolerates that degree of cruelty that is necessary to serve its legitimate needs.  However, when the level of cruelty is disproportionate to the crime, and consequently does not serve the needs of society, courts must find the punishment to be "cruel" within the term of art in the cruel and unusual punishment clauses.  Robinson, 370 U.S. at 666-667; Weems, at 369, 381.

Capital punishment, because it involves the taking of life, is qualitatively different from other punishments.  Furman, at 287 (Brennan, J., concurring.)  "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind."  Id., at 306 (Stewart, J., concurring).  "[I]n assessing the cruelty of capital punishment . . . we are not concerned only with the 'mere extinguishment of life' . . . but with the total impact of capital punishment from the pronouncement of judgment of death through the execution itself, both on the individual and on the society which sanctions its use."  People v. Anderson, 493 P.2d at 892.

Pain, both physical and mental, is inherent in the imposition of the death penalty and is certainly a factor in the determination of whether a punishment is degrading to the dignity of man.  Id.; cf. Weems at 366, Trop at 101.  Moreover, there is a tremendous amount of mental pain and anguish inherent in the anticipation of one's foreordained death, Commonwealth v. O'Neal (Mass. 1975), 339 N.E.2d 676 (Tauro, C.J. concurring)

[hereinafter O'Neal II].  Such strain constitutes exquisite "psychological torture" unique to the condemned person.  Note, Mental Suffering Under Sentence of Death:  A Cruel and Unusual Punishment, 57 Iowa L. Rev. 814, 830 (1972) [hereinafter Mental Suffering], O'Neal II at 680; People v. Anderson at 894.

The actual physical and psychological pain of execution itself is immeasurable.  However, there is a conflict of opinion regarding whether or not electrocution, the method of execution used in Ohio, produces instantaneous loss of consciousness.  One observed concluded, "I do not believe that anyone killed by electrocution dies instantly, no matter how weak the subject may be."  Comment, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1339 (1968), quoting Prof. Rota in Scott, The History of Capital Punishment 219 (1950).  Justice Brennan wrote, "Although our information is not conclusive, it appears that there is no method available that guarantees an immediate and painless death."  Furman, at 287 (Brennan, J., concurring).

The implications of state execution for a civilized society touch on far more than the concerns of the accused, the police and lawyers, a few witnesses, and the victim's family.  The power and responsibility of the state to punish and to punish humanely, fairly and non-discriminatorily is implicated.  The decision whether to execute and the decision whom to execute are questions of profound importance for the entire society.  Both the human reality for the accused and the implications for all members of a civilized society must be considered.

The human reality includes, first, the physical and mental suffering for the accused. Cases which demonstrate physical suffering include People v. Anderson, supra; In Re Kemmler (1980) 136 U.S. 436 (eight plus minutes to die in gas chamber); Gray v. Lucas (1983) 463 U.S. 1237 (3 jolts of electricity over 14 minutes); Evans v. Hooper (1982) 456 U.S. 605. See also, Glass v. Louisiana (1985), ___ U.S. ___, 85 L. Ed. 2d 514 (opinion of Justice Brennan, with Justice Marshall concurring, in a dissent from the denial of certiorari, in which Glass contended that "electrocution causes the gratutious infliction of unnecessary pain and suffering and does not comport with evolving standards of human dignity," in violation of the Eighth and Fourteenth Amendments.) Mental anguish was discussed in the following cases, Autry v. McKaskle (1984) 465 U.S. 1098 (Justice Brennan dissenting from denial of cert.) (accused had i.v. line for lethal injection inserted for one-half hour, stay granted, accused subsequently executed months later). It has also been recognized that "the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon." Solesbee v. Balkcom (1950) 339 U.S. 9, 14; Wainwright v. Ford (1984) ___ U.S. ___, 82 L. Ed. 2d 911. Mental Suffering at 821. See Ford v. Wainwright (1986), ___ U.S. ___, 54 U.S.L.W. 4799.

Secondly, the human reality involves the potential for error. Most recently, William Jackson, Lenell Geter, Nathaniel Carter, and Frank Fay have all been convicted at trial and served penitentiary sentences for crimes they did not commit. Of great impact to Ohioans, Ernest Holbrook, Jr., and Herman Rucker of

Wayne County were recently convicted of a murder and rape they did not commit. Only after two years of incarceration were their convictions overturned. <u>See</u>, <u>State</u> v. <u>Herman Ray Rucker</u>, No. 82-CR-018, Wayne County Court of Common Pleas. Once an execution has taken place an error can never be corrected. <u>Woodson</u> v. <u>North Carolina</u>, (1976), 428 U.S. 280.

The infliction of the death penalty extinguishes all rights of an individual; for life is the right upon which all other rights are based. This punishment is degrading to the dignity of man because it is cruel and unusual. Its imposition reaches far beyond the limits of contemporary civilized standards of decency.

> B.  The death penalty is arbitrarily, freakishly and discriminatorily inflicted, constituting cruel and unusual punishment and a denial of equal protection under the eighth and fourteenth amendments to the United States Constitution and Article I, Sections 2 and 9 of the Ohio Constitution.

The record of both Ohio and the nation in inflicting the death penalty is not a meritorious one. Arbitrariness in the selection of those to be executed is reflected time and again. Justice Brennan, in his concurring opinion in <u>Furman</u> at 293, stated:

> When a country of over 200 million people inflicts an unusually severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied. To dispel it would indeed require a clear showing of nonarbitrary infliction.

Of course, no such showing has been or can be made. <u>See</u> Bowers and Pierce, <u>Arbitrariness and Discrimination in Post-Furman Capital Statutes</u>, October 1980, Crime and Delinquency, 563, 575-586.

A review of the backgrounds and offenses of persons executed in this country since 1967, beginning with Gary Gilmore in Utah, reveals no particular distinctions between those executed and thousands of others across the country punished by imprisonment for similar crimes.  The arbitrariness of the imposition of the death penalty is revealed in the case of John Evans of Alabama, whose co-defendant, subsequent to Evans' execution, achieved a successful constitutional challenge to the statute under which both were prosecuted.  Ritter v. Smith, (11th Cir. 1984), 752 F. 2d 1505.  Arbitrariness is also apparent in the December, 1982, execution of Charles Brooks, Jr. in Texas.  Brooks' co-defendant, Woody Laudres, though convicted for the same crime on the same evidence will be eligible for parole in 1988.  No one was ever able to determine whether Brooks or Laudres was the triggerman. Even the original prosecutor, in horror at the arbitrary result, joined in the application for a stay of execution in Brooks case.

Four years after Furman, the Supreme Court affirmed the capital sentencing statutes adopted by Georgia, Florida, and Texas as being constitutionally sufficient because sentencing discretion was adequately guided by specific and detailed standards; the statutes provided for adequate appellate review; and the death penalty could be imposed, under these statutes, in a non-arbitrary and non-capricious fashion, Gregg, 428 U.S. at 195; Proffitt v. Florida (1976), 428 U.S. 241; Jurek v. Texas (1976), 428 U.S. 262.

However, a recent statistical study of all persons sentenced to death in Georgia, Ohio and Florida (from 1973 - 1976), and

Texas (from 1874 - 1976), representing approximately 70% of the nation's post-Furman death row in 1976, concluded that:

> Differential treatment by race of offender and victim has been shown to persist post-Furman to a degree comparable in magnitude and pattern to the pre-Furman period. It is not that the new statutes have failed to eliminate all or most of these racial differences; it is rather, that they have failed to alter in any substantial way the cumulative pattern of differential treatment by race that was present under the new unconstitutional pre-Furman capital statutes. . . .

Bowers and Pierce, supra at 629. In particular, "black killers and the killers of whites [were found to be] substantially more likely than others to receive a death sentence in all four states, with the race of victim tend[ing] to overshadow race of offender as a basis for differential treatment." Bowers of Pierce, supra at 595.

Statistics complied in Ohio under the post-Furman statute from 1973 - 1976 show that thirty percent of all persons who killed white victims were sentenced to death, while only 1.7% of all persons who killed black victims received similar sentences. Bowers & Pierce, supra, at 594 Table 2.

Recognition of the pervasive role of racial discrimination played a vital part in both the Furman decision and in the Coker decision. This is further demonstrated by the figures contained in Punishment 1930 - 1968, National Prisoner Statistics No. 45:

| | |
|---|---|
| Total Executions | 3,859 |
| Total for Murder | 3,334 |
| Black | 1,630 |
| White | 1,664 |
| Other | 565 |
| Total for Rape | 455 |

170

|               |     |
|---------------|-----|
| Black         | 405 |
| White         | 48  |
| Other         | 2   |
| Total for Other Crimes | 70 |

Furman at 364.  "It is immediately apparent that blacks were executed far more often than whites in proportion to their percentage of the population."  Id.

The current data sample for Ohio is small, but a brief review of the race of victim/race of offender chart for those persons already sentenced to death reveals only one white death-row resident who killed a black person (Frank Spisak was convicted of killing two black persons and one white person).  Eight blacks have been sentenced to death who killed white persons.

The record of application, the risk of irrevocable error, and the recognition of the fallibility of human judgment require but one conclusion, that the death penalty is an unconstitutionally cruel and unusual punishment that is inflicted in an arbitrary and capricious manner in derogation of the equal protection provisions of the Ohio and the United States Constitutions.

In neither State v. Jenkins (1984), 15 Ohio St. 3d 164, certiorari denied (1985), 473 U.S. ___, 87 L. Ed. 2d 643, nor State v. Maurer (1984), 15 Ohio St. 3d 259, did the Ohio Supreme Court address the issue of discriminatory application of the death penalty.  This is despite the fact that in both cases, appellants raised this issue.  It should be inferred from this

silence that this remains a viable issue in Ohio. While <u>Furman</u> attempted to create standards that eliminated this discriminatory impact, it is obvious from the cited studies, this impact continues to exist.

Life, the most fundamental right, may not be lawfully taken by a system that acts arbitrarily, capriciously, and discriminatorily. The aforementioned studies establish that past experience with death penalty laws in this state, and others, is fraught with such deficiencies. Considering that Ohio's new capital sentencing provisions are patterned after those studies, and that Ohio's own experience is that of racially discriminatory application of the death penalty within a quasi-mandatory scheme, it appears that such arbitrariness and discrimination persists.

    C.    The arbitrary and capricious application of the death penalty under the Ohio statutory scheme persists due to the uncontrolled discretion of the prosecutor.

The Eighth Amendment, as construed in <u>Furman</u>, does not merely forbid the vesting of unbridled discretion in the capital jury; it forbids any arbitrary imposition of capital punishment, whatever the source or mechanism of the arbitrariness, and no matter what particular form the action may take. <u>See Gregg</u>, 428 U.S. at 188; <u>Woodson</u>, 428 U.S. at 303; <u>Roberts</u> v. <u>Louisiana</u>, 428 U.S. 325 (1976).

The actual imposition of the death penalty under the new statutory scheme inevitably involves the exercise of a broad range of uncontrolled discretion by prosecuting attorneys. As long ago as 1931, the Wickersham Commission reported that "[t]he

Prosecutor [is] the real arbiter of what laws shall be enforced and against whom . . . ." National Commission on Law Observance and Enforcement, Report of Prosecution, 19 (1931). Since that time, the discretion exercised by other authorities (police in charging, judges in sentencing) "[has] expanded," "concentrat[ing] [even] more discretion in an office that already is unique in its unreviewed power." Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521 (1981).

"Discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action," Gregg, at 189. Yet, the prosecutor has acquired "virtually unlimited control over charging inconsistent with a system of criminal procedure fair to defendants and to the public." Vorenberg, supra, at 1525. Extensive studies demonstrate this discretion in choosing which individuals to prosecute and choosing what offenses to charge them with is fraught with the risk of, and in actuality results in, invidious, arbitrary discrimination. See J. Ely, Democracy and Distrust, 97 (1980).

The United States Supreme Court's decision in Woodson v. North Carolina (1976), 428 U.S. 280, made it clear that the fatal flaw of mandatory death penalty statutes is that without specific standards the process of deciding who is to be sentenced to death is shielded from judicial review. "Race of Victim and Location of the Crime: The Decision to Seek the Death Penalty in South Carolina" Journal of Criminal Law and Criminology (1983).

> [T]he mandatory death penalty statute
> provides no standards to guide the jury in
> its inevitable exercise of the power to
> determine which first degree murderer shall

> live and which shall die . . . There is no
> way under the North Carolina law for the
> judiciary to check arbitrary and capricious
> exercise of that power.

Woodson at 303.

The Ohio legislature enacted statutes which defined aggravating specifications, outlined specific mitigating factors, described the balancing procedure, and provided for mandatory appellate review and proportionality review in an effort to insure that, "discretion . . . [is] suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg at 189. A tracking mechanism for capital cases, tracing the filing, disposition, and decisional elements (in opinions prepared first by the trial court judges and then the appellate judges) was established in the Supreme Court of Ohio.

One significant defect exists in the initial phase of this tracking system which renders it of only limited value for purposes of insuring non-arbitrary application of the death penalty. The Ohio system fails to track other homicide cases which could have been capitally indicted but which were not so indicted. Hilliard, Capital Punishment in Ohio: Aggravating Circumstances, 31 Cleve. St. L. Rev. 495, 523 (1982). The Ohio tracking system only tracks those cases which have been indicted as capital cases. The charging decision is unconstrained and is inconsistent with a system of guided discretion to insure even treatment and consistency among all similar cases.

In Ohio, only two constraints, which are rarely, if ever, applied, exist on this discretion. The equal protection clause

of the federal and state constitutions will not preclude the "conscious exercise of some selectivity in enforcement," but will bar selectivity if the defendant meets his "heavy burden" of showing "intentional or purposeful discrimination" on the basis of "impermissible considerations (such) as race, religion or the desire to prevent his exercise of constitutional rights." State v. Flynt (1980), 63 Ohio St. 2d 132, citing Snowden v. Hughes (1944), 321 U.S. 1.  Problems of proof of this nature are considerable.  See Vorenberg, supra, at 1539-1542.  Another constraint is the application of R.C. 309.05, which provides for removal of a prosecutor for "willful and wanton neglect or gross misconduct."  No other controls appear to be applied to the exercise of prosecutorial discretion in this state.  See State v. Hopkins (1982), 69 Ohio St. 2d 80 (J. Holmes and W. Brown concurring in the judgment of conviction, despite a "sincere belief that this case presents an instance of prosecutorial overkill, a circumstance which should not be furthered by our law enforcement officials.")

The data available reveals that prosecutors exercise discretion in capital charging decisions.  In Enmund, the Supreme Court recognized the prosecutor's use of discretion to avoid capitally charging an accomplice, although under many statutes the accomplice is subject to capital prosecution.  Enmund at 796. The discriminatory use of this discretion was revealed in the Coker decision, demonstrated in part on a recognition that rape committed by a black man was punished capitally, while a white man was only punished by incarceration.  In Tichnell v. State

175

(Md. 183) 462 A. 2d 1, evidence revealed that an individual who committed a potentially capital offense in the city of Baltimore had only a 1.8% chance of a capital indictment and a .6% chance of receiving a death sentence after jury trial. This was compared to an individual in Garrett County, who had a 100% chance of capital indictment upon commission of a capitally chargeable offense and a 50% chance of receiving the death sentence after jury trial. The exercise of prosecutorial discretion clearly has a significant effect upon the decision of whom the State of Maryland will attempt to execute.

An extensive study of South Carolina prosecutors revealed a "striking variation in the probability of the prosecutor seeking the death penalty. . . . For example, a black offender who kills a white victim in a rural area of the state has an eleven times greater risk of having the death penalty requested than a black offender who kills a black victim in an urban area. This is true even though both offenses are capital murders subject to the same state statute." "Race of Victim and Location of Crime" at 783. Gregg, 428 U.S. at 189.

In recent cases the Court has further defined the proper extent to which discretion must be guided. In Zant v. Stephens (1983), 462 U.S. 862, on remand 716 F. 2d 276, the court stated that a statutory death penalty scheme is constitutional if it provides for a categorical narrowing of eligibility for the death penalty at the stage of legislative definition, a comprehensive and consistent individualized determination of suitability of the

176

sentence, and meaningful appellate review at the selection stage. See also, Barclay v. Florida (1983), 463 U.S. 939, reh. den. 464 U.S. 874.

The implementation of the death penalty under the new Ohio Revised Code provisions permits the exercise of uncontrolled discretion by prosecuting attorneys that violates the constraints of Zant and Barclay. Prosecutors are free to arbitrarily and capriciously choose which individuals to prosecute and what offenses with which to charge them. A particular prosecutor could choose, on the basis of one set of facts, to charge on simple murder, while on the same facts another could choose aggravated murder with the kidnapping specification: there is no guidance or control over this decision.

This virtually unlimited discretion over charging decisions fosters an improper individualized determination of the suitability of the death sentence. While the Supreme Court in Zant and Barclay stressed an individualized determination with regard to sentencing, it is equally important for there to be a consistent individualized determination of death penalty eligibility through constraints on the indictment process.

In Ohio, however, no such constraints exists. No independent review of the propriety of the charging decision is conducted. No judicial body considers the appropriateness of charging decisions. Yet in Zant and Barclay the Supreme Court has emphasized the importance of meaningful appellate review in death penalty cases. Appellate review at the charging stage has as fundamental an effect on the defendant's right as review of

the sentencing decision.  Ohio provides no guarantee of the defendant's rights, however, and prosecutors are free to charge as they please without constraint.

In effect, Ohio's system is so designed as to permit a prosecutor to side-step procedural safeguards of recent Supreme Court decisions by allowing arbitrary charging decisions that work unfairness on defendants before the safeguards which apply at trial begin to operate.

In _Jenkins_, _supra_ at 169 the Court considered this argument of unbridled discretion upon the part of the prosecution.  The Court rejected such argument relying upon the concurring opinion in _Furman_.  But the _Furman_ opinion failed to deal with the fact that each prosecutor is an individual, who has different values and concerns.  Individual values such as religion, willingness to work, or political ambitions are just some of the factors that influence a decision to seek a capital indictment.  Such considerations do not meet the controlled guidelines of _Furman_.

Although the charging decision may quite literally be the difference between life and death, that decision is a completely uncontrolled, discretionary choice of the prosecuting attorney fraught with arbitrariness and the potential for vindictiveness.  The present capital sentencing scheme therefore violates the Eighth and Fourteenth Amendments, as well as the Ohio constitutional protections in Article I, Sections 2 and 9.

2.  The Ohio death penalty scheme, as authorized by Ohio Revised Code Sections 2903.01 and 2929.02, _et seq._, deprives capitally charged defendants of their lives without due process

of law in violation of the guarantees of the fifth and fourteenth amendments to the United States Constitution and Article, I, Section 16 of The Ohio Constitution.

A. Where the substantive due process requirements that the least restrictive means of serving a compelling state interest, when fundamental rights are involved, are not met, the death penalty cannot be constitutionally inflicted.

The right to life is a constitutionally protected fundamental right. Commonwealth v. O'Neal (1975), 327 N.E.2d 662; Roe v. Wade (1973), 410 U.S. 113, rehearing denied (1973), 410 U.S. 959; Johnson v. Zerbst (1938), 304 U.S. 458; Yick Wo v. Hopkins (1886) 118 U.S. 356. The fifth and fourteenth Amendments to the Constitution state explicitly that neither the United States government nor any of the individual state governments may deprive a person of his life without due process of law. "Aside from its prominent place in the due process clause itself, the right to life is the basis for all other rights. In the absence of life all other rights do not exist." Commonwealth v. O'Neal, at 668. Thus, the right to life "encompas[ses] . . . 'the right to have rights'." Commonwealth v. O'Neal II (1975), 339 N.E. 2d 676 (Tauro, C.J. concurring). O'Neal II at 678. "An executed person" not only is deprived of life, but "has indeed 'lost the right to have rights'." Furman, 408 U.S. at 290 (Brennan, J., concurring). Unless life itself is protected by due process all of the other rights guaranteed by the Constitution are meaningless.

The duty and the power of the courts to protect individuals from unconstitutional legislative enactments is unquestionable.

179

Marbury v. Madison (1803) 5 U.S. 137; City of Euclid v. Heaton, (1968), 15 Ohio St. 2d 65.  Before this Court can affirm the imposition of the sanctions of the Ohio death penalty provisions, it must first examine the statutory scheme and determine whether it comports with due process of law.  If it does not, the statutes must be set aside.

Due process guarantees prohibit the taking of life unless the state can show a legitimate and compelling state interest. Commonwealth v. O'Neal, 327 N.E. 2d 668; O'Neal II, 339 N.E. 2d at 678 (Tauro, C.J., concurring); State v. Pierre (Utah, 1977), 572 P. 2d 1338 (Maughan, J., concurring and dissenting). Moreover, when fundamental rights are involved, substantive due process requires that "[e]ven though the governmental purpose be legitimate and substantial, the purpose cannot be pursued by means that broadly stifle personal liberties when the end can be more narrowly achieved." Shelton v. Tucker (1960), 364 U.S. 479; State v. Dixon (1973), 283 S. 2d 1 (Ervin, J., dissenting); Pierre, 572 P. 2d 1357. "In order for the state to justify the taking of life by legislative mandate, it must demonstrate that such action is the least restrictive means toward furtherance of . . . [the] compelling governmental end." Commonwealth v. O'Neal, 327 N.E. 2d at 668.

Concurring in Furman at 359, n. 141, Justice Marshall analogized his method of Eighth Amendment analysis with the strict scrutiny test of a Fourteenth Amendment due process approach, stating:

> Because capital punishment deprives an
> individual of a fundamental right (i.e., the

right to life), the State needs a compelling interest to justify it. Thus stated the substantive due process argument reiterates what is essentially the primary purpose of the cruel and unusual punishments clause of the Eighth Amendment – i.e., punishment may not be more severe than is necessary to serve the legitimate interest of the state.

In other contexts, such as cases involving religious freedom, the Supreme Court has held that, in spite of the state's compelling interest in the education of children, it may not impair individual freedoms where it is unable to show that the end to be served could not be satisfied by a less restrictive means. Wisconsin v. Yoder (1972), 406 U.S. 205. The right to life is no less deserving of such protection. Thus, for the death penalty to meet substantive due process requirements, it must (1) legitimately serve a compelling state interest and (2) be the least onerous punishment that can effectively serve those compelling state interests.

The societal interests commonly advanced to justify capital punishment are (1) savings lives, (2) protecting citizens, and (3) ensuring justice. O'Neal II at 681. These goals are often referred to, in penological terms, as (1) deterrence, (2) incapacitation/isolation, and (3) retribution/moral reinforcement. Id.; Gregg at 183, and n. 28.

There is, of course, one additional objective of punishment which has not been urged by the State to justify the use of capital punishment. The reformation of the individual offender is usually regarded as an important function of punishment. However, it can have no application where the death penalty is

181

exacted. Killing convicted criminals is utterly inconsistent with rehabilitation, and the death penalty obviously negates and utterly frustrates an interest the State has in that ultimate goal. O'Neal II at 681, n. 11.

Examining these possible justifications, the court in Gregg concluded the death penalty was sustainable and not in violation of the Eighth Amendment, "in the absence of more convincing evidence that the infliction of death as a punishment for murder is . . . without justification," Id. at 183. The Court in Gregg did not decide whether capital punishment is the least restrictive means for achieving the purported societal interests.

Capital punishment, because it involves the taking of life, is qualitatively different from other punishments. Furman, 408 U.S. at 187 (Brennan, J., concurring). This difference, therefore, necessitates the highest level of scrutiny in examining the State's justifications. In order to uphold the constitutionality of punishment which inflicts such suffering, absolutely extinguishing all rights, the State of Ohio must advance a substantial justification to demonstrate that the death penalty is not a needless imposition of pain and suffering, disproportionate to the severity of the offense or unconstitutionally cruel. See People v. Anderson, supra. See also, Furman, 408 U.S. at 331-332 (Marshall, J., concurring); Rudolph v. Alabama (1963), 375 U.S. 889, 891 (Goldberg, J., dissenting). The Ohio death penalty scheme does not satisfy this strict scrutiny test and must be declared unconstitutional.

B. <u>The death penalty is neither the least restrictive means of punishment not an effective means of deterrence.</u>

The state has a legitimate interest in protecting its citizens from murder.  One valid societal goal, in this respect, is deterrence.  The achievement of societal interests is not sufficient to justify the death penalty, however.  Because the impairment of the right to life is involved, thus denying all rights, the state's interests may not be effectively served by any means which would impair these fundamental constitutional rights to the extent that the death penalty does.

A number of studies have indicated that the death penalty does not have a superior deterrent effect to lesser punishments.  See Glasser, <u>Capital Punishment-Deterrent or Stimulus to Murder</u>? <u>Our Unexamined Deaths and Penalties</u>, 10 U. Tol. L. Rev. 417 (1979); Bailey, <u>Deterrent Effect of the Death Penalty for Murder In Ohio:  A Time Series Analysis</u>, 28 Cleve. St. L. Rev. 51 (1979); Bowers and Pierce, <u>The Illusion of Deterrence in Isaac Ehrlich's Research on Capital Punishment</u>, 85 Yale L. J. 187 (1975).  Jurisdictions having the death penalty have not been shown to have lower rates of criminal homicides than those states which have no death penalty.  Sellin, <u>Capital Punishment</u>, 1965, at 135-138.  Abolition of the death penalty does not result in a decreased rate of criminal homicide.  <u>Id</u>.

Capital punishment, rather than deterring murder, may actually induce it.  There is substantial evidence that persons of warped mentality and with suicidal motives may have committed murder so that they would be executed.  West, <u>Psychiatric Reflections on the Death Penalty</u>, 45 Amer. J. Orthopsychiatry 689

(1975); Solomon, <u>Capital Punishment as Suicide and Murder</u>, 45 Amer. J. Orthopsychiatry 701 (1975); Assn. of the Bar of the city of New York, Committee on Civil Rights, <u>The Death Penalty: It Should Be Abolished</u>, (1977).

Regarding deterrence, "the question to be considered is not simply whether capital punishment is a deterrent, but whether it is a more effective deterrent than life imprisonment," <u>Furman</u>, 408 U.S. at 346 (Marshall, J., concurring). "Despite the most exhaustive research by noted experts in the field, there is no convincing evidence that the death penalty is a deterrent superior to lesser punishments. In fact, the most convincing studies point in the opposite direction." <u>Commonwealth</u> v. <u>O'Neal</u>, 339 N.E. 2d at 682. <u>See</u>, <u>e.g.</u>, W. Bowers, <u>Execution in America</u> (1974); Forst, <u>The Deterrent Effect of Capital Punishment: A Cross-State Analysis of the 1960's</u>, 61 Minn. L. Rev. 743 (1977); Zeisel, <u>The Deterrent Effect of Capital Punishment: Facts v. Faith</u>, Sup. Ct. Ref. (1976).

Studies in Ohio have similarly failed to show any deterrent effect by imposition of the death penalty. Over twenty years ago, a study spanning fifty years of executions in the State of Ohio found no evidence that executions have any discernible negative effect on homicide rates. Ohio Legisl. Serv. Comm'n., <u>Capital Punishment</u> (1961). A more recent study of the period from 1910 to 1966 (the last execution in the state was in 1963) concludes:

> The evidence for Ohio provides no support for the argument that the certainty of the death penalty provides an effective deterrent to homicide. Rather, execution rates and

> homicide rates prove to be largely independent factors, with offense rates being a response to the changing demographic characteristics and socioeconomic conditions of the state. Accordingly . . . Ohio's experience with capital punishment during [its] last six decades does not support retentionist arguments based upon deterrence. . . . Ohio's experience with capital punishment provides no justification for reinstating the death penalty as an effective means of dealing with the state's murder problem.

Bailey, supra at 70.

The only empirical examinations of Ohio's experience with the death penalty agree that no deterrent effect has been demonstrated. On a nationwide basis, the United States Supreme Court has stated that the empirical findings are "inconclusive." Gregg v. Georgia, 428 U.S. at 185. In Shuman v. Walff (D. Ct. Nev., 1983), 571 F. Supp. 213) the court stated that in a case involving an intentional killing life without possible parole is a sufficient deterrent. Thus, the state's interest can be "adequately served by other less restrictive means of punishment." O'Neal II, 339 N.E. 2d at 685.

In Jenkins and Maurer, the Court did not address the issue of deterrence. This can at least partially be attributed to the fact that at the time of the decision there existed no widely accepted study indicating that the death penalty was an effective deterrent. Still today no such study exists.

    C.   The societal interest of incarceration of the offender can be effectively served by means less restrictive than the death penalty.

The second purported justification for executions, incapacitation of the offender for the protection of society, does not require capital punishment. The relevant state interests involved can be adequately served by restraint and isolation. Although executing the defendant is one way to prevent any further harm to society by an individual offender, it is not the only means to that end and is certainly not the least restrictive.

In the words of Justice Brennan:

> If a criminal convicted of a capital crime poses a danger to society, effective administration of the state's pardon and parole laws can delay or deny his release from prison, and techniques of isolation can eliminate or minimize the danger while he remains confined.

Furman v. Georgia, 408 U.S. at 300 (Brennan, J., concurring). In fact, "lesser alternatives, such as imprisonment, are accepted by society in cases where the risk of repetition would seem to be substantial . . . the dangerous psychopath who is found not guilty by reason of insanity is not executed . . . [he is] instead contained." Assn. of the Bar of the City of New York, supra. Ohio's provision for life imprisonment in a maximum security facility with no chance of parole for twenty or thirty years, R.C. Section 2929.02, should surely suffice.

In discussing incapacitation through the use of incarceration and parole, one noted commentator stated:

> Nationally there is substantial information to show that murderers can be incarcerated and paroled with safety, and that there is no discernible difference in this regard between those who are found guilty of one rather than another kind of homicide.

186

Bedau, <u>Death Sentences in New Jersey, 1907-1960</u>, 19 Rutgers L. Rev. 1 (1964).

While it may be argued that incarceration cannot provide the same guarantee against recidivism as execution, such an argument ignores the other state interests involved. The state clearly has a compelling interest in not punishing an innocent person, as demonstrated throughout the criminal justice system by provisions such as the presumption of innocence, necessity of a unanimous jury, and the requirement of proof beyond a reasonable doubt. Beyond this interest in not convicting the innocent, the state has a strong interest in assuring that, once discovered, any mistakes that are made are promptly corrected. Yet newly discovered evidence, such as the discovery of perjured testimony, simply cannot undo an execution.

The relevant state interest is not to protect society at all costs. If it were, the presumption of innocence could not be tolerated for it might result in a guilty person being released into society. All of the protections built into the criminal justice system involve some risk to society. In light of these risks, it cannot be established by the state that its interest in incapacitating certain defendants is so great that it cannot be effectively served by the life imprisonment provisions of O.R.C. Section 2929.02.

> D.    If retribution or revenge is to be considered, it can be satisfied by less onerous means than death.

Retribution cannot serve as the compelling state interest justifying capital punishment because there is no evidence that a less onerous penalty would not equally satisfy the public's outrage and its desire for punishment.  See O'Neal II, 339 N.E. 2d at 686.  It is clear that:

> [G]rading punishments according to the severity of the crime does not require that the upper limit of severity be the death penalty.

Bedau, The Death Penalty in America, 268 (Rev. ed. 1967).

"It is incompatible with the dignity of an enlightened society to attempt to justify the taking of life [merely] for purposes of vengeance." People v. Anderson, 6 Cal. 3d 638, 100 Cal. Rptr. 152, 493 P. 2d 880, cert. denied (1972), 406 U.S. 958. While in some views retribution may be a permissible aspect of punishment, it "is no longer the dominant objective of criminal law," Williams v. New York (1949), 337 U.S. 241, and it cannot act as the sole justification for a particular penalty.

The interest of the state in restraining and isolating dangerous individuals for the protection of its citizens can be adequately served by life imprisonment without impairing other valid state interests as well.  The failure of the state to meet its burden of demonstrating that it has chosen the least restrictive means in its efforts to achieve a compelling state interest requires this court to reject capital punishment as a violation of due process.

The failure of the state to meet "its heavy burden of demonstrating that, in pursuing its legitimate objectives, it has

188

chosen means which do not unnecessarily impinge on the fundamental constitutional right to life," O'Neal II, 339 N.E. 2d at 688, requires rejection of the death penalty as a punishment as it is violative of due process. The State of Ohio is obliged to show that the availability of the death penalty contributes more to the achievement of a legitimate state purpose than the availability in like cases of the penalty of life imprisonment. The state cannot satisfy these substantive due process requirements.

   3.    The fifth and fourteenth amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution guarantee fairness in judicial proceedings by requiring procedural due process, the violation of which will result in unequal protection of law, contrary to the guarantees in the fourteenth amendment and Article I, Section 2, and the imposition of cruel and unusual punishment, contrary to the eighth amendment and Article I, Section 9 of the Ohio Constitution.

It is well established that both the trial itself and the sentencing process must satisfy the constitutional requirements of due process. Gardner v. Florida (1977), 430 U.S. 349; cf. Beck v. Alabama (1980), 447 U.S. 625, 638; Eddings v. Oklahoma (1982), 455 U.S. 104, 111. Beginning with Furman, the court attempted to provide due process standards that would serve the goals of measured consistent application of punishment and fairness to the accused. Eddings at 111. Moreover, in order to insure that the death penalty is imposed on the basis of reason rather than emotion, the court has invalidated procedural rules that negatively affect the reliability of either guilt or

sentencing determinations, <u>Beck</u> at 638; <u>Gardner</u> at 357-358; <u>Lockett</u> v. <u>Ohio</u> (1978), 438 U.S. 586.

States may not impose a capital sentence through procedures that create a substantial risk of arbitrary and capricious application. <u>Gregg</u> at 188 and 193-195; <u>Furman</u> at 255, 274 and 309; <u>Spinkellink</u> v. <u>Wainwright</u> (5th Cir. 1978), 578 F.2d 582. The qualitative difference between capital and non-capital punishment requires that states use more reliable sentencing procedures when imposing the death penalty. <u>Lockett</u> at 604; <u>Woodson</u> at 305; <u>Gregg</u> at 187; <u>Proffit</u> v. <u>Wainwright</u> (11th Cir. 1982), 685 F.2d 1227 modified 706 F.2d 311; <u>cert</u>. <u>denied</u> 464 U.S. 1002, (because death penalty is uniquely severe and irrevocable there is a greater need for procedural safeguards in sentencing).

In addition, for a death penalty statute to be constitutionally valid it must provide specific guidelines for determining when the death penalty may be imposed. <u>Godfrey</u> v. <u>Georgia</u>, 446 U.S. 420; <u>Woodson</u> at 303; <u>Henry</u> v. <u>Wainwright</u> (5th Cir. 1981), 661 F.2d 56, 58 <u>vacated and remanded</u>, 457 U.S. 1114 (1982). Although such guidelines have not been conclusively defined, the court has indicated its approval of statutory death penalty schemes which (1) narrowly define the categories of cases in which a death sentence may be imposed, <u>Jurek</u>, 428 U.S. at 270, (2) require a finding of enumerated aggravating circumstances prior to imposition of the death penalty, <u>Gregg</u> at 159, (3) require aggravating circumstances to adequately and objectively narrow the class of defendants eligible for the death penalty, <u>Zant</u> v. <u>Stephens</u> (1983), 462 U.S. 862, on remand 716 F.2d 275,

(4) make an individualized determination of the appropriateness of the death penalty on the basis of the character of the individual and the circumstances of the crime, Id. at 2744, (5) require or allow for appellate review of proportionality, Pulley v. Harris (1984), 465 U.S. 37, and (6) emphasize the consideration of a wide range of mitigating factors, Lockett at 604.

Where such procedural safeguards are not implemented, there is an inherent risk that the death penalty will be imposed in spite of factors calling for a less severe penalty. Lockett at 605. When the choice is between life and death, such a risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments as well as Article I, Sections 2, 9 and 16 of the Ohio Constitution. Id. Ohio's statutory scheme must be stringently evaluated to determine if the guilt determining and sentencing phases of this death penalty trial meet such due process requirements.

> A. The Ohio death penalty scheme permits imposition of the death penalty on a less than adequate showing of culpability by failing to require a conscious desire to kill, premediatation, or deliberation as the culpable mental state.

The Supreme Court has stated that as the death penalty "is an extreme sanction, [it is] only suitable to the most extreme crimes." Gregg, 427 U.S. at 187. In Coker, 433 U.S. at 592, the court reaffirmed its prior holding in Gregg that the death penalty for a deliberate murder was not grossly disproportionate. However, in Lockett, at 613 (Blackman, J., concurring, 619-620

(Marshall, J., concurring) and 624 (White, J., concurring), members of the court expressed their views that imposition of the death penalty on one who did not possess at least a purpose to cause the death of the victim would likely violate the Eighth Amendment.

Recently, a majority of the Supreme Court on Enmund v. Florida (1982), 458 U.S. 782 found the imposition of the death penalty on a person who did not kill, attempt to kill, or intend to kill violated the Eighth and Fourteenth Amendments. The Court stated:

> It is fundamental that 'causing harm intentionally must be punished more severely than causing the same harm unintentionally'. . . [To do otherwise is] 'impermissible under the Eighth Amendment.'

Enmund at 798.

The Ohio Legislature has attempted to meet this constitutional issue by requiring that "No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another," and "that the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt." R.C. 2903.01(D).

Nowhere, however, in the Ohio Revised Code is the phrase "specific intent" defined. There is considerable confusion over the meaning of this term in the criminal law, particularly when attempts are made to distinguish this from "general intent". See LaFave and Scott, Criminal Law 201 (1972). Further confusion has developed with regard to crimes requiring that the defendant "intentionally cause a certain result," so that:

192

It is now generally accepted that a person
who acts (or omits to act) intends a result
of his act (or omission) under two quite
different circumstances; (1) when he
consciously desires that result, whatever the
likelihood of that result happening from his
conduct, and (2) when he knows that the
result is practically certain to follow from
his conduct, whatever his desire may be as to
that result . . . It may be concluded
therefore, that the word 'intent' in the
substantive criminal law has generally not
been limited to the narrow dictionary
definition of purpose, aim, or design, but
that it has often been viewed as encompassing
much of what would ordinarily be described as
knowledge.

LaFave, supra, at 196-197.

The Ohio Supreme Court in Jenkins, supra at 170, cites

Edmund for the principal that, for an individual to be eligible

for the death penalty, he must have killed or intended to kill.

As is obvious from LaFave cited above, there is serious question

as to the Ohio term "specific intent." Such confusion means that

a jury could convict an individual who does not have the

requisite mental culpability required by Edmund. State v. Mapes

(1985), 19 Ohio St. 3d 108 does not dispel the confusion because

the court equates "purposely" with "specific intent to kill". If

the two terms were equal, the legislature would have had no need

to enact R.C. 2903.01(D), requiring specific intent for a

conviction of aggravated murder, since "purpose" was already

required in the statute.

In Coker, the court emphasized the necessity of an

individualized consideration of each case, emphasizing the need

for ensuring that the severity of the offense is proportionate to

the penalty. Coker, 433 U.S. at 592. If the death penalty is

193

"suitable to the most extreme of cases," then in accordance with the Coker factors, there is certainly support for premeditation and deliberation as the requisite mental state to demonstrate specific intent.

> American criminal law has long considered a defendant's intention – and therefore his moral guilt – to be critical to 'the degree of [his] criminal culpability,' Mullaney v. Wilbur, 421 U.S. 684, 698 (1975), and the Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing.

Enmund at 800; citing Robinson, 370 U.S. at 667; cf. Weems, 217 U.S. at 362; Godfrey, 446 U.S. at 433. It is the most culpable of mental states, as shown by history and legislative action. Comment, The Constitutionality of Imposing the Death Penalty for Felony Murder, 15 Hous. L. Rev. 356, 375 (1978).

If the State's legitimate interests are to be weighed it is clear that, if any aggravated murder can be deterred by the threat of the death penalty, it is that murder which has been the subject of some reflection by a cool mind, Edmund, at 789, of "studied care in planning or analyzing the means of the crime, as well as a scheme encompassing the death of the victim." State v. Jenkins (1976), 48 Ohio App. 2d 99, cited with apparent approval in State v. Toth (1977), 52 Ohio St. 2d 206.

By failing to require the conscious desire to kill, or premeditation and deliberation as the culpable mental state, 2903.01(B) and 2929.04(A) run afoul of the federal and state Constitutions.

B.  The statutes fail to require a stringent standard of proof as to guilt and conviction before the death sentence may be imposed.

The absolute need for reliability in the guilt phase of a capital case requires that this higher standard of proof be applied.  The irrevocability of the penalty requires absolute reliability.  Absent absolute reliability, the accused can be subjected to a sentence of death in a manner violative of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

> Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a given case.

Woodson v. North Carolina (1976), 428 U.S. 208, 305 (emphasis added).

Insistence on reliability is a recurring theme in the Supreme Court's decisions in capital cases.  Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1, 60 (1980).  In Green v. Georgia (1979), 422 U.S. 95, 97, the Court recognized that even after a determination of guilt beyond a reasonable doubt has been made, testimony supporting the defendant's contention that he had not participated in the killing is "highly relevant to a critical issue in the punishment phase of the trial." (Emphasis added).  Because this testimony had been excluded, Green did not receive a "fair trial on the issue of punishment," and was entitled to a new sentencing hearing.

A more stringent standard of proof is thus required in capital cases to insure the reliability of the sentencing

decision Justice O'Connor stated in her concurrence in <u>Eddings</u> v.

<u>Oklahoma</u>.

> Because sentences of death are qualitatively different from prison sentences, this court has gone to <u>extraordinary measures</u> to ensure that the <u>prisoner sentenced to be executed is afforded process that will guarantee, as much as it humanly possible, that the sentence was not imposed out of whim</u>, passion, prejudice, <u>or mistake</u>.

(1982) 455 U.S. 104, 117-118.  (Emphasis added).  <u>See also</u>, the

majority opinion in <u>Beck</u> v. <u>Alabama</u> (1980), 447 U.S. 625, at 637

n. 14; Note, <u>The Impact of a Sliding Scale Approach to Due</u>

<u>Process on Capital Punishment Litigation</u>, 30 Syr. L. Rev. 675

(1979); <u>Radin</u>, <u>Cruel Punishment and Respect for Persons:  Super</u>

<u>Due Process for Death</u>, 53 So. Cal. L. Rev. 1143 (1980).

The Supreme Court will stringently evaluate guilt

determination practices in capital cases.  If a procedure

"enhances the risk of an unwarranted conviction," <u>Beck</u>, at 637,

or sentence, it will be struck down, even though the same

practice may be upheld in a non-capital case, <u>Beck</u>, at 637 n. 14.

Treating capital cases differently is totally consistent with

previous constitutional interpretations.  Historically the

United States Supreme Court has noted that "due process calls for

such procedural protections as <u>the situation demands</u> . . . [N]ot

all situations calling for procedural safeguards call for the

same kind of procedure." <u>Gardner</u> v. <u>Florida</u> (1977), 430 U.S.

349, 358 n. 9, quoting <u>Morrissey</u> v. <u>Brewer</u> (1972), 408 U.S. 471,

491 (emphasis added).

The proof beyond a reasonable doubt standard has been constitutionally required in criminal cases "to safeguard men from dubious and injust convictions." In re Winship (1970), 397 U.S. 358, 363. The petitioner in Winship was a juvenile facing a possible six years imprisonment. Crucial to the Court's decision was its assessment of the importance of the defendant's right not to be deprived of his liberty. Proof beyond a reasonable doubt was demanded in recognition that "the accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the convictions." Id. (emphasis added). Only this standard of proof also adequately commanded "the respect and confidence of the community in applications of the criminal law." Id. at 364. (Emphasis added).

In a capital case, far more than liberty and stigmatization are at issue. The defendant's interest in his life must be placed in the scales. Only then can an appropriate balancing of the interest be performed; only then can one know whether the "situation demands" a particular procedural safeguard. Given the magnitude of the interests at stake in a capital case and the necessity that the community "not be left in doubt whether innocent men are being condemned" irretrievably, Winship, at 364, the assessment of interests demands a standard for taking life which reduces the margin of error "as much as humanly possible," Eddings, supra, at 118. The most stringent standard of proof that is "humanly possible" is proof beyond all doubt. Appellant filed a motion requesting this burden of proof. (Tr. 41).

This is consistent with history.  The reasonable doubt rule has been a part of American jurisprudence since the late 119th century.  See Morano, A Re-Examination of the Development of the Beyond a Reasonable Doubt Rule, 55 Boston U.L. Rev. 507 (1975).  The reasonable doubt rule replaced a higher burden, the any doubt test.  Earlier courts instructed jurors that "your sense of justice, and your own feelings, will not allow you to convict the prisoner, unless your consciences are fully satisfied beyond all doubt of his guilt."  Id., at 511.  John Adams, as defense could in the Boston Massacre trials in 1770, argued in closing:

> [T]he best rule in doubtful cases, is, rather to incline to acquittal than conviction and . . . [w]here you are doubtful never act; that is, if you doubt of the prisoner's guilt, never declare him guilty; this is always the rule, especially in cases of life.

Rex v. Weems, quoted in 55 Boston U.L. Rev., at 516 (emphasis added).

The American Law Institute's MODEL PENAL CODE, cited by the Supreme Court as a statute "capable of meeting constitutional concerns," adopts the beyond-all-doubt standard at the sentencing.  See Gregg v. Georgia (1976), 428 U.S. 153, 191-195.  The MODEL PENAL CODE mandates a life sentence if the trial judge believes that "although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt."  MODEL PENAL CODE Section 210.6(1)(f).  If the trial judge has any doubt of the defendant's guilt, life imprisonment is automatically imposed without a sentencing hearing.  The words used are "all doubt", not merely "doubt" or "reasonable doubt".

Ohio law provides standard jury instructions of "reasonable doubt" and "proof beyond a reasonable doubt" as the applicable burden of proof in capital cases. R.C. 2901.05(D). Both definitions have been repeatedly challenged in the courts as inadequate. ". . . [T]he restylizing has changed and distorted the former definitions to such an extent that the statutory definition of reasonable doubt requires little more than a preponderance of the evidence." State v. Frost (May 2, 1978), No. 77AP-728 unreported (1978 Opinions 1101) (Whiteside, J., dissenting). See Cross v. Ledford (1954), 161 Ohio St. 469; Holland v. United States, 348 U.S. 121 (1954); Scurry v. United States, 347 F. 2d 468, 470 (D.C. Cir., 1965) cert. denied 289 U.S. 883 (1967) (. . . [I]mportant affairs is the traditional test for clear and convincing evidence . . . The jury . . . is prohibited from convicting unless it can say beyond a reasonable doubt thatdefendant is guilty as charged. . . . To equate the two in the juror's mind is to deny the defendant the benefit of a reasonable doubt.); State v. Crenshaw (1977), 51 Ohio App. 2d 63, 65; cf. State v. Nabozny (1978), 54 Ohio St. 2d 195; State v. Senett (1980), 70 Ohio App. 2d 171. Recently the Sixth Circuit found in a non-capital case that "although we may disapprove of the 'willing to act language' [in R.C. Section 2901.05(D)] . . . the instructions here, when taken as a whole, adequately convey the concept of reasonable doubt to the jury." Thomas v. Arn (6th Cir. 1983), 704 F. 2d 865, 869. Appellant objected to statutory definition of reasonable doubt. (Tr. 3098).

The Ohio reasonable doubt instructions, subject as they are to some challenge for inadequacy in non-capital cases, fail to satisfy the requirement of reliability in a capital case. Even in _Winship_, when considering the reasonable doubt standard, the Court stated that the fact finder must be convinced of guilt "with <u>utmost certainty</u>," _Id._, at 364, and that the court must "impress on the trier of fact the necessity of reaching a <u>subjective state of certitude</u>." _Id._, at 363. (Emphasis added). Ohio's definition of reasonable doubt is inadequate to meet even these standards, and therefore a felony jury must be instructed that a "guilty" verdict is foreclosed unless the state has proven all elements of the offense beyond all doubt.

Recent cases have illustrated the gross inadequacy of the reasonable doubt standard in capital cases. In <u>State v. Miller,</u> the defendant was sentenced to death solely upon fingerprint evidence that he had explained in an exculpatory manner. (1977) 49 Ohio St.2d 198 . A five-Justice majority of the Ohio Supreme Court concluded that "there was sufficient substantial evidence for the triers of fact to conclude that Miller was the criminal agent of the crimes charged," and therefore affirmed the conviction and sentence of death. <u>Id.</u> at 203. Two members of the Court dissented on the grounds that the evidence did not exclude "every reasonable hypothesis of innocence" and listed other evidence inconsistent with Miller's guilt. According to the dissent, the result of the majority's affirmance was the "impos[ition of] the death penalty on evidence insufficient to sustain a conviction." <u>Miller</u>, at 206. George Miller's death

sentence was eventually commuted as a result of the decision in _Lockett_ v. _Ohio_, 438 U.S. 586 (1978).  If no such decision had been rendered by the United States Supreme Court, however, Miller would have been executed.

A second, more timely example is of even greater significance.  In a capital case tried under the new law, _State_ v. _Herman Ray Rucker_, No. 82-CR-018 (Wayne County Common Pleas), the jury attempted to reverse itself.  After reaching a unanimous verdict on guilt, the jury returned for the sentencing hearing, heard the testimony, deliberated, and then asked the court for instruction as the jury was no longer in agreement as to the question of guilt.  After instruction by the court that they could only determine sentence at the second hearing, the jury opted for the least restrictive sentence alternative, life with parole eligibility in twenty years.  A new trial was ordered based on perjured testimony.  _Rucker_ was subsequently found not guilty of all charges.

In _Miller_ and in _Rucker_, doubt existed as to guilt of the accused.  Yet Miller received a death sentence affirmed on appeal, and _Rucker_, after an apparently agonizing jury decision, received a life sentence.  Doubt as to guilt is absolutely untenable in a capital case.  The accused's interest not merely in liberty, but in life, and the State's interest in justice are too vital to be infringed upon by doubt as to guilt.  A compromise sentence such as in _Rucker_ exacts too great a price from the accused and strikes too heavy a blow to the public's faith in justice to be tolerated.

But the insufficiency of the reasonable doubt standard is perhaps best illustrated by a non-capital case: the celebrated rape trial of William Bernard Jackson. A jury found William Jackson guilty of committing two rapes beyond a reasonable doubt. He was sentenced to prison. Yet nearly five years later, Dr. Edward F. Jackson was indicted for the same rapes and was later convicted.

William Bernard Jackson was released from prison following the indictment of Dr. Jackson. Yet had the crime been murder rather than rape, William Bernard Jackson might have been executed for another man's crimes, on the strength of proof beyond a reasonable doubt. No release or remedy would have been possible for the wrongfully convicted and executed man.

Therefore, the burden of proof as currently defined in Ohio law is constitutionally deficient to support or sustain a death sentence in a capital case.

C.  The Ohio death penalty statutes fail to require that the jury consider as a mitigating factor pursuant to R.C. 2929.04(B) that the evidence fails to preclude doubt as to the defendant's guilt. The fact that the evidence does not foreclose doubt as to guilt must be considered as a relevant mitigating factor under R.C. 2929.04(B).

R.C. 2929.04(B)(7) states, in pertinent part:

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt . . ., the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and

background of the offender, and all of the
following factors:

\* \* \*

(7) Any other factors that are relevant to
the issue of whether the offender should be
sentenced to death.

In addition, R.C. 2929.03(D)(2) states:

Upon consideration of the relevant evidence
raised at trial, the testimony, other
evidence, statement of the offender,
arguments of counsel, and, if applicable, the
reports submitted pursuant to division (D)(1)
of this section, the trial jury, if the
offender was tried by a jury, shall determine
whether the aggravating circumstances the
offender was found guilty of committing are
sufficient to outweigh the mitigating factors
present in the case. If the trial jury
unanimously finds, by proof beyond a
reasonable doubt, that the aggravating
circumstances the offender was found guilty
of committing outweigh the mitigating
factors, the trial jury shall recommend to
the court that the sentence of death be
imposed on the offender. Absent such a
finding the jury shall recommend that the
offender be sentenced to life imprisonment
with parole eligibility after serving twenty
full years of imprisonment. . . . (Emphasis
added).

Clearly the language in these statutory provisions contemplates a
balancing process focusing upon the mitigating factors present in
the case as compared to the offender's "guilt" with respect to
the aggravating specifications.

In determining the appropriateness of the death penalty, the
fact that the evidence presented failed to foreclose doubt as to
guilty <u>must</u> be considered as a relevant mitigating factor. "The
jury should have before it not only the prosecution's unilateral
account of the offense but the defense version as well; the jury

should be afforded the opportunity to see the whole picture. . .
." People v. Terry (1964), 61 Cal. 2d 137, 37 Cal. Rptr. 605,
395 P. 2d 381. The Court in Terry indicated that evidence
tending to show defendant's possible innocence of the offense(s)
involved for which he has been convicted is necessary.
Otherwise, the jury at the penalty phase will necessarily
"deliberate in some ignorance of the total issue." Id. The
Terry court concluded:

> . . . a jury determines both guilt and
> penalty may properly conclude that the
> prosecution has discharged its burden of
> proving defendant's guilt beyond a reasonable
> doubt but . . . may still demand a greater
> degree of certainty of guilt for the
> imposition of the death penalty. (Emphasis
> added).

Id. at 470.

The problem as to jury consideration of doubt in the penalty
phase is especially acute in the State of Ohio. As previously
discussed, Ohio employs a less stringent definition of beyond a
reasonable doubt, which invites mistake. By employing such a
standard, it becomes ever more critical that Ohio sentencing
juries be permitted to consider doubt as to the guilt of the
defendant.

In considering jury instructions concerning mitigating
factors, the court in Spivey v. Zant (5th Cir. 1981), 661 F.2d
464, reh. denied 667 F.2d 93, cert. denied 458 U.S. 1111, (5th
Cir, 1981), setting aside the petitioner's death sentence,
stated:

> The charge does not begin to communicate to
> the jury that the law recognizes the
> existence of facts or circumstances which,

204

though not justifying or excusing the offense, may properly be considered in determining whether to impose the death sentence.

\*      \*      \*

This constitutional requirement to allow consideration of mitigating circumstances would have no importance, of course, if the sentencing jury is unaware of what it may consider in reaching its decision . . . 'where discretion s afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' Citing Gregg v. Georgia, 428 U.S. at 188-189.

Id. at 470.

R.C. 2929.04(B)(7) mandates that the sentencing authority consider "any other factors that are relevant to the issue of whether the defendant should be sentenced to death." Clearly, the potential for mistake is relevant to such a decision. In fact, the United States Supreme Court has repeatedly emphasized the importance of reliability as a relevant factor in determining the constitutionality of death sentences. See generally, Woodson, at 305; Deciding Who Dies, 129 Univ. of Pa. L. Rev. 1 (November, 1980). It follows that the failure to consider the inherent potential for erroneous convictions, especially with respect to the circumstances of the particular case involved, would increase the possibility that a death penalty might be imposed under a "sentencing procedure that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." Gregg at 189.

205

The failure to require jury consideration of the fact that the evidence does not foreclose doubt as to guilt violates the constitutional standards established for the imposition of the death penalty. See Burr v. Florida (1985), ___ U.S. ___, 88 L. Ed. 2d 170 (Oct. 9, 1985), wherein Justices Marshall and Brennan dissented from the denial of certiorari when the question presented was: "whether the sentencing jury in a capital case may be prohibited from taking into account its own nagging doubts about the defendant's guilt as it considers whether the defendant deserves to die." Justices Marshall and Brennan wrote that Lockett v. Ohio (1978), 438 U.S. 586, and Eddings v. Oklahoma (1982), 455 U.S. 104 require the sentencer to consider any circumstance, including doubt about guilt, that the defendant proffers as a basis for a sentence less than death.

    D.   The statutes fail to require the state to prove the absence of any mitigating factors and that death is the only appropriate penalty before the death sentence may be constitutionally imposed.

The view that the prosecution must prove the absence of mitigating factors is consistent with R.C. 2929.03(D)(1)'s mandate that:

> The defendant shall have the burden of going forward with the evidence of any factor in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.

When R.C. 2.901.05 was enacted in 1974 to deal with affirmative defenses, it placed on the defendant the burden of going forward, but was silent as to the burden of proof. Thereafter, the Ohio Supreme Court interpreted R.C. 2901.05 to place on the state the burden of disproving or negating an affirmative defense once the defendant went forward with the evidence, <u>State</u> v. <u>Humphries</u>, 41 Ohio St. 2d 103 (1976). Later, in 1978, the legislature amended R.C. 2901.05 to make clear that the burden of raising and proving an affirmative defense is on the defendant. Since the legislature in 1981 enacted R.C. 2929.03(D)(1) of the death penalty law with full knowledge of the earlier judicial interpretation of R.C. 2901.05, and the language used is essentially identical, it follows that the legislature clearly intended to place the burden on the state to negate mitigation. Here, the defendant objected to the trial court's instructions to the jury at the mitigation phase which placed the burden on the defendant to prove the existence of mitigating circumstances by a preponderance of the evidence. (Tr. 3042, 3082, 3097, 3103).

Moreover, a contrary interpretation of Section 2929.03(D)(1) violates the state and federal due process and cruel and unusual punishment provisions. The defendant cannot be obliged to bear the burden of proving the existence of mitigating factors. If the defendant were so required, then in a case in which the evidence relating to mitigation was in equipoise, the jury would have to find that there were no mitigating circumstances. Aggravation would thus outweigh mitigation, and the jury would

207

have to impose the death sentence even though it was as likely as not that there were mitigating circumstances. This is contrary to the constitution insofar as it mandates respect for humanity and the greater need for reliability in determining whether the death penalty is appropriate. See Woodson, 429 U.S. at 305; Lockett, 438 U.S. at 604; and Mullaney v. Wilbur (1975), 421 U.S. 684, 697.

In an attempt to alleviate the possibility of imposing the death sentence in a situation where it is as likely as not that there are mitigating circumstances, such as where evidence of both aggravating and mitigating factors are comparatively equal, the State of Ohio has set forth the statutory requirement that there must be a finding by the trier of fact that the aggravating circumstances "are sufficient to outweigh the mitigating factors present in a case." R.C. 2929.03(D)(2). Ohio's statutory scheme has fallen short of constitutional mandates of due process and protection against cruel and unusual punishment by failing to require the state to prove beyond a reasonable doubt that the aggravating circumstances substantially outweigh the mitigating factors and to require the jury, trial judge, and appellate court to find that death is the only appropriate penalty. Absent such standards the risk of error in the imposition of the death penalty is intolerably great.

Under Eighth and Fourteenth Amendment standards of human decency and the need for greater reliability that death is the appropriate penalty, defendants should not be sentenced to death unless the scale substantially tips in favor of death. As the

208

Ohio provisions do not explicitly provide for merciful discretion on the part of the trier of fact, cf., e.g., Spivey, 661 F. 2d at 471; Gregg, 428 U.S. at 197; and Briley v. Commonwealth (Va. 1980), 273 S.E. 2d 48, and the death penalty becomes effectively mandatory once the statutory criteria are established, it is particularly important that the "scales of justice" be substantially tipped in favor of the death penalty. The fact that the aggravating circumstances merely outweigh the mitigating factors is an insufficient standard upon which to support the execution of a criminal defendant.

At present, the statutes fail to adequately control the decision-making process. See Gilloon, Capital Punishment and the Burden of Proof: The Sentencing Decision, 17 Calif. West. L. Rev. 316 (1981). The use merely of the term "outweigh" preserves reliance on the lesser standard of weight, that of preponderance of the evidence. A perception of marginally greater aggravating factors mandates execution. Such a result cannot be tolerated, as it is not a sufficiently reliable test for the irrevocable decision of life or death, and it creates an unacceptable risk of arbitrary or capricious sentencing.

Similarly, it must be shown that death is the only appropriate penalty, and such a determination must be made at each level of sentencing decision-making for the death penalty to be imposed. Although the Court of Appeals and the Ohio Supreme Court are required to conclude the penalty is appropriate, R.C. 2929.05, the trial judge and jury must also be obliged to conclude that death is the only appropriate method of serving the state's legitimate punishment goals. See Coker, 433 U.S. at 592.

R.C. 2929.03, 2929.04 and 2929.05 violate the due process clause and the cruel and unusual punishment provisions of the state and federal constitutions, by permitting the imposition of the death penalty when mitigating factors are present. Whenever mitigating factors are present, it is unconstitutional to impose the death penalty, because where any reason exists to spare a human life, common decency and basic notions of justice preclude the imposition of death.

E.   The Ohio death penalty statute impermissibly mandates imposition of the death penalty upon proof of an aggravating circumstance "outweighing" any evidence in mitigation.

The Ohio legislature, in an effort to correct the defects of the 1974 death penalty provisions struck down by the United States Supreme Court in Lockett v. Ohio, 438 U.S. 586 (1978), expanded the number of mitigating factors to be considered in capital sentencing from the three of the prior statute to seven, including a blanket provision, "other factors . . . relevant to the issue of whether the offender should be sentenced to death." R.C. 2929.04(B). However, the existence of any of these factors in mitigation "does not preclude the imposition of a sentence of death, but shall be weighed . . . against the aggravating circumstances." R.C. 2929.03(D)(2) and (3), 2929.04(C). Thus, as indicated above, under the present statute, death can be imposed even when mitigating factors exist. And, death is mandated either in the absence of mitigating factors or when existent mitigating factors are "outweighed" by the aggravating specifications proven at the guilt phase.

The legislature expanded the number of mitigating factors, but is has impermissibly devalued the importance of mitigation. Under the statute found unconstitutional in Lockett, "[o]nce a defendant is found guilty of aggravated murder with at least one of seven specified aggravating circumstances, the death penalty must be imposed unless . . . at least one of the following mitigating circumstances is established by a preponderance of the evidence." Lockett at 607. The prior statute may have impermissibly narrowed the range of mitigation, but the "establishment" of a mitigating circumstances precluded a death sentence. Under the current Ohio law, the sentencer is free to look at a broad scope of evidence in mitigation, but the sentencer is confined tightly in "weighing" that evidence.

The Supreme Court's opinion in Lockett recognized the accused's right to have the sentencing authority "consider" any proffered aspect of character, record or offense was more than a constitutional prohibition against restrictive rules concerning the admissibility of evidence at a sentencing hearing. "It is a right to have the sentencer use such evidence as it sees fit in deciding whether the defendant merits leniency." Hertz and Weisberg, "In Mitigation of the Penalty of Death: Lockett v. Ohio and the Capital Defendant's Right to Consideration of Mitigating Circumstances," 68 Calif. L. Rev. 317, 326 (1981). Chief Justice Burger explained the ruling: "None of the statutes we sustained in Gregg and the companion cases clearly operated at that time to prevent the sentencer from considering any aspect of the defendant's character and record or any circumstances of his offense as an independently mitigating factor." Lockett at 607.

211

A more recent expression of the "consideration" that must be given mitigation evidence is found in the Supreme Court's decision in <u>Eddings</u> v. <u>Oklahoma</u> (1982), 455 U.S. 104. Although the Oklahoma statute provided for the admission of evidence as to "any mitigating circumstances," the state courts rejected reliance on evidence of the accused's family history as mitigation because it did not "excuse" his behavior. The Supreme Court reversed death sentence, ruling that the sentencer must consider "<u>as a matter of law</u>, any relevant mitigating evidence." <u>Eddings</u> at 114. (Emphasis in original.) "We note that the Oklahoma death penalty statute permits the defendant <u>to present</u> evidence 'as to any mitigating circumstance.' . . . <u>Lockett</u> requires the sentencer to <u>listen</u>." <u>Eddings</u> at 113, fn. 10. (Emphasis added).

Ohio law requires that the sentencer weigh the aggravating specifications against the mitigating factors, to determine whether a life or death sentence is to be imposed. If the aggravating specification outweighs mitigating factors beyond a reasonable doubt, the sentencer must return a verdict of death.

No guidance is given the sentencing authority beyond the magic word, "weigh". Precisely how the sentencing authority can measure such disparate factors is never explained. There is not an effective method of identifying how the sentencer applied this weighing. The jurors are not required to explain in an opinion or otherwise what factors they considered, or how they "weighed" these factors.

This amorphous "weighing" process deprives the accused of his due process rights and his Eighth Amendment protections arbitrary sentencing because no discernible legal standard is applicable.  Giacco v. Pennsylvania (1966), 382 U.S. 399. Meaningful appellate review is impossible without a detailed statement by the jury describing how it weighed these factors. The trial court's written opinion summarizes only the court's reasoning without providing any information concerning how the jury viewed the evidence.  Indeed, it would be impossible for the judge to know the jury's reasoning.  Critical decisions on life or death questions implicating constitutionally protected rights are made in a vacuum, with no standard and no record.  See McGautha v. California, 402 U.S. 248, 312 (1981) (Brennan, J., dissenting).  The critical requirement of reliability, an essential ingredient in capital sentencing, is not protected. Gardner v. Florida, 430 U.S. 349 (1977); Lockett at 604; see, (for detailed discussion) Renda, "The Bitter Fruit of McGautha; Eddings v. Oklahoma and the Need for Weighing Method Articulation In Capital Sentencing."  20 American Crim. L. Rev. 63 (1982).

This inarticulate "weighing" process violates  basic due process protections particularly critical in a capital sentencing scheme:  a definite legal standard, a clear record of factual findings and legal conclusions, and an adequate basis for meaningful appellate review.  The resulting sentence is a product of due process violations and is violative of the constitutional protections against cruel and unusual punishment.  United States Constitution's Fifth, Eighth and Fourteenth Amendments.  Ohio Constitution, Article I, Sections 9 and 16.

Furthermore, the Ohio death penalty statutes preclude a mercy option, either in the absence of mitigation or when the aggravating circumstances "outweigh" the mitigating factors. The statutes in those situations mandate that death shall be imposed. R.C. 2929.03, 2929.04. The sentencing authority is impermissibly limited in its ability to return a life verdict by this provision.

In Gregg, at 199, the Supreme Court stated, "[N]othing in ay of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that he sentencing authority would focus on the particularized circumstances of the crime and the defendant." Gregg requires the state to establish, according to constitutionally mandated procedures, that capital punishment is appropriate for the defendant. Nothing requires the state to execute defendants for whom such a finding is made. Indeed the Georgia statute, approved in Gregg as being consistent with Furman, permits the jury to make a binding recommendation of mercy even though the jury did not find any mitigating circumstances in the case. Fleming v. State (Ga. 1977), 240 S.E. 2d 37; (Hayes v. State (Ga. 1981), 283 S.E. 2d 238; See also Stynchcombe v. Floyd (Ga. 1984), 311 S.W. 2d 308, 327. Subsequent to the Lockett decision, the Fifth and Eleventh Circuits have repeatedly reviewed and remanded cases for error in jury instructions when the trial court failed to clearly instruct the jury that they had option to return a

life sentence even if the aggravating circumstances outweighed mitigation. <u>Chenault</u> v. <u>Stynchcombe</u> (5th Cir. 1978), 581 F. 2d 444; <u>Spivey</u> v. <u>Zant</u> (5th Cir. 1981), 661 F. 2d 464 reh. en banc denied 667 F. 2d 93, cert. denied 458 U.S. 111; <u>Goodwin</u> v. <u>Balkcom</u> (11th Cir. 1982), 684 F.2d 794 cert. denied 460 U.S. 1098; <u>Westbrook</u> v. <u>Zant</u> (11th Cir. 1983), 704 F.2d 1487; <u>Tucker</u> v. <u>Zant</u>, 724 F.2d 882 (11th, 1984); <u>Gray</u> v. <u>Lucas</u> (5th Cir. 1982), 677 F.2d 1086, cert. denied 461 U.S. 910, reh. denied 462 U.S. 1124, cert. denied, stay denied 463 U.S. 1237; <u>Prejean</u> v. <u>Blackburn</u> (La. 1983), 570 F.Supp. 985 affirmed 743 F. 2d 1091.

Capital sentencing that is constitutionally individualized requires a mercy option. An individualized sentencing decision requires that the sentencer possess the power to choose mercy, to simply determine that death is not the appropriate penalty for this defendant for this crime. In <u>California</u> v. <u>Ramos</u> (1983), 463 U.S. 992, 1008, the Court stated that the jury is free to "determine whether or not death is the appropriate punishment."

Absent the mercy option, the accused faces a death verdict resulting from a <u>Lockett</u>-type mandatory statute, i.e., a statute that mandated a death verdict in the absence of one of three specific mitigating factors. Even under statutes with more inclusive mitigating factors, a trial court or jury decision that the evidence did not quite fit the mitigating factor, or was not really an "excuse", as in <u>Eddings</u>, a death sentence is mandated in the absence of a "mercy" option.

Several of the Justices have dissented in Supreme Court denials of <u>certiorari</u> in apparent recognition of this problem.

In King v. Mississippi, Justice Marshall urged that the Court grant certiorari to determine whether a statute imposing death when aggravating circumstances outweigh mitigating "impermissibly prevents the jury from basing its sentence on factors which may call for a less severe penalty, Lockett 605, even though they do not outweigh the aggravating circumstances proven by the prosecution. (1983) 461 U.S. 919.  Cf. Woodson v. North Carolina, 428 U.S. 280 (1976)."  In Smith v. North Carolina (1983), 459 U.S. 1056,  Justice Stevens expressed reservations that the North Carolina statute was violative of Lockett because it "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."  Justice Stevens was concerned that a jury might be satisfied that the aggravating circumstances warranted imposition of the death penalty, yet still feel that death was not the proper penalty.  See Ford v. Strickland (11th Cir. 1983), 696 2d 804, 868 cert. denied 464 U.S. 865, (Kravitch, concurring and dissenting).

Under Ohio law, the sentencer lacks the option of finding a life sentence appropriate in the face of a statute which requires that when aggravating circumstances outweigh mitigating factors "it shall impose a sentence of death on the offender."  R.C. Section 2929.03(D)(3).  A non-mandatory statutory scheme that permits the jury the discretion to recommend mercy in any case "overrides the risk that the death penalty will be imposed in spite of factors 'too intangible to write into a statute' which may call for a less severe penalty, and avoidance of that risk is constitutionally necessary."  Connor v. State (GA. 1983), 302 S.E. 2d 266.

Under R.C. 2929.05, courts affirming a death sentence in Ohio are required to find that death is the only _appropriate_ remedy, but the original sentencer has no such statutory requirement, and they must. The jury must make this decision and must make it in a fashion that will allow it to be reviewed objectively at the appellate level. Due process requires that the same standards apply at both levels. Arbitrary decisions are likely at the appellate level if courts make assumptions as to what the sentencer considered.

The "fundamental issue" in a capital sentencing proceeding is this "determination of the appropriate punishment to be imposed on an individual." _Spaziano_ v. _Florida_ (1984), 468 U.S. 447. The sentencer must "rationally distinguish between those individuals for whom death is an _appropriate_ sanction and those for whom it is not." _Id._, at 352. Appropriateness of the penalty thus appears to be the core, an indispensable element of a constitutionally valid sentencing scheme. Yet, Ohio's laws do not provide the jury with an opportunity to consider this.

The present Ohio statutes create an unacceptable risk that death will be imposed in spite of factors in mitigation, or in spite of the jury's decision that death is simply not an appropriate punishment for that man and that crime.

F.  R.C. 2903.01, 2929.022, 2929.03, 2929.04 and 2929.05 violate the eighth amendment prohibition against cruel and unusual punishment and the fourteenth amendment due process and equal portection clauses of the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution by requiring proof of aggravating circumstances in the guilt-determining state of a capital trial.

Ohio's statutory framework for the imposition of the death penalty upon a capitally charged defendant mandates a two-state bifurcated process.  Ohio's statutory procedure in death penalty cases directs that the findings as to aggravating factors be made at the initial, guilt-determining stage rather than at the later, sentence stage.  <u>This procedure is markedly different from the majority of states that currently have bifurcated death penalty trials</u>.  The majority  of these post-<u>Furman</u> statutory schemes provides consideration of the statutory aggravating circumstances at the penalty phase.

Both Florida and Georgia separate the consideration of statutory aggravating circumstances from the determination of guilt.  Fla. Stat. Section 921.141(1); Ga. Code Ann. Section 27-2503(c).  The difference between this and the Ohio procedure is significant.  The United States Supreme Court has approved the Georgia and Florida Schemes because of their ability to provide for an individualized determination and to narrow the category of defendants eligible for the death penalty.  <u>See</u> <u>Zant</u> v. <u>Stephens</u> (1983), 464 U.S. 862, on remand 716 F. 2d 276; <u>Barclay</u> v. <u>Florida</u> (1983), 463 U.S. 939.  Ohio's scheme cannot provide for these constitutional safeguards.

By requiring proof of the aggravating specifications simultaneously with proof of guilt, Ohio has effectively prohibited a sufficient individualized determination in sentencing as required by post-<u>Furman</u> cases.  <u>See</u> <u>Woodson</u> at 961. The jury must be free to determine whether death is the

218

appropriate punishment for a defendant.  By not requiring the state to establish guilt on the question of murder prior to the jury's consideration of the aggravating circumstances, the jury was unconstitutionally barred from making the necessary individualized determination of appropriateness.  This is especially prejudicial where, as in Ohio, the consideration of aggravating circumstances is accomplished without consideration of any mitigating factors.

The trial stage determination of guilt simultaneous with the finding of aggravating circumstances, without the simultaneous consideration of mitigating factors, resulted in a process that created a presumptive bias in favor of aggravated circumstances prior to the beginning of any sentencing hearing.  Any such bias precludes a fair individualized determination.

As will be discussed, infra, R.C. 2929.04(A)(7) does not narrow the category of defendants eligible for the death penalty. Without considering aggravating factors simultaneously with mitigating circumstances, Ohio cannot comprehensively examine the character of the individual and the circumstances of the offense. Without such an examination, an adequate individualized determination is impossible.  By failing to provide for an adequate individualized determination and by adopting a scheme in which aggravating circumstances do not narrow eligibility, Ohio's system violates the Furman constraints on the constitutional application of a death penalty scheme.

Without strict adherence to the Furman constraints the possibility of unbridled discriminatory application of the death

penalty violates the constitutional protections under the Eighth and Fourteenth Amendments of the United States Constitution and related provisions of the Ohio Constitution.  Ohio's procedural system, by requiring proof of aggravating circumstances in the guilt-determining stage of a capital trial, precludes strict adherence to the _Furman_ constraints.  Without these safeguards the risk of discriminatory and cruel punishment without application of due process or equal protection guarantees is unacceptably increased.  Such a statutory scheme is unconstitutional and cannot be the basis for imposition of the death penalty.

In _Jenkins_, _supra_, at 174, the Ohio Supreme Court rejected this argument, citing _Jurek_.  While it is true that the Texas statute requires the jury, in the guilt phase, to find that the crime falls into a particular category justifying capital punishment, there is nothing in the opinion to indicate that this particular aspect was addressed or raised by either side. Therefore, the United States Supreme Court never addressed the concerns of permitting the jury to find "aggravating circumstances" in the guilt phase.  In fact, the Texas procedure is so different from the Ohio procedure (in Texas there are really no aggravating circumstances _per se_) that it is difficult to analogize the Ohio and Texas death penalty schemes.  A careful reading of the Texas statute under examination in _Jurek_ reveals a capital sentencing scheme wholly different from Ohio's.  Texas law requires that one of the five aggravating circumstances be found before a defendant can be found guilty of capital murder.

Then in a second hearing, the state has the burden of going forward as well as proving beyond a reasonable doubt the below stated issues:

    A.    Whether the conduct of a defendant causing the death was committed deliberately and with the reasonable expectation that death would result; and

    B.    Whether it is probable that the defendant would commit criminal acts of violence constituting a continual threat to society.

Mitigating factors under the Texas scheme are not received for purposes of lessening the aggravating circumstances that had been proved at the guilt stage but to cast doubt on the prosecutor's burden to prove beyond a reasonable doubt that the defendant is not rehabilitatable.

On the other hand, Ohio's present statutory procedure for imposing death requires:

    A.    Defendant to carry the burden of presenting mitigating circumstances;

    B.    Lacks specific objective standards in weighing these factors and circumstances; and

    C.    Requires aggravating circumstances that have already been proved at the guilt stage beyond a reasonable doubt outweigh mitigation produced at the sentencing hearing.

Accordingly, Ohio's procedure requiring the jury to find aggravating circumstances beyond a reasonable doubt at the trial stage without the concurrent examination and balancing of mitigating circumstances capable of proscribing imposition of the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution, as well as Sections 9 and 16 of Article I of the Ohio Constitution.

221

G.    **R.C. 2929.021, 2929.03 and 2929.05 fail to assure adequate appellate analysis of excessiveness and disproportionality of death sentences.**

The Ohio Revised Code, through provisions in Sections 2929.021 and 2929.03, requires reporting of some data to the Court of Appeals and the Ohio Supreme Court, although as discussed above, there is a critical omission of a written life recommendation report from the jury. There are also substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses, or after charge reductions at trial. R.C. 2929.021 requires the reporting of only minimal information on these cases. There has been no determination by the Supreme Court that additional information will be required to be reported. Additional data is necessary to make an adequate comparison in these cases.

The Ohio statute is incomplete in the required tracking aspects because:

(1)    There is no specific mandate in R.C. 2929.05 that the courts actually consider all of the data essential to the disproportionality inquiry. See Gregg, 428 U.S. at 205.

(2)    Neither the statute nor the Ohio Supreme Court has arranged for the employment of resources (personnel, data collection and retrieval systems) to adequately compile and summarize the requisite data for this comparative evaluation. See State v. White, (Del., 1978), 395 A. 2d 1082, 1094-95.

(3)    There is no statutory requirement that the courts identify the types of cases considered, the particular cases considered, or submit written findings comparing the cases.

(4)    The Ohio statute fails to assure that the first group of cases – as in defendant's case – will be reviewed only when an adequate comparative base is obtained.

222

Adequate appellate review is a precondition to a finding that a state death penalty system is constitutional. <u>Zant</u>, 462 U.S. at 879; <u>Pulley</u> v. <u>Harris</u> (1984), 465 U.S. 37. The standard for review is one of careful scrutiny. <u>Zant</u>, 462 U.S. at 885, <u>Barclay</u>, 463 U.S. at 955-956. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime. <u>Id</u>.

There is uncertainty as to whether this information will be used by the Courts, how the expected comparative evaluation is to be carried out, and what documentation there will be of such evaluation, if performed.

Adequate appellate review is undercut by the failure of the Ohio statutes to require the jury recommending life imprisonment or the judge in that situation to identify the mitigating factors found to exist and to state why these outweigh the aggravating factors. Without this information no significant comparison of cases is possible since no written findings exist to serve as a basis for the comparison. Without a significant comparison of cases there can be no meaningful appellate review.

Careful scrutiny in the comparison of cases is possible only if a sufficient data base and a standardized method of comparison exists. There must be as much information regarding as many cases as possible in order for a comparison to be accurate and significant - to provide a relevant basis for distinguishing cases and appropriate penalties from each other. A standardized

223

method of comparison is necessary for a consistent process of comparison. Yet Ohio's system provides for procedures which are incompatible with the meaningful comparison of cases. These include accelerated review, the requirement that only minimal information be included in written findings at sentencing, the use of an as yet undetermined method of comparison, and the gathering of incomplete and inadequate data.

Ohio's record of review in the past further demonstrates the strong unlikelihood that appellate review will adequately ensure against arbitrariness and disproportionality. Under the Ohio death penalty statutes operating prior to <u>Lockett</u>, the Supreme Court found Ohio appellate review was defective in twenty-five (25) cases and required that the judgments in these cases be vacated insofar as they left undisturbed the death penalty imposed. See <u>Lockett</u>, 438 U.S. 586 (1978). Ohio's death penalty scheme is unconstitutional without the certainty of meaningful appellate review, a procedural safeguard necessary to the constitutionality of a death penalty scheme. <u>See</u>, <u>Zant</u>, at 2744. A substantial risk exists that sentences of death will thus be arbitrarily and capriciously imposed.

The Court of Appeals and the Ohio Supreme Court are statutorily, <u>see</u> R.C. 2929.05(A), and constitutionally required to determine whether a particular sentence of death is excessive or disproportionate to that imposed in similar cases:

> [The proportionality review] serves as a check against the random or arbitrary imposition of the death penalty.

_Gregg_, 428 U.S. at 204. While Ohio's capital sentencing provisions require collective of certain data relating to capital cases to facilitate this review, i.e., the entire records of cases in which the death penalty is imposed, R.C. 2929.03(G), and information as to each capital indictment, disposition (by plea, dismissal, or trial and sentence imposed, R.C. 2929.021, there is a fundamental omission in the collection scheme. This flaw arises from the failure of the jury when recommending life imprisonment to identify the mitigating factors found to exist, and why these outweigh the aggravating factors. The trial judge in this situation is also not required to file an opinion. Such information is essential for the reviewing courts to carry out their responsibility of assuring that excessive, disproportionate death sentences are not imposed.

The result of the failure to file opinions in these cases has created an information tracking system that contains only death verdicts. Basing a proportionality decision on a data bank containing only death verdicts can result in only one conclusion, that all death verdicts are proportional. Baldus, Pulaski, Woodworth and Kyle "Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach", _Stan_. _L_. _Rev_. 1, 7 n. (1980); _Woodson_ v. _North Carolina_ (1976), 428 U.S. 280, 316, and McCaskill v. _State_ (Fla. 1977), 344 So. 2d 1276, 1280.

The Supreme Court implicitly recognized the existence of a necessary relation between written findings and meaningful appellate review in _Proffitt_, 428 U.S. 250. Without written findings, no basis for meaningful appellate review exists. The

Court in <u>Zant</u> found that independent appellate review comparing similar cases where the death penalty was imposed and, significantly, where it was <u>not</u> imposed, was one of the essential reasons why Georgia's statutory death penalty scheme was constitutional. <u>Zant</u>, 462 U.S. at 879-880. Yet in Ohio no comparison of cases is possible where the jury imposes a life sentence because there are no written findings to serve as a basis for comparison. Since no meaningful comparison of such cases is possible, no meaningful appellate review can be undertaken. Consequently, the Ohio statutory scheme is constitutionally infirm.

4. By providing for a sentencing hearing before the same jury which convicted the Appellant, the statutes violate the Appellant's right to effective assistance of counsel, to an impartial jury, and to a fair hearing as guaranteed by the sixth and fourteenth amendments to the United States Constitution and Article I, Sections 5, 10 and 16 of the Ohio Constitution.

The Sixth Amendment to the United States Constitution and Article I, Sections 5 and 10 of the Ohio Constitution and the relevant case law make it clear that an accused in a criminal trial has the absolute right to a fair trial and the effective assistance of counsel. <u>See</u>, <u>McMann</u> v. <u>Richardson</u> (1970), 397 U.S. 759.

The Ohio statute providing for the death penalty for certain aggravated murders also provides for a bifurcated trial. The first portion of the trial is to determine the defendant's guilt; the second stage applies only after the defendant has been found guilty. The purpose of the second stage is to determine whether the defendant is to be sentenced to death or to life imprisonment with 20 or 30 years before parole eligibility. The statute requires both stages to be heard and decided by the same jury. Implicit in the two-stage process is the conflict between the death penalty statute and the aforementioned constitutional principles guaranteeing a fair trial and effective assistance of counsel.

Assume, for the purpose of example, that defense counsel, in viewing the facts of the case, feels that there is a close identification issue and that it is his best defense. With this bifurcated trial defense counsel would have to weigh whether or not to vigorously pursue this defense. The reason for this is that if counsel pursues this defense he must at some point argue to the jury that the state is unable to prove its case because they indicted the wrong person. Therefore, counsel must argue the defendant must be found not guilty. However, unless counsel feels very strongly about the prospects of victory he would necessarily be hesitant to do that for fear of having destroyed his credibility for the sentencing phase. If the defendant is convicted, the argument of mistaken identity precludes rationally arguing mitigation to the jury.

Defense counsel should not be forced to abandon a viable defense at the adjudicatory phase for fear of its prejudicing his client at the sentencing phase. Counsel can think of no similar situation in our system of criminal justice. The legislature should have eliminated the problem by providing for two separate juries, the first for determining guilt and the second for determining punishment. At the second trial, the prosecutor would be allowed to reiterate the specific evidence of aggravating circumstances. This method of handling the trials would eliminate the impairment of the right to have defense presented with the effective assistance of counsel.

The Sixth Amendment also guarantees the defendant, in all criminal prosecutions, an impartial jury. A sentencing hearing is part of the criminal prosecution, Mempa v. Rhay (1967), 389 U.S. 128; therefore, the sentencing jury should be an impartial one. Yet, once the jury has rejected the defendant's claims of innocence or guilt to a lesser offense and convicted him they have necessarily developed a mindset regarding the credibility of the defendant and his counsel. This disables jurors from sitting fairly and impartially.

The procedure required under the statute denies defendant effective assistance of counsel, and a fair trial by an impartial jury, at all phases and must be found to be unconstitutional pursuant to the Sixth Amendment to the United States Constitution and Article I, Sections 5, 10 and 16 of the Ohio Constitution.

5.  Sections 2929.03 and 2929.04 of the Ohio Revised Code violate the due process and equal protection clauses of the fourteenth amendment to the United States constitution:

the cruel and unusual punishment clauses of
the eighth amendment and Article I, Section
9; of the Ohio Consitution, and the double
jeopardy provisions of the fifth amendment
and Article I, Section 10, of the Ohio
Constitution.

R.C. 2929.04(A)(7), the felony murder provision, is
unconstitutional as it requires a harsher treatment to the
principal in a felony murder than is given to the principal in a
premeditated murder.

The first prerequisite for charging capital murder is that
the indictment must allege one of the two forms of aggravated
murder under R.C. 2903.01. The two forms are: (1) purposeful
killing with prior calculation and design, and (2) purposeful
killing during the commission of a felony.

The words "prior calculation and design" require more
planning than was required under Ohio's pre-1974 law; thus, the
language contemplates the classic, cold-blooded, well-planned
killing. This type of killing, though, is not, by itself, a
capital murder. What makes it a capital offense is an
aggravating circumstance. Thus, in premeditated murders, the
aggravated circumstances introduce new factors that go beyond the
essential elements of the crime. But, if the indictment charges
the defendant with felony murder, no new or additional
aggravating charges are required to make it a capital offense.
All that is required is that the charge of felony murder be
realleged as it has been in this case. The result is that one
charged with felony murder finds himself charged with a capital
offense when the principal in a cold-blooded, premeditated murder

229

does not. Such grossly disparate treatment is unjustified and violates the defendant's equal protection rights guaranteed under the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution. The death penalty statutes should not apply to this defendant who is indicted for felony murder when the aggravating circumstances are the felony murder itself.

The result of allowing the defendant to be capitally charged under these circumstances is the doubling of the aggravating factors, which in turn, results in due process, equal protection, cruel and unusual punishment, and double jeopardy violations contrary to the Constitutions of the United States and Ohio.

Courts in two states, North Carolina and Florida, have held that the felony cannot be used as an aggravating circumstance in a felony murder charge that is capitally triable. See State v. Silhan (N.C. 1981), 275 S.E. 2d 450, 477-478; Provence v. State, 337 So. 2d 738 (Fla., 1976) cert. denied, 431 U.S. 696 (1977). See also Collins v. Lockhart (8th Cir. 1985), 754 F. 2d 258, certiorari denied (1985), ___ U.S. ___, 54 U.S.L.W. 3375, and cases cited therein. In Ohio, the felony is meshed, in accordance with the statute, into the murder conviction as an essential element thereof, resulting in a bootstrapping effect which is violative of defendant's right.

Further, the implications of this bootstrapping are apparent when the jury must weigh the aggravating and mitigating circumstances. The balance will tip disproportionally in favor of the aggravating factors and therefore in favor of the death penalty.

In addition, R.C. 2929.04(A)(1) and 2903.01(B) are identical, with respect to the principal offender. An aggravating specification which merely repeats the requirements for aggravated murder is overbroad, as it fails to assign any additional facts so as to isolate a more heinous aggravated murder offense. The bootstrapping effect which is allowed by the death penalty statutes results in invidious discrimination in conflict with the mandate found in Skinner v. Oklahoma (1941), 316 U.S. 535. The state has arbitrarily selected one class of murderers who may be subject to the death penalty. The scheme, in fact, apparent in the death penalty statute, is inconsistent with the purported state interest. The most brutal, cold-blooded and premeditated murders do not fall within the types of murder that are eligible for the death penalty. Surely, if deterrence is a state objective, then this type of killing would be a prime target. Yet, this type of murder is excluded from the group that is subject to the death penalty. There is no rational basis and no compelling state interest for this distinction and its application is arbitrary and capricious.

The defendant is cognizant that the Ohio Supreme Court, in Jenkins, supra, overruled a similar objection. What counsel has trouble understanding is the basis on which that objection was overruled. The Court relied on Jurek, supra and the Texas statute. By some contorted means, the Ohio high court concluded Ohio and Texas law were similar. No such similarity exists. As previously stated, this Texas statute limits capital homicides to intentional and knowing murders committed in five situations

which include premeditated and felony murders.  (Note under Ohio law, premeditated murders are not capital unless accompanied by an underlying specification.)  Once a Texas jury determines that the offense falls within one of the five categories, it then must answer three questions in a proceeding that takes place after theverdict.  The prosecution has the burden of going forward and proof at the sentencing hearing and only if the state proves beyond a reasonable doubt an affirmative answer to each of the three question is death a possible sentence.  The primary question is:  "is the defendant likely to commit such violent acts again?"  In Ohio, as already stated, the underlying felony is an element of the offense and also the aggravating circumstances for purpose of both eligibility and sentencing. Thus the jury determines three times the underlying felony exists. Texas requires new and additional factors to be proven before death can be imposed.  Ohio does not.  Accordingly, Ohio's statutes are infirm.

>    6.    The death penalty authorized by sections
>          2929.02, 2929.022, 2929.03 and 2929.04 of the
>          revised code of Ohio violates the cruel and
>          unusual punishment provisions and due process
>          c l a u s e s   o f   t h e   s t a t e   a n d   f e d e r a l
>          constitutions gravating circumstance of
>          aggravated murder in the course of kidnapping
>          in R.C. 2929.04(A) is overbroad and fails to
>          reasonably justify the imposition of a more
>          severe sentence.  (Eighth and fourteenth
>          amendments, United States Constitution and
>          Article I, Sections 9, 10, and 16 of the Ohio
>          Constitution.)

Overbreadth, if present in a capital sentencing statute, will fatally undermine the statute's validity.  The United States Supreme Court requires that a state channel the sentencer's

232

discretion "by clear and objective standards," <u>Gregg</u> v. <u>Georgia</u> (1976) 428 U.S. 153, 198, that provide "specific and detailed guidance," <u>Proffitt</u> v. <u>Florida</u> (1976), 428 U.S. 242, 253 and that "make rationally reviewable the process for imposing a sentence of death." <u>Woodson</u> v. <u>North Carolina</u> (1976), 428 U.S. 280, 303. In <u>Godfrey</u> v. <u>Georgia</u> (1980), 446 U.S. 420, 428-429, 433, the Court vacated a death sentence because an arbitrary and capricious infliction of the death penalty had occurred in application of one of Georgia's aggravating circumstances:

> . . . [a] person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantly vile, horrible and inhuman", [so] [t]here is no principled way to distinguish this case in which the death penalty was imposed, from the many cases in which it was not.

Due to overbreadth of the aggravated circumstances, Godfrey's sentence was vacated. A similar result will obtain if the standard for imposition of death are so vague that they cannot be considered "clear and objective" or "provide specific and detailed guidance" to the sentencing authority.

Further, in <u>Zant</u> v. <u>Stephens</u>, the Court stated: "to avoid [the <u>Furman</u>] constitutional flaw, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of [aggravated] murder." (1983), 462 U.S. 862.

Danny Lee Hill has been indicted under R.C. 2903.01 of the Revised Code of Ohio for Aggravated Murder in the course of a felony, and three specifications are identified pursuant to

233

R.C. 2929.04(A)(7), i.e., that the aggravated murder was committed while the defendant was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, and/or rape, and/or aggravated arson. The defendant is further charged with one count of kidnapping under R.C. 2905.01, rape under R.C. 2907.02, and aggravated arson under R.C. 2909.02.

Defendant contends that the aggravating circumstances of aggravated murder while the offender was committing or attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping is overbroad, in that the elements of kidnapping, including the required act and the required mental state, are inherent in any aggravated murder. As the kidnapping specification fails to genuinely narrow the class of aggravated murders eligible for death, it must fail.

Inherent in any aggravated murder is a "restrain[t] of [the victim's] liberty" and/or a "remova[l] from the place where [the victim] is found" under R.C. 2905.01(A). As pointed out in the Legislative Service Commission Note:

> An offense under this section <u>does not depend on the distance</u> the victim is removed <u>or the manner in which he is restrained</u>. Rather, it depends on whether the removal or restraint is such as to place the <u>victim in the offender's power and beyond immediate help, even though temporarily</u> . . . Also, the restraint involved need not be actual confinement, but may be merely compelling the victim to stay where he is. (Emphasis added).

Causing the death of another is a very certain method of restraining his liberty of movement, permanently. It surely

234

establishes the offender's power over the victim, and precludes any immediate or future help for the victim.  The victim is certainly compelled to stay where he is, for he no longer has any ability for any movement of his own will.  Further, any movement of the victim's nearly lifeless body by the offender, for any distance, even inches, would appear to constitute a removal from the place where the victim is found, for purposes of R.C. 2905.01.

The last element of kidnapping, that the removal or restraint be accomplished by force, threat, or deception, is equally inherent in any murder.  "Force" means "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing", R.C. 2901.01(A), and this, or threat of it, is obviously present in any murder.

Any restraint or movement which occurs under these circumstances must be considered incidental to the commission of the aggravated murder, and cannot be considered appropriately as an aggravated circumstance, as it in no way rationally isolates a more serious or more deterrable murder offense.  See Enmund v. Florida (1982), 458 U.S. 782, 102 S. Ct. 3368, 3377-3378.  Nor does the kidnapping necessarily increase the risk of harm beyond that inherent in the underlying, presumably intended, offense of murder.  See People v. Daniels (1969), 71 Cal. 2d 1119, 80 Cal. Rptr. 897, 459 P. 2d 225; People v. Levy (1965), 15 N.Y. 2d 159, 256 N.Y.S. 2d 793, 204 N.E. 2d 842.  The ability of the kidnapping offense to be misused in this or similar respects is well recognized:

It is desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, <u>because the broad scope of this overlapping offense has given rise to serious injustice. Examples of abuse in prosecution for kidnapping are common</u>. Among the worst is use of this means to secure a death penalty or life imprisonment for behavior that amounts in substance to robbery or rape, in a jurisdiction where these offenses are not subject to such penalties.

Model Penal Code, Tent. draft No. 11, Comments to Sections 212.1, appearing at <u>Daniels</u>, 71 Cal. 2dat 1138. See also Official Draft and Revised Comments to Section 212.1, p. 220-221 (1980).

Even the Ohio Supreme Court has recognized that "kidnapping is implicit within every forcible rape" [R.C. 2907.02] and many felonious assaults [R.C. 2903.11]. <u>State</u> v. <u>Logan</u> (1979), 60 Ohio St. 2d 126, 130. The Ohio Supreme Court has also accepted <u>Daniels'</u>, 71 Cal. 2d 119, reasoning that if the movement or restraining is "merely incidental to a separate underlying crime," and "the limited asportation or restraining [did not] subject [the victim] to a substantial increase in the risk of harm separate from the underlying crime," no separate conviction for kidnapping may be maintained, <u>Logan</u>, 60 Ohio St. 2d at 135. This is an application of Ohio's "merger" doctrine codified in R.C. 2941.25 of the Revised Code of Ohio (the allied offenses of similar import statute).

Despite recognition of these principles, the kidnapping specification remains enumerated in R.C. 2929.04(A)(7). The ability to misuse this as an aggravating circumstance and transform any murder into a capital offense is present in the

face of the statute and has not been foreclosed by the <u>Logan</u> decision.  <u>Logan</u> dealt with the offenses of kidnapping and rape and found the conviction for kidnapping must be reversed based on the principles earlier set forth.  In <u>dicta</u>, the Ohio Supreme Court seemingly created an exception to these principles in interpretation of R.C. 2941.25:

> . . . within this pronounced rule <u>we adopt the policy</u> that <u>where murder</u>, the taking of a hostage, or extortion <u>is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense</u>.  (Emphasis added).

<u>Logan</u>, 60 Ohio St. 2d at 135.

This "policy" is inconsistent with the principles set forth in <u>Daniels</u>, and otherwise accepted by the Ohio Supreme Court.  At this time, the Ohio Supreme Court, however, appears to approve separate convictions for kidnapping and murder, and in so doing, permits capital offense statutes to arise from any murder.

As "a person of ordinary sensibility could fairly characterize almost every [aggravated] murder," <u>Godfrey</u>. 446 U.S. at 433, as committed in the course of kidnapping, the specification or aggravating circumstances in this case is overbroad and cannot be utilized for purposes of determining eligibility for the death penalty.  Imposing the death penalty on the basis of a felony which is an integral part of the murder, indeed, the very means of committing that murder, does not accomplish the constitutionally required purpose of rationally isolating the most serious, heinous, or deterrable offenses.  <u>In re Early</u> (1975), 14 Cal. 3d 122, 120 Cal. Rptr. 881, 534 P. 2d 1271, and fails to adequately guide and channel sentencing discretion.  <u>Godfrey</u>, 446 U.S. at 420.

NINETEENTH ASSIGNMENT OF ERROR

This Court cannot find that after reviewing all of the factors of R.C. 2929.05(A) that death was the appropriate sentence for Danny Lee Hill.

> This court cannot find, pursuant to R.C. 2929.05(A), that (1) the judgment of guilt of aggravated murder and the specifications was supported by sufficient evidence; (2) that the aggravating circumstances outweigh the mitigating factors in the case; (3) that the sentence of death is appropriate; (4) that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases; and (5) that the trial court properly weighed the aggravating circumstances and mitigating factors. Appellant's death sentence was imposed in violation of his rights to due process and freedom from cruel and unusual punishment. Fifth, eighth and fourteenth amendments to the United States Constitution; Article 1, Sections 9 and 16, Ohio Constitution.

R.C. 2929.05(A) imposes the following duties upon this Court in reviewing a death sentence: (1) to determine whether the judgment of guilt of aggravated murder and the specifications was supported by sufficient evidence; (2) to determine whether the aggravating circumstances outweigh the mitigating factors in the case; (3) to determine whether the sentence of death is appropriate; (4) to determine that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases; and (5) to determine whether the trial court properly weighed the aggravating circumstances and mitigating factors. In performing the required review in this case, this court will be unable to answer the five inquiries affirmatively. To do so would be to impose the death sentence in violation of Danny Lee Hill's rights to due process and freedom from cruel and

238

unusual punishment.  Fifth, eighth, and fourteenth amendments, United States Constitution.

1. Sufficiency of the Evidence of Aggravated Murder and the Specifications

The facts adduced at trial are exhaustively set forth in the Statement of Facts and will not be repeated in depth here.  The Ohio Supreme Court has held that in reviewing the sufficiency of the evidence:

> A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that the elements of an offense have been proved beyond a reasonable doubt.

State v. Eley (1978) 56 Ohio St. 2d 169.  In cases where circumstantial evidence is relied upon, the test is:

> "[W]here circumstantial evidence is relied upon to prove the elements of the crime, the jury must find it to be of such a conclusive and persuasive force that it excludes every reasonable hypothesis of innocense... Once a jury has reached its decision, an appellate court, where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocense.

State v. Graven (1978) 54 Ohio St. 2d 114.

Due process requires the evidence to meet the following test for sufficiency:

> Where, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia (1979) 443 U.S. 307, 319 (Emphasis in original).

In this case, the disputed questions of facts relevant this assignment of error are (1) were statements attributed to Danny Hill of his own volition of those impressed

239

upon him by law enforcement officers; and (2) if present, was there any evidence of Danny's participation in the events.

A careful review of all of Danny's statements elicited by law enforcement officers and the techniques utilized in obtaining them clearly show a confused person attempting to please his inquisitors. This Court not only can review the pertinent portions of the transcript, but also listen to the taped statement and view the video-taped statement. At best, they show he saw what happened.

Numerous questions still exist. The only piece of evidence that the Appellee uses to show a direct link between the events and Danny Hill is the bite mark found on the deceased's penis. While Dr. Mertz subjectively believes that the mark was left by the Appellant, Dr. Livine, the leading expert in the field cannot testify to a dental certainty that Danny caused the mark. Further, expert examination of this issue was precluded by the conduct of the Appellee in not providing valuable photographs to the Appellant for use by his experts. Also, the doctors only had two dental impressions for comparison purposes.

Danny was seen at one point at the Valu-King at the same time as Timothy Combs and the deceased. Timothy Combs is later observed by himself walking on the path shortly before a single scream is heard. The next observation of either Danny or Tim Combs is in the company of two other individuals, Andre McClain and another unidentified person. Despite all the attempts, no other physical evidence exists supporting the conviction and there was no evidence supporting the allegation that Danny

240

destroyed any evidence.  In a case where the evidence is "almost entirely circumstantial" and where death is a possible sentence, courts should be very careful to safeguard the defendant's rights. State v. Johnson (1986), 24 Ohio St. 3d 87, 95.  A careful review of this case does not support a finding that Danny Lee Hill committed aggravated murder or any of the specification or underlying charges.

## 2. The Aggravating Circumstances Do Not Outweigh The Mitigating Factors

R.C. 2929.05(A) requires the Court of Appeals to independently weigh the facts to determine whether it is convinced beyond a reasonable doubt that he aggravating circumstances outweigh the mitigating factors.  State v. Jenkins (1984), 15 Ohio St. 3d 164, 206, 208.  There is no presumption that the trial court's judgment was correct; the weighing process is independent of the judgment below.  State v. Maurer (1984) 15 Ohio St. 3d 239, 246, 247.

The only aggravating circumstances in this case are that the murder was committed while the offender was committing kidnapping, rape, and aggravated arson.  Non-statutory aggravating circumstances cannot be considered under the Ohio statute.  State v. Johnson, supra.

The testimony from the mitigation hearing is set forth in the Statement of Facts, and Appellant directs the court's attention to that portion of the Statement of Facts for the proof of the mitigating factors.  Appellant submits that the mitigating factors shown by the evidence, which primarily has to do with the

241

Appellant's background established mitigating factors pursuant to R.C. 2929.04(B)(3), (B)(4), (B)(6), and (B)(7).

These factors were shown by the following: (1) possible organic brain damage from head injuries as a child; (2) Danny's severly low mental age (seven years, three months); (3) the family background and history including his mental retardation of his mother, uncle, and brothers; (4) lack of proper care and counseling while at TCY; and (5) Danny's good institutional record at Brinkhaven and TCY.

Danny's IQ of 68 and mental age of seven years, three months severly limited his appreciation of the nature of his acts. By all account, with a structured and nurturing environment, Danny did extremely well such as his placement at Brinkhaven. He even did as well as can be expected at TCY considering the lack of guidance and counseling that occurred. His good institutional record is a mitigating factor. Skipper.

Residual doubts about Appellant's guilt of the offense (see previous discussion) is a mitigating factor. Smith v. Balkcom (5th Cir. 1981), 660 F.2d 573, 580-581

Under the evidence presented at trial, this court cannot find beyond a reasonable doubt that the aggravating circumstances of kidnapping, rape, and aggravated arson outweigh the mitigating factors present in this case.

Mitigation does not excuse or justify a crime, and Appellant has not attempted to offer any evidence that would excuse or justify the murder of Raymond Fife. The law is that not all person who are found guilty of committing aggravated murder must

242

die for the crime. Where there are substantial mitigating factors, as there are here, the law requires a sentence of life imprisonment, not death in the electric chair. When this court independently weights the evidence, it will find beyond a reasonable doubt that the aggravating circumstances do not outweigh the mitigating factors in this case.

### 3. The Sentence of Death is Inappropriate.

Reviewing the appropriateness of the death sentence includes review of trial procedural errors, even where the parties have not raised them. State v. Buell, (1986), 22 Ohio St. 3d 124, 142 (court raises Caldwell issue sua sponte; not assigned as error.) This brief has outlined, in eighteen other assignments of error, the substantive and procedural errors that have occurred in this case, and they will not be repeated here. But they must be included in this court's determination of the appropriateness of the death sentence.

The "appropriateness" determination is made independently of the reweighing of the evidence. State v. Wood (Utah. 1982), 648 P. 2d 71, 84; People v. Brown (Cal. 1985) 709 P. 2d 440, cert. granted on another issue (June 2, 1986), 54 LW 3787. In other words, death may be an inappropriate sentence even where the aggravating circumstances outweigh the mitigating factors.

At every chance there was, the Appellee focused the case on its gruesomeness and that Danny had committed other acts. Every attempt was made to inflame the three judge panel. A death sentence that is imposed because of passion and prejudice is arbitrary and cannot be upheld, Gregg v. Georgia (1976), 428 U.S.

153. The very adjectives used by the three judge panel to describe the other acts. In view of al of this information, death is not the appropriate sentence for Danny Lee Hill.

4. <u>Proportionality</u>.

Under R.C. 2929.05(A) this court must consider whether the sentence is excessive or disproportionate to the sentence imposed in similar cases. Defense counsel is not required to submit evidence of disproportionality. <u>State</u> v. <u>Jenkins</u>, <u>supra</u>, at 209.

It is counsel's understanding that this is the first case that a sentence of death has been imposed in Trumbull County. However, there is discussion in the record of other aggravated murder cases where death was not imposed. Therefore, this case must be compared with all those cases where the imposition of the death penalty was a possible sentence. Counsel for the state was improperly allowed to argue that certain mitigating factors involved in this case were not found in cases that resulted in the death penalty in other parts of the state. This fact alone should reverse this case.

5. <u>Trial Court's Opinion</u>.

As has already been argued, the trial court failed to give any weight to several of the mitigating factors shown in this case; and considered non-aggravating circumstances the trial court failed to consider all of the non-statutory mitigating circumstances; the court permitted consideration of duplicative aggravating circumstances; the trial court allowed the State a different standard for showing proportionality; and the trial court considered non-aggravating circumstances.

244

For the reason set forth in this and all the other assignments of error, Danny Lee Hill's death sentence must be vacated.

## CONCLUSION

For the reasons expressed in this brief and any other reasons which are apparent on the record, Appellant respectfully requests that the judgment and death sentence of the Trumbull County Court of Common Pleas be reversed, and a new trial granted. Alternatively, the sentence of death imposed by the three judge panel should be set aside and a term of life imprisonment ordered.

Respectfully submitted,

Roger Warner
Roger Warner

246

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served upon the County Prosecutor for Trumbull County, Court House, Warren, Ohio 44481, by hand-delivery of the same, on this 25th day of September, 1986.

_Roger Warner_
Roger Warner