IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                    :

    Plaintiff-Appellee,      :

v.                               :        Case No.  90-177

DANNY LEE HILL,                  :

    Defendant-Appellant.     :

APPEAL FROM THE COURT OF APPEALS
FOR THE ELEVENTH JUDICIAL DISTRICT OF OHIO
TRUMBULL COUNTY

---

BRIEF OF DEFENDANT-APPELLANT

VOLUME II OF II
[APPENDIX]

---

Roger Warner
(0019941)
TATARU, WALLACE & WARNER
181 East Livingston Avenue
Columbus, Ohio  43215
(614) 221-3821


Carol A. Wright
(0029782)
TYACK, WRIGHT & TURNER
7100 North High Street
Suite 209
Worthington, Ohio  43085
(614) 848-4140

Counsel for Defendant-Appellant

Dennis Watkins
Prosecuting Attorney
160 High Street, N.W.
Third Floor
Administration Building
Warren, Ohio  44481

Counsel for Plaintiff-Appellee



## TABLE OF CONTENTS

|  | Page[s] |
|---|---|
| Table of Contents | i-iii |
| Notice of Appeal to the Supreme Court of Ohio | 1 |
| Assignments of Error filed in the Court of Appeals | 2-3 |
| Opinion of the Court of Appeals | 4-92 |
| Journal Entry of the Court of Appeals | 93-94 |
| Opinion of the Court of Common Pleas | 95-97 |
| Journal Entry of the Court of Common Pleas | 98-99 |
| Journal Entry re:  Motion to Suppress | 100-105 |
| Crim. R. 11 | 106-107 |
| Crim. R. 16 | 108-110 |
| Crim. R. 23 | 111-112 |
| Crim. R. 33 | 113-114 |
| Evid. R. 401 | 115 |
| Evid. R. 403 | 116 |
| Evid. R. 404 | 117-118 |
| Article 1 Section 2, Ohio Constitution | 119 |
| Article 1 Section 5, Ohio Constitution | 120 |
| Article 1 Section 9, Ohio Constitution | 121 |
| Article 1 Section 10, Ohio Constitution | 122 |
| Article 1 Section 16, Ohio Constitution | 123 |
| Article 1 Section 26, Ohio Constitution | 124 |
| Fourth Amendment, United States Constitution | 125 |
| Fifth Amendment, United States Constitution | 125 |
| Sixth Amendment, United States Constitution | 125 |
| Eighth Amendment, United States Constitution | 126 |

i

## TABLE OF CONTENTS
### continued

Fourteenth Amendment, United States Constitution      126

ABA Standards Relatins to the Prosecuting Function,
     section 5-1.4      127-144

R.C. 120.16      145

R.C. 2313.06      146

R.C. 2313.08(B)      147

R.C. 2901.05      148

R.C. 2903.01      149-150

R.C. 2905.01      151

R.C. 2929.021      152

R.C. 2929.024      153

R.C. 2929.03      153-155

R.C. 2929.04      156-158

R.C. 2929.05      159

R.C. 2935.05      160

R.C. 2935.07      161

R.C. 2935.14      162

R.C. 2935.20      163-164

R.C. 2941.25      165-166

R.C. 2945.05      167

R.C. 2945.59      168-169

People v. Bernasco (Oct. 18, 1990), Illinois Sup.
     Ct. No. 69035, unreported, 1990 WL 155728 (Ill.)      170-180

State v. Fickes (March 29, 1985) Trumbull App. No.
     3419, unreported      181-198

## TABLE OF CONTENTS
continued

State v. Frost (May 2, 1978), Franklin App. No.
    81AP-619, unreported                   199-216

State v. Hill (March 25, 1982), Franklin App. No.
    81AP-663, unreported                   217-223

State v. Hutton (April 28, 1988), Cuyahoga App. No.
    51704, unreported                       224-339

State v. Luft (Dec. 26, 1978), Franklin App. No.
    78AP-302, unreported                   340-352

State v. Scarlett (Sept. 3, 1987), Montgomery App. No.
    10378, unreported                       353-371

State v. Ward (Feb. 15, 1983), Franklin App. No.
    82AP-451, unreported                   372-402

IN THE ELEVENTH DISTRICT COURT OF APPEALS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

    PLAINTIFF-APPELLEE,                 :       **90-177**

v.                                      :       Case No. 3720 and 3745

DANNY LEE HILL,                         :       (C.P. 85CR-317)

    DEFENDANT-APPELLANT.                :

## NOTICE OF APPEAL TO THE SUPREME COURT OF OHIO

Now comes the Appellant, Danny Lee Hill, and gives his notice of appeal
to the Supreme Court of Ohio from the judgment entered in the Court of
Appeals of Trumbull County, Eleventh Appellate District on the 27th day
of November, 1989, that this case did not originate in the Court of Appeals
and that this is an appeal as of right in that the Court of Appeals affirmed
a sentence of death in this case.

**FILED**
JAN 26 1990
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

**FILED**
COURT OF APPEALS

DEC 27 1989

TRUMBULL COUNTY, OHIO
MARGARET R. O'BRIEN, Clerk

Respectfully submitted,

*Roger Warner*
ROGER WARNER   (0019941)
TATARU, WALLACE & WARNER
181 East Livingston Avenue
Columbus, Ohio 43215
Attorney for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the following Notice of Appeal was
mailed by ordinary U.S. mail to Dennis Watkins, Prosecuting Attorney for
Trumbull County, 160 High Street, N.W., 3rd Fl. Administration Bldg., Warren,
Ohio 44481, this 26th day of December, 1989.

*Roger Warner*
ROGER WARNER
Attorney For Appellant

1.

## ASSIGNMENTS OF ERROR

**ASSIGNMENT OF ERROR NO. 1:**

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE STATEMENTS OF THE APPELLANT.

**ASSIGNMENT OF ERROR NO. 2:**

THE TRIAL COURT ERRED IN THE ADMISSION OF "OTHER ACTS" TESTIMONY.

**ASSIGNMENT OF ERROR NO. 3:**

THE TRIAL COURT IMPROPERLY ADMITTED CERTAIN EVIDENCE.

**ASSIGNMENT OF ERROR NO. 4:**

THE TRIAL COURT ERRED IN ADMITTING EXHIBIT 47, A "STICK".

**ASSIGNMENT OF ERROR NO. 5:**

THE RIGHT TO CONFRONT WITNESSES WAS VIOLATED.

**ASSIGNMENT OF ERROR NO. 6:**

THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO INCLUDE LICENSED DRIVERS IN THE POOL OF LICENSED DRIVERS.

**ASSIGNMENT OF ERROR NO. 7:**

THE TRIAL COURT ERRED IN ALLOWING THE APPELLANT TO WAIVE HIS RIGHT TO JURY IN WRITING PURSUANT TO CRIM. R. 23.

**ASSIGNMENT OF ERROR NO. 8:**

THE TRIAL COURT ERRED IN DENYING THE APPELLANT FUNDS TO EMPLOY AN EXPERT WITNESS FOR A MOTION HEARING.

**ASSIGNMENT OF ERROR NO. 9:**

THE ADMISSION OF EXHIBIT 3 (a photograph of Raymond Fife) WAS ERROR.

**ASSIGNMENT OF ERROR NO. 10:**

THE APPELLEE DID NOT GIVE THE APPELLANT COMPLETE DISCOVERY.

**ASSIGNMENT OF ERROR NO. 11:**

ADMISSION OF CERTAIN PHOTOGRAPHS WAS AN ABUSE OF DISCRETION.

## ASSIGNMENTS OF ERROR
continued

**ASSIGNMENT OF ERROR NO. 12:**

THE STATE MADE IMPROPER CLOSING ARGUMENTS AT BOTH THE GUILT AND MITIGATION PHASES OF THIS CASE.

**ASSIGNMENT OF ERROR NO. 13:**

THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

**ASSIGNMENT OF ERROR NO. 14:**

IT WAS ERROR FOR THE TRIAL COURT TO SENTENCE APPELLANT ON THE KIDNAPPING CHARGE AND THE KIDNAPPING SPECIFICATION.

**ASSIGNMENT OF ERROR NO. 15:**

THE MOTION FOR NEW TRIAL SHOULD HAVE BEEN GRANTED.

**ASSIGNMENT OF ERROR NO. 16:**

THE TRIAL COURT WAS IMPROPERLY PREVENTED BY DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT.

**ASSIGNMENT OF ERROR NO. 17:**

THE TRIAL COURT FAILED TO CONSIDER ALL OF THE EVIDENCE IN SUPPORT OF MITIGATING A DEATH SENTENCE.

**ASSIGNMENT OF ERROR NO. 18:**

A SENTENCE OF DEATH IS UNCONSTITUTIONAL.

**ASSIGNMENT OF ERROR NO. 19:**

THIS COURT CANNOT FIND THAT AFTER REVIEWING ALL OF THE FACTORS OF R.C. 2929.05(a) THAT DEATH WAS THE APPROPRIATE SENTENCE FOR DANNY LEE HILL.

90-177

FILED

MAR 0 8 1990

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

STATE OF OHIO

ELEVENTH DISTRICT

TRUMBULL COUNTY, OHIO

J U D G E S

STATE OF OHIO,

    Plaintiff-Appellee,

  - vs -

DANNY LEE HILL,

    Defendant-Appell...

HON. JUDITH A. CHRISTLEY, P.J.
HON. JOSEPH E. MAHONEY, J.
HON. DONALD R. FORD, J.

CASE NOS. 3720/3745

O P I N I O N

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the
    Court of Common Pleas
    Case No. 85 CR 317

JUDGMENT:  Affirmed.

ATTY. DENNIS WATKINS
COUNTY PROSECUTOR

ATTY. PETER KONTOS
ASSISTANT PROSECUTOR
160 High Street, N.W.
3rd Floor Administration Building
Warren, OH 44481

(For Plaintiff-Appellee)

ATTY. ROGER WARNER
181 East Livingston Avenue
Columbus, OH 43215

(For Defendant-Appellant)

FILED
COURT OF APPEALS

NOV 2 7 1989

TRUMBULL COUNTY, OHIO
MARGARET R. O'BRIEN, Clerk

VOL. 22 - 665

FORD, J.

On September 10, 1985, at approximately 5:15 p.m., Raymond Fife, age twelve, left the home of his parents in Warren, Ohio to visit his friend, Billy Simmons. He was to return home by 6:30 p.m. to attend a scout meeting. The victim decided to take a shortcut through a large field which was overgrown with thick woods, dense brush and trees and was located behind the nearby Value King. This area, which was crisscrossed by numerous dirt paths, was used by local residents as a shortcut between streets and as an area in which to ride bicycles.

At 5:50 p.m., Billy Simmons telephoned the victim's parents to ask why Raymond had not arrived. Concerned, the Fifes, along with some relatives and friends, began to search for Raymond. About three hours later, Raymond's father found him in the field directly behind the supermarket. At the time he was found, Raymond was alive, but unconscious. His body was nude, except that his shoes and socks were still on his feet, and his underwear had been tied around his neck. Two days later, Raymond died from the injuries he sustained on the evening of September 10.

The autopsy report revealed multiple injuries. In addition to numerous bruises and abrasions on his arms, neck, and upper torso, the victim had sustained second and third degree burns on his face, neck and shoulders. There

was a ligature mark around the neck, indicating that the victim had been choked. Examination of the skull revealed a subdural hemorrhage, suggesting that the victim had sustained severe blows to the head. Inspection of the lower body disclosed teeth marks on his penis and substantial damage to the anus. The victim's rectum and urinary bladder had been perforated.

On September 12, 1985, appellant, Danny Lee Hill, voluntarily went to the police station and inquired about a reward offered for information regarding the Fife homicide. Appellant spoke with Sergeant Stewart, who was not then actively involved in the investigation. However, Stewart made note of appellant's conversation. It was later discovered that appellant's statement contained knowledge of facts which had not been made available to the general public.

The next day, after reading Stewart's note regarding the conversation with appellant, Sergeant Steinbeck, who was directly involved with the investigation, went to the appellant's residence. (Steinbeck, a detective in the juvenile division, became involved in the case when he was asked to take a missing person's report from the victim's parents. After the victim's death, he remained active in the investigation.) Appellant voluntarily accompanied Sergeant Steinbeck to the police station where he received a

6.

VOL. 22 - 667

rights statement, executed a waiver of his rights, and was again interviewed. During the questioning, appellant offered an alibi. Appellant's mother arrived at the station later and corroborated his statement. This statement was typed by Steinbeck; but appellant, before signing it, departed with his mother.

Over the course of the weekend, the police investigation uncovered additional information which tended to refute the appellant's alibi. On Monday, September 16, 1985, Steinbeck, accompanied by Detective Morris Hill, appellant's uncle, traveled to appellant's abode to request that he go to the police station to sign the September 13 statement. The officers also asked appellant's mother to accompany them to police headquarters to give a written statement detailing her corroboration of his alibi. At the prompting of his mother, appellant consented to the request. Appellant was advised of his <u>Miranda</u> rights upon his arrival at the station.

After receiving his rights, appellant signed the typewritten form of the statement he made on September 13. Appellant was questioned by Officers Hill, Steinbeck and Stewart about the extent of his participation with the murder. Appellant denied any involvement. Finally, Detective Hill stated categorically that he believed appellant had been involved in the homicide. The detective

suggested to the appellant that the two of them talk privately. Detective Hill testified that, during the private conversation, he urged appellant to tell the truth. At that point, appellant informed Hill that he had been present during the murder of Raymond Fife. The other officers returned to the interrogation room, and appellant was asked to give a statement to the police.

Appellant's statements were recorded on audio and video tape. Although appellant admitted being present during the perpetration of the offenses, he denied having any involvement. Instead, he implicated Timothy Combs. (Combs was subsequently charged and convicted as a co-principal. His conviction was affirmed by this court in State v. Combs [Dec. 2, 1988], Portage App. No. 1725, unreported, and is presently pending before the Ohio Supreme Court). Appellant stated that Combs had inserted "a stick, like a broom handle" into the victim's rectum. Appellant was re-advised of his constitutional rights during the audio taping and before the video recording session. He executed a waiver after each of these statements of rights.

Appellant was indicted for kidnapping, rape, aggravated arson, felonious sexual penetration, aggravated robbery and aggravated murder with specifications on September 17, 1985.

Between the date of the indictment on September 17 and December 11, appellant filed a number of motions, including:

8.

VOL. 22 - 669

motions to suppress, for closure, for discovery, for an appointment of an expert, for change of venue, to include licensed drivers in the pool of prospective jurors, to insulate, motion for individual sequestered voir dire, and motion to prohibit death qualification for the venire. On December 16, 1985, a pretrial suppression hearing was held on appellant's motion to suppress statements he made to law enforcement officers on September 12, 13 and 16, 1985.

On January 7, 1986, appellant appeared before the court and executed a waiver of his right to a jury trial. Prior to executing this waiver, the trial court informed appellant that objections that appellant had to the manner in which juries had been selected would "in all probability" be overruled. Appellant waived his right to a jury trial cognizant of the trial court's intentions with respect to the pending motions. Immediately following appellant's waiver, the motions were overruled.

The trial began on January 21, 1986 and was heard by a three judge panel. At trial, a number of witnesses testified, including one who had seen appellant walking in the field and throwing a stick into the brush; two who had observed the co-defendant standing near the path at the same time that they heard a scream of twenty to thirty seconds; one who saw appellant washing a red substance from his pants some time after the assault; a pathologist who indicated the

-9-

stick fit the area of penetration like a "key in a lock;" a criminalist who could not find blood on appellant's pants or the stick; two females who had been sexually assaulted by appellant; two males who had been sexually solicited by him; and a forensic odontologist who, based upon some unique characterists of appellant's teeth, concluded that appellant inflicted the bite marks on the victim's penis.

Appellant presented a number of witnesses including those who were familiar with appellant's low level of intelligence, and a forensic odontologist who found that the dental evidence was generally inconclusive to show that appellant had made the bite marks on the victim's penis. However, based on defendant's exhibit "L", he did testify by way of qualification, as to one distinctive bite mark that: "What I'm saying is either Hill or Combs, both, could have left some of the marks, but the one mark that's consistent with the particular area most likely was left by Hill."

Other items admitted into evidence were the stick, the tape recorded conversation, the video tapes, and multiple photographs.

After hearing the evidence and deliberating for five hours, the court unanimously found appellant guilty on all counts, except aggravated robbery.

Pursuant to the dictates of R.C. 2929.04(B), a mitigation hearing began on February 26, 1986, before the

-10-

judicial tribune. *Again, after hearing the testimony and arguments, and weighing the aggravating circumstances against the mitigating factors, the court sentenced appellant to ten to twenty five years for both aggravated arson and kidnapping, life imprisonment for rape and felonious sexual penetration, and death for aggravated murder with specifications.*

Appellant has appealed that decision raising the following nineteen assignments of error.

### ASSIGNMENT # 1

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE STATEMENTS OF THE APPELLANT.

### ASSIGNMENT # 7

THE TRIAL COURT ERRED IN ALLOWING THE APPELLANT TO WAIVE HIS RIGHT TO JURY IN WRITING PURSUANT TO CRIM. R. 23.

Appellant's assignments of error one and seven address substantially similar issues of law and will therefore be discussed concurrently. Both assignments present the issues of the validity of the waiver of appellant's constitutional rights to counsel, to remain silent, and to a jury trial, predicated upon the appellant's mental capacity and illiteracy.

Although not expressly argued by appellant, these assignments contain, as a subtext, the contention that, given appellant's mental retardation and inability to

understand these legal proceedings, the sentence rendered in this case constitutes cruel and unusual punishment and is therefore violative of the Eighth Amendment to the United States Constitution.  This argument was extensively addressed in the recent landmark United States Supreme Court case of _Penry v. Lynaugh_ (June 26, 1989), 492 U.S. ___, 106 L. Ed. 2d 256, in which the Supreme Court upheld the constitutionality of the death penalty sentence given to petitioner, John Paul Penry, (although remanding for failure to consider mitigation evidence).

Petitioner, in _Penry_, _supra_, had been diagnosed as mildly to moderately retarded and was described as having the mental age of a six and one-half year old.  (By contrast, appellant has been diagnosed as having anywhere from a fifty-five to seventy-one full scale I.Q., which would cause him to be characterized as mildly to moderately retarded.  The record does not indicate that a finding was made as to appellant's mental age, although some reference was made in evidence on this subject indicating a mental age of seven to nine years.)  Petitioner Penry was charged with capital murder and found competent to stand trial. (As used in this context, competency means that petitioner was able to have a rational understanding of the proceedings against him and was able to participate in the preparation of his

--12-

own defense. See, e.g., Dusky v. United States (1960), 362 U.S. 402.)

Despite this finding of competency, petitioner argued that his reduced reasoning abilities made the potential death sentence disproportionate to his personal culpability. "In essence, Penry argue[d] that because of his diminished ability to control his impulses, to think in long-range terms, and to learn from his mistakes, he was not capable of acting with the degree of culpability that can justify the ultimate penalty." Penry, 492 U.S. ___, 106 L. Ed. 2d at 290-91, citing Thompson v. Oklahoma (1988), 487 U.S. ___, 101 L. Ed. 2d 702. After consideration of the mitigating factors permitted under Texas law, the trial court found petitioner guilty and sentenced him to death.

Petitioner's sentence was ultimately appealed to the United States Supreme Court. He argued that the imposition of a death sentence on someone with limited mental capabilities violated the "evolving standards of decency that mark the progress of a maturing society" and would therefore be unconstitutional under the Eighth Amendment. Penry, 492 U.S. ___, 106 L. Ed. 2d at 288. See, also, Trop v. Dulles (1958), 356 U.S. 86, 101. Petitioner further argued that the execution of a mentally retarded person was cruel and unusual punishment because it was

-13--

"disproportionate to his degree of personal culpability." *Penry*, 492 U.S. ___, 106 L. Ed. 2d at 289.

The Court, in response, stated that courts have long been opposed to utilizing the concept of mental age as a basis for relieving a defendant from criminal responsibility. *Penry*, 492 U.S. ___, 106 L. Ed. 2d at 292. The Court noted that a finding of a lack of capability, based on the diminished mental age of a party, would disenfranchise the mildly retarded from a right to contract or a right to marry. In *Penry*, the Court concluded:

> "*** [M]ental retardation is a factor that may well lessen a defendant's culpability for a capital offense. But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person of Penry's ability convicted of a capital offense simply by virtue of their mental retardation alone." *Ibid.*

As long as the court takes into consideration mitigating evidence of mental retardation, and the court addresses each h case on an individualized basis, it is not cruel and unusual to impose a sentence of death on a convicted perpetrator who is mentally retarded. *Penry* was ultimately remanded for resentencing, as Texas law did not permit the consideration of petitioner's mitigating evidence. (*Penry* addresses only cases in which the perpetrator is borderline or mildly mentally retarded. The United States Supreme Court in *Penry*, and this court here, offer no opinion as to the

-14-

*VOL. 22 - 675*

constitutionality of executing an offender whose handicap is more severe.)

The individualized basis mandated by the United States Supreme Court, in determining the constitutionality of the imposition of the death penalty on mentally retarded persons, also serves as the basis of analysis for determining the sufficiency of the waiver of constitutional rights by one who is mentally retarded.

In the first sub-argument of appellant's first assignment of error (there are seven sub-arguments in all), appellant challenges the validity of his waiver of his Sixth Amendment right to counsel. Appellant argues that his Sixth Amendment rights were violated because he could not "knowingly" and "intelligently" waive his rights, due to him being essentially illiterate and mentally retarded.

The standard used to assess the validity of the appellant's waiver of his Sixth Amendment rights was enunciated in Johnson v. Zerbst (1938), 304 U.S. 458, 464, which stated that "[t]he determination of whether there has been an intelligent waiver *** must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Subsequent decisions of the United States Supreme Court have focused on the separate nature of the "voluntary" and "knowing and intelligent" aspects of the

-15-

accused's waiver.  The court is required to make "discrete inquiries" into both the voluntariness of the waiver and the question of whether the waiver was "knowingly and intelligently" made.  Edwards v. Arizona (1981), 451 U.S. 477, 484; Schneckloth v. Bustamonte (1973), 412 U.S. 218; Miranda v. Arizona (1966), 384 U.S. 436.

There is little doubt that lack of mental acuity, or mental illness, can interfere with an accused's ability to give a knowing and intelligent waiver of his Sixth Amendment right to counsel.  However, "[t]his is not a field for inflexible rules" delineating the bright line that distinguishes those capable of an intelligent waiver from those who lack the ability to do so.  Miller v. Dugger (C.A. 11, 1988), 838 F.2d 1530, 1539, citing North Carolina v. Butler (1979), 441 U.S. 369, 375.  This court is aware that an accused who cannot comprehend his rights, cannot waive them intelligently.  Miller, supra. (See, e.g., Fare v. Michael C., 442 U.S. 707, 725 [youth and inexperience militating against intelligent waiver]; Cooper v. Griffin (C.A. 5, 1972), 455 F. 2d 1142, 1145 [mental retardation]; United States v. Short (C.A. 6, 1986), 790 F. 2d 464, 469 [language difficulties]).

This does not mean, however, that an accused's mental condition, by itself, will universally prevent the accused from ever effectively waiving a constitutional right.  See,

-16-

e.g., <u>Colorado</u> v. <u>Connelly</u> (1986), 479 U.S. 157. If, under the facts and circumstances present in this case, the court can determine that the defendant made a "knowing and intelligent waiver," the waiver will stand.

This court has recently considered the issue of whether a person with diminished mental capacity could "knowingly and intelligently" waive his rights in <u>State</u> v. <u>Mitzel</u> (Sept. 22, 1989), Trumbull App. No. 3917, unreported. <u>Mitzel</u>, <u>supra</u>, cites with approval <u>State</u> v. <u>Nichols</u> (1965), 3 Ohio App. 2d 182, which states that "subnormal mentality" may be considered in determining whether the confession was "knowingly" and "intellegently" made, but that diminished I.Q. will not, in and of itself, negate the waiver and preclude admission. Examination of all the facts and circumstances in <u>Mitzel</u> revealed that the defendant was sufficiently aware of the time, space, geography and environment of his confession, as well as the fact that the persons to whom he was confessing were policemen. The defendant-appellant there was found to be capable of making a "knowing" and "intelligent" waiver of his rights because the totality of the circumstances examined (including the videotaped confession) indicated that defendant-appellant had sufficient understanding to execute a valid waiver, even given the fact that he was of diminished mental capacity.

VOL. 22 - 675

Appellant, in the case at bar, admittedly suffers from some mental retardation (although the evidence presented is divergent as to the severity of the handicap) and has had concommitant difficulties in language comprehension throughout his formal education. Appellant is categorized as being mildly to moderately retarded. Evidence was presented which indicates that appellant is illiterate and this court acknowledges that literal recognition of each word contained in the "Miranda Rights" and/or "waiver form" may be beyond appellant's mental comprehensive capacity.

However, from the record here, particularly during the suppression hearing, this court is also aware (as was the trial court below) of the long and multi-faceted exposure appellant has had with the state's criminal justice system. The evidential table in this case also demonstrates that appellant exhibited a functional capacity to understand these rights, including the right to appointed counsel. This was evident from the exchange that occurred during the audio and video tape sessions. The officers who interrogated appellant had either significant contact with him and/or had questioned him on prior occassions and had developed informed estimates as to appellant's ability to understand, albeit in a vernacular sense, all aspects of the Miranda warning. The audio and video tapes of appellant's interrogations disclose that appellant was capable of

-18-

VOL. 22 - 679

understanding the questions put to him and of responding intelligently.

Moreover, the behavior of the appellant during the police investigation belies the notion that he was no more than a malleable victim of police suggestion. Appellant possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, appellant qualified and corrected the police officers's misstatements of the factual scenario which he had related to them. He also was able to follow "verbal concepting," displaying an understanding of the officers direction of questioning and the dialogue utilized during the interrogation.

In determining the existence of any waiver, appellee carries the burden of proving that the waiver was knowing and intelligent (_Miranda_, _supra_) and voluntary (_Lego v. Twomey_ [1972], 404 U.S. 477), by a preponderance of the evidence. See, _Miranda_. Once the trial court, as the trier of fact, has determined that the state has carried its burden, the decision will not be overruled unless found to be against the manifest weight of the evidence. Appellant has not demonstrated that the trial court's decision, specifically, that the waiver was knowingly and intelligently made, was against the manifest weight of the

evidence and, consequently, his first argument is without merit.

Appellant next contends that, as a result of his mental affirmities and the coercive action of the police, his waiver of his constitutional right was not voluntary. Appellant states that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law ***." Mincey v. Arizona (1977), 437 U.S. 385, 398. Appellee directs this court's attention to a number of cases, from various jurisdictions, which provide that low intelligence of the confessor does not necessarily exclude statements voluntarily made to police. See, e.g., State v. Sisneros (1968), 79 N.M. 600, 446 P. 2d 875; United States v. Glover (C.A. 9, 1979), 596 F. 2d 857. Glover, supra, cites United States v. Young (E.D. Pa., 1973), 355 F. Supp. 103, a case which is similar to that sub judice. Young, supra, considered the question of whether a defendant with an I.Q. of fifty-seven could voluntarily waive his Miranda rights. The court determined that he could do so, relying extensively on the defendant's "extensive dealings with the criminal process." Id. at 111.

Ohio law has noted that a waiver of Miranda rights is only valid when it is intelligent, knowing and voluntary. (See, e.g., State v. Scott (1980), 61 Ohio St. 2d 155) and states that failure to prove these elements by a

-20-

preponderance of the evidence is a violation of due process. State v. Jenkins (1984), 15 Ohio St. 3d 164, 231.

In Jenkins, supra, the Ohio Supreme Court, confronted with a scenario similar to the case at bar, was obligated to determine the voluntariness of a mentally retarded accused's waiver of his Miranda rights. The court noted that, although the police officers were not medical experts, they were able to observe and converse with the accused. "While the explanation of rights and their waiver must be weighed with the individual's ***mental capacity, the totality of the evidence (including the police observations) supports the trial court's judgment to admit the statement in this case." Id. at 233.

This court is further cognizant of the United States Supreme Court's decision in Connelly, supra, which substantially limited the areas in which a court can examine the voluntariness of the waiver and subsequent statement. "Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." Connelly, at 170.

In Connelly, the United States Supreme Court was confronted with the claim of defendant-respondent that his mental illness compelled him to confess to the murder of a girl. Defendant-respondent was a chronic schizophrenic who believed that the "voice of God" had compelled him to

-21-

confess. Defendant-respondent argued th      mental
condition interferred with his volitional abil. ty and kept
him from rendering a rational decision. The Court did not
accept defendant-respondent's contentions, holding instead
that "coercive police activity (was) a necessary predicate
to the finding that a confession (was) not 'voluntary'
within the meaning of the Due Process Clause of the
Fourteenth Amendment." Connelly, at 167. As the police did
not, in any way, coerce the statement, the Court said that
the statement was voluntarily given, and that the mental
state of the confessor was immaterial for a determination of
voluntariness.

As this court stated in addressing appellant's first
argument, the evidence adduced indicates that appellant had
the requisite intelligence to "knowingly, voluntarily and
intellengently" waive his Miranda rights, rights to which he
had been exposed numerous times. Moreover, the evidence
does not demonstrate any inappropriate coercion being
applied to appellant beyond some suggestive interrogations
advanced by the officers in the statement sessions.
Appellant's second argument is without merit.

Appellant next states that his statements were taken in
violation of the dictates of Miranda. This argument
essentially reiterates contentions voiced in appellant's
first two arguments. The crux of appellant's position can

be seen in <u>Moran</u> v. <u>Burbine</u> (1986), 475 U.S. 412, 421, which states:

> "The inquiry has two distinct dimensions. <u>Edwards</u> v. <u>Arizona</u>, <u>supra</u>, at 482, 68 L Ed 2d 378, 101 S Ct 1880; <u>Brewer</u> v. <u>Williams</u>, 430 US 387, 404, 51 L Ed 2d 424, 97 S Ct 1232 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived. <u>Fare</u> v. <u>Michael C.</u>, 442 US 707, 725, 61 L Ed 2d 197, 99 S Ct 2560 (1979). See also <u>North Carolina</u> v. <u>Butler</u>, 441 US 369, 374-375, 60 L Ed 2d 286, 99 S Ct 1755 (1979)."

Appellant argues that not only did he not possess this requisite awareness, but the police took advantage of this lack of mental acumen by applying several psychological ploys.

Appellee argues that appellant received his <u>Miranda</u> rights on at least four occasions over a four-day period and, as evidenced by the audio and video tape, appeared articulate and coherent as he answered questions. Moreover, the State refers to a multiplicity of cases which allow for the admissibility of the statements when rendered hours or even days after <u>Miranda</u> rights were administered. See,

-23-

VOL.22 - 614

*e.g., United States, ex rel. Henne, v. Fike (7th Cir., 1977), 563 F. 2d 809; State v. Gilreath (Ariz., 1971), 107 Ariz. 318, 487 P. 2d 385, cert. denied, 406 U.S. 921, (1972).*

This court finds, after examination of the evidence, that appellant was able to "knowingly, intelligently, and voluntarily" waive his *Miranda* rights and, in fact, did so. While, as *Mitzel* notes, a more thorough explication of appellant's understanding of the concepts embodied in *Miranda* would make our determination unequivocal, the officers present at the investigation appeared to ascertain the adequate quality of appellant's understanding of his rights. (This is particularly true where, as in this case, the officers had *Mirandized* the appellant on several previous occasions; and where appellant was apparently able to knowingly, voluntarily and intelligently waive his *Miranda* rights on each prior occasion. The record reveals that appellant's frequent brushes with the legal system include convictions for the rape of two women in 1984. Further, Detective Hill testified that appellant had been arrested fifteen to twenty times and that he had personally administered *Miranda* rights to appellant four or five times.) Appellant's third argument is without merit.

In his fourth sub-argument under the first assignment of error, appellant contends that his Fourth and Fourteenth

-24-

Amendment rights were violated when he was "seized from his home and placed into custodial interrogation without probable cause, proper judicial authorization, or his consent." Appellant argues correctly that the administration of _Miranda_ rights will not cure a Fourth Amendment violation. "[A]lthough a confession after proper _Miranda_ warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshhold requirement' for Fourth Amendment analysis." _Dunaway_ v. _New York_ (1979), 442 U.S. 200, 216. See, also, _State_ v. _Fickes_ (Mar. 29, 1985), Trumbull App. No. 3419, unreported (concurring opinion).

The United States Supreme Court has consistently held that custodial interrogations, conducted without probable cause, constitute violations of the accused's Fourth and Fourteenth Amendment rights. _Dunaway_, _supra_. The state may not, without probable cause, judicial authorization or consent, bring an accused to the police station for fingerprinting or for questioning. _Davis_ v. _Mississippi_ (1969), 394 U.S. 721; _Brown_ v. _Illinois_ (1975), 422 U.S. 590; _Hayes_ v. _Florida_ (1985), 470 U.S. 811. Nor will the police be able to shield an improper "seizure" under the "good faith" exception announced in _United States_ v. _Leon_ (1984), 468 U.S. 897; _Fickes_, _supra_.

-25-

This court finds that the record of this case is devoid of evidence indicating that the custodial interrogation of appellant violated his constitutional rights. When appellant first traveled to the Warren Police Department on September 12, 1985, he did so voluntarily and without prompting from anyone, police authority or otherwise. Appellant's reason for this visit was ostensibly to collect a reward (of which he had heard rumors) by implicating other persons in the attack of the victim. Appellant even accompanied Sergeant Stewart of the Warren police in an attempt to find the victim's bicycle.

Appellant returned to the police station the following day at the request of Sergeant Steinbeck. Steinbeck had read the note, left by Stewart (after his original meeting with appellant), which stated that appellant was aware of some of the facts of the homicide. Steinbeck went to appellant's home and asked if appellant would accompany him to the station to answer further questions. Appellant agreed. Although appellant was not under arrest, he was given his _Miranda_ rights by Steinbeck.

Steinbeck prepared a written statement, based on the questioning conducted with appellant. However, he neglected to have appellant sign the statement on that day. Instead, appellant (who was free to leave throughout the interrogation) left the police station with his mother.

Steinbeck, along with Detective Morris Hill, went to appellant's home on Monday, September 16, for the avowed purposes of getting appellant to accompany them to the station to sign the written statement and to obtain a formal statement from his mother regarding his alibi. The evidence is divergent as to the extent of appellant's initial voluntariness to return to the police station. There is some testimony that appellant became mildly recalcitrant to the idea of returning to the police station, only to change his mind at his mother's behest, and agreed to accompany the officers. On this point, there was sufficient evidence before the trial court, in its role of determining credibility, from which it could conclude that the appellant was not inappropriately coerced in accompanying the officer to the station again.

It is not necessary for this court to determine whether appellant "consented" to the final custodial interrogation as it appears from the evidence that the police had probable cause to interrogate the appellant on September 16. Probable cause is found, in the context of custodial interrogations, when the focus of the inquiry narrows itself sufficiently to the suspect being questioned. In this case, appellant provided some of the basis for probable cause in his initial conversation with Stewart, when he divulged information which was not known to the general public. Over

27.

the next three days, the Warren police received further information from appellant which focused suspicion on him. The police also spoke with witnesses who stated that appellant was around the scene of the crime at the time the murder had taken place.

Examination of the record reveals that all questioning of appellant occurred either with his consent and/or after the police had established probable cause to question him. Consequently, the interrogation of appellant satisfies the tests set forth in *Hayes* and *Dunaway*, *supra.*

Appellant also alleges, in both the third and fourth sub-arguments to his first assignment of error, that the police improperly coerced him into confessing by means of psychological ploys. Appellant specifically refers to language used during the interrogations, such as simplistic juvenile or infantile terminology and obscenities, which allegedly underscores his mental retardation and suggestability. Appellant also states that the police coerced a confession by threatening to use the statements of Timothy Combs as a means of showing that appellant had committed the crime.

Appellant's arguments are without merit. It seems ironic that, after contesting his ability to knowingly waive his constitutional rights, appellant would now object to the simplicity of the language used to question him. The

-28-

recorded conversations alluded to by appellant do not suggest the use of any improprieties by the police. Appellant's allegations as to threats purportedly made by police as to the use of Combs' statements are similar to those raised, and rejected, in State v. Jackson (1977), 50 Ohio St. 2d 253, 256. Appellant's fourth argument is without merit.

Appellant's fifth sub-argument of the first assignment of error asserts that appellant was denied due process of law when he was denied his statutory right to counsel. Appellant premises his argument upon R.C. 120.16(F) which states: "Information as to the right to legal representation by the county public defender or assigned counsel shall be afforded to an accused person immediately upon arrest, when brought before a magistrate, or when formally charged, whichever occurs first." Appellant argues that he was not specifically informed of the right to a public defender and therefore was denied due process.

The argument put forth by appellant has been considered by the Fourth Appellate District in State v. Semenchuk (Mar. 10, 1982), Athens App. No. 1036, unreported. In Semenchuk, supra, the appellant made a similar claim that the county public defender was not specifically mentioned when the appellant was given his Miranda rights. The Fourth Appellate District held:

-29-

> "*Rather obviously, compliance with the dictates of Miranda (sic) does not <u>specifically</u> inform a defendant of the availability of the county public defender as mandated by R.C. 120.16(F). Even so, we conclude such failure does not require exclusion of the confession for the reason that the exclusionary rules under the federal constitution are applicable in Ohio only to violations of constitutional rights. A default in state law alone is not a ground for exclusion of material evidence. See <u>Kettering v. Hollen</u> (1980), 64 Ohio St. 2d 232; <u>State v. Meyers</u> (1971), 26 Ohio St. 2d 190.*" <u>Semenchuk</u>, at 8. (Emphasis in original.)

Appellant further asserts that his right to counsel was denied when Detective Hill told appellant's mother that there was no need to hire an attorney, as a public defender would be appointed during the trial. Appellant argues that, but for the detective's statements, appellant's mother would have hired an attorney and, appellant would have been represented during the September 16, 1985 interrogation.

Appellant's arguments are reminiscent of those propounded by respondent in <u>Moran</u>, <u>supra</u>. In <u>Moran</u>, respondent was in custody and had waived his <u>Miranda</u> rights. Concurrent with petitioner's waiver, his attorney telephoned the police station and inquired as to the whereabouts of her client. The police did not tell counsel that respondent would be questioned that night and, further, did not tell respondent that counsel had been appointed for him. The United States Supreme Court held that "[e]vents occurring

-30--

outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. *** [T]he state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Id.* at 422-423.

The rationale expressed in *Moran* is equally applicable to the case *sub judice*. Appellant was not aware of his mother's inquiries as to the need for an attorney. The propriety, or lack thereof, of Detective Hill's answer to appellant's mother (his sister) are irrelevant to the issue of whether appellant gave a knowing, voluntary and intelligent waiver of his *Miranda* rights. Since, as discussed above, this court has determined that appellant did adequately waive his rights, the fifth argument is without merit.

In the sixth sub-argument of his first assignment, appellant argues that his recorded statements (both audio and video) should have been suppressed, as this evidence was obtained without compliance with R.C.2935.05. The statute in question reads as follows:

> "When a person named in section 2935.03 of the Revised Code has arrested a person without a warrant, he shall, without unnecessary delay, take the person arrested before a court or magistrate having jurisdiction of the offense, and shall file or cause to be filed an affidavit describing

-31-

*Vol. 41 - 692.*

the offense for which the person was arrested. Such affidavit shall be filed either with the court or magistrate, or with the prosecuting attorney or other attorney charged by law with prosecution of crimes before such court or magistrate and if filed with such attorney he shall forthwith file with such court or magistrate a complaint, based on such affidavit."

The facts reveal that appellant was arrested by the Warren police on September 16. At the time of his arrest, appellant was in the process of being questioned by the police, a fact finding exercise that took the better part of the afternoon, and included a visit to the crime scene. The state did not file its complaint until September 17.

Appellant asserts that this twenty-four hour delay in the filing of criminal charges necessitates the exclusion of the taped statements made during that time period. The conceptual basis behind appellant's argument is based upon federal law. Cases such as McNabb v. United States (1943), 318 U.S. 332, and Mallory v. United States (1957), 354 U.S. 449, stand for the proposition that where federal officers interrogate a person, arrested without a warrant, instead of taking him to a federal judge, as required by Fed. R. Crim. P. 5(a), the statements of the defendant are excluded from testimony. This rationale was not premised on any provision of the Bill of Rights, and few states specifically adopted the McNabb-Mallory doctrine. In 1968, Congress abridged the doctrine, replacing it with the Omnibus Crime Control and

Safe Street Act, which contained essentially the same provisions.

Ohio has expressly refused to adopt McNabb, supra, (State v. Cowans [1967], 10 Ohio St. 2d 96) and has never held that failure to comply with R.C. 2935.05 is grounds for exclusion of statements made during the interim. To the contrary, this court held, in State v. Mackey (Feb. 18, 1982), Portage App. No. 1142, unreported, that "a confession, which is otherwise voluntary, is admissible despite the fact the defendant was not taken before a court for arraignment without unnecessary delay." Mackey, supra, at 8. Even In re Thompson (1974), 4 O.O. 3d 359, relied upon heavily by appellant, does not suggest that the sanction for failure to comply with R.C. 2935.05 should be the exclusion of the statements. Moreover, Thompson, supra, states that the phrase "without unreasonable delay" should be interpreted to mean "within a reasonable time." Thompson, at 362.

This court does not conclude that the state waited an unreasonable amount of time before filing its complaint with the trial court. Nor, even were a violation of the statute found, would this court be empowered to grant the remedy requested by appellant, as Ohio courts will only apply the exclusionary rule when the violation committed by the police concerns a constitutional right. (Failure to comply with

R.C. 2935.05 would constitute only a statutory violation.) See _Cowans_, _supra_. Consequently, appellant's sixth sub-argument is without merit.

In the final sub-argument to the first assignment of error, appellant challenges the validity of the admission of statements made during questioning which were allegedly procured during plea bargaining negotiations. The statements alluded to by appellant are those in which appellant was told that Timothy Combs was going to implicate him as the perpetrator unless appellant cooperated. The taped confessions also reveal that appellant was told that the trial court would be informed if he cooperated. Appellant argues that the state impliedly promised appellant leniency if he were to cooperate. (Appellant does not categorize what, if any, promise the state made in exchange for his cooperation.)

Appellant correctly asserts that statements made during plea bargain negotiations are not admissible as evidence. _State_ v. _Davis_, (1980), 70 Ohio App. 2d 48. However, the factual scenario described (and witnessed on tape) does not portray a plea bargain negotiation. As the state asserts, "[a] promise merely to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." _United_

-34-

_States_ v. _Fera_ (C.A. 1, 1980), 616 F. 2d 590, 594, (Citations omitted); (_United States_ v. _Posey_ (C.A. 5, 1980), 611 F. 2d 1389; _United States_ v. _Frazier_ (C.A. 5, 1970), 434 F. 2d 994; _United States_ v. _Arcediano_ (1974), 371 F. Supp. 457, 469, quoted in _State_ v. _Edwards_ (1976), 49 Ohio St. 2d 31, 40. The alleged plea negotiations which occurred in this case fit squarely within the rule enunciated in _Edwards_, _supra_. Consequently, appellant cannot, as a matter of law, have his statements excluded on the basis that the statements were coerced during plea bargain negotiations.

Appellant's first assignment of error is without merit.

Appellant's seventh assignment of error raises arguments similar to those raised in the first assignment. The seventh assignment challenges appellant's ability to waive his Seventh Amendment right to a jury trial, under Crim. R. 23(A). Appellant cites _State_ v. _Kehoe_ (1976), 59 Ohio App. 2d 315, as requiring that a waiver of a jury trial must be (as with the waiver of all constitutional rights) "knowing, intelligent and voluntary."

In the case _sub judice_, appellant was afforded a separate hearing on January 7, 1986 for the purpose of determining whether appellant was making a voluntary, knowing and intelligent waiver. The trial court spoke with appellant for approximately forty-five minutes about the differences between a jury trial and a trial to a three

-35-

VOL. 22-696

judge panel. The trial court explained to the appellant that a panel of judges would hear evidence inadmissible before a jury; would not be subject to voir dire; would, in all probability, not grant appellant's request for a change of venue; and would already be privy to Timothy Combs' statements. Appellant stated that he understood these differences.

Following its explanation to appellant about the distinctions between bench trials and jury trials, the trial court presented appellant with a written waiver. Appellant was then permitted to discuss this waiver form with his attorney and his mother. Only after appellant returned from this discussion (which lasted approximately twenty-five minutes) and specifically asked for a three judge panel did the trial court accept appellant's waiver of this right to a jury trial.

There is no evidence in the record indicating that the trial court accepted the waiver without scrupulously ascertaining appellant's ability to understand the impact of his actions. Further, there is enough competent evidence to determine that the trial court's decision was not against the manifest weight of the evidence. In so holding, this court does not express any opinion as to the ability of other mentally retarded persons to waive their constitutional rights. Such a decision will have to be made

-36-

on an individual case by case basis, considering all appropriate facts and the totality of the circumstances of each case. This court does, however, hold that sufficient evidence exists in this matter to determine that appellant effectively (knowingly, intelligently and voluntarily) waived these constitutional rights.

Appellant's first and seventh assignments of error are without merit.

### ASSIGNMENT # 2

THE TRIAL COURT ERRED IN THE ADMISSION OF "OTHER ACTS" TESTIMONY.

In his second assignment of error, appellant asserts that the trial court erred by admitting evidence of "other acts" into the trial. He claims that this was a violation of R.C. 2945.59, Evid. R. 404(B), and the Due Process clause of the United States Constitution's Fourteenth Amendment.

The trial court permitted the state to introduce evidence of two prior rapes committed by the appellant when he was seventeen. This evidence was offered to prove motive, intent and the appellant's scheme for committing sexual assaults.

R.C. 2945.59 states that:

> "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the

-37-

defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

Evid. R. 404(B) provides that:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

R.C. 2945.59 is to be strictly construed against the state and conservatively applied by a trial court. *State* v. *DeMarco* (1987), 31 Ohio St. 3d 191. *Evidence of other acts of a defendant is admissible pursuant to R.C. 2945.59 only when it tends to show one of the matters enumerated in that statute and when it is relevant to prove the defendant's guilt of the offense in question." *DeMarco*, *supra*, paragraph one of the syllabus. (Emphasis added.)

The admission of the other acts of the appellant was proper because they tended to show the trial court that the appellant intended to rape the victim. See *State* v. *Gardner* (1979), 59 Ohio St. 2d 14; *State* v. *Flonnory* (1972), 31 Ohio St. 2d 124.

-38-

Additionally, the appellee claims that even if the admission of the prior acts was erroneous, it was not prejudicial. In State v. White (1968), 15 Ohio St. 2d 146, the court stated that improperly used testimony which could be cause for reversal at a jury trial would not necessarily be so at a bench trial. It must affirmatively appear on the record in a bench trial that the court relied on this improper testimony in arriving at its verdict in order for the error to be a ground for reversal. Accord State v. Post (1987), 32 Ohio St. 3d 380.

The trial court stated in its opinion that "no prior crimes were considered by the court in any way in reaching its verdict."

The second assignment of error is without merit.

### ASSIGNMENT # 3

THE TRIAL COURT IMPROPERLY ADMITTED CERTAIN EVIDENCE.

In his third assignment of error, the appellant contends that the trial court improperly admitted certain testimony of Raleigh C. Hughes, III, an ambulance attendant who saw the body at the site of the homicide, and certain testimony of Dr. Adelman. The appellant also claims that exhibit forty-seven, which the state asserts was the implement used by appellant to impale the victim, was improperly admitted. We will address the propriety of the

-39-

admission of this exhibit in appellant's fourth assignment of error.

Evid. R. 402 provides that all relevant evidence is admissible, unless otherwise excluded. Evid. R. 401 states that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, Evid. R. 403 expressly precludes the admission of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Additionally, that rule also provides that relevant evidence _may_ be excluded if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence.

At the close of the direct examination of Hughes, the appellee asked him to state his opinion regarding the victim's condition relative to other people he had treated. After overruling appellant's objection, Hughes replied that "this is probably one of the most gruesome things I've ever seen." Appellant claims that this had no bearing on the evidence and was elicited to inflame the passion of the three judges and to shift the focus of the case from

-40-

provable facts to the horrible nature of the crime and appellant's character.

In *White*, *supra*, the Ohio Supreme Court stated that they "indulge in the usual presumption that in a bench trial in a criminal case the [trial] court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *Id.* at 151. (Citations ommited.)

There is nothing in the record to show that this statement had any effect on the trial court's determination of appellant's guilt. We, too, indulge in the same presumption and conclude that the admission of this statement, although perhaps prejudically erroneous in a jury trial, was not so here. See, also, *State* v. *Eubank* (1979), 60 Ohio St. 2d 183.

Parenthetically, it should be noted in assignments nine, eleven and twelve appellant alleges error, which if tried before a jury would require greater analysis by this court. However, this cause was tried before a three judge tribunal and, unless the record clearly shows otherwise, this court will assume regularity and/or lack of prejudicial error.

Dr. Adelman testified that strangulation can cause the penis to become erect and that asphyxiation is often used by people to enhance their sexual orgasms.

-41-

*VOL. 22 - 762*

Appellant states that this testimony was of no probative value, and that there was an insufficient basis for the testimony. As to the latter contention, appellant does not explain why the basis for the testimony was insufficient.

Bite marks on the victim's penis were later identified by Dr. Mertz, a dentist and forensic odontologist, as those of the appellant's. The appellee maintains that the victim could have been asphyxiated in order to cause an erection for purposes of oral sex. Since the teeth marks on the victim's penis, when measured by Dr. Mertz at the morgue, were consistently smaller than the actual size of the impression of appellant's teeth, Dr. Mertz stated that the victim's penis was probably erect at the time it was bitten. If this were true, then the marks on the victim's penis would be proportionately smaller when measured by Dr. Mertz. Therefore, the testimony that the strangulation, i.e., asphyxiation, can cause a penis to become erect was probative testimony, shedding light on precisely what occurred that fateful day.

The third assignment of error is without merit.

### ASSIGNMENT # 4

THE TRIAL COURT ERRED IN ADMITTING EXHIBIT 47, A "STICK".

In appellant's fourth assignment of error and part of his third, he contends that the trial court erred by

-42-

admitting into evidence a piece of wood, which looked like the end of the handle of a household broom or mop. This piece of wood was identified as state's exhibit forty-seven. According to the appellee, it was forcibly inserted into the victim's rectum, causing internal damage and bleeding.

This handle was found in the thick brush of a field approximately six feet from a bicycle path. Donald Allgood, sixteen at the time of the trial, testified that from a distance of about thirty yards, he saw the appellant walking on the bicycle path and toss a stick into the field with a flick of his wrist. Although Allgood stated that the stick was about twelve inches long, he also indicated that it could have been a branch. After a search of the area was conducted by the police, the end of the broken handle was found.

Appellant states that the exhibit should not have been admitted because Dr. Adelman could not positively say that the broom handle was the item which caused the damage to the victim's rectum and bladder. An examination of the victim's damaged internal organs revealed that plant material was present but this cellular material could not be positively identified as originating from the broom handle introduced as exhibit forty-seven.

Mr. Dehus, a criminologist and forensic science analyst, testified for the appellant. He stated that he

tested the stick for blood and did not find any traces. He indicated that a pourous object such as exhibit forty-seven, if used in the manner claimed by the state, would normally absorb fluids, and traces of blood should have been found when it was tested. However, on cross-examination, he qualified this response by noting that he had been involved in cases in which the weapon did not have blood on it. He also agreed that an object could be "wiped" or "washed clean" eliminating the traces of blood.

Appellant, in the fourth assignment of error, states that the trial court improperly drew an inference from another inference.

During the course of a statement appellant made to the police shortly after the incident, a Warren police officer asked the appellant what another individual had inserted into the victim's rectum. Appellant responded, "A stick. Like a broom handle thing ***."

Dr. Adelman performed the autopsy on the victim and took several photographs of the damaged organs. He compared exhibit forty-seven with the tears in the victim's internal organs and concluded that the size and shape of the point of the stick were very compatible with the size and shape of the opening in the rectum. He described the "fit" as similar to a key in a lock. Dr. Adelman also testified that

both ends of the broom handle had probably been inserted into the victim's rectum.  He stated on direct examination:

> "The sharp end of the stick is -- would have
> made the penetration through the rectum and
> the urinary bladder that I've described.
> The blunt end of the stick would have made
> the mark on the rectum that did not
> penetrate; just a contusion, and the size
> relationships are quite consistent."

James Wurster, a criminalist employed by the Ohio Bureau of Criminal Identification and Investigation who specializes in the detection and identification of blood, stated that rain or dirt could have removed blood on a stick such as exhibit forty-seven.

The admissions of exhibit forty-seven was not improper based on the statement of the appellant and the testimony of Dr. Adelman and Messrs. Dehus and Wurster.  Additionally, there was no attempt to draw one inference upon another. The testimony elicited showed that appellant stated that "a broom handle thing" was inserted into the victim's rectum, that appellant was observed throwing a stick into the brush of a field near the homicide site, that the end of a broom or mop handle was found in the area where a witness saw the appellant throw a stick, and that the "jagged edge" of exhibit forty-seven fit the opening in the victim's rectum like a key in a lock.  These direct facts were presented in evidence in order for the court to make one inference--that exhibit forty-seven was the object which was inserted into

the rectum of the victim. The admission of exhibit forty-seven, based on these facts, was not improper.

Appellant's portion of his third assignment of error relating to exhibit forty-seven and his fourth assignment of error are without merit.

### ASSIGNMENT # 5

THE RIGHT TO CONFRONT WITNESSES WAS VIOLATED.

In his fifth assignment of error, appellant contends that his right to confront a witness was improperly denied. A seventeen year old boy who had been incarcerated at the Juvenile Justice Center testified that, while he was in one of the cells, the appellant tried to have sex with him.

Appellant claims that the appellee called Stephen Melius to the stand without prior disclosure to the appellant. Appellant also claims that when the witness was later recalled, it became "quite apparent that the witness's potential further testimony had been thoroughly reviewed with the prosecutor". Appellant asserts that he was effectively denied the right to full cross-examination of this witness, and relies on State v. Prater (1983), 13 Ohio App. 3d 98, for the proposition that a state's witness may not have his memory refreshed during a recess when still subject to cross-examination.

The appellee's position was that it did not know about the witness until the previous afternoon. The trial court

-46-

indicated that if the appellant wished to cross-examine the witness later, it would order him to remain in the county and that it would consider a request for a continuance so that appellant could investigate the witness.

The right to cross-examine a witness is a fundamental right applicable to the states. Pointer v. Texas (1965), 380 U.S. 400. Appellant was afforded this right, as well as the right to further cross-examination after investigation. In Davis v. Alaska (1974), 415 U.S. 308, the Supreme Court stated that the improper limitation on the right to cross-examination was an effective denial of the right to confront a witness.

In the case at bar, no restrictions were placed on appellant's right to cross-examine Melius; therefore, we cannot say that appellant's right to confront this witness was violated in any way. See Prater, supra. It should be noted that counsel did not request a continuance, but the witness was required to be available for recall by the defense. He was indeed subpoenaed and recalled by appellant. As such, the appellant was afforded an opportunity to prepare for and cross-examine Melius.

Second, appellant objects to the alleged "coaching" by the prosecution of this witness. The transcript reveals that an assistant prosecutor had spoken with the witness prior to being recalled. Melius, when questioned by

-47-

appellant's counsel during recall, stated that he was informed that the defense was:

> "Going to subpoena me back into court, and he told me some of the questions that you might ask me."

> "***

> "He said that you might---that you might ask me if that I gave some of the wrong dates and stuff like that."

Then when questioned by the state, the following occurred.

> "Q.   Steven when I talked to you this morning, I told you that Jim Lewis [appellant's trial counsel] subpoenaed you, did I tell you to make any kind of story up?"

> "A.   No, sir.

> "Q.   Did I tell you to tell the truth?

> "A.   Yes, sir."

This exerpted language represents the sum of the evidence before this court of appellee's alleged wrongdoings.   As such, the evidence is insufficient to show that the state "coached" the witness beyond simply urging him to tell the truth.   Moreover, as noted by the state, the witness' testimony "after coaching" did not differ from the prior day's narration on the witness stand.   From this evidential table, this court is unable to conclude that the state engaged in any improprieties of a prejudicial nature.

In Prater, the trial court specifically instructed the prosecution not to talk to a witness during a break in the

trial. Although the prosecutor disobeyed the order, the trial court concluded that even this "flagrant violation" of the court's effort to afford the defense a fair opportunity for effective cross-examination, did not deny the appellant the opportunity for full and effective cross-examination, in light of all of the evidence offered. The court in _Prater_ also stated that the prosecution cannot use a trial recess to coach a witness before defense counsel has finished his cross-examination of that witness. Since there was no such order, by the trial court, for the prosecutor in the case at bar to refrain from discussing the case with Melius, and it appeared that cross-examination had terminated, the assignment of error is without merit.

### ASSIGNMENT # 6

_THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO INCLUDE LICENSED DRIVERS IN THE POOL OF LICENSED DRIVERS. [SIC]_

Appellant asserts in his sixth assignment of error that the trial court erred by denying his motion to include licensed drivers in the pool of prospective jurors. He states that the selection of potential jurors from voter registration lists did not adequately reflect a fair cross-section of the community.

In the case at bar, appellant waived his right to a trial by jury. The trial was heard before a three judge

Vol. 22 - 74

panel, therefore, the denial of this motion could not possibly have had any effect on the trial.

This assignment of error is without merit.

### ASSIGNMENT # 8

THE TRIAL COURT ERRED IN DENYING THE APPELLANT FUNDS TO EMPLOY AN EXPERT WITNESS FOR A MOTION HEARING.

In his eighth assignment of error, appellant asserts that the trial court erred by denying him the necessary funds to employ an expert witness to show that appellant's motion for closure of the pretrial hearings was necessary to preserve a fair and impartial jury. He states that closure is an effective means of ensuring an impartial jury, and that an indigent defendant should be provided at all times with the reasonably necessary means of obtaining proper representation.

As it was stated in the sixth assignment of error, appellant waived his right to a trial by jury and was tried by three judges, not a jury of his peers. This court cannot help thinking that appellant's counsel upon appeal is slightly misplaced. The fact that appellant waived his right to trial by jury renders this assignment of error moot. Prior to executing his waiver of a jury trial, appellant was informed that the pre-trial motions addressed in assignments six and eight would, "in all probability," be overruled if appellant waiver his rights to a jury trial. The trial

court correctly concluded that appellant's motions would be anamolous in a trial to a three judge tribunal. Appellant indicated that he understood the effect of his waiver, and that it would result in the motions being overruled.

This court will not indulge appellant and analyze this assignment of error as if there *had* been a trial by jury.

The eighth assignment of error is without merit.

### ASSIGNMENT # 9

THE ADMISSION OF EXHIBIT 3 (A PHOTOGRAPH OF RAYMOND FIFE) WAS ERROR.

Appellant maintains in his ninth assignment of error that the admission of exhibit three, a school photograph of the victim taken prior to the assult in question, was error. Also, appellant claims that it was improper to permit the victim's mother to testify about family matters, and that it was wrong to permit the prosecutor to comment on the victim's good character during closing argument.

We find this assignment to be without merit.

First, appellant's counsel failed to object to the admission of the photograph, testimony or prosecutor's comments at trial. This failure precludes appellant from objecting now. State v. Wade (1978), 53 Ohio St. 2d 182, at paragraph one of the syllabus.

Appellant's argument would be more persuasive in a jury trial. The admission of the photo before a three judge

-51-

VOL. 22 - 712.

panel, however, was, at best, harmless error. There is no evidence that the court was swayed by testimony of the victim's mother or the claimed erroneous comments of the prosecutor.

The assignment of error is overruled.

### ASSIGNMENT # 10

THE APPELLEE DID NOT GIVE THE APPELLANT COMPLETE DISCOVERY.

The tenth assignment deals with the extent of discovery provided by the state to the appellant. Appellant objects that the following were not provided to him:

> "1. Allgood identified appellant from a photo array.
>
> 2. That photo array.
>
> 3. Exhibits 103-109.
>
> 4. Oral statements of appellant concerning those exhibits.
>
> 5. The statement of Stephen Melius.
>
> 6. The photographs used by Dr. Levine."

Appellant recognizes the foregoing lapses in discovery here, when viewed in a bifurcated context, are not detrimental, but argues the cumulative impact of all these items reaches plain error.

The state contends that there was sufficient other evidence to convict appellant. Also, the court afforded appellant additional time to prepare for both witnesses, Stephen Melius and Dr. Levine, indicating it was willing to

grant a continuance. However, appellant's counsel deigned not to request the time and continued forward wih the proceeding. Further, the specific photographs were supplemental, and, in some instances, duplicative of pictures that were already in evidence.

Appellant failed to show that the state did not make a good faith effort to supply all relevant materials. No plain error is found.

Appellant's tenth assignment is meritless.

### ASSIGNMENT # 11

ADMISSION OF CERTAIN PHOTOGRAPHS WAS AN ABUSE OF DISCRETION.

Appellant objects to the admission of exhibits which show the stick in relation to the cavity of the victim. He alleges this prejudiced the outcome.

Appellant notes the proper standard for admissibility of photographs from State v. Woodards (1966), 6 Ohio St. 2d 14. The court noted:

> "*** The rule is well settled that photo-
> graphs and color transparencies are not
> objectionable so long as they are properly
> identified, are relevant and competent and
> are accurate representations of the scene
> which they purport to portray. Indeed,
> photographs frequently convey information to
> the court and jury more accurately than
> words.
>
> "Although a photograph may be rendered
> inadmissible by its inflammatory nature, the
> mere fact that it is gruesome or horrendous
> is not sufficient to render it inadmissible
> if the trial court, in the exercise of its

-53-

discretion, feels that it would prove useful to the jury.

"The real question is whether the probative value of such photographs is outweighed by the danger of prejudice to the defendant." Woodards, supra, at 24-25. (Citations omitted.)

Appellant also cites State v. Luft (Dec. 26, 1978), Franklin App. No. 78AP-302, unreported. It, as well as Woodards, recognized the objectionable nature of some photographs, but nonetheless found harmless error with their admission.

In this cause, admission of the photographs does not rise to the crest of prejudicial error. There was sufficient other evidence as to the guilt of the defendant. Further, the exhibits were used to show the penetration of the stick and the "lock and key" fit of the stick to the injuries. Finally, the proceeding was had before a three judge panel rather than a jury, and the presumption remains that they only considered relevant evidence.

This assignment is overruled.

### ASSIGNMENT # 12

THE STATE MADE IMPROPER CLOSING ARGUMENTS AT BOTH THE GUILT AND MITIGATION PHASES OF THIS CASE.

Appellant alleges the prosecutor made improper remarks during closing arguments. He lists fourteen separate instances during both closing at trial and closing at the mitigation stage of the proceedings.

-54-

*The assignment is without merit.*

*Initially, it should be noted that appellant's attorney failed to object at the time to any of the statements. Appellant is precluded from raising it as error now.* *Wade*, *supra*.

*Further, a prosecutor is granted great leeway during closing argument, but there still are bounds within which he must operate. However, error will only be found if the remarks affected the verdict. See* State v. Wiggins *(Sept. 30, 1988), Lake App. No. 12-258, unreported.*

*Given the nature of the offense involved, the circumstances surrounding the death of the victim, and the length of the closing argument, it does not appear this would constitute prejudicial error, but merely harmless error, at best.*

*Finally, as noted previously, the trial was conducted before a three judge panel and not a jury, and the record fails to disclose any prejudice.*

### ASSIGNMENT # 13

*THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.*

*Appellant alleges ineffective assistance of counsel. He lists seven means by which counsel at trial was ineffective. These include:*

-55-

"(1) counsel should have had hearings on the pre-trial motions that were filed;

"(2) counsel should have attempted to seat a jury before waiving that right;

"(3) counsel failed to fully advise the appellant of his legal rights concerning appellant's waiver of a jury trial so that he could voluntarily, knowingly and intelligently make such a decision;

"(4) counsel should have continuously objected to an officer's belief that the appellant was lying;

"(5) counsel's failure to timely file a a motion for new trial with a hearing;

"(6) counsel's failure to object to appellee's improperly closing argument; and

"(7) counsel's failure to preserve the record or otherwise object on any issue that this court or any future court deems waived by such omission."

Appellant prefaces his argument by suggesting that he simply is preserving his right to appeal on this issue. As such, he just merely asserts how counsel was ineffective.

However, the Ohio Supreme Court has developed the proper framework to determine ineffective assistance of counsel. In State v. Lytle (1976), 48 Ohio St. 2d 391, the court indicated:

"*** [T]here must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties as to his client. Next and analytically separate from the question of whether the defendant's sixth amendment rights were violated, there must be a determination as to whether the defense was

-56-

prejudiced by counsel's ineffectiveness."
*Id.* at 396-7.

This was interpreted in *State v. Smith* (1981), 3 Ohio App.
3d 115, where the court held:

> "In order to establish prejudice to
> defendant resulting from a lack of effective
> assistance of counsel, defendant must
> establish upon appeal a substantial
> violation by counsel of an essential duty to
> his client. The defendant must then
> establish his defense was prejudiced by the
> violation of any such duty. *State v. Lytle*
> (1976), 48 Ohio St. 2d 391 [2 0.0. 2d 495].
> In light of the presumption of competency
> attributed to counsel in Ohio, the burden
> upon a defendant to establish ineffective
> assistance of counsel is a heavy one.
> *Vaughn v. Maxwell* (1965), 2 Ohio St. 2d 299
> [31 0.0. 2d 567]." *Id.* at 120.

Independent review of the record fails to disclose
where the second prong of the *Lytle* test has been met in
connection with the seven claimed deficiencies of trial
counsel. In other words, the record fails to demonstrate
where appellant was expressly prejudiced by the alleged
omissions and/or comissions of trial counsel.

In this cause, many of the alleged deficiencies of
trial counsel more aptly challenge counsel's strategies and
tactics. "*** [M]any trial tactics may be questioned after
an unfavorable result. A fair assessment of attorney
performance requires us to eliminate the distorting effect
of hindsight." *Post*, at 388. Moreover, *Strickland v.
Washington* (1984), 466 U.S. 668, states that tactical

-57-

decisions may not be the basis of demonstration of ineffective assistance of counsel, absent a showing of prejudice. See, also, State v. Peine (July 21, 1989), Lake App. No. 13-088, unreported, at 14-15. As stated, there is no showing of prejudice here. This court will not indulge in speculation regarding counsel's motivation in waiving a jury trial and his subsequent strategies and tactics employed before the three judge panel, including any judgmental exercise appellant's counsel may have considered to the effect that a gruesome factual scenario is less apt to influence emotionally a panel composed of judges than a jury of lay people.

In addition, appellant's assignment is deficient for failing to comply with the Appellate Rules. Specifically, appellant, in his brief, fails to fully develop his argument as required by App. R. 16 (A)(4), and pursuant to App. R. 12, this court may disregard "[e]rrors not specifically pointed out in the record and separately argued by brief ***."

Appellant's thirteenth assignment is without merit.

### ASSIGNMENT # 14

IT WAS ERROR FOR THE TRIAL COURT TO SENTENCE APPELLANT ON THE KIDNAPPING CHARGE AND THE KIDNAPPING SPECIFICATION.

Appellant alleges that the rape and kidnapping were

-58-

offenses of similar import and appellant should have only been convicted of one. As such, only one should have been used for the aggravating specification during the mitigation phase. He argues the cause should be remanded for new sentencing without the kidnapping specification.

Appellant relies upon _State v. Logan_ (1979), 60 Ohio St. 2d 126, where the court found that rape and kidnapping were of similar import and thus it was error for the court to convict on both counts. The reason was that the court could not find "*** that appellant had a separate animus to commit kidnapping." _Logan_, _supra_ at 135. The _Logan_ court continued:

> "Within this pronounced rule we adopt the policy that where murder, the taking of a hostage, or extortion is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense." _Logan_, at 135.

Clearly, the court noted the exception in situations which a murder is committed.

More recently, courts have focused upon the requirement of "separate animus" when analyzing rape and kidnapping. The court in _State v. Henry_ (1987), 37 Ohio App. 3d 3, found separate animus.

> "When the _Logan_ standard is applied to the facts in the instant case, it is apparent that a separate animus does in fact exist and, therefore, separate convictions are proper. First, the restraint was prolonged.

-59-

VOL. 11- 746

*The victim was abducted at approximately 1:30 a.m. and was not released until approximately 4:04 a.m. Second, the confinement was secretive. The abductors kept the victim's head down so that she would not be seen in the automobile. Moreover, when a police officer approached the automobile the victim was threatened and told not to let the officer know that she was in the automobile. Third, the movement involved was substantial. The victim was abducted in Bowling Green, driven to Toledo and then returned to Bowling Green. Fourth, there was a substantial increase in risk of harm to the victim. The farther the victim was removed from Bowling Green and the longer she was restrained, the less likely it was that she would be returned safely. The victim was taken on country roads and could have been killed or abandoned without encountering assistance nearby. Since the victim was taken in an automobile and driven a substantial distance, she was subjected to a risk of injury from the operation of the motor vehicle which was separate and distinct from the injury she was exposed to from the rapes."* Henry, supra at 9.

In this cause we have similar facts except for the distance of the asportation and the exact length of time. The restraint was long. The evidence supports the conclusion that the restraint lasted approximately forty-five minutes. The confinement here was also secretive. The victim was dragged off the traveled path. Third, after awakening and attempting to flee, the victim was again grabbed and dragged back into the woods. His mouth was covered to prevent pleas for help. The appellant remained with the victim while the co-defendant left to obtain the

lighter fluid. These facts demonstrate the separate animus for the kidnapping and the rape.

The assignment is without merit.

### ASSIGNMENT # 15

THE MOTION FOR NEW TRIAL SHOULD HAVE BEEN GRANTED.

Appellant asserts that the trial court erred in denying his motion for a new trial without first holding a hearing to determine the merits of the motion. On February 14, 1986, appellant filed a motion for a new trial without any supporting materials. In that motion, appellant requested an extension of time to file the supporting evidence. However, on March 31, 1986, the court overrruled appellant's new trial motion.

On April 7, 1986, appellant filed a motion to set aside the March 31, 1986 entry. Appellant filed an affidavit on April 7, 1986 in which Raymond Vaughn, appellant's half-brother, recanted his trial testimony. In the affidavit, hedenied seeing appellant washing blood out of his pants. He further averred that he so testified at trial because of the coercion of the prosecutor.

The trial court set the matter for hearing on May 8, 1986. However, apparently without holding the hearing, the court overruled the appellant's motion to vacate. Though not specifically articulated, appellant alleges that the

-61-

court abused its discretion by denying the motion without conducting a hearing.

This assignment is without merit.

Initially it should be noted Crim. R. 35 provides the basis upon which a new trial can be granted. It is incumbent upon the moving party to identify the basis for his motion and provide support for the allegation by material of evidential quality.

In _Toledo_ v. _Stuart_ (1983), 11 Ohio App. 3d 292, the court in the syllabus held:

> "1. Motions for new trials, made pursuant to Crim. R. 33, are not to be granted lightly. When such a motion is made pursuant to Crim. R. 33(A)(2), in which misconduct by jurors, prosecution witnesses or the prosecuting attorney is alleged, affidavits in support thereof must be submitted with the motion as further required by, and specified in, Crim. R. 33(C). If the defendant fails to produce supporting affidavits, the trial court, in its discretion, may deny the motion summarily without a hearing. (Crim. R. 33[A][2] and [C], construed.)
>
> "2. Neither the trial court's ruling on the new trial motion nor its decision on whether to hold a hearing thereon, will be disturbed on appeal in the absence of a clear showing that the court abused its discretion." (Emphasis in original.)

Furthermore, nothing in the Criminal Rules requires that a hearing be held. To the contrary, case law has endorsed the proposition that the decision to grant a hearing rests with

-62-

the discretion of the court. This was noted in <u>State</u> v. <u>Williams</u> (1975), 45 Ohio St. 2d 88.

> "'The granting of a motion for a new trial upon the ground of newly discovered evidence is necessarily committed to the wise discretion of the court, and a court of error cannot reverse unless there has been a gross abuse of that discretion. And whether that discretion has been abused must be disclosed from the entire record.' <u>State</u> v. <u>Lopa</u> (1917), 96 Ohio St. 410, 411." <u>Williams</u>, <u>supra</u>, at 93.

This was also noted in <u>United States</u> v. <u>Kearney</u> (C.A. D.C., 1982) 682 F.2d 214.

> "A motion for a new trial may be decided on the basis of affidavits without an evidentiary hearing. ***"

> "***'Moreover, the necessity for a hearing is diminished in cases involving challenged testimony where the trial judge has an opportunity to observe the demeanor and weigh the credibility of the witness at trial.'" Kearney, supra, at 219. (Citations omitted.) (Emphasis in original.)

In the original motion for new trial and the motion to vacate, appellant itemizes a number of reasons for new trial. However, appellant filed only one affidavit in support of the motion, and it was only applicable to one of the bases for new trial. As such, appellant has failed to fulfill the evidential requirements of Crim. R. 33. Therefore, the court did not abuse its discretion in denying the motion without a hearing.

-63-

Further, it should be noted appellant's grounds for a new trial, though not in response to the new trial motion, had been considered and reviewed by the trial court. In addition, appellant's theories of innocence have been reviewed by this court and rejected in other assignments of error.

Finally, no error obtains where the evidence is such that the outcome of the trial would not be different. See, e.g., State v. Duling (1970), 21 Ohio St. 2d 13. In this cause, the evidential table is sufficient, even excluding the testimony in question, which was recanted in Vaughn's affidavit, that was filed with the motion to vacate, to support a conviction. Furthermore, the testimony by the witness, in this cause, is not pivotal to appellant's conviction because it has little, if any, probative value in determining his guilt or innocence.

The fifteen assignment is rejected.


## ASSIGNMENT # 16

THE TRIAL COURT WAS IMPROPERLY PREVENTED BY (sic) DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT.

Appellant's sixteenth assignment of error alleges that the death penalty statute prevents the court from deciding whether the death penalty is appropriate. He argues because the statute mandates imposition of the death penalty if the

-64-

aggravating circumstances outweigh the mitigating factors, the court is not permitted to determine if the death penalty is appropriate.  He suggests that the court is "bound by the weighing process and [is] prohibited from deciding whether nevertheless death is inappropriate."

Appellant theorizes that the court is precluded from imposing life imprisonment out of a desire for mercy or simply because it feels the death penalty is inappropriate.

However, this has been rejected in _Jenkins_, _supra_, and _State_ v. _Buell_ (1986), 22 Ohio St. 3d 124.  Further the statute provides that the court may consider not only the six specified mitigating factors, but "any other factors that are relevant to the issue of whether the offender should be sentenced to death."  R.C. 2929.04(B)(7).  As such, the court does have discretion to consider "*** a broad range of specified and unspecified factors in mitigation of the imposition of a death sentence."  _Jenkins_, at 174.

This assignment is denied.

### ASSIGNMENT # 17

THE TRIAL COURT FAILED TO CONSIDER ALL OF THE EVIDENCE IN SUPPORT OF MITIGATING A DEATH SENTENCE.

In this assignment, appellant alleges that the court failed to consider all of the mitigating factors in sentencing appellant to be executed.  Specifically,

-65-

appellant argues that the court failed to consider the possible brain damage he suffered from injuries, his low mental age, and his good institutional record.

The first two are fairly similar in nature in that the injuries may have contributed to his low intelligence level or low mental age. However, the court clearly did consider this when it noted:

> "The court considered the following factors in possible mitigation:
>
> "***
>
> "2) The low intelligence of the defendant.
>
> "***
>
> "Neither low intelligence nor impaired judgment were given significant weight since no high degree of intelligence was necessary to understand the events of rape, kidnapping, arson and murder as committed on the night of the crime, and to classify participation in such events as poor judgment seems ridiculous."

Generally, the court did consider appellant's low mental age.

Appellant's mother during mitigation also testified that appellant had fallen off a swing and, on another occasion, had been hit by an automobile. However, no express evidence was offered which indicated appellant's retardation was the result of the physical traumas. To the contrary, evidence was offered which suggested that

-66-

V6l. 11 - 727

seventy-five percent of the time, the cause of the retardation is unknown.  Furthermore, Dr. Crusin indicated that neither of the injury reports indicated brain damage. As such, there was no evidence before the court which it could consider during mitigation on this subject.

Though not specifically identified by the trial court, it had before it the evidence of appellant's good institutional record.  At the mitigation hearing, the appellant presented a number of witnesses who testified about appellant's activities at Brinkhaven and TCY.  This testimony tended to suggest that appellant was a follower, not a leader.  This, too, was considered by the court where it noted:

> "The court considered the following factors in possible mitigation:
>
> "***
>
> "6)  Whether or not he was a leader or follower."

Independently, though the court may not have expressly listed appellant's good institutional record as an item of mitigation, that evidence was before the court.  Further, it appears that the court considered it in making its determination.  Simply because the court did not identify it specifically is not grounds for reversal.  To permit such would open the door for reversal of every sentence because

-67-

the courts fail to list and discount every possible mitigating factor. This is clearly unreasonable.

The constitutionality of the weighing process employed by the trial court in this case can be seen by contrast to that employed by the Texas court in Penry (which was found to be constitutionally deficient). Under Texas law, the jury was restricted in its application of mitigation evidence by the statutory requirement which dictated that the jury answer three specific questions. These questions were whether the defendant acted deliberately with the reasonable expectation that death would result; whether there was a probability that the defendant would continue to commit criminal acts of violence; and, whether the conduct of the defendant was unreasonable in response to the provocation. Penry, 492 U.S. ___, 106 L. Ed. 2d at 272.

The Supreme Court held that the Texas statutory scheme was flawed because the jury was not informed that it could give effect to mitigating evidence of petitioner Penry's mental retardation and abused background. Further, a trier of fact who attempted to give effect to petitioner's mitigating evidence of failure to learn from his mistakes, would be forced to conclude that petitioner would continue to commit violent crimes. The court held that the trier of fact must be allowed to express a "reasoned moral response" and remanded the case for resentencing. Penry, 492, U.S.

-68-

___, 106 L. Ed. 2d at 284; see, also, <u>Lockett</u> v. <u>Ohio</u> (1978), 438 Ohio St. 586, 605.

By contrast, R.C. 2929.04(B) allows for the consideration of several mitigating factors, including "any factors that are relevant to the issue of whether the defendant should be sentenced to death." 2929.04(B)(f). Further, the statute dictates that "the defendant shall be given great latitude in the presentation of evidence of the "mitigating factors ***." 2929.04(C). Therefore, it can be seen that, under Ohio law, the trier of fact is not precluded from considering mitigating factors and the weighing process cannot be found to violate due process.

Appellant's seventeenth assignment is without merit.

### ASSIGNMENT # 18

A SENTENCE OF DEATH IS UNCONSTITUTIONAL.

Appellant's eighteenth assignment of error challenges the constitutionality of the death penalty on numerous grounds. However, as he notes, the issues that he raises have been previously addressed and rejected by the Ohio Supreme Court and/or the United States Supreme Court.

First, appellant alleges that the death penalty is cruel and unusual punishment because it is: 1) degrading to the dignity of human beings; 2) arbitrarily, freakishly and discriminatorily inflicted; and 3) applied at the uncontrolled discretion of the prosecutor. These arguments

-69-

have been rejected in *Jenkins*, *supra*, and *State* v. *Zuern* (1987), 32 Ohio St. 3d 56.

Second, appellant argues the death penalty violates the due process clause because:  1) it is not the least restrictive means to serve a compelling state interest; 2) it is not an effective deterrent; and 3) incarceration is the more appropriate means.

In *Jenkins*, at 168, the court noted that the United States Supreme Court has repeatedly rejected the "least restrictive means" argument.  In *Gregg* v. *Georgia* (1976), 428 U.S. 153, the court rejected the deterrence theory leaving the resolution of that particular issue with the state legislatures.  The court in *Spanzio* v. *Florida* (1984), 468 U.S. 447, in rejecting appellant's final position, cited *Gregg*, *supra*, and noted that the death penalty may be the only appropriate sanction for certain criminal acts which are so grievous "an affront to humanity." *Spanzio*, *supra*, at 184.

Appellant next takes issue with the state's statutory framework under which the death penalty may be imposed.  The challenges include 1) execution may be had without proof of intent (rejected in *Jenkins*, at 171); 2) failure to establish a stringent standard of proof (rejected in *Jenkins* and *State* v. *Maurer* [1984], 15 Ohio St. 3d 239); 3) the jury is not permitted to consider its own doubt as to the

-70-

*VOL. 22 - 731*

defendant's guilt (rejected in *State v. Roe* [1989], 41 Ohio St. 3d 18); 4) the state is not required to prove the absence of mitigating factors (overruled in *State v. Lawrence* [1989], 44 Ohio St. 3d 24, *rev'd.* on other grounds); 5) the sentencing scheme requires mandatory imposition of the death penalty (overruled in *Buell, supra*); 6) the bifurcated process does not sufficiently narrow the category of defendant's eligibility for the death penalty (rejected in *Jenkins*); and 7) the appellate review process (rejected in *Buell* and *Jenkins*).

Fourth, appellant argues that the sentencing hearing conducted before the same body which tried him denies his right to effective assistance of counsel. He maintains defense counsel is unable to fully argue all elements of a case utilizing two separate defenses: one during the guilt phase and a different one during mitigation. The exact argument was rejected in *State v. Mapes* (1985), 19 Ohio St. 3d 108, at 117, and *State v. Hicks* (1984), 43 Ohio St. 3d 72.

Next, appellant hypothesizes that the state's capital punishment statutes are unconstitutional because they subject appellant to double jeopardy. In essence, appellant suggests that by permitting the state to use the underlying aggravating felony associated during the sentencing stage violates the Constitutional provision prohibiting double

-71-

jeopardy. This argument was overruled in <u>State</u> v. <u>Brown</u> (1988), 38 Ohio St. 3d 305, and <u>State</u> v. <u>Barnes</u> (1986), 25 Ohio St. 3d 203.

In the sixth constitutional attack, appellant alleges that the death penalty statutes are overly broad. Appellant's specific challenge was rejected in <u>Buell</u>.

The eighteenth assignment is without merit.

### ASSIGNMENT # 19

THIS COURT CANNOT FIND THAT AFTER REVIEWING ALL OF THE FACTORS OF R.C. 2929.05(A) THAT DEATH WAS THE APPROPRIATE SENTENCE FOR DANNY LEE HILL.

The nineteenth assignment essentially is an overview of the mandatory review procedure imposed upon this court by statute.

Initially, appellant suggests that the evidence was insufficient to support the conviction. Appellant attempts to identify the conflicting evidence which would tend to create reasonable doubt as to his guilt. He further suggests that the evidence "is almost entirely circumstantial" and would be insufficient to support the imposition of the death penalty. However, a more thorough review of the evidence which was before the trial court indicates that the evidential table is more than sufficient to permit a finding of guilt.

-72-

First, appellant, who voluntarily went to the police station, noted that the victim was choked with his underwear. This information could only have been known then by the investigators and the perpetrators.

Appellant was identified by a witness as the individual who tossed aside an object like a stick in the field. The state's expert identified the stick as the probable cause of the perforation of the rectum and urinary bladder. Further, there is evidence which suggests that the co-defendant was acting as a look out while appellant assaulted the boy.

The state also presented the testimony of a forensic odontologist who stated:

> "It's my professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and the photographs that I had, made the bite marks on [the victim's] penis."

He also "excluded Combs altogether" as the source of the bite marks, concluding, "I'm sure on the exclusion [of Combs] as well as the identification" of Hill as the source of the bite marks. Similarly, appellant's own witness on this subject concluded that it was likely that one of the bite marks belonged to appellant.

Next, appellant alleges that the aggravating circumstances do not outweigh the mitigating factors. Appellant alleges that the mitigating factors which include

-73-

his low I.Q., his family background and his institutional record justify life imprisonment.

However, the trial court's analysis of the aggravating circumstances weighed against the mitigating factors support its conclusion. The court indicated it considered the underlying facts of each of the specifications in the weighing process. The evidence of the rape included the biting of the penis, leaving teeth marks; the pulling of the genitalia, bruising the pelvic area; and the penetrating of the anus with the broom stick, perforating the rectum and rupturing the urinary bladder. The underlying facts regarding the arson indicate the victim was burned about his face and shoulders. The kidnapping evidence suggested the appellant was tackled off his bicycle, slammed on the bicycle pedal, kicked about and then moved to conceal the other crimes.

Further, appellant, after being involved in these acts, went to the police station to inquire about the reward. At the same time, appellant was attempting to implicate others to divert attention from himself. This evidence indicates a lack of remorse, a callous attitude and the heinous nature of his character. All are appropriately considered by the court and are against the fabric of mitigation.

Appellant suggests that the death penalty is inappropriate and argues that the sentence is the result of

passion and prejudice. The record does not reflect this. Rather, the judges listened to the evidence and properly convicted appellant. Then, the court, after the mitigation hearing, determined that the death penalty was appropriate.

Next, appellant maintains that the death penalty is disproportionate to other capital cases. As required by statute, this court is required to compare this case against other aggravated murder cases in this district. To date, in only two other cases State v. Glenn (Feb. 15, 1985), Portage App. No. 1286, unreported, and State v. Wiles (June 3, 1988), Portage App. No. 1675, unreported, did this court affirm the imposition of the death penalty.

In Glenn, supra, the defendant had devised a plan to effectuate the escape of his half-brother from the Mahoning County Jail. During the escape attempt, the defendant shot and killed a reserve deputy sheriff who was transporting the prisoner from the jail to a doctor's office. During mitigation, appellant called two witnesses who testified about the defendant's upbringing and environment. However, the jury recommended the death penalty, finding that the aggravated circumstances outweighed the mitigating factors. Glenn, at 1-3.

In Wiles, supra, the defendant was burglarizing the home of his former employers. He thought that the home was unoccupied but was confronted by the son of the owners. The

-75-

defendant proceeded to stab the victim at least eleven times and left the knife in the victim's back.  The victim died as a result of the stab wounds.  This court affirmed the conviction and imposition of the death penalty.

By comparison, the sentence in the present cause is not disproportionate.  The facts in this cause, including the sexual assult and physical beating, the torture, the burning, the strangulation, and method of death, the attempted concealment of the body, and appellant's callous lack of remorse constitute criminal acts which are so grievous an "affront to humanity" to justify the death penalty.  _Spanzio_, at 184.  Further, nothing suggests that this sentence was imposed arbitrarily, capriciously or indiscriminately.  The sentence is appropriate under these circumstances.  See _Jenkins_ and _Zuern_, _supra_.

Pursuant to statutory law, this court is required to weigh the aggravating circumstances against the mitigating factors.  This court in _Glenn_ analyzed the weighing process.

> "From a review of the mitigating factors disclosed by the evidence, it is also shown that the aggravating circumstances outweigh those mitigating factors and, thus, the death penalty was appropriate.  The Ohio Supreme Court has cited with approval the following definition of 'outweigh':
> 'Outweigh.  _To outweigh means to weigh more than, to be more important than._ _The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating_

-76-

V.1. 22 - 737

> circumstances outweigh the mitigating
> factors.
>
> 'It is the quality of the evidence
> that must be given primary
> consideration by you. The quality of
> the evidence may or may not be
> commensurate with the quantity of the
> evidence, that is, the number of
> witnesses or exhibits presented in
> this case. (Emphasis added).
> Jenkins, supra, at 172, fn. 9.'"
> Glenn, at 43-44.

Initially, it should be noted that the exact sequence and extent of appellant's actual direct involvement is not specifically detailed in the evidence. However, based upon the direct evidence of the degrees of his actual involvement and the circumstantial evidence implicating appellant in his conjunctive role in the co-defendant's action, we agree with the trial court's verdicts in this cause.

Upon examination of the evidence presented, this court presents its weighing analysis of the aggravating circumstances and mitigating factors in this case.

First, the trial court found beyond a reasonable doubt that appellant committed rape, kidnapping and aggravated arson, each of which is sufficient to constitute the specification for the purposes of aggravated murder under which capital punishment may be imposed. We have previously indicated that we agreed that there was a proper basis for the trial court's verdicts based on the record before us. Each specification shall be analyzed independently.

-77-

VOL. 22 - 738

The evidence which supported the rape conviction indicated that the victim was subjected to a significant amount of force. This is consistant with the relative size and age differences between the appellant and the victim. Initially, the victim was restrained and his mouth covered, but as the various sexual acts were performed, he was rendered unconscious. The physical attacks perpetrated on the deceased caused him to vomit and also cause extensive physical damage. Specifically, during the assault, which lasted approximately forty-five minutes, the victim was repeatedly bitten on the penis, which was evidenced by the bite marks. In addition, the autopsy revealed that the deceased had suffered multiple contusions, abrasions, and lacerations on his back, face, and thigh. Furthermore, his genitalia was pulled with egregious force. He was impaled repeatedly with both the blunt end and sharp end of an instrument which was long enough to perforate the rectum and rupture the victim's urinary bladder. As an apparent result of the agony of the cumulative torture, the victim was heard screaming continuously, for a period of twenty to thirty seconds, by passersby. At this time, witnesses observed Combs on the path behind Valu-King. Additionally, appellant's own statement indicated he remained with the victim while Combs absented himself from the scene, and that he did not go for help. This direct evidence base provides,

-78-

at the very least, that appellant was the only other person when the victim was experiencing the pinnacle of excruciating pain from these egregious assaults.

The evidence of the kidnapping discloses that the victim was violently assaulted since he was grabbed from his bicycle, was lifted by his neck and was choked as he dangled in the air. He was also being stripped of his clothing at this point. Next, his head and upper torso was slammed against the bicycle pedal. Apparently, he managed to slip free and run a short distance before being recaptured. He was slammed to the ground several times. He was also repeatedly kicked, suffered multiple blows to the body, and he sustained severe head injuries, which resulted in a subdural hemorrhage. He was strangled with his underwear, almost in a "hanging fashion", as his feet were again lifted off the ground as he was being choked. This action left ligature marks around the decedent's neck. Finally, the victim had been assaulted and was left while still alive in a secluded area where early medical attention was not likely.

The testimony at trial likewise reveals the following in relation to the aggravated arson. After the assailants completed their sexual assaults, the appellant remained with the victim while the co-defendant departed the area and found a container of charcoal lighter fluid at the back

of the Valu King store.  When the co-defendant returned to the scene of the crime, the fluid was poured on the victim's face and shoulder.  Parts of his clothing were ignited and the victim was set afire.  As a result, he suffered third degree burns to his face and neck.

The net effect of this brutalization is that this court has before it three sets of aggravating specifications which include the rape, kidnapping and aggravated arson to weigh against the mitigating factors. Each of these, the arson, the anal penetration and the assualts accompanying the kidnapping could have indepently caused death.

Prior to the imposition of the death penalty, however, R.C. 2929.04 requires the consideration of a number of statutory mitigating factors and mandates that these factors be weighed against the aggravating circumstances. These mitigating factors are as follows:

> "(1) Whether the victim of the offense induced or facilitated it;
>
> "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
>
> "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

VOL. 22. 741

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and deliquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether th offender should be sentenced to death."

R.C. 2929.04(C) allows a defendant great latitude in the presentation of evidence at the penalty hearing. The sentencing body must weigh these mitigating factors against the aggravating circumstances; the history, character and background of the perpetrator; and the nature and circumstances of the crime. R.C. 2929.04(B)

Items one and two are inapposite to the case *sub judice*. Under no characterization of the evidence can the victim be considered to have induced or facilitated this offense in any way other than by simply being young and helpless and incapable of escape. The evidential table is similarly devoid of evidence suggesting that the victim provoked appellant or that appellant was under duress to commit or participate in these violent acts.

The record is replete with competent, credible evidence which states that appellant has a diminished mental capacity.

He is essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient motor skills. Appellant is characterized as being mildly to moderately retarded.  There is some suggestion that appellant's "mental age" is that of a seven to nine year old boy.  Testimony places appellant's I.Q. between 55 and 71, which would cause him to be categorized as mildly to moderately retarded.

Other factors which are demonstrated by the evidence, however, include appellant's ability to conform his conduct to the requirements of the law and appellant's understanding of the criminality of the acts committed.  Appellant's own witness, Doctor Darnall, testified that appellant possessed an intellectual understanding of right and wrong and further stated that appellant's crimes cannot be attributed to the fact that he was mentally retarded.  Appellant's ability to differentiate between right and wrong can also be gleaned from his statement to Sergeant Stewart during the interview process on September 12, in which appellant indicated that he abstained from participating in the alleged theft of the victim's bicycle because such an act would cause him to return to confinement.  This evidence demonstrates that appellant understands the difference between right and wrong and could appreciate that the attacks perpetrated on the victim were "wrong."  This knowledge of the distinction between correct and criminal conduct is further demonstrated

-82-

in appellant's audio and video taped statements, in which he alleges that he remained uninvolved with the assaults on the victim because he knew such acts carried criminal penalties and that he did not want to return to confinement. Appellant himself further urges that, under proper structured supervision, such as that received at Brinkhaven and TCY, he is capable of conforming his conduct to societal standards.

Consideration of evidence delineating appellant's mental retardation is more properly applied when evaluating his ability to knowingly, intelligently and voluntarily waive his constitutional rights. There is no evidence presented that requires the conclusion that this crime was committed because a mental defect precluded appellant from making the correct moral or legal choice.

The fourth mitigating factor is the age of the defendant. R.C. 2929.03 requires that the death penalty be applied only to persons who were eighteen years of age or older at the time of the commission of the aggravated murder. Appellant was eighteen and one-half years of age at the time of the commission of the offense. Implicit in appellant's mitigation evidence is the argument that appellant's mental age is such that he, _de facto_ (if not _de jure_) falls below the requisite age limit for imposition of the death penalty.

-83-

As previously stated, courts are reluctant to exculpate persons from their wrongful acts on the basis of mental age. The evidence in this case indicates that appellant understood that the acts committed were criminal and further demonstrates that he attempted to shift blame to others through his statements to the police. Appellant's acts of exculpation were calculated, cunning and showed no sign of a childlike intellect. Other evidence presented indicates that appellant is "street-wise" and that, although he is handicapped in formal educational settings, he is slick and functional in his environment. Moreover, this is scarcely appellant's first brush with the criminal justice system. In sum, there is insufficient evidence for this court to conclude that the age of the appellant, mental or chronological, is too young for the imposition of the death penalty.

The fifth mitigating factor to be considered is the lack of criminal convictions and delinquency adjudications appellant has had prior to the present conviction. An examination of appellant's criminal record indicates that this particular factor is of no help to him whatsoever. The record manifests that one year prior to the murder, appellant was convicted of the rapes of two women. These crimes were somewhat reminiscent of the crime which appellant is presently appealing, as all were violent sexual

-84-

assaults.  Various persons in the trial alluded to other acts of violence in appellant's past, noting that appellant had been arrested ten to fifteen times.

Application of the sixth statutory factor turns on the question of whether the perpetrator of the crime was a participant, rather than a co-principal offender.  The trial court, in its review of the mitigation evidence, felt that regardless of which defendant first attacked the victim, both appellant and Timothy Combs engaged in conduct characterized by torture, rape and murder.  This court agrees with that assessment.  The evidential table indicates the involvement of appellant in the slaying of the victim.  Appellant's contention suggesting that he merely observed while co-defendant Timothy Combs tortured and assaulted the victim is overwhelmingly negated by his personal odontological "signature" on the penis of the victim.  Again, the record indicates that appellant remained in the field with the victim while Timothy Combs was observed standing on the path.  By appellant's own admission, he remained with the victim while Combs procured the lighter fluid.  At neither time did appellant seek help for the victim.  This mitigating factor is inapplicable in this case.

The final mitigating factor is a "catch-all" factor which assimilates all other mitigating evidence.  Appellant

has adduced several factors for consideration. The first of these is the poor family environment in which appellant grew up. Appellant was raised by his mother, who herself is mentally retarded. He is an illegitimate child. There has generally been no male authority figure in appellant's household, as each of his siblings was sired by a different father, most of whom did not marry appellant's mother.

This court is cognizant of the difficulties which may arise when growing up in an unstable and impoverished family environment. However, there is no evidence which suggests a logical nexus between appellant's childhood and this crime. Incidents of single-parent families in the United States is increasingly common. However, crimes of this savagery are characterized by a fundamental lack of human decency which does not necessarily arise from the condition of one's family life. Although no one would argue that an upbringing in this environment is often detrimental, there is no demonstrable connection between appellant's family life and the murder of the victim. Moreover, the record before this court does not indicate that appellant's home life caused his siblings to perpetrate violent crimes.

Appellant also argues that the state was deleterious in its duties to him while he was under their supervision and care. The record shows that appellant was sent to several juvenile facilities which were presumably intended to have

treatment, educational and penal consequences. Appellant has presented considerable evidence as to the insufficiency of psychological care at these institutions. Nevertheless, appellant maintains that he was making rehabilitative progress at the institutions, progress that was abruptly terminated when appellant was released prematurely. There is testimony from various staff personnel that indicates that appellant was released from the juvenile facilities against the staff's recommendation.

This court notes that it is distressing when someone who is mentally handicapped is not afforded the support necessary to lead a more full and complete lifestyle. Similarly, it is unfortunate that appellant, for whatever reason, was discharged prematurely from the juvenile facility. However, there is no evidence which suggests that appellant would have not committed this crime if he had been afforded further treatment or that the converse would be true. There is no evidence presented which demonstrates that appellant's treatment would have been any more effective had he stayed at Brinkhaven for another year. Perhaps the only real inference that can be drawn from appellant's arguments is that appellant would not have been able to commit the murder had he remained at the institution. If this court accepted that argument, we would be obligated to find the state  culpable every time a released criminal

-87-

perpetrated a new offense. Considerations of due process do not permit, nor would society tolerate, life imprisonment for every offense on the grounds that the perpetrator might commit another crime upon release.

Appellant also introduced considerable evidence as to his passive nature. This evidence suggests that appellant is a "follower," easily led (because of his handicap) and influenced by any person with a dominant personality. The inference which appellant intends this court to draw from this evidence is that appellant was misled into the commission of the murder by co-defendant Timothy Combs.

Several factors, however, militate against this inference. First, this court is aware of the two rapes appellant committed one year before the killing of Raymond Fife. These rapes, which were committed by appellant alone, were accompanied by death threats (both rapes were committed at knife point), both contained forced sexual intercourse (in one instance, anal intercourse), and were accompanied by beatings, and, in one attack, the biting of the victim. Clearly, appellant needed no promptings from a "dominant" person in order to engage in savage and bestial behavior. Additionally, appellant is accused of making homosexual advances toward one youth in the Trumbull County Juvenile Center and threatening to do the same to another child while at TCY.

-88-

Further, appellant demonstrated a functional understanding of right and wrong which is incongruous with the portrayal of him as a mere puppet. Appellant's actions, in going on his own to the police and attempting to implicate other persons in the murder of Raymond Fife, are scarcely those of a person with no independent will. Although this court does not dispute that appellant may have aspects of a "follower" in his personality makeup on occasions, the evidence suggests enough personal will, and a consistent *modus operandi*, which belies the notion that appellant's will was being subsumed by another.

Finally, appellant alleges that a childhood fall caused organic brain trauma which, along with a subsequent bicycle accident, promoted his moral deficiencies, and is a mitigating factor in appellant's behavior. This court notes that almost no evidence of organic brain damage is demonstrated by appellant. Dr. Darnall, who adduced the only credible evidence on this subject, indicated that any evidence of organic brain disease was slight and that no evidence of psychosis was discovered. This court also recognizes that many children fall during childhood and hit their heads. Contrary to appellant's argument, however, the vast majority do not become sadists and murderers.

The evidence as to appellant's mental and physical condition, age, family, treatment history and passive nature

-89-

does not outweigh the aggravating circumstances. The record demonstrates that appellant and co-defendant Timothy Combs kidnapped the victim, beat him violently, sexually assaulted him, impaled him with a long wooden instrument, and burned his face and body by pouring lighter fluid on the boy's face and shoulder and igniting it. Appellant's guilt is demonstrated by direct physical evidence, circumstantial evidence, and the appellant's own statements to the police. There is no question as to the appellant's involvement in the murder.

R.C. 2929.05(A) mandates that an appellate court, upon review, is to consider whether the sentence imposed was excessive or disproportionate to the penalty imposed in similar cases. This court has undertaken the weighing of the proportionality in the discussion of appellant's nineteenth assignment of error. In doing so, this court compared this case with State v. Glenn, supra, and State v. Wiles, supra, which were cases from this district in which the death penalty was imposed.

The comparison of the case sub judice with Glenn and Wiles, as indicated, demonstrates that the sentence in the present cause is not disproportionate. The facts of this case indicate that appellant committed acts on the victim, Raymond Fife, that not only go beyond the bounds of

-90-

acceptible human behavior, but also move beyond this court's understanding of behavior which is human at all.

An extensive review of each assignment of error manifests that they are without merit. After an independent review of the evidence, we conclude that appellant was found guilty of the specifications of kidnapping, rape, and arson beyond a reasonable doubt; the aggravating circumstances outweigh the mitigating factors; and that imposition of the death penalty is proper. In this case, the death penalty was appropriate as the sentence was not excessive or disproportionate to sentences imposed in similar cases.

Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

A certified copy of this document shall constitute the separate opinion as to findings of the court in this case within the meaning of R.C. 2929.05(A) and the Clerk of this Court shall immediately make and file such certified copy with the Clerk of the Supreme Court of Ohio.

Pursuant to R.C. 2953.07, this court having affirmed the trial court and the date for execution having passed,

89

this court sets the date of February 26, 1990 for the execution of the death sentence.

Donald R. Ford
JUDGE DONALD R. FORD

CHRISTLEY, P.J., concurs

MAHONEY, J., concurs

**FILED**
COURT OF APPEALS

NOV 27 1989

TRUMBULL COUNTY, OHIO
MARGARET R. O'BRIEN, Clerk

STATE OF OHIO         )                IN THE COURT OF APPEALS
                      ) SS.
COUNTY OF TRUMBULL    )                ELEVENTH DISTRICT


STATE OF OHIO,                              JUDGMENT ENTRY

        Plaintiff-Appellee,

        - vs -                          CASE NOS. 3720/3745

DANNY LEE HILL,

        Defendant-Appellant.


        This cause here on appeal from the Court of Common Pleas
for Trumbull County was considered in the manner proscribed by
law.  Pursuant to our consideration of it, the judgment of the
Court of Common Pleas is affirmed consistent with the Opinion
rendered here.

        Further, since it is apparent to this Court that the date
previously set for the execution of judgment and sentence of
the Court of Common Pleas has passed, it is ordered by this
Court that the sentence be carried into execution by the
Superintendent of the Southern Ohio Correctional Facility, or
in his absence, by the Deputy Superintendent, on the 26th day
of February, 1990 in accordance with the applicable statutes.

                              -93-

It is further ordered that a certified copy of this entry and warrant under the seal of this Court be duly certified to the Superintendent of the Southern Ohio Correctional Facility, and that said Superintendent shall make due return thereof to the Clerk of the Court of Common Pleas.


PRESIDING JUDGE JUDITH A. CHRISTLEY

JUDGE JOSEPH E. MAHONEY

JUDGE DONALD R. FORD


# FILED
COURT OF APPEALS

NOV 27 1989

TRUMBULL COUNTY, OHIO
MARGARET R. O'BRIEN, Clerk

Nader,     je
Shaker,    ge

STATE OF OHIO      )          IN THE COURT OF COMMON PLEAS
                   )SS.
COUNTY OF TRUMBULL )          CASE NO. 85-CR-317


STATE OF OHIO,              )

          Plaintiff         )

     -vs-                   )          OPINION OF THE COURT

DANNY LEE HILL,            )

          Defendant         )

                    *    *    *

          The following matters were considered by the Court
as part of the aggravating circumstances of this case:

     A)   The manner in which the rape was committed,
          particularly;

          1.   The amount of force;
          2.   The relative size of the defendant and
               the victim;
          3.   The relative age of the defendant and
               the victim;
          4.   The biting of the penis;
          5.   The pulling on the genitalia;
          6.   The length of time of the sexual abuse;
          7.   The concurrent use of a sharp instrument
               long enough to rupture the victim's
               urinary bladder.

     B)   The manner in which the kidnapping was conducted,
          particularly;

          1.   Slamming of the victim upon the ground and
               on the bicycle pedal;
          2.   The kicking of the victim;
          3.   The severe head injury inflicted;
          4.   The multiple blows to the victim's body;
          5.   The removal of the victim while he was
               still alive to a place where possible
               medical aid would likely be delayed.

     C)   The strangulation with the victim's own clothing
          and the attendant torture which must have been oc-
          casioned by being pulled off the ground and held
          in the air;

     D)   Burning of the victim's face and body which could
          only have been either a futile attempt to conceal
          his identity or simply a vicious attempt to in-
          flict more pain;

                    VOL 670 PAGE 232

VICLET C. WHITMAN
CLERK OF COURTS
TRUMBULL COUNTY

FILED
RECORDED
VOL ___ PAGE ___

FEB 23  4 43 PH 85

#150

VIOLET C. WHITMAN
CLERK OF COURTS
TRUMBULL COUNTY

FILED
RECORDED _____
VOL _____ PAGE _____

E)  The callous denial of the victim's request for
help and to get his mother;

F)  Total lack of remorse indicated by defendant's
appearance at the police station after the
murder inquiring about a reward;

G)  The totality of circumstances indicating that
the victim was tortured over a long period of
time evidencing a vicious, perverted, animalistic
state of mind.

It should be noted that no prior crimes were considered
by the Court in any way in reaching its verdict.

The Court considered the following factors in possible
mitigation:

1)  The age of the defendant;

2)  The low intelligence of the defendant;

3)  The poor family environment;

4)  The failure of the State or society to prevent
this crime;

5)  The defendant's impaired judgment;

6)  Whether or not he was a leader or follower.

Neither low intelligence nor impaired judgment were
given significant weight since no high degree of intelligence
was necessary to understand the events of rape, kidnapping, arson
and murder as committed on the night of the crime, and to classify
participation in such events as poor judgment seems ridiculous.

The family environment of the defendant, while not the
most desirable, was not seen as likely to produce this high de-
gree of crime.

Society's failure was not considered as significant
because every time a murder is committed, there may be some
philosophical blame to be laid at the feet of society as a whole.
To give this theory heavy weight would be a denial of the idea
of individual responsibility which lies at the core of criminal
jurisprudence.

The Court found little credible evidence as to which
co-defendant initiated the series of crimes involved.  In any
event, whoever may first have taken the victim from the bike

VOL 670 PAGE 293

before all the events ended, both participants have followed a blood lust characterized by a series of acts of torture, rape, and murder to such an extent that the question of who started them was viewed as essentially irrelevant.

In conclusion, upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, and arguments of counsel, it is the unanimous judgment of this Court that the aggravating circumstances in this case outweigh the mitigating factors beyond any reasonable doubt.

_____
THE HONORABLE DAVID F. McLAIN

_____
THE HONORABLE ROBERT A. NADER

_____
THE HONORABLE MITCHELL F. SHAKER

DATE:  ___February 28___, 1986.

VIOLET C. WHITMAN
CLERK OF COURTS
TRUMBULL COUNTY

Feb 28  4 40 PM '86

FILED
RECORDED
VOL ___ PAGE ___

VOL 670 PAGE 294

on first Count of Agg. Mu    with spec, senten  ced to death      nner
provided by laws of the Sta    f Ohio.                McLain,     dge
                                                      Shaker, Judge
                                                      Nader, Judge

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )    CASE NO. 85 CR-317
                                  )         (Cts. 1,2,3,4,6)
        Plaintiff                 )
                                  )    DEATH PENALTY
-vs-                              )
                                  )    SENTENCE TO CHILLICOTHE
DANNY LEE HILL,                   )    CORRECTIONAL INSTITUTE
                                  )
        Defendant                 )    ENTRY ON SENTENCE

The Defendant herein having been indicted by the September 1985 Term of

the Grand Jury of Trumbull County, Ohio for Count 1 Aggravated Murder with

Specifications of Aggravating Circumstances (ORC 2903.01(B), Count 2

Kidnapping (ORC 2905.01), Count 3 Rape (ORC 2907.02), Count 4 Aggravated

Arson (ORC 2909.02), Count 5 Aggravated Robbery (ORC 2911.01), and Count 6

Felonious Sexual Penetration (ORC 2907.12(A)(1)(3), and on the 21st day of

January, 1986, having been brought into Court for trial before a three judge

panel and being represented by counsel, Atty. James F. Lewis and Atty. Scott

Kenney, and after due deliberation was found guilty on January 31, 1986 of

Count 1 Aggravated Murder with Specifications of Aggravating Circumstances

(ORC 2903.01(B), Count 2 Kidnapping (ORC 2905.01), Count 3 Rape (ORC

2907.02), Count 4 Aggravated Arson (ORC 2909.02), and Count 6 Felonious

Sexual Penetration (ORC 2907.12(A)(1)(3);

This day, February 28, 1986, the Court made inquiry as to whether this

Defendant had anything to say why judgment should not be pronounced against

him, and the Defendant in answer showed no good cause or sufficient reason

why sentence should not be pronounced.

It is therefore ORDERED, ADJUDGED, and DECREED that the Defendant,

DANNY LEE HILL, be taken from the courtroom to the Trumbull County Jail and

from thence to the Chillicothe Correctional Institute at Chillicothe, Ohio,

and sentenced to death on February 28, 1987 on Count 1, and imprisoned

therein for the indeterminate period of ten (10) to twenty-five (25) years on

Count 2, the determinate period of Life on Count 3, the indeterminate period

of ten (10) to twenty-five (25) years on Count 4, and the determinate period

of Life on Count 6, as provided by law, and that he pay the cost of

prosecution taxed in the amount of $_____ for which execution

is awarded.

VOL 670 PAGE 413

VIOLET ... ...
CLERK OF COURTS
TRUMBULL COUNTY
11 27 ... '86

113 #156

PAGE TWO

It is further ORDERED that the Superintendent of the Chillicothe Correctional Institute shall take note that the Defendant herein has been incarcerated in the Trumbull County Jail pursuant to these charges since September 16, 1985 to date.

_____
DAVID F. MCLAIN
Judge of the Court of Common Pleas

_____
ROBERT A. NADER
Judge of the Court of Common Pleas

_____
MITCHELL F. SHAKER
Judge of the Court of Common Pleas

You are hereby notified that you have been convicted of a felony of violence and pursuant to Section 2923.13 of the Ohio Revised Code you are prohibited from acquiring, having, carrying, or using any firearm or dangerous ordnance.

VOL 670 PAGE 414

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 85-CR-317

STATE OF OHIO,                    )

        Plaintiff         )

  -vs-                            )          JOURNAL ENTRY

DANNY LEE HILL,                   )

        Defendant         )

        Defendant's motion to suppress denied.  Findings of Fact and Conclusions of Law filed herein.

THE HONORABLE DAVID F. McLAIN
Judge-Trumbull County Court
of Common Pleas-Courtroom #1

DATE: __January 17___, 1986

VOL 668 PAGE 958

-100-

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 85-CR-317

| STATE OF OHIO, | ) | |
|---|---|---|
| Plaintiff | ) | FINDINGS OF FACT |
| -vs- | ) | AND |
| DANNY LEE HILL, | ) | CONCLUSIONS OF LAW |
| Defendant | ) | |

## FINDINGS OF FACT

1) On September 12th, 1985, the defendant came to the Warren Police Department. His express reason for coming to the police department was to provide information as to the possible perpetrators of the Raymond Fife homicide and also to inquire about a possible reward;

2) He was not given a Miranda Warning on September 12th before talking to Detective Stewart of the Warren Police Department;

3) On September 13th, 1985, the defendant was taken to the Warren Police Department by Detective Steinbeck. He was not arrested, booked, fingerprinted, handcuffed, or restrained in any manner. The record shows that his appearance on this date was wholly voluntary. In addition, he was given the Miranda Warning before and during the interview;

4) On both September 12th and 13th, the defendant's statements were wholly exculpatory and suggested other individuals as possible suspects;

PAGE ONE OF FIVE PAGES

VOL 668 PAGE 959

5) On September 16th, 1985, Officer Steinbeck and Morris Hill, the defendant's uncle, came to the home of the defendant's mother, Vera Williams, with whom the defendant lived. They indicated they wished both Mrs. Williams and the defendant to come to the police department stating that they wanted to have Mrs. Williams sign a written statement confirming previous oral statements about her son's whereabouts at the time of the homicide. They also said they wished to have the defendant sign a typewritten summary taken by Officer Steinbeck during the interview of September 13th;

6) The police at the time in going to the defendant's house, had reason to believe that the defendant had not been truthful in his previous statements and wished to question him further;

7) The defendant initially expressed opposition to the officers' request to come to the police station, but went when his mother told him in very strong terms to go with the police because he "had nothing to hide." The Police officers did not use any coercion, threat, or force against the defendant; did not arrest, handcuff, or in any way seize the defendant against his will. On the contrary, the Court finds that the defendant was motivated solely by his mother's strong urging to go with the police. Mrs. Williams accompanied her son to the police department;

8) Upon arrival at the Department about 10:00 A.M., September 16th, the defendant was again given Miranda Warnings, placed in a 10 by 10 foot interview room, and was questioned by officers who began the interview by giving the defendant a Miranda Warning;

PAGE TWO OF FIVE PAGES

VOL 668 PAGE 960

9)  For   at an hour, the defendant continued claim no direct knowledge about the death of Raymond Fife;

10)  After this first hour of questioning, Detective Hill told his nephew, the defendant, that he did not believe the defendant and said he thought the defendant was involved in some way in the homicide;

11)  The defendant was then asked if he wanted to talk to one of the officers alone.  He chose his uncle, Detective Hill.  After a couple of minutes, Officer Hill advised the others that the defendant had admitted his presence at the scene of the homicide and was willing to tell what he knew;

12)  Detectives then resumed questioning and the defendant admitted he had seen the crime, but had no personal involvement in the acts leading to Raymond Fife's death.  The defendant's story was then tape recorded and later videotaped;

13)  At the time of making these statements admitting knowledge but denying personal culpability, Danny Hill had been advised of his Miranda Rights and understood them.  He further had knowingly waived those rights;

14)  At the time of giving this statement; the statements sought to be suppressed, Danny Hill was a retarded person and essentially illiterate;

15)  His mental impairment was not so great as to render him incapable of understanding his right to remain silent and his right to counsel and all aspects of the Miranda Warning;

16)  Police at no time used force or threats or made any promises to the defendant;

17)  From the time he came to the station September 16th, the defendant was interviewed at length by various police officers and was not specifically told until 11:55 A.M. that he was not under arrest and that he was free to leave;

PAGE THREE OF FIVE PAGES

VOL 668 PAGE 961

-103-

18)  The defendant was not told of his access to the office of the Public Defender for the purpose of obtaining counsel.

## CONCLUSIONS OF LAW

It is the opinion of this Court that no Fourth Amendment violation was shown because he was at no time "seized" by the police department, but rather came in either voluntarily, or as in the case of September 16th, because of his mother's demands.

While this Court believes the defendant's interrogation skated perilously close to what we will call for convenience a Fickes/Dunaway/Hayes violation and believes it would have been a safer practice to have advised the defendant that he was free to leave upon his arrival at the police station September 16th, the Court does not conclude that the police procedure involved here violated the defendant's Constitutional Rights under the Fourth Amendment.

Defendant's Fifth Amendment Rights were clearly protected by the numerous Miranda Warnings and waivers.  Though this Court believes that the defendant could not have effectively read the rights or waiver forms, the Court relies on the fact that at any time he was given a piece of paper to sign acknowledging receipt of the Miranda Warnings and waiving his rights, the paper was always read to him before he affixed any of his signatures.

Though defendant is retarded, he is not so seriously impaired as to have been incapable of voluntarily and knowingly giving the statements which the defendant now seeks to suppress.

PAGE FOUR OF FIVE PAGES

VOL 668 PAGE 962

The Court reaches this conclusion after seeing and listening to the defendant at the Suppression Hearing and listening to and watching the tape recording and videotaped statements of the defendant.  The Court concludes that the statements were made voluntarily, willingly, and knowingly.

Finally, while the Court believes that it would have been better practice to comply with the spirit of ORC 120.16 by advising the defendant of access to the Public Defender's Office, the Miranda Warning itself does address the right to free counsel and satisfies any Fifth or Sixth Amendment requirement before questioning.  This statute as written poses some difficulty in that it leaves doubt as to who should be considered "an accused person".

In view of the foregoing, the Court finds that the defendant's motion to suppress is not well taken and the same is hereby denied.

THE HONORABLE DAVID F. McLAIN
Judge-Trumbull County Court of
Common Pleas-Courtroom #1

DATE: ___January 17___, 1986

PAGE FIVE OF FIVE PAGES

Case: 4:96-cv-00795-JRA  Doc #: 22-9  Filed: 01/24/97  110 of 203.  PageID #: 4256

(4) He need make no statement at any point in the proceeding, but any statement made can and may be used against him.

**(D) Joint arraignment.** If there are multiple defendants to be arraigned, the judge may by general announcement advise them of their rights as prescribed in this rule.

**Cross-References to Related Sections**
Arraignment, RC §§ 2937.02, 2937.03, 2943.02.

**Text Discussion**
Arraignment. 1 Ohio Crim. Prac. & Pro. ch 17
Initial appearance. 1 Ohio Crim. Prac. & Pro. ch 9

**Forms**
Arraignment, service. 4 OJI § 401.07.
Reading indictment. 4 OJI § 401.11
Consent of defendant to arraignment in his absence; plea of not guilty. 2A Ohio Crim. Prac. & Pro. 4.05a
Waiver of reading of indictment, information, or complaint. 2A Ohio Crim. Prac. & Pro. 4.05b

**Outlines of Procedure**
Common pleas court actions. Leyshon No. 315
Magistrates courts. Leyshon Nos. 300—302

**Research Aids**
Arraignment, generally:
  O-Jur3d: Crim L § 809
  Am-Jur2d: Crim L §§ 420, 772, 1007
Explanation of rights; joint arraignment:
  O-Jur3d: Crim L § 811
Presence of defendant:
  O-Jur3d: Crim L § 810
Waiver:
  O-Jur3d: Crim L § 814

**ALR**
Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.
Admissibility of confession as affected by delay in arraignment of prisoner. 19 ALR2d 1331.
Court's duty to advise or admonish accused as to consequences of plea of guilty, or to determine that he is advised thereof. 97 ALR2d 549.

## RULE 11. Pleas, Rights Upon Plea

**(A) Pleas.** A defendant may plead not guilty, not guilty by reason of insanity, guilty or, with the consent of the court, no contest. A plea of not guilty by reason of insanity shall be made in writing by either the defendant or his attorney. All other pleas may be made orally. The pleas of not guilty and not guilty by reason of insanity may be joined. If a defendant refuses to plead, the court shall enter a plea of not guilty on behalf of the defendant.

**(B) Effect of guilty or no contest pleas.** With reference to the offense or offenses to which the plea is entered:

(1) The plea of guilty is a complete admission of the defendant's guilt.

(2) The plea of no contest is not an admission of defendant's guilt, but is an admission of the truth of the facts alleged in the indictment, information, or complaint and such plea or admission shall not be used against the defendant in any subsequent civil or criminal proceeding.

(3) When a plea of guilty or no contest is accepted pursuant to this rule, the court shall, except as provided in subsections (C)(3) and (4), proceed with sentencing under Rule 32.

**(C) Pleas of guilty and no contest in felony cases.**

(1) Where in a felony case the defendant is unrepresented by counsel the court shall not accept a plea of guilty or no contest unless the defendant, after being readvised that he has the right to be represented by retained counsel, or pursuant to Rule 44 by appointed counsel, waives this right.

(2) In felony cases the court may refuse to accept a plea of guilty or a plea of no contest, and shall not accept such plea without first addressing the defendant personally and:

(a) Determining that he is making the plea voluntarily, with understanding of the nature of the charge and of the maximum penalty involved, and, if applicable, that he is not eligible for probation.

(b) Informing him of and determining that he understands the effect of his plea of guilty or no contest, and that the court upon acceptance of the plea may proceed with judgment and sentence.

(c) Informing him and determining that he understands that by his plea he is waiving his rights to jury trial, to confront witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to require the state to prove his guilt beyond a reasonable doubt at a trial at which he cannot be compelled to testify against himself.

(3) With respect to aggravated murder committed on and after January 1, 1974, the defendant shall plead separately to the charge and to each specification, if any. A plea of guilty or no contest to the charge waives the defendant's right to a jury trial, and before accepting such plea the court shall so advise the

defendant and determine that he understands the consequences of such plea.

If the indictment contains no specification, and a plea of guilty or no contest to the charge is accepted, the court shall impose the sentence provided by law.

If the indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interests of justice.

If the indictment contains one or more specifications which are not dismissed upon acceptance of a plea of guilty or no contest to the charge, or if pleas of guilty or no contest to both the charge and one or more specifications are accepted, a court composed of three judges shall: (a) determine whether the offense was aggravated murder or a lesser offense; and (b) if the offense is determined to have been a lesser offense, impose sentence accordingly; or (c) if the offense is determined to have been aggravated murder, proceed as provided by law to determine the presence or absence of the specified aggravating circumstances and of mitigating circumstances, and impose sentence accordingly.

(4) With respect to all other cases the court need not take testimony upon a plea of guilty or no contest.

**(D) Misdemeanor cases involving serious offenses.** In misdemeanor cases involving serious offenses the court may refuse to accept a plea of guilty or no contest, and shall not accept such plea without first addressing the defendant personally and informing him of the effect of the pleas of guilty, no contest, and not guilty and determining that he is making the plea voluntarily. Where the defendant is unrepresented by counsel the court shall not accept a plea of guilty or no contest unless the defendant, after being readvised that he has the right to be represented by retained counsel, or pursuant to Rule 44 by appointed counsel, waives this right.

**(E) Misdemeanor cases involving petty offenses.** In misdemeanor cases involving petty offenses the court may refuse to accept a plea of guilty or no contest, and shall not accept such plea without first informing the defendant of the effect of the pleas of guilty, no contest, and not guilty.

The counsel provisions of Rule 44(B) and (C) apply to this subdivision.

**(F) Negotiated plea in felony cases.** When, in felony cases, a negotiated plea of guilty or no contest to one or more offenses charged or to one or more other or lesser offenses is offered, the underlying agreement upon which the plea is based shall be stated on the record in open court.

**(G) Refusal of court to accept plea.** If the court refuses to accept a plea of guilty or no contest, the court shall enter a plea of not guilty on behalf of the defendant. In such cases neither plea shall be admissible in evidence nor be the subject of comment by the prosecuting attorney or court.

**(H) Defense of insanity.** The defense of not guilty by reason of insanity must be pleaded at the time of arraignment, except that the court for good cause shown shall permit such a plea to be entered at any time before trial.

Amended, eff 7-1-76; 7-1-80

**Cross-References to Related Sections**

Pleas. RC §§ 2937.06 et seq., 2943.03 et seq.

**Ohio Rules**

Inadmissibility of pleas, offers of pleas. EvR 410.
Withdrawal of guilty plea. CrimR 32.1.

**Text Discussion**

Appeal of ruling on motion to suppress. 1 Ohio Crim. Prac. & Pro. § 23.8
Arraignment; plea. 1 Ohio Crim. Prac. & Pro. §§ 17.2, 17.3
Guilty pleas. 1 Ohio Crim. Prac. & Pro. ch 25
Inadmissibility of pleas. Ohio Ev §§ 410.1—410.5
Initial appearance. 1 Ohio Crim. Prac. & Pro. ch 9
Insanity. 1 Ohio Crim. Prac. & Pro. § 58.3
Insanity defense. 1 Ohio Crim. Prac. & Pro. § 33.3

**Forms**

Accepting a plea of guilty, no contest. 4 OJI § 401.13
Entry and plea of not guilty by reason of insanity—hospital examination. 2A Ohio Crim. Prac. & Pro. 4.07a
Entry appointing psychiatrist for examination upon insanity plea. 2A Ohio Crim. Prac. & Pro. 4.07c
Entry ordering sanity inquiry. 2A Ohio Crim. Prac. & Pro. 4.07b
Motion for sanity inquiry. 2A Ohio Crim. Prac. & Pro. 4.06
Plea of not guilty by reason of insanity. 2A Ohio Crim. Prac. & Pro. 4.06
Waiver; preliminary hearing. 2A Ohio Crim. Prac. & Pro. 4.02

**Outlines of Procedure**

Common pleas court actions. Leyshon No. 315
Magistrates courts. Leyshon Nos. 300—302

Case: 4:96-cv-00795-JRA  Doc #: 22-9  Filed: 01/24/97  112 of 203.  PageID #: 4258

the absence of evidence establishing that the personal attendance of the witness involved cannot be had at the trial: State v. Gettys, 49 OApp2d 241, 3 OO3d 386, 360 NE2d 735.

4. (1975) Where a witness testifies unfavorably against an accused at a preliminary hearing and such testimony is allowed at trial because of the absence of the witness, the defendant is entitled to introduce, for impeachment purposes, written evidence originating after the preliminary hearing which refutes the testimony: State v. Earley, 49 OApp2d 377, 3 OO3d 447, 361 NE2d 254.

5. (1975) In criminal cases no notice of an intention to use a deposition at trial is required: State v. Villagomez, 44 OApp2d 209, 73 OO2d 215, 337 NE2d 167.

6. (1978) Criminal Rule 15 deals exclusively with depositions and not prior testimony, and is therefore not controlling over the portion of RC § 2945.49 which deals with prior testimony: State v. Preston, 10 OO3d 275 (CP).

### RULE 16. Discovery and Inspection

**(A) Demand for discovery.** Upon written request each party shall forthwith provide the discovery herein allowed. Motions for discovery shall certify that demand for discovery has been made and the discovery has not been provided.

**(B) Disclosure of evidence by the prosecuting attorney.**

*(1) Information subject to disclosure.*

*(a) Statement of defendant or co-defendant.* Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:

(i) Relevant written or recorded statements made by the defendant or co-defendant, or copies thereof;

(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer;

(iii) Recorded testimony of the defendant or co-defendant before a grand jury.

*(b) Defendant's prior record.* Upon motion of the defendant the court shall order the prosecuting attorney to furnish defendant a copy of defendant's prior criminal record, which is available to or within the possession, custody or control of the state.

*(c) Documents and tangible objects.* Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant.

*(d) Reports of examination and tests.* Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, made in connection with the particular case, or copies thereof, available to or within the possession, custody or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney.

*(e) Witness names and addresses; record.* Upon motion of the defendant, the court shall order the prosecuting attorney to furnish to the defendant a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call at trial, together with any record of prior felony convictions of any such witness, which record is within the knowledge of the prosecuting attorney. Names and addresses of witnesses shall not be subject to disclosure if the prosecuting attorney certifies to the court that to do so may subject the witness or others to physical or substantial economic harm or coercion. Where a motion for discovery of the names and addresses of witnesses has been made by a defendant, the prosecuting attorney may move the court to perpetuate the testimony of such witnesses in a hearing before the court, in which hearing the defendant shall have the right of cross-examination. A record of the witness' testimony shall be made and shall be admissible at trial as part of the state's case in chief, in the event the witness has become unavailable through no fault of the state.

*(f) Disclosure of evidence favorable to defendant.* Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or to punishment. The certification and the perpetuation provisions of subsection (B)(1)(e) apply to this subsection.

*(g) In camera inspection of witness' statement.* Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.

If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.

If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.

Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal.

*(2) Information not subject to disclosure.* Except as provided in subsections (B)(1)(a), (b), (d), (f), and (g), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents.

*(3) Grand jury transcripts.* The discovery or inspection of recorded proceedings of a grand jury shall be governed by Rule 6(E) and subsection (B)(1)(a) of this rule.

*(4) Witness list: no comment.* The fact that a witness' name is on a list furnished under subsections (B)(1)(b) and (f), and that such witness is not called shall not be commented upon at the trial.

**(C) Disclosure of evidence by the defendant.**

*(1) Information subject to disclosure.*

*(a) Documents and tangible objects.* If on request or motion the defendant obtains discovery under subsection (B)(1)(c), the court shall, upon motion of the prosecuting attorney order the defendant to permit the prosecuting attorney to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, available to or within the possession, custody

or control of the defendant and which the defendant intends to introduce in evidence at the trial.

*(b) Reports of examinations and tests.* If on request or motion the defendant obtains discovery under subsection (B)(1)(d), the court shall, upon motion of the prosecuting attorney, order the defendant to permit the prosecuting attorney to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, available to or within the possession or control of the defendant, and which the defendant intends to introduce in evidence at the trial, or which were prepared by a witness whom the defendant intends to call at the trial, when such results or reports relate to his testimony.

*(c) Witness names and addresses.* If on request or motion the defendant obtains discovery under subsection (B)(1)(e), the court shall, upon motion of the prosecuting attorney, order the defendant to furnish the prosecuting attorney a list of the names and addresses of the witnesses he intends to call at the trial. Where a motion for discovery of the names and addresses of witnesses has been made by the prosecuting attorney, the defendant may move the court to perpetuate the testimony of such witnesses in a hearing before the court in which hearing the prosecuting attorney shall have the right of cross-examination. A record of the witness' testimony shall be made and shall be admissible at trial as part of the defendant's case in chief in the event the witness has become unavailable through no fault of the defendant.

*(d) In camera inspection of witness' statement.* Upon completion of the direct examination, at trial, of a witness other than the defendant, the court on motion of the prosecuting attorney shall conduct an in camera inspection of the witness' written or recorded statement obtained by the defense attorney or his agents with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.

If the court determines that inconsistencies exist the statement shall be given to the prosecuting attorney for use in cross-examination of the witness as to the inconsistencies.

If the court determines that inconsistencies

do not exist the statement shall not be given to the prosecuting attorney, and he shall not be permitted to cross-examine or comment thereon.

Whenever the prosecuting attorney is not given the entire statement it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal.

*(2) Information not subject to disclosure.* Except as provided in subsections (C)(1)(b) and (d), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the defense attorney or his agents in connection with the investigation or defense of the case, or of statements made by witnesses or prospective witnesses to the defense attorney or his agents.

*(3) Witness list; no comment.* The fact that a witness' name is on a list furnished under subsection (C)(1)(c), and that the witness is not called shall not be commented upon at the trial.

**(D) Continuing duty to disclose.** If, subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter, in order to allow the court to modify its previous order, or to allow the other party to make an appropriate request for additional discovery or inspection.

**(E) Regulation of discovery.**

*(1) Protective orders.* Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted or deferred, or make such other order as is appropriate. Upon motion by a party the court may permit a party to make such showing, or part of such showing, in the form of a written statement to be inspected by the judge alone. If the court enters an order granting relief following such a showing, the entire text of the party's statement shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

*(2) Time, place and manner of discovery and inspection.* An order of the court granting relief under this rule shall specify the time, place and manner of making the discovery and inspection permitted, and may prescribe such terms and conditions as are just.

*(3) Failure to comply.* If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

**(F) Time of motions.** A defendant shall make his motion for discovery within twenty-one days after arraignment or seven days before the date of trial, whichever is earlier, or at such reasonable time later as the court may permit. The prosecuting attorney shall make his motion for discovery within seven days after defendant obtains discovery or three days before trial, whichever is earlier. The motion shall include all relief sought under this rule. A subsequent motion may be made only upon showing of cause why such motion would be in the interest of justice.

**Cross-References to Related Sections**

Availability of public records, RC § 149.43.
Subpoena of witnesses or documents, RC § 2937.19.

**Ohio Rules**

Discovery, CivR 26—37
Recording of proceedings, CPSupR 10, MCSupR 8.
Videotaped evidence, CPSupR 12, MCSupR 10.

**Text Discussion**

Discovery. 1 Ohio Crim. Prac. & Pro. ch 18, 19
Discovery—relationship between Criminal and Juvenile Rules. 2 Anderson Fam. L. § 7.2 et seq
Grand jury; discovery. 1 Ohio Crim. Prac. & Pro. § 14.4d
Impeachment of witnesses. 1 Ohio Crim. Prac. & Pro. § 31.2
Motions. 1 Ohio Crim. Prac. & Pro. §§ 21.4, 21.6
Pretrial conference. 1 Ohio Crim. Prac. & Pro. § 24.1
Severance of defendants. 1 Ohio Crim. Prac. & Pro. § 15.9
Subpoena as discovery device. 1 Ohio Crim. Prac. & Pro. § 19.4, 20.1
Suppression motions; evidentiary hearings. 1 Ohio Crim. Prac. & Pro. ch 23
Use and availability of grand jury testimony. 1 Ohio Crim. Prac. & Pro. § 31.8

**Forms**

Defendant's demand for discovery. 2A Ohio Crim. Prac. & Pro. 4.22
Defendant's motion for disclosure of favorable evidence. 2A Ohio Crim. Prac. & Pro. 4.21

## RULE 21. Transfer from Common Pleas Court for Trial

**(A) When permitted.** Where an indictment or information charging only misdemeanors is filed in the court of common pleas, such court may retain the case for trial or the administrative judge may, within fourteen days after the indictment or information is filed with the clerk of the court of common pleas, transfer it to the court from which the bindover to the grand jury was made or to the court of record of the jurisdiction in which venue appears.

**(B) Proceedings on transfer.** When a transfer is ordered, the clerk of the court of common pleas shall transmit to the clerk of the court to which the case is transferred, the indictment, information, and all other papers in the case, or copies thereof, and any bail taken, and the prosecution shall continue in that jurisdiction.

**Cross-References to Related Sections**
Jurisdiction of common pleas court, RC § 2931.03.

**Text Discussion**
Bill of particulars, 1 Ohio Crim. Prac. & Pro. § 15.6
Misdemeanor prosecution by information, 1 Ohio Crim. Prac. & Pro. § 15.3

**Outlines of Procedure**
Common pleas court actions, Leyshon No.315

## RULE 22. Recording of Proceedings

In serious offense cases all proceedings shall be recorded.

In petty offense cases all waivers of counsel required by Rule 44(B) shall be recorded, and if requested by any party all proceedings shall be recorded.

Proceedings may be recorded in shorthand, or stenotype, or by any other adequate mechanical, electronic or video recording device.

**Cross-References to Related Sections**
Court may order full report of testimony, RC § 2301.20.

**Ohio Rules**
Recording of proceedings, CPSupR 10, MCSupR 8.
Videotaped evidence, CPSupR 12, MCSupR 10.

**Text Discussion**
Right to counsel; waiver, 1 Ohio Crim. Prac. & Pro. § 10.6

**Forms**
Request that proceedings be recorded (oral), 2A Ohio Crim. Prac. & Pro. 1.09

**Outlines of Procedure**
Common pleas court actions, Leyshon No.315

**Research Aids**
Recording of proceedings:
  O-Jur3d: Crim L § 643
  Am-Jur2d: Crim L § 399

### CASE NOTES AND OAG

1. (1978) Where there was no request for recording of a trial of a petty offense, the fact that the recording was not completely transcribable is not reversible error absent a showing of prejudice: State v. Skaggs, 53 OS2d 162, 7 OO3d 243, 372 NE2d 1355.

2. (1979) It is error to dismiss the charges against a defendant with prejudice when a transcript of the preliminary hearing cannot be made because the recording thereof was "not available" through no fault of the prosecution, without any significant opportunity for the prosecution to be heard and without an exploration of alternative means of correcting the omission or otherwise reducing its harmful effects: State v. Ferguson, 64 OApp2d 165, 18 OO3d 121, 411 NE2d 831.

3. (1979) The use of a form or stamp reciting that all rights have been fully explained is not a substitute for a proper recording of proceedings before a judge under CrimR 11 or CrimR 22: State v. Minor, 64 OApp2d 129, 18 OO3d 98, 411 NE2d 822.

4. (1975) In a criminal case, it is prejudicial error for a court not to require a translation and record of the remarks of an accused incapable of understanding the English language, but to rely solely upon the conclusions of an interpreter in determining whether the defendant fully understands the instructions of the court and the effects of a plea of guilty: State v. Pina, 49 OApp2d 394, 3 OO3d 457, 361 NE2d 262.

5. (1976) Where a defendant not represented by an attorney is convicted at trial of a petty offense for which an imprisonment penalty is imposed, the imprisonment portion of the sentence will be vacated unless a record was made (in accordance with CrimR 22 and CrimR 44) which affirmatively demonstrates that the defendant could have obtained counsel or, after being fully advised by the court, knowingly, intelligently and voluntarily waived assignment of counsel: State v. Haag, 49 OApp2d 268, 3 OO3d 301, 360 NE2d 756.

6. (1975) Under CrimR 22, a petty offense case need not be recorded unless such is requested by a party to the proceeding: State v. Gaetano, 44 OApp2d 233, 73 OO2d 245, 337 NE2d 664.

7. (1974) Where a transcript cannot be prepared from the tape recording of a trial, the defendant is deprived of his right to an effective appeal: Warrensville Heights v. Blackburn, 2 OO3d 124 (App).

## RULE 23. Trial by Jury or by the Court

**(A) Trial by jury.** In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney. In petty offense cases, where there is a right of jury

**CrimR 23**                    OHIO RULES OF CRIMINAL PROCEDURE                    628

trial, the defendant shall be tried by the court unless he demands a jury trial. Such demand must be in writing and filed with the clerk of court not less than ten days prior to the date set for trial, or on or before the third day following receipt of notice of the date set for trial, whichever is later. Failure to demand a jury trial as provided in this subdivision is a complete waiver of the right thereto.

**(B) Number of jurors.** In felony cases juries shall consist of twelve.

In misdemeanor cases juries shall consist of eight.

If a defendant is charged with a felony and with a misdemeanor or, if a felony and a misdemeanor involving different defendants are joined for trial, the jury shall consist of twelve.

**(C) Trial without a jury.** In a case tried without a jury the court shall make a general finding.

Amended, eff 7-1-80

**Cross-References to Related Sections**

Jury demand, RC §§ 1901.24, 2938.04.
Number of jurors, RC § 2938.06.
Right to trial by jury, RC § 2945.17.
Trial by court, RC § 2945.06.
Waiver of jury trial, RC § 2945.05.
Withdrawal of jury demand, RC § 2938.05.

**Ohio Constitution**

Right of trial by jury, OConst art I, § 5.

**Ohio Rules**

Time extension not permitted, CivR 45(B).

**Text Discussion**

Arrest warrant issuance, 1 Ohio Crim. Prac. & Pro. § 6.1
Assertion or waiver of right to trial by jury, 1 Ohio Crim. Prac. & Pro. ch 27
Initial appearance, 1 Ohio Crim. Prac. & Pro. ch 9
Trial of adult in juvenile court, 2 Anderson Fam. L. § 17.11
Verdict, 1 Ohio Crim. Prac. & Pro. ch 41

**Forms**

Jury demand; petty offense, 2A Ohio Crim. Prac. & Pro. 4.11
Waiver—jury trial—serious offenses, 2A Ohio Crim. Prac. & Pro. 5.01c

**Outlines of Procedure**

Common pleas court actions, Leyshon No. 315
Magistrates courts, Leyshon Nos. 300—302

**Research Aids**

Trial by jury by court:
O-Jur3d: Crim L § 864
Am-Jur2d: Jury §§ 70, 80, 83, 128

**ALR**

Mandamus or prohibition as remedy to enforce right to jury trial. 41 ALR2d 780.
Right of accused to insist, over objection of prosecution or court, upon trial by court without a jury. 51 ALR2d 1346.
Right to jury trial as violated by consolidated trial upon several indictments or informations against same accused, over his objection. 59 ALR2d 846.
Right to jury trial as violated by substitution of judge in criminal case. 83 ALR2d 1032.
Right to jury trial in criminal prosecution for driving while intoxicated or similar offense. 16 ALR3d 1373.
Right to jury trial in juvenile court delinquency proceedings. 100 ALR3d 1241.
Statute reducing number of jurors as violative of right to trial by jury. 47 ALR3d 895.
Sufficiency of waiver of full jury. 93 ALR2d 410.
Withdrawal of waiver of right of jury trial in criminal case. 46 ALR2d 919.

**Law Review**

Right to trial by jury—sixth amendment—a five-member jury does not satisfy the jury trial guarantee of the sixth amendment. *Ballew v. Georgia*, 435 US 223 (1978). Case note. 47 CinLRev 524 (1978).
Smaller juries and non-unanimity: analysis and proposed revision of the Ohio jury system. Note. 43 CinLRev 583 (1974).

**CASE NOTES AND OAG**

1. (1980) Generally, a trial court has a legal duty to comply with the literal language of CrimR 23(B) and afford a misdemeanant a jury composed of eight members (State ex rel. Columbus v. Boyland, 58 OS2d 490, 12 OO3d 401); nevertheless, the providing of a jury of twelve in misdemeanor cases, where a misdemeanant is jointly indicted and tried with a felon pursuant to CrimR 8, is not prejudicial to the rights of the misdemeanant: State v. Thomas, 61 OS2d 223, 15 OO3d 234, 400 NE2d 401.

2. (1979) Where a defendant in a petty offense case has a right to trial by jury and pleads not guilty and demands a jury trial in the manner provided by CrimR 23(A), it must appear of record that such defendant waived this right in writing in the manner provided by RC § 2945.05, in order for the trial court to have jurisdiction to try the defendant without a jury: State v. Tate, 59 OS2d 50, 13 OO3d 36, 391 NE2d 738.

3. (1979) Criminal Rule 23(B), which provides that "[i]n misdemeanor cases juries shall consist of eight," violates neither section 5 nor section 10 of article I of the Ohio constitution: State ex rel. Columbus v. Boyland, 58 OS2d 490, 12 OO3d 401, 390 NE2d 324.

4. (1978) Where an accused, charged with a capital offense, knowingly, intelligently, and voluntarily waives his right to a trial by jury pursuant to RC § 2945.05 and CrimR 23(A), and is subsequently tried before a three-judge panel, the panel may render a verdict upon a majority vote of its members pursuant to RC § 2945.06: State v. Ruppert, 54 OS2d 263, 8 OO3d 232, 375 NE2d 1250.

5. (1976) Where a defendant and his counsel waive the right to a jury trial and the cause is tried to a completion before a three judge panel whereupon it is discovered that there is no written waiver as provided for in CrimR 23(A), and the defendant and counsel promptly execute a written waiver, such action satisfies the procedural requirements

**Ohio Rules**

Rules of Evidence not applicable to probation revocation proceedings, EvR 101(C)(3).

**Text Discussion**

Probation and parole. 1 Ohio Crim. Prac. & Pro. § 51.7
Revocation of probation. 1 Ohio Crim. Prac. & Pro. § 43.4
Right to counsel. 1 Ohio Crim. Prac. & Pro. §§ 10.3, 10.4

**Research Aids**

Revocation of probation:
  **O-Jur3d:** Crim L §§ 1384, 1385
  **Am-Jur2d:** Crim L §§ 578, 579

**ALR**

Acquittal in criminal proceeding as precluding revocation of probation on same charge. 76 ALR3d 564.

Admissibility, in state probation revocation proceedings, of evidence obtained through illegal search and seizure. 77 ALR3d 636.

Admissibility, in state probation revocation proceedings, of incriminating statement obtained in violation of Miranda Rule. 77 ALR3d 669.

Propriety of revocation of probation for subsequent criminal conviction which is subject to appeal. 76 ALR3d 588.

Right to assistance of counsel at proceedings to revoke probation. 44 ALR3d 306.

Right to notice and hearing before revocation of suspension of sentence, parole, conditional pardon, or probation. 29 ALR2d 1074.

**Law Review**

An introduction to conditions of probation in Ohio. L. Poe Leggette. 9 CapitalULRev 639 (1980).

*State v. Miller* [42 OS2d 102 (1975)]: the use of hearsay in probation revocation hearings. Note. 3 ONorthLRev 604 (1975).

### CASE NOTES AND OAG

1. (1975) Reversible error does not exist when the preliminary hearing and the revocation hearing have been telescoped into one hearing when it does not appear that the defendant has been prejudiced by detention for an unreasonable length of time for the purpose of probation revocation proceedings between the day of his arrest and the day of hearing: State v. Miller, 45 OApp2d 301, 74 OO2d 476, 345 NE2d 82.

2. (1975) The notice of the preliminary hearing or of the revocation hearing required by Morrissey v. Brewer, 408 US 471, 92 SCt 2593, for the revocation of probation need only state the acts constituting the violation of the probation conditions and not the conditions of probation thus violated: State v. Miller, 45 OApp2d 301, 74 OO2d 476, 345 NE2d 82.

### RULE 33. New Trial

**(A) Grounds.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

(3) Accident or surprise which ordinary prudence could not have guarded against;

(4) That the verdict is not sustained by sufficient evidence or is contrary to law. If the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and shall pass sentence on such verdict or finding as modified;

(5) Error of law occurring at the trial;

(6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

**(B) Motion for new trial; form, time.** Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.

Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon

[...] or abuse of
[...] which the
[...] v[...]g a fair

[...]ec[...]ting at-
[...]te
[...]h[...]rdinary
[...] against;
[...]e[...] by suffi-
[...]la[...]. If the
[...]ot guilty of
[...]e was con-
[...]t [...]reof, or
[...], [...]e court
[...] according-
[...] new trial,
[...]i[...] or find-

[...]e trial;
[...]i[...] to the
[...] fendant
[...]ence have
[...]al. When a
[...]on the
[...]d[...]ce, the
[...]ring on the
[...]ffidavits of
[...]e[...]e is ex-
[...]e [...]ired by
[...]idavits, the
[...]th[...] motion
[...]a[...]e under
[...]e pros-
[...]fidavits or
[...]ff[...]avits of

time. Ap-
[...]d- by mo-
[...] newly
[...]e[...] within
[...]rendered,
[...]rial by
[...]a[...]e to ap-
[...]f that the
[...]nted from
[...]w[...]ch case
[...]e[...]n days
[...]g that the
[...]nted from
[...]rovided

[...]t of newly
[...]w[...]hin one
[...]d[...]upon

---

which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

**(C) Affidavits required.** The causes enumerated in subsection (A)(2) and (3) must be sustained by affidavit showing their truth, and may be controverted by affidavit.

**(D) Procedure when new trial granted.** When a new trial is granted by the trial court, or when a new trial is awarded on appeal, the accused shall stand trial upon the charge or charges of which he was convicted.

**(E) Invalid grounds for new trial.** No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of:

(1) An inaccuracy or imperfection in the indictment, information, or complaint, provided that the charge is sufficient to fairly and reasonably inform the defendant of all the essential elements of the charge against him.

(2) A variance between the allegations and the proof thereof, unless the defendant is misled or prejudiced thereby;

(3) The admission or rejection of any evidence offered against or for the defendant, unless the defendant was or may have been prejudiced thereby;

(4) A misdirection of the jury, unless the defendant was or may have been prejudiced thereby;

(5) Any other cause, unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial.

**(F) Motion for new trial not a condition for appellate review.** A motion for a new trial is not a prerequisite to obtain appellate review.

**Cross-References to Related Sections**
New trial, RC §§ 2931.15, 2945.79 et seq.

**Ohio Rules**
Time extension not permitted, CrimR 45(B).

**Text Discussion**
New trial. 1 Ohio Crim. Prac. & Pro. ch 45

---

**Forms**
Application for order allowing motion for new trial. 2A Ohio Crim. Prac. & Pro. 6.08
Motion for new trial. 2A Ohio Crim. Prac. & Pro. 6.04—6.06
Motion for new trial due to newly discovered evidence. 2A Ohio Crim. Prac. & Pro. 6.07

**Outlines of Procedure**
Common pleas court actions. Leyshon No.315
New trial. Leyshon No.319

**Research Aids**
Affidavits and other proof:
O-Jur3d: Crim L § 1350
Application for new trial; time:
O-Jur3d: Crim L §§ 1348, 1349, 1351
Effect of filing and of granting motion:
O-Jur3d: Crim L § 1354
Evidence, generally:
O-Jur3d: Crim L § 1553
Grounds for new trial:
O-Jur3d: Crim L § 1320 et seq
Am-Jur2d: New Tr §§ 4, 31, 172
Harmless and prejudicial error, generally:
O-Jur3d: Crim L § 1542
Indictment, information, and complaint, generally:
O-Jur3d: Crim L § 1545
Instructions:
O-Jur3d: Crim L §§ 981, 1575
Modification, generally:
O-Jur3d: Crim L § 1606
Necessity of motion for new trial, generally:
O-Jur3d: Crim L § 1448
Variance:
O-Jur3d: Crim L § 796

**ALR**
New trial, generally
Absence of convicted defendant during hearing of motion for new trial or in arrest of judgment. 69 ALR2d 835.
Amendment, after expiration of time for filing motion for new trial in criminal case, of motion made in due time. 69 ALR3d 933.
Appeal by state of order granting new trial in criminal case. 95 ALR3d 596.
Conviction of lesser offense as bar to prosecution for greater on new trial. 61 ALR2d 1141.
Conviction of one party to alleged conspiracy as affected by award of new trial to other party or parties. 91 ALR2d 710.
Disqualification of original trial judge to sit on retrial after reversal or remand. 60 ALR3d 176.
Double jeopardy as bar to retrial after grant of defendant's motion for mistrial. 98 ALR3d 269.
Formal requirements of decision on motion for new trial as regards appealability. 73 ALR2d 269.
Participation in, acceptance of, or submission to, new trial as precluding appellate review of order granting it. 67 ALR2d 191.
Power of trial court or judge to revoke order granting new trial in criminal case. 145 ALR 400.

However, when a presumption is based upon strong public policy such as the presumption against suicide, it was suggested by Justice Taft that, although the burden of persuasion would not shift, the trial court might be justified in mentioning to the jury that such a presumption exists as a matter of law even if the presumption has been rebutted by the opposing party. *Carson v. Metropolitan Life Insurance Company* (1956), 165 OS 238, 59 OO 310, 135 NE2d 259. Justice Taft was obviously concerned that the Thayer-Wigmore "bursting the bubble" theory of presumptions did not sufficiently protect the strong public policy respecting suicide and suggested the modification to the general rule accordingly. Nothing in Rule 301 would, by its specific language, preclude similar treatment were the *Carson* situation to arise under the rule. Aside from this rather modest variation, all presumptions are characterized the same by the rule without regard to the underlying policy issue giving rise to the presumption. A presumption arising from mere consideration of accessibility to the evidence such as the presumption that a letter is delivered if properly posted and the presumption of legitimacy arising from strong policy considerations are treated alike under the rules unless modified elsewhere by rule or by statute.

It should be observed that this rule seeks neither to define nor enumerate what presumptions exist. That is a matter of substantive law determined by the legislature or by court decision. McCormick §343 (2d ed. 1972). There is no rule defining terms such as "burden of proof," "burden of persuasion," or "preponderance." These are left to case law. Nor does the rule apply to presumptions in criminal cases. The function of presumptions in criminal cases is limited by constitutional restrictions of due process. See *State v. Robinson* (1976), 47 OS2d 103, 1 OO3d 61, 351 NE2d 88; *State v. Humphries* (1977), 51 OS2d 95, 5 OO3d 89, 364 NE2d 1354 and *State v. Bridgeman* (1977), 51 OApp2d 105, 5 OO3d 275, 366 NE2d 1378.

Finally, it is noted that the rule does not resolve difficult issues as to sufficiency of evidence necessary to rebut a presumption, the problems inherent in instructing the jury if the presumption is not rebutted, or a number of other difficult problems surrounding the subject. These are left to case law analysis and prior Ohio case law will continue to apply to these peripheral areas. An excellent analysis of the subject is found in Subrin, *Presumptions and Their Treatment Under the Law of Ohio*, 26 OSLJ 175 (1965).

**Text Discussion**

Presumptions. 1 OJI § 5.13
Presumptions in general in civil actions and proceedings. OhioEv § 301.1 et seq

**ALR**

Conflict of laws as to presumptions and burden of proof concerning facts of civil case. 35 ALR3d 289.
Effect of presumption as evidence or upon burden of proof, where controverting evidence is introduced. 5 ALR3d 19.
Modern status of the rule against basing an inference upon an inference or presumption upon a presumption. 5 ALR3d 100.

## RULE 302. [Reserved]

## ARTICLE IV. RELEVANCY AND ITS LIMITS

### RULE 401. Definition of "Relevant Evidence"

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Staff Note**

**Rule 401**

Rule 401 defines relevant evidence and is identical to Federal Evidence Rule 401.

Relevancy is not an inherent characteristic of any item of evidence. When it exists, it is a relationship between an item of evidence and a matter properly provable in the case. Evidence is relevant when it tends as a matter of common experience and logic to prove a matter of consequence. In the rule, "of consequence to the determination" is an expression of materiality. The rule expresses the usual and general concept of relevancy, *Barnett v. State* (1922), 104 OS 298, 135 NE 647; *Whiteman v. State* (1928), 119 OS 285, 164 NE 51.

**Text Discussion**

Definition of "Relevant Evidence". OhioEv § 401.1 et seq

### RULE 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible.

EvR 403 RULES OF EVIDENCE 362

Admissibility, in wrongful death action for pecuniary loss suffered by next of kin, etc., of evidence as to decedent's personal qualities with respect to sobriety or morality. 99 ALR2d 972.

Admissibility of evidence of plaintiff's or decedent's drawings from partnership or other business as evidence of earning capacity, in action for personal injury or death. 82 ALR2d 679.

**Evidence of negligence—**

Admissibility, in action involving motor vehicle accident, of evidence as to manner in which participant was driving before reaching scene of accident. 46 ALR2d 9.

Admissibility in evidence, on issue of negligence, of codes or standards of safety issued or sponsored by governmental body or by voluntary association. 75 ALR2d 778.

Admissibility, in railroad crossing accident case, of evidence of other functional failures of railroad crossing devices and appliances of the same kind at other times. 46 ALR2d 935.

Admissibility of evidence as to tire tracks or marks on or near highway. 23 ALR2d 112.

Admissibility of evidence of absence of other accidents or injuries at place where injury or damage occurred. 31 ALR2d 190.

Admissibility of evidence of absence of other accidents or injuries from a customary practice or method asserted to be negligent. 42 ALR2d 1055.

Admissibility of evidence of precautions taken, or safety measures used, on earlier occasions at place of accident or injury. 59 ALR2d 1379.

Admissibility, on issue of defendant's negligence in respect of condition of place where plaintiff was injured, of evidence of prior accidents or injuries at same place. 70 ALR2d 167.

Lack of proper automobile registration or operator's license as evidence of operator's negligence. 29 ALR2d 963.

**Scientific or statistical evidence—**

Admissibility and weight of surveys or polls of public or consumers' opinion, recognition, preference, or the like. 76 ALR2d 619.

Admissibility in wrongful death action of testimony of actuary or mathematician for purpose of establishing present worth of pecuniary loss. 79 ALR2d 259.

Admissibility of evidence as to experiments or tests in civil action for death, injury, or property damage against electric power company or the like. 54 ALR2d 922.

Admissibility of evidence of neutron activation analysis. 50 ALR3d 117.

Admissibility of experimental evidence as to explosion. 76 ALR2d 402.

Admissibility of experimental evidence, skidding tests, or the like, relating to speed or control of motor vehicle. 78 ALR2d 218.

Admissibility of experimental evidence to determine chemical or physical qualities or character of material or substance. 76 ALR2d 354.

Admissibility of experimental evidence to show visibility or line of vision. 78 ALR2d 152.

Admissibility of lie detector test taken upon stipulation that the result will be admissible in evidence. 53 ALR3d 1005.

Admissibility of mortality tables in personal injury action as dependent upon showing of permanency of injury. 50 ALR2d 419.

Admissibility of testimony of actuary or mathematician as to present value of loss or impairment of injured person's general earning capacity. 79 ALR2d 275.

Blood grouping tests. 46 ALR2d 1000.

Physiological or psychological truth and deception tests. 23 ALR2d 1306.

## RULE 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time

**(A) Exclusion mandatory.** Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

**(B) Exclusion discretionary.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

**Staff Note**

Rule 403

Rule 403 delineates the first exceptions established by rule to the basic directive of Rule 402 that all relevant evidence is admissible. The rule is essentially the same, in content, as Federal Evidence Rule 403. Except for the omission of a reference to waste of time, the rule is an earlier draft of the federal rule. 51 F.R.D. 345 (1971). The rule represents no significant change in existing Ohio law.

The rule mandates the exclusion of relevant evidence if the court finds that the probative value of the relevant evidence is substantially outweighed by any one of three dangers: unfair prejudice, confusion of the issues, or the misleading of the jury.

Where the court finds that the probative value of relevant evidence is substantially outweighed by considerations of undue delay or needless presentation of cumulative evidence, the court may exlude that relevant evidence but it is not required to do so.

The rule does not refer to waste of time as a basis for exclusion as does Federal Evidence Rule 403. Waste of time is a correlative to undue delay and needless cumulation.

**Text Discussion**

Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. OhioEv § 403.1 et seq

**ALR**

Admissibility and propriety, in homicide prosecution, of evidence as to deceased's spouse and children. 67 ALR2d 731.

Admissibility and propriety, in rape prosecution, of evidence that accused is married, has children, and the like. 62 ALR2d 1067.

Admissibility in evidence of colored photographs. 53 ALR2d 1102.

Admissibility, in nonstatutory rape prosecution, of evidence of pregnancy of prosecutrix. 62 ALR2d 1083.

Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.

Permitting demonstration to show effect of injury in action for bodily injury. 66 ALR2d 1382.

Prejudicial effect of admission of evidence as to Communist or other subversive affiliation or association of accused. 30 ALR2d 589.

Propriety and prejudicial effect of comment or evidence as to accused's willingness to take lie detector test. 95 ALR2d 819.

Propriety and prejudicial effect of showing, in criminal case, withdrawn guilty plea. 86 ALR2d 326.

Propriety, in trial of civil action, of use of model of object or instrumentality, or of site or premises, involved in the accident or incident. 69 ALR2d 424.

Propriety, in trial of civil action, of use of skeleton or model of human body or part. 58 ALR2d 689.

Propriety, in trial of criminal case, of use of skeleton or model of human body or part. 83 ALR2d 1097.

## RULE 404. Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes

(A) **Character evidence generally.** Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same, is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

(2) *Character of victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

(3) *Character of witness.* Evidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609.

(B) **Other crimes, wrongs or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**Staff Note**

Rule 404

Rule 404 is a slightly modified version of Federal Evidence Rule 404. The modification consists of the addition of limitations upon admissibility of relevant evidence as provided by statute in certain sex offenses. Rule 404 codifies existing Ohio law.

Character or a trait of character may be an element of a crime, a part of a claim, or a part of a defense. When that situation exists, character is an issue. Actions for libel, slander, malicious prosecution, seduction, and assault and battery have been delineated as cases in which character is an issue. *Lakes v. Buckeye State Mutual Insurance Ass'n.* (1959), 110 OApp 115, 12 OO2d 384, 168 NE2d 895. When character is an issue in the case, it can be proved by any relevant evidence. Rule 404 does not apply to cases where character is an issue.

The second use of character evidence is as circumstantial evidence which gives rise to an inference which tends to establish conduct on a particular occasion. Rule 404 is directed to that usage. It states the basic prohibition on using character evidence to establish conduct on a particular occasion and then sets forth the exceptions to the prohibition.

If character evidence is admissible under the rule, proof of character may be made as provided in Rule 405. If evidence of a witness's character trait of truth and veracity is offered on the issue of credibility, the admissibility is governed by Rules 607, 608, and 609.

Rule 404(A) Character Evidence Generally

Character evidence is generally inadmissible to prove conduct on a particular occasion. Evidence that a defendant is a careless person is not admissible to prove that he was negligent on a particular occasion. *Hatsio v. Red Cab Co.* (1945), 77 OApp 301, 33 OO 73, 67 NE2d 553. Character evidence is relevant in that it tends to prove a material proposition but its prejudicial effect substantially outweighs its probative value and it creates collateral issues. Rule 404(A) restates existing Ohio law.

Rule 404(A)(1) Character of Accused

The first exception to the general rule of inadmissibility is the limited use of evidence of a character trait of the accused. The basic rule is that

the defendant may, at his option, offer evidence of his good character as proof that he did not commit the act charged because such conduct is not in accord with his character. This is often denominated the "mercy defense." If the accused offers evidence of his good character, then and only then, can the prosecution offer evidence of the bad character of the accused. The rule is in accord with existing Ohio law. R.C. 2945.56; *State v. Markowitz* (1941), 138 OS 106, 20 OO 63, 33 NE2d 1.

Rule 404(A)(1) provides that evidence of the character of the accused, in certain sex offenses, shall be admissible as provided by statute. The purpose of including the provision in the rule is to assure that the rule does not supersede those statutes. R.C. 2907.02(D), rape, and R.C. 2907.05(D), gross sexual imposition, limit evidence of the accused's character trait for promiscuity to specified narrow issues. R.C. 2907.26, rules of evidence in prostitution cases, permits a broader use of character evidence than does the rule.

### Rule 404(A)(2) Character of Victim

The character of the victim is seldom relevant evidence in a criminal prosecution. Where self-defense is asserted by the accused, the character of the victim bears directly on the issue of self-defense. The rule accords to existing Ohio law. *McGaw v. State* (1931), 123 OS 196, 174 NE 741. Rule 404(A)(2) contains the same provision relative to the sex offenses as does Rule 404(A)(1) and for the same purpose.

### Rule 404(A)(3) Character of Witness

A witness's character trait for truth and veracity is always relevant for the purpose of attacking the credibility of the witness. Rule 607 sets forth who may impeach a witness and Rules 608 and 609 provide the methods of proof used in the impeachment of a witness.

### Rule 404(B) Other Crimes, Wrongs or Acts

Evidence of other crimes, wrongs or acts of the accused are not admissible to show that the accused committed the crime with which he is now charged. The prosecution may not offer evidence that the accused has perpetrated earlier burglaries to prove that he committed the burglary with which he is now charged. The rule does permit the use of such evidence for other purposes. In a non-exclusive listing, the rule sets forth the purposes of showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The rule is in accord with R.C. 2945.59. The statute does not refer specifically to identity, but it has been held that identity was included within the concept of scheme, plan, or system. *State v. Curry* (1975), 43 OS2d 66, 72 OO2d 37, 330 NE2d 720. The statute has been held to be subject to narrow construction. *State v. Burson* (1974), 38 OS2d 157, 66 OO2d 351, 309 NE2d 897. Evidence is admissible only when that purpose is inextricably related to the alleged criminal act.

## Text Discussion

Character evidence not admissible to prove conduct; exceptions; other crimes. **OhioEv § 404.1 et seq**

## ALR

**Character evidence generally—**

Admissibility of evidence of accused's good reputation as affected by remoteness of time to which it relates. 87 ALR2d 968.

Admissibility of evidence of uncommunicated threats on issue of self-defense in prosecution for assault. 98 ALR2d 195.

Admissibility of evidence of uncommunicated threats on issue of self-defense in prosecution for homicide. 98 ALR2d 6.

Prejudicial effect of admission of evidence as to Communist or other subversive affiliation or association of accused. 30 ALR2d 589.

Right of prosecution, in homicide case, to introduce evidence in rebuttal to show good, quiet, and peaceable character of deceased. 34 ALR2d 451.

**Other crimes, wrongs, or acts—**

Admissibility and effect of evidence or comment on party's military service or lack thereof. 9 ALR2d 606.

Admissibility, in civil assault and battery action, of similar acts or assaults against other persons. 66 ALR2d 806.

Admissibility, in civil case involving usury issue, of evidence of other assertedly usurious transactions. 67 ALR2d 232.

Admissibility, in civil motor vehicle accident case, of evidence that driver was or was not involved in previous accidents. 20 ALR2d 1210.

Admissibility, in forgery prosecution, of other acts of forgery. 34 ALR2d 777.

Admissibility, in prosecution based on abortion, of evidence of commission of similar crimes by accused. 15 ALR2d 1080.

Admissibility, in prosecution for bribery or accepting bribes, of evidence tending to show the commission of other bribery or acceptance of bribe. 20 ALR2d 1012.

Admissibility, in prosecution for criminal burning of property, or for maintaining fire hazard, of evidence of other fires. 87 ALR2d 891.

Admissibility, in prosecution for gambling or gaming offense, or evidence of other acts of gambling. 64 ALR2d 823.

Admissibility, in prosecution for illegal sale of intoxicating liquor, of other sales. 40 ALR2d 817.

Admissibility, in prosecution for illegal sale of narcotics, of evidence of other sales. 93 ALR2d 1097.

Admissibility, in prosecution for sexual offense, of evidence of other similar offenses. 77 ALR2d 841.

Admissibility, in robbery prosecution, of evidence of other robberies. 42 ALR2d 854.

Admissibility, in subornation of perjury prosecution, of evidence of alleged perjurer's plea of guilty to charge of perjury. 63 ALR2d 825.

Admissibility of evidence as to other offense as affected by defendant's acquittal of that offense. 86 ALR2d 1132.

Admissibility of evidence of other offenses in rebuttal of defense of entrapment. 61 ALR3d 293.

Admissibility on behalf of accused of evidence of similar acts or transactions tending to rebut fraudulent intent. 90 ALR2d 903.

Admissibility to establish fraudulent purpose or intent, in prosecution for obtaining or attempting to obtain

CONSTITUTION OF OHIO    8

Art. I, §2

Co. v. Cox, 55 OS 497]. See also Caldwell v. Railway, 14 OD(NP) 375.

77. An order or regulation of a city board of health, forbidding the sale of ice cream on highway or public grounds of the city unless contained in sealed or locked cans or other containers approved by the board of health, is a valid exercise of police power, and is constitutional: Metropolis v. Elyria, 23 CC(NS) 544, 34 CD 374.

78. The section of a building code enacted by a municipal council, which prohibits the erection of any building for the working of wood or other combustible materials within sixteen feet of any lot line is an unreasonable exercise of the police power and is void: State ex rel Book v. Cleveland, 20 CC(NS) 538, 29 CD 604.

79. This section does not render invalid GC § 6243 (RC § 4113.04) et seq, which modify the prior liability of employers. Such sections do not interfere with freedom of contract: Fath Constr. Co. v. Bausmerth, 15 CC(NS) 150, 23 CD 382, 57 Bull 401 (Ed) [affirmed, without opinion, 87 OS 509].

80. General Code § 13169 (RC § 1329.22) is valid and constitutional. It does not require that milk be sold only in glass jars or bottles having the name of the vendor blown therein; nor does it prohibit the use of such bottles other than for vending milk. The object of the legislature is to prevent the public from being misled as to the identity of the vendor: State v. Doyle, 17 CC(NS) 289, 32 CD 147; Jury v. State, 20 CC(NS) 139, 25 CD 514.

81. This section does not guarantee the right of acquiring, possessing and protecting property under all circumstances, since art. I, § 19, provides that private property, although inviolate, is subservient to public welfare: Walter v. State, 16 CC(NS) 523, 25 CD 567 [affirming, 3 NP(NS) 13, 15 OD 464], making it unlawful to permit a girl under eighteen years of age to work in a factory more than eight hours in one day, is constitutional: Bolton v. State, 16 CC (NS) 307, 26 CD 567.

83. An act limiting the hours of service of laborers on public works was held to be in conflict with this section as abridging the right to contract: Stewart v. Gardner, 10 CC(NS) 408, 20 CD 222.

84. The right to acquire property involves the right to contract, and applies to corporations as well as individuals and a law is unconstitutional that enlarges the price of road contracts by allowing mechanic's liens when the contractor has been paid in full: Stewart v. Gardner, 10 CC(NS) 408, 20 CD 218.

85. This section does not render invalid an ordinance which imposes a license fee upon persons who use vehicles upon the streets of municipal corporations: Sterling v. Bowling Green, 5 CC(NS) 217, 16 CD 581.

86. An act to deduct one per cent of the salary paid to teachers to create a pension fund violates this provision, as a teacher's salary is his property, and if he prefers to spend his money as he earns it, it is his right under the constitution to do so: State ex rel Ward v. Hubbard, 22 CC 252, 12 CD 87 [affirmed, without report, Hibbard v. State, 65 OS 574, 46 Bull 214].

87. It is a violation of the employer's right to acquire property for third persons to induce or coerce his workmen to leave, and injunction will lie against a labor union: Hillenbrand v. Building Trades Council, 14 OD(NP) 628, 1 Hosea, 327.

88. Under this section a statute which requires railways to give discharged employees a statement in writing of the reason for their discharge is unconstitutional, since it interferes with the rights of the railroad to acquire and to protect property: Connell v. Baltimore & O. R. Co., 14 OD(NP) 400.

89. An ordinance which provides: "In case of accident due to the operating of any vehicle, the person operating such vehicle shall stop and give reasonable assistance," is invalid, since it is not limited to cases in which the driver or operator of the vehicle is at fault; and since it requires a driver or operator who may not be at fault to give services, time and possibly money without compensation: Henry v. Cleveland, 27 OCA 321, 29 CD 165.

90. A zoning ordinance which is based on aesthetic considerations is invalid: Lucas v. State ex rel Abt, 21 OLR 363 (App).

91. A zoning ordinance which forbids the construction of apartment houses in a residential district is valid: State ex rel v. Durant, 21 OLR 395 (App); Kahn Bros. Co. v. Youngstown, 25 NP(NS) 31.

## § 2  Right to alter, reform, or abolish government, and repeal special privileges.

All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly. (See Const 1802, Art VIII, § 1.)

### U.S. Constitution Comparison

U.S. Const. Amend., XIV, § 1

### Research Aids

Equal protection:
O-Jur2d: Constitutional Law § 667 et seq
People as source of power:
O-Jur2d: Constitutional Law § 198 et seq; § 304 et seq
Restriction on grant of special privileges:
O-Jur2d: Constitutional Law § 538

### ALR

Diluting effect of minorities' votes by adoption of particular election plan, or gerrymandering of election district, as violation of equal protection clause of Federal Constitution. 27 ALR Fed 29.

### CASE NOTES AND OAG

#### INDEX

Aliens, 27, 97
Apportionment of political power, 58
Automobile guest statute, 2
Bail laws, 24, 63
Bank stock, valuation, 84
Blind, payments to, 38
Civil service employees, 76.1, 99
Coal weighing laws, 49
Commitment upon insanity verdict, 62
Consortium, wife's rights, 67
Cooperative marketing act, 81
Corporations, 25, 44, 45, 55, 56, 96
County ditches, improvement, 39
Courts, equality in, 35, 54
Debtor legislation, 47
Delinquent tax measures, 3, 6, 19
Elderly, special rates for, 100

the municipality's police power: Dayton v. Allen, 56 OO2d 366, 28 OMisc 181, 271 NE2d 574 (MC).

6. By the reserved powers of sovereignty the people of Ohio have affirmed the constitutional right to all its inhabitants to assemble or congregate: Toledo v. Sims, 14 OO2d 66, 84 OLA 476, 169 NE 2d 516 (MC).

7. An ordinance which provides that it shall be unlawful for any person to hold a public meeting for the purpose of speaking, whereby a number of people are gathered together so as to delay traffic or interfere with the free and uninterrupted use of the streets, avenues, alleys, parks and other public places in such city, unless such person shall first have obtained a permit, is not invalid: Canton v. Robertson, 20 NP(NS) 241, 63 Bull 33 [for a former opinion in same case, see Robertson v. Canton, 20 NP(NS) 188, 28 OD 66, 62 Bull 429 (Ed)].

8. Since this section provides that the people shall have the right to assemble together to consult for their common welfare, a municipal corporation which is acting under a local self-government charter may construct a hall for auditorium purposes; since the right to assemble involves the power to provide suitable facilities therefor: Heald v. Cleveland, 19 NP (NS) 305, 27 OD 435, 62 Bull 333 (Ed).

9. The right of assembly cannot be used to carry out an unlawful and criminal conspiracy to obstruct the operation of a railroad: Thomas v. Cincinnati, N. O. &c. R. Co., 62 Fed 803, 8 OFD 263.

10. Constitutional law; civil liberties; peaceable assembly; validity of ordinance requiring dispersal of crowd. (Case note.) 6 OSLJ 294.

## § 4 [Bearing arms; standing armies; subordination of military power.]

The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be kept up; and the military shall be in strict subordination to the civil power. (See Const 1802, Art VIII, § 20.)

**U.S. Constitution Comparison**

Right to bear arms, U.S. Const. Amend. II.
Subordination of military to civilian authority, U.S. Const. Art. II, § 2.

**Research Aids**

Constitutional right to bear arms:
   O-Jur2d: Weapons § 1 et seq
Relationship between civil and military authorities:
   O-Jur2d: Military § 1 et seq

**Law Review**

Firearms regulations. Editorial note. 17 West ResLRev 569.

### CASE NOTES AND OAG
#### INDEX

Concealed weapon statute, 2
Legislative regulation generally, 5
Militia to be subordinate, 10
Ordinances regulating weapons etc., 1, 3, 4, 6, 7, 8
Protection of property, 8, 9

1. (1976) A city ordinance which requires those having and those acquiring handguns to possess an identification card issued by the city is a reasonable exercise of the police power: Mosher v. Dayton, 48 OS2d 243, 2 OO3d 412, 358 NE2d 540.

2. It seems that this section does not prevent the legislature from forbidding persons to carry concealed weapons in their respective dwelling houses: State v. Nieto, 101 OS 409, 130 NE 663.

3. A charter city, operating under the provisions of Section 3 of Article XVIII of the Constitution of the state of Ohio, may validly enact an ordinance prohibiting the possession, within the city, of a firearm, by one previously convicted of a felony: Akron v. Williams, 113 OApp 293, 17 OO2d 317, 177 NE2d 802.

4. (1972) There is no essential difference between an ordinance which makes it an offense to bear arms for any purpose other than one's defense and security and the provisions of Article I, § 4 of the Ohio Constitution: Akron v. Dixon, 64 O.O.2d 122, 36 OMisc 122, 303 NE2d 923 (MC).

5. This section, which accords the right to bear arms, does not prevent the legislature from making such police regulations as may be necessary for the welfare of the public at large concerning the manner in which arms shall be borne and the use thereof: State v. Schutzler, 48 OO2d 389, 20 OMisc 79, 249 NE2d 549 (CP).

6. A gun control ordinance in the form of a registration of the person is a proper and reasonable exercise of the police powers granted to municipalities under the home rule provisions of Article XVIII, § 3, of the Ohio Constitution: Photos v. Toledo, 19 OMisc 147, 48 OO2d 274, 250 NE2d 916.

7. Ordinance may regulate the use and transportation of weapons: Akron v. White, 92 OLA 247.

8. Under this section an ordinance forbidding employment of guards during industrial disturbances is unconstitutional: In re Reilly, 23 NP(NS) 65, 31 OD 364.

9. This section does not render invalid GC § 13053 (former RC § 3773.26), which makes hunting or shooting on Sunday unlawful, even though it contains no exception in favor of the owners of farms who are endeavoring to protect their crops: Walter v. State, 16 CC(NS) 523, 25 CD 567 [affirming, 3 NP(NS) 13, 15 OD 464].

10. It is a contempt of court to muster a militia company, with music, so near the court as to disturb its proceedings. The military must be subordinate to the civil power, or the country ceases to be free: State v. Goff, W 78.

## § 5  Trial by jury; reform in civil jury system.

The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury. (As amended September 3, 1912.)

For earlier provisions of this section, see Former Provisions of the Constitution of Ohio, 1851 herein.

**U.S. Constitution Comparison**

Civil suits, right to trial by jury in, U.S. Const. Amend. VII.

Criminal prosecutions, right to trial by jury in, U.S. Const. Amend. VI.

contained in GC § 7685 (see now RC § 3313.66):
1935 OAG No.5003.
41. Board of education may allow school building
to be used for religious exercises: 1927 OAG p.795.

## § 8 [Writ of habeas corpus.]

The privilege of the writ of habeas corpus shall
not be suspended, unless, in cases of rebellion or
invasion, the public safety require it. (See Const
1802, Art VIII, § 12.)

**U.S. Constitution Comparison**
U.S. Const. art. I, § 9.

**Cross-References to Related Sections**
  Ohio Revised Code
    Habeas corpus, RC § 2725.01 et seq.

**Research Aids**
  Writ of habeas corpus:
    O-Jur2d: Habeas Corpus § 1 et seq

### CASE NOTES AND OAG

1. If a military tribunal has jurisdiction to try a
person who is charged with an offense against mili-
tary law, the civil courts can not interfere by a
writ of habeas corpus: In re Dostal, 243 Fed 664,
15 OLR 365, 62 Bull 381.

2. Where the court erroneously refuses to grant
an order of discharge, and instead thereof remands
the prisoner to jail, and continues the cause, the
order remanding the prisoner to jail, so long as it
remains unreversed, is a valid and legal authority
to the sheriff for retaining the prisoner in custody,
and the order cannot be reviewed and reversed,
or the prisoner discharged, by a proceeding in habeas
corpus before another tribunal: Ex parte McGehan,
22 OS 442.

3. It is legally incompetent for the supreme court
of Ohio to withdraw, by habeas corpus, persons in
custody of the district court of the United States,
charged with violation of an act of congress, while
the proceedings are pending, on the ground that the
act of congress is unconstitutional: Ex parte Bush-
nell, 8 OS 599 [For related proceedings see 9 OS 77].

4. A habeas corpus cannot be used as a summary
process to review errors in the sentence of a court
of competent jurisdiction. If the sentence is void,
habeas corpus lies; if voidable or erroneous, a writ
of error is the appropriate remedy: Ex parte Shaw,
7 OS 81.

5. For a discussion of the privilege of the writ of
habeas corpus, see Ex parte Collier, 6 OS 55.

## § 9 Bailable offenses; of bail, fine, and punishment.

All persons shall be bailable by sufficient
sureties, except for capital offenses where the
proof is evident or the presumption great. Ex-
cessive bail shall not be required; nor excessive
fines imposed; nor cruel and unusual punishments
inflicted. (See Const 1802, Art VIII, §§ 12, 13.)

**U.S. Constitution Comparison**
U.S. Const. Amend. VIII.

**Cross-References to Related Sections**
  Ohio Revised Code
    Appeal to Supreme Court, release upon, RC
    §§ 2953.09, 2953.10.
    Bail generally, RC § 2937.22 et .seq.
    Misdemeanor, violation of ordinance, RC §§ 2935.-
    10(D), 2935.15, 2953.05.1.

  Ohio Rules
    Bail generally, Crim. R. 46.

**Text Discussion**
  Bail. 1 Anderson's Ohio Crim. Prac. & Pro. Chap-
  ter 11

**Research Aids**
  Bailable offenses:
    O-Jur3d: Bail & Recognizance § 1 et seq
  Cruel and unusual punishment:
    O-Jur2d: Criminal Law § 65
  Excessive bail:
    O-Jur2d: Bail & Recognizance § 21 et seq
  Excessive fines:
    O-Jur2d: Fines §§ 6, 7

**ALR**
  Administration of corporal punishment in public
  school system as cruel and unusual punishment
  under Eighth Amendment. 25 ALR Fed 43.
  Length of sentence as violation of constitutional
  provisions prohibiting cruel and unusual punish-
  ment. 33 ALR3d 335.
  Upon whom rests burden of proof, where bail is
  sought before judgment but after indictment in
  capital case, as to whether proof is evident or
  the presumption great. 89 ALR2d 355.

**Law Review**
  Pretrial release of an accused in Ohio—proposed
  revision of Ohio bail laws. Dennis P. Hartmann.
  41 CinLRev 423 (1972).

### CASE NOTES AND OAG
**INDEX**

Bail—
  After conviction, 4, 6, 8
  Amount, 1, 13, 15, 16, 18, 19
  Capital cases, 5, 7, 9, 11, 12, 20, 22, 23
  Contempt proceedings, 14
  Juvenile proceedings, 17, 21
  Remedy for excessive, 3
  Right is absolute, 2
  Traffic offenses, 10
Cruel and unusual punishment—
  Alcoholic, incarceration of, 35
  Amount of fine, 29
  Concurrent life sentence, 37
  Death penalty, 31, 32, 33
  Driving while intoxicated, 36
  Drug violation sentence, 30
  Generally, 24, 25
  Municipal ordinance, 34, 36
  Sentence to women's reformatory, 27
  Subsequent reduction of penalty, effect, 26
  "Unusual" construed, 28

1. In fixing the amount of bail the court may
consider the character and past record of the accused,
the seriousness of and the number of crimes for
which he is charged and the penalties attached
thereto: Bland v. Holden, 21 OS2d 238, 50 OO2d
477, 257 NE2d 397.

2. T
the on
v. Jen
757.

3. T
of bai
accuse
final c
appeal
amoun
tutiona
may be
corpus
Bevac

4. T
guaran
subsec
court:
2d 333

5. U
statute
jurisdic
the me
murder
State c
393.

6. B
ment c
124 OS

7. T
hear a
ment f
to bail
454, 15

8. A
except
p or the
cretion
prisone
42 OS

9. T
be evic
Summo

10. (
sum of
is not a
person
his ante
Bradfu
311.

11. F
238, 33
OO2d
inflicted
with th
a const.
Ohio c
263, 61

12. U
vides t
with a
the pre
bail in
murder
cretion
ing tria
appeal
of murc
100 Ap

13. V
mission
tence o
charges

community: State v. Chaffin, 30 OS2d 13, 59 OO2d 51, 282 NE2d 46.

**25.** (1970) If a sentence falls within the terms of a valid statute, it will not amount to a "cruel and unusual punishment": State v. Juliano, 24 OS2d 117, 53 OO2d 307, 265 NE2d 290.

**26.** As a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment. Thus the amendment of a criminal statute reducing the punishment for its violation does not render a more severe sentence, imposed under the former statute, cruel and unusual: McDougle v. Maxwell, 1 OS2d 68, 30 OO2d 38, 203 NE2d 334.

**27.** A female offender sentenced to the Ohio Reformatory for Women upon conviction for a misdemeanor is not deprived of any constitutional right if such imprisonment is not for a longer period than any other offender of either sex might have been imprisoned in any of the penal institutions of the state under like circumstances: In re Fenwick, 110 OS 350, 144 NE 269, 22 OLR 143.

**28.** "Unusual" refers to the kind of punishment inflicted, and not to the fact that it is inflicted for offenses for which it has not heretofore been inflicted: Holt v. State, 107 OS 307, 140 NE 349.

**29.** If GC § 12873 (former RC § 2919.01) should be so construed as to impose a fine of double the amount of money embezzled, in cases where the embezzler had restored the amount of money embezzled voluntarily, such section would not impose a cruel or an unusual punishment so as to render it invalid under this section: State v. Cameron, 91 OS 50, 109 NE 584.

**30.** (1973) The 20-to-40 year penalty prescribed by RC § 3719.99(F) does not violate the Ohio and United States prohibitions against cruel and unusual punishment: State v. Abercrombie, 40 OApp2d 89, 69 OO2d 63, 318 NE2d 179.

**31.** (1971) Imposition of the death penalty in a first degree murder case, where the jury does not recommend mercy, does not constitute cruel and unusual punishment: State v. Anderson, 28 OApp2d 234, 57 OO2d 345, 277 NE2d 64.

**32.** The carrying out of the death penalty, imposed by a court having jurisdiction of the matter, by electrocution, is neither a cruel nor unusual punishment for the condemned person: State v. Wallen, 21 OApp2d 27, 50 OO2d 50, 254 NE2d 716.

**33.** The statute requiring death by electrocution for the crime of murder in the first degree, where the jury does not recommend mercy, does not violate the constitutional prohibition against cruel and unusual punishment: State v. McClellan, 12 OApp2d 204, 41 OO2d 378, 232 NE2d 414.

**34.** A municipal ordinance which prescribes a maximum penalty for assault or assault and battery of a fine of one thousand dollars and imprisonment in the workhouse for a period of one year, or both, does not violate Const. art. I, § 9, which forbids "cruel and unusual punishments": In re Calhoun, 87 App 193, 42 OO 401, 94 NE2d 388; Matthews v. Russell, 87 App 443, 43 OO 199, 95 NE2d 696.

**35.** (1974) Chronic alcoholism is a disease and not a crime, and the incarceration of an habitual alcoholic offender is cruel and unusual punishment in contravention of the Eighth Amendment to the United States Constitution and Section 9, Article I of the Ohio Constitution: Dayton v. Sutherland, 71 OO2d 313, 42 OMisc 35, 328 NE2d 416 (MC).

**36.** (1974) Cincinnati municipal code § 512-3 providing that no court may suspend the first three days

of any sentence for driving while intoxicated does not violate the prohibitions against "cruel and unusual punishment" contained in art. I, § 9 of the Ohio constitution and the Eighth Amendment to the U.S. Constitution: Cincinnati v. Wakim, 67 OO2d 65 (App).

**37.** There was no violation of the constitutional privilege against cruel and unusual punishment where two counts were properly joined in an indictment and defendant found guilty on both counts and sentenced to life imprisonment on each count, the sentence on the second count to run concurrently with the sentence on the first count: Zenz v. Alvis, 66 OLA 606, 118 NE2d 678 (App).

## §10 [Trial of accused persons and their rights; depositions by state and comment on failure of accused to testify in criminal cases.]

Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law. In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner us if in court. No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be made the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense. (As amended September 3, 1912.)

For earlier provisions of this section, *see* Former Provisions of the Constitution of Ohio, 1851 herein.

U.S. Co:
  Comp
  Confr
  Doub.
  Indict
  Natur
  Right
  Self-i
  Speed
    Am

Cross-Re
  Const
  Jury t

Ohio
  Arraig
  Comm
  Depos
  Grand
  Indict
  Jury t
  Prelim
  Public
  Speed
  Subpo
  Venue

Ohio
  Compl
  Depos.
  Grand
  Indict
  Jury tr
  Right
  Subpo

Text Dis
  Chang
    & F
  Definit
    & F
  Ex po:
    & F
  Mistri:
    And
  Right
    Pro.
  The te
  Ohio
  Venue.
  Cha

Research
  Trial o
  O-Ju
  &

ALR
  Accuse
  to ur
  Calling
  as in
  ALR:
  Comme
  prose
  amou
  failur
  Modern
  effect
  Fed

**15.** Imprisonment of insolvent debtor for no reason except insolvency, which would be excessive for violation of liquor laws, would be in nature of imprisonment for debt: Kohler v. State ex rel Goldstein, 24 App 272, 156 NE 510.

**16.** A judgment committing defendant to jail pursuant to RC § 3111.17 for his failure to pay or secure to be paid the maternity expenses, is not imprisonment for debt in a civil action, and does not violate this section of the Ohio constitution: Crawford v. Hasberry, 21 OO2d 350, 90 OLA 205, 186 NE2d 522 (JC).

**17.** An order attempting to imprison for debt, the obligation in question being a judgment against defendant, contravenes art. I, § 15 of the constitution: Maniago v. White, 14 OLA 687.

**18.** Under this section, an ordinance imposing a penalty of fine or imprisonment for carrying on an occupation without first having paid the occupational tax is not unconstitutional, the duty to pay a tax being a public duty and not a debt: In re Flynn, 23 NP(NS) 113, 31 OD 538.

**19.** Fines or penalties arising from a violation of the penal laws of the state are not debts within the meaning of this section, and imprisonment for failure to pay a fine is not an unconstitutional imprisonment for debt: 1940 OAG No.2424.

## § 16 [Redress in courts.]

All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.

[Suits against the state.] Suits may be brought against the state, in such courts and in such manner, as may be provided by law. (As amended September 3, 1912.)

For earlier provisions of this section, *see Former Provisions of the Constitution of Ohio, 1851 herein.*

**U.S. Constitution Comparison**
U.S. Const. Amend. V, Amend. XIV.

**Cross-References to Related Sections**
Ohio Revised Code
Court of claims, RC § 2743.01 et seq.

**Research Aids**
Due process:
O-Jur2d: Constitutional Law § 527 et seq; § 693 et seq.
Suits against the state:
O-Jur2d: Parties § 3 et seq

**Law Review**
Claims against the state of Ohio. John A. West. 36 CinLRev 239.
Defectively designed highways. Steven J. Erlsten. 16 ClevMarLR 264.
Governmental Immunity in Ohio: Common Law Doctrine or Constitutional Prohibition. Note. Capital ULR 134 (1974).
Ohio sovereign immunity. Ronald E. Schultz. 28 OSLJ 75.
The Ohio sundry claims board. John P. Walsh. 9 OSLJ 437.

Sovereign immunity abrogated in Ohio: Krause v. State. James B. Wilkens. 21 ClevStLRev 25.
Sovereign immunity—an argument con. Steven A. Sindell. 22 ClevStLRev 55 (1973).
Sovereign immunity—an argument pro. Robert F. Howarth, Jr. 22 ClevStLRev 48 (1973).

## CASE NOTES AND OAG
### INDEX

Aliens, 50, 55
Attempt to deny access to courts, 20, 43, 44, 58
Constitution prevails over common law, 42
Contracting away right to redress in court, 43, 58
Courts to be open, 48, 53
Due course of law —
  Administrative proceedings, 25, 29, 30
  Administrative rules, 20
  Common law rights, 26
  "Day in court," 37
  Definitions, 22, 24
  Depositions, 18
  Dismissal of action, 31
  Driver's license suspension, 34
  Essential rights required, 22
  Fourteenth amendment, relation to, 32, 35
  Insanity commitment, 17
  Judge's interest in decision, 38
  Mayor's court, 36
  Pre-judgments seizures, 23
  Prisoner may confer with counsel, 21
  Right to use property in business, 16, 19
  Unemployment compensation, 15
  Workers' compensation, 28
  Wrongful dismissal from office, 27
  Zoning ordinance, 33
Limitation of actions, 46
Necessity of "injury", 45
Obstructing justice, as violation of right to due process, 49
Police powers, 39, 51, 52
Publication of reports of proceedings, 57
Relationship to other constitutional provisions, 56
Remedy for every right, 41, 54
Sovereign immunity —
  Counties, 6
  Court of claims act, 1
  Fifth amendment not in conflict, 11
  Fourteenth amendment not in conflict, 4, 11
  Garnishment actions, 9
  Legislative consent required, 1, 3, 5, 7, 8, 9, 12
  Mandamus actions, 10
  Mechanic's lien, 13
  Misconduct of officers or agents, 3, 14
  Municipal corporations, 1, 2
  State university hospital, 12
Unborn child, 40, 47

**Sovereign immunity**

**1.** (1977) Section 16, art. I, of the Ohio Constitution requires legislative consent to a waiver of sovereign immunity. RC § 2743.01 specifically exempts political subdivisions of the state from the waiver of sovereign immunity in the court of claims act: Haas v. Akron, 51 OS2d 135, 5 OO3d 110, 364 NE2d 1376.

**2.** (1972) In an action for damages alleged to be caused by the negligence of an employee of a municipal hospital, the defense of governmental immunity is not available to the municipality which owns the hospital: Sears v. Cincinnati, 31 OS2d 157, 60 OO2d 113, 285 NE2d 732.

**3.** (1972) This section, as amended September 3, 1912, which provides that "* * * Suits may be brought against the state in such courts and in such

man self- to s 2d OO

**4.** pro the OS2 28 C

**5.** of le is n auth cinn 725.

**6.** sove to C on a or br muni Boar NE2

**7.** the s be pr Hosp

**8.** self-e islatio State OO 1

**9.** of ri again as ma The a by the ment ficers OO 1

**10.** commi statuto the pu Gregor

**11.** mune "the k Fifth States 29, 73

**12.** State t state o whethe capacity and the agains 31 OAp

**13.** U mits su chanic's belongs to enfo Citizens

**14.** T individu unautho agents CC(NS) 88 OS

each other, and to provide that such a contract be binding upon other agencies or departments of state government: 1962 OAG No.2889.

16. (1962) The Legislature in §§ 13 and 21 of Am. H. B. No.1123 has authorized charges to be made to the various departments affected by the bill for services rendered prior to the effective date of the bill: 1962 OAG No.2889.

17. (1962) The director of finance may not "add on" to an original appropriation made by the Legislature, but he may determine, in accordance with legislative standards, the cost of certain services, which cost the Legislature has, by an additional appropriation, authorized to be paid: 1962 OAG No. 2889.

18. (1962) The duty imposed upon the auditor of state in § 21 of Am. H. B. No.1123 to draw warrants is imposed by law and does not conflict with other duties of the auditor: 1962 OAG No.2889.

19. Revised Code § 4123.39.1 does not constitute an appropriation under this section, and in the absence of a specific appropriation, the auditor of state is not authorized to transfer from the general fund to the account of the industrial commission any funds for the purpose of paying the compensation awards and administration expenses incurred under RC §§ 4123.03.1 through 4125.03.7, as specified in RC § 4123.39.1: 1957 OAG No.460.

20. The general assembly can appropriate funds for a state department for the purchase of equipment and designate in the appropriation act the particular manufactured item or system of equipment by trade name to be so purchased: 1950 OAG No.2152.

21. Refunds cannot be made of overpayments of state franchise taxes in the absence of specific appropriation therefor by the Legislature: 1927 OAG p.1682.

22. Appropriation may be made only by law and not by joint resolution: 1927 OAG p.1110.

23. Money paid into the state treasury by mistake cannot be paid back until the legislature has made a specific appropriation therefor: 1927 OAG p.479.

### § 23   Impeachments; how instituted and conducted.

The house of representatives shall have the sole power of impeachment, but a majority of the members elected must concur therein. Impeachments shall be tried by the senate; and the senators, when sitting for that purpose, shall be upon oath or affirmation to do justice according to law and evidence. No person shall be convicted without the concurrence of two-thirds of the senators.

**Cross-References to Related Sections**

Ohio Revised Code

Testimony in impeachments, RC § 101.44 et seq.

**Research Aids**

Impeachments:
O-Jur2d: Legislature § 35

### CASE NOTES AND OAG

1. Constitution, art. II, §§ 23 and 24, relating to impeachment of judges, do not set out an exclusive

remedy and thus prevent the bringing of disbarment proceedings against a judge while in office: In re Copland, 66 App 304, 20 OO 103, 33 NE2d 857 [appeal dismissed, 137 OS 637, 20 OO 91].

### § 24   Who liable to impeachment, and punishment.

The governor, judges, and all state officers, may be impeached for any misdemeanor in office; but judgment shall not extend further than removal from office, and disqualification to hold any office under the authority of this state. The party impeached, whether convicted or not, shall be liable to indictment, trial, and judgment, according to law.

**Cross-References to Related Sections**

Ohio Revised Code

Testimony in impeachments, RC § 101.44 et seq.

**Research Aids**

Who is liable for impeachment:
O-Jur2d: Governor §§ 3, 22; Judges § 117; State of Ohio § 14

### § 25 Repealed May 8, 1973; see HJR No. 5, 110th General Assembly.

**For current analogous provision see Art. II, § 8.**

This section referred to when sessions of general assembly shall commence.

**For earlier provisions of this section, see Former Provisions of the Constitution of Ohio, 1851 herein.**

### § 26   What laws to have a uniform operation.

All laws, of a general nature, shall have a uniform operation throughout the state; nor, shall any act, except such as relates to public schools, be passed, to take effect upon the approval of any other authority than the general assembly, except, as otherwise provided in this constitution.

**Research Aids**

Uniform operation of laws:
O-Jur2d: Constitutional Law § 635 et seq

**Text Discussion**

Uniform operation of laws. 1 Anderson's Ohio Crim. Prac. & Pro. § 54.3c

**Law Review**

General versus special statutes in Ohio. Article by W. T. Mallison, Jr. 11 OSLJ 462.

Municipal corporations—charter and non-charter municipalities—uniform operation of laws—financial accountability. (Case note.) 21 CinLRev 506.

Ohio
general
througho
344.

Approval
Construc
Laws of
Scope an
Specific i
Counti
Electio
Health
Intoxic
Juries;
Local
Motor
Munic
Penal
Roads,
School
Worke
Uniform

Scope i
1. C
assembl
but tha
authorit
agency
and gra
and de
which i
in the
OO 16
2. W
to mak
tive on
future
138 OS
3. A
not ap
land, §

Constr
4. T
strict c
structio
others
such
State
438.

Appro
5.
gate tl
of the
cers:
115 N

Laws
6. I
statut
181,
affirm
7.
pose
gener
NE 7

# AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES

*Articles in addition to, and amendment of the Constitution of the United States of America, proposed by Congress, and ratified by the Legislatures of the several States, pursuant to the fifth article of the original Constitution.*

## AMENDMENT I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assembly, and to petition the Government for a redress of grievances.

(Effective 1791)

**Ohio Constitution Comparison**

Freedom of speech, press, Ohio Const. art. I, § 11.
Rights of assembly petition, Ohio Const. art. I, § 3.

## AMENDMENT II

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

(Effective 1791)

**Ohio Constitution Comparison**

Ohio Const. art. I, § 4.

## AMENDMENT III

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

(Effective 1791)

**Ohio Constitution Comparison**

Ohio Const. art. I, § 13.

## AMENDMENT IV

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(Effective 1791)

**Ohio Constitution Comparison**

Ohio Const. art. I, § 14.

## AMENDMENT V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

(Effective 1791)

**Ohio Constitution Comparison**

Compensation for taking for public use, Ohio Const. art. I, § 19.
Double jeopardy, Ohio Const. art. I, § 10.
Due process, art. I, § 16.
Indictment by grand jury, Ohio Const. art. I, § 10.
Self-incrimination, Ohio Const. art. I, § 10.

## AMENDMENT VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compusory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

(Effective 1791)

**Ohio Constitution Comparison**

Compulsory process, Ohio Const. art. I, § 10.
Confronting witnesses, Ohio Const. art. I, §10.
Nature of charge, Ohio Const. art. I, § 10.
Right to counsel, Ohio Const. art. I, § 10.
Right to trial by jury, Ohio Const. art. I, § 5.
Speedy and public trial by jury, Ohio Const. art. I, § 10.

## AMENDMENT VII

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

(Effective 1791)

**Ohio Constitution Comparison**
Ohio Const. art. I, § 5.

## AMENDMENT VIII

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

(Effective 1791)

**Ohio Constitution Comparison**
Ohio Const. art. I, § 9.

## AMENDMENT IX

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

(Effective 1791)

**Ohio Constitution Comparison**
Ohio Const. art. I, § 20.

## AMENDMENT X

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

(Effective 1791)

**Ohio Constitution Comparison**
Ohio Const. art. I, § 20.

## AMENDMENT XI

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

(Effective 1798)

## AMENDMENT XII

The Electors shall meet in their respective states and vote by ballot for President and Vice President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate; — The President of the Senate shall, in the presence of the Senate and House of Representatives; open all the certificates and the votes shall then be counted; — The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice President shall act as President, as in the case of the death or other constitutional disability of the President. — The person having the greatest number of votes as Vice President, shall be the Vice President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice President of the United States.

(Effective 1804)

## AMENDMENT XIII

SECTION 1.  Neither slavery nor involuntary servitiude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

SECTION 2.  Congress shall have power to enforce this article by appropriate legislation.

(Effective 1865)

**Ohio Constitution Comparison**
Ohio Const. art. I, § 6.

## AMENDMENT XIV

SECTION 1.  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

SECTION 2.  Representatives shall be appor-

lengthens rather than shortens the time occupied by trial. Careful preparation includes the kind of evaluation of the importance of testimony that avoids the pitfalls of "overtrying" the case.

The conduct of lawyers at the trial is of great significance for another reason. The drama and news value of a trial account for the wide exposure given to some cases and the public image of the administration of criminal justice will inevitably be based largely on the manner in which such trials are conducted. It is in the courtroom that the public image of justice and public confidence in the system are in large part shaped. Moreover, the experience of witnesses and jurors and observations of spectators in the courtroom will be communicated throughout the community and contribute significantly to the prevailing public attitude toward the role and function of the lawyer in the administration of justice.

## 5.1 Calendar control.

**Control over the trial calendar should be vested in the court. The prosecuting attorney should be required to file with the court as a public record periodic reports setting forth the reasons for delay as to each case for which he has not requested trial within a prescribed time following charging. The prosecuting attorney should also advise the court of facts relevant in determining the order of cases on the calendar.**

### Commentary

This standard is adopted from the Report of the Advisory Committee on the Criminal Trial. ABA STANDARDS, SPEEDY TRIAL § 1.2 (Approved Draft, 1968). In some jurisdictions the courts have delegated control of the criminal docket or calendar to the prosecutor, giving him authority to determine the order in which cases will be presented and even, in some places, authority to determine before which judge the case will be tried or a plea entered. The Advisory Committee on Prosecution and Defense Functions observed that some of the problems arising out of delegation of calendar control to the prosecutor developed because some courts failed to maintain adequate supervision and

112

in effect abdicated
mechanism has wo
for its use; once a
avoid even the app
even-handed admi

### 5.2 Courtroom d

(a) The pros
the dignity of th
decorum and b
ward the judge,
others in the co

(b) When ct
court, not oppo

(c) It is unp
havior or tacti
court or opposi

(d) A prose
rectives of the
verse rulings o
has a right to n
rulings.

(e) A prose
(f) Prosecut
operation of th
sional etiquett

### Commentary

**a. Rules of decor**

The gravity o
mands that the
manner. Certain
procedure have
courts and the
with their specia
sure calm, dispa

ried by trial. Careful
ne mportance of testi-
c: e.

ignificance for another
co nt for the wide ex-
c the administration
ely on the manner in
ti om that the public
stc..n are in large part
id jurors and observa-
m iicated throughout
e prevailing public at-
in the administration

st i in the court. The
e .vith the court as a
e reasons for delay as
al vithin a prescribed
orn..ey should also ad-
the order of cases on

ne Advisory Commit-
IDY TRIAL § 1.2 (Ap-
co rts have delegated
r ecutor, giving him
will be presented and
fo : which judge the
C mmittee on Prose-
ome of the problems
tl prosecutor devel-
jt te supervision and

---

In effect abdicated responsibility concerning the calendar. That this mechanism has worked efficiently in some places is not a valid basis for its use; once a case is initiated, the control should be in the court to avoid even the appearance of a conflict of interest or a lack of fair and even-handed administration of the docket.

### 5.2 Courtroom decorum.

**(a) The prosecutor should support the authority of the court and the dignity of the trial courtroom by strict adherence to the rules of decorum and by manifesting an attitude of professional respect toward the judge, opposing counsel, witnesses, defendants, jurors and others in the courtroom.**

**(b) When court is in session the prosecutor should address the court, not opposing counsel, on all matters relating to the case.**

**(c) It is unprofessional conduct for a prosecutor to engage in behavior or tactics purposefully calculated to irritate or annoy the court or opposing counsel.**

**(d) A prosecutor should comply promptly with all orders and directives of the court, but he has a duty to have the record reflect adverse rulings or judicial conduct which he considers prejudicial. He has a right to make respectful requests for reconsideration of adverse rulings.**

**(e) A prosecutor should be punctual in all court appearances.**

**(f) Prosecutors should take leadership in developing, with the cooperation of the courts and the bar, a code of decorum and professional etiquette for courtroom conduct.**

*Commentary*

**1. Rules of decorum**

The gravity of the human interests at stake in a criminal trial demands that the proceeding be conducted in an orderly and dignified manner. Certain standards of dress, decorum, manners and orderly procedure have evolved over the centuries to enhance the authority of courts and the status and authority of the advocates commensurate with their special offices and powers. Such standards also serve to insure calm, dispassionate consideration which places the focus on the

113

The Prosecution Function

evidence rather than personalities. In Europe and England the opposing counsel must wear the same garb; the "uniform" promotes dignity but also emphasizes the equality of the advocates who serve as officers of justice. The particular formalities observed in American courts differ from place to place, but it is usual and desirable, for example, to require that lawyers stand when addressing the court or being addressed by the court, that they refrain from addressing each other directly, that conventional courtroom forms of address be used in referring to the judge, opposing counsel and witnesses, and that in these and other ways an atmosphere compatible with the high purposes of a trial be maintained.

Rudeness and intemperance have no place in any court, especially in the relations between its professional members, the judge and lawyers. See, e.g., Wisconsin Code of Judicial Ethics No. 6, 36 Wis. 2d 252, 153 N.W.2d 873, 875 (1967).

The consensus of trial lawyers whose views were obtained by this Committee is that far too many American judges have tended to allow their courtrooms to "get out of hand," thus encouraging bad manners, excessive and unregulated zeal and other habits which prolong trials, confuse jurors and generally demean the profession and the courts. Interestingly, the lawyers of the widest experience in hotly contested criminal cases share a conviction that a "tightly run" courtroom is to be preferred over one which is lax. The latter, in this view, tends to lower the level of conduct to that of the least professional and most ill-mannered lawyer. Since the lawyers consulted and interviewed in depth (often recorded in verbatim transcripts) represented in the aggregate many hundreds of years of experience in the trial courts, this Committee attaches special significance to their views on the importance of courtroom decorum. Many of these consultants voiced apprehension that excesses of advocates are placing stresses on the adversary system tending to undermine if not defeat the basic objectives of a system of justice and indeed expose the adversary system itself to challenge.

Some trial courts have promulgated rules of decorum declaring standards of professional conduct which have evolved over the many generations. Whether so formalized or not, it is the duty of every

114





England the oppos-
m" promotes dignity
w ) serve as officers
merican courts differ
f r example, to re-
t  being addressed
h other directly, that
l  referring to the
i  these and other
irposes of a trial be

in, court, especially
the judge and law-
H  s No. 6, 36 Wis.

ire obtained by this
la e tended to allow
aging bad manners,
vhich prolong trials,
i  and the courts.
e in hotly contested
" courtroom is to be
v  w, tends to lower
il and most ill-man-
it viewed in depth
ie  in the aggregate
l courts, this Com-
n he importance of
c ed apprehension
he adversary system
t es of a system of
e  to challenge.
decorum declaring
l d over the many
...e duty of every

prosecutor to know the basic rules of decorum. Since he appears on one side of every criminal case, he can do much to set the tone of proceedings in court by faithful observance of such standards. See also ABA STANDARDS, THE DEFENSE FUNCTION § 7.1, and Commentary, *infra*.

### b. Intentional annoyance of the court or counsel

In any situation of contention it is imperative that the principal participants maintain an attitude of objectivity and mutual respect. It is unprofessional conduct for a lawyer deliberately to annoy or "bait" the presiding judge or opposing counsel. The advocate's duty as an officer of the court to uphold the dignity of the institution is paramount to any imagined or real tactical advantage that may seem available. Thus the prosecutor, like the defense counsel, is precluded from such tactics. See *id.*, § 7.1.

### c. Prosecutor's place in the courtroom

Related to the subject of this standard but outside the scope of this report is the matter of the relative places occupied physically by the prosecutor and defense counsel in the courtroom. Observers of trials in other countries have noted that the position of the professional participants often is signalled to the lay participants by the place in which the judge, prosecutor and counsel are seated in the courtroom. With few exceptions, American prosecutors and defense counsel are located at counsel tables in positions of equal dignity and proximity to the presiding judge. Any deviation from this should be avoided.

### 5.3 Selection of jurors.

(a) **The prosecutor should prepare himself prior to trial to discharge effectively his function in the selection of the jury and the exercise of challenges for cause and peremptory challenges.**

(b) **In those cases where it appears necessary to conduct a pretrial investigation of the background of jurors the prosecutor should restrict himself to investigatory methods which will not harass or unduly embarrass potential jurors or invade their privacy and, whenever possible, he should restrict his investigation to records and sources of information already in existence.**

115

The Prosecution Function

**(c) In jurisdictions where lawyers are permitted to personally question jurors on voir dire, the opportunity to question jurors should be used solely to obtain information for the intelligent exercise of challenges. A prosecutor should not intentionally use the voir dire to present factual matter which he knows will not be admissible at trial or to argue his case to the jury.**

*Commentary*

**a. Preparation**

Preparing for the selection of jurors may be simple or may require careful advance preparation. By no means does every case require pretrial investigation into the background of jurors. Often the important preparation is development of how to outline the case to prospective jurors and what questions should be put to them.

**b. Investigating prospective jurors**

It is a common practice in many parts of the country for investigations of prospective jurors to be made so that challenges can be exercised on an informed basis. These pretrial investigations can make selection of the jury a more intelligent and efficient process and are desirable in that respect. On the other hand, there is a danger that the investigative process may tend to annoy or intimidate the prospective jurors, especially if the investigation is conducted by official agents at the request of the prosecutor. It is incumbent upon the prosecutor to exercise great care to ensure that such investigations are conducted in a manner which will not harass the citizens and so as to avoid or at least minimize the likelihood that the prospective jurors will become aware of the inquiry. Failure to exercise care in such investigations risks discouraging citizens from jury service and the possibility of creating bias. Although discreet investigation prior to the selection of jury is permissible under these limitations, it is clear that after the jury has been selected it is improper and impermissible to subject the jurors to surveillance during trial. Sinclair v. United States, 279 U.S. 749, 63 A.L.R. 1258 (1928). If counsel suspects jury tampering or juror misconduct he should, of course, report it to the court.

116

Although the s
control of the cou
bers of this Advi
gations should be
available to both

**c. Using voir dire**

The process of
the court and cou
to judge the case
cause and peren
abused by lawye
In a related area,
duce into an arg
intended to influ
FESSIONAL ETHIC
verted if the cou
influence the ju
abuses, the Adv
mended that the
counsel to make
ABA STANDARDS

**5.4 Relations w**
  **(a) It is un**
cate privately
jurors concern
tor should av
communicatio
  **(b) The pr**
spect, avoiding
of undue solic
  **(c) After v**
ask questions
the juror in an
jury service.



§5.4

Standards with Commentary

Although the subject of investigation of prospective jurors under the control of the court is not within the scope of this Report, some members of this Advisory Committee expressed the view that such investigations should be under the control of the courts with the results made available to both counsel.

### c. Using voir dire to present evidence or argument

The process of examination of prospective jurors is designed to give the court and counsel an opportunity to determine if each juror is able to judge the case fairly and to afford a basis to exercise challenges for cause and peremptory challenges. Regrettably, this process is often abused by lawyers who seek to exercise improper influence on jurors. In a related area, it is well-established that a lawyer should not "introduce into an argument, addressed to the court, remarks or statements intended to influence the jury or bystanders." ABA CANONS OF PROFESSIONAL ETHICS No. 22 (1968). The spirit of this canon is subverted if the court permits voir dire examination to be employed to influence the jury improperly. Recognizing the existence of these abuses, the Advisory Committee on the Criminal Trial has recommended that the examination of jurors be done by the judge, allowing counsel to make reasonable inquiry subject to the control of the court. ABA STANDARDS, TRIAL BY JURY § 2.4 (Approved Draft, 1968).

### 5.4  Relations with jury.

(a) It is unprofessional conduct for the prosecutor to communicate privately with persons summoned for jury duty or impaneled as jurors concerning the case prior to or during the trial. The prosecutor should avoid the reality or appearance of any such improper communications.

(b) The prosecutor should treat jurors with deference and respect, avoiding the reality or appearance of currying favor by a show of undue solicitude for their comfort or convenience.

(c) After verdict, the prosecutor should not make comments to or ask questions of a juror for the purpose of harassing or embarrassing the juror in any way which will tend to influence judgment in future jury service.

117

§5.4

The Prosecution Function

*Commentary*

**a. Ex parte contacts with jurors**

Discussing the case privately with a juror before verdict is obviously a serious breach of professional standards of conduct. ABA CODE DR 7-108. If a juror attempts to discuss the case with the prosecutor, it is the duty of the prosecutor to report the fact to the judge. Even if the conversation does not concern the trial, no matter how innocent its purpose or trivial its content, the mere fact that counsel has conversed with the juror renders his conduct suspect and casts doubt on the verdict. See Annot., 62 A.L.R.2d 298, 310-22 (1958). In smaller communities where the prosecutor is more apt to be acquainted with the jurors, he must politely decline to engage in conversation with them.

**b. Treatment of the jury**

A lawyer "should avoid undue solicitude for the comfort or convenience of judge or jury and should avoid any other conduct calculated to gain special consideration." ABA CODE EC 7-36. Such behavior demeans the role of the jury as well as the lawyer and is in derogation of the system of justice. Part of the attitude of professional respect which the prosecutor owes the jury is his obligation not to refer to particular jurors by name when addressing the jury as a whole. See ABA INFORMAL DECISION NO. C 739 (1963). Because of the authority wielded by the prosecutor, it is especially important that he act with restraint and not abuse his public position, and that he use the opportunity as the opening advocate to set an example of correct conduct.

**c. Post-trial interrogation**

The ABA Special Committee on Evaluation of Ethical Standards, in the CODE OF PROFESSIONAL RESPONSIBILITY (Final Draft, 1969), adopted the following standard:

DR 7-108   Communication with or Investigation of Jurors.

(D) After discharge of the jury from further consideration of a case with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated merely to

118

harass or em
service.

We approve

**5.5 Opening**
    **In his**
**marks to e**
**will be ava**
**the case. I**
**less there i**
**evidence w**

*Commentary*

The purpo
brief stateme:
can support v
the prosecuto
support later
proof falls si
to give a clar
See Leonard
Hipplewith, :
2d 972 (195
by standards

**5.6 Presenta**
    **(a) It is**
**fer false ev**
**testimony**
    **(b) It is**
**for the pur**
**the judge**
**tionable qu**
**ments in th**
    **(c) It is**
**tangible ev**



§5.6

Standards with Commentary

harass or embarrass the juror or to influence his actions in future jury service.

We approve and adopt this standard as an appropriate definition.

**5.5 Opening statement.**

 **In his opening statement the prosecutor should confine his remarks to evidence he intends to offer which he believes in good faith will be available and admissible and a brief statement of the issues in the case. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted in evidence.**

*Commentary*

 The purpose of the opening statement is narrow and limited to a brief statement of the issues and an outline of what counsel believes he can support with competent and admissible evidence. In that statement the prosecutor should be scrupulous to avoid any utterance he cannot support later with such evidence. If, through honest inadvertence, his proof falls significantly short of his statement, he should ask the court to give a clarifying instruction to avoid either advantage or penalty. See *Leonard v. United States*, 277 F.2d 834 (9th Cir. 1960); *State v. Hipplewith*, 33 N.J. 300, 164 A.2d 481 (1960); Annot., 28 A.L.R. 2d 972 (1953). In other respects the opening statement is governed by standards applicable to closing argument. See § 5.8, *infra*.

**5.6 Presentation of evidence.**

 **(a) It is unprofessional conduct for a prosecutor knowingly to offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses.**

 **(b) It is unprofessional conduct for a prosecutor knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.**

 **(c) It is unprofessional conduct for a prosecutor to permit any tangible evidence to be displayed in the view of the judge or jury**

119

---

*(left margin fragments)*

, obviously
( )DE DR
c...or, it is
.ven if the
ir cent its
conversed
on the ver-
a er com-
d with the
with them.

.rt or con-
lt t calcu-
. ..ch be-
and is in
re ssional
i.. to refer
whole. See
o the au-
that he act
he use the
c correct

u ..ards, in
ft, 1969),

t of a case
it stions of
I ..erely to

which would tend to prejudice fair consideration by the judge or jury until such time as a good faith tender of such evidence is made.

(d) It is unprofessional conduct to tender tangible evidence in the view of the judge or jury if it would tend to prejudice fair consideration by the judge or jury unless there is a reasonable basis for its admission in evidence. When there is any doubt about the admissibility of such evidence it should be tendered by an offer of proof and a ruling obtained.

## Commentary

### a. False evidence

It is so elementary that it hardly calls for comment that a prosecutor, in common with all other advocates, is barred from introducing evidence which he knows to be false. This obligation applies to evidence which bears on the credibility of a witness as well as to evidence on issues going directly to guilt. Napue v. Illinois, 360 U.S. 264 (1950). Even if false testimony is volunteered by the witness and takes the prosecutor by surprise rather than being solicited by him, if he knows it is false his obligation is to see that it is corrected. *Ibid;* see United States v. Poole, 379 F.2d 645 (7th Cir. 1967). Although some courts have granted new trials to defendants even where the prosecutor was unaware of the falsity of the evidence, see Barbee v. Warden, 331 F.2d 842 (4th Cir. 1964), disciplinary action against prosecutors should be limited to those cases where the falsity of the evidence was known to, or reasonably should have been discovered by, the prosecutor.

### b. Presenting inadmissible evidence

The mere offer of known inadmissible evidence or asking a known improper question may be sufficient to communicate to the trier of fact the very material the rules of evidence are designed to keep from their view. Moreover, the damage may only be emphasized if it is underlined by an objection, so that the offer of inadmissible matter may leave opposing counsel with no effective remedy. This practice and the similar tactic of arguing to the bench or making comments on

120



§5.6

Standards with Commentary

or off the record, in a manner calculated to influence the jury, clearly are improper. ABA CODE DR 7-106(C). Many cases have held such conduct ground for declaring a mistrial or granting a new trial. See Annot., 109 A.L.R. 1089 (1937). An important goal in the improvement of trial practice is the observance of the rules of evidence by counsel in such a manner that the necessity for objections to be made is greatly reduced, reserving them for those matters as to which there is honest doubt about the admissibility of the evidence in question. Even though bench conferences should be kept to a minimum, counsel is free to state, out of the hearing of the jury but on the record, his intention to ask a particular question or offer certain evidence. By so doing he can secure a ruling so that, if objection to his proffer is sustained, the trial will not be tainted by the jurors' having heard the inadmissible question or having seen an inadmissible exhibit of an inflammatory nature.

A prosecutor should exercise great care in deciding what evidence to use; he should avoid jeopardizing a strong case by introducing evidence which is essentially cumulative but which may bring about a reversal. In the period when confessions were generally under attack many cases were reversed because confessions, which were not needed to make a case, had been introduced "to strengthen the case." Not surprisingly prosecutors, as with all lawyers, sought to make "assurance doubly sure," even when eyewitnesses and other evidence made out a strong case. Other comparable situations arise with respect to use of evidence challenged because of alleged flaws in the legality of an arrest, search or seizure. Some prosecutors have tended routinely to buttress an in-court identification with testimony of a prior consistent "show-up" or "line-up" identification, often thereby jeopardizing the case or suffering a reversal.

It is obviously not easy to forego use of reliable and probative evidence when it is at hand, but the prosecutor must do so in many instances. Here a high level of experienced litigation judgment is required and a prosecution office should have its senior litigation lawyers available for consultation on these hard decisions.

121

§5.7

The Prosecution Function

### c. Display and tender of tangible evidence

The rationale underlying subsection (b) of section 5.6, as explained in the immediately preceding commentary, applies to the standards of subsections (c) and (d). Tangible evidence involves special problems which require special treatment because such evidence is immediately visible once it is brought into the courtroom. As in subsection (b) dealing with testimonial evidence, the purpose of subsections (c) and (d) is to prevent tangible evidence from coming to the attention of the trier of fact unless and until it is offered. The premature display of a tangible article in the courtroom may be unduly inflammatory even though it is later admitted. Hence, such an article should not be exposed to view until it is formally offered for admission in evidence. Moreover, the offer must be made in good faith. If there is any doubt as to the admissibility of the article, the display and tender should be made outside the presence of the jury.

The same basic rationale governs asking an objectionable question for the purpose of hinting at matter which is not legally admissible. A related and even graver violation of correct standards is the "suggestive" type of question; an example of this is to ask a defendant or defense witness if he has ever been convicted of a particular crime when the prosecutor is not able to demonstrate the affirmative. See § 5.7(d), *infra*.

### 5.7 Examination of witnesses.

(a) The interrogation of all witnesses should be conducted fairly, objectively and with due regard for the dignity and legitimate privacy of the witness, and without seeking to intimidate or humiliate the witness unnecessarily. Proper cross-examination can be conducted without violating rules of decorum.

(b) The prosecutor's belief that the witness is telling the truth does not necessarily preclude appropriate cross-examination in all circumstances, but may affect the method and scope of cross-examination. He should not misuse the power of cross-examination or impeachment to discredit or undermine a witness if he knows the witness is testifying truthfully.

122



§5.7

Standards with Commentary

> **(c)** It is unprofessional conduct for a prosecutor to call a witness who he knows will claim a valid privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege.
>
> **(d)** It is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner cannot support by evidence.

*Commentary*

### a. Avoiding unnecessary embarrassment or humiliation

The scope of examination has always been subject to control in the court's discretion in order to prevent abuse of witnesses. At one time a privilege to refuse to answer degrading questions was recognized. See 3 WIGMORE, EVIDENCE § 781 (1940). Some states retain this privilege in statutes protecting witnesses from "irrelevant, improper or insulting questions, and from harsh or insulting demeanor." UTAH CODE ANN. § 78-24-11 (1953). See also MONT. REV. CODE § 93-2101-3 (1947). Clearly "a lawyer should never be unfair or abusive or inconsiderate to adverse witnesses or opposing litigants, or ask any question intended only to insult or degrade the witness." AMERICAN COLLEGE OF TRIAL LAWYERS, CODE OF TRIAL CONDUCT No. 10(d) (1963). The more difficult issue is the lawyer's duty when the question will yield some benefit to his case but at inordinate cost to the reputation of the witness. Highly experienced trial lawyers consulted by the Advisory Committee agreed that in this situation trial counsel must carefully balance the importance of the evidence in question against the humiliation and disgrace to the witness. Especially in the case of impeaching evidence, where the humiliation it will cause the witness is out of proportion in comparison with its impeachment value, the prosecutor should forego the question. For example, if the rules of evidence in force in the jurisdiction permit impeachment by showing convictions for crimes which do not have a direct bearing on the truth-telling propensities of the witness, the prosecutor should not bring to light a long-forgotten criminal conviction of the witness simply to discredit him.

123

The Prosecution Function

### b. Undermining a truthful witness

A question of long standing and not completely resolved is whether in cross-examination of a witness an advocate should be restrained by his belief that the witness has testified truthfully. Numerous experienced defense counsel of the American, Canadian and British bars, consulted by the Advisory Committee, expressed the view that counsel generally is not permitted to substitute his personal opinion for the available fact-finding processes of the trial and may properly invoke the usual cross-examination technique to test the witness's capacity and opportunity for observation and the ability to recall. However, many lawyers expressed the view that the manner and tenor of cross-examination ought to be restricted where examining counsel has knowledge of the truthfulness of the testimony given by the witness.

There was a consensus among the experts consulted, and one shared by the Advisory Committee, that the difficult and delicate decisions presented by the wide range and variety of situations cannot be made the subject of rigid standards. There was general agreement that cross-examination is perhaps the best known human device for ascertaining truth and revealing falsehood. Essentially an "invention" of the common law system, the power to cross-examine adverse witnesses is a monopoly of lawyers and ought not be misused for destroying known truth. The power to cross-examine is a power vested in a lawyer by virtue of his being an officer of the court. It is a power shared by the court itself but not often used. Strong arguments were advanced by highly skilled and experienced trial advocates that if the cross-examiner knows that the testimony of a particular witness is true, he may not properly use this "monopoly power" he possesses as an officer of the court for a purpose alien to its avowed objective by using it to destroy or undermine truth. This is the view shared widely by most British barristers and judges. Some, however, take the view that within limits a cross-examiner may employ conventional cross-examination techniques notwithstanding he knows that the testimony is true. Some also pointed out that the problem rarely arises and that when it does a lawyer is ill-advised to try to undermine a known truth-teller. A large number of trial counsel consulted agreed that no lawyer is under any

duty to compro[...]
powerful tool of [...]
American, Briti[...]
destroy a witnes[...]
conviction when [...]
sonable relations[...]

### c. Forcing a clai[...]

Most courts [...]
from the fact tha[...]
tello v. United S[...]
People, 364 P.2[...]
535, 341 P.2d 8[...]
59 N.W.2d 223 [...]
367 (1944). Th[...]
of effective cross[...]
inferences from [...]
Note, 33 U. Chi[...]
minimized it is [...]
claim of privileg[...]
cutor is informe[...]
he wishes to co[...]
the presence of [...]
States, 373 U.S. [...]

Concern has b[...]
the non-appeara[...]
vant information [...]
argument based [...]
Commonwealth [...]
(1964). This ar[...]
the prosecutor t[...]
See United State[...]
Since the prosecu[...]
a privilege, the [...]
to argue any inf[...]



§5.7

Standards with Commentary

duty to compromise his conscience or professional honor to use the powerful tool of cross-examination to defeat known truth. All experts, American, British and Canadian, agreed that it is improper to seek to destroy a witness's credibility with an ancient episode or long-forgotten conviction when the injury to the witness heavily outweighs any reasonable relationship to present veracity.

### c. Forcing a claim of privilege before the jury

Most courts preclude a jury from drawing evidentiary inferences from the fact that a witness has claimed a privilege. See. *e.g.*, San Fratello v. United States, 340 F.2d 560 (5th Cir. 1965); De Gesualdo v. People, 364 P.2d 374 (Colo. 1961); State v. Tanner, 54 Wash. 2d 535, 341 P.2d 869 (1959); *contra*, State v. Snyder, 244 Iowa 1244, 59 N.W.2d 223 (1953); State v. Addington, 158 Kan. 276, 147 P.2d 367 (1944). The theory underlying these cases is "the impossibility of effective cross-examination and the possibility that the jury may give inferences from the claim of privilege more weight than they deserve." Note, 33 U. CHI. L. REV. 151, 154 (1965). If these effects are to be minimized it is desirable that, whenever possible, issues relating to a claim of privilege be heard out of the presence of the jury. If the prosecutor is informed in advance that the witness will claim a privilege and he wishes to contest the claim, the matter should be treated without the presence of the jury and a ruling obtained. See Namet v. United States, 373 U.S. 179, 190 n.9 (1963).

Concern has been expressed that failure of the jury to be aware that the non-appearance as a witness of some person having possibly relevant information is due to a claim of privilege will leave an opening for argument based on the failure of the adversary to call the witness. See Commonwealth v. Donatelli, 202 P.Super. 565, 198 A.2d 338 (1964). This argument has been offered as a ground for permitting the prosecutor to compel a claim of privilege in the jury's presence. See United States v. Maloney, 262 F.2d 535, 537 (2nd Cir. 1959). Since the prosecutor is precluded from calling a person who will claim a privilege, the defense counsel is under a correlative obligation not to argue any inference from the absence of the person as a witness.

### d. Unfounded question

The attempt to communicate impressions by innuendo through questions which are answered in the negative, for example, "Have you ever been convicted of the crime of robbery?" or "Weren't you a member of the Communist Party?" or "Did you tell Mr. X that . . .?" when the questioner has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts. See, *e.g.*, Richardson v. United States, 150 F.2d 58 (6th Cir. 1945); People v. DiPaolo, 355 Mich. 394, 115 N.W.2d 78 (1962); State v. Flowers, 262 Minn. 164, 114 N.W.2d 78 (1962). See generally 6 WIGMORE, EVIDENCE § 1808(2) (1940). See also AMERICAN COLLEGE OF TRIAL LAWYERS, CODE OF TRIAL CONDUCT §§ 20(c), (d), (g) (1963).

### 5.8  Argument to the jury.

**(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.**

**(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.**

**(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.**

**(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.**

### Commentary

As the culmination of his efforts in the case, the prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness which should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special

126

weight to th[e]
associated w[ith]
presumably
364 (1925)
a strong cas[e]
conduct is g[reater]
256 P. 793,
Cain, *Sensa[tionalism]*
1 (1931); [
prosecutors
for exagger[ation]
of argumen[t]
People v. T[...]
Commonwe[alth]
must be fre[e]
"But, while
ones." Berg[er]
in detail wh[...]
it will depe[nd]
certain bro[ad]
experience [

### a. Argumen[t]

The mos[t]
must be co[nsistent]
reasonably
proved amo[ng]
cross-exami[nation]
for the clea[r]
been or co[...]
People v. [
generally A[...]
more fully [

The inte[...]
hensible. S[ee]

weight to the prosecutor's arguments, not only because of the prestige associated with his office, but also because of the fact-finding facilities presumably available to him. See De Carlo v. United States, 6 F.2d 364 (1925); Note, 54 COLUM. L. REV. 946 (1954). "If the state has a strong case, it is not necessary, and if it has a close case, such misconduct is gross injustice to the defendant." State v. Cyty, 50 Nev. 256, 256 P. 793, 794 (1927). See also De Carlo v. United States, *supra;* Cain, *Sensational Prosecutions and Reversals,* 7 NOTRE DAME LAW. 1 (1931); Note, 6 UTAH L. REV. 108 (1958). Unfortunately, some prosecutors have permitted an excess of zeal for conviction or a fancy for exaggerated rhetoric to carry them beyond the permissible limits of argument. See, *e.g.,* Berger v. United States, 295 U.S. 78 (1935); People v. Talle, 111 Cal.App.2d 650, 245 P.2d 633 (1952); Rowe v. Commonwealth, 269 S.W.2d 247 (Ky. 1954). Of course, a prosecutor must be free to present his arguments with logical force and vigor. "But, while he may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. at 88. To attempt to spell out in detail what can and cannot be said in argument is impossible, since it will depend largely on the facts of the particular case. Nevertheless, certain broad guidelines based on the function of argument and the experience of courts in typical situations can be established.

### a. Argument of reasonable inferences; misrepresentation

The most elementary rule governing the limits of argument is that it must be confined to the record evidence and the inferences which can reasonably and fairly be drawn therefrom. Assertions of fact not proved amount to unsworn testimony of the advocate, not subject to cross-examination. In a few cases prosecutors have been condemned for the clearly improper use before the jury of evidence which had not been or could not have been introduced in evidence at the trial, *e.g.,* People v. Brophy, 122 Cal.App.2d 638, 265 P.2d 593 (1954). See generally Annot., 46 A.L.R.2d 1423 (1956). This subject is treated more fully in section 5.9, *infra.*

The intentional misstatement of the evidence is particularly reprehensible. See Berger v. United States, *supra.* It has long been estab-

127

§5.8

The Prosecution Function

lished that "It is not candid or fair for the lawyer knowingly to mis-quote . . . the testimony of a witness . . . or in argument to assert as a fact that which has not been proved." ABA CANONS OF PROFESSIONAL ETHICS No. 22 (1968).

**b. Expressions of personal belief**

Such expressions by the prosecutor are a form of unsworn, un-checked testimony and tend to exploit the influence of his office and undermine the objective detachment which should separate a lawyer from the cause for which he argues. Such argument is expressly forbidden. ABA CODE DR 7-106 (C)(4); DRINKER, LEGAL ETHICS 147 (1953). Many courts have recognized the impropriety of such statements. Annot., 50 A.L.R.2d 766 (1956). This kind of argument is easily avoided by insisting that lawyers restrict themselves to statements which take the form, "The evidence shows . . ." or some similar form. The experienced American and British advocate will say, for example, "I leave it to you whether this evidence does not suggest . . ." etc. Harris v. United States, 402 F.2d 656, 657-59 D.C. Cir. (1968).

The line between permissible and impermissible argument is a thin one. Neither advocate may express his personal opinion as to the justice of his cause or the veracity of witnesses. Credibility is solely for the triers, but an advocate may point to the fact that circumstances or independent witnesses give support to one witness or cast doubt on another. The prohibition goes to the advocate's personally endorsing or vouching for or giving his opinion; the cause should turn on the evidence, not on the standing of the advocate, and the witnesses must stand on their own.

**c. Appeals to passion or prejudice**

Arguments which rely upon racial, religious, ethnic, political, economic or other prejudices of the jurors introduce elements of irrelevance and irrationality into the trial which cannot be tolerated in a society based upon the equality of all citizens before the law. Of course, the mere mention of the status of the accused as shown by the record may not be improper if it has some legitimate bearing upon some issue in the case, such as identification by color. But where the jury's pre-

128

disposition a
stigmatize th
trespassed th
evidence. Ac
prejudice as
judged only
51, 48 So. (
(1930); An:

**d. Injection c**

Reference
ernor or the
impermissib
decision. An
sequence of
yond the sc
courts have
See, e.g., Cc
132 N.E. 4
Annot., 44 .
reciprocal; a
ment of defe
out provoca
advocates a
and trial jud

**5.9  Facts c**

It is un
fer to or
trial or o
knowledg
the court

*Commentar*

The prob
and appella



disposition against some particular segment of society is exploited to stigmatize the accused or his witnesses, such argument has clearly trespassed the bounds of reasonable inference or fair comment on the evidence. Accordingly, many courts have denounced such appeals to prejudice as inconsistent with the requirement that the defendant be judged only upon the evidence. See, *e.g.*, Tannehill v. State, 159 Ala. 51, 48 So. 662 (1909); Cooper v. State, 136 Fla. 23, 186 So. 230 (1930); Annot., 45 A.L.R.2d 303, 322-68 (1956).

#### d. Injection of extraneous issues

References to the likelihood of other authorities, such as the governor or the appellate courts, correcting an erroneous conviction are impermissible efforts to lead the jury to shirk responsibility for its decision. Annot., 3 A.L.R.2d 1488 (1965). Predictions as to the consequence of an acquittal on lawlessness in the community also go beyond the scope of the issues in the trial and are to be avoided. Some courts have reversed convictions where such arguments were made. See, *e.g.*, Cooper v. State, *supra;* see People v. Sawhill, 299 Ill. 393, 132 N.E. 477, 484 (1921); Note, 54 COLUM. L. REV. 946 (1954); Annot., 44 A.L.R.2d 978 (1955). Of course, the restriction must be reciprocal; a prosecutor may be justified in making a reply to an argument of defense counsel which may not have been proper if made without provocation. The better solution to this problem lies in having advocates adequately instructed as to the limits of proper argument and trial judges willing to enforce fair rules as to such limits.

### 5.9 Facts outside the record.

It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record whether at trial or on appeal, unless such facts are matters of common public knowledge based on ordinary human experience or matters of which the court may take judicial notice.

#### Commentary

The problem of digression from the record can arise at both the trial and appellate levels. It is beyond question that at the trial level it is

129

highly improper for a lawyer to refer in colloquy, argument or other context to factual matter beyond the scope of the evidence or the range of judicial notice. This is true whether the case is being tried to a court or to a jury, but it is particularly offensive in a jury trial. It can involve the risk of serious prejudice with a mistrial as a possible remedy. Ordinarily a trial court should summarily exclude any reference in argument or otherwise to factual matter which is beyond the scope of the evidence in any significant way. The broad discretion a trial court has in such matters enables it to deal with them as they arise by allowing a party to reopen his case or take other appropriate steps to enlarge the record so as to provide an evidentiary basis for the matter he wishes to argue but has for some reason failed to establish.

At the appellate level it is an even graver violation of ethical standards to argue factual matter outside the record, for an appellate court has less flexibility to deal with the problems of enlarging the record. This subject is discussed more fully in the report on The Defense Function § 8.4, *infra.*

The stricture of this standard does not apply to matters of common knowledge based on ordinary human experience or matters of which a court may take judicial notice.

## 5.10 Comments by prosecutor after verdict.

**The prosecutor should not make public comments critical of a verdict, whether rendered by judge or jury.**

### Commentary

The Advisory Committee on the Criminal Trial has recommended that the trial judge refrain from praising or criticizing jurors for their verdict, pointing out that such remarks may improperly influence the jurors in other cases to which they may be assigned. ABA STANDARDS, TRIAL BY JURY § 5.6, and Commentary (Approved Draft, 1968). For like reasons and because of his influence as the representative of the people, the prosecutor should refrain from making public statements critical of a jury's verdict. He should similarly avoid the fact or appearance of trying to intimidate a judge when he tries the case alone.

**130**

PART VI. SEN

*Introductory N*

Too little at
sentencing. Wh
ticipation of th
narrow. The e:
make unsolicit
to seek to mal
counts of the s
ness pertains
supplying avai
correction of
process of sent
stage in the ey
must reapprai
nize that as an
verdict and co
his role may b

6.1  Role in s
(a) The
index of hi:
the senten(
formed jud
tence dispa
(b) Wh(
tion, the p
mendation
tion is requ
dation as t
(c) Wh
present ev
diction, b

**Research Aids**

County public defender:
  O-Jur3d: Civ S § 419
  Am-Jur2d: Crim L §§ 733, 983

**ALR**

Construction and effect of statutes providing for office of public defender. 36 ALR3d 1403.

## § 120.16  When representation to be provided; notice to accused.

(A)(1) The county public defender shall provide legal representation to indigent adults and juveniles who are charged with the commission of an offense or act that is a violation of a state statute and for which the penalty or any possible adjudication includes the potential loss of liberty and in postconviction proceedings as defined in this section.

(2) The county public defender may provide legal representation to indigent adults and juveniles charged with the violation of an ordinance of a municipal corporation for which the penalty or any possible adjudication includes the potential loss of liberty, if the county public defender commission has contracted with the municipal corporation to provide legal representation for indigent persons charged with a violation of an ordinance of the municipal corporation.

(B) The county public defender shall provide the legal representation authorized by division (A) of this section at every stage of the proceedings following arrest, detention, service of summons, or indictment.

(C) The county public defender may request the state public defender to prosecute any appeal or other remedy before or after conviction that he decides is in the interests of justice, and may provide legal representation in parole and probation revocation matters.

(D) The county public defender shall not be required to prosecute any appeal, postconviction remedy, or other proceeding, unless he is first satisfied there is arguable merit to the proceeding.

(E) Nothing in this section shall prevent a court from appointing counsel other than the county public defender or from allowing an indigent person to select his own personal counsel to represent him. A court may also appoint counsel or allow an indigent person to select his own personal counsel to assist the county public defender as co-counsel when the interests of justice so require.

(F) Information as to the right to legal representation by the county public defender or assigned counsel shall be afforded to an accused person immediately upon arrest, when brought before a magistrate, or when formally charged, whichever occurs first.

HISTORY: 136 v H 164 (Eff 1-13-76); 138 v H 204 (Eff 7-30-79); 140 v S 271. Eff 9-26-84.

**Cross-References to Related Sections**

Competency to stand trial, hearing on, RC § 2945.37.
Counsel for parents when permanent custody of child is at issue, RC §§ 2151.35.3, 2151.41.4.
County appointed counsel system, RC § 120.33.
Investigation services and experts for indigent, RC § 2929.02.4.
Payment of appointed counsel, RC § 2941.51.
Public defender commission; powers and duties, RC § 120.03.

**Research Aids**

Legal representation:
  O-Jur3d: Civ S § 420
  Am-Jur2d: Crim L § 987

**ALR**

Constitutionally protected right of indigent accused to appointment of counsel in state court prosecution. 93 ALR2d 747.
Court appointment of attorney to represent, without compensation, indigent in civil action. 52 ALR4th 1063.
Power of court to change counsel appointed for indigent, against objections of accused and original counsel. 3 ALR4th 1227.
Propriety and prejudicial effect of counsel's representing defendant in criminal case notwithstanding counsel's representation or former representation of prosecution witness. 27 ALR3d 1431.
Right of indigent defendant in criminal case to aid of state as regards new trial or appeal. 55 ALR2d 1072.
Right of indigent defendant in state criminal case to assistance of fingerprint expert. 72 ALR4th 874.

**Law Review**

Representation under the Ohio Public Defender Act. Note. 38 OSLJ 855 (1977).

## CASE NOTES AND OAG

1. (1980) An indigent parent is entitled to a transcript and counsel on appeal from a judgment permanently terminating his parental rights: State ex rel. Heller v. Miller, 61 OS2d 6, 15 OO3d 3, 399 NE2d 66.

2. (1982) Where a hearing is required on the merits of a post-conviction remedy petition (RC § 2953.21 et seq.), an indigent petitioner is entitled upon request as a matter of right under the provisions of the Public Defender Act, RC Chapter 120., to have counsel appointed to represent him at such hearing: State v. Barnes, 7 OApp3d 83, 7 OBR 96, 454 NE2d 572.

3. (1979) An indigent defendant possesses neither a constitutional nor a statutory right to counsel for postconviction proceedings. However, the court in its discretion may appoint counsel pursuant to the public defender statutes: State v. Castro, 67 OApp2d 20, 21 OO3d 338, 425 NE2d 907.

4. (1980) Pursuant to RC § 2941.51, the county is liable for the cost of providing an indigent defendant charged with a felony with a transcript of a probable cause hearing in municipal court where the transcript is ordered by counsel assigned to the case under RC § 120.16(E), under RC § 120.26(E), or otherwise, if the cost is approved by the court. The court may bill the county for such costs by certifying a statement of the charges from the court reporter and issuing a voucher to the county au-

days, in the order in which they stand on the appearance docket.

*HISTORY: 139 v S 114. Eff 10-27-81.

**Research Aids**

Trial docket generally:
  C.J.S.: Trial § 1
*West Key No. Reference*
  Trial 9(1)

## § 2311.13

Repealed, 139 v S 114, § 2 [RS § 5136; S&C 1035; 51 v 57; GC § 11389; Bureau of Code Revision, 10-1-53]. Eff 10-27-81.

This section required the clerk of the court to make a copy of the docket for use by the bar.

## § 2311.14 Interpreter provided for person with hearing, speech or other impediment.

### CASE NOTES AND OAG

1. (1984) Interpreter fees are to be taxed as part of the costs which shall be allowed to the prevailing party unless the court otherwise directs. (CivR 54[D], RC §§ 2311.14 and 2335.06, construed.): Huebner v. Cervi, 19 OApp3d 259, 19 OBR 411, 483 NE2d 1204.

2. (1988) Error in failure to qualify an interpreter as an expert witness is waived when the party requesting the interpreter fails to object in the trial court to the failure to so qualify the interpreter: State v. Rosa, 47 OApp3d 172, ___ NE2d ___.

3. (1988) The requirements of RC § 2311.14(B) and Evid. R. 604 mandating administration of an oath to an interpreter are waived when there is a failure to object in the trial court to a failure to so administer the oath: State v. Rosa, 47 OApp3d 172, ___ NE2d ___.

## § 2311.21 Abatement by death of party.

**Research Aids**

Generally:
  C.J.S.: Abatement and Revival § 117 et seq
*West Key No. Reference*
  Abatement and Revival 59-64

**ALR**

Claim for punitive damages in tort action as surviving death of tortfeasor or person wronged. 30 ALR4th 707.

Effect of death of party to divorce proceedings pending appeal or time allowed for appeal. 33 ALR4th 47.

### CASE NOTES AND OAG

1. (1983) An action for slander does not survive the death of either party, and plaintiff may not commence a new action against a deceased defendant by substituting the deceased's executor as a party: Oakwood v. Makar, 11 OApp3d 46, 11 OBR 79, 463 NE2d 61.

2. (1987) A claim for relief under 42 USC § 1981 is considered to be personal in nature, and as such, it is similar to actions for libel, slander and malicious prosecution which abate at the time of plaintiff's death pursuant to ORC § 2311.21: Alsup v. International Union of Bricklay-

ers and Allied Craftsmen of Toledo, Ohio, Local Union No. 3, 679 FSupp 716 (N.D.).

3. (1988) A claim for "psychic" injury or infliction of serious emotional distress survives the death of the person upon whom the injury or distress was inflicted: Bowman v. Parma Bd. of Edn., 44 OApp3d 169, 542 NE2d 663.

## § 2313.01 Commissioners of jurors.

**Cross-References to Related Sections**

Annual jury list, RC § 2313.08.

**Text Discussion**

Challenge to Array. 1 Ohio Crim. Prac. & Pro. (2d Ed.) § 21.206

### CASE NOTES AND OAG

1. (1982) Failure to follow the statutory jury selection procedures does not automatically require reversal of a conviction: State v. Puente, 69 OS2d 136, 23 OO3d 178, 431 NE2d 987.

## § 2313.06 Poll list and licensed drivers list.

On or before the last day of December of each year, unless otherwise ordered by the court of common pleas, the board of elections for each county shall compile and file with the commissioners of jurors of the county a certified, current list containing the names, addresses, dates of birth, and social security numbers, if the numbers are available, of all the electors of the county shown on the registration lists for the next preceding general election. On or before the last day of December of each year, unless otherwise ordered by the court of common pleas of any particular county, the registrar of motor vehicles shall compile and file with the commissioners of jurors of each county a certified, current list containing the names, addresses, dates of birth, duration of residence in this state, citizenship status, and social security numbers, if the numbers are available, of all residents of the particular county who have been issued, on or after January 1, 1984, a commercial driver's license pursuant to Chapter 4506. or a driver's license pursuant to Chapter 4507. of the Revised Code that is valid and current on the date of the compilation of the list, who are or will be eighteen years of age or older as of the day of the general election of the year the list is filed, and who, regardless of whether they actually are registered to vote, would be electors if they were registered to vote.

*HISTORY: 140 v H 183 (Eff 10-1-84); 143 v H 381. Eff 7-1-89.

**Cross-References to Related Sections**

Use of licensed drivers lists in addition to registration lists of electors for compiling jury lists, RC §§ 2313.08, 2313.42.

**ALR**

Age group underrepresentation in grand jury or petit jury venire. 62 ALR4th 859.

## § 2313.08  Annual jury list.

(A) The jury year in each county shall begin on the first Monday of August of each year, provided the court of common pleas may designate otherwise. A new and complete jury list shall be made up annually by the commissioners of jurors, and shall be certified by them and filed in their office before the beginning of each jury year. The names shall be entered in a suitable book or record, to be known as the "annual jury list," shall be arranged alphabetically so far as practicable and under convenient divisions by precincts, districts, and townships, and shall be properly indexed. With each name shall be recorded the occupation, place of business, place of residence, duration of residence in this state, citizenship status, date of birth, and social security number of the person, as nearly as they can be ascertained. A duplicate of the list shall be certified by the commissioners and filed in the office of the clerk of the court of common pleas. The commissioners may, by order of the court, add to the list, or enter on a supplementary list, the names of persons who shall thereafter be discovered to be qualified to serve as jurors.

(B) In the selection of names for the annual jury list, the commissioners may select all names from the list of electors certified by the board of elections pursuant to section 2313.06 of the Revised Code or may select all names from the list of qualified driver licensees certified by the registrar of motor vehicles pursuant to section 2313.06 of the Revised Code and from the list of electors certified by the board of elections pursuant to section 2313.06 of the Revised Code.

In the selection of the names for the annual jury list, unless otherwise ordered by the court, the commissioners shall assign a consecutive number to each name, starting with one, and shall use a key number that shall be designated by the court. The commissioners shall select the name of each prospective juror, starting with the name that corresponds to a randomly selected number that may range from the number one to the key number, and proceeding accordingly in the numerical sequence of the key number so designated, until the required number of prospective jurors has been selected.

(C) Automation data processing procedures and visual display apparatus may be utilized in the selection of the names for the annual jury list, and in the actual compilation of the list.

•**HISTORY:** 140 v H 183. Eff 10-1-84.

**Cross-References to Related Sections**

Selection of jurors for county court, RC § 1907.28.

**Research Aids**

Jury list generally:
C.J.S.: Juries § 155 et seq
West Key No. Reference
  Jury 60–64

### CASE NOTES AND OAG

1, (1982) Failure to follow the statutory jury selection procedures does not automatically require reversal of a conviction: State v. Puente, 69 OS2d 136, 23 OO3d 178, 431 NE2d 987.

2. (1985) To sustain a challenge to a jury-selection procedure on the ground the procedure violated the criminal defendant's right to a jury chosen from a fair cross-section of the community, the defendant must show (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable when compared to the group's representation in the community; and (3) the underrepresentation is due to the systematic exclusion of the group in the jury-selection process: State v. Buell, 29 OApp3d 215, 29 OBR 260, 504 NE2d 1161.

## § 2313.12  Exemptions of jurors; proof of exemption; certificate of exemption; record.

**Cross-References to Related Sections**

Firefighters excused from jury duty, RC § 737.26.
National guard member exempted from jury duty, RC § 5919.20.
Ohio defense corps, exempted from jury duty, RC § 5920.10.

**Text Discussion**

Challenge to jurors, generally. 1 Ohio Crim. Prac. & Pro. (2d Ed.) § 21.101

**ALR**

Age group underrepresentation in grand jury or petit jury venire. 62 ALR4th 859.

**Research Aids**

Exemptions:
C.J.S.: Juries § 153
West Key No. Reference
  Jury 55

### CASE NOTES AND OAG

1. (1982) Exclusion of doctors, dentists and lawyers does not violate the fair cross-section requirement: State v. Puente, 69 OS2d 136, 23 OO3d 178, 431 NE2d 987.

## § 2313.13  Service of juror may be postponed; temporary excuse or discharge.

The court of common pleas may postpone the whole or a part of the time of service of a juror, after notice for service, to a later date during the same term or part of a term or to a subsequent term or part of a term of the same jury year or may excuse a juror, after notice for service, from service at that term for not more than three days at a time, where the exigencies of his business require his temporary excuse. The court may also discharge for the term or part of a term, or excuse until a day certain, one or more jurors so notified whose attendance is not required for the trial of issues at that term or part of a term, or until that day. Each juror

so excused or whos
until a day certain n
opening of court on
the juror is discharg
•**HISTORY:** 139 v H 41

## § 2313.16

Except as provid
vised Code, the co
excuse a person, l
drawn and notified
faction of the judg
person acquainted

(A) The juror is
county, and will no

(B) The interests
will be materially
ance;

(C) The juror is

(D) The juror's
juror or the juror's
dangerously ill;

(E) The juror ha
in a court of recor
jury year.

When a person
case specified in th
fied to attend a te
claims an exemptio
by the judge presi
judge. Such an exc
term. Every appro
filed with the jury
•**HISTORY:** 139 v H 4

**Research Aids**

Excusing jurors:
C.J.S.: Juries § 205
West Key No. Referen
  Jury 75(1)–(6)

**Law Review**

Jury systems of the
and increased ef
11 ToledoLRev

## § 2313.17

11419-19; 114 v 19
1-53]. Eff 10-9-81.

This section conce
excuse in court.

## § 2313.18

of juror.

(A) No employe

term "mental deficiency" as used in RC § 2929.04(B), setting forth mitigating circumstances in a determination of punishment for aggravated murder, be construed liberally in favor of the defendant, such term cannot be construed to include "deficiency of conscience" in disregard of its ordinary and accepted meaning: State v. Bayless, 48 OS2d 73, 2 OO3d 249, 357 NE2d 1035.

10. (1976) Possession of narcotics does not violate an ordinance forbidding sale or use: Washington Court House v. McStowe, 45 OS2d 228, 74 OO2d 333, 343 NE2d 109.

11. (1980) Applying RC §§ 2901.04 and 1.47, the court held that the words "present to a juvenile" in RC § 2907.31 defining the offense of disseminating material harmful to juveniles must be interpreted to require presentation to individual juveniles rather than to the public generally: State v. Loshin, 19 OO3d 141 (App).

12. (1978) Any ambiguity in RC § 2929.41, concerning consecutive sentences, must, under RC § 2901.04, be resolved against the state and in favor of the accused: State v. Wilson, 57 OApp2d 11, 11 OO3d 8, 384 NE2d 1300.

13. (1977) Applying RC § 2901.04, the court concluded that the definition of "recklessness" found in RC § 2901.22(C) must be applied to traffic offenses; thus, mere negligence did not amount to reckless driving: State v. Klein, 51 OApp2d 1, 5 OO3d 57, 364 NE2d 1169.

14. (1977) Applying RC §§ 2901.04 and 2941.25, the court held that a defendant charged with unlawful taking of eight separate species of fish by net at the same time could only be convicted of one offense: State v. Fisher, 52 OApp2d 133, 6 OO3d 99, 368 NE2d 324.

15. (1976) Despite possible ambiguity and inconsistent coverage in RC § 2907.05, defining gross sexual imposition, the statutory prohibition may not be extended to cover a situation in which the only erogenous zone touched is that of the offender: State v. Baker, 50 OApp2d 68, 4 OO3d 46, 361 NE2d 1068.

16. (1978) Applying RC § 2901.04, the court held that a defendant charged with carrying a concealed weapon under RC § 2923.12 was not precluded from asserting the "defensive purposes" affirmative defense set forth therein by reason of the "not otherwise prohibited by law" condition where he was in violation of a municipal handgun owner's identification card ordinance: State v. Titus, 10 OO3d 300 (CP).

17. (1979) Noting the requirements of RC § 2901.04, the court held that the actual notice provisions of RC § 4509.04 are applicable to a license suspension on "points" under RC chapter 4507.: Wooster v. Pickett, 13 OO3d 407 (MC).

18. (1978) Citing RC § 2901.04, the court held that a municipal ordinance prohibiting walking along a roadway where a sidewalk is provided did not apply to running or jogging: Akron v. Barklay, 57 OMisc 17, 11 OO3d 187, 386 NE2d 269 (MC).

19. (1975) Strict construction of a criminal statute, as required under RC § 2901.04 would permit no extension of the language used to define "privilege" in RC § 2901.01(L) as to allow the "*** right, title, claim, or interest" in a motor vehicle to be asserted in any court in Ohio without exhibiting a certificate of title: State v. Isaac, 44 OMisc 87, 73 OO2d 331, 337 NE2d 818 (MC).

## § 2901.05   Burden and degree of proof.

(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.

(B) As part of its charge to the jury in a criminal case, the court shall read the definitions of "reasonable doubt" and "proof beyond a reasonable doubt," contained in division (D) of this section.

(C) As used in this section, an "affirmative defense" is either of the following:

(1) A defense expressly designated as affirmative;

(2) A defense involving an excuse or justification peculiarly within the knowledge of the accused, on which he can fairly be required to adduce supporting evidence.

(D) "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 137 v H 1168, Eff 11-1-78.

Not analogous to former RC § 2901.05 (GC § 12403; RS § 6810; S&C 402; 33 v 33; 124 v 14; Bureau of Code Revision, eff 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.

### Committee Comment to H 511

This section retains the substance of an existing law which presumes the innocence of an accused, requires the prosecution to prove guilt beyond a reasonable doubt, defines reasonable doubt, and requires the definition to be read to the jury. The definition of reasonable doubt combines elements of the former Ohio and existing federal definitions, restylized for greater ease in understanding.

Also the section places upon the accused the burden of going forward with the evidence of an affirmative defense. It defines affirmative defense to include defenses expressly designated as affirmative in various sections in the code, and defenses based on evidence within the accused's special knowledge which he himself ought fairly be required to adduce.

### Cross-References to Related Sections

Affirmative defense to—
Attempt, RC § 2923.02.
Bigamy, RC § 2919.01.
Carrying concealed weapons, RC § 2923.12.
Child stealing, RC § 2905.04.
Coercion, RC § 2905.12.
Complicity, RC § 2923.03.
Compounding a crime, RC § 2921.21.
Conspiracy, RC § 2923.01.
Conveying weapons, liquor or drugs into detention facility, RC § 2921.36.

# CHAPTER 2903: HOMICIDE AND ASSAULT

Section

## HOMICIDE

2903.01    Aggravated murder.
2903.02    Murder.
2903.03    Voluntary manslaughter.
2903.04    Involuntary manslaughter.
2903.05    Negligent homicide.
2903.06    Aggravated vehicular homicide.
2903.07    Vehicular homicide.
2903.08-2903.10 Repealed.

## ASSAULT

2903.11    Felonious assault.
2903.12    Aggravated assault.
2903.13    Assault.
2903.14    Negligent assault.
2903.15, 2903.16 Repealed.

## MENACING

2903.21    Aggravated menacing.
2903.22    Menacing.

## Committee Comment to H 511

Chapter 2903. defines those offenses, other than assaultive sex offenses, of which the primary thrust is actual or potential harm to persons.

The chapter contains the single capital offense defined in the code, aggravated murder, which includes the planned killing in cold blood, and the purposeful killing committed during kidnapping, rape, arson, robbery, burglary, or escape. The lesser offense of murder is defined simply as the purposeful killing of another.

Elements of the former offense of first degree manslaughter are divided between two sections: voluntary manslaughter, which is knowingly killing another while under extreme emotional stress brought on by serious provocation; and involuntary manslaughter, which is killing another as a proximate result of the commission of a felony. Involuntary manslaughter carries a more severe penalty if the death was caused through commission of a felony than if it resulted from commission of a misdemeanor. Under former law the penalty for manslaughter was the same regardless of whether the offense was voluntary or involuntary, and regardless of the cause of death. Negligent homicide, a new offense, is defined as negligently killing another by means of a deadly weapon or dangerous ordnance.

Two vehicular homicide offenses are included in the chapter, both dealing with killing another while operating a motor vehicle, motorcycle, snowmobile, locomotive, watercraft, or aircraft. The difference between the two is that the aggravated offense is committed recklessly, while the less serious offense is committed negligently. Former law connected these offenses to the violation of various traffic laws, rather than to the recklessness or negligence of the offender. Also, former law did not provide a homicide offense involving snowmobiles or aircraft, and the offense involving locomotives was obsolete and unenforceable.

Four assault and two menacing offenses are defined in the chapter. Felonious assault is knowingly causing serious physical harm to another by any means, or knowingly causing or attempting to cause physical harm to another by means of a deadly weapon or dangerous ordnance. Aggravated assault is the same, except that it is committed while the offender is under extreme emotional stress induced by serious provocation. Thus, felonious assault and aggravated assault complement murder and voluntary manslaughter, respectively. Simple assault and negligent assault offenses are also defined, complementing involuntary manslaughter and negligent homicide, respectively. The two menacing offenses are defined as causing another to believe the offender will harm him or his family or his property, and the distinction between the two is based on the degree of threatened harm.

## HOMICIDE

## § 2903.01 Aggravated murder.

(A) No person shall purposely, and with prior calculation and design, cause the death of another.

(B) No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

(C) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

(D) No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. In no case shall a jury in an aggravated murder case be instructed in such a manner that it may believe that a person who commits or attempts to commit any offense listed in division (B) of this section is to be conclusively inferred, because he engaged in a common design with others to commit the offense by force and violence or because the offense and the manner of its commission would be likely to produce death, to have intended to cause the death of any person who is killed during the commission of, attempt to commit, or flight from the commission of or attempt to commit, the offense. If a jury in an aggravated murder case is instructed that a person who commits or attempts to commit any offense listed in division (B) of this section may be inferred, because he engaged in a common design with others to commit the offense by force or violence or because the offense and the manner of its commission would be likely to produce death, to have intended to cause the death of any person who is killed during the commission of, attempt to commit, or flight from the commission of or attempt to commit the offense, the jury also shall be instructed that the inference is nonconclusive, that the inference may be considered in determining intent, that it is to consider all evidence introduced by the prosecution to indicate the person's intent and by the person to indicate his

§ 2903.01                      CRIMES—PROCEDURE                      24

lack of intent in determining whether the person specifically intended to cause the death of the person killed, and that the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 1. Eff 10-19-81.

Not analogous to former RC § 2903.01 (GC § 12423-1; 109 v 45; 121 v 557 (572); Bureau of Code Revision, 10-1-53; 126 v 114), repealed 134 v H 511, § 2, eff 1-1-74.

**Committee Comment to H 511**

The first part of this section restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary. By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment. See, *State v. Schaffer*, 133 Ohio App. 125, 17 O.O. 2d 114, 177 N.E. 2d 534 (Lawrence Co. App., 1960). The section employs the phrase, "prior calculation and design," to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation.

The second part of the section defines the offense of felony murder. The requirement that the killing must be purposeful is retained. See, *Turk v. State*, 48 Ohio App. 489, 2 O.O. 96, 194 N.E. 425 (Cuyahoga Co. App., 1934), aff'd 129 Ohio St. 245, 194 N.E. 453. The section expands upon the former offense of felony murder by listing kidnapping and escape, in addition to rape, arson, robbery and burglary, as the felonies during which a purposeful killing constitutes aggravated murder.

Aggravated murder is a capital offense, for which the penalty may be death or imprisonment for life. In addition, the offender may be fined up to $25,000. If any one of seven aggravating circumstances is specified in the indictment and proved beyond a reasonable doubt, and none of three mitigating circumstances is established by a preponderance of the evidence, the penalty is death. Otherwise, the penalty is life imprisonment. The penalties, the procedure for determining the penalty to be imposed in a given case, and the lists of aggravating and mitigating circumstances are set forth in sections 2929.02, 2929.03, and 2929.04.

**Transition — capital offenses.**

Persons charged with a capital offense committed prior to January 1, 1974, must be tried under the law as it existed at the time of the offense and, if convicted, sentenced to life imprisonment. If the section defining the offense provides for a lesser penalty under the circumstances of a particular case, then the lesser penalty must be imposed in that case.

Persons committing aggravated murder (the only capital offense in the new code) on and after January 1, 1974, must be charged and tried under the new law and, if convicted, may be subject to the death penalty. See, sections 2903.01, 2929.02 to 2929.04, and 2941.14.

**Cross-References to Related Sections**

Aggravated murder defined as offense of violence, RC § 2901.01(I).

Conviction as bar to inheritance from victim, RC § 2105.19.

Custody of defendant under suspended sentence, RC § 2953.11.

Death defined, RC § 2108.30.

Purpose defined, RC § 2901.22(A).

Standards for community-based corrections programs, RC § 5149.31.

**Ohio Constitution**

Bail for capital offenders, OConst art I, § 9.

**Comparative Legislation**

Aggravated murder:
   18 USC § 1111
   CA—Penal Code § 190.1
   FL—Stat Ann § 782.04
   IL—Ann Stat ch 38 § 8-4
   IN—Code § 35-13-4-1
   KY—Rev Stat Ann § 507.020
   MI—Comp Laws Ann § 750.316
   NY—Penal Law § 125.27
   PA—CSA tit 18 § 2502

**Text Discussion**

Culpability; purpose. 1 Ohio Crim. Prac. & Pro. § 51.3

Elements of offense. 1 Ohio Crim. Prac. & Pro. § 62.1

Guilty plea in aggravated murder cases. 1 Ohio Crim. Prac. & Pro. § 25.6

Penalties and sentencing in capital offense. 1 Ohio Crim. Prac. & Pro. § 51.6c, d

**Forms**

Aggravated murder. 4 OJI § 503.01

Aggravated murder: during specific felony. 4 OJI § 503.01

Sentencing hearing. 4 OJI § 503.01.

Specifications of aggravating circumstances. 4 OJI § 413.45

Statutory charge. 2A Ohio Crim. Prac. & Pro. 8.01

**Research Aids**

Aggravated murder and murder:
   O-Jur3d: Crim L § 1782
   Am-Jur2d: Crim L §§ 24-26

**ALR**

Admissibility of evidence as to other's character or reputation for turbulence on question of self-defense by one charged with assault or homicide. 1 ALR3d 571.

Application of felony murder doctrine where the felony relied upon is an included offense with the homicide. 40 ALR3d 1341.

Causing one, by threat or fright, to leap or fall to his death. 25 ALR2d 1186.

Degree of homicide as affected by accused's religious or occult belief in harmlessness of ceremonial ritualistic acts directly causing fatal injury. 78 ALR3d 1132.

Homicide as affected by lapse of time between injury and death. 60 ALR3d 1323.

Homicide by fright or shock. 47 ALR2d 1072.

Homicide: what constitutes "lying in wait." 89 ALR2d 1140.

*Notice:* For late 1982 legislation (passed Nov. 18 to Dec. 31), see 1983 Legislative Bulletin #1 (in Current Material Binder).

| 4 | 5 | OHIO CODE SUPPLEMENT | § 2905.02 |

den passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:

(1) Cause serious physical harm to another;

(2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code.

(B) Whoever violates this section is guilty of aggravated assault, a felony of the fourth degree. If the deadly weapon used by the offender in violating division (A)(2) of this section was a firearm, as defined in section 2923.11 of the Revised Code, the offender shall be sentenced to a term of actual incarceration of three years and an indefinite term of imprisonment pursuant to division (B) of section 2929.71 of the Revised Code.

*HISTORY: 139 v S 199. Eff 7-1-83.

The effective date of SB 199 is set by § 7 of H 269 (139 v —).

See provisions, § 6 of SB 199 (139 v —) following RC § 2903.11.

**Comment by director, Legislative Service Commission**

Section 2903.12 of the Revised Code is amended by S.B. 199 and also by Am. Sub. H.B. 103 of the 114th General Assembly, effective May 19, 1982. Comparison of these amendments in pursuance of section 1.52 of the Revised Code discloses that they are not irreconcilable, so that they are required by that section to be harmonized to give effect to each amendment.

† Publisher's Note: See Publisher's Note following RC § 2903.03 as to the effect of the 1982 amendments on the Committee Comments to H 511.

**Cross-References to Related Sections**
Mandatory incarceration, RC § 2929.71.

## § 2905.01 Kidnapping.

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

(1) To hold for ransom, or as a shield or hostage;

(2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm to the victim or another;

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against his will;

(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority.

(B) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or

mentally incompetent, by any means, shall knowingly do any of the following, under circumstances which create a substantial risk of serious physical harm to the victim:

(1) Remove another from the place where he is found;

(2) Restrain another of his liberty;

(3) Hold another in a condition of involuntary servitude.

(C) Whoever violates this section is guilty of kidnapping, an aggravated felony of the first degree. If the offender releases the victim in a safe place unharmed, kidnapping is an aggravated felony of the second degree.

*HISTORY: 139 v S 199. Eff 1-5-83.

The effective date of SB 199 (139 v —) is set by § 4 of H 269 (139 v —).

**Cross-References to Related Sections**

Denial of bail on appeal, RC §§ 2949.02, 2953.02.

### CASE NOTES AND OAG

1. (1982) Petitioner's claim is that kidnapping and aggravated robbery are the same offense for double jeopardy purposes. However, each offense has at least one element not in common with the other. Petitioner was charged with a taking of *property* by threat of force in connection with the charges of aggravated robbery. As to the kidnapping count, petitioner was charged with forcibly taking a *person* from one place to another. Accordingly, petitioner's convictions for aggravated robbery and kidnapping do not raise a double jeopardy issue: Floyd v. Marshall, 538 FSupp 381 (N.D.).

2. (1982) The facts required to establish kidnapping under RC § 2905.01(A)(1) or (2) are dissimilar to proof required to establish rape. The rape statute, RC § 2907.-02(A)(1), requires sexual conduct as defined in RC § 2907.-01(A), achieved by the threat of force: Floyd v. Marshall, 538 FSupp 381 (N.D.).

3. (1980) Gross sexual imposition as defined by RC § 2907.05(A)(3) and kidnapping as defined by RC § 2905.01 are not allied offenses of similar import under RC § 2941.25. Kidnapping and gross sexual imposition do not have sufficient similar elements or sufficient common elements or elements corresponding to such a degree that the commission of one offense will result in the commission of the other offense: State v. Moralevitz, 70 OApp2d 20, 24 OO3d 16, 433 NE2d 932.

## § 2905.02 Abduction.

(A) No person, without privilege to do so, shall knowingly do any of the following:

(1) By force or threat, remove another from the place where he is found;

(2) By force or threat, restrain another of his liberty, under circumstances which create a risk of physical harm to the victim, or place him in fear;

(3) Hold another in a condition of involuntary servitude.

first degree murder convictions, or to invalidate the indictment: Vargas v. Metzger, 35 OS2d 116, 64 OO2d 70, 298 NE2d 600.

## [§ 2929.02.1] § 2929.021 [Notice to supreme court of indictment charging aggravated murder: plea.]

(A) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the clerk of the court in which the indictment is filed, within fifteen days after the day on which it is filed, shall file a notice with the supreme court indicating that the indictment was filed. The notice shall be in the form prescribed by the clerk of the supreme court and shall contain, for each charge of aggravated murder with a specification, at least the following information pertaining to the charge:

(1) The name of the person charged in the indictment or count in the indictment with aggravated murder with a specification;

(2) The docket number or numbers of the case or cases arising out of the charge, if available;

(3) The court in which the case or cases will be heard;

(4) The date on which the indictment was filed.

(B) If the indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code and if the defendant pleads guilty or no contest to any offense in the case or if the indictment or any count in the indictment is dismissed, the clerk of the court in which the plea is entered or the indictment or count is dismissed shall file a notice with the supreme court indicating what action was taken in the case. The notice shall be filed within fifteen days after the plea is entered or the indictment or count is dismissed, shall be in the form prescribed by the clerk of the supreme court, and shall contain at least the following information:

(1) The name of the person who entered the guilty or no contest plea or who is named in the indictment or count that is dismissed;

(2) The docket numbers of the cases in which the guilty or no contest plea is entered or in which the indictment or count is dismissed;

(3) The sentence imposed on the offender in each case.

HISTORY: 139 v S 1. Eff 10-19-81.

**Cross-References to Related Sections**

Aggravated murder, RC § 2903.01.

## [§ 2929.02.2] § 2929.022 [Determination of aggravating circumstance.]

(A) If an indictment or count in an indictment charging a defendant with aggravated murder contains a specification of the aggravating circumstance of a prior conviction listed in division (A)(5) of section 2929.04 of the Revised Code, the defendant may elect to have the panel of three judges, if he waives trial by jury, or the trial judge, if he is tried by jury, determine the existence of that aggravating circumstance at the sentencing hearing held pursuant to divisions (C) and (D) of section 2929.03 of the Revised Code.

(1) If the defendant does not elect to have the existence of the aggravating circumstance determined at the sentencing hearing, the defendant shall be tried on the charge of aggravated murder, on the specification of the aggravating circumstance of a prior conviction listed in division (A)(5) of section 2929.04 of the Revised Code, and on any other specifications of an aggravating circumstance listed in division (A) of section 2929.04 of the Revised Code in a single trial as in any other criminal case in which a person is charged with aggravated murder and specifications.

(2) If the defendant does elect to have the existence of the aggravating circumstance of a prior conviction listed in division (A)(5) of section 2929.04 of the Revised Code determined at the sentencing hearing, then, following a verdict of guilty of the charge of aggravated murder, the panel of three judges or the trial judge shall:

(a) Hold a sentencing hearing pursuant to division (B) of this section, unless required to do otherwise under division (A)(2)(b) of this section;

(b) If the offender raises the matter of age at trial pursuant to section 2929.023 [2929.2.3] of the Revised Code and is not found at trial to have been eighteen years of age or older at the time of the commission of the offense, conduct a hearing to determine if the specification of the aggravating circumstance of a prior conviction listed in division (A)(5) of section 2929.04 of the Revised Code is proven beyond a reasonable doubt. After conducting the hearing, the panel or judge shall proceed as follows:

(i) If that aggravating circumstance is proven beyond a reasonable doubt or if the defendant at trial was convicted of any other specification of an aggravating circumstance, the panel or judge shall impose sentence according to division (E) of section 2929.03 of the Revised Code;

(ii) If that aggravating circumstance is not proven beyond a reasonable doubt and the defendant at trial was not convicted of any other specification of an aggravating circumstance, the panel or judge shall impose sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

(B) At the sentencing hearing, the panel of judges, if the defendant was tried by a panel of three judges, or the trial judge, if the defendant was tried by jury, shall, when required pursuant to division (A)(2) of this section, first determine if the specification of the aggravating circumstance of a prior conviction

listed in division (A)(5) of section 2929.04 of the Revised Code is proven beyond a reasonable doubt. If the panel of judges or the trial judge determines that the specification of the aggravating circumstance of a prior conviction listed in division (A)(5) of section 2929.04 of the Revised Code is proven beyond a reasonable doubt or if they do not determine that the specification is proven beyond a reasonable doubt but the defendant at trial was convicted of a specification of any other aggravating circumstance listed in division (A) of section 2929.04 of the Revised Code, the panel of judges or the trial judge and trial jury shall impose sentence on the offender pursuant to division (D) of section 2929.03 and section 2929.04 of the Revised Code. If the panel of judges or the trial judge does not determine that the specification of the aggravating circumstance of a prior conviction listed in division (A)(5) of section 2929.04 of the Revised Code is proven beyond a reasonable doubt and the defendant at trial was not convicted of any other specification of an aggravating circumstance listed in division (A) of section 2929.04 of the Revised Code, the panel of judges or the trial judge shall terminate the sentencing hearing and impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

HISTORY: 139 v S 1. Eff 10-19-81.

**Forms**

Sentencing hearing. 4 OJI § 503.01.
Specifications of aggravating circumstance. 4 OJI § 413.45.

**Cross-References to Related Sections**

Aggravated murder, RC § 2903.01.
Reasonable doubt defined, RC § 2901.05.

### [§ 2929.02.3] § 2929.023 [Defendant may raise matter of age.]

A person charged with aggravated murder and one or more specifications of an aggravating circumstance may, at trial, raise the matter of his age at the time of the alleged commission of the offense and may present evidence at trial that he was not eighteen years of age or older at the time of the alleged commission of the offense. The burdens of raising the matter of age, and of going forward with the evidence relating to the matter of age, are upon the defendant. After a defendant has raised the matter of age at trial, the prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the defendant was eighteen years of age or older at the time of the alleged commission of the offense.

HISTORY: 139 v S 1. Eff 10-19-81.

**Cross-References to Related Sections**

Aggravated murder, RC § 2903.01.
Reasonable doubt, RC § 2901.05.

### [§ 2929.02.4] § 2929.024 [Investigation services and experts for indigent.]

If the court determines that the defendant is indigent and that investigation services, experts, or other services are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing, the court shall authorize the defendant's counsel to obtain the necessary services for the defendant, and shall order that payment of the fees and expenses for the necessary services be made in the same manner that payment for appointed counsel is made pursuant to Chapter 120. of the Revised Code. If the court determines that the necessary services had to be obtained prior to court authorization for payment of the fees and expenses for the necessary services, the court may, after the services have been obtained, authorize the defendant's counsel to obtain the necessary services and order that payment of the fees and expenses for the necessary services be made as provided in this section.

HISTORY: 139 v S 1. Eff 10-19-81.

**Cross-References to Related Sections**

Aggravated murder, RC § 2903.01.

### § 2929.03  Imposing sentence for a capital offense.

(A) If the indictment or count in the indictment charging aggravated murder does not contain one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge of aggravated murder, the trial court shall impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

(B) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the verdict shall separately state whether the accused is found guilty or not guilty of the principal charge and, if guilty of the principal charge, whether the offender was eighteen years of age or older at the time of the commission of the offense, if the matter of age was raised by the offender pursuant to section 2929.023 [2929.02.3] of the Revised Code, and whether the offender is guilty or not guilty of each specification. The jury shall be instructed on its duties in this regard, which shall include an instruction that a specification shall be proved beyond a reasonable doubt in order to support a guilty verdict on the specification, but such instruction shall not mention the penalty which may be the consequence of a guilty or not guilty verdict on any charge or specification.

(C)(1) If the indictment or count in the indict-

ment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge but not guilty of each of the specifications, and regardless of whether the offender raised the matter of age pursuant to section 2929.023 [2929.-02.3] of the Revised Code, the trial court shall impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

(2) If the indictment or count in the indictment contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, and if the offender is found guilty of both the charge and one or more of the specifications, the penalty to be imposed on the offender shall be death, life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment, shall be determined pursuant to divisions (D) and (E) of this section, and shall be determined by one of the following:

(a) By the panel of three judges that tried the offender upon his waiver of the right to trial by jury;

(b) By the trial jury and the trial judge, if the offender was tried by jury.

(D)(1) Death may not be imposed as a penalty for aggravated murder if the offender raised the matter of age at trial pursuant to section 2929.023 [2929.02.3] of the Revised Code and was not found at trial to have been eighteen years of age or older at the time of the commission of the offense. When death may be imposed as a penalty for aggravated murder, the court shall proceed under this division. When death may be imposed as a penalty, the court, upon the request of the defendant, shall require a pre-sentence investigation to be made and, upon the request of the defendant, shall require a mental examination to be made, and shall require reports of the investigation and of any mental examination submitted to the court, pursuant to section 2947.06 of the Revised Code. No statement made or information provided by a defendant in a mental examination or proceeding conducted pursuant to this division shall be disclosed to any person, except as provided in this division, or be used in evidence against the defendant on the issue of guilt in any retrial. A pre-sentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or his counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division and furnished to it and any evidence raised at trial that is relevant to the aggravating circumstances the of-

fender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death, shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender. The defendant shall be given great latitude in the presentation of evidence of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code and of any other factors in mitigation of the imposition of the sentence of death. If the offender chooses to make a statement, he is subject to cross-examination only if he consents to make the statement under oath or affirmation.

The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.

(2) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section.

§ 2929.03                     CRIMES—PROCEDURE                              248

(3) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section, if, after receiving pursuant to division (D)(2) of this section the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, or if the panel of three judges unanimously finds, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender. Absent such a finding by the court or panel, the court or the panel shall impose one of the following sentences on the offender:

(a) Life imprisonment with parole eligibility after serving twenty full years of imprisonment;

(b) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(E) If the offender raised the matter of age at trial pursuant to section 2929.023 [2929.02.3] of the Revised Code, was convicted of aggravated murder and one or more specifications of an aggravating circumstance listed in division (A) of section 2929.04 of the Revised Code, and was not found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court or the panel of three judges shall not impose a sentence of death on the offender. Instead, the court or panel shall impose one of the following sentences on the offender:

(1) Life imprisonment with parole eligibility after serving twenty full years of imprisonment;

(2) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(F) The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific findings of which of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code it found to exist, what other mitigating factors it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors. The court or panel shall file the opinion required to be prepared by this division with the clerk of the appropriate court of appeals and with the clerk of the supreme court within fifteen days after the court or panel imposes sentence. The judgment in a case in which a sentencing hearing is held pursuant to this section is not final until the opinion is filed.

(G) Whenever the court or a panel of three judges imposes sentence of death, the clerk of the court in which the judgment is rendered shall deliver the entire record in the case to the appellate court.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 1. Eff 10-19-81.

**Committee Comment to H 511**

This section specifies the procedure to be followed in determining whether the sentence for aggravated murder is to be life imprisonment or death.

The death penalty is precluded unless the indictment contains a specification of one or more of the aggravating circumstances listed in section 2929.04. In the absence of such specifications, life imprisonment must be imposed. If the indictment specifies an aggravating circumstance, it must be proved beyond a reasonable doubt, and the jury must return separate verdicts on the charge and specification. If the verdict is guilty of the charge but not guilty of the specification, the penalty is life imprisonment.

If the verdict is guilty of both the charge and the specification, the jury is discharged and the trial begins a second phase designed to determine the presence or absence of one or more mitigating circumstances. If one of the three mitigating factors listed in section 2929.04 is established by a preponderance of the evidence, the penalty is life imprisonment. If none of such factors is established, the penalty is death. The procedure is essentially the same in the first phase of an aggravated murder trial whether the case is tried by a jury or by a three-judge panel on a waiver of a jury. The burden of proof still rests on the state, the same rules of evidence apply, the specification must be proved beyond a reasonable doubt, and the panel's verdict must be unanimous.

With respect to the mitigation phase of the trial, the procedure is somewhat different depending on whether the case is tried by a jury or a three-judge panel. A jury tries only the charge and specification, and the judge in a jury trial determines mitigation. If a jury is waived, the same three-judge panel tries not only the charge and specification, but also determines the presence or absence of mitigation. Also, the statute expressly provides that the panel's finding that no mitigating circumstance is established must be unanimous, or the death penalty is precluded. In other respects, the procedure for determining mitigation is similar whether the trial judge or a three-judge panel tries the issue. Mitigation must be established by a preponderance of the evidence, and the rules of evidence also apply in this phase of the trial (the requirement for a pre-sentence investigation and report, the requirement for a psychiatric examination and report, and the provision for an unsworn statement by the defendant, represent partial exceptions to the rules of evidence).

**Cross-References to Related Sections**

Aggravated murder, RC § 2903.01.
Execution of death sentence, RC §§ 2949.21-2949.31.
Parole eligibility, RC § 2967.13.
Penalties for murder, RC § 2929.02.
Reasonable doubt, RC § 2901.05.
Time of execution in capital cases, RC § 2947.08.

6. (1977) The proceeding established in RC §§ 2929.03 and 2929.04 for imposing sentence for a capital offense is not an adversary proceeding and, under the provisions of RC § 2929.03(D) and (E), and RC § 2929.04(B), neither the defendant nor the prosecution is required by statute to offer testimony or other evidence of mitigating circumstances: State v. Downs, 51 OS2d 47, 5 OO3d 30, 364 NE2d 1140.

7. (1977) Under the provisions of RC § 2929.03(D) and (E), and RC § 2929.04(B), the court is required to order a pre-sentence investigation and a psychiatric examination to be made and to order reports of the investigation and examination to be submitted to the court pursuant to RC § 2947.06: State v. Downs, 51 OS2d 47, 5 OO3d 30, 364 NE2d 1140.

8. (1977) Under the provisions of RC § 2929.03(D) and (E), the court must consider the reports which it is required to have prepared and submitted and any other reports, testimony or other evidence submitted, statements of the offender, whether under oath or not, or any other testimony or evidence submitted on behalf of the defendant, testimony or other evidence submitted by the prosecution, evidence submitted during the trial and arguments of counsel submitted to the court pursuant to division (D) of RC § 2929.03; and after consideration of all these items with regard to mitigating circumstances, the court is required to determine whether any mitigating circumstance listed in division (B) of RC § 2929.04 is established by a preponderance of the evidence: State v. Downs, 51 OS2d 47, 5 OO3d 30, 364 NE2d 1140.

9. (1977) Under the provisions of RC § 2929.03, if the court finds that none of the mitigating circumstances listed in division (B) of RC § 2929.04 is established by a preponderance of the evidence, then it shall impose the sentence of death on the offender; otherwise, it shall impose a sentence of life imprisonment on the offender (RC § 2929.03(E)): State v. Downs, 51 OS2d 47, 5 OO3d 30, 364 NE2d 1140.

10. (1977) The provision of RC § 2929.03(E) that "if the court finds *** that none of the mitigating circumstances listed in division (B) of RC § 2929.04 is established by a preponderance of the evidence, it shall impose the sentence of death on the offender," requires that the defendant bear the risk of nonpersuasion during the mitigation hearing, but does not impose an unconstitutional burden upon a defendant which would render the Ohio statutory framework for the imposition of capital punishment unconstitutional: State v. Downs, 51 OS2d 47, 5 OO3d 30, 364 NE2d 1140.

11. (1977) The provision of RC § 2929.03(E) requiring the court to impose the sentence of death on the offender "if the court finds, or if the panel of three judges unanimously finds that none of the mitigating circumstances listed in division (B) of RC § 2929.04 is established by a preponderance of the evidence ***" does not make the lack of mitigating factors an additional and constitutionally mandated element of a capital offense, and the state is not constitutionally required to prove the lack of such mitigating factors beyond a reasonable doubt: State v. Downs, 51 OS2d 47, 5 OO3d 30, 364 NE2d 1140.

12. (1977) In conducting a mitigation hearing, under the provisions of RC § 2929.03(D), a court, having appointed a psychiatrist and a psychologist pursuant to RC § 2947.06, is not constitutionally required to appoint an additional psychiatrist of the defendant's choosing at state expense: State v. Downs, 51 OS2d 47, 5 OO3d 30, 364 NE2d 1140.

13. (1977) Revised Code § 2929.03 is not unconstitutional in providing that the three-judge panel not only try the charges and specifications but also determine the sentence: State v. Miller, 49 OS2d 198, 3 OO3d 321, 361 NE2d 419.

14. (1976) A defendant is not coerced or impelled to waive his constitutional right to jury trial by RC § 2929.03(C)(1), (2) and (E), under the provisions of which an offender who waives a jury trial need persuade only one member of the three-judge panel at the mitigation hearing to avoid imposition of the death penalty: State v. Bell, 48 OS2d 270, 2 OO3d 427, 358 NE2d 556.

15. (1975) In the deliberation of a verdict concerning a charge of aggravated murder with specifications, the possible imposition of the death penalty is not within the province of the jury: State v. Strub, 48 OApp2d 57, 2 OO3d 40, 355 NE2d 819.

16. (1975) Since the potential imposition of the death penalty in the trial of an aggravated murder charge with specifications is not within the province of the jury, it is improper, upon voir dire, to question prospective jurors relative to such penalty: State v. Strub, 48 OApp2d 57, 2 OO3d 40, 355 NE2d 819.

## § 2929.04 Criteria for imposing death or imprisonment for a capital offense.

(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

(1) The offense was the assassination of the president of the United States or person in line of succession to the presidency, or of the governor or lieutenant governor of this state, or of the president-elect or vice president-elect of the United States, or of the governor-elect or lieutenant governor-elect of this state, or of a candidate for any of the foregoing offices. For purposes of this division, a person is a candidate if he has been nominated for election according to law, or if he has filed a petition or petitions according to law to have his name placed on the ballot in a primary or general election, or if he campaigns as a write-in candidate in a primary or general election.

(2) The offense was committed for hire.

(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.

(4) The offense was committed while the offender was a prisoner in a detention facility as defined in section 2921.01 of the Revised Code.

(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

(6) The victim of the offense was a peace officer, as defined in section 2935.01 of the Revised Code,

whom the offender had reasonable cause to know or knew to be such, and either the victim, at the time of the commission of the offense, was engaged in his duties, or it was the offender's specific purpose to kill a peace officer.

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for his testimony in any criminal proceeding.

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 [2929.02.3] of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

(1) Whether the victim of the offense induced or facilitated it;

(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

(4) The youth of the offender;

(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(C) The defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death.

The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender, but shall be weighed pursuant to divisions (D)(2) and (3) of section 2929.03 of the Revised Code by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 1. Eff 10-19-81.

### Committee Comment to H 511

This section provides that the death penalty for aggravated murder is precluded unless one of seven listed aggravating circumstances is specified in the indictment and proved beyond a reasonable doubt. The seven aggravating circumstances deal with: (1) assassination of the President, Vice President, Governor, Lieutenant Governor, or a person who has been elected to or is a candidate for any such office; (2) murder for hire; (3) murder to escape accountability for another crime; (4) murder by a prisoner; (5) repeat murder or mass murder; (6) killing a law enforcement officer; and (7) felony murder.

The section also provides that even if one or more aggravating circumstances is proved beyond a reasonable doubt, the death penalty for aggravated murder is still precluded if the trial court finds that any of three mitigating circumstances is established by a preponderance of the evidence. The mitigating circumstances are: (1) the victim of the offense induced or facilitated it; (2) the offender acted under duress, coercion, or strong provocation; and (3) although the defense of insanity could not be or was not established, the offense was chiefly the product of the offender's mental deficiency or psychosis (psychosis is mental illness, as distinguished from a behavioral disorder. Primarily psychopaths have a behavioral disorder.)

### Transition—capital offenses.

Persons charged with a capital offense committed prior to January 1, 1974, must be tried under the law as it existed at the time of the offense and, if convicted, sentenced to life imprisonment. If the section defining the offense provides for a lesser penalty under the circumstances of a particular case, then the lesser penalty must be imposed in that case.

Persons committing aggravated murder (the only capital offense in the new code) on and after January 1, 1974, must be charged and tried under the new law and, if convicted, may be subject to the death penalty. See, sections 2903.01, 2929.02 to 2929.04, and 2941.14.

### Transition—offenses other than capital offenses.

Persons charged with an offense, other than a capital offense, committed prior to January 1, 1974, must be

tried under the law as it existed at the time of the offense. Any such person convicted *and* sentenced prior to January 1, 1974, must be sentenced under the penalty provided in the law under which he was tried. Any such person either convicted or sentenced *on or after* January 1, 1974, must be sentenced under the lesser of the penalties provided for the offense for which he was tried or for the substantially equivalent offense in the new code. If there is no substantially equivalent offense in the new code, sentence must be imposed under the old law.

### Cross-References to Related Sections

Aggravated murder, RC § 2903.01.
Allegations in homicide indictment, RC § 2941.14.
Reasonable doubt, RC § 2901.05.
Sentencing for capital offense, RC § 2929.03.

### Ohio Constitution

Cruel and unusual punishment, OConst art I, § 9.

### Comparative Legislation

Death penalty:
18 USC § 3148
  CA—Penal Code § 1105
  FL—Stat Ann § 775.081
  IL—Ann Stat ch 38 § 119-5
  IN—Code § 35-50-2-9
  KY—Rev Stat Ann § 532.075
  MI—Comp Laws Ann § 750.91
  NY—Penal Law §§ 60.05, 60.06
  PA—CSA tit 18 § 1102; 61 § 2121

### Text Discussion

Guilty or no contest plea to capital offense. 1 Ohio Crim. Prac. & Pro. § 25.6
Penalties and sentencing in capital offenses. 1 Ohio Crim. Prac. & Pro. § 51.6c, e
Verdict; penalty. 1 Ohio Crim. Prac. & Pro. § 41.3

### Forms

Sentencing hearing. 4 OJI § 503.01.
Specifications of aggravating circumstance. 4 OJI § 413.45.

### Research Aids

Criteria for imposing death or imprisonment for a capital offense:
  **O-Jur3d:** Crim L §§ 1843—1845
  **Am-Jur2d:** Crim L §§ 609—612

### Law Review

Capital punishment in Ohio: the constitutionality of the death penalty statute. Comment. 3 UDayLRev 169 (1978).
Capital punishment statutes after *Furman* [408 US 238 (1972)]. Note. 35 OSLJ 651 (1974).
The constitutionality of Ohio's death penalty. Comment. 38 OSLJ 617 (1977).
Constitutional law—cruel and unusual punishments—the imposition and carrying out of the death penalty under current discretionary sentencing statutes constitutes cruel and unusual punishment in violation of the eighth and fourteenth amendments. *Furman v. Georgia,* 408 US 238 (1972). Case note. 42 CinLRev 172 (1973).

Criminal law—constitutional law—death penalty—evidence—intent of an aider and abettor to commit felony murder may be presumed from a conspiracy to commit the accompanying felony. *State v. Lockett,* 49 OS2d 48 (1976). Case note. 46 CinLRev 630 (1977).
Criminal law—death penalty—cruel and unusual punishment—individualized sentencing determination. *Lockett v. Ohio,* 438 US 586 (1978). Case note. 12 AkronLRev 360 (1978).
The death penalty and guilty pleas: Ohio rule 11 (C)(3)—a constitutional answer to a capital defendant's dilemma. Comment. 5 ONorthLRev 687 (1978).
Legislative response to *Furman v. Georgia* [408 US 238 (1972)]—Ohio restores the death penalty. Comment. 8 AkronLRev 149 (1974).
The response to *Furman:* can legislators breathe life back into death? Comment. 23 ClevStLRev 172 (1974).
*Witherspoon* [391 US 510 (1968)] revisited: exploring the tension between *Witherspoon* and *Furman.* Welsh S. White. 45 CinLRev 19 (1976).

### CASE NOTES AND OAG

[DECISIONS PRIOR TO MAJOR AMENDMENT, 139 v S 1, eff 10-19-81]

INDEX

Constitutionality, 1, 21
Effect of declaration of unconstitutionality, 3
Mitigating factors—
  Burden of proof, 10, 13
  Construction, 12, 15
  Duress or coercion, 8, 9, 20
  Limitations, 1
  Psychosis or mental deficiency, 4, 5, 7, 14, 16-18, 22
  Review by supreme court, 11
Specifications—
  Discretion of trial judge, 6
  Prior convictions, 2, 6
  Submission to jury, 19

1. (1978) The Ohio death penalty statute violates the eighth and fourteenth amendments in that it limits the discretion of the sentencing court by precluding it from considering any mitigating factors concerning the character of the offender or the nature of the offense other than those factors specifically enumerated in the statute: Lockett v. Ohio, 438 US 586, 57 LEd2d 973, 98 SCt 2954, 9 OO3d 26; Bell v. Ohio, 438 US 637, 57 LEd2d 1010, 98 SCt 2977, 9 OO3d 52 (reversing 49 OS2d 48).

2. (1980) Where it is necessary to charge a prior offense in the indictment for purposes of enhanced punishment, as a matter of state law the prior offense becomes an element of the second offense, and, therefore, it is not reversible error to read to the jury an indictment which contains the averment of a prior conviction or to place such indictment in the jury's possession during its deliberations. The admission of petitioner's prior conviction in a single-stage trial conformed with Ohio's rules of evidence and criminal procedure: Lonberger v. Jago, 635 F2d 1189 (6thCir).

3. (1978) Defendant's sentence reduced to life imprisonment in accord with United States Supreme Court decisions on the Ohio death penalty: State v. Bridgeman, 55 OS2d 261, 9 OO3d 401, 381 NE2d 184.

4. (1978) Revised Code § 2929.04(B)(3) is not unconstitutionally vague: State v. Black, 54 OS2d 304, 8 OO3d 296, 376 NE2d 948.

5. (1978) Sexual psychopathy is not the equivalent of

elements of the crime of murder in the first degree for purposely and wilfully killing a policeman: State v. Ross, 92 App 29, 49 OO 196, 108 NE2d 77.

4. Where officers under the direction of their superiors had been sent to search for the participant in a robbery, and in doing so entered the cottage where a policeman met his death, the jury was justified in concluding that the officer was in the discharge of his duties when killed, within the scope of this section: State v. Dingledine, 14 OO 339 (App) [appeal dismissed, 135 OS 251].

5. Where one of several persons arming themselves with firearms and conspiring to resist sheriff kills sheriff while in discharge of duties, all conspirators are guilty of first degree murder: Rails v. State, 43 App 129, 182 NE 691, 35 OLR 80.

## § 2929.05 [Appellate review of death sentence.]

(A) Whenever sentence of death is imposed pursuant to sections 2929.03 and 2929.04 of the Revised Code, the court of appeals and the supreme court shall upon appeal review the sentence of death at the same time that they review the other issues in the case. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors. The court of appeals or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case.

Any court of appeals that reviews a case in which the sentence of death is imposed shall file a separate opinion as to its findings in the case with the clerk of the supreme court. The opinion shall be filed within fifteen days after the court issues its opinion and shall contain whatever information is required by the clerk of the supreme court.

(B) The court of appeals and the supreme court shall give priority over all other cases to the review of judgments in which the sentence of death is imposed, and, except as otherwise provided in this section, shall conduct the review in accordance with the Appellate Rules.

(C) Whenever sentence of death is imposed pursuant to section 2929.022 [2929.02.2] or 2929.03 of the Revised Code, the court of common pleas that sentenced the offender shall, upon motion of the offender and after conducting a hearing on the motion, vacate the sentence if all of the following apply:

(1) The offender alleges in the motion and presents evidence at the hearing that he was not eighteen years of age or older at the time of the commission of the aggravated murder for which he was sentenced;

(2) The offender did not present evidence at trial pursuant to section 2929.023 [2929.02.3] of the Revised Code that he was not eighteen years of age or older at the time of the commission of the aggravated murder for which he was sentenced;

(3) The motion was filed at any time after the sentence was imposed in the case and prior to execution of the sentence;

(4) At the hearing conducted on the motion, the prosecution does not prove beyond a reasonable doubt that the offender was eighteen years of age or older at the time of the commission of the aggravated murder for which he was sentenced.

HISTORY: 139 v S 1. Eff 10-19-81.

Cross-References to Related Sections
Reasonable doubt, RC § 2901.05.

## § 2929.06 [Resentencing hearing after vacation of death sentence.]

If the sentence of death that is imposed upon any offender is vacated upon appeal because the court of appeals or the supreme court, in cases in which the supreme court reviews the sentence upon appeal, could not affirm the sentence of death under the standards imposed by section 2929.05 of the Revised Code, is vacated upon appeal for the sole reason that the statutory procedure for imposing the sentence of death that is set forth in sections 2929.03 and 2929.04 of the Revised Code is unconstitutional, or is vacated pursuant to division (C) of section 2929.05 of the Revised Code, the trial court that sentenced the offender shall conduct a hearing to resentence the offender. At the resentencing hearing, the court shall sentence the offender to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

HISTORY: 139 v S 1. Eff 10-19-81.

Cross-References to Related Sections
Parole eligibility, RC § 2967.13.

§ 2935.05

a person who interferes with the detention of a suspected shoplifter: State v. Griffin, 54 OMisc 52, 6 OO3d 455, 376 NE2d 1364 (MC).

8. (1968) A merchant's employee who is a security officer of one establishment can exercise the right of detention under RC § 2935.04.1 when a person is observed taking merchandise from another mercantile establishment: State v. Stone, 16 OMisc 161, 45 OO2d 123, 241 NE2d 302 (MC).

9. (1974) A private investigator may not arrest a person for the commission of a misdemeanor, except where the investigator is employed by a merchant and has probable cause to believe that the person arrested is guilty of shoplifting: OAG No.74-041.

## § 2935.05  Affidavit filed in case of arrest without warrant.

When a person named in section 2935.03 of the Revised Code has arrested a person without a warrant, he shall, without unnecessary delay, take the person arrested before a court or magistrate having jurisdiction of the offense, and shall file or cause to be filed an affidavit describing the offense for which the person was arrested. Such affidavit shall be filed either with the court or magistrate, or with the prosecuting attorney or other attorney charged by law with prosecution of crimes before such court or magistrate and if filed with such attorney he shall forthwith file with such court or magistrate a complaint, based on such affidavit.

HISTORY: GC § 13432-3; 113 v 123(140), ch 11, § 3; Bureau of Code Revision (Eff 10-1-53); 128 v 97, Eff 1-1-60.

Cross-References to Related Sections
Issuance of warrant, RC § 2935.08.

Ohio Rules
Arrest without warrant, CrimR 4(E)(2).
See CrimR 4(E)(2), (F); 4.1. As to the relationship between statutes and Rules, see Publisher's Note, page v.

Comparative Legislation
Affidavit for arrest without warrant:
   CA—Penal Code § 1276
   FL—Stat Ann § 901.15
   IL—Ann Stat ch 38 § 109-1
   IN—Code § 34-1-6-2
   KY—Rev Stat Ann § 440.280
   MI—Comp Laws Ann § 764.15
   NY—Crim Pro Law § 140.27
   PA—CSA tit 42, RCr 101, 130

Text Discussion
Grand jury. 1 Ohio Crim. Prac. & Pro. ch 14
Warrantless felony arrest. 1 Ohio Crim. Prac. & Pro. § 4.3

Research Aids
Detention, custody, and disposition of arrested person:
   O-Jur3d: Crim L § 486
   Am-Jur2d: Arrest §§ 76, 77

ALR
Delay in taking before magistrate or denial of opportunity to give bail as supporting action for false imprisonment. 98 ALR2d 966.

## CASE NOTES AND OAG

1. The failure of the police to comply with this section, which provides that when a police officer has arrested a person without a warrant, he must without unnecessary delay take such person before a court or magistrate, does not invalidate a subsequent conviction on proper and sufficient evidence: Cato v. Alvis, 288 F2d 530, 16 OO2d 437 (6th Cir).

2. (1964) The mere detention of an accused for a period of time before he is taken before a magistrate and charged does not constitute an infringement of his constitutional rights so as to invalidate his subsequent conviction: Henderson v. Maxwell, 176 OS 187, 27 OO2d 59, 198 NE2d 456, reopened on other grounds, 426 F2d 150, 27 OMisc 4, 54 OO2d 248.

3. (1977) Where the affidavit required by RC § 2935.05 was not properly docketed by the clerk and included among the original papers filed with the court, the court will assume that the 10-day period prescribed by JuvR 29(A) commenced on the day of the defendant's arrest: In re Tberkldsen, 54 OApp2d 195, 8 OO3d 335, 376 NE2d 970.

4. The duty of a village marshal, designated chief of police, upon an arrest without a warrant is to take the arrested person without unnecessary delay before a court or magistrate having jurisdiction of the offense and there make complaint or cause complaint to be made, stating the offense for which such arrest was made: Vajner v. Orange, 119 App 227, 27 OO2d 98, 191 NE2d 843.

5. Failure to file charges without unreasonable delay as required by this section does not entitle the defendant to file a plea in abatement to dismiss the affidavit: Columbus v. Glenn, 60 OLA 449, 102 NE2d 279 (App).

6. (1974) Criminal Rule 4(E)(2) and RC § 2935.05 impose a duty on an arresting officer to bring a person arrested without a warrant before a magistrate within a reasonable time and without unnecessary delay and to file a complaint describing the offense. It is suggested that a flexible 12-hour rule be adopted, in which time police authorities should either perform this duty or release the arrestee: In re Thompson, 4 OO3d 359 (CP).

7. Under RC § 1907.10.1, a clerk of a county court is authorized to take affidavits, and affidavits may be filed with such a clerk under this section, RC §§ 2935.06 and 2935.09; 1962 OAG No. 3141.

8. After an arresting officer or private person has had a reasonable length of time to prefer charges against one who is arrested without a warrant, there is no authority for holding such person in jail without charges being preferred against him: 1935 OAG No. 4837.

## § 2935.06  Duty of private person making arrest.

A private person who has made an arrest pursuant to section 2935.04 of the Revised Code or detention pursuant to section 2935.041 [2935.04.1] of the Revised Code shall forthwith take the person arrested before the most convenient judge or clerk of a court of record or magistrate, or deliver such person to an officer authorized to execute criminal warrants who shall, without unnecessary delay, take such person before the court or magistrate having jurisdiction of the offense. The officer may, but if he does not, the private person shall file or cause to be filed in such court or before such

magistrate an affidavit stating the offense for which the person was arrested.

HISTORY: GC § 13432-4; 113 v 123(140), ch 11, § 4; Bureau of Code Revision (Eff 10-1-53); 128 v 97. Eff 1-1-60.

**Cross-References to Related Sections**

Bail, RC § 2935.15.

Issuance of warrant, RC § 2935.08.

**Ohio Rules**

Arrest without warrant, CrimR 41(E)(2).

See CrimR 4(E)(2), (F). As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Comparative Legislation**

Duty of private person making arrest:
  CA—Penal Code § 847
  IL—Ann Stat ch 38 §§ 7-6, 107-3
  IN—Code § 35-1-13-1
  KY—Rev Stat Ann § 431.005
  MI—Comp Laws Ann §§ 764.14, 764.16

**Research Aids**

Detention, custody, and disposition of arrested person:
  O-Jur3d: Crim L § 486
  Am-Jur2d: Arrest § 34

**ALR**

Delay in taking before magistrate or denial of opportunity to give bail as supporting action for false imprisonment. 98 ALR2d 966.

## § 2935.07    Person arrested without warrant shall be informed of cause of arrest. (GC § 13432-5)

When an arrest is made without a warrant by an officer, he shall inform the person arrested of such officer's authority to make the arrest and the cause of the arrest.

When an arrest is made by a private person, he shall, before making the arrest, inform the person to be arrested of the intention to arrest him and the cause of the arrest.

When a person is engaged in the commission of a criminal offense, it is not necessary to inform him of the cause of his arrest.

HISTORY: GC § 13432-5; 113 v 123(140), ch 11, § 5; Bureau of Code Revision. Eff 10-1-53.

**Text Discussion**

Lawful arrest. 1 Ohio Crim. Prac. & Pro. § 7.1

**Research Aids**

Procedure in making arrest:
  O-Jur3d: Crim L § 483
  Am-Jur2d: Arrest § 71

### CASE NOTES AND OAG

1. (1975) Where authorized to make an arrest pursuant to RC § 2935.04, a private person, prior to attempting the arrest, must inform the person to be arrested of the intention to arrest, and of the cause of the arrest unless such cause is contemporaneous with the arrest: State v. Rogers, 43 OS2d 28, 72 OO2d 16, 330 NE2d 674.

2. (1972) Where probable cause exists for an arrest by a police officer, the failure to notify the accused of the cause of his arrest does not render the arrest illegal if he is notified of the offense with which he is charged soon after he is taken into custody: State v. Fairbanks, 32 OS2d 34, 61 OO2d 241, 289 NE2d 352.

## § 2935.08    Issuance of warrant.

Upon the filing of an affidavit or complaint as provided in sections 2935.05 or 2935.06 of the Revised Code such judge, clerk, or magistrate shall forthwith issue a warrant to the peace officer making the arrest, or if made by a private person, to the most convenient peace officer who shall receive custody of the person arrested. All further detention and further proceedings shall be pursuant to such affidavit or complaint and warrant.

HISTORY: GC § 13432-6; 113 v 123(140), ch 11, § 6; Bureau of Code Revision (Eff 10-1-53); 128 v 97 (Eff 1-1-60); 129 v 582(748). Eff 1-10-61.

**Ohio Rules**

Issuance of warrant, CrimR 4(A).

See CrimR 4. As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Comparative Legislation**

Issuance of warrant:
  18 USC § 2235
  CA—Penal Code §§ 813 et seq, 1427
  FL—Stat Ann §§ 901.02, 901.08
  IL—Ann Stat ch 38 § 111-2
  IN—Code §§ 35-1-17-3, 35-1-17-4
  KY—Rev Stat Ann § 15.725
  MI—Comp Laws Ann § 764.1
  NY—Crim Pro Law § 120.30
  PA—CSA tit 42, RCr 134

**Research Aids**

Detention, custody, and disposition of arrested person:
  O-Jur3d: Crim L § 486
  Am-Jur2d: Arrest §§ 69—79

### CASE NOTES AND OAG

1. (1972) A warrant of arrest issued, under favor of RC § 2935.08, by the clerk of courts, a nonjudicial officer, does not violate a defendant's rights under the Fourth Amendment of the United States Constitution which guarantees that a warrant will not issue except upon probable cause: State v. Fairbanks, 32 OS2d 34, 61 OO2d 241, 289 NE2d 352.

2. The service upon an accused of a copy of the affidavit containing all the information which a summons is required to contain constitutes a compliance with this section, providing for the issuance of a summons instead of a warrant in misdemeanor case: Lyndhurst v. Beaumont, 84 OLA 103, 170 NE2d 291 (CP).

3. Where a highway patrolman arrests a person found violating a law of this state, for which violation he is authorized to arrest, he must follow the procedure prescribed by RC §§ 2935.03, 2935.05, 2935.08, and 2935.13: 1961 OAG No. 2214.

charged, he shall be taken before the clerk or deputy clerk of the court and let to bail, as provided in sections 2937.22 to 2937.46, inclusive, of the Revised Code, if the magistrate be not available, or if the defendant is arrested in a county other than that of the issuing court or magistrate he shall forthwith be taken before the most convenient magistrate, clerk, or deputy clerk of a court of record, and there let to bail for his appearance before the issuing court or magistrate within a reasonable time to be set by such clerk.

HISTORY: 128 v 97. Eff 1-1-60.

Not analogous to former RC § 2935.13 (GC § 13432-12; 113 v 123(142); Bureau of Code Revision, 10-1-53), repealed 128 v 97(116), § 2, eff 1-1-60; but see in part former RC § 2935.12 (GC § 13432-11; 113 v 123(141); Bureau of Code Revision, 10-1-53).

**Ohio Rules**

Pretrial release in misdemeanor cases, CrimR 46(D).
Proceedings upon arrest, CrimR 4(E).
See CrimR 4(E)(1), (F); 46. As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Research Aids**

Detention, custody, and disposition of arrested person:
O-Jur3d: Crim L § 486
Am-Jur2d: Arrest §§ 75-79

**ALR**

Delay in taking before magistrate or denial of opportunity to give bail as supporting action for false imprisonment. 98 ALR2d 966.

## CASE NOTES AND OAG

1. (1979) Ohio Criminal Rule 4(E) requires the arresting officer to deliver an accused to the initial appearance before the court in the case of all warrantless arrests and in the case of arrests made pursuant to a warrant in the county from which the warrant issued or an adjoining county: OAG No. 79-106.

2. (1979) Where an arrest pursuant to a warrant is made in any county other than the county from which the warrant issued or an adjoining county, and the accused is incarcerated in the jail of the county where the arrest is made, the sheriff of the county of arrest is responsible for making certain that an officer conveys the accused before a court in that county for the bail hearing required by Ohio Criminal Rule 4(E)(1): OAG No. 79-106.

3. (1979) If an accused arrested pursuant to a warrant in a county other than the county from which the warrant is issued or an adjoining county is not released on bail, the political subdivision which has charged the accused with the offense must pick up the accused and deliver him to the court that issued the warrant, without unnecessary delay: OAG No. 79-106.

## § 2935.14   Rights of person arrested.

If the person arrested is unable to offer sufficient bail or, if the offense charged be a felony, he shall, prior to being confined or removed from the county of arrest, as the case may be, be speedily permitted facilities to communicate with an attorney at law of his own choice, or to communicate with at least one relative or other person for the purpose of obtaining counsel (or in cases of misdemeanors or ordinance violation for the purpose of arranging bail). He shall not thereafter be confined or removed from the county or from the situs of initial detention until such attorney has had reasonable opportunity to confer with him privately, or other person to arrange bail, under such security measures as may be necessary under the circumstances.

Whoever, being a police officer in charge of a prisoner, or the custodian of any jail or place of confinement, violates this section shall be fined not less than one hundred nor more than five hundred dollars or imprisoned not more than thirty days, or both.

HISTORY: 128 v 97. Eff 1-1-60.

Not analogous to former RC § 2935.14 (GC § 13432-13; 113 v 123(142); Bureau of Code Revision, 10-1-53), repealed 128 v 97(116), § 2, eff 1-1-60; but see in part former RC § 2935.16 (GC §§ 12856-1, 13432-15; 113 v 123(142); Bureau of Code Revision, 10-1-53) and RC § 2935.17 (GC § 13432-16; 113 v 123(143); Bureau of Code Revision, 10-1-53).

**Cross-References to Related Sections**

Dereliction of duty, RC § 2921.44.
Felony defined, RC § 2901.02.
Interfering with civil rights, RC § 2921.45.
Juveniles taken into custody, RC § 2151.35.2.
Right to counsel, RC § 2935.20.

**Ohio Rules**

Bail, CrimR 46.
Proceedings upon arrest, CrimR 4(E).
See CrimR 4(E), (F); 44, 46. As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Comparative Legislation**

Rights of person arrested:
CA—Penal Code §§ 825, 851.5
FL—Stat Ann §§ 901.07, 901.08
IL—Ann Stat ch 38 § 103-1
IN—Code § 35-1-4-1
KY—RCr 2.14, 3.08
MI—Comp Laws Ann § 764.1
NY—Crim Pro Law § 120.90

**Text Discussion**

Arrest with warrant, procedure upon. 1 Ohio Crim. Prac. & Pro. § 6.3

**Research Aids**

Opportunity to communicate with attorney or other person:
O-Jur3d: Crim L §§ 299, 487
Am-Jur2d: Arrest § 107

What constitutes a refusal:
O-Jur3d: Crim L § 2254

**ALR**

Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.
Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.

Given under my hand this ......... day of
...... , 19.....

A.B., Judge of ...... Court
Clerk of ...... Court

The following form of summons is sufficient:
The State of Ohio, ........... County, ss:
To the Bailiff or ........... Constable:

Whereas there has been filed before me an Affidavit (Complaint) of which the following is a copy (here copy) or the substance (here set forth the substance, omitting formal parts). You are commanded to summon one said E.F. to appear before me on the ...... day of ...... , 19..., at .... o'clock, ..... M., at ...... Building, ..........., Ohio, to answer to said charge.

You will make due return of this summons forthwith upon service.

A.B., Judge of ...... Court
Clerk of ...... Court

HISTORY: 128 v 97. Eff 1-1-60.

Not analogous to former RC § 2935.18 (GC § 13432-17; 113 v 123(143); Bureau of Code Revision, 10-1-53); repealed 128 v 97(116), § 2, eff 1-1-60; but see former RC § 2935.20 (GC § 13432-19; 113 v 123(143); Bureau of Code Revision, 10-1-53; analogous to former GC §§ 13500, 13501; RS §§ 7137, 7138; S&C 816, 1402; 35 v 87; 36 v 18; 68 v 3).

**Ohio Constitution**

General warrants, OConst art I, § 14.

**Ohio Rules**

Form of warrant or summons, CrimR 4(C).
See CrimR 4(C). As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Comparative Legislation**

Contents of warrant, summons or notice:
CA—Penal Code § 815
FL—Stat Ann § 901.04
IL—Ann Stat ch 38 § 107-11
IN—Code § 35-1-6-2
KY—RCr 2.06, 6.54
MI—Comp Laws Ann § 764.1
NY—Crim Pro Law § 120.10
PA—CSA tit 42, RCr 120

**Text Discussion**

Arrest warrant. 1 Ohio Crim. Prac. & Pro. ch 6

**Forms**

Arrest warrant; felony. 2A Ohio Crim. Prac. & Pro. 2.09
Arrest warrant; upon prosecutor's request. 2A Ohio Crim. Prac. & Pro. 2.10a
Citation; minor misdemeanor. 2A Ohio Crim. Prac. & Pro. 2.01
Prosecutor's request for warrant upon indictment or information. 2A Ohio Crim. Prac. & Pro. 2.10b
Return of summons. 2A Ohio Crim. Prac. & Pro. 2.13
Return of warrant. 2A Ohio Crim. Prac. & Pro. 2.11
Summons. 2A Ohio Crim. Prac. & Pro. 2.12

**Research Aids**

Requisites and sufficiency of warrant:
O-Jur3d: Crim L § 462
Am-Jur2d: Search §§ 73-82

**CASE NOTES AND OAG**

1. (1970) The fact that an arrest warrant is not directed to a specific officer or department as required by RC § 2935.18, will not warrant a motion to quash where the accused is not prejudiced thereby: State v. Sizer, 25 OMisc 245, 54 OO2d 406, 265 NE2d 468 (CP).

§ **2935.19    Form of affidavit.**

An affidavit in the form following is sufficient:
The State of Ohio,
........County, ss:
Before me, A. B., personally came C. D., who being duly sworn according to law, deposes and says that on or about the ......................day of .................. at the county of........, one E. F. (here describe the offense committed as nearly according to the nature thereof as the case will admit, in ordinary and concise language.)
Sworn to and subscribed before me, this........ .... day of ............... , 19 ..

A.B., Judge

HISTORY: GC § 13432-18; 113 v 123(143), ch. 11, § 18; Bureau of Code Revision (Eff 10-1-53); 127 v 1039(1100). Eff 1-1-58.

Analogous to former GC §§ 13497, 13498.

**Ohio Rules**

Complaint, CrimR 3.
See CrimR 3. As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Forms**

Affidavit in support of complaint for arrest warrant or summons. 2A Ohio Crim. Prac. & Pro. 2.08

**Research Aids**

Requisites and sufficiency of complaint or affidavit; authorized forms:
O-Jur3d: Crim L §§ 465, 730
Am-Jur2d: Affi §§ 11-19

**CASE NOTES AND OAG**

1. The fact that the charge in the indictment does not conform to that originally made in the affidavit does not affect the validity of the conviction: Stebelton v. Haskins, 177 OS 52, 29 OO2d 76, 201 NE2d 884.

2. No affidavit charging the violation of a municipal ordinance shall be held invalid for the reason that it fails to negative any exception, excuse or proviso contained in the ordinance creating or defining the offense: Strongsville v. McPhee, 142 OS 534, 27 OO 466, 53 NE2d 522.

3. An affidavit charging a crime must contain allegations of sufficient facts to bring the charge within the language of the statute under which prosecution is sought: Noble v. State, 11 App 495, 31 OCA 470.

§ **2935.20    Right to counsel.**

After the arrest, detention, or any other taking into custody of a person, with or without a warrant, such person shall be permitted forthwith facilities to communicate with an attorney at law of his choice who is entitled to practice in the courts of this state, or to communicate with any other person of his

choice for the purpose of obtaining counsel. Such communication may be made by a reasonable number of telephone calls or in any other reasonable manner. Such person shall have a right to be visited immediately by any attorney at law so obtained who is entitled to practice in the courts of this state, and to consult with him privately. No officer or any other agent of this state shall prevent, attempt to prevent, or advise such person against the communication, visit, or consultation provided for by this section.

Whoever violates this section shall be fined not less than twenty-five nor more than one hundred dollars or imprisoned not more than thirty days, or both.

HISTORY: 131 v 677. Eff 11-1-65.

Not analogous to former RC § 2935.20 (GC § 13432-19; 113 v 123(143); Bureau of Code Revision, 10-1-53), repealed 128 v 97(116), § 2, eff 1-1-60.

### Cross-References to Related Sections

Dereliction of duty, RC § 2921.44.
Interfering with civil rights, RC § 2921.45.
Rights of persons arrested, RC § 2935.14.

### Ohio Constitution

Right to counsel, OConst art I, § 10.

### Ohio Rules

See CrimR 4(E), 44.

### Comparative Legislation

Right to counsel:
18 USC § 3006A
CA—Penal Code § 825
FL—Stat Ann § 901.24
IL—Ann Stat ch 38 § 103-1
IN—Code § 35-1-7-3
KY—RCr 2.14
MI—Comp Laws Ann § 766.3
NY—Crim Pro Law § 170.10
PA—Const Art I, § 9

### Research Aids

Right to counsel:
O-Jur3d: Crim L §§ 299, 487, 2254
Am-Jur2d: Crim L § 732 et seq

### ALR

Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.
Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.
Representation by unlicensed counsel as compliance with constitutional right of accused to counsel. 68 ALR2d 1141.
Scope and extent, and remedy or sanction for infringement, of accused's right to communicate with his attorney. 5 ALR3d 1360.

### Law Review

State v. Sargent [41 OS2d 85 (1975)]: constricting the right to counsel. Melvin S. Narol. 2 ONorthLRev 811 (1975).

## CASE NOTES AND OAG

1. (1978) By failing to file a timely motion to suppress, defendant waived any error arising from the denial of his right to make a phone call after his arrest: State v. Moody, 55 OS2d 64, 9 OO3d 71, 377 NE2d 1008.

2. (1975) A person accused of driving while intoxicated "refuses" to take a blood-alcohol test where the attending law enforcement officers have complied with RC §§ 2935.14 and 2935.20, and the accused continues to withhold his consent to submit to the test: McNulty v. Curry, 42 OS2d 341, 71 OO2d 317, 328 NE2d 798.

3. (1975) Where a defendant who is charged with operating a vehicle while under the influence of alcohol (RC § 4511.19) is allowed to communicate with his attorney by telephone pursuant to RC § 2935.20, and when his conduct is observed during that communication with his knowledge and without complaint or a request for privacy, testimony offered concerning such conduct does not deprive the defendant of the effective assistance of counsel: State v. Sargent, 41 OS2d 85, 70 OO2d 169, 322 NE2d 634.

4. (1979) A request to exercise the statutory right to counsel pursuant to RC § 2935.14 and RC § 2935.20 prior to taking a designated chemical sobriety test in and of itself does not constitute a refusal within the meaning of RC § 4511.19.1: Snavely v. Dollison, 61 OApp2d 140, 15 OO3d 244, 400 NE2d 415.

5. (1978) Where a police officer extends ample courtesies to a plaintiff accused of driving while intoxicated in allowing him the use of a telephone to reach his attorney, the officer must inform the plaintiff at the time of the last request to take the test that no further use of the telephone will be allowed and that it is necessary for the plaintiff to make a decision, after failing to contact such attorney, as to whether he will refuse to take the test without the advice of his counsel: Lawton v. Bureau of Motor Vehicles, 57 OApp2d 159, 11 OO3d 160, 386 NE2d 267.

6. (1975) Following an arrest for D.W.I., facilities for communication with an attorney must be furnished immediately upon request and the officer may not delay until it suits his convenience, his paperwork is done, or slating is completed: Raine v. Curry, 45 OApp2d 155, 74 OO2d 171, 341 NE2d 606.

7. (1974) A good-faith request of an arrested person to exercise his statutory right, pursuant to RC § 2935.20, to call an attorney, before submitting to a chemical test required by RC § 4511.191 [4511.19.1], does not constitute a refusal to take such test where the delay occasioned by the exercise of the statutory right will not unduly or unreasonably delay the administering of the test: Siegwald v. Curry, 40 OApp2d 313, 69 OO2d 293, 319 NE2d 381.

8. (1973) Revised Code § 2935.20 does not require that the police affirmatively offer telephone facilities to a person arrested, and this section was not violated where defendant did not request to communicate with his attorney: State v. Jones, 35 OApp2d 92, 64 OO2d 208, 300 NE2d 230, reversed on other grounds, 37 OS2d 21, 66 OO2d 79, 306 NE2d 409.

9. (1970) Under the provisions of RC §§ 2935.14 and 2935.20, an arrested person, regardless of the nature of the crime or offense for which he is being held, must be immediately offered an opportunity to communicate with an attorney or other person for the purpose of contacting an attorney, and such arrested person has the right to be immediately visited by the attorney of his choice: Dayton v. Nugent, 25 OMisc 31, 54 OO2d 31, 265 NE2d 826 (MC); Siegwald v. Curry, 39 OMisc 16, 68 OO2d 157, 314 NE2d 191 (MC 1973).

sold or name of the place where the offense is committed need not be designated: Osborn v. State, 21 NP(NS) 270, 29 OD 326.

### § 2941.21  Averments as to joint ownership. (GC § 13437-20)

In an indictment or information for an offense committed upon, or in relation to, property belonging to partners or joint owners, it is sufficient to allege the ownership of such property to be in such partnership by its firm name, or in one or more of such partners or owners without naming all of them.

HISTORY: GC § 13437-20; 113 v 123(167), ch 16, § 20; Bureau of Code Revision. Eff 10-1-53.

Analogous to former GC § 13591.

**Ohio Rules**

Nature and contents of indictment or information, CrimR 7(B).

**Research Aids**

Ownership of property:
  O-Jur3d: Crim L § 755
  Am-Jur2d: Indict § 219

#### CASE NOTES AND OAG

1. The rule prescribed by former GC § 13591 (see now RC § 2941.21) is a rule of pleading and not of substantive law: Jones v. State, 70 OS 36, 70 NE 952.
2. Where, in an indictment for larceny, the property stolen is alleged to belong to one A, and the evidence shows that it belongs to A and B as partners, a conviction is proper. This section changes the common law rule on this subject: Lasure v. State, 19 OS 43.

### § 2941.22  Averments as to will or codicil. (GC § 13437-21)

In an indictment or information for stealing a will, codicil, or other testamentary instrument, or for forgery thereof, or, for a fraudulent purpose, keeping, destroying, or secreting it, whether in relation to real or personal property, or during the life of a testator or after his death, it is not necessary to allege the ownership or value thereof.

HISTORY: GC § 13437-21; 113 v 123(167), ch 16, § 21; Bureau of Code Revision. Eff 10-1-53.

Analogous to former GC § 13592.

**Ohio Rules**

Nature and contents of indictment or information, CrimR 7(B).

**Research Aids**

Ownership of property; value of property:
  O-Jur3d: Crim L §§ 755, 756
  Am-Jur2d: Indict § 219

### § 2941.23  Averments as to election. (GC § 13437-22)

In an indictment or information for an offense committed in relation to an election, it is sufficient to allege that such election was authorized by law, without stating the names of the officers holding it or the person voted for or the offices to be filled at the election.

HISTORY: GC § 13437-22; 113 v 123(167), ch 16, § 22; Bureau of Code Revision. Eff 10-1-53.

Analogous to former GC § 13593.

**Ohio Rules**

Nature and contents of indictment or information, CrimR 7(B).

**Research Aids**

Designation of other persons in election violation:
  O-Jur3d: Crim L § 752
  Am-Jur2d: Elect §§ 388—390

### § 2941.24  Repealed, 135 v H 716, § 2 [GC § 13437-23; 113 v 123(168); Bureau of Code Revision, 10-1-53]. Eff 1-1-74.

This section concerned counts for embezzlement and larceny.

### § 2941.25  Multiple counts.

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

HISTORY: 134 v H 511. Eff 1-1-74.

Not analogous to former RC § 2941.25 (GC § 13437-24; 113 v 123(168); Bureau of Code Revision, 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.

**Committee Comment to H 511**

This section provides that when an accused's conduct can be construed to amount to two or more offenses of similar import, he may be charged with all such offenses but may be convicted of only one. If his conduct constitutes two or more dissimilar offenses, or two or more offenses of the same or similar kind but committed at different times or with a separate "ill will" as to each, then he may be charged with and convicted of all such offenses.

The basic thrust of the section is to prevent "shotgun" convictions. For example, a thief theoretically is guilty not only of theft but of receiving stolen goods, insofar as he

receives, retains, or disposes of the property he steals. Under this section, he may be charged with both offenses but he may be convicted of only one, and the prosecution sooner or later must elect as to which offense it wishes to pursue. On the other hand, a thief who commits theft on three separate occasions or steals different property from three separate victims in the space, say, of 5 minutes, can be charged with and convicted of all three thefts. In the first instance the same offense is committed three different times, and in the second instance the same offense is committed against three different victims, i.e. with a different animus as to each offense. Similarly, an armed robber who holds up a bank and purposely kills two of the victims can be charged with and convicted of one count of aggravated robbery and of two counts of aggravated murder. Robbery and murder are dissimilar offenses, and each murder is necessarily committed with a separate animus, though committed at the same time.

**Ohio Constitution**

Double jeopardy, OConst art I, § 10.

**Ohio Rules**

Joinder of offenses, CrimR 8(A).

Pretrial motions, CrimR 12(B).

Relief from prejudicial joinder, CrimR 14.

Trial together of indictments, informations or complaints, CrimR 13.

**Text Discussion**

Double jeopardy. 1 Ohio Crim. Prac. & Pro. § 33.14

Joinder of offenses. 1 Ohio Crim. Prac. & Pro. § 15.7

**Forms**

Indictment. 2A Ohio Crim. Prac. & Pro. 2.04

**Research Aids**

Multiple counts:

O-Jur3d: Crim L § 1055

Am-Jur2d: Crim L §§ 525, 546, 547, 549; Indict §§ 69, 97, 308, 309

**ALR**

Inconsistency of criminal verdict, as between different counts of indictment or information. 18 ALR3d 259.

Inconsistency of criminal verdict with verdict on another indictment or information tried at same time. 16 ALR3d 866.

Seizure or detention for purpose of committing rape, robbery, or similar offense as constituting separate crime of kidnapping. 43 ALR3d 699.

Single or separate larceny predicated upon stealing property from different owners at the same time. 37 ALR3d 1407.

**Law Review**

State v. Ikner [44 OS2d 132 (1975)]: examining the merger doctrine and double jeopardy, in terms of auto theft. Note. 4 ONorthLRev 111 (1977).

## CASE NOTES AND OAG

### INDEX

Aggravated murder, separate counts, 10, 13

Burglary and robbery, 7

Federal habeas corpus, 1

Kidnapping and rape, 3, 5, 6, 8

Offenses of similar import, 8, 15, 16

   Election by prosecution, 10, 11

Possession and sale of drugs, 4

Rape, 16

Separate animus, 6, 14

Separate offenses, 9, 15, 17, 18

Specification of crime, 9

Tampering with coin machine and theft, 2

Theft and receiving stolen goods, 12, 14

Theft of motor vehicle and contents, 18

Unlawful taking and possession of fish, 17

1. (1980) Whether two crimes should be merged because they involve related acts is a question of state law not cognizable in federal habeas corpus: Heard v. Jago, 515 FSupp 162 (S.D.).

2. (1981) Where it is charged in separate counts that the defendant, with purpose to commit theft, knowingly entered, forced an entrance into, tampered with, or inserted any part of an instrument into any coin machine, in violation of RC § 2911.32, and that upon entry, theft of money or property contained therein was consummated by the defendant, in violation of RC § 2913.02, the offenses together constitute "allied offenses of similar import" as to which the defendant may be indicted for both offenses but convicted of only one: State v. Baer, 67 OS2d 220, 21 OO3d 138, 423 NE2d 432.

3. (1980) Where there is an act of asportation by deception which constitutes kidnapping and which is significantly independent from the asportation incidental to the rape, the two crimes are committed separately and can be punished multiply under RC § 2941.25(B): State v. Ware, 63 OS2d 84, 17 OO3d 51, 406 NE2d 1112.

4. (1980) Where a defendant is charged with the possession for sale of a narcotic drug in violation of RC § 3719.20(A), and with the sale of a narcotic drug in violation of RC § 3719.20(B), and the facts demonstrate that both charges are based upon a single sale and involve the same parties and the same type and quantity of drugs, and it is not proven that the defendant possessed a quantity of any type of narcotic drug in excess of the amount sold, the defendant may be indicted for both offenses but may be convicted of only one: State v. Roberts, 62 OS2d 170, 16 OO3d 201, 405 NE2d 247.

5. (1979) A rape conviction, pursuant to RC § 2907.02(A)(1), and a kidnapping conviction, pursuant to RC § 2905.01(A)(4), are allied offenses of similar import within the meaning of RC § 2941.25(A), and cannot be punished multiply when they are neither committed separately nor with a separate animus as to each within the meaning of RC § 2941.25(B): State v. Price, 60 OS2d 136, 14 OO3d 379, 398 NE2d 772.

6. (1979) In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to RC § 2941.25(B): (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions; (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate

Case: 4:96-cv-00795-JRA Doc #: 22-9 Filed: 01/24/97 172 of 203. PageID #: 1610

view to expeditious and effective ascertainment of the truth regarding the matters in issue.

HISTORY: GC § 13442-2; 113 v 123(178), ch.21, § 2; Bureau of Code Revision. Eff 10-1-53.

**Cross-References to Related Sections**

Jurisdiction when jury trial waived, RC § 2945.06.

**Text Discussion**

Arraignment; plea. 1 Ohio Crim. Prac. & Pro. § 17.2
Jury instructions during trial. 1 Ohio Crim. Prac. & Pro. § 38.2
Pleadings. 1 Ohio Crim. Prac. & Pro. ch 21
View of scene by jurors. 1 Ohio Crim. Prac. & Pro. § 28.5
Withdrawal of guilty plea. 1 Ohio Crim. Prac. & Pro. § 42.2

**Research Aids**

Functions of judge, generally:
  O-Jur3d: Crim L § 937
  Am-Jur2d: Trial §§ 30, 45-48

**ALR**

Power of trial court to dismiss prosecution or direct acquittal on basis of prosecutor's opening statement. 75 ALR3d 649.
Propriety of trial court's declaration of mistrial or discharge of jury, without accused's consent, on ground of prosecution's disclosure of prejudicial matter, or making prejudicial remarks in presence of jury. 77 ALR3d 1143.

**CASE NOTES AND OAG**

1. (1978) Challenged statements and actions of the trial judge in a criminal case will not justify a reversal of the conviction, where the defendant has failed in light of the circumstances under which the incidents occurred to demonstrate prejudice: State v. Wade, 53 OS2d 182, 7 OO3d 362, 373 NE2d 1244.

2. Not only with respect to evidence and argument of counsel, but with respect to control of the proceedings generally, the court, in the furtherance of justice, has the duty under the constitution and the law to see that the trial is orderly: State v. Wells, 134 OS 404, 13 OO 12, 17 NE2d 658.

3. (1976) It is not error for the court to refuse to exclude or to give a limiting or cautionary instruction regarding the results of defendant's polygraph examination on the grounds that such results do not ordinarily constitute "relevant and material evidence" within the meaning of RC § 2945.03 where defendant requested the examination, stipulated the expertise of the person administering the test, and expressly waived any rights he may have had regarding the admissibility of the results: State v. Poole, 50 OApp2d 204, 4 OO3d 172, 362 NE2d 678.

4. (1964) The unanticipated interruption by an attorney not properly concerned with the trial of a criminal matter defeats an "expeditious and effective" procedure. Such an intrusion cannot be justified or excused, and is prejudicial to the rights of the defendant incident to the direction given a trial court in RC § 2945.03: Columbus v. Tullos, 1 OApp2d 107, 30 OO2d 121, 204 NE2d 67.

5. The results of a polygraph test do not constitute relevant and material evidence within the meaning of RC § 2945.03 and are not admissible in evidence even if the person tested has previously stipulated that such may be in-

troduced against him at trial: State v. Hill, 40 OApp2d 16, 69 OO2d 9, 317 NE2d 233.

6. An affirmative duty is imposed on a trial court by this section "to control all proceedings during the trial" in order to prevent bias or prejudice against the accused or a denial to him of a fair trial: State v. Farmer, 90 App 49, 46 OO 391, 103 NE2d 289.

§ 2945.04    Repealed, 135 v H 716, § 2 [GC § 13442-3; 113 v 123(179); Bureau of Code Revision, 10-1-53]. Eff 1-1-74.

This section concerned reasonable doubt.

[TRIAL BY COURT]

§ 2945.05    Defendant may waive jury trial. (GC § 13442-4)

In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I ..........., defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

HISTORY: GC § 13442-4; 113 v 123(179), ch.21, § 4; Bureau of Code Revision. Eff 10-1-53.

**Ohio Rules**

Trial by jury, CrimR 23.
See CrimR 23(A). As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Text Discussion**

Jury waiver. 1 Ohio Crim. Prac. & Pro. § 27.2
Trial to the court. 1 Ohio Crim. Prac. & Pro. § 27.5

**Research Aids**

Trial by jury or by court:
  O-Jur3d: Crim L § 864
  Am-Jur2d: Trial §§ 473, 1238—1240

**CASE NOTES AND OAG**

INDEX

Capacity, 7
Constitutionality, 2
Court may not reject waiver, 7, 14
Guilty plea, effect, 3, 4, 6
How waiver to be made, 13
Minor, application to, 9
Municipal courts, 10, 11, 15

of prior juvenile court involvement, the introduction of a juvenile record to rebut such evidence is not prejudicial error: State v. Hale, 21 OApp2d 207, 50 OO2d 340, 256 NE2d 239.

2. (1969) It is reversible error, in the trial of an accused for robbery, for the prosecution to ask the defendant on cross-examination whether "you have ever been tried of attempted theft in 1964," where the prosecution makes no attempt to show that defendant was ever tried for an attempted theft in 1964 and produces no evidence of any conviction of an attempted theft in 1964: State v. Crawford, 17 OApp2d 141, 46 OO2d 175, 244 NE2d 774.

## § 2945.57  Number of witnesses to character. (GC § 13444-18)

The number of witnesses who are expected to testify upon the subject of character or reputation, for whom subpoenas are issued, shall be designated upon the praecipe and, except in cases of murder in the first and second degree, manslaughter, rape, assault with intent to commit rape, or selling intoxicating liquor to a person in the habit of becoming intoxicated, shall not exceed ten upon each side, unless a deposit of at least one per diem and mileage fee for each of such additional witnesses is first made with the clerk of the court of common pleas. Not more than ten witnesses upon each side shall be permitted to testify upon the question of character or reputation in a criminal cause unless their full per diem and mileage fees have been deposited or paid by the party in whose behalf they are sworn, and the clerk shall not issue a certificate for compensation to be paid out of the county treasury to a witness who has testified upon the subject of character or reputation, except as provided in this section.

HISTORY: GC § 13444-18; 113 v 123(189), ch.23, § 18; Bureau of Code Revision. Eff 10-1-53.

Analogous to former GC § 13662.

**Ohio Rules**

Character evidence, EvR 404, 405.
See CrimR 17.

**Text Discussion**

Character and reputation evidence. 1 Ohio Crim. Prac. & Pro. § 33.10

**Research Aids**

Number of witnesses:
O-Jur3d: Crim L § 1283
Am-Jur2d: Trial § 140

**ALR**

Limiting number of noncharacter witnesses in criminal case. 5 ALR3d 238.

### CASE NOTES AND OAG

1. While the provision of this section limiting to ten the number of character witnesses in certain cases, unless the fees for the additional number are provided for by the party calling them, is constitutional and valid, yet it is directory only, and the action of the court of common pleas in

refusing to enforce the statute in this respect is not subject to review by this court on error: State v. Stout, 49 OS 270, 30 NE 437.

2. A trial court in a criminal case has no authority to limit unreasonably the number of witnesses called to give character or reputation testimony, in view of the provisions of this section: State v. Carter, 75 App 545, 31 OO 322, 58 NE2d 794.

## § 2945.58  Alibi. (GC § 13444-20)

Whenever a defendant in a criminal cause proposes to offer in his defense, testimony to establish an alibi on his behalf, such defendant shall, not less than three days before the trial of such cause, file and serve upon the prosecuting attorney a notice in writing of his intention to claim such alibi. Notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi.

HISTORY: GC § 13444-20; 113 v 123(190), ch.23, § 20; Bureau of Code Revision. Eff 10-1-53.

**Ohio Rules**

Notice of alibi, CrimR 12.1.
See CrimR 12.1. As to the relationship between statutes and Rules, see Publisher's Note, page v.

**Comparative Legislation**

Alibi:
FRCrP 12.1
CA—Penal Code § 948
FL—CrR 3.200
IL—Ann Stat ch 38 § 114-14; SCt Rules 412, 413
IN—Code § 35-5-1-1
MI—Comp Laws Ann §§ 768.20, 768.21
NY—Crim Pro Law § 250.20
PA—CSA tit 42, RCr 305, 311

**Text Discussion**

Notice of alibi. 1 Ohio Crim. Prac. & Pro. § 19.2

**Research Aids**

Alibi:
O-Jur3d: Crim L §§ 357, 837
Am-Jur2d: Crim L §§ 192—201

**Law Review**

State v. Focht [37 OS2d 173 (1974)]: reprieve for notice-of-alibi in Ohio. William H. Harriger. 2 ONorthLRev 61 (1974).

### CASE NOTES AND OAG

1. (1977) Revised Code § 2945.58 is presumptively superseded by CrimR 12.1: State v. Smith, 50 OS2d 51, 4 OO3d 118, 362 NE2d 988.

## § 2945.59  Proof of defendant's motive. (GC § 13444-19)

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident

on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

HISTORY: GC § 13444-19; 113 v 123(190), ch.23, § 19; Bureau of Code Revision. Eff 10-1-53.

### Cross-References to Related Sections

Gross sexual imposition, RC § 2907.05.
Rape, RC § 2907.02.

### Ohio Rules

Other crimes, wrongs or acts, EvR 404(B).
See CrimR 16(B)(1)(b).

### Text Discussion

Evidence of similar acts in delinquency cases. 2 Anderson Fam. L. § 8.13
Other crimes. Ohio Ev §§ 404.21, 404.24
Proof of same or similar acts. 1 Ohio Crim. Prac. & Pro. § 32.5

### Forms

Other acts. 4 OJI § 402.61

### Research Aids

When evidence of other crimes or acts is admissible:
O-Jur3d: Crim L § 1160 et seq
Am-Jur2d: Evid §§ 320—335

### ALR

Admissibility, in forgery prosecution, of other acts of forgery. 34 ALR2d 777.
Admissibility, in prosecution based on abortion, of evidence of commission of similar crimes by accused. 15 ALR2d 1080.
Admissibility, in prosecution for bribery or accepting bribes, of evidence tending to show the commission of other bribery or acceptance of bribe. 20 ALR2d 1012.
Admissibility, in prosecution for criminal burning of property or for maintaining fire hazard, of evidence of other fires. 87 ALR2d 891.
Admissibility, in prosecution for gambling or gaming offense, of evidence of other acts of gambling. 64 ALR2d 823.
Admissibility, in prosecution for illegal sale of intoxicating liquor, of other sales. 40 ALR2d 817.
Admissibility, in prosecution for illegal sale of narcotics, of evidence of other sales. 93 ALR2d 1097.
Admissibility, in prosecution for sexual offense, of evidence of other similar offense. 77 ALR2d 841.
Admissibility, in robbery prosecution, of evidence of other robberies. 42 ALR2d 854.
Admissibility, in subornation of perjury prosecution, of evidence of alleged perjurer's plea of guilty to charge of perjury. 63 ALR2d 825.
Admissibility of evidence as to other offense as affected by defendant's acquittal of that offense. 86 ALR2d 1132.

Admissibility of evidence of other offenses in rebuttal of defense of entrapment. 61 ALR3d 293.
Admissibility of evidence of subsequent criminal offenses as affected by proximity as to time and place. 92 ALR3d 545.
Admissibility to establish fraudulent purpose or intent, in prosecution for obtaining or attempting to obtain money or property by false pretenses, of evidence of similar attempts on other occasions. 78 ALR2d 1359.
Presumption of good faith in cross-examination of character witness for accused with reference to particular acts or crimes. 47 ALR2d 1319.
Remoteness in time of other similar offenses committed by accused as affecting admissibility of evidence thereof in prosecution for sex offenses. 88 ALR3d 8.

### Law Review

Admissibility of evidence of other crimes—emphasis on use in prosecution of sex crimes—for which the defendant had been acquitted, under similar crimes rules, at subsequent trial—Oliphant v. Koehler, 594 F2d 547 (6thCir 1979). Case note. 7 NoKyLRev 133 (1980).
Criminal law—admissibility of prior criminal acts—testimony referring to the prior criminal acts as verbal acts of the res gestae—State v. Spears, 58 OApp2d 11 (1978). Case note. 9 CapitalULRev 419 (1979).
Impeaching credibility through evidence of prior convictions: federal rule of evidence 609(a). Comment. 3 UDayLRev 459 (1978).
Proof of prior act evidence. Comment. 49 CinLRev 613 (1980).
State v. Kulig [37 OS2d 157 (1974)]: established principles misapplied? Van R. Shirey. 2 ONorthLRev 83 (1974).

## CASE NOTES AND OAG

### INDEX

Absence of mistake or accident, 12-14, 45
Acts not constituting a crime, 60
Admissible evidence, 20
Chain of events, 61
Charge to the jury, 34, 37, 40, 51
Conspiracy, 23
Contested issue, relevancy, 1
Failure to object, 21, 34
Forgery, prior judicial admission, 39
Fraud, 30
Gambling, use of federal tax return, 52
Harmless error, 4, 7
Hearing on admissibility, 25
Homicide, prior violent disposition, 27, 58
Identity of accused, 17
Impeachment, 28, 32, 44, 47
Inadmissible evidence, 35
Juvenile offenses, 9
Material issues, 10, 11
Prior investigation evidence, 48
Proof of independent offense, 6, 26, 41
Proof of motive, intent, or plan, 2, 8, 19, 22, 29, 43, 45, 50, 55, 56
Proof of other crimes, 16, 59
Prosecution's opening statement, 34
Relationship of acts, 15
Remoteness, 49, 57
Res gestae, 24
Right to remain silent not to be compromised, 33
Robbery, 18

| Citation | Rank(R) | Database | Mode |
|---|---|---|---|
| Slip Copy | R 1 OF 4 | IL-CS | P |
| 1990 WL 155728 (Ill.) | | | |

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT L
REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

The **PEOPLE** of the State of Illinois, Appellant,
v.
Brian **BERNASCO**, Appellee.
No. 69035.
Supreme Court of Illinois.
Oct. 18, 1990.

Justice STAMOS delivered the opinion of the court:

In the circuit court of Madison County, the 17-year-old defendant, Brian Bernasco, was charged by information with two counts of residential burglary (Ill.Rev.Stat.1985, ch. 38, par. 19-3). That court suppressed his confession finding that, though the confession was not coerced or otherwise the product improper police conduct, and though the confession was preceded by Miranda warnings (see Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694). Defendant's intelligence level was so low that his Miranda waiver and his confession were neither voluntary nor knowing.

The appellate court affirmed. (185 Ill.App.3d 480, 133 Ill.Dec. 563, 541 N.E.2d 774.) The appellate court held that, even though defendant's Miranda waiver and confession were voluntary within the meaning of the fifth and fourteenth amendments (U.S. Const., amends. V, XIV; see Colorado v. Connelly (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473), his Miranda waiver was invalid because, as the trial court found, it was not knowing and intelligent (see Moran v. Burbine (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421; People v. Turner (1973), 56 Ill.2d 201, 205-07, 306 N.E.2d 27). (185 Ill.App.3d at 490, 133 Ill.Dec. 563, 541 N.E.2d 774.) The appella court acknowledged that in given cases the confessions of subnormally intelligent defendants have been held admissible, but the court observed that the question of intelligent waiver is a factual one that may depend in part o such circumstances as a defendant's background and conduct. The appellate court concluded that the trial court's finding in the present cause was not against the manifest weight of the evidence. We then allowed the State's petition for leave to appeal (107 Ill.2d R. 315(a)) and now affirm.

The chief issue is whether a valid Miranda waiver must be knowing and intelligent in addition to being free from coercion or other misconduct. The secondary issue is whether the trial court's finding, that defendant did not knowingly and intelligently waive his Miranda rights or confess, was in accord with the manifest weight of the evidence.

The facts of this cause were fully set forth in the appellate court's opinion. We will refer to them as necessary. Briefly, defendant was of subnormal intelligence and was questioned by police outside his father's presence and on the assumption that he could understand Miranda warnings. At trial, his father testified that defendant had left school in the ninth grade and had had no prior police experience. A psychologist testified that defendant could not understand certain Miranda terminology and that he would

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WOR

probably have agreed to almost anything said to him if doing so would end his
interrogation. Defendant testified that he had not been paying attention to
his Miranda waiver form, had not understood it, and had been scared.

I

[1] The State contends that, in Colorado v. Connelly (1986), 479 U.S. 157,
S.Ct. 515, 93 L.Ed.2d 473, the Supreme Court decisively rejected the theory
which the appellate court relied and for which defendant argues: that a
Miranda waiver and resulting confession must be knowing and intelligent as we
as constitutionally "voluntary" in order to be admissible. In turn, the
appellate court and defendant rest their view on Moran v. Burbine (1986), 47
U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410. We hold that the State's contentic
is not supported by Connelly and that Burbine's requirement of intelligent
knowledge as well as of voluntariness continues to be the law.

Connelly involved a defendant who, while mentally ill, had confessed to
a murder. He had first confessed spontaneously upon approaching a police
officer in the street. He had then confessed twice more after being given
Miranda warnings. No improper police coercion had accompanied his confession

The Colorado Supreme Court held that, as a matter of due process,
voluntariness required that the first, spontaneous confession have been "the
product of a rational intellect and a free will," regardless of whether there
had been improper coercion; that, despite any lack of official coercive
origin, the confession's very admission into evidence would have constituted
State action implicating the fourteenth amendment's due process clause; and
that, because of evidence that the defendant had been suffering from a serior
mental disorder, the trial court correctly found that he had lacked a ration
intellect and free will and that the confession had thus been involuntary.
(People v. Connelly (Colo.1985), 702 P.2d 722, 728-29.) As for the subsequen
confessions, the Colorado Supreme Court likewise held that, because of the
evidence of the defendant's mental condition, the trial court correctly
concluded that the State had failed to prove clearly and convincingly that th
defendant's attempted waivers of Miranda rights were free and intelligent so
to be voluntary and thus effective. People v. Connelly, 702 P.2d at 727.

On review, the United States Supreme Court held that, in order to satisfy th
fourteenth amendment's due process requirements as to voluntariness, it is
sufficient that a confession not be causally related to coercive police
conduct. (Colorado v. Connelly, 479 U.S. at 167, 107 S.Ct. at 522, 93 L.Ed.
at 484.) The Court rejected any conclusion that, "by itself and apart from
relation to official coercion," a defendant's mental condition might determin
constitutional voluntariness. (Connelly, 479 U.S. at 164, 107 S.Ct. at 520.
L.Ed.2d at 482.) Accordingly, any voluntariness inquiries into a confessing
defendant's state of mind, "inquiries quite divorced from any coercion brough
to bear on the defendant by the State," should be left for resolution by Stat
evidence rules pertaining to reliability; such matters are not governed by t
fourteenth amendment's due process clause. Connelly, 479 U.S. at 166-67, 107
S.Ct. at 522, 93 L.Ed.2d at 484.

The Connelly Court explained that it was reversing the Colorado judgment in
its entirety because the Court believed that the judgment's underlying analys
had been influenced by an erroneous view of constitutional voluntariness
requirements. However, the Court explicitly noted that, on remand, the
Colorado court could reconsider other issues not inconsistent with the Federa

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WOR

opinion (Connelly, 479 U.S. at 171 n. 4, 107 S.Ct. at 524 n. 4, 93 L.Ed.2d at 487 n. 4) issues that apparently could include the separate question whether defendant's Miranda waivers had been intelligent and knowing (see Connelly, 4 U.S. at 184 n. 5, 107 S.Ct. at 531 n. 5, 93 L.Ed.2d at 495 n. 5 (Brennan, J., joined by Marshall, J., dissenting)).

Though it is clear from the Connelly majority opinion and the cited dissent that a confession, made after a Miranda waiver, might still be suppressed on grounds that Miranda's protections had not been intelligently knowingly waived, it is not perfectly clear from the Connelly majority opinion whether such suppression would have a constitutional basis. Nevertheless, defendant would ground suppression in the constitutional jurisprudence of Burbine, and we agree that Burbine has continuing vitality in this regard.

According to Burbine, an inquiry into Miranda waiver has "two distinct dimensions": (1) whether there was a free, uncoerced choice and (2) whether there was awareness of the right and the consequences of abandoning it. (Burbine, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421; accord Colorado v. Spring (1987), 479 U.S. 564, 573, 107 S.Ct. 851, 857; 93 L.Ed.2d 954, 965.) A valid Miranda waiver would thus require "both an uncoerced choice and the requisite level of comprehension." (Emphasis added.) (Burbine, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421.) Burbine traced its requirements of voluntariness and intelligent knowledge to Miranda itself and beyond. Burbine, 475 U.S. at 421, 106 S.Ct. at 1140-41, 89 L.Ed.2d at 420-21 (" 'provided the waiver is made voluntarily, knowingly and intelligently' "), quoting Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707.

In Burbine, the police had failed to inform the respondent that an attorney, whom the respondent's sister had attempted to retain for him, had telephoned the police less than an hour before the respondent's interrogation and had be told by the police that the respondent would not be interrogated until the ne day. (Burbine, 475 U.S. at 415-17, 106 S.Ct. at 1138-39, 89 L.Ed.2d at 417-18.) The Court found no doubt about the respondent's "comprehension of the full panoply of [Miranda ] rights * * * and of the potential consequences of decision to relinquish them." (Burbine, 475 U.S. at 422, 106 S.Ct. at 1141, L.Ed.2d at 421.) The Court, viewing Miranda as establishing protections against the "compulsion inherent in custodial interrogation," reaffirmed that "full comprehension of the rights to remain silent and request an attorney [i sufficient to dispel whatever coercion is inherent in the interrogation process." (Burbine, 475 U.S. at 425, 427, 106 S.Ct. at 1143, 1144, 89 L.Ed.2 at 423, 424.) The unethical failure to inform the respondent of the attorney call did not deprive him of "knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." (Burbine, 475 U.S. at 423-24, 106 S.Ct. at 1142, 89 L.Ed.2d at 422.) Accordingly, "[b]ecause respondent's voluntary decision to speak was made with full awareness and comprehension of all the information Miranda requires the polic to convey," his Miranda waivers were valid. Burbine, 475 U.S. at 424, 106 S.Ct. at 1142, 89 L.Ed.2d at 422.

In arguable contrast to the twin Burbine-recognized requirements of voluntariness and intelligent knowledge for Miranda waivers, the Connelly Cou initially declared with seeming breadth that admissibility of a confession by defendant whose mental state interfered with " 'rational intellect' " and " 'free will' " is to be governed by State evidence rules "rather than by our

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WOR

previous decisions regarding coerced confessions and Miranda waivers." (Connelly, 479 U.S. at 159, 107 S.Ct. at 518, 93 L.Ed.2d at 477.) Burbine was a previous decision regarding Miranda waivers, albeit one announced only nine months before.

However, Connelly merely means that, in general, issues of intelligent knowledge are separate from issues of voluntariness. The Connelly opinion was actually addressing (1) an initial confession given under circumstances requiring no Miranda warning (hence involving no question of waiver), the voluntariness of the confession being at issue, and (2) subsequent confession given after Miranda warnings, the voluntariness of the Miranda waivers being issue. Thus—in a narrower vein than that in which the opinion's opening sentences might cursorily be read—the Court continued that, in determining whether a confession is voluntary where there has been no official coercion, inquiries into the state of a confessing defendant's mind, when "divorced from any coercion * * * by the State," are to be resolved by State evidence law rather than by the due process clause of the fourteenth amendment. (Connelly, 479 U.S. at 166-67, 107 S.Ct. at 522, 93 L.Ed.2d at 484.) Likewise, in determining whether a Miranda waiver is voluntary, a court is to consider the presence or absence of coercion emanating from official sources, not coercion that is of unofficial origin or that flows merely from a defendant's psychological peculiarities. Connelly, 479 U.S. at 170-71, 107 S.Ct. at 523-24, 93 L.Ed.2d at 486-87.

We observe that at no point did the Connelly Court overrule Burbine's and other cases' requirement that a Miranda waiver be intelligent and knowing as well as voluntary. The Connelly opinion analyzed merely the constitutional voluntariness component of a confession's admissibility and of a waiver's validity. Connelly, 479 U.S. at 167, 170, 107 S.Ct. at 522, 523, 93 L.Ed.2d 484, 486 (citing, inter alia, Burbine ).

Thus, from a Federal constitutional viewpoint, only voluntariness, rather than intelligent knowledge, ordinarily need be shown in the case of a confession (such as the Connelly respondent's first one) that is given under circumstances not requiring a Miranda warning. But, where a defendant confesses after being given Miranda warnings (as in the case of the subsequent Connelly confession), both intelligent knowledge and voluntariness remain requirements for assuring that a defendant's Miranda waiver reflects Miranda's "carefully drawn approach": its "subtle balance" between the need for police questioning and the coercive pressures inherent in such questioning. See Burbine, 475 U.S. at 426-27, 106 S.Ct. at 1143-44, 89 L.Ed.2d at 424.

This understanding of Connelly and Burbine has been confirmed by later decisions. (See Colorado v. Spring (1987), 479 U.S. 564, 572, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 965 (Miranda waiver must be made " 'voluntarily, knowingly and intelligently' "); cf. Illinois v. Perkins (1990), 495 U.S. ----, 110 S.Ct. 2394, 110 L.Ed.2d 243 (where murder confession was obtained deceptively by undercover "cellmate" prior to any need for Miranda warning on murder charge, and thus no Miranda waiver question existed, sole self-incrimination issue was voluntariness in sense of absence of coercion; intelligent knowledge not issue where no Miranda waiver question presented); Michigan v. Harvey (1990), 494 U.S. ----, ----, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293, 301 (waiver of right of counsel under sixth amendment must be voluntary, knowing, and intelligent; equivalent of Miranda warnings generally suffices to establish

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WORKS

knowing and intelligent waiver of sixth amendment right during post-indictment questioning); Patterson v. Illinois (1988) 487 U.S. 285, 292 & n. 4, 108 S.Ct. 2389, 2394 & n. 4, 101 L.Ed.2d 261, 272 & n. 4 (whether Miranda waiver also waived right to counsel under sixth amendment during subsequent post-indictment questioning depended on whether Miranda waiver was both "vol[u]ntary" and "knowing and intelligent"].) Commentators support this understanding. Dripps, Requiem for Miranda: The Rehnquist Court's Voluntariness Doctrine in Historical Perspective, 67 Wash.U.L.Q. 59, 143-47 & n. 383 (1989) (criticizing perceived retreat from Miranda but implicitly recognizing that Connelly left intelligent knowledge waiver requirement intact); Berger, Compromise and Continuity: Miranda Waivers, Confession Admissibility, and the Retention of Interrogation Protections, 49 U.Pitt.L.Rev. 1007, 1018-15, 1042-54 (1988) (intelligent knowledge remains separate Miranda waiver requirement in addition to voluntariness); Note, Constitutional Protection of Confessions Made by Mentally Retarded Defendants, 14 Am.J.L.Med. 431, 433 36, 448 50 (1988) (probably after Connelly, but certainly after Patterson, intelligent knowledge remains separate Miranda waiver requirement); Note, Colorado v. Connelly: The Demise of Free Will as an Independent Basis for Finding a Confession Involuntary, 33 Vill.L.Rev. 895, 907, 920-22 (1988) (intelligent knowledge is separate requirement).

[There remains a world of difference between voluntariness and intelligent knowledge. It has been noted, though, to analytically different effect, that mentally ill person may "confess" at length quite without external compulsion but not intelligently and knowingly; while a perfectly rational person on the torture rack may confess intelligently and knowingly but without free will. People v. Kincaid (1981), 87 Ill.2d 107, 127-28, 57 Ill.Dec. 610, 429 N.E.2d 508 (Simon, J., dissenting) (issue on review was solely whether confession was "voluntary"; dissent discussed no distinction between lack of coercion and intelligent knowledge in terms of post-1986 Durbin-Connelly constitutional voluntariness doctrine but simply deemed both hypothetical confessions not "voluntary").

[There are, for Federal constitutional purposes, a distinction does need to be made between two types of awareness in interpreting the Miranda-derived waiver requirement of intelligent knowledge.

[The first type of awareness involves "know[ing] and understand[ing] ever[y] possible consequence of a waiver of the Fifth Amendment privilege" (Spring, 479 U.S. at 574, 107 S.Ct. at 857, 93 L.Ed.2d at 966), being "totally rational[] and properly motivated" when confessing (Connelly, 479 U.S. at 165, 107 S.Ct. at 521, 93 L.Ed.2d at 484), or having all information that might be "useful" or that "might * * * affect[t one's] decision to confess" (Burbine, 475 U.S. at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 421), such as a list of "all the possible subjects of questioning in advance of interrogation" (Spring, 479 U.S. at 576, 107 S.Ct. at 859, 93 L.Ed.2d at 968). In the cited cases, the Supreme Court held that this mental state is not necessary for a valid Miranda waiver. The Constitution does not demand "that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights" (Burbine, 475 U.S. at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 421), and there is no Federal constitutional right to confess only when in possession of information that "could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature" (Spring,

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WORKS

U.S. at 377, 107 S.Ct. at 850, 93 L.Ed.2d at 867.)

The second type of awareness involves simply being cognizant at all times of "the State's intention to use [one's] statements to secure a conviction" and the fact that one can "stand mute and request a lawyer." (Burbine, 475 U.S. at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 422.) The latter mental state is what is held necessary for a valid Miranda waiver.

This second type of awareness has been elucidated more recently than Connelly and Burbine were decided. (See Patterson v. Illinois (1988), 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261.) As noted by the Supreme Court in later cases discussing a "knowing and intelligent" waiver of rights to counsel under the fifth and sixth amendments (U.S. Const., amends. V, VI), a waiver must reflect "an intentional relinquishment or abandonment of a known right or privilege"; "the accused must [know] what he is doing" so that "his choice is made with eyes open"; the accused must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Patterson, 487 U.S. at 292, 108 S.Ct. at 2395, 101 L.Ed.2d at 272.

In satisfying the latter formulation's "constitutional minimum," the Patterson Court found it sufficient under the sixth amendment that the petitioner had been aware of two points: (1) he had a right to consult with an attorney, to have an attorney present during questioning, and to have an attorney appointed if he could not afford to retain one privately; and (2) any statements that he made could be used against him in criminal proceedings, and an attorney's presence during questioning could serve him by affording him advice on making any statements. (Patterson, 487 U.S. at 293, 108 S.Ct. at 2395, 101 L.Ed.2d at 273.) Though Patterson's waiver claim arose under the sixth amendment rather than the fifth, the Court noted that the awareness just described resembled the level of knowledge found necessary in Burbine, adding that, for purposes of post indictment questioning such as in Patterson, there is "a strong similarity between the level of knowledge a defendant must have to waive his Fifth amendment right to counsel, and the protection accorded to Sixth Amendment rights." (Patterson, 487 U.S. at 297, 299 n. 12, 108 S.Ct. at 2397, 2398 n. 12, 101 L.Ed.2d at 275, 276 n. 12; accord Michigan v. Harvey (1990), 494 U.S. ___, ___, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293, 301.) It is therefore clear from Miranda and its progeny, including Patterson, that this second type of awareness on a defendant's part is necessary in order to constitute the intelligent knowledge that in turn is required for blunting the coercive effects of police interrogation in a Miranda waiver context.

The foregoing review of intelligent-knowledge waiver doctrine is a key to harmonizing Connelly with Burbine. It also aids in deciding the present cause.

[2] The trial judge in the present cause found that defendant had no prior criminal experience and had a beginning fourth-grade reading and comprehension level that prevented him from "understand[ing] what was happening here" and from "hav[ing] a knowing understanding of what was happening," so that he could not effectively waive his Miranda rights "without the aid of his parents or someone who would assist him in translating what was really happening." In other words, as the trial judge found, "because of [defendant's] station in life, because of the circumstances surrounding the situation, he was unable to form a necessary intent to knowingly waive his rights." (The parties agree

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WOR

think defendant's father was not present at defendant's interrogation. the father testified that the police refused him permission to be present, and the trial judge so found.)

The trial judge had heard testimony from a school psychologist that defendant's measured intelligence quotient placed him at the bottom of the slow-learner, low-average range. The psychologist testified that such persons need to go over things time and time again in order to assimilate the same material than [sic ] a student who functions in the normal range of intelligence." The psychologist also testified that defendant probably would not have understood the terms "interrogate," "court-appointed attorney," "intimidation," "immunity," and "waiver" but that he would have agreed "to anything that was said to him to get himself out of the situation." (The terms "a lawyer appointed for me," "waiver," "immunity," and "intimidated" are contained in the waiver form signed by defendant.)

On cross-examination, the psychologist testified that defendant probably had an idea what a lawyer is, though he would not be able to give a very specific accurate definition; that defendant understood the terms "silent," "I do not have to talk with any Collinsville Police Officer unless I want to," and "I know that I can refuse to answer any questions," all of which appeared on his waiver form; but that he would have some difficulty with the word "statement" in the form's phrase "stop giving any statements any time." On redirect examination, the psychologist also testified that defendant might be confused by the term "legal rights" and would probably refer to "right" in opposition to "wrong."

In his written order, the trial judge found that, based on his observations of defendant during direct testimony, defendant had substantial difficulty in understanding relatively routine questions, was limited in his comprehension of simple words, and was substantially unable to understand relatively simple concepts. The order also recited that the trial judge was convinced from the psychological testimony that defendant would have agreed to and signed almost anything given him during interrogation.

Though the trial judge erred in finding that defendant's confession was not voluntary in the Federal constitutional sense, his findings provide ample support for concluding that defendant's Miranda waiver was not knowing and intelligent.

If intelligent knowledge in the Miranda context means anything, it means the ability to understand the very words used in the warnings. It need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy; but to waive rights intelligently and knowingly, one must at least understand basically what the rights encompass and minimally what their waiver will entail. Here, defendant was found not to understand fundamental terms contained in the Miranda warnings of his rights, not to have been able to form an intent to waive those rights, and not to have a normal ability to understand questions and concepts. Such findings, if borne out by the evidence, are sufficient to warrant the conclusion that defendant did not waive his Miranda rights knowingly and intelligently, and hence to justify suppressing his confession. See Note, Constitutional Protection of Confessions Made by Mentally Retarded Defendants, 14 Am.J.L.Med. 431, 432-33, 440-44 (1989) (discussing mentally retarded

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WORK

persons' limited intellectual ability to make knowing and intelligent Miranda waivers), cf. Holti, Miranda in a Juvenile Setting: A Child's Right to Silence, 78 J.Crim.L. & Criminology 534, 536-37, 546-56 (1987) (citing evidence that most youths lack proper comprehension of rights under police interrogation; proposing use of simplified version of Miranda warnings; Note, Now My Son, You Are a Man: The Judicial Response to Uncounseled Waiver of Miranda Rights by Juveniles in Pennsylvania, 92 Dick.L.Rev. 153, 168-71, 175-83 (1987) (discussing factors judicially and scientifically found to bear on juvenile competence of arrestees under age 18).

Our own prior cases lend further weight to today's holding. We have often fully analyzed Miranda waivers with regard to whether they were both voluntary and knowing and intelligent. For example, we recently did so in People v. Reid (1990), 136 Ill.2d 27, 51-52, 54-56, 143 Ill.Dec. 239, 554 N.E.2d 174, a case bearing some factual resemblance to the present one. Though we held there that the trial court's denial of a motion to suppress a confession was not against the manifest weight of the evidence (Reid, 136 Ill.2d at 59, 60, 143 Ill.Dec. 239, 554 N.E.2d 174), we were conscious of our responsibility to show deference to the findings of a trial court that had assessed credibility, demeanor, and the relevant facts—a responsibility we likewise have now, given the trial court's decision to suppress defendant's confession in the present cause. (See People v. Rogers (1988), 123 Ill.2d 487, 455, 123 Ill.Dec. 963, 528 N.E.2d 667.) The Reid result is also distinguishable in that the mother of the 15-year old subnormally intelligent defendant had been present with him and thus available to explain events to him during his interrogation, even though she was not an attorney. Reid, 136 Ill.2d at 46, 58-57, 143 Ill.Dec. 239, 554 N.E.2d 174.

Seven additional cases in which this court recognized that a Miranda waiver must be knowing and intelligent as well as voluntary were People v. Evans (1988), 125 Ill.2d 50, 74, 125 Ill.Dec. 790, 530 N.E.2d 1360; People v. Rogers, 123 Ill.2d at 494-500, 123 Ill.Dec. 963, 528 N.E.2d 667; People v. Racine (1988), 122 Ill.2d 95, 110-13, 118 Ill.Dec. 606, 522 N.E.2d 615; People v. Tompkins (1988), 121 Ill.2d 401, 433-34, 117 Ill.Dec. 927, 521 N.E.2d 38; People v. Murphy (1978), 72 Ill.2d 421, 437, 21 Ill.Dec. 350, 381 N.E.2d 677; People v. Hoskins (1978), 71 Ill.2d 254, 258-59, 363, 16 Ill.Dec. 447, 375 N.E.2d 78; and People v. Turner (1973), 56 Ill.2d 201, 205-07, 306 N.E.2d 27. See also People v. Aldridge (1980), 79 Ill.2d 87, 37 Ill.Dec. 286, 402 N.E.2d 176 (presuming that right of counsel under sixth amendment was involved, but analyzing issue in terms of voluntary and knowing waiver following fifth-amendment Miranda warnings); People v. Wipfler (1977), 68 Ill.2d 158, 171-72, 11 Ill.Dec. 262, 368 N.E.2d 870 (treating both non-coercion and intelligent knowledge as components of voluntariness).

Independently of Miranda and its Federal voluntariness principles, Illinois courts have long held that, to be admissible, a confession must be "voluntary" in a State-law sense, and that a defendant's mental ability, familiarity with the English language, age, education, and experience are among factors to be weighed in determining from the totality of the circumstances whether a confession or waiver of rights is "voluntary" in that sense. (See People v. Turner, 56 Ill.2d at 206, 306 N.E.2d 27; People v. Hester (1968), 39 Ill.2d 489, 497-98, 237 N.E.2d 466; People v. Cecraft (1967), 37 Ill.2d 19, 22, 226 N.E.2d 16; People v. Earl (1966), 34 Ill.2d 11, 15, 213 N.E.2d 556.)

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WORKS

(Insanity is treated as a categorical exception; under Illinois law, the confession of an insane person is involuntary per se. (People v. Lamberty (1900), 410 Ill. 451, 455, 102 N.E.2d 326; cf. 33 Vill.L.Rev. at 903-05 (collecting similar State and pre-Connelly Federal holdings).) In their holdings under State law, Illinois courts in effect have treated intelligent knowledge as one component of a confession's overall voluntary use, rather than as an admissibility criterion separate from voluntariness as in Miranda and its law. (See also Ill.Rev.Stat.1989, ch. 38, par. 114-11 (governing motions to suppress confessions as involuntary).) The line of Miranda cases represented by Burbine, Connelly, Spring, and Patterson has now seemingly settled, for Federal constitutional purposes, that voluntariness and intelligent knowledge are separate questions; however, for purposes of our own evidence law they are inter-related. Still, at this point we need not further consider how or whether our own State's common, statutory, or constitutional law would bear on the issues before us, because the parties have not raised such questions, and because Federal constitutional principles by themselves are sufficient to inform our present judgment.

In this latter connection, we note the State's argument that Supreme Court cases cited by defendant as supporting a separate admissibility requirement of intelligent knowledge are explainable by whether police misconduct was present of which a defendant was aware. (See Patterson, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261; Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954; Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410; Smith v. Illinois (1984), 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488.) The State says that in either there was no such misconduct (Spring and Patterson) or a defendant was aware of such misconduct and it had no effect on him (Burbine), defendants' statements were found admissible. The State concludes that, since no police misconduct occurred here, the cases cited by defendant support admitting his confession, not suppressing it.

The annunciation of Miranda principles in Patterson, Spring, and Burbine, which we have already discussed, survives the State's attempt to interpret those cases factually. All three cases clearly require that a Miranda waiver be both constitutionally voluntary and a decision taken knowingly and intelligently. In further response to the State's contention, consult the tone though not the substance of a separate opinion in Connelly, 479 U.S. at 177-78, 107 S.Ct. at 527-28, 93 L.Ed.2d at 491 (Brennan, J., joined by Marshall, J., dissenting):

"While it is true that no police misconduct discernible by a defendant had occurred when statements were held admissible in Patterson, Spring, and Burbine, it is also true that in those cases the Court explicitly, and at least as significantly, recognized that the statements followed knowing and intelligent waivers of rights. See Patterson, 487 U.S. at 292, 108 S.Ct. at 2394, 2395, 101 L.Ed.2d at 272, 277 ("the specific issue posed here is whether [defendant's] waiver was a 'knowing and intelligent' waiver"); "Because we believe that [defendant's] waiver * * * was 'knowing and intelligent,' we find no error"; Spring, 479 U.S. at 573-75, 107 S.Ct. at 857-58, 93 L.Ed.2d at 965-66 (no allegation of coercion; no allegation that defendant failed to understand that he could remain silent and that anything said could be used against him; waiver was "indisputably" made "knowingly and intelligently"); Burbine, 475 U.S. at 421-24, 106 S.Ct. at 1141-42, 89 L.Ed.2d at 421-22

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WORKS

similar case of waiver not at issue; no question about commission of
rights: police misconduct in failing to tell defendant about attorney's
telephone call could not have affected his intelligence and voluntariness
in waiving Miranda rights.)

The fact that defendants in Patterson, Spring, Moran, and the present case
were all conscious of no police misconduct signifies only that, as regards the
rights, the intelligent knowledge Miranda waiver element existed, this would
a case of first impression. Arguably unlike the present defendant, the
defendants in the cited cases understood their Miranda rights and the effect
of their statements. Whether defendant knowingly and intelligently waived his
Miranda rights and gave his confession remains the key factual question here.

## II

We now turn to the question whether the manifest weight of the evidence
contradicts the trial court's finding that defendant did not waive his Miranda
rights or give his confession knowingly and intelligently.

We do not sit to reweigh the evidence as if we were a trial court;
a reviewing court will not disturb a trial court's determination on a motion to
suppress evidence unless it is against the manifest weight of the evidence.
(People v. Galvin (1987), 127 Ill.2d 153, 162, 129 Ill.Dec. 72, 535 N.E.2d
837.) Whether a defendant intelligently waived his right to counsel depends
in each case, on the particular facts and circumstances of that case, including
the defendant's background, experience, and conduct. (People v. Turner (1987)
111 Ill.2d 201, 205-06, 306 N.E.2d 87.) The trial court here reached its
conclusion after hearing police, parental, and psychological testimony and
was in a very significant making its own observations of defendant while he was
testifying.

The State argues that defendant could read his confession aloud and
that he told the police and they believed that he understood his rights. The
State further argues that defendant understood that he did not have to speak
with police and that he understood what a lawyer was. The State cites several
cases, most of them noted in the appellate court's opinion (185 Ill.App.3d at
895, 133 Ill.Dec. 563, 541 N.E.2d 774), in which the confessions of defendants
with low intelligence and little education have been held admissible. Many
aspects of the cases cited by the State can easily be distinguished on the
facts of the defendants' backgrounds and trials. In any event, as the
appellate court wrote, "[t]hese decisions can offer little support for the
State in position * * * since the validity of a waiver of rights is essentially
a question of fact." (185 Ill.App.2d at 895, 133 Ill.Dec. 563, 541 N.E.2d
774.) The State has not persuasively demonstrated that the trial court
manifestly erred when it found, based on the facts and circumstances of this
case, that defendant did not knowingly and intelligently waive his Miranda
rights or give his confession.

For the foregoing reasons, the judgment of the appellate court is affirmed.
Judgment affirmed.
Ill., 1990.
People v. Bernasco
139 Ill. 155729, 562 N.E.2d
END OF DOCUMENT

COPR. (C) WEST 1990 NO CLAIM TO ORIG. U.S. GOVT. WORKS

COURT OF APPEALS

ELEVENTH DISTRICT

TRUMBULL COUNTY, OHIO

STATE OF OHIO,

        Plaintiff-Appellant,

  - vs -

VAN GERBET FICKES,

        Defendant-Appellee.

J U D G E S

HON. ALFRED E. DAHLING, P.J.
HON. DONALD R. FORD, J.
HON. ROBERT E. COOK, J.

CASE NO. 3419

O P I N I O N

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the
                                  Court of Common Pleas
                                  Case No. 83-CR-357 and 83-CR-404

JUDGMENT:  Affirmed.

ATTY. DENNIS WATKINS
COUNTY PROSECUTOR
160 High Street, N.W.
Warren, OH 44481

(For Plaintiff-Appellant)

ATTY. MARTIN F. WHITE
130 Franklin, S.E.
Warren, OH 44481

(For Defendant-Appellee)

COOK, J.

On October 10, 1983, officers of the Warren Police Department were called to the scene of an apparent double homicide at 3050 West Market Street. The bodies of Christine Fickes and Donald Fickes, mother and brother of appellee, Van Gentry Fickes, had been discovered in their West Market Street home by appellee, his wife, Candy Fickes, and two friends, Donald and Betty Bunyon. The two victims had died as the result of shotgun wounds.

The officers conducted an investigation at the scene of the crime, but they did not question appellee who was at the scene when they arrived. Appellee left the scene with his uncle, Milton Willrich, and went to his mother-in-law's home on Monticello Avenue.

Later, two police officers were sent to the residence on Monticello to pick up appellee and bring him to the police station for questioning. The officers advised Willrich that they had been told to bring appellee to the station for questioning. They had no conversation with appellee. Appellee was not asked if he wanted to go to the station nor was he advised that he was under arrest. Willrich offered to take appellee to the station, but the officers replied that they had to do so. Appellee was not frisked nor handcuffed. No conversation between the officers and appellee occurred on the way to the station.

At the station, appellee was taken to the uniform captain's

office, which is also known as the report room, where he remain-
ed by himself for approximately one-half hour.  An officer
remained outside the door to the room to watch appellee.  On
one occasion, appellee left the room to get a drink of water but
was accompanied by the police officer.  The officer then
instructed him to return to the room.

Detective James Teeple then came to the report room and
read appellee his Miranda rights.  Appellee signed a Miranda
rights waiver form.  Teeple and appellee engaged in a conversa-
tion, the contents of which were later disputed by the parties.
Teeple performed an atomic absorption test on appellee's hands
to determine whether he had recently fired a gun.  Before the
test, appellee indicated he had recently handled shotgun shells
while building a device for his birthday celebration.  Appellee
and Teeple had further discussions as to guns allegedly in
appellee's mother's residence and a conversation appellee said
he had with his mother the night before.

After appellee's discussion with Teeple, Lt. Ralph Marchio
took appellee to an upstairs interrogation room for further
questioning.  Teeple told Marchio that appellee had acknowledged
the presence of gunpowder on his hands.  The interrogation room
to which appellee was taken was seven feet by seven feet and had
no windows.  Marchio and appellee were joined by two other
detectives, Morris Hill and Charles Sines.  Appellee was again
advised of his Miranda rights and signed a Miranda rights form.
He was questioned for two to three hours by Marchio in the
presence of the other two detectives.  He was asked about the

powder on his hands which he explained was the result of his handling the contents of the shells and firecracker powder that could be found in a container at his residence.  The police checked his story as to the container of powder and found the cannister containing powder and firecrackers at his apartment. Appellee was subsequently released.

A short time later, the police received a call that an automobile matching the description of Christine Fickes' automobile had been found in Packard Park near a footbridge that appellee had indicated, during his earlier questioning, that he had walked on the day of the killings.  On the other side of the footbridge, along a path, the officers found a folded receipt from Raider Auto Supply representing a 25¢ purchase made on October 10, 1983.  An employee from Raider Auto Supply remembered the sale.  She described a buyer who matched the physical description of Christine Fickes.  The buyer had purchased a fuse for "her son" although she did not indicate which son.  Fuses had been found at the residence of Christine Fickes.

Marchio, Mill, and Sines, at approximately 11:00 p.m., went to appellee's mother-in-law's house where they found appellee. They told him he was wanted downtown for more questioning.  He was transported to the station.  When they arrived at the station, he was taken to the same interrogation room he had occupied earlier.  He was again read his Miranda rights and signed a waiver of said rights.  He was asked if he had seen his mother on October 10.  He replied, as he had done earlier, that he had not seen her on that date.  He said nothing different

than he had a earlier. The police show appellee the receipt Simes had found, and he denied ever having seen it.

Appellee filed a motion to suppress the results of the atomic absorption test, his oral statements to the police, and the cannister taken from his home on the grounds that his Fourth Amendment rights had been violated. On April 6, 1984, the court granted appellee's motion to suppress finding that both times appellee was transported to the Warren Police Station, he was "seized" within the meaning of the Fourth Amendment and that both seizures were unsupported by probable cause. Therefore, the court concluded appellee's Fourth Amendment rights were violated, and the court invoked the exclusionary rule as to the atomic absorption test conducted on October 10, 1983, appellee's remarks to the police on October 10, 1983, and the cannister taken from appellee's home on October 10, 1983. The court entered findings of fact and conclusions of law.

Appellant, the State of Ohio, has appealed the judgment of the trial court and has filed the following five assignments of error:

> "1. The trial court erred in its finding of fact and conclusion of law, and thereby erroneously suppressed the State's evidence.

> "2. The trial court erred in finding that Defendant was illegally detained in violation of the Fourth Amendment, and thereby erroneously suppressing the State's evidence.

> "3. The trial court erred in finding that the Defendant was subjected to a custodial interrogation, and thus erroneously suppressed the State's evidence.

"4.   The trial court erred in finding that the Defendant was unlawfully detained at the police station in violation of his Fourth Amendment rights, and thereby erroneously suppressed the State's evidence.

"5.   The trial court erred in not considering the good faith conduct of the police, and thereby erroneously suppressed the State's evidence."

The assigned errors are without merit.

Appellant first contends the court erred in its findings of fact and conclusions of law.  It argues that the court erred in finding that the police violated appellant's Fourth Amendment rights when they first brought him to the police station to be interviewed on October 10, 1983 and when they brought him to the station for a second time for further questioning.  It denies that appellee was seized on either occasion for Fourth Amendment purposes.

The Fourth Amendment of the United States Constitution reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Until 1968, the term "seizure" was synonymous with "arrest" for Fourth Amendment purposes and required probable cause.  Then the United States Supreme Court handed down Terry v. Ohio (1968), 392 U.S. 1; Adams v. Williams (1972), 407 U.S. 143; United States v. Brignoni-Ponce (1975), 422 U.S. 873; and

7

Michigan v. Summers (1981), 452 U.S. 692, which created certain very limited exceptions to the requirement of probable cause to justify a seizure.  However, except for these limited exceptions, any detention can only be supported by probable cause or consent.  In the absence of probable cause or consent, such detention is an unreasonable seizure and the exclusionary rule applies to any evidence obtained as a result of such illegal detention.  Brown v. Illinois (1975), 422 U.S. 590; Wong Sun v. United States (1963), 371 U.S. 471.

In the cause sub judice, appellant admits there was no probable cause to "seize" or "arrest" appellee during his October 10, 1983 visit to the police station but argue that appellee was not, in fact, "seized" at that time.

A person is "seized" for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would have believed he was not free to leave.  Florida v. Royer (1983), ___ U.S. ___, 75 L. Ed. 2d 229; United States v. Mendenhall (1980), 446 U.S. 544.

In the instant cause, appellee testified at the suppression hearing that, when he was first taken to the station on October 10, 1983, he believed he was not free to leave.  The court found the two police officers told appellee's uncle he could not take appellee to the police station, that they had to do so.  At the station, appellee was placed in a room by himself, an officer remaining at the door.  Appellee left the room only once, to get a drink of water, at which time he was accompanied by the officer.  He was given Miranda warnings, warnings

BEST COPY AVAILABLE

required in regard to in-custodial interrogation.  Virtually, the entire interrogation was about his whereabouts and activities on the day of the murders, which he was required to repeat several times.  Appellee was interrogated in a small interrogation room with three officers present most of the time.  At 8:30 p.m., the detectives conferred and decided that "we didn't have enough to hold him overnight," and appellee was released to his family.

When reviewing the findings of fact of a trial court, a reviewing court is guided by a presumption that the findings of fact are correct.  <u>Seasons Coal Co.</u> v. <u>Cleveland</u> (1984), 10 Ohio St. 3d 77.  While the evidence presented at the suppression hearing was conflicting on some points, there was competent, credible evidence in support of the court's finding that appellee was "seized" for purposes of the Fourth Amendment when he was taken to and questioned at the police station on October 10, 1983.  Judgments supported by competent, credible evidence will not be reversed as against the weight of the evidence.  <u>C.E. Morris Co.</u> v. <u>Foley Construction Co.</u> (1976), 54 Ohio St. 2d 279.

Appellant seeks, in its fifth assignment of error, to excuse the conduct of the police in the instant cause by applying the "good faith" rule recently pronounced by the United States Supreme Court in <u>United States</u> v. <u>Leon</u> (1984), 468 U.S. ___, 82 L. Ed. 2d 677.  It argues that appellee was questioned because he was a "natural witness", that appellee could not have concluded he was being detained, and that appellee cooperated

voluntarily.

However, the trial court found that the police were inter-
rogating appellee as a suspect, not as a mere witness to the
crime, said finding being supported by the record.  The police
knew they had no probable cause to detain appellee for question-
ing.  In fact, at 8:30 p.m., after questioning appellee as to
his whereabouts and activities on October 10, 1983, the police
discussed among themselves as to whether they had enough to hold
him overnight and decided they did not.

We conclude the "good faith" exception to the exclusionary
rule is not applicable in the instant cause.

Judgment affirmed.

_____

JUDGE ROBERT E. COOK

DAHLING, P.J., dissents,
FORD, J., concurs with attached concurring opinion.

ELEVENTH DISTRICT

TRUMBULL COUNTY

J U D G E S
HON. ALFRED B. DARLING, P.J.
HON. DONALD R. FORD, J.
HON. ROBERT E. COOK, J.

STATE OF OHIO,

Plaintiff-Appellant                    CASE NO.  3419

- vs -                         C O N C U R R I N G

VAN GENTRY FICKES,                     O P I N I O N

Defendant-Appellee

FORD, J.,

Although I concur with the majority opinion, there are two areas of the appellant's argument that invite additional attention.

The appellant admits in its brief, and also makes reference to a stipulation to the same effect, that it did not have probable cause to arrest the appellee when it first brought him to the Warren Police Station.  Contrary to the findings of the trial court, the state asserts that appellee was not in custodial detention at that time, nor was he exposed to custodial interrogation when he was initially questioned, or when he was the subject of an atomic absorption test.  The appellant's rationale here is simply that any "tainted" procedure was interdicted by intervening events and that appellee's conduct in the interrogation sessions and the

gun powder test was purely voluntary.  Therefore, the appellant urges that the products of this examination should be admissible.

It is clear that <u>Brown</u> v. <u>Illinois</u> (1975), 422 U.S. 590 stands for the proposition that Miranda warnings per se do not inherently "under <u>Wong Sun</u> always purge the taint of an illegal arrest."  It is also fundamental in inquiries such as posed in this case that a separate and distinct focus must be maintained between Fourth and Fifth Amendment considerations. "Although a confession after proper <u>Miranda</u> warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis."  <u>Dunaway</u> v. <u>New York</u> (1979), 442 U.S. 200.

In this regard, the record here indelibly manifests that there simply is not a sufficient factual basis to break or attenuate the causal link between the improper investigatory seizure of the appellee and the acquisition of the evidential matters the appellant wishes to extricate from exclusion.  The efforts of the appellant to distinguish the case sub judice factually and legally from the holdings and litany of <u>Davis</u> v. <u>Mississippi</u> (1969), 394 U.S. 721, <u>Brown</u> v. <u>Illinois</u>, <u>supra</u>, <u>Dunaway</u> v. <u>New York</u>, <u>supra</u>, and <u>Taylor</u> v. <u>Alabama</u> (1982), 457 U.S. 687, are not substantially convincing.

Nor does the appellant find succor in a recent case before the United States Supreme court on this general subject, which strongly indicates that Fourth Amendment attenuation considerations have not been modified or liberalized to the extent that correlative ones have been under the Fifth Amendment.

"The Wong Sun doctrine applies as well when the fruit of the Fourth Amendment violation is a confession. *** But as we explained in Quarles and Tucker, a procedural Miranda violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. Dunaway v. New York, 442 U.S. 200, 216-217 (1979); Brown v. Illinois, 422 U.S., at 600-602. 'The exclusionary rule, *** when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth.' Id., at 601. Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Taylor v. Alabama, supra, at 690." Oregon v. Elstad (1985), 53 U.S.L.W. 4244, at 4246, 4247.

Next, the appellant in a "last swing" argument contends by strong inference that even if the evidence in question was technically illegally seized, it should not be excluded when police officers act in good faith and in a reasonable manner

when the ends of deterrence will not be significantly served. The appellant relies expressly on <u>United States</u> v. <u>Williams</u> (1980), 622 F. 2d 830, cert. denied 449 U.S. 1127 for this proposition, and I assume by implication anticipatorily on the language of Justice Powell in his concurring opinion in <u>Brown</u> v. <u>Illinois</u>, <u>supra</u>, where he employs the language that:

> "[The court] *** recognizes that in some circumstances strict adherence to the Fourth Amendment exclusionary rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes." <u>Id.</u> at 609.

Justice Powell also makes the point in <u>Brown</u>, <u>supra</u>, that for these purposes he distinguishes between the treatment of flagrant abuses and "technical" violations of the Fourth Amendment:

> "*** In my view, these extremes call for significantly different judicial responses. *** I would require the clearest indication of attenuation in cases in which official conduct was flagrantly abusive of the Fourth Amendment rights. *** I would consider the equalizing potential of Miranda warnings rarely sufficient to dissipate the taint." <u>Id.</u> at 610, 611.

Justice Powell also comments while again referring to flagrant abuse:

> "I thus would require some demonstrably effective break in the chain of events leading from the illegal arrest to the statement, such as actual consultation with counsel or the accused's presentation before a magistrate for a

determination of probable cause, before
the taint can be deemed removed." Id.

However, with respect to "technical" violations and their
treatment, he states:

"At the opposite end of the spectrum lie
'technical' violations of Fourth
Amendment rights where, for example,
officers in good faith arrest an
individual in reliance on a warrant later
invalidated or pursuant to a statute that
subsequently is declared unconstitutional
***." Id.

Again in cases not involving flagrant abuse he added:

"*** In cases in which this underlying
premise is lacking, the deterrence
rationale of the exclusionary rule does
not obtain, and I can see no legitimate
justification for depriving the
prosecution of reliable and probative
evidence. Thus, with the exception of
statements given in the immediate
circumstances of the illegal arrest - a
constraint I think is imposed by existing
exclusionary-rule law - I would not
require more than proof that effective
Miranda warnings were given and that the
ensuing statement was voluntary in the
Fifth Amendment sense. Absent
aggravating circumstances, I would
consider a statement given at the
stationhouse after one has been advised
of Miranda rights to be sufficiently
removed from the immediate circumstances
of the illegal arrest to justify its
admission at trial." Id. at 612.

Hence, we see the basis for the appellant's contention. We
note, however, that a close examination of United States
Supreme Court cases on these issues does not disclose any
perceptible adoption of Justice Powell's position in Brown,

supra, by either a clear majority of that court, or an expanding plurality in support of his analysis. Parenthetically, the facts in this case would hardly bring it within the "technical" violation penumbra discussed by Justice Powell in Brown, supra.

In fact, the most recent pronouncement of the United States Supreme Court reinforces the rationale of Davis v. Mississippi, supra, the majority in Brown v. Illinois, supra, and Dunaway v. New York, supra. Hayes v. Florida (1985), 53 U.S.L.W. 4382 lends no present credence to the appellant's position that a further exemption under the Fourth Amendment or the exclusionary rule in the nature of a "good faith" or "technical" violation concept will be engrained to permit the use of evidence obtained under such circumstances in legal proceedings. On the contrary, despite some language in Justice White's majority opinion in Hayes, supra, dealing with a possible exception for on site fingerprinting, the court expressly reaffirmed Davis v. Mississippi, supra. Justice Brennan took umbrage with Justice White's language on that particular point both from the standpoint of its logic and because it was advisory in nature with respect to a potential exception.

Thus, the Hayes case additionally serves to further buttress the judgment of the trial court and the opinion of this court in this case. In Hayes, after the police concluded

that Hayes was the principal suspect in a burglary-rape case, the police went to his home without a warrant to obtain his fingerprints. The police spoke to Hayes on the front porch of his house. As he was reluctant to go with them, one of the officers suggested that he would then be arrested. Hayes responded that he would go with them rather than be arrested and accompanied the police to the station where he was fingerprinted. His prints matched those taken at the crime scene; he was charged. Subsequently, Hayes moved to suppress the fingerprints. This was denied by the trial court, and he was convicted of burglary and sexual battery. In reversing the conviction and reaffirming Davis, supra, the Supreme Court had this to say:

> "*** And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause." Hayes, supra, at 4383.

and

> "*** None of our later cases have undercut the holding in Davis that transportation to and investigative detention at the stationhouse without probable cause or judicial authorization together violate the Fourth Amendment.

Indeed, some 10 years later, in <u>Dunaway</u> v. <u>New York</u> (1979), 442 U.S. 200, we refuse to extend <u>Terry</u> v. <u>Ohio</u>, <u>supra</u>, to authorize investigative interrogations at police stations on less than probable cause, even though proper warnings under <u>Miranda</u> v. <u>Arizona</u> (1966), 384 U.S. 436, had been given. We relied on and reaffirmed the holding in <u>Davis</u> that in the absence of probable cause or a warrant investigative detentions at the police station for fingerprinting purposes could not be squared with the Fourth Amendment, 442 U.S., at 213-216. ***." <u>Id.</u>

For these additional reasons, the judgment of the trial court should be affirmed.

*Donald R. Ford*

JUDGE DONALD R. FORD

-198-

IN THE COURT OF APPEALS OF FRANKLIN COUNTY, OHIO

State of Ohio,                              :

        Plaintiff-Appellee,         :

v.                                          :        No. 77AP-728

W. Alvin Frost,                             :

        Defendant-Appellant.        :

---

D E C I S I O N

Rendered on May 2, 1978

---

MR. GEORGE C. SMITH, Prosecuting Attorney,
MR. STEVE ROBINS, Assistant,
    Franklin County Hall of Justice,
    369 South High Street,
    Columbus, Ohio,
    For Plaintiff-Appellee.

CASSIDY, NIEHOFF & MEEKS,
MR. PAUL D. CASSIDY and
MR. R. WILLIAM MEEKS,
    24 North High Street,
    Columbus, Ohio,
    and
CRABBE, BROWN, JONES, POTTS & SCHMIDT,
MR. E. JAMES HOPPLE, of Counsel,
    42 East Gay Street,
    Columbus, Ohio,
    For Defendant-Appellant.

---

McCORMAC, J.

    Defendant was indicted on twenty-one counts of sale of unregistered securities and sale of securities without a license. A not guilty plea was

No. 77AP-728                                                    2

entered to all charges.  Two counts were *nolle prossed* prior to trial and the remaining 19 counts were submitted to a jury who found defendant guilty of 14 counts and not guilty of 5 counts.

Defendant was fined $500 per count, totalling $7,000 plus court costs.  From the judgment of the trial court, an appeal has been taken, setting forth the following assignments of error:

> 1. "The trial court erred by instructing the jury that the appellant had the burden of proof by a preponderance of the evidence in order to establish the defense of exempt securities transactions, thereby denying the appellant a fair trial, in violation of the Fourteenth Amendment to the United States Constitution and Article One Section 16 of the Ohio Constitution and O.R.C. Section 2901.05(A)(C)."
>
> 2. "The trial court erred by charging the statutory definitions of reasonable doubt and proof beyond a reasonable doubt contained in O.R.C. Section 2901.05 and made applicable to all criminal prosecution in the State of Ohio on the grounds that it violates due process of law by relieving the state of the obligation of proving guilt to the constitutionally requisite standard of certainty."
>
> 3. "The trial court erred by refusing to require the State of Ohio to elect between 'multiple counts' as contained in the indictment, thereby violating the provisions of O.R.C. Section 2941.25 and the due process provisions of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution."
>
> 4. "The trial court erred in refusing to include in its instruction to the jury, appellant's special instruction number six concerning the application of the culpable mental state of knowledge as it applied to alleged violations of the Ohio Securities Act and as it affected the defenses of mistake of law and/or mistake of fact, thereby violating appellant's rights under the due process provisions of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution."