No. 77AP-728                                                     3

    The defendant, W. Alvin Frost, is the president of Consumer Companies of America, Inc., (hereinafter called C.C.A.). C.C.A., a corporation, was formed in 1971, at which time one thousand shares of stock were authorized and issued, 250 to defendant. The initial issue of shares were exempt from compliance with Ohio Security Laws pursuant to R. C. 1707.03(O).

    During 1975 and 1976, the defendant sold, either for himself or others, stock in C.C.A. The stock sold was part of the original shares issued to defendant and three other persons. All of the stock was sold to persons listed as "representatives" of C.C.A. None of the shares were sold to outsiders. Defendant has never registered any shares nor has he ever been licensed as a salesman or broker of securities. The shares were sold for varying amounts and all of the buyers indicated satisfaction with their purchase.

    Defendant was charged with multiple counts of violation of R. C. 1707.44(A), which provides as follows:

> "(A)  No person shall engage in the business
> of acting as broker for others in the purchase
> or sale of securities, sell securities, cause
> them to be sold, offer them for sale, cause
> them to be offered for sale, or engage in the
> business of buying, selling, or dealing in
> securities otherwise than in transactions
> through or with a licensed dealer, unless the
> securities are of a kind specified in division
> (G) or (I) of section 1707.02 of the Revised
> Code, the transactions are of a kind specified
> in divisions (B) to (L) and (O) to (Q) of
> section 1707.03 of the Revised Code, or in
> section 1707.04 or 1707.06 of the Revised
> Code, or the transactions are exempt under
> section 1707.34 of the Revised Code, without
> being licensed by the division of securities."

Defendant was also charged for the same sales with multiple counts

of violation of R. C. 1707.44(C), which provides, as pertinent, as follows:

> "(C) No person shall knowingly and inten-
> tionally sell, cause to be sold, offer for
> sale, or cause to be offered for sale, any
> security which comes under any of the fol-
> lowing descriptions:
>
> "(1) Is not exempt under section 1707.02 of
> the Revised Code, nor the subject matter of
> one of the transactions exempted in sections
> 1707.03, 1707.04, and 1707.34 of the Revised
> Code, has not been registered by description
> or qualified, and is not the subject matter
> of a transaction that has been registered by
> description;"

In the instance of either the charge of an illegal sale or sale

without a license, the crucial issue is whether defendant's sale of shares

of C.C.A. constituted an exempt transaction. If the transactions were

exempt, there was no requirement for defendant to be licensed and no

violation on his part by participating in a sale. In this respect, R. C.

1707.03(B) provides as follows:

> "(B) A sale of securities made by or on be-
> half of a bona fide owner, neither the issuer
> nor a dealer, is exempt, if such sale is made
> in good faith and not for the purpose of
> avoiding sections 1707.01 to 1707.45, inclusive,
> of the Revised Code, and is not made in the
> course of repeated and successive transactions
> of a similar character. * * *"

The principal issue in this case is who has the burden of proof

of whether the transactions in C.C.A. shares by defendant were exempt pur-

suant to R. C. 1707.03(B).

R. C. 1707.45, entitled Burden of Proof, provides as follows:

> "In any indictment, complaint, or information
> under section 1707.44 of the Revised Code, it
> shall not be necessary to negative the existence

of facts which would bring a security within
section 1707.02 or 1707.05 of the Revised
Code, or would bring a transaction within
section 1707.03, 1707.04, or 1707.06 of
the Revised Code or to negative existence of
facts which would bring a transaction within
the exceptions of sections 1707.33 and 1707.34
of the Revised Code. The burden of proof
shall be upon the party claiming the benefits
of any of such sections."

R. C. 2901.05 provides as follows concerning the burden and de-

gree of proof in a criminal case:

"(A) Every person accused of an offense is
presumed innocent until proven guilty beyond
a reasonable doubt, and the burden of proof
is upon the prosecution. The burden of going
forward with the evidence of an affirmative
defense is upon the accused.

"* * *

"(C) As used in this section, an 'affirmative
defense' is either of the following:

"(1) A defense expressly designated as affirma-
tive;

"(2) A defense involving an excuse or justifi-
cation peculiarly within the knowledge of the
accused, on which he can fairly be required to
adduce supporting evidence."

R. C. 1707.03(B) is expressly designated an affirmative defense

by R. C. 1707.45, as defined in R. C. 2901.05(C)(1). Moreover, the de-

fenses described by R. C. 1707.45 fit the definition of R. C. 2901.05(C)(2).

Thus the burden of proof referred to in R. C. 1707.45 is that of going

forward with the evidence rather than proving the defense by a preponder-

ance of the evidence.

As stated by the Supreme Court in *State v. Robinson* (1976), 47

Ohio St. 2d 103, and reiterated in *State v. Humphries* (1977), 51 Ohio St.

No. 77AP-728                                                                6

2d 95, a defendant who pleads an affirmative defense has only the burden
of going forward with evidence of a nature and quality sufficient to raise
that defense and does not have the burden of establishing such defense by
a preponderance of the evidence.  The burden of proof of only going for-
ward with the evidence set forth by R. C. 2901.05(A) is applicable to an
affirmative defense specified as such by a statute as well as one so re-
garded at common law.  R. C. 2901.05(C)(1) provides for a defense expressly
designated as affirmative, which includes the statutory defense herein set
forth in R. C. 1707.45.  See Committee Comment, R. C. 2901.05.

The Supreme Court of Michigan has similarly construed the burden
of proof under its security laws of proving an exemption or exception by
requiring the defendant to only produce evidence to go forward with the de-
fense rather than to prove the affirmative defense by a preponderance of
the evidence.  See *People v. Dempster* (1976), 242 N.W. 2d 381.  The
Michigan Exemption Statute, MSA Section 19.776 (402) (d), provides, similar
to R. C. 1707.45, that the burden of proving an exemption or exception is
upon the person claiming it.

The trial court overruled defendant's specific objection to the
charge on the exemption defense and instructed the jury that appellant must
sustain the burden of proof by a preponderance of the evidence.  Thus, the
trial court erroneously placed the burden of proof upon the defendant by
a preponderance of the evidence, contrary to R. C. 2901.05(A).

We need not consider whether the General Assembly can constitu-
tionally require defendant to prove an exemption defense by a preponderance
of the evidence as such proof is not required in Ohio.

Assignment of error number one is sustained.

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 5 of 201. PageID #: 4354

Defendant next argues that Ohio's statutory definition of reason-
able doubt and proof beyond a reasonable doubt, as set forth by R. C.
2901.05(D), violates due process of law in that its effect is to permit
proof of guilt by less than a reasonable doubt.

R. C. 2901.05(B) provides as follows:

"(B)  As part of its charge to the jury in a
criminal case, the court shall read the defini-
tions of 'reasonable doubt' and 'proof beyond
a reasonable doubt,' contained in division (D)
of this section.

"* * *

"(D)  'Reasonable doubt' is present when the
jurors, after they have carefully considered
and compared all the evidence, cannot say they
are firmly convinced of the truth of the charge.
It is a doubt based on reason and common sense.
Reasonable doubt is not mere possible doubt, be-
cause everything relating to human affairs or
depending on moral evidence is open to some pos-
sible or imaginary doubt.  'Proof beyond a reason-
able doubt' is proof of such character that an
ordinary person would be willing to rely and act
upon it in the most important of his own affairs."

Appellant objects to the last sentence of R. C. 2901.05(D), which
is the definition of proof beyond a reasonable doubt, arguing that proof
of such character that an ordinary person would be willing to rely and
act upon it in the most important of his affairs is not proof beyond a
reasonable doubt since the ordinary person is frequently required to act
upon proof of a lesser nature by choosing the most preferable course of
action.  There is certainly much validity in this argument as it seems
that the definition of "proof beyond a reasonable doubt" tends to water
down the preceding definition of "reasonable doubt."  See *Scurry v. United
States* (D.C., 1965), 347 F. 2d 468; cert. denied 389 U.S. 883 (1967).

This court has recently decided that the revised definition of

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 6 of 201. PageID #: 4355

reasonable doubt set forth by R. C. 2901.05(D) does not establish a
fundamentally different test than set forth in repealed R. C. 2945.04,
citing *State v. Gettys* (1976), 49 Ohio App. 2d 241 at 250. See *State v.
May*, case No. 77AP-509, unreported decision rendered on December 27, 1977
(1977 Decisions, page 4814). That view is in accordance with the comment
of the Criminal Code Committee. However, in the author's viewpoint the
reasoning to the contrary of Judge McBride in *State v. Crenshaw* (1977),
51 Ohio App. 2d 63, Judge Whiteside in the dissent appears more sound.
Judge McBride, speaking for the Court of Appeals of Montgomery County, con-
cluded that proof of reasonable doubt as defined by R. C. 2901.05(D) reduces
the level of doubt from an abiding conviction to a moral certainty to a
present firm conviction.

The United States Supreme Court has expressed the assumption that
proof of a criminal charge beyond a reasonable doubt is constitutionally
required. See *In re Winship* (1970), 397 U.S. 358, at 362. It would appear
that possible error could be eliminated, perhaps of constitutional magni-
tude, if the final sentence of R. C. 2901.05(D) were deleted, or if the
word "unhesitatingly" were added to the last sentence before "in the most
important of his own affairs." I would recommend that trial courts modify
the statutory definition to this extent until the issue is decided by the
Ohio Supreme Court.

It can be argued that the final sentence of R. C. 2901.05(D) must
be read in context with the preceding definition of reasonable doubt and
thus, as a whole, preserves the requirement of proof beyond a reasonable
doubt.

Since this issue has been decided by this court in *State v. May*,

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 7 of 201. PageID #: 4356

to avoid a conflict within the court, I will follow our ruling in *State
v. May.*

Assignment of error number two is overruled.

Appellant's third assignment of error raises the question of
whether appellant can be convicted and sentenced for selling unregistered
securities as well as selling securities without a license based on the
same transaction.

R. C. 2941.25 provides as follows:

"(A)  Where the same conduct by defendant can
be construed to constitute two or more allied
offenses of similar import, the indictment or
information may contain counts for all such
offenses, but the defendant may be convicted
of only one.

"(B)  Where the defendant's conduct constitutes
two or more offenses of dissimilar import, or
where his conduct results in two or more of-
fenses of the same or similar kind committed
separately or with a separate animus as to each,
the indictment or information may contain counts
for all such offenses, and the defendant may be
convicted of all of them."

There was no separate animus in any one transaction for the sale
of the securities and the lack of a license.  Thus, whether defendant may
be convicted of one or two counts for the same sale depends upon whether
selling unregistered securities and sale without a license are offenses of
similar or dissimilar import.

The classic case of allied offenses of similar import are receiv-
ing stolen property and theft of the same property.  The Supreme Court
pointed out that receiving is technically not an included offense of theft,
but that they are allied offenses of similar import, and that in a practical
sense receiving is an included offense of theft. *Maumee v. Geiger* (1976),

No. 77AP-728

45 Ohio St. 2d 238.  The Supreme Court stated that an accused may be tried for both offenses but may be convicted and sentenced for only one.  The election may take place after the jury finds defendant guilty of both offenses.

A defendant with a license to sell securities can be convicted of sale of an unregistered security.  A defendant without a license who sells a registered security can be convicted of failure to have a license. If the securities in this case are not exempt, the seller, to avoid violation of the security laws, must both register the shares prior to sale and obtain a license to sell them.  The offenses, while not involving a separate animus, are offenses of dissimilar import.

Appellant's third assignment of error is overruled.

Appellant's fourth assignment of error is that the trial court incorrectly defined "knowingly," an element of the offense set forth in R. C. 1707.44(C), and erroneously rejected appellant's special instruction concerning knowledge which, in effect, permitted the jury to find that the defendant acted knowingly even if he was ignorant or mistaken as to the law of securities.

The trial court defined knowingly in the exact terms of R. C. 2901.22(B), which states as follows:

> "(B)  A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."

The court also added the following (Tr. 529):

> "* * * Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence.  You will

> determine from these facts and circumstances
> whether they existed at the time in the mind
> of the Defendant, and the awareness or belief
> that he was selling, causing to be sold, offer-
> ing for sale, or causing to be offered for sale
> the appropriate securities."

The court correctly charged the jury as to the definition of
knowingly and properly rejected appellant's instruction which would per-
mit a finding of innocence based on ignorance of law.

Moreover, defendant testified that he knew the securities were
not registered, that he had no licensed to sell securities and that he
sold the securities.

Appellant's fourth assignment of error is overruled.

Appellant's first assignment of error is sustained, and appellant's
second, third and fourth assignments of error are overruled.  The judgment
of the trial court is reversed.  The case is remanded to the trial court
for further procedure consistent with this decision.

> HOLMES, P.J., concurs in part and dissents in part.
> WHITESIDE, J., concurs in part and dissents in part.

---

HOLMES, P. J., dissenting in part and concurring in part.

I must dissent from the majority decision.  It is my view that
the special statute R. C. 1707.45 was enacted by the General Assembly for
a specific purpose, i.e., to protect the public from the foibles and prob-
lems inherent in the promotion and sale of stocks and securities.  To
apply a later enacted general statute relating to burden of proof in

criminal statutes would not be to carry out the intent of the legislature.
If the legislature has intended to nullify the burden in the prior en-
acted specific statute, it could have well done so but it did not choose
to do so.

Whenever a prior special act and a later general statute are in
conflict, the special act should remain in force as an exception to the
general, *Leach v. Collins* (1931), 123 Ohio St. 530.

I must also disagree with my colleagues as it would relate to
assignment of error number two in that I adhere to this court's prior
determination that the statutory definition of "reasonable doubt" does
not violate the due process clause of the Fourteenth Amendment to the
United States Constitution.  I reaffirm my position as announced in this
court's prior decision in *State v. May*, case number 77AP-509, decision
rendered on December 27, 1977 (1977 Decisions, page 4814).

I agree with the majority decision as it relates to assignments
of error numbers three and four.

_____

WHITESIDE, J., concurring in part and dissenting in part.

Although I concur in the majority opinion with respect to the
first, third, and fourth assignments of error, I am unable to concur with
the overruling of the second assignment of error.

With respect to the first assignment of error, I would further
find that the trial court's application of R. C. 1707.45 herein is incon-
sistent with *Mullaney v. Wilbur* (1975), 421 U.S. 684; 95 S. Ct. 1881.

R. C. 1707.44(A) and 1707.44(C), set out in full in the majority

opinion, so define the offenses involved that there is no violation of
the statutes if the transaction is of a kind specified as exempted by
R. C. 1707.03.  Such statutes do not give rise in the true sense to an
affirmative defense.  R. C. 1707.44(A) creates as one element of the
offense the sale of securities required to be registered under Ohio law
and precludes anyone other than a licensed dealer from selling securities
required to be registered.  Similarly, R . C. 1707.44(C) creates as an
element of the offense the sale of securities required by law to be
registered but which are not registered.

     The trial court's charge effectively removed any burden of the
state to prove the securities were ones required to be registered.  In
short, the charge relieved the state of proving that the securities law
was violated and placed on defendant the burden of proving by a preponder-
ance of the evidence that he had not violated the Ohio Securities Law.
Proof respecting whether or not a violation of law has occurred (that is
whether the securities are required to be registered or are exempt), is
basic to the offense.  Placing the burden of proof upon defendant results
in requiring him to prove the critical fact in dispute.

     Although R. C. 1707.45 was in effect when present R. C. 2901.05
was enacted, they must, pursuant to R. C. 1.51, be construed to give effect
to both.  The majority opinion sets forth the basis for so doing.  R. C.
1707.45 makes the matter an affirmative defense, and R. C. 2901.05 defines
defendant's burden as that of going forward with the evidence.   In addi-
tion, this result is necessary to avoid the constitutional problem stated
above.  See R. C. 1.47(A).

     With respect to the new statutory definition of reasonable doubt,

however, I am unable to concur with the majority, even in the interest of preserving uniformity. Although in the unreported decision rendered in *State v. May*, No. 77AP-509, Court of Appeals of Franklin County, December 27 1977 (1977 Decisions, page 4814), the majority of this court found R. C. 2901.05(D) to be constitutional, it did so in reliance upon *State v. Gettys* (1976), 49 Ohio App. 2d 241. However, *Gettys* did not involve the constitutional issue, the only issue determined being whether it was error to charge in accordance with R. C. 2901.05(D) when the crime involved was committed prior to the effective date of said section.

Moreover, in *May*, this court did not discuss *State v. Crenshaw* (1977), 51 Ohio App. 2d 63, which considered the constitutional issue.

*Gettys* and *May* referred to the committee comment to R. C. 2901.05 (D), which states that: "* * * The definition of reasonable doubt combines elements of the former Ohio and existing federal definitions, restylized for greater ease of understanding." The comment fails to recognize that the restylizing has changed and distorted the former definitions to such an extent that the statutory definition of reasonable doubt requires little more than a preponderance of the evidence.

The first sentence of the statutory definition defines reasonable doubt as being only clear and convincing evidence, stating:

> "'Reasonable doubt' is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge.* * *"

In *Cross v. Ledford* (1954), 161 Ohio St. 469, the Supreme Court defined such standard as being that of clear and convincing evidence,

No. 77AP-728                                                         15

stating in the third paragraph of the syllabus that:

> "Clear and convincing evidence is that measure
> or degree of proof * * * which will produce in
> the mind of the trier of the facts a firm belief
> or conviction as to the facts sought to be
> established."

The distinction between reasonable doubt and clear and convincing

is set forth in the opinion of *Cross*, at page 477, as follows:

> "* * * Clear and convincing evidence is that
> measure or degree of proof which will produce
> in the mind of the trier of facts a firm be-
> lief or conviction as to the allegations sought
> to be established.  It is intermediate, being
> more than a mere preponderance, but not to the
> extent of such certainty as is required beyond
> a reasonable doubt as in criminal cases.  It
> does not mean clear and *unequivocal*. * * *"

Proof beyond a reasonable doubt means clear and *unequivocal*.  The

first sentence of R. C. 2901.05(D) requires only that there be a firm be-

lief or conviction but does not require that such belief be unequivocal.

For this reason, the statutory definition is constitutionally inadequate.

Trial courts may correct this constitutional defect, however, by

the addition of a single word "unequivocally" to the first sentence of

R. C. 2901.05(D), so that it states:

> "'Reasonable doubt' is present when the jurors,
> after they have carefully considered and com-
> pared all the evidence, cannot say they are
> firmly *and unequivocally* convinced of the truth
> of the charge. * * *" (Emphasis added.)

An even more serious constitutional defect is created by the last

sentence of the statutory definition of R. C. 2901.05(D), which states:

> "* * * 'Proof beyond a reasonable doubt' is
> proof of such character that an ordinary person
> would be willing to rely and act upon it in the
> most important of his own affairs."

-213-
305

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 14 of 201. PageID #: 4363

Although an ordinary person may hesitate to act because of a
reasonable doubt with respect to the most important of his own affairs,
he makes his decision and acts upon what he decides is probably better,
or best, to do under the circumstances--a test akin to the preponderance
of the evidence test and requires even a lesser degree of certainty than
the clear and convincing test.

The last sentence of the statutory definition is defective be-
cause it permits a finding of proof beyond a reasonable doubt, even in
circumstances where an ordinary person would pause and hesitate to take
action concerning the most important of his own affairs. One frequently
may act despite hesitation because of doubt. The correct charge upon this
basis, and the one used by many jurisdictions (see 36 Words and Phrases,
536-543), was approved in *McGoon v. State* (1931), 39 Ohio App. 212, which
affirmed a charge that reasonable doubt "* * * is such a doubt as would
cause a reasonable, prudent and considerate person to pause and hesitate
to take action concerning the matters affecting his own material interests
or matters pertaining to the more important matters of life."

No case has been cited wherein the last sentence of R. C. 2901.05
(D) has been approved as a proper definition of reasonable doubt, nor has
research revealed any. Instead, emphasis is placed upon hesitation to act,
rather than acting with or without hesitation.

There are cases wherein courts have refused to reverse a convic-
tion because of failure of the trial court to define reasonable doubt that
would make a person hesitate to act. *E.g. Holland v. United States* (1954),
348 U.S. 121, 75 S. Ct. 127, and *Scurry v. United States* (1965), 359 F. 2d
468. In such cases, however, the defendant had failed to raise the issue
at trial, and the courts found that the instructions as a whole correctly

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 15 of 201. PageID #: 4364

conveyed the concept of reasonable doubt.

The statutory definition, however, fails to accomplish this purpose, first defining reasonable doubt in terms of clear and convincing evidence, and then defining proof beyond a reasonable doubt substantially in terms of preponderance of the evidence. The present statutory definition conveys no better concept of reasonable doubt than the charge found to be prejudicially erroneous in *State v. Sargent* (1975), 41 Ohio St. 2d 85, although that case is distinguishable and not controlling, the trial court having given the former statutory charge and then erroneously expanding upon it. Again, the constitutional defect in the last sentence of R. C. 2901.05(D) can be cured by the addition of the single word "unhesitatingly," which changes the import of the sentence so as to correctly reflect the nature of reasonable doubt. Accordingly, trial courts may correct the constitutional defect of the last sentence of R. C. 2901.05(D), so that it states:

> "* * * 'Proof beyond a reasonable doubt' is
> proof of such character that an ordinary person
> would be willing *unhesitatingly* to rely and act
> upon it in the most important of his own affairs."
> (Emphasis added.)

It is not necessary that reasonable doubt be explained by reference to the confusing term "moral certainty." However, any change must embody the same meaning. The present statute, R. C. 2901.05(D), does not, but instead, creates a much lower standard for proof beyond a reasonable doubt. The suggested additions herein would correct the defect in the statutory definition and convey the import of "moral certainty" without using the term. There are undoubtedly other methods of explaining reasonable doubt

No. 77AP-728                                                    18

without using the term "moral certainty." However, the present statutory
definition fails to accomplish this purpose and instead so dilutes the
meaning of reasonable doubt so as to require little more than a preponder-
ance of the evidence (and at most clear and convincing evidence), to support
a finding of proof beyond a reasonable doubt.

Accordingly, I would sustain the second assignment of error.
Hopefully, upon retrial of this case and in future cases, trial courts will
so modify the statutory definition as to cure its constitutional defect
until such time as the General Assembly takes appropriate action to correct
the statutory definition.

---

DISCOVERY— New trial ordered as sanction for prosecutor's
failures to give adequate discovery.

IN THE COURT OF APPEALS OF FRANKLIN COUNTY, OHIO

State of Ohio,                          :

    Plaintiff-Appellee,          :

v.                                      :          No. 81AP-663

Gregory Hill,                           :

    Defendant-Appellant.         :

---

D E C I S I O N

Rendered on March 25, 1982

---

MR. MICHAEL MILLER, Prosecuting Attorney,
MS. KAREN L. MARTIN, Assistant,
    Franklin County Hall of Justice,
    369 South High Street,
    Columbus, Ohio 43215,
    For Plaintiff-Appellee.

MR. JAMES KURA, Franklin County Public Defender,
MR. ALLEN V. ADAIR, Assistant,
    400 South Front Street,
    Columbus, Ohio 43215,
    For Defendant-Appellant.

---

NORRIS, J.

    Defendant appeals from his conviction in the Court of
Common Pleas for Franklin County for aggravated robbery, felonious
assault, and possession of a dangerous ordnance.

    Lynn Marsh was the owner of a combination car wash and
beer-wine carryout. About midnight, during the evening of December
13-14, 1980, while he was closing the carryout, he opened the door for
someone he assumed was seeking change for the car wash, and was

No. 81AP-663                                                                      2

confronted by a man wearing a ski mask and carrying a sawed-off
shotgun. Marsh was told he was to be robbed, to open the cash register,
and to lie face down on the floor. Another man then entered, and, while
Marsh was on the floor, he was struck on the head with a hard object,
causing profuse bleeding.

Catherine Sprouse, of Jackson, Ohio, testified that, at
around noon on December 14, defendant came to her house carrying a ski
mask and a case containing a sawed-off shotgun; and that defendant told
her he had come to Jackson in order to establish an alibi, and that he
had robbed a carryout and thought he had killed a man. Mrs. Sprouse's
son, who was present, testified to essentially the same circumstances.

A member of the narcotics division of the Columbus Police
Department testified that, while attempting to buy drugs on December 4,
he had seen defendant with a sawed-off shotgun. The same police officer
arrested defendant on December 17, while he was in possession of the
sawed-off shotgun.

Defendant raises four assignments of error:

"1. Improper application of Criminal Rule
16(B)(1)(g) providing for in camera inspection
of the statement of a witness denied appellant
due process of law.

"2. Failure on the part of the prosecution to
disclose evidence favorable to the defendant
pursuant to Criminal Rule 16(B)(1)(f) denied
appellant a fair trial and due process of law.

"3. Opinion testimony was erroneously admitted,
the witness not having been found qualified to
testify as an expert and not having stated
whether or not the opinions expressed were
based on reasonable scientific certainty.

"4. Under the totality of the circumstances
presented upon the record, appellant was denied
a fair trial and due process of law."

No. 81AP-663                                                    3

        In his first assignment of error, defendant argues that he

was prejudiced by the failure of the trial court to grant him a proper

in camera inspection of certain statements of witnesses, as mandated by

Crim. R. 16(B)(1)(g), which provides:

> "(g) In camera inspection of witness' state-
> ment. Upon completion of a witness' direct
> examination at trial, the court on motion of
> the defendant shall conduct an in camera inspec-
> tion of the witness' written or recorded state-
> ment with the defense attorney and prosecuting
> attorney present and participating, to deter-
> mine the existence of inconsistencies, if any,
> between the testimony of such witness and the
> prior statement.
>
> "If the court determines that inconsistencies
> exist, the statement shall be given to the
> defense attorney for use in cross-examination
> of the witness as to the inconsistencies.
>
> "If the court determines that inconsistencies
> do not exist the statement shall not be given
> to the defense attorney and he shall not be
> permitted to cross-examine or comment thereon.
>
> "Whenever the defense attorney is not given the
> entire statement, it shall be preserved in the
> records of the court to be made available to
> the appellate court in the event of an appeal."
> [Crim. R. 16(B)(1)(g).]

        The first question posed to Mr. Marsh by defense counsel on

cross-examination was whether he had made a written report of the

incident to the police department. Upon receiving an affirmative

answer, defense counsel moved for an in camera inspection, citing Crim.

R. 16(B)(1)(g). The trial court examined the two-page typewritten

general complaint from the Hilliard Police Department prepared by an

officer of that department, and purporting to be a summary of facts

related to him by Mr. Marsh upon investigation on December 14, 1980.

The report indicated in typewriting that Mr. Marsh had signed the

No. 81AP-663                                                          4

report under this language: "[t]he above report is true and correct to the best of my knowledge * * *." After concluding that the report was a written statement under Crim. R. 16(B)(1)(g), and determining that there were no inconsistencies between the statement and Mr. Marsh's testimony, the trial court overruled defense counsel's motion. Defense counsel moved for a mistrial on the ground that the judge had both examined the statement and ruled from the bench, denying him participation in an in camera inspection. The motion was overruled, and the trial court ordered the statement preserved as an exhibit of the court.

While it is clear that the trial court did not comply with the mandate of Crim. R. 16(B)(1)(g), we have reviewed the statement and find no inconsistencies. Accordingly, while there was error, defendant may not have been prejudiced by that error. See State v. White (1968), 15 Ohio St.2d 146; State v. Johnson (1978), 62 Ohio App.2d 31.

When defense counsel cross-examined Mrs. Sprouse, he determined that she had made a written report, and he again demanded an in camera inspection. The trial judge overruled the motion, apparently on the basis that the statement was not available to him and he therefore could not determine whether Mrs. Sprouse was referring to a statement she made, or to police department notes. Later, after Mrs. Sprouse had completed her testimony, the state had completed direct examination of the next witness, and counsel and the trial court were in chambers, the prosecutor handed to the court a typewritten two-page investigation report prepared by a detective with the Hilliard Police Department on December 19, 1980, relating an interview with Mrs. Sprouse and her son. The court found inconsistencies between the report and Mrs. Sprouse's testimony, and offered defense counsel the

-220-

opportunity to cross-examine her on those inconsistencies. Defense counsel moved for a mistrial saying that the statement was provided him too late. The motion was overruled.

While the trial court was tardy in permitting an in camera inspection of the Sprouse statement, defendant was not necessarily prejudiced thereby, since opportunity was afforded for cross-examination.

In his second assignment of error, defendant argues that the failure of the state to provide discovery by informing him that Marsh had undergone hypnosis in an effort to assist him in recalling details of the robbery, and the trial court's refusal to impose sanctions for that failure, prejudiced defendant's cause. The state did not reveal the hypnosis session to defense counsel until he had commenced his cross-examination of Marsh, in spite of pretrial discovery requests having been made by the defense. Upon the representation of the prosecutor that he had learned of the hypnosis session only a few minutes before revealing it, the trial judge overruled a defense motion for mistrial on the basis that so severe a sanction was not warranted in the absence of prosecutorial misconduct. Defense counsel was permitted to review the tape recording of the hypnosis session, and apparently agreed with the court's assessment that there was nothing inconsistent among the tapes, the victim's pretrial statement to police, and his testimony at trial. Defense counsel continued to complain that failure to reveal the hypnosis left him at a disadvantage in trial preparation--he had been unable to explore the potential such a session would have for post-hypnotic suggestion and the resulting unreliability of the victim's testimony at trial--and, in

voir dire and opening statements. His later motion for a continuance
was also overruled by the trial court.

          We agree with defense counsel that the fact of the hypnosis
session was subject to pretrial discovery under Crim. R. 16(B)(1)(d) or
(f).[1]  However, because the trial judge possesses a wide range of
discretion in determining what sanctions should be applied for failure
to provide discovery, we are unable to say that the trial court abused
its discretion by refusing the extreme sanction of mistrial. Whether
the trial court should have ordered the lesser requested sanction of a
continuance, is a closer question. Nevertheless, even if the trial
court did err in not granting a continuance, the error was not
necessarily prejudicial to defendant's cause in view of there being no
inconsistencies in the victim's relation of events in his statement to
police, in the hypnosis session, and in his testimony at trial.
Unreported decision of this court in State v. Flowers, No. 78AP-830,
rendered on June 21, 1979 (1979 Decisions, page 1682, at 1687).

          The third assignment of error, which complains of the
qualifications of a "criminalist" who was permitted to testify for the
state as an expert witness concerning the sawed-off shotgun and its
carrying case, is overruled. Defense counsel failed to object to the
lack of qualifications of the expert witness at trial, and has not in
this appeal demonstrated plain error. Under Crim. R. 52(B), plain
errors or defects affecting substantive rights may be noticed on appeal
even though they were not brought to the attention of the trial court.
However, the rule is invoked only in exceptional circumstances where

---

[1]Subdivision (d) of Crim. R. 15(B)(1) provides for pretrial discovery
of " * * * physical or mental examinations, and of scientific tests or
experiments * * * ," while subdivision (f) provides for pretrial dis-

No. 81AP-663                                                                 7

the error affects the fairness, integrity, or public reputation of judicial proceedings, and in order to avoid a miscarriage of justice. State v. Wolery (1976), 46 Ohio St.2d 316, at 327; State v. Craft (1977), 52 Ohio App.2d 1, at 7.

In his fourth assignment of error, defendant complains that an accumulation of problems in discovery and at trial combined to deny him a fair trial. In addition to the complaints raised in the first and second assignments of error, defendant cites the failure of the state to have advised him in pretrial discovery that Mrs. Sprouse was a paid police informant, and, of a misquoting of testimony by the prosecutor in final argument, all of which had been called to the trial court's attention.

While none of these problems by themselves would warrant a reversal of defendant's conviction, when taken together, in combination, their detrimental effect accumulated to the point where defendant's cause was prejudiced and it cannot be said that he received a fair trial. While granting a mistrial was not mandatory, the trial court should have applied other proper sanctions in an effort to cure the individual infractions as they were brought to the court's attention. The first, second, and fourth assignments of error are sustained.

The third assignment of error is overruled, the first, second, and fourth assignments of error are sustained, the judgment of the trial court is reversed, and this case is remanded to the trial court for a new trial.

Judgment reversed and remanded for new trial.

WHITESIDE, P.J., and McCORMAC, J., concur.

-223-

COURT OF APPEALS OF OHIO, EIGHTH DISTRICT

COUNTY OF CUYAHOGA

NO. 51704


STATE OF OHIO

      Plaintiff-Appellee

  -vs-

PERCY "JUNE" HUTTON

      Defendant-Appellant

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

JOURNAL ENTRY
and
OPINION

DATE OF ANNOUNCEMENT
OF DECISION:

APRIL 28, 1988

CHARACTER OF PROCEEDING:

Criminal appeal from
Common Pleas Court,
No. CR-203416.

JUDGMENT:

Reversed and remanded.

DATE OF JOURNALIZATION:

APPEARANCES:

For Plaintiff-Appellee:

John T. Corrigan, Esq.
Cuyahoga County Prosecutor
Justice Center
1200 Ontario Street
Cleveland, OH 44113

For Defendant-Appellant:

Floyd B. Oliver, Esq.
1949 East 105 Street
Cleveland, OH 44106

DAVID T. MATIA, J.:

Defendant-appellant, Percy "June" Hutton, appeals his conviction, death sentence and other sentences for two counts of aggravated murder with gun, mass murder, and felony murder specifications; two counts of kidnapping with gun specifications; and one count of attempted murder with gun and violence specifications.

On October 16, 1985, the grand jury of Cuyahoga County returned a true bill of indictment against the appellant for: two counts of aggravated murder, one count of attempted murder, and two counts of kidnapping, all with various specifications (as enumerated above). The defendant entered a plea of not guilty to these charges at his arraignment on October 18, 1985.

The matter went to trial on January 13, 1986. The appellant was convicted of all five counts and specifications as follows:

a) one count of aggravated murder (R.C. 2903.01(A)) of Derek "Ricky" Mitchell with gun, mass murder, and felony murder specifications;

b) one count of aggravated murder (R.C. 2903.01(B)) of Derek "Ricky" Mitchell with gun, mass murder, and felony murder specifications;

c) two counts of kidnapping (R.C.. 2905.01) of Derek "Ricky" Mitchell and Samuel Simmons, Jr. with gun specifications;

d) one count of attempted murder of Samuel Simmons, Jr. (R.C. 2903.02/2923.02) with gun and violence specifications.

-2-

The evidence at trial offered by the state and the defendant was frequently parallel.  However, the major factual issues were vigorously disputed.  We will discuss the evidence under the following two headings below.

## I.  The State's Case

The evidence at trial on behalf of the state of Ohio began with the testimony of Samuel Simmons, Jr.  Samuel Simmons, Jr. (victim number one) was to evolve in this matter as the victim of the third count of the indictment, kidnapping, and the fifth count of the indictment, attempted murder.  Simmons testified that he knew the appellant nearly all of his life and commonly referred to him as a 'brother,' although they were not related. Simmons stated that in mid-September of 1985, the appellant approached Simmons regarding an allegedly stolen sewing machine which the appellant accused Simmons and Derek "Ricky" Mitchell (victim number two) of stealing.  The appellant threatened to kill both Simmons and Mitchell (victim number two under the first and second counts of aggravated murder with specifications and the fourth count of kidnapping)  if the appellant found out that they had anything to do with the theft of the appellant's sewing machine.

Simmons testified that the defendant and Bruce Laster (the co-defendant in this case, but not on trial in the case sub judice)  picked Simmons up at his house in the early morning hours of Monday, September 16, 1985, ostensibly to repair a

motor vehicle Simmons said the appellant wanted him to help the appellant repair.  Simmons testified that he entered the back seat of appellant's Chrysler Cordoba automobile and seated himself next to a .22 caliber rifle.  However, before going directly to the vehicle needing repair, the appellant, co-defendant Laster, and Simmons drove to Mitchell's house on Norman Avenue to discuss the appellant's missing sewing machine.  Simmons testified that he had been told by the appellant that $750 in cash was hidden in the sewing machine. The money was to be used by the appellant for his tuition at an auto mechanic's school in Indianapolis, Indiana.

After speaking with the appellant, Mitchell then agreed to go with the appellant, co-defendant Laster, and Simmons to talk to an unidentified man who had told the appellant that Mitchell tried to sell him a stolen sewing machine.  Instead of driving to the unidentified man's house, the appellant drove to the Regional Transit Authority lot on East 93 Street.  Upon arrival, the appellant ordered Mitchell out of the car and walked him to the edge of the street.  Although Simmons could not hear the conversation, Simmons did see the appellant hold a handgun to Mitchell's head.  Simmons remained in the car with the co-defendant Laster, who held a rifle in his hand.

The appellant and Mitchell returned to the car.  Then Mitchell directed the appellant to drive to East 30 Street and Community College Avenue.  Mitchell entered a house and shortly

thereafter motioned for the appellant to come into the house. The appellant went into the house. The appellant then returned to the car with a white sewing machine case and placed it in the trunk of the car. Mitchell also returned from the house to the appellant's car.

The appellant then drove to his mother's house on East 101 Street and Cedar Avenue and took the white colored sewing machine case into the house. The co-defendant Laster held a rifle in his hand until the appellant came out of the house.

Then they all drove up the street to an alley where the appellant stopped and pointed to a Cadillac Eldorado which Simmons claims the appellant wanted Simmons to repair for the appellant.

After Simmons and the appellant got out of the appellant's car, the appellant then decided to move his Chrysler Cordoba away from the Cadillac Eldorado which was parked in the alley. The appellant moved his Chrysler Cordoba out of view from the alley to a point on the next street. Co-defendant Laster and Mitchell remained in appellant's automobile. Appellant then walked back to Simmons who was still standing in the alley, opened the driver's door and the hood of the car, and told Simmons to get into the car and start the car with a screwdriver. Simmons testified appellant then shot him twice in the back of the head with a handgun while Simmons was seated in the Cadillac Eldorado. Whereupon, the appellant ran down the

alley to his Chrysler Cordoba on the next street.  Simmons fell
out of the Cadillac Eldorado onto the alley.  With great
difficulty, Simmons made his way up the alley and down the
street to the appellant's mother's house where he banged on the
door.  However, no one answered the door.  Simmons immediately
proceeded to the next door neighbor's house, banged on the front
door, and requested help.  When Simmons heard the appellant
drive up to the house, he ran into the backyard.  The appellant
repeatedly told Simmons "Come here.  Come here."  (Tr. 972).
Simmons asked the appellant to take him to the hospital, fearing
he would die without treatment.  Co-defendant Laster and
Mitchell were still in the appellant's auto.  The wounded
Simmons entered the appellant's auto whereupon the appellant,
Mitchell and co-defendant Laster all drove Simmons to St. Luke's
Hospital.  En route, Simmons told Mitchell that the appellant
had shot him, but the appellant denied Simmons' version and said
he (appellant) saw a man come out of a house in the vicinity of
the Cadillac Eldorado and shoot Simmons.  (Tr. 973-974).  On
cross-examination, Simmons testified that he did not tell
Mitchell who had shot him.  He also testified that he repeatedly
asked Mitchell to go into the hospital with him.  (Tr. 1097,
1105).

Upon arrival at St. Luke's Emergency Room, none of the
occupants of the car wished to accompany Simmons into the
hospital.  However, Mitchell did help Simmons out of the car and

guided him into the arms of a security guard who ran outside to assist Simmons. Mitchell returned to the appellant's car and thereafter, the appellant, co-defendant Laster, and Mitchell sped off. Then the appellant, co-defendant Laster, and Mitchell drove to Mitchell's house to pick up Eileen Sweeney, Mitchell's girlfriend. Ms. Sweeney had been living there with her boyfriend, Mitchell. They all drove Sweeney to St. Luke's so she could check on Simmons' condition. Sweeney testified that this was the last time she saw Mitchell alive.

Simmons testified that he spoke with Sweeney at the hospital before he went into surgery. He told her "Percy Hutton is the one who shot me. Go out there and tell Ricky [Mitchell] to get out that car (sic) and come into the hospital." (Tr. 977). Sweeney rushed out of the room and Simmons didn't see her again that morning (Monday, September 16, 1985).

Eileen Sweeney testified she ran outside to the parking lot but appellant's car was gone. She waited at the hospital until the appellant returned to the hospital parking lot. The appellant and co-defendant Laster did return to the hospital but without Mitchell. Sweeney inquired of appellant as to the whereabouts of Mitchell. The appellant told her that Mitchell was at home and that he would take her there. However, instead of taking her directly home, Sweeney testified that co-defendant Laster dropped her and the appellant off at a park on Fairhill Road where the appellant raped her. Defense counsel objected

-7-

prior to the introduction of the rape testimony, and after a
sidebar conference, the trial court instructed the jury that
they were "about to receive evidence which might tend to show
that this Defendant committed other criminal acts which have not
been included in this case and, therefore, are not before you
[the jury] for your consideration.***" (Tr. 1181). The court
instructed the jury to disregard any other evidence with respect
to the conduct of the appellant. (Tr. 1182). Further, the
trial court later cautioned the jury that the testimony was
admitted for the very limited purpose of establishing continuity
of the events. (Tr. 1332).

It should be noted that in a second subsequent indictment
the appellant was charged with two counts of rape with
specifications and one count of kidnapping Eileen Sweeney with
specifications. The prosecutor moved the court prior to the
trial sub judice to combine the second rapes-kidnapping
indictment with the present indictment and to try the additional
crimes of rape and kidnapping in the same proceedings with the
aggravated murders, attempted murder, and kidnapping counts.
(Tr. 3). The court denied the prosecutor's request for joinder
and agreed with the defendant's objections to the merger. (Tr.
6).

While at the park, the appellant threatened Sweeney with a
handgun and told her "Ricky wasn't coming back" and "to forget
about him." (Tr. 1265). Upon co-defendant Laster's return to

-8-

the park in the auto, appellant took two rifles out of the trunk and placed them in the backseat of the car. (Tr. 1184). Appellant then drove Sweeney to her home located on Norman Avenue. Sweeney testified that the house had been ransacked while she was at the hospital and that Mitchell was not there. She asked appellant to drive her to Mitchell's grandmother's house off East 112 Street and Miles Avenue. Once there, appellant escorted her into the house and told her "***Ricky wasn't coming back, and if I told someone would be looking for me." (Tr. 1191). She told appellant she wouldn't tell anyone. However, upon the appellant's departure, Sweeney informed LaWanda Mitchell, the sister of Mitchell, of the events that occurred in the early hours of Monday, September 16, 1985.

Both Simmons and Sweeney reported the events of the morning of Monday, September 16, 1985 to the police. On September 30, 1985, a decomposed unidentified body was found at East 88 Street and St. Catherine Avenue. Mitchell's body was so decomposed that Mitchell's family members could not identify Mitchell's body. (Tr. 1440). However, Eileen Sweeney and LaWanda Mitchell did identify Mitchell's shoe. Later, x-rays of Mitchell's hand, taken in connection with a previous accident, corresponded with x-rays taken at the coroner's office, and a positive identification of Mitchell was obtained.

-232-

-8-

-9-

Deputy Coroner Robert Challener testified that he could not positively state how long Mitchell had "been dead, but he estimated the time at approximately two weeks before the body was found. Mitchell sustained gunshot wounds to the left side of his head and to the right side of his chest.

Based on the information received from Simmons and Sweeney, the appellant was arrested on October 5, 1985. At his arraignment on October 28, 1985, appellant pled not guilty.

-10-

## II.  The Defense

The appellant presented four witnesses on his own behalf.

The first witness, Denise Richardson, testified that she saw Mitchell on the afternoon of Tuesday, September 17, 1985. (The testimony during the state's case was that the last time Mitchell was seen alive was on Monday, September 16th.) Richardson testified that on Tuesday, September 17, 1985, she saw Mitchell carrying a white sewing machine case and he asked her if she had seen the appellant or knew his whereabouts.

The second witness was Samuel Simmons, Sr.  He testified that his son, Samuel Simmons, Jr.'s reputation for truthfulness was not very good. (Tr. 1848). Simmons, Sr. knew the appellant "all his life" and his reputation for truthfulness was "very good." (Tr. 1850). He testified that he went to St. Luke's Hospital to see his son on Monday, September 16, 1985 and his son said he didn't know who shot him. (Tr. 1053).

Appellant's third witness was Celeste Laster.  Celeste Laster, the appellant's girlfriend and the sister of the co-defendant Bruce Laster, testified she, the appellant, and co-defendant Laster were at the appellant's mother's house on East 101 Street and Cedar Avenue when Mitchell banged on their front door in the early morning hours of Monday, September 16, 1985. She woke the appellant up while Mitchell was yelling "Sam [Simmons] got shot." (Tr. 1870).  She heard Simmons shouting to the appellant "Somebody shot me, man.  Take me to the hospital."

-234-

She said the appellant got dressed and drove Simmons and Mitchell to the hospital. The appellant returned home after 4:00 a.m., Monday, September 16, 1985. Later that morning Celeste Laster and the appellant visited Simmons at the hospital.

The appellant left for mechanic's school in Indianapolis, Indiana on Tuesday, September 17, 1985.

Appellant's fourth witness, Mary Alice Jefferson, the evening desk clerk at the Indianapolis, Indiana Y.M.C.A., testified to the fact that appellant was a resident at the Y.M.C.A. while attending mechanic's school.

Finally, the appellant took the stand and testified that Simmons and Mitchell broke into the appellant's house on Corlett Avenue and stole the upstairs neighbor's sewing machine. The appellant later saw them trying to sell a white case to a man at a store on East 101 Street and Cedar Avenue. The appellant testified he talked to both Simmons and Mitchell and told them to return the sewing machine or he would turn them over to the police.

The next time the appellant saw Simmons was on Sunday, September 15, 1985 at approximately 11:00 p.m. on East 105 Street. Simmons told the appellant Mitchell wanted to talk with him. The appellant, co-defendant Laster and Simmons drove to Mitchell's house on Norman Avenue. Mitchell told the appellant that he would take the appellant to the house where the sewing

machine was located.  At first, Mitchell had him drive in one direction, but asked him to turn around at the Woodhill bus station after reconsidering where the sewing machine might be located.  They eventually drove down to East 30 Street and Community College Avenue.  Mitchell went inside a house for ten minutes and came outside carrying a Singer sewing machine case. When the appellant went to put the case in the trunk, he realized it was not a Kenmore sewing machine, and hence was not the missing sewing machine, and he had Mitchell return it. Mitchell promised to find the one the appellant was looking for and return it later.

Appellant testified further that he had been painting all day and he was tired and exasperated with driving around looking for the sewing machine, so he and co-defendant Laster drove Simmons and Mitchell back to Mitchell's house.  While driving down an alley on East 101 Street, appellant testified Simmons saw a brown Cadillac Eldorado that Simmons wanted to steal.  The appellant told him to leave the Cadillac Eldorado alone.  The appellant then testified that he dropped Simmons and Mitchell off at Mitchell's residence on Norman Avenue.  He and co-defendant Laster returned to the house on East 101 Street around midnight on Monday, September 16, 1985.

Later, Celeste Laster (appellant's girlfriend) woke appellant up to tell the appellant that Mitchell was banging on the door yelling that Simmons had been shot.  The appellant got

dressed, drove his car in front of the next door neighbor's house and saw Simmons with a sawed-off pump shotgun. The appellant then drove Simmons, Mitchell and co-defendant Laster to the hospital. He dropped Simmons off at the hospital, returned to Mitchell's and Sweeney's house on Norman Avenue and appellant, co-defendant Laster and Mitchell picked Sweeney up and drove her to the hospital to check on Simmons' condition. After taking Sweeney to the hospital, appellant and co-defendant Laster took Mitchell back to his house on Norman Avenue. Mitchell went inside the house and came back out with the sawed-off shotgun Simmons had earlier. Mitchell told the appellant that while Simmons was attempting to steal the Cadillac Eldorado, a "man just came out of nowhere" and shot Simmons. (Tr. 1939). The appellant then dropped Mitchell off at East 55 Street and Outhwaite because Mitchell "knew some guys that would help him out" in seeking revenge on behalf of Simmons. (Tr. 1942).

The appellant and co-defendant Laster returned to the hospital to pick up Sweeney, who repeatedly asked him where Mitchell was. The appellant told her he dropped Mitchell off at East 55 Street. (Tr. 1943). The appellant drove Sweeney back to her and Mitchell's house on Norman Avenue and then to East 112 Street and Miles.

The appellant denied owning any guns. He denied any wrongdoing with regard to rape, kidnapping, attempted murder, and aggravated murder.

-14-

As noted above, the jury found the appellant guilty of two counts of kidnapping (Simmons and Mitchell) with gun specifications, one count of attempted murder (Simmons) with gun and violence specifications, and two counts of aggravated murder (Mitchell) with gun, mass murder, and felony murder specifications. (In a separate trial for the kidnapping/rapes of Ms. Sweeney, the appellant was acquitted in a bench trial).

At the "penalty" trial, the appellant made a short unsworn statement denying any wrongdoing. A presentence probation department investigation report and psychiatric evaluation summary were prepared at the appellant's request and were before the jury during its deliberation. Specifically, the jury recommended the death penalty, and the trial judge accepted that recommendation.

On February 28, 1986 he was sentenced as follows:

To death on September 16, 1986, pursuant to his conviction of counts one and two, aggravated murder with specifications, as recommended by the jury;

To three years actual incarceration regarding the gun specifications in counts one and two;

To ten to twenty-five years for the fifth count, attempted murder; and

To three years actual sentence regarding the gun specification in the attempted murder charge.

-238-

-15-

The court found that counts three and four with regard to kidnapping were crimes of similar import and they were therefore merged with the offenses of aggravated murder and attempted murder. No ruling was made by the court whether the terms of incarceration were to be served concurrently or consecutively.

Appellant appeals to this court and assigns fourteen assignments of error.

### III.  The Appellant's Assignments of Error

Appellant's assignments of error numbers I, II, V, IX and X, have all been considered and rejected on appeal in Ohio's heretofore reviewed capital cases.  The appellant has cited numerous assignments of error asserted in these prior capital cases in his appellate brief.  This entire opinion is based principally on the following cases concerning the Capital Punishment Act:  State v. Jenkins (1984), 15 Ohio St. 3d 164 and its progeny; State v. Mapes (1985), 19 Ohio St. 3d 108; State v. Martin (1985), 19 Ohio St. 3d 122; State v. Williams (1986), 23 Ohio St. 3d 16; State v. Scott (1986), 26 Ohio St. 3d 92; State v. Zuranski (Dec. 11, 1986), Cuyahoga App. No. 50447, unreported.

### Assignment of Error No. I

> "I.  DEATH QUALIFICATION OF THE GUILT PHASE JURY IN A CAPITAL CASE VIOLATES THE DEFENDANT'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AND ART. I SECTIONS 2 AND 10 OF THE OHIO CONSTITUTION."

#### - Death Qualification -

Appellant contends that the process of "death qualifying" a jury violated his constitutional rights in that:

> "A.  Death qualification results in a conviction-prone jury.
>
> "B.  Death qualification results in a jury not drawn from a fair cross-section of the community.
>
> "C.  The death qualification process itself prejudiced the defendant.

"D.  Death qualification violates the equal
     protection clause."

It is the appellant's position that jury selection in a capital case results in "death qualification." Death qualification is defined by the appellant as the effective exclusion of jurors opposed to the imposition of capital punishment.

The appellant's first assignment of error has four thrusts as enumerated above. All have been heretofore addressed. On appeal, this assignment of error has never been well taken. See Jenkins, Mapes, Martin, Williams, Scott, Zuranski, supra.

The appellant correctly argues that the Ohio Supreme Court is not in harmony with the decision of the United States Court of Appeals for the Eighth Circuit in Grigsby v. Mabry (1985), 758 F.2d 226. Grigsby, however, has been reversed by the United States Supreme Court sub nom. Lockhart v. McCree (1986), 90 L. Ed. 2d 137.

In Lockhart, supra, at p. 149, the Supreme Court said "Death-Qualification" is a system that is:

> "*** carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial."

This first assignment of error is not well taken.

## Assignment of Error No. II

"II.   IMPOSITION  OF  THE  DEATH  SENTENCE
VIOLATES  THE  SIXTH,  EIGHTH  AND  FOURTEENTH
AMENDMENTS  TO  THE  UNITED  STATES  CONSTITUTION
AND  ART.  I  SECTIONS  2,  9,  10  AND  16  OF  THE
OHIO CONSTITUTION."

- Statutory Unconstitutionality -

This assignment of error comprises the following nine sub-
arguments:

"A.   Infliction  of  the  death  sentence
necessarily  violates  the  defendant's  due
process rights.

"B.  Revised Code, Section 2929.022, Section
2929.03  and  Section  2929.04  violate
defendant's rights to effective assistance of
counsel  and  to  trial  before  an  impartial
jury.

"C.  Revised  Code  Section  2929.03,  Section
2929.04  and  Section  2920.04  are
unconstitutional  as  they  fail  to  provide
adequate guidelines for deliberation, leaving
the  jury  without  proper  guidelines  in
balancing  the  aggravating  and  mitigating
circumstances.

"D.   Ohio  Revised  Code  Section  2929.022,
Section 2929.03 and Section 2929.04 and Ohio
Rule  of  Criminal  Procedure  11(C)(3)  place  an
unconstitutional  burden  on  the  defendant's
right to a jury trial.

"E.   Ohio  Revised  Code  Section  2929.03  fails
to  provide  a  meaningful  basis  for
distinguishing  between  life  and  death
sentences.

"F.   The  appellate  review  provision  of
Section 2929.05 fails to specifically require
inquiry and findings regarding arbitrariness,
passion, or prejudice.

"G.   The  Ohio  death  penalty  statute
impermissibly  mandates  imposition  of  the
death penalty and precludes a mercy option in

the absence of mitigating evidence or when aggravating circumstances outweigh mitigating factors.

"H.   The Ohio death penalty scheme permits imposition of the death penalty on a less than adequate showing of culpability by failing to require a conscious desire to kill, premeditation, or deliberation as the culpable mental state.

"I.    The statutes fail to require proof beyond all doubt as to guilt and conviction before the death sentence may be imposed."

Again the appellant asserts assignments of error frequently argued.  See Jenkins, Martin, Williams, Scott, Zuranski, supra; State v. Buell (1986), 22 Ohio St. 3d 124; and State v. Brooks (1986), 25 Ohio St. 3d 144.  In all of these cases, the unconstitutionality of the Capital Punishment Act was rejected. Most recently this assignment of error was raised in Zuranski, supra, and again rejected.

In Jenkins, the Supreme Court of Ohio stated at p. 179,

"***we hold that Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981 *** does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution."

The second assignment of error is not well taken.

## Assignment of Error No. V

"V.   THE TRIAL JUDGE ABUSED HIS DISCRETION BY ALLOWING INTO EVIDENCE A SERIES OF GRUESOME PHOTOGRAPHS WHICH CONTAINED LITTLE PROBATIVE VALUE,   THEREBY   DENYING   APPELLANT'S CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL."

- Gruesome Photographs -

In his fifth assignment of error, appellant argues that the court erred when it received into evidence gruesome photographs of the body of the victim, Mitchell, which could only inflame the jury.

In State v. Maurer, (1985), 19 Ohio St. 3d 108, the Supreme Court of Ohio held at p. 264 that "the admission of photographs is left to the sound discretion of the trial court." The Maurer court further stated, at p. 266:

"Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative to testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number. (Emphasis added)."

Once again the appellant's fifth assignment of error has been considered on appeal in other cases. They are Martin, Mapes, Maurer, Zuranski, supra. This assignment of error was rejected in these and other cases on review.

In the case sub judice, the trial court did not abuse its discretion by receiving into evidence photographs which were

-21-

relevant and probative of the circumstances surrounding the death of Mitchell.  The photographs were illustrative of the testimony given by various state witnesses and were not repetitive nor cumulative in number.

Appellant's fifth assignment of error is without merit.

## Assignment of Error No. IX

"IX.   THE TRIAL JUDGE ERRONEOUSLY INSTRUCTED THE JURY TO EXCLUDE CONSIDERATION OF BIAS, PREJUDICE OR SYMPATHY FOR THE ACCUSED THEREBY DEPRIVING APPELLANT OF EVIDENCE IN MITIGATION AND CONSIDERATION OF THAT MITIGATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND OHIO CONSTITUTION ART. I SECTIONS 9 AND 16."

- Bias, Sympathy and Prejudice -

Appellant's ninth assignment of error has been reviewed in the following cases:   Jenkins, Johnson, Williams, Scott, Zuranski, supra.  It was rejected in these cases.

In a capital case, this issue was first addressed in State v. Jenkins, supra.  In that case the Supreme Court of Ohio held at p. 192:

"The instruction to the jury in the penalty phase of a capital prosecution to exclude consideration of bias, sympathy or prejudice is intended to insure that the sentencing decision is based upon a consideration of the reviewable guidelines fixed by statute as opposed to the individual juror's personal biases or sympathies.  We believe the instruction adequately conveys this purpose by using the term 'sympathy' together with the terms 'bias' and 'prejudice.' When read in conjunction with a correct instruction as to mitigation, as was the case here, the jury is directed to focus on the guidelines set forth by statute.

"We think this direction is necessary and entirely consistent with the view expressed by the United States Supreme Court in Barclay v. Florida, supra,  at 1144, that, '[t]he thrust of our decisions on capital punishment has been "that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  Zant v. Stephens,    U.S.    ,

                    \*\*\* 77 L. Ed. 2d 235 \*\*\* (1983), quoting
<u>Gregg</u> v. <u>Georgia</u>, 428 U.S. 153, 189 \*\*\*
(1976) (opinion of Stewart, Powell and
Stevens, J.J.).'" (Emphasis added)

In the case <u>sub judice</u> the trial court charged the jury:

    "You must not be influenced by any
consideration of sympathy or prejudice.

    "It is your duty to carefully <u>weigh</u> the
evidence to decide all disputed questions of
fact, to apply the instructions of the court
to your findings, and to render your verdict
accordingly.

    "In fulfilling your duties, your efforts must
be to arrive at a just verdict, considering
all of the evidence, arguments, and make your
findings with intelligence and impartiality,
and <u>without bias, sympathy or prejudice</u> so
that both the State of Ohio and the defendant
will feel that their case was fairly and
impartially tried." (Tr. 2318-2319).
(Emphasis added).

    This instruction is identical to that given in <u>Jenkins</u>,
<u>supra</u>, and other capital cases heretofore reviewed by our
Supreme Court wherein it was approved. It is an accurate
statement of the law and a precise instruction to the jury.

    As in <u>Jenkins</u>, the trial court's instruction with regard to
the exclusion of bias, prejudice, or sympathy, was properly
given subsequent to the "guilt/innocence" deliberation of the
jury and prior to the juries "penalty" deliberations. Said
instruction was given in accordance with Jenkins.

    The statutory structure for the jury's consideration of the
criteria for imposing death or imprisonment for a capital case
is set forth in R.C. 2929.04.

Subsection (A) establishes the eight criteria (aggravating circumstances) for which the death penalty can be imposed.

Subsection (B) establishes the seven mitigating factors which must be found by a jury in order to mitigate against or preclude the imposition of capital punishment.  Subsection (B) reads as follows:

> "(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 [2929.02.3] of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and the circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

> "(1) Whether the victim of the offense induced or facilitated it;

> "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

> "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

> "(4) The youth of the offender;

> "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death." (Emphasis added).

The predicate of subsection (B) is that

"*** the *** trial jury *** shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt the nature and circumstance of the offense, the history, the character, and background of the offender, and all of the following factors: ***." R.C. 2929.04(B). (Emphasis added).

For the jury to include consideration of bias, prejudice or sympathy during its deliberations flies in the face of the legislature's mandate that the jury "*** consider, and weigh against the aggravating circumstance the statutory mitigating factors." (See R.C. 2929.04 above).

By this assignment of error IX, the appellant asserts a frequently heretofore raised assignment of error in capital cases. See Jenkins, Williams, Scott, and Zuranski, supra. All of these cases rejected this assignment of error.

The appellant's ninth assignment of error is not well taken.

Assignment of Error No. X

> "X.  THE  TRIAL  COURT  AND  THE  PROSECUTOR
> INSTRUCTED THE JURY THROUGHOUT THE TRIAL THAT
> THEIR DECISION IN THE PENALTY PHASE IS ONLY A
> RECOMMENDATION IN VIOLATION OF THE EIGHTH AND
> FOURTEENTH AMENDMENTS TO THE UNITED STATES
> CONSTITUTION AND ART. I SECTIONS 9, 10 AND 16
> OF THE OHIO CONSTITUTION."

- Jury Recommendation of "Punishment" -

Appellant's tenth assignment of error has been frequently
asserted as an assignment of error in previous capital cases.
See Jenkins, Williams, Scott and Zuranski, supra.   In a rather
thorough discussion of this assignment of error, this court in
Zuranski, supra, addressed itself to this issue.   The Zuranski
court quoted R.C. 2929.03(D)(2) and noted that the word
'recommend' appears in that section of the code five times.

R.C. 2929.03(D)(2) provides as follows:

> "(2) Upon consideration of the relevant
> evidence raised at trial, the testimony,
> other evidence, statement of the offender,
> arguments of counsel, and, if applicable, the
> reports submitted pursuant to division
> (D)(1) of this section, the trial jury, if
> the offender was tried by a jury, shall
> determine whether the aggravating
> circumstances the offender was found guilty
> of committing are sufficient to outweigh the
> mitigating factors present in the case.   If
> the trial jury unanimously finds, by proof
> beyond a reasonable doubt, that the
> aggravating circumstances the offender was
> found guilty of committing outweigh the
> mitigating factors, the trial jury shall
> recommend to the court that the sentence of
> death be imposed on the offender.   Absent
> such a finding, the jury shall recommend that
> the offender be sentenced to life
> imprisonment with parole eligibility after
> serving twenty full years of imprisonment or
> to life imprisonment with parole eligibility

after serving thirty full years of imprisonment.

"If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section." (Emphasis added).

This issue was first addressed in Jenkins, supra, and the trial court's instruction was approved therein. Similarly, as noted above, when the issue was raised in the other capital cases, the jury "recommendation of punishment" assignment of error was not well taken.

Appellant's tenth assignment of error is not well taken.

In light of the evidence and other appropriate reasons, assignments of error VIII, XI, XII and XIV are deserving of review and discussion, but are not well taken.


Assignment of Error No. VIII

> "VIII.  THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTIONS FOR ACQUITTAL, WHICH DENIED HIM DUE PROCESS OF LAW, AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS."

> - Crim. R. 29(A) Motion -

Here, the appellant argues regarding the sufficiency of the evidence.

Crim. R. 29 (Motion for Acquittal) provides as follows:

> "(A) Motion for Judgment of Acquittal. The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." (Emphasis added).

The appellant contends that the prosecutor failed to produce sufficient evidence to support each and every element of the offenses of aggravated murder, attempted murder, and kidnapping.

For the most part, appellant's argument is not well taken. After reviewing the record and relevant case law, we find that the prosecutor did produce sufficient evidence, if believed, to support the attempted murder and kidnapping of Simmons.

However, the prosecutor did not produce sufficient evidence, if believed, to support the two counts of aggravated murder of Mitchell.

The kidnapping indictment relating to Mitchell charged appellant with:

> "*** unlawfully and purposely and by force, threat, or deception removed Ricky Mitchell from the place where he was found or restrained him of his liberty for the purpose of facilitating the commission of a felony or the the flight thereafter and/or terrorizing, or inflicting serious physical harm on Ricky Mitchell, and failed to release the victim in a safe place unharmed." R.C. 2905.01.

The kidnapping charge carried with it a gun specification.

However, the record in the case _sub judice_ does not establish sufficient evidence, if believed, to support the offense of the kidnapping of Mitchell.

The state's theory with regard to the kidnapping of Mitchell was premised upon kidnapping by deception. The element of deception is defined in R.C. 2913.01(A) as:

> "(A)    'Deception'    means    knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission which creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."

The record clearly reveals that the state failed to establish the element of deception. In fact, the record reveals that Mitchell had three separate opportunities to "leave" the appellant and not return to his company: 1) Mitchell arrived with the appellant at the home located at East 30 Street and Community Avenue; 2) Mitchell helped Simmons to the hospital whereupon Mitchell voluntarily returned to the appellant's automobile; and 3) Mitchell returned to his home on Norman Avenue and than voluntarily returned to the appellant's automobile with Ms. Sweeney.

A review of the evidence does not sufficiently support a kidnapping conviction in that the state's evidence of restraint of Mitchell, if any, is insufficient. The trial court erred in overruling appellant's Crim. R. 29(A) motion as to the kidnapping of Mitchell. See Jackson v. Virginia (1979), 443 U.S. 307; State v. Bridgeman (1978), 55 Ohio St. 2d 261.

In addition, the trial court erred in overruling the appellant's Crim. R. 29(A) motion with regard to the offenses of the aggravated murder of Mitchell. R.C. 2903.01 specifically delineates the elements of the offense of aggravated murder with said elements being:

"Division (A):

"(1) Purposely    and    with    prior calculation and design

"(2) Cause death of another.

"or

"Division (B):

"(1) Purposely cause death of another

"(2) While committing, attempting to commit, fleeing immediately after committing or attempting to commit

"(3) Kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, or escape.

A review of the case sub judice clearly reveals that the evidence at the close of the state's case was entirely lacking in proof, either direct or circumstantial, as to several vital elements of the offenses of aggravated murder as charged in the indictment. Specifically, the record reveals that:

1) there was no evidence before the trial court as to the circumstances, time, or place of Mitchell's death;

2) there was no evidence before the trial court that Mitchell met his death while in the company of the appellant during the morning of September 16, 1985;

3) the coroner could only provide an approximation of the time of Mitchell's death;

4) there was evidence of a vague conditional threat made by the appellant toward Mitchell and the display of a handgun which could have possibly indicated hostility between the appellant and Mitchell; and

5) there was evidence that the appellant made a number of statements to the effect that "Ricky wasn't coming back." However, such statements could hardly be considered as an admission of murder.

In deciding the appellant's Crim. R. 29(A) motion for judgment of acquittal as to the counts of aggravated murder, the trial court should have considered that:

1)    there was no direct evidence that the appellant caused the death of Mitchell. The only evidence in the record on this issue was that the appellant was in the company of Mitchell on the morning of September 19, 1986 and that the appellant made conditional threats against Mitchell. In addition, the appellant exhibited a violent disposition by shooting Simmons;

2)    there was no evidence, either direct or circumstantial, with regard to the element of purposeful kiling of another;

3)    there was no evidence that the appellant intended to cause the death of another; and

4)    there was no evidence as to felony murder in that what felony was perpetrated by the appellant at the time of the alleged murder.

As can be seen, the state failed to provide evidence with regard to several vital elements of the offense of aggravated murder.

The Supreme Court of Ohio, in State v. Bridgeman (1978), 55 Ohio St. 2d 261, syllabus, with regard to Crim. R. 29(A) motions of acquittal, held that:

> "Pursuant to Crim. R. 29(A), a court shall
> not order an entry of judgment of acquittal
> if the evidence is such that reasonable minds
> can reach different conclusions as to whether
> each material element of a crime has been
> proved beyond a reasonable doubt."

In the case sub judice, reasonable minds could not reach different conclusions as to whether the material elements of causation, purpose, and specific intent to cause the death of Mitchell had been proved beyond a reasonable doubt. Therefore, the trial court erred in overruling the appellant's Crim. R. 29(A) motion for acquittal with regard to the offenses of aggravated murder.

This error, however, does not jeopardize the integrity of the other charges for which the appellant was found guilty. The appellant's Crim. R. 29(A) motion for acquittal was properly overruled by the trial court with respect to the offenses of attempted murder and kidnapping in that the state met the burden of Bridgeman.

Finally, the appellant contends that his defense counsel erred by addressing the Crim. R. 29(A) motions solely to the two aggravated murder charges and the kidnapping charge relating to Mitchell. The record reveals that defense counsel was under the impression that the attempted murder and kidnapping charges relating to Simmons should be treated differently. For example, at the close of the state's case the following discussion ensued at Tr. 1801-1802:

> "THE COURT: You have nothing to offer with respect to the other two Counts, I take it, Mr. Hill?
>
> "MR. HILL: Your Honor, it is Defendant's position and as -- well, Rule 29, as I understand it, indicates that the issue of credibility is not before the Court at this particular time, and we would stipulate

> that if the victim, Sam Simmons' testimony is believed, that a prima facie case has been made with respect to those two charges." (Emphasis added).

The trial court, however, stated at Tr. 1803:

> "THE COURT: With respect to Defendant's motions for judgments of acquittal, upon consideration of the motion and the argument of counsel, the Court is of the view that the motion for summary judgment on all Counts is not well taken and, therefore, the motion as to each Count will be overruled." (Emphasis added).

At the close of the defendant's case, the same circumstances arose. Once again, the trial court denied the Crim. R. 29(A) motion "as to all counts." (Tr. 2129).

However, the appellant's contention of error by defense counsel is not well taken. The record clearly reveals that the state meet the test to be applied to a Crim. R. 29(A) motion for acquittal as established in State v. Bridgeman, supra. Defense counsel is under no obligation to make a motion for acquittal solely for the reason of appearance.

In the case sub judice, defense counsel was aware of the evidence presented by the state with regard to the offenses of attempted murder and kidnapping of Simmons. In addition, the trial court examined the appellant's Crim. R. 29(A) motion for acquittal with regard to each offense pending against the appellant regardless of the form of the defense counsel's motion practice.

Therefore, no error resulted from the failure of appellant's counsel to include in his motions for acquittal, made pursuant to Crim. R. 29(A), the offenses of attempted murder and the kidnapping of Simmons.

However, the trial court did err in overruling the appellant's Crim. R. 29(A) motions for acquittal with regard to the two offenses of aggravated murder as a result of the failure of the state to provide evidence with regard to the material elements of causation, purpose, and specific intent to cause the death of Mitchell.  Reasonable minds could only conclude that the state had not proved each material element of the offenses of aggravated murder beyond a reasonable doubt.

Therefore, the appellant's eighth assignment of error is partially well taken.

## Assignment of Error No. XI

"XI.   THE TRIAL COURT ERRED IN DISMISSING A
JUROR AFTER THE GUILT PHASE BUT PRIOR TO THE
PENALTY PHASE, CONTRARY TO OHIO CRIMINAL RULE
24(F)   AND   R.C.   SECTION   2929.03(C)(2)(b),
THEREBY DENYING APPELLANT HIS UNITED STATES
AND OHIO CONSTITUTIONAL RIGHTS TO A FAIR
TRIAL AND DUE PROCESS."

### – Juror Substitution –

The   appellant   contends   that   the   trial   court   improperly
excused  regularly  seated  juror  Mrs.  Pemberton  after  she  joined
in  returning  a  guilty  verdict  at  the  first  "guilt/innocence"
trial but before the second "penalty" trial.

According  to  defense  counsel  at  Tr.  2366,  Mrs.  Pemberton
communicated  to  the  trial  court,  the  prosecutor  and  the  defense
counsel  that  "she  was  just  tired  of  the  whole  thing.   She
figured  that  she  had  done  enough."   Defense  counsel  objected  to
her dismissal as a juror by the trial court.

Unfortunately,  apparently  the  entire  proceedings  pertaining
to  the  substitution  of  Mrs.  Pemberton  as  a  seated  juror  by  one
of  the  two  remaining  alternate  jurors  are  not  on  the  record.
However,  a  review  of  the  record  at  Tr.  2354,  et  seq.  reveals  the
following  to  be  all  the  statements  of  both  counsel  and  the  court
referring  to  the  following  reasons  given  by  Mrs.  Pemberton  for
her  request  to  be  relieved  as  a  juror.   They  were  as  follows:

1)   She  raised  a  possible  medical  issue,  though  no  medical
examination  was  sought  nor  diagnosis  made.    (This  reason  is
attributable to Mr. Hill (defense counsel) at Tr. 2355).

2)   She was tired of the whole thing.  She figured that she had done enough.  (Tr. 2366 attributable to Mr. Hill).

3)   That her son had become ill at the time and that was something which was preying upon her mind.  (Tr. 2366 attributable to Mr. Levenberg (the prosecutor)).

4)   She also brought to the court's attention that a vacation had been scheduled.  This would be the only time that she would be allowed by her employers to avail herself of this opportunity.  That she and her family had made plans to be out of town during this period of time.  (Tr. 2367 attributable to Mr. Levenberg).  She felt that again with her son's condition would also affect her ability to be a fair and impartial juror and hear out those things that would come to the jury's attention during this particular phase of the trial.  (Tr. 2367 attributable to Mr. Levenberg).

5)   The court viewed that juror as she left the courtroom and it was obvious to the court that she was crying and seemingly overwrought concerning something.  (Tr. 2369 attributable to the court).

6)   A number of things that bothered her and suddenly seemed to overwhelm her.  (Tr. 2369 attributable to the court).

7)   One of them being the fact that her employer was not paying her regular salary while she served on this jury panel.  (Tr. 2369 attributable to the court).

8)   That a minor child was ill at home and needed her attention.  (Tr. 2369 attributable to the court).

9) That the family had planned a vacation to start that very weekend which she said she was going to miss. (Tr. 2369 attributable to the court).

10) Some other matters, all of a personal nature. (Tr. 2370 attributable to the court).

11) It would be negative as to her health. (Tr. 2370 attributable to the court).

12) Mrs. Pemberton felt that she could not serve any further. Earlier, when polled, she indicated her acquiescence in and approval of the jury's "guilty" verdict during the guilt/innocence trial. (Tr. 2370 attributable to the court).

13) The juror was visibly shaken and in the court's lay opinion, she was highly upset. (Tr. 2370, an observation by the court).

The appellant argues that none of the reasons cited above should have permitted Mrs. Pemberton to be excused as a juror. Appellant contends that the trial court erred in substituting the alternate juror, Mr. Phiel, for the heretofore seated 'regular' juror, Mrs. Pemberton, before the second "penalty" trial. Appellant further contends that he was entitled to the same jury during both the first "guilt/innocence" trial and the second "penalty" trial. Once Mrs. Pemberton was excused, however, he argues the court should have allowed the remaining eleven jurors to proceed with the sentencing phase or declare a mistrial on its own motion.

Criminal R. 23(B) (Number of Jurors) provides as follows:

"In felony cases juries shall consist of
twelve."

This rule, being procedural, was waivable by appellant.  A
reading of the record at the point in the proceedings reveals
that neither the appellant nor his counsel waived a jury of
twelve for a jury of eleven.  (See Tr. 2372, et seq.)

Appellant's contention that the court ought to have declared
a mistrial similarly is not well taken.  Alternate jurors, Mr.
Phiel nor Mrs. Whatley were excused at the end of the first
"guilt/innocence" trial and hence were available to assume the
duties of a second "penalty" trial deliberating juror.

As possibly fortuitous for the appellant as it might have
been for the trial court to declare a mistrial at this point, it
would have been a clear abuse of discretion for the trial judge
not to continue to try the second "penalty" trial for want of a
juror when either of two were available, ready, willing, and
able to be seated as a deliberating juror.  (Perhaps a double
jeopardy issue could have been raised by the appellant had the
alternate juror Mr. Phiel not been substituted for the seated
juror Mrs. Pemberton and the trial court having declared a
mistrial on its own initiative).

The trial court inquired of then alternate juror, Mr. Phiel,
whether he could serve as a deliberating juror in the second
"penalty" trial and he responded "yes." (Tr. 2373). He further
qualified as follows:

    "THE COURT:  ***Mr. Phiel, you did sit
    and participate in this trial during the
    guilt phase, did you not, sir?

"MR. PHIEL: Yes, I did.

"THE COURT: And you participated up to the point the jury withdrawing to deliberate; is that right?

"MR. PHIEL: Yes.

"THE COURT: Now, sir, the question before us has to do with the Jury's verdict in the case as it returned this verdict. I will ask you, <u>will you as an alternate -- as a juror, a regular panelist who must now consider the punishment phase, do you adopt the conclusions of the regular panel, including Constance Pemberton, which was returned to the Court on the 29th day of January, 1986?</u>

"MR. PHIEL: Yes.

"THE COURT: <u>Are you now, sir, prepared to proceed with the panel to dispose of the remaining considerations in this case which the Court has before it this afternoon?</u>

"MR. PHIEL: <u>Yes.</u>

"THE COURT: Thank you, sir. ***" (Tr. 2373-2374). (Emphasis added).

At the outset, we note that we have been unable to find any case law exactly on point with this assignment of error. Thus, we now turn to the Criminal Rules for guidance and to garner the philosophy behind the Criminal Rules as they relate to juror selection.

<u>Crim. R. 24(B)(9) states as a basis for a challenge for cause that a juror be excused if "*** he is possessed of a state of mind evincing enmity or bias toward the defendant or the state."</u>

This subsection, though not exactly applicable to the instant problem, indicates to trial courts the philosophy of this criminal rule that a person of a hostile state of mind ought not initially be seated as a deliberating juror. Similarly, extrapolating from Crim. R. 24(B)(9), once seated, a deliberating juror ought to be excused from jury duty if and when he (she) indicates an attitude that would likely involve a possible, if not probable, hostile state of mind if not excused from jury duty.

Similarly, as in Crim. R. 24(B)(9), <u>Crim. R. 24(B)(14) indicates that a juror who "*** is otherwise unsuitable for any other cause to serve as a juror" should be dismissed.</u> Again extrapolating, this subsection also manifests a philosophy which ought to be employed by a trial court in excusing a seated juror indicating a desire to abandon jury duty.

While Crim. R. 24(F) states that an "alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."

<u>In a capital case, there are two separate trials.</u> The first, the "guilt/innocence" trial, is followed by the second, "penalty" trial, wherein the jury weighs the aggravating circumstances and the mitigating factors and thereafter recommends punishment.

In the instant case, the trial court obviously concluded that the second "penalty" trial ought to have available

alternate jurors. Hence, the trial court had two alternate jurors (Mr. Phiel and Mrs. Whatley) 'in reserve', who could replace an excused seated juror and conclude the work of the two trials by deliberating at the second "penalty" trial. We hold that the trial court did not abuse its discretion under these circumstances by substituting a qualified alternate juror for the disheartened Mrs. Pemberton. State v. Adams (1980), 62 Ohio St. 2d 151, 157.

The trial court properly excused Mrs. Pemberton. The trial court could not proceed with only the eleven heretofore seated jurors without the appellant's waiver of Crim. R. 23(B). The trial court properly seated the available voir dire qualified alternate juror, Mr. Phiel, after inquiring of him as to his suitability to serve at this point in the trial. That is, Mr. Phiel, the substitute for juror Pemberton, adopted the conclusions of the regular panelists at the first "guilt/innocence" trial and agreed to faithfully perform his task at the second "penalty" trial. The trial judge certainly did not abuse his discretion substituting a marginal juror with a properly seated and requalified alternate juror in the "penalty" proceedings. (Tr. 2364-2374).

This eleventh assignment of error is not well taken.

## Assignment of Error No. XII

"XII. INEFFECTIVE ASSISTANCE OF COUNSEL AT
TRIAL DEPRIVED THE APPELLANT OF HIS RIGHT TO
EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED
BY THE OHIO AND UNITED STATES CONSTITUTIONS."

- Ineffective Assistance of Counsel at Trial -

In his twelfth assignment of error appellant contends his
defense counsel rendered ineffective assistance of counsel.
Appellant's basic thrust is that his defense counsel failed to
move for mistrial at certain key points throughout the trial,
i.e., after introduction of "other acts evidence; after
admission of pictures of the corpse; after limitations on
recross and redirect examination; after alleged prosecutorial
misconduct during trial and closing arguments; and after a juror
was dismissed.

A review of the record demonstrates that appellant's
argument is without merit. At the guilt phase, counsel
conducted the defense in an acceptable manner.

In Strickland v. Washington (1984), ___ U.S. ___, 80 L. Ed.
2d 674, the United States Supreme Court adopted a two-prong
analysis for determining whether cousel's assistance was so
defective as to mandate reversal of a conviction:

"First, the defendant must show that
counsel's performance was deficient. This
requires showing that counsel made errors so
serious that counsel was not functioning as
the 'counsel' guaranteed the defendant by the
Sixth Amendment. Second, the defendant must
show the deficient performance prejudiced the
defense. This requires showing that
counsel's errors were so serious as to
deprive the defendant of a fair trial, a

trial whose result is reliable.  <u>Strickland</u> at 693."

The test set out in <u>Strickland</u> is essentially the same as that enunciated in <u>State</u> v. <u>Hester</u> (1976), 45 Ohio St. 2d 71, 79 and <u>State</u> v. <u>Lytle</u> (1976), 48 Ohio St. 2d 391, 395, vacated on other grounds (1978), 438 U.S.  910.  In <u>Lytle</u>, the Supreme Court of Ohio established the guidelines for determining the ineffective assistance of counsel issue.  The court held at pp. 396-397:

> "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. <u>First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client.</u> Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, <u>there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.</u>" (Emphasis added).

A properly licensed attorney in Ohio is presumed competent. <u>Vaughn</u> v. <u>Maxwell</u> (1965), 2 Ohio St. 2d 299, 301.  The burden of proving ineffectiveness of counsel is on the defendant.  <u>State</u> v. <u>Smith</u> (1981), 3 Ohio App. 3d 115.

In a separate assignment of error, appellant has demonstrated error by the trial court in limiting recross and redirect examination.  Also, we have sustained appellant's contention of prosecutorial misconduct.  However, we do not believe that defense counsel failed to meet his burden and performed so deficiently as to prejudice the appellant's right

to a fair trial by failing to move for mistrial after these acts by the trial court and prosecutor.

The appellant argues that his defense counsel prejudiced his interests by failing to make a motion for acquittal regarding the kidnapping and attempted murder of Simmons. This argument was discussed and rejected in the eighth assignment of error.

The appellant further contends his defense was compromised by the fact that the defense counsel failed to file many pretrial motions. The defense counsel did file two motions before trial. They were for a bill of particulars and for discovery. Appellant fails to cite which motions were not filed and how the motions would have enhanced his defense. Appellant's contention is without merit.

Finally, appellant cites cumulative errors by the defense counsel as evidence of ineffective assistance of counsel at trial. A review of the record reveals that appellant's argument is not well taken. Counsel presented cogent argument to the court and jury, he vigorously cross-examined state witnesses, and he often objected to inappropriate testimony. Such action by defense counsel demonstrates counsel's knowledge of the facts and law involved in the guilt phase of the case sub judice.

Accordingly, appellant's twelfth assignment of error is overruled.

## Assignment of Error No. XIV

"XIV.   THE COMBINATION OF ERRORS OCCURRING THROUGHOUT BOTH THE GUILT AND THE PENALTY PHASE DEPRIVED THE APPELLANT-DEFENDANT OF HIS CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL."

- Accumulated Error -

Rules of Appellate Procedure, Rule 12(A) reads:

"(A) Determination.   In every appeal from a trial court of record to a court of appeals, not dismissed, the court of appeals shall review and affirm, modify, or reverse the judgment or final order of the trial court from which the appeal is taken.   The appeal shall be determined on its merits on the assignments of error set forth in the briefs required by Rule 16, on the record on appeal as provided by Rule 9, and, unless waived, on the oral arguments of the parties, or their counsel, as provided by Rule 21. <u>Errors not specifically pointed out in the record and separately argued by brief may be disregarded.</u>   All errors assigned and briefed shall be passed upon by the court in writing, stating the reasons for the court's decision as to each such error." (Emphasis added).

A reading of appellant's fourteenth assignment of error leads only to the conclusion that the hereinabove asserted fourteenth assignment of error is not well taken by reason of App. R. 12(A).

Assignment of errors numbers IV, VI, VII, and XIII are well taken and require the reversal of this conviction and remand of this prosecution for retrial of both the "guilt/innocence" trial and the "penalty" adjudication.


## Assignment of Error No. IV

"IV. THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF EVIDENCE OF IRRELEVANT PREJUDICIAL 'OTHER ACTS' OF PERCY HUTTON, AND THEREBY DEPRIVED HIM OF HIS RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL, AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 16 OF THE OHIO CONSTITUTION."

- "Other Acts" -

In this fourth assignment of error, the appellant contends that the trial court erred in permitting a witness for the state of Ohio, Ms. Eileen Sweeney, to testify that the appellant and the co-defendant Laster picked her up at the hospital and en route home Laster let the appellant and Sweeney out of the automobile at a secluded park. She further testified that the appellant forced her to go behind a bush and raped her vaginally and orally. (The defendant was separately charged in a three count indictment, for one count of kidnapping and two counts of rape. As indicated earlier, it was this set of events which the prosecutor sought to have merged for trial with the case sub judice. The trial court did not permit this merger of the two indictments, sustaining the objection of defense cousel who objected on the record to such merger.)

In Ohio, the general rule is that "other acts" evidence is inadmissible where the alleged "other acts" are <u>wholly independent</u> of the offense for which a defendant is on trial. <u>State</u> v. <u>Wilkinson</u> (1980), 64 Ohio St. 2d 308, 314.

Exceptions to this general rule are enumerated in R.C. 2945.59 (Proof of Defendant's Motive), which provides as follows:

> "In any criminal case in which the defendant's <u>motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved,</u> whether they are contemporaneous with or prior or subsequent thereto, <u>notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.</u>" (Emphasis added).

The first of the most recent Ohio Supreme Court cases on the issue of proof of "other acts" of the defendant in criminal cases is <u>State</u> v. <u>Burson</u> (1974), 38 Ohio St. 2d 157. In that case, in a <u>per curiam</u> decision the court held:

> "This court has, thus far, permitted this statute to operate as an exception to the general rule that the introduction of evidence tending to show that the accused has committed any crime unconnected with the offense for which he is on trial is not permitted. <u>State</u> v. <u>Hector</u> (1969), 19 Ohio St. 2d 167, 249 N.E. 2d 912. <u>Therefore, R.C. 2945.59 must be strictly construed against the state.</u> See <u>State</u> v. <u>Strong</u> (1963), 199 Ohio App. 31, 196 N.E. 2d 801." (Emphasis added).

Thus the court enunciated the general rule and the exception thereto, R.C. 2945.59.

The next major case is <u>State</u> v. <u>Curry</u> (1975), 43 Ohio St. 2d 66.  Chief Justice O'Neill clearly stated the rule on "other acts" evidence as follows:

> "As is the case with most general rules, the rule denying admissibility of evidence of other crimes is subject to certain exceptions.  The only exceptions relevant in the present case are those codified in R.C. 2945.59:
>
> "'In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.'"

The similarity of the case at bar and <u>Curry</u>, <u>supra</u>, is striking.  The Supreme Court in <u>Curry</u> addressed it at p. 70:

> "The only questions at issue, therefore, were whether appellee had or attempted to have sexual intercourse with Marie on the morning of July 8, 1972.  Recognizing that these integrally related questions were the only material elements in dispute, it is necessary to determine whether any of the matters enumerated in R.C. 2945.59 (motive, intent, absence of mistake or accident, or scheme, plan or method of doing an act) were relevant at appellee's trial, and, if so, whether the prosecution's 'other acts' testimony tended to prove that relevant enumerated matter." (Emphasis added).

The <u>Curry</u> court held that the defendant's "other acts" of sexual activity with another female on another date was not integrally connection with his activities in the case <u>sub judice</u>.

The next case is <u>State</u> v. <u>Lytle</u> (1976), 48 Ohio St. 2d 391. Chief Justice Celebrezze addressed the issue at p. 403:

> "'***To be admissible pursuant to the sub-category *** <u>the "other acts" testimony must concern events which are inextricably related to the alleged criminal act.</u>'(Emphasis added.)

In <u>State</u> v. <u>Wilkinson</u> (1980), 64 Ohio St. 2d 308, 314, Justice Paul W. Brown wrote:

> "It is a well established rule that in a criminal trial <u>evidence</u> of previous or subsequent criminal acts, <u>wholly independent of the offense for which a defendant is on trial, is inadmissible.</u> <u>Whiteman</u> v. <u>State</u> (1928), 119 Ohio St. 285; <u>State</u> v. <u>Hector</u> (1969), 19 Ohio St. 2d 167. ***" (Emphasis added).

Further, at p. 315, Justice Brown stated:

> "'"Scheme, plan or system" evidence is relevant in two general factual situations. First, those situations in which the "other acts" form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment. *** To be admissible pursuant to this subcategory of "scheme, plan or system" evidence, the "other acts" testimony <u>must concern events which are inextricably related to the alleged criminal act.</u>'" (Again, emphasis added).

Justice Brown concluded at p. 317:

> "'***[E]vidence of <u>other crimes may be presented when "they are so blended or connected with the one on trial as that proof of one incidentally involves the other;</u> or

> explains the circumstances thereof; or tends
> logically to prove any element of the crime
> charged."' (Citation  United States' v. Turner
> (C.A. 7, 1970), 423 F. 2d 481, at 483-84,
> certiorari denied 398 U.S. 967." (Emphasis
> added).

Justice Brown reiterated at p. 318:

> "***To the contrary, the exceptions in
> the statute must be strictly construed.
> State v. Burson, supra, at 158."

Finally, see State v. DeMarco (1987), 31 Ohio St. 3d 191:

> "Evidence of other acts of a defendant is
> admissible pursuant to R.C. 2945.59 only when
> it tends to show one of the matters
> enumerated in that statute and when it is
> relevant to prove the defendant's guilt of
> the offense in question." (Emphasis added).

Ms. Sweeney could have and did rightfully testify about the
appellant's possession of a handgun in the park and that while
in the park the appellant said to her, "Ricky wasn't coming back
*** to forget about him."

The inquiry by the prosecutor pertaining to the alleged
kidnapping/rapes; however, was totally improper.  It was not
inextricably related to the crimes of the case-in-chief, namely:
the aggravated and attempted murders and kidnappings.

In the instant case, the only possible reason of informing
the jury of the defendant's sexual conduct in the context of
rape would have been to show his "*** scheme, plan or system
***." It could not come within any other proviso of
R.C. 2945.59.  By no stretch of the imagination was Sweeney's
testimony regarding the alleged rapes-kidnapping evidence of

"other acts" inextricably related to the aggravated and attempted murders and kidnappings charged in the indictment.

Further, this testimony was highly prejudicial to the appellant. Evid. R. 403(A) states:

> "(A) Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury." (Emphasis added).

We find that the jury received this damaging testimony over appellant's objection and improperly considered it as further proof of the appellant's commission of the aggravated and attempted murders and kidnappings.

The appellant's fourth assignment of error is well taken and mandates reversal.

## Assignment of Error No. VI

> "VI.   THE TRIAL COURT ERRED IN LIMITING BOTH
> RE-DIRECT AND RECROSS-EXAMINATION OFFERED BY
> DEFENSE   COUNSEL,   THEREBY   DENYING   APPELLANT
> HIS   UNITED   STATES   AND   OHIO   CONSTITUTIONAL
> RIGHTS  TO  A  FAIR  TRIAL,  DUE  PROCESS  OF  LAW,
> AND CONFRONTATION."

- Redirect and Recross Examination Errors -

Appellant's sixth assignment of error contends that the court improperly restricted both redirect examination (by the prosecutor) and recross examination (by defense counsel) of the state's witness Mrs. Mary Etta Pollard.

Appellant's argument has merit in that the evidence elicited from the state's witness, Mrs. Mary Etta Pollard, was highly prejudicial and damaging to the defendant and that the court did not allow defendant to recross examine her and rehabilitate her.

Initially, on direct examination, Mrs. Pollard testified for the state that she was the appellant's neighbor; and that she heard Simmons in the early morning hours of September 16, 1995 knocking on her door yelling "I'm shot. I'm shot." She saw the appellant pull up to her house in his car and call for Simmons to "Come here." (Tr. 1576).

On  cross-examination,  the  defense  counsel  asked  Mrs. Pollard at Tr. 1592:

> "Q.   Isn't  it  a  fact  that  you  have  never
> known  the  Defendant  to  have  been  violent
> towards someone?
>
> "A.   Never."

Thereafter, <u>on redirect,</u> the prosecutor questioned Pollard at Tr. 1598-1599:

> "Q. Now, Mrs. Pollard, isn't it a fact that you know Percy Hutton <u>took the life of someone?</u>
>
> "MR. HILL: Objection.
>
> "THE COURT: Overruled.
>
> "A. Answer?
>
> "THE COURT: Yes, you may answer.
>
> "A. Yes, I heard of it.
>
> "Q. Don't you consider that an act of violence?
>
> "A. <u>I consider that, from the way I got it --</u>
>
> "Q. Could you give me a yes or no answer?
>
> "MR. HILL: Your Honor, may we approach the bench?
>
> "THE COURT: Just a moment, sir. If you can answer the question in the form asked of you, Mrs. Pollard, you should do so. If you cannot, and you don't understand it, say so so that the counsel can reframe the question and rephrase it.
>
> "A. <u>Well, I don't understand that particular question.</u>
>
> "Q. If someone takes the life of another, don't you consider that an act of violence?
>
> "MR. HILL: Objection.
>
> "THE COURT: Overruled.
>
> "A. Answer?
>
> "THE COURT: Yes, you may answer.

"A.   It is according to the circumstances.
      Yes, it is an act of violence, but if
      you are protecting yourself, you have to
      protect yourself any kind of way, you
      have to know how to protect yourself.  I
      can't just see someone going out and
      shooting someone or killing someone.  I
      think, yes, that's an act of violence.

"Q.   Now, isn't it a fact that you also know
      that   this   Defendant,   Percy   Hutton,
      committed armed robbery?

"A.   No, I don't know that as a fact.

"Q.   Okay.  But you do know that he did take
      the life of someone?

"A.   Yes, I heard that.

"Q.   Would you consider armed robbery to be
      an act of violence?

          "MR. HILL:  Objection.

          "THE COURT:   Overruled.   You may
      answer.

"A.   Yes."  (Emphasis added).

On  recross  examination  the  defense  counsel  attempted  to
question Ms. Pollard as to the details of the appellant's taking
of someone's life.   The trial court sustained the prosecutor's
objections and the defense counsel ended his recross examination
without further questioning.   It was obvious that Mrs. Pollard
wished  to  say  more  to  clarify  her  answer  when  she  said  "I
consider that, from the way I get it--."  She also informed the
court that "Well, I don't understand that particular question."
And finally she said "It is according to the circumstances."

-56-

From these interjections by Mrs. Pollard it is obvious that she had more to say on the issue. It is obvious that defense counsel knew the appellant took the life of another, was prosecuted for manslaughter, and his conviction was reversed on appeal. Defense trial counsel wanted to inquire about this matter. Appellant asserts as error that the prosecutor never clarified the fact that the appellant's 1978 conviction for voluntary manslaughter, felonious assault, and abduction was reversed by this court in State v. Hutton (May 8, 1980), Cuyahoga App. No. 39954, unreported. It was the responsibility of defense counsel to try to rehabilitate on this issue. He obviously was endeavoring on recross examination to get into this area but was precluded from doing so by the trial court.

Appellant's complaint that the prosecutor's questioning of the witness regarding the appellant's "tak(ing) the life of another" when the prosecutor knew or should have known that the appellant's conviction was reversed is well taken, however. This court, in State v. Sims (1981), 3 Ohio App. 3d 321, at 323 held that:

> "Evid R. 404(B) excludes evidence of other bad acts to prove the character of the accused, in order to show that the accused acted in conformity with his character on the occasion of the crime; proof of other bad acts is admissible only to show 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' In the case at bar, however, the evidence of prior arrests was not offered to prove the character of the accused. Both Wagner v. State and State v. Cole, supra, forbid the use of prior arrests to impeach a

defendent's (sic) testimony on cross-examination. The state did not refer to the appellant's prior arrest to impeach <u>his</u> testimony. The evidence of prior arrests was offered to impeach Mr. King's testimony that the appellant had a reputation for non-violence. This line of inquiry is proper under Evid R. 405(A), which provides:

"'In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. <u>On cross-examination, inquiry is allowable into relevant specific instances of conduct.</u> (Emphasis added.)'

"The fact that the appellant had been arested for aggravated robbery and felonious assault would necessarily affect his reputation for nonviolence. These instances of misconduct were therefore relevant to the testimony of the character witness, and were admissible to impeach <u>his</u> statement that the appellant had a reputation for non-violence. This result would have been reached even prior to the enactment of the Rules of Evidence, under the authority of <u>State v. Elliott</u> (1971), 25 Ohio St. 2d <u>249</u> [549 O.O.2d 371], in which the Ohio Supreme Court held:

"'A character witness may be cross-examined as to the existence of reports of particular acts, vices, or associations of the person concerning whom he has testified which are inconsistent with the reputation attributed to him by the witness -- not to establish the truth of the facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given his testimony. Such inconsistent testimony tends to show either that the witness is unfamiliar with the reputation concerning which he has testified, or that his standards of what constitutes good repute are unsound.' (Paragraph two of syllabus.)" (Emphasis in original).

The Supreme Court in State v. Elliott (1971), 25 Ohio St. 2d 249 stated that the witness' testimony cannot be used to establish the truth of the fact asserted.  The court also stated at p. 253:

> "If the defendant had never been convicted of a felonious assault, such question by the prosecutor, being made in bad faith, would be the predicate for error. ***" (Emphasis added).

In the instant case, the prosecutor questioned Mrs. Pollard as to appellant's "tak[ing] the life of another" with the knowledge that appellant's voluntary manslaughter conviction had been reversed.  The prosecutor's questions went beyond the mere impeachment of Mrs. Pollard and were manifestly asked for the further purpose of discrediting the appellant to the jury.  As such, the prosecutor's line of redirect examination was wholly unfair and highly prejudicial to the appellant.  See Wagner v. State (1926), 115 Ohio St. 136; State v. Cole (1958), 107 Ohio App. 444.

Evid. R. 609(C) mandates:

> "(C) Effect of Pardon, Annulment, Expungement, or Certificate of Rehabilitation. Evidence of a conviction is not admissible under this rule if (1) the conviction has been the subject of a pardon, annulment, expungement, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted, and that person has not been convicted of a subsequent crime which was punishable by death or imprisonment in excess of one year, or (2) the conviction has been the subject of a pardon, annulment, expungement, or other equivalent procedure based on a finding of innocence." (Emphasis added).

Thus the prosecutor discredited the appellant by using a reversed-on-appeal conviction -- a non-conviction under Evidence Rule 609(C).

See 81 Am. Jur. 2d 576 which states:

"Effect of appeal or motion.

"While the fact of previous reversal of a judgment of conviction so far destroys it as to preclude proof of the conviction to affect credibility, ***." (Emphasis added).

This sixth assignment of error is well taken and mandates reversal.

## Assignment of Error No. VII

"VII.  PROSECUTORIAL MISCONDUCT DURING TRIAL
AND  FINAL  ARGUMENT  TO  THE  JURY  DENIED
APPELLANT  HIS  FOURTEENTH  AMENDMENT  DUE
PROCESS RIGHT TO A FAIR AND IMPARTIAL TRIAL.

- Prosecutorial Misconduct During Trial and Closing Argument -

Assignment of error VII basically addresses prosecutorial
conduct.  It has two thrusts:  1) the prosecutor's misconduct at
trial by reason of the prosecutor's redirect examination of
Mrs. Mary Etta Pollard, and 2) the prosecutor's final argument
during his "penalty trial" closing arument.

During our consideration of assignment of error number VI we
have  discussed  prosecutorial  misconduct  during  direct
examination of Mrs. Pollard and found it improper.

A prosecutor is at liberty to prosecute with earnestness and
vigor,  striking  hard  blows,  but  may  not  strike  foul  ones.
Berger  v.  United  States  (1935),  295  U.S.  78,  88.   The
prosecution must avoid insinuations and assertions which are
calculated to mislead the jury.  Id.

The transcript at Tr. 2392-2397 reveals the appellant's area
of concern with the prosecutor's "punishment" trial closing
argument.

"MR. LEVENBERG:  ***

"Here  is  an  interesting  statutory
mitigating factor, the Defendant's lack of a
significant  history  of  prior  criminal
convictions and delinquency adjudications.

"In other words, what the Legislature is
saying here is that if you have got someone
who has a significant lack of a history of

these things or perhaps no history at all,
then that's a mitigating factor and you
should be ascribing some weight to it.

"Well, you have heard some of the things
about this Defendant.  You know that he has
got a conviction in the past for armed
robbery, and you know that he has got a
conviction for having a weapon while under a
disability, but you are going to hear and you
are going to see a lot more about the
criminal conduct of this Defendant when you
read the pre-sentence investigative report
from the Probation Department, going back to
Juvenile adjudications.  You can see how he
has been spending his adult life and whether
or not he has taken advantage of the time he
has spent in State institutions.

"Well, was the Defendant the principal
here or was he an aider and abettor?  I don't
think there is any question on that issue.
Of course, if he is the aider and abettor,
then that might be a mitigating factor as
opposed to being the principal.

"Then there is the catch-all, anything
else that you should decide is a mitigating
factor.  That makes your job tough, but I
think each one of you knew full well that
when you got involved in this process and you
made that commitment to us and to the Court,
that you would be able to come up to that
challenge.  It is not going to be an easy job
to go back in there, it is not a flip of the
coin.

"What is there about this Defendant's
past?  Well, it goes on for one page, almost
a full second page and an addendum about his
criminal activity.  Starting in 1967 charged
with auto trespass.  This would be as a
juvenile.

"Again in 1969 the same charge, auto
trespass.  Both times he was released.
Caught a couple of breaks.

"Finally in February of '69, one month
later after that last time, he was released
again, auto trespass.  This time Juvenile

Court had enough, they put him on probation. See, even back in '67 he had an interest in automobiles.  Fermenting then that back yard roving mobile outside your neighborhood auto repair operation, 24-hours a day.

"March '69, while he was on probation for only a month, auto break-in, larceny. Goes up another notch.  Adjudicated delinquent, placed with Ohio Youth Commission.

"The year is not even over, December 1969, auto stealing.  Adjudicated delinquent, placed with Ohio Youth Comjission (sic).

"September '71, and of course they are giving you ages over here in parentheses by these dates, how old when all of these are happening, he is still not even an adult yet.  Carrying a concealed weapon.  No disposition.

"November '71, he finally turned 18, auto stealing. Released.  Another break.

"December '71, Selective Service Act Auto Law.  Again he gets a release, this time out in Lakewood.  How many times do they have to pat this guy on the back?

"Finally in June of '72 we come to his armed robbery.  Found guilty by another jury.  Sentenced him to the Ohio State Reformatory.  Gets out on parole in April of '76.

"A little more than a year later, July of '77, he is involved with a homicide. Murder, felonious assault, having weapon while under disability, kidnapping.  That was when he was working as a security guard with Admiral Security, Incorporated.  Remember that.

"He is found guilty in '78 of voluntary manslaughter, felonious assault, weapons disability and abduction.  Sentenced again.  This time he doesn't go to the Reformatory, he goes to a penitentiary.  He appeals the conviction and everything except

for the weapons disability charge is reversed by the Court of Appeals and there is no further prosecution. He gets paroled again.

"Then we come to the addendum because it is out of sequence here.

"June of '81, Euclid, Ohio, charged with carrying a concealed weapon, having a weapon while under a disability. Later that year the case is dismissed.

"December '81, Cleveland, Ohio, receiving stolen property and possession of criminal tools. Goes to trial, this time he is found not guilty.

"One of the interesting things that you will see here is that all of this stuff is under the name of Percy Hutton, and these two here, after he gets on parole the second time, are under the name of William Hutton. Things are too hot under the name of Percy Hutton.

"June of '84, forgery. He gets released again. Then finally October, 1985, perhaps this time the law and the people of the State of Ohio have finally caught up with Percy Hutton, also known as William Hutton, and he is charged with aggravated murder, kidnapping and attempted murder. You will also note that he has another case pending, rape and kidnapping, and it doesn't take much to figure out what that involves.

"That's a little bit about the criminal history of the Defendant. You have to decide whether or not there is a significant lack of criminal history here, juvenile adjudications.

"I submit to you, ladies and gentlemen, that the record says that there is not, and that is not a mitigating factor as it relates to this Defendant, Percy Hutton, that there are no psychological or psychiatric, medical, mental, whatever you want to call it, mitigating factors here as it relates to this Defendant.

> "This Defendant has had more than
> enough breaks by the system, throughout his
> youth and his adult life, and he has refused
> to take advantage of them.  *** (Tr. 2392-
> 2397).  (Emphasis added).

In the instant case, the prosecutor's remarks during trial, closing argument and at the "penalty" phase greatly harmed the appellant's substantial rights to a fair trial.

In a capital case, it is impermissible to reveal to the jury the existence of offenses for which the defendant has not been convicted.  In the case sub judice, the record reveals that the state specifically enumerated during closing arguments the appellant's alleged criminal history and specifically revealed the following offenses for which the appellant had been charged in the past:  1) auto trespass; 2) auto trespass; 3) auto trespass; 4) auto break-in, larceny; 5) auto stealing; 6) carrying concealed weapon; 7) auto stealing; 8) selective service auto law; 9) armed robbery; 10) murder, felonious assault, having a weapon while under disability, and kidnapping; 11) carrying a concealed weapon; 12) receiving stolen property and possession of criminal tools; and 13) forgery.  Of these thirteen alleged criminal ofenses, only the offenses of armed robbery and voluntary manslaughter resulted in convictions with the offense of manslaughter being reversed on appeal.

The conduct of the state in revealing the appellant's criminal history with regard to charged offenses which did not result in convictions was impermissible and resulted in an unfair prejudice to the appellant.

In _United States_ v. _Hastings_ (1983), 76 L. Ed. 2d 96, 107, the United States Supreme Court held that in order to sustain a conviction under these circumstances it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty.  Here, we do not find, beyond a reasonable doubt, that the jury would have found defendant guilty absent the prosecutor's improper remarks.

Accordingly, the seventh assignment of error is well taken and mandates reversal.

## Assignment of Error No. XIII

"XIII. INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE DEPRIVED APPELLANT OF A FAIR AND COMPLETE HEARING AS TO THE APPROPRIATE SENTENCE, THEREBY DENYING APPELLANT OF HIS RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. I. SECTIONS 9 AND 10 OF THE OHIO CONSTITUTION."

- Ineffective Assistance of Counsel at the "Penalty" Proceedings -

Appellant claims that the only evidence offered in mitigation was the unsworn statement of the appellant. This is not entirely true. As previously noted, the jury did receive a presentence report and psychiatric report relating to the appellant. Also, the defense counsel's closing argument reiterated appellant's unsworn statement that he was not guilty and reminded the jury that the Court of Appeals reversed the appellant's 1978 voluntary manslaughter conviction. Defense counsel also attempted to excuse away appellant's lengthy juvenile record.

Appellant argues as further evidence of error that his trial counsel:

1) failed to object to the firearm specifications. This argument lacks merit. A review of the record clearly reveals that the firearm specifications which form the basis of the appellant's argument were submitted to the jury during the "guilt/innocence" phase of the trial. The trial court did not submit the firearm specifications to the jury during the

"penalty" phase and thus the holding of <u>State</u> v. <u>Johnson</u> (1986), 14 Ohio St. 3d 87, is not applicable herein.

Thus, the inclusion of the firearm specifications for the juries deliberation in the "guilt/innocence" phase was without error and the appellant's counsel was not ineffective with regard to said jury deliberation of the firearm specifications.

2) failed to object to prosecutor's reading of appellant's juvenile record to jury at penalty phase. Defense counsel failed his obligation by allowing the probation report to go to the jury in the form prepared by the probation department. Minimally, defense counsel ought to have had the appellant's criminal record excised as to certain of the appellant's criminal notations which, in reality, were never found to have been crimes.

In fact, the request of appellant's counsel for a probation report in conjunction with the known criminal history of the appellant was ineffective assistance of counsel in that the litany of various alleged offenses in the appellant's probation report prejudiced the appellant. The opportunity of the state to use the unsubstantiated criminal history of the appellant during the mitigation phase resulted in the unsubstantiated criminal history becoming an additional aggravating circumstance for all intents and purposes. For example, the record sheet referred to dispositions as "released," "no disposition," and

"pending."   R.C.   2909.04,   Criteria   for   Imposing   Death   or
Imprisonment for a Capital Offense, subsection (B) specifically
provides:

> "*** the *** trial jury *** shall consider
> and    weigh    against    the    aggravating
> circumstances  proved  beyond  a  reasonable
> doubt, the nature and circumstances of the
> offense,    the    history,    character,    and
> background   of   the   offender,   and   all   the
> following factors:
>
>                    *    *    *
>
> (5)  The  offender's  lack  of  a  significant
> history  of  prior  criminal  convictions  and
> delinquency adjudications; ***"

In  the  case  <u>sub  judice</u>,  the  jury  received  a  presentence
probation report enumerating twelve purported criminal episodes
in the defendant's life which all may not have been crimes. (As
noted earlier, approximately half of these matters were disposed
of as "released," "no disposition," and "pending.")  Presented
to  the  jury  in  that  form,  the  jury  could  make  improper
inferences  or  conclusions  about  the  appellant's  purported
criminal life.  It is safe to assume that the jury could infer
whatever it pleased about the defendant simply because they were
improperly given this information.   And the prosecutor argued
them vigorously (see assignment of error VII).

Defense trial counsel ought to have requested the excision
of these references to the appellant's alleged prior criminal
life.   Certainly,  it  was  not  harmless  error  to  allow  this
information  to  go  to  the  jury.   (See  <u>State</u>  v.  <u>Glenn</u>,  28  Ohio

St. 3d 451, at 459, for a discussion of other similar types of problems with presentence probation reports going to juries in capital cases).  It is this court's view that this constitutes ineffective assistance of counsel.

3)  failed to object when prosecutor only briefly mentioned the reversal of voluntary manslaughter, felonious assault, and abduction convictions by Court of Appeals.  This objection refers to the prosecutor briefly mentioning the reversal of the voluntary manslaughter, felonious assault, and abduction convictions on the appellant's successful appeal of the conviction for those counts.  One can only conceive that the prosecutor recalled the error of his way in going into this subject during his case-in-chief while in the "guilt/innocence" proceedings.  We have written of them earlier and they were obviously improper.  By no stretch of the imagination can this court efficaciously approve this conduct by the prosecutor. Closing arguments are not evidentiary proceedings.  This <u>jury was so instructed</u> during the "guilt/innocence" trial.  How the prosecutor perceived that he could introduce evidentiary matters during the state's sentencing proceedings closing arguments in a capital case defies description.  Though it was improper for the prosecutor to endeavor to introduce evidence during his "penalty" closing argument, it actually might be perceived as inuring to the appellant's benefit.  A review of the transcript reveals that defense counsel did the best he could with a bad

situation under the circumstances.    However, his efforts
constituted ineffective assistance of counsel.

4)    failed to object to use of "recommend" in jury
instructions regarding the death sentence.    This is a repeated
assignment of error.    We have addressed ourselves to it in
assignment of error number X.    It is not well taken.

5)    failed to object to jurors returning home over the
weekend between guilt and penalty phase.    The rule pertaining to
the control of jurors is found in Crim. R. 24(G), which provides
as follows:

> "(G) Control of Juries
>
> "(1) Before Submission of Case to Jury.
> Before submission of a case to the jury, the
> court, upon its own motion or the motion of a
> party, may restrict the separation of jurors
> or may sequester the jury.
>
> "(2) After Submission of Case to Jury
>
> *  *  *
>
> "(C) Capital Cases.  After submission of
> a capital case to the jury, the jury shall
> remain under the supervision of an officer of
> the court until a verdict is rendered or the
> jury is discharged by the court.
>
> "(3) Separation in Emergency.  Where the
> jury is sequestered or after a capital case
> is submitted to the jury, the court may, in
> an emergency and upon giving cautionary
> instructions, allow temporary separation of
> jurors." (Emphasis added).

Appellant complains that the trial court failed in allowing
jurors to return to their homes over the weekend between the
"guilt/innocence" and the "sentencing" phase.

This jury had concluded its deliberations and rendered its verdict in the "guilt/innocence" proceedings. The jury had rendered its verdict and within the sound discretion of the trial judge the court allowed the trial jury to return home for the weekend. The empaneled trial jury had no other business before it at that time except to wait for the second "penalty" trial. It had no deliberations with which to involve itself. Hence, it was entirely discretionary with the trial judge as to whether the jury should be supervised or sequestered. To sequester citizens at a non-crucial phase of the trial, that is, at the culmination of their deliberations of the "guilt/innocence" proceedings and before the consideration of the "sentencing" proceedings, would have been unnecessary and conceivably at least inconvenient for the jury.

It is within the sound discretion of the trial judge to handle its trial jury in a method most effective, most prudent and most conducive of producing their fair and just verdict. Hence, if the trial court perceives sequestration necessary, absent an abuse of discretion, it may so do: if a trial judge perceives the better approach to be a "separation of the jury," absent an abuse of discretion, it may so do.

There is nothing in the statutory or case literature pertaining to capital cases which requires the trial judge to sequester a jury rather than allowing them to return to their homes.

In <u>Jenkins</u>, <u>at</u> p. 234, the Supreme Court says:

"During their actual deliberations in a capital case, jurors must be sequestered. R.C. 2945.33. Ohio's statutory framework for imposition of capital punishment neither mandates nor precludes sequestration of the jury following its guilty verdict, but prior to the penalty phase. However, in an effort to minimize the risk of jury contamination, the court herein directed that the jury remain under loose court supervision between the two trial segments. During this interval the jury was not receiving evidence or deliberating; however, the court believed certain communications could be prejudicial. The court transported the jurors to a resort motel in an adjoining county where bailiffs could monitor their activities. Their spouses and children could visit and they could participate in various recreational activities." (Emphasis added).

From the above opinion of the Supreme Court we can only conclude that the sequestration or the separation of the jury is within the sound discretion of the trial court. We see no abuse of discretion whatsoever in that regard in these proceedings.

As enumerated herein we feel the defendant was deprived of effective assistance of counsel. This thirteenth assignment of error is partially well taken as indicated herein.

Assignment of error III appropriately deserves this court's attention at a later date.

<u>Assignment of Error No. III</u>

"III.   IN VIOLATION OF THE EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND ART. I, SECTIONS 9, AND 16
OF THE OHIO CONSTITUTION, THE APPELLANT'S
SENTENCE OF DEATH IS INAPPROPRIATE AND
DISPROPORTIONATE TO SIMILAR CASES."

- Proportionality -

Appellant's assignment of error III raises the
proportionality issue.  It arises out of and because of R.C.
2929.05.  This section mandates that both the Court of Appeals
and the Supreme Court review all capital cases to determine
whether the trial court's sentence was appropriate.

R.C. 2929.05 states:

"***The court of appeals and the supreme
court shall review the judgment in the case
and the sentence of death imposed by the
court or panel of three judges in the same
manner that they review other criminal cases,
except that they shall review and
independently weigh all of the facts and
other evidence disclosed in the record in the
case and consider the offense and the
offender to determine whether the aggravating
circumstances the offender was found guilty
of committing outweigh the mitigating factors
in the case, and whether the sentence of
death is appropriate.  In determining whether
the sentence is excessive or disproportionate
to the penalty imposed in similar cases.
They shall also review all of the facts and
other evidence to determine if the evidence
supports the finding of the aggravating
circumstances the trial jury or the panel of
three judges found the offender guilty of
committing outweigh the mitigating factors
present in the case and that the sentence of
death is the appropriate sentence in the case
***."  R.C. 2929.05(A).

By reason of this court's findings pertaining to assignments of error IV, VI, VII, and XIII, we feel it inappropriate to decide the proportionality issue at this time.  It is entirely possible that on review of this matter by the Supreme Court that that court will agree with us.  Hence our consideration of proportionality would be premature and inappropriate prior to a retrial of the case-in-chief which this case calls for.  If that be the case and the matter returned to the Court of Common Pleas for further proceedings, the trial court would be left in the uncomfortable position of trying a case calling for possible capital punishment wherein an appellate court had in fact therebefore found that the imposition of capital punishment was warranted.

A consideration of proportionality should only be made <u>after</u> a review of the case manifests that a fair and just trial was had.

If on the other hand the Supreme Court disagrees with our rulings on the "reversed" assignments of error, this matter should be remanded to this court for a finding on the "proportionality" assignment of error.

Judgment reserved.

This cause is reversed and remanded for further proceedings consistent with this opinion.

It is, therefore, considered that said appellant recover of said appellee his costs herein.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

ANN McMANAMON, P.J., CONCURS

WITH CONCURRING OPINION;

PATTON, J., DISSENTS WITH

DISSENTING OPINION.

_____
JUDGE
DAVID T. MATIA

N.B.  This entry is made pursuant to the third sentence of Rule 22(D), Ohio Rules of Appellate Procedure.  This is an announce-ment of decision (see Rule 26).  Ten (10) days from the date hereof this document will be stamped to indicate journalization, at which time it will become the judgment and order of the court and time period for review will begin to run.

COURT OF APPEALS OF OHIO EIGHTH DISTRICT

COUNTY OF CUYAHOGA

NO. 51704

STATE OF OHIO                  :
                               :
      Plaintiff-Appellee       :          C O N C U R R I N G
                               :
     -v-                       :          O P I N I O N
                               :
PERCY HUTTON                   :
                               :
      Defendant-Appellant      :
                               :

DATE OF ANNOUNCEMENT OF DECISION:      APR 2 8 1988
_____

ANN McMANAMON, J., CONCURRING:

    Ann McManamon, J.   Although I concur that  Percy Hutton's
conviction must be reversed, I do so on narrower grounds. I
agree that reversible error occurred in the admission of Eileen
Sweeney's testimony that Hutton raped her (the fourth assignment
of error), and in defense counsel's ineffective assistance dur-
ing the penalty phase (the thirteenth assignment of error).
While I concur that the trial court erroneously restricted the
scope of defense counsel's recross-examination (the sixth assign-
ment of error), I do not believe the error was prejudicial. I

cannot concur that the trial court erred in overruling Hutton's Crim. R. 29 motions for acquittal (the eighth assignment of error). Finally, I believe the court's admission of a series of gruesome photographs was erroneous and prejudicial (the fifth assignment of error).

I agree that the trial court erred in admitting Eileen Sweeney's testimony about the alleged rape, and that this error requires reversal of Hutton's conviction.

Sweeney testified that Hutton, after picking her up at the hospital, drove to a park and raped her. While at the park, Sweeney averred, Hutton brandished a small silver handgun with a white handle, a weapon similar to the one described by Samuel Simmons, Jr. Sweeney further alleged that Hutton told her "Ricky wasn't coming back" (Tr. 1183), and that she should "forget about him." (Tr. 1265).

Evid. R. 404(B) provides:

"Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Construing this rule and its statutory counterpart, R.C. 2945.59, the supreme court has held that "other acts" evidence is admissible "only when it tends to show one of the matters enumerated in that statute and when it is relevant to prove the defendant's guilt of the offense in question." State v. DeMarco

-3-

(1987), 31 Ohio St. 3d 191, paragraph one of the syllabus. See, also, State v. Burson (1974), 38 Ohio St. 2d 157, 158. The rule is to be construed strictly against the state and applied conservatively by trial courts. DeMarco, supra, at 194.

I see no basis for the state's argument that the alleged rape was relevant to show intent, motive, opportunity and lack of mistake. Under the state's trial theory, Hutton's motive was to avenge the theft of a sewing machine. It was undisputed that Hutton had the opportunity to kill Mitchell. Neither intent nor mistake was at issue in the case. The primary trial issue was the identity of Mitchell's killer, and the rape evidence was irrelevant to that inquiry.

The state contends the alleged rape provided an essential context in which to present Sweeney's description of the handgun and Hutton's admission.

A defendant's other acts may be admissible as probative of a "scheme, plan or system" if the evidence "forms part of the immediate background" of the charged offense. State v. Wilkinson (1980), 64 Ohio St. 2d 308, paragraph two of the syllabus (construing R.C. 2945.59). However, the other acts must be "inextricably intertwined" with the offense and be "necessary to give the complete picture of what occurred." Id. at 318. See, also, State v. Thompson (1981), 66 Ohio St. 2d 495, 498.

The alleged rape cannot be characterized as "inextricably intertwined" with either Hutton's statement or Sweeney's identi-

-4-

fication of the gun. Hutton's admission in that context was merely cumulative in view of Sweeney's account of their subsequent conversation at LaWanda Mitchell's home:

> "A.   He first asked me, would I tell Ricky's family what happened. Then he told me, Ricky wasn't coming back, and if I told someone would be looking for me. I told him I wouldn't tell, and he talked on the phone to someone." (Tr. 1191).

Moreover, the disputed testimony could effectively have been presented to the jury without reference to the alleged rape. Since the temporal sequence was not critical at that point in the state's version of the events, the alleged episode at the park could have been deleted without denying the jury "the complete picture of what occurred."

Assuming the evidence had some marginal relevance, it would still be inadmissible if its probative value was "substantially outweighed by the danger of unfair prejudice ***." Evid. R. 403(A); State v. Wilson (1982), 8 Ohio App. 3d 216, 219.

I note initially the trial court overruled the state's motion to consolidate the rape charge with the counts tried herein. Since all the charges arose from the same chain of events, and the evidence supporting the alleged rape was simple and distinct from that underlying the other offenses, it is fair to infer the court's ruling reflected concern with the danger of unfair prejudice. (Tr. 5-6). Cf. State v. Hammon (Jan. 16, 1986), Cuyahoga App. No. 49934, unreported (discussing the considerations pertinent to deciding a Crim. R. 14 motion to sever counts for trial).

The prejudice averted by the court's ruling was realized when the court permitted the introduction of Sweeney's testimony. Given the highly inflammatory nature of this evidence, considered with its dubious relevance, exclusion pursuant to Evid. R. 403(A) was warranted.

Although the court instructed the jury not to consider the alleged rape as substantive evidence, the damage could not be undone. Under analogous circumstances, the supreme court has recently cautioned:

> "The existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule. The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand. For this reason, we do not consider the trial court's admonitions to the jury that appellee's prior convictions are immaterial to his guilt of the present charge sufficient to cure the error." State v. Allen (1987), 29 Ohio St. 3d 53, 55.

Despite the trial court's limiting instruction, the actual use of the evidence at trial far exceeded the narrow purposes professed by the state below and on appeal. In closing arguments during the guilt phase, the prosecutor remarked:

> "I mean, my God in heaven, there is no way, as many of these cases as I have handled since I have been associated with the office of the Cuyahoga County Prosecutor, I will never, never be able to appreciate what rape means to a woman. I cannot." (Tr. 2282).

In the penalty phase, the prosecutor, while expounding upon Hutton's juvenile and adult criminal record, reminded the jury:

> "You will also note that he has another case pending, rape and kidnapping, and it doesn't take much to figure out what that involves." (Tr. 2397).

-6-

The record thus illustrates a classic example of how "other acts" evidence may be misused. The use of such evidence to show a defendant's propensity toward criminal conduct is strictly proscribed. State v. Mann (1985), 19 Ohio St. 3d 34, paragraph one of the syllabus. Because I do not believe this error was harmless beyond a reasonable doubt, this court must reverse Hutton's convictions and remand this cause for a new trial. See State v. Williams (1983), 6 Ohio St. 3d 281, paragraph three of the syllabus.

In his thirteenth assignment of error, Hutton contends he received ineffective assistance of counsel during the penalty phase when, inter alia, defense counsel failed to object to the prosecutor's recitation of Hutton's juvenile record. Hutton's juvenile and adult criminal record was contained in a pre-sentence report prepared pursuant to R.C. 2929.03(D)(1), which provides in part:

> "*** When death may be imposed as a penalty, the court, upon the request of the defendant, shall require a pre-sentence investigation to be made and, upon the request of the defendant, shall require a mental examination to be made, and shall require reports of the investigation and of any mental examination submitted to the court, pursuant to section 2947.06 of the Revised Code. *** A pre-sentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or his counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any

report prepared pursuant to this division and furnished to it."

Hutton's juvenile record contained six notations, three marked "released" or "no disposition," and three delinquency adjudications. His adult criminal record consisted of five instances noted "released," "dismissed," or acquitted. Hutton had only two actual convictions, one of which was later reversed on appeal. Two cases were listed as "pending": the instant cause as well as rape and kidnapping charges related to the Sweeney incident.

Although the rules of evidence generally apply to the penalty phase of capital cases, presentence reports are an exception. State v. Jenkins (1984), 15 Ohio St. 3d 164, 171. In State v. Glenn (1986), 28 Ohio St. 3d 451, 458, the supreme court, finding error in the presence of hearsay witness statements in a presentence report, held that the permissible content of the report is limited to information which is "directly relevant to the aggravating and mitigating circumstances." Glenn, supra, at paragraph two of the syllabus. Irrelevant information should be excised, id. at 459-460, though it remains an open question whether a defendant may withdraw the entire report once it has been prepared. Id. at 460, fn. 2. Neither excision nor withdrawal was requested in this case.

A defendant may not challenge the inclusion of relevant, though prejudicial, material in a presentence report. As noted

by the supreme court in <u>State</u> v. <u>Buell</u> (1986), 22 Ohio St. 3d
124, 138:

> "***[T]he defendant decides whether to expose him-
> self to the risk of potentially incriminating presen-
> tence investigations ***. There is no constitutional
> infirmity in providing the defendant with such an
> option. Additionally, the jury should be privy to all
> information relevant to its task of deciding whether a
> defendant should be sentenced to life in prison or
> whether it should recommend that the defendant be put
> to death." See, also, <u>State</u> v. <u>Steffen</u> (1987), 31 Ohio
> St. 3d 111, 121.

A capital defendant's criminal record may be pertinent to
the statutory mitigating factor set forth in R.C. 2929.04(B)(5):

> "***[T]he court, trial jury, or panel of three judg-
> es shall consider, and weigh against the aggravating
> circumstances proved beyond a reasonable doubt, the
> nature and circumstances of the offense, the history,
> character, and background of the offender, and all of
> the following factors:
>
> "***
>
> "(5) The offender's lack of a significant history of
> prior criminal convictions and delinquency adjudica-
> tions."

Significantly, the provision limits the relevancy of a
criminal record to actual "convictions" and "delinquency
adjudications." This language plainly entitles a defendant to
argue in mitigation that he has no significant history of such
dispositions without requiring him to explain away instances
when he was released, the charges were dismissed, or he was
acquitted outright. These dispositions thus are not "directly
related" to the mitigating factor, and the syllabus law of
<u>Glenn</u>, <u>supra</u>, mandates that they cannot be revealed to the jury.

Nor is the information admissible as pertinent to the jury's duty to consider Hutton's "history, character, and background." Initially, I believe we should be reluctant to invoke such generalities to expand upon the specific denotation of criminal convictions and delinquency adjudications -- the most reliable evidence of a criminal background. Such an interpretation would render subdivision (B)(5) meaningless, and would be contrary to the maxim of statutory construction, "Expressio unius est exclusio alterius" (the mention of one thing implies the exclusion of another). This maxim is not a rule of law but an aid in determining the legislative intent. State, ex rel. Jackman, v. Court of Common Pleas of Cuyahoga Cty. (1967), 9 Ohio St. 2d 159, 164. However, since the admission of a defendant's every brush with the law, as part of his "history" or "background," could effectively deny consideration of the statutory mitigating factor, application of the maxim is appropriate here.

Moreover, we should not lose sight of the fact that R.C. 2929.04(3) governs the admission of mitigating, not aggravating, evidence. Some prejudice is perhaps unavoidable; division (B) is mandatory in directing the jury to consider all the matters listed therein. Indeed, the supreme court has rejected claims of prejudice from the sentencer's express consideration of the heinous character of the crime. Such consideration, the court reasoned, was part of the sentencer's duty to consider the

"nature and circumstances of the offense" to determine whether any mitigating aspect could be extracted. See Steffen, supra, at 117; State v. Byrd (1987), 32 Ohio St. 3d 79, 81.

However, the provisions at issue cannot be so easily reconciled. The sentencer's duty to consider a capital defendant's background must be harmonized with its duty to weigh a defendant's lack of a significant history of criminal convictions and delinquency adjudications. The potential conflict can only be resolved in favor of preserving the specific statutory mitigating factor set forth in subdivision (B)(5).

I recognize that in non-capital cases the sentencing judge may be advised of and consider mere arrests. State v. Burton (1977), 52 Ohio St. 2d 21, 23; Maple Hts. v. Dickard (1986), 31 Ohio App. 3d 68, 71. However, there is a distinct difference between providing such information to a trial judge, who is presumably able to discount the inflammatory nature of the information, and supplying it to a jury of lay persons in a capital case. Indeed, the only guidance the jury received when this material was first revealed came from the prosecutor, who interpreted the import of the notation, "released," as it applied to three of Hutton's arrests:

"Caught a couple of breaks. [Tr. 2394].

"* * *

"Another break.

"* * *

"How many times do they have to pat this guy on the back?" (Tr. 2395).

The prosecutor concluded:

"The defendant has had more than enough breaks by the system, throughout his youth and his adult life, and he has refused to take advantage of them." (Tr. 2397).

Defense counsel attempted to explain to the jury that the notation, "released," did not necessarily mean the suspect received a "break." (Tr. 2401). Counsel acknowledged the difficulty in his endeavor since he -- presumably like the prosecutor -- had no knowledge of the underlying facts.

I believe it is immaterial that Hutton did not actually attempt to assert his criminal history as a mitigating factor. Hutton's strategy had no bearing on the permissible contents of the presentence report since, under Buell, supra, a report cannot be edited to include only information favorable to the defendant. Rather, the subject matter of a presentence report is dictated by the information's relevance to aggravating and mitigating factors. Glenn, supra. In the case at bar, the only dispositions which were properly contained in the report were convictions and delinquency adjudications, and the jury's only concern was whether these notations demonstrated an absence of a significant history of such dispositions.

The inclusion of irrelevant information in a presentence report is not reversible error per se. Although the supreme court has not yet addressed this specific issue, the court, on several occasions, has been faced with other defects in a

capital jury's deliberative process. See <u>Jenkins</u>, <u>supra</u>, at 197-200 (duplicative aggravating circumstances); <u>State</u> v. <u>Johnson</u> (1986), 24 Ohio St. 3d 87, 92-94, and <u>State</u> v. <u>Penix</u> (1987), 32 Ohio St. 3d 369, 371-372 (non-statutory aggravating circumstances); and <u>Glenn</u>, <u>supra</u> (hearsay in presentence report). In each of these cases the court examined the irregularity for its effect on the statutory balancing procedure. The ultimate inquiry must be whether the defect "'impermissibly tips the scales in favor of death, and essentially undermines the required reliability in the jury's determination.'" <u>Penix</u>, <u>supra</u>, at 371, quoting <u>Johnson</u>, <u>supra</u>, at 94.

In <u>Glenn</u>, <u>supra</u>, the supreme court analyzed the issue in the context of a presentence report which contained unsworn witness statements. The court concluded the error was harmless because appellant retained the right to call and cross-examine the witnesses; the trial court had given appellant the opportunity to withdraw the report; and the independent appellate review demonstrated that the aggravating circumstances outweighed the mitigating factors to "an overwhelming degree." <u>Id</u>. at 460.

I believe the inclusion of the irrelevant criminal history, accompanied by the prosecutor's commentary, tainted the jury's determination.[1] In this case, unlike <u>Glenn</u>, Hutton lacked the

---

[1] I note, too, that the report of the court psychiatric

(CONTINUED)

ability to rebut the irrelevant data, and was not given an opportunity to withdraw the report. Most importantly, the criminal record carried with it an inflammatory quality that cannot be gauged on appellate review. The inclusion of the pending rape and kidnapping charges, which lent credence to the inadmissible "other acts" evidence, was patently prejudicial. While this court conceivably could weigh the factors and circumstances divorced from the tainted evidence, to do so would be to ignore Hutton's right to a reliable jury determination in the first instance. The supreme court commented in Penix, supra, at 373:

> "The role of the jury is integral to the sentencing process in death penalty cases. While a recommendation by the jury that the death penalty be imposed must be reviewed and reweighed by the trial and appellate courts, a jury decision to impose life imprisonment is final."

I thus conclude defense counsel's failure to object to the prosecutor's characterization of Hutton's criminal record, as well as his failure to move for excision of the irrelevant

---

[1] (FOOTNOTE CONTINUED)

clinic erroneously states that Hutton had been convicted of murder, kidnapping and other offenses in 1977. The report explains that Hutton "appealed the case, and was released from prison after two years." The convictions were actually for voluntary manslaughter and abduction, and Hutton was "released from prison" because this court reversed his convictions. Such misstatement in any trial, let alone a capital murder case, is inexcusable.

dispositions, was a prejudicial, "substantial violation of an essential duty" owed to Hutton. <u>State</u> v. <u>Lytle</u> (1976), 48 Ohio St. 2d 391, paragraph one of the syllabus. See, also, <u>Strickland</u> v. <u>Washington</u> (1984), 466 U.S. 668. I respectfully disagree with Judge Matia, however, that defense counsel's mere request for a presentence report constituted ineffective assistance of counsel. Nevertheless, on the narrower ground discussed above, I concur that defense counsel was deficient during the penalty phase, and that the sentence of death must be vacated. See <u>Johnson</u>, <u>supra</u>, at 94.

I agree that the trial court erroneously restricted Hutton's recross-examination of the state's witness, Mary Etta Pollard, but I disagree that this error requires reversal of the convictions.

During cross-examination, defense counsel initiated an inquiry into Hutton's character:

"Q.    Isn't it a fact that you have never known the defendant to have been violent towards someone?

"A.    Never" (Tr. 1592).

On redirect examination, the prosecutor challenged her assertion:

"Q.    Now, Mrs. Pollard, isn't it a fact that you know Percy Hutton took the life of someone?

"MR. HILL:    Objection.

"THE COURT:    Overruled.

"***

"A.     Yes, I heard of it.

"***

"Q.     If someone takes the life of another, don't
        you consider that an act of violence?

"***

"A.     It is according to the circumstances. Yes, it
        is an act of violence, but if you are pro-
        tecting yourself, you have to protect
        yourself any kind of way, you have to know
        how to protect yourself. I can't just see
        someone going out and shooting someone or
        killing someone. I think, yes, that's an act
        of violence.

"Q.     Now, isn't it a fact that you also know that
        this defendant, Percy Hutton, committed armed
        robbery?

"A.     No, I don't know that as a fact.

"Q.     Would you consider armed robbery to be an act
        of violence?

"***

"A.     Yes." (Tr. 1598-99).

Defense counsel pursued the inquiry on recross-examination:

"Q.     ***Isn't it a fact that when you heard about this,
        that there was more to it than just the fact of
        him having taken someone's life?

"MS. HARBER:      Objection.

"A.     Yes.

"THE COURT:      Objection will be sustained. The answer
                 will be stricken. The jury is instructed
                 to disregard that answer.

"Q.     Can you tell us, in connection with this incident
        that you just testified about, what is it that you
        heard?

"MS. HARBER:      Objection

> "THE COURT:        Sustained.
>
> "MR. HILL:         No further questions." (Tr. 1600).

Evid. R. 404(A) generally prohibits the use of character evidence to prove conduct on a specific occasion. However, in an exception to this rule, subdivision (1) permits a criminal defendant to offer such evidence of his own character. Evid. R. 405 requires the defendant to introduce the evidence by reputation or opinion testimony; on cross-examination, the state may inquire into specific instances of conduct.

I do not agree that the prosecutor's queries constituted misconduct. Hutton's counsel clearly attempted to convert Pollard into a character witness for the defense. Having done so, Hutton cannot complain of the state's impeachment of Pollard's perception by reference to her knowledge of specific instances of violent conduct attributed to Hutton. See State v. Sims (1981), 3 Ohio App. 3d 321, 323-324. Prejudice is inherent in such rebuttal testimony and is a risk a defendant takes by presenting character evidence. See Michelson v. United States (1948), 335 U.S. 469. Although a limiting instruction would have been appropriate, id. at 472, 484-485, it was Hutton's burden to request one. Evid. R. 105. Cf. State v. Gordon (1971), 28 Ohio St. 2d 45, 51.

Hutton contends the query whether Pollard knew Hutton "took the life of someone" was improper since the criminal convictions resulting from the incident were reversed on appeal. I

disagree. The prosecutor carefully limited his inquiry to the underlying conduct rather than the criminal adjudication. Strictly speaking, the prosecutor's question was factually accurate. Since he properly could inquire about incidents of violence from which no criminal charges flowed, the reversal of Hutton's convictions stemming from that incident is immaterial. See Sims, supra, at 323 (allowing inquiry about defendant's unrelated arrest to impeach character witness).

The trial court's limitation of Hutton's recross-examination raises a more troubling issue. Although defense counsel's initial inquiry on cross-examination did not call for opinion or reputation testimony, as required by Evid. R. 405(A), no objection was raised. The court properly sustained the prosecutor's first objection on recross-examination because the question was leading. Although leading questions are generally permitted on cross-examination, Evid. R. 611(C), Pollard was, in effect, Hutton's witness at that point.

It is not as apparent why the court sustained the second objection. Although the question could perhaps have been framed more precisely, it is clear counsel was attempting to elicit Pollard's reasons for discounting the prosecutor's examples of Hutton's violent conduct. The question did not call for hearsay since its relevance lay not in the truth of whatever she heard, but in its effect upon her opinion.

I conclude that, while the court's limitation was improper, it did not rise to the level of prejudicial error. Pollard was partially able to explain her opinion, and her character testimony would not, in any event, have significantly benefited Hutton's defense. Because the court's error was harmless beyond any reasonable doubt, this assignment of error must be overruled.

I cannot concur in Judge Matia's disposition of Hutton's eighth assignment of error, which challenges the denial of Hutton's Crim. R. 29 motions for acquittal. Our review is limited to the Mitchell kidnapping and murder convictions since trial counsel expressly waived a sufficiency challenge to the counts arising from the Simmons shooting. (Tr. 1801-1802). Although the convictions for Mitchell's kidnapping and murder were merged for sentencing, the kidnapping conviction must be reviewed because it is an element of one of the aggravated murder convictions as well as a death penalty specification.

I believe the state presented sufficient evidence to support both the kidnapping and murder counts. Approximately one week before the evening at issue, Hutton told Mitchell and Simmons he would kill them both if he learned they stole the sewing machine. A jury could reasonably find this motive compelled Hutton to shoot Simmons. The expert ballistics testimony showed it was

possible that Mitchell and Simmons were shot with the same gun. Before shooting Simmons, Hutton had held a gun to Mitchell's head when they stopped at the bus lot. Mitchell was last seen alive when he left the hospital with Hutton, who later told Eileen Sweeney that Mitchell "wasn't coming back."

A reviewing court will not reverse a conviction on sufficiency grounds if the evidence would permit reasonable minds to differ as to whether the state proved each element of the offense beyond a reasonable doubt. State v. Bridgeman (1978), 55 Ohio St. 2d 261, syllabus.

The state theorized at trial that Hutton kidnapped Mitchell by deception to facilitate his murder. (Tr. 2142, 2280). See R.C. 2905.01(A)(2). Conversely, one of Hutton's aggravated murder convictions, charged in the second count of the indictment, is felony murder based on the kidnapping.

The evidence reasonably permits a finding of kidnapping by deception. Simmons testified that Hutton told Mitchell on the way to the hospital that someone came out of the house and shot Simmons. (Tr. 973-974). When Mitchell left the hospital with Hutton and Laster, he believed that they were on their way to "get" the person who shot Simmons. (Tr. 974-975). The jury could reasonably have found Hutton instilled Mitchell's belief, and that, consistent with the preceding events that evening, Hutton instead intended to kill him.

In addition to felony murder, Hutton was convicted of aggravated murder, as charged in the first count of the indictment, under a theory of prior calculation and design. See R.C. 2903.01(A). The same evidence outlined above supports a finding that Hutton killed Mitchell with "some kind of studied analysis with its object being the means by which to kill." State v. Jenkins (1976), 48 Ohio App. 2d 99, 101-102. See, also, State v. Davis (1982), 8 Ohio App. 3d 205, 206-207. I would thus affirm the court's ruling under this theory as well.

I cannot concur in Judge Matia's disposition of Hutton's fifth assignment, which challenges the admission of a series of photographs of Mitchell's body into evidence.

The supreme court has adopted a strict standard governing the admissibility of photographs in capital cases:

"To be admissible in a capital case, the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature. Contrary to the Evid. R. 403 standard, where the probative value must be minimal and the prejudice great before the evidence may be excluded *** if the probative value does not, in a simple balancing of the relative values, outweigh the danger of prejudice to the defendant, the evidence must be excluded." State v. Morales (1987), 32 Ohio St. 3d 252, 258. See, also, State v. Maurer (1984), 15 Ohio St. 3d 239, paragraph seven of the syllabus.

In this case the state introduced ten photographs of Mitchell's decomposed, maggot-infested corpse. These photographs were relevant, the state urges, for identification purposes and to illustrate the time and manner of Mitchell's death.

I disagree. Hutton did not contest the identification of Mitchell's body. Indeed, defense counsel did not even cross-examine Dr. Benjamin Kaufman, a consultant for the county coroner's office, who positively identified the body through a comparison of x-rays.

Neither of Mitchell's bullet wounds is clearly discernible in any of the photos. Because of the state of decomposition, the deputy coroner was unable to locate one of the entrance wounds. In any event, Hutton did not challenge the prosecution's version of the cause of death.

The exhibits graphically illustrate that, consistent with the deputy coroner's testimony, Mitchell had been dead some time before his body was discovered. However, it was hardly necessary to use ten photographs to prove this point.

Prejudice from the admission of the photos was inevitable. Although the gruesome nature of a photograph will not render it per se inadmissible, Maurer, supra, at 265, there must be a counterbalancing probative value. While the prejudice may have been mitigated somewhat by the jury's probable recognition that Hutton did not cause the advanced decomposition of Mitchell's body, I believe the prejudice was nonetheless sufficient to outweigh the meager probative value.

-22-

The photos were also cumulative in nature and most, if not all of them, should have been excluded on that ground. <u>Morales</u>, <u>supra</u>. See, also, <u>State</u> v. <u>Thompson</u> (1987), 33 Ohio St. 3d 1, 9. For example, state's exhibits 17, 18 and 19 depict virtually the same view of Mitchell's body on the coroner's table. Exhibits 16 and 29 repetitively depict a close-up view of Mitchell's skull. Because the quantity of the photos added nothing to their dubious probative value, exclusion was warranted.

COURT OF APPEALS OF OHIO  EIGHTH DISTRICT

COUNTY OF CUYAHOGA

NO. 51704

STATE OF OHIO                              :
                                           :
        Plaintiff-Appellee         :
                                           :
  -vs-                                     :      DISSENTING OPINION
                                           :
PERCY HUTTON                               :
                                           :
        Defendant-Appellant        :
                                           :
                                           :

DATE OF ANNOUNCEMENT OF DECISION:          APR 2 8 1988

PATTON, J., DISSENTING:

    A majority of this panel believes that appellant's fourth and thirteenth assignments of error are well taken.  I do not agree that error, let alone reversible error, intervened in either the guilt or penalty phases of this case, and thus I cannot agree that appellant's fourth or thirteenth assigned errors have merit.  Accordingly, I must respectfully dissent from the majority's reversal of this conviction and sentence based on those two assignments of error.

-2-

I.

The majority finds merit in the appellant's fourth assignment of error pertaining to the alleged "other acts" evidence testified to by Eileen Sweeney. I am not persuaded that the admission of this evidence violated Evid. R. 404(B) or its statutory counterpart, R.C. 2945.59, or that it gave rise to prejudicial error.

The majority concedes that it was not improper for Ms. Sweeney to testify to appellant's declaration that Ms. Sweeney should forget about Mr. Mitchell because he would not be coming back. The majority also acknowledges that Ms. Sweeney could testify to having seen appellant possess a handgun with a white handle when he took her to Fairhill Park. Nevertheless, the majority believes that the testimony concerning the alleged sexual assault was inadmissible as "other acts" evidence and that this testimony deprived appellant of a fair trial. I cannot agree.

Evidence Rule 404(B) generally proscribes the use of other crimes, wrongs or acts independent of the offense for which the defendant is on trial where that evidence is used to demonstrate that the defendant has a propensity for crime or that his character is in conformity with the other acts. See State v Mann (1985), 19 Ohio St. 3d 34, paragraph one of the syllabus. See also State v. Zuern (1987), 32 Ohio St. 3d 56, 59. But this general rule of exclusion does not apply where the evidence of another crime is relevant to prove the accused's guilt of the crime charged or to

connect him with it, and the evidence is not offered merely to show propensity or disposition on the accused's part to commit the crime. See State v. Watson (1971), 28 Ohio St. 2d 15, 21 (construing R.C. 2945.59). In State v. Wilson (1982), 8 Ohio App. 3d 216, this Court recognized that the listing of permissible uses of evidence as set forth in the second sentence of Evid. R. 404(B) is illustrative, but not exhaustive or exclusive, and thus "a party may sometimes introduce 'other acts' evidence, although the purpose for its admission is not enumerated in Evid. R. 404(B)." Wilson, 8 Ohio App. 3d at 219. See also 2 Weinstein and Berger, Weinstein's Evidence (1986) 404-54 to 404-56, Paragraph 404[08] and cases cited therein.

One recognized permissible use of such evidence is "[t]o complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings." McCormick, Evidence (3d Ed. Cleary Ed. 1984) 558, Section 190. This use is consistent with prior Ohio caselaw. In State v. Thompson (1981), 66 Ohio St. 2d 496, the Ohio Supreme Court stated:

> "Other acts" testimony is relevant and, thus, admissible, under the "scheme, plan or system" exception of R.C. 2945.59 where those acts form part of the immediate background of the crime charged, and hence are "inextricably related" to the act alleged in the indictment; that is, where the challenged evidence plays an integral part in explaining the sequence of events and is necessary to give a complete picture of the alleged crime.

-4-

Id. at 498. In State v. Wilkinson (1980), 64 Ohio St. 2d 308, the court explained that "the jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void -- without knowledge of the time, place and circumstances of the acts which form the basis of the charge." Id. at 317 (quoting United States v. Roberts (C.A. 6, 1977), 548 F.2d 665, 667, certiorari denied, 431 U.S. 931). Thus, "evidence of other crimes may be presented when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." Wilkinson, 64 Ohio St. 2d at 317.

I agree that evidence of other bad acts may not be admitted to prove that the individual is a bad person who is prone to commit crimes, including the one for which he stands charged. But in the instant case, Ms. Sweeney's testimony was not offered to show that appellant was prone to commit crimes, but instead was offered to explain the sequence of events between the time that Ms. Sweeney learned that Derek Mitchell was in danger and the time that appellant ultimately released Ms. Sweeney. This does not fall within the proscription against "other acts" evidence contained in Evid. R. 404(B). For example, in State v. Buck (1982), 3 Ohio App. 3d 349, where the defendant was charged with felonious assault against police officers, the court rejected the argument that "other acts" evidence was improperly admitted where the evidence disclosed the

-5-

defendant had threatened several people before the police arrived
to investigate a domestic violence report.  The court held that the
jury was entitled to "the complete picture" of what occurred, not-
withstanding that the "other acts" could constitute separate offen-
ses.  Such evidence is admissible because it explains and connects
a chain of events resulting directly in the arrest of the defen-
dant.  See State v. Gonzalez (May 17, 1984), Cuyahoga App. No.
47216, unreported, slip op. at 6.

The facts of this case provide a compelling illustration of evi-
dence that is necessary to put the sequence of events in context.
At approximately 2:30 a.m., Ms. Sweeney was taken to St. Luke's Hos-
pital by the appellant, in the company of Bruce Laster and the vic-
tim Derek Mitchell, presumably to learn whether Samuel Simmons,
Jr. was still alive in spite of the gunshot wounds to his head.
When Ms. Sweeney arrived at Simmons' room, she discovered that he
was alive.  Simmons told her that he had been shot by appellant and
that she should tell Mr. Mitchell to get out of the appellant's car
immediately because they were going to kill him.  Ms. Sweeney left
Simmons and ran to the hospital's parking lot to relay Simmons' mes-
sage to Mitchell, but the car was gone.  Appellant and Laster re-
turned within thirty minutes, but they were without Mr. Mitchell.
Appellant told Ms. Sweeney that they had taken Mr. Mitchell home.
Ms. Sweeney entered the car on appellant's assurance that he would
take her home, but appellant instead drove to Fairhill Park.  Once

-6-

there, appellant told Ms. Sweeney to forget about Mr. Mitchell be-
cause he was not coming back. Ms. Sweeney observed that appellant
possessed a handgun with a white handle, which corroborated Mr. Sim-
mons' testimony. Ms. Sweeney testified that appellant then raped
her. Thereafter, appellant warned Ms. Sweeney not to tell anyone
what had transpired and that if Ms. Sweeney did disclose anything,
then "someone" would be looking for her. Shortly after 4:00 a.m.,
the appellant and Laster drove Ms. Sweeney to LaWanda Mitchell's
house, where she was released.

The majority would seemingly allow Ms. Sweeney to testify that
she was with appellant for an undetermined period of time, during
which she saw the gun and heard appellant's incriminating remarks.
The majority would not allow Ms. Sweeney to explain that appellant
detained her against her will from the time she re-entered appel-
lant's car at the hospital until she was released at LaWanda Mit-
chell's house. By excluding evidence explaining the immediate se-
quence of events, the majority would put Ms. Sweeney's testimony in
a vacuum and allow the jury to speculate as to why she would accom-
pany appellant for an unspecified period of time even though she
had reason to believe that appellant had harmed Mr. Mitchell. A
shrewd defense counsel would not inquire on cross-examination as to
Ms. Sweeney's reasons for remaining with appellant, but could effec-
tively defile her before the jury during closing arguments in order
to impeach her testimony. At that point, there would be no

-7-

opportunity for Ms. Sweeney to testify to the actual sequence of events. In my view, the admission of Ms. Sweeney's testimony violated neither the letter nor the spirit of Evid. R. 404(B).

Under these circumstances, I cannot agree that Ms. Sweeney's testimony concerning the alleged rape should have been excluded. Her testimony was highly probative of evidence linking appellant with the murder because it explained the circumstances during the critical period of time immediately after she last saw Mr. Mitchell. Contrast State v. Curry (1975), 43 Ohio St. 2d 66, 73 ("other acts" evidence occurring five months apart were "chronologically and factually separate occurrences"). These facts do not allow for a neat severance of separate and distinct events, but instead reflect a continuing course of conduct from the time of the deceased's disappearance until appellant's final intimidating threat to Ms. Sweeney that "someone" would be looking for her if she disclosed the events of the evening.

Moreover, I am not persuaded that the probative value of Ms. Sweeney's testimony was substantially outweighed by its prejudicial effect. See Evid. R. 403(A). In State v. Zuern (1987), 32 Ohio St. 3d 56, an aggravated murder case, the court found no merit in the contention that prejudicial error occurred when a witness remarked that the defendant was already in prison for murder. Id. at 58-61. When the reference to a prior murder charge in Zuern does not produce reversible error, it is difficult to see how Ms.

-8-

Sweeney's allegation of rape can constitute prejudicial error.
Moreover, the trial court in the instant case gave careful limiting
instructions before and after Ms. Sweeney's testimony to minimize
any inflammatory effect. (Tr. 1181-82, 1332).

In light of the foregoing, I am convinced that Ms. Sweeney's
testimony was properly allowed and was not violative of the pro-
scription against "other acts" evidence contained in Evid. R. 404
(B). Even if portions of her testimony were objectionable, I can-
not agree that such testimony constituted reversible error. "Close
evidentiary questions are within the domain of the trial court."
Calderon v. Sharkey (1982), 70 Ohio St. 2d 218, 223. In my opin-
ion, the trial court did not err in admitting Ms. Sweeney's testi-
mony. Accordingly, I would overrule appellant's fourth assignment
of error.


II.

The majority also concludes that reversible error occurred dur-
ing the sentencing phase of this case as a result of the disclosure
of information contained in appellant's presentence report. The ma-
jority concludes that appellant was denied effective assistance of
counsel when appellant's trial counsel requested a presentence re-
port that included a summary of appellant's prior arrests and/or
convictions. The majority thus finds merit in the thirteenth as-
signment of error. I cannot agree with the majority's conclu-
sions.

-9-

At the outset, it should be noted that to support his claim that he was denied effective assistance of counsel, appellant's brief asserts, among other things, that his trial counsel failed to object during the prosecution's closing remarks.  Appellant does not complain about the admission of the presentence report itself. Nevertheless, one member of the majority now concludes that counsel rendered ineffective assistance simply by requesting a presentence report, while another member of the majority concludes that counsel was ineffective when he failed to move to excise certain information from appellant's presentence report.  In my view, the foregoing arguments are not persuasive.

With regard to the prosecution's closing remarks, the general rule is that some latitude is granted to both parties in closing argument.  See State v. Byrd (1987), 32 Ohio St. 3d 79, 82.  "[T]he conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial."  State v. Maurer (1984), 15 Ohio St. 3d 239, 266.  In the instant case, counsel did not register an objection to the State's closing argument.  Absent plain error, the failure to object to closing remarks ordinarily precludes a subsequent complaint about that argument on appeal.  See Snyder v. Stanford (1968), 15 Ohio St. 2d 31; Cleveland v. Egeland (1986), 26 Ohio App. 3d 83. Instead of finding that the prosecutor's remarks were plain error in this case, the majority attempts to rest its conclusion on the

-10-

claim that appellant was denied effective assistance of counsel. The majority's reasoning is unconvincing.

With regard to the claim of ineffective assistance of counsel, the majority correctly notes that the appellant must demonstrate that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. See Strickland v. Washington (1984), 466 U.S. 668; State v. Lytle (1976), 48 Ohio St. 2d 391. Judicial review of counsel's performance must be highly deferential, and a reviewing court must make every effort to eliminate the distorting effect of hindsight. Strickland v. Washington, 466 U.S. at 689; State v. Post (1987), 32 Ohio St. 3d 380, 388.

In the instant case, appellant requested that a presentence report be prepared for the sentencing phase of this case, pursuant to R.C. 2929.03(D)(1). Included in the presentence report was a summary of appellant's prior arrests and/or convictions for both his juvenile and adult life. In State v. Steffen (1987), 31 Ohio St. 3d 111, the court observed that only the defendant can request that a presentence report be prepared. Id. at 121. Thus, " *** the defendant decides whether to expose himself to the risk of potentially incriminating presentence investigations, including mental examinations. *** [T]he jury should be privy to all information relevant to its task of deciding whether a defendant should be sentenced to life in prison or whether it should recommend that defendant be put to death." Steffen, 31 Ohio St. 3d at 121 (quoting

-11-

State v. Buell (1986), 22 Ohio St. 3d 124, 138).  The fact that a presentence report contains information that might not be admissible during the guilt phase of a capital prosecution is not of itself a basis for a finding of error in the sentencing phase.  See State v. Glenn (1986), 28 Ohio St. 3d 451, 459.

Judge Matia believes that counsel's mere request for a presentence report constituted ineffective assistance of counsel.  I agree with Judge McManamon to the extent that she rejects that the mere request for a presentence report constituted ineffective assistance of counsel.  A presentence report may contain both favorable and unfavorable information on a defendant, but the fact that the report contains some unfavorable information does not by itself establish that counsel was not acting as the "counsel" guaranteed by the Sixth Amendment when the presentence report was requested.  Indeed, it is not inconceivable that counsel could be accused of being incompetent if he did not request a presentence report.  In my view, the conclusion that the disclosure of unfavorable information by itself demonstrates that counsel was ineffective misapprehends the correct scope of review of counsel's performance by failing to give due deference to the presumed competence of counsel.

I am also unable to join in Judge McManamon's analysis of appellant's claim that he was denied effective assistance of counsel during the penalty phase.  Judge McManamon focuses on the admissibility in a presentence report of references to appellant's previous

-12-

arrests that did not result in either a conviction or a delinquency adjudication. In my view, the issue here is not whether it was error under the law of evidence to admit these prior arrests. Contrast State v. Post (1987), 32 Ohio St. 3d 380, 382-84 (challenging admissibility of victim impact statement in presentence report); State v. Steffen (1987), 31 Ohio St. 3d 111, 121-22 (challenging admissibility of presentence report); State v. Glenn (1986), 28 Ohio St. 3d 451, 459-60 (challenging admissibility of hearsay statements in presentence report). Instead, the only issue is whether trial counsel's failure to object to the presentence report was so deficient that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, and whether counsel's failure to object prejudiced appellant's defense. See Strickland v. Washington, supra; State v. Lytle, supra. The record in this case does not support either component of an ineffectiveness claim.

Initially, it is not necessary to determine whether counsel's performance in this regard was deficient since there is no indication that appellant was prejudiced by counsel's alleged deficiency. See Strickland v. Washington, 466 U.S. at 697. To establish that he has been prejudiced by counsel's representation, the appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 466 U.S. at 694.

-13-

In this case, there has been no showing that in the absence of some or all of appellant's presentence report, there is a reasonable probability that the jury would have found that the aggravating circumstance did not outweigh the mitigating factors. The State proved by proof beyond a reasonable doubt that the murder of Derek Mitchell was a part of a course of conduct involving the purposeful attempt to kill two or more persons. See R.C. 2929.04 (A)(5). Against this aggravating circumstance must be weighed all the mitigating factors drawn from (1) the nature and circumstances of the offense; (2) the history, background and character of appellant; and (3) any of the factors listed in R.C. 2929.04(B)(1) through (7) which exist in this case. See State v. Post, 32 Ohio St. 3d at 394. After considering the circumstances of this case, I am not persuaded that there is a reasonable probability of a different outcome even if appellant's presentence report is disregarded. Under these circumstances, it cannot be said that counsel's failure to excise some portions of the presentence report prejudiced appellant's defense. Cf. State v. Glenn (1986), 28 Ohio St. 3d 451, 459-60 (improper statements in presentence report did not affect mitigation phase of trial where aggravated circumstances overwhelmingly outweighed mitigating factors).

Moreover, I am not persuaded that counsel's performance fell outside the wide range of reasonable professional assistance such that counsel's representation was constitutionally deficient. Appellant requested that a presentence report be prepared, pursuant

-14-

to R.C. 2929.03(D)(1).   Under Ohio's sentencing scheme, the trial
jury must consider the presentence report as it weighs the aggravat-
ing circumstances against any mitigating factors present in the
case.

In State v. Glenn (1986), 28 Ohio St. 3d 451, a presentence re-
port was introduced during the mitigation phase of an aggravated
murder trial that included witness statements to the police and dif-
ferent versions of the crime taken from police reports that tended
to undermine the impartiality of the report.   The court found the
inclusion of those statements to be harmless error under the circum-
stances of that case.   Glenn, 28 Ohio St. 3d at 460.   Without speci-
fying what a presentence report should or should not contain, the
Glenn court admonished that a presentence report "should include
only such information as is directly relevant to the aggravating
and mitigating circumstances."   Glenn, paragraph two of the sylla-
bus.

In the instant case, appellant's presentence report included a
summary of appellant's prior record for his juvenile and adult
life.   The report indicated whether appellant was adjudicated de-
linquent or whether he was found guilty of the charged offense.
The report also indicated whether appellant had been released or if
there had been no disposition in the case or if charges remained
pending against him.   Although there was no notation on the presen-
tence report itself, both the prosecutor and appellant's trial
counsel explained that one of appellant's adult convictions had
been reversed on appeal. (Tr. 2396; 2400-2401).

-15-

There is no suggestion in this case that appellant's prior criminal record was considered as a non-statutory aggravating circumstance. But see Barclay v. Florida (1983), 463 U.S. 939 (held: death sentence valid despite trial court's consideration of defendant's prior record, in violation of state law). Instead, in the instant case, the concurring opinion concludes that it was reversible error for the presentence report to refer to any previous charge against appellant that did not result in an actual conviction or delinquency adjudication. But the purpose of the mitigation phase of an aggravated murder trial is for the sentencer to acquire a more thorough knowledge of the defendant's character and history to determine whether any mitigating factors militate against imposing the sentence of death. See Williams v. New York (1949), 337 U.S. 241; State v. Barker (1978), 53 Ohio St. 2d 135, 150-51. A bare recital of the defendant's prior convictions and delinquency adjudications hardly provides the sentencer with a complete profile of the individual defendant.

In State v. Burton (1977), 52 Ohio St. 2d 21, the court observed:

> [I]t is well-established that a sentencing court may weigh such factors as arrests for other crimes. As noted by the Second Circuit United States Court of Appeals, the function of the sentencing court is to acquire a thorough grasp of the character and history of the defendant before it. The court's consideration ought to encompass negative as well as favorable data. Few things can be so relevant as other criminal activity of the defendant. "To argue that the presumption of innocence is affronted by considering unproved criminal activity is as implausible as taking the double jeopardy clause to bar reference to past convictions."

-16-

<u>State</u> v. <u>Burton</u>, 52 Ohio St. 2d at 23 (quoting <u>United States</u> v. <u>Doyle</u> (C.A. 2, 1965), 348 F.2d 715, 721, <u>certiorari denied</u>, 382 U.S. 843).  While I acknowledge that the sentence of death is qualitatively different from other sentences ordinarily imposed by a court, I see no reason why prior arrests may be considered by a sentencer in a non-capital case but cannot be considered in a capital case as part of "the history, character, and background of the offender," R.C. 2929.04(B), particularly if the offender attempts to offer his insubstantial prior criminal history as a mitigating factor, R.C. 2929.04(B)(5).  In an appropriate case, the sentencer may accord great weight to the absence of a significant history of prior criminal convictions and delinquency adjudications.  But excluding charges that did not result in a conviction or delinquency adjudication precludes the sentencer from acquiring an accurate understanding of the offender's history and background and frustrates the requirement that sentencing be guided and channeled by a system that focuses on the circumstances of each individual homicide and each individual defendant.  <u>Zant</u> v. <u>Stephens</u> (1983), 462 U.S. 862, 879; <u>Proffitt</u> v. <u>Florida</u> (1976), 428 U.S. 242, 258.

Finally, the majority undervalues the function of the trial judge, who actually imposes the sentence under Ohio's statutory sentencing scheme.  In this case, the sentencing jury's function was to recommend the appropriate sentence.  See R.C. 2929.03(D)(2).  The ultimate responsibility rests with the sentencing judge.  See

-17-

R.C. 2929.03(D)(2)-(3).  An offender's presentence report ordinarily is not submitted to a jury other than when requested by the offender in a capital case.  See State v. Glenn (1986), 28 Ohio St. 3d 451, 459; R.C. 2929.03(D)(1).  However, presentence reports are not unfamiliar to our trial judges.  See Crim. R. 32.2.  The trial judge is in the best position to check a sentencing jury that may have misused information contained in the offender's presentence report.  While the mere presence of a trial judge may not be an absolute guarantee against the arbitrary imposition of the death penalty, I am convinced that the trial judge is particularly well suited to giving the appropriate weight to the information contained in the offender's presentence report.  The sentencing judge thus acts as a check on a sentencing jury that has been misled or that has given undue consideration to the presentence report.

Thus, where the information contained in appellant's presentence report was relevant to determine whether any mitigating factors were present in this case, I cannot see how counsel's failure to object to some portions of that presentence report can be considered as ineffective assistance of counsel.  But even if I agreed that the contents of a presentence report should be limited to some extent, I cannot agree that counsel's failure to move for excision of some of appellant's prior charges fell below an objective standard of reasonableness and so undermined the proper functioning of

-18-

the adversarial process that the trial cannot be relied upon as hav-
ing produced a just result. Strickland v. Washington, 466 U.S. at
686, 688. "It is all too tempting for a defendant to second-guess
counsel's assistance after conviction or adverse sentence, and it
is all too easy for a court, examining counsel's defense after it
has proved unsuccessful, to conclude that a particular act or omis-
sion of counsel was unreasonable." Id. at 689. In this case, ap-
pellant was not denied the effective assistance of reasonably compe-
tent counsel.

Accordingly, I would overrule appellant's fourth and thirteenth
assignments of error and affirm the conviction and sentence.

IN THE COURT OF APPEALS OF FRANKLIN COUNTY, OHIO

State of Ohio,                   :

         Plaintiff-Appellee,     :

v.                        :      No. 78AP-302

Donn M. Luft,               :

         Defendant-Appellant.   :

---

D E C I S I O N

Rendered on December 26, 1978

---

MR. GEORGE C. SMITH, Prosecuting Attorney,
MR. ALAN C. TRAVIS, Assistant,
    Franklin County Hall of Justice,
    369 South High Street,
    Columbus, Ohio,
    For Plaintiff-Appellee.

MR. WILLIAM S. LAZAROW,
MR. STUART A. BENIS,
    16 East Broad Street,
    Columbus, Ohio,
    For Defendant-Appellant.

---

HOLMES, P. J.

     This cause involves the appeal of a judgment of the Common Pleas Court of Franklin County upon a jury verdict finding the defendant-appellant guilty of two counts of aggravated murder and one count of murder. The defendant was sentenced to life imprisonment on the two counts of aggravated murder, and to a term of fifteen years to life on the count of murder.

The defendant had been initially indicted on three counts of aggravated murder, but, at the outset of the hearings, was found incompetent to stand trial. However, after a period in Lima State Hospital and a finding by the trial court that defendant was now legally sane, the defendant did stand trial, and was found guilty as charged.

The taking of lives, the criminal charges therefor, and the trials for such acts, always present extremely difficult challenges and determinations for the trier of the facts and for the reviewing court. This case is no exception to that circumstance; in fact, it presents a number of facets that make it even more difficult of resolve in that we have a fact pattern of a young man who, because of internal family conflict, or mental trauma of one sort or another, determined to take the life of his mother, his father, and his sister. For precisely what reason the acts were committed, the survivors, other members of the family, friends, or society may never know - but the acts of violence were committed - about that there is no dispute. The dispute, and the basic question of this appeal, is whether the defendant-appellant was in the legal sense aware of that which he had accomplished.

The trial court, on the initial question of the sanity of the appellant, found the defendant not to be capable of standing trial. Upon later hearing, after confinement and treatment at Lima State Hospital, the defendant was found to be mentally capable of standing trial.

After presentation of all of the evidence on behalf of the state, inclusive of the forethought of the specific acts and the measures taken to hide or conceal such acts - as well as the evidence adduced to show the mental state of the perpetrator - the jury made its determination

No. 78AP-302

not only that the acts were carried out by the defendant, but that he

had committed such acts with the legal capacity to understand the nature

and significance of such acts.

The defendant-appellant appeals his judgment of conviction,

setting forth the following assignments of error:

"I.    The prosecution's failure to disclose
evidence favorable to the defendant and material
to guilt and punishment, as well as the prosecu-
tion's repeated introduction of irrelevant testi-
mony designed to inflame the jury, deprived the
defendant of his right to a fair trial in viola-
tion of the Fourteenth Amendment of the United
States Constitution.

"II.   The trial court erred, in admitting over
defendant's objections, evidence relating to the
Probate Court records, the Credit Union records,
hearsay evidence and inflammatory photographs.

"III.  The trial court erred in overruling defend-
ant's motions for judgment of acquittal and motion
for a new trial, since the evidence was uncontro-
verted that the defendant was insane at the time
of the offense.

"IV.   The trial court erred in failing to charge
the jury that the state had the burden of dis-
proving the affirmative defense of insanity in
violation of the due process clause of the Four-
teenth Amendment of the United States Constitu-
tion.

"V.    The trial court erred in overruling defend-
ant's motion to suppress statements and searches
in violation of the Fourth and Fifth Amendments of
the United States Constitution, and the introduction
of this evidence based upon the testimony of Detec-
tive Tom Jones further denied the defendant his
right to a fair trial in violation of the Four-
teenth Amendment of the United States Constitution."

The first assignment of error alleges that the state denied

the defendant his right of discovery of evidence pursuant to Crim. R.

16 which would have been favorable to his defense.  The first basis of

such claim is that the state withheld evidence that the appellant had previously contacted the Columbus City Prosecutor's office, and had related to a member of such office that certain outside oppressive elements were being brought to bear upon him and bringing pressure upon him to commit acts against his will. This conversation and contact with the prosecutor's office were alleged to be a showing that the defendant-appellant was in an extreme mental state, and that such contacts should have been fully disclosed to the defense in support of the claim that the defendant-appellant was of unstable mind at the time of committing the acts for which he was charged.

It is true that these acts of the defendant-appellant may tend to show an oppressed and confused mental condition; however, the defense did obtain a complete deposition of the assistant city prosecutor involved in the prior contacts by the appellant, and the deposition was presented at trial. So it may be concluded that the defense had the reasonable availability of this information at the time of trial.

Also there is the claim by the appellant that a certain drawing of a man referred to as a "stickman" or pencil line drawing, which inferentially was done by the defendant, had been withheld by the prosecution. The drawing showed an arrow piercing the head of the characterization of a man. Such drawing it is suggested would tend to show the appellant's psychotic state. In a review of the evidence, it does not readily appear that any police officer, or member of the prosecutor's office, deliberately withheld this drawing from the evidence.

We turn to the introduction by the state of the series of photographs of the deceased members of the family which had allegedly been shot

No. 78AP-302                                             5

by the appellant.  Some of the photographs had been taken at the airport
where the bodies were found in the trunk of an automobile.  Other photo-
graphs introduced into evidence had been taken at the morgue.  The photo-
graphs were gross and most unnecessary to the prosecution of this case.
We are neither able to approve of, nor condone, the multitudinous eviden-
tiary use of some 30 such photographs in that they were not presented for
the purpose of supporting any contested issue as to the manner or mode of
death, nor as to any reasonable scientific proof necessary to the trial
of this cause.  Therefore, we state that the introduction of the photo-
graphs was not only unnecessary, but bordering upon the erroneous use of
such evidence.  However, in review of the totality of the evidence adduced
as to the commission of these acts, and the evidence as to the guilt of
this defendant, we hold the introduction of such evidence not to be pre-
judicial.

    The prosecution presented testimony relating to the value of
the estate of the deceased parents and sister, supposedly in support of
a theory that there may have been a profit motive in the killings.  There
was also introduced on behalf of the state certain Credit Union records
showing that the appellant had attempted to borrow money, but had been
rejected because of an unstable financial condition.  We feel that the
introduction of these records was not significantly probative of the major
issue to be decided by the trier of the facts; however, in the totality of
the record here considered, we hold such not prejudicial.  The admissi-
bility of the evidence in any trial rests within the sound discretion of
the trial court.  The court did not abuse its discretion in this regard.

    Based upon the foregoing, the first and second assignments of

No. 78AP-302                                              6

error are hereby dismissed.

        In the appellant's third assignment of error, it is argued
that the trial court should have granted a motion for judgment of ac-
quittal pursuant to Crim. R. 29 as a matter of law on the basis that the
state had not proven the appellant's insanity as one of the elements
requisite to the finding of guilty of the charge of aggravated murder.
Such motion was made at the conclusion of the state's case, and again at
the conclusion of all of the evidence.

        Crim. R. 29(A) provides in pertinent part that:

        "The court * * * shall order the entry of a
        judgment of acquittal of one or more offenses
        charged in the indictment, information,
        or complaint, if the evidence is insufficient to
        sustain a conviction of such offense or offenses.
        The court may not reserve ruling on a motion for
        judgment of acquittal made at the close of the
        state's case."

        This rule neither establishes that sanity is one of the elements
of the crime of aggravated murder, nor does it require that the trial court
make a finding of not guilty by reason of the absence of specific proof
by the state that the defendant was not insane.  The test under this rule
upon a motion for acquittal is to review the evidence and determine if
reasonable minds could differ on all of the evidence presented bearing on
the guilt or innocence of the defendant including the issue of the defense
of insanity.  We believe this to be in keeping with the interpretation of
Crim. R. 29 as found in *State v. Lane* (1976), 49 Ohio St. 2d 77, 85, and
*State v. Hancock* (1976), 48 Ohio St. 2d 147.

        The sanity of a defendant in a criminal case is not an element
of the criminal offense, but is a consideration of the trier of the facts
upon all of the evidence adduced to be considered upon the issue of the

no. 76AP-302

defendant's capacity to understand the nature of the act which he has committed, and consequently upon his guilt or innocence. The trier of the facts, the jury in this instance, must examine all of the acts of the defendant prior to, during, and after the alleged acts and, construing such evidence along with all of the expert testimony offered on behalf of the defense of insanity, must determine whether they have been persuaded as to the guilt of the defendant beyond a reasonable doubt.

Here there was extensive evidence offered as to certain acts of the appellant prior to the commission of the fatal acts. Evidence was adduced relating to the purchase of the gun, the attempts at cleaning the carpet, the placing of the bodies in plastic bags and sleeping bags, the placing of the bodies in the trunk of the automobile, the driving and parking of the automobile at the airport, and the appellant's failure to respond to the repeated attempts to arouse anyone in the house after the occurrence even though he was within the residence, and the appellant's statements to the Whitehall school principal and police officer that his family had been called out of town.

On behalf of the defense, conversely, there was evidence by way of psychological and psychiatric testimony that the personal background of the appellant, his erratic actions prior to, as well as during, the commission of the acts, were ample evidence of the appellant's schizophrenic characteristics.

All of the evidence adduced that could reasonably be related to the issue of the appellant's sanity or insanity was conflicting in nature, and it was well within the province of the jury to determine whether or not appellant had full capability and responsibility for his

acts.  Reasonable minds could differ on this issue, and the trial court
was well within its discretion to overrule the motion for a judgment
of acquittal.  Therefore, the third assignment of error is hereby dis-
missed.

In the fourth assignment of error, the appellant argues that
the trial court erred in failing to charge the jury that the state had
the burden of disproving the affirmative defense of insanity.

The law to be applied at the time of this trial is to be
found within R. C. 2901.05(A), and decisions of the Ohio Supreme Court
construing such section.  In *State v. Humphries* (1977), 51 Ohio St. 2d
95, the syllabus law is to be found as follows:

> "1. Under the provisions of R. C. 2901.05(C)
> (2), a plea of not guilty by reason of insanity
> is an affirmative defense.
>
> "2. Under the provisions of R. C. 2901.05(A),
> a defendant who pleads an affirmative defense
> has only the burden of going forward with evi-
> dence of a nature and quality sufficient to
> raise that defense, and does not have the burden
> of establishing such defense by a preponderance
> of the evidence.
>
> "3. Under the provisions of R. C. 2901.05(A),
> when a defendant pleads an affirmative defense,
> and presents evidence of a nature and quality
> sufficient to raise that defense, the state bears
> the burden of persuasion beyond a reasonable
> doubt upon every issue necessary to convict the
> defendant.
>
> "4. The General Assembly enacted R. C. 2901.05
> to be effective January 1, 1974.  Every criminal
> trial held on and after that date is required to
> be conducted in accordance with the provisions of
> that section."

This syllabus law of *Humphries* specifically holds that insanity
is an affirmative defense as construed in *State v. Robinson* (1976), 47

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 148 of 201. PageID #: 4497

Ohio St. 2d 103, and pronounced a change in the common law which his-
torically held that the defendant had the burden of proving an affirma-
tive defense by a preponderance of the evidence. It is interesting to
note that two justices dissented from the majority opinion, and that
two justices, in concurring, specifically stated that, although the
court in *Robinson* had judicially pronounced the change in the common
law burden of asserting affirmative defenses, there was no constitutional
prohibition in reverting again to that prior common law principle by
legislative enactment.

Again, in *State v. Chase* (1978), 55 Ohio St. 2d 237, the Supreme
Court had occasion to address the question of the burden of establishing
the affirmative defense of insanity. In such case, the syllabus law
approved and followed *State v. Robinson* and *State v. Humphries, supra.*
The additional law of the case is to be found within paragraph two of
the syllabus as follows:

> "2. Once a defendant who pleads not guilty by
> reason of insanity presents evidence of a nature
> and quality sufficient to raise that defense, the
> trier of fact must consider all the evidence in
> the case, including all the evidence as to the
> affirmative defense, and if the trier of the fact
> entertains a reasonable doubt of defendant's
> guilt, the defendant must be acquitted, or if
> the trier of the fact entertains no reasonable
> doubt as to the defendant's guilt, the defendant
> must be convicted."

The court, in *Chase*, concluded that the instruction given by
the trial court "suggested that the jury could not acquit the defendant
unless he actually 'established' the defense in the jury's mind by some
unspecified quantum of proof. Thus the instruction imposed on the
defendant a greater burden of proof than the law allows, and it was,

therefore, prejudicial error."

Chief Justice O'Neill, in the opinion in *Chase*, pointed out that the crucial question in the jury's proper consideration of the affirmative defense was not which party had the burden of proof, "but rather the standard by which the trier of fact is permitted to draw inferences from the evidence as a whole."

Specifically as to the erroneous jury instruction in that case, Chief Justice O'Neill stated:

> "* * * The court did not explain that when the trier of fact has considered all of the evidence, including all of the evidence as to the affirmative defense, the trier of fact must acquit the defendant if the trier of fact entertains a reasonable doubt as to the defendant's guilt, or if the trier of the fact entertains no reasonable doubt as to the defendant's guilt, the trier of fact must convict the defendant. For these reasons the judgment must be reversed."

It is important to note that the court, although approving and following *Robinson* and *Humphries, supra*, did not, within the decision, speak of the state having any specific burden of proof. Instead, the court dwelt upon the element of "persuasion" of the jury and pointed out that "the jury must consider all of the evidence in the case from whatever source, including all of the evidence as to the affirmative defense." Based upon all of such evidence, if there is a reasonable doubt as to the defendant's guilt, the jury must acquit. If the jury entertains no such reasonable doubt of the defendant's guilt, the jury must convict, following *State v. Norman* (1921), 103 Ohio St. 541.

Further attention to the subject of the burden of proof required where an affirmative defense has been properly presented was given by our Ohio Supreme Court in *State v. Abner* (1978), 55 Ohio St. 2d 251, wherein

the syllabus law is to be found the following:

> "Where, in a criminal case, the defendant has
> gone forward with evidence of a nature and quality
> sufficient to raise the defense of self-defense,
> it is not error for a trial court to refuse a jury
> instruction that the state must prove beyond a
> reasonable doubt that the defendant did not act
> in self-defense."

Justice Herbert, at pages 253 and 254 of the opinion, explains

the syllabus law of that case as follows:

> "* * * As indicated in *Robinson*, if it has been
> determined as a matter of law that the issue of
> self-defense has been properly presented, a trial
> court should instruct the jurors as to the elements
> of that defense. In such case, the trial court
> has no occasion to speak of the burden of proof
> other than to explain the prosecution's burden of
> proving guilt beyond a reasonable doubt. The
> holding in *Robinson* does not mandate instruction
> that the prosecution must carry the burden of
> proving an absence of self-defense."

Justice Herbert continues, stating:

> "Once the affirmative defense of self-defense has
> been properly rais    the trier of fact must con-
> sider it and all t   evidence in the case and if,
> after so doing, the trier entertains a reasonable
> doubt of the defendant's guilt he must be acquitted.
> On the other hand, if the trier of fact considers
> all of the evidence in the case, including the
> properly raised affirmative defense of self-defense,
> and entertains no reasonable doubt of the defendant's
> guilt, he must be convicted. *State v. Chare* (1978),
> 55 Ohio St. 2d 237, ____ N.E. 2d ____. Therefore,
> where the defendant has gone forward with evidence
> of a nature and quality sufficient to raise the
> defense of self-defense, it is not error for a
> trial court to refuse a jury instruction that the
> state must prove beyond a reasonable doubt that the
> defendant did not act in self-defense."

In the instant case, the trial court instructed the jury on

the state's burden of proof in establishing the elements of the crime as

follows:

No. 78AP-302                                                     12

> "If you find that the State failed to prove beyond
> a reasonable doubt any element of the crimes charged
> in the indictment or the act of any lesser included
> offense thereof, you must find the Defendant not
> guilty. Such a finding of not guilty would complete
> your duties and you would return a verdict of not
> guilty. However, if you find that the State proved
> beyond a reasonable doubt that the Defendant did
> commit the act or acts as charged or the act of any
> lesser included offense thereof, you must proceed
> to determine whether the Defendant was insane at
> the time the act was committed."

Upon the issue of the affirmative defense of insanity, the

trial court very carefully instructed the jury as follows:

> "The plea of not guilty by reason of insanity
> raises the issue of the insanity of the Defendant
> at the time of the commission of the act. Insanity
> is a disease or other defect of the Defendant's mind
> that so impaired his reason that at the time of the
> criminal act with which he is charged, either he did
> not know that such act was wrong or he did not have
> the ability to refrain from doing that act. A person
> is insane and not responsible for criminal conduct
> if at the time of his act, one, he has a disease or
> other defect of his mind and, two, such disease or
> defect impaired his reason, and three, his reason
> was so impaired that he did not know that what he
> did was wrong or he did not have the ability to re-
> frain from doing that act. In other words, a person
> is insane if a mental disease or defect so impaired
> his mental power to understand the nature and conse-
> quences of his act that he did not know that the
> particular act was wrong or that he did not have
> the ability to avoid committing the criminal act.
>
> "Insanity may be of short or of long duration. The
> test for insanity remains the same, irrespective of
> its duration. Whether a form of temporary insanity
> exists in this case is a question of fact for you to
> determine. If after considering all of the evidence
> including that on the subject of insanity, you are
> convinced beyond a reasonable doubt that the State
> has proven each and every element of the crimes
> charged or of any lesser included offenses contained
> therein, then you must return a verdict of guilty as
> charged or of any lesser included offense contained
> therein.

"The Defendant has no burden to prove insanity.
If the evidence fails to establish that the
Defendant was insane at the time of the offense,
such failure does not create an inference that
the Defendant is guilty of the offense charged.
If after considering all the evidence including
that on the subject of insanity, you are not
convinced beyond a reasonable doubt that the State
has proven each and every element of the crimes
charged or of any lesser included offenses con-
tained therein, then you must return a verdict of
not guilty as charged or of any lesser included
offenses contained therein, unless you find that
the Defendant was insane pursuant to the foregoing
instructions.  In that event, your verdict shall
be not guilty by reason of insanity."

After a complete review of the applicable law as it would

relate to the specific instruction as given the jury in this case, and

in considering the instruction as requested by the defendant, we hold

that the instruction as given the jury was proper, and that the trial

court did not err in refusing to give the proffered instruction.  There-

fore, the fourth assignment of error is hereby dismissed.

In the appellant's fifth assignment of error, it is argued that

the conviction should be reversed because one of the detectives who had

originally investigated these murders was later suspended from the Police

Department on a nonrelated charge of presenting false evidence in another

case.

Any circumstances surrounding this detective in another investi-

gation are not within the record of this case, and may not be considered

upon this appeal.  Therefore, this assignment of error is dismissed.

Based upon all of the foregoing, the judgment of the Common

Pleas Court of Franklin County is hereby affirmed.

WHITESIDE and REILLY, JJ., concur.

1931
crm 19

IN THE COURT OF APPEALS OF MONTGOMERY COUNTY, OHIO

STATE OF OHIO                    :

    Plaintiff-Appellee       :

vs.                              :          CASE NO.  CA 10378

KATHLENE L. SCARLETT            :

    Defendant-Appellant      :

. . . . . . . . . . . .

# O P I N I O N

Rendered on the __3rd__ day of September, 1987.

. . . . . . . . . . . .

RONALD L. FOBES, Prosecutor for the City of Miamisburg, 10
North First Street, Miamisburg, Ohio 45342
    Attorney for Plaintiff-Appellee

JOHN H. RION, Rion, Rion and Rion Co., L.P.A., Suite 1630,
P. O. Box 1262, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WOLFF, J.

On November 28, 1986, at 12:55 a.m., Officer Wilson of the
Miami Township Police Department stopped the automobile driven
by Kathlene Scarlett.  Wilson testified that he clocked
Scarlett on radar, and that her speed was 80 mph.  The
particular part of State Route 741 where Scarlett was stopped
has a posted speed limit of 45 mph.  (Tr. p. 22.)  Wilson
testified that he also observed the vehicle "weaving
excessively."  (Tr. p. 22.)

Wilson initially stopped Scarlett for speeding and failure
to drive within marked lanes.  (Tr. p. 5.)  Wilson testified

-353-

that he smelled alcohol on Scarlett's breath, and that he administered field sobriety tests. (Tr. p. 23.) Wilson stated that Scarlett performed satisfactorily on some of the tests, but not others. (Tr. p. 29, 30.) Wilson then arrested Scarlett and took her to the Miami Township police station, where she was given her Miranda rights. The implied consent law's notification of consequences of test refusal form was also read to her. (R.C. 4511.191(C)) Scarlett did not waive her right to counsel.

Scarlett testified that she asked to call her lawyer, but the police told her that she had to first submit to the blood-alcohol test. (Tr. p. 40.) This testimony was uncontradicted. She did take the test, and called her attorney afterwards. The test was given at 2:20 p.m., or 1 hour and 25 minutes after the initial stop.

Scarlett sought to suppress certain statements, and the result of the blood-alcohol test, which showed a blood alcohol content of .167%. The Court overruled the motion to suppress the test results. On March 12, 1987, Scarlett entered a plea of no contest to the DUI charge. She was fined $250, sentenced to three days in jail, and her license was suspended for 90 days. She appeals, asserting two assignments of error:

> The gathering of evidence subsequent to repeated requests for counsel constitutes a deprivation of appellant's Sixth Amendment right to counsel.

> Absent articulable facts upon which an arresting officer would believe that other

*1933*

3.

crimes are being committed, a further search is
prohibited by the Fourth Amendment.

Addressing first the second assignment, Scarlett argues
that Officer Wilson did not have probable cause to ask
Scarlett if she was drinking, or to give her the field
sobriety tests.  This assignment is not well taken.

Wilson observed Scarlett travelling 80 mph in a 45 mph
zone.  She was also driving erratically.  After the stop,
Scarlett admitted she had been drinking.  This was clarified
at the suppression hearing by the trial court's questioning:

> THE COURT:     I've got just a question I
> want to clear up before you leave . . . If you
> would go again, for the Court and perhaps I
> missed it, you stopped the defendant's
> automobile and exactly what transpired at the
> time that you walked up to the car?
>
> A.  I asked to see her driver's license,
> which she produced a, it's a slip of paper, a
> temporary valid permit.
>      . . .
> A.  She handed me that, I informed her why
> I stopped her, then asked her if she had been
> drinking.  She said that she did.
>
> THE COURT:     Did you at any time smell
> any odor of alcohol?
>
> A.  Not until after I had her on the
> sobriety test which I could smell an odor of
> alcohol on her breath.  And then after I had
> her in custody it was even stronger in the
> cruiser.
>
> THE COURT:     And, you asked her if she
> had been drinking?  Why did you ask her that?
>
> A.  It's, if I suspect that someone has
> been, is under the influence, that's a question
> I just ask everyone if I stop them for that
> reason, if they had been drinking, because of
> the erratic driving.

-355-

             THE COURT:       Okay. And, then after she made her statement, then what?

             A. I had her step out of her car and submit to the field sobriety tests.

(Tr. p. 37.)

Given Scarlett's excessive speed and erratic driving, Officer Wilson properly inquired of her whether she'd been drinking, and properly subjected her to field sobriety tests. Based on Scarlett's performance of the sobriety tests, her admission of alcoholic consumption, and the swerving and excessive speed, there was ample probable cause for Wilson to place Scarlett under arrest for DUI. The second assignment is overruled.

The first assignment of error involves Scarlett's argument that the results of the blood-alcohol test should have been suppressed because the police informed her that she could not contact her attorney until after she had submitted to the blood-alcohol test.

Scarlett bases her argument on the Sixth Amendment to the Constitution of the United States. We must reject the Sixth Amendment argument, however, because the Ohio Supreme Court has stated in McNulty v. Curry (1975), 42 Ohio St. 2d 341, that an individual does not enjoy a Sixth Amendment right to counsel in connection with a decision to take or refuse a blood-alcohol test.

             Appellant basically contends that he was entitled to, and deprived of, the due process

1935

5.

guarantees of the Sixth and Fourteenth
Amendments to the United States Constitution
"in that he was unable to consult with counsel
prior to making any decision on the test
requested by the arresting police department."
        . . . .
    In Schmerber v. California, 384 U.S. 757
(1966), police officers performed a blood-
alcohol test on defendant Schmerber despite his
refusal, on the advice of counsel, to consent
to the test.  Upon that basis, a denial of the
right to counsel claim was asserted, but it was
rejected by the court because Schmerber, having
no right to refuse to take the test, was not
denied legal advise as to his rights.  The
court said at page 766:  "No issue of counsel's
ability to assist petitioner in respect of any
rights he did possess is presented. * * *"

    Lest we lose sight of our constitutional
guarantees, the Sixth Amendment, in pertinent
part, provides:

    "In all criminal prosecutions, the accused
shall enjoy the right * * * to have the
assistance of counsel for his defense."

    Section 10, Article I of the Ohio
Constitution provides:

    "In any trial, in any court, the party
accused shall be allowed to appear and defend
in person and with counsel * * *."

    The Fourteenth Amendment provides that no
state shall "* * * deprive any person of life,
liberty, or property, without due process of
law * * *."

    The Supreme Court, in recognition of modern
criminal prosecution, has construed the Sixth
Amendment provision to "apply to 'critical'
stages of the proceedings. * * *" United States
v. Wade, (1967), 388 U.S. 218, 224.

    In United States v. Wade, supra, at page
227, the court determined that line-ups are
"critical stages" of the proceedings as opposed
to mere "preparatory steps, such as
systematized or scientific analyzing of the
accused's * * * blood sample."  (Emphasis

6.

ours.)  Inasmuch as the submission to a blood
test necessarily precedes the blood's analysis
such stage is merely preparatory to a
"preparatory step" and, thus, beyond the ambit
of Sixth Amendment protection.

Under the Ohio implied-consent statute,
R.C. Section 4511.19.1, a person accused of
driving while intoxicated has no constitutional
right to refuse to take a blood-alcohol test.
Westerville v. Cunningham (1968), 15 Ohio St.
2d 121, 44 O.O.2d 119, paragraph two of the
syllabus.)  That statute is constitutionl, and
proceedings thereunder are not a criminal
prosecution, but are civil and administrative
only.   Hoban v. Rice (1971), 25 Ohio St. 2d
111, 54 O.O. 2d 254, paragraph one of the
syllabus; State v. Starnes, supra (21 Ohio St.
2d 38, 50 O.O. 2d 84, paragraph two of the
syllabus.)

In light of the foregoing, it is the
judgment of this court that the constitutional
right to counsel has no application to this
case, because the decision to withhold or give
consent to take a test is not a "critical
stage" of a "criminal prosecution."

(Id. at 343, 344-5.)  (Emphasis in original.)  (Footnotes
omitted.)

Although McNulty involved a civil license suspension

proceeding based on an alleged refusal to submit to a blood-

alcohol test rather than a criminal prosecution for driving

under the influence of alcohol, we are satisfied that McNulty

is dispositive of Scarlett's Sixth Amendment claim, which is

raised here in the context of a criminal proceeding.

Our research satisfies us that the Ohio position on the

Sixth Amendment right to counsel is consistent with most,

albeit not all, of the courts which have considered this

situation in the context of a criminal proceeding.

*1937*

Although the Fourteenth Amendment was not raised by Scarlett in this appeal, we are nevertheless pursuaded by our own research and reflection that Scarlett was denied due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution, by the conduct of the Miami Township police, and that the results of the breath-alcohol test should have been suppressed.

Although the first paragraph from McNulty quoted supra does mention due process and the Fourteenth Amendment, we are satisfied from our reading of McNulty that the Court's focus was on the Sixth Amendment right to counsel and that its mention of the Fourteenth Amendment only pertained to the fact that the Sixth Amendment of the Constitution of the United States is made applicable to the several states through the Fourteenth Amendment. We base this conclusion upon the fact that McNulty discussed the Sixth Amendment right to counsel at length and did not discuss the Fourteenth Amendment's guarantee of due process at all.

It is beyond dispute that the police denied Scarlett her statutory right to counsel as provided at R.C. 2935.20.

> After the arrest, detention, or any other taking into custody of a person, with or without a warrant, such person shall be permitted forthwith facilities to communicate with an attorney at law of his choice who is entitled to practice in the courts of this state, or to communicate with any other person of his choice for the purpose of obtaining counsel. Such communication may be made by a reasonable number of telephone calls or in any other reasonable manner. Such person shall

have a right to be visited immediately by an
attorney at law so obtained who is entitled to
practice in the courts of this state, and to
consult with him privately.  No officer or any
other agent of this state shall prevent,
attempt to prevent, or advise such person
against the communication, visit, or
consultation provided for by this section.

Whoever violates this section shall be
fined not less than twenty-five nor more than
one hundred dollars or imprisoned not more than
thirty days, or both.

Several reported appellate decisions from Ohio have held
that an individual's attempt to exercise the statutory right
to counsel conferred by R.C. 2935.20 does not constitute a
refusal to take a blood-alcohol test.  Siegwald v. Curry
(1974), 40 Ohio App. 2d 313; Raine v. Curry (1975), 45 Ohio
App. 2d 155; Snavely v. Dollison (1979), 61 Ohio App. 2d 140;
Stone v. McCullion (1985), 27 Ohio App. 3d 112.  Our research
however, has uncovered no reported Ohio case from either the
Supreme Court or the Courts of Appeal which deals directly
with the consequences, in a criminal prosecution, of a
defendant's having taken a blood-alcohol test after having
been refused access to counsel following a request to contact
counsel.

In State v. Gootee (1984), Mont. Cty. No. CA 8569,
unreported, this court reversed an order suppressing a blood-
alcohol test given under circumstances similar to those
involved here.  This court held that there was no Sixth
Amendment violation and that violation of R.C. 2935.20 did not
give rise to exclusion of the result of the blood-alcohol

test. In so holding, this court cited <u>Kettering v. Bollen</u> (1980), 64 Ohio St. 2d 232; <u>State v. Unger</u> (1981), 67 Ohio St. 2d 65. The Fourteenth Amendment guarantee of due process was apparently not raised as an issue on appeal because it is not discussed at all in the opinion of this court.

In <u>State v. Bollen</u>, <u>supra</u>, the court stated at page 234 as follows:

> The exclusionary rule has been applied by this court to violations of a constitutional nature only. In <u>State v. Myers</u> (1971), 26 Ohio St. 2d 190,196, this court enunciated the policy that the exclusionary rule would not be applied to statutory violations falling short of constitutional violations, absent a legislative mandate requiring the application of the exclusionary rule.

This same principle was reiterated in <u>Unger</u>, <u>supra</u>. Apparently it was not contended in <u>Gootee</u> that a violation by the police of R.C. 2935.20 could have constitutional implications. Assuming this to be the case, <u>Gootee</u> was properly determined on the basis of <u>McNulty</u>, <u>Bollen</u> and <u>Unger</u>, <u>supra</u>.

In cases involving similar facts, the Franklin County Court of Appeals has affirmed a trial court's refusal to suppress the test result in <u>Columbus v. Barris</u> (March 31, 1987), 86AP-792, unrep., and reversed a trial court's suppression of the test result in <u>Columbus v. Reed</u> (December 23, 1986), 86AP-530, unrep. The arguments on appeal, as in <u>Gootee</u>, involved the Sixth Amendment and R.C. 2935.20, but not the Fourteenth Amendment guarantee of due process.

*1940*

There is, however, nothing rendering R.C. 2935.20 and the due process clause of the Fourteenth Amendment mutually exclusive. We are convinced that a violation of R.C. 2935.20 can, in turn, violate the due process guarantee of the Fourteenth Amendment and, in this case, necessitate exclusion of the blood-alcohol test as the only efficacious sanction for police disregard of this statutory right to contact counsel.

We believe that the Court of Appeals of Maryland, that state's court of last resort, admirably analyzes and properly adopts the due process argument advanced under circumstances similar to those present here. In <u>Sites v. State</u> (1984), 300 Md. 702, 481 A. 2d 192, after saying that there was neither a statutory nor a Sixth Amendment right to suppression, that court stated at 197-200:

> Appellant contends that he had a due process right under the Fourteenth Amendment to communicate with counsel preliminary to making the determination whether to submit to the chemical test. He relies primarily upon <u>People v. Gursey</u>, 22 N.Y.2d 224, 292 N.Y.S.2d 416, 239 N.E.2d 351 (1968); <u>Troy v. Curry</u>, 36 Ohio Misc. 144, 303 N.E. 2d 925 (1973); <u>State v. Newton</u>, 291 Or. 788, 636 P.2d 393 (1981)--all cases involving implied consent laws similar to the Maryland statute where, as here, the arrestee asked to communicate with counsel prior to taking the sobriety test.
>
> In <u>Gursey</u>, the issue before the court was "whether a criminal conviction may rest upon the results of a chemical test performed over the defendant's initial objection and after he had been prevented from telephoning his lawyer for legal advice concerning the test, such communication involving no significant or obstructive delay." 239 N.E. 2d at 352. The lower appellate court had determined that the

denial of the arrestee's request to telephone
counsel constituted a violation of his
"constitutional rights." Id. In affirming
that judgment, the Court of Appeals of New York
concluded "that the test results were secured
in violation of defendant's privilege of access
to counsel without occasioning any significant
or obstructive delay." Id. The court
recognized that the defendant "possessed a
number of statutory options which could be
asserted only during the transaction at the
station house, and concerning which the advice
of counsel, if available, was relevant." Id.
at 352-53.

The court said:

"[L]aw enforcement officials may not,
without justification, prevent access be-
tween the criminal accused and his lawyer,
available in person or by immediate
telephone communication, if such access
does not interfere unduly with the matter
at hand....

* * * * * * *

"...Granting defendant's requests would
not have substantially interfered with
the investigative procedure, since the
telephone call would have been concluded
in a matter of minutes.... Consequently,
the denial of defendant s requests for an
opportunity to telephone his lawyer must
be deemed to have violated his privilege
of access to counsel." Id. at 352-53.

The Court in Gursey added this caveat:

"The privilege of consulting with
counsel concerning the exercise of
legal rights, should not, however,
extend so far as to palpably impair
or nullify the statutory procedure
requiring drivers to choose between
taking the test or losing their
licenses." Id. at 353.

But, the Court reiterated:

"... Where the defendant wishes

only to telephone his lawyer or
consult with a lawyer present in
the station house or immediately
available there, no danger of delay
is posed.... If the lawyer is not
physically present and cannot be
reached promptly by telephone or
otherwise, the defendant may be
required to elect between taking
the test and submitting to revoca-
tion of his license, without the
aid of counsel." Id. at 353.

The Court emphasized that "there can be no
recognition of an absolute right to refuse the
test until a lawyer reaches the scene." Id.
In so stating, the court referred, with
approval, to the concurring opinion in an
earlier civil license revocation appeal,
Finocchairo v. Kelly, 11 N.Y.2d 58, 226
N.Y.S.2d 403, 181 N.E.2d 427 (1962).

In Finocchairo, as in Gursey, the police
denied the defendant permission to call his
lawyer before making the choice whether to take
the sobriety test. The concurring opinion,
while declining to decide whether, in a
criminal prosecution, any of the defendant's
constitutional rights would have been violated
by refusal to permit communication with counsel
prior to taking the test, expounded at length
upon due process considerations inherent in the
police refusal. At one point, the concurring
opinion said "that it was in violation of due
process of law as part of a criminal
prosecution to have refused respondent
opportunity to telephone to his lawyer." 181
N.E.2d at 428-29 (emphasis in original). At
another point, the concurring opinion spoke of
due process as a concept which varies according
to the context, its substance being ingrained
in our national traditions, with fairness of
procedures constituting due process in the
primary sense, citing Supreme Court
authorities. Id. at 429. The substance of due
process, the concurring opinion continued,
"required that respondent, having been arrested
on a criminal charge, should be afforded
opportunity on request to telephone to his
lawyer provided that he could have reached him
promptly." Id.

Troy v. Curry, supra, was an Ohio Municipal Court decision which held, in a single conclusory sentence, that failure to permit consultation with counsel was unconstitutional under the due process clause of the Fourteenth Amendment.

In State v. Newton, supra, the Supreme Court of Oregon while finding no Sixth Amendment right to counsel, concluded in a plurality opinion that the right of a person arrested for drunk driving timely to call his lawyer before taking the test was traditionally and rigorously observed with "roots deep in the law." 636 P.2d at 405. The plurality found the right to be so fundamental as to be embodied in the Fourteenth Amendment and thus to inhibit states to "deprive any person of...liberty...without due process of law." The court said that the defendant's freedom to call a lawyer before deciding whether to submit to a breathalyzer test was safeguarded by the Fourteenth Amendment, and specifically by the "Defendant's liberty to communicate," which was deemed a significant and substantial liberty free from "purposeless restraints." 636 P.2d at 406. The plurality said that "allowance of a telephone call following an arrest has become traditional and incommunicado incarceration is regarded as inconsistent with American notions of ordered liberty." Id. at 406.[4]

---

[4]        In Heles v. State of S.D., 530 F.Supp. 646 (D.S.D. 1982), the court held that under the due process clause of the Fourteenth Amendment, law enforcement officials could not, without justification, prevent a driver arrested for drunk driving from contacting a lawyer prior to submitting to sobriety testing, if such a request is made and does not unduly interfere with the administration of the test. On appeal, the judgment was vacated on mootness grounds because of the appellant's death. 682 P.2d 201 (8th Cir.1982).

---

The due process clause of the Fourteenth Amendment has long been recognized as a source of a right to counsel independent of the Sixth

*1944*

14.

Amendment where critically important to the
fairness of the proceedings.  See e.g.,
Goldberg v. Kelly (1970), 397 U.S. 254, 90
S.Ct. 1011, 25 L.Ed.2d 287; Simmons v. United
States (1968), 390 U.S. 377, 88 S.Ct. 967, 19
L.Ed.2d 1247; Stovall v. Denno (1967), 388 U.S.
293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199; United
States v. Wade (1967), 388 U.S. 218, 87 S.Ct.
1926, 18 L.Ed.2d 1149; In re Gault (1967), 387
U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527; Grano,
Kirby, Biggers, and Ash:  Do Any Constitutional
Safeguards Remain Against The Danger Of
Convicting The Innocent?, (1974), 72
Mich.L.Rev. 719, 742-752.  We recognized in
Rutherford v. Rutherford (1983), 296 Md. 347,
358, 464 A.2d 228 that the constitutional right
to counsel is broader than the specific
guarantee of the Sixth Amendment and Article 21
of the Maryland Declaration of Rights in that,
under certain circumstances, "the requirements
of due process include a right to counsel, with
appointed counsel for indigents, in civil cases
or other proceedings not constituting critical
stages of criminal trials."  The concept of a
due process right was described as far back as
Palko v. Connecticut (1937), 302 U.S. 319, 58
S.Ct. 149, 82 L.Ed. 288 as a guarantee of
respect for those personal immunities which are
so rooted in the traditions and conscience of
our people as to be ranked as fundamental or
implicit in the concept of ordered liberty.
While the exact contours of the due process
right are not definable with precision, the
right, as restated in Rochin v. California
(1952), 342 U.S. 165, 173, 72 S.Ct. 205, 210,
96 L.Ed. 183, is one that assures that
convictions cannot be brought about in criminal
cases by methods which offend a sense of
justice.

Other courts have concluded that a person
apprehended for drunk driving has no due
process right to communicate with counsel
before deciding whether to submit to chemical
testing.  See Gottschalk v. Sueppel (1966), 258
Iowa 1173, 140 N.W.2d 866; State v. Jones (Me.
1983), 457 A.2d 1116; State v. Braunesreither
(S.C. 1979), 276 N.W. 2d 139.  Moreover, it is
unclear whether the right to communicate with
counsel found to exist by the New York Court of
Appeals in Gursey (a pre-Kirby case) was based

on the due process clause of the Fourteenth
Amendment or upon some other constitutional or
common law ground.

The Supreme Court recognized in South
Dakota v. Neville (1983), 459 U.S. 553, 103
S.Ct. 916, 74 L.Ed.2d 748 that "the choice to
submit or refuse to take a blood-alcohol test
[in drunk driving cases] will not be an easy or
pleasant one for a suspect to make." 103 S.Ct.
at 923. By affording a suspect the power to
refuse chemical testing, Maryland's implied
consent statute deliberately gives the driver a
choice between two different potential
sanctions, each affecting vitally important
interests. Indeed, revocation of a driver's
license may burden the ordinary driver as much
or more than the traditional criminal sanctions
of fine or imprisonment. The continued
possession of a driver's license, as the
Supreme Court has said, may become essential to
earning a livelihood; as such, it is an
entitlement which cannot be taken without the
due process mandated by the Fourteenth
Amendment. See Dixon v. Love (1977), 431 U.S.
105, 97 S.Ct. 1723, 52 L.Ed.2d 172; Bell v.
Burson (1971), 402 U.S. 535, 91 S.Ct. 1586, 29
L.Ed. 2d 90. Considering all the
circumstances, we think to unreasonably deny a
requested right of access to counsel to a drunk
driving suspect offends a sense of justice
which impairs the fundamental fairness of the
proceeding. We hold, therefore, that the due
process clause of the Fourteenth Amendment, as
well as Article 24 of the Maryland Declaration
of Rights, requires that a person under
detention for drunk driving must, on request,
be permitted a reasonable opportunity to
communicate with counsel before submitting to a
chemical sobriety test, as long as such
attempted communication will not substantially
interfere with the timely and efficacious
administration of the testing process. In this
regard, it is not possible to establish a
bright line rule as to what constitutes a
reasonable delay, although the statute intself
mandates that in no event may the test be
administered later than two hours after the
driver's apprehension. Of course, it is the
statutory purpose to obtain the best evidence
of blood alcohol content as may be practicable

1946

16.

in the circumstances, and it is common
knowledge that such content dissipates rapidly
with the passage of time.  Thus, if counsel
cannot be contacted within a reasonable time,
the arrestee may be required to make a decision
regarding testing without the advice of
counsel.  We emphasize that in no event can the
right to communicate with counsel be permitted
to delay the test for an unreasonable time
since, to be sure, that would impair the
accuracy of the test and defeat the purpose  of
the statute.  Manifestly, whether a driver who
seeks to communicate with counsel has been
denied his due process right to do so depends
on the circumstances of each case.  Where that
right is plainly violated, and the individual
submits to the test, we think the only
effective sanction is suppression of the test
results where adverse to the defendant.  A
reviewing court, however, should afford great
deference to the determination of the police
authorities that denial of the requested right
of access to counsel was reasonably necessary
for the timely administration of the chemical
sobriety test.

People v. Gursey, a case of the Court of Appeals of New
York, that state's court of last resort, is quoted extensively
by Sites, supra.  The portion of Gursey quoted in Sites has
been criticized by the Franklin County Court of Appeals in
Siegwald v. Curry, supra, wherein the court states at page
321:

The apparent New York result from these
cases is that where a person, required to
submit to a chemical test pursuant to the
implied consent law, refuses to do so until he
telephones his attorney, such person's driving
rights are revoked even though the right to
telephone the attorney is denied by the police.
However, if, instead of refusing to submit to
the test when denied the right to telephone his
attorney, he submits to the test, the results
of the test are not admissible into evidence
against him.  We cannot agree that such is, or

should be, the law of Ohio.  Such a rule would
encourage persons arrested for driving while
intoxicated to immediately request the right to
call an attorney, and, when denied the right to
do so by the police, as the cases indicate
appears to be the custom, to submit to the
test, and have the results thereof suppressed
upon trial, thereby substantially lessening the
chances of conviction.

We cannot agree with this criticism of the Gursey case, as
it implicitly discourages the individual from exercising a
statutory right and countenances police conduct that denies
the individual this statutory right.  The Siegwald criticism
of Gursey is even more curious when viewed in the light of
Raine v. Curry, also decided by the Franklin County Court of
Appeals one year after Curry, wherein the court stated at
pages 157-158:

> The first and most significant assignment
> of error is that the trial court was mistaken
> in holding that there must be an expression of
> willingness by the defendant to take the test
> before the refusal to call an attorney is
> prejudicial.  In so holding, the trial court
> misinterprreted the holdings of this court in
> the cases of Crabtree v. Curry, Franklin County
> Court of Appeals, No. 74AP-86, July 30, 1974,
> and Siegwald v. Curry (1974), 40 Ohio App. 2d
> 313.  Both of these cases stress the
> requirement of permitting an arrested person
> facilities to communicate with an attorney,
> forthwith.  We quote, as follows, from Judge
> Holmes' decision in Crabtree:

> > "The foregoing demonstrates a lack of
> > understanding by the officer of his
> > mandatory statutory obligation under
> > R.C. 2935.20 to forthwith afford to an
> > arrested person facilities to communicate
> > with an attorney.  This means that
> > facilities for communication with an
> > attorney must be furnished immediately
> > upon request and the officer may not delay

*1948*

18.

> until it suits his convenience, his paper-
> work is done, or slating is completed.
> The testimony of the officer indicates he
> violated R.C. 2935.20 in this instance."

We are in complete agreement with the Courts of Appeal of New York and Maryland that the right to confer with counsel about whether to submit to a blood-alcohol test cannot be extended to the point of frustrating the lawful object of obtaining of a breath sample within two hours of the time of arrest or a refusal to submit to a blood-alcohol test within two hours of the time of arrest.  <u>See</u> R.C. 4511.19, 4511.191.

In other words, consistent with his right to due process, an individual can be expected to make the decision unaided by counsel, if it can be fairly said that, given the particular circumstances, access to counsel would prevent administering a timely test, or obtaining a timely refusal.

We further agree that broad deference must be given to the determination of the police that denial of the requested right of access to counsel was reasonably necessary for the timely administration of the blood-alcohol test.

In this case, giving the broadest deference to the police, we fail to see how Scarlett's request would have impeded them in obtaining either a timely blood-alcohol sample or a timely refusal.  Scarlett was stopped at 12:55 a.m.  The test was given at 2:20 a.m., one hour and twenty-five minutes after the initial stop.  Although she was required to wait until after the test was administered, she was still able to contact her

*1949*

attorney by 2:45 a.m., ten minutes before the elapsing of the two hour period.  Had she been allowed to make her phone call prior to deciding whether to take the test, the call would have been made at sometime around 2:20 a.m., 35 minutes before the two hour period elapsed.

Under these circumstances, we conclude that Scarlett's constitutional guarantee to due process of law was denied her and that the appropriate sanction is suppression of the breath-alcohol test results.  The first assignment is sustained.

Accordingly, the judgment is reversed and this matter will be remanded to the Miamisburg Municipal Court for further proceedings in accordance with the law.

. . . . . . . . . . . .

KERNS, P.J., concurs in judgment.

BROGAN, J., concurs.

Copies mailed to:

Ronald L. Fobes
John H. Rion
Hon. Charles A. Lowman III

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                          :

      Plaintiff-Appellee,          :

v.                                      :                  No. 82AP-451
                                         (REGULAR CALENDAR)

Darrell Ward,                           :

      Defendant-Appellant.         :

---

O  P  I  N  I  O  N

Rendered on February 15, 1983

---

MR. MICHAEL MILLER, Prosecuting Attorney, and
MS. JOYCE S. ANDERSON, for appellee.

MR. ROGER WARNER, for appellant.

---

APPEAL from the Court of Common Pleas of
Franklin County.

BROGAN, J.

      This appeal emanates from the judgment and sentence of the
Court of Common Pleas of Franklin County of the appellant, Darrell
Ward, on February 2, 1982 for aggravated murder, aggravated burglary
and aggravated robbery. Appellant was tried jointly with his brother,
Kenneth Ward, for the above-stated charges, but the jury was unable to
reach a verdict as to him, and the trial court declared a mistrial on
those charges.

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 173 of 201. PageID #: 4522

Counsel for appellant filed a motion for a new trial and a motion to modify the consecutive sentences imposed by the court. Both motions were overruled by the court. Appellant filed a notice of appeal on March 1, 1982, of the judgment and sentence of February 2, 1982, alleging eight assignments of error.

The first assignment of error reads as follows:

> "I. The trial court abused its discretion by admitting into evidence photographs of the victim which were highly prejudicial, gross and unnecessary and which did not have any probative value in determining the issues of this case."

On the morning of July 17, 1981, the body of Leona Freeman, aged 75 years, was found in a freezer in her home. Mrs. Freeman's hands and feet had been tied behind her back, the lower half of her face had been wrapped with duct tape, and she had been shot once in the center of the forehead at near contact range. A red pillow was found inside the freezer with the body. The full details of the offense were not released to the press.

Mrs. Freeman's home had been ransacked. Some jewelry and gold coins were missing and the police found two empty gun holsters in front of the freezer. The police were informed by the victim's neighbor that the deceased kept handguns and shotguns in her home. Charles Wharton testified Mrs. Freeman owned two .38 revolvers.

At the request of the Madison Township Police Department, in whose jurisdiction the incident occurred, Detectives Eagon and Miller of the Columbus Crime Search Unit were dispatched to the Freeman residence. They found that the house had been ransacked. Outside, there

No. 82AP-451                                                              3

were numerous coins scattered in and around the driveway, a crowbar was found just off the edge of the driveway, and tire tracks were also found. A plaster cast was taken of the tire track.

In addition, the body of Leona Freeman was discovered in a large freezer located in the basement of the house. Her arms and legs had been "hog-tied" with rope and her head was encased in duct or furnace tape from her eyes to her chin. Mrs. Freeman had been shot once in the head. Her dress had been pulled up over her waist. Next to the freezer, there was an empty holster though no guns were found in the house. Also, a pillow was left on top of the body, but when the stain on it was tested, there were negative results for findings of oil, powder, or flesh residue. The stain was not tested for semen.

Captain Swonger of the Madison Township Police Department testified that it was his job to investigate anyone who had had prior contact with the victim. This investigation led to the name of a Luther Johnson, Sr., who had done some repair work for Mrs. Freeman on September 1, 1981, according to a service contract found among her personal papers. However, it was later learned that Johnson, Sr., was in jail at the time of this incident. As a result, Swonger investigated possible employees of Johnson, Sr., who may have come into contact with Mrs. Freeman. It was through this process that the police derived the names of Luther David Johnson, Jr., Michael Minnear, and later on, the appellant. Swonger followed this lead by visiting Minnear at his home. He impounded Minnear's truck in order to obtain cast impressions of the tire tracks.

Michael Minnear was interviewed by police on October 1, 1981, at his home and informed by the police that they were investigating a homicide. After giving them a statement, he was charged with the same charges to which appellant stands convicted. As a result of the interview, police found some of Mrs. Freeman's jewelry and a roll of duct tape used to gag Mrs. Freeman in a sewer behind the Hilton Inn off Interstate 70-East.

Minnear testified that he gave three statements to the police, to wit: one at his home, one later that day at the police station, and another one after he furnished counsel. He stated that he was telling the truth in his first two statements to the police, but tried to hide his knowledge that there would be a burglary until he could talk to an attorney. (Tr. 16.)

He testified that, as a result of negotiations with his counsel and the state, he was going to enter a plea to aggravated burglary and the other charges would be dismissed. He stated that he was going to enter the plea because he felt he was guilty of that charge. He stated no promises were made concerning the sentence, but that he would simply have to take his chances with the judge.

Gerald Simmons, Minnear's counsel, corroborated his client's version of the plea negotiations. He stated that no promises had been made by the state and his client would have to take his chances after his plea of guilty with the trial judge in February 1982. Simmons admitted that after assurances were made Minnear would assist the state, his bond was lowered, and he was released.

-375-

No. 82AP-451                                                                                          4

Michael Minnear was interviewed by police on October 1, 1981, at his home and informed by the police that they were investigating a homicide. After giving them a statement, he was charged with the same charges to which appellant stands convicted. As a result of the interview, police found some of Mrs. Freeman's jewelry and a roll of duct tape used to gag Mrs. Freeman in a sewer behind the Hilton Inn off Interstate 70-East.

Minnear testified that he gave three statements to the police, to wit: one at his home, one later that day at the police station, and another one after he furnished counsel. He stated that he was telling the truth in his first two statements to the police, but tried to hide his knowledge that there would be a burglary until he could talk to an attorney. (Tr. 16.)

He testified that, as a result of negotiations with his counsel and the state, he was going to enter a plea to aggravated burglary and the other charges would be dismissed. He stated that he was going to enter the plea because he felt he was guilty of that charge. He stated no promises were made concerning the sentence, but that he would simply have to take his chances with the judge.

Gerald Simmons, Minnear's counsel, corroborated his client's version of the plea negotiations. He stated that no promises had been made by the state and his client would have to take his chances after his plea of guilty with the trial judge in February 1982. Simmons admitted that after assurances were made Minnear would assist the state, his bond was lowered, and he was released.

-375-

No. 82AP-451                                                      5

Minnear testified that on July 16, 1982, Minnear met appellant, Kenny Ward and Luther David Johnson, Jr., at appellant's home. (Tr. 167.) Renewing a request that he had made several days earlier, appellant asked Minnear to drive them to a house so they could burglarize it because there were guns and money inside. (Tr. 168, 173.) Appellant, Kenny and Johnson, Jr., got gloves, a small crowbar, duct tape and a piece of rope. Some of these items came from Minnear's house. (Tr. 171-172.) He stated that the appellant obtained the duct tape from Minnear's house.

Minnear drove them to Leona Freeman's house. He dropped them off and returned to pick them up approximately one and one-half hours later. (Tr. 177-178.) Appellant came out and told him they were not finished. Minnear drove around a while longer. (Tr. 179.) Appellant came out with pistols in his shirt. Kenny came out carrying a stereo turntable and dropping coins as he went. (Tr. 181.)

Appellant said the victim had made him mad. Minnear asked if they had hurt her and appellant said they had not, that they had left her tied up. Johnson, Jr., then came out of the house. (Tr. 187.) The four men went back to the Ward house and divided the loot into saleable and non-saleable items. They dumped the things they did not want in a sewer. (Tr. 193.)

After the men returned to the Ward house on Groves Road, two women showed up. (Tr. 195.) Johnson, Jr., and one of the girls went into a bedroom. (Tr. 196.) Twenty minutes later the girl ran naked and

screaming from the room. Johnson tried to hit the other girl. Kenny Ward gave the naked girl some clothes and Minnear took the two girls home. (Tr. 197.) He dropped the girls in a nearby apartment complex but did not know exactly where they lived. He then went home.

Minnear read about the murder in the Sunday paper. Kenny Ward and appellant came to Minnear's house. When asked if they had killed Mrs. Freeman, they responded that the crazy Johnson boy must have done it. To explain why Minnear had not heard the shots, Kenny suggested that Johnson could have held a pillow over her head to muffle the shots. (Tr. 203.)

Minnear talked to appellant again on the last day of July. (Tr. 205.) When questioned about the murder, appellant said, "What would you think if I done it?" (Tr. 207.) In September, appellant told Minnear that he had gotten rid of the guns. (Tr. 208-210.)

On cross-examination, Minnear stated that while he was in jail he was threatened by Luther Johnson, Jr. He also admitted he made a mistake in his statement to Detective Britt when he said Kenny Ward came out to the car and said the victim made him mad. He stated he was just talking to the detectives too fast and meant to say the appellant had made the remark.

He further admitted on cross-examination that he was unemployed, his wife had been working off and on, and he was behind on his obligations at the time of the crime. He stated he had borrowed money from his nephew.

No. 82AP-451                                                                    7

The only independent witness that the prosecutor placed on the stand to corroborate Minnear's testimony was Luther Johnson, Sr., who is the father of one of the codefendants Luther Johnson, Jr. Johnson, Sr., indicated that he had done some work for Mrs. Freeman, and the appellant had on one occasion assisted him on fixing a leaking faucet. (Tr. 327-328.) Also, Mrs. Freeman visited the shop and it was possible that the appellant saw the victim. On the day of the murder, he was in jail for theft of utilities. (Tr. 329.) He also has a prior theft by deception conviction from 1968. (Tr. 330.)

Johnson, Sr., also testified that he drank with Ward on several occasions. (Tr. 331.) The last conversation took place on September 30, 1981, at the Gilded Cage located on Beechwood and Livingston. He stated that they arrived at the bar around 6:00 p.m., and drank until around 1:00 a.m., when they returned to his house. Johnson, Jr., was with them. During the evening, he asked appellant about his involvement, which Johnson, Sr., explained as, "And they had--Darrell had went to the house and--Mrs. Freeman's, and they burglarized the place and he killed Mrs. Freeman." (Tr. 332.) Johnson, Sr., continued by saying that appellant told him that he searched through the house until he found a .38 special and a pillow, which he held beside the gun when he shot her in the head, and left her in the freezer.

Upon cross-examination, it was revealed that less than one month earlier, Johnson, Sr., used a sledge hammer on Kenny Ward's car. In a statement made October 20, 1981, to the Madison Township Police

Department, Johnson, Sr., stated that Ward put a pillow over her head and shot her. (Tr. 355.) In a taped statement of October 5, 1981, the detectives from Madison Township were told "the reason you are here is to see if we can add something to our case that will help us get David (his son) off a murder rap." (Tr. 356.) In that same interview, he stated that his son was forced to the Freeman residence by gunpoint and he was too afraid afterward to turn himself in.

All other corroborating facts point to either Minnear or Johnson, Jr. The tape, rope, and crowbar were all identified as Minnear's. (Tr. 252, 297.) It was Minnear's truck. (Tr. 297.) Minnear was wearing the boots that night. (Tr. 216.) It was Minnear who placed the items in the sewer. (Tr. 193, 298.) Along the same line, it was Johnson, Jr., or his family members, who pawned jewelry and coins. (Tr. 400.)

Both appellant and his brother took the stand on their behalf and denied any involvement in this matter. The appellant testified that he had worked at Columbus Auto Parts until October of 1979. However, he was eligible for unemployment compensation and a supplemental income from the United Auto Workers. (Tr. 465.) In addition, his wife received $8,500 to compensate her for a personal injury she incurred. (Tr. 466.)

Appellant contends that the trial court committed prejudicial error in admitting into evidence five color photographs introduced by the state in its case in chief. The following is a summary of the exhibits:

No. 82AP-451                                                                              9

     (Exhibit 49) is a color photograph depicting the deceased as she was found by the police lying in her freezer. The photograph shows the location of the single bullet wound to the upper forehead and the duct tape covering her nose and mouth. The photograph depicts blood on the left shoulder area emanating from the wound. A red pillow is shown near the right side of the victim.

     (Exhibit 50) a color photograph which depicts the victim lying on her stomach after she was removed from the freezer nude from the waist down. The exhibit depicts the victim's hands and feet as they were tied behind her back. The upper part of the back and left arm show the presence of blood.

     (Exhibit 51) a color photograph depicting the victim as she was found in the freezer by the police. This photo shows the lower half of her body nude from the waist down with her legs tied with a rope. The red pillow is in the same position as in Exhibit 49.

     (Exhibit 52) a color photograph depicting the victim as she lay in the freezer showing her body from the knees up. She appears as in Exhibit 49.

     (Exhibit 53) is a color polaroid photograph depicting the victim's face at the time of autopsy. Some blood is depicted on her forehead and the duct tape has been removed from around her mouth and nose.

     Counsel for appellant entered a timely objection to the above mentioned photographs at trial. The following is counsel's objection:

"I object to Exhibits No. 49, 50, 51, 52 and 53 as having absolutely no probative value whatsoever in light of the testimony and that their prejudicial impact is so severe, so great, that no jury is going to be able to rationally consider this case after looking at these photos. I want the record to reflect that these photos are so inflammatory, so gross and so disgusting that anyone looking at them will not be able to impartially determine what the facts are. Specifically Exhibit 49 is Mrs. Freeman with the bullet hole in her head. Exhibit No. 50 does not portray the body as it was found in the freezer and I am not even sure where the photograph was taken. I assume it was in the house somewhere. It shows her roped and tied and a number of witnesses have already testified to that.

"I still can't figure out the purpose of Exhibit No. 51, because Exhibit No. 50 shows her roped and tied and there is some rope and I guess her legs in that photograph. Exhibit No. 52 is about the worst picture I have ever seen in a criminal case and Exhibit No. 53 is a picture of Mrs. Freeman after probably rigor mortis has set in and death has changed her appearance and Mr. Fardal got on the witness stand and testified. No one asked him any questions. I just don't see the purpose of it." [Tr. 421-422.]

Appellant contends that since the record reveals he and counsel for the codefendant were willing to stipulate that there was an aggravated murder, aggravated robbery, and aggravated burglary, the identity of the victim, and to the contents of the autopsy, the photographs served no useful purpose except to inflame and prejudice the jury as to his client. Appellant argues that the sole issue before the jury was whether the Ward brothers were present at the scene of the crime, not that a crime took place.

The basic premise in Ohio for the admission of photographs was stated in State v. Woodards (1966), 6 Ohio St. 14, 215 N.E. 2d 568, which held:

> "* * * The rule is well settled that photographs and color transparencies are not objectionable so long as they are properly identified, are relevant and competent and are accurate representations of the scene which they purport to portray. Indeed, photographs frequently convey information to the court and jury more accurately than words. Oliver v. State, 225 Ark. 809, 286 S.W. 2d 17; Vaca v. State, 150 Neb. 516, 34 N.W. 2d 873.
>
> "Although a photograph may be rendered inadmissible by its inflammatory nature, the mere fact that it is gruesome of horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury. People v. Brubaker, 53 Cal. 2d 37, 346 P. 2d 8; People v. Jenko, 410 Ill. 478, 102 N.E. 2d 783; Commonwealth v. Novak, 395 Pa. 199, 150 A. 2d 102.
>
> "The real question is whether the probative value of such photographs is outweighed by the danger of prejudice to the defendant. See Wisniewski v. State, 51 Del. 84, 138 A. 2d 333. But see People v. Jackson, 9 Ill. 2d 484, 138 N.E. 2d 528; Kiefer v. State, 239 Ind. 103, 153 N.E. 2d 899."

Indeed this court has recognized that there could be situations where similar types of photographs would be erroneous. State v. Luft (Dec. 26, 1978), No. 78AP-302, unreported (1978 Decisions 3678). In Luft, the court stated:

> "* * * We are neither able to approve of, nor condone, the multitudinous evidentiary use of some 30 such photographs, in that they were not presented for the purpose of supporting any contested issue as to the manner or mode of

No. 82AP-451

> death, nor as to any reasonable scientific
> proof necessary to the trial of this cause.
> Therefore, we state that the introduction of
> the photographs was not only unnecessary, but
> bordering upon the erroneous use of such
> evidence. However, in review of the totality of
> the evidence adduced as to the commission of
> these acts, and the evidence as to the guilt of
> this defendant, we hold the introduction of
> such evidence not to be prejudicial."

State's exhibits 50 and 51 are not gruesome in nature.

Exhibit 51 reveals the fact that the freezer was emptied for the

placement of the victim and shows her feet tied. Exhibit 50 shows the

manner in which the victim's arms and legs were tied and portrays her

general height and weight. Exhibit 52 portrays the victim in a near

full-length photo exactly as she was found. It portrays the neck

contact wound and the duct tape. It also gives a vivid indication of

her size. Exhibit 49 is redundant and shows nothing not seen in the

other photographs. Exhibit 53 is of no relevance and should have been

denied admittance.

Appellee contends the photographs were relevant as they

graphically portrayed that the size of the victim and the structure of

the freezer necessitated the conclusion that there was at least two

perpetrators to the crime. We do not perceive any error in the trial

court's discretionary ruling that exhibits 50, 51 and 52 would prove

useful to the jury, and their probative value is not outweighed by

prejudicial effect. The defendant cannot limit the introduction of

competent, relevant evidence against him by offering to stipulate the

fact. State v. Eaton (1969), 19 Ohio St. 2d 145.

Appellant contended in his trial objection that the jury could not rationally consider this case after looking at these photos. Nonetheless, this jury did not convict the codefendant, although shown the same photos as presented in appellant's trial.

Nonetheless, a trial judge should use extreme caution in this area where the evidence against a defendant is not strong. It is often difficult to determine what fact or facts tips the scales and convinces a jury that a defendant is guilty.

In summary, we believe that the trial court has considerable discretion in the admission of photographs. It is a judgment call to which our system of justice gives him or her primary responsibility. While two of the photographs were either redundant or irrelevant, we do not believe the court committed prejudicial error in admitting them.

The first assignment of error is overruled.

The second assignment of error reads as follows:

"II. The trial court erred on failing to sustain the appellant's motion for a judgment of acquittal pursuant to Criminal Rule 29(A) made at the end of the state case in chief, in that there was no credible evidence independent of the testimony of an accomplice to find the appellant guilty beyond a reasonable doubt."

Appellant contends that the trial court erred in not granting his Rule 29 motion at the end of the state's case in chief as there was sufficient evidence to sustain the convictions of the offenses charged in the indictment. This court held in State v. Plunket (Dec. 28, 1979), No. 78AP-809, unreported (1979 Decisions 4177), that:

> "A criminal conviction must be supported by
> substantial evidence upon which a jury could
> reasonably conclude that all elements of the
> offense have been proven beyond a reasonable
> doubt. * * * It follows that pursuant to
> Crim. R. 29(A) a court shall not order an entry
> of judgment of acquittal if the evidence is
> such that reasonable minds can reach different
> conclusions as to whether each material element
> of a crime has been proven beyond a reasonable
> doubt. * * *"

The crux of the state's case relies on testimony of Michael Minnear who was an accomplice in this murder. In order to convict a person using such evidence, R. C. 2923.03(D) requires that "[N]o person shall be convicted of complicity under this section solely upon the testimony of an accomplice, unsupported by evidence." In interpreting this statute, the Supreme Court of Ohio held that an accomplice's testimony "must be corroborated by some other fact, circumstance, or testimony which also points to the identity of the one he accuses as a guilty actor." State v. Myers (1978), 53 Ohio St. 2d 74, 75, 372 N.E. 2d 356. See also, State v. Pearson (1980), 62 Ohio St. 2d 291, 405 N.E. 2d 296; State v. Johnson (1980), 70 Ohio App. 2d 152, 435 N.E. 2d 429; and State v. Allsup (1980), 67 Ohio App. 2d 131, 426 N.E. 2d 499. The facts before the Myers court did not require them to establish a standard for determining what would be the requisite sufficiency necessary to corroborate an accomplice's testimony. However, the court did state in a footnote that:

> "* * * [W]here other states have required, by
> statute or judicial decision, corroboration of
> accomplice testimony, the test has generally
> been 'to eliminate from consideration the

No. 82AP-451                                                    15

> evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence * * * which tends to connect the defendant with the commission of the offense.'" Forbes v. State (Tex. Crim. App. 1974), 513 S.W. 2d 72, 76, cert. denied 420 U.S. 910. Myers, supra, at 75-76.

In reviewing what various courts have concluded as to what is sufficient corroboration, the court, in Allsup, states that:

> "* * * [S]ome evidence, independent of the statement by the accomplice, that 'tends to connect the defendant' * * * with the crime charged. It would appear that this 'other evidence' need not be necessarily of sufficient strength to, by itself, constitute proof beyond a reasonable doubt, but must directly, or by reasonable inference, connect the defendant with the crime."

It is clear that the accomplice Minnear's testimony was corroborated by some other evidence, to wit: the testimony of Luther Johnson, Sr., which also points to the identity of the one the accomplice accuses as the guilty actor. This is some evidence independent of the statement of the accomplice that "tends to connect" the defendant with the crime charged. State v. Myers, supra.

Appellant does not dispute that this is some other evidence tending to connect him to the crime, but contends it should not suffice as the sufficient corroboration needed as Luther Johnson, Sr.'s testimony is incredible as a matter of law. We cannot agree. The testimony of Luther Johnson, Sr., meets the requirement of R. C. 2923.03(D) and the interpretation placed on that legislation by the

No. 82AP-451

Supreme Court of Ohio in Myers. The question of credibility to be given that statement is for the jury. State v. DeHass (1967), 10 Ohio St. 2d 230.

When no reasonable person could fail to find reasonable doubt, the trial court should take the case from the jury and grant a Crim. R. 29 motion. State v. Bridgeman (1978), 55 Ohio St. 2d 261. Such is not the state of the evidence before us.

The second assignment of error is overruled.

The third assignment of error reads as follows:

"III. The trial court erred in first allowing and then excluding the evidence of 'similar acts' of a third party in violation of appellant's rights to confrontation and a fair trial when there is a question as to the identity of the perpetrator."

Appellant contends that the trial court committed prejudicial error when the court refused to permit appellant to call as witnesses for the defense two individuals who would testify that they were victims of acts of violence by the codefendant, Luther Johnson, Jr. Appellant contends that this testimony of other "similar acts" of the codefendant, Luther Johnson, Jr., is highly relevant as it tends to show that Johnson, Jr., was the person who went berserk and killed Mrs. Freeman and not the accused.

Appellant's counsel attempted to call to the stand in his defense Harry Walker, a neighbor of Johnson, Jr. After the trial court ruled the testimony of Walker was irrelevant to the issues before the court, counsel proffered into the record that, if called, Mr. Walker

Case: 4:96-cv-00795-JRA Doc #: 22-10 Filed: 01/24/97 189 of 201. PageID #: 4538

No. 82AP-451                                                     17

would testify that, at some prior date, which he did not specify,
Johnson, Jr., inexplicably suddenly grabbed a machete and carved up
Walker's arm. Counsel for appellant also attempted to call to the stand
another individual by the name of Jones for the purpose of relating an
act of violence committed by Johnson, Jr., when the trial court
indicated he would not permit such testimony, counsel for the appellant
proffered for the record that Jones would testify he was a friend of
Johnson, Jr.'s, and that Johnson beat him senseless when Jones refused
to perform oral sex upon him.

        The record already contained some evidence of Johnson,
Jr's, violent tendencies. Minnear testified that, on the night of the
homicide, Johnson, Jr., took a young girl into a bedroom and she later
came running out of the room naked and with blood all over her face.
Johnson, Sr., testified he has a police record, has kicked the "hell
out of a few policemen, and had psychiatric problems when he was
younger." (Tr. 347.)

        Where a defendant claims he has been misidentified,
evidence of crimes committed by another may be admissible if the crimes
are sufficiently similar to the offense charged and if the perpetrator
of those crimes is similar in appearance to the defendant. United
States v. Hallman (D.C. Cir., 1971), 439 F. 2d 603 at 605. United
States v. Armstrong (9th Cir., 1980), 621 F. 2d 951; United States v.
Robinson (2nd Cir.,1976), 544 F. 2d 110. Cf. State v. Burke (Jan. 21,
1982), No. 81AP-466, unreported (1982 Decisions 57).

The modus operandi must be so similar as to show a
connection with the crime with which the defendant is charged. Compare
Devere v. State (6th Cir., 1890), 5 C.C. 509, motion for leave to
appeal overruled, 25 W.L.B. 435 (1891). State v. Sheppard (1955), 100
Ohio App. 345, affirmed (1956), 165 Ohio St. 293, certiorari denied,
352 U.S. 910, habeas granted on other grounds. Sheppard v. Maxwell
(1966), 384 U.S. 333, with Holt v. United States (5th Cir., 1976), 342
F. 2d 163.

In Hallman, supra, the court held that the refusal to
permit introduction of evidence that defendant had been mistakenly
arrested in another robbery case was not an abuse of discretion, where
defense counsel did not bring out any relationship between the two
charges (other than they were both for robbery) and did not proffer
that there was any similarity between two offenses in terms of modus
operandi.

In Armstrong, supra, the court held that in a prosecution
for armed bank robberies, the trial court committed error in excluding
testimony that another man, matching the description of the bank
robber, had used bait money taken in that robbery to purchase a car;
however, erroneous exclusion of the testimony did not warrant reversal
of the convictions for two other bank robberies.

In Robinson, supra, the court held that the defendant
should have been permitted to introduce testimony by a jailer that a
person shown on film made by bank surveillance camera was a person

other than defendant and evidence that the other person was suspected
of two armed robberies which occurred in the area within six days prior
to the bank robbery with which defendant was charged.

Thus, it is clear that evidence of similar acts of a third
party evidencing a design or system may be admissible where there has
been a challenge to identification. See 2 Wigmore, Evidence Section 304
at 252 (Chadbourn Rev. Ed. 1979). The cases cited by appellant deal
with the situation where the defendant claims to be misidentified. In
the matter, sub judice, no one identified the appellant or anyone else
as the killer. Neither Minnear nor Johnson, Sr., accused appellant of
shooting Mrs. Freeman, each testified that appellant told him he shot
the victim. Moreover, the unrelated acts of Johnson, Jr., were
insufficiently similar to the offenses at bar. This was a
robbery-burglary-murder. The other acts were assaults. While the act of
killing the victim with a single shot is an act of violence, the act is
not unique. Burglaries often end in violence. The burglar, who is no
stranger to the victim found at home, kills to avoid detection. There
was evidence presented by Johnson, Sr., that appellant had done some
maintenance work for the victim, and the testimony that he admitted the
killing is consistent with the fear of the perpetrator being identified.

The other acts of Johnson, Jr., neither impeaches the
veracity of Johnson, Sr., or Minnear, nor does it show bias or
prejudice. The evidence of the violent character of Johnson, Jr., does
not contradict the testimony that appellant told Johnson, Sr., and
Minnear that he killed Mrs. Freeman.

The third assignment of error is not well taken.

The fourth assignment of error reads as follows:

"IV. The trial court erred in limiting appellant's right to cross examine witnesses in violation of appellant's right to due process."

Appellant claims that he should have been permitted to cross-examine Kenny Ward, a codefendant, regarding his interrogation by the police.

In the course of interviewing Kenny Ward, one of the detectives referred to an Officer Number 1 in defendant's proffered Exhibit A (a transcript of a taped interview with Kenny Ward), suggested in colorful language the possibility that Luther Johnson, Jr., might have killed Mrs. Freeman because she bit his penis when he tried to force her to perform fellatio. While explaining to Kenny that there was no evidence to support his theory, Officer Number 1 stated he personally believed that Johnson, Jr., because of his violent character, was the type of man who would kill. Officer Number 1 referred to several specific examples, including the machete and homosexual incidents about which the court had just ruled it would not allow evidence to be introduced. (Tr. 483-487.)

Aside from a few innocuous comments about his and his brother's background, Kenny Ward said only that he knew nothing about it. He did not implicate appellant; he said nothing which was inconsistent with his testimony.

Appellant wished to read the narrative statements of Officer Number 1 and then ask Kenny Ward what his responses had been.

193 of 201

(Tr. 489.) As counsel for the state noted, many of the police officer's comments were not questions, but merely speculation. (Tr. 490.) Moreover, in most cases, Kenny Ward made no responses. (Tr. 490; Defendant's Proffered Exhibit A.) Neither Kenny's answers nor his silence was inconsistent with his testimony.

During the questioning of Kenny Ward by the police officers, one of the officers opined that he did not believe appellant did the killing. Clearly, however, no police officer would have been permitted to merely take the stand and offer his opinion as to who he thought the killer was. Had one attempted to do so and indicated in his opinion he thought appellant had done so, counsel for appellant would have strongly and rightfully objected. Evidence should not be composed of mere speculation, but of hard facts. Having been presented the facts, it is for the jury to decide whether the facts presented prove guilt. The trial court properly sustained the state's objection to the use of the officer's opinions to cross-examine Kenny Ward. A defendant's right to cross-examine may not be unreasonably curtailed, but his right is not absolute and may in the appropriate case be limited to accommodate other legitimate interest in the criminal trial process. Chambers v. Mississippi (1973), 410 U.S. 284; State v. Walker (1978), 53 Ohio St. 2d 192.

The state is entitled to a fair trial, as well as the accused, and the admission of mere opinion, evidenced by an investigating officer, would have been highly prejudicial to the state. Evid. R. 403(A) provides that relevant evidence should be excluded if

its probative value is substantially outweighed by the danger of unfair prejudice. We do not believe that the trial court abused its discretion in denying the admission of the evidence proffered by the defense.

The fourth assignment of error is likewise overruled.

The fifth assignment of error reads as follows:

> "V. The trial court abused its discretion by allowing the state to make improper statements in closing arguments to the jury in violation of appellant's right to a fair trial."

Initially, counsel for appellant contends that the prosecutor engaged in an improper argument to the jury when he referred to the killing of Mrs. Freeman as an execution.

> (Prosecutor) "So while they are in there, what happens? We've got an execution. It is not just a murder. It is an execution.* * *" (Tr. 531.)

There was no objection made by the defense when this remark was made by the prosecutor. Where there is not an immediate objection to statements made during closing argument, a defendant must be able to show that the statement was both erroneous and so prejudicial as to result in a manifest miscarriage of justice. Crim. R. 52(B); Scott v. State (1923), 107 Ohio St. 475.

If there is evidence supporting counsel's argument, he should not be interfered with as the jury will determine the weight to be given the evidence. State v. Champion (1924), 109 Ohio St. 281. The evidence herein indicates that the victim was shot in her forehead at contact range with her hands and feet bound and her mouth taped closed. The killing has all the appearances of an execution, and we find nothing unfair in the prosecutor's characterization of the killing as an "execution."

-393-

No. 82AP-451                                                          23

Appellant contends that the prosecutor improperly suggested to the jury in his closing argument that Johnson, Sr., had no motive to lie because he already knew that there were to be no deals or leniency forthcoming in his son's upcoming case. Counsel for the state contends no such remark was made by the prosecutor in final argument, and we are unable to find such remark in the closing argument.

Appellant contends the following remarks made by the prosecutor in his closing argument were prejudicial:

> (Prosecutor) "* * * He loves his son and he sat there right from that stand, not only did he tell you that he's been a thief and his son's been a thief, he even showed him how to steal electricity, he told you that he'd do anything he could to help his son out? He told you that if he could get his son out of jail tomorrow he'd do it. Now I don't doubt it. I don't think you're going to doubt that either, but how is relating the conversation between the Wards and he here going to help his son out? (Tr. 536.)

> "* * *

> (Prosecutor) "Now the contention is going to be that just because he is David's father he's going to get up here and lie. For the life of me I don't know how it is going to help David.* * * (Tr. 537.)

> "* * *

> (Prosecutor) "I still am trying to figure out what good Luther, Sr. is doing for David by testifying like that. I'm still trying to figure it out. It goes to his motive for testifying. What good is he doing? Mike Minnear got a deal, you heard him testify. You didn't hear David get a deal and testify. You didn't hear that. I don't know what good it is doing and because he's been convicted of theft, you can't believe anything he says? And according to Mr. Kravitz, anybody that's ever committed a crime is highly more likely to commit another crime. That is a bunch of bologna. You won't

> hear that from Judge Martin. Common sense will
> tell you that. (Tr. 575.)
>
> "* * *.
>
> (Prosecutor) "* * * And what prompted Kenny
> Ward's statement when they came over to Mike
> Minnear's house afterwards? When he and Darrell
> talked about oh, that crazy Johnson must have
> done it, and Kenny goes yeah, he could have
> used the pillow. There's a pillow found in the
> freezer. Now where would Kenny just come out
> with that out of the clear blue sky and where
> would Mike Minnear come out with it, because
> that wasn't released either, in the --." (Tr.
> 581.)

Johnson, Sr., was cross-examined at length by the defense as to his willingness to do anything to protect his son. (Tr. 348, 356, 367, 371, 376, 377.) Defense counsel knew that plea bargains with respect to Johnson, Jr., had been offered and rejected by the state. Johnson, Jr., was offered an opportunity to plead to murder and he rejected it. (Tr. 625.) If defense counsel wished to pursue in his questioning of Johnson, Sr., the witness' personal belief that his testimony would probably help his son, he need only have asked. We see nothing wrong in the prosecutor's comment that he could not see how Johnson, Sr.'s testimony could help his son. We find nothing objectionable about the prosecutor's argument concerning Minnear's statement concerning Kenneth Ward. It is a fair comment on evidence in the record.

> The fifth assignment of error is overruled.
>
> The sixth assignment of error reads as follows:
>
> "VI. The trial court erred in denying appel-
> lant's request for a mistrial when it became
> evident that the jury was not following the
> court's instructions."

No. 82AP-451                                                                    25

On January 26, 1981, at 5:10 p.m., the jury began its deliberation and retired for the evening at 6:20 p.m. The jury returned the next morning to continue its deliberation. At 1:45 p.m., they submitted a two-prong question. First, "can they see transcripts of police interrogations of Minnear or hear the tapes alluded to in direct examination," and secondly, if they cannot, they wanted to hear Minnear's testimony relevant to the day he was arrested and all of Darrell Ward's testimony. (Tr. 608-609.) Both requests were denied.

Later that afternoon, the jury requested that the instructions be given again. (Tr. 614.) The court, after consulting counsel for all parties, asked the jury to be more specific. Thereafter, they requested instructions on beyond a reasonable doubt and an aider and abettor, as well as the necessary elements of aggravated murder and involuntary manslaughter. (Tr. 615.) Counsel for appellant moved for a mistrial at this time. (Tr. 621.) These instructions were again given to the jury. The jury returned later that morning with a further request to rehear Johnson, Sr.'s testimony. This was denied. (Tr. 638-639.) Despite the denial, they again wanted to hear Johnson, Sr.'s testimony, but only that portion which related to his direct examination concerning specific names named on July 16. Counsel for the defendant objected, and the court denied the jury's request. Half an hour later, the jury reached a verdict.

Appellant contends the requests of the jury indicate they lost their way during their deliberation. We must agree. The request to

see the transcripts of the interview of Minnear or the tapes of the interviews of Minnear was understandable. While not introduced, there was reference to the fact when Minnear was interviewed, the interview was taped and transcribed. Indeed, counsel for the appellant cross-examined Minnear from a copy of the transcript of the interviews. (Tr. 254, 255, 256, 259, 262.) Nonetheless, after the request for the transcript or tapes were refused by the trial court, no further request was made for them by the jury, nor did they indicate they could not reach a verdict without them.

It is not unusual for a jury to request the court to have the court reporter reread testimony of certain trial witnesses. The court may in its discretion permit the jury to rehear part or all of the testimony of any witness, or part or all of the instructions of law, in the presence of counsel and the defendant. State v. Weind (1977), 50 Ohio St. 2d 224; see also State v. Berry (1971), 25 Ohio St. 2d 255. We find no abuse of discretion in the trial court's refusal to have the testimony of some of the witnesses reread.

We do not believe the court erred in refusing to grant a mistrial at appellant's request. The request was made after the jury had deliberated for a little over one day. The fact that the jury desired a rereading of some of the instructions is certainly not unusual. Indeed, many courts feel the better practice is that a full copy of the jury instructions be permitted in the jury room as additional rereading requests are often encountered.

The sixth assignment of error is without merit.

No. 82AP-451

27

The seventh assignment of error reads as follows:

"VII. The verdict of the jury was against the manifest weight of the evidence and instead was the result of statements of the prosecutor designed to arouse the passions of the jury in violation of appellant's right to a fair trial."

A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt. State v. Eley (1978), 56 Ohio St. 2d 169.

In the matter sub judice, the accomplice Michael Minnear, when arrested, involved appellant, his brother, and Luther Johnson, Jr. in the burglary, which resulted in the victim's death. The fact that the victim was a fairly large woman and she was placed in a freezer suggests the likelihood of at least two perpetrators of the crime. Since the victim was bound and gagged, her killing could reasonably be explained to be the result of the killer committing the act because the victim could identify him. The police recovered evidence that Luther Johnson, Sr., did home repair work for the victim and that Luther Johnson, Jr. and his mother sold items which came out of the burglary. Luther Johnson, Sr., was incarcerated at the time of the crime, but he involved his son as well as the appellant as being connected with the crime. Specifically, he testified the appellant admitted killing the victim. He further testified that his son and the appellant had done work for the victim in her home on an earlier occasion. It would be reasonable therefor for the jury to conclude that Mrs. Freeman could identify appellant and Luther Johnson, Jr., as there was no testimony they wore masks.

Michael Minnear testified that he was a good friend of the appellant, but was only a passing acquaintance of Luther Johnson, Jr. There was testimony that Luther Johnson, Jr., had violent tendencies. Nonetheless, Minnear testified it was the appellant who came out of the house carrying revolvers in his shirt, and who admitted to him that he killed Mrs. Freeman. The jury had the opportunity to observe Minnear during his testimony as well as Luther Johnson, Jr. They were also able to observe the demeanor of the appellant who testified that he was asleep in his apartment during the time of the crime. Credibility of the witnesses is primarily a matter for the jury to determine. State v. DeHass, supra. A conviction will not be reversed unless it can be said that no reasonable mind could fail to find reasonable doubt. State v. Bridgeman, supra.

The seventh assignment of error is overruled.

The eighth assignment of error reads as follows:

"VIII. The trial court erred in denying appellant's motion for a new trial and his request for an evidentiary hearing on the motion."

Appellant moved for a new trial citing reasons stated in Crim. R. 33(A)(2),(3), (5) and (6), to wit:

"(2) Misconduct of the * * * prosecuting attorney, or the witnesses for the state;

"(3) Accident or surprise which ordinary prudence could not have guarded against;

"* * *

"(5) Error of law occurring at the trial;

"(6) * * * [N]ewly discovered evidence.* * *"

error in the trial court's overruling of the motion for a new trial without an evidentiary hearing. There was no evidence submitted by the defendant after trial that could be characterized as misconduct of the prosecutor or a witness for the state, accident or surprise which ordinary prudence could not have guarded against, error of law, or newly discovered evidence.

Parenthetically, we might add that, while the appellant filed his appeal prior to the ruling by the trial court on his motion for new trial, we shall consider this assignment as preserved in his premature appeal.

The eighth assignment of error is, however, without merit.

For the foregoing reasons, appellant's assignments of error are overruled and the judgment of the trial court is affirmed.

Judgment affirmed.

STRAUSBAUGH and MOYER, JJ., concur.

--------

BROGAN, J., of the Second Appellate District, sitting by designation in the Tenth Appellate District.