IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

    v.                           :        Case No.  90-177

DANNY LEE HILL,                  :

    Defendant-Appellant.         :


APPEAL FROM THE COURT OF APPEALS
FOR THE ELEVENTH JUDICIAL DISTRICT OF OHIO
TRUMBULL COUNTY

---

BRIEF OF DEFENDANT-APPELLANT

VOLUME I of II

---


Roger Warner
(0019941)
TATARU, WALLACE & WARNER
181 East Livingston Avenue
Columbus, Ohio  43215
(614) 221-3821

Carol A. Wright
(0029782)
TYACK, WRIGHT & TURNER
7100 North High Street
Suite 209
Worthington, Ohio  43085
(614) 848-4140

Counsel for Defendant-Appellant

Dennis Watkins
Prosecuting Attorney
160 High Street, N.W.
Third Floor
Administration Building
Warren , Ohio 44481

Counsel for Plaintiff-Appellee



EXHIBIT
_M_

# TABLE OF CONTENTS

|                          | Page[s]      |
|--------------------------|--------------|
| TABLE OF CONTENTS        | i-xiv        |
| TABLE OF AUTHORITIES     | xv-xxii      |
| PROPOSITIONS OF LAW      | xxiv-xxix    |
| STATEMENT OF THE CASE    | 2            |
| STATEMENT OF THE FACTS   | 3-53         |
| LAW AND ARGUMENT         |              |

PROPOSITION OF LAW NUMBER 1:     54

AN ACCUSED'S RIGHT TO COUNSEL IS VIOLATED WHEN HE IS DEPRIVED OF COUNSEL FOR CUSTODIAL INTERROGATION WHEN HE DOES NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY RELINQUISH A KNOWN RIGHT DUE TO THE MISCONDUCT OF LAW ENFORCEMENT AUTHORITIES AND THE ACCUSED BEING MENTALLY RETARDED IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS OF THE OHIO CONSTITUTIONS.

Authorities Cited in Proposition of Law No. 1:

| Powell v. Alabama (1932), 287 U.S. 45          | 54      |
|------------------------------------------------|---------|
| Massiah v. United States (1964), 377 U.S. 201  | 54      |
| Spano v. New York (1959), 360 U.S. 315         | 54,55   |
| Brewer v. Williams 430 U.S. 397                | 55      |
| Johnson v. Zerbst (1938), 304 U.S. 458         | 55      |
| Miranda v. Arizona (1966) 384 U.S. 436         | 55      |
| Michigan v. Mosley (1975), 423 U.S. 96         | 55      |

PROPOSITION OF LAW NUMBER 2:     61

AN ACCUSED'S STATEMENTS ARE NOT VOLUNTARY WHEN SUCH STATEMENTS WERE COERCED BY THE PSYCHOLOGICAL TACTICS OF LAW ENFORCEMENT OFFICERS ON A RETARDED INDIVIDUAL WHO WAS ESSENTIALLY ILLITERATE AND THE ADMISSION OF SUCH STATEMENTS VIOLATES THE DUE PROCESS CLAUSES OF BOTH THE OHIO AND UNITED STATES CONSTITUTIONS.

**TABLE OF CONTENTS**
continued

**Authorities Cited in Proposition of Law No. 2:**

State v. Chase (1978), 55 Ohio St. 2d 237     61
Rufer v. State (1874), 25 Ohio St. 464     61
Mincey v. Arizona (1977), 437 U.S. 385     61,62
Miller v. Fenton (1985), 474 U.S. 104     62
Colorado v. Connelly (1986), 479 U.S. 157     62
Reck v. Pate (1961), 367 U.S. 433, 442     62
Townsend v. Sain (1962), 372 U.S. 293     62
Blackburn v. Alabama (1960), 361 U.S. 199     62

**PROPOSITION OF LAW NUMBER 3:**     71

     AN ACCUSED'S STATEMENTS ARE NOT ADMISSIBLE UNLESS THE STATE ESTABLISHES THAT THE PROCEDURAL SAFEGUARDS CONTINUED IN THE MIRANDA WARNINGS WERE PROPERLY GIVEN OR KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED AS PROVIDED UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PORTION OF THE OHIO CONSTITUTION.

**Authorities Cited in Proposition of Law No. 3:**

Schneckloth v. Boustamounte (1973), 412 U.S. 218     71
Rhode Island v. Innis, (1980), 446 U.S. 291     71-72
Wilson v. United States (C.A. D.C., 1982), 444 A.
    2d 25     72
Michigan v. Mosley (1975), 423 U.S. 96     73
Moran v. Burbine (1986), 475 U.S. 412     73
Colorado v. Connelly (1986), 479 U.S. 157     73
People v. Bernasco (Oct. 18, 1990), Ill No. 69035,
    unreported, 1990 WL 155728 (Ill.)     73
Miranda v. Arizona (1966), 384 U.S. 436     76
U.S. v. Crouder (C.A. 6, 1982), 691 F.2d 280     77

**PROPOSITION OF LAW NUMBER 4:**     80

     AN ACCUSED'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS UNDER THE OHIO CONSTITUTION ARE VIOLATED WHEN AN ACCUSED IS SEIZED FROM HIS HOME THROUGH THE USE OF PSYCHOLOGICAL PLOYS BY LAW ENFORCEMENT OFFICERS UPON AN ACCUSED WHO IS MENTALLY RETARDED AND ESSENTIALLY ILLITERATE.

**TABLE OF CONTENTS**
continued

**Authorities Cited in Proposition of Law No. 4:**

Hayes v. Florida (1985), 470 U.S. 811                          80
Dunnaway v. New York (1979), 442 U.S. 200                      80
Florida v. Royer (1983), 430 U.S. 490                          80
State v. Fickes (March 29, 1985), Trumbull
     App. No. 3419, unreported.                              84

**PROPOSITION OF LAW NUMBER 5:**                               87

    AN ACCUSED IS DENIED HIS RIGHT TO DUE PROCESS
UNDER BOTH THE OHIO AND UNITED STATES
CONSTITUTIONS WHEN HE IS DENIED HIS STATUTORY
RIGHT TO COUNSEL PURSUANT TO R.C. 120.16,
2934.14 AND 2935.20.

**Authorities Cited in Proposition of Law No. 5:**

R.C. 120.16                                                    87-88
R.C. 2935.14                                                   87-88
R.C. 2935.20                                                   87-88
State v. Scarlett (Sept. 3, 1987), Montgomery
     App. No 10378, unreported.                              87
R.C. 120.16(F)                                                 87

**PROPOSITION OF LAW NUMBER 6:**                               89

    NONCOMPLIANCE WITH R.C. 2935.05 RESULTS IN AN
ILLEGAL ARREST, AND ANY STATEMENTS AND/OR
EVIDENCE DERIVED THEREFROM SHOULD BE
SUPPRESSED.

**Authorities Cited in Proposition of Law No. 6:**

R.C. 2935.05                                                   89-90
R.C. 2935.07                                                   89,93
State v. Fairbanks (1972), 32 Ohio St. 2d 34                   92
Johnson v. Reddy (1955), 163 Ohio St. 347                      94
Leger v. Warren (1900), 62 Ohio St. 500                        94
In Re Thompson (1974), 4 Ohio Op. 3d 359                       94

**PROPOSITION OF LAW NUMBER 7:**                               96

    WHEN STATEMENTS ARE MADE BY AN ACCUSED TO LAW
ENFORCEMENT OFFICERS UNDER THE IMPRESSION OF
RECEIVING LENIENCY OR SOME OTHER BENEFIT, THEN
THOSE STATEMENTS ARE INADMISSIBLE IN ANY LATER
TRIAL.

# TABLE OF CONTENTS
continued

## Authorities Cited in Proposition of Law No. 7:

United States v. Geders (C.A. 5, 1978),
    566 F.2d 1227                           96-97
State v. Davis (1980), 70 Ohio App. 2d 48    97

## PROPOSITION OF LAW NUMBER 8:          98

THE ADMISSION OF OTHER CRIMES, WRONGS, OR ACTS, INTO EVIDENCE BY THE TRIAL COURT VIOLATED R.C. 2945.59 EVID. R. 404(B) AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION TO THE PREJUDICE OF THE APPELLANT THUS REQUIRING REVERSAL.



## Authorities Cited in Proposition of Law No. 8:

Evid. R. 404(B)                             98-99
R.C. 2945.59                             98-104
State v. DeMarco (1987), 31 Ohio St. 3d 191    99
State v. Gardner (1979), 59 Ohio St. 2d 14    100
State v. Burson (1974), 38 Ohio St. 2d 157    100
State v. Flonnery (1972), 31 Ohio St. 2d 125   100-101
State v. Benner (1988), 40 Ohio St. 3d 301    101
State v. Hutton (April 28, 1988), Cuyahoga App. No.
  51704, unreported                        101
State v. Curry (1975), 43 Ohio St. 2d 66   102-103
Evid. R. 403                              103

## PROPOSITION OF LAW NUMBER 9:          106

A TRIAL COURT MUST EXCLUDE EVIDENCE THAT IS EITHER NOT RELATIVE OR ITS RELEVANCE IS OUTWEIGHED BY ITS PREJUDICIAL EFFECT OR SUCH EVIDENCE IS SOLELY INTRODUCED TO INFLUENCE THE COURT. THE EFFECT OF THE ERRONEOUS EVIDENTIARY RULINGS WAS THE DENIAL OF APPELLANT'S RIGHT TO DUE PROCESS AND FAIR AND IMPARTIAL TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

**TABLE OF CONTENTS**
continued

**Authorities Cited in Proposition of Law No. 9:**

| | |
|---|---|
| Evid. R. 401 | 106 |
| Evid. R. 403 | 106 |
| State v. White, (1968), 15 Ohio St. 2d 146 | 107 |
| State v. Eubank (1979), 60 Ohio St. 2d 183 | 107 |
| State v. DeMarco, (1987), 31 Ohio St. 3d 191 | 107-108 |

**PROPOSITION OF LAW NUMBER 10:**      111

> AN INFERENCE OF FACT CANNOT BE PREDICATED UPON ANOTHER INFERENCE, BUT MUST BE PREDICTED UPON A FACT SUPPORTED BY LAW. SOBOLOVITZ V. LUBRIC OHIO CO. (1923). 107 OHIO ST. 204. IT IS ERROR FOR A TRIAL COURT TO DRAW AN INFERENCE FROM ANOTHER INFERENCE BECAUSE THE FOUNDATION OF THE SECOND INFERENCE IS SO INSECURE THAT RELIANCE UPON IT WOULD RESULT IN AN INFERRED FACT WHICH IS MERELY SPECULATIVE IN NATURE.

**Authorities Cited in Proposition of Law No. 10**

Sobolovitz v. Lubric Ohio Co., (1923), 107 Ohio St. 204   111

**PROPOSITION OF LAW NUMBER 11:**      112

> AN ACCUSED'S RIGHT TO CONFRONTATION IS VIOLATED WHEN A PROSECUTOR CONSULTS WITH AN IMPORTANT WITNESS WHILE THAT WITNESS WAS SUBJECT TO RECALL AND WAS A SURPRISE WITNESS OF WHICH DEFENSE COUNSEL HAD NO PRIOR KNOWLEDGE.

**Authorities Cited in Proposition of Law No. 11:**

| | |
|---|---|
| Pointer v. Texas, (1965), 380 U.S. 400 | 112 |
| Article I, Section 10, Ohio Constitution | 112 |
| Alford v. United States, (1931), 282 U.S. 687 | 112 |
| Smith v. Illinois, (1968), 390 U.S. 129 | 112 |
| Davis v. Alaska, (1975), 415 U.S. 308 | 113 |
| State v. Prater, (1983), 13 Ohio App. 3d 98 | 113-114 |
| Brady v. Maryland (1963), 373 U.S. 83 | 115 |

**TABLE OF CONTENTS**
continued

PROPOSITION OF LAW NUMBER 12:  116

  IT IS A DENIAL OF AN ACCUSED'S RIGHT TO A FAIR
  CROSS-SECTION OF THE COMMUNITY TO DENY A
  REQUEST FOR INCLUSION IN THE POOL OF
  PROSPECTIVE JURORS LICENSED DRIVERS PURSUANT
  TO R.C. 2313.08(B) IN VIOLATION OF THE SIXTH
  AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
  CONSTITUTION, AND ARTICLE I, SECTION TEN OF
  THE OHIO CONSTITUTION.

Authorities Cited in Proposition of Law No. 12:

R.C. 2313.08(B)  116
Duren v. Missouri (1979), 439 U.S. 357  116,120
Jury System of the Eighties:  Toward a Fairer Cross-
  Section and Increased Efficiency, Dogin and
  Trevelin, Toledo L. Rev. 944 (1980)  116
Jury Representatives: "A Mandate for Multiple Source
  Lists," Kairys, Kadane, and Lehoezky, 64 Cal.
  L. Rev. 776 (1977)  117
R.C. 2313.06  117-121
R.C. 2313.08  117-121
People v. Harris, (1984), 36 Cal. 3d 36, 679 P. 2d 443  121
In Re Rhymes (Cal. Ct. App. 2d Dist., 1985)
  37 Cr. L. Rptr. 2459  121
IV Center for Jury Studies Newsletter 6 (No. 1982)
  of the National Center for State Courts  121

PROPOSITION OF LAW NUMBER 13:  122

  IT IS A VIOLATION OF AN ACCUSED'S RIGHT TO
  JURY TRIAL GUARANTEED BY THE SIXTH AND
  FOURTEENTH AMENDMENTS TO THE UNITED STATES
  CONSTITUTION AND ARTICLE I, SECTION 10 OF THE
  OHIO CONSTITUTION WHEN THE COURT DOES NOT
  DETERMINE ON THE RECORD, SPECIFICALLY
  ADDRESSING AN ACCUSED, WHETHER HE HAS
  KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY
  WAIVED HIS RIGHT TO A JURY TRIAL.

Authorities Cited in Proposition of Law No. 13:

Crim.R. 23  122
R.C. 2945.05  122
Crim.R. 11(C)  122
State v. Kehoe (1978), Ohio App. 2d 315  122
State v. Morris (1982), 8 Ohio App. 3d 12  122-123
State v. Griffin (1983), 13 Ohio App. 3d 376  123

**TABLE OF CONTENTS**
continued

## PROPOSITION OF LAW NUMBER 14:                                124

IT IS REVERSIBLE ERROR FOR A TRIAL COURT TO
DENY AN ACCUSED FUNDS NECESSARY TO EMPLOY AN
EXPERT FOR PURPOSES OF A MOTION FOR CLOSURE OF
PRE-TRIAL HEARING THAT WAS NECESSARY TO
PRESERVE A FAIR AND IMPARTIAL JURY PURSUANT TO
THE FIFTH, SIXTH AND FOURTEENTH AMENDMENT, OF
THE UNITED STATES CONSTITUTION AND ARTICLE I,
SECTIONS 2, 10 AND 16 AND ARTICLE II, SECTION
26.

## Authorities Cited in Proposition of Law No. 14:

People v. Elliott (1960), 54 Cal. 2d 498              124
People v. Pratt (1967), 27 App. Div 2d 199,
    278 N.Y.S. 2d 89.                                 124
Philadelphia Newspapers, Inc. v. Jerome (1978),
    478 Pa. 484.                                      124
State ex rel. Chillicothe Gazette, Inc. v.
    Court of Common Pleas (1982), 2 Ohio St.
    3d 24                                         124-125
Nebraska Press Assn. v. Stuart (1976), 427, U.S. 539  125
State v. Montana, ex rel. Daniel Paul Smith v.
    District Court (1982), 654 P. 2d 682              125
R. C. 2929.024                                        126
Washington v. Texas (1967), 388 U.S. 14               127
New York Cent. Rd., Co. v. Public Utilities Commission,
    (1952), 157 Ohio St. 257                          128
Gilday v. Board of Elections (C.A. 6, 1972)
    472 F. 2d 214                                 128-129
State ex rel, Wright v. Morrison (1947)
    80 Ohio App. 135                                  129
Griffin v. Illinois (1956) 351 U.S. 12               129
Ross v. Moffitt (1974), 417 U.S. 600                 130
Geders v. United States (1976) 425 U.S. 80           130
State v. Hester, (1976) 45 Ohio St. 2d 71            130
State ex rel. Smith v. District Court (1982) 654
    P. 2d 682                                         131
Ake v. Oklahoma, (1985) 470 U.S. 68                  131

## PROPOSITION OF LAW NUMBER 15:                                132

A TRIAL COURT ERRS AND ABUSES ITS DISCRETION
IN ADMITTING A PRE-DEATH PHOTOGRAPH OF THE
VICTIM.    SUCH ERROR VIOLATES APPELLANT'S
RIGHTS UNDER EVID. R. 404, THE FIFTH AND
FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE

## TABLE OF CONTENTS
continued

OHIO CONSTITUTION.

### Authorities Cited in Proposition of Law No. 15:

| | |
|---|---|
| Evid. R. 404 | 132-133 |
| White v. State (Akla. Cr. 1983), 674 P. 2d 31 | 132 |
| Gardner v.Florida (1977) 430 U.S. 349 | 133 |
| Eddings v. Oklahoma (1982), 455 U.S. 104 | 133 |
| Woodson v. North Carolina (1976), 428 U.S. 280 | 133 |
| Booth v. Maryland (1987), 482 U.S. 496 | 133-134 |
| South Carolina v. Gathers (1989), 490 U.S. ___, 104 L.Ed. 2d 276, 109 S. Ct. 2207 | 133 |
| R.C. 2942.041 | 134 |
| People v. Ramirez (Ill. 1983), 457 N.E. 2d 31 | 134,136 |
| Vela v. Estelle (C.A. 5, 1983), 708 R. 2d 954 | 134 |
| Brooks v. Kemp (C.A. 11, 1985), 762 F. 2d 1383 | 134-135 |
| Adan v. State (Fla. 1984), So. 2d 1195 | 135 |
| Randolph v. State (Fla. 1984), 463 So. 2d 186 | 135 |
| People v. Levitt (Cal. 1984), 156 Cal. App. 3d 500 | 135 |
| State v. Huertas (1990) 51 Ohio St. 3d 22 | 135 |
| State v. Post (1987), 32 Ohio St. 3d 380 | 135 |
| State v. Sowell (1988), 39 Ohio St. 3d 322 | 135 |
| State v. Brewer (1990), 48 Ohio St. 3d 50 | 135-136 |
| Hathaway v. Florida (Fla. 1958), 100 So. 2d 622 | 136 |

### PROPOSITION OF LAW NUMBER 16:                            138

   WHEN THE STATE REPEATEDLY FAILS TO COMPLY WITH
   CRIM. R. 16, IT IS VIOLATING AN ACCUSED'S
   RIGHT TO A FAIR TRIAL AND TO THE EFFECTIVE
   ASSISTANCE OF COUNSEL.

### Authorities Cited in Proposition of Law No. 16:

| | |
|---|---|
| Crim. R. 16 | 138-140 |
| State v. Hill (March 25, 1982), Franklin App. No. 81AP-663, unreported | 138 |
| State v. Johnston (1988) 39 Ohio St. 3d 48 | 139 |
| Brady v. Maryland, (1963), 373 U.S. 83 | 139 |

## TABLE OF CONTENTS
continued

### PROPOSITION OF LAW NUMBER 17:       141

IT IS AN ABUSE OF DISCRETION FOR A TRIAL COURT TO ALLOW INTO EVIDENCE PHOTOGRAPHS OF THE VICTIM BECAUSE SUCH PHOTOGRAPHS WERE HIGHLY PREJUDICIAL, GROSS, AND UNNECESSARY AND WHICH LACKED PROBATIVE VALUE IN DETERMINING THE ISSUES INVOLVED. THEIR ADMISSION VIOLATED THE APPELLANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

### Authorities Cited in Proposition of Law No. 17:

| | |
|---|---|
| State v. Woodards (1966), 6 Ohio St. 2d 14 | 141 |
| State v. Luft (Dec. 26, 1978) Franklin App. No. 78AP-302, unreported | 141-142 |
| State v. Ward (Feb. 15, 1983), Franklin County App. No. 82AP-451, unreported | 142 |
| State v. Thompson (1987) 33 Ohio St. 3d 1 | 142 |

### PROPOSITION OF LAW NUMBER 18:       144

PROSECUTORIAL MISCONDUCT DURING BOTH THE GUILT AND MITIGATION PHASE OF CLOSING ARGUMENTS DENY AN ACCUSED HIS RIGHT TO A FAIR TRIAL AND AN IMPARTIAL FACT-FINDER AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

### Authorities Cited in Proposition of Law No. 18:

| | |
|---|---|
| State v. Manago (1974), 38 Ohio St. 2d 233 | 144 |
| State v. Smith (1976), 50 Ohio App. 2d 183 | 144 |
| State v. Woodards (1966), 6 Ohio St. 2d 14 | 144 |
| State v. Muscatello (1977), 57 Ohio App. 2d 231 Aff'd 55 Ohio St. 2d 201 | 144 |
| Wither v. United States (C.A. 6, 1979), 602 F.2d 124 | 144 |
| Cook v. Bordenkircher (C.A. 6, 1979), 602 F.2d 117 | 144-145 |
| Berger v. United States (1934), 295 U.S. 78 | 145 |
| ABA Standards Relating to the Prosecution Function 5.1 et seq. | 145 |
| State v. Agner (1972), 30 Ohio App. 2d 96 | 148 |
| Tucker v. Zant (C.A. 11, 1984), 724 F.2d 882 | 148 |
| Brooks v. Kemp (C.A. 11,1985), 762 F.2d 1383 | 149 |

**TABLE OF CONTENTS**
continued

**PROPOSITION OF LAW NUMBER 19:**                                    150

      WHEN THE ISSUE OF EFFECTIVE ASSISTANCE OF
COUNSEL IS RAISED THAT INVOLVES MATTER BOTH
WITHIN THE RECORD AND OUTSIDE THE RECORD THE
PROPER AVENUE FOR REVIEWING THAT ISSUE SHOULD
BE ON POST-CONVICTION RELIEF EVEN IF COUNSEL
ON APPEAL IS NOT TRIAL COUNSEL. THE ACCUSED'S
RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS
VIOLATED PURSUANT TO THE SIXTH AND FOURTEENTH
AMENDMENT RIGHTS TO THE UNITED STATES
CONSTITUTION AND ARTICLE I, SECTION TEN AND
SIXTEEN OF THE OHIO CONSTITUTION.

**Authorities Cited in Proposition of Law No. 19:**

State v. Cole (1982), 2 Ohio St. 3d 112                              150
State v. Smith (1985) 17 Ohio St. 3d 98                             150
Beasley v. United States (C.A. 6, 1974), 491 F.2d 687               151
State v. Hester (1976), 45 Ohio St. 2d 71                           151
State v. Lyte (1976), 48 Ohio St. 2d 391                            151
State v. Nabozny (1978), 54 Ohio St. 2d 195                         151
State v. Clayton (1980), 62 Ohio St. 2d 45                          151
ABA Standard Relating to the Prosecution Function
    and the Defense Function, (1971)                           151

**PROPOSITION OF LAW NUMBER 20:**                                    154

      THE TRIAL COURT ERRED IN ENTERING A JUDGMENT
OF CONVICTION FOR KIDNAPPING AND THE OTHER
FELONIES WHERE CONVICTIONS ON BOTH OFFENSES
ARE CONTRARY TO R.C. 2941.25. SECONDLY, WHERE
AN UNDERLYING FELONY COUNT WHICH IS ALSO USED
AS A SPECIFICATION FOR AGGRAVATED MURDER
MERGES, THEN IT CANNOT BE CONSIDERED AS AN
ADDITIONAL SPECIFICATION FOR SENTENCING
PURPOSES.

**Authorities Cited in Proposition of Law No. 20:**

R.C. 2941.25                                                        154-156
State v. Logan (1979), 60 Ohio St. 2d 126                           154-155
State v. Cooey (1989), 46 Ohio St. 3d                               155
State v. Brown (1982), 7 Ohio App. 3d 113                           156

## TABLE OF CONTENTS
continued

**PROPOSITION OF LAW NUMBER 21:**                                   157

A MOTION FOR NEW TRIAL SHOULD NOT BE DENIED
WITHOUT A FULL HEARING WHEN MADE PURSUANT TO
CRIM. R. 33.  A DENIAL OF SUCH A HEARING AND
THE MOTION VIOLATES AN ACCUSED'S FIFTH, SIXTH
AND FOURTEENTH AMENDMENT RIGHTS TO THE UNITED
STATES CONSTITUTION AND ARTICLE I, SECTIONS
TEN AND SIXTEEN OF THE OHIO CONSTITUTION AND
CRIM. R. 33.

**Authorities Cited in Proposition of Law No. 21:**

Crim. R. 33                                                157
State v. Turner (1983), 10 Ohio App. 3d 328               157
Toledo v. Stuart (1983), 11 Ohio App. 3d 292             157
State v. Petro (1947), 148 Ohio St. 505               158-159
State v. Abi-Sarkis (1988), 41 Ohio App. 3d 333          159

**PROPOSITION OF LAW NUMBER 22:**                                   161

OHIO'S MANDATORY SENTENCING SCHEME PREVENTED
THE   PANEL   OF   THREE   JUDGES   FROM   DECIDING
WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT
IN     VIOLATION     OF     APPELLANT'S     RIGHTS     AS
GUARANTEED   BY   THE   EIGHTH   AND   FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE I, SECTION NINE AND SIXTEEN OF THE
OHIO CONSTITUTION.

**Authorities Cited in Proposition of Law No. 22:**

R.C. 2929.03                                               161
Lockett v. Ohio (1978), 438 U.S. 586                   161-162
Woodson v. North Carolina (1976), 428 U.S. 280           162
Smith v. North Carolina (1982), 459 U.S. 1056            162
State v. McDougall (N.C. 1983), 301 S.E. 2d 308          162
State v. Wood (Utah 1982), 648 P. 2d 71                  162
Robert (Harry) v. Louisiana (1977), 431 U.S. 633         162
Barclay v. Florida (1983), 463 U.S. 939                  162
Zant v. Stephens (1983), 462 U.S. 862                    162

**TABLE OF CONTENTS**
continued

**PROPOSITION OF LAW NUMBER 23:**                    163

    THE FAILURE TO CONSIDER ALL OF THE EVIDENCE IN
SUPPORT OF MITIGATING A DEATH SENTENCE
VIOLATES R.C. 2929.03(F) AND THE EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

**Authorities Cited in Proposition of Law No. 23:**

R.C. 2929.03(F)                                      163
R.C. 2929.03(D)(3)                                   163
State v. Maurer (1984), 15 Ohio St. 3d 239           163
Lockett v. Ohio (1978), 438 U.S. 586                 164
Eddings v. Oklahoma (1982), 455 U.S. 104         164,165
Skipper v. South Carolina (1986), 39 Crim. L. 3041   165

**PROPOSITION OF LAW NUMBER 24:**                    166

    THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND SECTIONS 2,9,10 AND 16, ARTICLE I OF THE
OHIO CONSTITUTION ESTABLISH THE REQUIREMENTS
FOR A VALID DEATH PENALTY SCHEME. OHIO
REVISED CODE SECTIONS 2903.01, 2929.02,
2929.021, 2929.022, 2929.023, 2929.03, 2929.04
AND 2929.05, OHIO'S STATUTORY PROVISIONS
GOVERNING THE IMPOSITION OF THE DEATH PENALTY,
DO NOT MEET THE PRESCRIBED CONSTITUTIONAL
REQUIREMENTS AND ARE UNCONSTITUTIONAL, BOTH ON
THEIR FACE AND AS APPLIED TO APPELLANT.

**Authorities Cited in Proposition of Law No. 24:**

R.C. 2903.01                                         166
R.C. 2929.02                                         166
R.C. 2929.021                                    166-175
R.C. 2929.022                                        166
R.C. 2929.023                                        166
R.C. 2929.03                                     166-175
R.C. 2929.04                                         166
R.C. 2929.05                                     166-177
Robinson v. California (1960), 370 U.S. 660      166,168
Furman v. Georgia (1972), 409 U.S. 238,
    rehearing denied (1972), 409 U.S. 902    166-167,171
Rhodes v. Chapman (1981) 452 U.S. 337                166
Trop v. Dulles (1958), 356 U.S. 86                   166

**TABLE OF CONTENTS**
continued

Coker v. Georgia (1977), 433 U.S. 584 — 167

People v. Anderson (Cal. 1972), 493 P. 2d 880,
cert. denied (1972), 406 U.S. 958 — 168

Woodson v. North Carolina (1976), 428 U.S. 280 — 169,173

Race of the Victim and Location of the Crime:
The Decision to Seek the Death Penalty in
South Carolina, Journal of Criminal Law
and Criminology. (1983) — 169

Commonwealth v. O'Neal (Mass. 1975), 327 N.E. 2d 662 — 169

Roe v. Wade (1973), 410 U.S. 113, rehearing denied
(1973) 410 U.S. 959 — 169

Johnson v. Zerbst (1948), 304 U.S. 458 — 169

Yick Wo v. Hopkins (1886), 118 U. S. 356 — 169

Commonwealth v. O'Neal, II (Mass. 1977), 339 N.E.
2d 1338 — 170

Shelton v. Tucker (1960), 364 U.S. 479 — 170

State v. Dixon (Fla. 1973), 283 So. 2d 1 — 170

State v. Pierre (Utah 1977), 572 P. 2d 1338 — 170

Gregg v. Georgia (1976), 428 U.S. 153 — 170-171

R.C. 2903.01(B) — 171

R.C. 2929.04(A)(7) — 171

State v. Jenkins (1984), 15 Ohio St. 3d 164 — 171

Adamson v. Ricketts (C.A. 9, 1988), 865 F.2d 1011 — 172

Walton v. Arizona (1990), ___ U.S. ___ 110 S. Ct.
3047 — 172

Zant v. Stephens (1983), 462 U.S. 862 — 173,175

Barclay v. Florida (1983) 463 U.S. 939 — 173

Lowenfield v. Phelps (1988), 484 U.S.___, 98
L. Ed. 2d 286 — 173

R.C. 2929.04(A)(7) — 173

R.C. 2903.01(B) — 173

Crim. R. 11(C)(3) — 174

Lockett v. Ohio (1978), 438 U.S. 586 — 174,175

United States v. Jackson (1968), 390 U.S. 570 — 174

Pulley v. Harris (1984), 465 U.S. 37 — 175

State v. Steffen (1987), 31 Ohio St. 3d 111 — 176

R.C. 2929.05(A) — 176

Smith v. North Carolina (1982), 458 U.S. 1056 — 177

Spaziano v. Florida (1984), 468 U.S. 447 — 178

**PROPOSITION OF LAW NUMBER 25:** — 181

THIS COURT CANNOT FIND, PURSUANT TO R.C.
2929.05(A), THAT (1) THE JUDGMENT OF GUILT OF
AGGRAVATED MURDER AND THE SPECIFICATIONS WAS
SUPPORTED BY SUFFICIENT EVIDENCE; (2) THAT THE
AGGRAVATING CIRCUMSTANCES OUTWEIGH THE
MITIGATING FACTORS IN THE CASE; (3) THAT THE

xiii

### TABLE OF CONTENTS
continued

SENTENCE OF DEATH IS APPROPRIATE; (4) THAT THE SENTENCE OF DEATH IS NOT EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES; AND (5) THAT THE TRIAL AND APPELLATE COURTS PROPERLY WEIGHED THE AGGRAVATING CIRCUMSTANCES AND MITIGATING FACTORS. APPELLANT'S DEATH SENTENCE WAS IMPOSED IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT AS ENCOMPASSED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS NINE AND SIXTEEN OF THE OHIO CONSTITUTION.

## Authorities Cited in Proposition of Law No. 25:

| | |
|---|---|
| R.C. 2929.05(A) | 181-184 |
| State v. Eley (1978), 56 Ohio St. 2d 169 | 182 |
| State v. Graven (1978), 54 Ohio St. 2d 114 | 182 |
| Jackson v. Virginia (1979), 443 U.S. 307 | 182 |
| State v. Johnson (1986), 27 Ohio St. 3d 87 | 184 |
| State v. Jenkins (1984), 15 Ohio St. 3d 164 | 184,187 |
| State v. Maurer (1984), 15 Ohio St. 3d 239 | 184 |
| R.C. 2929.04(B)(3), (B)(4), (B)(6) and (B)(7) | 184 |
| Skipper v. South Carolina (1986), 39 Crim. L. Rptr. 3041 | 185 |
| Smith v. Balkcom (C.A. 5, 1981), 660 F.2d 573 | 185 |
| State v. Buell (1986), 22 Ohio St. 3d 124 | 186 |
| State v. Wood (Utah 1982), 648 P.2d 71 | 186 |
| People v. Brown (Cal. 1985), 709 P.2d 440 | 186 |
| Gregg v. Georgia (1976), 428 U.S. 153 | 186 |
| R.C. 2929.05 | 187 |
| State v. Steffen (1989), 31 Ohio St. 3d 111 | 187 |
| State v. Rogers (1985), 17 Ohio St. 3d 174 | 187 |

## TABLE OF AUTHORITIES

**CASE LAW**                                                    **PAGE[S]**

Adamson v. Ricketts (C.A. 9, 1988), 865 F.2d 1011            172

Adan v. State (Fla. 1984), So. 2d 1195                       135

Ake v. Oklahoma (1985), 470 U.S. 68                         131

Alford v. United States (1931), 282 U.S. 687                112

Barclay v. Florida (1983), 463 U.S. 939                     162,173

Beasley v. United States (C.A. 6, 1974), 491 F.2d 687       151

Berger v. United States (1934), 295 U.S. 78                 145

Blackburn v. Alabama (1960), 361 U.S. 199                   62

Booth v. Maryland (1987), 482 U.S. 496                      133,134

Brady v. Maryland (1963), 373 U.S. 83                       115,139

Brewer v. Williams (1977), 430 U.S. 387                     55

Brooks v. Kemp (C.A. 11, 1985), 762 F.2d 1383               134,135,149

Coker v. Georgia (1977), 443 U.S. 584                       167

Colorado v. Connelly (1986), 479 U.S. 157                   62,73

Commonwealth v. O'Neal (Mass. 1975), 339 N.E.2d 676         169

Commonwealth v. O'Neal (1975), 327 N.E.2d 662               172

Cook v. Bordenkircher (C.A. 6, 1979), 602 F.2d 117          144,145

Davis v. Alaska (1974), 415 U.S. 308                        113

Dunaway v. New York (1979), 442 U.S. 200                    80

Duren v. Missouri (1979), 439 U.S. 357                      116,120

Eddings v. Oklahoma (1982), 455 U.S. 104                    133,164,165

Florida v. Royer (1983), 430 U.S. 490                       80

Furman v. Georgia (1972), 408 U.S. 238                      166,167,171

**TABLE OF AUTHORITIES**
continued

Gardner v. Florida (1977), 430 U.S. 349      133

Geders v. United States (1976), 425 U.S. 80      130

Gilday v. Board of Elections, (C.A. 6, 1972),
472 F.2d 214      128,129

Gregg v. Georgia (1976), 427 U.S. 153      170,171,186

Griffin v. Illinois (1956), 351 U.S. 12      129

Hathaway v. Florida (Fla. 1958), 100 So. 2d 622      136

Hayes v. Florida (1985), 470 U.S. 811      80

Henry v. Wainwright (C.A. 5, 1981), 661 F.2d 56
vacated and remanded, 457 U.S. 1114 (1982)      94

In Re Rhymes (Cal. Ct. App. 2d Dist., 1985), 37
Cr. L.Rptr. 2459      121

In Re Thompson (1974), 4 Ohio Op. 3d 359      94

Jackson v. Virginia (1979), 443 U.S. 307      182

Johnson v. Reddy (1955), 163 Ohio St. 347      94

Johnson v. Zerbst (1938), 304 U.S. 458      55,169

Leger v. Warren (1900), 62 Ohio St. 500      94

Lockett v. Ohio (1978), 438 U.S. 586      161,162,164
174,175

Lowenfield v. Phelps (1988), 484 U.S. ____,
98 L.Ed. 2d 286      173

Massiah v. United States (1964), 377 U.S. 201      54

Michigan v. Mosley (1975), 432 U.S. 96      55,73

Miller v. Fenton (1985), 474 U.S. 104      62

Mincey v. Arizona (1977), 437 U.S. 385      61,62

Miranda v. Arizona (1966), 438 U.S. 436      55,76

Moran v. Burbine (1986), 475 U.S. 412      73

xvi

## TABLE OF AUTHORITIES
continued

Nebraska Press Assn. v. Stuart (1976), 427 U.S. 539     125

New York Cent. Rd. Co. v. Public Utilities Commission
(1952), 157 Ohio St. 257     128

People v. Anderson 6 Cal. 3d 638, 100 Cal. Rptr. 152,
493, P.2d 880, cert. denied (1972), 406 U,S. 958     168

People v. Bernasco (Oct. 18, 1990), Ill. No. 69035,
unreported, 1990 WL 155728 (Ill.)     73

People v. Brown (Cal. 1985), 709 P.2d 440     186

People v. Elliot (1960), 54 Cal. 2d 498     124

People v. Harris (1984), 36 Cal. 3d 36, 679 P.2d 443     121

People v. Levitt (Cal. 1984), 156 Cal. App. 3d 500     135

People v. Pratt (1967), 27 App. Div. 2d 199,
278 N.Y.S. 2d 89     124

People v. Ramirez (Ill. 1983), 457 N.E.2d 31     134,136

Philadelphia Newspapers, Inc. v. Jerome (1978),
478 Pa. 484     124

Pointer v. Texas (1965), 380 U.S. 400     112

Powell v. Alabama (1932), 287 U.S. 45     54

Pulley v. Harris (1984), 465 U.S. 37     175

Randolph v. State (Fla. 1984), 463 So. 2d 186     135

Reck v. Pate (1961), 367 U.S. 433     62

Rhode Island v. Innis (1980), 446 U.S. 291     71,72

Rhodes v. Chapman (1981), 452 U.S. 337     166

Roberts (Harry) v. Louisiana (1977), 431 U.S. 633     162

Roe v. Wade (1973) 410 U.S. 113     169

Robinson v. California (1960), 370 U.S. 660     166,168

Ross v. Moffitt (1974), 417 U.S. 600     130

xvii

## TABLE OF AUTHORITIES
continued

Rufer v. State  (1874), 25 Ohio St. 464 — 61

Schneckloth v. Boustamonte (1973), 412 U.S. 218 — 71

Shelton v. Tucker (1960), 364 U.S. 479 — 170

Skipper v. South Carolina (1986), 39 Crim.
L.Rptr. 3041 — 165,185

Smith v. Balkcom (C.A. 5, 1981), 660 F.2d 573 — 185

Smith v. Illinois (1968), 390 U.S. 129 — 112

Smith v. North Carolina (1982), 459 U.S. 1056 — 162,177

Sobolovitz v. Lubric Oil Co. (1923), 107 Ohio
St. 204 — 111

South Carolina v. Gathers (1989), ____ U.S. ____,
109 S.Ct. 2207 — 133

Spano v. New York (1959), 360 U.S. 315 — 54,55

Spaziano v. Florida (1984), 468 U.S. 447 — 178

State v. Abi-Sarkis (1988), 41 Ohio App. 3d 333 — 159

State v. Agner (1972), 30 Ohio App. 2d 96 — 148

State v. Benner (1988), 40 Ohio St. 3d 301 — 101

State v. Brewer (1990), 48 Ohio St. 3d 50 — 135,136

State v. Brown (1982), 7 Ohio App. 3d 113 — 156

State v. Buell (1986), 22 Ohio St. 3d 124 — 186

State v. Burson (1974), 38 Ohio St. 2d 157 — 100

State v. Chase (1978), 55 Ohio St. 2d 237 — 61

State v. Clayton (1980), 62 Ohio St. 2d 45 — 151

State v. Cole (1982), 2 Ohio St. 3d 112 — 150

State v. Cooly (1989), 46 Ohio St. 3d 20 — 155

State v. Curry (1975), 43 Ohio St. 2d 66 — 102,103

xviii

## TABLE OF AUTHORITIES
continued

State v. Davis (1980), 70 Ohio App. 2d 48 — 97

State v. DeMarco (1987), 31 Ohio St. 3d 191 — 99,107,108

State v. Dixon (1973), 283 S.2d 1 — 170

State v. Eley (1978), 56 Ohio St. 2d 169 — 182

State v. Eubank (1979), 60 Ohio St. 2d 183 — 107

State ex. rel. Chillicothe Gazette, Inc. v.
Court of Common Pleas (1982), 2 Ohio St. 3d 24 — 124,125

State ex. rel. Smith v. District Court (1982),
654 P.2d 682 — 131

State ex. rel. Wright v. Morrison (1947), 80
Ohio App. 135 — 129

State v. Fairbanks (1972), 32 Ohio St. 2d 34 — 92

State v. Fickes (March 29, 1985), Trumbell App.
No. 3419, unreported — 80

State v. Flonnery (1972), 31 Ohio St. 2d 125 — 100,101

State v. Gardner (1979), 59 Ohio St. 2d 14 — 100

State v. Graven (1978), 54 Ohio St. 2d 169 — 182

State v. Griffin (1983), 13 Ohio App. 3d 376 — 123

State v. Hester (1976), 45 Ohio St. 2d 71 — 130,151

State v. Hill (March 25, 1982), Franklin App.
No. 81AP-663, unreported — 138

State v. Huertas (1990), 51 Ohio St. 3d 22 — 135

State v. Hutton (April 28, 1988), Cuyahoga App.
No. 51704, unreported — 101

State v. Jenkins (1984), 15 Ohio St. 3d 164,
cert. denied (1985), 473 U.S. ____, 87 L.Ed. 2d — 171,184,187

State v. Johnson (1986), 27 Ohio St. 3d 87 — 184

State v. Johnston (1988), 30 Ohio St. 3d 48 — 139

## TABLE OF AUTHORITIES
continued

State v. Kehoe (1978), Ohio App. 2d 315        122

State v. Logan (1979), 60 Ohio St. 2d 126      154,155,156

State v. Luft (Dec. 26, 1978), Franklin App.
No. 78AP-302, unreported                        141,142

State v. Lyte (1976), 48 Ohio St. 2d 391       151

State v. Manago (1974), 38 Ohio St. 2d 233     144

State v. Maurer (1984), 15 Ohio St. 3d 239,
cert. denied (1985), ____ U.S. ____, 105 S.Ct. 2714    163,184

State v. McDougall (N.C. 1983), 301 S.E.2d 308     162

State of Montana ex. rel. Daniel Paul Smith v.
District Court (1982), 654 P.2d 682               125

State v. Morris (1982), 8 Ohio App. 3d 12      122,123

State v. Muscatello (1977), 57 Ohio App. 2d 231,
254, aff'd 55 Ohio St. 2d 201                   144

State v. Nabozny (1978), 54 Ohio St. 2d 195     151

State v. Petro (1947), 148 Ohio St. 505        158,159

State v. Pierre (Utah 1977), 572 P.2d 1338     170

State v. Post (1987), 32 Ohio St. 3d 380       135

State v. Prater (1983), 13 Ohio App. 3d 98     113,114

State v. Rogers (1985), 17 Ohio St. 3d 174     187

State v. Scarlett (Sept. 3, 1987), Montgomery App.
No. 10378, unreported                           87

State v. Smith (1976), 50 Ohio App. 2d 183     144

State v. Smith (1985), 17 Ohio St. 3d 98       150

State v. Sowell (1988), 39 Ohio St. 3d 322     135

State v. Steffen (1987), 31 Ohio St. 3d 111,
____ U.S. ____, cert. denied 109 S.Ct. 1089     176,187

## TABLE OF AUTHORITIES
continued

State v. Thompson (1987), 33 Ohio St. 3d 1 — 142

State v. Turner (1983), 10 Ohio App. 3d 328 — 157

State v. Ward (Feb. 15, 1983), Franklin App.
No. 82AP-451, unreported — 142

State v. White (1968), 15 Ohio St. 2d 146 — 107

State v. Wood (Utah 1982), 648 P.2d 71 — 162,186

State v. Woodwards (1966), 6 Ohio St. 2d 14 — 141,144

Toledo v. Stuart (1983), 11 Ohio App. 3d 292 — 157

Townsend v. Sain (1962), 372 U.S. 293 — 62

Trop v. Dulles (1958), 356 U.S. 86 — 166

Tucker v. Zant (C.A. 11, 1984), 724 F.2d 882 — 148

U.S. v. Crouder (C.A. 6, 1982), 691 F.2d 280 — 77

U.S. v. Jackson (1968), 390 U.S. 570 — 174

United States v. Geders (C.A. 5, 1978), 566
F.2d 1227 — 96,97

Vela v. Estelle (C.A. 5, 1983), 708 F.2d 954 — 134

Walton v. Arizona (1990), _____ U.S. _____, 110
S.Ct. 3047 — 172

Washington v. Texas (1967), 388 U.S. 14 — 127

White v. State (Okla. Cr. 1983), 674 P.2d 31 — 132

Wilson v. United States (C.A. D.C., 1982),
444 A.2d 25 — 72

Wither v. United States (C.A. 6, 1979), 602
F.2d 124 — 144

Woodson v. North Carolina (1976), 428 U.S. 280 — 133,162
169,173

Yick Wo v. Hopkins (1886), 118 U.S. 356 — 169

## TABLE OF AUTHORITIES
continued

Zant v. Stephens (1983), 462 U.S. 862        162,173,175

**STATUTES:**

| | |
|---|---|
| R.C. 120.16 | 87,88 |
| R.C. 2313.06 | 117,118,119,120,121 |
| R.C. 2313.08 | 116,117,118,119,120,121 |
| R.C. 2903.01 | 166,171,173 |
| R.C. 2905.01 | 166 |
| R.C. 2929.02 | 166 |
| R.C. 2929.021 | 166 |
| R.C. 2929.023 | 166 |
| R.C. 2929.024 | 126 |
| R.C. 2929.03 | 161,163,166,167,168,169, 170,171,172,173,174,175 |
| R.C. 2929.04 | 134,166,171,173,184 |
| R.C. 2929.05 | 166,176,181,182, 183,184,185,187 |
| R.C. 2935.05 | 89,90 |
| R.C. 2935.07 | 89,93 |
| R.C. 2935.14 | 87,88 |
| R.C. 2935.20 | 87,88 |
| R.C. 2935.25 | 154,155,156 |
| R.C. 2941.25 | 122 |
| R.C. 2945.59 | 98,99,100 101,102,103,104 |

## TABLE OF AUTHORITIES
continued

**MISCELLANEOUS:**

ABA Standards Relating to the Prosecution Function
5.1 et seq.                                                      145

ABA Standards Relating to the Prosecution Function
and the Defense Function (1971)                                  151

Crim. R. 11                                                122,174

Crim. R. 16                                            138,139,140

Crim. R. 23                                                    122

Crim. R. 33                                                    157

Evid. R. 401                                                   106

Evid. R. 403                                               103,106

Evid. R. 404                                         98,99,132,133

Jury System of the Eighties:  Toward a Fairer
     Cross-Section and Increase Efficiency,
     Dogin and Trevelin, Toledo L. Rev. 944
     (1980)                                                    116

Jury Representatives: "A Mandate for Multiple
     Source Lists," Kairys, Kadane, and Lehoezky,
     64 Cal. L.Rev. 776 (1977)                                 117

IV Center for Jury Studies Newsletter 6 (No. 1982)
     of the National Center for State Courts                   121

xxiii

## PROPOSITIONS OF LAW

### PROPOSITION OF LAW NUMBER 1:

AN ACCUSED'S RIGHT TO COUNSEL IS VIOLATED WHEN HE IS DEPRIVED OF COUNSEL FOR CUSTODIAL INTERROGATION WHEN HE DOES NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY RELINQUISH A KNOWN RIGHT DUE TO THE MISCONDUCT OF LAW ENFORCEMENT AUTHORITIES AND THE ACCUSED BEING MENTALLY RETARDED IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS OF THE OHIO CONSTITUTIONS.

### PROPOSITION OF LAW NUMBER 2:

AN ACCUSED'S STATEMENTS ARE NOT VOLUNTARY WHEN SUCH STATEMENTS WERE COERCED BY THE PSYCHOLOGICAL TACTICS OF LAW ENFORCEMENT OFFICERS ON A RETARDED INDIVIDUAL WHO WAS ESSENTIALLY ILLITERATE AND THE ADMISSION OF SUCH STATEMENTS VIOLATES THE DUE PROCESS CLAUSES OF BOTH THE OHIO AND UNITED STATES CONSTITUTIONS.

### PROPOSITION OF LAW NUMBER 3:

AN ACCUSED'S STATEMENTS ARE NOT ADMISSIBLE UNLESS THE STATE ESTABLISHES THAT THE PROCEDURAL SAFEGUARDS CONTINUED IN THE MIRANDA WARNINGS WERE PROPERLY GIVEN OR KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED AS PROVIDED UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PORTION OF THE OHIO CONSTITUTION.

### PROPOSITION OF LAW NUMBER 4:

AN ACCUSED'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS UNDER THE OHIO CONSTITUTION ARE VIOLATED WHEN AN ACCUSED IS SEIZED FROM HIS HOME THROUGH THE USE OF PSYCHOLOGICAL PLOYS BY LAW ENFORCEMENT OFFICERS UPON AN ACCUSED WHO IS MENTALLY RETARDED AND ESSENTIALLY ILLITERATE.

**PROPOSITION OF LAW NUMBER 5:**

AN ACCUSED IS DENIED HIS RIGHT TO DUE PROCESS UNDER BOTH THE OHIO AND UNITED STATES CONSTITUTIONS WHEN HE IS DENIED HIS STATUTORY RIGHT TO COUNSEL PURSUANT TO R.C. 120.16, 2934.14 AND 2935.20.

**PROPOSITION OF LAW NUMBER 6:**

NONCOMPLIANCE WITH R.C. 2935.05 RESULTS IN AN ILLEGAL ARREST, AND ANY STATEMENTS AND/OR EVIDENCE DERIVED THEREFROM SHOULD BE SUPPRESSED.

**PROPOSITION OF LAW NUMBER 7:**

WHEN STATEMENTS ARE MADE BY AN ACCUSED TO LAW ENFORCEMENT OFFICERS UNDER THE IMPRESSION OF RECEIVING LENIENCY OR SOME OTHER BENEFIT, THEN THOSE STATEMENTS ARE INADMISSIBLE IN ANY LATER TRIAL.

**PROPOSITION OF LAW NUMBER 8:**

THE ADMISSION OF OTHER CRIMES, WRONGS, OR ACTS, INTO EVIDENCE BY THE TRIAL COURT VIOLATED R.C. 2945.59 EVID. R. 404(B) AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION TO THE PREJUDICE OF THE APPELLANT THUS REQUIRING REVERSAL.

**PROPOSITION OF LAW NUMBER 9:**

A TRIAL COURT MUST EXCLUDE EVIDENCE THAT IS EITHER NOT RELATIVE OR ITS RELEVANCE IS OUTWEIGHED BY ITS PREJUDICIAL EFFECT OR SUCH EVIDENCE IS SOLELY INTRODUCED TO INFLUENCE THE COURT.  THE EFFECT OF THE ERRONEOUS EVIDENTIARY RULINGS WAS THE DENIAL OF APPELLANT'S RIGHT TO DUE PROCESS AND FAIR AND IMPARTIAL TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NUMBER 10:**

AN INFERENCE OF FACT CANNOT BE PREDICATED UPON ANOTHER INFERENCE, BUT MUST BE PREDICTED UPON A FACT SUPPORTED BY LAW. <u>SOBOLOVITZ</u> V. <u>LUBRIC OHIO CO</u>. (1923). 107 OHIO ST. 204. IT IS ERROR FOR A TRIAL COURT TO DRAW AN INFERENCE FROM ANOTHER INFERENCE BECAUSE THE FOUNDATION OF THE SECOND INFERENCE IS SO INSECURE THAT RELIANCE UPON IT WOULD RESULT IN AN INFERRED FACT WHICH IS MERELY SPECULATIVE IN NATURE.

**PROPOSITION OF LAW NUMBER 11:**

AN ACCUSED'S RIGHT TO CONFRONTATION IS VIOLATED WHEN A PROSECUTOR CONSULTS WITH AN IMPORTANT WITNESS WHILE THAT WITNESS WAS SUBJECT TO RECALL AND WAS A SURPRISE WITNESS OF WHICH DEFENSE COUNSEL HAD NO PRIOR KNOWLEDGE.

**PROPOSITION OF LAW NUMBER 12:**

IT IS A DENIAL OF AN ACCUSED'S RIGHT TO A FAIR CROSS-SECTION OF THE COMMUNITY TO DENY A REQUEST FOR INCLUSION IN THE POOL OF PROSPECTIVE JURORS LICENSED DRIVERS PURSUANT TO R.C. 2313.08(B) IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION TEN OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NUMBER 13:**

IT IS A VIOLATION OF AN ACCUSED'S RIGHT TO JURY TRIAL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION WHEN THE COURT DOES NOT DETERMINE ON THE RECORD, SPECIFICALLY ADDRESSING AN ACCUSED, WHETHER HE HAS KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED HIS RIGHT TO A JURY TRIAL.

**PROPOSITION OF LAW NUMBER 14:**

IT IS REVERSIBLE ERROR FOR A TRIAL COURT TO DENY AN ACCUSED FUNDS NECESSARY TO EMPLOY AN EXPERT FOR PURPOSES OF A MOTION FOR CLOSURE OF PRE-TRIAL HEARING THAT WAS NECESSARY TO PRESERVE A FAIR AND IMPARTIAL JURY PURSUANT TO THE FIFTH, SIXTH AND FOURTEENTH AMENDMENT, OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 10 AND 16 AND ARTICLE II, SECTION 26.

**PROPOSITION OF LAW NUMBER 15:**

A TRIAL COURT ERRS AND ABUSES ITS DISCRETION IN ADMITTING A PRE-DEATH PHOTOGRAPH OF THE VICTIM. SUCH ERROR VIOLATES APPELLANT'S RIGHTS UNDER EVID. R. 404, THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NUMBER 16:**

WHEN THE STATE REPEATEDLY FAILS TO COMPLY WITH CRIM. R. 16, IT IS VIOLATING AN ACCUSED'S RIGHT TO A FAIR TRIAL AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

**PROPOSITION OF LAW NUMBER 17:**

IT IS AN ABUSE OF DISCRETION FOR A TRIAL COURT TO ALLOW INTO EVIDENCE PHOTOGRAPHS OF THE VICTIM BECAUSE SUCH PHOTOGRAPHS WERE HIGHLY PREJUDICIAL, GROSS, AND UNNECESSARY AND WHICH LACKED PROBATIVE VALUE IN DETERMINING THE ISSUES INVOLVED. THEIR ADMISSION VIOLATED THE APPELLANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NUMBER 18:**

PROSECUTORIAL MISCONDUCT DURING BOTH THE GUILT AND MITIGATION PHASE OF CLOSING ARGUMENTS DENY AN ACCUSED HIS RIGHT TO A FAIR TRIAL AND AN IMPARTIAL FACT-FINDER AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NUMBER 19:**

WHEN THE ISSUE OF EFFECTIVE ASSISTANCE OF COUNSEL IS RAISED THAT INVOLVES MATTER BOTH WITHIN THE RECORD AND OUTSIDE THE RECORD THE PROPER AVENUE FOR REVIEWING THAT ISSUE SHOULD BE ON POST-CONVICTION RELIEF EVEN IF COUNSEL ON APPEAL IS NOT TRIAL COUNSEL. THE ACCUSED'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NUMBER 20:**

THE TRIAL COURT ERRED IN ENTERING A JUDGMENT OF CONVICTION FOR KIDNAPPING AND THE OTHER FELONIES WHERE CONVICTIONS ON BOTH OFFENSES ARE CONTRARY TO R.C. 2941.25. SECONDLY, WHERE AN UNDERLYING FELONY COUNT WHICH IS ALSO USED AS A SPECIFICATION FOR AGGRAVATED MURDER MERGES, THEN IT CANNOT BE CONSIDERED AS AN ADDITIONAL SPECIFICATION FOR SENTENCING PURPOSES.

**PROPOSITION OF LAW NUMBER 21:**

A MOTION FOR NEW TRIAL SHOULD NOT BE DENIED WITHOUT A FULL HEARING WHEN MADE PURSUANT TO CRIM. R. 33. A DENIAL OF SUCH A HEARING AND THE MOTION VIOLATES AN ACCUSED'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION AND CRIM. R. 33.

**PROPOSITION OF LAW NUMBER 22:**

OHIO'S MANDATORY SENTENCING SCHEME PREVENTED THE PANEL OF THREE JUDGES FROM DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT IN VIOLATION OF APPELLANT'S RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION NINE AND SIXTEEN OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NUMBER 23:**

THE FAILURE TO CONSIDER ALL OF THE EVIDENCE IN SUPPORT OF MITIGATING A DEATH SENTENCE VIOLATES R.C. 2929.03(F) AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**PROPOSITION OF LAW NUMBER 24:**

THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 2,9,10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION ESTABLISH THE REQUIREMENTS FOR A VALID DEATH PENALTY SCHEME. OHIO REVISED CODE SECTIONS 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 AND 2929.05, OHIO'S STATUTORY PROVISIONS GOVERNING THE IMPOSITION OF THE DEATH PENALTY, DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL, BOTH ON THEIR FACE AND AS APPLIED TO APPELLANT.

**PROPOSITION OF LAW NUMBER 25:**

THIS COURT CANNOT FIND, PURSUANT TO R.C. 2929.05(A), THAT (1) THE JUDGMENT OF GUILT OF AGGRAVATED MURDER AND THE SPECIFICATIONS WAS SUPPORTED BY SUFFICIENT EVIDENCE; (2) THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE MITIGATING FACTORS IN THE CASE; (3) THAT THE SENTENCE OF DEATH IS APPROPRIATE; (4) THAT THE SENTENCE OF DEATH IS NOT EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES; AND (5) THAT THE TRIAL AND APPELLATE COURTS PROPERLY WEIGHED THE AGGRAVATING CIRCUMSTANCES AND MITIGATING FACTORS. APPELLANT'S DEATH SENTENCE WAS IMPOSED IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT AS ENCOMPASSED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS NINE AND SIXTEEN OF THE OHIO CONSTITUTION.

## STATEMENT OF THE CASE

On January 31, 1986, the Appellant, Danny L. Hill, was convicted by a three-judge panel of aggravated murder with death penalty specifications of kidnapping, rape, and aggravated arson. In addition, he was convicted of kidnapping, rape, aggravated arson, and felonious sexual penetration. The three-judge panel sentenced the Appellant to death on the aggravated murder with death penalty specifications as well as an indefinite period of ten (10) to twenty-five (25) years on the kidnapping count, a determinate period of life on the rape count, an indeterminate period of ten (10) to twenty-five (25) years for aggravated arson, and a determinate period of life on the charge of felonious sexual penetration.

These convictions were affirmed by the Eleventh District Court of Appeals including the death sentence on November 27, 1989. Appellant timely filed his appeal on December 27, 1989 in the Eleventh District Court of Appeals.  He subsequently filed that notice with this Court on January 26, 1990.

The Appellant is now before this Court seeking reversal of the Court of Appeals and Trial Court and urging a new trial. Alternatively, the Appellant is requesting that the sentence of death be set aside and a life sentence by imposed.

2

## STATEMENT OF THE FACTS

Since R.C. 2929.05 provides that this Court must independently weigh all of the facts and other evidence presented in this case to determine whether or not a sentence of death is appropriate under the standards set forth in the statute, a full summary of the transcript is given herein.

## PRE-TRIAL SUPPRESSION

On December 16, 1985, a pre-trial hearing was held on the Appellant's motion to suppress statements he allegedly made to law enforcement officers, orally, on cassette tape, and by videotape.

Sergeant Thomas Stewart of the Warren Police Department testified that the Appellant voluntarily came down to the police station on September 12, 1985, at approximately 7:00 p.m. to discuss information he had on the Raymond Fife homicide.  Stewart had known the Appellant since he was about six years old because his former partner of eleven years, Morris Hill, was the Appellant's uncle.  Appellant stated he had left home on the night in question at approximately 7:00 p.m.  Appellant indicated that he saw Maurice Lowery riding on the bicycle owned by the victim.  He described the bicycle as having rub wheels on it, but could not remember the color.  Also, Sergeant Stewart testified that the Appellant talked about some of the details of the case; however, the only specific item mentioned in the summary of the oral statements given by the Appellant was the fact that the shorts were tied in a knot and were around the victim's throat.  While the Appellant mentioned several possible names in connection with this

3

case, it was Sergeant Stewart who brought up the name of Tim Combs.
Stewart was unable to find the bicycle. Stewart dropped the
Appellant
off at home about 8:20 p.m. A couple of hours subsequent to this
interview, Stewart summarized the Appellant's statement in writing
consisting of two pages, which he gave to Sergeant Steinbeck later
that evening.

At the time Stewart encountered the Appellant, his information
concerning the homicide was limited. He had been to the crime
scene on September 10, 1985, with Lieutenant Fisher. He talked to
the ambulance driver, who told him the victim had been badly beaten
up. Stewart did not personally observe the body, or talk to any of
the other officers at the scene.

Sergeant Stewart next encountered the Appellant the following
Monday, September 16, 1985, at approximately 10:45 a.m. in an
interrogation room at the police station. Detective Morris Hill
and Sergeant Dennis Steinbeck were with him in an interrogation
room. Steinbeck arranged to get the Appellant some food from the
jailer and briefly talked to Vera Williams, the Appellant's mother.
Stewart was in the room with Sergeant Steinbeck questioning the
Appellant in regard to a statement given on the previous Friday in
which the Appellant had not indicated his involvement in the crime.
However, certain inconsistencies had arisen between what the police
had found out over the intervening weekend regarding the Appellant
being in the neighborhood and the statement he had given on Friday.
Hill and Steinbeck were in the room with the Appellant. He was not

4

talking to them.

The interrogation room was six by six to seven by seven feet. There were no windows or one way mirrors. There was a door, but no communication was allowed to the outside. The door can be locked. Appellant would not talk to Stewart when he entered the room with Hill.

Thereafter, the Appellant was left alone with Detective Hill in the interrogation room with the door shut. A short time later, Detective Hill emerged from the room and stated that the Appellant had admitted being at the scene. Until this time, the Appellant had maintained that he had no involvement with the homicide nor gave any incriminating statements. He continually portrayed his usual demeanor. However, both Steinbeck and Stewart indicated that when they returned to the interrogation room, they found the Appellant crying and visibly upset. At this point, Stewart proceeded to take a tape recorded statement. During the statement, Detective Hill returned to the interrogation room where an off the tape discussion was held. Hill had brought a rights waiver sheet with him. It was decided, evidently by Detective Hill, to make sure what the Appellant's rights were. Detective Hill then read the Appellant his rights (as evidenced by Exhibit 3) and the Appellant signed a waiver at 11:55 a.m. The waiver was read thirty-five minutes after the tape recording commenced. Stewart indicated that the Appellant appeared normal.

At this time, Stewart did not recall any additional wording which began with, "Further, I have been advised I am not under

5

arrest . . ."; however, the language did not appear on the tape. Stewart identified Exhibit 3 as the "old" rights waiver sheet which did not include this additional language noted above. Stewart identified Exhibit 3 as the rights waiver sheet he saw Detective Hill read to Appellant, Appellant looked at and read for himself, the one Appellant signed, and the one that he had witnessed. At the end of the tape recorded statement, Stewart informs the Appellant that while he does not know what charges would be filed, Stewart implied truthful cooperation would be better. Then they asked the Appellant for the videotaping. During this entire time, David Watkins, the County Prosecutor, was present at the station in another room. The videotaping may have been discussed with the prosecutor at this time.

Later, upon being recalled to the stand on Wednesday, December 18, 1985, Sergeant Stewart admitted that he was mistaken, and that was the Appellant's Exhibit "D", a rights waiver sheet that was only located the afternoon before this portion of his testimony, that was actually read to the Appellant and which the Appellant signed, and Stewart witnessed. This "new" rights waiver sheet did include the additional language above. Basically, upon Stewart's initial testimony, there were not two rights waiver sheets, but only one rights waiver sheet which was identified as State's Exhibit 3.

The Appellant was informed after the taped statement was completed around 12:30 p.m. that he was being detained. At no time, did either the Appellant or his mother request an attorney.

6

Appellant's mother only stated to Appellant, "tell them the truth."

Around 2:00 p.m. a videotaped statement was taken, which lasted just over an hour. Four officers were present during the taping and the Appellant's rights were again read to him. Afterwards, Stewart searched Appellant's house. Stewart obtained a permissive search wavier signed by Appellant's mother. Stewart found a pair of grey trousers in the bathroom. He brought the trousers as well as several pairs of underwear and a pair of socks back to the station. Stewart gave them to Detective Teeple, who was in charge of all the physical evidence. Then, the detectives took the Appellant out to the scene of the homicide.

At the scene, the Appellant indicated the trail of the victim on his bicycle, where the victim tried to get away, and where Appellant thought the body last was located. Appellant also showed where Tim Combs obtained the lighter fluid. Appellant seemed cooperative, and at no time did he ask for an attorney.

On September 19th, a search warrant was requested for blood samples, saliva samples, dental impressions, and photographs of the Appellant's mouth and teeth. The reviewing magistrate limited the warrant to the dental impressions and photographs. This warrant was served and the evidence gathered.

Sergeant Dennis Steinbeck testified that his first involvement with the case was on the first night when he took the initial missing person's report. He did not come into contact with the Appellant until Friday, September 13th. Steinbeck indicated that upon reviewing the note from Sergeant Stewart regarding information

7

from the Appellant from the previous evening, Steinbeck decided to further question the Appellant.  On Friday morning, approximately 8:30 or 9:00 a.m., Steinbeck knocked on the door of the residence, received no response, but then, Appellant responded from the second story bedroom window.  Steinbeck claimed that the Appellant was willing to go downtown with him upon his request.  Appellant got in the front passenger side of the cruiser and was not handcuffed. Later, he was not booked or fingerprinted.

Once downtown, Appellant was placed in a small interrogation room.  Appellant was in that particular room and interviewed by Steinbeck for approximately four hours.  The starting time for the statement taken from the Appellant was approximately 1:15 p.m. and the ending time was 2:00 p.m.  In addition, there is a rights waiver sheet with a time 10:10 a.m., which would indicate that the interrogation started at or near that time.  Steinbeck indicated that he read the Appellant his rights from a form and asked Appellant to read it.  The Appellant, evidently, had the form in his hand, was looking at it, then signed his name.

A short time after the statement was completed, the Appellant's mother arrived at the police station.  She informed Steinbeck that the Appellant was at home asleep until approximately 7:00 p.m., which was consistent with what the Appellant had just informed him.  Thereafter, Steinbeck allowed the Appellant to go home with his mother.  However, the statement that was made was not signed by the Appellant.

On Monday, September 16, 1985, Detective Hill was assigned to

8

the case to assist Steinbeck in picking up the Appellant.  The
purpose for going to Appellant's residence to pick him up was
two-fold:  first, to obtain the Appellant's signature on the
statement he made Friday; and, secondly, to have the Appellant's
mother come down and make a formal statement.  However, under
cross-examination, Steinbeck also indicated that they wanted to
further question the Appellant.  In fact, at no time, was a formal
statement taken from the Appellant's mother.  She was moved from
room to room within the police department.  In addition, the
Appellant signed his Friday statement very early upon his arrival
that morning.

Detectives Steinbeck and Hill went to the Appellant's house
and picked up the Appellant around 9:30 - 10:00 a.m. that Monday
morning.  Appellant told his mother that he did not want to go, but
she told him he had to go.  Both the Appellant and his mother were
taken to separate interview rooms.  The Appellant was orally
advised of his rights by Detective Hill.  During this
interrogation, Detective Hill left the room and Sergeant Stewart
came into the room at approximately 10:45 a.m.  Steinbeck and
Stewart continued to question the Appellant in regard to the
statement he had given on Friday and some inconsistencies that
appeared to exist because of some statements that the police
obtained from Troy Cree, Darren Ball, David Hunter, and Donald
Allgood, all of which or some of which placed the Appellant near
the scene of the crime at approximately 3:30 to 6:00 p.m. on
Thursday, September 10, 1985.

Thereafter, Detective Hill returned, and at some juncture Stewart and Steinbeck left the room. Detective Hill was left alone with the Appellant with the door closed. Again, Steinbeck agrees with Stewart that Detective Hill was in the interrogation room alone with the Appellant a little while or maybe a few minutes; however upon their return, the Appellant was crying and was visibly upset which was not the Appellant's condition when they left the room. Upon Detective Hill's exiting the room, he indicated that the Appellant admitted being there and that they (meaning Steinbeck and Stewart) should go ahead and further question him. At that juncture, a tape record was brought into the room and they proceeded to tape the Appellant's statements in regard to the homicide. Subsequent to the taped statement, a video-taped statement was taken in the line-up room. The Appellant was again advised of his rights. The video taped statement lasted up until 2:38 p.m.

Steinbeck had known the Appellant since he was twelve. He has arrested the Appellant before as a juvenile and on occasion had the opportunity to read his rights to him. He believed the Appellant had normal intelligence, and was not under the influence of drugs or alcohol.

Detective Hill, the Appellant's uncle, testified that originally he was not assigned to the homicide, however, he was assigned to this case on Monday morning, September 16, 1985. He had known the Appellant all of his life, and indicated that to his knowledge, the Appellant could read and write. However, until

10

Appellant got into some juvenile trouble, Detective Hill admitted
that he never spent much time with him.  Also, he described him as
fairly intelligent.  Detective Hill is the brother of Appellant's
mother.  He has arrested his nephew on numerous occasions in the
past and has advised him of his rights during some of those
occasions.

Detective Hill stated that he went with Detective Steinbeck to
the Appellant's house.  At that time, Detective Hill indicated that
the Appellant did not want to come to the station.  He was able to
convince his sister that all they wanted her son for was to sign
his Friday statement and that they were going to take a statement
from her.  In actuality, the real motive was to get the Appellant
downtown for further questioning.

Detective Hill also testified that when the Appellant was a
juvenile, approximately a year or a year and a half earlier, the
Appellant was allegedly involved in the break-in of the Detective's
ex-wife's house and his mother's house.  After his arrest and
transportation to the police station, Detective Hill admitted that
he physically beat the Appellant.  He indicated this was at the
direction of the Appellant's mother.  He also stated that he would
not do that now because the Appellant is an adult.

According to Detective Hill, he was left alone in the room
with the Appellant at the Appellant's request.  Detective Hill told
the Appellant that he should tell the truth and not be afraid
because no one was going to harm him.  At that point, the Appellant
broke down and admitted that he had been at the scene of the

11

homicide.  Detective Hill then left the room and indicated to
Steinbeck and Stewart to obtain a statement.  Thereafter, the tape
recorded session was started.  During this taping, Detective Hill
returned and had a discussion with Steinbeck and Stewart, and they
decided to give the Appellant his rights.

Officer James Teeple testified to the accuracy and
authenticity of the video tape recording that was placed in
evidence, as well as a copy of the tape recorded statement of the
Appellant taken earlier that Monday.

Attorney Dennis Watkins, County Prosecutor for Trumbull
County, testified that on Sunday, September 15, 1985, he went to
the Warren Police Department to consult with some officers
concerning the progress that was being made in the investigation.
At that time, he met with maybe eight or nine officers, reviewed
the evidence that had been gathered until that point, reviewed
potential suspects and reviewed any statements from witnesses
concerning the Appellant.  Mr. Watkins told Sergeant Steinbeck to
have the Appellant sign his Friday statement.  The Appellant was
certainly a suspect, and should be further interrogated about this
case and by officers that knew him.

Vera Williams, the Appellant's mother, testified that on
Friday, September 13, 1985, she went to the Warren Police
Department after learning her son was there.  Upon her arrival, she
asked her brother, Detective Hill, why the Appellant was at the
station.  He informed her that the Appellant was being questioned
concerning the Fife homicide.  Detective Hill said that Appellant

12

was not involved, and the police just wanted his testimony. About one hour later, the Appellant was allowed to go home with his mother. Ms. William did state to the police that her son was at home asleep until 7:00 p.m. on the night in question.

On the following Monday, while Ms. Williams was returning from the store, she observed Detectives Hill and Steinbeck. Detective Hill asked her if she wanted to have a ride home which was refused. After her arrival at home, Hill and Steinbeck knocked on her door. At this juncture, Steinbeck indicated that he wanted the Appellant to come down to the station for further questioning. However, the Appellant refused to go. At this point, Detective Hill indicated to his sister that they needed to take her statement that she had given to Detective Steinbeck the previous Friday and have the Appellant sign his Friday statement. Ms. Williams told the Appellant he had to go with the police officers.

Upon arriving at the station, the Appellant was placed in one interrogation room, while his mother was placed in the next room. Ms. Williams indicated that she could hear loud voices in the room where the Appellant was, and she could recognize the voices of Detectives Hill and Steinbeck talking to her son in loud and raised voices. After Ms. Williams was left alone for some time in the interrogation room, she became concerned about her son. She left the room on her own and went to the interrogation room where the Appellant was located. She unlocked the door and went inside. Once inside, she observed her brother, Detective Hill, with his head down. She asked what the officers were doing with her son.

13

At that point, Detective Hill just indicated that they were going over the statement that the Appellant had given on Friday and that they would be finished in a little while longer. They then escorted Ms. Williams out of the room and placed her in another interrogation room further away from the interrogation room in which her son was being held.

Later, after the taped recorded statement, but before the video taped statement, Ms. Williams asked Detective Hill should she secure the services of an attorney since Detective Hill was indicating that they were going to hold the Appellant. At that point, Detective Hill replied that she should not pay for the services of an attorney, since the Court would appoint an attorney for the Appellant when he goes to Court in regards to the matters for which he was being held. At this time, Ms. Williams was not told of the actual charges for which he was being detained.

James L. Freeman, the supervisor of attendance for the Trumbull County School systems, testified Exhibit "B" was the permanent record card which includes the official transcript from Goddard High School in Columbus progress report for ninth grade and school year 1983/84, records from Brinkhaven, and all other records of the Appellant from kindergarten through seventh grade and part of ninth grade. The records indicated that his ninth grade grades were all failures. The records further indicated that the Appellant had been in special education classes since first grade. The Appellant had had four separate intelligence tests given during this period on which he scored 70 in 1973; 62 in 1975; 49 in 1980;

14

and 63 in 1982. These results placed the Appellant's abilities within the educable mentally retarded range.

The Appellant testified that sometime between 8:30 a.m. and 9:00 a.m. on Friday, September 13, 1985, Detective Steinbeck came to his house waking him up. At that time, the Appellant told the detective, through an upstairs window, that he did not want to go to the police station for any further questioning. Detective Steinbeck then simply ordered the Appellant to put his clothes on, come downstairs, and go to the police station, The Appellant complied because he does what the police order him to do. Upon his arrival at the police station, the Appellant was placed in one of the interrogation rooms and interrogated by Detective Steinbeck. (According to the rights waiver sheet entered as a State's Exhibit, and the testimony of Detective Steinbeck, the Appellant may have originally been placed in the interrogation room at approximately 10:00 a.m., and a statement later taken from Appellant which commenced at approximately 1:15 p.m. and last until 2:00 p.m.) The Appellant stated that he was in the interrogation for approximately three hours during which time he tried to leave but the door was locked. The Appellant also stated that he told Steinbeck that he wanted to leave.

Although Appellant was shown a Constitutional rights waiver form allegedly read and shown to the Appellant on September 13, 1985, at 10:10 a.m. (Exhibit 9), the Appellant did not recognize the substance of the form; however, he did recognize what appeared to be his signature. In addition, although the Appellant could not

15

read or recognize the typewritten statement prepared by Detective
Steinbeck, allegedly on September 13, 1985, the Appellant did not
recognize that it appeared to have his signature on the form.
Concerning questions about his constitutional rights, the Appellant
was asked the meaning of Constitutional, voluntary, knowingly, and
other related words, and did not recognize, understand, or know the
meaning of those words.

The Appellant further testified that on Monday, September 16,
1985, he was asleep in his room when he was told by his mother to
put some clothes on and go downtown with Detectives Hill and
Steinbeck. The Appellant told them he did not want to go downtown,
and that he had said all he wanted to the detectives on Friday.
Upon his arrival downtown, he was placed in an interrogation room.
The Appellant was under the impression that his mother was coming
down to sign a statement.

Detective Steinbeck initiated the questioning concerning Tim
Combs who was charges as a co-defendant. He was yelling at the
Appellant. Later, Detective Hill came into the interrogation room
and as the door swung open he hit the Appellant in the back of the
head. The Appellant jumped up as if to "swing" when Detective Hill
threw him against the wall. Detective Hill threatened him and
slapped him across the face. Afterwards, he told the police what
they wanted to hear. Later, Detective Teeple put some papers in
front of the Appellant and told him to sign, which he did. When
asked why he talked to the police, the Appellant stated because you
have to talk to them. He stated he did not even know what an

16

attorney is.

During cross-examination, the Appellant admitted to being at the station before and that it was his signature on certain documents (previous rights waiver sheets) but that he does not remember them. The Appellant also indicated he could not recall certain events regarding the tape recording or the video tape; however, when shown the particular videotape, he did not deny that what was said on the tape was actually said at the time by him.

Dr. Nancy Schmidtgoessling, a highly qualified clinical psychologist, examined the Appellant at great length giving him a battery of tests. Dr. Schmidtgoessling testified that she gave the Wechler Intelligence Test to the Appellant and that his total I.Q. score was 68. This score places the Appellant in the mild range of mental retardation, which means his score would be below ninety-eight to ninety-nine percent of the population at large. On every verbal subtest, the Appellant's score fell within the retarded range with his greatest weakness being practical judgment. As for that subtest, the Appellant was moderate retarded.

Dr. Schmidtgoessling also gave further subtests. They showed that the Appellant's general fund of knowledge, his vocabulary, ability to calculate, ability to draw similarities (which is a characteristic of abstract thought), and his immediate recall where all in the mild range of retardation. The Appellant also could not tell the difference between what is essential and what is not essential.

In the area of academic testing, the Appellant tested below

17

.03. This score means that the Appellant's grade equivalent is below third grade. Unfortunately, the test cannot measure below this level even though the Appellant does fall below this level. A review of his educational records are entirely consistent with this finding. His words recognition was also extremely poor. The underlying causes for this problem were numerous with motivation being a factor. However, since the frustration of inability increased as the Appellant grew older, his motivation obviously would decrease. However, the Appellant was not a malingerer.

Dr. Schmidtgoessling indicated that the Appellant could not read nor recognize a substantial majority of the words on the Constitutional Rights and Waiver form. She further testified that she tested the Appellant in regard to verbal word recognition and discovered that he did not recognize, nor could understand the meaning of a substantial majority of the words that were found in the Constitutional Rights and Waiver form. For example, the word "Constitutional" is understood by the Appellant to mean institution, being the place where the Appellant was placed in Columbus as a juvenile sometime in the past.

Finally, Dr. Schmidtgoessling also determined that if the Appellant were made to understand in the most simplest terms, i.e., his constitutional rights, the Appellant's prior conditioning and image of the police and their authority would override anything that he would understand. For example, in simple terms, she explained that if anybody were to talk to the Appellant that he was to "shut up" and not talk to them. However, she did ask the

18

Appellant if a police officer came to talk to him, would Appellant talk to the police officer. The Appellant, without hesitation, indicated he would go ahead and talk to the police officer, simply because the man would be a police officer, and people have to talk to a police officer.

In a written opinion, the trial Court overruled the motion to suppress statements.

<u>GUILT PHASE</u>

The trial of this case commenced on January 21, 1986, in front of a three judge panel.

The State's first witness was the Appellant's seventeen year old brother, Robert Vaughn, who testified that he saw his brother washing a pair of grey pants on Tuesday night as well as Wednesday and Thursday evening in the upstairs bathroom. He stated that the Appellant was washing out something red, like blood, using a scrub board. On cross-examination, the Appellant's brother admitted the Appellant owned three such pairs of pants and he could not be sure if these were the same pants he saw that night. In addition, the witness also washed his pants in the same manner as they did not have a washer or dryer. He also conceded that the substance could have been many other things other than blood.

Miriam Fife, the deceased's mother, testified that her son returned from school at 2:35 p.m. on that Tuesday. Her son had a boy scout meeting at the Second Christian Church scheduled for 6:30 p.m., but after eating dinner, he set off on his bicycle at 5:15 to see is friend Billy Simmons. The trip normally took seven to ten

19

minutes to complete. However, Billy Simmons came over to the Fife residence about 6:10 p.m. He had not seen the deceased. On his way to the Fife residence he only saw one person, but did not know who it was. When the deceased left home, he was wearing grey striped silky shorts, a black T-shirt with Wrangler written on it, white sports socks, and baseball tennis shoes. The police were called at 8:00 p.m., and the body was discovered at 9:30 p.m.

Raleigh C. Hughes, an emergency medical technician received a phone call from the Warren Fire Department to go to 1821 Jackson Street, S.W., at approximately 9:30 p.m. Upon arrival, numerous civilians were with the body and the area had been trampled down. The boy was non-responsive to treatment and his breathing was heavily labored. He had vomited all over himself, though the boy's father had wiped up most of it. He was naked from the waist down with signs of burns on his right cheek. There were numerous other injuries to the body including the groin area being swollen and the rectum area torn. The technician did not notice any scratching on the left cheek. The boy was treated at the scene and taken to the hospital. Mr. Raleigh also indicated that he returned to the scene the next day to assist in locating the missing bicycle. There were approximately one hundred people searching the area the next day.

Thomas Skoczylas, a patrolman for the Warren Police Department, arrived at the scene that night at approximately 9:40 p.m. The body was located about two hundred forty to three hundred feet from the corner of the Value King in an area of high weeds which had been trampled down. It was also raining that night.

20

Officer Skoczylas noticed a pair of jockey underwear, a black
T-shirt around the throat area, and a pair of socks on the boy,
otherwise he was naked. The underwear and T-shirt appeared burned,
but there was no burn area underneath the body.

James Teeple, a Warren police officer from the crime scene
search unit, received a bag from Sergeant Steinbeck which contained
the underwear and black T-shirt that had been previously collected.
Detective Teeple transported these items to the Bureau of Criminal
Investigations (BCI), where BCI technicians were unable to check
for accelerant. These items were forwarded to a laboratory in
Columbus where they tested negative for accelerant.

Detective Teeple went to the hospital that night and arranged
for a rape kit to be administered. Due to the lateness of the
hour, and the bad weather, he was unable to examine the scene that
night. The next day, the detective took pictures and examined the
scene. At the scene, Teeple found a blue handkerchief, (which the
deceased's father had left there), medical apparatus, bits of
charred clothing, and trampled grass. The charred clothing was
preserved, but not offered into evidence. Two days later, the
bicycle was found.

On Sunday, September 15th, Officer Teeple reviewed a statement
made by a witness, Donald Allgood. As a result, he and some other
officers took Allgood out to the area near the Value King where
Allgood claimed he saw four boys come out of the brush. Two of the
boys were closing their zippers while a third one tossed something
into the brush. The next day, an area of one hundred by

21

seventy-five feet of brush was cleared. Six feet from the path at a slight angle they found a "stick" which looked like a broom handle which apparently looked as though it has recently been placed there. The "stick" was sent to a laboratory for a determination if any blood was on it, however no test for fingerprints was requested by the police.

After the Appellant's videotape statement on the sixteenth, Officer Teeple returned to the area behind the Value King. At that time he located a plastic container which appeared burned. Testimony was presented that this piece of evidence originally was a bottle of Topco Charcoal Lighter Fluid but the burnt plastic was not compared to the bottle of lighter fluid. When Teeple checked the dumpsters behind the Value King, they were empty. He did obtain a pair of socks that had brown to red stains on them which belonged to a co-defendant, Timothy Combs. Teeple also obtained, pursuant to search warrants, samples of blood and dental impressions from both defendants. At this point in time the videotaped statement of the Appellant was played.

Dr. Joseph Sudimack, Jr., the County corner, stated that the autopsy was performed on September 13, by Dr. Adelman. The coroner's verdict was that death was caused by cardio-respiratory arrest, secondary to asphyxiation and sub-dural hematoma and multiple trauma. He further stated that death could have therefore been caused by asphyxiation, the sub-dural hematoma, or the rectal bladder injury or any combinations of them.

Sergeant Dennis Steinbeck, assigned to the juvenile division

of the Warren Police Department, was the officer that received the initial missing persons report from the Fife family. At the scene, he obtained some of the physical evidence from Officer Skoczylas. Steinbeck was told by the ambulance attendant that the decedent had been sexually assaulted. From these facts and the nature of the crime, Steinbeck already had a number of suspects in mind, including both the Appellant and a co-Defendant, Timothy Combs. After reviewing Danny's statement made Thursday night (the 13th), Steinbeck went to Danny's house on Friday between 9:30 to 10:00 a.m. and brought Danny down to the station for further questioning. During the entire interrogation of three hours, Danny denied any involvement in the homicide. A statement was taped which included only Danny's answers, but not the questions. Danny's mother did come down and state that he was at home until 7:00 p.m. on the night in question.

On Sunday, Steinbeck was again at the police station. At this point, he reviewed other statements from various witnesses which had come forward. These witnesses stated that they had seen both the Appellant and Timothy Combs at the Value King the afternoon of the homicide.

Steinbeck next saw the Appellant the following day when, accompanied by Detective Hill, Steinbeck went to the Appellant's home and informed Danny they wanted both he and his mother to come to the station. They wanted the Appellant to sign the statement he had made on Friday, and his mother to make a statement. Initially, Danny refused to go, but his mother told him he had to go to the

23

station.  At the station he signed the prior statement.  The officers then continued to question him for about an hour and a half during which time he repeatedly denied any involvement in the homicide.  Suddenly, Danny was left alone with his uncle, Detective Hill for a short period of time.  Afterwards, the Appellant made a taped statement which lasted for about forty minutes.  Later, a videotaped statement was obtained.

During cross-examination, Steinbeck admitted that Timothy Combs was a suspect in this case, but the police made no attempt to contact him until after obtaining the Appellant's statements of September 16.  Steinbeck claimed he did not have probable cause to question him despite witnesses placing him at the scene.  Furthermore, Combs had a history of sexual crimes involving juvenile males around the ages of ten to twelve.  Once Appellant's statement was obtained, Steinbeck went to Combs' school and arrested him.

Dr. Howard Adelman, the pathologist, did the autopsy on the deceased.  His initial observations of the body revealed multiple injuries that were visible externally, burned area especially about the face, multiple contusions, abrasions, lacerations caused by blunt force, ligature mark around the neck, and profuse bleeding from the rectal area.  There were four separate "injuries" that could have caused death either independently or in conjunction with the other causes, namely, the sub-dural hemorrhage, the penetration and perforation of the rectum and urinary bladder, the ligature strangulation, and the burns and the contusions showing the

24

beatings.   An object penetrated the rectal area at least twice which took a great deal of force.   There was a great deal of blood from this injury.   There were second and third degree burns caused either by flame or a hot, molten type object.   There were bite marks found on the penis that appeared to be human.   Dr. Adelman suggested that the police contact Dr. Curtis Mertz for further analysis of this injury.   There were scratches and abrasions on the ankles, thighs and legs, some of which could have been caused by a sharp object.   While the deceased was brain dead when brought to the hospital, he remained comatose and in a vegetative state for approximately two days.

Dr. Adelman was allowed, over heated objection, to testify concerning the stick that was found in the overgrown area.   He stated that the plant cells present in the stick were very similar to the plant cells that were found in the tissues of the body. Secondly, the size of the penetration injury was consistent with the stick in question.   It was the doctor's contention that while he had no idea of the type of wood the stick was, it was of such a nature that the splintered end of the stick would absorb blood. Furthermore, numerous objects could be consistent with the penetration involved here.   Wood is wood.

Concerning the burning, it was limited to the right side of the face, shoulder, and neck area.   The ligature mark which went around the entire neck, could have been caused by a T-shirt being tied around the neck.

Donald Allgood, a sixteen year old tenth grader, that lived

25

around the corner from the Value King, was walking around with a friend after football practice on September 16, 1985. He saw the Appellant, Timothy Combs, and two other youths coming out of the field coming from Value King, walking in a line. First in line was Tim Combs, then the Appellant, followed by two others. He did not pay much attention to them but saw the Appellant throw a stick into the woods, which were heavily wooded, using a flick of this wrist. He saw Tim Combs pull his pants zipper up, and put his head down when noticed by the witness. While at first he did not know their names, he was able to pick out pictures of the Appellant and Tim Combs from a photo array. One of the other boys was Andre McCain. He also stated that the fourth person was also pulling his zipper up.

Upon cross-examination, Donald Allgood stated he did not mention the stick on his initial statement on Saturday, the 14th, because he did not think it was important. In addition, he had not mentioned distance either. He did not remember the stick until Sunday. He made two separate statements to the police, and reviewed his prior statements with the prosecutor before he took the stand. Furthermore, he never did get a good look at what was thrown. Donald also stated that the Appellant was wearing blue jeans not the grey trousers previously testified to earlier.

Sergeant Thomas Stewart of the Warren Police Department first became involved in this case when he saw Danny at the police station on September 12, 1985. Starting around 7:30 p.m., the Appellant made a statement which included facts in it that Sergeant

26

Stewart thought were important.  The Appellant mentioned the underwear found around the boy's neck.  The Appellant also said he had been at home since 7:00 p.m. on the night in question. Stewart did not see the Appellant again until the following Monday.

On that Monday, Sergeant Stewart was present for both the taped statement and the videotaped statement.  After the statements were taken, Stewart took the Appellant out to the scene where he was able to point out the location of the bicycle, the area where the deceased was found, and the area near the Value King where the solvent was, and where he exited the woods.  However, the Appellant initially was hesitant and unsure of things.  The next day, Stewart obtained permission from Mrs. Williams to search her house.  He was looking for grey pants.  He found only one pair, which were in the bathroom, washed and hanging up.  The pants were drying.

Stewart also searched Timothy Combs house pursuant to a previously issued search warrant.  The most significant item found during that search was the pair of socks with the red stains on them.  Search warrants were also obtained for dental impressions of both the Appellant and Timothy Combs.

On cross-examination, Stewart denies that he was present when Appellant was left alone with Detective Hill.  In fact, he had not participated in the interrogation until Detective Hill came out of the room to say that Danny now wished to talk.  During the taped and videotaped statements, Danny was highly suggestive to ideas placed there by the interrogators.  In fact, when Danny was at the scene he did not take the officers to a particular area, but

27

instead, just pointed to various general areas. During the videotape, Danny became confused when shown the chalkboard with a diagram of the scene on it.

James Wurster, a criminologist in the trace evidence section of BCI, stated that ninety percent of his work involves serology (blood). Wurster concluded that the blood on Combs' socks could be that of the deceased's. He found no blood on the grey trousers that Sergeant Stewart removed from the Appellant's home. However, if there had been dried blood on the pants, it could still be detected even if the pants had been washed thoroughly. It would take a couple of hours for the blood to dry.

The "stick" was microscopically examined with particular care given to the areas of discoloration. Chemical tests for blood were negative. Wurster stated that wood is a porous material and that blood would soak in at the broken end like a sponge. Any blood on such a piece of wood would dry commensurate with its exposure to air. Even if the stick were wiped off, it would not remove that which was already absorbed. Furthermore, there was dirt still on the stick that any rain that may have occurred did not wash away.

A motion in limine to preclude testimony of alleged similar acts under R.C. 2945.59 was again overruled. Candyce Jenkins, a twenty-three year old woman, testified that on March 2, 1984, the Appellant came to her house, put his fist through her window and went in the house. The Appellant had a knife, and asked for money. He told her to take her clothes off, perform oral sex on him, and threatened to kill her if she refused him. He was in her house for

28

one and half hours during which time both anal and vaginal sex occurred. The Appellant bit her on the back of the shoulder as well as on one of her breasts. He subsequently left. Ms. Jenkins also stated that the Appellant was "high" and she smelled alcohol on his breath. In addition, Ms. Jenkins was able to secure the knife from the Appellant. The knife was not used, nor anyone in the household injured by its use.

Mary Ann Brison testified that on February 9, 1984, on her way to the Value King, she was confronted by the Appellant who came up from behind her and threw her on the ground. He punched her in the face, threatened her, and undressed her. He performed vaginal intercourse for a short period of time. He wanted money but took her cigarettes and ran away. During the incident, the Appellant put the knife away. He was holding a brown paper bag and the smell of alcohol was on his breath.

Detective Hill, the Appellant's uncle, also related his connection with the investigation of this case. Hill testified that he has known the Appellant his entire life including on a professional basis, but has not had much occasion to talk to him. He claims that Danny is intelligent in terms of being street wise, and gets out of trouble all of the time. Detective Hill was first assigned to the case on September 16, 1985, in the morning at which time he was sent to his sister's house to get the Appellant to come to the station. He brought Danny back to the station, where he was interrogated. He stated that he was alone with the Appellant for a couple of minutes but did not hit the Appellant. Detective Hill

29

did admit that he had "whipped' Danny once before after Danny had denied doing something.

Larry Dehus, an expert criminologist, generally testifies for the prosecution in criminal cases. His background included ten years as a supervisor with the Miami Valley Regional Crime Laboratory in Dayton, Ohio which served the various police agencies in Dayton and the surrounding communities and counties where he was involved in hundreds of investigations. As a criminologist and forensic scientist, his work included arson analysis.

Dr. Dehus had an opportunity to microscopically examine the "stick" for trace material and tested chemically for traces of blood. He described the "stick" as a broken implement, composed of hard wood but porous in nature. He found no traces of blood. If the "stick" had blood on it, the blood would have soaked in the porous and which could not have been washed or wiped away. Placing the "stick" in the ground would not have removed the blood from it. Even invisible traces of blood can be detected on this type of broken wood utilizing this testing procedure. It was his opinion that if the "stick" was used to penetrate a person's body in such a manner that blood had gotten around the "stick", blood would be found on the "stick" even if it rained and attempts were later made to wipe the "stick" clean. He also examined the foreign bodies removed from the deceased from the slides that were taken. His conclusion was that the foreign bodies were some type of cellular plant material which was not necessarily wood. There really was not enough material present to make a proper identification.

The third area Mr. Dehus testified about concerned the Topco Charcoal Lighter Fluid and its use on the T-shirt and underwear of the victim. The lighter fluid is composed partly of mid-range hydrocarbon components, mid-range in terms of volatility. If the lighter fluid had been used on the T-shirt and underwear and they were incinerated then there should be traces of hydrocarbons on these items. Even if the items were soaked in water, this procedure would not remove the hydrocarbons.

Matthew Hunter, a sixteen year old youth, saw the Appellant, Timothy Combs, and two other youths together on Jackson Street around 3:00 p.m. on September 10, 1985, walking southwest. At around 5:00 p.m. that day, Matthew, his brother, and his sister walked over to the Value King where they again saw the Appellant and Timothy Combs. The Appellant and Timothy Combs were in the parking lot going towards the store. Matthew knew who both were prior to this incident. The Appellant was wearing grey sweat pants. When Matthew came out of the Value King, the Appellant and Timothy Combs were over by the laundromat. As Matthew left the store area, he was the deceased riding his bicycle into the parking lot. Matthew also saw Maurice Lowery and Donald Allgood in the same area that afternoon riding their bicycles. Matthew did not see where the deceased went once Matthew passed him. When asked about Timothy Combs, Matthew stated that Combs had a reputation as a fag and had once tried to make Matthew pull off his pants and was "feeling on (him)". At no time did Matthew see Darren Ball or Troy Cree.

31

Dr. Robert Walton, a dentist, took dental impressions of both the Appellant and Timothy Combs. Dr. Walton stated that the Appellant's teeth had the unusual characteristic of having the upper right maxillary central incisor fractured from the distal incisal edge to approximately three-quarters mid-incisal. However, Dr. Walton then states that it is not unusual for a person to have a rotated, chipped tooth. Both the Appellant and Combs have a diastema, which is a separation of the upper front teeth. This structure of these teeth occurs in approximately fifteen percent of the population. The dental impressions that were taken of the two individuals are very close to actual representations, but not one hundred percent accurate.

Darren Ball was going home with Troy Cree after football practice on September 10, 1985, at approximately 5:15 p.m. They were going down one of the trails off Willow behind the Value King when they saw Timothy Combs coming from the direction of the Value King. After confronting Combs, they walked faster, almost jogging, away from him. Darren told Troy that Combs was a "fagot". About twenty to thirty seconds later, they heard a scream that sounded like a scream from a child. At the time, they were not concerned about the scream. At no time did they see the deceased, the Appellant, or anyone else in the area that afternoon.

William Carnahan, a sergeant with the Warren Police Department, worked with Detective Teeple in the collection and preservation of the physical evidence in this case. He was present when Donald Allgood was taken to the scene on Sunday, September 15,

1985, to show the location where Allgood saw something tossed away by the Appellant. As a result, the next day the "stick" was located six feet off the path and twenty feet off the roadway at an angle underneath leaves and other foliage.

On January 27, 1986, Carnahan made a sketch of the area behind the Value King. He measured a variety of distances relevant to this case. The shortest distance measured from the corner of the Value King building to the path was 347 feet while the longest was 504 feet. The distance from the blacktop area behind the Value King to the area where the deceased was found was 116 feet. It was seventy-two feet from the path to the location of the bicycle, and one hundred thirty-nine feet from the path to the location of the clothing. There was two hundred seventy-one feet from the bicycle to the location of the body in a kind of roundabout manner because of existing conditions, but two hundred ten feet measured directly. It was six hundred ten feet from the edge of the blacktop of the road to the edge of the path. The plastic container was found one hundred thirty feet around the path from the area of the blacktop path.

Dr. Curtis Mertz, a local dentist, testified as an expert for the Appellee, State of Ohio, concerning forensic odontology which is primarily the relationship of the law to dentistry. Part of this field is the study of bite marks which can be used as a means of identification more from the prospective of ruling out someone than including them. Most cases where bit marks are being utilized for identification purposes result in a finding of insufficient

33

detail to make such a determination.

In examining the deceased's penis, Dr. Mertz concluded that there appeared to be bite marks on it. He found six indentions as well as areas of ecchymosis which were of insufficient depth to take impressions. The indentions were also of insufficient depth to take impressions, so Dr. Mertz took photographs of what he observed. Dr. Mertz conceded that by utilizing this method of recording the indentations, anything that is not within the focal plane of the camera would be distorted. Filming also caused shadows because of the focal object was found. Furthermore, he admitted that any indentations that were found were affected by any movement of the tissue. Dr. Mertz also disagreed with an article in the field which suggested that if pictures are used, they should be taken for five days in a row. His disagreement was based that the article only applies to people who are living.

He ruled out that the marks were caused by the deceased because the deceased did not have a diastema. A diastema is a space or separation between two adjoining teeth. Dr. Mertz told the police that the person that my have caused the bite marks would have a space between two central incisors and a fractured upper right central incisor (#8). Dr. Mertz was given dental impressions of only the Appellant and Timothy Combs. It was his opinion that the bite marks were caused by the Appellant. This opinion was not based on the diastema because both the Appellant and Combs have them, but more so because of the Appellant's occlusion (overbite). However, this conclusion was a judgment decision that is

34

subjective.

At this time, the Appellee proffered a statement by its next witness in order for the Court to determine whether the anticipated "other" acts testimony was admissible. The Appellee claimed that they had only received the information concerning this witness the day before the motion. While they informed counsel for the Appellant that such a witness may exist, they did not inform him of the exact nature of this testimony nor the name of the witness.

Stephen Melius, a seventeen year old eleventh grader, testified that the was incarcerated in the juvenile justice center at the end of January – beginning of February for a period of five days. During that time, Melius claims he shared a cell with the Appellant and a "white boy" named Bob. During the first night he was there with the Appellant, Melius states that the Appellant made overtures and improper advances towards him requesting both oral and anal sex. Melius states that the Appellant made an actual attempt to perform oral sex with him. After Melius pushed his head away, nothing more happened.

Upon further examination at a later point in the trial, Melius admitted that he talked to one of the prosecutors in the hallway who told him he may have given some wrong dates. Also, this prosecutor told the witness some of the questions that the Appellant's counsel may ask him. Despite this coaching, Melius maintained that the incident he testified to happened in January or February, 1984, that he spent two days with the Appellant in the

35

same cell, and it was prior to the March incident involving Anthony Kirksey. Melius also admitted that he had lied to the Court twelve or thirteen times in the past when he told the Court he would not run away and then he ran away.

Lawrence Kamoda, the program director for Hillside Hospital, testified that Timothy Combs was a patient at the hospital from August 8, 1985, until his release on September 5, 1985.

James Freeman, the supervisor and pupil accounting for the Warren City Schools, is the keeper of the records for the school. He testified that the records included Danny's permanent record card, transcript from Goddard High School (Ohio Youth Commission, report card for the 1983/84 school year from the Warren City Schools, and a progress report from Brinkhaven for the 1982/83 school year.) In addition, the records included four prior psychological tests of the Appellant. The records showed that in school years 1983/84 all of his grades were failures. Since first grade, the Appellant had been in special classes for the educable mentally retarded. Records of his attendance at classes were also included.

Frank Goodman, the director of student services, special education, for the Warren City Schools, testified that the special classes that Danny had been attending since the first grade, were for those students whose intelligence (I.Q.) quotient score was eighty or below. The Appellant's records show that he has always functioned at a grade level lower than the one in which he was placed. When the Appellant was six years old his I.Q. was seventy,

36

having a mental age of four years six months.   In 1975, his I.Q. was sixty-two correlating to a mental age of five years six months. An I.Q. test performed in 1980 resulted in a full scale I.Q. score of forty-nine.  When the Appellant was just over fifteen years old, his I.Q. score was sixty-three reflecting a mental age of nine years two months.  Mr. Goodman did not, however, administer any of these tests.

James Teeple took the stand again, and stated that the plastic bag containing a piece of what appears to be burnt cloth found where the body was located, the Wrangler T-shirt, and the underwear were all submitted to the arson lab.  Each item was tested for accelerant.

Dan Gelfius testified that he has been a forensic chemist at the Arson Crime Lab for the State of Ohio for over seven years.  He examined and tested the Wrangler T-shirt, the underwear, pieces of cloth located at the scene, and portions of plastic to determine the presence of any accelerant.  The T-shirt, underwear, and other pieces of cloth, while burnt, showed no evidence of accelerant. The pieces of plastic did reveal traces of hydrocarbons consistent with charcoal lighter fluid.  While hydrocarbon and water do not mix, the water could displace the hydrocarbons.  In order for cotton to burn it is necessary for the material to reach five hundred degrees which would burn someone.

Sergeant Steinbeck was again called to the stand.  He testified that Timothy Combs stated a tree stick not a broom handle was used on the deceased.

The director of the juvenile court for Trumbull County, James Maderitz, brought in specific housing records of the Juvenile Justice System which are compiled on a daily basis. There was only one time in 1984 where it was possible for Stephen Melius to be in the same cell as the Appellant and that was March 22, 1984. On March 21, 1984, the Appellant was place in the same cell as Anthony Kerksey. On neither day was the Appellant placed in a cell with two other individuals. It is not even clear from the chart whether the Appellant had even spent a night with Stephen Melius.

In 1983, there was one other night that the Appellant and Stephen Melius spent in the same cell. It was May 16, 1983, and they were with another juvenile named David Milen. There was an alleged incident of rape involving Stephen Melius and Anthony Kirksey which occurred on March 17, 1984, one week prior to the time the Appellant and Stephen Melius may have shared the same cell.

Dr. Lowell J. Levine, a dentist and full time forensic odontologist, had been involved in hundreds of bite mark cases. He has testified in twenty-five to fifty cases. While he has seen bite marks to a penis before, they are not common. Dr. Levine was originally contacted by the prosecutor to examine evidence in this case. Numerous photographs and the dental models were given to him for study. In his examinations two problems arose in forming an opinion; the type of tissue (flaccid or erect) and relating the measurements from the photographs to the actual models. After eight hours he was able to say with a reasonably scientific

38

certainty that one, the marks were human bit marks, two, he could not come to a conclusion if either or both (referring to the Appellant and Timothy Combs) made the marks, and three, he could not rule out Timothy Combs as the individual that caused the bite marks.  A written report summarizing these findings was sent to the State of Ohio.

There was one bite mark that the doctor did not feel belonged to Timothy Combs, but he did not conclude it belonged to the Appellant.  Furthermore, the doctor had only two models for comparison purposes.  There also could have been three or four separate acts of biting.  Seeing the actual penis would not necessarily be an advantage for making these determinations.

As affidavit under seal from the U.S. Department of Commerce, National Oceanic and Atmospheric Administration showed the official weather data on September 10, 1985, at the Youngstown Airport.  The airport is eleven miles from the scene of this homicide.

The last witness to testify at the trial phase of this case was Kendall Thomas, a fourteen year old boy.  He testified that in the woods between Austin Village Plaza and his home, he was confronted by Timothy Combs, who had a piece of glass in his hand.  Combs, while threatening to kill Kendall with the glass, took Kendall's pants down and committed anal intercourse with him.

After closing arguments, and five hours of deliberations, the panel rendered a verdict of guilty to count one, aggravated murder, with    all    specifications    except    the    aggravated    robbery specifications.  The Court also found the Appellant guilty of all

39

other counts except the aggravated robbery count.  The Court then set this case for sentencing at a future hearing.

## MITIGATION PHASE

On February 26, 1987, a mitigation hearing was held.  It was stipulated that the testimony of Frank Goodman and James Freeman concerning the records they had previously presented at the Guilt Phase would be admissible herein.

Vera Williams, the Appellant's mother, testified that Danny was one of four children, with Danny being second oldest.  Each child has a different father.  Vera quit school after the eighth grade, and can only read and write "a little".  Ms. Williams was unable to even remember the birthdays of her children.  She then worked for six years at the Goldenburg Hosiery Department; Chicken Market, but has not worked since that time.

Danny's father never lived with the family.  The oldest child's father did not live with the family either.  Mr. Vaughn, the father of the third child, was married to Vera for approximately one year before they were divorced, and he left the family residence.  Mr. Williams, the father of the youngest of the children, lived with the family for ten years, but he died in early 1985.

Mr. Williams was close to Danny, even though he was not at home much because of his employment.  Also, there was a period of time that three of his children lived with the family.  Prior to Mr. Williams moving in with Danny's mother, there was no male role model in the home.

40

Three of her children, including Danny, were slow learners. Danny kept having problems in school because the teachers did not have the extra time for someone like Danny with his special needs. Mr. Williams did not help Danny in his education. Danny was enrolled in special classes for the educable mentally retarded. Danny ended up attending Fairhaven School for the Mentally Retarded in Niles for two or three years. While attending this school, the other kids on the school bus teased him so much because of his disabilities that he would get off the school bus before he got to school. As a result, Danny had a bad attendance record at school. However, things did approve after the first year. Later on, Danny twice attended Brinkhaven, which is a group home located in a rural setting.

Danny got along with his brother, but they each had their separate friends. He keeps a special eye on his youngest brother who is seven years old. It seems that Danny would get into more trouble when he was with his friends. While Vera had a hard time disciplining her children, Danny was very helpful around the house and as a child, he was very passive and would cry often.

Danny has had two injuries to the head. One head injury occurred as he fell backwards off a swing and his head and jaw hit an axe when he was a baby. He was taken to the hospital as a result. Another time occurred when he was struck by a car a year earlier and had to be operated on while he was at Brinkhaven. A third occasion also occurred when Danny was struck by a car causing leg and other injuries.

41

On cross-examination, Vera stated that while she repeatedly told Danny that it was wrong for him to steal, once he was outside of her control he would do wrong things. Vera testified that Danny had been in Columbus from May of 1984 to May of 1985 and came home after that time.

Vera further testified that she never had a chance to visit with Danny while he was in Columbus. However, when he returned home, he stayed around the house all the time. He helped baby sit Damien, his younger brother, and Ella's children. Danny also had an eyesight problem, necessitating the use of glasses, but he lost his glasses at Fairhaven. The glasses were never replaced.

Mary Robinson, Danny's grandmother, has been married to his grandfather for twenty-five years. They have five children including Vera and Morris. One of these children, Willie, was in an accident that caused brain damage. As a result, Willie still lives at home.

Mrs. Robinson's grandchildren include only Vera's children. When Mr. Williams died, Danny would do everything she asked of him. In fact, Danny would take pride at his accomplishments and would seek out attention and affection for completing these chores. Danny seemed to need praise. Danny was very slow and got along best with younger children. He also got along with his uncle Willie. Also, Danny was a follower. Mrs. Robinson would visit Danny at Brinkhaven along with his mother. Danny seemed very proud of his accomplishments there.

Mrs. Robinson also stated that Vera was all right at

42

disciplining the children until they got bigger. Part of the
difficulty was there was no father figure in the house. Mr.
Williams was not the father figure the children needed. Mrs.
Robinson also testified that Danny never burglarized her house.

Maurice Cox, a sixteen year old tenth grader, has known Danny
for two years. Maurice considers himself a close friend of the
Appellant that spend considerable time with Danny except when Danny
was in Columbus. He never saw Danny fight, and they never got in
any trouble.

Paula Guilford, a youth counselor for the State of Ohio -
Department of Youth Services for sixteen months, worked with Danny
as his parole officer. Prior to her work for the Department of
Youth Services, Ms. Guildford was in school and worked part-time as
a family counselor at the Mahoning County Juvenile Court. She was
assigned Danny's case in November of 1984. She directly supervised
him upon his release from the Training Center for Youth in Columbus
in April of 1985 until August, 1985. She had no personal contact
with Danny until his release. However, she had monthly contact
with this family.

Ms. Guildford's assessment of the home was it would be
structured enough for Danny if counseling was followed through and
his parole rules were followed. However, a return home was the
last alternative because Danny was too old for group homes. The
counseling recommended for Danny was psychological counseling
coupled with employment training from the Bureau of Vocational
Rehabilitations (BVR). Danny was supposed to have had counseling

43

at T.C.Y.

Once Danny was released in April, Ms. Guildford saw him at least every other week for somewhere between fifteen and thirty minutes per visit. Based upon her review of his records and her visits with Danny, she felt that Danny was quiet and a person that "could be easily led by others more than a follower." Ms. Guilford referred Danny to BVR, but did not know if that was followed-up since it was the responsibility of the family or individual to see to that follow-up. As for psychological counseling, once Ms. Guildford made the recommendation to an agency, it was up to that agency to contact the youth and make the necessary arrangements.

On cross-examination, Ms. Guildford testified that Danny was at TCY for two counts of rape. Furthermore, the records showed that the Appellant was alone during the commission of the offenses.

Diedre L. Poindexter testified that she became Danny's youth counselor on August 5, 1985. She met with Danny a number of times and was able to review all of his records. Ms. Poindexter felt that Danny needed a very structured program, but there was not one in the area. Therefore, Danny was left at home with the underlying understanding that, since he was over eighteen, if any further problems arose, it would be the problem of the adult system.

Ms. Poindexter indicated that Danny was referred to BVR, but he never completed the application. She described Danny as not being very verbal in that you had to "pry" information out of him. Danny was never disrespectful, but just not motivated. For example, Danny participated in a bowling outing, but did not

44

intermingle with the others. In general, Danny was a follower, though the records showed that he did initiate incidents on occasions. Danny seemed to be a depressed youth. He had the lowest I.Q. in her group of forty-two and was the slowest.

Mark Brink, the vice-president of Brinkhaven Enterprises, stated that Danny was first referred to the Emmanuel Boys' Home during the summer of 1982. Emmanuel Boys' Home is one of five group homes for youths under eighteen. These homes are in a farm setting with individualized schooling programs for each of the youths in their care. They also have individual and group counseling. They are licensed by the State of Ohio and youths are referred to them either from the local county or the Youth Commission.

Danny was at the home until February, 1983. He left because there was a lack of funding for him by the County. Mr. Brink was around Danny eight hours a day, five days a week as a youth worker. They worked very extensively with Danny because of his inability to read or write. There was some progress made in this schooling. Danny was given various responsibilities and chores around the farm. If there was incentive for him to do these jobs, then he did them very well, otherwise he had no pride in his work. The type of incentive that was necessary was recognition or appreciation of his work and his progress. The need for praise was not uncommon among children that were residing at Brinkhaven.

Danny was the type of child who wanted to get along with the other children. He would do things for them as favors, if they

asked. He basically got along well with the other residents. This need for friendship would get Danny in trouble. If Danny was sent to do some chores with someone who wanted to play around instead of doing the chores, Danny would follow suit. However, if Danny were with one of the other boys, he would get the chore done and return to the house. He never seemed to take the initiative himself.

Danny was a definite follower. He also was one of the slower boys in the program. He was always trying to please the staff. While there was some improvement during this time in the program, he still needed twenty-four hour supervision. This type of supervision could not be maintained at home.

Vanessa Conley, a teacher's aide and former youth leader at TCY, had Danny in her cottage for five or six months starting in April of 1984. This period of time would include eight hours a day. TCY is for children sent to the Ohio Youth Commission that are emotionally disturbed or mentally unbalanced. Ms. Conley has worked at the institution for seven years.

The children that are placed at TCY are broken down into four groups, hostile (those bigger boys who may cause harm to smaller ones), semi-hostile, small children (usually the small twelve to fourteen year old), and the honor cottage groups. Initially Danny was placed in the hostile group, but he was being beaten up by the older kids, so he was transferred to the semi-hostile group. There was a definite lack of programs or counseling offered to these boys. Each boy was seen by a psychiatrist as they entered, but there was little follow-up. A social worker would be assigned, but

46

she may see a child ten minutes out of every two or three weeks. Also, there was no special training outside of schooling that the boys received.

During the time Danny was under the supervision, Ms. Conley felt she was a mother image for him. They got along well, and Danny would try to protect her. There even was an incident where a student got out of hand and Danny stood up to defend her. He did not pick on the other boys, and obeyed the rules. Basically, he was a follower. Danny did qualify for the honor cottage just before he left TCY.

Danny was very helpful to Ms. Conley in the chores that needed to be done around the cottage. He liked to be praised for his accomplishments. He told her that when he was released he wanted to live with this grandmother because she was strict with him. Danny indicated that he was having problems at home. Ms. Conley did not feel that Danny should have been released when he was because he was not ready. Even Danny felt that he was not ready for release. Ms. Conley felt he still needed the structural environment.

Lloyd Ayers had worked in the Department of Youth Services for thirteen years, four of which were with TCY. He was a youth leader/ aid on the 7:00 a.m. to 3:00 p.m. for the hostile group. Upon Danny's initial arrival, he was placed in the hostile group. Mr. Ayers felt that nothing was being done to assist Danny with his problems.

Paul West, another youth leader, had worked at TCY for ten years. Mr. West worked with Danny the entire year that Danny was

47

there. Danny was assigned to participate in the sex offenders
program but due to the waiting list, did not attend until around
his last four to six months. Because of institutional policies,
such as having only one psychiatrist for everybody, Danny may have
only seen him four or five times the entire year.

Mr. West described Danny as a follower, and that it was hard
for him to make friends. Upon his initial arrival, Danny sought
out negative peers. After a conference with Danny, he started to
turn around his behavior. His stay at TCY was pleasant. He would
seek out group leaders. While Danny was originally placed in the
hostile group, he was never hostile himself. Danny was basically
a loner, and was not a problem at TCY. He did once attempt AWOl,
but was brought back. Danny did extra jobs and chores, and was
praised and rewarded. Mr. West did think Danny was borderline
mentally retarded which placed him in about the middle of the one
hundred and sixty-five boys there.

Cheryl West, spouse of Mr. West, worked at TCY for eight
years. She has since retired. She was trained in the field of
mental retardation, as a counseling specialist, first aid, and
crisis intervention. Danny was one of her students for six months.
When Danny was initially in the hostile group, he could not keep up
with the others. He was not as hostile as the other kids. Danny
was a follower, and the other kids started picking on him. It
resulted in Danny being moved to another group. There was even an
incident where one of the other boys tried to rape Danny.

Danny was placed in the special learning disabilities classes.

48

He was also signed up for sex education classes. By the time he was allowed to attend the classes, it was only three weeks before Danny was to leave TCY. Danny attended one session only. It was due to a disagreement with the social worker that Danny did not go back for the remaining couple of sessions. The information that was being taught at that time Danny already had been taught. The classes had nothing to do with giving him any help or insight for the acts that placed him at TCY. Not much else was done to help Danny with his problems.

Danny was a follower of the older boys, but a leader to the younger ones. He sometimes would try to intimidate the younger kids, but would not follow through with it. He needed a very structured environment and constant supervision. When they released Danny, Ms. West felt that he was not ready to leave.

Dr. Douglas Darnall, a practicing psychologist from Youngstown, did a psychological evaluation of Danny in 1983 for purposes of determining whether he should be bound over to the general division of the Common Pleas Court. Dr. Darnall conducted numerous tests on Danny. His verbal I.Q. was 49 with two of the subtests receiving a zero score. He had a performance I.Q. of 69 with a full scale I.Q. of 55. These scores place Danny in the mild range retardation.

As a result of his testing, Dr. Darnall came to certain conclusions. He concluded that Danny would easily misread people and he was poor in judgment. Therefore, he would react improperly under stressful situations. Danny has a suspicious nature and

49

looks at the world in a hostile fashion. He has poor self esteem. He operates on impulse and feelings and does not think things through. Danny was highly suggestible or influenced by others. Dr. Darnall found that Danny had a conduct disorder undersocialized aggressive meaning that his problems were behavioral in nature as compared to a mental disorder like psychosis or depression. From an emotional point of view, Danny was a loner. His adaptive functioning was poor He was passive and would not take the initiative. In other words he was susceptible to being led by others. At the time of his evaluation, it was hard for Danny to form relationships with adults. When asked his recommendations concerning the bindover, Dr. Darnall recommended against bindover because Danny performed well in a structured-supportive environment within limits. He did very well at Brinkhaven - a program for the mild mentally retarded. The Department of Youth Services has no such services.

On cross-examination, Dr. Darnall stated that Danny fluctuates between mild retardation and borderline. There are numerous factors that would result in the variance of scores. At the time of evaluation, he had thirteen prior offenses but did not know what they were. If aggressive behavior continued past his eighteen birthday, then Dr. Darnall would examine the possibility of a personality disorder. Dr. Darnall did find slight evidence of organic brain damage. He found no evidence of psychosis. There is no real relationship between his prior offenses and his intellectual level. Furthermore, Danny, intellectually, understood

50

right from wrong.

On re-direct examination, Dr. Darnall indicated that Danny's reading and writing level is on a second or third grade level. If Danny were to develop good relationships with some adults he would become socialized. The same would be true if Danny developed a friendship of a duration longer than six months. Praising a person of Danny's condition was an appropriate treatment.

Nancy Schmidtgoessling, a clinical psychologist, tested Danny and his mother. Danny's verbal I.Q. was 69, his performance I.Q. was 60, with his full scale I.Q. being 68. This level showed a mild range of retardation. She gave him the WRAT-R test which is an academic type of test. Danny failed markedly below the first percentile. His scores on the reading were so low, they could not be calculated. On spelling and arithmetic, Danny scored on a very low level on functions that there is less than 5% of the population below that level. Dr. Schmidtgoessling also gave Danny a Peabody Picture Test which is a receptive vocabulary test. Danny came out with an estimated I.Q. of 62, which was consistent with the other testing.

Dr. Schmidtgoessling also interviewed Danny's mother and tested her I.Q. Danny's mother had a full scale I.Q. test of 63 which also was in the range of mildly retarded. She reviewed the school records of Danny's siblings. There was instability in the home as there was no father figure for Danny's first eight years. After that, there was Mr. Williams who was always at work and an alcohol abuser. It was difficult for a mother, in essence alone,

51

to control four male children, especially as they got older.

It was Dr. Schmidtgoessling's conclusion that while Ms. Williams loved her children, they were more than she could handle. A review of the school records of all four children showed that they all have exhibited behavioral problems. Children such as these need a structured environment with a lot of one on one contact. These children experienced lots of failures and frustrations. Danny exhibited these behavior problems. His moral development was primitive, that is, he was pre-centered, shortsighted, and did things for immediate gratification.

Danny was a passive type of person. Passive persons tend to mirror his environment. When Danny was in an institutional setting, he functioned within socially acceptable levels. However, in his home environment, he mirrored the problems inherent within that environmental setting. In addition, retarded people, such as Danny, are much more limited in their ability to extract themselves from bad situations.

Douglas Crush testified that he was a psychologist with a specialty in neuropsychology. Neuropsychology is the study of the higher cortical functions with the focus on the relationship between brain function and behavior. He examined Danny on February 25, 1986, for approximately five hours. Danny tested a full scale I.Q. of 64, with his verbal I.Q. being 62 and performance I.Q. of 67. Dr. Crush also used the Peabody test which came out with an I.Q. equivalency of 51-58, which converted to a mental age of seven years, three months. That result placed him in less than the

52

lowest one percent of the general population over the age of eighteen.  These tests meant that Danny fell within the mild retarded range.

Dr. Crush also tested Danny with the Halstead right Hand batter of tests which are designed to establish relationships between brain functions and ability to carry out those functions. It's a cognitive/thinking test.  Danny tested .9, which falls within the severely impaired range.  The scale goes from zero to one with one being the most impaired.

After hearing closing arguments, the Court rendered its verdict that the Appellant be sentenced to death on the aggravated murder with specifications with concurrent sentences of ten to twenty-five years for kidnapping; life imprisonment for rape; ten to twenty-five years for aggravated arson; and life imprisonment for felonious sexual imposition.

## FIRST PROPOSITION OF LAW

**AN ACCUSED'S RIGHT TO COUNSEL IS VIOLATED WHEN HE IS DEPRIVED OF COUNSEL FOR CUSTODIAL INTERROGATION WHEN HE DOES NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY RELINQUISH A KNOWN RIGHT DUE TO THE MISCONDUCT OF LAW ENFORCEMENT AUTHORITIES AND THE ACCUSED BEING MENTALLY RETARDED IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS OF THE OHIO CONSTITUTIONS.**

The modern right to counsel had its origin in the historic Scotsboro case, Powell v. Alabama, in which the Supreme Court of the United States held that even at the critical periods prior to a trial, a defendant is entitled to counsel because of the vital importance of such proceedings. (1932), 287 U.S. 45. As the Court pointed out:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he may have a perfect one. He requires the guiding hand of counsel at ever step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

Id. at 68-69. Thirty-two years later, the Court, in Massiah v. United States, held that once adversary proceedings have been initiated, a defendant has the right to legal representation when police officers interrogate him. (1964) 377 U.S. 201. The Court cited with approval Justice Douglas' concurrence in Spano v. New York (1959), 360 U.S. 315, where he stated that to deny counsel at

54

this critical stage may deny him "effective representation by counsel at the only stage when legal aid and advice may help him." 377 U.S. at 204, quoting 360 U.S. at 326.

With the decision in Miranda, may scholars felt Massiah had lost its significance. However, the Court reiterated the Massiah doctrine in Brewer v. Williams, which upheld Massiah in that once adversary proceedings have commenced against an individual, he has the right to legal representation when the government interrogates him. 430 U.S. 387, 401. The Court went on to hold that the right to counsel "does not depend on a request by the defendant, and that courts indulge in every reasonable presumption against waiver." Id. at 404 (further citations omitted). Furthermore, the standard for determining whether there was an effective waiver of counsel is stated in Johnson v. Zerbst. Id. The Johnson standard is that a defendant does not waive his constitutional right to counsel unless the State proves an intentional and voluntary relinquishment or abandonment of a know right. (1938), 304 U.S. 458.

However, Miranda does impose one procedural safeguard in relation to the right of counsel: "(I)f the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questions." Miranda v. Arizona (1966), 384 U.S. 436, 474. See also, Michigan v. Mosley (1975), 423 U.S. 96, 105 (fn.10).

In the instant case, the Appellant, was brought downtown to

the Warren Police Department along with his mother, Vera Williams, by Detectives Morris Hill and Dennis Steinbeck. The Appellant was then separated from his mother and placed in Interrogation Room No. 1. Mrs. Williams, was placed in the next interrogation room adjacent to Interrogation Room No. 1. Vera Williams testified that she was placed in and left alone in the interrogation room adjacent to Interrogation Room No. 1, in which Detectives Morris Hill and Dennis Steinbeck were interrogating the Appellant. She overheard Officers Hill and Steinbeck utilizing loud tones of voice and badgering language towards her son. As a result, she left the interrogation room in which she was placed and went next door. She opened the door and went into Interrogation Room No. 1. At that point, she saw Detective Morris Hill in the room, along with Detective Steinbeck and her son, Danny Hill. At that point in time, she asked why they were questioning her son in that manner. In response, her brother, Detective Morris Hill, simply indicated that they were finishing up the statement that the Appellant had given previously on Friday, September 13, 1985, and quickly ushered her out and away from the interrogation room where the Appellant was located. At the time, Vera Williams became concerned as to what, in fact, was going on and questioned her brother, regarding her intention to secure legal counsel for her son. In response to her statement regarding her intention to secure legal counsel Detective Hill, told her that there was no sense in hiring and paying for a lawyer, because the Court would appoint a lawyer for the Appellant free of charge, without expense to her. Thereafter,

56

the officers ushered Vera Williams into another room located within the police department a further distance away, in order that she would not overhear what was taking place in Interrogation Room No. 1. Subsequently, after Vera Williams had remained alone in another room some distance away from Interrogation Room No. 1, she again became concerned and exited the room and contacted her brother, who, at that time, indicated that her son would not be going home as he had previously indicated to her. Detective Thomas Stewart testified that after the tape recorded statement was taken, he informed the Appellant that he would be detained at the Warren Police Department and that he was, evidently, formally under arrest at that time. However, Detective Thomas Stewart also indicated that, as a result of his conference with Attorney Dennis Watkins, who was also at the Warren Police Department, that the Appellant was under arrest. Stewart further informed Appellant of the charges for which he was being held. Also, Officers Hill, Steinbeck, and Stewart all testified that they did not inform the Appellant of his right to representation by the County Public Defender at any time during his custodial interrogation and after he was formally placed under arrest after the completion of the tape recorded statement on Monday, September 16, 1985. Subsequently, the Appellant gave a videotape statement in which he was not advised of his Miranda rights nor advised of his right to be represented by the County Public Defender.

From the evidence adduced from Dr. Schmidtgoessling, Mr. Goodman, and Mr. Freeman and the documents introduced regarding the

57

education history and testing performance of the Appellant in regard to the Stanford-Benet and Wechler Intelligence Tests, it was clear that the Appellant was a functional illiterate and considered mile to border-line mentally retarded. Specifically, in 1980 and 1984, the Appellant scored a total of 49 on the Wechler Intelligence Test, which is a broader and more inclusive test than the Stanford-Benet Test, on which the Appellant tested in the low 60's. The Appellant is certainly an easy target for manipulation and suggestion by his own peers, let alone law enforcement officers who are well adept in handling persons such as the Appellant. Obviously, it is one thing to be intelligent enough to understand and comprehend what your rights are and then proceed to make an intelligent choice whether to waive them or not. The Appellant's situation defies imagination in the sense that his problem is three-fold: first, he is unable to verbally recognize and understand the meaning of the words that comprise the Miranda rights; second, he is unable to assimilate the information regardless of its simplistic word transmission to him; and third, he is unable to utilize judgment or reason based upon his automatic pre-conditioned mental reflexes. Thus, the Appellant in the instant case cannot understand or verbally recognize the words which comprise his Constitutional rights, could not assimilate rights information and its consequences; and even if he had managed to accomplish the foregoing two hurdles, his pre-conditioning in submission to police authority would compel him to talk to the police in any case. Therefore, if the Appellant had no knowledge

58

of the nature of the right to counsel, it is apparent that the Appellant was not able to intelligently, knowingly, or competently waive that Constitutional right.

By shuffling the Appellant's mother around Detective Hill used his influence as a family member to pacify and thwart the mother's effort in regard to securing counsel for her son at that time.

This was prior to the giving, by the Appellant, of his tape recorded statement and his video tape statement, thus, the law enforcement authorities were given time to continue their custodial detention of the Appellant and to secure incriminatory statements. Obviously, by thwarting and persuading the Appellant's mother, Vera Williams, not to hire counsel, the law enforcement officers defeated the purpose of the Miranda warnings and violated the Appellant's Constitutional rights to legal counsel. At the same time, the mother, Vera Williams, was retained in the Police Department and ushered into another room in which more time was consumed without interruption to law enforcement authorities. In point of fact, even after the tape recorded statement, the arrest of the Appellant, and the videotape statement, the Appellant never appeared in a court of law or before a magistrate until the next day, more than 24 hours from the time he was allegedly arrested.

The psychological ploy being utilized was to isolate the Appellant from any helpful outside influences. This posture set up the confrontation that occurs between the Appellant and his uncle, Detective Hill. This dual role by Detective Hill circumvented the Appellant's rights in a manner that prevented him from knowingly,

59

voluntarily or intelligently waiving his constitutional rights.

## SECOND PROPOSITION OF LAW

**AN ACCUSED'S STATEMENTS ARE NOT VOLUNTARY WHEN SUCH STATEMENTS WERE COERCED BY THE PSYCHOLOGICAL TACTICS OF LAW ENFORCEMENT OFFICERS ON A RETARDED INDIVIDUAL WHO WAS ESSENTIALLY ILLITERATE AND THE ADMISSION OF SUCH STATEMENTS VIOLATES THE DUE PROCESS CLAUSES OF BOTH THE OHIO AND UNITED STATES CONSTITUTIONS.**

The second basis for the suppression of these statements is that they were involuntary in nature.  In State v. Chase, the Ohio Supreme Court reaffirmed two basic principles regarding the admissibility of statements given by a person accused of a crime. (1978), 55 Ohio St. 2d 237.  It is imperative that a statement be voluntary and that voluntariness is a federal question governed by federal standards.  As the Court stated:

> Long before Miranda, it was well established that a confession, to be admissible, must be voluntary.  As was stated in Rufer v. State (1874), 25 Ohio St. 464, 470, 'Whilst voluntary confessions are always admissible against a prisoner on trial, it is well settled that confessions of guilt made through the influence of hopes or fears, induced by promises or threats of temporal benefit or disadvantage, are wholly inadmissible.'  This rule is now a matter of federal constitutional law. Miranda, of course, laid down minimum requirements which the police must observe in conducting interrogations. 1 But, as this Court has held, the question of whether the accused's statements were in fact voluntary is separate from the question of compliance with Miranda.  Moreover, formal compliance with the requirements of Miranda does not preclude proof that the statements themselves were involuntary.

Id. at 246.  (further citations omitted).

Similarly, the United States Supreme Court has held that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law: even though there is ample evidence aside from the confession to support the conviction. Mincey v. Arizona, (1977), 437 U.S. 385, 398.  Therefore, any

61

statement attributed to an accused must be "the product of a rational intellect and free will," if such a statement is to be admissible at trial. Id. (Further citations omitted.)

Furthermore, the Court recently reiterated this position ":that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton (1985), 474 U.S. 104, 107. The Court has gone on to hold, however, that there must be some type of "state action" to support a claim of a violation of the due process clause. Colorado v. Connelly (1986), 479 U.S. 157.

To determine whether a statement is the product of a rational intellect and a free will, and therefore voluntary, certain well-established principles are applicable:

> (1)  Determination of whether a statement is involuntary 'requires more than a mere color-matching of cases.'  It requires careful evaluation of all the circumstances of the interrogation. Id. at 401, quoting in part, Reck v. Pate (1961), 367 U.S. 433, 442. (Footnote omitted).

> (2)  If an individual's 'will was overborne' or 'if his confession was 'not the product of a rational intellect and a free will,' his confession is inadmissible because coerced.  These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. Townsend v. Sain. (1962), 372 U.S. 293, 307. (Footnotes omitted).

> (3)  It has been held irrelevant the absence of evidence of improper purpose on the part of the questioning officers. Blackburn v. Alabama (1960), 361 U.S. 199, 208.

The voluntariness test is designed therefore to bar admission of those confessions which:  (a) were of doubtful reliability because

of the practices used to obtain them; or (b) were obtained by offensive police practices even if reliability was not in question; or (c) were obtained under circumstances in which the defendant's free choice was significantly impaired, even if the police did not resort to offensive practices. In applying the voluntariness test, the Courts must examine the "totality of the circumstances" surrounding each statement.

In the instant case, we are faced with an accused that is mentally retarded and essentially illiterate. This egregious action that was initiated by law enforcement officers was the ruse of using an uncle who was also a detective for the Warren Police Department to get the Appellant to go down to the police station. It is this same uncle who is left alone in the room with Appellant after the Appellant has consistently and emphatically denied any involvement in the homicide during the course of the interrogation; the officers were constantly using a variety of interrogation techniques to wear the Appellant down. These techniques include the use of false information to mislead and confuse the Appellant.

More specifically, the record reveals that the Appellant was in custodial detention on Friday, September 13, 1985 for more than four hours, and in custodial detention on Monday, September 16, 1985 for approximately two and a half hours before the tape recorded statement was taken of the Appellant at approximately 11:30 a.m. As testified to by the police officers, Officer Dennis Steinbeck continuously questioned the Appellant, Danny Lee Hill, on Friday, September 13, 1985, and Officers Morris Hill, Dennis

63

Steinbeck, and Thomas Stewart, off and on, questioned the Appellant on Monday, September 16, 1985, at the Warren Police Department. On Monday, September 16, 1985, as verified by the Appellant's mother, Vera Williams, Officers Hill and Steinbeck, for a least the initial hour of interrogation, were yelling and using badgering language to the Appellant. Also, during the entire four-hour process of interrogation on Friday, September 13, 1985, the Appellant allegedly gave the substance of what appears in the typewritten statement taken by Officer Dennis Steinbeck; however, the Appellant did not give any statement incriminating himself whatsoever until approximately 11:40 a.m. on Monday, September 16, 1985. The Appellant testified that he was unwilling to go down to the police department with Officer Dennis Steinbeck on Friday, September 13, 1985. Again, on Monday, September 16, 1985, the Appellant was unwilling to accompany the officers to the Warren Police Department. However, the Appellant's uncle, Morris Hill, utilized his relationship with his sister, the Appellant's mother, to come down to the Warren Police Department on that Monday to give a statement. Morris Hill also persuaded the Appellant's mother to have the Appellant come with her.

Officer Morris Hill testified that he was not involved in the investigation until Monday, September 16, 1985, on which date he was dispatched with Detective Steinbeck to go pick up his nephew based upon the suggestion given by Attorney Dennis Watkins in conversation with Officer Steinbeck on Sunday, September 15, 1985, that a relative or family member should be used in regard to either

64

picking up or interviewing the Appellant.  Detective Morris Hill testified that he had on prior occasions, when the Appellant was a juvenile approximately a year and a half ago, physically beaten the Appellant at the Warren Police Department.  At the time, the Appellant was in the custody of the juvenile officers at the Warren Police Department, and Detective Morris Hill, in the use of his own terminology, gave the Appellant a "whipping".  Officer Hill testified as to his physical statute being approximately 5'10", 230 lbs., 20-inch biceps, and capable of lifting 600 to 700 lbs. of weight.  In turn, the Appellant testified that, in fact, he had been beaten by his uncle, Detective Morris Hill, at the Warren Police Department, when he was a juvenile.  The Appellant described it as being physically slapped around and that Detective Morris Hill borrowed another officer's belt and struck him with it; thus, the terminology used by Detective Hill in his testimony was appropriately, "I gave him a whipping".

Officer Steinbeck and Officer Stewart testified that on Monday, September 16, 1985, up until the time that Detective Morris Hill was left alone with the Appellant in the locked interrogation room, he had not admitted any involvement in the crime nor given any incriminatory statements.  At that time, Detective Morris Hill testified that he was left alone with the Appellant and stated to the Appellant, "No one is going to do anything to you," and, "No one is going to harm or hurt you",  again to which the Appellant allegedly stated to Detective Morris Hill that he was there at the scene when the assault took place upon Raymond Fife.  Officers

65

Steinbeck and Stewart testified that upon exiting the room, Detective Morris Hill stated to them that the Appellant was involved and they should go ahead and question him further. Thereafter, upon the return to the room by Officers Steinbeck and Stewart, the Appellant testified that when Detective Morris Hill was in the room alone with him, he put him up against the wall and slapped him, and that, indeed, he was afraid and fearful of his uncle based upon that conduct and the beating and whipping he had given him on a prior occasion at the Warren Police Department.

The Appellant further testified that, at the beginning of the videotape statement which occurred later, Detective Morris Hill, who was sitting to the immediate left of the Appellant, kicked him under the table prior to the commencement of the videotape session. The Appellant also testified that he was unable to read any of the Constitutional rights forms that were presented to him, and that he was unable to read the alleged typewritten statement taken by Detective Dennis Steinbeck on Friday, September 13, 1985. He also testified that he did not write very well, which was unquestionable borne out by the sample of handwriting taken in court. Appellant introduced the typewritten statement and a Constitutional rights form that were previously secured from the Appellant when he was a juvenile; however, the Appellant was unable to recognize either of the documents. He was only able to recognize his handwritten signature, which, if the court will notice, Appellant misspelled his name on the documents.

Officer Morris Hill described the Appellant as having normal

intelligence.    All of the officers indicated that they never
questioned the Appellant regarding his ability to read and write.
In fact, Officers Morris Hill, Thomas Stewart, and Dennis Steinbeck
testified that during the entire time that they had the Appellant
in custodial detention and were interrogating him on Friday,
September 13, 1985, on Monday, September 16, 1985, they never asked
the Appellant to write anything other than his name, never asked
the Appellant to read any of the documents aloud, never questioned
the Appellant as to the definition of any words, and never
questioned the Appellant as to the meaning of any of the language
from the Constitutional rights form or to read the statement taken
from the Appellant on Friday.

The Appellant testified, upon questioning regarding his
constitutional rights, he had no idea what they were and did not
understand the meaning of the words, "constitutional", "voluntary",
"knowingly", and so forth.  The introduction of the school records
regarding the Appellant contained a number of Stanford-Benet and
Wechler Intelligence Tests which placed the Appellant in the low
60's range for the Stanford-Benets and placed the Appellant at a 49
total I.Q. for the Wechler Test, which was a more comprehensive
test than the Stanford-Benet.  Dr. Schmidtgoessling testified that
the Appellant, although scoring a 68 on her administration of the
Wechler Test, had scored the lowest scores on the subtest involving
a    person's    judgment,    reasoning    and    analytical    skills.
Additionally, testimony was elicited indicating the fact that the
Appellant had been enrolled in special E.M.R. classes during his

67

entire education process and had attended Fairhaven School for the Mentally Retarded. Additionally, during cross examination of the Appellant on the stand, it was evident that in regard to some of the responses to some of the questions propounded to him by the Appellee that he did not understand nor comprehend the context of the questions. His responses were not addressed to the questions on may occasions. Additionally, when he was asked the difference between talking and not talking, he was able to distinguish the difference. However, when the prosecutor asked him that he should not talk and the prosecutor was going to continue to talk, his response was that he would continue to talk instead of not talking. It is obvious from the limited appearance by the Appellant in court that not only does he lack the bare essential verbal skills to understand and comprehend what is being said or told to him, but that he also lacks totally the ability to utilize judgment and reasoning power regarding what little he does understand.

Although the limited capabilities of the Appellant were obviously apparent to counsel and the court immediately, it is incomprehensible how all of the law enforcement officers, including Detective Dennis Steinbeck, Detective Thomas Stewart and the Appellant's uncle, Detective Morris Hill, would classify the Appellant as fairly intelligent and not recognize his true mental capabilities, having been acquainted with the Appellant for such a long period of time. On the other had, it is entirely possible that the law enforcement officer were, in fact, well aware and cognizant of the Appellant's low mental capabilities and his

68

inability to read and write. As a consequence of the law enforcement authorities being aware of the Appellant's low mental capabilities and his inability to read and write. As a consequence of the law enforcement authorities being aware of the Appellant's mental deficiencies, they simply took advantage of the same in order to perfunctorily secure his signature on all of the documents required by law and to then pursue their ultimate objective, which would be to investigate and secure incriminatory statements from the Appellant.

Taking into account the "totality of the circumstances", it is apparent that the tape recorded statement and the videotape statement elicited from the Appellant was involuntary in nature and that the Appellee failed to prove by the required standard of preponderance of the evidence that the same was voluntary. The relevant factors of the Appellant's age (being just 18), the Appellant's lack of mental capabilities (placing him in the mild or moderate retarded range), the previous physical abuse imposed upon the Appellant and the abuse imposed upon him during the interrogation on Monday, September 16, 1985, the length of the interrogation process (in total being approximately seven hours), the confinement in the interrogation room with the door locked, lacking freedom of movement, the on and off interrogation by a number of police officers, the fact that the interrogation took place in the Warren Police Department where the Appellant was beaten before, the psychological impact of the threats to a mildly retarded person that Tim Combs was going to blame the homicide on

69

the Appellant, the psychological effect on the Appellant of the promise by Detective Hill that "no one was going to hurt or harm him" certainly leads to the conclusion that the tape recorded statement and videotape statement were involuntarily induced and secured from the Appellant.

## THIRD PROPOSITION OF LAW

AN ACCUSED'S STATEMENTS ARE NOT ADMISSIBLE UNLESS THE
STATE ESTABLISHES THAT THE PROCEDURAL SAFEGUARDS
CONTINUED IN THE MIRANDA WARNINGS WERE PROPERLY GIVEN OR
KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED AS
PROVIDED UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE
UNITED STATES CONSTITUTION AND THE EQUIVALENT PORTION OF
THE OHIO CONSTITUTION.

The Appellant's statements were taken in violation of the
Appellant's right against self-incrimination. As the Miranda court
stated:

> Once warnings have been given, the subsequent
> procedure is clear. If the individual indicates in any
> manner, at any time prior to or during questioning, that
> he wishes to remain silent, the interrogation must cease.
> At this point, he has shown that he intends to exercise
> his Fifth Amendment privilege: any statement taken after
> the person invokes his privilege cannot be other than the
> product of compulsion, subtle or otherwise. Without the
> right to cut off questioning, the setting of in custody
> interrogation operates on the individual to overcome free
> choice and produce a statement after the privilege has
> been once invoked. If the individual states that he
> wants an attorney, the interrogation must cease until an
> attorney is present. At that time, the individual must
> have an opportunity to confer with an attorney and to
> have him present during any subsequent questioning.

384 U.S. at 473-474. In addition, the standard established for the
waiver of this right is the same as that of the right of counsel:
the State has the burden of proving that the defendant
intentionally and voluntarily relinquished or abandoned a known
right. 304 U.S. 438. See also, Schneckloth v. Boustamounte
(1973), 412 U.S. 218.

The United States Supreme Court has examined the issue of what
constitutes interrogation under Miranda in Rhode Island v. Innis,
which held:

The Miranda safeguards come into play whenever a person

71

in custody is subjected to either express questioning or
its functional equivalent.   This is to say, the term
"interrogation" under Miranda refers not only to express
questioning, but also to any words or actions on the part
of the police (other than those normally attendant to
arrest and custody) that the police should know are
reasonably likely to elicit an incriminating response
from the suspect.   The latter portion of this definition
focuses primarily upon the perceptions of the suspect,
rather than the intent of the police. . . . A practice that
the police should know is reasonably likely to evoke an
incriminating response from a suspect thus amounts to
interrogation.

(1980), 446 U.S. 291, 300-301 (footnotes omitted).  Citing Innis,

the Court of Appeals for the District of Columbia held, in Wilson

v. United States, that a defendant's statement was not admissible

because he had invoked his right to remain silent which was not

"scrupulously honored" by the police.  (D.C. App. 1982), 444 A. 2d

25.  In Wilson, the defendant was arrested in Arlington, Virginia,

and spent the night in jail.  His Miranda rights were read to him

that night as well as the next morning when the police transported

him back to the District of Columbia.  Defendant refused to answer

questions, but was "curious" about the charges against him and the

supporting evidence.  Though the defendant did not relinquish his

Miranda rights, a continued dialogue took place between the two

officers and the defendant while they were on their way to the

police station.  After repeated discussions designed to elicit

statements from the defendant, the defendant finally made a

statement when confronted with the fact that the witness against

him was his friend who witnessed the crime.  It was further found

that even though the defendant was inquiring about the evidence

against him, the police were nurturing this conversation and that

this action on their parts constituted an interrogation in violation of the defendant's Miranda rights. The Wilson court also held that the interrogation employed in this case violated the standards established by the Supreme Court in Michigan v. Mosley for the proper procedure to be used in a custodial interrogation. Id. at 29.

The determination of what constitutes a waiver that is voluntary, knowingly, and intelligently given was stated in Moran v. Burbine:

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

(1986), 475 U.S. 412, 421, (further citations omitted).

The Court of Appeals intertwined this standard set forth in Burbine with the separate standard for voluntariness set forth in Connelly. However, by doing so, the Court below did not properly review whether the Appellant's Miranda rights were knowingly, and intelligently waived. In People v. Bernasco, the Illinois Supreme Court, in a similar factual senecio, discusses these distinctions in great detail. (Oct. 18, 1990), Ill. No. 69035, unreported, 1990 WL 155728 (Ill). If this case were reviewed under the standards set forth in Burbine, the decision of the trial court would have been reversed.

73

When the Appellant was brought to the Warren Police Department for custodial interrogation on Friday, September 13, 1985, the old constitutional rights form was read and given to the Appellant to sign, which evidently he did.  Officer Steinbeck further testified that he did not, at any time, ask the Appellant if he could read or write or ask the Appellant to read the Constitutional rights form aloud nor inquire whether the Appellant understood any of the words or the meaning of anything that was read to him.  Thereafter, approximately three and one half hours later, the Appellant gave Officer Steinbeck a verbal statement regarding his whereabouts and the events surrounding September 10, 1985.  After the Appellant was taken into custodial detention by Detective Morris Hill and Dennis Steinbeck, the Appellant was taken to the Warren Police Department again and placed in the same Interrogation Room No. 1.  According to the testimony of Detective Morris Hill, he verbally gave the Appellant his rights from memory on arrival at the Warren Police Department.  Detective Hill recited the four Miranda warnings; however, he did not recite the language of the Waiver of Rights found on the form simply because he had not memorized the same.  Evidently, Detective Hill indicated that the Appellant verbally stated at the time that he understood his rights and waived them verbally.  In addition, Detective Hill indicated that he did not ask the Appellant whether he could read or write, nor did he ask the Appellant to explain any of the words or what the rights were in order to ensure that the Appellant understood his rights.  Additionally, the detective, since he had recited the Miranda

74

warnings from memory, did not include the additional language about not being under arrest which he had not memorized and which was found on the revised rights form, labeled as Appellant's Exhibit "D". Also, it is interesting to note that although the Appellant was in the same Interrogation Room No. 1 in which on the previous Friday Detective Steinbeck secured the written constitutional rights form signed by the Appellant, that on this occasion, although the forms were in the same desk drawer in the same room, that the written constitutional rights form was not utilized until after the tape recorded statement had begun and later interrupted to get the rights form taken from the same desk signed. According to the testimony of the Appellant, he did not recall his uncle or any other officers verbally giving him his rights when he was initially taken to the Warren Police Department on Monday morning, September 16, 1985. After commencement of the tape recorded statement of the Appellant, starting at 11:30 a.m., the Appellant, in response to questions propounded by Detectives Steinbeck, Stewart, and Hill, the Appellant gave an incriminatory statement to the effect that he was at the scene of the assault on Raymond Fife. Thereafter, the tape was interrupted by the officers and Detective Hill proceeded to read to the Appellant his constitutional rights. As noted earlier, new and additional language regarding the fact that the Appellant was not under arrest and free to leave was added to the basic form of the constitutional rights and they were read straight through in their entirety. Detective Hill, after reading the Constitutional rights, which constituted the top half of the

75

form, simply asked the Appellant if he understood, and Appellant replied, "Yeah". Then the bottom portion was read in regard to the waiver of the rights and no response was ever elicited from the Appellant; however, he was asked to sign the rights sheet form. In point of fact, as noted earlier, he actually signed two forms at that time, according to the officer's revised testimony. Therefore, in regard to his custodial detention on Monday, September 16, 1985, the only indication of the administration of the Miranda warnings to the Appellant is given only by Detective Morris Hill, who did the recitation of the rights from memory prior to the Appellant giving any incriminatory statement. The constitutional rights form allegedly given and signed by the Appellant on Friday, September 13, 1985, would refer to that particular time at which the Appellant was in custodial detention regarding the interrogation of that day. When there is a long break in the interrogation process or a substantial lapse of time between separate custodial interrogations, it is incumbent upon the police authorities to re-advise the Appellant of his rights and the fact that a prior statement and waiver of rights was given three days before to the Appellant is not relevant to the issue of the waiver of rights on Monday, September 16, 1985. Miranda v. Arizona, supra.

In fact, based upon the testimony, the Appellant on Monday, September 16, 1985, indicated to the police, which was acknowledged by the officers, that he told them at his house that he had already given a statement and he did not want to be questioned any further.

In the case of U.S. v. Crouder, the Court held that a defendant's statement to police authorities that he did not want to be further questioned or discuss the charges against him and that he had already given a statement to the police earlier is, in fact, an assertion, not a waiver, of his constitutional right to remain silent. (C.A. 6, 1982), 691 F. 2d 280.

Also, according to the testimony elicited from Messrs, Freeman and Goodman of the Warren County Schools and the records introduced regarding the intelligence tests administered to the Appellant, the Appellant was classified as moderate to mildly retarded and that his achievement level from the records indicated that he had not gone beyond the point of a second grade level education. Additionally, Dr. Schmidtgoessling testified that the Appellant was particularly weak and scored the lowest in verbal tests regarding reading, writing, and word recognition and also scored low in the subtests regarding the use of judgment, reason and analyzation. Dr. Schmidtgoessling further testified that the Appellant had no comprehension or understanding of the words utilized in the constitutional rights form and did not understand the meaning of his Constitutional rights. Based upon the Appellant's lack of ability in judgment, reasoning and analyzation, even if his constitutional rights were translated in the most simple and basic language, his preconditioning and image of police officers and police authority automatically compelled him to speak to them, even if he was told to do otherwise. In his words, "I must talk to them because they are the police".

It is difficult to believe that Detective Steinbeck, Detective Stewart, and the Appellant's uncle, Detective Hill, after having known the Appellant for such a long period of time, were totally unaware of the Appellant's mental capacity and his inability to read and write throughout their long acquaintance with the Appellant. Additionally, it is obvious that Detectives Hill, Steinbeck and Stewart at no time ever inquired or thought to ask the Appellant if he could read, write, or if he understood anything that he was being read or told to him. On the other hand, it is apparent from the manner of questioning and the dialogue contained on the tape recorded cassette and the videotape statement of the Appellant that they were aware the Appellant was subject to suggestion and easily influenced and lead by others. It is obvious from the tape recorded statement and the videotape statement that the officers knowingly utilized very childish and simplistic language and implemented simple psychological ploys to have the Appellant respond. For instance, on the tape recorded statement, the following dialogue occurred between Detective Stewart and the Appellant:

> Q: You know, Danny, it seems like everything we suggest to you, you agree with us, right? Isn't that the way it seems to you?
> A: What?
>
> Q: Now, if we suggest something, it seems that you agree with us. In other words, about the cigarette lighter; I suggested he was looking for it, and you agreed with it. Now, if I was to suggest and say that the boy sucked your pee-pee, would you agree to that?

To the average person viewing the videotape statement and listening to the tape recorded statement, it is immediately

apparent that the Appellant does not have normal intelligence. Therefore, based upon the manner in which the Appellant was interviewed by Officers Hill, Steinbeck and Stewart and their previous acquaintance with the Appellant over a number of years, and the fact that the Appellant is the nephew of Detective Morris Hill, it is incredulous to believe that these officers did not know the mental capacity and abilities of the Appellant. On the other hand, taking advantage of the ignorance and lack of mental capabilities of the Appellant, they were able to secure the Appellant's signature on all of the documents required and to have him acquiesce in everything that was told to him to presumably protect his rights. Therefore, the officers were not about to ask the Appellant any pertinent questions regarding his ability to understand the meaning of his Constitutional rights; otherwise, it would have appeared on the tape cassette recording and the videotape for all to know that, in fact, the Appellant did not understand nor intelligently, voluntarily, and knowingly waive his rights.

In the final analysis, based upon the facts in the instant case, the Appellee failed to establish that the Appellant was properly administered his Miranda rights as required by law and that he knowingly, intelligently, and voluntarily waived the same. Therefore, in absence of such proof, the tape recorded statement and the videotape statement taken from the Appellant, as well as all evidence secured as a result thereof, should have been found inadmissible and excluded from the trial.

## FOURTH PROPOSITION OF LAW

**AN ACCUSED'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS UNDER THE OHIO CONSTITUTION ARE VIOLATED WHEN AN ACCUSED IS SEIZED FROM HIS HOME THROUGH THE USE OF PSYCHOLOGICAL PLOYS BY LAW ENFORCEMENT OFFICERS UPON AN ACCUSED WHO IS MENTALLY RETARDED AND ESSENTIALLY ILLITERATE.**

The Fourth Amendment of the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Without judicial authorization or probable cause to arrest, the taking into custody and detention of a person violates the Fourth Amendment absent a valid consent. Hayes v. Florida (1985), 470 U.S. 811. See also, Dunnaway v. New York (1979), 442, U.S. 200. A person is "seized" for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would have believed he was not free to leave. Florida v. Royer (1983), 430 U.S. 490.

In the instant case, Officer Steinbeck testified that he went alone to the Appellant's residence and talked to the Appellant from an upstairs window. He testified that he requested the Appellant to come downtown for questioning in regard to the Fife homicide; however, the Appellant testified that he initially indicated he did not want to go downtown for any questioning, but that Officer Steinbeck ordered him to put his clothes on and go downtown. Once downtown, the Appellant was placed in Interrogation Room No. 1, and he was either with an officer at all times or the door was locked,

80

and he could not leave the premises. The Appellant indicated that he tried at some time when an officer was not present to open the door and leave, but the door was locked from the outside. Officer Steinbeck indicated that he had read Appellant his Miranda rights and had him sign them upon coming to the station, at approximately 10:00 a.m. on Friday, September 13, 1985; however, he did not indicate that he told the Appellant at the time that he was not under arrest and that he could leave at any time. Without the typewritten statement taken by Detective Steinbeck being signed, the Appellant's mother, Vera Williams, came to the police department and talked briefly to Detective Dennis Steinbeck and took her son home at approximately 2:00 p.m. on that Friday, September 13, 1985.

It was determined on Sunday, September 15, 1985, that the Appellant was a suspect in regard to this particular case and that he must be questioned and interrogated further. It was also determined that it would be helpful if a relative of the family was used to entice the Appellant to come downtown for further questioning and interrogation. On Monday morning, September 16, 1985, Detectives Steinbeck and Hill, went to the Appellant's residence. After the officers entered the residence, the Appellant indicated from one of the upstairs rooms that he did not want to go downtown for any further questioning. He remained upstairs. At that juncture, Detective Hill, convinced his sister to come downtown for the purpose of taking her statement, and that she should bring along the Appellant in order that he may sign the

81

statement he gave on Friday, September 13th. Both the Appellant and his mother testified that the Appellant went downtown on Monday, September 16th, and he was not to be further questioned in regard to the Fife homicide. However, upon arriving at the Warren police Department, the Appellant was placed in Interrogation Room No. 1 and separated from his mother, who was placed in another room next door. A statement never was taken of Vera Williams and the statement unsigned by Appellant on Friday was signed immediately that morning upon his arrival. The Appellant further indicated that he asked to go home; however, the officers simply continued to question him and would not let him leave. As it was put by Detective Hill, it was better to get the Appellant down to the Warren Police Department because then he would be on their "home turf".

Also, it was testified to by the police officers and Attorney Dennis Watkins that, up until the time that the Appellant gave the tape recorded statement, probable cause did not exist regarding the arrest of the Appellant for any criminal activity.

Application of the law to the foregoing facts would indicate that the Appellant was "seized" in the context of the Fourth Amendment and placed in the custody by the physical force and authority of Officer Steinbeck on Friday, September 13, 1985, and by Officers Hill and Steinbeck on Monday, September 16, 1985. On both occasions, the Appellant indicated that he did not want to go downtown and rejected the requests by the police officers. On Friday, September 13, 1985, Detective Steinbeck simply ordered the

Appellant to come downtown and he acquiesced to that demand and was physically transported and confined in the interrogation room in the Warren Police Department. Thereafter, he was unable to leave the room upon request and the door was locked and he was confined therein.

On Monday, September 16, 1985, the Appellant indicated he did not want to go downtown for any further questioning; however, the police officers, by use of Detective Hill, deceived the Appellant as well as his mother, Vera Williams, into being transported by them in the police cruiser to the Warren police Department by indicating that they were going to take Vera Williams' statement. In truth of fact, no statement was ever taken from Vera Williams and she was shuffled from room to room in order to occupy her while they were questioning her son. The Appellant also indicated that he wanted to leave and could not because the door was locked from the outside, and that at other times officers were always present with him. Obviously, the restraint and detention of the Appellant was complete on both occasions when the police placed the Appellant in their automobiles, took him to the Warren Police Department and placed him inside the interrogation room, and kept the door locked and officers present questioning the Appellant at all times. On both occasions, the detention took place contrary to the will of the Appellant; however, the Appellant submitted only after the show of physical force and authority utilized by the police authorities.

The United States Supreme Court, in examining the issue of investigative detention, states as follows:

There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. <u>Dunaway</u>, 442 U.S., at 212; <u>Florida</u> v. <u>Royer</u>, 420 U.S. 490, 499 (1983) (plurality opinion). In our view, it continues to be that the lines cross when the police, without probable cause or warrant, forcefully remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We would adhere to the view that such seizures, at least where not under judicial supervision, are sufficient like arrests to invoke the traditional rule that arrest may constitutionally be made only on probable cause.

<u>Hayes</u> at ____, 84 L. Ed 2d 705. In this case, custodial detention

occurring on Friday, September 13, 1985, and Monday, September 16,

1985, is well within the definitions and guidelines set forth by

the United States Supreme Court in <u>Hayes</u>, See also, <u>State</u> v.

<u>Fickes</u> (March 29, 1985), Trumbull App. No 3419, unreported.

Although the Appellant initially rejected the invitation to go

to the Warren Police Department by Officers Hill and Steinbeck on

Monday, September 16, 1985, the Appellant did decide to accompany

his mother who requested that he get dressed and accompany her to

the station. However, it was under the understanding that a

statement was to be taken from the mother, Vera Williams, and the

Appellant was to sign the statement allegedly given on Friday,

September 13, 1985. However, it was further understood by both

Vera Williams and the Appellant that no questioning was to take

place. In addition, it is obvious that in reality the Appellant

would not have accompanied the police officers to the Warren Police

Department on Monday, September 16, 1985, unless the evasive move

84

was made in regard to the officer's request that the mother, Vera Williams, come to the police department to make a statement. In point of fact, obviously there was no intention to take a statement from Vera Williams and once at the police station, she was simply shuffled from room to room and pacified so that the police would know where she was and what she was doing.

The Appellee may well argue that, although the Appellant was reluctant and did not want to come to the police station, initially on Monday, September 16, 1985, it was at the request of his mother that he accompany her and go to the police station, and therefore his trip to the police station was voluntary on his part. However, it would appear that to adopt such a view in light of the circumstances under which the Appellant was brought to the station, that the use of subterfuge or deception to accomplish that which cannot be accomplished directly by law enforcement authorities should be rejected by the law and the courts as well. In other words, if it is illegal to take a suspect into custody and transport him to a police station for investigative purposes without probable cause, it would seem just as illegal to thwart the unwillingness of the suspect to go with the police to the station by utilizing deception and subterfuge to accomplish the same end. The real purpose and motive of the law enforcement authorities became apparent once the Appellant and the mother arrived at the police department and upon the confinement of the Appellant in the interrogation room, separated from his mother, with the outside door locked and police commencing the interrogation and

85

interviewing of the Appellant, and which represents a seizure and custodial detention of the Appellant without probable cause in violation of the Appellant's Fourth Amendment right, as made applicable to the states by the Fourteenth Amendment. Any and all tape recorded, videotape statements, and any and all physical evidence secured as a result thereof should be suppressed and excluded as evidence from the trial.

## FIFTH PROPOSITION OF LAW

**AN ACCUSED IS DENIED HIS RIGHT TO DUE PROCESS UNDER BOTH THE OHIO AND UNITED STATES CONSTITUTIONS WHEN HE IS DENIED HIS STATUTORY RIGHT TO COUNSEL PURSUANT TO R.C. 120.16, 2934.14 AND 2935.20.**

Ohio has recognized the importance of the right to counsel by the enactment of R.C. 120.16, 2935.14, and 2935.20. R.C. 120.16 insures that a defendant be informed not only that he has the right to counsel, but that he must also be told upon arrest that he has the right to be represented by the county public defender or assigned counsel if the defendant is indigent. R.C. 2935.14 grants a defendant a specific right to consult with his attorney in private and a violation of the right by a law enforcement officer is punishable by a fine or imprisonment or both. R.C. 2935.20 also grants similar rights with penalties provided for violations. It should be noted that this section provides for communications by telephone.

Once a statutory right to counsel has been enacted by a legislature, a violation of the statute violates the due process clause of the Fourteenth Amendment. The sanction for such a violation is exclusion of such statement thus obtained. See, State v. Scarlett (Sept. 3, 1987), Montgomery App. No. 10378, unreported.

Pursuant to R.C. 120.16(F), information as to the right of legal representation by the county public defender should have been given to the Appellant immediately upon his arrest, which was shortly after 12:00 noon on Monday, September 16, 1985. Presumably, that is the time that the Appellant was actually

arrested, although Detective Stewart stated to the Appellant that he was going to be detained, and it was in regard to the Fife homicide. At no time during the Appellant's interrogation at the Warren Police Department on Monday, September 16, 1985 was he ever informed of his right to legal representation by the County Public Defender or assigned counsel; however, assigned counsel would refer to a county in which as assigned counsel system is in operation.

In Trumbull county, the public defender system is in place and has the duty and responsibility to represent persons who qualify. However, the statute is even more broad in that it does not require any prequalification of a person's financial status, and that is only to be determined initially by a county public defender. The Trumbull Country Public Defender's Office has staff personnel who are in the Warren Municipal Court daily, and they have previously placed the Warren Police Department on notice of the requirements of Revised Code 120.16 regarding the information that should be given to an arrested person, Exhibits 1 and 2, attached hereto.

Therefore, the tape recorded statement and the videotape statement and any and all evidence stemming therefrom should be suppressed and ruled inadmissible because the Appellant did not knowingly, intelligently and voluntarily waive his right to legal counsel. Law enforcement authorities denied to Appellant legal counsel by preventing Appellant's mother from immediately retaining legal counsel, and by failing to inform Appellant to the right of legal representation by the county public defender, pursuant to R.C. 120.16, 2935.14 and 2935.20.

88

## SIXTH PROPOSITION OF LAW

**NONCOMPLIANCE WITH R.C. 2935.05 RESULTS IN AN ILLEGAL ARREST, AND ANY STATEMENTS AND/OR EVIDENCE DERIVED THEREFROM SHOULD BE SUPPRESSED.**

The tape recorded statement and the videotape statements should be suppressed and ruled inadmissible as a result of an illegal arrest of the Appellant by virtue of the noncompliance with R.C. 2935.05 and 2935.07.  R.C. 2935.05 entitled, "Affidavit Filed in Case of Arrest Without a Warrant" provides as follows:

> When a person named in Section 2935.03 of the Revised Code has arrested a person <u>without a warrant</u>, he shall <u>without unnecessary delay</u> take the person arrested <u>before a court or magistrate</u> having jurisdiction of the offence, and shall <u>file or cause to be filed an affidavit describing the offense</u> for which the person was arrested. Such affidavit shall be filed either with the court or magistrate, or with the prosecuting attorney or other attorney charges by law with the prosecution of crimes before court or magistrate and if filed with such attorney, he shall forthwith file with such court or magistrate a complaint based on such affidavit. (Emphasis added).

R.C. 2935.07 entitled, "A person Without a Warrant Shall Be Informed of Cause of Arrest" provides in pertinent part:

> When an arrest is made without a warrant by an officer, he shall inform the person arrested of such officer's authority to make the arrest and <u>cause of the arrest</u>. (Emphasis added).

In the instant case, the Appellant was formally arrested by Detective Stewart of the Warren Police Department on Monday, September 16, 1985 at approximately 12:30 p.m.  According to testimony of Detective Stewart, at approximately 12:30 p.m. on Monday, September 16, 1985, after the tape recorded statement, he stated to the Appellant that the Appellant was going to be "detained" and that the reason for him being detained was "in

89

regard to the Fife homicide." Pursuant to R.C. 2935.05, Detective Stewart, when he placed the Appellant under arrest, at 12:30 p.m., was required to take the Appellant before a magistrate without unnecessary delay and cause to be filed an affidavit describing the offenses for which the Appellant was arrested. Obviously, as of 12:30 p.m. on a Monday, the Municipal Court of Warren and the Court of Common Pleas which had jurisdiction over these matters, were open and accessible to Detective Stewart during the afternoon on Monday, September 16, 1985 and the morning of Tuesday, September 17, 1985. It was not until approximately 1:00 p.m. on Tuesday, September 17th, at which time Officer Stewart caused to be filed affidavits charging the Appellant with particular offense and having him appear before a magistrate. Thus, the Appellant was held incommunicado for more than 24 hours after having been arrested and not brought before a magistrate or affidavits filed specifying the offenses for which the Appellant was originally arrested on Monday, September 16, 1985 at 12:30 p.m.

Additionally, Detective Stewart failed to adequately inform the Appellant of the charges for which he was being detained and arrested. Obviously, Detective Stewart never indicated any particular criminal offense for which the Appellant was being held; however, he just said it was in "regard to the Fife homicide". Additionally, it should be noted that at the time Detective Stewart indicated to the Appellant that he would be detained, he left the room and went to confer with Attorney Dennis Watkins, who is the prosecutor of Trumbull County. If Detective Stewart was in any

90

doubt as to what the charges would be, it seems likely that as a result of the conference with Attorney Watkins, Stewart would be able to specify the particular offenses for which the Appellant was being held.  Clearly, by Monday, September 16, 1985, the office of the Prosecuting Attorney and the Warren Police Department were well aware of the criminal acts which were perpetrated upon the young victim of the crime.  The Appellant at that point in time had already indicated the facts regarding the incident on the tape recorded statement.

On the other hand, even though the Appellant is mild or borderline mentally retarded and essentially illiterate, it is entirely possible that once Detective Stewart would have indicated to him that he was going to be charged with rape, robbery, felonious sexual penetration, arson, kidnapping, and murder, it is conceivable that something would have clicked in the mind of the Appellant to alert him that these were not necessarily his friends and they wee not looking out for his best interests.  So, in order not to upset the apple cart and to proceed unproblematically into the videotape, it was consciously agreed not to really inform the Appellant of any of the particular and specific offenses for which he was being held and would be charged.  On the other hand, since the Appellant had previously asked and tried to leave the Interrogation Room No. 1 where he was custodially detained, and such a request was previously ignored and denied earlier, the Detectives, in order to justify and make legal his detention, technically placed him under arrest.  Obviously, the use of the

91

words "technical arrest" refers to the manner in which it was done by utilizing the word "detained" and be failing to inform the Appellant at the time of the specific cause for his detention by specifically and particularly describing the offenses for which he is being held and would be charged. In the case of State v. Fairbanks, this Court of Ohio held that for probable cause to exist for an arrest by a police officer, the failure to notify the accused of the cause of his arrest does not render the arrest illegal, if he is notified of the offense with which he is charged soon after he is taken into custody. (1972), 32 Ohio St. 2d 34. In Fairbanks, the defendant was arrested as a result of probable cause existing when the police officers visibly observed the defendant, who was a convicted felon, throwing away a .22 caliber pistol which the police recovered, and the police having probable cause regarding the commission of a felony, immediately placed the defendant under arrest and took him to the police department. Soon thereafter, law enforcement authorities caused to be filed a complaint charging the defendant with a crime. In the meantime, while the defendant was under arrest for that particular offense actually physically observed by the police officer, he was questioned in regard to a number of homicide incidents.

The defendant unsuccessfully argued that at the time of his arrest, he was not informed of the cause of his arrest; however, the court found that the defendant, after being placed in custody, was very soon thereafter charged with the crime. In the meantime, as a result of his arrest for discarding the .22 caliber weapon, he

was also questioned in regard to the homicides for which, at the time, it was debatable whether probable cause existed for his detention; however, the court ruled that the defendant was not prejudiced even though he was not informed of the cause of his immediate arrest when the affidavit charging him with possession of the .22 caliber weapon was filed and warrant issued thereafter upon return to the station. Therefore, the court ruled, basically, that even though the defendant was not technically advised of the cause of his arrest, that technical error was corrected by virtue of the fact that an affidavit and warrant was issued immediately upon return to the police department and there was no prejudice to the defendant.

However, in the instant case, the situation is otherwise. Although the law enforcement officers knew at approximately 12:30 p.m., on Monday, September 16, 1985, that there was probable cause for the arrest and made the arrest, they failed to inform the Appellant of the reason or cause for his arrest. R.C. 2935.07 requires law enforcement authorities to at least specify the nature of the crimes for which the person is arrested. In the instant case, it is apparent from the testimony adduced at the suppression hearing that Detective Stewart, in conjunction with his conferences with the Trumbull County Prosecutor, was well aware of what the charges would be in regard to the arrest that was made of the Appellant at 12:30 p.m. on September 16, 1985. However, it is also apparent that the arresting officer, Detective Stewart, failed to specifically or particularly inform the Appellant of the cause of

93

his arrest by specifying even in a general nature the charges for which the Appellant was arrested and what would be filed against him. To utilize such a ploy of failing to inform the Appellant of the nature and the crimes for which the person is arrested. they left the Appellant totally ignorant of the potential consequences regarding any further cooperation and talking with law enforcement authorities.

A person arrested in the State of Ohio without a warrant cannot be held in custody for any longer than is reasonably necessary to obtain a warrant for his detention. Johnson v. Reddy (1955), 163 Ohio St. 347; Leger v. Warren (1900), 62 Ohio St. 500. Additionally, in the case of In re Thompson, the court held:

> Rather than the old inflexible 72 hour rule, this court is suggesting a flexible 12 hour rule. Every suspect, arrested without a warrant without charges having been filed against him, must, within 12 hours of the arrest, be either formally charged, taken before a magistrate for his initial appearance and given the opportunity to have bail set or released. This rule would apply whenever the suspect may be arrested--day or night, weekday, weekend, or holiday. Such is no less than is required by the United States Constitution and Ohio Law.
>
> It is not sufficient that an affidavit be filed on a warrant issued thereon within the 12 hour period of time. In addition, to fully comply with the law, the suspect must be brought before the judge or magistrate having jurisdiction of the offense within the period of time stated above.

(1974), 4 Ohio Op. 3d 359, 362.

It is evident that there were no facts or circumstances that would have prevented Detective Stewart, after arresting the Appellant, to cause to be filed the appropriate affidavits and warrants issued and to have the Appellant brought immediately

94

before a magistrate of court of jurisdiction.  Further, it is
equally apparent that, under the facts and circumstances, the
arresting officer was in a position, after conferring with the
prosecuting attorney and having the evidentiary background of the
case and hearing a statement given by the Appellant, to fully
inform and advise the Appellant of the offenses for which he was
being arrested and would be filed against him, i.e. rape,
kidnapping, arson, felonious sexual penetration, robbery, and
aggravated murder.

## SEVENTH PROPOSITION OF LAW

**WHEN STATEMENTS ARE MADE BY AN ACCUSED TO LAW ENFORCEMENT OFFICERS UN̶D̶E̶R̶ ̶T̶H̶E̶ ̶** [handwritten] ̶G LENIENCY OR SOME OTHER** [handwritten] ̶**ATEMENTS ARE INADMISSIBL**[handwritten]

[handwritten marginalia: Argument the same as Ass. of Error 7 #2, with the following NEW authorities: State v. Gardner, State v. Flannery, State v. Benner, State v. Hutton, Brown v. State]

It is submit[handwritten obscures] [s]tatements attributed to the Appellant [handwritten obscures] [enforce]ment officers were made during the [handwritten obscures] [neg]otiations and are therefore inadmi[handwritten obscures] induced to make statements to de[handwritten obscures] Department in the hope (which was [handwritten obscures] by law enforcement officer) of recei[handwritten obscures] [con]sideration in this matter.

In <u>United States</u> v. <u>Geders</u>, the court had an occasion to express its opinion on the admissibility of statements made by a defendant to an Assistant United States Attorney during the court of a plea bargaining process. (C.A. 5, 1978), 566 F.2d 1227. In reaching the conclusion that the defendant's statements were inadmissible, the court noted that:

> When the government and the defendant discuss criminal activities, each side entertaining the desire to receive a quid pro quo, the government does so at its own risk, the statements made by the Defendant will not be admissible against him at trial.

<u>Id</u>. at 1231. Furthermore, the court answered the contention of the government that plea bargaining had not commenced when the defendant made his statements, noting:

> {T}o hold that statements made by a Defendant during a meeting with government officials are plea related only if the Defendant actually offers to enter a plea could encourage the 'shouted offer to plea 'only' after the hours is out of the barn.'. . . More importantly, such a

96

holding would elevate form over substance.

Id.

No hard and fast standard can be imposed on determining when the plea bargaining process is initiated. As can be seen from a cursory reading of Geders, the commencement of "the plea bargaining process is not to be determined according to hypertechnical distinctions" since a defendant is not required to "accompany all admissions with a 'preamble explicitly demarcating' the beginning of plea discussions." Id. at 1230. Hence, the commencement of plea bargaining discussions is to be determined liberally in favor of a defendant and most strongly against the State. In State v. Davis, that court reiterated that point in also holding that statements made during plea negotiations may not be introduced into evidence. (1980), 70 Ohio App. 2d 48.

In the case at hand, the Appellant is mentally retarded and essentially illiterate. Repeatedly, detectives from the Warren Police Department informed the Appellant that Timothy Combs, an eventual co-defendant, was in the next room or on his way down to talk first. In fact, during cross examination, Detective Steinbeck admitted that he told the Appellant that if he talked, he would benefit from it, otherwise Combs would blame him for everything. Therefore, any statements elicited from the Appellant under these circumstances should have been suppressed.

## EIGHTH PROPOSITION OF LAW

THE ADMISSION OF OTHER CRIMES, WRONGS, OR ACTS, INTO
EVIDENCE BY THE TRIAL COURT VIOLATED R.C. 2945.59., EVID.
R. 404(B), AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH
AMENDMENT TO THE U.S. CONSTITUTION TO THE PREJUDICE OF
THE APPELLANT THUS REQUIRING REVERSAL.

(A) The admission of other crimes, wrongs or acts prejudiced
Appellant's due process rights in the guilt phase.

(B) The admission of other crimes wrongs or acts prejudiced
Appellant's due process rights in the sentencing phase.

During the guilt phase of Appellant's trial the State called
Candyce Jenkins as a witness.  Over defense counsel's objection,
Ms. Jenkins testified that on March 2, 1984, Appellant had put his
fist through her window and entered her house.  She claimed
Appellant had a knife, asked for money, and proceeded to tell her
to take off her clothes and perform oral sex on him.  He was in the
house for 1 1/2 hours during which time both anal and vaginal
intercourse occurred.  Ms. Jenkins testified that Appellant bit her
on the back of the shoulder and on one of her breasts.

Marge Ann Brison, a witness for the State, testified that on
February 9, 1984, Appellant came up behind her and threw her to the
ground.  She stated that Mr. Hill punched her, threatened her, and
performed vaginal intercourse.  He then took her cigarettes and ran
away.

Stephen Melius, a seventeen year old was called by the State.
(The witness's name was not provided in discovery, which is
discussed in Proposition of Law No. 16).  He claimed that he was
incarcerated in the same cell as Appellant in late January or early

98

February of 1984. He testified that Appellant made overtures towards him requesting both oral and anal sex. Melius claimed he pushed Appellant away and nothing more happened. Cross examination revealed that Melius and Hill were not incarcerated together during this period of time.

Appellant submits that the admission of these other acts severely prejudiced his rights in both the sentencing and guilt phase.

Evid. R. 404(B) provide that:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule of evidence is codified in R.C. 2945.59 which provides:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

In State v. DeMarco (1987), 31 Ohio St. 3d 191, this Court stated that R.C. 2945.59 must be strictly construed against the State. Trial courts should not only be very conservative in applying this evidentiary exception, but they have previously been cautioned against overly-broad uses of this statute to admit otherwise inadmissable evidence.

99

The Appellate Court found that the admission of the other acts was proper because they tended to show the Trial Court that the Appellant intended to rape the victim. In support of its holding the Appellate Court cites State v. Gardner (1979), 59 Ohio St. 2d 14. In that case this Court allowed evidence of an alleged forcible rape occurring the night preceding the events for which the defendant was being tried to be admitted. This Court held that the "other acts" evidence went to the Defendant's intent. The Defendant in Gardner claimed that he intended to participate in consensual sexual relations, not forcible rape. This Court found that the "other acts" testimony was relevant to the issue of intent because there was "such a temporal, model and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question." Id. at 20, citing State v. Burson (1974), 38 Ohio St. 2d 157, 159. There was no similar temporal, model, or situational relationship existing between the "other acts" testimony admitted in Appellant Hill's case. The Jenkins and Brison incidents occurred more than 1 1/2 years prior to the Fife homicide, when Appellant was a juvenile. Both those incidents involved women and knives, not young boys and burning. Melius' testimony was less than credible. Even if accepted as true, however, that alleged incident occurred over 1 1/2 years prior to the homicide. It also lacked similar characteristics of the homicide.

State v. Flonnery (1972), 31 Ohio St. 2d 125 also involved

other acts testimony. The "other acts" admitted in <u>Flonnery</u>, unlike the acts here, parallel the crime for which Flonnery was being tried.

This Court also found no prejudice in the admission of similar "other acts" in <u>State</u> v. <u>Benner</u> (1988) 40 Ohio St. 3d 301, at 306, a capital case. Once again, however, the "other acts" admitted into evidence were very similar rapes and murders and the offenses had been joined for purposes of trial. Moreover, there was a course-of-conduct specification that made each strangulation or attempted strangulation relevant.

The facts presented in the case sub judice more closely parallel the other acts erroneously admitted in <u>State</u> v. <u>Hutton</u> (April 28, 1988), Cuyahoga App. No. 51704, unreported. In <u>Hutton</u> the Cuyahoga Court of Appeals held that the Trial Court committed reversible error in permitting evidence of "other acts" to be introduced in the death penalty trial. See <u>Hutton</u> Assignment of Error Number 4, pp. 47-52. Appendix p. 271. The "other acts" evidence in Hutton's case involved an alleged rape of the victim's girlfriend, which the State contended occurred after the victim was murdered. In its discussion, the Appellate Court notes, apparently with approval, that the Trial Court refused to merge the two indictments and erroneously admitted the testimony to the Defendant's prejudice. The rape in Hutton was even more closely intertwined with the aggravated murder than the acts admitted in Hill's case.

Clearly, there has been no showing in this case that the

101

"other acts" that the State sought to prove that the Appellant had committed show any type of motive for the crime alleged in the indictment. The other incidents are not contemporaneous with nor logically connected with the allegations set forth in the indictment. Neither is the issue of intent addressed by the admission of the "other acts".

The second situation in which this type of evidence may be admitted is that dealing with an attempt by the State to prove absence of mistake or accident on the part of the Appellant in the commission of the allegations. Such an issue was never raised during the course of the trial, and therefore is not pertinent to discussion here.

The third situation for which such evidence may be admissible is to prove the defendant's scheme, plan or system in doing an act. One of two factual situations must arise in order for "other acts" testimony to be admissible. The court addressed these two scenarios in State v. Curry. (1975), 43 Ohio St. 2d 66. In Curry, the court stated that the first situation in which such evidence may be admissible is that:

> . . . (i)n which the "other acts" form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment. In such cases, it would be virtually impossible to prove that the accused committed the crime charged with out also introducing evidence of the other acts. To be admissible pursuant to this sub-category of "scheme, plan or system" evidence, the "other acts" testimony must concern events which are inextricably related to the alleged criminal act.

Id. at 73. These "incidents" are chronologically and factually separate occurrences. No evidence was presented at the trial of

102

this matter to show any acts that are inextricably related to those acts set forth in the indictment.

Secondly, establishing identity of a perpetrator of a criminal act is the second factual situation for which this type of evidence may be admissible. As stated in Curry:

> One recognized method of establishing that the accused committed the offense set forth in the indictment is to show that he has committed similar crimes within a period of time reasonably near the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and other crimes.

Id. at 74. (further citations omitted). As in the Curry case, conduct attributable to the Appellant and not identity was at issue. Thus, the admissions herein were not properly admitted under this theory.

Three "other acts" were admitted into evidence against the Appellant. Two of these acts seemed to involve prior allegations of delinquency involving complaints of rape that occurred in February or March of 1984. Such evidence, in the form that it was presented, meets none of the criteria set forth above for admission. As for the Milius testimony, that was admitted into evidence concerning a possible allegation of "something", (possibly sexual advances) the record is very scant as to whether or not anything even occurred; and any relevancy it may have to any of the issues is negligible.

Furthermore, Evid. R. 403 states:

(A) Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

In the case at hand, not only did the trial court admit this evidence improperly, but also allowed the State to comment vehemently and continuously on the horrible nature of the prior acts. Apparently, the focus of the trial court was no longer on the issues of the indictment, but rather on the issues of the prior acts. This is further accentuated by the fact that one of the acts introduced into evidence was not even known to the Appellant until during the course of the case. This is not a proper time to deal with it as a legal issue. While the court stated that it would grant reasonable time for a continuance in order to investigate the situation, this was done so only after the evidence had been heard by the court. As was shown by the evidence presented by the Appellant, whether or not the third "other act" even occurred was very unclear; its relevance was even more obscure. Thus, the prejudicial effect of its admission clearly outweighed any relevance. In addition, the defendant was put in the compromising posture of having to defend himself against the "other act" as well as defending himself against the allegations set forth in the indictment.

This predicament is clearly what R.C. 2945.59 is designed to prevent. The admission into evidence of these "other acts" seemed to be solely for the purpose of inflaming the three judge panel as the State would continuously argue throughout the trial that the defendant was an "animal", not whether or not he was guilty of the charges set forth in the indictment. The cumulative effect of each admission and the ramifications of such admission clearly prejudice

104

the Appellant in both the guilt and sentencing phase of the trial necessitating nothing short of a reversal in this case.

## NINTH PROPOSITION OF LAW

A TRIAL COURT MUST EXCLUDE EVIDENCE THAT IS EITHER NOT RELAVANT OR WHOSE RELEVANCE IS OUTWEIGHED BY ITS PREJUDICIAL EFFECT OR IS SOLELY INTRODUCED TO INFLUENCE THE COURT.  THE EFFECT OF THE ERRONEOUS EVIDENTIARY RULINGS WAS THE DENIAL OF APPELLANT'S RIGHT TO DUE PROCESS AND FAIR AND IMPARTIAL TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

Evid. R. 401 allows for the admission of any relevant evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence".  This general rule is tempered by Evid. R. 403 which states:

Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.

(A) Exclusion mandatory.

Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) Exclusion discretionary.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

1.  The Hughes comment.

Raleigh C. Hughes, an ambulance attendant who was at the scene of the homicide and saw the body, was allowed to testify that the scene was "one of the most gruesome things I've ever seen." Testimony of this nature had no bearing on the evidence in this case.  This comment was elicited to inflame the passions of the

106

three judge panel as part of the State's continual effort to shift the focus of this case from facts that could be proven to the horrible nature of the crime and the Appellant's character. These types of comments permeate the entire record from opening statement to closing argument. See e.g.: Tr. 6, 335, 418, 702, 1168-1170, 1173-1175.

The Appellate Court, although acknowledging that the Hughes comment may have been prejudicially erroneous in a jury trial, found that it was not prejudicial to Appellant in this court trial, citing State v. White (1968), 15 Ohio St. 2d 146, and State v. Eubank (1979), 60 Ohio St. 2d 183. Both State v. White and State v. Eubank stated in the proposition that error occurring in a trial to a court is given different weight than error occurring in a jury trial. In fact, a judge is presumed to consider only the relevant material and competent evidence in arriving at a judgment.

This general rule, however, can not be legitimately imposed in disregard of the evidentiary rules. Nor should the choice of a three judge panel be a license to a prosecutor to engage in "overkill" particularly in a death penalty case.

The type of comment elicited from Hughes was not a single isolated event. A review of the transcript reveals many instances where the prosecutor and the State's witnesses indulged in "overkill."

This court has previously held:

"Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, conviction will be reversed where the cumulative effect of the errors deprives a defendant of

the constitutional right to a fair trial."

State v. DeMarco, paragraph 2 of the syllabus.

The instant case not only presents a plethora of violations of the Rules of Evidence, but also it is impossible to isolate the errors and apply the presumption that the repetitive nature of the problem did not affect the panel in either the guilt or, more importantly, the sentencing phase.

Further, erroneous evidentiary rulings include the following:

2.  Exhibit 47, the "stick".

Exhibit 47 is a "stick" similar in appearance to a broken off broom handle which was found six feet off the N.E. of the path leading off Willow Drive. Donald Allgood testified that he saw the Appellant flick something into the brush, but was unsure what it was. In fact, this information was not even mentioned in this witness' first statement. Based upon this information, Detective Teeple, along with others, searched a five hundred square foot area. Exhibit 47 was found in this area.

It was Appellee's contention that this "stick" was the circular and pointed object that penetrated the deceased's rectal area and bladder. However, Dr. Adelman could not state with any degree of medical certainty that Exhibit 47 was the object. In fact, he testified that a tree limb would also be consistent with the injury. In terms of the foreign matter that was found in the tissue, Dr. Adelman testified that it consisted of plant material which was similar in nature to Exhibit 47 or any other piece of wood. Upon the trial court's questioning, the doctor admitted that

108

the cellular formation he found in the tissue could not be specifically matched with any wooden object in particular. Larry Dehus, a criminologist and forensic science analyst, testified that material found in the tissue could be consistent with things other than wood since other things were made up of cellular plant material.

James Wurster testified that the stick was tested for blood and the test result was negative. Mr. Dehus stated that if Exhibit 47 was the object in question, then it was more likely than not that blood should have been detected. Appellee contended that any blood that was on Exhibit 47 would have washed away in the rain that occurred. This reasoning ignores the fact that the "stick" was covered with dirt and discoloration which should also have been washed away under this theory. Also, there was testimony that if Exhibit 47 was the object, blood would have been absorbed and remained in the "stick".

Therefore, Exhibit 47 had no probative value in this case and should not have been admitted into evidence. Even if there was any relevance to this exhibit, it was substantially outweighed by unfair prejudice, of confusion of the issues, or of misleading the three judge panel.

3.    Dr. Adelman's testimony concerning asphyxia as a sexual overtone and to enhance sexual orgasms.

This testimony by Dr. Adelman was not probative of any issue involved in this case. Furthermore, there was an insufficient basis for this testimony. There was no testimony presented that

this scenario ever happened.  For these reasons, Appellant's objection to this testimony should have been sustained.

## TENTH PROPOSITION OF LAW

AN INFERENCE OF FACT CANNOT BE PREDICATED UPON ANOTHER INFERENCE, BUT MUST BE PREDICATED UPON A FACT SUPPORTED BY LAW. SOBOLOVITZ v. LUBRIC OHIO CO. (1923) 07 OHIO ST. 204. IT IS ERROR FOR ___ RAW AN INFERENCE FROM ANOT___ IDATION OF THE SECOND INFER___ E UPON IT WOULD RESULT I___ MERELY SPECULATIVE IN NATU___

*Same as Ass of Error # 4, No New Authorities Cited    10*

In admitting State' ___ rial court improperly relied on an i___ ence. The first inference is that t___ anch that Donald Osgood alleges he s___ d on that inference is that the "st___ ated the deceased. The serious dis___ of this exhibit were previously dis___ Proposition of Law No. 9. To further compound the exhibit's lack of value is the stacking of the inferences. As such, Exhibit 47 should never have been admitted into evidence. The admission of the "stick" deprived Appellant of a fair and impartial trial under the fifth, sixth and fourteenth amendments to the U.S. Constitution and Article One Section Ten and Sixteen on the Ohio Constitution.

111

**ELEVENTH PR~~~~**

AN ACCUSED'S RIGHT TO C~
PROSECUTOR CONSULTS WITH
WITNESS WAS SUBJECT TO RE
OF WHICH DEFENSE COUNSEL

The right to cross-examin~ ~ight
guaranteed by the United States ~ ~ the
states.  Pointer v. Texas (1965) ~hio
Constitution independently provi~ ~ee,
Section 10, Article I, Ohio Cons~

The United States Supreme Co~ ~~~~:

> It is the essence of a fair trial that reasonable
> latitude be given the cross-examiner, even though he is
> unable to state to the court what facts a reasonable
> cross-examination might develop.  Prejudice ensues from
> a denial of the opportunity to place the witness in his
> proper setting and put the weight of his testimony and
> his credibility to a test, without which the jury cannot
> fairly appraise them.  To say that prejudice can be
> established only by showing that the cross-examination,
> if pursued, would necessarily have brought out facts
> tending to discredit the testimony in chief, is to deny
> a substantial right and withdraw one of the safeguards
> essential to a fair trial.

Alford v. United States (1931), 282 U.S. 687, at 692 (further
citations omitted).  See also, Smith v. Illinois (1968), 390 U.S.
129.

In the case at hand, the state called Stephen Melius to the
stand suddenly in the middle of the trial without prior disclosure
to the Appellant.  An objection to this witness' testimony was
overruled.  However, the trial court stated that it would order
that the witness remain in the county and available for further
cross-examination. After the prosecutor examined this witness, the
Appellant did some initial cross-examination.  Subsequently, the

Appellant was able to investigate this witness' testimony. Upon recalling Stephen Melius to the stand, it was quite apparent that the witness' potential further testimony had been thoroughly reviewed with the prosecutor.

The right to confrontation is violated, and reversal is required, when cross-examination is improperly limited in a manner that is equivalent to a denial. Davis v. Alaska (1975), 415 U.S. 308. The issue raised herein is more delineated. It was error for the trial court to effectively deny full cross-examination of a crucial prosecution witness.

This issue is similar to that raised in State v. Prater (1983), 13 Ohio App. 3d 98. In that case, a recess was taken during the course of a cross-examination. Upon resumption of trial, it was clear that the prosecutor had "refreshed" the memory of the key prosecuting witness by reviewing with the witness a transcript of her testimony at the preliminary hearing. This discussion was held despite a court order that the witness not discuss her testimony with anyone during the recess. The court stated:

> quite properly, the prosecutor may prepare his witnesses and review the expected testimony in advance of trial, so as to insure an orderly and coherent presentation of his case.
> However, the prosecutor cannot use trial recesses to "coach" or otherwise "rehabilitate" his witnesses before defense counsel has finished his cross-examination.

Id. at 101. The court, however, did not reverse the case because in reviewing the entire testimony, there was no showing of prejudice.

113

It is Appellant's contention that the necessary showing of prejudice can be presumed from the facts herein. The conduct of the prosecutor in the handling of this witness should not be condoned. This conduct only reinforces the Appellant's contention that the state was attempting to direct the court's attention to collateral materials and not to the factual issues involved in this case. Furthermore, this witness offered evidence which was obviously given credence by the Appellate Court. The Appellate Court in its discussion of mitigating factors cites Steve Melius' testimony as a reason to find that Appellant is not merely a "follower" easily led (because of his mental handicap) and influenced by any person with a dominant personality. Ap. Opinion p. 85. Accordingly, the testimony of Melius was not an insignificant portion of the trial. It went directly to Appellant's claim that his co-defendant Timothy Combs was the more culpable party. Therefore, the prosecutor's conduct with this witness cannot be presumed harmless error as in _Prater_.

The fair administration of justice should likewise condemn this type of procedure. As stated in _Prater_, the prosecutor's duty is not to "win the case" but "to see justice is done and the truth elicited". 13 Ohio App. 3d at 101.

The policy underlying such a rule is obviously to prevent witnesses from tailoring their testimony to one party's views. In other words, the policy is to prevent a witness from lying or from being provided with responses which are more credible than their own response might be. Such a policy is inherent in the concept of

a right to a fair trial as guaranteed by the United States Constitution.  As stated by the United States Supreme Court in Brady v. Maryland (1963), 373 U.S. 83 at 84, "Society wins not only when the guilty are convicted but when criminal trials are fair; our system suffers when any accused is treated unfairly."

When a prosecutor attempts to influence any witness' testimony and proceeds to admit they have, in fact, talked to a witness during the trial outside the courtroom and literally in the middle of defense counsel's cross-examination, the trial court abuses its discretion in failing to, at a minimum, inquire into all that was discussed.  The interference in the effective cross-examination of this witness violated the confrontation clauses of both the U.S. and Ohio Constitution.

115

## TWELFTH PROPOSITION OF LAW

IT IS A DENIAL OF AN ACCUSED'S RIGHT TO A FAIR CROSS-
SECTION OF THE COMMUNITY TO DENY A REQUEST FOR INCLUSION
IN THE POOL OF PROSPECTIVE JURORS LICENSED DRIVERS
PURSUANT TO R.C. [illegible] SIXTH AND
FOURTEENTH AMEND[illegible] CONSTITUTION,
AND ARTICLE I, S1 [illegible] CONSTITUTION.

*[handwritten: 12 SAME AS ASS. OF ERROR # 6, NEW Authorities; Jury System of the 80's, Jury Representatives, Center for Jury Studies]*

The Appellant is [illegible] a jury array

chosen from a fair c[illegible]. *Duren* v.

*Missouri* (1979), 439 U.[illegible]

The jury array fr[illegible] selected was

drawn from Trumbull Cou[illegible] Appellant

contends that this vot[illegible] adequately

reflect a fair cross-sec[illegible]. The trial court

denied Appellant's motion to include licensed drivers in the pool

of prospective jurors.

Reliance on voter registration lists does, as a general

proposition, exclude distinct groups from the pool of potential

jurors.  Two attorneys with experience in this area have stated

that:

> The sole use of voter registration lists will result in
> a prospective juror list on which males, whites, the
> middle-aged, and that better educated are
> disproportionately ever-represented.

Dogin and Trevelin, *Jury System of the Eighties:  Toward a Fairer

Cross-Section and Increased Efficiency*, Toledo L. Rev. 944 (1980).

Census Bureau statistics support this observation.  Blacks, for

example, were underrepresented by 9.4% on voter registration lists

in the November, 1972 elections, and by 11.7% in the November, 1974

election.  Persons of Spanish origin were underrepresented by 38.6%

116

in 1972, and by 43.9% in 1974. Additionally, all age groups from 18 to 34 were underrepresented in both election years, and those who had completed one to three years of high school without graduating were underrepresented by 12.9% in 1972, and 12.7% in 1974. Kairys, Kadane, and Lehoezky, Jury Representatives: "A Mandate for Multiple Source Lists," 65 Cal. L. Rev. 776 (1977). Moreover:

> (A) recent study of federal juries selected solely from voter registration lists confirms that 'systematically underrepresented groups include females, racial minorities, those with less education, younger persons and those with low status occupation.' Corp., 'Federal Grand Juries: How True a Cross-Section of the Community'," 7 The Justice System Journal, No. 2 (1982).

Appellant contends that the groups underrepresented are blacks, poor people, and those with low status jobs, as there is no reason to believe that Trumbull County is substantially different from the rest of the nation in this regard.

Pursuant to the authority of R.C. 2313.06 and 2313.08, the pool from which potential jurors are selected is expanded beyond the more confined pool which includes only those electors certified by the Board of Elections pursuant to R.C. 2313.06. Obviously, whether an individual is registered to vote or not has nothing to do with his qualification to serve as a juror. Prior to the revision of R.C. 2313.06 and R.C. 2313.08, both effective October 1, 1984, the only source for a pool of jurors was the list of qualified electors compiled by the Board of Elections of each county. In the revision of the foregoing statute, it is obvious that the legislature intended to expand upon the number of citizens

who, although qualified to sit as jurors, were simply not included because they were not on the list of qualified electors compiled by the Board of Elections and filed with the Commissioners of Jurors of each county. As a result, a significant number of people within the community, although qualified as jurors, are not called upon to serve; they are systematically excluded by the process of compilation of the jury pool. By deriving potential jurors exclusively from a pool of jurors compiled only of qualified electors registered to vote, a significant portion of the community population was excluded from potentially serving on jury service. However, since the revision of Ohio Revised Code 2313.08, the list and poll of names from which the venires can be drawn is expanded to more fairly represent the community and to obtain a fairer cross-section of those who reside within the confines of the county.

In the past, it would appear that the use of the poll list certified by the Board of Elections was exclusively utilized only because of its accessibility and lack of expense in compilation. However, with the advent and use of modern computer systems the compilation of lists of selected groups of individuals is simplified and economical to prepare. Such is the case regarding the list of licensed drivers within any one county who would be qualified to vote if registered. Contact with the Bureau of Motor Vehicles by Counsel indicates that within two weeks such a list is available to Trumbull County in either printed form or as magnetic tape for computer use. The utilization of such driver license

118

lists as provided by the Bureau of Motor Vehicles does not appear to be difficult to integrate with the current computerized selection process of jury pool lists currently compiled by use of Trumbull County's Auditor's computer system under contract with the Board of Elections.

Out of an approximate population of 240,000 people, there are currently approximately 125,000 registered voters in Trumbull County. Of the remaining 115,000, some of which would not be qualified electors, such as persons under the age of 18, there is still a significant segment of the population within the community whick is excluded from jury service solely because they do not appear on the list of electors from the Board of Elections. By virtue of the exclusive use of poll lists, there is an overrepresentation of white male and female persons of late middle age to elderly, whereas, there is an underrepresentation of both white and black male and female persons from eighteen (18) years old to early middle age. Therefore, within the large group of persons, who although qualified to vote, are not registered, there exist distinctive subgroups which are not adequately represented on venire in relation to the number of such persons in the community.

Perhaps the exclusion of non-voters containing the distinctive subgroups referred to above was justified in the past based upon the nonavailability and inordinate expense of compiling comprehensive lists; however, as presently constituted, R.C. 2313.06 and 2313.08 authorize and contemplate that drivers license lists be used to draw jury pool lists. At this juncture, the

arbitrary refusal to utilize the drivers license lists provided for that purpose, would appear to be unwarranted and a direct infringement upon the Appellant's Sixth Amendment right to have a fair cross section of the community.

In <u>Duren</u>, the Court prescribed the test whereby it could be determined whether the "fair cross section" requirement has been violated:

1. The group alleged to be excluded is a "distinctive" group in the community.

2. Representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such person in the community; and

3. Defender representation is due to systematic exclusion of the group in the jury selection process.

439 U.S. at 364.

Applying the foregoing criteria to the instant case, the group excluded within the community is "distinctive" since it is composed of persons who, although qualified to register to vote, have not, and is comprised of subgroups referred to above. The second criteria is met by virtue of the fact that the foregoing persons as a "distinctive" group were not originally included in the pool of potential jurors from which the jury lists were compiled, although they reside within the country. Obviously, these people are not represented in any of the venires drawn from which juries are selected, yet there is a significant number of such persons residing within the community. As for the third criteria, it is equally obvious that this under-representation, which in fact was

120

no representation at all as to non-voters, was due to a systematic exclusion by virtue of the fact that the jury list consisted solely of qualified electors certified by the Board of Elections of the County.  Obviously, with the revision of R.C. 2313.06 and 2313.98, the legislature intended the pool of potential jurors to be expanded and a more fair representative cross section of the community to be called upon to serve as jurors.

The California Supreme Court has held that the use of voter registration lists for random selection of jury pools is constitutionally invalid.  People v. Harris (1984), 36 Cal. 3d 36, 679 P. 2d 443.  R.C. 2313.08 (B) allows the jury commission to use either a list of the electors, or a combined list of electors and the list of qualified drivers.  The use of the combined voter registration list and the driver's license list would substantially correct the unconstitutionality of the current system.  In Re Rhymes (Cal. Ct. App. 2d Dist., 1985 ) 37 Cr. L. 2459.  See also, IV Center for Jury Studies Newsletter 6 (No. 1982) of the National Center for State Courts.

The trial court erred in overruling Appellant's motion, and his conviction and sentence should be reversed.

121

## THIRTEENTH PROPOSITION OF LAW

IT IS A VIOLATION OF AN ACCUSED'S RIGHT TO JURY TRIAL
GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF
THE OHIO CONSTITUTION WHEN THE COURT DOES NOT DETERMINE
ON THE RECORD, SPECIFICALLY ADDRESSING AN ACCUSED,
WHETHER HE HAS KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY
WAIVED HIS RIGHT TO A JURY TRIAL.

Crim. R. 23 provides that an accused may knowingly,
intelligently, and voluntarily waive his right to a jury trial in
writing. Furthermore, R.C. 2945.05 provides that such waiver
"shall be in writing, signed by the defendant, and filed in said
cause and made a part of the record thereof." It is the
Appellant's contention that this waiver should be treated as a
waiver and plea pursuant to Crim. R. 11(C), especially in light of
the special factual situation that existed in this case.

In State v. Kehoe, the syllabus of the court states:

A jury waiver signed by the defendant's attorney and
filed prior to trial in a serious offense case does not
constitute a knowing, intelligent and voluntary waiver by
the defendant of defendant's constitutional right to
trial by jury where there is nothing in the record
showing that the defendant received a full explanation
of, and understood, his right to trial by jury. Crim. R.
23(A).

(1978), Ohio App. 2d 315. In State v. Morris, the defendant signed
a jury waiver, and was very briefly addressed by the trial court
concerning the waiver. (1982), 8 Ohio App. 3d 12. Upon the later
challenge of that waiver, the court held:

While the trial court may pursue a detailed
examination of the defendant to satisfy itself that the
defendant is fully apprised by his right to a jury trial,
such an extended interrogation is not required. The
Criminal Rule and the Revised Code are satisfied by a
writing signed by the defendant himself and filed with
the court. Unlike some jurisdictions, Ohio does not

122

require that the court personally inform the defendant of this right or make direct inquiry of the defendant as to the voluntariness of his waiver.

Id. at 15. (Footnote omitted.) See also, State v. Griffin (1983), 13 Ohio App. 3d 376 in footnote 6 of Morris, the court listed the numerous states where this is required.

In the case at hand, the trial court had already determined that the Appellant was mentally retarded and essentially illiterate. Furthermore, the Appellant's signature on the waiver not only is hardly legible, but also appears misspelled. Under the facts of this case, the trial court should have addressed the defendant personally to determine if such a waiver was signed knowingly, voluntarily and intelligently. Unlike those cases cited above, this case is a capital case in which all of the Appellant's rights should be scrupulously honored.

(It should be noted at this point that there may be matters contained outside the record relative to this issue that will be raised on post-conviction relief if such is necessary. It is raised here, in part, to preserve this issue to further review.)

123

## FOURTEENTH PROPOSITION OF LAW

**IT IS REVERSIBLE ERROR FOR A TRIAL COURT TO DENY AN ACCUSED FUNDS NECESSARY TO EMPLOY AN EXPERT FOR PURPOSES OF A MOTION FOR CLOSURE OF PRE-TRIAL HEARING THAT WAS NECESSARY TO PRESERVE A FAIR AND IMPARTIAL JURY PURSUANT TO THE FIFTH, SIXTH AND FOURTEENTH AMENDMENT, OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 10 AND 16 AND ARTICLE II, SECTION 26.**

In the context of pretrial proceedings, closure is an effective means of ensuring an impartial jury, and consequently, a fair trial in accordance with the due process considerations, without unduly limiting the First Amendment rights to access. Several state courts, faced with balancing the competing interests of the right of freedom of the press and the right to trial by impartial jury, have decided strongly in favor of preserving impartiality where the conflict occurs in pretrial proceedings. In People v. Elliot (1960), 54 Cal. 2d 498, the Court observed that closure was a fundamental safeguard to the designed to protect the accused's right to an impartial and unbiased jury by preventing dissemination of pretrial testimony either by newspaper or other media. The court in People v. Pratt (1967), 27 App. Div 2d 199, 278 N.Y.S. 2d 89, upheld closure of a pretrial hearing where publication of testimony produced at the hearing produced a reasonable possibility of prejudice. In the case of Philadelphia Newspapers, Inc. v. Jerome (1978), 478 Pa. 484 the Court held that closure of pretrial hearing did not deny the press any clear right where the public interest in avoiding unfair trials was advanced.

The defense carries the evidentiary burden at a pretrial hearing of establishing the right to closure. In Ohio,

justification for a restraint on the press must be evidenced by:

    (a)   the nature and extent of pretrial news coverage;

    (b)   whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and

    (c)   how effectively a restraining order would operate to prevent the threatened danger.

State ex rel. Chillicothe Gazette, Inc. v. Court of Common Pleas (1982), 2 Ohio St. 3d 24, quoting Nebraska Press Assn. v. Stuart (1976), 427, U.S. 539.

Appellant requested a hearing in order to present evidence on this issue. Obviously, such evidence can only be adduced through the use of expert testimony concerning the demography and social behavior of the community and media access thereto. The only way to develop this type of information and evidence is through the employment of an expert sociologist and social psychologist.

The Supreme Court of Montana has dealt with this precise issue in a very important and highly relevant case. State of Montana, ex. rel. Daniel Paul Smith v. District Court (1982), 654 p. 2d 682. That court made the following suggestion:

In determining whether a 'clear and present danger' exists the Court suggests that the following facts might be considered: (1) empirical evidence regarding the percentage of general population who read newspapers or who listen to other forms of media; (2) statistics regarding the percentage of media reader/listeners who read or follow homicide or criminal stories; and (3) expert psychological testimony regarding the capacity of an individual to disregard pretrial publicity, which might include tainted evidence, when making an objective determination of the facts upon completion of a trial.

Id. at 688.

Counsel was willing to make the necessary arrangements

forthwith to employ said expert in an attempt to meet the burden of proof for the requested orders. The defense lacked only the funds to employ the expert. Various factors militated in favor of granting the defense funds to employ said expert.

Statutory support for appointment of an expert to testify on the issue outlined by the Montana Supreme Court is found in R.C. 2929.024 which provides in part that

> If the court determines that the defendant is indigent and that . . . experts . . . are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial . . . the court shall authorize the defendant's counsel to obtain the necessary services for the defendant . . .

The statute goes on to state that the court shall grant the funds to employ the expert. Rule 65 of the Supreme Court Rules of Superintendence for Courts of Common Pleas also supports this proposition.

While it is true that the statute does not specifically provide for appointment of experts at pretrial hearings, such services are nonetheless "reasonably necessary for the proper representation" of a defendant on trial for his life. The defense carries the evidentiary burden at pretrial hearings to establish the necessity of closure. The effect of rulings made at pretrial have as serious an effect upon the final determination of guilt as rulings made during trial. The statute implicitly recognizes that an indigent defendant should be provided at all times with the reasonably necessary means of obtaining proper representation. The decision of the Supreme Court of Montana illustrates that appointment in the circumstances of the case at bar is vitally

126

necessary to the proper representation of a death-penalty defendant.

The goal of the statute is to ensure a fair trial independent of a defendant's economic status. This goal pertains to pretrial hearing as much as to trial itself. An arbitrary limitation based strictly upon statutory language, standing alone and without reference to its underlying purpose, should not thwart this goal. The statute should be construed to apply at pretrial hearing as well as at trial.

The appointment of an expert witness also receives support from the Sixth Amendment and Fourteenth Amendment of the United States Constitution and the Article I, Section 10 of the Ohio Constitution right to have compulsory process for obtaining witnesses in the defendant's favor. As the Supreme Court stated in Washington v. Texas (1967), 388 U.S. 14.

> The right to offer the testimony of witnesses, . . . is . . . the right to present a defense . . . An accused . . . has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

If a death-penalty defendant is denied presentation of a necessary witness merely for the reason that he cannot afford one, he is in effect deprived of the right to establish a defense on the issue for which the testimony is requested. Here defendant sought to establish through an expert witness the need for closure of pretrial evidentiary hearing so that an impartial fact-finder could be preserved. The testimony of an expert sociologist or psychologist on the issue of the capacity of an individual to

127

disregard pretrial publicity when making an objective determination of the facts was relevant, material, and necessary to the defense. Where an impartial fact-finder is not certain, the defendant's ability to establish a defense is threatened; reasonable steps should be taken to ensure that this fundamental element of due process is maintained. As the Montana Court has shown, the appointment of the expert sociologist or psychologist is such a reasonable step.

The Fifth Amendment and the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution's guarantee of due process also supports appointment for other reasons. The defense is required to meet an evidentiary burden on the issue of closure of pretrial hearing. It would be incongruous with the guarantee of due process to impose this burden on the defendant and simultaneously to deny him the means of meeting this burden merely because of his economic status. Expert psychological or sociological testimony is necessary in order for the defense to meet the Nebraska Press Association burden. Without the aid of such testimony it would be impossible for the defense to produce objective and comprehensive evidence of the sort required to meet its burden. If an expert were not appointed, the burden on the defense would be insurmountable, and the imposition of a burden that by its very nature is impossible to meet violates due process.

Due process requires a fair opportunity to be heard, New York Cent. Rd. Co. v. Public Utilities Commission (1952), 157 Ohio St. 257 a meaningful hearing, Gilday v. Board of Elections (C.A. 6,

1972), 472 F. 2d 214; and hearing in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety, from the standpoint of justice and law, of the step asked to be taken. State ex rel, Wright v. Morrison (1947), 80 Ohio App. 135.

In the case at bar expert testimony was needed for the Appellant to meet its burden. Expert testimony was available on the critical factual issues involved in closure. Denial of appointment would make a fair, meaningful hearing impossible. Without appointment, the Appellant was denied ample opportunity to make a fairly adequate showing of the propriety of closure from the standpoint of justice. Without the appointment of an expert witness in this case, the motion of due process was improperly denied.

Equal protection considerations of the Fourteenth and Fifth Amendments to the United States Constitution and Article I, Section 2 and Article II, Section 26 of the Ohio Constitution suggest the propriety of appointment of an expert sociologist and/or psychologist in this case. In Griffin v. Illinois (1956), 351 U.S. 12 (1956), the plurality opinion noted that there can be no equal justice where the kind of trial one gets depends on the amount of money he has. While Griffin dealt specifically with the conditioning of appellate review on the availability of a trial transcript, the principle embodied by the court's statement is essential to a viable and meaningful constitutional principle of equal protection. Equal justice is threatened in the situation

where the impartiality of the fact-finder could vary according to the economic status of the defendant and his consequent ability to provide expert testimony on an issue directly determinative of that impartiality.

It may be true that equal protection does not require absolute equality or precisely equal advantage, but the state must assure the indigent defendant an adequate opportunity to present his claims fairly.  Ross v. Moffitt (1974), 417 U.S. 600.  Appellant here does not seek all possible advantages, but only the opportunity to present crucial evidence necessary to the fair determination of the issue of closure.

Finally, the Sixth and Fourteenth Amendment of the United States Constitution and the Article I, Section 10 of the Ohio Constitution right to effective assistance of counsel supports the Appellant's plea for the appointment of an expert witness.  It has been recognized that a court order restricting counsel from fully assisting his client may result in a denial of effective assistance.  Geders v. United States (1976), 425 U.S. 80.  While the facts of Geders vary from these of the case at bar, the underlying principle is sound.  Court orders restricting counsel from fully assisting his client by not providing for appointment of essential witnesses would prevent counsel from meeting the Ohio effective assistance standard of "fair trial" established in State v. Hester (1976), 45 Ohio St. 2d 71.  Counsel should be permitted to call witnesses who alone can give critically relevant and material evidence on issues that go directly to ensuring a fair

130

trial by preserving the impartiality of the fact-finder.

The Montana Court in <u>State ex rel. Smith</u> v. <u>District Court</u> (1982), 654 P. 2d 682, also said that empirical evidence regarding the percentage of general population who read newspapers or who listen to other forms of media, and statistics regarding the percentage of media reader/listeners who read or follow homicide or criminal cases are also areas of inquiry relative to a motion of this kind.

In the recent case of <u>Ake</u> v. <u>Oklahoma</u>, the United States Supreme Court reaffirmed the fundamental principal that indigent defendants should be provided the "basic tools of an adequate defense." (1985), 470 U.S. 68. Justice Marshall went on to state:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

<u>Id</u>.

Therefore, the Appellant's motion should have been granted.

131

## FIFTEENTH PROPOSITION OF LAW

**A TRIAL COURT ERRS AND ABUSES ITS DISCRETION IN ADMITTING A PRE-DEATH PHOTOGRAPH OF THE VICTIM. SUCH ERROR VIOLATES APPELLANT'S RIGHTS UNDER EVID. R. 404, THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

At trial, a pre-death photograph was presented to the court and later admitted into evidence. States Exhibit 3. This photograph clearly was not relevant and its introduction was solely to inflame and prejudice the court. The introduction of such photographs is unfair. Whit[...] 674 P. 2d 31, 36. Furthermore, the d[...] o testify about the number of membe[...] matters. Finally, in the closing of [...] phases of the case, the prosection w[...]ed's good character and his right to [...]

*This is Ass of 15 error 9, with the following new authorities: Booth v. Maryland South Carolina v. Gathers State v. Huertas " " Post " " Sowell " Brewer*

The law is clear in Oh[...] character is generally not admissibl[...] states as follows:

> Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by the statute enacted by the General Assembly are applicable.

The rule is quite clear. The prosecutor may introduce character traits of the victim only: 1) to rebut a character trait raised by the defendant; or 2) to rebut evidence that the victim was the

132

aggressor. Neither justification for the evidence applies here.

The United States Supreme Court has consistently held that capital cases must be as free as humanly possible from passion, prejudice or mistake. <u>Gardner</u> v. <u>Florida</u> (1977), 430 U.S. 349, 358; <u>Eddings</u> v. <u>Oklahoma</u> (1982), 455 U.S. 104, 119 (O'Connor, Jr., concurring). Because sentences of death are quantitatively different from prison sentences, factors that infect the reliability of the capital process cannot be tolerated. <u>Woodson</u> v. <u>North Carolina</u> (1976), 428 U.S. 280, 305.

More recently, in <u>Booth</u> v. <u>Maryland</u> (1987), 482 U.S. 496, the United States Supreme Court held that the introduction of victim impact evidence in the penalty phase of a capital trial is constitutionally impermissible. Victim impact evidence is defined in <u>Booth</u> as including evidence which describes the personal characteristics of the victim, the emotional trauma suffered by the victim's family, or the family members' opinions and characterizations of the defendant and the crime. <u>Id</u> at 502. The Court in <u>Booth</u> reasoned that "the prospect of a 'mini-trial' on the victim's character * * * could well distract the sentencing jury from its constitutionally required task-determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime.

A similar issue was raised in <u>South Carolina</u> v. <u>Gathers</u> (1989), 490 U.S.____, 104 L. Ed 2d 276, 109 S. Ct. 2207, where the U.S. Supreme Court reaffirmed <u>Booth</u> v. <u>Maryland</u> finding a due process violation where the prosecutor argued that the victim was

a religious man and a registered voter based on the papers found scattered near his body. The testimony in the present case interjected the sympathy or passion factor that the United States Supreme Court has consistently held must be eliminated from the capital sentencing process.

R.C. 2929.04 also reflects the legislature's desire to eliminate sympathy for the victim from jury consideration in a capital case. Aggravated murder indictments are specifically exempted from the statutory provisions which permit a representative of the victim from making a statement as to the victimization or sentence.

Other states that have considered this question have continuously rejected interjection of sympathy for the victim in the capital litigation process. The Illinois Supreme Court in People v. Ramirez (Ill. 1983), 457 N.E. 2d 31, held that an offer of irrelevant and inflammatory evidence as to the murder victim's family resulted in reversal. Testimony by a murder victim's widow at the first stage of a death penalty hearing is error when the fact that the deceased left a widow is immaterial. The Court further reasoned:

> It is axiomatic that a defendant's guilt must be established by competent evidence uninfluenced by bias and prejudice, and that, therefrom, evidence that a murder victim has left a spouse or children is inadmissible since it does not enlighten the trier of fact as to the guilt or innocence of the defendant or as to the punishment he should receive, but only serves to prejudice and inflame the jury.

Id. See also Vela v. Estelle (5th Cir. 1983), 708 R. 2d 954, 961-963, cert. den. (1984), 79 L. Ed. 2d 195; Brooks v. Kemp (11th Cir.

en banc (1985), 762 F. 2d. 1383, 1409-1410.

The Florida Supreme Court has adopted a stricter rule.  A member of a deceased victim's family may not testify in a homicide trial for purpose of identifying the victim when nonrelated, credible witnesses are available to make such identification.  Adan v. State (Fla. 1984), So. 2d 1195; Randolph v. State (Fla. 1984), 463 So. 2d 186.  The court had adopted this rule because identification by the victim's family serves only to interject the sympathy factor into trial.  Randolph,. supra at 189.

California had adopted a similar rule.  In People v. Levitt (Cal. 1984), 156 Cal. App. 3d 500, the court stated that the fact a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than the commission of homicide in the first place.  Such bereavement is relevant to damages in a civil action but it has no relationship to the proper purposes of sentencing in a criminal case.

Ohio, too, has held that such evidence is inadmissible in a capital trial.  In State v. Huertas (1990), 51 Ohio St. 3d 22, this court reversed a death penalty because of the improper admission of testimony from the victim's mother regarding his good character, the effect of his death on his family and her belief that Appellant should get the death penalty.

This court has, however, distinguished victim impact evidence offered in a jury trial from similar evidence offered in a bench trial.  In State v. Post (1987), 32 Ohio St. 3d. 380, 383, State v. Sowell, (1988), 39 Ohio St. 3d 322, and State v. Brewer (1990), 48

135

Ohio St. 3d 50, this court found the admission of such evidence harmless in bench trials absent some indication that the three judge panel relied on the victim impact or character evidence in arriving at its sentence. Such a finding is absurd in this case where the evidence was not only admitted but also repeatedly argued to the panel. Judges are no less human than jurors. To presume they are unaffected by emotions is ludicrous. Additionally, such a distinction between juries and three judge panels denies a defendant who chooses a three judge panel the equal protection of the law.

Attorneys for both the state and the accused have a responsibility to present their evidence in the manner most likely to secure for the accused a trial free from any suggestion which might bring before the jury any matter not germane to the issue of guilt. Hathaway v. Florida (Fla. 1958), 100 So. 2d 622, 664. The testimony concerning the victim in this case would violate this responsibility.

Once this sympathy factor has been introduced, the courts have been quick to reverse convictions. In Ramirez, supra, it was sufficient that the prosecutor asked the widow if she was married to the victim at the time of his death. Therefore, the sympathy testimony in the present case require reversal and that the matter be remanded for a new trial.

In this case, the prosecution goes beyond just the introduction of such testimony, but the repetitive arguing of it throughout the closing arguments at both the guilt and mitigation

136

stages.   This type of conduct merits reversal of this conviction and the granting of a new trial.

## SIXTEENTH PROPOSITION OF LAW

**WHEN THE STATE REPEATEDLY FAILS TO COMPLY WITH CRIM. R. 16, IT IS VIOLATING AN ACCUSED'S RIGHT TO A FAIR TRIAL AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL.**

Crim. R. 16 provides for the rules governing discovery in a criminal case. Once a discovery request has been made, it is incumbent upon the state to comply with such a request. If such compliance is not forthcoming, an accused must apply to the court for a motion to compel. If the court finds that such an order is well taken then the court may order the state to comply.

In the instant case, the Appellant fully complied with Crim. R. 16 in order to fully obtain that which was discovery. The state failed to provide the discoverable information that (1) Donald Allgood had identified the Appellant from a photo array; (2) the photo array itself; certain photographs - Exhibits 103-109; the accompanying oral statements of the Appellant; the testimony of Stephen Melius; and certain photographs utilized by Dr. Levine.

While this Court may not believe that each individual failure to provide full discovery warrants reversal, the combination of these failures does warrant reversal. See State v. Hill (March 25, 1982), Franklin County App. No. 81AP-663, unreported. One oversight might have been unintentional, but six stretches the imagination. Especially prejudicial are the last two examples. Steven Melius' testimony came as a complete surprise in the middle of trial. The Appellee claimed they only became aware of the witness the day before he took the stand.

The photographs that Dr. Levine testified to having access to

for his expert opinion when he was originally hired by the Appellee were not known to the Appellant until January 31, 1986, the day the witness took the stand. These photographs formed a substantial part of the basis for his testimony. Dr. Mertz did not refer to them. The prejudice of their earlier denial is two-fold; first in Dr. Levine's opinion, they are the photographs that led to his testimony that certain bite marks were likely to be the Appellant (though he could not testify to a dental certainty on this issue); and second, other defense experts were not shown these photographs and thus prevented Appellant from fully litigating and researching this crucial evidence. Since it is Appellee's contention that these bite marks were their strongest evidence, then the prejudice to the Appellant in not having them is self-evident.

The appellate court in addressing this issue summarily dismissed the assignment of error based on Appellant's failure to show that the state did not make a good faith effort to supply all relevant materials. Good or bad faith is not an issue in determining a violation of Crim. R. 16. In analyzing a similar issue in <u>State</u> v. <u>Johnston</u> (1988), 39 Ohio St. 3d 48, this court cited the U.S. Supreme Courts holding in <u>Brady</u> v. <u>Maryland</u> <u>Id</u>. at 87, where it stated: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, <u>irrespective of the good faith or bad faith of the prosecution</u>". (Emphasis added.) This court went on to find that the key issue in the analysis of a Crim. R. 16 violation was whether the evidence is

139

material.

In this case the evidence was material. As previously discussed in Proposition of Law Number Eleven, the testimony of Steven Melius was used by the appellate court to negate a mitigating factor and therefore contributed directly to the death penalty. Such evidence was clearly material.

The pictures used by Dr. Levine regarding the bite marks, coupled with his testimony regarding his opinion that Appellant made the bite marks also obviously directly contributed to the guilty verdict and the death sentence. The prosecutors failure to comply with Crim. R. 16 prejudiced Appellant by denying him access to highly material evidence. Such failure requires this Court to reverse Appellant's convictions and remand for a new trial.

*[Handwritten: Same Argument as Ass. of Error #1, Sub. Sec. 7. No New Authorities 17]*

IT IS AN ABU[SE] _____ [CO]URT TO ALLOW
INTO EVIDENC[E] _____ BECAUSE SUCH
PHOTOGRAPHS _____ GROSS, AND
UNNECESSARY _____ E VALUE IN
DETERMINING _____ [THEI]R ADMISSION
VIOLATED THE _____ [AN]D FOURTEENTH
AMENDMENTS TO _____ [AN]D ARTICLE
I, SECTIONS _____ [CON]STITUTION.

The basic pre[mise] _____ [o]f photographs was

stated in <u>State</u> v.

> The rule is well settled that photographs and color
> transparencies are not objectionable so long as they are
> properly identified, are _____
> accurate representations _____
> purport to portray. I[n] _____
> convey information to the _____
> than words.
>
> Although a photograp[h] _____
> by its inflammatory natu[re] _____
> gruesome or horrendous i[n] _____
> inadmissible if the trial _____
> discretion, feels that it _____
> The real question is whet[her] _____
> photographs is outweighed _____
> the defendant.

*[Handwritten: This is Ass. of Error #11. New Authority State v. Thompson]*

(1966), 6 Ohio St. 2d 14, 24-2_____.

Indeed, courts have previ_____ _____ _____ [wo]uld be

situations where similar types of photographs would be erroneous.

<u>State</u> v. <u>Luft</u> (Dec. 26, 1978), Franklin County App. No. 78AP-302,

unreported.  In <u>Luft</u>, the court stated:

> We are neither able to approve of, nor condone, the
> multitudinous evidentiary use of some 30 such
> photographs, in that they were not presented for the
> purpose of supporting any contested issue as to the
> manner or mode of death, nor as to any reasonable
> scientific proof necessary to trial of this case.
> Therefore, we state that the introduction of the
> photographs was not only unnecessary, but bordering upon
> the erroneous use of such evidence.  However, in review
> of the totality of the evidence adduced as to the
> commission of these acts, and the evidence as to the

141

guilt of this defendant, we hold the introduction of such evidence not to be prejudicial.

Id. at 3682. See also, State v. Ward. (Feb. 15, 1983), Franklin County App. No. 82AP-451, unreported.

In State v. Thompson (1987), 33 Ohio St. 3d. 1 this court enunciated a two-fold test for admitting photographic evidence. First, does the probative value of the photographs outweigh their probative impact and second, are the photographs repetitive or cumulative in number. Id. at 9. This court found the slides in Thompson to be cumulative and repetitive but harmless in the guilt phase. In the penalty phase, however, this court found that the mere mention of the slides coupled with the prosecutors improper argument required vacation of the death sentence.

> "Although the prosecutor did not actually show the slides again, his entreaty that the jury should remember the slides could have had no other effect than to cause the jurors to reexperience the horror and outrage they must have felt upon viewing the slides earlier in the trial."

Id. at 15. The photos in the instant case were of course shown to a three judge panel and not a jury. Accordingly, the Appellate Court applied the presumption that the panel only considered relevant evidence. Nevertheless, to presume that judges, by virtue of their robes, do not experience horror and outrage by the photograph of a young boys rectal cavity perforated by some object is preposterous. To further presume that this panel was unaffected in its decision by these photos along with the continuous interjection of collateral matters and Appellant's character by the prosecutor through improper argument and inadmissible evidence is

142

ludicrous.

In the case at hand, the photographs are showing the cavity of the victim along with the "stick" (Exhibit 47).  For the reasons stated earlier, Exhibit 47 should have been excluded from evidence. To then allow gruesome, unnecessary, and prejudicial photographs of the same thing in relation to a cavity of the victim increases the prejudice to the Appellant.  These photographs had no probative value to the issues herein.  They were highly prejudicial and thus this court must reverse Appellant's  convictions and sentence.

## EIGHTEENTH PROPOSITION OF LAW

**PROSECUTORIAL MISCONDUCT DURING BOTH THE GUILT AND MITIGATION PHASE CLOSING ARGUMENTS DENY AN ACCUSED HIS RIGHT TO A FAIR TRIAL AND AN IMPARTIAL FACT-FINDER AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

Closing arguments to the fact-finder are not evidence. State v. Manago. (1974), 38 Ohio St. 2d 233. Though counsel should be allowed some latitude in his remarks to the fact-finder, he should refrain from making "comments that extend to matters outside the record . . . and tend to influence the jury to make a decision based upon matters other than evidence constituting proof of guilt beyond a reasonable doubt." State v. Smith. (1976), 50 Ohio App. 2d 183. (Further citations omitted.) See also, State v. Woodards. (1966), 6 Ohio St. 2d 14. However, where one instance of unfair comment possibly may be cured by the trial court, the cumulative effect of a series of improper comments may be "sufficiently prejudicial to have denied the _____ ite v. Muscatello (1977), 57 Ohio App _____ St. 2d 201.

The Sixth Circuit has al_____ Wither v. United States, the court _____ of the improper argument of the Ass_____ (6th Cir. 1979), 602 F. 2d 124. C_____ 1979), 602 F. 2d 117. The court sta_____

    believes that it has t_____ed
    States Attorneys in this Circuit to follow the slogan
    carved in wood at the entrance to the office of the
    Attorney General of the United States: "The United
    States wins its point whenever justice is done its

citizens in the courts." The U.S. Attorney in the courtroom is much more than just another lawyer. He speaks to the jury for the United States of America. His words carry the weight of his office. The United States above all parties should never proffer invidious comparison between races or argument founded on facts outside of the record. Such erroneous argument, because of its source, is much more likely to be accepted by a jury than is similarly objectionable argument by a private practitioner.

Id. The standard by which closing remarks was set forth in Berger

v. United States,

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a grater or less degree, has confidence that these obligations, which so plainly rest upon served. Consequently, improper suggestions, insinuations, and, especially, assertion of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

(1934), 295 U.S. 78, 88. See also, ABA Standards Relating to the

Prosecution Function Section 5.1 et esq.

In the instant case, the following remarks were made by the

prosecutor:

1. You know, back on September 10th, our community had a little boy, and we've had a lot of little boys in our community, but this 12-year old boy we have not talked about too much. We've dealt with him in an abstraction. He hasn't been ere. And the Court is aware of the leaps

145

and bounds and the rights of victims. I'm not trying to ignore the procedural rights of the defendants' in cases, but sometimes we forget and don't pay attention when we talk about Constitutional Rights of the defendant, and we don't, in the balance – how about Raymond Fife's right to live? How about his Constitutional Rights to be here today, to be in school, to celebrate his 13th birthday with his parents. (Tr. 1167).

2. The question that is to be determined by this Court is whether that man [indicating to the Appellant] and his buddy, Timothy Combs, engaged in a criminal enterprise wherein he destroyed and devoured a little boy on the 10th day of September of 1985 . . . I can't imagine in my 10 years as being prosecutor that this could happen. (Tr. 1167-1168).

3. Now, one witness that testified, Candyce Jenkins . . . She described the defendant as an "animal". The other one hatred. (Tr. 1169).

4. . . . but he [the Appellant] followed him [Timothy Combs] back to the scene of the crime to look for evidence to destroy so they could cover up their heinous, unbelievable, animalistic behavior. He would make the Marquis deSade proud! (Tr. 1173).

5. Now, we know on September 10th, 1985, the year of our Lord – and I'm going to go through, as I view the evidence – as Mr. Kontos and I see the facts to be and the truth to be. (Tr. 1175).

6. Maybe Mr. Lewis will argue that Raymond wasn't on the bike. It didn't have fingerprints. Well, there's an explanation, you don't necessarily have fingerprints on everything. And rain will affect fingerprints as it will affect blood. (Tr. 1196).

7. Who does this Court feel is more qualified? Mr. Dehus or Mr. Gelfius on the charcoal lighter as to paint thinner and hydrocarbons? I thought that his testimony was much more credible. I don't feel Mr. Dehus; it couldn't break down; very unlikely, and I don't think that's the case. I think that the witness form the Arson Lab who deals strictly with arson is the most credible witness in this case, and that substantiates the State's case. (Id.).

8. No one wants to testify against his brother, just like Morris Hill didn't want to testify against his nephew. (Tr. 1197).

9. Finally, Your Honors, to get this poor, dumb boy who

146

really wouldn't do anything, who tried to sexually attack Mr. Melius, tried to put his mouth in the boy's penis, grabbed his penis, we know he did violently rape Mary Ann Brison in the same wooded area.   Talked about how he talked hateful to her.   We know what he did to Candyce Jenkins; had anal sex, oral sex, vaginal sex, once again, anal sex, had a knife and threatened to cut her vagina out; bit her on the breast.   Seems to be his calling card; the bite.   And when she screamed and yelled that it hurt, he said, "Good! I want it to hurt."   And that's what this case is about.   This case isn't just about a killing.   This case is about an individual who thrives and relishes on inflicting pain and torture to other human beings.   (Tr. 1272).

10.   Raymond Fife was a 12-year-old boy; very active and vibrant, who was caught in the middle of a living hell cause by this defendant.   Raymond Fife had no justice while he was living, but he demands justice now even in his absence, and justice demands, Your Honors, and you return a verdict . . . (Tr. 1274).

11.   The reason that it is so clear is because the defense has not shown by or has not substantiated or brought about any mitigating factors in this case, and it's very clear, aggravating circumstances, especially three of them, will clearly outweigh the absence of any mitigation.   (Tr. 340).

12.   Well, I'd like to cite a few days that they weren't together:   February 8th, 1984, when this defendant raped Mary Ann Brison.   They weren't together March 3rd, 1984, when this defendant raped and brutalized Candyce Jenkins. They weren't together April 1984 through April 1985 when this defendant was incarcerated.   (Tr. 342).

13.   In addition to that, he says he has difficulty with his motor skills between the right hand and lift hand and he's not very good at that.   He didn't have any problem grabbing women that I told you about before.   Grabbing them with his left had and the knife in the right hand while he sexually assaulted them.   (Tr. 348).

14.   Now, there was a witness that the State would have wanted to present in this case, but unfortunately we could not call him.   Raymond Fife.   He would have been able to testify as to what happened that particular day.   He would have been able to tell all of us, including this defendant, how he felt when he was abducted and helpless and felt doomed because he had no opportunity to escape. He would have been able to tell us what it felt like to be punched and continually kicked; what it felt like to

147

be strangled so severely that he'd be gasping for breath. He'd be able to describe the pain involved and sexual molestation. He'd also be able to tell you and tell all of us what it would feel like - - the indescribable pain when your flesh is burning and you're helpless to do anything about. An finally, he'd be able to tell us what it would be like to have a stick rammed up your rectal cavity so deeply and so severely that it perforates through the rectum and goes into the urinary bladder. But he's not here to testify about that thanks to this defendant.

There's some other things that Raymond Fife can't come here and testify about either. He can't testify about how he misses his family, about how he misses his friends in the Scout group, about how he'd like to be with his father in the backyard feeding the birds, how he'd like to be able to live and love and share his love with his family and friends, and he will never be able to do that because of this defendant; this manifestation of evil, this anomaly to mankind, this disgrace to mankind sitting at the end of that table took care of that! And the most commentary about the makeup of this defendant is the manner of the death of Raymond Fife. (Tr. 351-353).

It is clear from the above portions of the closing arguments from both the guilt and mitigation phases of this case that the Appellee argued improperly. Appellee repeatedly attempted to inflame the three judge panel. A conviction based on the inflammation of the fact-finder's fears and passion and not based solely on the evidence requires reversal. State v. Agner (1972), 30 Ohio App. 2d 96. See also Tucker v. Zant (11th Cir. 1984), 724 F. 2d 882, vacated en banc (this point not discussed) (1985), 762 F. 2d 1480. The Appellate Court presumed that the panel only considered relevant evidence. Nevertheless, to presume that judges, by virtue of their robes, do not experience personal feelings influenced by the interjection of collateral matters, Appellant's character and other prejudicial matters is ludicrous.

The prosecutor's closing argument invited the fact-finder to

148

compare the relevant worth of the victim and the Appellant. The value of the victim's life should not be argued to the fact-finder. <u>Brooks</u> v. <u>Kemp</u> (11th Cir. <u>en banc</u> 1985), 762 F. 2d 1383.

Overall, the closing argument contained matters outside the record, the personal beliefs of the prosecutors, inflammatory language designed to inflame the fact-finder, and sympathetic remarks about the victim and his family and other non-aggravating factors. Each of these types of arguments were improper and violated the Appellant's constitutional rights.

## NINETEENTH PROPOSITION OF LAW

**WHEN THE ISSUE OF EFFECTIVE ASSISTANCE OF COUNSEL IS RAISED THAT INVOLVES MATTER BOTH WITHIN THE RECORD AND OUTSIDE THE RECORD THE PROPER AVENUE FOR REVIEWING THAT ISSUE SHOULD BE ON POST-CONVICTION RELIEF EVEN IF COUNSEL ON APPEAL IS NOT TRIAL COUNSEL.  THE ACCUSED'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE UNITED STATE CONSTITUTION AND ARTICLE I, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

Appellant contends there is evidence of ineffective assistance both within and outside the record.  If this Court determines that the evidence of ineffective assistance of counsel is insufficient within the record, counsel for Appellant believes that the issue must be raised on direct appeal so that if matters are brought forth in a post-conviction petition relating matters that are outside the record it can be coupled with the matters stated below without there being an argument that the Appellant has waived this issue by not raising it on a direct appeal.  In reviewing the cases of State v. Cole (1982), 2 Ohio St. 3d 112 and State v. Smith (1985), 17 Ohio St. 3d 98, it is unclear whether or not an Appellant must raise ineffective assistance of counsel in his direct appeal when represented by an attorney other than his trial attorney when the basis for the argument includes matters both within the record and outside the record before this court. Therefore, if the evidence raised below is insufficient to establish ineffective assistance of counsel in and of itself, then the Appellant is requesting that he not be barred later from using this same evidence coupled with evidence that is not in the record before this Court to show the ineffective assistance of trial

counsel.

The right to counsel under the Sixth Amendment has no meaning unless it includes the right to the effective assistance of counsel. Beasley v. United States (6th Cir. 1974), 491 F. 2d 687 and cases cited therein. The standard necessary to show that a defendant had ineffective assistance of counsel is whether he had a fair trial and substantial justice was done. State v. Hester (1976), 45 Ohio St. 2d 71. This analysis must be done on a case-by-case basis. Id. The Court established a two-prong test to determine if the Hester rule has been met:

> When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.

State v. Lyte (1976), 48 Ohio St. 2d 391, 396-397.

The burden of proof is initially upon the Appellant to show that he was denied the effective assistance of counsel. State v. Nabozny (1978), 54 Ohio St. 2d 195. It is not enough that counsel may have made "tactical" mistakes during the course of the trial. See, State v. Clayton (1980), 62 Ohio St. 2d 45. However, these decisions do note that guidelines do exist to establish the proper standards that should be employed by counsel in the criminal arena. See e.g., ABA Standards Relating to the Prosecution Function and the Defense Function (Approved Draft 1971).

In the instant case, trial counsel for the Appellant was ineffective in that:  (1) counsel should have had hearings on the

151

pre-trial motions that were filed; (2) counsel should have attempted to seat a jury before waiving that right; (3) counsel failed to fully advise the Appellant of his legal rights concerning Appellant's waiver of a jury trial so that he could voluntarily, knowingly and intelligently make such a decision; (4) counsel should have continuously objected to an officer's belief that Appellant was lying; (5) counsel's failure to timely file a motion for new trial with a hearing; (6) counsel's failure to object to Appellee's improperly closing argument; and (7) counsel's failure to preserve the record or otherwise object on any issue that this Court or any future court deems waived by such omission.

These deficiencies did prejudice the Appellant's rights. The waiver of jury was clearly premature. Counsel should have attempted to seat a jury to determine whether or not a change of venue was necessary and second, what type of a jury panel would develop. In doing this, more options are created for the Appellant in securing a fair and impartial jury thus preserving his right to a jury trial. Counsel can develop Appellant's case with pre-trial motions and be in a better position to show prejudice if they are denied. Counsel should always be required in these cases to fully advise their client's of these rights especially with an illiterate, mentally retarded client. Further, not objecting or properly preserving the record did prejudice the Appellant since it did not preserve issues, allowing inadmissible evidence into the record, and caused improper, inflammatory argument by the Appellee to go unchallenged. These are not "tactical" decisions.

While this Court may not view each of these incidences independently as sufficient to constitute ineffective assistance of counsel, this Court should consider them for their combined effect. As stated above, Appellant will still maintain that these incidents coupled with matters that will not be in the record do constitute ineffective assistance of counsel, and at the very least, we which this Court to allow us to preserve that issue for a post-conviction proceeding.

## TWENTIETH PROPOSITION OF LAW

**THE TRIAL COURT ERRED IN ENTERING A JUDGMENT OF CONVICTION FOR KIDNAPPING AND THE OTHER FELONIES WHERE CONVICTIONS ON BOTH OFFENSES ARE CONTRARY TO R.C. 2941.25. SECONDLY, WHERE AN UNDERLYING FELONY COUNT WHICH IS ALSO USED AS A SPECIFICATION FOR AGGRAVATED MURDER MERGES, THEN IT CANNOT BE CONSIDERED AS AN ADDITIONAL SPECIFICATION FOR SENTENCING PURPOSES.**

R.C. 2941.25 states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be <u>convicted</u> of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them. (Emphasis added).

In the instant case, Appellant was convicted of kidnapping, rape, aggravated arson, felonious sexual penetration and aggravated murder, with specifications. Appellant submits that any kidnapping that may have taken place was incidental to the other felonies for which Appellant was convicted. Since there exists no separate animus as to the kidnapping, this conviction and sentence for this count cannot stand pursuant to R.C. 2941.25. This same issue was addressed by this court in <u>State</u> v. <u>Logan</u> (1979), 60 Ohio St. 2d 126, where it held, in the syllabus:

In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate

154

convictions, however, when the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions.

(b)  Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

In discussing the underlying policy of R.C. 2941.25, this court noted that "the basic thrust of the policy is to prevent 'shotgun' convictions". Logan at 131. This is exactly what occurred in the case at bar. The problem is further exacerbated by the addition of kidnapping as a specification to the aggravated murder charge. When the prosecution relies on the same conduct to support both convictions for kidnapping, rape and aggravated murder with death penalty specifications, R.C. 2941.25 is violated.

A similar issue was raised in State v. Cooey (1989), 46 Ohio St. 3d, a recent capital case. The facts in Cooey, however, are distinguishable from the facts herein and more easily support the holding that there was a separate animus for both the kidnapping counts and the rape counts. In Cooey, the victims were taken by automobile from a shopping mall in Akron to an isolated wooded area in Norton, Ohio with the initial motive of robbery. The victims were raped upon their arrival in Norton, Ohio. They were placed back in the Defendant's car and then brought back outside and beaten, strangled and robbed.

The victim in this case was merely pulled off his bicycle a few feet from a traveled path and subsequently raped and assaulted

155

in a relatively short period of time.  Any restraint of the victim was incidental to the other crimes and cannot be found to constitute the crime of kidnapping.

Likewise, in State v. Brown, this court held that:

> Pursuant to Crim. R. 32(B), a judgment or conviction must set forth the verdict and the sentence.  Because the trial court's entry of judgment included a sentence for both crimes, it is irrelevant that it was provided that the sentences were to be served concurrently; for purposes of R.C. 2941.25, Appellant has been convicted of both offenses, in violation of that section.

(1982), 7 Ohio App. 3d 113.  Therefore, it is irrelevant that the trial court sentenced the Appellant to concurrent sentences of incarceration.  It is still not proper pursuant to R.C. 2941.25(B).

Since the kidnapping count should have merged with the other felony counts, it also becomes apparent that the kidnapping specification to the aggravated murder should have merged with the other specifications.  Not only does the kidnapping count merge, but with one less specification on the aggravated murder count, only two specifications should have been considered as aggravated factors.  Therefore, at the very least, this case should be remanded for a new sentencing with instructions consistent with the foregoing proposition.

## TWENTY-FIRST PROPOSITION OF LAW

A MOTION FOR NEW TRIAL SHOULD NOT BE DENIED WITHOUT A
FULL HEARING WHEN MADE PURSUANT TO CRIM. R. 33. A DENIAL
OF SUCH A HEARING AND THE MOTION VIOLATES AN ACCUSED'S
FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE
UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS TEN
AND SIXTEEN OF THE OHIO CONSTITUTION AND CRIM. R. 33.

In the instant c                    Appellant filed a

motion for a new tri                n February 14,

1986, prior to the m               . On March 31,

1986, said motion wa               il 4, 1986, the

Appellant's motion 1               n an explanation

for the request. A                 duled for May 8,

1986. On May 7, 1                  the Appellant's

subpoenas in suppo                 , the trial court

summarily denied t                 w trial.

Appellant's motion for a new trial included affidavits and a
detailed factual and legal basis for the motion. The trial court
scheduled a hearing on the motion. Subpoenas were issued to
witnesses to support the allegations raised in the motion. The
court squashed those subpoenas and then summarily overruled the
motion not only without a hearing, but without findings of facts
and conclusions of law. This procedure violated the Appellant's
constitutional rights under both the United States and Ohio
Constitutions. See <u>State</u> v. <u>Turner</u> (1983), 10 Ohio App. 3d 328.
Cf. <u>Toledo</u> v. <u>Stuart</u> (1983), 11 Ohio App. 3d 292.

Although a motion for new trial is committed to the discretion
of the trial court, in a capital case where death is the ultimate
penalty, a heightened degree of reliability is required for any

157

conviction. As such, a trial court should determine all motions for new trial filed in a capital case with greater leeway to a Defendant than a typical case.

In this case the trial court gave little, if any, consideration to Appellant's motion. Additionally, by failing to issue findings of fact or conclusions of law after summarily overruling the motion, the trial court failed to articulate any reason for its decision. By this failure, both the appellate court and this court are seriously hampered in reviewing the trial court's action. At the very least, this case should be remanded to the trial court with instructions to file an opinion with findings of fact and conclusions of law as to why the motion was overruled.

Appellant raised several bases for a new trial in his motion. The most important were newly discovered evidence and prosecutorial misconduct. Additionally, defense counsel specifically requested time to supplement the motion with affidavits. Counsel was in the midst of preparing for mitigation and needed more time to prepare affidavits. After the court overruled Appellant's motion, counsel filed a motion to vacate the ruling with a detailed summary of the facts he believed would be established at a hearing on the motion coupled with subpoenas, exhibits and an affidavit from Raymond Vaughn, Appellant's half brother, in which he recanted his trial testimony.

In determining a motion for new trial based on newly discovered evidence, the Ohio Supreme Court held in the syllabus of State v. Petro (1947), 148 Ohio St. 505, that:

To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. (State v. Lopa, 96 Ohio St. 410, 117 N.E. 319, approved and followed.

Appellant submits that both the recanted testimony of Raymond Vaugh and the evidence regarding the dental impressions as detailed in the motion meet the Petro requirements.  Although there may be some dispute as to whether the evidence merely impeaches or contradicts the former, Appellant contends that a more appropriate standard for determining when new evidence warrants a new trial would be that standard enunciated by the Cuyahoga Court of Appeals in State v. Abi-Sarkis (1988), 41 Ohio App. 3d 333.  In that case, the appellate court recognized that a motion for new trial should be granted even if the new evidence impeaches and contradicts former evidence so long as the newly discovered evidence goes to key issues in the criminal case.  Id. at paragraph six of the syllabus.  New evidence, by its very nature, will necessarily contradict former evidence.  If such new evidence casts doubt upon a fact finder's resolution of key issues, a new trial must be granted.

The motion in the instant case was also based on prosecutorial misconduct, (in essence the failure to comply with discovery request detailed more fully in Proposition of Law Number Sixteen). A new trial for prosecutorial misconduct is not subject to the same

159

guidelines as one for newly discovered evidence.  It is to be granted if the Defendant was prejudiced thereby or prevented from having a fair trial.  Appellant Hill was prejudiced by the failure of the prosecutor to turn over all photos and by the identification of Hill close to the scene of the crime by Donald Allgood, a surprise witness.  Therefore, this case should be remanded back to the trial court for a hearing on the motion for new trial.

## TWENTY-SECOND PROPOSITION OF LAW

OHIO'S MANDATORY SENTENCING SCHEME PREVENTED THE PANEL OF THREE JUDGES FROM DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT IN VIOLATION OF APPELLANT'S RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION NINE AND SIXTEEN OF THE OHIO CONSTITUTION.

Under R.C. 2929.03 et seq., if a three-judge panel finds that the statutory aggravating factors outweigh mitigating factors beyond a reasonable doubt, then the jury is required to impose a death sentence. This mandatory scheme prohibits the three-judge panel from considering whether death is really the appropriate punishment in this case, even if the aggravating circumstances outweigh the mitigating circumstances. The three-judge panel is bound by the weighing process and prohibited from deciding whether nevertheless death is not appropriate. The failure of the statute and the court in this case to permit the three-judge panel to decide whether death was appropriate notwithstanding the weighing result violated Danny Hill's rights against cruel and unusual punishment. These rights are guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 9 and 16 of the Ohio Constitution.

The statute and instruction prevents the sentencer from asking what is the ultimate inquiry: whether death is the appropriate sentence in Danny Hill's case. A three-judge panel must always be free to confront the ultimate questions of whether death is the appropriate punishment, even where mitigating factors do not outweigh aggravating factors. Lockett v. Ohio (1978), 438 U.S. 586, 601 (plurality opinion) (quoting Woodson v. North Carolina

(1976), 428 U.S. 280 (opinion of Stewart, J.).  See also, <u>Smith</u> v. <u>North Carolina</u> (1982), 459 U.S. 1056 (Justice Stevens dissenting from denial of certiorari); <u>State</u> v. <u>McDougall</u> (N.C. 1983), 301 S.E. 2d 308, 327; <u>State</u> v. <u>Wood</u> (Utah 1982), 648 P. 2d 71, 83.

The three-judge panel may wish to vote for life out of a desire for mercy, or it may believe that the death penalty is simply inappropriate for the specific crime that has been committed.  These factors are legitimate components of the sentencing process.  The sentencing process:

> . . . must permit consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

<u>Lockett</u>, 438 U.S. at 586 (quoting <u>Woodson</u>, 428 U.S. at 304).  <u>See also</u>, <u>Robert (Harry)</u> v. <u>Louisiana</u> (1977), 431 U.S. 633, 637.

The failure of the Ohio statute and its application to this case to permit the three-judge panel to make an unconstrained determination of the appropriateness of the death sentence violated Danny Hill's rights against cruel and unusual punishment.  It prevented the three-judge panel from making the essential constitutional prerequisite of an individualized sentencing determination.  Absent an individualized determination, the death sentence cannot stand.  <u>Barclay</u> v. <u>Florida</u> (1983), 463 U.S. 939 and <u>Zant</u> v. <u>Stephens</u> (1983), 462 U.S. 862.

For these reasons, this Court should vacate the death sentence and either remand for re-sentencing to life imprisonment or remand for a new trial.

## TWENTY-THIRD PROPOSITION OF LAW

**THE FAILURE TO CONSIDER ALL OF THE EVIDENCE IN SUPPORT OF MITIGATING A DEATH SENTENCE VIOLATES R.C. 2929.03(F) AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

R.C. 2929.03(D)(3), in pertinent part, states:

> Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender arguments of counsel, and if applicable, the reports submitted to the court . . . if, after receiving . . the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt . . . that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender.

R. C. 2929.03(F) requires this finding be set forth in a separate opinion which includes "the reason why the aggravating circumstances . . . were sufficient to outweigh the mitigating factors" In <u>State</u> v. <u>Maurer</u> (1984), 15 Ohio St. 3d 239, <u>Cert. denied</u> (1985), _____U.S._____, 105 S. Ct. 2714, <u>rehearing denied</u> (1985), ____U.S.____, 106 S. Ct. 15, the Ohio Supreme Court stated in syllabus number three:

> The trial court, when it imposes a sentence of death, shall state in a separate opinion its <u>specific findings as to the existence of any mitigating factors</u>, the aggravating circumstances the offender was found guilty of committing, and the <u>reason why these aggravating circumstances were sufficient to outweigh the mitigating factors</u>.

(Emphasis added). The trial court is required to present for review, in its separate opinion, a meaningful explanation of its weighing procedures in justification of the death penalty.

The court in <u>Maurer</u> emphasized the importance of the trial court's duty to fully explain its findings.

In so holding, we do not intend to trivialize the duty of the trial court under R.C. 2929.03(F) to articulate its reasoning or to suggest that such an omission is insignificant. It is not. The failure of a trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances. In a closer case, those perceptions could make a difference in the manner in which a defendant pursues his appeal and in which a reviewing court makes its determination.

Ohio's statutory review procedures were enacted in order to ensure the mandates of _Lockett_ v. _Ohio_ (1978), 438 U.S. 586, and _Eddings_ v. _Oklahoma_ (1982), 455 U.S. 104, are met where death penalties are imposed. _Lockett_ and _Eddings_ require that imposition of death sentences must include a consideration of the Appellant's character or record and the circumstances of the offense where the defendant presents such evidence. While _Lockett_ established the absolute right to present mitigation evidence, _Eddings_ went further, stating:

> We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in _Lockett_. Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings offered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

455 U.S. at _____. (Emphasis added). (Footnotes omitted).

In its opinion, the three-judge panel did not find any evidence presented in mitigation of sentence as mitigating factors, though it considered numerous factors in possible mitigation. The

164

court failed to mention and gave no weight to the following evidence Appellant had offered in mitigation:

1. the possible brain damage from various head injuries throughout childhood;

2. the severely low mental age of Danny (seven years, three months); and

3. Danny's good institutional record at Brinkhaven and TCY. (See Skipper v. South Carolina (1986), 39 Crim. L. Rptr. 3041.)

The court thus gave no weight, as a matter of law, to much of the mitigating evidence presented, in direct violation of Eddings. Eddings requires sentencers to listen to and consider valid and compelling mitigating evidence. Eddings at 115, fn. 10.

The trial court's failure to consider mitigating evidence was contrary to the teachings of Lockett and Eddings and, therefore, Appellant's sentence must be vacated.

165

## TWENTY-FOURTH PROPOSITION OF LAW

THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND SECTIONS 2,9, 10 AND 16,
ARTICLE I OF THE OHIO CONSTITUTION ESTABLISH THE
REQUIREMENTS FOR A VALID DEATH PENALTY SCHEME. OHIO
REVISED CODE SECTIONS 2903.01, 2929.02, 2929.021,
2929.022, 2929.023, 2929.03, 2929.04 AND 2929.05, OHIO'S
STATUTORY PROVISIONS GOVERNING THE IMPOSITION OF THE
DEATH PENALTY, DO NOT MEET THE PRESCRIBED CONSTITUTIONAL
REQUIREMENTS AND ARE UNCONSTITUTIONAL, BOTH ON THEIR FACE
AND AS APPLIED TO APPELLANT.

The Eighth Amendment to the United States Constitution and Section 9, Article I of the Ohio Constitution, explicitly prohibit the infliction of cruel and unusual punishment upon a convicted criminal offender. The Eighth Amendment protections are applicable to the States through the Fourteenth Amendment. Robinson v. California (1960), 370 U.S. 660. The principle underlying this prohibition, governmental respect for human dignity, must be the court's guideline in determining whether a challenged punishment is constitutional. Furman v. Georgia (1972), 409 U.S. 238, rehearing denied (1972), 409 U.S. 902 (Brennan, J., concurring); Rhodes v. Chapman (1981), 452 U.S. 337, 361; Trop v. Dulles (1958), 356 U.S. 86.

The prohibition against cruel and unusual punishment promises to all that the State's power to punish will be exercised within the limits of civilized standards. Trop, supra. What constitutes cruel and unusual punishment is not a static concept, but rather a concept which "must draw [its] meaning for the evolving standards of decency that mark the progress of a maturing society". Id. at 101. This concept must be interpreted in a flexible and dynamic manner.

166

arbitrary and discriminatory imposition of the death penalty.

The United States Supreme Court's decision in Woodson v. North Carolina (1976), 428 U.S. 280, made it clear that the fatal flaw of mandatory death penalty statutes is that without specific standards the process of deciding who is to be sentenced to death is shielded from judicial review. As stated in Paternoster, Race of Victim and Location of the Crime:  The Decision to Seek the Death Penalty in South Carolina, Journal of Criminal Law and Criminology (1983):

> [T]he mandatory death penalty statute provides no standard to guide the jury in its inevitable exercise of the power to determine which first degree murderers shall live and which shall die * * * There is no way under the North Carolina law for the judiciary to check arbitrary and capricious exercise of that power.

Uncontrolled discretion of the prosecutor is one of Ohio's methods to circumvent this requirement.

The right to life is a constitutionally protected fundamental right.  Commonwealth v. O'Neal (Mass. 1975), 327 N.E. 2d 662; cf. Roe v. Wade (1973), 410 U.S. 113, rehearing denied (1973), 410 U.S. 959; Johnson v. Zerbst (1938), 304 U.S. 458; Yick Wo v. Hopkins (1886), 118 U.S. 356.  The Fifth and Fourteenth Amendments to the Constitution state explicitly that neither the United States government nor any of the individual state governments may deprive a person of his life without due process of law.  "Aside from its prominent place in due process clause itself, the right to life is the basis for all other rights.  In the absence of life all other rights do not exist." Commonwealth v. O'Neal, supra, at 688.

Due process guarantees prohibit the taking of life unless the state can show a legitimate and compelling state interest.

Commonwealth v. O'Neal, supra, at 668; Commonwealth v. O'Neal II (Mass. 1975), 339 N.E. 2d 1338 (Maughan, J., concurring and dissenting), certiorari denied (1978), 439 U.S. 882. Moreover, when fundamental rights are involved, substantive due process requires that "[e]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle personal liberties when the end can be more narrowly achieved." Shelton v. Tucker (1960), 364 U.S. 479; State v. Dixon (Fla. 1973), 283 So. 2d 1 (Ervin, J., dissenting), certiorari denied (1974), 416 U.S. 943; Pierre, 572 P. 2d at 1357. "In order for the State to justify the taking of life by legislative mandate, it must demonstrate that such action is the least restrictive means toward furtherance of * * * [the] compelling governmental end." Commonwealth v. O'Neal, supra, at 668.

The societal interests commonly advanced to justify capital punishment are (1) saving lives, (2) protecting citizens, and (3) ensuring justice. O'Neal II at 681. These goals are often referred to, in penological terms, as (1) deterrence, (2) incapacitation/isolation, and (3) retribution/moral reinforcement. Id.; Gregg v. Georgia (1976), 428 U.S. 153, rehearing denied (1976), 429 U.S. 875.

The death penalty is neither the least restrictive nor an effective means of deterrence. Isolation of the offender can be effectively served by means less restrictive than the death penalty, as can retribution. These societal interests do not justify the death penalty, thus, such punishment is cruel and

unusually applied.

Due process and equal protection rights require that states not impose a capital sentence through procedures that create a substantial risk of arbitrary and capricious application. Gregg, 428 U.S. at 188 and 193-195; Furman, 408 U.S. 255, 274 and 309. The Ohio scheme does not meet these requirements. For example, by failing to require the conscious desire to kill, or premeditation and deliberation as the culpable mental state, R.C. 2903.01(B) and R.C. 2929.04(A)(7) run afoul of the federal and state constitutions. Nor does the Ohio code require that imposition of the death penalty only be allowed after proof beyond all doubt.

Another deficiency is that the statutes do not require the State to prove the absence of any mitigating factors and that death is the only appropriate penalty. The statutory scheme is also unconstitutionally vague which can lead to arbitrary imposition of the death penalty. Moreover, the statutes have impermissibly devalued the importance of mitigation because no method exists to ensure a proper "weighing an consideration" is accomplished. Because of these deficiencies, the Ohio statutory scheme does not meet the requirements of Furman and its progeny.

Also, this court has interpreted the Ohio statutory scheme to require that capital defendants prove the existence of a mitigating factor by a preponderance of the evidence. State v. Jenkins (1984), 15 Ohio St. 3d 164, 171. This standard is unconstitutional because it prevents the sentencer from considering relevant mitigating factors. The Ninth Circuit Court of Appeals found

171

unconstitutional the Arizona capital sentencing scheme that requires a capital defendant to establish a mitigating factor by a preponderance of the evidence. Adamson v. Ricketts (C.A. 9, 1988), 865 F. 2d 1011, certiorari denied (1990), _____U.S._____, ____S. Ct._____. The court held as follows:

> [O]ur objection lies in the fact that once evidence is deemed relevant to mitigation, * * * it will not be weighed against the aggravating circumstance[s] unless that evidence establishes a mitigating circumstance by a preponderance. * * *.
>
> Thus, the * * * courts are precluded from weighing evidence of mitigation that, while not satisfying the evidentiary standard, nonetheless may give the sentencer reservations about the appropriateness of imposing a sentence of death. This exclusion of relevant evidence at the sentencing stage violates the principle established by Woodson, Roberts, Lockett, Eddings and reaffirmed in Turner that a sentencing court must weigh all relevant mitigation evidence against the aggravating circumstances. Thus, the process established by the Arizona death penalty statute is unconstitutional as a matter of law.

Id. at 1041. The United States Supreme Court also has had the opportunity to consider the constitutionality of the preponderance standard. In Walton v. Arizona (1990), _____U.S._____, 110 S. Ct. 3047, the court specifically considered the constitutionality of the standard within the confines of Arizona's statute. The issue concerning the preponderance standard could not garner a majority. The issue still remains unresolved.

The Ohio statutes also violate the constitution by requiring proof of aggravating circumstances in the guilt phase of capital trials. The United States Supreme court has approved schemes which separate the consideration of statutory aggravating circumstances from the determination of guilt because of their ability to provide

172

an individualized determination and to narrow the category of defendant's eligible for the death penalty. See Zant v. Stephens (1983), 462 U.S. 862; Barclay v. Florida (1983), 463 U.S. 939, rehearing denied (1983), 464 U.S. 874. Ohio's statutory scheme cannot provide for these constitutional safeguards.

By requiring proof of the aggravating specifications simultaneously with proof of guilt, Ohio has effectively prohibited a sufficient individualized determination in sentencing as required by post-Furman cases. See Woodson, 428 U.S. 961. The jury must be free to determine whether death is the appropriate punishment for a defendant. By not requiring the state to establish guilt on the question of murder prior to the jury's consideration of the aggravating circumstances, the jury is unconstitutionally barred from making the necessary individualized determination of appropriateness. This is especially prejudicial where, as in Ohio, the consideration of aggravating circumstances is accomplished without consideration of any mitigating factors.

The statutory scheme for capital felony murder also fails to comply with the requirements set forth in Lowenfield v. Phelps (1988), 484 U.S. ____, 98 L.Ed. 2d 286. Ohio's statutory scheme allows an aggravating circumstance, R.C. 2929.04(A)(7), to merely repeat an element of aggravated murder contained in R.C. 2903.01(B).

Without strict adherence to the Furman constraints, the possibility of unbridled discriminatory application of the death penalty violates the constitutional provisions under the Eighth and

173

fourteenth Amendments to the United States Constitution and related provisions of the Ohio constitution. Ohio's procedural system, by requiring proof of aggravating circumstances in the guilt-determining stage of a capital trial, precludes strict adherence to the Furman constraints. Without these safeguards, the risk of discriminatory and cruel punishment without application of due process or equal protection guarantees is unacceptably increased. Such a statutory scheme is unconstitutional and cannot be the basis for imposition of the death penalty.

The Ohio scheme is also unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial. A defendant who decides to plead guilty or no contest to an indictment, which contains one or more capital specifications, receives the benefit of having the trial court judge vested with the discretion to dismiss the specifications "in the interest of justice". Crim. R. 11(C)(3). Accordingly, the capital indictment may be dismissed regardless of the presence or absence of mitigating circumstances. No such corresponding provision exists if a capital defendant elects to proceed to trial before a jury.

In Lockett v. Ohio (1978), 438 U.S. 586, Justice Blackman, in his concurring opinion, found this discrepancy in Ohio's statute to be constitutionally infirm, and violated the United State Supreme Court' pronouncement in United States v. Jackson (1968), 390 U.S. 570. Id. at 617. Moreover, it needlessly burdened the defendant's exercise of his right to trial by jury. Since the United States

174

Supreme Court's decision in Lockett, the infirmity has not been cured and Ohio's statute remains unconstitutional.

Another aspect of the unconstitutionality of Ohio's scheme concerns excessiveness and disproportionality issues. The Ohio Revised Code, through provisions in R.C. 2929.021 and 2929.03, requires reporting of some data to the Court of Appeals and the Ohio Supreme Court; although as discussed above, there is a critical omission of a written life recommendation report from the trial court. There are also substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses, or after charge reductions at trial. R.C. 2929.021 requires the reporting of only minimal information on these cases. There has been no determination by the Supreme Court that additional information will be required to be reported. Additional data is necessary to make an adequate comparison in these cases. There is no system of adequate tracking under the Ohio scheme. This prohibits adequate appellate review.

Adequate appellate review is a precondition to a finding that a state death penalty system is constitutional. Zant, supra, at 879; Pulley v. Harris (1984), 465 U.S. 37. The standard for review is one of careful scrutiny. Zant at 884, 885. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime. Id.

Adequate appellate review is undercut by the failure of the Ohio statutes to require the jury or three judge panel recommending

175

life imprisonment to identity the mitigating factors. Without this information, no significant comparison of cases is possible since no written findings exist to serve as a basis for comparison. Without a significant comparison of cases, there can be no meaningful appellate review.

Careful scrutiny in the comparison of cases is possible only if a sufficient data base and a standardized method of comparison exists. There must be as much information regarding as many cases as possible in order for a comparison to be accurate and significate - - to provide a relevant basis for distinguishing cases and appropriate penalties from each other. A standardized method of comparison is necessary for a consistent process of comparison. Yet Ohio's system provides for procedures which are incompatible with the meaningful comparison of cases. these include accelerated review. the requirement that only minimal information be included in written finding at sentencing, the use of other death cases decided by the reviewing court as a method of comparison, and the gathering of incomplete and inadequate data.

The proportionality system in Ohio is also flawed because of the method used for case comparison. This court in State v. Steffen (1987), 31 Ohio St. 3d 111, cert. denied (1988), ___U.S.__ _, 109 S. Ct. 1089, at paragraph one of the syllabus, held that "the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty imposed." By only reviewing those cases in which death is imposed, the capital

176

defendant is prevented from receiving a fair proportionality review. No meaningful manner exists in which to distinguish those capital defendants who are deserving of the death penalty and those who are not.

The Ohio scheme is also unconstitutional in that it fails to provide the sentencing authority with an option to choose a life sentence when there are only aggravating circumstances. By foreclosing the jury's or three judge panel's ability to return a life sentence unless aggravating circumstances fail to outweigh mitigating factors, Ohio's statutes violate the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution. Merely concluding that the aggravating circumstances outweigh those mitigating factors may be inadequate, as a jury or three judge panel may still conclude that "a comparison of the aggravating factors with the totality of the mitigating factors leaves it in doubt as to the proper penalty, "i.e., in doubt as to whether death is the appropriate punishment in a specific case. Smith v. North Carolina (1982), 459 U.S. 1056 (Stevens, J., dissenting from denial of certiorari).

Under R.C. 2929.05, courts affirming a death sentence in Ohio are required to find that death is the only appropriate remedy, but the original sentencer has no such statutory requirement, and it must. The jury or three judge panel must make this decision and must make it in a fashion that will allow it to be reviewed objectively at the appellate level. Due process requires that the

same standards apply at both levels. Arbitrary decisions are likely at the appellate level if courts make assumptions as to what the sentencer considered.

The "fundamental issue" in a capital sentencing proceeding is this "determination of the appropriate punishment to be imposed on an individual". Spaziano v. Florida (1984), 468 U.S. 447. The sentencer must "rationally distinguish between those for whom death is an appropriate sanction and those for whom it is not". Id. at 352. Appropriateness of the penalty thus appears to be at the core, and indispensable element of a constitutionally valid sentencing scheme. Yet, Ohio's laws do not provide the jury or three judge panel with an opportunity to consider this.

The Eighth Amendment to the United States Constitution and Section 9, Article I of the Ohio Constitution prohibit infliction of cruel and unusual punishment. The meaning of the term "cruel and unusual" must be established based on the values and ideals of an enlightened society. Current social values have progressed from those of the past where the "justice" system called for "an eye for an eye". Contemporary societal values are inconsistent with the purposeless extinction of life. The death penalty, by these standards, is cruel and unusual punishment.

The Fifth and Fourteenth Amendments to the United States Constitution, as well as Sections 2 and 16, Article I of the Ohio Constitution, provide guarantees to equal protection of the law and due process. These guarantees are further safeguards against imposition of the death penalty, even if it is not found to be

inherently cruel and unusual.

Due process guarantees that, where fundamental rights are at risk, the life of the defendant may not be taken without substantive safeguards first being met. Governmental action cannot be justified unless the interest to be served is a compelling governmental interest. Further, that interest must be promoted through use of the least restrictive means that can effectively serve the stated interest. The State of Ohio has failed to establish a compelling state interest. Moreover, the State has failed to show that a less restrictive means, such as life imprisonment, could not effectively serve the interests the State has asserted a justifying the death penalty.

Due process also guarantees fair proceedings through which sentencing is accomplished. Where procedures implemented do not adequately ensure reliability in the guilt and sentencing determinations, there is an increased risk that the death penalty will be imposed arbitrarily and discriminatorily, in violation of Equal Protection guarantees. Where this occurs, the death penalty, as applied, constitutes cruel and unusual punishment.

Ohio's statutory scheme under which the death penalty is authorized fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur. The procedures utilized under this scheme actually promote the imposition of the death penalty and, thus, are constitutionally intolerable, and violate the Fifth, Sixth, Eighth and Fourteen Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I

of the Ohio Constitution.

## TWENTY-FIFTH PROPOSITION OF LAW

THIS COURT CANNOT FIND, PURSUANT TO R.C. 2929.05(A), THAT
(1) THE JUDGMENT OF GUILT OF AGGRAVATED MURDER AND THE
SPECIFICATIONS WAS SUPPORTED BY SUFFICIENT EVIDENCE; (2)
THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE
MITIGATING FACTORS IN THE CASE; (3) THAT THE SENTENCE OF
DEATH IS APPROPRIATE; (4) THAT THE SENTENCE OF DEATH IS
NOT EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED
IN SIMILAR CASES; AND (5) THAT THE TRIAL AND APPELLATE
COURTS PROPERLY WEIGHED THE AGGRAVATING CIRCUMSTANCES AND
MITIGATING FACTORS.   APPELLANT'S DEATH SENTENCE WAS
IMPOSED IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND
FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT AS ENCOMPASSED
BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS NINE
AND SIXTEEN OF THE OHIO CONSTITUTION.

R.C. 2929.05(A) imposes the following duties upon this Court
in reviewing a death sentence:    (1) to determine whether the
judgment of guilt of aggravated murder and the specifications was
supported by suff_____  _____ (2) to determine whether the
aggravating circum____ _____ ____ __ng factors in the
case; (3) to d_____ _____ __ ce of death is
appropriate; (4) _____ _____ e of death is not
excessive or disp_____ _____ imposed in similar
cases; and (5) _____ _____ al court properly
weighed the aggr____ _____ ____ gating factors.    In
performing the r_____ _____ this court will be
unable to answer ___ _____ ely.  To do so would
be to impose the death sentence __ _____ of Danny Lee Hill's
rights to due process and freedom from cruel and unusual
punishment.    Fifth, eighth, and fourteenth amendments, United
States Constitution.

[handwritten annotation: Same as Ass, 25 of Error 19 New Authorities: State v. Steffen, State v. Rogers, Skipper v. South Carolina]

   1.   Sufficiency of the Evidence of Aggravated Murder and the
        Specifications

The facts adduced at trial are exhaustively set forth in the Statement of Facts and will not be repeated in depth here. This Court has held that in reviewing the sufficiency of the evidence:

> A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that the elements of an offense have been proved beyond a reasonable doubt.

State v. Eley (1978), 56 Ohio St. 2d 169. In cases where circumstantial evidence is relied upon, the test is:

> "[W]here circumstantial evidence is relied upon to prove the elements of the crime, the jury must find it to be of such a conclusive and persuasive force that it excludes every reasonable hypothesis of innocence. . . Once a jury has reached its decision, an appellate court, where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence.

State v. Graven (1978), 54 Ohio St. 2d 114.

Due process requires the evidence to meet the following test for sufficiency:

> Where, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia (1979), 443. U.S. 307, 319 (Emphasis in original).

In this case, the disputed questions of facts relevant this assignment of error are (1) were statements attributed to Danny Hill of his own volition of those impressed upon him by law enforcement officers; and (2) if present, was there any evidence of Danny's participation in the events.

A careful review of all of Danny's statements elicited by law

182

enforcement officers and the techniques utilized in obtaining them clearly show a confused person attempting to please his inquisitors. This Court not only can review the pertinent portions of the transcript, but also listen to the taped statement and view the video-taped statement. At best, they show he saw what happened.

Numerous questions still exist. The only piece of evidence that the Appellee uses to show a direct link between the events and Danny Hill is the bit mark found on the deceased's penis. While Dr. Mertz subjectively believes that the mark was left by the Appellant, Dr. Livine, the leading expert in the field cannot testify to a dental certainty that Danny caused the mark. Further, expert examination of this issue was precluded by the conduct of the Appellee in not providing valuable photographs to the Appellant for use by his experts. Also, the doctors only had two dental impressions for comparison purposes.

Danny was seen at one point at the Valu-King at the same time as Timothy Combs and the deceased. Timothy Combs is later observed by himself walking on the path shortly before a single scream is heard. The next observation of either Danny or Tim Combs is in the company of two other individuals, Andre McClain and another unidentified person. Despite all the attempts, no other physical evidence exists supporting the conviction and there was no evidence supporting the allegation that Danny destroyed any evidence. In a case where the evidence is "almost entirely circumstantial" and where death is a possible sentence, courts should be very careful

183

to safeguard the defendant's rights.  State v. Johnson (1986), 24 Ohio St. 3d 87, 95.  A careful review of this case does not support a finding that Danny Lee Hill committed aggravated murder or any of the specification or underlying charges.

    2.   The Aggravating Circumstances Do Not Outweigh The Mitigating Factors.

R.C. 2929.05(A) requires the Court of Appeals and this Court to independently weigh the facts to determine whether it is convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.  State v. Jenkins (1984), 15 Ohio St. 3d 164, 206, 208.  There is no presumption that the trial court's judgment was correct; the weighing process is independent of the judgment below.  State v. Maurer (1984), 15 Ohio St. 3d 239, 246, 247.

The only aggravating circumstances in this case are that the murder was committed while the offender was committing kidnapping, rape, and aggravated arson.  Non-statutory aggravating circumstances cannot be considered under the Ohio statute.  State v. Johnson, supra.

The testimony from the mitigation hearing is set forth in the Statement of Facts, and Appellant directs the court's attention to that portion of the State of Facts for the proof of the mitigating factors.  Appellant submits that the mitigating factors shown by the evidence, which primarily has to do with the Appellant's background established mitigating factors pursuant to R.C. 2929.04(B)(3), (B)(4), (B)(6), and (B)(7).

These factors were shown by the following:  (1) possible

organic brain damage from head injuries as a child; (2) Danny's severely low mental age (seven years, three months); (3) the family background and history including his mental retardation of his mother, uncle and brothers; (4) lack of proper care and counseling while at TCY; and (5) Danny's good institutional record at Brinkhaven and TCY.

Danny's IQ of 68 and mental age of sever years, three months severely limited his appreciation of the nature of his acts.  By all accounts, with a structured and nurturing environment, Danny did extremely well such as his placement at Brinkhaven.  He even did as well as can be expected at TCY considering the lack of guidance and counseling that occurred.  His good institutional record is a mitigating factor. Skipper.

Residual doubts about Appellant's guilt of the offense (see previous discussion) is a mitigating factor.  Smith v. Balkcom (C.A. 5, 1981),660 F.2d 573, 580-581.

Under the evidence presented at trial, this court cannot find beyond a reasonable doubt that the aggravating circumstances of kidnapping, rape, and aggravated arson outweigh the mitigating factors present in this case.

Mitigation does not excuse or justify a crime, and Appellant has not attempted to offer any evidence that would excuse or justify the murder of Raymond Fife.  The law is that not all persons who are found guilty of committing aggravated murder must die for the crime.  Where there are substantial mitigating factors, as there are here, the law requires a sentence of life

185

imprisonment, not death in the electric chair. When this court independently weighs the evidence, it will find beyond a reasonable doubt that the aggravating circumstances do not outweigh the mitigating factors in this case.

3.   The Sentence of Death in Inappropriate.

Reviewing the appropriateness of the death sentence includes review of trial procedural errors, even where the parties have not raised them. State v. Buell, (1986), 22 Ohio St. 3d 124, 142 (court raises Caldwell issue sua sponte; not assigned as error.) This brief has outlined, in twenty-four assignments of error, the substantive and procedural errors that have occurred in this case, and they will not be repeated here. But they must be included in this court's determination of the appropriateness of the death sentence.

The "appropriateness" determination is made independently of the reweighing of the evidence. State v. Wood (Utah. 1982), 648 P. 2d 71, 84; People v. Brown (Cal. 1985) 709 P. 2d 440, cert. granted on another issue (June 2, 1986), 54 LW 3787. In other words, death may be an inappropriate sentence even where the aggravating circumstances outweigh the mitigating factors.

At every chance there was, the Appellee focused the case on its gruesomeness and that Danny had committed other acts. Every attempt was made to inflame the three judge panel. A death sentence that is imposed because of passion and prejudice is arbitrary and cannot be upheld, Gregg v. Georgia (1976), 428 U.S. 153. The very adjectives used by the three judge panel to describe

186

the other acts supports this conclusion. This is also true in the appellate decision. In view of all of this information, death is not the appropriate sentence for Danny Lee Hill.

4. Proportionality.

Under R. C. 2929.05(A) this court must consider whether the sentence is excessive or disproportionate to the sentence imposed in similar cases. Defense counsel is not required to submit evidence of disproportionality. State v. Jenkins, supra, at 209. Although this court has previously had that the proportionality review required by R. C. 2929.05 does not require a review of those cases in which a life sentence was imposed, appellant raises this issue in order to preserve the issue for federal review. State v. Steffen (1989), 31 Ohio St. 3d 111. Appellant submits that there is no true proportionality review if there is only a comparison to other cases in which the death sentence is imposed. If the policy of the proportionality review is to insure that criminal defendants are treated similarly and that the death sentence is not imposed arbitrarily, courts will never discover any evidence of dissimilarity or arbitrariness if they are not required to examine anything other than death sentences. Additionally, it courts are only required to examine those death sentences affirmed in their own geographical jurisdictions, as held in State v. Rogers (1985), 17 Ohio St. 3d 174, and followed in this case by the Franklin County Court of Appeals, the proportionality review is further weakened. With these conditions, it is highly unlikely that a proportionality review will ever detect if a criminal defendant is

treated dissimilarly or if the death penalty has been imposed arbitrarily.

It is counsel's understanding that this is the first case that a sentence of death has been imposed in Trumbull County. However, there is discussion in the record of other aggravated murder cases where death was not imposed. Therefore, this case must be compared with all those cases where the imposition of the death penalty was a possible sentence. Counsel for the state was improperly allowed to argue that certain mitigating factors involved in this case were not found in cases that resulted in the death penalty in other parts of the state. This fact alone should reverse this case.

5.   <u>Trial Court's Opinion</u>.

As has already been argued, the trial court failed to give any weight to several of the mitigating factors shown in this case; and considered non-aggravating circumstances the trial court failed to consider all of the non-statutory mitigating circumstances; the court permitted consideration of duplicative aggravating circumstances; the trial court allowed the State a different standard for showing proportionality; and the trial court considered non-aggravating circumstances.

6   <u>Court of Appeal's Opinion</u>.

The appellate court's opinion is replete with considering non-aggravated circumstances as well as discussing the lack of mitigating factors which were not raised to justify their affirmance of the death sentence. For example, the appellate court used Appellant's character as an aggravated circumstance when the

court stated "[t]his evidence indicates a lack of remorse, a callous attitude and the heinous nature of his character". Op. at 71. This is not one of the statutory aggravated circumstances stated in the statute.

Further, the factors that the appellant court used to negate his mental capacity, or lack of, shows that the court below did not appreciate the significance of the evidence. The "shifting of blame" or knowing that the alleged theft would cause confinement are instances showing childlike reactions to overwhelming situations and not indicative of showing an adult standard of the differences between right and wrong. In addition, the court below used the improper argument that family background/environment was not significant because such a life/environment did not cause "his siblings to perpetrate violent crimes." See Op. at 83.

Using these factors or circumstances in the weighing process invalidate the death sentence affirmed by the court below. For the reasons set forth in this and all the other assignments of error, Danny Lee Hill's death sentence must be vacated.

## CONCLUSION

Death is the most extreme penalty a society can inflict on one of its own members. Consequently, a death penalty case requires the use of extreme caution throughout every state of the trial and appellate phases of such a case. The preceding Propositions of Law set forth the most egregious errors which occurred during these phases. These errors denied Danny Lee Hill a fair trial and appeal, and have resulted in Danny facing a death sentence.

For the reasons expressed in this brief and any other reasons which are apparent on the record, Appellant respectfully requests that the judgment and death sentence of the Trumbull County Court of Common Pleas and the Eleventh Appellate District be reversed, and a new trial granted. Alternatively, the sentence of death imposed by the three judge panel should be set aside and a term of life imprisonment ordered.

Respectfully submitted:

*Roger Warner*
Roger Warner                    (0019941)
TATARU, WALLACE & WARNER
181 East Livingston Avenue
Columbus, OH  43214
(614) 221-3821
Co-counsel for Defendant-Appellant

*Carol Wright* (RW)
Carol Wright
TYACK, WRIGHT & TURNER
7100 North High Street, Suite 209
Worthington, OH  43085
(614) 848-4140
Co-counsel for Defendant-Appellant

190

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Brief was served upon Dennis Watkins, Prosecuting Attorney of Trumbull County, 160 High Street, N.W., Third Floor Administration Building, Warren, OH 44481, Attorney for Appellee, on this __4th__ day of February, 1991.

Roger Warner

Roger Warner        (0019941)

same standards apply at both levels. Arbitrary decisions are likely at the appellate level if courts make assumptions as to what the sentencer considered.

The "fundamental issue" in a capital sentencing proceeding is this "determination of the appropriate punishment to be imposed on an individual". Spaziano v. Florida (1984), 468 U.S. 447. The sentencer must "rationally distinguish between those for whom death is an appropriate sanction and those for whom it is not". Id. at 352. Appropriateness of the penalty thus appears to be at the core, and indispensable element of a constitutionally valid sentencing scheme. Yet, Ohio's laws do not provide the jury or three judge panel with an opportunity to consider this.

The Eighth Amendment to the United States Constitution and Section 9, Article I of the Ohio Constitution prohibit infliction of cruel and unusual punishment. The meaning of the term "cruel and unusual" must be established based on the values and ideals of an enlightened society. Current social values have progressed from those of the past where the "justice" system called for "an eye for an eye". Contemporary societal values are inconsistent with the purposeless extinction of life. The death penalty, by these standards, is cruel and unusual punishment.

The Fifth and Fourteenth Amendments to the United States Constitution, as well as Sections 2 and 16, Article I of the Ohio Constitution, provide guarantees to equal protection of the law and due process. These guarantees are further safeguards against imposition of the death penalty, even if it is not found to be

178

inherently cruel and unusual.

Due process guarantees that, where fundamental rights are at risk, the life of the defendant may not be taken without substantive safeguards first being met. Governmental action cannot be justified unless the interest to be served is a compelling governmental interest. Further, that interest must be promoted through use of the least restrictive means that can effectively serve the stated interest. The State of Ohio has failed to establish a compelling state interest. Moreover, the State has failed to show that a less restrictive means, such as life imprisonment, could not effectively serve the interests the State has asserted a justifying the death penalty.

Due process also guarantees fair proceedings through which sentencing is accomplished. Where procedures implemented do not adequately ensure reliability in the guilt and sentencing determinations, there is an increased risk that the death penalty will be imposed arbitrarily and discriminatorily, in violation of Equal Protection guarantees. Where this occurs, the death penalty, as applied, constitutes cruel and unusual punishment.

Ohio's statutory scheme under which the death penalty is authorized fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur. The procedures utilized under this scheme actually promote the imposition of the death penalty and, thus, are constitutionally intolerable, and violate the Fifth, Sixth, Eighth and Fourteen Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I

of the Ohio Constitution.

## TWENTY-FIFTH PROPOSITION OF LAW

THIS COURT CANNOT FIND, PURSUANT TO R.C. 2929.05(A), THAT (1) THE JUDGMENT OF GUILT OF AGGRAVATED MURDER AND THE SPECIFICATIONS WAS SUPPORTED BY SUFFICIENT EVIDENCE; (2) THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE MITIGATING FACTORS IN THE CASE; (3) THAT THE SENTENCE OF DEATH IS APPROPRIATE; (4) THAT THE SENTENCE OF DEATH IS NOT EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES; AND (5) THAT THE TRIAL AND APPELLATE COURTS PROPERLY WEIGHED THE AGGRAVATING CIRCUMSTANCES AND MITIGATING FACTORS. APPELLANT'S DEATH SENTENCE WAS IMPOSED IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT AS ENCOMPASSED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS NINE AND SIXTEEN OF THE OHIO CONSTITUTION.

R.C. 2929.05(A) imposes the following duties upon this Court in reviewing a death sentence: (1) to determine whether the judgment of guilt of aggravated murder and the specifications was supported by sufficient evidence; (2) to determine whether the aggravating circumstances outweigh the mitigating factors in the case; (3) to determine whether the sentence of death is appropriate; (4) to determine that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases; and (5) to determine whether the trial court properly weighed the aggravating circumstances and mitigating factors. In performing the required review in this case, this court will be unable to answer the five inquiries affirmatively. To do so would be to impose the death sentence in violation of Danny Lee Hill's rights to due process and freedom from cruel and unusual punishment. Fifth, eighth, and fourteenth amendments, United States Constitution.

1.  <u>Sufficiency of the Evidence of Aggravated Murder and the Specifications</u>

181

The facts adduced at trial are exhaustively set forth in the Statement of Facts and will not be repeated in depth here. This Court has held that in reviewing the sufficiency of the evidence:

> A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that the elements of an offense have been proved beyond a reasonable doubt.

State v. Eley (1978), 56 Ohio St. 2d 169. In cases where circumstantial evidence is relied upon, the test is:

> "[W]here circumstantial evidence is relied upon to prove the elements of the crime, the jury must find it to be of such a conclusive and persuasive force that it excludes every reasonable hypothesis of innocence. . . . Once a jury has reached its decision, an appellate court, where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence.

State v. Graven (1978), 54 Ohio St. 2d 114.

Due process requires the evidence to meet the following test for sufficiency:

> Where, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia (1979), 443. U.S. 307, 319 (Emphasis in original).

In this case, the disputed questions of facts relevant this assignment of error are (1) were statements attributed to Danny Hill of his own volition of those impressed upon him by law enforcement officers; and (2) if present, was there any evidence of Danny's participation in the events.

A careful review of all of Danny's statements elicited by law

182

enforcement officers and the techniques utilized in obtaining them clearly show a confused person attempting to please his inquisitors. This Court not only can review the pertinent portions of the transcript, but also listen to the taped statement and view the video-taped statement. At best, they show he saw what happened.

Numerous questions still exist. The only piece of evidence that the Appellee uses to show a direct link between the events and Danny Hill is the bit mark found on the deceased's penis. While Dr. Mertz subjectively believes that the mark was left by the Appellant, Dr. Livine, the leading expert in the field cannot testify to a dental certainty that Danny caused the mark. Further, expert examination of this issue was precluded by the conduct of the Appellee in not providing valuable photographs to the Appellant for use by his experts. Also, the doctors only had two dental impressions for comparison purposes.

Danny was seen at one point at the Valu-King at the same time as Timothy Combs and the deceased. Timothy Combs is later observed by himself walking on the path shortly before a single scream is heard. The next observation of either Danny or Tim Combs is in the company of two other individuals, Andre McClain and another unidentified person. Despite all the attempts, no other physical evidence exists supporting the conviction and there was no evidence supporting the allegation that Danny destroyed any evidence. In a case where the evidence is "almost entirely circumstantial" and where death is a possible sentence, courts should be very careful

183

to safeguard the defendant's rights. State v. Johnson (1986), 24 Ohio St. 3d 87, 95. A careful review of this case does not support a finding that Danny Lee Hill committed aggravated murder or any of the specification or underlying charges.

### 2. The Aggravating Circumstances Do Not Outweigh The Mitigating Factors.

R.C. 2929.05(A) requires the Court of Appeals and this Court to independently weigh the facts to determine whether it is convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. State v. Jenkins (1984), 15 Ohio St. 3d 164, 206, 208. There is no presumption that the trial court's judgment was correct; the weighing process is independent of the judgment below. State v. Maurer (1984), 15 Ohio St. 3d 239, 246, 247.

The only aggravating circumstances in this case are that the murder was committed while the offender was committing kidnapping, rape, and aggravated arson. Non-statutory aggravating circumstances cannot be considered under the Ohio statute. State v. Johnson, supra.

The testimony from the mitigation hearing is set forth in the Statement of Facts, and Appellant directs the court's attention to that portion of the State of Facts for the proof of the mitigating factors. Appellant submits that the mitigating factors shown by the evidence, which primarily has to do with the Appellant's background established mitigating factors pursuant to R.C. 2929.04(B)(3), (B)(4), (B)(6), and (B)(7).

These factors were shown by the following: (1) possible

184

organic brain damage from head injuries as a child; (2) Danny's severely low mental age (seven years, three months); (3) the family background and history including his mental retardation of his mother, uncle and brothers; (4) lack of proper care and counseling while at TCY; and (5) Danny's good institutional record at Brinkhaven and TCY.

Danny's IQ of 68 and mental age of seven years, three months severely limited his appreciation of the nature of his acts. By all accounts, with a structured and nurturing environment, Danny did extremely well such as his placement at Brinkhaven. He even did as well as can be expected at TCY considering the lack of guidance and counseling that occurred. His good institutional record is a mitigating factor. Skipper.

Residual doubts about Appellant's guilt of the offense (see previous discussion) is a mitigating factor. Smith v. Balkcom (C.A. 5, 1981),660 F.2d 573, 580-581.

Under the evidence presented at trial, this court cannot find beyond a reasonable doubt that the aggravating circumstances of kidnapping, rape, and aggravated arson outweigh the mitigating factors present in this case.

Mitigation does not excuse or justify a crime, and Appellant has not attempted to offer any evidence that would excuse or justify the murder of Raymond Fife. The law is that not all persons who are found guilty of committing aggravated murder must die for the crime. Where there are substantial mitigating factors, as there are here, the law requires a sentence of life

imprisonment, not death in the electric chair. When this court independently weighs the evidence, it will find beyond a reasonable doubt that the aggravating circumstances do not outweigh the mitigating factors in this case.

    3.   <u>The Sentence of Death in Inappropriate</u>.

Reviewing the appropriateness of the death sentence includes review of trial procedural errors, even where the parties have not raised them. <u>State</u> v. <u>Buell</u>, (1986), 22 Ohio St. 3d 124, 142 (court raises <u>Caldwell</u> issue <u>sua sponte</u>; not assigned as error.) This brief has outlined, in twenty-four assignments of error, the substantive and procedural errors that have occurred in this case, and they will not be repeated here. But they must be included in this court's determination of the appropriateness of the death sentence.

The "appropriateness" determination is made independently of the reweighing of the evidence. <u>State</u> v. <u>Wood</u> (Utah. 1982), 648 P. 2d 71, 84; <u>People</u> v. <u>Brown</u> (Cal. 1985) 709 P. 2d 440, cert. granted on another issue (June 2, 1986), 54 LW 3787. In other words, death may be an <u>i</u>nappropriate sentence even where the aggravating circumstances outweigh the mitigating factors.

At every chance there was, the Appellee focused the case on its gruesomeness and that Danny had committed other acts. Every attempt was made to inflame the three judge panel. A death sentence that is imposed because of passion and prejudice is arbitrary and cannot be upheld, <u>Gregg</u> v. <u>Georgia</u> (1976), 428 U.S. 153. The very adjectives used by the three judge panel to describe

the other acts supports this conclusion. This is also true in the appellate decision. In view of all of this information, death is not the appropriate sentence for Danny Lee Hill.

    4. <u>Proportionality</u>.

Under R. C. 2929.05(A) this court must consider whether the sentence is excessive or disproportionate to the sentence imposed in similar cases. Defense counsel is not required to submit evidence of disproportionality. <u>State</u> v. <u>Jenkins</u>, <u>supra</u>, at 209. Although this court has previously had that the proportionality review required by R. C. 2929.05 does not require a review of those cases in which a life sentence was imposed, appellant raises this issue in order to preserve the issue for federal review. <u>State</u> v. <u>Steffen</u> (1989), 31 Ohio St. 3d 111. Appellant submits that there is no true proportionality review if there is only a comparison to other cases in which the death sentence is imposed. If the policy of the proportionality review is to insure that criminal defendants are treated similarly and that the death sentence is not imposed arbitrarily, courts will never discover any evidence of dissimilarity or arbitrariness if they are not required to examine anything other than death sentences. Additionally, it courts are only required to examine those death sentences affirmed in their own geographical jurisdictions, as held in <u>State</u> v. <u>Rogers</u> (1985), 17 Ohio St. 3d 174, and followed in this case by the Franklin County Court of Appeals, the proportionality review is further weakened. With these conditions, it is highly unlikely that a proportionality review will ever detect if a criminal defendant is

187

treated dissimilarly or if the death penalty has been imposed arbitrarily.

It is counsel's understanding that this is the first case that a sentence of death has been imposed in Trumbull County. However, there is discussion in the record of other aggravated murder cases where death was not imposed. Therefore, this case must be compared with all those cases where the imposition of the death penalty was a possible sentence. Counsel for the state was improperly allowed to argue that certain mitigating factors involved in this case were not found in cases that resulted in the death penalty in other parts of the state. This fact alone should reverse this case.

5.  Trial Court's Opinion.

As has already been argued, the trial court failed to give any weight to several of the mitigating factors shown in this case; and considered non-aggravating circumstances the trial court failed to consider all of the non-statutory mitigating circumstances; the court permitted consideration of duplicative aggravating circumstances; the trial court allowed the State a different standard for showing proportionality; and the trial court considered non-aggravating circumstances.

6  Court of Appeal's Opinion.

The appellate court's opinion is replete with considering non-aggravated circumstances as well as discussing the lack of mitigating factors which were not raised to justify their affirmance of the death sentence. For example, the appellate court used Appellant's character as an aggravated circumstance when the

188

court stated "[t]his evidence indicates a lack of remorse, a callous attitude and the heinous nature of his character". Op. at 71. This is not one of the statutory aggravated circumstances stated in the statute.

Further, the factors that the appellant court used to negate his mental capacity, or lack of, shows that the court below did not appreciate the significance of the evidence. The "shifting of blame" or knowing that the alleged theft would cause confinement are instances showing childlike reactions to overwhelming situations and not indicative of showing an adult standard of the differences between right and wrong. In addition, the court below used the improper argument that family background/environment was not significant because such a life/environment did not cause "his siblings to perpetrate violent crimes." See Op. at 83.

Using these factors or circumstances in the weighing process invalidate the death sentence affirmed by the court below. For the reasons set forth in this and all the other assignments of error, Danny Lee Hill's death sentence must be vacated.

189

## CONCLUSION

Death is the most extreme penalty a society can inflict on one of its own members. Consequently, a death penalty case requires the use of extreme caution throughout every state of the trial and appellate phases of such a case. The preceding Propositions of Law set forth the most egregious errors which occurred during these phases. These errors denied Danny Lee Hill a fair trial and appeal, and have resulted in Danny facing a death sentence.

For the reasons expressed in this brief and any other reasons which are apparent on the record, Appellant respectfully requests that the judgment and death sentence of the Trumbull County Court of Common Pleas and the Eleventh Appellate District be reversed, and a new trial granted. Alternatively, the sentence of death imposed by the three judge panel should be set aside and a term of life imprisonment ordered.

Respectfully submitted:

*Roger Warner*
Roger Warner                    (0019941)
TATARU, WALLACE & WARNER
181 East Livingston Avenue
Columbus, OH  43214
(614) 221-3821
Co-counsel for Defendant-Appellant

*Carol Wright* (RW)
Carol Wright
TYACK, WRIGHT & TURNER
7100 North High Street, Suite 209
Worthington, OH  43085
(614) 848-4140
Co-counsel for Defendant-Appellant

190

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Brief was served upon Dennis Watkins, Prosecuting Attorney of Trumbull County, 160 High Street, N.W., Third Floor Administration Building, Warren, OH 44481, Attorney for Appellee, on this ___4th___ day of February, 1991.

Roger Warner

Roger Warner                    (0019941)