IN THE SUPREME COURT OF APPEALS

STATE OF OHIO,                    )
                                 )
    Plaintiff-Appellee    )         CASE NO. 90-177
                                 )
-vs-                             )
                                 )
DANNY LEE HILL,                  )
                                 )
    Defendant-Appellant )

*************************************************************
  ON APPEAL FROM THE ELEVENTH DISTRICT COURT OF APPEALS
           TRUMBULL COUNTY, OHIO
*************************************************************
         BRIEF OF PLAINTIFF-APPELLEE
*************************************************************

DENNIS WATKINS, #0009949
Prosecuting Attorney,
ATTORNEY PETER J. KONTOS, #0024893
Chief Counsel-Criminal Division; and
Trumbull County Prosecutor's Office
160 High Street, N.W.
3rd Floor Administration Bldg.
Warren, OH 44481
Telephone No. (216) 841-0426

    FILED
    JUN 0 . 1991
    MARCIA J. MENGEL CLERK
    SUPREME COURT OF OHIO

    ATTORNEYS FOR
    PLAINTIFF-APPELLEE

        ATTORNEY ROGER WARNER, #0019941
        Tataru, Wallace & Warner
        181 East Livingston Avenue
        Columbus, OH 43215
        Telephone No. (614) 221-3821
        ATTORNEY CAROL A. WRIGHT,
        #0029782
        Tyack, Wright & Turner
        7100 North High St., Suite 209
        Worthington, OH 43085
        Telephone No. (614) 848-4140

        ATTORNEYS FOR
        DEFENDANT-APPELLANT

EXHIBIT

TABLE OF CONTENTS

PAGE(S)

Table of Authorities............................. xvi-
xxii

STATEMENT OF THE FACTS........................... 1-53
    Pre-trial Suppression Hearing............... 1-15
    Guilt Phase................................. 15-42
    Mitigation Phase............................ 42-53

PROPOSITION OF LAW NO. 1......................... 54-58

    THE APPELLANT'S SIXTH AMENDMENT RIGHT TO
    COUNSEL WAS NOT VIOLATED, NOR DID THE
    DEFENDANT'S MENTAL CONDITION NEGATE AN
    OTHERWISE KNOWING AND INTELLIGENT WAIVER
    OF HIS CONSTITUTIONAL RIGHTS, INCLUDING
    THE RIGHT TO COUNSEL, ON MONDAY, SEPTEMBER,
    16, 1985.

    Authorities

    Miranda v. Arizona (1966), 384 U.S. 436..... 54
    State v. Cowans (1967), 10 Ohio St. 2d 96... 54
    Lego v. Twomey (1972), 404 U.S. 477......... 54
    Colorado v. Connelly (1986), 107 S. Ct. 515,
        522..................................... 54
    State v. Scott (1980), 61 Ohio St. 2d 155... 54,58

PROPOSITION OF LAW NO. 2......................... 59-68

    THE APPELLANT'S STATEMENTS OF SEPTEMBER
    13, 1985 AND SEPTEMBER 16, 1985 WERE
    VOLUNTARILY AND FREELY GIVEN AND WERE
    NOT COERCED OR ILLEGALLY OBTAINED.

    Authorities

    State v. Dailey (1990), 53 Ohio St. 3d 88... 59
    State v. Edwards (1976), 49 Ohio St. 31
        vacated in part 438 U.S. 911............ 60
    State v. Barker (1978), 53 Ohio St. 2d 135
        cert. denied 439 U.S. 913.............. 60
    Commonwealth v. Abrams (Pa. 1971), 278 A.2d
        902.................................... 63
    People v. Chaffee (App. Div. 1970), 346

N.Y.S.2d 30............................ 63
U.S. v. Glover (9th Cir. 1979), 596 F2d 857,
    cert. denied 414 U.S. 857............. 63
Stanley v. State (Ga. 1977), 242 S.E.2d 173,
    cert. denied, 439 U.S. 882 (1978)...... 63
State v. Nichols (1965), 3 Ohio App. 2d 182.
Vance v. Bordenkircher (4th Cir. 1982), 692
    F.2d 978.............................. 63
State v. Jenkins (1984), 15 Ohio St. 3d 164. 64
State v. Royster (1976), 48 Ohio St. 2d
    381-389.............................. 65,67
People v. Coffey (Mich. App. 1972), 202
    N.W.2d 456........................... 67
U.S. v. Ritter (10th Cir. 1972), 456 F.2d
    178.................................. 67
State v. Russell (Iowa 1978), 261 N.W.2d
    490.................................. 67
State v. Gordon (Me. 1978), 387 A.2d 611.... 67
People v. Morales (1978), 404 N.Y.S.2d 344.. 67
State v. Green (1978), 244 S.E.2d 369....... 67
U.S. ex. rel. Rush v. Ziegele (3rd Cir.
    1973), 474 F.2d 1356................. 67
State v. Collins (1972), 297 A.2d 620....... 67
Criswell v. State (1970), 422 P.2d 355...... 67
State v. Ortiz (N.M. 1967), 422 P.2d 355.... 67-68
State v. Lujan (1975), 534 P.2d 1112, cert.
    denied, 423 U.S. 1025 (1976).......... 68
State v. Thompson (N.C. 1975), 214 S.E.2d
    742.................................. 68
State v. Sissneros (1968), 446 P.2d 875,
    880.................................. 68
Weihofen, Mental Disorder as a Criminal
    Defense, 455 (Dennis & Co., New York,
    1954)................................ 68

PROPOSITION OF LAW NO. 3...................... 69-72

AN ACCUSED'S STATEMENTS ARE ADMISSIBLE
WHERE THE STATE ESTABLISHES THAT THE
PROCEDURAL SAFEGUARDS IN MIRANDA WERE
PROPERLY GIVEN AND KNOWINGLY, INTELLI-
GENTLY AND VOLUNTARILY WAIVED.

Authorities

State v. Bates (1976), 48 Ohio St. 2d 315... 70
Miranda v. Arizona (1966), 384 U.S. 436..... 70
Moran v. Burbine (1986), 106 S. Ct. 1135

      1141................................... 70
Colorado v. Connelly (1986), 107 S. Ct. 515. 70
U.S. ex. rel. Henne v. Fike (7th Cir. 1977),
      563 F.2d 809.......................... 70-71
State v. Gilreath (Ariz. 1971), 487 P.2d
      385, cert. denied, 406 U.S. 921
      (1972)................................ 71
Gregg v. State (Ga. 1974), 210 S.E.2d 659... 71
State v. Myers (Me. 1975), 345 A.2d 500.... 71
Joyce v. State (Mo. App. 1982), 637 S.W.2d
      386.................................. 71
Maguire v. U.S. (9th Cir. 1986), 396 F.2d
      327, cert. denied, 393 U.S. 1099
      (1969)................................ 71
Biddy v. Diamond (5th Cir. 1975), 516 F.2d
      118.................................. 71
Johnson v. State (Ala. App. 1975), 324 So.
      2d 298............................... 71
Babcock v. State (Tex. 1971), 473 S.W.2d
      941.................................. 71

PROPOSITION OF LAW NO. 4...................... 73-78

    AN ACCUSED'S FOURTH AND FOURTEENTH
    AMENDMENT RIGHTS ARE NOT VIOLATED WHEN
    THE ACCUSED INITIATES POLICE CONTACT AND
    THEN VOLUNTARILY AND FREELY CHOOSES TO
    ACCOMPANY A POLICE OFFICER TO A POLICE
    STATION.

    Authorities

Dunaway v. New York (1979), 442 U.S. 200.... 75,78
Miranda v. Arizona (1966), 384 U.S. 436..... 75
State v. Bates (1976), 48 Ohio St. 2d 315... 75,78
State v. Hall (1976), 48 Ohio St. 2d 325.... 75
People v. Giles (App. Div. 1977), 400 N.Y.S.
      2d 181............................... 75-76
Moseley v. Stanton (1972), 348 F. Supp. 1... 76
Hayes v. Florida (1985), 84 L. Ed. 2d 705,
      cert. denied, 93 L. Ed. 2d 65.......... 78

PROPOSITION OF LAW NO. 5...................... 79-81

    THE APPELLANT WAS NEVER DENIED HIS RIGHT
    TO COUNSEL; FURTHER APPELLANT HAD NO
    RIGHT TO BE ADVISED THAT HE HAD A RIGHT
    TO BE REPRESENTED BY A PUBLIC DEFENDER

UNDER OHIO STATUTORY LAW OR UNDER THE
U.S. OR OHIO CONSTITUTIONS.

Authorities

Ohio Revised Code § 120.16(f)............... 79
State v. Steward (Franklin County Appeals
　　1981), 80 AP-443, 81 Decisions 2045.... 79
Ohio Revised Code § 120.16................. 79
Moran v. Burbine (1986), 106 S. Ct. 1135.... 79,80

PROPOSITION OF LAW NO. 6........................ 82-84

OHIO REVISED CODE §§ 2935.05 AND 2935.07
WERE COMPLIED WITH AND ALL STATEMENTS
OBTAINED AT THE TIME OF ARREST ARE
ADMISSIBLE.

Authorities

Ohio Revised Code § 2935.05................. 82
Ohio Revised Code § 2935.07................. 82
Miranda v. Arizona (1966), 384 U.S. 436..... 82
Johnson v. Reddy (1955), 163 Ohio St. 347... 83
McNabb v. U.S. (1943), 318 U.S. 322......... 83
Mallory v. U.S. (1957), 354 U.S. 449........ 83
State v. Cowans (1967), 10 Ohio St. 2d 96... 83
U.S. v. Lester (8th Cir. 1981), 647 F.2d
　　869.................................... 84
State v. Sampson (1982), 4 Ohio App. 3d 287. 84

PROPOSITION OF LAW NO. 7........................ 85-86

LAW ENFORCEMENT OFFICIALS PROPERLY OBTAINED
STATEMENTS FROM THE APPELLANT.  FURTHERMORE,
AT NO TIME DID OFFICERS ENGAGE IN PLEA
BARGAINING NEGOTIATIONS.

Authorities

U.S. v. Posey (5th Cir. 1980), 611 F. 2d
　　1389................................... 85
U.S. v. Fera (1st Cir. 1980), 616 F.2d 590
　　cert. denied, 446 U.S. 969............. 85
State v. Davis (1980), 70 Ohio App. 2d 48... 85
State v. Maurer (1984), 15 Ohio St. 3d 239.. 85

PROPOSITION OF LAW NO. 8........................ 87-100

THE TRIAL COURT PROPERLY ADMITTED PRIOR
SEXUAL OFFENSES COMMITTED BY THE APPELLANT
UNDER R.C. § 2945.59, EVIDENCE RULE 404(B),
AND THE DUE PROCESS CLAUSE OF THE FOUR-
TEENTH AMENDMENT OF THE U.S. CONSTITUTION;
MOREOVER, THIS EVIDENCE WAS NOT CONSIDERED
IN ANY WAY BY THE COURT IN REACHING ITS
VERDICT.

Authorities

State v. Gardner (1979), 59 Ohio St. 2d 14.. 88,91,
                                             93-95

State v. Maestas (Iowa 1974), 224 N.W.2d
        248................................. 89
State v. Flonnery (1972), 31 Ohio St. 2d
        125.................................. 89,93,
                                             94

State v. Benner (1988), 40 Ohio St. 301..... 89
Ohio Revised Code § 2945.59................. 90,92,
                                             93,94,
                                             97

Ohio Rule of Evidence 404(B)............... 90,93
State v. Shively (1961), 172 Ohio St. 128... 91
State v. White (1962), 116 Ohio App. 522.... 91,97
State v. Craig (S. Ct. Neb. 1985), 361 N.W.
        2d 206............................... 91-92
Neaveill v. State (1985), 474 N.E.2d 1045... 92
Grey v. State (Ind. 1980), 404 N.E.2d 1348.. 92
Hoehn v. State (Ind. 1985), 472 N.E.2d 926.. 92
Daniel's v. State (Ind. 1980), 408 N.E.2d
        1244................................. 92
State v. McFarlen (Ariz. 1973), 517 P.2d 87. 92
State v. Superior Court of the State of
        Arizona (Ariz. 1981), 631 P.2d 142..... 92
State v. Bayless (1976), 48 Ohio St. 2d 73.. 93
State v. Snowden (1976), 49 Ohio App. 2d 7.. 94,95
State v. Curry (1975), 43 Ohio St. 2d 66.... 96
State v. Depina (1984), No. 1283 Court of
        Appeals 9th INd. Dis.................. 96
People v. Jackson (1980), 110 Cal. App. 3d
        560, 167 Cal. Rptr. 915.............. 97
State v. Howard (1982), 447 A.2d 1167....... 97
People v. Burgin (1979), 392 N.E.2d 251..... 97
State v. Gatlin (1980), 295 N.W.2d 538...... 97
State v. Saltarelli (Wash. 1981), 629 P.2d
        1344................................. 97

State v. Valdez (1979), 534 P.2d 449....... 97
Austin v. State (1974), 319 N.E.2d 130,
    cert. denied, 421 U.S. 1012........... 97
State v. Masqua (1972), 502 P.2d 728, cert.
    denied 411 U.S. 951.................... 97
Ohio Rule of Evidence 403................... 98
State v. Wiles (1991), 59 Ohio St. 3d 71.... 98,99
State v. Post (1987), 32 Ohio St. 2d 380.... 99

PROPOSITION OF LAW NO. 9........................ 101-107

    WHEN THE TRIAL COURT ADMITTED CERTAIN
    PROBATIVE EVIDENCE, ANY ALLEGED PRE-
    JUDICIAL EFFECT IT MIGHT HAVE ON A JURY
    WAS CURED SINCE THE CASE WAS TRIED TO A
    THREE-JUDGE PANEL.

    Authorities

    Ohio Rule of Evidence 401................... 101
    Ohio Rule of Evidence 403................... 101
    State v. White (1968), 15 Ohio St. 2d 146... 102,103
    State v. Walker (1969), 21 Ohio App. 2d 27.. 102
    In Re Baker (1969), 18 Ohio App. 2d 276..... 102
    State v. Austin (1976), 52 Ohio App. 2d 59.. 102
    State v. Post (1987), 32 Ohio St. 3d 80
        cert. denied, 484 U.S. 1079, reh.
        denied, 485 U.S. 1061................ 102
    State v. Astley (1987), 36 Ohio App. 3d 247. 102
    State v. Moreland (1990), 50 Ohio St. 3d 58. 102-103
    State v. Eubank (1979), 60 Ohio St. 2d 183.. 103

PROPOSITION OF LAW NO. 10....................... 108-110

    WHEN THE TRIAL COURT ADMITS AN EXHIBIT
    INTO EVIDENCE BASED ON AN INFERENCE FROM
    NUMEROUS FACTS ADDUCED FROM DIRECT
    EVIDENCE, IT HAS NOT ERRED TO THE
    PREJUDICE OF APPELLANT.

    Authorities

    Sobolovitz v. Lubric Oil Co. (1923), 107
        Ohio St. 204, overruled by McDonald v.
        Cartage Co. (1959), 169 Ohio St. 522... 109

PROPOSITION OF LAW NO. 11....................... 111-115

WHEN A PROSECUTION WITNESS IS SUBJECTED TO
CROSS-EXAMINATION, SPEAKS WITH THE
PROSECUTOR, AND IS LATER RECALLED BY DEFENSE
AND GIVES THE SAME CONSISTENT TESTIMONY
UNDER YET ADDITIONAL CROSS-EXAMINATION,
THE ACCUSED'S RIGHT TO CONFRONTATION HAS
NOT BEEN VIOLATED.

Authorities

Pointer v. Texas (1965), 380 U.S. 400....... 113
Alford v. United States (1931), 282 U.S.
        687................................... 113
Smith v. Illinois (1968), 390 U.S. 129...... 113
Davis v. Alaska (1974), 415 U.S. 308........ 113,114
State v. Prater (1983), 13 Ohio App. 3d 98.. 114,115

PROPOSITION OF LAW NO. 12........................ 116-117

THE DENIAL OF APPELLANT'S REQUEST FOR
INCLUSION OF LICENSED DRIVERS IN THE POOL
OF PROSPECTIVE JURORS BY THE TRIAL COURT
DID NOT VIOLATE HIS RIGHT TO A FAIR AND
IMPARTIAL TRIAL.

Authorities

State v. Johnson (1972), 31 Ohio St. 2d 106. 116
State v. Strodes (1976), 48 Ohio St. 2d 113;
        vacated on other grounds 438 U.S. 911
        (1978)................................. 116
U.S. v. Gometz (7th Cir. 1984), 730 F.2d
        475 (en banc), cert. denied, 469 U.S.
        899.................................... 116
Camp v. U.S. (5th Cir. 1969), 413 F.2d 4199,
        cert. denied, 396 U.S. 968............ 116
U.S. v. Afflerback (10th Cir. 1985), 754
        F.2d 866, cert. denied 172 U.S. 1029,
        105 S. Ct. 3506, reh. denied, 473 U.S.
        927, 106 S. Ct. 20.................... 116
State ex. rel. Warner v. Baer (1921), 103
        Ohio St. 585, 134 N.E. 786............ 116
Luce v. U.S. (1984), 469 U.S. 38............ 117

PROPOSITION OF LAW NO. 13........................ 118-128

THE TRIAL COURT PROPERLY AND THOROUGHLY
DETERMINED ON THE RECORD THAT THE

APPELLANT KNOWINGLY, INTELLIGENTLY AND
VOLUNTARILY WAIVED HIS RIGHT TO A JURY
TRIAL.

Authorities

Ohio Rule of Criminal Procedure 23........... 118,126
State v. Griffin (1983), 13 Ohio App. 3d
    376.................................... 119
Ohio Revised Code § 2945.05.................. 126,127
State v. Morris (1982), 8 Ohio App. 3d 12... 126
State v. Harris (1976), 48 Ohio St. 2d 351,
    vacated on other grounds, 98 S. Ct.
    3148................................... 126
State v. Jells (1990), 53 Ohio St. 3d 22.... 126

PROPOSITION OF LAW NO. 14...................... 129-131

THE DENIAL BY THE TRIAL COURT OF
APPELLANT'S REQUEST FOR APPOINTMENT OF
AN EXPERT TO ASSIST IN HIS MOTION FOR
CLOSURE OF PRE-TRIAL HEARINGS DID NOT
VIOLATE HIS RIGHT TO A FAIR AND IMPARTIAL
JURY.

Authorities

Ross v. Moffitt (1974), 417 U.S. 600........ 129
Britt v. North Carolina (1971), 404 U.S.
    226, 227............................... 129
State v. Jenkins (1984), 15 Ohio St. 2d 164,
    194, cert. denied, ___ U.S. ___, 105
    S. Ct. 3514, reh. denied, ___ U.S.
    ___, 106 S. Ct. 19..................... 130
Ohio Revised Code § 2929.024................. 130
State v. Roe (1989), 41 Ohio St. 3d 18, 21,
    cert. denied, 110 S. Ct. 1535.......... 130
Gannett Co. v. DePasquale (1979), 443 U.S.
    368.................................... 130
State ex. rel. Dayton Newspapers v.
    Phillips (1976), 46 Ohio St. 2d 457.... 131
State ex. rel. Chillicothe Gazette, Inc.
    v. Court (1982), 2 Ohio St. 3d 24...... 131

PROPOSITION OF LAW NO. 15...................... 132-135

IT IS PRESUMED THAT IN A BENCH TRIAL, THE
COURT CONSIDERED ONLY THE RELEVANT,

MATERIAL, AND COMPETENT EVIDENCE UNLESS
IT AFFIRMATIVELY APPEARS TO THE CONTRARY.

Authorities

Ohio Rule of Evidence 404(A)(2)............. 132
Booth v. Maryland (1987), 482 U.S. 496...... 132,133
State v. Huertas (1990), 51 Ohio St. 3d 22.. 133
State v. Post (1987), 32 Ohio St. 3d 380,
       cert. denied 484 U.S. 1079 (1988)...... 133-134
State v. Sowell (1988), 39 Ohio St. 3d 322.. 134
State v. Cooey (1989), 46 Ohio St. 3d 20.... 134
State v. Brewer (1990), 48 Ohio St. 3d 50... 134
State v. White (1968), 15 Ohio St. 2d 146... 134

PROPOSITION OF LAW NO. 16........................ 136-139

APPELLANT'S RIGHT TO A FAIR TRIAL WAS NOT
VIOLATED BY AN ALLEGED LACK OF DISCOVERY
WHEN APPELLANT DOES NOT SHOW A PREJUDICIAL
EFFECT, THE ITEMS IN QUESTION WERE NOT
MATERIAL, AND THE TRIAL COURT GAVE
APPELLANT THE OPPORTUNITY FOR CONTINUANCE.

Authorities

Ohio Rule of Criminal Procedure 16.......... 136,138
State v. Johnston (1988), 39 Ohio St. 3d 48. 136,137
U.S. v. Bagley (1984), 473 U.S. 667, 682.... 136
State v. Wickline (1990), 50 Ohio St. 3d
       114, 116................................ 136
State v. Long (1978), 53 Ohio St. 2d 91..... 137,139
Ohio Rules of Criminal Procedure 16(E)(3)... 138

PROPOSITION OF LAW NO. 17........................ 140-143

ADMISSIBILITY OF EVIDENCE RESTS WITHIN
THE SOUND DISCRETION OF THE TRIAL COURT.
PHOTOGRAPHS AND TANGIBLE OBJECTS ARE
ADMISSIBLE, IF RELEVANT AND OF PROBATIVE
VALUE, AS LONG AS THE DANGER THAT
MATERIAL PREJUDICE TO APPELLANT IS OUT-
WEIGHED BY PROBATIVE VALUE.

Authorities

State v. Jells (1990), 53 Ohio St. 3d 22.... 140
State v. Maurer (1984), 15 Ohio St. 3d 239.. 140

State v. Woodards (1966), 6 Ohio St. 2d 14,
    cert. denied, 385 U.S. 930............ 141
State v. Lane (1976), 49 Ohio St. 2d 77..... 142
State v. White (1968), 15 Ohio St. 2d 146
    151.................................. 142
State v. Wallen (1969), 21 Ohio App. 2d 27.. 142
U.S. v. Gerandison (4th Cir. 1985), 780
    F.2d 425, cert. denied, 110 S. Ct.
    2178................................. 143

PROPOSITION OF LAW NO. 18................... 144-151

WHEN THE PROSECUTION MAKES ALLEGED IM-
PROPER COMMENTS IN CLOSING ARGUMENT
WHERE THERE IS NO JURY, NO OBJECTION
MADE BY APPELLANT, AND NO SHOWING OF
PLAIN ERROR THAT WOULD RESULT IN A
DIFFERENT OUTCOME, THE APPELLANT IS
NOT DENIED HIS RIGHT TO A FAIR TRIAL.

Authorities

State v. Liberatore (1982), 69 Ohio St. 2d
    583, 589............................. 144
State v. White (1968), 15 Ohio St. 2d 146.. 145,148
State v. Walker (1969), 21 Ohio App. 2d 27
    aff'd. 25 Ohio St. 2d 45............. 145
State v. Eubank (1979), 60 Ohio St. 2d 183.. 145
State v. Post (1987), 32 Ohio St. 3d 380,
    cert. denied, 108 S. Ct. 1061........ 145
State v. Astley (1987), 36 Ohio App. 3d 247. 145
State v. Moreland (1990), 50 Ohio St. 3d 58. 145
State v. Jells (1990), 53 Ohio St. 3d 22.... 145
State v. Wade (1978), 53 Ohio St. 2d 182,
    vacated on other grounds, 98 S. Ct.
    3138................................. 146
State v. Tyler (1990), 50 Ohio St. 3d 24.... 146
State v. Lott (1990), 51 Ohio St. 3d 160.... 147
U.S. v. Young (1984), 470 U.S. 1........... 148
State v. Smith (1976), 50 Ohio App. 2d 183.. 149
State v. Woodards (1966), 6 Ohio St. 2d 14
    cert. denied, 385 U.S. 930........... 149
State v. Muscatello (1977), 57 Ohio App. 2d
    231, aff'd. 55 Ohio St. 2d 201....... 149
Wither v. U.S. (6th Cir. 1979), 602 F.2d
    124.................................. 149
Cook v. Bordenkircher (6th Cir. 1979), 602
    F.2d 117, cert. denied, 444 U.S. 936... 150

Berger v. U.S. (1934), 295 U.S. 78.......... 150
State v. Agner (1972), 30 Ohio App. 2d 96... 150
Tucker v. Zant (11th Cir. 1984), 724 F.2d
    882................................... 150
Brooks v. Kemp (11th Cir. en banc 1985),
    762 F.2d 1382, vacated by 106 S. Ct.
    3325................................... 150

PROPOSITION OF LAW NO. 19...................... 152-155

THE RECORD DEMONSTRATES THAT APPELLANT'S
RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL
WAS NOT VIOLATED PURSUANT TO THE SIXTH
AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION AND ARTICLE I,
SECTION 10 AND 16 OF THE OHIO CONSTITUTION.

Authorities

Strickland v. Washington (1984), 466 U.S.
    668, 693............................... 152
Michel v. Louisiana (1955), 350 U.S. 91
    101................................... 152
State v. Hester (1976), 45 Ohio St. 2d 71,
    79.................................... 152-153
State v. Lytle (1976), 48 Ohio St. 2d 391,
    395, vacated on other grounds 98 S.
    Ct. 3135.............................. 153
State v. Seiber (1990), 56 Ohio St. 4, 11... 153
Ohio Rule of Appellate Procedure 16(A)(4)... 153
State v. Lott (1990), 51 Ohio St. 3d 160,
    174................................... 154
State v. Smith (1981), 3 Ohio App. 3d 115... 154
State v. White (1968), 15 Ohio St. 2d 146,
    151................................... 154
State v. Clayton (1980), 62 Ohio St. 2d 45,
    49 cert. denied, 449 U.S. 879.......... 154

PROPOSITION OF LAW NO. 20...................... 156-159

KIDNAPPING AND OTHER FELONIES IN THE
INSTANT CASE WERE COMMITTED SEPARATELY
AND WITH SEPARATE ANIMUS, AND ACCORDINGLY,
DO NOT MERGE FOR CONVICTION PURPOSES PUR-
SUANT TO OHIO REVISED CODE § 2941.25.

Authorities

Ohio Revised Code § 2941.25.................. 156
State v. Logan (1979), 60 Ohio St. 2d 126... 156,157
Ohio Revised Code § 2905.01(A)(3)........... 156
State v. Powell (1990), 49 Ohio St. 3d 255,
    261.................................... 157,158
State v. Henry (1987), 37 Ohio App. 3d 3.... 157,158
State v. Moore (1983), 18 Ohio App. 3d 226.. 158
State v. Donald (1979), 57 Ohio St. 2d 73... 159
State v. Willey (1981), 5 Ohio App. 3d 86... 159
State v. Adams (1978), 53 Ohio St. 2d 223... 159


PROPOSITION OF LAW NO. 21...................... 160-164

    IT IS WITHIN THE TRIAL COURT'S DISCRETION
TO DENY A MOTION FOR NEW TRIAL WITHOUT A
HEARING, PARTICULARY WHERE THE MOVANT HAS
FAILED TO FULFILL THE EVIDENTIARY REQUIRE-
MENTS OF CRIM. R. 33.

    Authorities

Ohio Rules of Criminal Procedure 33......... 160
State v. Abi-Sarkis (1988), 41 Ohio App.
    3d 333................................. 160
Toledo v. Stuart (1983), 11 Ohio App. 3d
    292.................................... 161
State v. Turner (1983), 10 Ohio App. 3d 328. 161
United States v. Kearney (1982), 682 F.2d
    214.................................... 162-163
U.S. v. Lee (1980), 634 F.2d 383, cert.
    denied, 450 U.S. 1002.................. 163
State v. Duling (1970), 21 Ohio St. 2d 13... 163
State v. Williams (1975), 43 Ohio St. 2d 88. 164

PROPOSITION OF LAW NO. 22...................... 165

    OHIO'S STATUTORY FRAMEWORK FOR IMPOSITION
OF CAPITAL PUNISHMENT BY A PANEL OF THREE
JUDGES DOES NOT CREATE A MANDATORY
SENTENCING SCHEME IN VIOLATION OF THE
EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION OR ANY PRO-
VISION OF THE OHIO CONSTITUTION.

    Authorities

State v. Buell (1986), 22 Ohio St. 3d 124,

141, cert. denied, 480 U.S. 923, 107
S. Ct. 240, reh. denied, 481 U.S.
1033, citing Barclay v. Florida (1983),
463 U.S. 939 and Profitt v. Florida
(1976), 428 U.S. 242................... 165

State v. Jenkins (1984), 15 Ohio St. 3d
164, cert. denied, ____ U.S. ____,
87 L. Ed. 2d 643..................... 165

PROPOSITION OF LAW NO. 23...................... 166-170

WHEN THE TRIAL COURT CONSIDERS ALL
EVIDENCE OF MITIGATING CIRCUMSTANCES AND
ARTICULATES IN ITS OPINION PURSUANT TO
§ 2929.03 THE REASONS WHY THE AGGRAVATING
CIRCUMSTANCES OUTWEIGH THE MITIGATING
FACTORS BY PROOF BEYOND A REASONABLE
DOUBT, THEN THE IMPOSITION OF THE DEATH
PENALTY IS PROPER.

Authorities

State v. Steffen (1987), 31 Ohio St. 3d 111,
cert. denied, 108 S. Ct. 1089, reh.
denied, 108 S. Ct. 1587............... 166,167

State v. DePew (1988), 38 Ohio St. 3d 275,
cert. denied, 109 S. Ct. 1008, reh.
denied, 109 S. Ct. 1773............... 167

State v. Jells (1990), 53 Ohio St. 3d 22.... 167

State v. Stumpf (1987), 32 Ohio St. 3d 95... 167

Lockett v. Ohio (1978), 438 U.S. 586........ 168

Eddings v. Oklahoma (1982), 455 U.S. 104.... 168

State v. Maurer (1984), 15 Ohio St. 2d 239.. 168

Skipper v. South Carolina (1986), 39 Crim.
L. Rptr. 3041..................... 169

PROPOSITION OF LAW NO. 24...................... 171-176

THE OHIO DEATH PENALTY SCHEME SET FORTH IN
OHIO REVISED CODE §§ 2903.01 AND 2929.02,
ET. SEQ. DOES NOT VIOLATE THE UNITED STATES
CONSTITUTION OR THE OHIO CONSTITUTION.

Authorities

State v. Jenkins (1984), 15 Ohio St. 3d 164,
cert. denied, 105 S. Ct. 3514, reh.
denied, 106 S. Ct. 19................ 171,172

State v. Buell (1986), 22 Ohio St. 3d 124... 173,174
176
171,172
175,176

State v. Lott (1990), 51 Ohio St. 3d 160.... 171
Gregg v. Georgia (1976), 428 U.S. 153, 184,
187.................................... 171,173
State v. Zuern (1987), 32 Ohio St. 3d 56,
65..................................... 172
McClesky v. Kemp (1987), 481 U.S. 279....... 172
Roe v. Wade (1973), 410 U.S. 113............ 172
Proffitt v. Florida (1976), 428 U.S. 242.... 173
Jurek v. Texas (1976), 428 U.S. 262........ 173
Woodson v. North Carolina (1976), 428 U.S.
280................................... 173
Roberts v. Louisiana (1976), 428 U.S. 325... 173
Adamson v. Ricketts (C.A.9, 1988), 865 F.2d
1011, cert. denied, 110 S. Ct. 3287.... 174

PROPOSITION OF LAW NO. 25....................... 177-189

UPON INDEPENDENT REVIEW PURSUANT TO R.C.
§ 2929.05(A), THIS COURT SHOULD FIND THAT
THE CONVICTION BELOW IS BASED UPON SUF-
FICIENT EVIDENCE AND IS NOT AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE, THAT THE
AGGRAVATING CIRCUMSTANCES APPELLANT WAS
FOUND GUILTY OF OUTWEIGH ANY MITIGATING
FACTORS, THAT THE SENTENCE OF DEATH IS
APPROPRIATE IN THIS CASE, THAT THE
SENTENCE OF DEATH IS NOT EXCESSIVE OR
DISPROPORTIONATE TO THE PENALTY IMPOSED
IN SIMILAR CASES, AND TAHT THE TRIAL AND
APPELLATE COURTS PROPERLY WEIGHED THE
AGGRAVATING CIRCUMSTANCES AND THE
MITIGATING FACTORS.

Authorities

Ohio Revised Code § 2929.05................. 177,183
184,185
187
Ohio Revised Code § 2929.05(A)............. 177
State v. White (1968), 15 Ohio St. 2d 146,
151................................... 178
State v. DeHass (1967), 10 Ohio St. 2d 30... 181
Seasons Coal Company v. Cleveland (1984), 10

    Ohio St. 3d 77, 81...................... 181
Pulley v. Harris (1984), 465 U.S. 37, 79 L.
    Ed. 2d 29, 104 S. Ct. 871.............. 184,
                                             185-186
Furman v. Georgia (1972), 408 U.S. 239...... 185
State v. Jenkins (1984), 15 Ohio St. 3d 164. 185,186
                                             187
State v. Wickline (1990), 50 Ohio St. 3d
    114................................... 186
State v. Steffen (1987), 31 Ohio St. 3d 111. 186-187
State v. Post (1987), 32 Ohio St. 3d 380.... 187,188
State v. Byrd (1987), 32 Ohio St. 3d 79..... 187-188
State v. Stumpf (1987), 32 Ohio St. 3d 95... 188
State v. Martin (1985), 19 Ohio St. 3d 122.. 188
State v. Williams (1986), 23 Ohio St. 2d 16. 188
State v. Barnes (1986), 25 Ohio St. 3d 203.. 188
State v. Scott (1986), 26 Ohio St. 3d 97.... 188
State v. Maurer (1984), 15 Ohio St. 3d 329.. 188,189
State v. Rogers (1985), 17 Ohio St. 3d 174.. 188
State v. Buell (1986), 22 Ohio St. 3d 124... 188
State v. Powell (1990), 49 Ohio St. 3d 255.. 188
State v. Tyler (1990), 50 Ohio St. 3d 24.... 188
State v. Johnson (1989), 46 Ohio St. 3d 96.. 188
Ohio Revised Code § 2929.03(F).............. 189

CONCLUSION.................................. 190

CERTIFICATION.............................. 191

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                           <u>PAGE(S)</u>

<u>Adamason v. Ricketts</u> (C.A.9, 1988), 865 F.2d
   1011, <u>cert. denied</u>, 110 S. Ct. 3287......... 174
<u>Alford v. U.S.</u> (1931), 282 U.S. 687........... 113
<u>Austin v. State</u> (1974), 319 N.E.2d 130, <u>cert.</u>
   <u>denied</u>, 421 U.S. 1012...................... 97
<u>Babcock v. State</u> (Tex. 1971), 473 S.W.2d 941..... 71
<u>Berger v. U.S.</u> (1934), 295 U.S. 78.............. 150
<u>Biddy v. Diamond</u> (5th Cir. 1975), 516 F.2d 118... 71
<u>Booth v. Maryland</u> (1987), 482 U.S. 496....... 132,133
<u>Britt v. North Carolina</u> (1971), 404 U.S. 226,
   227.......................................... 129
<u>Brooks v. Kemp</u> (11th Cir. <u>en banc</u> 1985), 762 F.2d
   1382, vacated by 106 S. Ct. 3325............ 150
<u>Camp v. U.S.</u> (5th Cir. 1969), 413 F.2d 4199,
   <u>cert. denied</u>, 396 U.S. 968................. 116
<u>Colorado v. Connelly</u> (1986), 107 S. Ct. 515, 522. 54,70
<u>Commonwealth v. Abrams</u> (Pa. 1971), 278 A.2d 902.. 63
<u>Cook v. Bordenkircher</u> (6th Cir. 1979), 602 F.2d
   117, <u>cert. denied</u>, 444 U.S. 936............ 150
<u>Criswell v. State</u> (1970), 422 P.2d 355........ 67
<u>Daniel's v. State</u> (Ind. 1980), 408 N.E.2d 1244... 92
<u>Davis v. Alaska</u> (1974), 415 U.S. 308............ 113,114
<u>Dunaway v. New York</u> (1979), 442 U.S. 200......... 75,78
<u>Eddings v. Oklahoma</u> (1982), 455 U.S. 104........ 168
<u>Furman v. Georgia</u> (1972), 408 U.S. 239........... 185
<u>Gannett Co. v. DePasquale</u> (1979), 443 U.S. 368... 130
<u>Gregg v. Georgia</u> (1976), 428 U.S. 153, 184, 187.. 171,173
<u>Gregg v. State</u> (Ga. 1974), 210 S.E.2d 659........ 71
<u>Grey v. State</u> (Ind. 1980), 404 N.E.2d 1348....... 92
<u>Hayes v. Florida</u> (1985), 84 L. Ed. 2d 705, <u>cert.</u>
   <u>denied</u>, 93 L. Ed. 2d 65.................... 78
<u>Hoehn v. State</u> (Ind. 1985), 472 N.E.2d 926....... 92
<u>In Re Baker</u> (1969), 18 Ohio App. 2d 276......... 102
<u>Johnson v. Reddy</u> (1955), 163 Ohio St. 347........ 83
<u>Johnson v. State</u> (Ala. App. 1975), 324 So. 2d
   298.......................................... 71
<u>Joyce v. State</u> (Mo. App. 1982), 637 S.W.2d 386... 71
<u>Jurek v. Texas</u> (1976), 428 U.S. 262............. 173
<u>Lego v. Twomey</u> (1972), 404 U.S. 477............. 54
<u>Lockett v. Ohio</u> (1978), 438 U.S. 586........... 168
<u>Luce v. U.S.</u> (1984), 469 U.S. 38................. 117
<u>Maquire v. U.S.</u> (9th Cir. 1986), 396 F.2d 327,
   <u>cert. denied</u>, 393 U.S. 1099 (1969)......... 71
<u>Mallory v. U.S.</u> (1957), 354 U.S. 449............ 83

McClesky v. Kemp (1987), 481 U.S. 279............ 172
McNabb v. U.S. (1943), 318 U.S. 322.............. 83
Michel v. Louisiana (1955), 350 U.S. 91, 101..... 152
Miranda v. Arizona (1966), 384 U.S. 436 ........ 54,70,
                                                  75
Moran v. Burbine (1986), 106 S. Ct. 1135, 1141... 70,79,
                                                  80,82
Moseley v. Stanton, (1972), 348 F. Supp. 1....... 76
Neaveill v. State (1985), 474 N.E.2d 1045........ 92
People v. Burgin (1979), 392 N.E.2d 251.......... 97
People v. Chaffee (App. Div. 1970), 346 N.Y.S.2d. 63
People v. Coffey (Mich. App. 1972), 202 N.W.2d
        456.. ................................... 67
People v. Giles (App. Div. 1977), 400 N.Y.S.2d
        181...................................... 75-76
People v. Jackson (1980), 110 Cal. App. 3d
        560, 167 Cal. Rptr. 915.................. 97
People v. Morales (1978), 404 N.Y.S.2d 344....... 67
Pointer v. Texas (1965), 380 U.S. 400............ 113
Proffitt v. Florida (1976), 428 U.S. 242........ 173
Pulley v. Harris (1984), 465 U.S. 37, 79 L. Ed.
        2d 29, 104 S. Ct. 871.................... 184,
                                                  185-186
Roberts v. Louisiana (1976), 428 U.S. 325........ 173
Roe v. Wade (1973), 410 U.S. 113................. 172
Ross v. Moffitt (1974), 417 U.S. 600............ 129
Seasons Coal Company v. Cleveland (1984), 10
        Ohio St. 3d 77, 81...................... 181
Skipper v. South Carolina (1986), 39 Crim. L.
        Rptr. 3041............................... 169
Smith v. Illinois (1968), 390 U.S. 129.......... 113
Sobolovitz v. Lubric Oil Co. (1923), 107 Ohio St.
        204, overruled by McDonald Cartage Co.
        1959, 169 Ohio St. 522................... 109
Stanley v. State (Ga. 1977), 242 S.E.2d 173,
        cert. denied, 439 U.S. 882 (1978).......... 63
State v. Abi-Sarkis (1988), 41 Ohio App. 3d 333.. 160
State v. Adams (1978), 53 Ohio St. 2d 223....... 159
State v. Agner (1972), 30 Ohio App. 2d 96....... 150
State v. Astley (1987), 36 Ohio App. 3d 247...... 102,145
State v. Austin (1976), 52 Ohio App. 2d 59....... 102
State v. Barker (1978), 53 Ohio St. 2d 135,
        cert. denied, 439 U.S. 913................ 60
State v. Barnes (1986), 25 Ohio St. 2d 203...... 188
State v. Bates (1976), 48 Ohio St. 2d 315....... 70,75,
                                                  78
State v. Bayless (1976), 48 Ohio St. 2d 73...... 93
State v. Benner (1988) 40 Ohio St. 301.......... 89

State v. Brewer (1990), 48 Ohio St. 3d 50........ 134
State v. Buell (1986), 22 Ohio St. 3d 124....... 171,172
    175,176
    188
State v. Buell (1986), 22 Ohio St. 3d 124, 141,
    cert. denied, 480 U.S. 923, 107 S. Ct.
    240, reh. denied, 481 U.S. 1033, citing
    Barclay v. Florida (1983), 463 U.S. 939
    and Profitt v. Florida (1976), 428 U.S. 242. 165
State v. Byrd, (1987), 32 Ohio St. 3d 179........ 187-188
State v. Clayton (1980), 62 Ohio St. 2d 45, 49,
    cert. denied, 449 U.S. 879.................. 154
State v. Collins (1972), 297 A.2d 620............ 67
State v. Cooey (1989), 46 Ohio St. 3d 20........ 134
State v. Cowans (1967), 10 Ohio St. 2d 96....... 54,83
State v. Craig (S. Ct. Neb. 1985), 361 N.W.2d
    206............................................ 91-92
State v. Curry (1975), 43 Ohio St. 2d 66........ 96
State v. Dailey (1990), 53 Ohio St. 3d 88....... 59
State v. Davis (1980), 70 Ohio App. 2d 48....... 85
State v. DeHass (1967), 10 Ohio St. 2d 130...... 181
State v. DePew (1988), 38 Ohio St. 3d 275,
    cert. denied, 109 S. Ct. 1088, reh. denied,
    109 S. Ct. 1773.............................. 167
State v. Depina (1984), No. 1283 Court. of App.
    9th Ind. Dis.................................. 96
State v. Donald (1979), 57 Ohio St. 2d 73....... 159
State v. Duling (1970), 21 Ohio St. 2d 13....... 163
State v. Edwards (1976), 49 Ohio St. 2d 31
    vacated in part, 438 U.S. 911............... 60
State v. Eubank (1979), 60 Ohio St. 2d 183...... 103,145
State ex. rel. Chillicothe Gazette, Inc. v.
    Court (1982), 2 Ohio St. 2d 24............. 131
State ex. rel. Dayton Newspapers v. Phillips,
    (1976), 46 Ohio St. 3d 457................. 131
State ex. rel. Warner v. Baer (1921), 103 Ohio
    St. 585, 134 N.E. 786....................... 116
State v. Flonnory (1972), 31 Ohio St. 2d 125.... 89,93,
    94
State v. Gardner (1979), 59 Ohio St. 2d 14...... 88,91,
    93-95
State v. Gatlin (1980), 295 N.W.2d 538.......... 97
State v. Gilreath (Ariz. 1971), 487 P.2d 385,
    cert. denied, 406 U.S. 921 (1972).......... 71
State v. Gordon (Me. 1978), 387 A.2d 611........ 67
State v. Green (1978), 244 S.E.2d 369........... 67
State v. Griffin (1983), 13 Ohio App. 3d 376.... 119
State v. Hall (1976), 48 Ohio St. 2d 325........ 75

State v. Harris (1976), 48 Ohio St. 2d 351,
      vacated on other grounds, 98 S. Ct. 3148.... 126
State v. Henry (1987), 37 Ohio App. 3d 3........ 157,158
State v. Hester (1976), 45 Ohio St. 2d 71, 79. .. 152
State v. Howard (1982), 447 A.2d 1167............ 97
State v. Huertas (1990), 51 Ohio St. 3d 22....... 133
State v. Jells (1990), 53 Ohio St. 3d 22......... 126,140
                                                  145,167
State v. Jenkins (1984), 15 Ohio St. 3d 164...... 64,185,
                                                  186,187
State v. Jenkins (1984), 15 Ohio St. 3d 164,
     cert. denied 105 S. Ct. 3514, reh. denied,
     106 S. Ct. 19............................... 171,172
                                                  173,174
                                                  176
State v. Jenkins (1984), 15 Ohio St. 3d 164,
     cert. denied, ___ U.S. ___, 87 L. Ed. 2d
     643....................................... 165
State v. Jenkins (1984), 15 Ohio St. 2d 164, 194,
     cert. denied, ___ U.S. ___, 105 S. Ct.
     3514, reh. denied,___, U.S. ___, 106 S.
     Ct. 19................................... 130
State v. Johnson (1972), 31 Ohio St. 2d 106...... 116
State v. Johnson (1989), 46 Ohio St. 3d 96....... 188
State v. Johnston (1988), 39 Ohio St. 3d 48..... 136,137
State v. Lane (1976), 49 Ohio St. 2d 77.......... 142
State v. Liberatore (1982), 69 Ohio St. 2d 583,
     589....................................... 144
State v. Logan (1979), 60 Ohio St. 2d 126........ 156,157
State v. Long (1978), 53 Ohio St. 2d 91.......... 137,139
State v. Lott (1990), 51 Ohio St. 3d 160, 174.... 147,154
                                                  171
State v. Lujan (1975), 534 P.2d 1112, cert.
     denied, 423 U.S. 1025 (1976)............... 68
State v. Lytle (1976), 48 Ohio St. 2d 391, 395,
     vacated on other grounds, 98 S. Ct. 3135.... 153
State v. Maestas (Iowa 1974), 224 N.W.2d 248..... 89
State v. Martin (1985), 19 Ohio St. 3d 122....... 188
State v. Masqua, (1972), 502 P.2d 728, cert.
     denied, 411 U.S. 951...................... 97
State v. Maurer (1984), 15 Ohio St. 2d 239....... 85,140,
                                                  168,188
                                                  189
State v. McFarlen (Ariz. 1973), 517 P.2d 87...... 92
State v. Moore (1983), 18 Ohio App. 3d 226....... 158
State v. Moreland (1990), 50 Ohio St. 3d 58...... 102-103
                                                  145
State v. Morris (1982), 8 Ohio App. 3d 12........ 126

State v. Muscatello (1977), 57 Ohio App. 2d 231,
    aff'd. 55 Ohio St. 2d 201.................. 149
State v. Myers (Me. 1975), 345 A.2d 500........ 71
State v. Nichols (1965), 3 Ohio App. 2d 182...... 63
State v. Ortiz (N.M. 1967), 422 P.2d 355........ 67-68
State v. Post (1987), 32 Ohio St. 2d 380........ 99,187,
                                                 188
State v. Post (1987), 32 Ohio St. 3d 80, cert.
    denied 484 U.S. 1079, reh. denied, 485 U.S.
    1061.................................... 102
State v. Post (1987), 32 Ohio St. 3d 380, cert.
    denied, 484 U.S. 1079 (1988)............... 133-134
State v. Post (1987), 32 Ohio St. 3d 380, cert.
    denied, 108 S. Ct. 1061................... 145
State v. Powell (1990), 49 Ohio St. 3d 255, 261.. 157,158
                                                 188
State v. Prater (1983), 13 Ohio App. 3d 98 ...... 114,115
State v. Roe (1989), 41 Ohio St. 3d 18, 21, cert.
    denied, 110 S. Ct. 1535.................. 130
State v. Rogers (1985), 17 Ohio St. 3d 174....... 188
State v. Royster (1976), 48 Ohio St. 2d 381-389.. 65,67
State v. Russell (Iowa 1978), 261 N.W.2d 490..... 67
State v. Saltarelli (Wash. 1981), 629 P.2d 1344.. 97
State v. Sampson (1982), 4 Ohio App. 3d 287...... 84
State v. Scott (1986), 26 Ohio St. 3d 97......... 188
State v. Scott (1980), 61 Ohio St. 2d 155........ 54,58
State v. Seiber (1990), 56 Ohio St. 4, 11........ 153
State v. Shively (1961), 172 Ohio St. 128........ 91
State v. Sissneros (1968), 446 P.2d 875, 880..... 68
State v. Smith (1981), 3 Ohio App. 3d 115........ 154
State v. Smith (1976), 50 Ohio App. 2d 183....... 149
State v. Snowden (1976), 49 Ohio App. 2d 7....... 94,95
State v. Sowell (1988), 39 Ohio St. 3d 322....... 134
State v. Steffen (1987), 31 Ohio St. 3d 111,
    cert. denied, 108 S. Ct. 1089, reh. denied,
    108 S. Ct. 1587.......................... 166,167
                                                 186
State v. Steward (Franklin County Appeals 1981)
    80 AP-443, 81 Decisions 2045............... 79
State v. Strodes (1976), 48 Ohio St. 2d 113,
    vacated on other grounds 438 U.S. 911
    (1978)................................... 116
State v. Stumpf (1987), 32 Ohio St. 3d 95........ 167,188
State v. Superior Court of the State of Arizona
    (Ariz. 1981), 631 P.2d 142................ 92
State v. Thompson (N.C. 1975), 214 S.E.2d 742.... 68
State v. Turner (1983), 10 Ohio App. 3d 328...... 161

State v. Tyler (1990), 50 Ohio St. 3d 24......... 146,188
State v. Valdez (1979), 534 P.2d 449............. 97
State v. Wade (1978), 53 Ohio St. 2d 182,
    vacated on other grounds, 98 S. Ct. 3138.... 146
State v. Walker (1969), 21 Ohio App. 2d 27....... 102
State v. Walker (1969), 21 Ohio App. 2d 27,
    aff'd., 25 Ohio St. 2d 45................... 145
State v. Wallen (1969), 21 Ohio App. 2d 27....... 142
State v. White (1968), 15 Ohio St. 2d 146........ 102,103
                                                  134,145
                                                  148
State v. White (1968), 15 Ohio St. 2d 146, 151... 142,154
                                                  178
State v. White (1962), 116 Ohio App. 522, 524.... 91,97
State v. Wickline (1990), 50 Ohio St. 3d 114,
    116........................................ 136,186
State v. Wiles (1991), 59 Ohio St. 3d 71......... 98,99
State v. Willey (1981), 5 Ohio App. 3d 86........ 159
State v. Williams (1986), 23 Ohio St. 2d 16...... 188
State v. Williams (1975), 43 Ohio St. 2d 88...... 164
State v. Woodards (1966), 6 Ohio St. 2d 14,
    cert. denied, 385 U.S. 930................. 141,149
State v. Zuern (1987), 32 Ohio St. 3d 56, 65..... 172
Strickland v. Washington (1984), 466 U.S. 668,
    693.. ..................................... 152
Toledo v. Stuart (1983), 11 Ohio App. 3d 292..... 161
Tucker v. Zant (11th Cir. 1984), 724 F.2d 882 ... 150
U.S. v. Afflerback (10th Cir. 1985), 754 F.2d
    866, cert. denied, 172 U.S. 1029, 105 S. Ct.
    3506, reh. denied, 473 U.S. 927, 106 S. Ct.
    20......................................... 116
U.S. v. Bagley (1984), 473 U.S. 667, 682......... 136
U.S. ex. rel. Henne v. Fike (7th Cir. 1977),
    563 F.2d 809............................... 70-71
U.S. ex. rel. Rush v. Ziegele (3rd Cir. 1973),
    474 F.2d 1356.............................. 67
U.S. v. Fera (1st Cir. 1980), 616 F.2d, 590,
    cert. denied, 446 U.S. 969................. 85
U.S. v. Gerandison (4th Cir. 1985), 780 F.2d
    425, cert. denied, 110 S. Ct. 2178......... 143
U.S. v. Glover (9th Cir. 1979), 596 F.2d 857
    cert. denied, 414 U.S. 857................. 63
U.S. v. Gometz (7th Cir. 1984), 730 F. 2d 475,
    (en banc), cert. denied, 469 U.S. 899...... 116
U.S. v. Kearney (1982), 682 F.2d 214............. 162-163
U.S. v. Lee (1980), 634 F.2d 383, cert. denied,
    450 U.S. 1002.............................. 163
U.S. v. Lester (8th Cir. 1981), 647 F.2d 869..... 84

U.S. v. Posey (5th Cir. 1980), 611 F.2d 1389..... 85
U.S. v. Ritter (10th Cir. 1972), 456 F.2d 178.... 67
U.S. v. Young (1984), 470 U.S. 1................ 148
Vance v. Bordenkircher (4th Cir. 1982), 692 F.2d
        978.......................................... 63
Wither v. U.S. (6th Cir. 1979), 602 F.2d 124..... 149
Woodson v. North Carolina (1976), 428 U.S. 280... 173

STATUTES

Ohio Revised Code § 120.16....................... 79
Ohio Revised Code § 120.16(f).................... 79
Ohio Revised Code § 2905.01(A)(3)................ 156
Ohio Revised Code § 2929.024..................... 130
Ohio Revised Code § 2929.03(F)................... 189
Ohio Revised Code § 2929.05...................... 177,183
                                                  184,185
                                                  187
Ohio Revised Code § 2929.05(A)................... 177
Ohio Revised Code § 2935.05...................... 82
Ohio Revised Code § 2935.07...................... 82
Ohio Revised Code § 2941.25...................... 156
Ohio Revised Code § 2945.05...................... 126,127
Ohio Revised Code § 2945.59...................... 90,92,
                                                  93,94
                                                  97

OHIO RULES OF CRIMINAL PROCEDURE

Ohio Rule of Criminal Procedure 16............... 136,138
Ohio Rule of Criminal Procedure 16(E)(3)......... 138
Ohio Rule of Criminal Procedure 23............... 118,126
Ohio Rule of Criminal Procedure 33............... 160

OHIO RULES OF EVIDENCE

Ohio Rule of Evidence 401........................ 101
Ohio Rule of Evidence 403........................ 98,101
Ohio Rule of Evidence 404(B)..................... 90,93
Ohio Rule of Evidence 404(A)(2).................. 132

OHIO RULES OF APPELLATE PROCEDURE

Ohio Rule of Appellate Procedure 16(A)(4)........ 153

MISCELLANEOUS

Weihofen, Mental Disorder as a Criminal Defense,
        455 (Dennis & Co., New York, 1954).......... 68

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                    )
                                 )
        Plaintiff-Appellee       )        CASE NO. 90-177
                                 )
-vs-                             )
                                 )
DANNY LEE HILL,                  )
                                 )
        Defendant-Appellant      )

**********************************************************
ON APPEAL FROM THE ELEVENTH DISTRICT COURT OF APPEALS
TRUMBULL COUNTY, OHIO
**********************************************************
BRIEF OF PLAINTIFF-APPELLEE
**********************************************************

## STATEMENT OF THE FACTS

Since Ohio Revised Code 2929.05 provides that this Honorable Court must independently weigh all the facts and other evidence presented in this case to determine whether or not a sentence of death is appropriate under the standards set forth in the statute, a more detailed summary of the transcript is provided.

### PRE-TRIAL SUPPRESSION HEARING

On December 16, 1985, a pre-trial hearing was held on Appellant's motion to suppress statements he made to law enforcement officers on September 12, 13 and 16, 1985. These statements were made orally by Appellant and recorded in writing, tape cassette and videotape by members of the Warren Police Department.

Sgt. Thomas Stewart, a 21-year veteran of the Warren Police Dept., testified that he first became involved in the Raymond Fife homicide on September 10, 1985, the night the victim was attacked behind the Palmyra Road Valu King.  He was on the scene after other Warren Police patrols and paramedics had responded.  Sgt. Stewart was there to "find out what was going on" and remained about 50 feet from the 12 year old victim. (TR. S. 37, 38).

Sgt. Stewart's next involvement in the Fife homicide came September 12, 1985, when the Appellant arrived at the Warren Police station to offer some information about "that boy being beat up in the field." (TR. S. 9).  The Appellant came to the police station voluntarily.  Sgt. Stewart did not know whether the Appellant walked or was driven to the station. (Id.)

Sgt. Stewart testified that the Appellant said he had seen a Maurice Lowery riding the victim's bike. While the Appellant claimed he could not remember the color of the bike, he knew it had nub wheels.  He further told Sgt. Stewart that if he did not retrieve the bike immediately, Lowery might "put it back in the field." (TR. S. 9, 10).  Sgt. Stewart testified that the Appellant said it was Lowery's brother who identified the bike for the Appellant, and warned him not to "narc on"

Lowery. (TR. S. 10). According to Stewart's testimony, the Appellant also volunteered that the victim had been strangled with some underwear. (TR. S. 15).

The Appellant offered to show Sgt. Stewart where the bike was located. (TR. S. 11). Sgt. Stewart admitted that he made a half-hearted attempt to find the bike with the aid of the Appellant. He said he felt the Appellant was fabricating the entire story. (TR. S. 61, 62). While the Appellant and Sgt. Stewart engaged in a fruitless search for the victim's bike, the Appellant showed Sgt. Stewart where Tim Combs lived. (TR. S. 12). Sgt. Stewart testified that the Appellant told him, "He (Combs) likes boys. He could have done it." (TR. S. 11).

Sgt. Stewart dropped off the Appellant at his home that night. Sgt. Stewart then prepared a two page report on the interview and ride with the Appellant and forwarded it to Capt. Lozinski. (TR. S. 12, 13).

Sgt. Stewart testified that he next saw the Appellant at approximately 10:45 a.m. Monday, September 16, 1985. The Appellant was in an interview room with Sgt. Dennis Steinbeck and the Appellant's uncle, Det. Morris Hill. (TR. S. 16). Sgts. Stewart and Steinbeck left the Appellant alone with his uncle for a couple of

minutes.  Det. Hill emerged from the brief session with Appellant saying, "He (Appellant) wants to tell us what happened."  (TR. S. 17).  The Appellant was offered some water, which he refused, but later accepted a couple of sandwiches.  Sgt. Stewart described the Appellant as "very cooperative."  (TR. S. 16).

Appellant agreed to having his statements recorded on cassette.  (TR. S. 17).  According to Sgt. Stewart's testimony, the Appellant appeared normal and was not under the influence of drugs or alcohol.  (TR. S. 18). Prior to the taping, Appellant acknowledged that his rights were read to him earlier that day.  Appellant then signed a waiver of rights form during the course of the recorded interview.  (TR. S. 19).

Prior to and during the tape-recorded statement, there was no police guard in the hall and the door to the interview room was not locked, according to Sgt. Stewart's testimony.  (TR. S. 113-114).  At the end of the recording, Sgt. Stewart told Appellant that they would have to detain him.  (TR. S. 22).

At no time did the Appellant or his mother, who was at the police station, request to see an attorney.  (TR. S. 23).

The cassette recording, which began about 11:30 a.m., concluded around 12:30 p.m. The Appellant also agreed to be video-taped. His rights were read again and he did not request an attorney. (TR. S. 24).

Following the video-taped interview, the Appellant took officers on a tour of the wooded area behind the Valu King where young Raymond Fife was assaulted. The Appellant pointed out the trail on which Raymond was riding, the area where the boy tried to escape from his abductors, where the victim was grabbed and knocked to the ground in another area, where Tim Combs obtained lighter fluid to saturate and ignite the victim and where Raymond was abandoned after the assault. The Appellant was again described as "very cooperative" and did not request an attorney.

Also that afternoon, the Appellant's mother, Vera Williams, granted officers a permissive search warrant to retrieve items of clothing which the Appellant wore on the night of the assault. Sgt. Stewart obtained a pair of gray trousers which he described as "the only clean clothes in the house." (TR. S. 26).

On September 19, 1985, a search warrant was issued to obtain dental impressions and photographs of the mouth and teeth of the Appellant. Sgt. Stewart testified that

he met the Appellant at Dr. Robert Walton's office in Howland Township where the impressions were made and photographs were taken.  Sgt. Stewart testified the Appellant did not protest and was very cooperative during the procedure.  (TR. S. 32).

Also testifying was Warren Police Sgt. Steinbeck of the Juvenile Division.  Sgt. Steinbeck was involved in the Raymond Fife homicide from the evening the lad was attacked.  Sgt. Steinbeck took the initial missing person report from the child's parents, and was later called to St. Joseph's Riverside Hospital when the boy's badly beaten body was discovered.  (TR. S. 117).

Sgt. Steinbeck's first contact with the Appellant came Friday, September 13, 1985.  He arrived at the Appellant's home at approximately 9:30 a.m. to transport the Appellant to further discuss the statement he had given to Sgt. Stewart the night before.  The Appellant said he would get dressed and voluntarily accompany Sgt. Steinbeck.  (TR. S. 118).  After arriving at the station, the Appellant was advised of his rights by Sgt. Steinbeck and he signed a waiver of rights form.  (TR. S. 119).

Throughout the course of a three hour interview, Sgt. Steinbeck testified that the Appellant contradicted himself many times.  However, he never asked for an

attorney and never asked that the interview be stopped. (TR. S. 121, 122).

The Appellant's mother arrived at the police station that Friday afternoon.  She told Sgt. Steinbeck her son could not be involved in the homicide because he was asleep until 7:00 p.m. the night of the assault.  Around 2:00 p.m. after typing a statement by the Appellant, Sgt. Steinbeck told him he was free to leave, which he did without signing his statement.  (TR. S. 124).

Sgt. Steinbeck testified that Mrs. Williams' statement concerning the whereabouts of the Appellant on the night of the attack was contradicted by other witnesses who saw the Appellant the day of the assault at the Valu King.  He learned of these contradictions on Sunday, September 15, 1985.  (TR. S. 125).

Along with the Appellant's uncle, Det. Morris Hill, Sgt. Steinbeck went to the Appellant's home Monday, September 16, 1985, to take him to the station to sign the statement he made the previous Friday.  Sgt. Steinbeck also wanted Mrs. Williams to accompany them and give a written statement concerning the information she gave police on Friday.  (TR. S. 126).  Both accompanied the officers voluntarily.  The Appellant was not handcuffed or booked when he arrived at the station at

approximately 10:00 a.m.  (Id.).  Det. Hill advised the Appellant of his rights.  (TR. S. 127).

During questioning that morning by Det. Hill, Sgts. Steinbeck and Stewart, the Appellant again changed his story when informed that the police were going to interview Tim Combs.  (TR. S. 128).  According to Sgt. Steinbeck's testimony, the Appellant was then asked if he wanted to speak to one of the three officers privately. The Appellant asked to be alone with Det. Hill.  The Appellant's request was granted.  Det. Hill emerged from the interview room a brief time later telling Sgts. Steinbeck and Stewart that the Appellant had admitted being at the scene when Raymond Fife was attacked.  (TR. S. 129).

As testified to by Sgt. Stewart, the three officers then engaged in a cassette-recorded interview with the Appellant.  (TR. S. 130).  The Appellant was not hesitant about the recording, he did not ask to leave and he did not ask for an attorney.  At the conclusion of the cassette recording, the Appellant agreed to a video-taped statement.  Again, he never asked that the questioning be stopped, never asked for an attorney and never asked to leave.  (TR. S. 130, 131).

Sgt. Steinbeck testified that he had arrested the Appellant many times and that each time he had said he understood his rights. (TR. S. 132, 139).

Concurring with Sgt. Steinbeck's assessment of the Appellant's understanding of his rights was the Appellant's uncle, Morris Hill, a 22-year veteran of the Warren Police Dept. He said he personally has given his nephew his rights four or five times. (TR. S. 185). On September 16, 1985 when Det. Hill read the Appellant his rights prior to taking a statement regarding the Fife murder, the Appellant advised his uncle "at that point in time that he understood exactly what his rights were." (TR. S. 189).

Det. Hill also testified that, at the request of the Appellant's mother, he had administered corporal punishment to the Appellant when he was a juvenile. (TR. S. 213, 214). This had occurred after the Appellant burglarized his grandmother's and cousin's homes. (TR. S. 232, 233). Det. Hill testified that he has not done this since the Appellant reached the age of majority.

As was previously testified, Det. Hill said he joined Sgt. Steinbeck on September 16, 1985, when the pair went to the Appellant's home to ask him and his mother to go down to the station to sign a statement the

Appellant had given the preceding Friday.  Det. Hill said at no time did the Appellant protest to him that he did not want to go down to the station.  (TR. S. 187).  Once at the station, the Appellant signed his statement form of September 13, 1985, with Det. Hill and Sgt. Stewart looking on.  (TR. S. 190).

In discussing the Fife homicide with the Appellant, Det. Hill said he was "cooperative...but trying to deceive."  (TR. S. 191).  Finally, at about 10:45 a.m., the Appellant asked Sgts. Steinbeck and Stewart to leave the room.  At this point, the Appellant admitted, "I was there.  I was in the field when he (Fife) got murdered," according to Det. Hill's testimony.  (TR. S. 193).

After this admission, the Appellant agreed to make an audio-cassette recorded statement.  Half way through the tape, Det. Hill presented him with a waiver of rights form which he signed.  No request for an attorney was made.  The Appellant did not ask to leave.  (TR. S. 194, 195).

Following the audio-cassette interview, the Appellant gave a video-cassette interview after speakng briefly with his mother.  Neither the Appellant nor his mother requested an attorney, but rather Appellant's

mother just encouraged Appellant "to tell the truth." (TR. S. 197).

Testifying next was Warren Det. James Teeple. Det. Teeple operated the video camera when the Appellant gave his taped statement. Det. Teeple said of the Appellant, "He understood everything I conveyed to him and cooperated fully." (TR. S. 241).

Next testifying was Trumbull County Prosecutor Dennis Watkins. He said he was present at the Warren Police Dept. on Sunday, September 15, 1985, reviewing evidence in the Raymond Fife homicide. The prosecutor testified that he discussed statements submitted by the Appellant and other witnesses, reviewed possible suspects and later visited the scene of the assault. (TR. S. 274).

Recounting a discussion with Sgt. Steinbeck, Atty. Watkins relayed that Sgt. Steinbeck felt the Appellant knew more than he was telling about the attack on Raymond Fife. (TR. S. 275). Further, Atty. Watkins said he felt it was important the Appellant's signature be obtained on a statement he gave two days earlier and that the police "reinitiate conversation" with the Appellant (TR. S. 276) concerning the Fife murder.

The Appellant's mother, Vera Williams, told the Court that she met her son at the Warren Police Dept. the

afternoon of September 13, 1985, the day he gave a statement to the police. He was permitted to leave with his mother that afternoon. (TR. S. 300). Mrs. Williams also testified that she accompanied her son to the police department on the following Monday as the Appellant was questioned further. Mrs. Williams said her son had not been drinking that day (Monday, September 16, 1985) and was mentally alert. (TR. S. 308). She further testified that her son knows right from wrong. (TR. S. 310).

James L. Freeman, supervisor of attendance for Trumbull County Schools, introduced the Appellant's permanent record card from when he was a student in the Warren City School System, Brinkhaven and Herbert Goddard High School. (TR. S. 314).

Mr. Freeman testified that when the Appellant was subjected to a compulsory education format, such as at Goddard, he passed almost everything. (TR. S. 329). He further said that a possible explanation for poor grades was lack of motivation or poor attendance. (TR. S. 322).

The Appellant admitted under cross-examination that when he made his initial visit to the Warren Police Dept., he did so with the express intent of lying as to the involvement of someone else in the Raymond Fife homicide. The incentive for this fabrication was an

12

alleged $5,000 reward offered by the Boy Scouts. (TR. S. 382). "The reason I went down there was to try to see if I could get it (the reward) about saying I seen somebody, which I ain't seen him...I was lying, let's put it like that. I was lying," the Appellant testified. (TR. S. 382).

Also regarding the initial visit to the police department on September 12, 1985, the Appellant agreed with Prosecutor Watkins that he was looking for his uncle, Morris Hill (TR. S. 383) when he came in to give his bogus statement. However, when Atty. Watkins raised the point that the Appellant had accused Det. Hill of kicking him under the table in the interview room (TR. S. 370), the Appellant denied he sought out Det. Hill on September 12, 1985. (TR. S. 383).

The Appellant denied giving any statements to police or signing any waiver of rights forms. When presented with State's Exhibits 15, 16, 17, 18 (voluntary statement and three waiver of rights forms), he said he did not remember signing them. (TR. S. 373, 374, 395-397). The Appellant also claimed he did not recall what he told officers during a one-hour, eight-minute video-taped interview, yet said he remembered passing Atty. Watkins

in the hall at the Warren Police Dept. September 16, 1985. (TR. S. 387).

Nancy Schmidtgoessling, a Clinical Psychologist, gave the Appellant a battery of tests October 25, 1985. When questioned about alleged brain damage in cross-examination, Ms. Schmidtgoessling admitted she had no medical evidence to support her theory. Ms. Schmidtgoessling testified that the Appellant has never been diagnosed as being brain-damaged and her only evidence to support this contention was a statement from the Appellant's mother that he had fallen off a swing as a small child. (TR. S. 489).

She further testified under cross-examination that someone of the Appellant's intellectual level could gain knowledge of criminal justice procedures with numerous experiences within the system. "There's no question at all that repeated exposure is definitely going to enhance comprehension. Even for a slow learner, I do feel with increased contact, certainly more is going to be obtained," (TR. S. 507) she testified.

Ms. Schmidtgoessling also admitted that the Appellant could have been lying to her during the course of his five-hour session with her in order to skew test results. She said that he was aware he was facing a

possible death penalty sentence and that the Appellant had expressed concern over dying in the electric chair. (TR. S. 494).

The Suppression Hearing concluded with Ms. Schmidtgoessling's testimony. The Appellant's motion for suppression was overruled by the Court in a written opinion. (TR. D. 112).

### GUILT PHASE

The Appellant's trial to determine his guilt or innocence in the death of Raymond Fife began January 21, 1986. Having waived his right to a jury trial, the case was heard by a three-judge panel.

The Appellee's first witness in the case was Raymond Vaughn, the Appellant's 17-year old brother. At the time of the Fife homicide, Vaughn, the Appellant, their mother and younger brother lived at 1394 Fifth St., Warren, Ohio. (TR. 39). The witness testified that on September 10, 1985, the night Raymond Fife was attacked, he observed the Appellant washing out a pair of gray pants. The witness said he saw the Appellant washing out the same pair of pants in the same manner on September 11 and 12, 1985. (TR. 40). The Appellant was in the family's bathroom, using a scrub board to wash out the pants in the bath tub (TR. 41).

The witness said that the Appellant was scrubbing at a red substance on the pants.  "It looked like blood to me," (TR. 42) Vaughn testified.  The witness then identified Appellee's Exhibit 1 as the pants he saw the Appellant washing the night Raymond Fife was assaulted and the two subsequent nights.  (TR. 41).

Taking the stand next was the slain boy's mother, Miriam Fife.  She told the Court that Raymond was the youngest of eight children, and that he would have turned 13 on his next birthday.  (TR. 56).  Raymond returned home from school at 2:35 p.m. September 10, 1985, ate his dinner at 4:30 p.m. and left his house on Austin Avenue for the last time at 5:15 p.m.  (TR. 57, 59).  He was on his way to his friend's house to work on bikes, (TR. 59) after which time the victim and his friend, Billy Simmons, were to stop by the Fife house and go to their weekly Boy Scout meeting at Second Christian Church set for 6:30 p.m. (Id.).

The victim, however, never made it to the Simmons house on Willow Drive.  It usually took Raymond seven to ten minutes to ride his bike from the Fife home to the Simmons home, (TR. 62) but at 5:50 p.m., 40 minutes after Raymond left his house, Billy Simmons called to say that Raymond had not yet arrived.  (TR. 63).

Billy then rode his bike over to the Fife house, never spotting Raymond. Mrs. Fife then went to Second Christian Church to see if he went early to his Boy Scout meeting. Raymond was not there, and his assistant scoutmaster joined Mrs. Fife in the search. (TR. 63). Also joining in the search was Raymond's older sister, Paula. (TR. 64). By 8:00 p.m., no one had located the boy and Mrs. Fife called the Warren Police Dept. (Id.)

After the police took statements from the Fifes, the boy's father, Issac Fife, and brother-in-law, Ray Pontius, went out looking for Raymond. Mrs. Fife was called by Mr. Pontius from the hospital at 9:30 p.m. to say they had found Raymond. (TR. 65).

Mrs. Fife also testified that her son was wearing gray striped silky shorts, a black Wrangler T-shirt with white writing, white sport socks and baseball tennis shoes when he left her house for the last time September 10, 1985. (TR. 65).

Billy Simmons took the stand and said that he and Raymond were very close friends and that they had been going to Boy Scouts together for about a year. (TR. 67, 68). With the aid of Plaintiff's Exhibits 2 and 4, Billy showed the Court the path that he and Raymond would take when riding to one another's homes. (TR. 70-73). He

testified that he rode the path behind the Palmyra Road Valu King the night Raymond was assaulted, but did not notice anything unusual. (TR. 75).

Testifying next for the Plaintiff was Raleigh C. Hughes III, an Emergency Medical Technician for Med Star Ambulance in Warren, Ohio. Mr. Hughes said he was notified that a sexual assault victim was awaiting attention just off Jackson Street in Warren. (TR. 85). One of the firefighters met Mr. Hughes on Jackson St. and escorted him to where the victim lay. Mr. Hughes said they walked at least a quarter mile through a densely wooded area. The vegetation was wet due to a misty rain. (TR. 86}.

Mr. Hughes talked with the boy's father, Issac Fife, who had discovered his son's nude and battered body just moments earlier. (TR. 87). Mr. Hughes said Raymond was draped with his father's jacket. (Id.). The 11-year EMT described the victim's injuries as "probably one of most gruesome things I've ever seen." (TR. 96).

The witness said Raymond was quite severely burned on his right cheek, neck and upper part of his chest. Raymond's face was disfigured with a possible broken jaw. His left eye was fixed and dialated, conditions indicative of possible neurological damage. (TR. 89).

Mr. Hughes noticed an inch-deep indentation on the right side of the child's neck. Raymond was unconscious and gasping for breath. (TR. 90). The victim's scrotum was swollen and discolored, his rectum torn and bleeding. (TR. 91).

The child was transported to St. Joseph's Riverside Hospital at 9:58 p.m. after the EMTs had worked on him for about 20 minutes. (TR. 95).

The responding police officer that night was Warren City Police Ptlm. Thomas Skoczylas. The officer said he followed the paramedic squad through the wooded area off Jackson Street. (TR. 102). He observed the victim, lying on his back, with a rug over him. Ptlm. Skoczylas said the boy had a pair of jockey underwear around his neck, as well as a black T-shirt. (TR. 103). Also near the boy was his father's blue handkerchief which had been used to wipe vomit off the boy's face. (TR. 104). Ptlm. Skoczylas said the boy's face was swollen and bruised. (Id.) The clothing around Raymond's neck appeared to be burned. (TR. 106, 107). Both items were placed into an evidence bag that night. (TR. 105, 106). The officer identified Plaintiff's Exhibit 6 as the underwear found and Exhibit 7 as the T-shirt. (Id.)

Identifying numerous pieces of Plaintiff's exhibits was Det. James Teeple, a 25-year veteran with the Warren Police Department.  Det. Teeple is involved with the collection, transportation and preservation of evidence, as well as fingerprinting, polygraph and crime lab work. (TR. 117, 118).

Det. Teeple testified that he took Donald Allgood to the area off Jackson St. where on the night of the assault, Allgood had seen four males coming out of the woods, two of whom were adjusting their zippers. (TR. 128).  Det. Teeple also said Allgood was taken to the spot where he saw one of the four toss a stick into the woods. (TR. 129). With the assistance of the Warren City Street Dept., the brush was cleared away September 16, 1985 and a stick was found.  Det. Teeple testified that while other debris in the area was overgrown with moss and securely attached, "it (the stick) appeared to be freshly put.  Hadn't been there for a long time." (TR. 131).  Det. Teeple identified Plaintiff's Exhibit 47 as the stick he recovered that day.  (Id.).

Det. Teeple also returned to the scene of the assault September 18, 1985 where he recovered a partially charred plastic bottle.  In visiting the Valu King, he

was able to purchase what appeared to be a similar bottle containing Topco Charcoal Lighter Fluid.  (TR. 135-137).

Det. Teeple also identified numerous photographs of the victim's clothing, the crime scene, aerial photographs of the crime scene and dental impressions of the Appellant and co-defendant, Timothy Combs.  (TR. 135-150).

The Court then viewed the video-taped statement by the Appellant which Det. Teeple photographed.  (TR. 162).

Trumbull County Coroner Dr. Joseph Sudimack testified that Raymond's injuries were so extensive, it was impossible to pinpoint which particular injury caused his death.  His report states the cause of death as cardio respiratory arrest, secondary to asphyxiation and subdural hematoma and multiple trauma.  (TR. 172).

Dr. Sudimack said Raymond's death could have been caused by the asphyxiation, brain damage or the penetration of the rectal bladder area, or a combination of these injuries.  (TR. 174).  Dr. Sudimack reached his conclusions from the autopsy performed by Dr. Howard Adelman on September 13, 1985.  (TR. 171).

Sgt. Steinbeck testified that the Appellant offered numerous misleading statements, lies and contradictory stories to Warren Police regarding the Raymond Fife

homicide. (TR. 216, 217).  For example, he claimed in a typed-written statement that he hadn't seen co-defendant Tim Combs "since he went to jail." (TR. 315).  Then, in later statements recorded on video tape, Appellant describes a host of brutal, sadistic acts perpetrated by Combs against the victim.  (TR. 306, 307, 309, 310, 314, 317, 318).

Sgt. Steinbeck also said the Appellant gave numerous stories concerning his whereabouts the night of September 10, 1985 claiming to be at home in bed, at Southwest Park and babysitting for someone named Ella.  (TR. 249).

On September 16, 1985, the day of the Appellant's arrest, he gave both an audio and video cassette-recorded statement regarding his involvement in the Fife homicide. Sgt. Steinbeck said the statements were contradictory. (TR. 224).  Particularly, Sgt. Steinbeck noted that in the audio statement the Appellant made no reference to the stick that was used to impale the victim.  (Id.). Furthermore, he claimed it was co-defendant Combs who used the stick on Raymond saying it was "a stick.  Like a broom handle thing." (TR. 338).

With few details of this crime released to the news media, (TR. 218) Sgt. Steinbeck testified that it was Hill who, in this initial statement, volunteered that

underwear was placed around the boy's neck.  (TR. 336).
The Appellant also stated in his video-taped statement
that the underwear was set afire.  (TR. 306).

While Sgt. Steinbeck did note that there were about
four other possible suspects in this case apart from the
Appellant and co-defendant Combs, the Appellant was the
only one of the suspects to walk into the police station
and give false information about the crime. (TR. 333).

According to Sgt. Steinbeck's testimony, his first
contact with the Appellant was September 13, 1985.  He
went out to the Appellant's home and offered him a ride
to the police department to elaborate on a statement he
had given Sgt. Stewart the night before.  Appellant
voluntarily came to the station.  (TR. 204).  The
Appellant signed a Constitutional Rights Waiver form at
1010 hours after Sgt. Steinbeck read the rights aloud.
(TR. 205).

The Appellant was brought down again to the police
station on September 16, 1985 to sign a typed statement
taken September 13, 1985.  (TR. 210).  He was given his
Miranda Warning that morning by his uncle, Morris Hill.
(TR. 212).  He was also Mirandized during the audio
cassette recording he made and waiver of rights forms
were signed. (TR. 219, 220).

Dr. Howard Adelman, Pathologist and Co-Director for the laboratory at St. Joseph's Riverside Hospital in Warren, took more than six hours to perform an autopsy on Raymond Fife on September 13, 1985. (TR. 352). The doctor noticed many external injuries on the 12-year-old boy's body, including burn marks, multiple contusions, abrasions and lacerations and ligature mark around the boy's neck. (TR. 349). Dr. Adelman also noticed that the boy was bleeding from the rectal area so profusely it was "as though it were under pressure." (TR. 361).

Other external injuries were also noted, including human bite marks on the boy's penis and black and blue marks on his scrotum, (TR. 363) possibly caused by pulling or blunt force. (TR. 364). The doctor also noticed second and third degree burns, possibly caused by flames, molten objects, gasoline or charcoal lighter fluid. (TR. 361, 362).

Raymond's internal injuries were equally extensive. Dr. Adelman said the lad suffered a subdural hemorrhage on the left side of his head. This could be caused by blunt force or a fall on the ground. (TR. 352). There were retroperitoneal and abdominal contusions, which amount to hemorrhages of the tissues that hold together the intestines. These injuries could be caused by an

object, kicking or punching after repeated assaults, (TR. 353, 354) Dr. Adelman testified.

Dr. Adelman further testified that the victim had been impaled with an object which was inserted through the anus and then penetrated the rectum and into the urinary bladder. (TR. 355). The doctor said such an assault would cause "a terrible amount of pain." (TR. 356). Also noted was a circular imprint on the rectum which did not perforate. (TR. 360). Dr. Adelman testified that this imprint could not have been made by a penis. (TR. 412).

The injuries to the rectal area appeared to have been made by Plaintiff's Exhibit 47, a broken broom handle-type object with one jagged and one blunt end. "I found that this object (Exhibit 47) is very consistent with the object that could have caused these penetrations," Dr. Adelman testified. (TR. 378). Furthermore, the doctor said, comparing the photographs of the injury to the stick itself, "the size and shape of the point of the stick were very compatible with the size and shape of the opening (penetration)." (T.R. 382).

Dr. Adelman said the fit of the jagged end of the stick to the penetration was "similar to a key in a lock." (TR. 383). As for the blunt contusion to the rectum, Dr.

Adelman testified that the "size and relationships are quite consistent" with the blunt end of the stick. (<u>Id.</u>)

Also, Dr. Adelman saved tissues from the rectum, anus and urinary bladder. (TR. 378). In examining these tissues under a microscope, he found foreign objects which matched plant cells seen in splinters from the stick. (TR. 387). "They have a very similar appearance. Each one has a pattern of lines and octagonal forms for the cellular outlines," Adelman said. (TR. 387).

The doctor also testified that if the stick were inserted for only a short time, it may absorb little or no blood, (TR. 416) and that if the stick were rammed in the ground, rained on or wiped off these actions "could easily remove the blood." (TR. 417).

Dr. Adelman also noted that the victim had lost so much blood, that his internal organs were pale in appearance. (TR. 361). The boy suffered a hemorrhage in the larynx indicative of strangulation. (TR. 365). There were cuts and abrasions around the arms, left cheek, ankles, legs and thighs. The victim also suffered a muscular hemorrhage in the tongue, due to a fall on the chin area or blow to the chin, (TR. 366) and swelling and hemorrhage of the outer and inner part of the lips caused by a blunt force type of beating. (TR. 367).

The doctor listed several injuries which, independent of one another, could have caused Raymond's death.  He said the subdural hemorrhage, the perforation of the rectum and urinary bladder, the strangulation and the beatings and burning each could have caused Raymond's death. (TR. 370).

Donald Allgood, a Warren Western Reserve sophomore, testified that he saw the Appellant and co-defendant Combs coming out the woods behind the Palmyra Road Valu King between 5:30 p.m. and 6:00 p.m. the night Raymond was attacked.  (TR. 434).  Mr. Allgood was taking a walk with a friend of his.  (TR. 432).  It was still daylight. (TR. 434).

Mr. Allgood testified that he saw Combs coming out of the woods first, the Appellant following and two other people behind him.  (TR. 434).  Combs, who the witness knows, (TR. 448), was dressed in a leather jacket and blue jeans. (TR. 438).  Mr. Allgood testified that Combs was pulling up his zipper and put his head down when he caught sight of the witness.  (TR. 439).

The witness further testified that he saw the Appellant toss a stick back into the wooded area just as he was coming out.  Mr. Allgood said the Appellant threw the stick, "with a little flick of his wrist, he threw a

stick to his right." (TR. 437). Mr. Allgood said he observed these occurrences as he was walking south, approaching the corner of Willow and Hemlock. (TR. 436).

On September 14, 1985, Mr. Allgood picked Combs and the Appellant out of an eight person photo line-up as two of the four people he had seen September 10, 1985 coming out of the woods. (TR. 442). The witness identified Plaintiff's Exhibit 47 as possibly being the stick the Appellant threw as he was exiting the woods September 10, 1985. (TR. 497).

Sgt. Stewart testified that the Appellant came to the police station around 7:30 p.m. the night of September 12, 1985 and claimed to have seen Maurice Lowery riding Raymond's bike through the Westlawn projects. (TR. 504, 505). He also told Sgt. Stewart that he had seen Lowery coming out of the woods near the Hampshire House at 1:00 a.m. (TR. 506). The Appellant admitted to Sgt. Stewart that he knew Tim Combs, but claimed he hadn't seen Combs "since he's been out of the joint." (TR. 509). The Appellant also told Sgt. Stewart he was at home sleeping the night of the attack. (TR. 511).

Sgt. Stewart next encountered the Appellant on September 16, 1985 at the Warren Police Dept. He joined

Det. Hill and Sgt. Steinbeck in an audio-taped interview with the Appellant. (TR. 516). During that taped interview, the Appellant signed two waiver of rights forms, State Exhibits 57 and 58. (TR. 520). After the audio recording, the Appellant agreed to a video-cassette recording during which time Sgt. Stewart said the Appellant's rights were read again. (TR. 523).

Sgt. Stewart also received a waiver to search the Fifth St. residence of the Appellant. The Permission to Search was signed by the Appellant's mother, Vera Williams. (TR. 523). In executing the search, Sgt. Stewart found a pair of gray trousers that were sought after. They were hanging in the bathroom drying and were the only clean clothes in the apartment. (TR. 526). Mrs. Williams identified the pants as belonging to the Appellant and not any of his three brothers.

Sgt. Stewart also accompanied the Appellant to the crime scene where he identified the spot where Raymond was found, which way he was facing, where solvent was used to ignite the victim and where he exited the woods. (TR. 530).

On September 19, 1985, the witness testified that he searched co-defendant Timothy Combs' house and confiscated a pair of tube socks. (TR. 545). Also on

that day, he obtained search warrants for dental impressions, saliva tests, x-rays, photos of the Appellant and Tim Combs (TR. 547) and escorted the pair to Dr. Robert Walton's office to obtain this evidence. (TR. 547).

James Wurster, a Criminologist with Bureau of Criminal Identification's Trace Evidence Section, testified concerning tests he ran for human blood on the Appellant's gray pants, Combs' tube socks and the stick. Based on a comparison of genetic markers of Raymond Fife's blood and the blood found on Combs' sock, Mr. Wurster concluded that 86 percent of the Caucasian population could be eliminated as possible sources for the blood on the sock. (TR. 603). He said there was nothing inconsistent with the blood found on the sock and Raymond's blood. (TR. 604).

Mr. Wurster said he found no blood on the Appellant's gray pants, (TR. 605) but noted that depending on the amount of washing and the method of washing blood could be removed from the fabric. (TR. 607). He also testified that while he found no blood on the stick, that it was possible to remove blood from the stick by wiping it off, sticking it in the ground or exposing the stick to rain. (TR. 610).

Testifying next for the State were two young women who the Appellant was convicted of raping prior to the assault on Raymond Fife. Candyce Jenkins testified that she was raped repeatedly by the Appellant over a 90-minute period in her home on Delaware St. in Warren, Ohio on March 2, 1984. (TR. 686). From her home she could see the wooded area behind the Palmyra Road Valu King. (TR. 687).

Miss Jenkins told the Court the Appellant showed up at her back door claiming to be waiting for his cousin. Sensing something was amiss, Miss Jenkins told the Appellant that she had a gun, at which time the Appellant dared her to shoot. Miss Jenkins ran to her bedroom to get her gun, and the Appellant put his fist through the window and unlocked the door.

As Miss Jenkins entered the kitchen, he caught up with her and forced her to undress and to perform oral sex. Holding a knife to her throat, he then bent her over and raped her anally, threatening to kill her as he assaulted her. (TR. 690). The Appellant's objective was the infliction of great pain. "I screamed that it hurt and he said good, that he wanted it to." (TR. 693). He then forced her back into the living room where he continued to perform anal sex on her. (TR. Id.).

While raping her in the living room, he bit her on the back of the shoulder and the left breast. The Appellant threatened to mutilate Miss Jenkins. "He said he was going to take the knife and stick it in my ass and cut out my pussy and cut off my breasts." (TR. 694). He further threatened to rape and mutilate the victim's three-year-old daughter who was alseep in her room. The Appellant told Miss Jenkins her child would make a "good fuck and that he was going to cut her up in front of me." (TR. Id.).

Miss Jenkins testified that the repeated assaults amused Appellant. "He seemed to enjoy it because he started laughing," (TR. Id.) she said. Miss Jenkins further told the Court, "He had no emotions. He had no feeling as far as when I told him I was in pain. He didn't care. He laughed about it. He had no feelings. He was like an animal." (TR. 702).

According to the testimony offered by Mary Ann Brison, she was raped by the Appellant February 8, 1984, just off a path behind the Palmyra Road Valu King. (TR. 703). After purchasing some cigarettes and pop at the Valu King, she proceeded down the path behind the store and was grabbed from behind and thrown to the ground by the Appellant. (TR. 704, 705). As the Appellant started

to undo her pants, she threatened to scream and started to struggle. The Appellant responded by punching her in the face and producing a knife. He told Miss Brison that he had killed before and wouldn't hesitate to kill her. (TR. 706). The Appellant then engaged in vaginal intercourse with Miss Brison. In a hateful tone, the Appellant told his victim that if she told anyone what happened he would either kill her himself or have her killed. (TR. 706).

The Appellant's uncle, Morris Hill, a detective with the Warren Police Dept., testified that his nephew is frequently in trouble with the law yet "slick enough to get out of it." (TR. 714). Det. Hill testified that he first became involved in the case September 16, 1985 when he was assigned by his captain to go out and pick up the Appellant at his residence. (TR. 715). Once at the station, Det. Hill watched as Sgt. Steinbeck read the statement given by the Appellant on September 13, 1985. The Appellant then signed the statement. (TR. 719). Det. Hill had read the Appellant his rights. (TR. 720).

After requesting that Sgts. Stewart and Steinbeck leave the interview room, the Appellant admitted to his uncle that he "was in the field behind the Valu King when the young Fife boy got murdered." (TR. 721). An audio

tape interview then ensued with Sgts. Steinbeck and Stewart. Det. Hill then entered the room with two waiver of rights forms. One was read aloud, both were signed by the Appellant. (TR. 726). Det. Hill told the Appellant he was free to leave at any time. (TR. 738). Following a video-tape interview, Det. Hill accompanied the Appellant and other officers to the crime scene. (TR. 729).

Testifying for the Appellant out of sequence was Larry Dehus, a Criminologist from Dayton, Ohio. Having examined Plaintiff's Exhibit 47, Mr. Dehus said he found no traces of blood on the stick. (TR. 773). However, under cross-examination, Mr. Dehus testified that he has examined other blunt instruments used as weapons and found no blood on them. He further testified that you cannot exclude a suspected weapon just because it has no blood on it. Mr. Dehus also said that the blood must have an opportunity to absorb into the object in question for traces of the substance to remain. (TR. 783, 784). He further testified that repeated washing can remove blood from clothing. (TR. 801).

Under cross-examination, Mr. Dehus, testifying about Raymond's shorts and underwear, stated that if an accelerant did not soak through to a lower surface, it is possible for the accelerant to be completely consumed by

fire.  He further admitted that he had never seen the items in question until they were handed to him on the witness stand that day. (TR. 791).

Matthew Hunter, a junior at Warren Western Reserve High School, told the Court that he saw the Appellant and Tim Combs together on two separate occasions the day Raymond was assaulted.  At approximately 3:00 p.m. on September 10, 1985, Matthew was cutting the grass for a neighbor lady on Jackson Street.  He testified that he saw the Appellant and Tim Combs walking down the middle of the street while he was mowing. (TR. 804, 815).  Matthew said there were two others with the Appellant and Combs but he did not know their names.  He knows the Appellant from having lived two houses down from him, and he knows Combs from having played basketball with him. (TR. 804).

Matthew testified that he saw the Appellant and Combs about two hours later at the Palmyra Road Valu King.  Matthew, along with his brother and sister, took the path behind the store. (TR. 806).  As they came around to the front of the building, Matthew says he saw the Appellant and Combs standing in front of a laundromat in the same plaza. (TR. 807).  Matthew also said he saw Raymond Fife ride a small, red dirt bike through the Valu

King parking lot after Matthew purchased juice and cookies at the store. (TR. 808, 809). Matthew said he did not know Raymond at the time, but recognized his photo when it appeared on local television newscasts after the attack. (TR. 822).

Matthew also testified that Tim Combs once fondled him, but he got away before Combs could do anything else. (TR. 826).

Dr. Robert Walton of Howland Township testified next. He stated that on September 19, 1985, while in the presence of two uniformed officers, Det. Teeple and Sgt. Stewart, and Dr. Howard Adelman, he took impressions of the Appellant's teeth, x-rays and interocclusal records. (TR. 831, 832). A close-up photograph, intra/extra orally, of the Appellant's mouth was also taken. (TR. 835). Similar procedures were run on Combs.

Dr. Walton's examination concluded that the Appellant has a chipped and rotated #8 tooth (upper right maxillary central incisor). (TR. 832). He also has diastema (a space) between the upper central incisors. This is common to only 15 percent of the population, or less. (TR. 833).

Darren Ball, a Warren Western Reserve freshman, said he and a friend passed Tim Combs on the path behind the

Palmyra Road Valu King at about 5:30 p.m. on September 10, 1985. Darren and Troy Cree took the path off Willow as they were walking home from football practice. (TR. 844). Darren testified that he saw Combs walking away from the store. They exchanged greetings. (TR. 846). Darren and Troy then started to jog (TR. 847) because they were aware of Combs' reputation as a homosexual. (TR. 853). Darren said as they were about to leave the path they heard a child scream, but didn't think anything of it. (TR. 847 & 848).

Troy Cree, a Warren Western Reserve freshman, testified that he did not know Combs or his reputation prior to Darren's remarks on the path behind the Valu King. (TR. 860). Troy also told the Court that he picked Combs out of a photo line-up at the Warren Police Dept. two days after the attack on Raymond Fife. (TR. 863).

Det. Sgt. William Carnahan, a 20-year veteran of the Warren Police Dept., testified concerning some of the chain of evidence in the Fife homicide. Det. Sgt. Carnahan was present for the autopsy of the victim at which time he photographed Raymond's head, chest, torso, penis, anus, rectum, left arm and shoulder. (TR. 871, 872). He also accepted blood samples from the victim and transported them to the Bureau of Criminal Identification

at Richfield, along with Raymond's undershorts and bike and the Appellant's shoes and gray pants.  (TR. 873, 874).

Det. Sgt. Carnahan also was with Donald Allgood on September 15, 1985 when Allgood showed officers where Danny Lee Hill tossed a stick into the woods near the path off Willow Street. (TR. 877).  Det. Sgt. Carnahan returned to that area with members of the Warren Parks Dept. on September 16, 1985 and discovered the stick (State's Exhibit 47) approximately six feet off the path. (TR. 878).

Testifying next for the State was Dr. Curtis Mertz, a renowned expert in the field of forensic odontology. Dr. Mertz, from Ashtabula, Ohio, has been a licensed dentist since 1944, is Chief of Dental Staff at Medical Center in Ashtabula and was the first president of the American Board of Forensic Odontology. (TR. 906-909).  He is recognized as a leading authority in the field of dental identification and has been called on by the Federal Aviation Administration to identify crash victims. (TR. 910).  Dr. Mertz is also well-known for his expertise in bite marks.  He has been involved in 35 to 40 such investigations.  (TR. 914).

On September 13, 1985, Dr. Mertz came to the morgue at St. Joseph's Riverside Hospital to view the body of Raymond Fife.  He described his first impression of the body as "a pitiful sight," noting ligature marks around the neck, bruises on the face and lips, fractured teeth from recent blows to the mouth and what appeared to be fresh bite marks on the penis. (TR. 918, 919).  The fractured teeth, he testified, were caused by a fairly heavy blow to the mouth.  (TR. 923).

With a reasonable degree of dental certainty, Dr. Mertz concluded that the Appellant inflicted the bite marks on Raymond's penis. (TR. 937).  This conclusion was reached by analyzing dental impressions and photos taken of the Appellant and Tim Combs and the victim's penis. (TR. 938).  He discovered that while Combs' teeth hit together with a normal occlusion, the Appellant's upper teeth fit over the lower teeth to a greater degree. (Id.).  Had Combs made the bite marks, the marks made by the lower teeth would have been more distinct. (TR. 939, 997, 1000).  Also, Dr. Mertz noted that the Appellant, and not Combs, has a fractured number 8 tooth, which would most likely explain the irregular, triangular mark left on the victim's penis. (TR. 942-945).  The bruise,

Dr. Mertz testified, is consistent with a fractured tooth because the tissue is pushed up. (TR. 944).

Dr. Mertz noted that both the Appellant and Combs have diastema (a separation between two teeth), but he testified that diastema is common in only 5.2 percent of the black population. (TR. 947). He further stated that it is not common to find both a diastema with a chipped and rotated tooth. (TR. 949). Finally, the doctor testified that the way such a bite mark would be inflicted would be for the penis to be in the mouth some distance, as in fellatio. (TR. 959).

Stephen Melius, a 17-year old junior at LaBrae High School, told the Court that the Appellant requested sexual favors from him while the pair was incarcerated at the Juvenile Justice Center, and then molested him when he refused the Appellant. (TR. 1025, 1026). Stephen testified that he and the Appellant shared a cell sometime during the winter of 1984 (TS. 1024) but admitted that he might be wrong on the date because of his frequent incarceration at JJC for being a runaway. (TR. 1131).

Stephen said the Appellant, who was sleeping in a bunk while Stephen was on the floor, (TR. 1024) reached out and grabbed the witness' penis. When Stephen pushed

his hand away, the Appellant requested that the pair engage in anal intercourse. Stephen told the Appellant no. (TR. 1025). Not dissuaded, the Appellant asked if he could perform oral sex on the witness. Again, Stephen told him no. When Stephen rolled over to try to go to sleep, the Appellant then tried to pull Stephen's pants down. When Stephen pushed the Appellant's hand away for yet a second time, the Appellant then brought his head down between Stephen's legs in an effort to perform oral sex on him. This time, Stephen pushed the Appellant's head away. (TR. 1026).

The witness testified that he did not tell JJC officials about these events for fear "he (the Appellant) might try to do it again." (TR. 1027). The State did not become aware of this event until the Appellant's trial was in progress. (TR. 1018-1021). Stephen's testimony, along with the testimony offered by Candyce Jenkins and Mary Ann Brison, was admitted by the Trial Court pursuant to Ohio Revised Code § 2945.59. At the conclusion of Stephen Melius' testimony, the State rested. (TR. 1048).

Testifying for the Appellant was James Freeman, Supervisor of Attendance for Warren City Schools. He produced into evidence the Appellant's permanent record and four psychological tests. When asked if he could

explain the Appellant's low scores, Mr. Freeman replied, "Attendance would be a good reason." (TR. 1063).

Dr. Lowell Levine, a Forensic Odontologist called by the Appellant, testified that he could not conclude whether the Appellant inflicted the bite marks on the victim's penis.  He reviewed photographs of the victim and models of the Appellant's and Combs' mouths. (Tr. 1140).  He said the bite marks were human, but he could not come to a conclusion, with a reasonable degree of certainty.  Dr. Levine testified that some of the marks could have been made by both. (TR. 1146).  However, Dr. Levine ruled out Combs as a possible source of the mark inflicted with what appears to be a broken tooth. (TR. 1151, 1152).

After closing arguments, the three-judge panel deliberated for five hours and returned guilty verdicts on Aggravated Murder with Specifications of Aggravating Circumstances, Kidnapping, Rape, Arson and Felonious Sexual Penetration.  The Appellant was acquitted of Aggravated Robbery.  The Court set February 12, 1986 as the hearing date on the sentences to be imposed. (TR. 1275).

### MITIGATION PHASE

The mitigation hearing for the Appellant began February 26, 1986 before the three-judge panel. The first witness called by the Appellant was Vera Williams, the Appellant's mother.

Mrs. Williams gave contradictory statements as to the number of years there had been a male role-model in the home with the Appellant. Despite these contradictions, she testified that the Appellant had a role model in her home from the time he was 8-years-old. (TR. M. 11). She also described Mr. Williams' relation with the Appellant as "kind of close." (TR. M. 13).

Despite her best efforts to teach the Appellant right from wrong, she admitted that he was a repeat offender and did not learn from his experiences. (TR. M. 28). Mrs. Williams also testified that she could not control his behavior when he was out of her sight. (TR. M. 29). In spite of the brushes with the law that her other two (2) sons have had, Mrs. Williams acknowledged that neither has been charged with or convicted of Aggravated Murder. (TR. M. 30).

Testifying next for the Appellant was his grandmother, Mary Robinson. Mrs. Robinson said the Appellant got along with Willie and his youngest brother, Damien, but that he did not "mix" with older children.

(TR. M. 39). "He like small children," Mrs. Robinson said. (Id.).

Paula Guilford told the Court that she had been the Appellant's parole officer from April to August, 1985. She is a youth counsel for the Department of Youth Services. (TR. M. 51, 52). Ms. Guilford testified that she made a post-institutionalization referral for the Appellant to the Bureau of Vocational Rehabilitation, but as far as she knows, the family never followed up on her call. She also referred the Appellant for psychological counseling with Trumbull County Mental Health, but never received any reports saying that he had been there. (TR. M. 62, 63).

Ms. Guilford initially described the Appellant as "a follower," (TR. M. 61) but under cross-examination admitted that he was institutionalized for two (2) rapes which he committed on his own. (TR. M. 63).

Testifying next for the Appellant was Deidre Poindextor who served as his parole officer from the DYS from August 5, 1985 until his arrest five (5) weeks later in the Fife homicide. (TR. M. 73, 74). She testified that she referred the Appellant to the Bureau of Vocational Rehabilitation, but that he never completed his application there. (TR. M. 70). She said he lacked

motivation. (TR. M. 71).  Ms. Poindextor also told the
Court that the Appellant "did initiate some incidents" at
the Training Center for Youth while institutionalized.
(TR. M. 72).

Mark Brink, Vice President for Brinkhaven
Enterprises, told the Court that he was a youth worker at
the facility when the Appellant was institutionalized
there from the summer of 1982 to February, 1983. (TR. M.
75, 76, 79).  The last time he saw the Appellant was in
February, 1983 when he left the facility. (TR. M. 89).
Mr. Brink said that the Appellant got in trouble a number
of times while at Brinkhaven. (TR. M. 84).  The Appellant
also fought with the other kids when they teased him.
(TR. M. 85).

The next witness, Vanessa Conley, supervised the
Appellant during 1984 while he was at the Buckeye
Training Center for Youth in Columbus. (TR. M. 99).  Ms.
Conley is a teacher's aide who had the Appellant in her
cabin for semi-hostile boys. (TR. M. 92, 99).  She said
that based on her personal experience, she does not
believe the Appellant is mentally retarded. (TR. M. 112).
Ms. Conley has a mentally retarded brother and four (4)
mentally retarded uncles. (Id.).

Ms. Conley testified that she once had to lock up the Appellant to keep him from beating up another boy at TCY. (TR. M. 114).  She said he could not understand why he was not permitted to beat up another boy. (TR. M. 115).  Ms. Conley acknowledged that while TCY does do some good for certain residents, there are some who do not get help and some do not learn. (TR. M. 117).

Lloyd Ayers, a youth leader for TCY, testified that he was assigned to the Appellant for six (6) months in 1984. (TR. M. 120).  He told the Court that the Appellant was supposed to participate in sex awareness, AA and drug abuse programs but never did. (TR. M. 122, 123).  Ayers also testified that the Appellant went AWOL once while at TCY. (TR. M. 126).

Anthony West, a youth leader at TCY, saw the Appellant every day at the facility from April, 1984 through April, 1985. (TR. M. 143).  Mr. West also acknowledged that the Appellant once went AWOL and "got in a little scuffle with the police." (TR. M. 152).  Mr. West said that when the Appellant first came to TCY, he was placed with the hostile group, and it was Mr. West that had him re-assigned to the semi-hostile group three (3) months later because of threats of "kicking his butt." (TR. M. 150).

Next testifying for the Appellant was Cheryl West, a now-retired youth leader from TCY and wife of the previous witness. (TR. M. 165). Mrs. West testified that the Appellant attended his assigned sex education class only one (1) time. During that one and only session, Mrs. West told the Court that the Appellant had a conflict with the social worker teaching the class and elected to skip the class for the remainder of his institutionalization. "Danny chose not to go back to the class because Danny said that he wasn't teaching him anything." (TR. M. 168).

Mrs. West acknowledged that he would try to intimidate the younger boys there. (TR. M. 171). For example, he was isolated for making a "gesture" to one 12-year-old boy and by threatening him saying, "I'm going to take your booty." (Id.) The witness also said you had to follow through on any chore you asked him to perform to make sure he completed the task. (TR. M. 172).

Mrs. West testified that she and the Appellant went before the deputy superintendent to urge that he be sent to a group home rather than being returned to his family home. (TR. M. 173). This was because the Appellant felt he would get in trouble again if he returned home. (TR. M. 174). However, Deputy Superintendent Ann Swilger told

the Appellant he was "a hopeless case," and that "hopefully, you'll you get in more trouble and you'll just do more time." (TR. M. 173).

Dr. Douglas Darnall, a psychologist from Youngstown, Ohio, told the Court that the Appellant's mild mental retardation had no relation to his criminal activity. (TR. M. 230). Dr. Darnall conducted a psychological evaluation of the Appellant in December, 1983. The evaluation was to determine whether or not the Appellant, who was then 15-years-old, should be bound over to the grand jury as an adult to stand trial on a breaking and entering charge. (TR. M. 183).

Dr. Darnall testified that the only relation his intelligence has to his criminal activity is that he "does a very poor job of committing crimes" and gets caught often. (TR. M. 231). Dr. Darnall testified that when he evaluated the Appellant at age 15, the Appellant had 13 prior offenses. (TR. M. 215).

Dr. Darnall told the Court that the Appellant had a history of violating other people's rights. (TR. M. 194) He described the Appellant as "optional with adult authority," noting "he's going to do what he wants." (TR. M. 198). This was particularly evidenced in his refusal to go to school. (Id.) Dr. Darnall also testified that

if there is "discomfort" in a particular situation, Appellant will avoid the situation, such as school, for example. (TR. M. 191).  The witness also said that the Appellant "doesn't worry about tomorrow" and does not take into account any of the consequences of his actions. (Id.)

According to the multiaxial diagnosis, the Appellant has a conduct disorder under socialized aggressive. This, Dr. Darnall stated, was primarily a behavioral problem rather than a mental disorder. (TR. M. 193).  Dr. Darnall noted that the Appellant tends to gravitate "towards an anti-social peer group." (TR. M. 192).  The Appellant has a tendency to misread people and react. Further, he has a suspicious nature and would look at the world in "a hostile fashion." (TR. M. 189).  Dr. Darnall noted that the Appellant displayed more apathy than anxiety over the criminal charges he was facing. (TR. M. 209).

Dr. Darnall stated that when there is a biological reason for mental retardation, the retardation is severe or profound, which is not the Appellant's case. (TR. M. 225).  The doctor testified that there is no psychosis present in the Appellant, and there is no connection between his intellectual level and the charge he was

facing at that time. "You cannot attribute those charges due to his intellectual level," the doctor said. (TR. M. 227). Dr. Darnall concluded that his family environment more so than his intelligence contributed to his aggressive behavior. (TR. M. 233).

Nancy Schmidtgoessling, a Clinical Psychologist from Cincinnati who did psychological evaluations on both the Appellant and his mother, classified the Appellant as "impulsive and assaultive." (TR. M. 248, 274). She said that she found insufficient evidence for an insanity defense, (TR. M. 288) and that the Appellant knew right from wrong and could have refrained from the crimes of which he stood convicted. (TR. M. 289).

She administered to both the Appellant and his mother, Vera Williams, the WAIS-R tests subsequent to the Fife homicide. The Appellant scored a full-scale 68 and his mother a 63, placing them both in the mild range of mental retardation. (TR. M. 256). However, Schmidtgoessling said that his retardation was not the cause of his criminal conduct, (TR. M. 278) and that most retarded people in this country do not commit crimes, but instead adapt to society. (TR. M. 276). Schmidtgoessling testified that the Appellant was aware of his actions on the night Raymond Fife was attacked and knew that those

actions were wrong. (TR. M. 294). She found no evidence of mental disease or defect. (TR. M. 295).

Schmidtgoessling also told the Court that when she interviewed the Appellant at the Trumbull County Jail on October 25, 1985, she did not get the impression that he was worried about his pending trial and possible death sentence. (TR. M. 280). She described his moral development as "very primitive" which is characterized by being concerned only with what felt good to him or whether he would get caught doing something he should not. (TR. M. 264). She noted that he had a history of conduct disorder with multiple incidents of truancy, not listening to his teachers, hanging out with "the wrong kids" and a criminal record which included stealing and "assaults on women." (TR. M. 263).

The witness also told the Court that Appellant does not feel for other people, (TR. M. 281) and does not learn from his mistakes. (TR. M. 275). She also told the Court that the Appellant's mother loved all of her children and that she thought it was important to teach them not to steal. (TR. M. 257, 259). There was evidence that all four (4) boys have a history of disregarding rules, (TR. M. 258) but Schmidtgoessling admitted that despite a lack of a father figure in the home, none of

the other three (3) had been convicted of rape or murder. (TR. M. 287).

The final witness for the Appellant was Dr. Douglas Crush, a Youngstown psychologist. He is trained in the field of neuropsychology, the study of brain function and behavior. (TR. M. 297). He administered a battery of tests to the Appellant in February, 1986. (TR. M. 298). Dr. Crush said the Appellant achieved a full-scale I.Q. score of 64 in the Wechsler Intelligence Scale Revised.

Dr. Crush also acknowledged that while hospital records stated the Appellant suffered a concussion at age 17 months and 18 years, (TR. M. 326, 327), there is no evidence of neurological injury. Also, millions of people suffer concussions without suffering brain injury. (TR. M. 329).

After closing arguments, the Court deliberated for four (4) hours. The Court sentenced the Appellant to 10-25 years for both the Aggravated Arson and Kidnapping and Life in prison for Rape and Felonious Sexual Penetration. For the crime of Aggravated Murder, the Appellant was sentenced to death.

Appellant's conviction and death sentence was affirmed by the Eleventh District Court of Appeals in an 89-page opinion filed November 27, 1989. Appellant then

filed an appeal with this Honorable Court on February 4, 1991.  Appellee, the State of Ohio, now responds to Appellant's brief to this Court.

PROPOSITION OF LAW NO. 1

THE APPELLANT'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS NOT
VIOLATED, NOR DID THE DEFENDANT'S MENTAL CONDITION NEGATE
AN OTHERWISE KNOWING AND INTELLIGENT WAIVER OF HIS
CONSTITUTIONAL RIGHTS, INCLUDING THE RIGHT TO COUNSEL, ON
MONDAY, SEPTEMBER 16, 1985.

Before addressing the issues presented in this
assignment of error and others that follow, the State
would note the following. First, whenever there is
custodial interrogation of a person and a Miranda waiver
is made, the State bears a heavy burden of proving a
knowing and intelligent waiver. Miranda v. Arizona
(1966), 384 U.S. 436; State v. Cowans (1967), 10 Ohio
St. 2d 96. Second, in Lego v. Twomey (1972), 404 U.S.
477, the U.S. Supreme Court held that the State carries
the burden of proving on the voluntariness of a
confession by a preponderance of the evidence. This
holding was reaffirmed in Colorado v. Connelly (1986) 107
S. Ct. 515, 522. Lastly, as with any trial, a
suppression hearing involves the trial court sitting as
the trier of fact and therefore what weight, if any, that
is given to the testimony of the witnesses, rests with
the trial judge. State v. Scott (1980), 61 Ohio St. 2d
155.

This is the first of many arguments which should be
based on the full facts. Appellant, in his brief,

engages in a pattern of alleging facts that are one-sided and which often fail to mention the State's version, the one which the Court chose to believe. For example, at p. 59 of the Appellant's Brief, it is stated that the Appellant's mother, Mrs. Vera Williams, claimed to have told Det. Morris Hill that she was going to obtain legal counsel for her son. She said that Det. Hill, her brother, told her that there was no sense in hiring an attorney since the court would appoint one. This was said to have occurred on Monday, September 16, 1985. Though not mentioned, Det. Hill and other officers denied at the Suppression Hearing that Mrs. Williams ever mentioned the need for an attorney for her son.

Also in his first argument to this Honorable Court, the Appellant is portrayed as a mild to border-line mentally retarded individual who was taken advantage of by the police. Appellant claims that he was, in short, unable to understand and freely waive his right to counsel. Appellant, however, fails to mention his long history and familiarity with law enforcement officers, and the many times he was given his Miranda rights including his right to appointed counsel. Officers testified that the Appellant was of normal to average intelligence (TR. S. p. 8). Det. Morris Hill described

the Appellant as being "slick" and said he seems to get out of many things he does wrong.  He dupes people.

The first reviewing court in his case, the Eleventh District Court of Appeals, found that the Appellant's waiver of rights was "knowingly and intelligently" made. (Appellate Court Opinion, pg. 17).  The Court cited the Appellant's "multifaceted exposure" to the State's criminal justice system, and further noted that "Appellant was capable of understanding the questions put to him and of responding intelligently." Id. at 15-16. Furthermore, the Court found:

> (T)he behavior of the Appellant during the police investigation belies the notion that he was no more than a malleable victim of police suggestion.  Appellant possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, Appellant qualified and corrected the police officers' misstatements of the factual scenario which he had related to them.  He was also able to follow 'verbal concepting,' display-ing an understanding of the officers' direction of questioning and the dialogue utilized during the interrogation.  Id.

The trial court, in its Findings of Fact and Conclusions of Law following the Suppression Hearing held in this matter found:

> 1.  ...The police officers did not use any coercion, threat, or force against the Defendant against his will.  On the contrary, the Court finds that the defendant was motivated solely by his mother's strong urging to go with the police.

Mrs. Williams accompanied her son to the police department;

2. Upon arrival at the department about 10:00 a.m., September 16th, the defendant was again given Miranda Warnings...;

3. At the time of making these statement, admitting knowledge but denying personal culpability, Danny Hill had been advised of his Miranda Rights and understood them. He further had knowingly waived those rights;

4. At the time of giving this statement; the statement sought to be suppressed, Danny Hill was a retarded person and essentially illiterate, and

5. His mental impairment was not so great as to render him incapable of understanding his right to remain silent and his right to counsel and all aspects of the Miranda Warning. (Suppression Findings, Paragraphs 7, 8, 13, 14, 15).

The State intends to review the issues and let the record speak for itself as to the facts. It will not give an endless one-sided, and at times, inaccurate litany of the events which the Appellant offered in his brief. The picture presented (i.e. believe everything that Danny Hill tells you and disregard all the police witnesses) of a helpless, hapless Defendant, slapped and kicked into submission and an involuntary statement is wholly unbelievable in view of the testimony given by the Appellant at the Suppression Hearing. Further, the audio and video tapes of September 16, 1985 give the best evidence regarding Hill's state of mind. The trial

court, as the trier of fact, determined what weight it would give to the testimony of the witnesses, and thus under the law, its judgment in deciding what to believe should be sustained.  State v. Scott, supra.

Thus, the Appellant's First Proposition of Law is without merit.

PROPOSITION OF LAW NO. 2

THE APPELLANT'S STATEMENTS OF SEPTEMBER 13, 1985 AND
SEPTEMBER 16, 1985 WERE VOLUNTARILY AND FREELY GIVEN AND
WERE NOT COERCED OR ILLEGALLY OBTAINED.

The Appellant next argues that his recorded statements of September 16, 1985 were not voluntary and therefore should be ruled inadmissible under the Federal and Ohio Constitutions.

As recently as 1990, this Court has upheld the proposition that a low I.Q. does not automatically vitiate a rights waiver. In State v. Dailey (1990), 53 Ohio St. 3d 88, the defendant successfully challenged, at both the trial and appellate court levels, a confession he made when questioned on a sex offense. Not unlike the Appellant, the defendant in Dailey was 18 years old, had an I.Q. of 71 and a reading comprehension of less than a third grade level.

This Court overturned the appellate and trial court and ruled that the confession was admissible in the defendant's upcoming trial on gross sexual imposition:

> The record in this case is devoid of any suggestion that the deputy chief (the inter-viewer) resorted to physical or psychological pressure to elicit a statement from defendant. In the absence of any police coercion resulting in defendant's confession, the confession was voluntarily made. His age and low I.Q. standing alone do not negate the voluntariness of his statement." Id. at 92. (Emphasis added).

In Appellant's written statement of September 13, 1985, not only was he not under custodial interrogation, but in addition he was given Miranda warnings which only served to augment the indicia of voluntariness.  In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the characteristics of the defendant (age, mentality, prior criminal experience) and the nature of the interrogation (length, intensity frequency, physical deprivation, mistreatment, threat, inducement).  State v. Edwards (1976), 49 Ohio St. 2d 31, vacated in part 438 U.S. 911; State v. Barker (1978), 53 Ohio St. 2d 135, cert. denied 439 U.S. 913.

Appellant argues that he was subject to physical and psychological coercion and badgering by police officers. The Appellant testified he was alone with his uncle, Morris Hill, for one to one and one-half hours and was assaulted, in spite of the fact that Officers Stewart, Steinbeck and Hill testified that the Defendant was not alone with his uncle for more than a couple of minutes (TR. S. 17, 129, 193).  Further, the Appellant portrayed himself as a poor boy who couldn't understand the officers (i.e. he was retarded and therefore couldn't

knowingly waive his Miranda rights and give a free and voluntary statement).

The State submits the Appellant was feigning his lack of understanding of court proceedings and his Constitutional rights; that he was untruthful regarding the infliction of mental and physical abuse by any police officer, let alone his own uncle. It is incredible to believe that the Appellant's uncle (with the same name and blood-line) would coerce statements from his own nephew and attempt to falsely accuse him in a capital murder case. Vera Williams even testified that her brother, Det. Morris Hill, was truthful. The State therefore will no longer dignify the obvious self-serving and untrue factual scenario orchestrated by the defense by responding to the picture presented in their brief.

Some comments on the facts and law as the State views this matter. First, the Appellant has had numerous experiences with police and the criminal justice system. He has been arrested between fifteen and twenty times. Det. Morris Hill had given the Appellant the Miranda warnings some four or five times prior to the Fife case (TR. S. 185). Other officers on prior arrests have given the Appellant his Miranda warnings. Even the Appellant states that he likes Mark Massucci because he explained

his rights apparently in a better fashion than other police officers on other occasions.  In short, this Appellant has been in and out of jail for the past several years and is street wise to the criminal milieu he honors.  As Det. Morris Hill says, he is "slick" and seems to get out of many things he does wrong.  He dupes people.

Appellant also argues his 68 IQ buttresses the argument that the statements of September 16, 1985 should be deemed involuntary.  The evidence suggests that his I.Q. is higher than 68 and that he is not mentally retarded.  He is borderline.  A better view of the psychologist testimony in this case is that the Defendant has an anti-social personality and only partially cooperates in psychological testing, as he knows it has always been to his advantage to play dumb.  Moreover, Nancy Schmidtgoessling, the Appellant's own expert witness, admitted under oath that repeated contacts with the criminal justice system will breed familiarity with its procedures.  "There is no question at all that repeated exposure is definitely going to enhance comprehension even for a slow learner, I do feel with increased contact, certainly more is going to be obtained," she stated.  (TR. S. 507).

In any event, assuming the Appellant is a slow learner by nature rather than by choice, the level of intellectual functioning is clearly sufficient to hold that his statements were voluntary, since the law generally holds that low intelligence does not necessarily exclude an inculpatory statement. Commonwealth v. Abrams, (Pa.1971), 278 A.2d 902 (69 I.Q. waiver found); People v. Chaffee (App. Div. 1970) 346 N.Y.S.2d 30 (70 I.Q. waiver found); U.S. v. Glover (9th Cir. 1979), 596 F.2d 857, cert. denied 414 U.S. 857 (I.Q. in bottom one percentile, waiver valid in view of prior experience with police); Stanley v. State (Ga. 1977), 242 S.E.2d 173, cert. denied, 439 U.S. 882 (1978) (I.Q. of 62, valid waiver). Low mentality is not a defense for crime; nor is congenital or other inferiority a test of criminal responsibility. The fact that an accused is weak mentally, but not insane, should not affect the admissibility of a voluntary confession, or excuse one for his criminal acts. State v. Nichols (1965), 3 Ohio App. 2d 182. See also: Vance v. Bordenkircher (4th Cir. 1982), 692 F.2d 978 (where question of voluntariness of confession is made on totality of circumstances with I.Q. of 62 and mental age of nine confession was found voluntary).

A leading recent Ohio Supreme Court case on the "IQ Defense" is State v. Jenkins (1984), 15 Ohio St. 3d 164, where the defendant gave a statement to the effect that he shot a police officer to death because he did not want to get caught for the bank robbery.  He also asserted that his low level of intelligence (IQ of 63) should have resulted in his confession being thrown out by the court and his death sentence rescinded.  This court said no to the IQ defense.  The trial court found no "...direct or possible correlation between the defendant's IQ...and his ability to successfully rob a bank and his responsibility for killing a police officer while effectuating his escape."  Jenkins at 204-205.

Regarding the issue of mitigation of sentence, this court went on to say:

> ...Despite a low I.Q., appellant demonstrated that he could disarm a bank guard and immobilize all the tellers and patrons in the bank by threat of force.  He clearly intended to fire his weapon and was fully aware that the person at whom he directed his shots was a police officer.  There was no evidence to suggest that appellant's low intelligence distorted the decision-making processes he employed in perpetrating this robbery and murder, which would mitigate against the punishment imposed.  Id. at 206.

Further, Jenkins contended that he lacked sufficient intelligence to understand his rights or the effect of a waiver, and that, therefore, his low intelligence

64

precluded a knowing waiver. The court went on to hold that while intelligence is undoubtedly one factor for a court to weigh when considering the voluntariness of an inculpatory statement:

> In the instant case, the police officers testified that they had indeed informed Appellant of his rights and that he affirmatively responded he understood and waived those rights...While the explanation of rights and their waiver must be weighed with the individual's medical condition and mental capacity, the totality of the evidence supports the trial court's judgment to admit the state-ment in this case." Id. at 233. See also: State v. Royster (1976), 48 Ohio St. 2d 381, 387-389, vacated in part on other grounds.

The State argues in the present matter that if the Appellant had the intelligence to kidnap, repeatedly rape, mutilate, defile and murder a 12-year-old boy and, further the keenness of mind to attempt to cover up his crimes and his involvement by blaming others, it is surely reasonable that a trial court could find that the Appellant had the intelligence to give a voluntary statement and the mental condition to understand his Miranda rights and knowingly waive the same.

The trial court, in its Findings of Fact and Conclusions of Law, stated:

> Defendant's Fifth Amendment Rights were clearly protected by the numerous Miranda Warnings and waivers. Though this Court believes that the defendant could not have effectively read the rights or waiver forms,

the Court relies on the fact that at any time he was given a piece of paper to sign acknowledging receipt of the Miranda Warnings and waiving his rights, the paper was always read to him before he affixed any of his signatures.

Though the defendant is retarded, he is not so seriously impaired as to have been incapable of voluntarily and knowingly giving the statements which the defendant now seeks to suppress.  The Court reaches this conclusion after seeing and listening to the defendant at the Suppression Hearing and listening to and watching the tape recording and videotaped statements of the defendant.  The Court concludes that the statements were made voluntarily, willingly, and knowingly.  (Emphasis added)

The State additionally would emphasize the importance of the audio and video taped statements of September 16, 1985 admitted into evidence.  They totally and accurately depict the mental and physical condition of the Appellant and the content and context of the long statements given that day.  In short, the real Danny Hill is seen and heard.  His demeanor, cockiness, sarcastic smiles, and the logical deviousness of his thought processes is readily apparent.  As the court in sentencing this Appellant to death said, "The totality of circumstances ...indicated...that the victim was tortured over a long period of time evidencing a vicious, perverted, animalistic state of mind."

Lastly, even mental illness does not in itself preclude a statement from being voluntary and admissible. People v. Coffey (Mich. App. 1972), 202 N.W.2d 456 (defendant a paranoid schizophrenic, but was lucid and calm when making statement; confession voluntary); U.S. v. Ritter (10th Cir. 1972), 456 F.2d 178 (history of emotional instability; fear of police did not militate against finding of waiver despite allegations that suspect was tired and hungry and had specifically refused to sign waiver form); State v. Russell (Iowa 1978), 261 N.W.2d 490) (waiver valid despite suspect being in "state of shock"); State v. Gordon (Me. 1978), 387 A.2d 611 (suspect testified he could not remember interrogation because he was high on L.S.D., waiver effective). Further, the fact that defendant had been under psychiatric observation since childhood, had IQ of 67, and had been described as mentally retarded and schizophrenic did not preclude a finding of a knowing waiver of constitutional rights. People v. Morales (1978), 404 N.Y.S.2d 344. See also: State v. Green (1978), 244 S.E.2d 369; State v. Royster, supra; U.S. ex. rel. Rush v. Ziegele (3rd Cir. 1973) 474 F.2d 1356; State v. Collins (1972), 297 A.2d 620; Criswell v. State (1970), 422 P.2d 355; State v. Ortiz (N.M. 1967), 422

P.2d 355; <u>State v. Lujan</u> (1975), 534 P.2d 1112, <u>cert.</u> <u>denied</u>, 423 U.S. 1025 (1976) (may be legally insane but still legally competent to admit confession); <u>State v.</u> <u>Thompson</u> (N.C. 1975), 214 S.E.2d 742 (I.Q. 55, admissible).

The test to determine mental competence to make a voluntary confession was aptly stated in <u>State v.</u> <u>Sisneros</u> (1968), 446 P.2d 875, 880:

> A reading of the confessions and of the testimony concerning the defendant's mental capacities and his actions after the crime clearly demonstrates that he had sufficient mental capacity at that time to be conscious of what he was doing, to retain memory of his actions, and to relate with reasonable accuracy the details of his actions. This is all that was required, insofar as his mental state or condition is concerned to support the voluntariness of the confession.

Professor Henry Weihofen stated:

> 'Incompetency at Time of Confession.' <u>For a defendant to make a valid confession, he must have had sufficient mental capacity at the time to be conscious of the physical acts performed by him, to retain them in his memory, and to state them with reasonable accuracy.</u> It has been held that when a confession is offered, if the defendant offers to prove he was not mentally competent to make such confession, this issue should be tried before the confession is admitted. But mere mental instability or temporary lack of faculties only goes to the weight to be given the confession. Weihofen, <u>Mental Disorder as a Criminal Defense</u>, 455 (Dennis & Co., New York, 1954).

The Appellant's Second Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 3

AN ACCUSED'S STATEMENTS ARE ADMISSIBLE WHERE THE STATE ESTABLISHES THAT THE PROCEDURAL SAFEGUARDS CONTAINED IN MIRANDA WERE PROPERLY GIVEN AND KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVED.

Appellant claims that the State failed to establish by sufficient legal proof that he was properly given his Miranda warnings and that he knowingly and intelligently waived his rights under the law.

As previously stated the prosecution believes the credible evidence shows that the Appellant was given his Miranda rights when none were needed, that he was given his rights on at least four (4) different occasions over a period of four (4) days, that he signed three (3) different waiver forms, and that at all times, he fully understood what he was doing. Further, seldom does a court get the quantity and quality of evidence to prove these points as it has in the present case. That is, through his taped statement and the video, the Court has the opportunity to see and hear the Appellant at the time he made the statements, and determine whether they were voluntarily made. Furthermore, the Court can see that the Appellant was able to understand what was said to him and gave articulate and coherent responses. Police who have just beaten a confession from a defendant, don't

have his mother there and then make a video production of his mental and physical condition.  See State v. Bates (1976), 48 Ohio St. 2d 315.

The U.S. Supreme Court has held "(o)nly if the 'totality of the circumstances' surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran v. Burbine (1986), 106 S. Ct. 1135, 1141.  Again, review of audio tape and the video would demonstrate that both prongs of Burbine are met.  There was no coercion to force the Appellant to waive his rights and his demeanor would indicate that the he had the requisite level of understanding.

Further, in the case of Colorado v. Connelly (1986), 107 S. Ct. 515, the Court ruled, "(a)bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."  Id. at 520.

Lastly, the law generally provides that only one Miranda warning need be given.  Most courts have permitted the use of statements taken many hours or in some cases, days after the single giving of Miranda warnings.  U.S. ex. rel. Henne v. Fike (7th Cir. 1977),

563 F.2d 809 (nine hours); State v. Gilreath (Ariz. 1971), 487 P.2d 385, cert. denied, 406 U.S. 921 (1972) (thirty-six hours); Gregg v. State (Ga. 1974), 210 S.E.2d 659 (warnings given fourteen hours before statement); State v. Myers (Me. 1975), 345 A.2d 500 (seventeen hours before statement); Joyce v. State (Mo. App. 1982), 637 S.W.2d 386 (warnings given day before incriminating statements were made); Maguire v. U.S. (9th Cir. 1986), 396 F.2d 327, cert. denied, 393 U.S. 1099 (1969) (three days before statement); Biddy v. Diamond (5th Cir. 1975), 516 F.2d 118 (twelve days; suspect asked if she remembered her rights); Johnson v. State (Ala. App. 1975), 324 So. 2d 298 (three days before statement); Babcock v. State (Tex. 1971), 473 S.W.2d 941 (two days). As the trial court found in its conclusions of the Suppression Hearing held in this cause: "At the time of making these statements admitting knowledge but denying personal culpability Danny Hill had been advised of his Miranda Rights and understood them. He further had knowingly waived those rights." (Findings Supp. Hrg. p. 3 #13).

The Eleventh District Court of Appeals came to the same conclusion:

Appellant was able to 'knowingly, intelligently and voluntarily' waive his

71

<u>Miranda</u> rights and, in fact, did so...(T)he officers present at the investigation appeared to ascertain the adequate quality of Appellant's understanding of his rights.  (This is particularly true where, as in this case, the officers had <u>Mirandized</u> the Appellant on several previous occasions; and where Appellant was apparently able to knowingly, voluntarily, and intelligently waive his Miranda rights on each prior occasion).  (Appellate Court Opinion at p. 21).

Thus, the Appellant's Third Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 4

AN ACCUSED'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS ARE
NOT VIOLATED WHEN THE ACCUSED INITIATES POLICE CONTACT
AND THEN VOLUNTARILY AND FREELY CHOOSES TO ACCOMPANY A
POLICE OFFICER TO A POLICE STATION.

In his Fourth Proposition of Law, Appellant claims he
was subjected to detention and seizure on Friday,
September 13, 1985 and again on Monday, September 16,
1985 at the hands of Warren Police Officers.  It
isinteresting to note that no mention was made of the
Appellant's visit to the  Warren Police Department on
Thursday night, September 12, 1985.  This antecedent
event is important since it explains the Appellant's
desire to confront the Warren Police Department regarding
the Fife homicide.  He initiated the contact with the
police.  He offered information.  He went to the police
station.  He showed Sgt. Stewart where Tim Combs lives.
He put the police on the trails of Andre McCain and
Maurice Lowery.  Is this a man who is afraid of the
police and not wanting to talk to police about the Fife
homicide?  Further, the Appellant testified that he went
to the police station to see his Uncle Morris Hill
(although he later denied going to the police department
to see his uncle, one of many contradictions in his
testimony) and was there to give information on the Fife

case since he heard "on the streets" that there was a reward being offered.  (TR. S. 382).

Surely if the Appellant went to the Warren Police Department to give information to collect a reward in the Fife homicide, he should be very happy to see Dennis Steinbeck the next morning in a follow-up on his information.  After all, the police must be buying his story that others were involved in tying "underwear around the neck" of Raymond Fife.

Therefore it was only reasonable and logical for the Appellant to agree to go to the police station on Friday morning, September 13, 1985.  He was only requested to talk over his story again with another police officer. Officer Steinbeck went by himself to get the Appellant that Friday morning and did absolutely nothing that would suggest to Danny Hill that he was being detained.  The record shows that Sgt. Steinbeck said the following to the Defendant:  "I told him that I read Sergeant Stewart's note that noticed that (sic) that he knew something about the homicide.  Would he come down with me and talk it over again with me."  Then, "He told me he'd get dressed and come with me."  (TR. S. 118).  Sgt. Steinbeck didn't even go in the Appellant's house. Again, if Sgt. Steinbeck is believed, it is clear that

there was no seizure of the Appellant that Friday in violation of Dunaway v. New York (1979), 442 U.S. 200. Sgt. Steinbeck testified that the Appellant was not under arrest, not handcuffed, not booked, not fingerprinted, rode in the front seat with him, and left with his mother after giving a statement.

Additionally, Sgt. Steinbeck gave the Appellant his Miranda rights on two (2) occasions that Friday; once on the Waiver of Rights Form where Sgt. Steinbeck read him his Constitutional Rights, and a second time when preparing his typewritten statement. See State's Exhibits 8 and 9. Shortly after the typed statement was completed, the Appellant left the police station with his mother. He was at the police station for approximately four (4) hours. Although it was unnecessary, the reading of the Appellant's Miranda rights and signing of the Waiver showed that the police were being cautious and that the Appellant understood his rights. Further, under Ohio law, the signature on a form waiving rights after receiving Miranda warning, ordinarily establishes that the defendant intelligently and voluntarily waived his rights. State v. Bates (1976), 48 Ohio St. 2d 315, vacated on other grounds; State v. Hall (1976), 48 Ohio St. 2d 325, vacated on other grounds. See also: People

v. Giles (App. Div. 1977), 400 N.Y.S.2d 181; Moseley v. Stanton (1972), 348 F. Supp. 1.

On Monday, September 16, 1985, the Appellant and his mother was given a ride to the police station by Sgt. Steinbeck and his uncle, Morris Hill, so that Appellant could sign his statement of Friday, September 13, 1985, which had not been signed, and to discuss the truthfulness of that statement. According to Morris Hill, Sgt. Steinbeck and even the Appellant's mother, Vera Williams, the Appellant went with the police because his mother told him to go.

Further, on Monday, September 16, 1985, the police never directly told the Appellant to come to the station while at his mother's house. The communication and instructions to "get his ass downstairs," and "you got nothing to hide," came from his mother. In addition, the mother in making that request of Appellant, was never told that he was under arrest, would be placed under arrest if he did not come down to the station, or even that he had to come downtown with them. Lastly, there was no request by Appellant or his mother to use alternative transporation.

The record is clear that nothing was done by the police which would lead Danny Hill to believe he had no

freedom of choice. "(T)here was sufficient evidence before the trial court...from which it could conclude that the Appellant was not inappropriately coerced in accompanying the officer to the station." (Appellate Court Opinion at p. 24). He was given his rights by Morris Hill upon arrival at the police station at 10:00 a.m. He was told at that time by Det. Hill that he was not under arrest. Furthermore, Sgt. Thomas Stewart told Appellant he was free to go a short while later. In spite of the warnings, the Appellant agreed to talk to police officers. In fact, on that Monday, the Appellant was read his Miranda Rights twice, he was told three (3) times that he was not under arrest, and he was told twice that he was free to leave at anytime.

Furthermore, it was the opinion of the Appellate Court that probable cause for the arrest of Appellant existed when Dets. Steinbeck and Hill engaged him in the final custodial interrogation. "Probable cause is found, in the context of custodial interrogations, when the focus of the inquiry narrows itself sufficiently to the suspect being questioned." (Appellate Court Opinion at p. 24). The Court went on to say that the Appellant provided the basis for the probable cause through his initial conversation with Sgt. Stewart, additional

statements and actions by the Appellant, and independent witnesses placing the Appellant at the scene of the crime the night of the attack.

Although the law only requires the State to show the Appellant's waiver by way of a signed form, State v. Bates, supra, or by way of testimony, the State in this case has entered into evidence two (2) lengthy recordings of what actually transpired that Monday; one a cassette-tape recording (approximately 40 minutes long) and the other a video-tape recording (approximately 1 hour and 8 minutes in length).  It is the people's contention that these tapes provide the best evidence to show that the Appellant was not subject to a detention or seizure that day.  His demeanor, his acknowledgement of understanding his constitutional rights and the fact he was not under arrest, all plainly point out that Danny Lee Hill was never subject to an unreasonable seizure by police on September 16, 1985.  Dunaway v. New York (1979), 442 U.S. 200; Hayes v. Florida (1985), 84 L. Ed. 2d 705, cert. denied, 93 L. Ed. 2d 65.

Therefore, Appellant's Fourth Proposition of Law is without merit.

PROPOSITION OF LAW NO. 5

THE APPELLANT WAS NEVER DENIED HIS RIGHT TO COUNSEL;
FURTHER APPELLANT HAD NO RIGHT TO BE ADVISED THAT HE HAD
A RIGHT TO BE REPRESENTED BY A PUBLIC DEFENDER UNDER OHIO
STATUTORY LAW OR UNDER THE U.S. OR OHIO CONSTITUTIONS.

Appellant claims that his right to counsel under the
Sixth Amendment was violated, arguing that he should have
had been advised that a public defender was available to
represent him and that he should have been brought before
a court without necessary delay.

Ohio Revised Code § 120.16(f) does not require the
police to tell the Appellant that he had the right to the
legal representation by the public defender.  Hill
was told he had the right to counsel and that if he could
not afford an attorney, one would be appointed for him;
he was so advised four times.  The Defendant did not ask
for an attorney and at all times, waived his right to
counsel on September 16, 1985.  See State v. Steward
(1981), 80 AP-443, 81 Decisions 2045 (Franklin County
Appeals) where it was held that the failure to advise of
the right to public defender under Ohio Revised Code §
120.16 was not error.

The Appellant's mother's inquiry concerning counsel
in no way suggests that the Appellant was denied his
right to counsel.  A similar scenario arose in Moran v.
Burbine (1986) 106 S. Ct. 1135.  In Moran, the defendant

was in custody for interrogation regarding a murder. Although he waived his right to counsel, his sister contacted the public defender's office and attempted to secure legal services for her brother. When the public defender called the police station, at the request of Burbine's sister, she was told they were through with him for the night. Burbine confessed to the killing in an interview session which followed the phone call.

The Supreme Court decided Burbine's confession was admissible. "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." Id. at p. 1141. The Court continued, "(o)nce it is determined that a suspect's decision not to rely on his rights is uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." Id. Following the Moran analysis, it is clear that the Appellant was apprised of his right to counsel several times, and validly waived that right.

The Appellant's Fifth Proposition of Law is without merit.

<u>PROPOSITION OF LAW NO. 6</u>

<u>OHIO REVISED CODE §§ 2935.05 AND 2935.07 WERE COMPLIED
WITH AND ALL STATEMENTS OBTAINED AT THE TIME OF ARREST
ARE ADMISIBLE.</u>

<u>Ohio Revised Code</u> § 2935.05 states:

When a person named in section 2935.03 of
the Revised Code has arrested a person without
a warrant, he shall, without unnecessary delay,
take the person arrested before a court or
magistrate having jurisdiction of the offense,
and shall file or cause to be filed an affidavit
describing the offense for which the person was
arrested.  Such affidavit shall be filed either
with the court or magistrate, or with the pros-
ecuting attorney or other attorney charged by
law with prosecution of crimes before such court
or magistrate and if filed with such attorney he
shall forthwith file with such court or magistrate
a complaint, based on such affidavit.

The Appellant claims that he should have been
brought before a judge having jurisdiction over his case
sometime after 12:30 p.m. on September 16, 1985, instead
of the next day as was done in this case.  The law is
clear that since the Appellant was continuing an ongoing
statement with the police, it was totally unnecessary to
arraign the Appellant.  Otherwise, any defendant
confessing to a crime would not be able to give details
of the crime and other valuable evidence, such as a
video-taped statement, going to the crime scene, and
physical evidence.  What matters is the Appellant having
been given his <u>Miranda</u> Rights several times and waiving
those rights on the September 16, 1985.  In short, the

defense would handcuff the police and possibly forever deprive officers of the truth.

The law does not require that a police officer run to the courthouse once a defendant confesses and is placed under arrest or otherwise detained. The Appellant was arraigned the day after his arrest and the facts clearly show the time period between arrest and his initial appearance was reasonable. Johnson v. Reddy (1955), 163 Ohio St. 347.

The Eleventh District Court of Appeals found that there was no unnecessary delay in charging the Appellant. "This court does not conclude that the State wanted an unreasonable amount of time before filing its complaint with the trial court. Nor, even were there a violation to be found, would this court be empowered to grant the remedy requested by the appellant." (Appellate Court Opinion at p. 30).

More importantly, Ohio law provides that the exclusionary rule of McNabb v. U.S. (1943), 318 U.S. 322 and Mallory v. U.S. (1957), 354 U.S. 449, that a confession obtained after an "unnecessary delay" by the police in the arraignment of the accused is inadmissible at trial has no application at trials in Ohio courts. State v. Cowans (1967), 10 Ohio St. 2d 96.

Furthermore, validity of arrest is judged on whether probable cause actually exists, not on whether arresting officer stated the correct reason for the arrest. U.S. v. Lester (8th Cir. 1981), 647 F.2d 869; State v. Sampson (1982), 4 Ohio App. 3d 287.

Therefore, Appellant's Sixth Proposition of Law is without merit.

PROPOSITION OF LAW NO. 7

LAW ENFORCEMENT OFFICIALS PROPERLY OBTAINED STATEMENTS
FROM THE APPELLANT.  FURTHERMORE, AT NO TIME DID OFFICERS
ENGAGE IN PLEA BARGAINING NEGOTIATIONS.

This particular argument of error is utterly without
merit and not substantiated by the record.  The verbal
exchange between officers and the Appellant on September
16, 1985 was appropriate and did not mislead him into
believing that the police, prosecutor or court were going
to be lenient with him regarding sentence.  U.S. v.
Posey (5th Cir. 1980), 611 F. 2d 1389; U.S. v. Fera (1st
Cir. 1980), 616 F.2d 590, cert. denied, 446 U.S. 969.

The Appellate Court notes, "the factual scenario
described (and witnessed on the tape) does not portray a
plea bargain negotiation," (Appellate Court Opinion at p.
31), thus the Appellant's reliance on State v. Davis
(1980), 70 Ohio App. 2d 48, is misplaced.

A similar question was decided by this Court in
State v. Maurer (1984), 15 Ohio St. 3d 239, when an
investigating officer told an aggravated murder suspect
that punishment other than death could be imposed, such
as life in prison or confinement in a mental institution.
This Court concluded that in examining the totality of
the circumstances, the officer's statements did not
coerce the defendant into confession, and therefore, the

suspect's statements were voluntary and admissible.  <u>Id</u>.
at 257, 258.

Therefore, the Appellant's Seventh Proposition of
Law is without merit.

## PROPOSITION OF LAW NO. 8

THE TRIAL COURT PROPERLY ADMITTED PRIOR SEXUAL OFFENSES COMMITTED BY THE APPELLANT UNDER R.C. § 2945.59, EVIDENCE RULE 404(B), AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION; MOREOVER, THIS EVIDENCE WAS NOT CONSIDERED IN ANY WAY BY THE COURT IN REACHING ITS VERDICT.

The Appellant makes two assertions of error. First, that the admission of other crimes, wrongs or acts prejudiced Appellant's due process rights in the guilt phase. Second, the admission of other crimes, wrongs or acts prejudiced Appellant's due process rights in the sentencing phase. The other acts evidence in question concerns the testimony of three witnesses at the guilt phase of trial.

Candyce Jenkins' testified for the State during the guilt phase of Appellant's trial. Ms. Jenkins testified that the Appellant broke into her home and raped her anally and vaginally at knife point on March 2, 1984, and that during the rape Appellant bit her on the back of her shoulder and on her breast.

Mary Ann Brison testified for the State that the Appellant punched her, threatened her and vaginally raped her in the woods on February 9, 1984.

Finally, Stephen Melius, a 17-year-old boy testified for the State that the Appellant made overtures toward him requesting both oral and anal sex during January and

February of 1984 while both were incarcerated in the same cell.

The Eleventh District Court of Appeals on p. 38 of their opinion upheld the admission of the other acts evidence under the reasoning of State v. Gardner (1979), 59 Ohio St. 2d 14, finding the other acts were properly admitted because "they tended to show the trial court that the Appellant intended to rape the victim." Further, the Court found that a temporal, modal and situational relationship existed between the other acts and the crime alleged. The Appellant argues that no such relationship was present. Appellant obviously overlooks the fact that the prior rape on Ms. Jenkins involved anal sex, as well as the fact that the Appellant allegedly bit her on the back and breast. Raymond Fife was the victim of anal sex and was bitten on his penis. Also, the prior rape by the Appellant of Ms. Brison occurred in the same woods behind the same Valu King Store where the Appellant and Timothy Combs raped and murdered twelve-year-old Raymond Fife. Further, Appellant asserts that the other acts evidence involved women and knives and not young boys and burning. The State, however, put on evidence of another attempted act by the Appellant on Stephen Melius, a 17-year-old boy.

Finally on this point, Appellant argues that no temporal relationship could exist between the other acts and the alleged crime because one and one-half years of passed. Several courts have found a sufficient temporal relationship to exist between other acts and the crime alleged where greater lapses in time have occurred between the two. A six-year time lapse was approved in State v. Maestas (Iowa 1974), 224 N.W.2d 248.

Appellant next contends that the Appellate Court's reliance on State v. Flonnery (1972), 31 Ohio St. 2d 125 is misplaced because that case is distinguishable from the case at bar. The Appellant argues that the "other acts" in Flonnery closely paralleled the crime charged, whereas in the instant case, they do not. Again, Appellant overlooks the obvious factual similarities between the other acts and the crime perpetrated against Raymond Fife, as have been previously illustrated.

Appellant then attempts to distinguish State v. Benner (1988), 40 Ohio St. 3d 301. In that case, this court decided no prejudice existed in the admission of similar acts evidence in a capital case. The Appellant contends that, unlike the present case, Benner involved prior acts of very similar rapes and murders. In the case at bar, the other acts perpetrated against Ms.

Jenkins and Ms. Brison have been shown to bear close factual similarities with the crime alleged. Both were raped by Appellant. One was raped anally while another was bitten as was Raymond Fife. Finally, Ms. Brison was raped in the same location as Raymond Fife. Another contention of the Appellant is that no showing was made that the "other acts" tended to show motive, intent or common scheme or plan. As to the issue of intent or motive, Ohio law provides in § 2945.59 of the <u>Revised Code</u> as follows:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

Further, <u>Ohio Rule of Evidence Rule</u> 404(B), states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. <u>It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.</u>

Ohio Courts have generally been receptive to admit prior similar sexual conduct of a defendant with children

when intent or motive is relevant and material to an issue present in a pending criminal case involving a sex offense.  State v. Shively (1961), 172 Ohio St. 128; State v. White (1962), 116 Ohio App. 522.  Moreover, prior sexual acts with third parties may be admitted. See:  State v. Gardner (1979), 59 Ohio St. 2d 14.

In Shively, this Court sustained a sodomy conviction involving children, and addressed the admissibility of similar or prior sexual acts by the defendant, referring to the trial court's charge concerning the "alleged moral disposition and perversity of the defendant."  Shively plainly demonstrates that child sexual abuse cases deserve careful consideration when it comes to prior sordid acts with children.

Other jurisdictions also recognize the importance of allowing evidence regarding prior similar acts when children are the victims.  The Nebraska Supreme Court in State v. Craig (S. Ct. Neb. 1985), 361 N.W.2d 206, recently stated succinctly the policy reasons for admissibility:

> Evidence of repeated incidents may be especially relevant in proving sexual crimes committed against persons otherwise defense-less due to age, either the very young or the elderly, since without proof by other acts of defendant, sexual offenses against the defense-less, except in cases of fortuitous presence of eyewitnesses, would likely go unpunished.

Further, the Court wrote:

> Sexual crimes have consistently been classified with those in which evidence of other, similar sexual conduct has been recognized as having independent relevance; generally, evidence of other sex offenses by a defendant may be admissible.

In Indiana, courts have long recognized "while ordinarily evidence of other crimes is inadmissible except to show intent, motive, purpose, identity, or common scheme or plan, Indiana law recognizes an exception for those acts showing a depraved sexual instinct. Neaveill v. State (1985), 474 N.E.2d 1045. See also: Grey v. State (Ind. 1980), 404 N.E.2d 1348; Hoehn v. State (Ind. 1985), 472 N.E.2d 926; Daniel's v. State (Ind. 1980), 408 N.E.2d 1244; State v. McFarlen (Ariz. 1973), 517 P.2d 87; State v. Superior Court of the State of Arizona (Ariz. 1981), 631 P.2d 142.

Although Ohio has not explicitly held there is an exception for acts showing a depraved sexual instinct, it has, as discussed heretofore, readily admitted acts qualifying under Ohio Revised Code § 2945.59.

The question at hand presently is whether the State had evidence of a depraved sexual act committed by the Appellant and whether such an act qualifies as admissible evidence under the law set out in § 2945.59. The State

proved at a hearing that the Appellant, Danny Lee Hill, committed two prior intentional, violent, and malicious rapes which were relevant to proving the issue of intent, motive and scheme in the rape/aggravated murder of Raymond Fife on September 10, 1985. The prosecution demonstrated at the hearing the factual and legal similarities of the crimes which supported admissibility. Furthermore, the State proved by substantial evidence the Appellant's prior similar acts. This Court held in State v. Bayless (1976), 48 Ohio St. 2d 73, for the proposition that prior crimes committed by a defendant as a juvenile are admissible under Ohio Revised Code § 2945.59. Again, State's evidence showed that the Appellant committed the crimes of rape at the age of 17. One of these rapes was committed in Warren, Ohio in the same woods behind the same Valu King Store where the Appellant and Timothy Anthony Combs raped and murdered 12-year-old Raymond Fife.

Appellant's own statements in this case provided the legal foundation for admissibility. He denied an intent to rape Raymond Fife. Three Ohio cases set forth the proper analysis involved in determining admissibility under § 2945.59 and Evidence R. 404(B): State v. Flonnory (1972), 31 Ohio St. 2d 124; State v. Gardner

(1979), 59 Ohio St. 2d 14 and State v. Snowden (1976), 49 Ohio App. 2d 7.

In Flonnory, the defendant was convicted of felony-murder (robbery) in 1967 and was sentenced to death.  He appealed and claimed the trial judge committed error in admitting evidence of his participation in two other armed robberies.  This Court in discussing Ohio Revised Code § 2945.59 said:

> Much confusion about R.C. § 2945.59 might be avoided if it were observed that nowhere therein do the words "like" or "similar" appear. The statute permits the showing of "other acts" when such other acts "tend to show" certain things.  If such other acts do in fact "tend to show" any of those things they are admissible notwithstanding they may not be "like" or "similar" to the crime charged.  (Emphasis added).  Flonnory at 126.

The Court went on to note that the other armed robberies were admissible to prove intent since a limiting instruction was given by the trial court.

In Gardner, the admission of evidence regarding prior sexual acts of the defendants with third parties was alleged to be erroneous.  This Court stated that:

> It is well-settled that such evidence is admissible only when "the prior offense is part of a common plan or scheme or where it tends to prove motive, intent, knowledge or identity, not because the prior acts prove that defendant is crime prone, but in spite of such fact, on the theory that the circumstances involved in the prior offense or offenses comprise substantial probative

> evidence of guilt of the particular offense
> in question." (Emphasis added)  State v.
> Hector (1969), 19 Ohio St. 2d 6 paragraph
> two of the syllabus.  Gardner at 20.

The defendant in Gardner denied using force in the rape

and said the victim consented to having sex.  Therefore,

the defendant contended that he did not intend to commit

forcible rape but instead intended to participate in

consensual sexual intercourse.  The element of intent was

therefore a material fact in issue.  The Gardner Court

then went on to consider the question of relevance,

stating:

> In order for evidence concerning the acts
> (prior rapes) to be relevant to the issue of
> intent, they "must have such a temporal, modal
> and situational relationship with the acts
> constituting the crime charged that evidence
> of the other acts discloses purposeful action
> in the commission of the offense in question."
> State v. Burson (1974), 38 Ohio St. 2d 157, 159.
> (Emphasis added)  Gardner at 20.

See also:  State v. Snowden (1976), 49 Ohio App. 2d 7,

for general discussion of law prior to Gardner.

In summary, Ohio law requires two tests to be met

before prior acts are deemed admissible.  The first test

is one of materiality while the second test is one of

relevancy.

In the case at hand, evidence showed that the

Appellant denied intent to rape.  Therefore, the

Appellant's intent was a disputed material issue.

Secondly, evidence showed that two prior rapes perpetrated by Appellant, Danny Lee Hill, were acts that had such a "temporal, modal and situational relationship" with the acts constituting the crime charged to be deemed relevant and probative.  Based on this reasoning, the Appellate Court found that the "other acts" evidence admitted at the Appellant's trial tended to show the Appellant's intent.

On the issue of whether the other acts are admissible to show the Appellant's common scheme or plan in doing the act charged, the Appellant cites State v. Curry (1975), 43 Ohio St. 2d 66.  Curry established that in order for other acts to be admissible, they must form part of the immediate background of the alleged act and must concern events which are inextricably related to the alleged criminal act.  Appellant asserts this criteria has not been met because the prior acts and the crimes alleged are chronologically and factually separate occurrences.  The State has demonstrated previously, that these crimes are chronologically and factually similar.

The prior rapes of the Appellant involve rapes which occurred in February of 1984, approximatley 19 months prior to the crimes charged.  In State v. Depina, No. 1283, Court of Appeals 9th Ind. Dis. (1984) the Court of

Appeals of Medina County held that a prior rape victim of the defendant some five years before could testify at trial concerning identity under Ohio Revised Code § 2945.59 for a rape committed on another victim. See also: State v. White (1962), 116 Ohio App. 522, (one year prior, approved).

Other jurisdictions have considred the question of relevancy and time lapses between wrongful acts. See: People v. Jackson (1980), 110 Cal. App. 3d 560, 167 Cal. Rptr. 915 (One year and nine months between acts, approved); State v. Howard (1982), 447 A.2d 1167; People v. Burgin (1979), 392 N.E.2d 251; State v. Gatlin (1980), 295 N.W.2d 538; State v. Saltarelli (Wash. 1981), 629 P.2d 1344; and State v. Valdez (1979), 534 P.2d 449; (Two-year time lapses between acts sufficiently temporal); Austin v. State (1974), 319 N.E.2d 130 cert. denied, 421 U.S. 1012, (Five-year time lapse upheld); State v. Masqua (1972), 502 P.2d 728, cert. denied 411 U.S. 951, (Three-year time lapse between acts deemed sufficiently temporal).

Further, the State established similar factors present in the case at bar and the prior rapes which permit admissibility. They include: (1) geographical proximity, (2) age of victims, (3) type of area, (4)

method of exit, (5) bodily harm or threat, (6) manner in which victim was initially accosted, and (7) time of day.

Appellant's next assertion is that the "other acts" evidence should have been mandatorily excluded under Ohio Rule of Evidence 403, and thus, its admission was erroneous.  Evid. R. 403 is concerned with undue prejudice resulting from the admission of other acts evidence, as well as the possibility of confusion of the issues and misleading the jury.  The Appellant's case was heard before a three-judge panel, thus confusion of the issues and the possibility of misleading the jury were not relevant concerns.  The only issue of concern is whether the "other acts" evidence resulted in undue prejudice to the Appellant.

In State v. Wiles (1991), 59 Ohio St. 3d 71, this Court held that "in reviewing a bench trial an appellate court presumes the trial court considered nothing but relevant and competent evidence in reaching its verdict." Thus, any assertion by the Appellant of undue prejudice is without merit given the presumption set forth in Wiles.

On appeal, the State argued that if the admission of the "other acts" evidence was error, it was harmless

under the holding of State v. Post (1987), 32 Ohio St. 2d

380.  The Appellate Court agreed, stating:

> In State v. White (1968), 15 Ohio St. 2d
> 146, the court stated that improperly used
> testimony which could be cause for reversal
> at a jury trial would not necessarily be so
> at a bench trial.  It must affirmatively
> appear on the record in a bench trial that
> court relied on this improper testimony in
> arriving at its verdict in order for the
> error to be a ground for reversal...The
> trial court stated in its opinion that "no
> prior crimes were considered by the court
> in any way in reaching its verdict."
> (Appellate Ct. Op. at 39).

Finally, Appellant contends that the "other acts"

evidence was intended solely to inflame the three-judge

panel because the State continuously referred to the

Appellant as "an animal."  Again, this argument is

without merit given this Court's reasoning in Wiles,

supra.  Therein, the Prosecutor referred to the Appellant

as "an ogre...a man eating monster, a hideous, brutish

person and 'an animal'."  The Appellant therein argued

this was too inflammatory.  This Court held that "strong

characterizations such as 'beast', 'cruel human vulture',

and 'vile creature' have been allowed where there is

support for them in the record."  Wiles, supra.  This

Court found the record in Wiles to support such

characterization because there was evidence that the

Appellant stabbed the victim "at least 10 times, mostly

in the back, and [the victim] sustained a total of twenty-four wounds."

In the present case, the record strongly supports such a characterization of the Appellant. Raymond Fife suffered burn marks, multiple contusions, abrasions and lacerations, as well as a ligature mark around his neck (TR. 349). The victim had bite marks on his penis as well as black and blue marks on his scrotum (TR. 363), possibly caused by a blunt force (TR. 364). Raymond Fife also suffered a subdural hemorrhage of the left side of his head (TR. 352) and retroperitoneal and abdominal contusions. Further, the record shows he was impaled with an object inserted into his anus penetrating the rectum into the urinary bladder (TR. 355). If this record does not support the characterization of the Appellant as "an animal," the State believes none ever would.

In conclusion, the State believes that the trial court's admission of these "other acts" did not constitute reversible error given the reasoning set forth above.

Appellant's Eighth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 9

WHEN THE TRIAL COURT ADMITTED CERTAIN PROBATIVE EVIDENCE, ANY ALLEGED PREJUDICIAL EFFECT IT MIGHT HAVE ON A JURY WAS CURED SINCE THE CASE WAS TRIED TO A THREE-JUDGE PANEL.

The evidence the Appellant alleges was improperly admitted in his Ninth Proposition of Law was both relevant and non-prejudicial.

Evidence Rule 401 defines relevant evidence as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Evidence Rule 403 deals with exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.  These grounds pertaining to prejudice, confusion or misleading are couched in the context of the effect on a jury.  However, the case at bar was not tried to a jury. It was tried to a three-judge panel with many years of criminal trial experience.  Statements, comments, exhibits, and the like that may unduly influence a jury which either hears or considers it or is instructed to disregard it do not have the same impact when the court is the trier of fact.  The court is presumed to consider only the properly-admitted evidence in a case.

In State v. White (1968), 15 Ohio St. 2d 146, the prosecution used evidence of the deceased's good background and relied on that evidence in its argument for the death penalty. There was also evidence concerning the family the deceased left behind. This Court stated:

> Such evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused and the penalty to be imposed. The principal reason for the prejudicial effect is that it serves to inflame the passion of the jury with evidence collateral to the principal issue at bar. Although the admission and sub-sequent argument with the use of this testimony may very well have constituted prejudicial error before a jury, we do not believe that defendant was prejudiced before a three-judge court under the facts in the instant case.
>
> ...We indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary. People v. Smith, 55 Ill. App. 2d 480, 204 N.E.2d 577. White at 151.

See also State v. Walker (1969), 21 Ohio App. 2d 27; In Re Baker (1969), 18 Ohio App. 2d 276; State v. Austin, (1976), 52 Ohio App. 2d 59 State v. Post (1987), 32 Ohio St. 3d 80 cert. denied, 484 U.S. 1079, reh. denied, 485 U.S. 1061; State v. Astley (1987), 36 Ohio App. 3d 247.

This Court reaffirmed its holding in White in the recent capital case State v. Moreland (1990), 50 Ohio St.

3d 58. Regarding blood-type evidence which the three-judge panel considered, this Court ruled, "we assume that the panel considered only relevant material and competent evidence in arriving at its judgment." Moreland at 63.

In State v. Eubank (1979), 60 Ohio St. 2d 183, the trial court permitted, over the defendant's objection, two witnesses to testify about prior acts in a gross sexual imposition case. This Court stated that although the testimony was not properly admitted, it was harmless error since it was tried to the Court. In following White, supra, the Court stated: "In examining the record to determine this issue, we may give weight to the fact that the error occurred in a trial to the court, rather than a jury trial." Eubank at 187.

Raleigh Hughes, an ambulance attendant who arrived at the scene of the homicide, testified as to injuries suffered by Raymond Fife, including burns, ligature marks, bruises, and bleeding from the rectum. (TR. 87-95). All this testimony was relevant since Appellant was not only charged with aggravated murder, but with aggravated arson, rape and felonious sexual penetration as well.

His relevant testimony was not rendered prejudicial by synopsizing that it was, "one of the most gruesome

things I've ever seen." (TR. 96). The Appellate Court said of Mr. Hughes' statement, "(t)there is nothing in the record to show that this statement had any effect on the trial court's determination of the Appellant's guilt." (Appellate Court Opinion at p. 38). In addition, if one were to assume _arguendo_ that the statement was inflammatory, it would be rendered harmless, given the presumption that the three-judge panel considered only the competent, material and relevant evidence.

Appellant next alleges that Exhibit 47, a broken broom handle, had no probative value. In Appellant's confession, he describes that, "A stick, like a broom handle thing..." was forced into Raymond Fife's rectum. (TR. 338).

Donald Allgood testified that he saw Appellant coming off the path in the woods off Willow Drive. He further testified that he saw Appellant flick a stick into the woods off the path. (TR. 437).

Within six (6) feet of the path described by Allgood, the Warren Police Dept. found a broken broom handle documented as Exhibit 47. It is the State's contention that Exhibit 47 is the broom handle described by the Appellant.

Dr. Adelman testified that the injury caused to Raymond Fife's rectum and the fit of the jagged end of Exhibit 47 fit, "very similar to a key in a lock." (TR. 383). He also testified that the contusions in Raymond's rectum were the same size and consistent with the rounded end of the broom handle. (TR. 83).

Dr. Adelman also testified that he found fiber in Raymond's rectum that he characterized as wood, and that the cells of the fibers in Raymond's rectum and those from the broom handle were very similar. (TR. 387).

Dr. Adelman testified that the blood could easily be removed from the stick so that it could not be detected. (TR. 417). James Wurster, a Criminologist for the Bureau of Criminal Investigation and Identification specializing in serology, testified that blood could be removed from a stick if it were stuck in the ground, wiped, or rained upon. (TR. 610). Even Appellant's expert, Mr. Dehus, only stated it was more likely that blood would remain on a stick. For all of the above reasons, Exhibit 47 was probative and properly admitted.

Appellant next contends the testimony of Dr. Adelman concerning asphyxia and its effect on the human penis was not probative. Dr. Adelman testified that asphyxia by strangulation can cause erections. (TR. 418).

The reason for that testimony is two-fold. First, as testified by Dr. Mertz, in order to cause the kind of bite mark on Raymond's penis, the oral contact necessary would be that equivalent to fellatio. (TR. 959). Asphyxiation could enhance an erection for purposes of oral sex.

Secondly, Dr. Mertz testified about the difference in size of a flacid and erect penis. This was done to explain the difference in size of the bite mark as found on Raymond Fife in a flacid state and the bite impression taken of Appellant. If in an erect state, the bite marks on Raymond's penis would have been identical in size with Appellant's bite impression.

With respect to the combined testimony of Dr. Mertz and Dr. Adelman, the Appellate Court said, "the testimony that the strangulation, i.e., asphyxiation, can cause a penis to become erect was probative testimony, shedding light on precisely what occurred that fateful day." (Appellate Court Opinion at p. 39).

Therefore, Dr. Adelman's testimony was most probative. Assuming arguendo that it would have had a prejudicial effect on a jury, it would not do so to a three-judge panel.

Appellant's Ninth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 10

WHEN THE TRIAL COURT ADMITS AN EXHIBIT INTO EVIDENCE BASED ON AN INFERENCE FROM NUMEROUS FACTS ADDUCED FROM DIRECT EVIDENCE, IT HAS NOT ERRED TO THE PREJUDICE OF APPELLANT.

Appellant alleges that the Court erroneously drew an inference from another inference to improperly admit Exhibit 47. The State introduced a number of facts from which the Court was asked to draw one conclusion: simply, that Exhibit 47 was the object shoved into Raymond Fife's rectum.

Through several witnesses' direct testimony, the State circumstantially showed that Exhibit 47 was the object used in the homicide.

Through the following facts the court properly admitted the broken broom handle as the object used:

1) Appellant, in his confession, stated that a "broom handle thing" was used. (TR. 338);

2) Donald Allgood saw Appellant coming out of the path at the date, time and area where the homicide occurred. He testified that he saw Appellant flick a stick into the woods off the path. (TR. 437);

3) Within six (6) feet of the path described by Donald Allgood, the Warren Police found a broken broom handle marked Exhibit 47;

4) Dr. Adelman testified that the jagged edge of Exhibit 47 fit the perforation in Raymond's rectum like "a key in a lock." Dr. Adelman also testified that the contusions in victim's rectum were the same size and con-

sistent with the rounded edge of Exhibit 47;

    5) Dr. Adelman further testified that the fibers found in Raymond's rectum and those from Exhibit 47 are very similar and clearly both are wood. (TR. 387-388).

All these facts led the court to draw only one inference, thereby properly admitting Exhibit 47 into evidence.

Contrary to the Appellant's contention, the Appellate Court found "there was no attempt to draw one inference from another." (Appellate Court Opinion at p. 42). The Appellate Court reasoned:

    The testimony elicited showed that Appellant stated that 'a broom handle thing' was inserted into the victim's rectum, that Appellant was observed throwing a stick into the brush of a field near the homicide site, that the end of a broom or mop handle was found in the area where a witness saw the Appellant throw a stick, and that the 'jagged edge' of Exhibit 47 fit the opening in the victim's rectum like a key in a lock. These direct facts were presented in evidence in order for the court to make one inference--- that Exhibit 47 was the object which was inserted into the rectum of the victim. Id. at p. 42 and 43.

Sobolovitz v. Lubric Oil Co. (1923), 107 Ohio St. 204, overruled by McDonald v. Cartage Co. (1959), 169 Ohio St. 522, cited by Appellant is clearly distinguishable on its facts. There, through circumstantial evidence it was inferred that ownership of a truck belonged to the defendant. However, the court

would not allow additional inferences on one set of facts. In the instant case, there were a number of facts presented to allow for one inference.

Even if Exhibit 47 were not properly admitted, it in no way prejudiced the Appellant. The victim clearly was penetrated with a wooden object. The error, if any, would be harmless especially in light of the fact that this was a bench trial.

Appellant's Tenth Proposition of Law is without merit.

PROPOSITION OF LAW NO. 11

WHEN A PROSECUTION WITNESS IS SUBJECTED TO CROSS-EXAMINATION, SPEAKS WITH THE PROSECUTOR, AND IS LATER RECALLED BY DEFENSE AND GIVES THE SAME CONSISTENT TESTIMONY UNDER YET ADDITIONAL CROSS-EXAMINATION, THE ACCUSED'S RIGHT TO CONFRONTATION HAS NOT BEEN VIOLATED.

Appellant's right to confrontation was not denied by the Court. Appellant notes that Stephen Melius was called in the middle of the trial without prior disclosure. However, the State did not know about the witness or what his testimony would be until the previous afternoon. (TR. 1020).

The Court gave Appellant's attorney the options of cross-examining the witness that day, or at a later time, or cross-examination that day and, if requested, at a later time, and the opportunity to ask for a continuance if necessary. (TR. 1022).

The witness was cross-examined by counsel for Appellant after direct examination. The following day Melius was recalled by Appellant. Appellant never requested a continuance. No restrictions were placed on Appellant's right to cross-examine Melius, and thus Appellant's right to confront the witness was not violated in any way.

Likewise, Appellant's argument that Melius was impermissibly "coached" by the State is without merit and

111

was summarily rejected by the Appellate Court. The Appellate Court stated:

> The evidence is insufficient to show that the state "coached" the witness beyond simply urging him to tell the truth. Moreover, as noted by the state, the witness' testimony "after coaching" did not differ from the prior day's narration on the witness stand." (Appellate Ct. Op. at 45).

Appellant notes in his brief at p. 114 that Melius "offered evidence which was obviously given credence by the appellate court" in finding that Appellant was not merely a "follower." The Appellate Court, however, also gave weight to other evidence offered which proves that Appellant was more than just a hapless follower of Timothy Combs as he brutalized Raymond Fife. The Appellate Court also cited the brutal rapes committed by Appellant against Candyce Jenkins and Mary Ann Brison. No one disputes that these savage acts were committed by the Appellant alone, without any coaxing or coaching by Timothy Combs. The Appellate Court also notes that the Appellant went alone to the Warren City Police Department in his self-serving attempt to blame the Fife assault on others. (Appellate Ct. Op. at 85 and 86). Thus, it is clear that the Appellate Court found that Appellant's will was not overcome by the alleged wiles of the

underaged Combs.  Such a conclusion can be reached with or without the Melius testimony.

Appellant cites Pointer v. Texas (1965), 380 U.S. 400, for the proposition that the right to cross-examine a witness is a fundamental right guaranteed by the Constitution.  In Pointer, a statement of a witness was introduced in court without the witness testifying. There, the defendant could not cross-examine the witness thereby violating a fundamental Constitutional right.

The instant case is clearly distinguishable.  In the case at bar, Appellant was given an opportunity to cross-examine the witness.  He was also given time to investigate his testimony and recall him to the stand.

Alford v. United States (1931), 282 U.S. 687 and Smith v. Illinois (1968), 390 U.S. 129, cited by Appellant have facts distinguishable from the instant case.  Both Alford and Smith dealt with defendants not being permitted to properly cross-examine prosecution witnesses.  Defense counsel were not permitted to cross-examine witnesses concerning their identification and addresses.

There were no such constraints on Appellant's cross-examination in the case at bar.  The Court, in the instant case, advised Appellant that the witness would

remain available in case the Appellant wished to recall him for further cross-examination.

In Davis v. Alaska (1974), 415 U.S. 308, cited by Appellant, the Court said that the improper limiting of cross-examination acted as an effective denial of the right to confrontation. In Davis, the trial court limited the right of the defendant to cross-examine the witness with respect to his prior criminal record.

In the instant case, no such restrictions were applied. As a matter of fact, Melius admitted being incarcerated in the juvenile center a dozen times. (TR. 1030).

Appellant also cites State v. Prater (1983), 13 Ohio App. 3d 98, wherein after a court order not to talk to the witness during a recess prior to the completion of cross-examination, the prosecutor had a discussion with the witness. Even so, the Court, in declining to reverse, stated: "I cannot fairly say, in the context of all of the evidence, that the appellant was denied the opportunity for full cross-examination." Prater at 101.

In the instant case, there was not an express order not to discuss the case. In addition, the testimony of the witness in the instant case did not change, nor was the discussion in the case at bar at a juncture where it

was obvious that cross-examination had not ended. Rather, the discussion took place prior to recall of the witness.

Moreover, the _Prater_ court also stated that "In this context, a Confrontation Clause violation is shown, and reversal is required, only when cross examination is denied or its exercise is so severely restricted that the equivalent of a denial of results." _Id._ at 99. The _Prater_ Court also noted that despite the recess conference with the witness, the defense attorney was still able to conduct a "vigorous and lengthy cross-examination so the appellant's right to confront the witness was not abridged. _Id._ at 100.

Appellant's Eleventh Proposition of Law is without merit.

PROPOSITION OF LAW NO. 12

THE DENIAL OF APPELLANT'S REQUEST FOR INCLUSION OF
LICENSED DRIVERS IN THE POOL OF PROSPECTIVE JURORS BY THE
TRIAL COURT DID NOT VIOLATE HIS RIGHT TO A FAIR AND
IMPARTIAL TRIAL.

The great weight of authority in Ohio and the
federal jurisdictions support the validity of
voter registration lists as the sole source of
prospective jurors. See e.g. State v. Johnson (1972), 31
Ohio St. 2d 106; State v. Strodes, (1976), 48 Ohio St. 2d
113, vacated on other grounds 438 U.S. 911 (1978); U.S.
v. Gometz (7th Cir. 1984), 730 F.2d 475 (en banc), cert.
denied, 469 U.S. 899.  Moreover, those potential jurors
who choose not to register to vote are not a cognizable
group for purposes of "fair cross-section" analysis.
See: Camp v. U.S. (5th Cir. 1969), 413 F.2d 4199, cert.
denied, 396 U.S. 968; U.S. v. Afflerback (10th Cir.
1985), 754 F.2d 866, cert. denied 172 U.S. 1029, 105 S.
Ct. 3506, reh. denied, 473 U.S. 927, 106. S. Ct. 20.

In the instant case, Appellant waived his right to a
trial by jury.  (TR. d. 103-104) (Tr. H. Waiver of Jury
Trial p. 5).  Since no jury was empaneled, Appellant
cannot claim prejudice by the actual makeup of the jury.
Accordingly, Appellant has waived any objection to the
jury array.  Cf. State ex. rel. Warner v. Baer (1921),
103 Ohio St. 585, 134 N.E. 786  (accused who consented to

116

trial by 11-member jury after one of the original jurors became ill was later estopped from prosecuting error); Luce v. U.S. (1984), 469 U.S. 38 (defendant who did not testify at trial not entitled to review of trial court's ruling denying his motion to forbid use of prior conviction for impeachment purposes).

The Appellate Court points out, "In the case at bar, Appellant waived his right to a trial by jury.  The trial was heard before a three-judge panel, therefore, the denial of his motion (to expand jury pool to licensed drivers) could not possibly have had any effect on the trial."  (Appellate Court Opinion at p. 47).

Appellant was not denied a jury drawn from a fair cross-section of the community; and, he waived any right to object to the jury array by his election to waive his right to a trial by jury.

Appellant's Twelfth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 13

THE TRIAL COURT PROPERLY AND THOROUGHLY DETERMINED ON THE
RECORD THAT THE APPELLANT KNOWINGLY, INTELLIGENTLY AND
VOLUNTARILY WAIVED HIS RIGHT TO A JURY TRIAL.

It is claimed that the trial court erred in allowing
the Appellant to waive his right to a jury trial in
writing pursuant to Criminal Rule 23 and in not
determining on the record whether the Appellant
knowingly, intelligently and voluntarily waived his right
to a jury trial. This Proposition of Law is the best
example of many misrepresentations found in the brief of
the Appellant. The Appellant falsely accuses the trial
judge of failing personally to address the Appellant and
determine on the record whether the Appellant understood
what it meant to waive one's right to a jury trial.
(Appellant's brief at p. 123). This falsehood takes
place because the Appellant and his counsel failed to
have transcribed the record of the hearing of jury waiver
held on January 6, 1986. Without knowing the facts of
what really occurred, Appellant proceeded to totally
misrepresent the facts and the applicable law.

The State thereupon requested and received a full
record of the Appellant's hearing on the waiver of jury
trial. The transcript of this hearing shows without
question that Judge McLain fully and thoroughly

determined that Appellant Hill was knowingly and intelligently waiving his constitutional right to a jury trial.  <u>State v. Griffin</u> (1983), 13 Ohio App. 3d 376. The record reads:


    Tuesday, January 7, 1986, at 1:15 P.M.

    COURT: All right, gentlemen. I think we'll begin with the matter of the possible waiver of trial by jury, and I prepared such a waiver, and I think it's appropriate, though, that I mention some things to Mr. Hill so that I can determine whether he really wants to waive his right to a jury trial.

    Mr. Hill, would you be more comfortable in sitting and listening to me or do you want to stand up?

    ATTORNEY JAMES F. LEWIS: You want to stand up?

    COURT: I want you to be comfortable when I'm talking to you.

    (Defendant Hill and counsel approach the bench.)

    COURT: Mr. Hill, your attorney has indicated to the Court; that is, to me, that you may wish to give up your right to trial by jury and instead, to have your case heard by a panel of three judges. Do you have that under consideration?

    DEFENDANT HILL: Yes, I do.

    COURT: Okay. Before receiving any waiver of a jury trial; that is, the paper by which you'll have to ask to be tried by the three judges, I must decide that you're doing so knowingly and willingly. Doesn't mean that you have to be an expert on all matters of law, but you must have some general idea of what this is all about, and I must be satisfied that you understand so the basic difference between a jury trial and a trial by three judges.

Now, in a jury trial, 75 people are picked at random; that is, they're just picked out of a box where there are a lot of names of people who are registered voters, and they come from all over the county. Do you know what I mean by the county? Warren, Niles, Brookfield. You understand?

DEFENDANT HILL: Yes, sir.

COURT: The jury's job is to listen to the witnesses that come in and testify. You've been a witness yourself at a hearing. You've seen other witnesses. You know what witnesses are?

DEFEDANT HILL: Yes, sir.

COURT: And to look at the exhibits and the things such as pictures, statements, whatever may be admitted in that way, and after the evidence has been received by the jury, I will -- that is, the trial judge, and I will tell them about the law they will use in the case cause the jury won't know anything about the law. They'll have to accept my instructions on that.

The next procedure would be to go back in the jury room and decide whether or not you were guilty of any of the charges. They must all agree on the question of whether or not you should be found guilty or not guilty of each charge. Do you understand that?

DEFENDANT HILL: Yes, sir.

COURT: That is, all 12 people --

DEFENDANT HILL: Yes, sir.

COURT: -- would have to agree. If you are found guilty of the charge that has death as a possible punishment -- and you know that you're charged with such a crime, do you not?

DEFENDANT HILL: Yes, sir.

COURT: Okay. The jury would then recommend to me whether or not your sentence should be death or life imprisonment, and in passing sentence, I can accept the recommendation of the jury with respect to the death penalty, but if I don't agree with it, I can reduce that

sentence from death to life imprisonment.  And I cannot do it the other way.  If the jury recommends imprisonment after finding you guilty of some charge, I must accept that.  Do you understand?

DEFENDANT HILL:  Yes, sir.

COURT:  Okay.  If you file this written motion giving up your right to a jury, then the case would be tried by a panel of three judges who would decide whether or not, based on the evidence, you were guilty or not guilty of any of the charges.

I feel I should point out to you some of the things which will happen as a result of your giving up a jury trial.  First of all, you've asked for a change of venue.  That is, you've asked to have this case tried out of Trumbull County.  If you waive your right to trial by jury, this case will be tried by three judges in this courtroom.  And you will have no right to pick the judges or question them as you would have with the jury.  And your motion for change of venue, in all probability, will be overruled.

You have other motions pending that have been filed by your lawyer.  I don't know whether you've seen them or not.  It's not necessary that you understand all the legal ramifications, but depending on whether the jury's selected or whether it is a 3-judge panel, certain things will occur which will be different, and in this case, if you give up your right to a trial, objections that you have to the manner in which juries have been selected will be, in all probability, overruled unless I have further evidence.

Have you discussed this matter of giving up your right to trial by jury with your attorney?

DEFENDANT HILL:  Yes, I did.

COURT:  Okay.  And has that been over some period of time or more than 15, 20 minutes or hours, or how long?

DEFENDANT HILL:  An hour ago.

COURT:  Okay.  Have you talked it over with anyone else?

DEFENDANT HILL:  My mother.

COURT:  Okay.  Your lawyer's goal; that is, what he's going to try to do in this case -- should be pretty obvious, is to have the jury, or 3-judge panel in this case as it might be, find you not guilty.  In the event that that doesn't happen, your attorney's next goal would be to have you found not guilty of some of the charges or found guilty of lesser offenses.  Do you know what I mean by a lesser offense?

DEFENDANT HILL:  Not all of them.

COURT:  Aggravated Murder, Murder, Manslaughter; different offenses.  Some are included within other ones. So, that would be a secondary goal for him if he couldn't get you acquitted of all charges.

Finally, if you happen to be found guilty of any charges in this case, his goal would be to have you penalized by life imprisonment instead of death.

Instead of telling me why he thinks it's better, has your lawyer told you why he thinks it would be better?

DEFENDANT HILL:  I don't remember.

COURT:  Well, perhaps if you talked a little bit about that -- he has an idea that that would be a better strategy for you; a better way of treating this case. That your chances would be better.  Do you understand what I mean by that?

DEFENDANT HILL:  Yes.

COURT:  I'll point out some of the major differences between the jury and the 3-judge panel and ask if you considered these things.  If you haven't considered them, you should take a little time.  We'll have a short recess and you can discuss them with your lawyer.

The jury has more people; 12 as opposed to three. The jury would sit in those green chairs over there. Twelve people.  If the judges hear the case, it'll be three of us sitting up her where I'm sitting right now. Some people think since the verdict has to be unanimous, that 12 would be a better number for a defendant than three.

The jurors know little or nothing about the law. The judges already know the law, or if they have any doubt about what it is, they know how to look it up in the law books.

DEFENDANT HILL:  Yes, sir.

COURT:  So at the jury trial, the jury would be given a written instruction of law by the Court.  The 3-judge panel -- the three judges would simply decide the case unless they were in doubt about the law, in which case, they'd do their best to find out about it.

The judges in this case will probably be quite a bit older than the average jury and a lot older than you are.

DEFENDANT HILL:  Yes, sir.

COURT:  Race has no place, in my mind, in the courtroom, and it should not be in anybody's mind, but it is unlikely that any of the judges selected would be black.  There might be some on the jury.  I -- we do the thing properly, no person should judge on the basis of race, but that's one thing you should consider.

Now, I want you to see if you can follow this, Danny. The judges in this case, if you have them try the case, they may see or hear some evidence which the jury would never see.

Now, for example, if, during the trial, Mr. Watkins calls a witness and your lawyer, Mr. Lewis, objects to the testimony of the witness, I could tell the jury to go out in the hallway while we had a discussion about what the evidence was going to be, and if I said you can't let this evidence in, then the jury would never hear it simply because they'd be out of the room then, but in this type of case, since the judge -- somebody has to make the rulings, the judges will make rulings during the trial and make ones before the trial.

Finally, I'd like to point out to you as the judge in this case that the law provides that I be one of the three judges sitting on this case, and I will have seen and heard some things which the State cannot put to the jury.  For example, in deciding -- do you remember when

you had a motion -- the State had a motion to try you together with Mr. Combs?

DEFENDANT HILL:  Yes, sir.

COURT:  Okay.  Well, at that time, it was necessary for me to listen to Timothy Combs' statements along with your own.  Now, his statement will not be shown to a jury in any way in your case, and I promise you that any evidence that I've heard or which I may hear which is not proper will not be considered by me nor revealed to the other two judges.  That's something else for you to think about.

Now, I prepared this written waiver in the form that I think is appropriate, and I'm going to give you some time to think about it and see whether you want to sign it.  And it reads, as follows.  First of all, I'd like to ask you for the record:  Do you have some difficulty with reading?

DEFENDANT HILL:  Yes, I do.

COURT:  Okay.  If you don't understand any of the words, you go over them with your attorney.

The waiver of jury trial means that you are giving up your right to jury trial.  Reads as follows:

"I, Danny Lee Hill, the defendant in the case of the State of Ohio versus Hill, want to give up my right to a trial by jury.  After talking with my attorney, I now want to be tried by three judges selected in the way the law provides.  I fully understand that I have a constitutional right to a trial by jury.  I further understand that I could change my mind and ask for a jury trial, and I understand the Court must grant me a jury trial if I ask for it at any time before the trial by the three judges start.  I also understand that once the trial by the three judges starts, I would not then be allowed to ask for a jury."

Now, that's a lot of material for you to absorb, and I want you to go with your lawyer now and think this matter over and talk over some of the things.  And I'll give you the papers which I've been reading from.

124

ATTORNEY LEWIS:  Your Honor, can we have permission to have Mrs. Williams, the mother, also in with Danny when I explain it to him?  I talked briefly with her. Would that be okay with the Court?

COURT:  Would that be any problem with the officers?

ATTORNEY LEWIS:  Any problem with that?

DEPUTY SHERIFF:  No, as long as we're here.

ATTORNEY LEWIS:  As long as you're here?

DEPUTY SHERIFF:  Right.

COURT:  Advise the Court when you are ready.

(Court in recess at 2:00 P.M.)

(At this point, Defendant Hill and his counsel conduct a conference.)

(Back in session at 2:25 P.M.)

COURT:  All right.  Danny, you've been talking with your lawyer now, have you not, for the last 25 minutes or so?

DEFENDANT HILL:  Yeah.

COURT:  And did he go over this matter of a jury trial with you?

DEFENDANT HILL:  Yeah.

COURT:  And you want to tell me now what decision you've made after talking this over.

DEFENDANT HILL:  I want to have --

COURT:  What do you want to do?  Who do you want to try it?  Three judges --

DEFENDANT HILL:  Three judges.

COURT:  -- or do you want the jury?

DEFENDANT HILL:  You.

COURT:  I hope you understand -- you mean myself and two other judges?

DEFENDANT HILL:  (Nods head affirmatively.)

COURT:  Have you gone over this paper here, which you'll have to sign -- the law requires you make this request in writing.  Have you gone over that paper, Danny?

DEFENDANT HILL:  Um-hum.

COURT:  Any questions about it now?

DEFENDANT HILL:  (Shakes head negatively.)

COURT:  Okay.  Mr. Watkins or Mr. Kontos, will you witness?

ATTORNEY DENNIS WATKINS:  Yes, sir.

(Defendant Hill, Attorney Lewis, and Attorney Watkins sign the waiver.)

The court went beyond what is necessary in a jury waiver as required by Rule 23 of the Ohio Rules of Criminal Procedure and Ohio Revised Code § 2945.05.  See State v. Morris (1982), 8 Ohio App. 3d 12; State v. Griffin (1983), 13 Ohio App. 3d 376; State v. Harris (1976), 48 Ohio St. 2d 351, vacated on other grounds, 98 S. Ct. 3148, (oral waiver of jury/three judge panel, written waiver not signed until after verdict/valid waiver).

As this Court pointed out in the recent case of State v. Jells (1990), 53 Ohio St. 3d 22, "(t)here is no requirement in Ohio for the trial court to interrogate a

defendant in order to determine whether he or she is fully apprised of the right to a jury trial.  The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the Court, and made in open Court after arraignment and opportunity to consult with counsel." Id. at 25 and 26. Despite the fact that no such requirement existed, Judge McLain did engage in a lengthy discussion with the Appellant personally, and then adjourned the proceedings long enough for the Appellant to talk to his attorney and his mother.

This Court went on to say that while it may be the "better practice" to enumerate the ramifications of a jury trial waiver, mere compliance with the signature requirements of Ohio Revised Code § 2945.05 is sufficient. Id. at 26.

Furthermore, the Appellate Court found that the Appellant's waiver was knowing, intelligent and voluntary. In reviewing the lengthy exchange between the Appellant and Judge McLain, the Appellate Court found, "(t)here is no evidence in the record indicating that the trial court accepted the waiver without scrupulously ascertaining Appellant's ability to understand the impact of his actions...sufficient evidence exists in this matter to

determine that Appellant effectively (knowingly, intelligent and voluntarily) waived those constitutional rights." (Appellate Court Opinion at p. 33 and 34).

Therefore, Appellant's Thirteenth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 14

THE DENIAL BY THE TRIAL COURT OF APPELLANT'S REQUEST FOR
APPOINTMENT OF AN EXPERT TO ASSIST IN HIS MOTION FOR
CLOSURE OF PRE-TRIAL HEARINGS DID NOT VIOLATE HIS RIGHT
TO A FAIR AND IMPARTIAL JURY.

Initially, it must again be noted that Appellant waived his right to a trial by jury. (TR. d. 103-104). For the reasons previously set forth in Appellee's response to the Twelfth Proposition of Law, such waiver should now estop Appellant from objecting to speculative prejudice to the impartiality of a jury.

As the Appellate Court noted, "(t)his court cannot help thinking that Appellant's counsel upon appeal is slightly misplaced. The fact that Appellant waived his right to trial by jury renders this assignment of error moot." (Appellate Court Opinion at pg. 47).

In any event, the trial court properly denied Appellant's request for an expert sociologist in his motion for pre-trial closure. (TR. d. 84). As Appellant acknowledges, the State need not purchase all the assistance a wealthier accused could afford. Ross v. Moffitt (1974), 417 U.S. 600. Fundamental fairness requires that an indigent be provided with the "basic tools of an adequate defense." Britt v. North Carolina, (1971), 404 U.S. 226, 227. Simply stated, the appointment of an expert to assist in evaluating a

potential juror's capacity to disregard pretrial publicity does not rise to the level of a "basic tool" necessary to establish a "adequate defense."

In State v. Jenkins (1984), 15 Ohio St. 2d 164, 194, cert. denied, ___ U.S. ___, 105 S. Ct. 3514, reh. denied, ___ U.S. ___, 106 S. Ct. 19, this Court expressly held that the services of a social scientist to establish the effects of pretrial publicity was not required under Ohio Revised Code § 2929.024 or the Constitutions of the United States and State of Ohio. This Court described the experts as "no more than consultants to counsel as opposed to sources of evidence relevant to disputed factual issues." Id. In a more recent affirmation of Jenkins, this Court held that the Appellant must establish that such experts are "reasonably necessary" and that the Appellant could not have gleaned the same information through alternative methods, such as juror questionnaires. State v. Roe (1989), 41 Ohio St. 3d 18, 21, cert. denied, 110 S. Ct. 1535. Indeed, such experts were not utilized by the defense in procuring a closure order barring the press and public from a pretrial suppression hearing in the case of Gannet Co. v. DePasquale (1979), 443 U.S. 368.

Appellant has failed to demonstrate prejudice by the denial of the appointment of an expert in the matter of pretrial closure. The trial court in balancing the principles, the Appellant's right to a fair trial and the First Amendment prohibition against abridgment of the freedom of the press, properly considered other measures likely to mitigate the effects of unrestrained pretrial publicity, i.e. a determination of prejudice during voir dire within the parameters of Appellant's Motion for a Change of Venue. (TR. d. 52). This procedure was approved in State ex. rel. Dayton Newspapers v. Phillips (1976), 46 Ohio St. 2d 457; and State ex. rel. Chillicothe Gazette, Inc. v. Court (1982), 2 Ohio St. 3d 24. Appellant's subsequent waiver of his right to a jury trial eliminated any possible prejudice to his right to a fair and impartial trial.

Appellant's Fourteenth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 15

IT IS PRESUMED THAT IN A BENCH TRIAL, THE COURT CONSIDERED ONLY THE RELEVANT, MATERIAL, AND COMPETENT EVIDENCE UNLESS IT AFFIRMATIVELY APPEARS TO THE CONTRARY.

Appellant argues that the admission of a pre-death photograph of Raymond Fife (TR. 66), minimal testimony relating to family background (TR. 56), and brief comments by the State arguing Raymond's right to live (TR. 1167, TR.M. 352) constituted reversible error. While these matters were not objected to at trial, Appellant now attempts to characterize them as either impermissible evidence of the victim's character under Evid. R. 404(A)(2), or as impermissible victim impact evidence under the standard set forth in Booth v. Maryland (1987), 482 U.S. 496. Both arguments are wholly without merit.

Appellant's argument relating to Evid. R. 404(A)(2) is both illogical and misleading. That rule governs when evidence of a trait of a victim's character is admissible for the purpose of proving that the victim acted in conformity with that character trait on a particular occasion. Clearly, the rule is not applicable to the matters raised by Appellant since the matters in no way relate to the purpose of showing that Raymond acted in

conformity with a particular character trait on a particular occasion.

Victim impact evidence is defined in Booth as including evidence which describes the personal characteristics of the victim, the emotional trauma suffered by the victim's family, or the family member's opinions and characterizations of the defendant and the crime. Booth, supra at 502; State v. Huertas (1990), 51 Ohio St. 3d 22. Thus, initially, it is highly questionable whether the photograph, the brief family background testimony, and the comments regarding Raymond's right to live, are even properly characterized as "victim impact evidence." Even if the matters are so characterized, however, the facts that Appellant properly waived his right to a trial by jury (TR. d. 103-104) and that the trial was conducted before a three-judge panel conclusively establish that Appellant's arguments are without merit.

As Appellant acknowledges, the Ohio Supreme Court in applying Booth has repeatedly held that the admission of victim impact evidence at a capital trial which is a bench trial is harmless where there is no indication that the three-judge panel relied on the victim impact evidence in arriving at its sentence. State v. Post

(1987), 32 Ohio St. 3d 380, cert. denied 484 U.S. 1079
(1988); State v. Sowell (1988), 39 Ohio St. 3d 322; State
v. Cooey (1989), 46 Ohio St. 3d 20; State v. Brewer
(1990), 48 Ohio St. 3d 50.  These holdings were based
upon the Court's reliance on "the usual presumption that
in a bench trial in a criminal case the Court considered
only the relevant, material and competent evidence in
arriving at its judgment unless it affirmatively appears
to the contrary."  State v. White (1968), 15 Ohio St. 2d
146 (paragraph two of the syllabus); cited in Post, at
384; Sowell, at 328; and Brewer, at 55.  Appellant does
not, and indeed, could not demonstrate that the
three-judge panel considered anything other than the
relevant, material, and competent evidence; rather
Appellant weakly claims that the distinction between a
jury and a three-judge panel is invalid.  There is no
support for this notion.  Moreover, Appellant's reliance
on Huertas, supra, for the proposition that the admission
of victim impact evidence in a capital case is reversible
error, is clearly misplaced, in light of the fact that
the Court expressly distinguished Huertas from Post,
Sowell, and Brewer based on the fact that Huertas
involved a jury trial.  Huertas at 24-25.

Appellant's Fifteenth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 16

APPELLANT'S RIGHT TO A FAIR TRIAL WAS NOT VIOLATED BY AN ALLEGED LACK OF DISCOVERY WHEN APPELLANT DOES NOT SHOW A PREJUDICIAL EFFECT, THE ITEMS IN QUESTION WERE NOT MATERIAL, AND THE TRIAL COURT GAVE APPELLANT THE OPPORTUNITY FOR A CONTINUANCE.

The Appellant was not prejudiced by an alleged failure of the State to comply with the discovery requirements of Criminal Rule 16. The State supplied Appellant with literally hundreds of items of discovery, including photographs, many of which were not even introduced at trial.

Though not a Criminal Rule 16 case, Appellant relies on this Court's recent holding in State v. Johnston (1988), 39 Ohio St. 3d 48. Appellant argues that this Court ruled that if the information sought was material, then the State should turn it over to the Defendant.

What the Appellant fails to detail is this Court's standard in determining whether or not the discovery sought is "material." Quoting U.S. v. Bagley (1984), 473 U.S. 667, 682, this Court found "such evidence shall be deemed material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'." This Court affirmed this holding in State v. Wickline (1990), 50 Ohio St. 3d 114, 116.

In the Johnston case, the "reasonable probability" was high that the result would have been different because the information withheld was a statement by a woman who suggested that someone other than the defendant may have murdered the victims." Johnston at 62, footnote 24. No such reasonable probability exists in the case at bar. If anything, some of the discovery sought would only reinforce the Appellant's guilt.

This is particularly true of the photographs of the bite marks on the victim's penis used by their own witness, Dr. Levine. The Appellant knew through discovery that Dr. Levine concluded the bite marks could have been made by the Appellant and could not have been made by co-defendant, Tim Combs. Thus, it is unclear how supplying Appellant with repetitive photographs would be of assistance to him. The Appellant was not prejudiced by a lack of these photos.

The Appellant also was not prejudiced by the failure to supply the photo array used by Donald Allgood. This array was not introduced at trial. Allgood had seen the Appellant numerous times before, and the lineup was merely used to assist Mr. Allgood in connecting the Appellant's name with his face (TR. 442). As stated in State v. Long (1978), 53 Ohio St. 2d 91, for an alleged

error to rise to the level of plain error, it must be shown that without the error, the case outcome would be different.  There was no error in not supplying the photographs, but even if it were, it would be harmless error.

The Appellant further complains that he was not supplied with photographs of himself and the police during a visit to the crime scene, and with statements he made during that visit.  Those statements were never transcribed.  However, the trial court did offer a continuance and the Appellant declined (Tr. 537).  The offer of continuance was pursuant to Criminal Rule 16(E)(3).  With respect to the photographs from the crime scene, the Appellant was supplied with numerous photos of that location.  Furthermore, a lack of a photograph of the Appellant standing side-by-side Warren Police officers, designating where he beat, burned and sodomized Raymond Fife, can hardly be deemed prejudicial.  Again, the Court offered a continuance and it was declined (TR. 539).

The Appellant claims he was prejudiced by not having Stephen Melius' name on the witness list.  The State was not aware of Melius' identity until the day prior to his testimony (TR. 1020), thus, no violation of Crim. R. 16

occurred. Moreover, the Court indulged the Appellant with several options:

> JUDGE McLAIN: Well, the Court's going to permit this witness to testify under the following conditions: That he may be cross examined right now if you choose, and if you are -- if you feel there may be other things to cross examine him upon, the witness will be ordered to remain in the county and be available to return for further cross examination. If at any time before the final lack of time to investigate this person still needs -- you need more time after that, the Court will consider those specific requests for delays, continuances, and things of that sort, and detrmine the merits of those matters later on.

Appellant cross-examined Melius and recalled him the following day. Appellant did not articulate how Mr. Melius' testimony would have affected trial preparation strategy or outcome. The Appellant suffered no prejudicial error, nor was the plain error standard of Long met.

Appellant has failed to show how he was prejudiced or denied a fair trial by these alleged discovery denials. These contentions do not rise to the level of plain error. The items sought were not material, nor would they have changed the outcome of the proceedings.

The Appellant's Sixteenth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 17

ADMISSIBILITY OF EVIDENCE RESTS WITHIN THE SOUND
DISCRETION OF THE TRIAL COURT.  PHOTOGRAPHS AND TANGIBLE
OBJECTS ARE ADMISSIBLE, IF RELEVANT AND OF PROBATIVE
VALUE, AS LONG AS THE DANGER THAT MATERIAL PREJUDICE TO
APPELLANT IS OUTWEIGHED BY PROBATIVE VALUE.

In State v. Jells (1990), 53 Ohio St. 3d 22, this

Court was asked to rule as to whether autopsy photos of a

homicide victim were cumulative, repetitive and

prejudicial.  It should be noted that as in the case at

bar, Jells was tried to a three-judge panel.

In Jells, the female victim was found dead partially

nude in Cleveland, Ohio dump.  The cause of death was

listed as multiple blunt trauma to the head, neck, trunk

and extremities.  She had sustained an estimated 90

separate blows to her body.  This Court found that while

the photos were repetitious, the three-judge panel would

have convicted the defendant even without the photographs

because of other evidence submitted.  "Assuming in this

case that some of the photographs should not have been

admitted due to their repetitive or cumulative nature,

any error was harmless."  Jells at 31.  The Court then

went on to detail other evidence introduced at trial

which would lead reasonable minds to conclude that Jells

was guilty.  "Clearly, the three-judge panel would have

convicted appellant even if the photographs had not been

introduced into evidence." Id. Such is certainly true in the case at bar. Even if the photographs of Raymond Fife's rectal cavity and the "stick" had not been introduced, the three-judge panel would have convicted Appellant.

This Court also ruled in State v. Maurer (1984), 15 Ohio St. 3d 239 that "(p)roperly authenicated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the other photographs are not repetitive or cumulative in number." Id. at 266. Pictures of the injury to Raymond Fife's rectal cavity and the suspected weapon used are clearly probative to the issue of the Appellant's guilt in the case at bar.

In State v. Woodards (1966), 6 Ohio St. 2d 14, cert. denied, 385 U.S. 930, color sides from an autopsy were properly admitted. In ruling that the slides did not prejudice the defendant's right to a fair trial, the court stated "the mere fact that [a photograph] is gruesome or horrendous, is not sufficient to render it

inadmissible."  Id.  See also, State v. Lane (1976), 49
Ohio St. 2d 77.

Contrary to the assertions of Appellant, the
photographs contained in Exhibits 75-84 and the stick,
Exhibit 47, were explained by Dr. Adelman in connection
with a valid cause of death. (TR. 370-386).
Specifically, Dr. Adelman used the exhibits to show the
penetration of Raymond Fife's rectum, relating the
perforation to placement of the stick.  Donald Allgood
related that he observed Appellant with a stick in the
vicinity of the place Raymond Fife was located.  (TR.
435-437).

Again, it must be emphasized that Appellant waived
his right to a trial by jury.  (TR. d. 103-104).  There
is a presumption in a bench trial that "the court
considered only the relevant, material and competent
evidence in arriving at its judgment, unless it
affirmatively appears to the contrary.  State v. White
(1968), 15 Ohio St. 2d 146, 151.  See also, State v.
Wallen (1969), 21 Ohio App. 2d 27.

Assuming arguendo, that the Court abused its wide
discretion and the probative value of the exhibits were
outweighed by the danger of prejudice, any resultant

error was harmless. See <u>U.S. v. Gerandison</u> (4th Cir. 1985), 780 F.2d 425, <u>cert. denied</u>, 110 S. Ct. 2178.

Appellant's Seventeenth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 18

WHEN THE PROSECUTION MAKES ALLEGED IMPROPER COMMENTS IN CLOSING ARGUMENT WHERE THERE IS NO JURY, NO OBJECTION MADE BY APPELLANT, AND NO SHOWING OF PLAIN ERROR THAT WOULD RESULT IN A DIFFERENT OUTCOME, THE APPELLANT IS NOT DENIED HIS RIGHT TO A FAIR TRIAL.

Comments made by the prosecution in closing arguments at both the guilt and mitigation phase of the trial did not constitute error, and did not deprive Appellant of his right to a fair trial.  This Court has held that, "the prosecutor is entitled to a certain degree of latitutde in summation." State v. Liberatore (1982), 69 Ohio St. 2d 583, 589.  For reasons that will follow, the State submits that it did not exceed the latitude this Court granted in Liberatore.

Generally, the trial court instructs a jury that what they will hear in closing argument is each side's version of the evidence presented and that anything said by the attorneys is not evidence.  These instructions are given so that the lay person sitting on the jury, who is generally unfamiliar with criminal proceedings, will understand the appropriate function of closing arguments. However, in the instant case, there was no jury.  The case was heard by a three-judge panel experienced in criminal proceedings with a full and proper understanding of the purpose of closing arguments.  They are obviously

aware that closing argument is not evidence, and the fear of inflaming lay people composing a jury is absent.

In <u>State v. White</u> (1968), 15 Ohio St. 2d 146, the prosecution used evidence of the deceased's good background and relied on that evidence in its argument for the death penalty. This was done over the objection of defendant. This Court in <u>White</u> stated that comments that might constitute error in jury cases do not prejudice a defendant before a three-judge court. The Court further states at p. 151:

> ...We indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary. <u>People v. Smith</u>, 55 Ill. App. 2d 480, 204 N.E. 2d 577.

See also: <u>State v. Walker</u> (1969), 21 Ohio App. 2d 27, <u>aff'd</u>. 25 Ohio St. 2d 45; <u>State v. Eubank</u> (1979), 60 Ohio St. 2d 183; <u>State v. Post</u> (1987), 32 Ohio St. 3d 380, <u>cert. denied</u>, 108 S. Ct. 1061; <u>State v. Astley</u> (1987), 36 Ohio App. 3d 247.

This Court upheld the presumption that the Court considers only "relevant, material and competent evidence" in the recent capital cases of <u>State v. Moreland</u> (1990), 50 Ohio St. 3d 58 and <u>State v. Jells</u> (1990), 53 Ohio St. 3d 22.

Appellant enumerates fourteen (14) different passages where he alleges improper remarks were made. It is important to note that there was not one objection to any of the remarks of the State cited by Appellant. Failing to object to remarks in closing argument waived Appellant's claim to error since none of the comments constituted flagrantly improper comments. State v. Wade (1978), 53 Ohio St. 2d 182, vacated in other grounds, 98 S. Ct. 3138. This is especially true since there was no jury to inflame.

Furthermore, none of the comments alone or collectively, even assuming arguendo that the comments were improper, would have caused a different outcome in the case. Such was the consideration of this Court in State v. Tyler (1990), 50 Ohio St. 3d 24, another capital case, where allegedly irrelevant evidence was repeated by the prosecutor in closing arguments. This Court concluded beyond a reasonable doubt that the testimony did not contribute to the verdict, or the sentence, and thus, there was no plain error. Id. at 35 and 36. This Court must conclude the same in the case at bar Even without the 14 remarks complained of by the Appellant, it is clear, beyond a reasonable doubt, that he murdered

Raymond Fife and that the death penalty is the appropriate punishment.

This Court considered the very issue of alleged improper closing remarks to a three-judge panel in State v. Lott (1990), 51 Ohio St. 3d 160. This Court found that, in fact, the prosecutor had made improper remarks in closing. (The State in the case at bar does not concede that any of the 14 complained of remarks are improper). The prosecutor in Lott peppered his closing remarks with hearsay statements and personal opinions as to Lott's guilt. This Court concluded, "Lott received a fair trial before three trained jurists, despite the prosecutorial misconduct." Id. at 167.

The Appellate Court in this case concluded, "(g)iven the nature of the offense involved, the circumstances surrounding the death of the victim, and the length of the closing argument, it does not appear this would constitute prejudicial error, but merely harmless error, at best...The trial was conducted before a three-judge panel and not a jury, and the record fails to disclose any prejudice." (Appellate Ct. Op. at 52).

Certain remarks cited as improper by Appellant are such that the State is unable to pick out the impropriety alleged. For example, in Appellant's third allegation on

page 146 of his brief, the State merely repeated the testimony of two of its witnesses. In number five the prosecution remarks that it will go through the evidence as it viewed it. That is precisely what a closing argument is.

In number twelve, for example, the State is rebutting the allegation of a defense witness that Appellant was always with him and never got in trouble. This was merely an invited response. In U.S. v. Young (1984), 470 U.S. 1, the United States Supreme Court stated:

> Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction. Young at 12-13.

In Young, the defendant did not object or ask for a curative instruction.

Remarks one (1), ten (10) and fourteen (14) involving the absence, rights, and character of the deceased, are similar to the case in White, supra, where the Court did not find error since the case was tried was before three judges.

The cases cited by Appellant are either distinguishable on the facts or support the State's position.

In _State v. Smith_ (1976), 50 Ohio App. 2d 183, and _State v. Woodards_ (1966), 6 Ohio St. 2d 14, cert. denied, 385 U.S. 930, cited by Appellant, it was held that comments in closing argument not objected to by the defendant were harmless error.  In _Woodards_, the defendant was called "useless," "gangrenous," and a "parasite."  Both of these cases were tried to a jury where the likelihood of prejudice to the defendant by inflammatory remarks is greater.

_State v. Muscatello_ (1977), 57 Ohio App. 2d 231, aff'd. 55 Ohio St. 2d 201, cited by Appellant, is clearly distinguishable.  There, over objection, improper comments as to the elements of the crime were made by the prosecution.  In addition, no curative instructions were given.  However, if the case would have been tried to a court instead of a jury, the improper comments on the elements of the crime would have been harmless since a judge is presumed to know the law.

In _Wither v. U.S._ (6th Cir. 1979), 602 F.2d 124, in a trial to a jury, the prosecution's comments that no white witness contradicted the victim where the defendant was black constituted reversible error.  Without further elaboration, _Wither_ is distinguishable from the case at bar.

In <u>Cook v. Bordenkircher</u> (6th Cir. 1979), 602 F. 2d 117, <u>cert. denied</u>, 444 U.S. 936, improper comments in closing argument which were not objected to by defendant, were held not to violate his right to a fair trial.

In <u>Berger v. U.S.</u> (1934), 295 U.S. 78, the prosecution's comments in closing argument claiming personal knowledge were held to be error. No such claim was asserted in the instant case. <u>Berger</u> was tried before a jury unlike the case at bar. In addition, defense counsel objected to the prosecution's improprieties in <u>Berger</u>.

In <u>State v. Agner</u> (1972), 30 Ohio App. 2d 96, the prosecution's comments, over objection, in final argument calling for a conviction based on a need to meet a public demand were held to be reversible error. Unlike <u>Agner</u>, there was no jury, no objection, and no calling for conviction as a public demand.

<u>Tucker v. Zant</u> (11th Cir. 1984), 724 F.2d 882, held that comments by the prosecution at a sentencing hearing that improperly appealed to the emotion of a jury were error. In the instant case, there was no jury.

In <u>Brooks v. Kemp</u> (11th Cir. <u>en banc</u> 1985), 762 F.2d 1383, vacated 106 S. Ct. 3325, the Court stated that errors by the prosecution during closing argument would

not warrant reversal unless in their absence the outcome would have changed.  As stated earlier in this argument, the outcome would not have changed.

Appellant's Eighteenth Proposition of Law is without merit.

PROPOSITION OF LAW NO. 19

THE RECORD DEMONSTRATES THAT APPELLANT'S RIGHT TO
EFFECTIVE ASSISTANCE OF COUNSEL WAS NOT VIOLATED PURSUANT
TO THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION AND ARTICLE I, SECTION 10 AND 16 OF
THE OHIO CONSTITUTION.

Appellant all but concedes there is insufficient
evidence to show ineffective assistance of counsel.
Seven allegations of instances of the ineffective
assistance are cited by Appellant.  A two-prong analysis
for determining whether counsel's assistance was so
defective as to require reversal of a conviction has been
adopted by the Supreme Court:

> First, the defendant must show that
> counsel's performance was deficient.  This
> requires showing that counsel was not
> functioning as the 'counsel' guaranteed the
> defendant by the Sixth Amendment.  Second,
> the defendant must show the deficient per-
> formance prejudiced the defense.  This
> requires showing that counsel's errors were
> so serious as to deprive the defendant of a
> fair trial, a trial whose result is reliable."
> Strickland v. Washington, 466 U.S. 668, 693
> (1984).

Counsel is "strongly presumed" to have rendered
adequate assistance, and "the defendant must overcome the
presumption that, under the circumstances, the challenged
action 'might be considered sound trial strategy.'"  Id.
at 694-695 (quoting Michel v. Louisiana (1955), 350 U.S.
91, 101).  Ohio has adopted a test essentially the same
as that in Strickland in State v. Hester (1976), 45 Ohio

St. 2d 71, 79, and <u>State v. Lytle</u>, (1976), 48 Ohio St. 2d

391, 395, vacated on other grounds 98 S. Ct. 3135.  <u>Lytle</u>

states:

> When considering an allegation of
> ineffective assistance of counsel, a two-
> step process is usually employed.  First,
> there has been a substantial violation of any
> defense counsel's essential duties to his
> client.  Next...there must be a determination
> as to whether the defense was prejudiced by
> counsel's ineffectiveness.

With respect to the issue of prejudice, this Court

recently stated: "To establish prejudice, the defendant

must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of

the proceeding would have been different."  <u>State v.</u>

<u>Seiber</u> (1990), 56 Ohio St. 4, 11.  In the case at bar,

Appellant is unable to make such a showing.  In addition,

the Appellate Court found, "the record fails to

demonstrate where Appellant was expressly prejudiced by

the omissions and/or commissions of trial counsel."

(Appellate Ct. Op. at 54).  The Appellate Court also

found that Appellant's argument was deficient for failing

to comply with <u>Appellate Rule</u> 16(A)(4) which required the

Appellant to fully develop his argument.  <u>Id</u>. at 55.

This Court has held that a properly licensed

attorney in Ohio is presumed to be competent.  This Court

reaffirmed this position in the recent capital case of

State v. Lott (1990), 51 Ohio St. 3d 160, 174. The burden of proving ineffectiveness is on the defendnt. State v. Smith (1991), 3 Ohio App. 3d 115.

The Appellant here has clearly failed to meet this burden and the record amply demonstrates that Appellant was not deprived of his right to a fair trial by the performance of his counsel. Appellant's attorney has a wealth of trial experience in criminal defense and is a former assistant prosecutor. He capably advocated his client's case and objected when appropriate. Appellant's counsel clearly did not violate his "essential duties" to his client, and the fact that this case was tried before a three-judge panel, rather than a jury, is further evidence that Appellant was in no way prejudiced. State v. White (1968), 15 Ohio St. 2d 146, 151.

Regarding the seven allegations by Appellant of instances of ineffective assistance of counsel, six of the seven can properly be classified under the heading "trial tactics." In State v. Clayton (1980), 62 Ohio St. 2d 45, 49, cert. denied, 449 U.S. 879, the Court stated: "...the fact that there was another better strategy available does not amount to a breach of an essential duty to his client." The remaining allegation - that Appellant's counsel failed to fully advise his client

regarding his waiver of his right to a jury trial - is refuted in the State's response to the Appellant's Thirteenth Proposition of Law.

The record reflects that counsel for the Appellant filed in excess of 50 motions on behalf of his client, along with numerous subpoenas. Counsel's cross-examination of the State's witnesses requires approximately 280 pages of transcript, excluding hearings on motions. Appellant's counsel presented approximately 20 witnesses on his behalf. The record is replete with evidence of zealous and vigorous efforts by the attorney for Appellant.

Appellant's Nineteenth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 20

<u>KIDNAPPING AND THE OTHER FELONIES IN THE INSTANT CASE
WERE COMMITTED SEPARATELY AND WITH SEPARATE ANIMUS, AND
ACCORDINGLY, DO NOT MERGE FOR CONVICTION PURPOSES
PURSUANT TO OHIO REVISED CODE § 2941.25</u>

Appellant cites <u>State v. Logan</u> (1979), 60 Ohio St. 2d 126 for the proposition that the kidnapping of Raymond Fife was merely incidental to the other felonies for which Appellant was convicted. Under the specific facts set forth in <u>Logan</u>, rape and kidnapping were held to be offenses of similar import and thus, it was error for the Court to have convicted on both counts. The Court's focus in <u>Logan</u> was on whether the offenses were committed separately or with a separate animus, with "animus" being defined as immediate motive. Applying the <u>Logan</u> standard to the case at bar, the record reflects that the kidnapping commenced near the parking lot of Valu King. (TR. 73-78, 808-809). Appellant along with Tim Combs forcibly removed Raymond Fife from the path near the parking lot to a wooded area where they could not be seen. There he was purposely and repeatedly beaten in the head and body. This was not done for the immediate motive of rape, felonious penetration or aggravated arson, but to terrorize and inflict serious physical harm. See <u>Ohio Revised Code</u> § 2905.01(A)(3) (Kidnapping).

Anal intercourse was then performed forcibly on Raymond Fife which constitutes rape.  Additionally, the bite marks upon the penis of Raymond Fife confirms fellatio by Appellant.  Then Fife was moved to another area of the woods where the victim had a piece of wood rammed into his anus. (Felonious Sexual Penetration).  At that site, he was also strangled by his own underwear and set on fire.  (Aggravated Arson).

This scenario demonstrates that not only was there a separate immediate motive or animus, but that the acts were committed separately with the kidnapping continuing long after the rape.

Furthermore, as the Appellate Court recognized in the case at bar, the exception to the general rule announced in Logan is applicable here:

> Within the pronounced ruled we adopt the policy that where murder, the taking of a hostage, or extortion is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense.  (Emphasis added).  Logan at 135.

See also State v. Powell (1990), 49 Ohio St. 3d 255, 261.

Additional case law provides further support for the finding that the kidnapping and the other offenses of which Appellant was convicted are not allied offenses of similar import.  In State v. Henry (1987), 37 Ohio App. 3d 3 (cited by the Appellate Court in the case at bar),

the Court found that a separate animus existed for the offenses of kidnapping and rape and that, therefore, separate convictions were warranted. Among the factors the Henry Court considered significant were that the restraint of the victim was prolonged, the confinement was secretive, and that there was a substantial increase in risk of harm to the victim. Henry at 9. Here, Raymond Fife was restrained for approximately forty-five minutes while various acts of brutality were committed against him. The confinement was secretive, as the victim was dragged off the travelled path, kept in the woods, and had his mouth covered to prevent pleas for help. Finally, there was clearly a substantial increase in the risk of harm to the victim since restraining and then leaving the victim in a wooded area undoubtedly decreased the possibility that the badly-injured victim would be discovered. See also Powell at 262.

In State v. Moore (1983), 18 Ohio App. 3d 226, the Court there held that in a kidnapping and rape conviction where the movement of the victim is substantial or the restraint of liberty is for a significant period of time, the two offenses do not merge. The case clearly illustrates that under appropriate fact patterns

kidnapping and rape are demonstrably separate offenses. See generally State v. Donald (1979), 57 Ohio St. 2d 73.

In State v. Willey (1981), 5 Ohio App. 3d 86, the Court held that aggravated arson and involuntary manslaughter were not offenses of similar import. In addition, it is clear from the statement of facts and the trial transcript that the various torturous acts visited upon young Raymond, although committed one after the other, were separate acts.

Finally, it is axiomatic that if kidnapping and rape in the instant case were committed separately and with separate animus, it is proper to consider each of the felonies as a separate specification for purposes of the death penalty. See: State v. Adams (1978), 53 Ohio St. 2d 223.

Appellant's Twentieth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 21

IT IS WITHIN A TRIAL COURT'S DISCRETION TO DENY A MOTION
FOR A NEW TRIAL WITHOUT A HEARING, PARTICULARLY WHERE THE
MOVANT HAS FAILED TO FULFILL THE EVIDENTIARY REQUIREMENTS
OF CRIM. R. 33.

On May 8, 1986, as a result of the State's motion to
quash, the Court properly denied Appellant's motion to
set aside the overruling of his original motion for new
trial.

The Appellant cites State v. Abi-Sarkis (1988), 41
Ohio App. 3d 333, a Cuyahoga County appellate case.  The
defendant in Abi-Sarkis was a Cleveland, Ohio priest
convicted of the rape and gross sexual imposition of one
of his parishioners.  Both the trial testimony and
subsequent testimony in a civil case based on the
incident raised serious doubt as to whether force was
used against the alleged victim, or if she consented to
acts.  Specifically, the alleged victim gave one story of
the "attack" during the priest's criminal trial, and a
substantially different version during a deposition for
the civil lawsuit filed against the priest and his order.

The Appellate Court remanded for a new trial,
noting, "(o)ur review of the record leaves us with
considerable doubt the appellant committed the crimes for
which he has been convicted." Id. at 399.  The Court
cited the victim's failure to cry for help, failure to

report the "rape" to the police, and an obvious pecuniary interest as evidence that the "victim's" story was less than reliable. No such analogy can be drawn in the case at bar. The evidence introduced at trial could easily withstand the "new" evidence alleged by the Appellant and reasonable minds must still agree that the Appellant is guilty beyond a reasonable doubt.

Appellant also cites Toledo v. Stuart (1983), 11 Ohio App. 3d 292, wherein a motion for a new trial based on misconduct of a prosecution witness (recanting) was denied without hearing. The Court in Stuart stated that absent a clear showing of abuse of discretion the appellate court would not disturb the decision of the trial court.

Appellant also cites State v. Turner (1983), 10 Ohio App. 3d 328. Turner is distinguishable from the instant case in two ways. First, that case was reversed in order to be consistent with a local rule of court allowing for hearings if requested. Second, it was based on newly-discovered evidence which is the only ground listed under Rule 33 that specifically alludes to a hearing.

It is not necessary for the Court to have a hearing on a motion for new trial. This is especially true where the Court is also the trier of fact. This is so, because

the three-judge panel used its judgment in observing a witness' demeanor and weighing the credibility and did not merely validate the verdict where these judgments were made by a jury.

The Court in United States v. Kearney (1982), 682 F.2d 214 stated:

> A motion for new trial may be decided on the basis of affidavits without an evidentiary hearing. Ewing v. United States, 135 F.2d 633, 638 (D.C. Cir. 1942) (Rutledge, J); Hillman v. United States, 192 F 264 272 (9th Cir. 1911), cert. denied, 225 U.S. 699, 32 S. Ct. 834, 56 L. Ed. 1263 (1912); Chetkovitch v. United States, 53 F.2d 26 (9th Cir. 1931); Gordon v. United States, 178 F.2d 896 (6th Cir.), cert. denied, 339 U.S. 935, 70 S. Ct. 664, 94 L. Ed. 1353; United States v. Johnson, 327 U.S. 106, 112, 66 S. Ct. 464, 466, 90 L. Ed. 562 (1946). United States v. Ward, supra, in the 8th Circuit, is to the same effect. In affirming the denial, without a hearing, of a new trial based on a recanting affidavit of a witness its per curiam opinion states:

> Appellants contend that the trial court erred in denying their new trial motion without the benefit of a hearing to determine the validity of the alleged recanted testimony. A motion for new trial based on newly discovered evidence may be decided ordinarily upon affidavits without a hearing. [citations ommitted]...Moreover, the necessity for a hearing is diminished in cases involving challenged testimony where the trial judge has had an opportunity to observe the demeanor and weigh the credibility of the witness at trial. [citation ommitted]...Furthermore, 'courts look upon recantation with suspicion. The trial court, which has had the witness before it, is in a much better position to determine where the truth lies than an appellate court.' [citation ommitted]. On this record we are satisfied the court did not abuse its discretion

in failing to hold a hearing. 544 F.2d at 976, cert. denied, 430 U.S. 930. Kearney at 219.

Furthermore, assuming arguendo that a hearing had occurred based on the allegations in the motion and the single affidavit submitted, the court would have properly denied the motion for a new trial. Appellant's only affidavit was a questionable partial recanting of sworn testimony by his brother. Appellant's argument fails on two counts. First, the credibility of the recanting witnesses affidavit is questionable at best considering his relationship to Appellant. Secondly, even if the affidavit would have been totally believed at a hearing, it would have not resulted in a different outcome at trial. U.S. v. Lee (1980), 634 F.2d 383, cert. denied, 450 U.S. 1002, involved a recanting witness. The court stated:

> At the outset we note that: [T]he impact of recanted testimony as a basis for a new trial motion depends both on the credibility of the recanting witness and the materiality of his testimony. Unless the recanted testimony would probably produce an acquittal on retrial, a new trial motion on this ground must be denied. Lee at 384.

In Ohio, a similar test is applied in determining whether the failure to grant a motion for new trial is error. In State v. Duling (1970), 21 Ohio St. 2d 13, the court affirmed a conviction where a motion for a new

trial based on newly discovered evidence was denied by the trial court.  The court stated that the evidence, "...fails to disclose any strong probability that the result would be changed by a new trial, and, therefore is not sufficient evidence to warrant the granting of a new trial."  Duling at 17.

It is within the trial court's sound discretion to deny Appellant's motion for a new trial.  In State v. Williams (1975), 43 Ohio St. 2d 88, this Court stated:

> The granting of a motion for a new trial upon the ground of newly discovered evidence is necessarily committed to the wise discretion of the court, and a court of error cannot reverse unless there has been a gross abuse of that discretion.  And whether that discretion has been abused must be disclosed from the entire record.  Williams at 93.

The trial court did not abuse its discretion by properly denying the motion for a new trial without a hearing.  The allegations and sole affidavit would not have produced an acquittal.  This is even more compelling since the Court was also the trier of fact.

Appellant's Twenty-First Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 22

OHIO'S STATUTORY FRAMEWORK FOR IMPOSITION OF CAPITAL PUNISHMENT BY A PANEL OF THREE JUDGES DOES NOT CREATE A MANDATORY SENTENCING SCHEME IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION OR ANY PROVISION OF THE OHIO CONSTITUTION.

Appellant's argument has been rejected in State v. Buell (1986), 22 Ohio St. 3d 124, 141, cert. denied, 480 U.S. 923, 107 S. Ct. 240, reh. denied, 481 U.S. 1033, citing Barclay v. Florida (1983), 463 U.S. 939 and Proffitt v. Florida (1976), 428 U.S. 242 noting that the Florida statutes allow the sentencing authority to recommend death where mitigating circumstances exist, provided they are outweighed by aggravating factors. See also, State v. Jenkins (1984), 15 Ohio St. 3d 164, cert. denied, ___ U.S. ___, 87 L. Ed. 2d 643.

As the court stated in Jenkins, Appellant is permitted to consider "a broad range of specified and unspecified factors in mitigation of the imposition of a death sentence. Id. at 174.

Appellant's Twenty-Second Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 23

WHEN THE TRIAL COURT CONSIDERS ALL EVIDENCE OF MITIGATING
CIRCUMSTANCES AND ARTICULATES IN ITS OPINION PURSUANT TO
§ 2929.03 THE REASONS WHY THE AGGRAVATING CIRCUMSTANCES
OUTWEIGH THE MITIGATING FACTORS BY PROOF BEYOND A
REASONABLE DOUBT, THEN THE IMPOSITION OF THE DEATH
PENALTY IS PROPER.

Appellant in this Proposition of Law attempts to
convince this Court that because a particular fact or
theory is raised in mitigation, the trial court must
address that fact or theory in its written opinion
concerning the imposition of the death sentence. This is
completely contrary to countless Ohio Supreme Court
rulings on this issue.

In State v. Steffen (1987), 31 Ohio St. 3d 111,
cert. denied, 108 S. Ct. 1089, reh. denied, 108 S. Ct.
1587, this Court ruled that while there is legislative
intent to give a defendant "wide latitude" to introduce
any evidence that he might consider mitigating, "this
does not mean that the court is necessarily required to
accept as mitigating everything offered by the defendant
and admitted." Id. at 129. This Court further stated
that just because a defendant introduces evidence during
mitigation, a Court is not automatically bound to give
that evidence weight. "The court in its own independent
weighing process may properly choose to assign absolutely

no weight to this evidence if it considers it to be non-mitigating." Id.

This position was reiterated by this Court in State v. DePew (1988), 38 Ohio St. 3d 275, cert. denied, 109 S. Ct. 1088, reh. denied, 109 S. Ct. 1773. Here, the defendant in a triple homicide, felt it was error that the trial court did not consider his sparing the life of a potential fourth victim as mitigating. In DePew, the defendant was convicted of stabbing to death a 27-year-old woman, her 7-year-old daughter and her 12-year-old sister and then setting fire to the house in which all three victims were killed. DePew assigned error to the fact that the trial judge did not consider as mitigating factor that he did not stab to death an infant in the same house that night, and that he removed the infant from the house before torching the home. This Court found, "that he only committed three murders when he could have committed four can hardly be characterized as extenuating circumstances." Id. at 292. As in Steffen, this Court did not require the trial court to make reference every conceivable fact or theory of mitigating in the sentencing opinion. See also State v. Jells (1990), 53 Ohio St. 3d 22 and State v. Stumpf (1987), 32 Ohio St. 3d 95.

The trial court clearly followed the mandate of Lockett v. Ohio (1978), 438 U.S. 586, by not limiting the mitigating factors that may be considered. The trial court heard testimony and considered all mitigating factors without excluding any factors from consideration consistent with Eddings v. Oklahoma (1982), 455 U.S. 104.

Appellant also cites State v. Maurer (1984), 15 Ohio St. 2d 239. In Maurer, the trial court did not articulate in its opinion why the aggravated circumstances outweighed the mitigating factors. In reviewing the case, the Ohio Supreme Court concluded, "We cannot conclude that appellant was prejudiced by the failure of the trial court to enunciate its reasoning." Maurer at 247.

In the case at bar, not only did the Court consider all the mitigating factors, but also enunciated why the aggravated circumstances outweighed the mitigating factors beyond a reasonable doubt.

Appellant alleges that the three-judge panel found no evidence presented in mitigation as mitigating factors. The second page of the trial court's opinion clearly demonstrates that this is not so. (Document #150). Appellant then alleges that certain evidence was not mentioned and thereby given no weight. Appellant is

merely playing "word games" in his brief.  For example,
he alleges that "the severely low mental age of Danny"
(page 165 of Appellant's brief) was not considered by the
court.  However, on page two (2) of the trial court's
opinion, the second enumerated factor in mitigation was
"The low intelligence of the defendant."  Simply because
a mitigating factor considered by the trial court is not
worded in the language used in Appellant's brief does not
mean that it was not mentioned or given weight.

Possible brain damage as a mitigating factor was
considered within the context of low intelligence and
impaired judgment since Appellant's witnesses testified
on the relationship between brain damage and low
intelligence.  (See, for example, Dr. Crush's testimony,
TR. M. 326, 327).

Appellant also alleges that Appellant's good
institutional record at Brinkhaven and TCY were not
considered.  He cites Skipper v. South Carolina (1986),
39 Crim. L. Rptr. 3041, in support of this allegation.
However in Skipper, the trial court refused to allow
testimony of witnesses at the jail (institution) where he
was housed.  Clearly, that did not happen in this case.
Several witnesses did testify from the various
institutions where Appellant was housed, and to

characterize their testimony in toto as evidence of a good institutional record is dubious.

In any event, those witnesses that testified from the institutions were used to show that Appellant was a follower not a leader, and that the State facilities did not fulfill their obligations to treat Appellant. Both of these issues were considered on page two (2) of the trial court's opinion in mitigating factors four (4) and six (6).

After enumerating the mitigating factors, the trial court then articulated why each was outweighed beyond a reasonable doubt by the aggravating circumstances.

Appellant's Twenty-Third Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 24

<u>THE OHIO DEATH PENALTY SCHEME SET FORTH IN OHIO REVISED
CODE §§ 2903.01 and 2929.01, ET. SEQ. DOES NOT VIOLATE
THE UNITED STATES CONSTITUTION OR THE OHIO CONSTITUTION.</u>

This Court, in a plethora of capital cases, has soundly rejected the Appellant's contention that Ohio's current death penalty statutes violate the Federal Constitution's Eighth Amendment prohibition against cruel and unusual punishment. <u>State v. Jenkins</u> (1984), 15 Ohio St. 3d 164, <u>cert. denied</u> 105 S. Ct. 3514, <u>reh. denied</u>, 106 S. Ct. 19; <u>State v. Buell</u> (1986), 22 Ohio St. 3d 124; <u>State v. Lott</u> (1990), 51 Ohio St. 3d 160.

Appellant's Eighth Amendment argument has been unequivocally rejected by the U.S. Supreme Court, which has ruled that the death penalty is, "an extreme sanction, suitable to the most extreme crimes." <u>Gregg v. Georgia</u> (1976), 428 U.S. 153, 184 and 187.

Appellant further argues that Ohio's death penalty scheme allows for the imposition of the death penalty in an "arbitrary and discriminatory manner," suggesting that too much is left to the whims and fancies of the individual prosecutors. This Court completely dismantled this argument in <u>Jenkins</u>, <u>supra</u>. This Court ruled, "Defendants will escape the death penalty through prosecutorial charging decisions only because the offense

is not sufficiently serious, or because the proof is insufficiently strong." <u>Jenkins</u> at 169 and 170.

Also with respect to the Appellant's argument of racial discrimination in the imposition of the death penalty, this Court has been quite clear that the defendant must demonstrate a discriminatory intent. <u>State v. Zuern</u> (1987), 32 Ohio St. 3d 56, 65. No such intent has been demonstrated here. Pointing to a 1987 State Public Defender's report, this Court ruled, "(t)he implication seems rather difficult to avoid that a mere counting of victims and offenders by race reveals almost no basis to imply a probability that the race of the victim played any part in the sentencing." <u>Id.</u> See also <u>McClesky v. Kemp</u> (1987), 481 U.S. 279.

The Appellant next argues that the death penalty is violative of the Fifth and Fourteenth Amendments to the Constitution. The Appellant claims that "the right to life is a constitutionally protected fundamental right," and uses the landmark abortion case of <u>Roe v. Wade</u> (1973), 410 U.S. 113 to buttress his position.

This Court dismissed defense arguments that Ohio's death penalty scheme violates the Fifth and Fourteenth Amendments in both <u>Jenkins</u> and <u>Buell</u>. This Court has dismissed the Appellant's contention that there is no

172

compelling state interest in maintaining a death penalty system. "(T)he Supreme Court has recognized that the death penalty, as a sanction or punishment, is proper in extreme cases," Jenkins at 168. Certainly, the sex-torture murder of a 12-year-old boy should qualify as an "extreme case."

The Appellant argues, "Isolation of the offender can be effectively served by means less restrictive than the death penalty." (Appellant's brief at p. 170). This Court specifically rejected the "least restrictive" argument in Jenkins at 168 citing a string of U.S. Supreme Court cases in support of its position: Gregg, supra; Proffitt v. Florida (1976), 428 U.S. 242; Jurek v. Texas (1976), 428 U.S. 262; Woodson v. North Carolina (1976), 428 U.S. 280; and Roberts v. Louisiana (1976), 428 U.S. 325. Jenkins at 168.

The Appellant further argues that the death penalty is not a deterrent to crime. The U.S. Supreme Court has ruled that, for many types of murder, "the death penalty is a significant deterrent." Gregg at 185 and 186. The Court further held that the deterrent value is something for the legislatures and not the courts to decide. Id. at 186.

In an attempt to convince this Court that Ohio's capital sentencing statutes violate the U.S. Constitution, Appellant cites Adamson v. Ricketts (C.A.9, 1988), 865 F.2d 1011, cert. denied, 110 S. Ct. 3287.  The Appellant found one Federal Court which agreed with his contention that requiring the defendant to prove mitigating factors by a preponderance of the evidence is unconstitutional.  This Court has steadfastly maintained since Jenkins that the preponderance standard is the proper standard.  In a more recent opinion, this Court briefly addressed the Adamson case:

> Complaining that the challenged instruction precluded the jury from weighing the evidence that, while not satisfying the evidentiary standard, may hve been relevant to the mitigation of the penalty of death, Appellant invites us to reconsider our opinion in State v. Jenkins in light of recent decisional law on the federal level. (Adamson). We decline this invitation. State v. Lawrence (1990), 44 Ohio St. 3d 27, rev'd. on other grounds.

This Court should continue to so decline.

The Appellant next argues that Ohio statutes violate the Constitution by requiring proof of aggravating circumstances in the guilt phase of capital trials.  "Ohio has effectively prohibited a sufficient individualized determination in sentencing..." (Appellant's brief at 173).  The Appellant offers no case law to support a position that one trial should be held

to determine guilt, another to determine aggravating circumstances and a third to determine mitigating factors. This Court addressed his issue in Buell where it ruled, "(W)e agree with the court of appeals' finding that no presumptive bias is created in favor of aggravating factors by requiring their proof beyond a reasonable doubt in the guilt phase. Whether a sentencing phase is needed at all rests on predetermination." Id. at 137. Therefore, this Court has found no bias in a trial which determines both guilt and aggravating circumstances during the same proceeding.

The Appellant's next argument that Ohio's death penalty statute poses an impermissible risk of death for those who chose a jury trial, need not be addressed here. Appellant opted for trial by a three-judge panel. Therefore, by the Appellant's own analysis, he was subject to less of a risk of death than he would have been had he opted for a jury trial. By the Appellant's own analysis, he was not prejudiced by Ohio's Death Penalty scheme.

Next, the Appellant contends that because Ohio law requires no "Written Life Recommendation," that adequate Appellate Review is not possible. (Appellant's brief at 175). Once again, this Court has clearly disagreed. In

both <u>Jenkins</u> and <u>Buell</u>, this Court has found that such written findings are not an "indispensible ingredient" to appellate review.  In <u>Buell</u>, this Court ruled that the trial court's required written findings of Ohio Revised Code § 2929.03 (F), plus the Appellate Court's independent determination of sentence appropriateness protect the defendant against arbitrary and capricious death sentences.  <u>Buell</u> at 137.

This Court, through <u>Jenkins</u> and its progeny, has totally rejected the Appellant's overall argument that Ohio's death penalty scheme is volative of the U.S. and Ohio Constitutions.  This Court has also dismantled many of the Appellant's subarguments, such as the lack of compelling state interest argument, the unbounded prosecutorial discretion argument, the racial discrimination argument, the less restrictive means argument, the mitigation by preponderance argument, and the recommendation for life argument.  The constitutionality of Ohio's Death Penalty statute has been reaffirmed in countless instances since <u>Jenkins</u>. The U.S. Supeme Court has taken no action to undermine the current death penalty scheme in Ohio.

The Appellant's Twenty-Fourth Proposition of Law is without merit.

## PROPOSITION OF LAW NO. 25

UPON INDEPENDENT REVIEW PURSUANT TO R.C. § 2929.05(A), THIS COURT SHOULD FIND THAT THE CONVICTION BELOW IS BASED UPON SUFFICIENT EVIDENCE AND IS NOT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THAT THE AGGRAVATING CIRCUMSTANCES APPELLANT WAS FOUND GUILTY OF OUTWEIGH ANY MITIGATING FACTORS, THAT THE SENTENCE OF DEATH IS APPROPRIATE IN THIS CASE, THAT THE SENTENCE OF DEATH IS NOT EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, AND THAT THE TRIAL AND APPELLATE COURTS PROPERLY WEIGHED THE AGGRAVATING CIRCUMSTANCES AND THE MITIGATING FACTORS.

Appellate review of the death penalty is provided by § 2929.05, Ohio Revised Code.  In pertinent part, sub-paragraph (A) of that section sets forth the required review:

> The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they re-view other criminal cases, except that they shall review and independently weigh all the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing out-weigh the mitigating factors in the case, and whether the sentence of death is appropriate.  In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is ex-cessive or disproportionate to the penalty im-posed in similar cases.  They shall also review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.  The court

> of appeals or the supreme court shall affirm a
> sentence of death only if the particular court
> is persuaded from the record that the aggravating
> circumstances the offender was found guilty of
> committing outweigh the mitigating factors pre-
> sent in the case and that the sentence of death
> is the appropriate sentence in the case.

Review of the facts and circumstances herein leads to the inescapable conclusion that the sentence of death should be affirmed.

Appellee will not attempt to reiterate all of the evidence presented below. Suffice it to say that the uncontradicted evidence shows that the judgment imposing a death sentence, is amply supported.

Initially it is noted that this matter was tried to a three-judge panel. It is presumed that the judges considered only the relevant, material and competent evidence free from the "passion and prejudice" claimed by Appellant. State v. White (1968), 15 Ohio St. 2d 146, 151.

Addressing the evidence at trial, it is apparent from the statements of Appellant to the Warren Police Department that Appellant was more than just a casual observer to the events described. Initially, the Appellant appeared at the Warren Police Dept. volunteering a statement concerning the Raymond Fife homicide. He admitted during his suppression hearing

that he was there to lie and to blame someone else for the attack. (TR. S. 382). He also revealed that the victim was choked with his own underwear, a fact that only the investigators and the perpetrators could know. (TR. S. 15).

In his video-cassette interview with Warren Police, he revealed that Raymond Fife had been impaled with a stick, which he described as "like a broom handle." (TR. S. 338). This description certainly fits State's Exhibit #47, an implement which Dr. Howard Adelman testified was consistent with the plant cells found in Raymond Fife's rectum, anus and urinary bladder, (TR. 370, 387), bruises caused by a blunt instrument, and tears in the urinary bladder, (TR. 382, 383); an implement which Donald Allgood said he saw the Appellant, not co-defendant Combs, throw into the weeds off Jackson Street. (TR. 497); and an implement that was later recovered by Warren City workers in the same area where Allgood saw the Appellant toss "a stick."

Although Appellant would like this court to believe that he only stood idly by while co-defendant Combs beat, raped, impaled, strangled and burned Raymond Fife, two forensic odontologists testified that co-defendant Combs could be ruled out as a possible source for bite marks

found on the boy's penis. (TR. 939, 997, 1000, 1151, 1152). One of those doctors, Dr. Curtis Mertz, concluded with a reasonable degree of dental certainty that the Appellant had inflicted bite marks on the victim's penis (TR. 937), despite his claim that he only touched the boy's neck to see if he was still breathing. When co-defendant Combs was seen by Darren Ball and Troy Cree on the path behind Valu King in his shorts at the date, time and place of the crime, they heard a young boy's scream as they hurriedly left the path. (TR. 847-848). Who was causing Raymond Fife to scream in those woods when Combs was on the path? There is no doubt that Appellant was an active participant in every aspect of the tragedy.

While it is apparent that the Appellant's statements in his video-taped statement were designed to place the entire blame of the Raymond Fife assault on co-defendant Combs, the Appellant's long litany of contradictory statements impeach the credibility of the Appellant as he describes himself as only an innocent bystander in this crime. At one point, the Appellant denied having seen Combs at all, and then states that he watched him assault Fife. (TR. 306-318). He claimed to be in bed, baby sitting and out with Combs the night of the attack. (TR.

249, Id.) He also made no reference to the stick until the video-tape statement. (TR. 249).

After careful evaluation of the evidence, three judges determined that the evidence was sufficient to convict Appellant of five (5) of the six (6) charges on which he was indicted, as well as the correspondent specifications. Such evaluation necessarily involved weighing the credibility of witnesses. The credibility of witnesses and the weight to be accorded their testimony is primarily a function of the trier of fact. State v. DeHass (1967), 10 Ohio St. 2d 30; See generally, Seasons Coal Company v. Cleveland (1984), 10 Ohio St. 3d 77, 81 (a finding of error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witness is not).

As to the Appellant's contention that the mitigating factors outweigh the aggravating factors, this court's attention is directed to the Opinion of the trial court (Document #150), as issued by the three-judge panel, along with the sentence. The aggravating circumstances, in the view of the lower court, included the manner in which the rape was committed, i.e., the amount of force used, the relative size of the victim and the Appellant, the biting of the penis, pulling on the

genitalia, the length of time the abuse took place, and the use of an instrument long enough to rupture the victim's urinary bladder.

The lower court also refers to the "attendant torture" in strangling the victim with his own clothing by pulling the boy off the ground and dangling him in the air as he fought for oxygen. Also, the court notes that the burning of the victim was either a "vicious attempt to inflict more pain" or to conceal his identity. The panel also cites the Appellant's denial as of Raymond's request for his mother as "callous," and says the Appellant demonstrated a total lack of remorse in trying to cash in on his actions by inquiring about the reward for information about Fife's death.

Also considered by the lower court as an aggravating circumstance was the manner in which the kidnapping was committed. Of particular concern was the slamming of the victim on the ground and a bicycle pedal, the kicking of the victim, the severe head injuries and multiple blows to the victim's body, and the removal of Raymond's body to a place where medical attention would likely be delayed.

Finally, the court notes that the victim was tortured over a long period of time "evidencing a vicious, perverted, animalistic state of mind."

The trial court further stated that it considered the following factors in mitigation:

1) The age of the defendant;

2) The low intelligence of the defendant;

3) The poor family environment;

4) The failure of the State or society to prevent this crime;

5) The defendant's impaired judgment; and

6) Whether or not he was a leader or a follower.

The trial court then unanimously concluded that "the aggravating circumstances in this case outweigh the mitigating factors beyond any reasonable doubt." The Appellate Court reached the same conclusion after an extensive weighing analysis of the aggravating circumstances and mitigating factors. (Appellate Ct. Op. at 74-87).

Upon independent review pursuant to Ohio Revised Code § 2929.05, this court should, as did both the trial and appellate court, conclude under all of the circumstances, that the death penalty was properly imposed. The aggravating circumstances clearly outweigh

Appellant's minimal mitigation. The death sentence is entirely appropriate for these senseless crimes.

Appellant's proportionality review argument likewise must fail. Proportionality review of sentencing in capital cases is not constitutionally mandated. <u>Pulley v. Harris</u> (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871. Traditionally, proportionality has been used in the "abstract evaluation of the appropriateness of a sentence for a particular crime." <u>Id</u>. at 875. On occasion, the Supreme Court has found a punishment to be inherently disproportionate (and therefore cruel and unusual) when imposed for a particular crime or category of crime. However, the court has unequivocally stated that, "[t]he death penalty is not in all cases a disproportionate penalty..." <u>Id</u>. Thus, while emphasizing the importance of appellate review, there is "no basis in our cases for holding that a comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed..." <u>Id</u>. at 879.

In Ohio, <u>Ohio Revised Code</u> § 2929.05, provides for appellate review of sentencing in capital cases. However, the true test of any review of sentencing in a similar cases is not whether identical conduct begets identical punishment, but whether, "the sentence <u>in this</u>

184

case was imposed arbitrarily, or freakishly as condemned in Furman v. Georgia (1972), 408 U.S. 239." State v. Jenkins (1984), 15 Ohio St. 3d 164 at 210. [Emphasis added]. If the proportionality review of § 2929.05, Ohio Revised Code, required identical sentences for similar offenses, only by happenstance or misfortune would an otherwise lawfully-imposed capital sentence be upheld on appeal. Essentially, Appellant urges this court to adopt a position that invites direct comparison of each and every factor involved in the particular case reviewed with each and every individual factor of other death sentences imposed in the court's jurisdiction. This direct, point-by-point comparison for equivalency of sentence should result in affirmance of only the single most offensive homicide committed within the court's jurisdiction. Clearly, mathematical equivalency is not the basis upon which review of a death sentence is predicated.

This is consistent with the requirement that review is limited to the "appropriateness of a sentence for a particular crime." Pulley v. Harris, supra, 104 S. Ct. at 875. This Court has held that:

> [t]he fundamental purpose behind pro-
> portionality review is to ensure that sen-
> tencing authorities do not retreat to the
> pre-Furman era when sentences were imposed

arbitrarily, capriciously and indiscriminately. State v. Jenkins, supra, at 176.

At the time Jenkins was decided, 280 capital indictments had been filed in Ohio but only ten percent led to imposition of the death penalty. Jenkins at 210. The kind of individual, point-by-point comparison review sought by Appellant herein is not provided for by Ohio statutes and is not constitutionally mandated.

> This Court has never held that a pro-portionality review requires equal treatment of all capital defendants...The purpose of proportionality review is therefore to insure that the death penalty is not imposed in a random, freakish arbitrary or capricious manner.  State v. Zuern (1987), 32 Ohio St. 2d 56 at 64.

In State v. Wickline (1990), 50 Ohio St. 3d  114, the appellant who had been sentenced to death by a three-judge panel for aggravated murder, contended that the Court should conduct a proportionality review by reviewing all cases involving a capital charge in Franklin County and by comparing appellant's punishment with the lack of punishment imposed upon his accomplice, who was the prosecution's main witness.  Citing State v. Steffen (1987), 31 Ohio St. 3d 111, this Court held that:

> The proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed.

Accordingly, the proper question presented in review under Revised Code § 2929.05 is whether the death sentence below was imposed "arbitrarily, capriciously and indiscriminately." Jenkins at 176; Zuern, at 64.  That others may have had the better fortune of receiving an extension of mercy does not make Appellant's penalty arbitrarily or capriciously imposed.

Cases in which the death penalty was possible but which resulted in another result are not before the court in the proportionality review provided by Revised Code § 2929.05, "No reviewing court need consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not." Steffen at 124.  Thus, in review under Revised Code § 2929.05, this court should compare the sentence imposed for Appellant's felony murder with cases in which the death penalty has been affirmed to determine if Appellant's death sentence was imposed in an arbitrary, capricious, freakish or random fashion.

Recent decisions demonstrate that in Ohio Appellant's sentence for aggravated (felony) murder was not imposed in an arbitrary, freakish or capricious manner.  See State v. Post (1987), 32 Ohio St. 3d 380 at 395;  State v. Byrd (1987), 32 Ohio St. 3d 79 at 94; and

State v. Stumpf (1987), 32 Ohio St. 3d 95 at 107.  In each of the foregoing cases, this court has listed other felony murder cases in which the death penalty has been upheld.  Comparison of those felony murders in which the death penalty was affirmed leads to the conclusion that Appellant's sentence was not imposed arbitrarily or freakishly.  This court has upheld death sentences in a number of cases involving felony murders.  See State v. Martin (1985), 19 Ohio St. 3d 122 (aggravated robbery); State v. Williams (1986), 23 Ohio St. 2d 16 (aggravated robbery);  State v. Barnes (1986), 25 Ohio St. 3d 203 (aggravated burglary and aggravated robbery);  State v. Scott (1986), 26 Ohio St. 3d 97 (aggravated robbery); State v. Post, supra (aggravated robbery);  State v. Byrd, supra (aggravated robbery);  State v. Maurer (1984), 15 Ohio St. 3d 329 (kidnapping);  State v. Rogers (1985), 17 Ohio St. 3d 174 (kidnapping; rape);  State v. Buell (1986), 22 Ohio St. 3d 124 (kidnapping);  State v. Stumpf, supra (aggravated robbery);  State v. Powell (1990), 49 Ohio St. 3d 255 (kidnapping);  State v. Tyler (1990), 50 Ohio St. 3d 24 (aggravated robbery);  State v. Johnson (1989), 46 Ohio St. 3d 96 (aggravated robbery).  Comparison with these cases of felony murder demonstrates that Appellant's death sentence is not disproportionate

to his offense and is the appropriate sentence in this case. Appellant's demonstrated callousness and his low regard for human life are born out by review of the events chronicled by the record on appeal.

The Supreme Court of Ohio has found lack of prejudice where a trial court has failed to properly comply with the requirements of Revised Code § 2929.03(F). See State v. Maurer (1984), 15 Ohio St. 2d 239. In Maurer, the trial judge failed to specify reasons why the aggravating circumstances outweighed the mitigating factors. Despite this failure to comply with the statutory provisions, this court concluded that proper independent review by the court of appeals and by this court was "designed, at least in part, to correct such omissions." Id. at 247. Here, the court did not fail to comply with Revised Code § 2929.03(F) but afforded the defendant an even greater opportunity to seek a life sentence than he was entitled to under decisional law.

Appellant's Twenty-Fifth Proposition of Law is without merit.

CONCLUSION

For the foregoing reasons and law, the State respectfully prays that Appellant's conviction and death sentence be affirmed.

Respectfully submitted,

DENNIS WATKINS, #0009949
Prosecuting Attorney

PETER J. KONTOS, #0024893
Chief Counsel-Criminal Division
Trumbull County Prosecutor's
     Office
160 High Street, N.W.
3rd Floor Administration Bldg.
Warren, OH 44481
Telephone No. (216) 841-0426

ATTORNEYS FOR THE STATE OF OHIO,
PLAINTIFF-APPELLEE

CERTIFICATION

This is to certify that a copy of the foregoing Brief of Plaintiff-Appellee was mailed by ordinary U.S. mail to the Attorneys for Defendant-Appellant, Attorney Roger Warner of Tataru, Wallace & Warner, 181 East Livingston Avenue, Columbus, OH 43215 and Carol A. Wright of Tyack, Wright & Turner, 7100 North High Street, Suite 209, Worthington, OH 43085, this 3rd day of June, 1991.

DENNIS WATKINS, #0009949
Prosecuting Attorney


PETER J. KONTOS, #0024893
Chief Counsel-Criminal Division
Trumbull County Prosecutor's
    Office
160 High Street, N.W.
Warren, OH 44481
Telephone No. (216) 841-0426

ATTORNEYS FOR THE STATE OF OHIO,
PLAINTIFF-APPELLEE