No._____

---

IN THE SUPREME COURT OF THE UNITED STATES

October Term, 1992

---

DANNY LEE HILL, Petitioner

V.

STATE OF OHIO, Respondent

---

PETITION FOR WRIT OF CERTIORARI TO THE
OHIO SUPREME COURT

---

CAROL A. WRIGHT
Attorney at Law
Ohio Reg. No. 0029872
7100 North High Street, Suite 209
Worthington, Ohio  43085
(614) 848-4140

and

ROGER WARNER
Counsel of Record
Ohio Reg. No. 0019941
171 East Livingston Avenue
Columbus, Ohio  43215
(614) 221-3821

Attorneys for Petitioner

DENNIS J. WATKINS
PETER J. KONTOS
Trumbull County Prosecuting Attorneys
160 High Street
3rd Floor
Administration Building
Warren, Ohio  44481

Counsel for Respondent


EXHIBIT 1

## QUESTIONS PRESENTED

1.  WHETHER A CONVICTION AND SENTENCE OF DEATH MAY STAND WHEN STATEMENTS ARE ELICITED FROM A MENTALLY RETARDED, ESSENTIALLY ILLITERATE ACCUSED THROUGH MISCONDUCT OF LAW ENFORCEMENT OFFICIALS, COERCION BY PSYCHOLOGICAL TACTICS, AND PROMISES OF LENIENCY IN VIOLATION OF THE FOURTH, SIXTH AND FOURTEENTH AMENDMENTS.

2.  WHETHER A CONVICTION OR DEATH SENTENCE IS CONSISTENT WITH DUE PROCESS AND THE FIFTH, SIXTH AND EIGHTH AMENDMENT WHEN THERE IS NO UNANIMOUS VERDICT BY A THREE-JUDGE PANEL ON THE ISSUE OF WHETHER THE PETITIONER WAS A PRINCIPAL OR A NON-PRINCIPAL ACTING WITH PRIOR CALCULATION AND DESIGN.

3.  WHETHER A DEATH SENTENCE SHOULD BE SET ASIDE WHEN THAT SENTENCE IS BASED ON NON-AGGRAVATING CIRCUMSTANCES AND NO SIGNIFICANT WEIGHT IS GIVEN TO THE MITIGATING FACTOR BOTH AT TRIAL AND THROUGHOUT DIRECT APPELLATE REVIEW IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## PARTIES TO THE PROCEEDINGS

The parties to the proceedings below are the State of Ohio, by and through counsel Dennis J. Watkins and Peter J. Kontos, and Danny Lee Hill, defendant at trial and petitioner herein. Mr. Hill has been represented by Roger Warner as counsel of record in all prior appellate proceedings. Mr. Hill has been represented by Carol A. Wright as counsel of record in his appeal to the Supreme Court of Ohio.

TABLE OF CONTENTS

Page No.

QUESTIONS PRESENTED                                          2

LIST OF PARTIES                                             3

OPINIONS BELOW                                             8

JURISDICTION                                               8

STATEMENT OF THE CASE                                      9

REASONS FOR GRANTING THE WRIT                             14

1.   A CONVICTION AND SENTENCE OF DEATH CANNOT STAND WHEN STATEMENTS ARE ELICITED FROM A MENTALLY RETARDED, ESSENTIALLY ILLITERATE ACCUSED THROUGH MISCONDUCT, COERCION, AND PROMISES OF LENIENCY BY LAW ENFORCEMENT OFFICIALS IN VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.

A.   MR. HILL'S STATEMENTS WERE NOT VOLUNTARY WHEN SUCH STATEMENTS WERE COERCED BY THE PSYCHOLOGICAL TACTICS OF LAW ENFORCEMENT OFFICERS ON A MENTALLY RETARDED INDIVIDUAL WHO WAS ESSENTIALLY ILLITERATE AND THEIR ADMISSION VIOLATED THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.                   14

B.   MR. HILL'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN HE WAS SEIZED FROM HIS HOME THROUGH THE USE OF PSYCHOLOGICAL PLOYS BY LAW ENFORCEMENT OFFICERS (INCLUDING MR. HILL'S OWN UNCLE).                       21

II.  PETITIONER'S CONVICTION AND DEATH SENTENCE ARE INCONSISTENT WITH DUE PROCESS AND THE SIXTH AMENDMENT SINCE THE THREE-JUDGE PANEL DID NOT UNANIMOUSLY FIND THE PETITIONER GUILTY OF EITHER BEING THE PRINCIPAL OFFENDER OR BEING A NON-PRINCIPAL ACTING WITH PRIOR CALCULATION OR DESIGN.        25

III. PETITIONER'S DEATH SENTENCE SHOULD BE SET ASIDE WHEN THAT SENTENCE IS BASED ON NON-AGGRAVATING CIRCUMSTANCES AND NO SIGNIFICANT WEIGHT IS GIVEN TO THE MITIGATING FACTOR BOTH AT TRIAL AND THROUGHOUT DIRECT APPELLATE REVIEW IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.                       32

CONCLUSION                                                36

4

APPENDIX

Rehearing entry                                                A-1

Propositions of Law raised in Ohio Supreme Court              A-2

Opinion of Ohio Supreme Court                                 A-5

Assignments of Error Raised in Court of Appeals              A-18

Opinion of the Trumbull County, Ohio, Court of Appeals   A-19

5

## TABLE OF AUTHORITIES

Page(s)

**STATUTES**

**U.S. Statutes**

28 U.S.C. Sec. 1257(A)                                            9

**Ohio Revised Code**

R.C. 2929.03.01(B)                                               27
R.C. 2929.04(A)(1)-(8)                                           27
R.C. 2929.04(A)(7)                           9, 25, 27, 28, 31
R.C. 2929.05                                                     32

**CASE LAW**

Barefoot v. Estelle, 463 U.S. 880 (1983)                         33

Beck v. Alabama, 447 U.S. 625 (1980)                             31

Blackburn v. Alabama, 361 U.S. 199, 208 (1960)                   15

Cabana v. Bullock, 474 U.S. 376, 384 (1986)                      27

Caldwell v. Mississppi, 472 U.S. 320 (1985)                      31

Clemons v. Mississippi, 494 U.S. 738 (1989)                      35

Colorado v. Connelly, 479 U.S. 157 (1986)                        14

Duncan v. Louisiana, 391 U.S. 145 (1968)                         28

Dunnaway v. New York, 442 U.S. 200 (1979)                    21, 24

Eddings v. Oklahoma, 445 U.S. 104 (1982)                         34

Evitts v. Lucey, 469 U.S. 387 (1985)                         32, 33

Florida v. Royer, 430 U.S. 490 (1983)                        21, 24

Ford v. Wainwright, 477 U.S. 399 (1986)                          31

Gardner v. Florida, 430 U.S. 349 (1977)                          31

Gregg v. Georgia, 428 U.S. 153 (1976)                            35

Hayes v. Florida, 470 U.S. 811 (1985)                        21, 25

In Re Winship, 397 U.S. 358 (1970)                           28, 30

Jackson v. Virginia, 443 U.S. 307 (1979)                         30

Lockett v. Ohio, 438 U.S. 586 (1978)                          31, 34

Miller v. Fenton, 474 U.S. 104, 107 (1985)                       14

Mincey v. Arizona, 437 U.S. 385, 398 (1977)                      14

Penry v. Lynaugh, 492 U.S. 302 (1989)                        34, 36

Reck v. Pate, 367 U.S. 433, 442 (1961)                           15

Sandstrom v. Montana, 442 U.S. 510 (1979)                        30

Schad v. Arizona, ____ U.S. ____, 111 S. Ct. 2491 (1991)     26, 31

State v. Barnes, 25 Ohio St. 3d 203, cert. denied,
    480 U.S. 926 (1987)                                      27, 31

State v. Hutton, 53 Ohio St. 3d 36 (1990)                        33

State v. Jenkins, 15 Ohio St. 3d 164 (1984), cert. denied,
    472 U.S. 1032 (1985)                                         27

State v. Penix, 32 Ohio St. 3d 369 (1987)                        28

Stringer v. Black, ____ U.S. ____, 112 S. Ct. 1130 (1992)        33

Townsend v. Said, 372 U.S. 293, 307 (1962)                       15

Williams v. Florida, 399 U.S. 78 (1970)                          30

Woodson v. North Carolina, 428 U.S. 280 (1976)           31, 35, 36

**Miscellaneous:**

Ohio Crim. R. 31(A)                                              29

**ARTICLES:**

    1 STEPHEN (SIR JAMES FITZJAMES), A HISTORY OF THE
CRIMINAL LAW OF ENGLAND 304-05 (1883).                           29

No._____

IN THE SUPREME COURT OF THE UNITED STATES

October Term, 1992

DANNY LEE HILL, Petitioner

V.

STATE OF OHIO, Respondent

PETITION FOR WRIT OF CERTIORARI TO THE
OHIO SUPREME COURT

The petitioner, Danny Lee Hill, prays for a writ of certiorari to review the judgment and opinion of the Ohio Supreme Court. The Ohio Supreme Court opinion was entered on August 12, 1992. The Ohio Supreme Court decision denying Petitioner's motion for rehearing was entered on September 30, 1992.

### OPINIONS BELOW

The opinion of the Ohio Supreme Court is reported in 64 Ohio St. 3d 313 and is reprinted in the appendix hereto at page A-5 infra. The opinion of the Trumbull County, Ohio Court of Appeals is unreported and is reprinted in the appendix at pages A-19 infra.

### JURISDICTION

Petitioner appealed his conviction at trial to the Trumbull County, Ohio Courts of Appeals. Petitioner subsequently appealed his conviction and death sentence to the Ohio Supreme Court which affirmed the conviction and death sentence in an opinion entered on August 12, 1992. Petitioner filed a motion for rehearing in the

Ohio Supreme Court which was denied by entry filed on September 30, 1992. This petition is filed within ninety (90) days of this date. The jurisdiction of this Court to review the judgment, decision, and opinion of the Ohio Supreme Court is invoked under 28 U.S.C. Sec 1257(A).

## STATEMENT OF THE CASE

### A.  Nature of the case:

This is a petition for a writ of certiorari to the Ohio Supreme Court. Danny Lee Hill seeks review of the Ohio Supreme Court decision affirming his conviction and sentence of death.

### B.  Course of the Proceedings:

Danny Lee Hill was indicted by the Trumbull County, Ohio grand jury on one count of aggravated murder with four specifications pursuant to R.C. 2929.04(A)(7). The underlying felonies included kidnapping, rape, aggravated arson, and aggravated robbery. Mr. Hill was convicted by a three-judge panel of aggravated murder with specifications of kidnapping, rape, and aggravated arson. He was found not guilty of the specification and underlying felony of aggravated robbery. He was also found guilty of kidnapping, rape, aggravated arson and felonious penetration. On the aggravated murder count, Mr. Hill was sentenced to death.

Danny Lee Hill appealed his case to the Trumbull County Court of Appeals which affirmed his convictions and death sentence. Mr. Hill next appealed to the Ohio Supreme Court which also affirmed his convictions and death sentence. Following the Ohio Supreme

9

Court's denial of petitioner's motion for rehearing, this petition for writ of certiorari ensued.

**C.    Disposition in the Courts below:**

A three-judge panel of the Trumbull County, Ohio Court of Appeals affirmed petitioner's conviction and sentence.  The Ohio Supreme Court affirmed petitioner's convictions and sentence.

**D.    Statement of Facts:**

On September 10, 1985, at approximately 5:15 p.m., Raymond Fife left home to go to a friend's house.  Several individuals saw Fife and other individuals, including Danny Lee Hill and Timothy Combs (another defendant), in the field behind a Valu-King parking lot.  Fife's body was discovered in this area, naked and apparently beaten and burnt in the face.  He died two days later.

Subsequently, Mr. Hill came to the police station to make a statement ostensibly to obtain some reward.  Afterwards, Mr. Hill went home.  A Detective brought Mr. Hill back to the station the next day for further interrogation, but he again was released.  The following Monday, two detectives (including Mr. Hill's uncle) went out to Mr. Hill's residence and brought him back to the police station.  After several hours and different interrogation techniques, statements were elicited from Mr. Hill.  While Mr. Hill never admitted any direct involvement in the homicide, he did state he was with the victim while the other defendant left to get lighter fluid and a broomstick.

Substantial evidence was presented to the Court that Mr. Hill was mentally retarded and could not tell the difference between

10

what is essential and what is not essential.  Mr. Hill's grade equivalent was below third grade and he was essentially illiterate. Finally, Dr. Schmidtgoessling indicated that even if Mr. Hill were made to understand in the most simplest terms, i.e., his constitutional rights, the petitioner's prior conditioning and image of the police and their authority would override anything he would understand.

The trial court overruled Mr. Hill's motion to suppress statements, finding that he made them voluntarily and was in no way coerced to make them.  Further, he did not affirmatively assert his right to counsel and even if he did, the statement's admission was harmless error.  Mr. Hill was subsequently found guilty of all charges except aggravated robbery and its equivalent specification on the aggravated murder charge.

Both the Trumbull County Court of Appeals and the Ohio Supreme Court rejected Mr. Hill's mitigation evidence and found that it was outweighed by the manner in which the victim died.  Accordingly, the death sentence was affirmed by both courts.

## SUMMARY OF THE ARGUMENT

(1)   Statements elicited from a mentally retarded, essentially illiterate defendant through use of misconduct, coercion, and promises of leniency by law enforcement officials violated his constitutional rights.   Law enforcement officials systematically deprived the petitioner of his rights by coercing him to the police station, isolating him, badgering him, and then leaving him with a detective (also his uncle) who had physically abused him in the past in order to obtain statements.   These statements were not made voluntarily and were obtained in violation of constitutional rights.   This error was not harmless.

(2)   The United States Constitution requires that the state prove each and every element of a crime charged beyond a reasonable doubt and such a finding must be unanimous in a death penalty case. The verdicts in petitioner's case found him guilty under alternative specifications where unanimity must be found on any one specification.   The three judge-panel did not unanimously agree on whether the petitioner was the principal offender or he was a non-principal acting with prior calculation or design.   Therefore, any verdict or sentence cannot be found reliable consistent with due process.

(3)   Ohio's statutory scheme requires that a jury (or three-judge panel) must weigh statutory aggravated circumstance(s) against mitigating evidence.   Appellate courts are then required to independently review and weigh the evidence.   In petitioner's case, non-statutory aggravated circumstances were considered while

mitigating factors were not properly weighed, if at all. This improper "weighing" violated the Eighth Amendment requirement of an individualized sentencing determination and fundamental due process. Therefore, petitioner was denied his right to be considered as a unique human being.

This Court should accept jurisdiction of petitioner's case in order to determine these issues. This Court has accepted for review similar issues in <u>Withrow v. Williams</u> (No. 91-1030) and <u>Graham v. Collins</u> (No. 91-7580).

## REASONS FOR GRANTING THE WRIT

I.    A CONVICTION AND SENTENCE OF DEATH CANNOT STAND WHEN
      STATEMENTS ARE ELICITED FROM A MENTALLY RETARDED, ESSENTIALLY
      ILLITERATE ACCUSED THROUGH MISCONDUCT, COERCION, AND PROMISES
      OF LENIENCY BY LAW ENFORCEMENT OFFICIALS IN VIOLATION OF THE
      FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.

      A.    MR. HILL'S STATEMENTS WERE NOT VOLUNTARY WHEN SUCH
            STATEMENTS WERE COERCED BY THE PSYCHOLOGICAL TACTICS OF
            LAW ENFORCEMENT OFFICERS ON A MENTALLY RETARDED
            INDIVIDUAL WHO WAS ESSENTIALLY ILLITERATE AND THEIR
            ADMISSION VIOLATED THE DUE PROCESS CLAUSE OF THE
            FOURTEENTH AMENDMENT.

This Court has held that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law: even though there is ample evidence aside from the confession to support the conviction. Mincey v. Arizona, 437 U.S. 385, 398 (1977). Therefore, any statement attributed to an accused must be "the product of a rational intellect and free will," if such a statement is to be admissible at trial. Id. (Further citations omitted.)

Furthermore, the Court reiterated this position ":that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 107 (1985). The Court has gone on to hold, however, that there must be some type of "state action" to support a claim of a violation of the due process clause. Colorado v. Connelly, 479 U.S. 157 (1986).

To determine whether a statement is the product of a rational intellect and a free will, and therefore voluntary, certain well-established principles are applicable:

14

(1)  Determination of whether a statement is involuntary 'requires more than a mere color-matching of cases.'  It requires careful evaluation of all the circumstances of the interrogation.  <u>Id</u>. at 401, quoting in part, <u>Reck v. Pate</u>, 367 U.S. 433, 442 (1961).  (Footnote omitted).

(2)  If an individual's 'will was overborne' or if his confession was 'not the product of a rational intellect and a free will,' his confession is inadmissible because coerced.  These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement.  <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1962).  (Footnotes omitted).

(3)  It has been held irrelevant the absence of evidence of improper purpose on the part of the questioning officers.  <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960).

The voluntariness test is designed therefore to bar admission of those confessions which:  (a) were of doubtful reliability because of the practices used to obtain them; or (b) were obtained by offensive police practices even if reliability was not in question; or (c) were obtained under circumstances in which the defendant's free choice was significantly impaired, even if the police did not resort to offensive practices.  In applying the voluntariness test, the Courts must examine the "totality of the circumstances" surrounding each statement.

Mr. Hill is mentally retarded and essentially illiterate.  The egregious action that was initiated by law enforcement officers was the ruse of using an uncle who was also a detective for the Warren Police Department to get the Mr. Hill to go down to the police station.  It is this same uncle who is left alone in the room with Mr. Hill after Mr. Hill has consistently and emphatically denied any involvement in the homicide during the course of the

15

interrogation   The officers were constantly using a variety of interrogation techniques to wear Mr. Hill down.  These techniques include the use of false information to mislead and confuse Mr. Hill.

More specifically, Mr. Hill was in custodial detention on Friday, September 13, 1985 for more than four hours, and in custodial detention on Monday, September 16, 1985 for approximately two and a half hours before the tape recorded statement was taken of Mr. Hill at approximately 11:30 a.m.  As testified to by the police officers, Officer Dennis Steinbeck continuously questioned Mr. Hill on Friday, September 13, 1985, and Officers Morris Hill, Dennis Steinbeck, and Thomas Stewart, off and on, questioned him on Monday, September 16, 1985, at the Warren Police Department.  On Monday, September 16, 1985, as verified by Mr. Hill's mother, Vera Williams, Officers Hill and Steinbeck, for a least the initial hour of interrogation, were yelling and using badgering language to Mr. Hill.  Also, during the entire four-hour process of interrogation on Friday, September 13, 1985, Petitioner allegedly gave the substance of what appears in the typewritten statement taken by Officer Dennis Steinbeck; however, he did not give any statement incriminating himself whatsoever until approximately 11:40 a.m. on Monday, September 16, 1985.  Even then he did not admit any direct involvement in the homicide.  Mr. Hill testified that he was unwilling to go down to the police department with Officer Dennis Steinbeck on Friday, September 13, 1985.  Again, on Monday, September 16, 1985, Mr. Hill was unwilling to accompany the

officers to the Warren Police Department. However, Mr. Hill's uncle, Morris Hill, utilized his relationship with his sister, Petitioner's mother, to get both her and her son to come down to the Warren Police Department on that Monday to give a statement.

Officer Morris Hill testified that he was not involved in the investigation until Monday, September 16, 1985, on which date he was dispatched with Detective Steinbeck to go pick up his nephew based upon the suggestion given by the prosecuting attorney in conversation with Officer Steinbeck on Sunday, September 15, 1985, that a relative or family member should be used in regard to either picking up or interviewing Mr. Hill. Detective Morris Hill testified that he had on prior occasions, when his nephew was a juvenile approximately a year and a half ago, physically beaten him at the Warren Police Department. At the time, Mr. Hill was in the custody of the juvenile officers at the Warren Police Department, and Detective Morris Hill, in the use of his own terminology, gave his nephew a "whipping". Officer Hill testified as to his physical statute being approximately 5'10", 230 lbs., 20-inch biceps, and capable of lifting 600 to 700 lbs. of weight. In turn, Mr. Hill testified that, in fact, he had been beaten by his uncle, Detective Morris Hill, at the Warren Police Department, when he was a juvenile. Mr. Hill described it as being physically slapped around and that Detective Morris Hill borrowed another officer's belt and struck him with it; thus, the terminology used by Detective Hill in his testimony was appropriately, "I gave him a whipping".

17

Officer Steinbeck and Officer Stewart testified that on Monday, September 16, 1985, up until the time that Detective Morris Hill was left alone with his nephew in the locked interrogation room, he had not admitted any involvement in the crime nor given any incriminatory statements. At that time, Detective Morris Hill testified that he was left alone with Mr. Hill and stated to him, "No one is going to do anything to you," and, "No one is going to harm or hurt you", again to which Mr. Hill allegedly stated to Detective Morris Hill that he was there at the scene when the assault took place upon Raymond Fife. Officers Steinbeck and Stewart testified that upon exiting the room, Detective Morris Hill stated to them that Mr. Hill was involved and they should go ahead and question him further. Thereafter, upon the return to the room by Officers Steinbeck and Stewart, Mr. Hill was crying and visibly upset which was not Mr. Hill's condition when they left the room. Mr. Hill stated that when Detective Morris Hill was in the room alone with him, he put him up against the wall and slapped him, and that, indeed, he was afraid and fearful of his uncle based upon that conduct and the beating and whipping he had given him on a prior occasion at the Warren Police Department. Repeatedly, the detectives informed Mr. Hill that Timothy Combs, an eventual co-defendant, was in the next room or on his way down to talk first. In fact, Detective Steinbeck admitted that he told Mr. Hill that if he talked, he would benefit from it, otherwise Combs would blame him for everything.

18

Mr. Hill further testified that, at the beginning of the videotape statement which occurred later, Detective Morris Hill, who was sitting to the immediate left of him, kicked him under the table prior to the commencement of the videotape session. Mr. Hill also testified that he was unable to read any of the Constitutional rights forms that were presented to him, and that he was unable to read the alleged typewritten statement taken by Detective Dennis Steinbeck on Friday, September 13, 1985. He also testified that he did not write very well, which was unquestionable borne out by the sample of handwriting taken in court. Petitioner introduced the typewritten statement and a Constitutional rights form that were previously secured from him when he was a juvenile; however, Mr. Hill was unable to recognize either of the documents. He was only able to recognize his handwritten signature, where he misspelled his own name. The detectives describe the petitioner as having normal intelligence and never inquired into his abilities to understand anything that was occuring. On the other hand, it was clear that Mr. Hill was essentially illiterate and had no understanding of his constitutional rights.

It was obvious from the limited appearance by Mr. Hill in court that not only does he lack the bare essential verbal skills to understand and comprehend what is being said or told to him, but that he also lacks totally the ability to utilize judgment and reasoning power regarding what little he does understand.

Although the limited capabilities of Mr. Hill were obviously apparent to counsel and the court immediately, it is

incomprehensible how all of the law enforcement officers, including Detective Dennis Steinbeck, Detective Thomas Stewart and Mr. Hill's uncle, Detective Morris Hill, would classify the him as fairly intelligent and not recognize his true mental capabilities, having been acquainted with him for such a long period of time.  On the other had, it is entirely possible that the law enforcement officer were, in fact, well aware and cognizant of Mr. Hill's low mental capabilities and his inability to read and write.  As a consequence of the law enforcement authorities being aware of Mr. Hill's mental deficiencies, they simply took advantage of the same in order to perfunctorily secure his signature on all of the documents required by law and to then pursue their ultimate objective, which would be to investigate and secure incriminatory statements from him.

Taking into account the "totality of the circumstances", it is apparent that the tape recorded statement and the videotape statement elicited from Mr. Hill were involuntary in nature and that the Appellee failed to prove by the required standard of preponderance of the evidence that the same was voluntary.  The relevant factors of Petitioner's age (being just 18), his lack of mental capabilities (placing him in the mild or moderate retarded range), the previous physical abuse imposed upon him and the abuse imposed upon him during the interrogation on Monday, September 16, 1985, the length of the interrogation process (in total being approximately seven hours), the confinement in the interrogation room with the door locked, lacking freedom of movement, the on and off interrogation by a number of police officers, the fact that the

interrogation took place in the Warren Police Department where he was beaten before, the psychological impact of the threats to a mildly retarded person that Tim Combs was going to blame the homicide on him, the psychological effect on Mr. Hill of the promise by Detective Hill that "no one was going to hurt or harm him" certainly leads to the conclusion that the tape recorded statement and videotape statement were involuntarily induced and secured from Mr. Hill.

> B.   MR. HILL'S FOURTH AND FOURTEENTH AMENDMENT
>      RIGHTS WERE VIOLATED WHEN HE WAS SEIZED FROM
>      HIS HOME THROUGH THE USE OF PSYCHOLOGICAL
>      PLAYS BY LAW ENFORCEMENT OFFICERS (INCLUDING
>      MR. HILL'S OWN UNCLE).

Without judicial authorization or probable cause to arrest, the taking into custody and detention of a person violates the Fourth Amendment absent a valid consent. Hayes v. Florida, 470 U.S. 811 (1985).  See also, Dunnaway v. New York, 442, U.S. 200 (1979).  A person is "seized" for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would have believed he was not free to leave. Florida v. Royer, 430 U.S. 490 (1983).

On September 13, 1985, Officer Steinbeck went alone to the petitioner's residence and talked to him from an upstairs window. He testified that he requested Mr. Hill to come downtown for questioning in regard to the Fife homicide; however, Mr. Hill testified that he initially indicated he did not want to go downtown for any questioning, but that Officer Steinbeck ordered him to put his clothes on and go downtown.  Once downtown,

Petitioner was placed in Interrogation Room No. 1, and he was either with an officer at all times or the door was locked, and he could not leave the premises. Mr. Hill indicated that he tried at some time when an officer was not present to open the door and leave, but the door was locked from the outside. Officer Steinbeck indicated that he had read Mr. Hill his Miranda rights and had him sign them upon coming to the station, at approximately 10:00 a.m. on Friday, September 13, 1985; however, he did not indicate that he told him at the time that he was not under arrest and that he could leave at any time. Without the typewritten statement taken by Detective Steinbeck being signed, Mr. Hill's mother, Vera Williams, came to the police department and talked briefly to Detective Dennis Steinbeck and took her son home at approximately 2:00 p.m. on that Friday, September 13, 1985.

It was determined on Sunday, September 15, 1985, that Mr. Hill was a suspect in regard to this particular case and that he must be questioned and interrogated further. It was also determined that it would be helpful if a relative of the family was used to entice Mr. Hill to come downtown for further questioning and interrogation. On Monday morning, September 16, 1985, Detectives Steinbeck and Hill, went to Mr. Hill's residence. After the officers entered the residence, Mr. Hill indicated from one of the upstairs rooms that he did not want to go downtown for any further questioning. He remained upstairs. At that juncture, Detective Hill, convinced his sister to come downtown for the purpose of taking her statement, and that she should bring along her son in

order that he may sign the statement he gave on Friday, September 13th. Both Mr. Hill and his mother went downtown on Monday, September 16th, and they were told there would not be further questioning in regard to the Fife homicide. However, upon arriving at the Warren police Department, Mr. Hill was placed in Interrogation Room No. 1 and separated from his mother, who was placed in another room next door. A statement never was taken of Vera Williams and the statement that was unsigned by Mr. Hill on Friday was signed immediately that morning upon his arrival. Mr. Hill further indicated that he asked to go home; however, the officers simply continued to question him and would not let him leave. As it was put by Detective Hill, it was better to get his nephew down to the Warren Police Department because then he would be on their "home turf". Until the time that Mr. Hill gave the tape recorded statement, probable cause did not exist regarding the arrest of Mr. Hill for any criminal activity.

Mr. Hill was "seized" in the context of the Fourth Amendment and placed in the custody by the physical force and authority of Officer Steinbeck on Friday, September 13, 1985, and by Officers Hill and Steinbeck on Monday, September 16, 1985. On both occasions, Mr. Hill indicated that he did not want to go downtown and rejected the requests by the police officers. On Friday, September 13, 1985, Detective Steinbeck simply ordered Mr. Hill to come downtown and he acquiesced to that demand and was physically transported and confined in the interrogation room in the Warren

Police Department. Thereafter, he was unable to leave the room upon request and the door was locked and he was confined therein.

On Monday, September 16, 1985, Mr. Hill indicated he did not want to go downtown for any further questioning; however, the police officers, especially Detective Hill, deceived his nephew and sister into being transported by them in the police cruiser to the Warren police Department by indicating that they were going to take Vera Williams' statement. In truth of fact, no statement was ever taken from Vera Williams and she was shuffled from room to room in order to occupy her while they were questioning her son. The Petitioner also indicated that he wanted to leave and could not because the door was locked from the outside, and that at other times officers were always present with him. Obviously, the restraint and detention of Mr. Hill was complete on both occasions when the police placed him in their automobiles, took him to the Warren Police Department and placed him inside the interrogation room, and kept the door locked and officers present questioning him at all times. On both occasions, the detention took place contrary to the will of Mr. Hill; however, he submitted only after the show of physical force and authority utilized by the police authorities.

This Court, in examining the issue of investigative detention, states as follows:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. Dunaway, 442 U.S., at 212; Florida v. Royer, 420 U.S. 490, 499 (1983) (plurality opinion). In our view, it continues to be that the lines cross when the

24

police, without probable cause or warrant, forcefully
remove a person from his home or other place in which he
is entitled to be and transport him to the police
station, where he is detained, although briefly, for
investigative purposes. We would adhere to the view that
such seizures, at least where not under judicial
supervision, are sufficient like arrests to invoke the
traditional rule that arrest may constitutionally be made
only on probable cause.

Hayes at ____, 84 L. Ed 2d 705. As envisioned by Hayes, custodial

detention occurred on Friday, September 13, 1985, and Monday,

September 16, 1985.

II.   PETITIONER'S CONVICTION AND DEATH SENTENCE ARE INCONSISTENT
      WITH DUE PROCESS AND THE FIFTH, SIXTH AND EIGHTH AMENDMENTS
      SINCE THE THREE-JUDGE PANEL DID NOT UNANIMOUSLY FIND THE
      PETITIONER GUILTY OF EITHER BEING THE PRINCIPAL OFFENDER OR
      BEING A NON-PRINCIPAL ACTING WITH PRIOR CALCULATION OR DESIGN.

Danny Lee Hill was indicted for one count of aggravated murder

with four specifications pursuant to R.C. 2929.04(A)(7). The

underlying felonies included kidnapping, rape, aggravated arson,

and aggravated robbery. The indictment charged Mr. Hill in the

alternative in each specification, i.e.:

> . . . and either Danny Lee Hill was the principal
> offender in the commission of the Aggravated Murder, or
> if not the principal offender, committed the Aggravated
> Murder with prior calculation and design.

This case was tried to a three-judge panel which rendered a

verdict journalized as follows:

### SPECIFICATION 1 TO THE FIRST COUNT (KIDNAPPING):

> All judges concurring, the Court finds by proof beyond a
> reasonable doubt that the offense of Aggravated Murder
> was committed while DANNY LEE HILL was committing
> kidnapping and either said DANNY LEE HILL was the
> principal offender in the commission of the Aggravated
> Murder or, if not the principal offender, committed the
> Aggravated Murder with prior calculation and design.
> (Emphasis added).

25

The three-judge panel rendered the same verdict in the exact alternative language as to Specification 2 (Rape) and Specification 3 (Aggravated Arson). The three-judge panel found Mr. Hill not guilty of Specification 4--the Aggravated Robbery.

This verdict establishes that the three-judge panel did not unanimously find Mr. Hill guilty of the necessary specification. The language of the verdict must be taken at face value. "Or if not" suggests that one or more of the judges was not convinced beyond a reasonable doubt that Mr. Hill was the principal offender or was a non-principal acting with prior calculation and design. Had the three judges agreed on both elements of the specification, they no doubt would have used "and" as opposed to "or if not." The trial court's failure to unanimously make one finding or the other on the capital specification was error. Mr. Hill was thus deprived of his right to a unanimous verdict. The three-judge panel had to specifically determine into which one of the two categories (principal offender or non-principal offender acting with prior calculation and design) Mr. Hill fell, for these constituted independent elements of the offense.

Recently, a plurality of this Court held that it is for state courts to determine whether "statutory alternatives" are (1) "mere means of committing a single offense" or (2) constitute "independent elements of the crime." Schad v. Arizona, ____ U.S. ____, 111 S. Ct. 2491 (1991). If the statutory alternatives do constitute independent elements, then their existence (or

26

nonexistence) must be separately determined by the jury.  <u>Cabana v. Bullock</u>, 474 U.S. 376, 384 (1986).

In Ohio, the aggravating circumstances set forth in R.C. 2929.04(A)(1)-(8) are elements essential to a capital conviction. Absent conviction of an aggravating circumstance, a defendant convicted of aggravated murder cannot be eligible for the death sentence.  The Ohio Supreme Court has recognized this, particularly with regard to the aggravating circumstance in R.C. 2929.04(A)(7):

> It is noteworthy that R.C. 2903.01(B) (aggravated felony-murder) and R.C. 2929.04(A)(7) are not identical. ***
> [T]he state, in order to prevail upon an aggravating circumstance in R.C. 2929.04(A)(7), must additionally prove that the offender was the principal offender in the commission of the aggravated murder or, if the offender was not the principal offender, that the aggravated murder was committed with prior calculation and design.

<u>State v. Jenkins</u>, 15 Ohio St. 3d 164, 177 (1974), certiorari denied (1985), 472 U.S. 1032 fn. 17.  As the court again explained in <u>State v. Barnes</u>, 25 Ohio St. 3d 203, 206-207, certiorari denied (1987), 480 U.S. 926, R.C. 2929.04(A)(7) allows imposition of the death penalty for aggravated felony-murder "only when the defendant was the principal offender or when the murder was premeditated." This aggravating circumstance "require(s) an additional fact, independent of the elements of aggravated murder, be proved before an offender is eligible for capital punishment." <u>Id</u>.  Thus, under Ohio's statutory scheme, the aggravating circumstance in R.C. 2929.04(A)(7) is an independent element of a capital offense.

Moreover, the conditions of being either a principal offender or a non-principal offender who acts with prior calculation and design are <u>independent</u> elements.  R.C. 2929.04(A)(7), by its own

terms, establishes a distinction (***either the offender was the principal offender *** <u>or, if not</u> the principal offender, committed the aggravated murder with prior calculation and design") (Emphasis added.)   The Ohio Supreme Court recognized as much in <u>State v. Penix</u>, 32 Ohio St. 3d 369, 371 (1987) (emphasis added):

> [T]he criteria set forth in R.C. 2929.04(A)(7) are constructed in the alternative.  If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (i.e., the actual killer), or where the defendant was not the principal offender, if he committed the murder with prior calculation and design.   The language of the statute provides that<u> these alternatives which are not to be charged and proven in the same cause.</u>

Thus, principal offender-non-principal offender acting with prior calculation and design are independent elements of a capital offense.   The jury or three-judge panel must make a specific finding that the capital defendant is <u>either</u> the principal <u>or</u> a non-principal.  The three-judge panel failed to do this as shown by their verdict.

The Due Process Clause of the Fourteenth Amendment requires the state to prove every element of a crime beyond a reasonable doubt.  In <u>In Re Winship</u>, 397 U.S. 358 (1970).  The Sixth Amendment guarantees the criminal defendant the right to trial by jury.  From these two Amendments flows the principle that the jury in a criminal case must be instructed to find every element of the offense beyond a reasonable doubt.  Without a jury instruction on each element the criminal defendant is deprived of a jury determination of his guilt or innocence, a right protected by the Due Process Clause, <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968), and

the Sixth Amendment. The same reasoning applies to a capital case where a three-judge panel sits as fact finder.

All jury verdicts in Ohio must be unanimous. Ohio Crim. R. 31(A). A requirement of jury unanimity on every element of the offense has constitutional underpinnings. A decision of a three-judge panel in a capital case also requires unanimity. Requiring unanimity is a critically important means of implementing the beyond-a-reasonable-doubt standard. Historically, the two have been closely connected.

> The justification of the [unanimity] rule, now that the character of the jury has changed from that of witnesses to that of judges of fact, seems to be that it is a direct consequence of the principle that no one is to be convicted of a crime unless his guilt is proved beyond all reasonable doubt. How can it be alleged that this condition has been fulfilled so long as some of the judges by whom the matter is to be determined do in fact doubt?

> \* \* \*

> There is a definite meaning in the rule that criminal trials are to be decided by evidence plain enough to satisfy in one direction or the other a certain number of representatives of the average intelligence and experience of the community at large, but if some of the members of such a group are of one opinion and some of another, the result seems to be that the process has proved abortive and ought to be repeated.

> 1 STEPHEN (SIR JAMES FITZJAMES), A HISTORY OF THE CRIMINAL LAW OF ENGLAND 304-05 (1883).

Requiring proof of guilt beyond a reasonable doubt is one of many aspects of English common law which have become fundamental tenets of American common law and, indeed, American Constitutional law. The Due Process Clause of the Fourteenth Amendment imposes

this standard on state criminal proceedings.  As this Court has

stated:

> Lest there remain any doubt about the constitutional
> stature of the reasonable-doubt standard, we explicitly
> hold that the Due Process Clause protects the accused
> against conviction except upon proof beyond a reasonable
> doubt of every fact necessary to constitute the crime
> with which he is charged.

Sandstrom v. Montana, 442 U.S. 510, 520 (1979), quoting In Re

Winship, supra, 364 (emphasis supplied).

> The standard of proof beyond a reasonable doubt ***
> "plays a vital role in the American scheme of criminal
> procedure," because it operates to give concrete
> substance" to the presumption of innocence, to ensure
> against unjust convictions, and to reduce the risk of
> factual error in criminal proceeding.

Jackson v. Virginia, 443 U.S. 307, 315 (1979), quoting, In Re

Winship, supra, at 363.

Thus, the beyond-a-reasonable-doubt standard is given force by

the unanimity requirement.  It cannot be said that the state has

proven every element of the offense beyond a reasonable doubt if

some of the jurors or judges in a three-judge panel do in fact

doubt.

Indeed, not even a substantial majority passes muster in a

capital case.  This Court has never approved nonunanimous verdicts

in death cases, or verdicts by juries of fewer than twelve.  When

approving reductions in jury size or convictions by nonunanimous

juries, the Court has been careful to note that the case at issue

was noncapital.  Williams v. Florida 399 U.S. 78, 103 (1970).  ("In

capital cases, *** it appears that no State provides for less than

12 jurors - a fact that suggests implicit recognition of the value

of the larger body as a means of legitimizing society's decision to impose the death penalty." See, also, Schad, supra, at 2498 fn. 5.

The concern with the reliability and accuracy of the jury verdict is at its height in capital cases. Ford v. Wainwright, 477 U.S. 399, 411 (1986); Caldwell v. Mississippi, 472 U.S. 320 (1985) (O'Connor, J., concurring); Beck v. Alabama, 447 U.S. 625, 638 (1980); Lockett v. Ohio, 438 U.S. 586, 605 (1978) (plurality opinion); Gardner v. Florida, 430 U.S. 349, 357, 458 (1977); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion). Therefore, in capital cases, the Due Process Clause requires that the jury be instructed to reach its determination unanimously as to every element constituting the capital offense which makes the defendant death-eligible. This, of course, includes the capital specifications. State v. Barnes, 25 Ohio St. 3d 203, 206-207 (1986). There is no exception when the case is tried to a three-judge panel. In Mr. Hill's case, no such requirement was imposed.

To summarize, the principal offender/prior calculation and design elements of the aggravating circumstance in R.C. 2929.04(A)(7) are independent elements of a capital offense. Jurors must be instructed to find one or the other of these independent elements. The jurors' verdict on these independent elements must be unanimous in a capital case. A three-judge panel is also required to find unanimously on each element.

The evidence presented by the state never truly developed nor supported either theory as to principal offender or prior

31

calculation and design. The trial court was merely overwhelmed with the horrible nature of the facts. It is important to note that there was a co-defendant in this case who did not testify at Mr. Hill's trial. Mr. Hill's own statements do not support either theory.

This is no evidence of prior calculation and design and there was not sufficient evidence to suggest anything other than Timothy Combs as the principal offender in the Aggravated Murder. The trial court's own sentencing opinion makes clear that they were uncertain as to who did what to Mr. Fife. As such, this court cannot find this verdict to be reliable. Mr. Hill cannot be said to deserve death if the three-judge panel in his case was not able to unanimously find which one of the elements which makes Mr. Hill eligible for death was proven beyond a reasonable doubt.

III. PETITIONER'S DEATH SENTENCE SHOULD BE SET ASIDE WHEN THAT SENTENCE IS BASED ON NON-AGGRAVATING CIRCUMSTANCES AND NO SIGNIFICANT WEIGHT IS GIVEN TO THE MITIGATING FACTOR BOTH AT TRIAL AND THROUGHOUT DIRECT APPELLATE REVIEW IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

This Court has held that when a state opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution and, in particular, with the Due Process Clause. Evitts v. Lucey, 469 U.S. 387 (1985). The State of Ohio, through its enactment of R.C. 2929.05, has required that appellate courts independently engage in a review of a death sentence and independently weigh the aggravating circumstances against the mitigating factors in each case. By merely stating that the aggravating circumstances

outweigh the mitigating factors without any analysis, the courts below have engaged only in a "meaningless ritual" condemned in Evitts thereby denying Mr. Hill due process.

Ohio is a "weighing" state. Under Ohio law, after a jury has found a defendant guilty of capital murder and at least one statutory aggravating circumstance, it must weigh the aggravating circumstance or circumstances against the mitigating evidence. The appellate courts are then required to independently review and weigh the evidence. Both appellate courts failed to perform these functions in Mr. Hill's case.

Had the weighing process been properly performed the Ohio courts would not have considered as aggravating circumstances ". . . the manner in which the victim was kidnapped and killed; the rape, burning, strangulation, and torture the victim endured; and the total brutalization that took place . . ." Clearly these are not aggravating circumstances under the Ohio statutory scheme.

In Stringer v. Black, this Court Court held that "We require close appellate scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determination in death penalty cases." _____ U.S. _____, 112 S. Ct. 1130, 1136 (1992). Since the Ohio Supreme Court and the Court of Appeals failed to apply the close scrutiny guaranteed by R.C. 2929.05, there is no heightened reliability as required by Barefoot v. Estelle, 463 U.S. 880 (1983) and State v. Hutton, 53 Ohio St. 3d 36 (1990).

33

Ohio's statutory review procedures were enacted in order to ensure the mandates of <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978), and <u>Eddings v. Oklahoma</u>, 445 U.S. 104 (1982), are met where death penalties are imposed. <u>Lockett</u> and <u>Eddings</u> require that imposition of death sentences must include a consideration of Petitioner's character or record and the circumstances of the offense where the defendant presents such evidence. While <u>Lockett</u> established the absolute right to present mitigation evidence, <u>Eddings</u> went further, stating:

> We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in <u>Lockett</u>. Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings offered on his behalf. <u>The sentencer</u>, and the Court of Criminal Appeals on review, <u>may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration</u>.

455 U.S. at _____. (Emphasis added). (Footnotes omitted).

The Trumbull County Court of Appeals in their opinion gave no weight to the mitigating factor of Mr. Hill's mental retardation. Although reviewing the evidence the appellate court dismisses this as a mitigating factor as it holds that it does not rise to the level of a mental defect precluding Mr. Hill from making the correct moral or legal choice. This is an improper standard by which to measure the mitigating factor of mental retardation. <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989). It also fails to give Mr. Hill the individual consideration required by this Court in capital

cases. The Ohio Supreme Court fell into a similar trap by equating mental retardation to an I.Q. score without serious consideration of Mr. Hill's mental age and lack of capacity to refrain from acting. The Supreme Court focus on this mitigating factor in terms of a defense to the charge rather than evidence to consider in mitigation. In addition, no discussion was had concerning the possible brain damage from various head injuries Mr. Hill suffered throughout childhood.

In <u>Clemons v. Mississippi</u>, 494 U.S. 738 (1989), the United States Supreme court wrote that appellate reweighing must afford the capital defendant "the <u>individualized</u> treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances." (Emphasis added.) The requirement of an individualized determination of the appropriateness of the death sentence is mandated as a fundamental prerequisite to a constitutional capital punishment scheme.

The need for individualized treatment of each particular capital defendant has been stressed, over and over again, since this Court approved capital punishment in <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976). In <u>Gregg</u>, <u>Supra</u>, at 206, the Court held that the sentencer must focus on "the particularized characteristics of the individual defendant." In <u>Woodson v. North Carolina</u>, 428 U.S. 280, 304 (1976), the Court explained:

> A process that accords no significance to relevant facts of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It

TRUMBULL COUNTY
160 HIGH STREET
WARREN, OHIO  44481

M E M O R A N D U M

TO:       Elected Officials and Department Heads

FROM:    **RISK MANAGEMENT DEPARTMENT**

RE:       <u>Trumbull County Health Plan</u>

DATE:    February 23, 1993


Effective immediately, Emerald Health Network has a <u>new</u> <u>P.O. Box number (94808) for submitting Emerald claim forms.</u> Please destroy all old forms in your possession and replace them with the new one attached.  You can make copies of these.

Also enclosed is a supply of Provider Directories.  Each employee should receive one and it is important that all <u>outdated</u> directories be discarded.

The Emerald Health Network is announcing that effective February 1, 1993, St Joseph's Riverside Hospital is joining the Network.  At the same time, Trumbull Memorial Hospital has opted to terminate its contract with Emerald  and will therefore be leaving the Network on January 31, 1993.   A vast majority of Emerald physicians affiliated with Trumbull Memorial also have privileges at St. Joseph's Riverside.

<u>NOTE:</u>  Under the Trumbull County Health Plan, you are permitted to go to any hospital of your choice, but if it is not an Emerald Facility, you <u>must</u> call Alternative Care Management Systems - 1-800-237-7337 - for pre-approval for <u>INPATIENT</u> admission. (ACMS has taken over the functions for Peer Review Systems.)

Attached is a letter from Trumbull Memorial Hospital confirming there would be no balance billing.

If you have further questions, please call Barbara in the Risk Management Office, 675-2460.

# TRUMBULL
## MEMORIAL HOSPITAL

1350 EAST MARKET ST., P.O. BOX 1269,  WARREN, OHIO 44482-1269  PHONE (216) 841-9011, FAX (216) 841-9281

CHARLES A. JOHNS
President

February 8, 1993

Ms. Barbara Johnson
Risk Manager
Trumbull County
160 High Street
Warren, Ohio  44481

Dear Ms. Johnson:

Confirming our recent conversation, Trumbull Memorial Hospital
will provide a five (5) percent discount for services provided to
Trumbull County employes and dependents for covered services
under your insurance arrangements with Emerald and Buckeye
Benefits.

It is my understanding that employes and dependents may use any
hospital or physician of their choice, and that there will be no
balance billing other than for deductibles or co-insurance that
may be part of the Trumbull County hospitalization plan.  Anyone
wishing to confirm this should contact Mr. Don Wollick of Buckeye
Benefits.

If I can be of any further assistance, please do not hesitate to
contact me.

Sincerely,

L. G. McManus
Vice President-Finance

LGM/cjm

VHA. Member of Voluntary Hospitals of America, Inc..

♻ printed on recycled paper

treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

This theme of individualized consideration was echoed in <u>Penry v. Lynaugh</u>, <u>supra</u>, where the U.S. Supreme Court again stressed the need for individualized treatment of each capital defendant: "The sentencer must *** be able to consider and give effect to (mitigating) evidence in imposing sentence. (Citation omitted). Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence."

It is therefore clear that any proper appropriateness determination must be made in terms of an individualized consideration of the particular characteristics of the defendant. This determination must treat the defendant as a "uniquely human being." There was much mitigating evidence put forward at Mr. Hill's capital trial about his history and family background, and how that shaped his character and behavior. The Court of Appeals, however, gave this evidence little or no weight. Neither the appellate court or the Ohio Supreme Court judged Mr. Hill on the basis of his particular character and background. This process ignores the mandate that Danny Lee Hill be considered as a unique human being.

## CONCLUSION

For the foregoing reasons, this Petition for Certiorari should be granted.

_Carol A. Wright_

CAROL A. WRIGHT
Attorney at Law
Ohio Reg. No. 0029872
7100 North High Street, Suite 209
Worthington, Ohio 43085
(614) 848-4140

and

_Roger Warner_

ROGER WARNER
Counsel of Record
Ohio Reg. No. 0019941
171 East Livingston Avenue
Columbus, Ohio 43215
(614) 221-3821

Attorneys for Petitioner

APPENDIX A-1

# The Supreme Court of Ohio

1992 TERM

To wit:  September 30, 1992

| | | |
|---|---|---|
| State of Ohio,<br>Appellee, | : <br> : | Case No.  90-177 |
| v. | : | REHEARING ENTRY |
| Danny Lee Hill,<br>Appellant. | :<br>: | (Trumbull County) |

IT IS ORDERED by the Court that rehearing in this case be, and the same is hereby, denied.

(Court of Appeals Nos. 3720 & 3745)

THOMAS J. MOYER
Chief Justice

PROPOSITIONS OF LAW RAISED IN OHIO SUPREME COURT

PROPOSITION OF LAW NO. 1:

AN ACCUSED'S RIGHT TO COUNSEL IS VIOLATED WHEN HE IS DEPRIVED OF COUNSEL FOR CUSTODIAL INTERROGATION WHEN HE DOES NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY RELINQUISH A KNOWN RIGHT DUE TO THE MISCONDUCT OF LAW ENFORCEMENT AUTHORITIES AND THE ACCUSED BEING MENTALLY RETARDED IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS OF THE OHIO CONSTITUTIONS.

PROPOSITION OF LAW NO. 2:

AN ACCUSED'S STATEMENTS ARE NOT VOLUNTARY WHEN SUCH STATEMENTS WERE COERCED BY THE PSYCHOLOGICAL TACTICS OF LAW ENFORCEMENT OFFICERS ON A RETARDED INDIVIDUAL WHO WAS ESSENTIALLY ILLITERATE AND THE ADMISSION OF SUCH STATEMENTS VIOLATES THE DUE PROCESS CLAUSES OF BOTH THE OHIO AND UNITED STATES CONSTITUTIONS.

PROPOSITION OF LAW NO. 3:

AN ACCUSED'S STATEMENTS ARE NOT ADMISSIBLE UNLESS THE STATE ESTABLISHES THAT THE PROCEDURAL SAFEGUARDS CONTINUED IN THE MIRANDA WARNINGS WERE PROPERLY GIVEN OR KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED AS PROVIDED UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PORTION OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 4:

AN ACCUSED'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AND THE EQUIVALENT PROVISIONS UNDER THE OHIO CONSTITUTION ARE VIOLATED WHEN AN ACCUSED IS SEIZED FROM HIS HOME THROUGH THE USE OF PSYCHOLOGICAL PLOYS BY LAW ENFORCEMENT OFFICERS UPON AN ACCUSED WHO IS MENTALLY RETARDED AND ESSENTIALLY ILLITERATE.

PROPOSITION OF LAW NO. 5:

AN ACCUSED IS DENIED HIS RIGHT TO DUE PROCESS UNDER BOTH THE OHIO AND UNITED STATES CONSTITUTIONS WHEN HE IS DENIED HIS STATUTORY RIGHT TO COUNSEL PURSUANT TO R.C. 120.16, 2934.14 AND 2935.20.

PROPOSITION OF LAW NO. 6:

NONCOMPLIANCE WITH R.C. 2935.05 RESULTS IN AN ILLEGAL ARREST, AND ANY STATEMENTS AND/OR EVIDENCE DERIVED THEREFROM SHOULD BE SUPPRESSED.

PROPOSITION OF LAW NO. 7:

    WHEN STATEMENTS ARE MADE BY AN ACCUSED TO LAW ENFORCEMENT OFFICERS UNDER THE IMPRESSION OF RECEIVING LENIENCY OR SOME OTHER BENEFIT, THEN THOSE STATEMENTS ARE INADMISSIBLE IN ANY LATER TRIAL.

PROPOSITION OF LAW NO. 22:

    OHIO'S MANDATORY SENTENCING SCHEME PREVENTED THE PANEL OF THREE JUDGES FROM DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT IN VIOLATION OF APPELLANT'S RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION NINE AND SIXTEEN OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 23:

    THE FAILURE TO CONSIDER ALL OF THE EVIDENCE IN SUPPORT OF MITIGATING A DEATH SENTENCE VIOLATES R.C. 2929.03(F) AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO. 24:

    THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 2,9,10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION ESTABLISH THE REQUIREMENTS FOR A VALID DEATH PENALTY SCHEME. OHIO REVISED CODE SECTIONS 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 AND 2929.05, OHIO'S STATUTORY PROVISIONS GOVERNING THE IMPOSITION OF THE DEATH PENALTY, DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL, BOTH ON THEIR FACE AND AS APPLIED TO APPELLANT.

PROPOSITION OF LAW NO. 25:

    THIS COURT CANNOT FIND, PURSUANT TO R.C. 2929.05(A), THAT (1) THE JUDGMENT OF GUILT OF AGGRAVATED MURDER AND THE SPECIFICATIONS WAS SUPPORTED BY SUFFICIENT EVIDENCE; (2) THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE MITIGATING FACTORS OF THE CASE; (3) THAT THE SENTENCE OF DEATH IS APPROPRIATE; (4) THAT THE SENTENCE OF DEATH IS NOT EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES; AND (5) THAT THE TRIAL AND APPELLATE COURTS PROPERLY WEIGHED THE AGGRAVATING CIRCUMSTANCES AND MITIGATING FACTORS. APPELLANT'S DEATH SENTENCE WAS IMPOSED IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT AS ENCOMPASSED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS NINE AND SIXTEEN OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 26:

    IT IS UNCONSTITUTIONAL TO SECURE A CAPITAL CONVICTION WHEN ALL OF THE INDEPENDENT ELEMENTS OF THE CRIME ARE NOT DETERMINED UNANIMOUSLY BY A THREE-JUDGE PANEL.  SUCH A CONVICTION VIOLATES THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, SECTION 9, 10 AND 16, ARTICLE 1 OF THE OHIO CONSTITUTION, AND R.C. 2901.05(D) AND R.C. 2929.022.

THE STATE OF OHIO, APPELLEE, v. HILL, APPELLANT.

[Cite as *State v. Hill* (1992), 64 Ohio St.3d 313.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 90-177—Submitted April 8, 1992—Decided August 12, 1992.)

APPEAL from the Court of Appeals for Trumbull
County, Nos. 3720 and 3745.

On September 10, 1985, at approximately 5:15 p.m., twelve-year-old Raymond Fife left home on his bicycle to visit a friend, Billy Simmons. According to Billy, Raymond would usually get to Billy's residence by cutting through the wooded field with bicycle paths located behind the Valu-King store on Palmyra Road in Warren.

Matthew Hunter, a Warren Western Reserve High School student, testified that he went to the Valu-King on the date in question with his brother and sister shortly after 5:00 p.m. Upon reaching the front of the Valu-King, Hunter saw Tim Combs and defendant-appellant, Danny Lee Hill, walking in the parking lot towards the store. After purchasing some items in the Valu-King, Hunter observed defendant and Combs standing in front of a nearby laundromat. Combs greeted Hunter as he walked by. Hunter also saw Raymond Fife at that time riding his bike into the Valu-King parking lot.

Darren Ball, another student at the high school, testified that he and Troy Cree left football practice at approximately 5:15 p.m. on September 10, and walked down Willow Street to a trail in the field located behind the Valu-King. Ball testified that he and Cree saw Combs on the trail walking in the opposite direction from the Valu-King. Upon reaching the edge of the trail close to the Valu-King, Ball heard a child's scream, "like somebody needed help or something."

Yet another student from the high school, Donald E. Allgood, testified that he and a friend were walking in the vicinity of the wooded field behind the Valu-King between 5:30 p.m. and 6:00 p.m. on the date in question. Allgood noticed defendant, Combs and two other persons "walking out of the field coming from Valu-King," and saw defendant throw a stick back into the woods. Allgood also observed Combs pull up the zipper of his blue jeans. Combs "put his head down" when he saw Allgood.

At approximately 5:50 p.m. on the date in question, Simmons called the Fife residence to find out where Raymond was. Simmons then rode his bicycle to

the Fifes' house around 6:10 p.m. When it was apparent that Raymond Fife's whereabouts were unknown, Simmons continued on to a Boy Scouts meeting, while members of the Fife family began searching for Raymond.

At approximately 9:30 p.m., Mr. Fife found his son in the wooded field behind the Valu-King. Raymond was naked and appeared to have been severely beaten and burnt in the face. One of the medics on the scene testified that Raymond's groin was swollen and bruised, and that it appeared that his rectum had been torn. Raymond's underwear was found tied around his neck and appeared to have been lit on fire.

Raymond died in the hospital two days later. The coroner ruled Raymond's death a homicide. The cause of death was found to be cardiorespiratory arrest secondary to asphyxiation, subdural hematoma and multiple trauma. The coroner testified that the victim had been choked and had a hemorrhage in his brain, which normally occurs after trauma or injury to the brain. The coroner also testified that the victim sustained multiple burns, damage to his rectal-bladder area and bite marks on his penis. The doctor who performed the autopsy testified that the victim sustained numerous external injuries and abrasions, and had a ligature mark around his neck, and testified that the victim had been impaled with an object that had been inserted through the anus, and penetrated through the rectum into the urinary bladder.

On September 12, 1985, defendant went downtown to the Warren Police Station to inquire about a $5,000 reward that was being offered for information concerning the murder of Raymond Fife. Defendant met with Sergeant Thomas W. Stewart of the Warren Police Department and told him that he had "just seen Reecie Lowery riding the boy's bike who was beat up." When Stewart asked defendant how he knew the bike he saw was the victim's bike, defendant replied, "I know it is." Defendant then told Stewart, "If you don't go out and get the bike now, maybe [Lowery will] put it back in the field." According to Stewart, the defendant then stated that he had seen Lowery and Andre McCain coming through the field at around 1:00 that morning. In the summary of his interview with defendant, Stewart noted that defendant "knew a lot about the bike and about the underwear around the [victim's] neck." Also, when Stewart asked defendant if he knew Tim Combs, defendant replied, "Yeah, I know Tim Combs. * * * I ain't seen him since he's been out of the joint. He like boys. He could have done it too."

On September 13, 1985, the day after Stewart's interview with defendant, Sergeant Dennis Steinbeck of the Warren Police Department read Stewart's summary of the interview, and then went to defendant's home and asked him to come to the police station to make a statement. Defendant voluntarily

went to the police station with Steinbeck, whereupon defendant was advised of his Miranda rights and signed a waiver-of-rights form. Defendant made a statement that was transcribed by Steinbeck, but the sergeant forgot to have defendant sign the statement. Subsequently, Steinbeck discovered that some eyewitnesses had seen defendant at the Valu-King on the day of the murder.

On the following Monday, September 16, Steinbeck went to defendant's house accompanied by defendant's uncle, Detective Morris Hill of the Warren Police Department. Defendant again went voluntarily to the police station, as did his mother. Defendant was given his Miranda rights, which he waived at that time as well. After further questioning by Sergeants Stewart and Steinbeck and Detective Hill, defendant indicated that he wanted to be alone with his uncle, Detective Hill. Several minutes later, defendant stated to Hill that he was "in the field behind Valu-King when the young Fife boy got murdered."

Defendant was given and waived his Miranda rights again, and then made two more voluntary statements, one on audiotape and the other on videotape. In both statements, defendant admitted that he was present during the beating and sexual assault of Raymond Fife, but that Combs did everything to the victim. Defendant stated that he saw Combs knock the victim off his bike, hold the victim in some sort of headlock, and throw him onto the bike several times. Defendant further stated that he saw Combs rape the victim anally and kick him in the head. Defendant stated that Combs had pulled it off. Defendant related that Combs then took something like a broken broomstick and jammed it into the victim's rectum. While defendant never choked the victim and burnt him with lighter fluid, he did admit that he stayed and admitted any direct involvement in the murder, he did admit that he stayed with the victim while Combs left the area of the attack to get the broomstick and the lighter fluid used to burn the victim.

Upon further investigation by authorities, defendant was indicted on counts of kidnapping, rape, aggravated arson, felonious sexual penetration, aggravated robbery and aggravated murder with specifications.

On December 16, 1985, a pretrial hearing was held on defendant's motion to suppress statements made to police officers both orally and on tape. On January 17, 1986, the court of common pleas concluded as follows:

"It is the opinion of this Court that no Fourth Amendment violation was shown because [defendant] was at no time 'seized' by the police department, but rather came in either voluntarily, or as in the case of September 16th because of his mother's demands.

" * * *

316 SUPREME COURT, JANUARY TERM, 1992 [64 Ohio St.3d

*Statement of the Case*

"Defendant's Fifth Amendment Rights were clearly protected by the numerous *Miranda* Warnings and waivers. Though this Court believes that the defendant could not have effectively read the rights or waiver forms, the Court relies on the fact that at any time he was given a piece of paper to sign acknowledging receipt of the *Miranda* Warnings and waiving his rights, the paper was always read to him before he affixed any of his signatures.

"Though defendant is retarded, he is not so seriously impaired as to have been incapable of voluntarily and knowingly given the statements which the defendant now seeks to suppress. The Court reaches this conclusion after seeing and listening to the defendant at the Suppression Hearing and listening to and watching the tape recording and videotaped statements of the defendant. The Court concludes that the statements were made voluntarily, willingly, and knowingly."

Meanwhile, on January 7, 1986, defendant appeared before the trial court and executed a waiver of his right to a jury trial.

On January 21, 1986, defendant's trial began in front of a three-judge panel. Among the voluminous testimony from witnesses and the numerous exhibits, the following evidence was adduced:

Defendant's brother, Raymond L. Vaughn, testified that he saw defendant wash his gray pants on the night of the murder as well as on the following two days. Vaughn identified the pants in court, and testified that it looked like defendant was washing out "something red. * * * It looked like blood to me * * *."

Detective Sergeant William Carnahan of the Warren Police Department testified that on September 16, 1985 he went with eyewitness Donald Allgood to the place where Allgood stated he had seen defendant and Combs coming out of the wooded field, and where he had seen defendant toss "something" into the woods. Carnahan testified that he returned to the area with workers from the Warren Parks Department, and that he and Detective James Teeple found a stick about six feet from the path where Allgood saw defendant and Combs walking.

Dr. Curtis Mertz, a forensic odontologist, stated that: "It's my professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and the photographs that I had, made the bite on Fife's penis."

The defense called its own forensic odontologist, Dr. Lowell Levine, who stated that he could not conclude with a reasonable degree of certainty as to who made the bite marks on the victim's penis. However, Levine concluded: "What I'm saying is either Hill or Combs, or both, could have left some of the

---

marks but the one mark that's consistent with the particular area most likely was left by Hill."

Doctor Howard Adelman, the pathologist who performed the autopsy of the victim's body, testified that the size and shape of the point of the stick found by Detective Carnahan was "very compatible" with the size and shape of the stick opening through the victim's rectum. Adelman described the fit of the stick in the victim's rectum as "very similar to a key in a lock."

At the close of trial, the trial panel deliberated for five hours and unanimously found defendant guilty on all counts, except the aggravated robbery count and the specification of aggravated robbery to the aggravated murder count.

Pursuant to R.C. 2929.04(B), a mitigation hearing was held by the three-judge panel beginning on February 26, 1986. The panel received testimony, and thereafter weighed the aggravating circumstances against the mitigating factors. The panel then sentenced defendant to ten to twenty-five years' imprisonment for both aggravated arson and kidnapping, life imprisonment for rape and felonious sexual penetration, and the death penalty for aggravated murder with specifications.[1]

Upon appeal, the court of appeals affirmed the panel's judgment of conviction and sentence.

The cause is now before this court upon an appeal as of right.

---

*Dennis Watkins,* Prosecuting Attorney, and *Peter J. Kontos,* for appellee.

*Tatarn, Wallace & Warner* and *Roger Warner, Tyack, Wright & Turner* and *Carol A. Wright,* for appellant.

---

SWEENEY, J. Pursuant to R.C. 2929.05(A), this court is required to undertake a three-prong analysis in reviewing the instant death penalty case. First, we will consider the specific issues raised by defendant with respect to the proceedings below. We will review all of defendant's propositions of law, even though some may be deemed to have been waived since they were not raised below. Second, we will independently weigh the aggravating circumstances in this case against all factors which mitigate against the imposition of the death sentence. Third, we will independently consider whether defendant

1. Timothy Combs was also charged and convicted as a principal offender in the murder of Raymond Fife. See *State v. Combs* (Dec. 2, 1988), Portage App. No. 1725, unreported, 1988 WL 128449.

dant's sentence is appropriately disproportionate to the penalty imposed in similar cases.

In his first proposition of law, defendant contends that his Sixth and Fourteenth Amendment right to counsel was violated because he was deprived of counsel during custodial interrogation. Defendant further contends that he could not waive his right to counsel and that his statements to the police were not voluntary since he is mentally retarded.

With respect to waiver, the United States Supreme Court in *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, reaffirmed its prior holding in *Lego v. Twomey* (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, that the state carries the burden of proving the voluntariness of a confession by a preponderance of the evidence. However, *Connelly* also holds that evidence of police coercion or overreaching is necessary for a finding of involuntariness, and not simply evidence of a low mental aptitude of the interrogee. *Id.*, 479 U.S. at 164, 107 S.Ct. at 520, 93 L.Ed.2d at 482-483; see *State v. Clark* (1988), 38 Ohio St.3d 252, 527 N.E.2d 844. See, also, *United States v. Young* (E.D.Pa.1973), 355 F.Supp. 103, where the court held that a defendant with an IQ of 57 could voluntarily waive his *Miranda* rights due to his "extensive dealings with the criminal process." *Id.* at 111.

The record herein indicates that defendant made a statement to Sergeant Steinbeck after waiving his *Miranda* rights, but that Steinbeck apparently forgot to have defendant sign his transcribed statement. Subsequently, Steinbeck and Detective Hill went to defendant's home to have him sign the statement and have his mother make a statement concerning defendant's whereabouts on the day of the Fife murder. Defendant and his mother voluntarily went to the police station with the officers where he was again given his *Miranda* rights before and during the time he made some incriminating statements to the police officers concerning his presence at the murder.

In our view, defendant's arguments are without merit. Upon a careful review of the record, we can discern no coercive or overreaching tactics employed by the police during questioning. Based on *Connelly, supra*, this court's ruling in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 233, 15 OBR 311, 370-371, 473 N.E.2d 264, 321-322, and his prior dealings with the criminal process as a juvenile, defendant's mental aptitude did not undercut the voluntariness of his statements or his waiver of *Miranda* rights. Accordingly, we overrule defendant's first proposition of law.

In his second proposition of law, defendant asserts that his statements to the Warren police officers were not voluntary since the statements were the result of psychological tactics employed by the police on a retarded individual who is essentially illiterate. Defendant contends that the admission of such

statements violates the Due Process Clauses of both the United States and Ohio Constitutions.

Defendant's arguments in this respect are based on his relationship with his uncle, Morris Hill, a detective with the Warren Police Department. Detective Hill testified that prior to defendant's reaching the age of eighteen, he would at times physically discipline defendant at the request of defendant's mother.

A review of the record indicates that immediately prior to defendant's first admission that he was present at the murder of the victim, he was left alone with Detective Hill. Shortly thereafter, Detective Hill summoned the other interrogating police officers and stated that defendant was going to tell what he knew about the murder. Defendant testified at the suppression hearing that Detective Hill kicked him under the table in order to make him start talking when the officers began to tape his statement. Defendant argues that taking into account the totality of circumstances, it is apparent that the tape-recorded statement and the videotape statement were involuntary, especially when one considers the psychological ploy used by the police on him, a retarded individual, that another person (Tim Combs) was going to blame him for the murder.

Upon a careful review of the testimony and the audiotape and videotape statements, we do not find that the interrogation tactics used by the police officers, even in light of defendant's mental capacity, rendered the statements involuntary, or that the officers improperly induced the defendant to make incriminating statements. In *State v. Jackson* (1977), 50 Ohio St.2d 253, 4 O.O.3d 429, 364 N.E.2d 236, this court upheld a confession that ensued after detectives told a suspect that others had implicated him in the commission of a criminal offense.

In our view, the trial court correctly determined that the statements made by defendant were voluntary. Therefore, we find defendant's second proposition of law to be without merit.

In this third proposition of law, defendant argues that the state failed to establish that he was properly given his *Miranda* rights, or that he knowingly, voluntarily and intelligently waived such rights.

Contrary to defendant's arguments, the record amply supports the fact that defendant was given his *Miranda* rights several times, and that during each of these times such rights were knowingly, voluntarily and intelligently waived by defendant. See *Young, supra*. Thus, we find defendant's third proposition of law to be not well taken.

A-8

Case 1:04-cc-00795-SAS Doc # 22-22 Filed 11/21/07 Page 1 of 48 PageID #:5423

SUPREME COURT, JANUARY TERM, 1992 [64 Ohio St.3d

In his fourth proposition of law, defendant asserts that his Fourth and Fourteenth Amendment rights were violated when he was seized from his home through the use of psychological ploys by the police officers.

Our review of the record, however, indicates that defendant voluntarily went with the police officers to the police station at the urging of his mother. Defendant was not taken into custody at the time the police officers brought him to the police station; the police had come to his home to try to get him to go to the police station to sign the prior statement he had made to Sergeant Steinbeck. The officers also wanted to get a statement from defendant's mother concerning defendant's whereabouts on the day of the Fife murder. In addition, defendant indicates on the audiotape made on September 16, 1985 that he was not under arrest when he went to the police station and that he gave his statement voluntarily.

Under these circumstances, we find defendant's fourth proposition of law to be wholly without merit.

In his fifth proposition of law, defendant contends that he was denied his right to due process when he was denied his statutory right to counsel pursuant to R.C. 120.16, 2935.14 and 2935.20.

We cannot, however, find any evidence supporting defendant's contention that he was denied his right to counsel. The record indicates that at no time did defendant ever request an attorney. While it is true that defendant's mother, Vera Williams, testified that she asked her brother, Detective Hill, if she should hire an attorney, and he told her that it would not be necessary since an appointed attorney would be assigned to the defendant, there is no credible evidence in the record that defendant ever invoked his right to counsel either before or during the times he talked to the police officers. In addition, defendant was not under arrest at the time in question and had come voluntarily to the police station.

As this court noted in *State v. Benner* (1988), 40 Ohio St.3d 301, 310, 533 N.E.2d 701, 711-712, in the context of *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, a person must affirmatively articulate a request for counsel in order for the right to attach during interrogation. See *United States v. Pearson* (C.A.11, 1984), 746 F.2d 787, 793.

Even assuming, *arguendo*, that defendant's statements should have been suppressed, the other evidence in the instant cause is so overwhelming as to render any error harmless beyond a reasonable doubt. Accordingly, we reject defendant's fifth proposition of law.

STATE v. HILL

In his sixth proposition of law, defendant alleges that the police failed to comply with R.C. 2935.05,[1] and that his arrest was therefore illegal, and any statements derived therefrom must be suppressed.

The record indicates that defendant was arrested on September 16, 1985, and that charges were filed the very next day. In our view, defendant's argument of unnecessary delay is wholly unpersuasive. Even if we were to find that the alleged delay was unnecessary and violated the statute, the absence of any constitutional infringement would not compel suppression in absence of any constitutional infringement. See *State v. Cowans* (1967), 10 Ohio St.2d 96, 39 O.O.2d 97, 227 N.E.2d 201. Therefore, we overrule defendant's sixth proposition of law.

In his seventh proposition of law, defendant asserts that the statements he gave to the police officers were made under the impression that he would receive leniency or some other benefit. Inasmuch as he received no leniency, defendant argues that the statements made should be inadmissible in any later trial.

In our view, defendant's argument is without support. The record is totally devoid of anything that could be remotely characterized as a plea-bargain arrangement between defendant and the police officers. Accordingly, we summarily overrule defendant's seventh proposition of law.

In his eighth proposition of law, defendant contends that trial court committed prejudicial error by admitting into evidence other crimes, wrongs or acts committed by defendant. Defendant submits that in so doing, the trial court violated R.C. 2945.59, Evid.R. 404(B) and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The error complained of in this vein involves the testimony of three witnesses for the prosecution. Candyce S. Jenkins testified that in March 1984, defendant went to her house, broke a window with his fist, and entered the premises carrying a knife. Jenkins stated that defendant raped her twice anally, once vaginally, and made her perform fellatio on him.

Jenkins further testified that defendant bit her on the back and on the breast during the rape, and told her that he was going to stick the knife up

---

1. R.C. 2935.05 provides as follows:

"When a person named in section 2935.03 of the Revised Code has arrested a person without a warrant, he shall, without unnecessary delay, take the person arrested before a court or a magistrate having jurisdiction of the offense, and shall file or cause to be filed an affidavit describing the offense for which the person was arrested. Such affidavit shall be filed either with the court or magistrate, or with the prosecuting attorney or other attorney charged by law with prosecution of crimes before such court or magistrate and if filed with such attorney he shall forthwith file with such court or magistrate a complaint, based on such affidavit"

Opinion, per Sweeney, J.

her rectum, cut out her vagina and cut off her breasts. Jenkins also stated that defendant threatened to rape her baby, who was in another room in the house, and cut her up. Jenkins stated that she was able to escape from defendant while he put his pants back on, and that she saw defendant flee to the field behind the Valu-King. Defendant later pled guilty to the rape in juvenile court.

Mary Ann Brison testified that she was raped at knifepoint by defendant on the morning of February 8, 1984 while walking on a path leading from the Valu-King.

Stephen Melius testified that he was a cellmate of defendant in the Juvenile Justice Center during the winter of 1984. Melius stated that defendant put his hand on him and expressed a desire to perform anal intercourse and fellatio on him. Melius testified that he refused both the defendant's advances and the invitation to perform anal intercourse and fellatio with defendant.

Evid.R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

R.C. 2945.59 states as follows:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

In our view, the testimony of all three witnesses was properly admitted since such testimony tended to show the motive, plan and identity of defendant. See Benner, supra, 40 Ohio St.3d at 306, 533 N.E.2d at 708.

In State v. Flonnory (1972), 31 Ohio St.2d 124, 126, 60 O.O.2d 95, 96-97, 285 N.E.2d 726, 729, this court observed:

"Much confusion about R.C. 2945.59 might be avoided if it were observed that nowhere therein do the words 'like' or 'similar' appear. The statute permits the showing of 'other acts' when such other acts 'tend to show' any of those certain things. If such other acts do in fact 'tend to show' any of those

Opinion, per Sweeney, J.

things they are admissible notwithstanding they may not be 'like' or 'similar' to the crime charged." (Emphasis added.)

Likewise, in State v. Jamison (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, this court held in the syllabus:

"Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B). To be admissible these other acts must tend to show by substantial proof 'identity' or other enumerated purposes under Evid.R. 404(B). Although the standard for admissibility is strict, the other acts need not be the same as or similar to the crime charged. * * *"

In light of these precedents, we believe that Jenkins's testimony tended to identify defendant as an assailant of Fife because similarly to the instant murder, defendant left his mark by biting Jenkins during the commission of the rape. Defendant's threat to Jenkins that he would stick the knife up her rectum is similar to what was perpetrated on Fife, except with a broken broom-like handle.

Brison's testimony tended to show defendant's plan to attack and rape in the same wooded field area behind the Valu-King where Fife was brutalized.

Melius's testimony tended to show defendant's motive to forcibly have sex with another male.

In any event, even if the admission of the testimony was improper, since the case was tried before a three-judge panel, it must affirmatively appear on the record that the panel relied on the alleged improper testimony. State v. Post (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

Given that the trial panel stated in its opinion weighing the aggravating circumstances against the mitigating factors that "no prior crimes were considered by the Court in any way in reaching its verdict," we fail to see how defendant was prejudiced. Accordingly, we overrule defendant's eighth proposition of law.

In his ninth proposition of law, defendant submits that his rights to due process and a fair and impartial trial were violated when the trial court admitted evidence that was not relevant, or whose relevance was outweighed by its prejudicial effect.

The first example of error raised by defendant concerns the testimony of Raleigh Hughes, an ambulance attendant who arrived at the murder scene, who commented on the condition of the victim's body. In summarizing his impression of what he saw, Hughes stated that it was "one of the most gruesome things I've ever seen."

While Hughes's testimony in this respect should probably not have been admitted, there has been no showing of prejudice that overcomes the presumption that the three-judge panel considered only the relevant, nonprejudicial evidence submitted. See *Post, supra.*

Defendant next challenges the admission of the broomstick into evidence by arguing that there was no probative value in its admission. However, we believe that admission of the stick was properly justified for several reasons: (1) Donald Allgood testified that he saw defendant "flick" a stick into the woods at the time and near the place where the homicide took place; (2) defendant stated on tape that Tim Combs stuck "[a] stick * * * [l]ike a broom handle thing" in the victim's rectal opening; and (3) Dr. Adelman testified that the shape of the stick in comparison to the injury inflicted in the victim's rectum was "very similar to a key in a lock." Given the foregoing testimony, we find that the stick was properly admitted into evidence during the trial.

Lastly, defendant alleges error in the testimony of Dr. Adelman that asphyxia by strangulation can cause a penile erection. In our view, however, such testimony was relevant in supplementing the testimony of Dr. Mertz to explain the differences in the size of the marks made on the victim's penis and the bite impression taken of defendant.

Based on all the foregoing, we find defendant's ninth proposition of law to be not well taken.

Defendant, in his tenth proposition of law, contends he was denied a fair trial because the trial court admitted into evidence State's Exhibit 4f, the broomstick. Defendant argues under this proposition that the stick should not have been admitted because it caused the trial court to erroneously draw an inference from another inference. In support, defendant relies on *Sobolovitz v. Lubric Oil Co.* (1923), 107 Ohio St. 204, 140 N.E. 634.

Upon a careful review of the record, we believe that the facts adduced during trial led the trial court to draw only one inference: that the stick was used on the victim and, thus, was properly admitted. The admission by defendant that "a broom handle thing" was used, Allgood's testimony that he saw defendant "flick" a stick into the woods, Dr. Adelman's "key in a lock" testimony, and plant fibers found in the victim's rectum all supported the single inference that the stick was used on the victim. Also, passing over the fact that the *Sobolovitz* holding was later limited, we find that it is readily distinguishable from the cause *sub judice*. Accordingly, we overrule defendant's tenth proposition of law.

In his eleventh proposition of law, defendant asserts that his right to confrontation of witnesses against him was violated when the prosecutor consulted a witness who was subject to recall and who was a surprise witness

of which defense counsel had no prior knowledge. In support of his argument, defendant relies on *Davis v. Alaska* (1975), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, and *State v. Prater* (1983), 13 Ohio App.3d 98, 13 OBR 114, 468 N.E.2d 356.

We believe, however, that neither of these cases is on point or supports defendant's assertion. When the witness complained of, Stephen Melius, was recalled as a witness, he was questioned by defense counsel with respect to his contacts with the prosecution.[3] A review of the testimony and other evidence reveals that the defendant's right to confrontation was not infringed, nor was his opportunity for cross-examination denied or restricted. Even if we were to assume that Melius was in fact a surprise witness, the defendant had a full and fair opportunity to cross-examine on Melius's limited testimony and, thus, any error was rendered harmless. Accordingly, we find defendant's eleventh proposition of law to be unmeritorious.

In his twelfth proposition of law, defendant argues that he was denied due process because the pool of prospective jurors was drawn from only licensed drivers who were registered voters, and that such pool did not reflect a fair cross-section of the community.

---

3. Upon recall, the following exchange took place between defense counsel and Stephen Melius:

"Q. * * * have you had an occasion to talk with any officers of the Warren Police Department prior to the time you arrived here today and were sitting in the hallway?

"A. Yes, sir.

"* * *

"Q. And who were those officers?

"A. This guy sitting right here (indicating).

"Q. This guy sitting right here (indicating)? Pete? Technically, he's an officer. Pete. And what'd Pete talk to you about?

"A. He just told me that you guys were going to subpoena me back into Court, and he told me some of the questions that you might ask me.

"Q. Oh, he did! Oh! Okay. That's interesting. What kind of questions did he tell [you] I was going to ask you?

"A. He said you might—that you might ask me that I gave some of the wrong dates and stuff like that.

"Q. Okay. Remember anything else?

"A. Um-hum. No.

"Q. Well, how'd you answer the questions? What did he ask you specifically?

"A. He asked me if—that I was—that I gave you the wrong dates about the times me and Danny Lee Hill were in JJC together.

"Q. He told you you gave the wrong dates?

"A. Yes.

"Q. I see. What else did he tell you?

"A. That's about it.

"Q. That's about it?

"A. Um-hum.

"Q. Okay. * * *"

Case 4:96-cv-00795-JRA Doc # 22-22 Filed 01/24/97 52 of 148 PageID #: 5426

SUPREME COURT, JANUARY TERM, 1992 [64 Ohio St.3d
Opinion, per Sweeney, J.

Contrary to defendant's argument, the great weight of authority supports the validity of voter registration lists as the sole source of prospective jurors. See, e.g., State v. Johnson (1972), 31 Ohio St.2d 106, 60 O.O.2d 85, 285 N.E.2d 751, paragraph two of the syllabus. Accord State v. Spirko (1991), 59 Ohio St.3d 1, 35-36, 570 N.E.2d 229, 265.

In any event, defendant waived his right to a jury trial and opted for a trial before a three-judge panel. Under these circumstances, the denial of defendant's motion by the trial court to expand the pool of potential jurors did not prejudice him. Therefore, we summarily overrule defendant's twelfth proposition of law.

In his thirteenth proposition of law, defendant contends that the trial court failed to determine on the record whether his waiver of a jury trial was made knowingly, intelligently and voluntarily.

We have reviewed the record regarding defendant's waiver and believe his argument in this vein is totally devoid of merit. As this court pointed out in State v. Jells (1990), 53 Ohio St.3d 22, 26, 559 N.E.2d 464, 468: "The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel."

Since the trial court amply fulfilled the requirements set forth in Jells, supra, we find defendant's thirteenth proposition of law to be not well taken.

In his fourteenth proposition of law, defendant asserts that the trial court committed reversible error in denying him the funds necessary to employ an expert for purposes of a motion for closure of a pretrial hearing that was necessary to preserve a fair and impartial jury.

We find this assertion to be without merit. Even assuming that the trial court erred in this vein, any prejudice to defendant was eliminated by his subsequent waiver of his right to a trial by jury. Accordingly, we summarily reject defendant's fourteenth proposition of law.

In his fifteenth proposition of law, defendant argues that the trial panel abused its discretion in admitting a predeath photograph of the victim and permitting the victim's mother to testify about her family. Defendant submits that introduction of such sympathy testimony constitutes reversible error.

In our view, defendant's claim of error is without merit. Defendant tries to raise Miriam Fife's testimony to the level of an impermissible victim-impact statement proscribed by Booth v. Maryland (1987), 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, but a careful review of her testimony reveals nothing even remotely approaching impermissible "victim impact evidence." In any

STATE v. HILL
Opinion, per Sweeney, J.

event, we note once again that the cause was tried before a three-judge panel and not a jury, and we find nothing which would indicate that the three-judge panel relied on such evidence in arriving at its sentence. Post, supra. Therefore, we overrule defendant's fifteenth proposition of law.

Defendant, in his sixteenth proposition of law, contends that his rights to a fair trial and to effective assistance of counsel were violated by the state's repeated failure to comply with the discovery requirements of Crim.R. 16. Specifically, defendant submits that the state failed to provide the following discoverable information: (1) Donald Allgood's identification of defendant from a photo array, (2) the photo array itself, (3) photos of defendant with officers at the crime scene and accompanying oral statements of defendant, (4) the testimony of Stephen Melius, and (5) photos utilized by defense witness Dr. Levine in his testimony regarding the bite marks on the victim's penis.

In State v. Wickline (1990), 50 Ohio St.3d 114, 117, 552 N.E.2d 913, this court reaffirmed the standard of "materiality" set forth in State v. Johnston (1988), 39 Ohio St.3d 48, 61, 529 N.E.2d 898, 911, paragraph five of the syllabus:

"In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense. (United States v. Bagley * * * [1984], 473 U.S. 667 [105 S.Ct. 3375, 87 L.Ed.2d 481], followed.)"

Upon reviewing the items enumerated by defendant, we find that his contentions in this respect are without merit. With regard to the pictures used by Dr. Levine, we point out that he was defendant's expert witness and it is undisputed the defense was aware, through discovery, that Dr. Levine concluded the bite marks could have been made by defendant. Even if defendant had had the photographs used by Dr. Levine, the outcome of the trial would not have been different.

We also discern no prejudice to defendant from the state's failure to supply the photo array used by Donald Allgood. The photo array was not introduced at trial and was not "material" under the Johnston test.

With respect to the photos of defendant with the officers at the crime scene, we note that the trial panel did, pursuant to Crim.R. 16(E)(3), offer defendant a continuance, but defendant declined. The statements made by defendant at

Case 1:09-cv-00704-DCC Doc #: 22-12 Filed 01/23/13 Page 53 of 148 Page ID #3107

328    64 Ohio St.3d

SUPREME COURT, JANUARY TERM, 1992 [64 Ohio St.3d
Opinion, per Sweeney, J.

the crime scene were never transcribed. Once again, we find no prejudicial error in the state's failure to supply such photos pursuant to Crim.R. 16.

In regard to the testimony of Stephen Melius, we believe that such testimony although of some relevance, was not crucial and merely dealt with a collateral act. In addition, the defense cross-examined Melius and recalled him as a witness the day after his initial testimony. Defendant has not articulated how Melius's testimony was "material" or would have affected trial preparation, strategy or outcome. In any event, the trial panel stated that it disregarded defendant's prior acts.

Since we believe that no prejudicial error has been shown, we overrule defendant's sixteenth proposition of law.

In his seventeenth proposition of law, defendant argues that the trial panel abused its discretion in admitting photographs of the victim that he characterizes as "highly prejudicial, gross and unnecessary" and lacking in probative value.

In *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402, 473 N.E.2d 768, 792, this court stated that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and are probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." See, also, *Benner, supra,* and *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394.

In our view, the probative value of the photographs complained of far outweighed any prejudicial effect. Similar to our holding in *Jells, supra,* which was also tried before a three-judge panel, the outcome would not have been different here even if the gruesome photographs had not been introduced into evidence. The photographs in issue were relevant, however, to support the testimony of the expert witnesses during trial. In any event, since the introduction of such photographs did not constitute prejudicial error, we overrule defendant's seventeenth proposition of law.

In his eighteenth proposition of law, defendant asserts that he was denied a fair trial by prosecutorial misconduct during both the guilt and mitigation phase closing arguments. Specifically, defendants cites fourteen instances of what he alleges to be improper prosecutorial comments.[4]

4. The instances of prosecutorial misconduct alleged by defendant are as follows:
   1. "You know, back on September 10th, our community had a little boy, and we've had a lot of little boys in our community, but this 12-year old boy we have not talked about too much. We've dealt with him in an abstraction. He hasn't been here. And the Court is aware of the

Footnote 4—Continued

leaps and bounds and the rights of victims. I'm not trying to ignore the procedural rights of the defendants in cases, but sometimes we forget and don't pay attention when we talk about Constitutional Rights of the defendant, and we don't, in the balance—how about Raymond Fife's right to live? How about his Constitutional Rights to be here today, to be in school, to celebrate his 13th birthday with his parents."

2. "The question that is to be determined by this Court is whether that man [indicating to the defendant] and his buddy, Timothy Combs, engaged in a criminal enterprise wherein he destroyed and devoured a little boy on the 10th day of September of 1985. * * * I can't imagine in one witness that could happen."

3. "* * * describes the defendant as an "animal." * * * The other one hatred."

4. "* * * [B]ut he [the defendant] followed him [Timothy Combs] back to the scene of the crime to look for evidence to destroy so they could cover up their heinous, unbelievable, animalistic behavior. He would make the Marquis deSade proud."

5. "Now, we know on September 10th, 1985, the year of our Lord—and I'm going to go through, as I view the evidence—as Mr. Kontos and I see the facts to be and the truth to be."

6. "Maybe Mr. Lewis will argue that Raymond wasn't on the bike. It didn't have fingerprints. And rain will affect fingerprints as it will affect blood."

7. "Who does this Court feel is more qualified? Mr. Debus or Mr. Gelfius on the charcoal lighter as to paint thinner and hydrocarbons? I don't know; very unlikely, and I don't think that's credible. I don't feel Mr. Debus; it couldn't break it down. We used this Lab who deals strictly with arson is the most credible witness in this case, and that substantiates the State's case."

8. "No one wants to testify against his brother, just like Morris Hill didn't want to testify against his nephew."

9. "Finally, Your Honors, to get this poor, dumb boy who really wouldn't do anything, who tried to sexually attack Mr. Melius, tried to put his mouth in the boy's penis, grabbed his penis, we know he did violently rape. We know what he did to Candyce Jenkins; had anal sex, oral sex, talked hateful to her, had a knife and threatened to cut her vaginal sex, once again, anal sex, had a knife and threatened to cut her vagina out; hit her on the breast. Seemed... hurt, he said, 'Good! I want it to hurt.' And that's what this case is about. This case isn't just about an individual who thrives and relishes on inflicting pain and about a killing

10. "another human being."

11. "Raymond Fife was a 12-year-old boy; very active and vibrant, who was caught in the middle of a living hell caused by this defendant. Raymond Fife had no justice while he was living, but he demands justice now even in his absence, and justice demands, Your Honors, that you return a verdict of guilty. * * *"

11. "The reason that it is so clear is because the defense has not shown by or has not substantiated or brought about any mitigating factors in this case, and it's very clear, aggravating circumstances, especially three of them, will clearly outweigh the absence of any mitigation."

12. "Well, I'd like to cite a few days that they weren't together. February 8th, 1984, when this defendant raped Mary Ann Brison. They weren't together March 3rd, 1984, when this defendant raped and brutalized Candyce Jenkins. They weren't together April 1984 through April 1985 when this defendant was incarcerated."

13. "In addition to that, he says he has God. He didn't have any problem grabbing right hand and he's not very good at that. He didn't have any problem grabbing them with his left hand and the knife in the women that I told you about before."

14. "Now, there was a witness that the State wanted to present in this case, but right hand while he sexually assaulted the boy, Raymond Fife. He would have been able to testify as to unfortunately we could not call him. Raymond Fife.

Opinion, per Sweeney, J.

In *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566, this court observed that "the prosecution is entitled to a certain degree of latitude in summation." Additionally, in *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 136, 239 N.E.2d 65, 70, we noted that "[w]e indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." See, also, *Jells, supra*, and *Post, supra*.

A review of the instances cited by defendant indicates that no objections were raised when any of the complained-of comments were made, and therefore any error is deemed waived. *State v. Lott* (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293, 301–302. In addition, we find that neither prejudicial error nor plain error as set forth in *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, is present in the context in which the comments by the prosecution were made. Accordingly, we find defendant's eighteenth proposition of law to be not well taken.

Defendant, in his nineteenth proposition of law, cites seven instances in which he was denied a fair trial due to the ineffective assistance of counsel in that counsel failed: (1) to request hearings on all the pretrial motions that were filed; (2) to seat a jury before waiving the right to a jury trial; (3) to fully advise the defendant of his legal rights concerning his waiver of a jury trial so that he could voluntarily, knowingly and intelligently decide whether to waive the right; (4) to enter a continuing objection to a police officer's testimony of his belief that defendant was lying; (5) to timely file a motion for a new trial with a hearing; (6) to object to the state's improper

---

Footnote 4—Continued

what happened that particular day. He would have been able to tell all of us, including this defendant, how he felt when he was abducted and helpless and felt doomed because he had no opportunity to escape. He would have been able to tell us what it felt like to be punched and continually kicked; what it felt like to be strangled so severely that he'd be gasping for breath. He'd be able to describe the pain involved and sexual molestation. He'd also be able to tell you and tell all of us what it would feel like—the indescribable pain when your flesh is burning and you're helpless to do anything about it. And finally, he'd be able to tell us what it would be like to have a stick rammed up your rectal cavity so deeply and so severely that it perforates through the rectum and goes into the urinary bladder. But he's not here to testify about that thanks to this defendant.

"There's some other things that Raymond Fife can't come here and testify about either. He can't testify about how he misses his family, about how he misses his friends in the Scout group, about how he'd like to be with his father in his backyard feeding the birds, how he'd like to be able to live and love and share his love with his family and friends, and he will never be able to do that because of this defendant; that, of that table took care of that! And the most this disgrace to mankind sitting at the end of this defendant is the manner of the death of Raymond Fife."

---

Opinion, per Sweeney, J.

closing argument; and (7) to preserve the record or otherwise object on any issue that this court or any future court deems waived by such omission.

In *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, the high court established a two-prong analysis for determining whether ineffective assistance of counsel merits a reversal of a criminal conviction:

" * * * First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. * * *"

In applying the *Strickland* standard to the seven instances of ineffective assistance of counsel, and upon reviewing the instances both individually and collectively, we find no prejudice to defendant that compels a reversal of his conviction. Therefore, we overrule defendant's nineteenth proposition of law.

In his twentieth proposition of law, defendant asserts that "the trial court erred in entering a judgment of conviction for kidnapping and the other felonies where convictions on both offenses are contrary to R.C. 2941.25. Secondly, where an underlying felony count which is also used as a specification for aggravated murder merges, then it cannot be considered as an additional specification for sentencing purposes."

In the cause *sub judice*, defendant was convicted of kidnapping, rape, aggravated arson, felonious sexual penetration and aggravated murder.

R.C. 2941.25 provides as follows:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

"(B) Where the defendant's conduct constitutes two or more offenses of the dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

In *State v. Blankenship* (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816, 817, this court summarized the well-developed, two-part precedents involving R.C. 2941.25:

"This court has set forth a two-tiered test to determine whether two crimes are allied offenses of similar import. In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses. (*State v. Logan* [1979], 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345; *State v. Mitchell* [1983], 6 Ohio St.3d 416, 6 OBR 463, 453 N.E.2d 593; *State v. Talley* [1985], 18 Ohio St.3d 152, 18 OBR 210, 480 N.E.2d 439; Anderson's Ohio Criminal Practice and Procedure [1987] 280-281.)"

A-14

332

SUPREME COURT JANUARY TERM, 1992 [64 Ohio St.3d]
Opinion, per Sweeney, J.

the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's *conduct* is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses."

In *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, a case upon which defendant relies, this court found rape and kidnapping to be allied offenses of similar import. However, the *Logan* court also held that where murder is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense. *Id.* at 135, 14 O.O.3d at 879, 397 N.E.2d at 1352.

Similarly, in *State v. Powell* (1990), 49 Ohio St.3d 255, 262, 552 N.E.2d 191, 199, this court found kidnapping and attempted rape not to be allied offenses of similar import.

In the instant cause, the record reflects that the kidnapping commenced near the parking lot of Valu-King. Defendant, along with Tim Combs, forcibly removed Raymond Fife from the path near the parking lot to a wooded area where they could not be seen. There, the victim was purposely and repeatedly beaten on the head and body. This does not appear to have been done for the immediate motive of rape, felonious penetration or aggravated arson, but to terrorize and inflict serious physical harm. See R.C. 2905.01(A)(3) (kidnapping).

Anal intercourse was also performed forcibly on the victim, which constitutes rape. In addition, the bite marks on the victim's penis indicate that fellatio was performed by defendant. A piece of wood was stuck into the victim's anus (felonious sexual penetration). The evidence also shows that the victim was strangled by his own underwear and set on fire (aggravated arson).

The foregoing scenario demonstrates that not only was there a separate immediate motive or animus, but that the acts were committed separately with the kidnapping continuing after the rape.

Based on the facts and evidence set forth in the record, as well as *Logan*, *supra*, we hold that the crimes upon which defendant was convicted were not allied offenses of similar import and the trial panel did not err in considering the specifications for sentencing purposes. Accordingly, we find defendant's twentieth proposition of law to be without merit.

In his twenty-first proposition of law, defendant argues that his constitutional rights were violated when the trial panel denied his motion for a new trial without a hearing.

Crim.R. 33 allows a trial court to entertain a motion for a new trial, and "[t]he allowance of a motion for a new trial on the grounds of newly discovered evidence is within the competence and discretion of the trial judge; and in the absence of a clear showing of abuse such decision will not be disturbed." *State v. Williams* (1975), 43 Ohio St.2d 88, 72 O.O.2d 49, 330 N.E.2d 891, paragraph two of the syllabus.

A review of the record reveals that the only newly discovered evidence proffered by defendant at the time of his motion was the affidavit of his brother, Raymond Vaughn, who recanted his sworn testimony that he had seen defendant washing blood out of pants. In our opinion, even with the recantation affidavit, the result of the defendant's trial would not have been different. See *State v. Duling* (1970), 21 Ohio St.2d 13, 50 O.O.2d 40, 254 N.E.2d 670.

Since we find no abuse of discretion by the trial court in this vein, we overrule defendant's twenty-first proposition of law.

In his twenty-second proposition of law, defendant essentially contends that Ohio's statutory framework for imposition of capital punishment creates a mandatory sentencing scheme in contravention to both the state and federal constitutions.

We find defendant's argument in this vein to be not well taken. As this court noted in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 174, 15 OBR 311, 320, 473 N.E.2d 264, 277: "[T]he system currently in place in Ohio does require the sentencing authority to focus on the particular nature of the crime as well as allow the accused to present a broad range of specified and nonspecified factors in mitigation of the imposition of the death sentence."

In addition, this court upheld the statutory framework assailed by defendant in *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795. Accordingly, we reject defendant's twenty-second proposition of law.

In his twenty-third proposition of law, defendant argues that the trial panel failed to consider all of the evidence in support of mitigation during the penalty phase, and thus violated R.C. 2929.03(F) and the Eighth and Fourteenth Amendments to the United States Constitution.

Our careful review of the sentencing opinion, however, convinces us that the trial court did in fact consider all mitigating factors presented by defendant, and articulated the reason each was outweighed by the aggravating circumstances beyond a reasonable doubt. Thus, we hold that the trial court

A-15

SUPREME COURT, JANUARY TERM, 1992 [64 Ohio St.3d

Opinion, per Sweeney, J.

complied with the dictates of R.C. 2929.03(F). See *State v. Steffen* (1987), 31 Ohio St.3d 111, 118, 31 OBR 273, 279, 509 N.E.2d 383, 391. Therefore, we overrule defendant's twenty-third proposition of law.

In this twenty-fourth proposition of law, defendant contends that the death penalty scheme established in R.C. 2903.01 and 2929.02 *et seq.* violates the United States and Ohio Constitutions both facially and as applied to defendant.

The specific claims of unconstitutionality by defendant have been rejected by this court in numerous cases. See, *e.g.*, *Jenkins*, *Buell*, and *Lott*, *supra*. Accordingly, we reaffirm the constitutionality of Ohio's death penalty scheme both facially and as applied to defendant, especially since defendant proffers no compelling reason as to why the death penalty scheme is unconstitutional as applied to him. Therefore, we overrule defendant's twenty-fourth proposition of law.

In his twenty-fifth and final proposition of law, defendant argues that this court cannot find him guilty of aggravated murder, or find that the death sentence is proportionate and appropriate, under the independent appellate review required by R.C. 2929.05(A).

As has been set forth in the factual recitation above, and as will be seen in this court's independent review of the defendant's guilt and death sentence, the conviction rendered by the trial panel was supported by sufficient evidence and the death sentence is both proportionate and appropriate. Thus, we reject defendant's final proposition of law.

Having reviewed the various propositions of law raised by defendant, and having found none of them to be meritorious, we next turn to our responsibility of independently weighing the aggravating circumstances against the mitigating factors of the case.

In so doing, we review the testimony in the record, and note first that defendant's mother, Vera Williams, testified that all of her children were "slow" and that defendant's father never lived with the family. In sum, defendant had a poor family environment.

Dr. Douglas Darnall, a psychologist, testified that defendant had an I.Q. of 55 and that his intelligence level according to testing fluctuates between mild retarded and borderline intellectual functioning, and that he is of limited intellectual ability. Dr. Darnall did state, however, that defendant was able to intellectually understand right from wrong.

Dr. Nancy Schmidtgoessling, a clinical psychologist, testified that defendant had a full scale I.Q. of 68, which is in the mild range of mental retardation, and that the defendant's mother was also mildly retarded. Dr. Schmidtgoess-

---

64 Ohio St.3d]

STATE v. HILL

Opinion, per Sweeney, J.

ling also testified that defendant's moral development level was "primitive," a level at which "one do[es] things based on whether you think you'll get caught or whether it feels good. [T]hat's essentially whereabout [sic] a 2-year old is."

Dr. Douglas Crush, another psychologist, testified that defendant had a full-scale I.Q. of 64, and that his upper level cortical functioning indicated very poor efficiency.

Other mitigation testimony on behalf of defendant indicated that he was a follower and not a leader, who had to be placed in group homes during his youth.

Defendant also gave an unsworn statement to the trial court, in which he stated that he was sorry what happened, and that he didn't want to die. Defendant then started to cry.

With respect to the enumerated mitigating factors set forth in R.C. 2929.04, we find that defendant's mental retardation is a possible mitigating factor. See *Penry v. Lynaugh* (1989), 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256. However, as the *Penry* court noted, there are various levels of mental retardation, and a person must be viewed individually as to the degree of retardation.

Upon a careful review of the expert testimony proffered with respect to defendant's mental retardation, we find a very tenuous relationship between the acts he committed and his level of mental retardation. As several of the experts pointed out, defendant did not suffer from any psychosis, and he knew right from wrong.

Defendant's relative youth, i.e., eighteen years old at the time of the murder, is entitled to some weight. However, we believe this mitigating factor is clearly outweighed by the aggravating circumstances of the case. In addition, defendant's poor family environment, even if considered in mitigation, in no way outweighs the aggravating circumstances.

When considering the manner in which the victim was kidnapped and killed; the rape, burning, strangulation and torture the victim endured; and the total brutalization that took place, we find that these aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

Finally, this court must decide whether the sentence of death imposed here is excessive or disproportionate to the sentences in similar cases. We hold that the death sentence here is neither excessive nor disproportionate to the sentences approved for kidnapping/rape/murder in *State v. Durr* (1991), 58 Ohio St.3d 86, 568 N.E.2d 674; *Benner*, *Steffen*, and *Apanovitch*, *supra*. Accordingly, the penalty imposed here is appropriate.

**SUPREME COURT, JANUARY TERM, 1992** [64 Ohio St.3d 336.]

*Statement of the Case*

In conclusion, we first find that there is no merit to any of the specific propositions of law raised by defendant which would compel a reversal of his convictions of the crimes described. Second, we find that the aggravating circumstances outweigh the mitigating factors presented, beyond a reasonable doubt. Third, we find the evidence sufficient to support the conviction, and the sentence of death appropriate in this case, as it is neither excessive nor disproportionate to the penalty imposed in similar cases. Therefore, in accordance with R.C. 2929.05(A), we affirm the conviction and sentence of death in this cause.

Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.

---

THE STATE OF OHIO, APPELLEE, v. LAWSON, APPELLANT.

[Cite as *State v. Lawson* (1992), 64 Ohio St.3d 336.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 90-1342—Submitted May 19, 1992—Decided August 12, 1992.)

APPEAL from the Court of Appeals for Clermont County, No. CA88-05-044.

On or about January 13, 1987, Cheryl Titus returned to her Clermont County home at around 5:00 p.m. to discover that burglars had broken in through her porch door. A microwave oven, VCR, checkbook and camera were stolen. Titus immediately contacted the police, who responded to the scene and took a report. An initial investigation disclosed no suspects. Later that same year, on June 1, 1987, the Titus residence was again burglarized. On this occasion, the intruders stole the same kind of items as before, which Titus and her husband had replaced with insurance proceeds.

Detective Randy Harvey, during the course of his investigation of the June 1, 1987 burglary, came into contact with Timothy Martin. Martin had on several prior occasions assisted the Clermont County Sheriff's Office as a confidential informant. After notifying Harvey that Tim Lawson and his brother, appellant Jerry R. Lawson, were involved in the Titus burglaries, Harvey arranged for a phone conversation between Tim Lawson and Martin

---

to be recorded. Martin succeeded in obtaining a taped conversation wherein Tim Lawson discussed sale prices for items he and appellant had burglarized from the Titus residence. Subsequently, Detective Harvey sought an aggravated burglary indictment against Tim Lawson. Martin was later subpoenaed to appear before the grand jury on August 5, 1987, although it is not certain that he testified. The grand jury returned an indictment charging Tim Lawson with two counts of aggravated burglary. Tim Lawson was subsequently arrested and released on bond.

After Tim Lawson's release in late August or early September 1987, his brother, appellant, came to Tim's home. Tim Lawson's live-in girlfriend, Desiree Henson, testified that she overheard their conversation in which they discussed how "Tim Martin needed to be taken care of" and how they "had to get rid of him" in order to prevent his testimony against them. Henson also overheard the brothers indicate their intention of "taking him somewhere and whooping his butt * * *." In addition, they discussed how hard it would be

"to get him [Martin] to go anywhere with Jerry."

During the morning of September 23, 1987, appellant arrived at the home of Tim Lawson, ostensibly to drive his brother to work. The two traveled instead to the New Richmond, Ohio home of Billy and Sue Payton, siblings who were acquainted with Martin and the Lawsons. There, the parties discussed their mutual hatred of Tim Martin "because of all the things he'd done to both of our families." Supposedly, Martin had tried to kill Sue, his former girlfriend. Martin, according to one witness, tried to "set up" Tim and his sister on criminal charges and had even threatened to "rip [the head] off" Desiree Henson's infant child. During the course of this conversation, appellant grew angrier and angrier.

Knowing that Martin would be reluctant to go anywhere alone with appellant, the group decided to employ deception in order to lure Martin to a secluded area and give him a severe beating. Billy suggested: "I can say I know where a pot field is * * *." Billy believed that this subterfuge would cause Martin to "get dollar signs in his eyes" and thereby lose his caution. Billy phoned Martin, told him the agreed-upon story, and Martin was persuaded to meet with them.

At approximately 10:30 a.m. on that day, appellant, Tim, and Billy met with Martin and the four set off for the fictitious marijuana field. Appellant drove the group through a number of back roads to a secluded spot in Highland County. Once at the location, Martin was told that the marijuana was in a wooded area behind a nearby cornfield. The four exited the vehicle and proceeded toward the wooded area, Martin still expecting to find a field of marijuana. They arrived at a dry creekbed and all stopped to urinate. After

## ASSIGNMENTS OF ERROR RAISED IN COURT OF APPEALS

### ASSIGNMENT OF ERROR NO. 1:

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE STATEMENTS OF THE APPELLANT.

### ASSIGNMENT OF ERROR NO. 16:

THE TRIAL COURT WAS IMPROPERLY PREVENTED BY DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT.

### ASSIGNMENT OF ERROR NO. 17:

THE TRIAL COURT FAILED TO CONSIDER ALL OF THE EVIDENCE IN SUPPORT OF MITIGATING A DEATH SENTENCE.

### ASSIGNMENT OF ERROR NO. 18:

A SENTENCE OF DEATH IS UNCONSTITUTIONAL.

### ASSIGNMENT OF ERROR NO. 19:

THIS COURT CANNOT FIND THAT AFTER REVIEWING ALL OF THE FACTORS OF R.C. 2929.05(a) THAT DEATH WAS THE APPROPRIATE SENTENCE FOR DANNY LEE HILL.

90-177

FILED
MAR 08 1990
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

STATE OF OHIO
ELEVENTH DISTRICT
TRUMBULL COUNTY, OHIO

*J U D G E S*

STATE OF OHIO,

    Plaintiff-Appellee;

– vs –

DANNY LEE HILL,

    Defendant-Appellant.

HON. JUDITH A. CHRISTLEY, P.J.
HON. JOSEPH E. MAHONEY, J.
HON. DONALD R. FORD, J.

CASE NOS. 3720/3745

*O P I N I O N*

CHARACTER OF PROCEEDINGS:   Criminal Appeal from the
                                       Court of Common Pleas
                                       Case No. 85 CR 317

JUDGMENT:   Affirmed.

ATTY. DENNIS WATKINS
COUNTY PROSECUTOR

ATTY. PETER KONTOS
ASSISTANT PROSECUTOR
160 High Street, N.W.
3rd Floor Administration Building
Warren, OH 44481

(For Plaintiff-Appellee)

ATTY. ROGER WARNER
181 East Livingston Avenue
Columbus, OH 43215

(For Defendant-Appellant)

FILED
COURT OF APPEALS

NOV 27 1989

TRUMBULL COUNTY, OHIO
MARGARET R. O'BRIEN, Clerk

C.C.
R. Warner
Mandate to C.P.
J.E. Mandate
to Superintendent
of Southern Ohio
Correctional Inst.
sent by c. mail
539-573 -11-27 89

Received by
Atty. Warner
12-1-89

# VOL. 22- 665

FORD, J.

On September 10, 1985, at approximately 5:15 p.m., Raymond Fife, age twelve, left the home of his parents in Warren, Ohio to visit his friend, Billy Simmons. He was to return home by 6:30 p.m. to attend a scout meeting. The victim decided to take a shortcut through a large field which was overgrown with thick woods, dense brush and trees and was located behind the nearby Value King. This area, which was crisscrossed by numerous dirt paths, was used by local residents as a shortcut between streets and as an area in which to ride bicycles.

At 5:50 p.m., Billy Simmons telephoned the victim's parents to ask why Raymond had not arrived. Concerned, the Fifes, along with some relatives and friends, began to search for Raymond. About three hours later, Raymond's father found him in the field directly behind the supermarket. At the time he was found, Raymond was alive, but unconscious. His body was nude, except that his shoes and socks were still on his feet, and his underwear had been tied around his neck. Two days later, Raymond died from the injuries he sustained on the evening of September 10.

The autopsy report revealed multiple injuries. In addition to numerous bruises and abrasions on his arms, neck, and upper torso, the victim had sustained second and third degree burns on his face, neck and shoulders. There

VOL. 22 - 666

was a ligature mark around the neck, indicating that the victim had been choked. Examination of the skull revealed a subdural hemorrhage; suggesting that the victim had sustained severe blows to the head. Inspection of the lower body disclosed teeth marks on his penis and substantial damage to the anus. The victim's rectum and urinary bladder had been perforated.

On September 12, 1985, appellant, Danny Lee Hill, voluntarily went to the police station and inquired about a reward offered for information regarding the Fife homicide. Appellant spoke with Sergeant Stewart, who was not then actively involved in the investigation. However, Stewart made note of appellant's conversation. It was later discovered that appellant's statement contained knowledge of facts which had not been made available to the general public.

The next day, after reading Stewart's note regarding the conversation with appellant, Sergeant Steinbeck, who was directly involved with the investigation, went to the appellant's residence. (Steinbeck, a detective in the juvenile division, became involved in the case when he was asked to take a missing person's report from the victim's parents. After the victim's death, he remained active in the investigation.) Appellant voluntarily accompanied Sergeant Steinbeck to the police station where he received a

rights statement, executed a waiver of his rights, and was again interviewed. During the questioning, appellant offered an alibi. Appellant's mother arrived at the station later and corroborated his statement. This statement was typed by Steinbeck; but appellant, before signing it, departed with his mother.

Over the course of the weekend, the police investigation uncovered additional information which tended to refute the appellant's alibi. On Monday, September 16, 1985, Steinbeck, accompanied by Detective Morris Hill, appellant's uncle, traveled to appellant's abode to request that he go to the police station to sign the September 13 statement. The officers also asked appellant's mother to accompany them to police headquarters to give a written statement detailing her corroboration of his alibi. At the prompting of his mother, appellant consented to the request. Appellant was advised of his _Miranda_ rights upon his arrival at the station.

After receiving his rights, appellant signed the typewritten form of the statement he made on September 13. Appellant was questioned by Officers Hill, Steinbeck and Stewart about the extent of his participation with the murder. Appellant denied any involvement. Finally, Detective Hill stated categorically that he believed appellant had been involved in the homicide. The detective

suggested to the appellant that the two of them talk
privately. Detective Hill testified that, during the
private conversation, he urged appellant to tell the truth.
At that point, appellant informed Hill that he had been
present during the murder of Raymond Fife. The other
officers returned to the interrogation room, and appellant
was asked to give a statement to the police.

Appellant's statements were recorded on audio and video
tape. Although appellant admitted being present during the
perpetration of the offenses, he denied having any
involvement. Instead, he implicated Timothy Combs. (Combs
was subsequently charged and convicted as a co-principal.
His conviction was affirmed by this court in State v. Combs
[Dec. 2, 1988], Portage App. No. 1725, unreported, and is
presently pending before the Ohio Supreme Court). Appellant
stated that Combs had inserted "a stick, like a broom
handle" into the victim's rectum. Appellant was re-advised
of his constitutional rights during the audio taping and
before the video recording session. He executed a waiver
after each of these statements of rights.

Appellant was indicted for kidnapping, rape, aggravated
arson, felonious sexual penetration, aggravated robbery and
aggravated murder with specifications on September 17, 1985.

Between the date of the indictment on September 17 and
December 11, appellant filed a number of motions, including:

VOL. 22 - 669

motions to suppress, for closure, for discovery, for an
appointment of an expert, for change of venue, to include
licensed drivers in the pool of prospective jurors, to
insulate, motion for individual sequestered voir dire, and
motion to prohibit death qualification for the venire.   On
December 16, 1985, a pretrial suppression hearing was held
on appellant's motion to suppress statements he made to law
enforcement officers on September 12, 13 and 16, 1985.

On January 7, 1986, appellant appeared before the court
and executed a waiver of his right to a jury trial.   Prior
to executing this waiver, the trial court informed appellant
that objections that appellant had to the manner in which
juries had been selected would "in all probability" be
overruled.   Appellant waived his right to a jury trial
cognizant of the trial court's intentions with respect to
the pending motions.   Immediately following appellant's
waiver, the motions were overruled.

The trial began on January 21, 1986 and was heard by a
three judge panel.   At trial, a number of witnesses
testified, including one who had seen appellant walking in
the field and throwing a stick into the brush; two who had
observed the co-defendant standing near the path at the same
time that they heard a scream of twenty to thirty seconds;
one who saw appellant washing a red substance from his pants
some time after the assault; a pathologist who indicated the

stick fit the area of penetration like a "key in a lock;" a criminalist who could not find blood on appellant's pants or the stick; two females who had been sexually assaulted by appellant; two males who had been sexually solicited by him; and a forensic odontologist who, based upon some unique characterists of appellant's teeth, concluded that appellant inflicted the bite marks on the victim's penis.

Appellant presented a number of witnesses including those who were familiar with appellant's low level of intelligence, and a forensic odontologist who found that the dental evidence was generally inconclusive to show that appellant had made the bite marks on the victim's penis. However, based on defendant's exhibit "L", he did testify by way of qualification, as to one distinctive bite mark that: "What I'm saying is either Hill or Combs, both, could have left some of the marks, but the one mark that's consistent with the particular area most likely was left by Hill."

Other items admitted into evidence were the stick, the tape recorded conversation, the video tapes, and multiple photographs.

After hearing the evidence and deliberating for five hours, the court unanimously found appellant guilty on all counts, except aggravated robbery.

Pursuant to the dictates of R.C. 2929.04(B), a mitigation hearing began on February 26, 1986, before the

judicial tribune. Again, after hearing the testimony and arguments, and weighing the aggravating circumstances against the mitigating factors, the court sentenced appellant to ten to twenty five years for both aggravated arson and kidnapping, life imprisonment for rape and felonious sexual penetration, and death for aggravated murder with specifications.

Appellant has appealed that decision raising the following nineteen assignments of error.

## ASSIGNMENT # 1

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE STATEMENTS OF THE APPELLANT.

## ASSIGNMENT # 7

THE TRIAL COURT ERRED IN ALLOWING THE APPELLANT TO WAIVE HIS RIGHT TO JURY IN WRITING PURSUANT TO CRIM. R. 23.

Appellant's assignments of error one and seven address substantially similar issues of law and will therefore be discussed concurrently. Both assignments present the issues of the validity of the waiver of appellant's constitutional rights to counsel, to remain silent, and to a jury trial, predicated upon the appellant's mental capacity and illiteracy.

Although not expressly argued by appellant, these assignments contain, as a subtext, the contention that, given appellant's mental retardation and inability to

understand these legal proceedings, the sentence rendered in this case constitutes cruel and unusual punishment and is therefore violative of the Eighth Amendment to the United States Constitution. This argument was extensively addressed in the recent landmark United States Supreme Court case of Penry v. Lynaugh (June 26, 1989), 492 U.S. ___, 106 L. Ed. 2d 256, in which the Supreme Court upheld the constitutionality of the death penalty sentence given to petitioner, John Paul Penry, (although remanding for failure to consider mitigation evidence).

Petitioner, in Penry, supra, had been diagnosed as mildly to moderately retarded and was described as having the mental age of a six and one-half year old. (By contrast, appellant has been diagnosed as having anywhere from a fifty-five to seventy-one full scale I.Q., which would cause him to be characterized as mildly to moderately retarded. The record does not indicate that a finding was made as to appellant's mental age, although some reference was made in evidence on this subject indicating a mental age of seven to nine years.) Petitioner Penry was charged with capital murder and found competent to stand trial. (As used in this context, competency means that petitioner was able to have a rational understanding of the proceedings against him and was able to participate in the preparation of his

own defense. See, e.g., _Dusky v. United States_ (1960), 362 U.S. 402.)

Despite this finding of competency, petitioner argued that his reduced reasoning abilities made the potential death sentence disproportionate to his personal culpability. "In essence, Penry argue[d] that because of his diminished ability to control his impulses, to think in long-range terms, and to learn from his mistakes, he was not capable of acting with the degree of culpability that can justify the ultimate penalty." _Penry_, 492 U.S. ___, 106 L. Ed. 2d at 290-91, citing _Thompson v. Oklahoma_ (1988), 487 U.S. ___, 101 L. Ed. 2d 702. After consideration of the mitigating factors permitted under Texas law, the trial court found petitioner guilty and sentenced him to death.

Petitioner's sentence was ultimately appealed to the United States Supreme Court. He argued that the imposition of a death sentence on someone with limited mental capabilities violated the "evolving standards of decency that mark the progress of a maturing society" and would therefore be unconstitutional under the Eighth Amendment. _Penry_, 492 U.S. ___, 106 L. Ed. 2d at 288. See, also, _Trop v. Dulles_ (1958), 356 U.S. 86, 101. Petitioner further argued that the execution of a mentally retarded person was cruel and unusual punishment because it was

"disproportionate to his degree of personal culpability."
*Penry*, 492 U.S. ___, 106 L. Ed. 2d at 289.

The Court, in response, stated that courts have long been opposed to utilizing the concept of mental age as a basis for relieving a defendant from criminal responsibility. *Penry*, 492 U.S. ___, 106 L. Ed. 2d at 292.  The Court noted that a finding of a lack of capability, based on the diminished mental age of a party, would disenfranchise the mildly retarded from a right to contract or a right to marry. In *Penry*, the Court concluded:

> "*** [M]ental retardation is a factor that may well lessen a defendant's culpability for a capital offense.  But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person of Penry's ability convicted of a capital offense simply by virtue of their mental retardation alone." *Ibid.*

As long as the court takes into consideration mitigating evidence of mental retardation, and the court addresses each h case on an individualized basis, it is not cruel and unusual to impose a sentence of death on a convicted perpetrator who is mentally retarded.  *Penry* was ultimately remanded for resentencing, as Texas law did not permit the consideration of petitioner's mitigating evidence.  (*Penry* addresses only cases in which the perpetrator is borderline or mildly mentally retarded. The United States Supreme Court in *Penry*, and this court here, offer no opinion as to the

VOL. 22 - 675

constitutionality of executing an offender whose handicap is more severe.)

The individualized basis mandated by the United States Supreme Court, in determining the constitutionality of the imposition of the death penalty on mentally retarded persons, also serves as the basis of analysis for determining the sufficiency of the waiver of constitutional rights by one who is mentally retarded.

In the first sub-argument of appellant's first assignment of error (there are seven sub-arguments in all), appellant challenges the validity of his waiver of his Sixth Amendment right to counsel. Appellant argues that his Sixth Amendment rights were violated because he could not "knowingly" and "intelligently" waive his rights, due to him being essentially illiterate and mentally retarded.

The standard used to assess the validity of the appellant's waiver of his Sixth Amendment rights was enunciated in Johnson v. Zerbst (1938), 304 U.S. 458, 464, which stated that "[t]he determination of whether there has been an intelligent waiver *** must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Subsequent decisions of the United States Supreme Court have focused on the separate nature of the "voluntary" and "knowing and intelligent" aspects of the

accused's waiver. The court is required to make "discrete inquiries" into both the voluntariness of the waiver and the question of whether the waiver was "knowingly and intelligently" made. Edwards v. Arizona (1981), 451 U.S. 477, 484; Schneckloth v. Bustamonte (1973), 412 U.S. 218; Miranda v. Arizona (1966), 384 U.S. 436.

There is little doubt that lack of mental acuity, or mental illness, can interfere with an accused's ability to give a knowing and intelligent waiver of his Sixth Amendment right to counsel. However, "[t]his is not a field for inflexible rules" delineating the bright line that distinguishes those capable of an intelligent waiver from those who lack the ability to do so. Miller v. Dugger (C.A. 11, 1988), 838 F.2d 1530, 1539, citing North Carolina v. Butler (1979), 441 U.S. 369, 375. This court is aware that an accused who cannot comprehend his rights, cannot waive them intelligently. Miller, supra. (See, e.g., Fare v. Michael C., 442 U.S. 707, 725 [youth and inexperience militating against intelligent waiver]; Cooper v. Griffin (C.A. 5, 1972), 455 F. 2d 1142, 1145 [mental retardation]; United States v. Short (C.A. 6, 1986), 790 F. 2d 464, 469 [language difficulties]).

This does not mean, however, that an accused's mental condition, by itself, will universally prevent the accused from ever effectively waiving a constitutional right. See,

*Vol. 22 - 677*

e.g., _Colorado_ v. _Connelly_ (1986), 479 U.S. 157. If, under the facts and circumstances present in this case, the court can determine that the defendant made a "knowing and intelligent waiver," the waiver will stand.

This court has recently considered the issue of whether a person with diminished mental capacity could "knowingly and intelligently" waive his rights in _State_ v. _Mitzel_ (Sept. 22, 1989), Trumbull App. No. 3917, unreported. _Mitzel_, _supra_, cites with approval _State_ v. _Nichols_ (1965), 3 Ohio App. 2d 182, which states that "subnormal mentality" may be considered in determining whether the confession was "knowingly" and "intellegently" made, but that diminished I.Q. will not, in and of itself, negate the waiver and preclude admission. Examination of all the facts and circumstances in _Mitzel_ revealed that the defendant was sufficiently aware of the time, space, geography and environment of his confession, as well as the fact that the persons to whom he was confessing were policemen. The defendant-appellant there was found to be capable of making a "knowing" and "intelligent" waiver of his rights because the totality of the circumstances examined (including the videotaped confession) indicated that defendant-appellant had sufficient understanding to execute a valid waiver, even given the fact that he was of diminished mental capacity.

_VOL. 22 - 67_

Appellant, in the case at bar, admittedly suffers from some mental retardation (although the evidence presented is divergent as to the severity of the handicap) and has had concommitant difficulties in language comprehension throughout his formal education. Appellant is categorized as being mildly to moderately retarded. Evidence was presented which indicates that appellant is illiterate and this court acknowledges that literal recognition of each word contained in the "Miranda Rights" and/or "waiver form" may be beyond appellant's mental comprehensive capacity.

However, from the record here, particularly during the suppression hearing, this court is also aware (as was the trial court below) of the long and multi-faceted exposure appellant has had with the state's criminal justice system. The evidential table in this case also demonstrates that appellant exhibited a functional capacity to understand these rights, including the right to appointed counsel. This was evident from the exchange that occurred during the audio and video tape sessions. The officers who interrogated appellant had either significant contact with him and/or had questioned him on prior occassions and had developed informed estimates as to appellant's ability to understand, albeit in a vernacular sense, all aspects of the Miranda warning. The audio and video tapes of appellant's interrogations disclose that appellant was capable of

understanding the questions put to him and of responding intelligently.

Moreover, the behavior of the appellant during the police investigation belies the notion that he was no more than a malleable victim of police suggestion. Appellant possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, appellant qualified and corrected the police officers's misstatements of the factual scenario which he had related to them. He also was able to follow "verbal concepting," displaying an understanding of the officers direction of questioning and the dialogue utilized during the interrogation.

In determining the existence of any waiver, appellee carries the burden of proving that the waiver was knowing and intelligent (Miranda, supra) and voluntary (Lego v. Twomey [1972], 404 U.S. 477), by a preponderance of the evidence. See, Miranda. Once the trial court, as the trier of fact, has determined that the state has carried its burden, the decision will not be overruled unless found to be against the manifest weight of the evidence. Appellant has not demonstrated that the trial court's decision, specifically, that the waiver was knowingly and intelligently made, was against the manifest weight of the

VOL. 22 - 696

evidence and, consequently, his first argument is without merit.

Appellant next contends that, as a result of his mental affirmities and the coercive action of the police, his waiver of his constitutional right was not voluntary. Appellant states that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law ***." Mincey v. Arizona (1977), 437 U.S. 385, 398. Appellee directs this court's attention to a number of cases, from various jurisdictions, which provide that low intelligence of the confessor does not necessarily exclude statements voluntarily made to police. See, e.g., State v. Sisneros (1968), 79 N.M. 600, 446 P. 2d 875; United States v. Glover (C.A. 9, 1979), 596 F. 2d 857. Glover, supra, cites United States v. Young (E.D. Pa., 1973), 355 F. Supp. 103, a case which is similar to that sub judice. Young, supra, considered the question of whether a defendant with an I.Q. of fifty-seven could voluntarily waive his Miranda rights. The court determined that he could do so, relying extensively on the defendant's "extensive dealings with the criminal process." Id. at 111.

Ohio law has noted that a waiver of Miranda rights is only valid when it is intelligent, knowing and voluntary. (See, e.g., State v. Scott (1980), 61 Ohio St. 2d 155) and states that failure to prove these elements by a

VOL. 22~681

preponderance of the evidence is a violation of due process. State v. Jenkins (1984), 15 Ohio St. 3d 164, 231.

In Jenkins, supra, the Ohio Supreme Court, confronted with a scenario similar to the case at bar, was obligated to determine the voluntariness of a mentally retarded accused's waiver of his Miranda rights. The court noted that, although the police officers were not medical experts, they were able to observe and converse with the accused. "While the explanation of rights and their waiver must be weighed with the individual's ***mental capacity, the totality of the evidence (including the police observations) supports the trial court's judgment to admit the statement in this case." Id. at 233.

This court is further cognizant of the United States Supreme Court's decision in Connelly, supra, which substantially limited the areas in which a court can examine the voluntariness of the waiver and subsequent statement. "Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." Connelly, at 170.

In Connelly, the United States Supreme Court was confronted with the claim of defendant-respondent that his mental illness compelled him to confess to the murder of a girl. Defendant-respondent was a chronic schizophrenic who believed that the "voice of God" had compelled him to

Vol. 22 - 612.

confess. Defendant-respondent argued th⸱ mental condition interferred with his volitional ability and kept him from rendering a rational decision. The Court did not accept defendant-respondent's contentions, holding instead that "coercive police activity (was) a necessary predicate to the finding that a confession (was) not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, at 167. As the police did not, in any way, coerce the statement, the Court said that the statement was voluntarily given; and that the mental state of the confessor was immaterial for a determination of voluntariness.

As this court stated in addressing appellant's first argument, the evidence adduced indicates that appellant had the requisite intelligence to "knowingly, voluntarily and intellengently" waive his Miranda rights, rights to which he had been exposed numerous times. Moreover, the evidence does not demonstrate any inappropriate coercion being applied to appellant beyond some suggestive interrogations advanced by the officers in the statement sessions. Appellant's second argument is without merit.

Appellant next states that his statements were taken in violation of the dictates of Miranda. This argument essentially reiterates contentions voiced in appellant's first two arguments. The crux of appellant's position can

be seen in _Moran_ v. _Burbine_ (1986), 475 U.S. 412, 421, which states:

> "The inquiry has two distinct dimensions. _Edwards_ v. _Arizona_, _supra_, at 482, 68 L Ed 2d 378, 101 S Ct 1880; _Brewer_ v. _Williams_, 430 US 387, 404, 51 L Ed 2d 424, 97 S Ct 1232 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the _Miranda_ rights have been waived. _Fare_ v. _Michael C._, 442 US 707, 725, 61 L Ed 2d 197, 99 S Ct 2560 (1979). See also _North Carolina_ v. _Butler_, 441 US 369, 374-375, 60 L Ed 2d 286, 99 S Ct 1755 (1979)."

Appellant argues that not only did he not possess this requisite awareness, but the police took advantage of this lack of mental acumen by applying several psychological ploys.

Appellee argues that appellant received his _Miranda_ rights on at least four occasions over a four-day period and, as evidenced by the audio and video tape, appeared articulate and coherent as he answered questions. Moreover, the State refers to a multiplicity of cases which allow for the admissibility of the statements when rendered hours or even days after _Miranda_ rights were administered. See,

e.g.; *United States, ex rel. Henne*, v. *Fike* (7th Cir., 1977), 563 F: 2d 809; *State* v: *Gilreath* (Ariz., 1971), 107 Ariz. 318, 487 P. 2d 385, *cert.* *denied*, 406 U.S. 921, (1972).

This court finds; after examination of the evidence, that appellant was able to "knowingly, intelligently, and voluntarily" waive his *Miranda* rights and, in fact, did so. While, as *Mitzel* notes, a more thorough explication of appellant's understanding of the concepts embodied in *Miranda* would make our determination unequivocal, the officers present at the investigation appeared to ascertain the adequate quality of appellant's understanding of his rights. (This is particularly true where, as in this case, the officers had *Mirandized* the appellant on several previous occasions; and where appellant was apparently able to knowingly, voluntarily and intelligently waive his *Miranda* rights on each prior occasion. The record reveals that appellant's frequent brushes with the legal system include convictions for the rape of two women in 1984. Further, Detective Hill testified that appellant had been arrested fifteen to twenty times and that he had personally administered *Miranda* rights to appellant four or five times.) Appellant's third argument is without merit.

In his fourth sub-argument under the first assignment of error, appellant contends that his Fourth and Fourteenth

VOL. 22 - 615

A-40

Amendment rights were violated when he was "seized from his home and placed into custodial interrogation without probable cause, proper judicial authorization, or his consent."  Appellant argues correctly that the administration of *Miranda* rights will not cure a Fourth Amendment violation.  "[A]lthough a confession after proper *Miranda* warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshhold requirement' for Fourth Amendment analysis." *Dunaway* v. *New York* (1979), 442 U.S. 200, 216.  See, also, *State* v. *Fickes* (Mar. 29, 1985), Trumbull App. No. 3419, unreported (concurring opinion).

The United States Supreme Court has consistently held that custodial interrogations, conducted without probable cause, constitute violations of the accused's Fourth and Fourteenth Amendment rights. *Dunaway*, *supra*.  The state may not, without probable cause, judicial authorization or consent, bring an accused to the police station for fingerprinting or for questioning. *Davis* v. *Mississippi* (1969), 394 U.S. 721; *Brown* v. *Illinois* (1975), 422 U.S. 590; *Hayes* v. *Florida* (1985), 470 U.S. 811.  Nor will the police be able to shield an improper "seizure" under the "good faith" exception announced in *United States* v. *Leon* (1984), 468 U.S. 897; *Fickes*, *supra*.

This court finds that the record of this case is devoid of evidence indicating that the custodial interrogation of appellant violated his constitutional rights. When appellant first traveled to the Warren Police Department on September 12, 1985, he did so voluntarily and without prompting from anyone, police authority or otherwise. Appellant's reason for this visit was ostensibly to collect a reward (of which he had heard rumors) by implicating other persons in the attack of the victim. Appellant even accompanied Sergeant Stewart of the Warren police in an attempt to find the victim's bicycle.

Appellant returned to the police station the following day at the request of Sergeant Steinbeck. Steinbeck had read the note, left by Stewart (after his original meeting with appellant), which stated that appellant was aware of some of the facts of the homicide. Steinbeck went to appellant's home and asked if appellant would accompany him to the station to answer further questions. Appellant agreed. Although appellant was not under arrest, he was given his _Miranda_ rights by Steinbeck.

Steinbeck prepared a written statement, based on the questioning conducted with appellant. However, he neglected to have appellant sign the statement on that day. Instead, appellant (who was free to leave throughout the interrogation) left the police station with his mother.

Steinbeck, along with Detective Morris Hill, went to appellant's home on Monday, September 16, for the avowed purposes of getting appellant to accompany them to the station to sign the written statement and to obtain a formal statement from his mother regarding his alibi. The evidence is divergent as to the extent of appellant's initial voluntariness to return to the police station. There is some testimony that appellant became mildly recalcitrant to the idea of returning to the police station, only to change his mind at his mother's behest, and agreed to accompany the officers. On this point, there was sufficient evidence before the trial court, in its role of determining credibility, from which it could conclude that the appellant was not inappropriately coerced in accompanying the officer to the station again.

It is not necessary for this court to determine whether appellant "consented" to the final custodial interrogation as it appears from the evidence that the police had probable cause to interrogate the appellant on September 16. Probable cause is found, in the context of custodial interrogations, when the focus of the inquiry narrows itself sufficiently to the suspect being questioned. In this case, appellant provided some of the basis for probable cause in his initial conversation with Stewart, when he divulged information which was not known to the general public. Over

the next three days, the Warren police received further information from appellant which focused suspicion on him. The police also spoke with witnesses who stated that appellant was around the scene of the crime at the time the murder had taken place.

Examination of the record reveals that all questioning of appellant occurred either with his consent and/or after the police had established probable cause to question him. Consequently, the interrogation of appellant satisfies the tests set forth in Hayes and Dunaway, supra.

Appellant also alleges, in both the third and fourth sub-arguments to his first assignment of error, that the police improperly coerced him into confessing by means of psychological ploys. Appellant specifically refers to language used during the interrogations, such as simplistic juvenile or infantile terminology and obscenities, which allegedly underscores his mental retardation and suggestability. Appellant also states that the police coerced a confession by threatening to use the statements of Timothy Combs as a means of showing that appellant had committed the crime.

Appellant's arguments are without merit. It seems ironic that, after contesting his ability to knowingly waive his constitutional rights, appellant would now object to the simplicity of the language used to question him. The

recorded conversations alluded to by appellant do not suggest the use of any improprieties by the police. Appellant's allegations as to threats purportedly made by police as to the use of Combs' statements are similar to those raised, and rejected, in State v. Jackson (1977), 50 Ohio St. 2d 253, 256. Appellant's fourth argument is without merit.

Appellant's fifth sub-argument of the first assignment of error asserts that appellant was denied due process of law when he was denied his statutory right to counsel. Appellant premises his argument upon R.C. 120.16(F) which states: "Information as to the right to legal representation by the county public defender or assigned counsel shall be afforded to an accused person immediately upon arrest, when brought before a magistrate, or when formally charged, whichever occurs first." Appellant argues that he was not specifically informed of the right to a public defender and therefore was denied due process.

The argument put forth by appellant has been considered by the Fourth Appellate District in State v. Semenchuk (Mar. 10, 1982), Athens App. No. 1036, unreported. In Semenchuk, supra, the appellant made a similar claim that the county public defender was not specifically mentioned when the appellant was given his Miranda rights. The Fourth Appellate District held:

"*Rather obviously, compliance with the dictates of Miranda (sic) does not <u>specifically</u> inform a defendant of the availability of the county public defender as mandated by R.C. 120.16(F). Even so, we conclude such failure does not require exclusion of the confession for the reason that the exclusionary rules under the federal constitution are applicable in Ohio only to violations of constitutional rights. A default in state law alone is not a ground for exclusion of material evidence. See <u>Kettering v. Hollen</u> (1980), 64 Ohio St. 2d 232; <u>State v. Meyers</u> (1971), 26 Ohio St. 2d 190.*" <u>Semenchuk</u>, at 8. (Emphasis in original.)

Appellant further asserts that his right to counsel was denied when Detective Hill told appellant's mother that there was no need to hire an attorney, as a public defender would be appointed during the trial. Appellant argues that, but for the detective's statements, appellant's mother would have hired an attorney and, appellant would have been represented during the September 16, 1985 interrogation.

Appellant's arguments are reminiscent of those propounded by respondent in <u>Moran</u>, <u>supra</u>. In <u>Moran</u>, respondent was in custody and had waived his <u>Miranda</u> rights. Concurrent with petitioner's waiver, his attorney telephoned the police station and inquired as to the whereabouts of her client. The police did not tell counsel that respondent would be questioned that night and, further, did not tell respondent that counsel had been appointed for him. The United States Supreme Court held that "[e]vents occurring

*Vol. 22 - 691*

outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. *** [T]he state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." Id. at 422-423.

The rationale expressed in Moran is equally applicable to the case sub judice. Appellant was not aware of his mother's inquiries as to the need for an attorney. The propriety, or lack thereof, of Detective Hill's answer to appellant's mother (his sister) are irrelevant to the issue of whether appellant gave a knowing, voluntary and intelligent waiver of his Miranda rights. Since, as discussed above, this court has determined that appellant did adequately waive his rights, the fifth argument is without merit.

In the sixth sub-argument of his first assignment, appellant argues that his recorded statements (both audio and video) should have been suppressed, as this evidence was obtained without compliance with R.C.2935.05. The statute in question reads as follows:

> "When a person named in section 2935.03 of the Revised Code has arrested a person without a warrant, he shall, without unnecessary delay, take the person arrested before a court or magistrate having jurisdiction of the offense, and shall file or cause to be filed an affidavit describing

VOL. 22 - 692

the offense for which the person was arrested. Such affidavit shall be filed either with the court or magistrate, or with the prosecuting attorney or other attorney charged by law with prosecution of crimes before such court or magistrate and if filed with such attorney he shall forthwith file with such court or magistrate a complaint, based on such affidavit."

The facts reveal that appellant was arrested by the Warren police on September 16. At the time of his arrest, appellant was in the process of being questioned by the police, a fact finding exercise that took the better part of the afternoon, and included a visit to the crime scene. The state did not file its complaint until September 17.

Appellant asserts that this twenty-four hour delay in the filing of criminal charges necessitates the exclusion of the taped statements made during that time period. The conceptual basis behind appellant's argument is based upon federal law. Cases such as McNabb v. United States (1943), 318 U.S. 332, and Mallory v. United States (1957), 354 U.S. 449, stand for the proposition that where federal officers interrogate a person, arrested without a warrant, instead of taking him to a federal judge, as required by Fed. R. Crim. P. 5(a), the statements of the defendant are excluded from testimony. This rationale was not premised on any provision of the Bill of Rights, and few states specifically adopted the McNabb-Mallory doctrine. In 1968, Congress abridged the doctrine, replacing it with the Omnibus Crime Control and

Safe Street Act, which contained essentially the same provisions.

Ohio has expressly refused to adopt <u>McNabb</u>, <u>supra</u>, (<u>State</u> v. <u>Cowans</u> [1967]; 10 Ohio St. 2d 96) and has never held that failure to comply with R.C. 2935.05 is grounds for exclusion of statements made during the interim. To the contrary, this court held, in <u>State</u> v. <u>Mackey</u> (Feb. 18, 1982), Portage App. No. 1142, unreported, that "a confession, which is otherwise voluntary, is admissible despite the fact the defendant was not taken before a court for arraignment without unnecessary delay." <u>Mackey</u>, <u>supra</u>, at 8. Even <u>In re</u> <u>Thompson</u> (1974), 4 O.O. 3d 359, relied upon heavily by appellant, does not suggest that the sanction for failure to comply with R.C. 2935.05 should be the exclusion of the statements. Moreover, <u>Thompson</u>, <u>supra</u>, states that the phrase "without unreasonable delay" should be interpreted to mean "within a reasonable time." <u>Thompson</u>, at 362.

This court does not conclude that the state waited an unreasonable amount of time before filing its complaint with the trial court. Nor, even were a violation of the statute found, would this court be empowered to grant the remedy requested by appellant; as Ohio courts will only apply the exclusionary rule when the violation committed by the police concerns a constitutional right. (Failure to comply with

VOL. 22 - 194

R.C. 2935.05 would constitute only a statutory violation.) See *Cowans*, *supra*. Consequently, appellant's sixth sub-argument is without merit.

In the final sub-argument to the first assignment of error, appellant challenges the validity of the admission of statements made during questioning which were allegedly procured during plea bargaining negotiations. The statements alluded to by appellant are those in which appellant was told that Timothy Combs was going to implicate him as the perpetrator unless appellant cooperated. The taped confessions also reveal that appellant was told that the trial court would be informed if he cooperated. Appellant argues that the state impliedly promised appellant leniency if he were to cooperate. (Appellant does not categorize what, if any, promise the state made in exchange for his cooperation.)

Appellant correctly asserts that statements made during plea bargain negotiations are not admissible as evidence. *State* v. *Davis*, (1980), 70 Ohio App. 2d 48. However, the factual scenario described (and witnessed on tape) does not portray a plea bargain negotiation. As the state asserts, "[a] promise merely to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." *United*

VOL. 22 - 695

*States* v. *Fera* (C.A. 1, 1980), 616 F. 2d 590, 594, (Citations omitted); (*United States* v. *Posey* (C.A. 5, 1980), 611 F. 2d 1389; *United States* v. *Frazier* (C.A. 5, 1970), 434 F. 2d 994; *United States* v. *Arcediano* (1974), 371 F. Supp. 457, 469, quoted in *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 40. The alleged plea negotiations which occurred in this case fit squarely within the rule enunciated in *Edwards*, *supra*. Consequently, appellant cannot, as a matter of law, have his statements excluded on the basis that the statements were coerced during plea bargain negotiations.

Appellant's first assignment of error is without merit.

Appellant's seventh assignment of error raises arguments similar to those raised in the first assignment. The seventh assignment challenges appellant's ability to waive his Seventh Amendment right to a jury trial, under Crim. R. 23(A). Appellant cites *State* v. *Kehoe* (1976), 59 Ohio App. 2d 315, as requiring that a waiver of a jury trial must be (as with the waiver of all constitutional rights) "knowing, intelligent and voluntary."

In the case *sub judice*, appellant was afforded a separate hearing on January 7, 1986 for the purpose of determining whether appellant was making a voluntary, knowing and intelligent waiver. The trial court spoke with appellant for approximately forty-five minutes about the differences between a jury trial and a trial to a three

judge panel.  The trial court explained to the appellant that a panel of judges would hear evidence inadmissible before a jury; would not be subject to voir dire; would, in all probability, not grant appellant's request for a change of venue; and would already be privy to Timothy Combs' statements.  Appellant stated that he understood these differences.

Following its explanation to appellant about the distinctions between bench trials and jury trials, the trial court presented appellant with a written waiver.  Appellant was then permitted to discuss this waiver form with his attorney and his mother.  Only after appellant returned from this discussion (which lasted approximately twenty-five minutes) and specifically asked for a three judge panel did the trial court accept appellant's waiver of this right to a jury trial.

There is no evidence in the record indicating that the trial court accepted the waiver without scrupulously ascertaining appellant's ability to understand the impact of his actions.  Further, there is enough competent evidence to determine that the trial court's decision was not against the manifest weight of the evidence.  In so holding, this court does not express any opinion as to the ability of other mentally retarded persons to waive their constitutional rights.  Such a decision will have to be made

**VOL.22-697**

on an individual case by case basis, considering all appropriate facts and the totality of the circumstances of each case. This court does, however, hold that sufficient evidence exists in this matter to determine that appellant effectively (knowingly, intelligently and voluntarily) waived these constitutional rights.

Appellant's first and seventh assignments of error are without merit.

### ASSIGNMENT # 2

THE TRIAL COURT ERRED IN THE ADMISSION OF "OTHER ACTS" TESTIMONY.

In his second assignment of error, appellant asserts that the trial court erred by admitting evidence of "other acts" into the trial. He claims that this was a violation of R.C. 2945.59, Evid. R. 404(B), and the Due Process clause of the United States Constitution's Fourteenth Amendment.

The trial court permitted the state to introduce evidence of two prior rapes committed by the appellant when he was seventeen. This evidence was offered to prove motive, intent and the appellant's scheme for committing sexual assaults.

R.C. 2945.59 states that:

> "In any criminal case in which the
> defendant's motive or intent, the absence of
> mistake or accident on his part, or the
> defendant's scheme, plan, or system in doing
> an act is material, any acts of the

*VOL. 22 - 695*

defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved; whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

Evid. R. 404(B) provides that:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

R.C. 2945.59 is to be strictly construed against the state and conservatively applied by a trial court. State v. DeMarco (1987), 31 Ohio St. 3d 191. Evidence of other acts of a defendant is admissible pursuant to R.C. 2945.59 only when it tends to show one of the matters enumerated in that statute and when it is relevant to prove the defendant's guilt of the offense in question." DeMarco, supra, paragraph one of the syllabus. (Emphasis added.)

The admission of the other acts of the appellant was proper because they tended to show the trial court that the appellant intended to rape the victim. See State v. Gardner (1979), 59 Ohio St. 2d 14; State v. Flonnory (1972), 31 Ohio St. 2d 124.

VOL. 22 - 693

Additionally, the appellee claims that even if the admission of the prior acts was erroneous, it was not prejudicial. In State v. White (1968), 15 Ohio St. 2d 146, the court stated that improperly used testimony which could be cause for reversal at a jury trial would not necessarily be so at a bench trial. It must affirmatively appear on the record in a bench trial that the court relied on this improper testimony in arriving at its verdict in order for the error to be a ground for reversal. Accord State v. Post (1987), 32 Ohio St. 3d 380.

The trial court stated in its opinion that "no prior crimes were considered by the court in any way in reaching its verdict."

The second assignment of error is without merit.

### ASSIGNMENT # 3

THE TRIAL COURT IMPROPERLY ADMITTED CERTAIN EVIDENCE.

In his third assignment of error, the appellant contends that the trial court improperly admitted certain testimony of Raleigh C. Hughes, III, an ambulance attendant who saw the body at the site of the homicide, and certain testimony of Dr. Adelman. The appellant also claims that exhibit forty-seven, which the state asserts was the implement used by appellant to impale the victim, was improperly admitted. We will address the propriety of the

admission of this exhibit in appellant's fourth assignment of error.

Evid. R. 402 provides that all relevant evidence is admissible, unless otherwise excluded. Evid. R. 401 states that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, Evid. R. 403 expressly precludes the admission of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Additionally, that rule also provides that relevant evidence _may_ be excluded if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence.

At the close of the direct examination of Hughes, the appellee asked him to state his opinion regarding the victim's condition relative to other people he had treated. After overruling appellant's objection, Hughes replied that "this is probably one of the most gruesome things I've ever seen." Appellant claims that this had no bearing on the evidence and was elicited to inflame the passion of the three judges and to shift the focus of the case from

provable facts to the horrible nature of the crime and appellant's character.

In *White*, *supra*, the Ohio Supreme Court stated that they "indulge in the usual presumption that in a bench trial in a criminal case the [trial] court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *Id.* at 151. (Citations ommited.)

There is nothing in the record to show that this statement had any effect on the trial court's determination of appellant's guilt. We, too, indulge in the same presumption and conclude that the admission of this statement, although perhaps prejudically erroneous in a jury trial, was not so here. See, also, *State* v. *Eubank* (1979), 60 Ohio St. 2d 183.

Parenthetically, it should be noted in assignments nine, eleven and twelve appellant alleges error, which if tried before a jury would require greater analysis by this court. However, this cause was tried before a three judge tribunal and, unless the record clearly shows otherwise, this court will assume regularity and/or lack of prejudicial error.

Dr. Adelman testified that strangulation can cause the penis to become erect and that asphyxiation is often used by people to enhance their sexual orgasms.

VOL. 22 - 762.

Appellant states that this testimony was of no probative value, and that there was an insufficient basis for the testimony. As to the latter contention, appellant does not explain why the basis for the testimony was insufficient.

Bite marks on the victim's penis were later identified by Dr. Mertz, a dentist and forensic odontologist, as those of the appellant's. The appellee maintains that the victim could have been asphyxiated in order to cause an erection for purposes of oral sex. Since the teeth marks on the victim's penis, when measured by Dr. Mertz at the morgue, were consistently smaller than the actual size of the impression of appellant's teeth, Dr. Mertz stated that the victim's penis was probably erect at the time it was bitten. If this were true, then the marks on the victim's penis would be proportionately smaller when measured by Dr. Mertz. Therefore, the testimony that the strangulation, i.e., asphyxiation, can cause a penis to become erect was probative testimony, shedding light on precisely what occurred that fateful day.

The third assignment of error is without merit.

### ASSIGNMENT # 4

THE TRIAL COURT ERRED IN ADMITTING EXHIBIT 47, A "STICK".

In appellant's fourth assignment of error and part of his third, he contends that the trial court erred by

VOL. 21-763

tested the stick for blood and did not find any traces. He indicated that a pourous object such as exhibit forty-seven, if used in the manner claimed by the state, would normally absorb fluids, and traces of blood should have been found when it was tested. However, on cross-examination, he qualified this response by noting that he had been involved in cases in which the weapon did not have blood on it. He also agreed that an object could be "wiped" or "washed clean" eliminating the traces of blood.

Appellant, in the fourth assignment of error, states that the trial court improperly drew an inference from another inference.

During the course of a statement appellant made to the police shortly after the incident, a Warren police officer asked the appellant what another individual had inserted into the victim's rectum. Appellant responded, "A stick. Like a broom handle thing ***."

Dr. Adelman performed the autopsy on the victim and took several photographs of the damaged organs. He compared exhibit forty-seven with the tears in the victim's internal organs and concluded that the size and shape of the point of the stick were very compatible with the size and shape of the opening in the rectum. He described the "fit" as similar to a key in a lock. Dr. Adelman also testified that

both ends of the broom handle had probably been inserted into the victim's rectum. He stated on direct examination:

> "The sharp end of the stick is -- would have made the penetration through the rectum and the urinary bladder that I've described. The blunt end of the stick would have made the mark on the rectum that did not penetrate; just a contusion, and the size relationships are quite consistent."

James Wurster, a criminalist employed by the Ohio Bureau of Criminal Identification and Investigation who specializes in the detection and identification of blood, stated that rain or dirt could have removed blood on a stick such as exhibit forty-seven.

The admissions of exhibit forty-seven was not improper based on the statement of the appellant and the testimony of Dr. Adelman and Messrs. Dehus and Wurster. Additionally, there was no attempt to draw one inference upon another. The testimony elicited showed that appellant stated that "a broom handle thing" was inserted into the victim's rectum, that appellant was observed throwing a stick into the brush of a field near the homicide site, that the end of a broom or mop handle was found in the area where a witness saw the appellant throw a stick, and that the "jagged edge" of exhibit forty-seven fit the opening in the victim's rectum like a key in a lock. These direct facts were presented in evidence in order for the court to make one inference--that exhibit forty-seven was the object which was inserted into

the rectum of the victim. The admission of exhibit forty-seven, based on these facts, was not improper.

Appellant's portion of his third assignment of error relating to exhibit forty-seven and his fourth assignment of error are without merit.

### ASSIGNMENT # 5

THE RIGHT TO CONFRONT WITNESSES WAS VIOLATED.

In his fifth assignment of error, appellant contends that his right to confront a witness was improperly denied. A seventeen year old boy who had been incarcerated at the Juvenile Justice Center testified that, while he was in one of the cells, the appellant tried to have sex with him.

Appellant claims that the appellee called Stephen Melius to the stand without prior disclosure to the appellant. Appellant also claims that when the witness was later recalled, it became "quite apparent that the witness's potential further testimony had been thoroughly reviewed with the prosecutor". Appellant asserts that he was effectively denied the right to full cross-examination of this witness, and relies on State v. Prater (1983), 13 Ohio App. 3d 98, for the proposition that a state's witness may not have his memory refreshed during a recess when still subject to cross-examination.

The appellee's position was that it did not know about the witness until the previous afternoon. The trial court

indicated that if the appellant wished to cross-examine the witness later, it would order him to remain in the county and that it would consider a request for a continuance so that appellant could investigate the witness.

The right to cross-examine a witness is a fundamental right applicable to the states. _Pointer_ v. _Texas_ (1965), 380 U.S. 400. Appellant was afforded this right, as well as the right to further cross-examination after investigation. In _Davis_ v. _Alaska_ (1974), 415 U.S. 308, the Supreme Court stated that the improper limitation on the right to cross-examination was an effective denial of the right to confront a witness.

In the case at bar, no restrictions were placed on appellant's right to cross-examine Melius; therefore, we cannot say that appellant's right to confront this witness was violated in any way. See _Prater_, _supra_. It should be noted that counsel did not request a continuance, but the witness was required to be available for recall by the defense. He was indeed subpoenaed and recalled by appellant. As such, the appellant was afforded an opportunity to prepare for and cross-examine Melius.

Second, appellant objects to the alleged "coaching" by the prosecution of this witness. The transcript reveals that an assistant prosecutor had spoken with the witness prior to being recalled. Melius, when questioned by

appellant's counsel during recall, stated that he was
informed that the defense was:

> "Going to subpoena me back into court, and
> he told me some of the questions that you
> might ask me."

> "***

> "He said that you might---that you might ask
> me if that I gave some of the wrong dates and
> stuff like that."

Then when questioned by the state, the following occurred.

> "Q. Steven when I talked to you this
> morning, I told you that Jim Lewis
> [appellant's trial counsel] subpoenaed
> you, did I tell you to make any kind of
> story up?"

> "A. No, sir.

> "Q. Did I tell you to tell the truth?

> "A. Yes, sir."

This exerpted language represents the sum of the evidence
before this court of appellee's alleged wrongdoings. As
such, the evidence is insufficient to show that the state
"coached" the witness beyond simply urging him to tell the
truth. Moreover, as noted by the state, the witness'
testimony "after coaching" did not differ from the prior
day's narration on the witness stand. From this evidential
table, this court is unable to conclude that the state
engaged in any improprieties of a prejudicial nature.

In Prater, the trial court specifically instructed the
prosecution not to talk to a witness during a break in the

VOL. 22 - 769

trial. Although the prosecutor disobeyed the order, the trial court concluded that even this "flagrant violation" of the court's effort to afford the defense a fair opportunity for effective cross-examination, did not deny the appellant the opportunity for full and effective cross-examination, in light of all of the evidence offered. The court in _Prater_ also stated that the prosecution cannot use a trial recess to coach a witness before defense counsel has finished his cross-examination of that witness. Since there was no such order, by the trial court, for the prosecutor in the case at bar to refrain from discussing the case with Melius, and it appeared that cross-examination had terminated, the assignment of error is without merit.

### ASSIGNMENT # 6

THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO INCLUDE LICENSED DRIVERS IN THE POOL OF LICENSED DRIVERS. [SIC]

Appellant asserts in his sixth assignment of error that the trial court erred by denying his motion to include licensed drivers in the pool of prospective jurors. He states that the selection of potential jurors from voter registration lists did not adequately reflect a fair cross-section of the community.

In the case at bar, appellant waived his right to a trial by jury. The trial was heard before a three judge

panel, therefore, the denial of this motion could not possibly have had any effect on the trial.

This assignment of error is without merit.

### ASSIGNMENT # 8

THE TRIAL COURT ERRED IN DENYING THE APPELLANT FUNDS TO EMPLOY AN EXPERT WITNESS FOR A MOTION HEARING.

In his eighth assignment of error, appellant asserts that the trial court erred by denying him the necessary funds to employ an expert witness to show that appellant's motion for closure of the pretrial hearings was necessary to preserve a fair and impartial jury. He states that closure is an effective means of ensuring an impartial jury, and that an indigent defendant should be provided at all times with the reasonably necessary means of obtaining proper representation.

As it was stated in the sixth assignment of error, appellant waived his right to a trial by jury and was tried by three judges, not a jury of his peers. This court cannot help thinking that appellant's counsel upon appeal is slightly misplaced. The fact that appellant waived his right to trial by jury renders this assignment of error moot. Prior to executing his waiver of a jury trial, appellant was informed that the pre-trial motions addressed in assignments six and eight would, "in all probability," be overruled if appellant waiver his rights to a jury trial. The trial

*VOL. 22 - 711*

court correctly concluded that appellant's motions would be anamolous in a trial to a three judge tribunal. Appellant indicated that he understood the effect of his waiver, and that it would result in the motions being overruled.

This court will not indulge appellant and analyze this assignment of error as if there _had_ been a trial by jury.

The eighth assignment of error is without merit.

### ASSIGNMENT # 9

THE ADMISSION OF EXHIBIT 3 (A PHOTOGRAPH OF RAYMOND FIFE) WAS ERROR.

Appellant maintains in his ninth assignment of error that the admission of exhibit three, a school photograph of the victim taken prior to the assult in question, was error. Also, appellant claims that it was improper to permit the victim's mother to testify about family matters, and that it was wrong to permit the prosecutor to comment on the victim's good character during closing argument.

We find this assignment to be without merit.

First, appellant's counsel failed to object to the admission of the photograph, testimony or prosecutor's comments at trial. This failure precludes appellant from objecting now. _State v. Wade_ (1978), 53 Ohio St. 2d 182, at paragraph one of the syllabus.

Appellant's argument would be more persuasive in a jury trial. The admission of the photo before a three judge

VOL. 22 - 712

panel, however, was, at best, harmless error. There is no evidence that the court was swayed by testimony of the victim's mother or the claimed erroneous comments of the prosecutor.

The assignment of error is overruled.

### ASSIGNMENT # 10

THE APPELLEE DID NOT GIVE THE APPELLANT COMPLETE DISCOVERY.

The tenth assignment deals with the extent of discovery provided by the state to the appellant. Appellant objects that the following were not provided to him:

> "1. Allgood identified appellant from a photo array.
>
> 2. That photo array.
>
> 3. Exhibits 103-109.
>
> 4. Oral statements of appellant concerning those exhibits.
>
> 5. The statement of Stephen Melius.
>
> 6. The photographs used by Dr. Levine."

Appellant recognizes the foregoing lapses in discovery here, when viewed in a bifurcated context, are not detrimental, but argues the cumulative impact of all these items reaches plain error.

The state contends that there was sufficient other evidence to convict appellant. Also, the court afforded appellant additional time to prepare for both witnesses, Stephen Melius and Dr. Levine, indicating it was willing to

grant a continuance. However, appellant's counsel deigned not to request the time and continued forward wih the proceeding. Further, the specific photographs were supplemental, and, in some instances, duplicative of pictures that were already in evidence.

Appellant failed to show that the state did not make a good faith effort to supply all relevant materials. No plain error is found.

Appellant's tenth assignment is meritless.

## ASSIGNMENT # 11

ADMISSION OF CERTAIN PHOTOGRAPHS WAS AN ABUSE OF DISCRETION.

Appellant objects to the admission of exhibits which show the stick in relation to the cavity of the victim. He alleges this prejudiced the outcome.

Appellant notes the proper standard for admissibility of photographs from State v. Woodards (1966), 6 Ohio St. 2d 14. The court noted:

> "*** The rule is well settled that photo-
> graphs and color transparencies are not
> objectionable so long as they are properly
> identified, are relevant and competent and
> are accurate representations of the scene
> which they purport to portray. Indeed,
> photographs frequently convey information to
> the court and jury more accurately than
> words.

> "Although a photograph may be rendered
> inadmissible by its inflammatory nature, the
> mere fact that it is gruesome or horrendous
> is not sufficient to render it inadmissible
> if the trial court, in the exercise of its

discretion, feels that it would prove useful
to the jury.

"The real question is whether the probative
value of such photographs is outweighed by
the danger of prejudice to the defendant."
*Woodards*, *supra*, at 24-25. (Citations
omitted.)

Appellant also cites *State* v. *Luft* (Dec. 26, 1978), Franklin

App. No. 78AP-302, unreported.  It, as well as *Woodards*,

recognized the objectionable nature of some photographs, but

nonetheless found harmless error with their admission.

In this cause, admission of the photographs does not

rise to the crest of prejudicial error.  There was

sufficient other evidence as to the guilt of the defendant.

Further, the exhibits were used to show the penetration of

the stick and the "lock and key" fit of the stick to the

injuries.  Finally, the proceeding was had before a three

judge panel rather than a jury, and the presumption remains

that they only considered relevant evidence.

This assignment is overruled.

### ASSIGNMENT # 12

THE STATE MADE IMPROPER CLOSING ARGUMENTS AT BOTH THE GUILT

AND MITIGATION PHASES OF THIS CASE.

Appellant alleges the prosecutor made improper remarks

during closing arguments.  He lists fourteen separate

instances during both closing at trial and closing at the

mitigation stage of the proceedings.

## VOL.22.715

The assignment is without merit.

Initially, it should be noted that appellant's attorney failed to object at the time to any of the statements. Appellant is precluded from raising it as error now. <u>Wade</u>, <u>supra</u>.

Further, a prosecutor is granted great leeway during closing argument, but there still are bounds within which he must operate. However, error will only be found if the remarks affected the verdict. See <u>State</u> v. <u>Wiggins</u> (Sept. 30, 1988), Lake App. No. 12-258, unreported.

Given the nature of the offense involved, the circumstances surrounding the death of the victim, and the length of the closing argument, it does not appear this would constitute prejudicial error, but merely harmless error, at best.

Finally, as noted previously, the trial was conducted before a three judge panel and not a jury, and the record fails to disclose any prejudice.

### ASSIGNMENT # 13

THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

Appellant alleges ineffective assistance of counsel. He lists seven means by which counsel at trial was ineffective. These include:

VOL. 22 - 716

"(1) counsel should have had hearings on the pre-trial motions that were filed;

"(2) counsel should have attempted to seat a jury before waiving that right;

"(3) counsel failed to fully advise the appellant of his legal rights concerning appellant's waiver of a jury trial so that he could voluntarily, knowingly and intelligently make such a decision;

"(4) counsel should have continuously objected to an officer's belief that the appellant was lying;

"(5) counsel's failure to timely file a a motion for new trial with a hearing;

"(6) counsel's failure to object to appellee's improperly closing argument; and

"(7) counsel's failure to preserve the record or otherwise object on any issue that this court or any future court deems waived by such omission."

Appellant prefaces his argument by suggesting that he simply is preserving his right to appeal on this issue. As such, he just merely asserts how counsel was ineffective.

However, the Ohio Supreme Court has developed the proper framework to determine ineffective assistance of counsel. In State v. Lytle (1976), 48 Ohio St. 2d 391, the court indicated:

"*** [T]here must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties as to his client. Next and analytically separate from the question of whether the defendant's sixth amendment rights were violated, there must be a determination as to whether the defense was

prejudiced by counsel's ineffectiveness."
_Id._ at 396-7.

This was interpreted in _State v. Smith_ (1981), 3 Ohio App.
3d 115, where the court held:

> "In order to establish prejudice to
> defendant resulting from a lack of effective
> assistance of counsel, defendant must
> establish upon appeal a substantial
> violation by counsel of an essential duty to
> his client. The defendant must then
> establish his defense was prejudiced by the
> violation of any such duty. _State v. Lytle_
> (1976), 48 Ohio St. 2d 391 [2 O.O. 2d 495].
> In light of the presumption of competency
> attributed to counsel in Ohio, the burden
> upon a defendant to establish ineffective
> assistance of counsel is a heavy one.
> _Vaughn v. Maxwell_ (1965), 2 Ohio St. 2d 299
> [31 O.O. 2d 567]." _Id._ at 120.

Independent review of the record fails to disclose
where the second prong of the _Lytle_ test has been met in
connection with the seven claimed deficiencies of trial
counsel. In other words, the record fails to demonstrate
where appellant was expressly prejudiced by the alleged
omissions and/or comissions of trial counsel.

In this cause, many of the alleged deficiencies of
trial counsel more aptly challenge counsel's strategies and
tactics. "*** [M]any trial tactics may be questioned after
an unfavorable result. A fair assessment of attorney
performance requires us to eliminate the distorting effect
of hindsight." _Post_, at 388. Moreover, _Strickland v._
_Washington_ (1984), 466 U.S. 668, states that tactical

VOL. 22 - 711

decisions may not be the basis of demonstration of ineffective assistance of counsel, absent a showing of prejudice. See, also, State v. Peine (July 21, 1989), Lake App. No. 13-088, unreported, at 14-15. As stated, there is no showing of prejudice here. This court will not indulge in speculation regarding counsel's motivation in waiving a jury trial and his subsequent strategies and tactics employed before the three judge panel, including any judgmental exercise appellant's counsel may have considered to the effect that a gruesome factual scenario is less apt to influence emotionally a panel composed of judges than a jury of lay people.

In addition, appellant's assignment is deficient for failing to comply with the Appellate Rules. Specifically, appellant, in his brief, fails to fully develop his argument as required by App. R. 16 (A)(4), and pursuant to App. R. 12, this court may disregard "[e]rrors not specifically pointed out in the record and separately argued by brief ***."

Appellant's thirteenth assignment is without merit.

### ASSIGNMENT # 14

IT WAS ERROR FOR THE TRIAL COURT TO SENTENCE APPELLANT ON THE KIDNAPPING CHARGE AND THE KIDNAPPING SPECIFICATION.

Appellant alleges that the rape and kidnapping were

*VOL. 22 - 719*

offenses of similar import and appellant should have only been convicted of one. As such, only one should have been used for the aggravating specification during the mitigation phase. He argues the cause should be remanded for new sentencing without the kidnapping specification.

Appellant relies upon State v. Logan (1979), 60 Ohio St. 2d 126, where the court found that rape and kidnapping were of similar import and thus it was error for the court to convict on both counts. The reason was that the court could not find "*** that appellant had a separate animus to commit kidnapping." Logan, supra at 135. The Logan court continued:

> "Within this pronounced rule we adopt the policy that where murder, the taking of a hostage, or extortion is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense." Logan, at 135.

Clearly, the court noted the exception in situations which a murder is committed.

More recently, courts have focused upon the requirement of "separate animus" when analyzing rape and kidnapping. The court in State v. Henry (1987), 37 Ohio App. 3d 3, found separate animus.

> "When the Logan standard is applied to the facts in the instant case, it is apparent that a separate animus does in fact exist and, therefore, separate convictions are proper. First, the restraint was prolonged.

VOL. 22 - 726

The victim was abducted at approximately
1:30 a.m. and was not released until
approximately 4:04 a.m. Second, the
confinement was secretive. The abductors
kept the victim's head down so that she
would not be seen in the automobile.
Moreover, when a police officer approached
the automobile the victim was threatened and
told not to let the officer know that she
was in the automobile. Third, the movement
involved was substantial. The victim was
abducted in Bowling Green, driven to Toledo
and then returned to Bowling Green. Fourth,
there was a substantial increase in risk of
harm to the victim. The farther the victim
was removed from Bowling Green and the
longer she was restrained, the less likely
it was that she would be returned safely.
The victim was taken on country roads and
could have been killed or abandoned without
encountering assistance nearby. Since the
victim was taken in an automobile and driven
a substantial distance, she was subjected to
a risk of injury from the operation of the
motor vehicle which was separate and
distinct from the injury she was exposed to
from the rapes." Henry, supra at 9.

In this cause we have similar facts except for the
distance of the asportation and the exact length of time.
The restraint was long. The evidence supports the
conclusion that the restraint lasted approximately forty-
five minutes. The confinement here was also secretive. The
victim was dragged off the traveled path. Third, after
awakening and attempting to flee, the victim was again
grabbed and dragged back into the woods. His mouth was
covered to prevent pleas for help. The appellant remained
with the victim while the co-defendant left to obtain the

*VOL. 22 - 721*

lighter fluid.   These facts demonstrate the separate animus for the kidnapping and the rape.

The assignment is without merit.

### ASSIGNMENT # 15

THE MOTION FOR NEW TRIAL SHOULD HAVE BEEN GRANTED.

Appellant asserts that the trial court erred in denying his motion for a new trial without first holding a hearing to determine the merits of the motion. On February 14, 1986, appellant filed a motion for a new trial without any supporting materials.  In that motion, appellant requested an extension of time to file the supporting evidence. However, on March 31, 1986, the court overrulled appellant's new trial motion.

On April 7, 1986, appellant filed a motion to set aside the March 31, 1986 entry.  Appellant filed an affidavit on April 7, 1986 in which Raymond Vaughn, appellant's half-brother, recanted his trial testimony.  In the affidavit, hedenied seeing appellant washing blood out of his pants.  He further averred that he so testified at trial because of the coercion of the prosecutor.

The trial court set the matter for hearing on May 8, 1986.  However, apparently without holding the hearing, the court overruled the appellant's motion to vacate.  Though not specifically articulated, appellant alleges that the

court abused its discretion by denying the motion without conducting a hearing.

This assignment is without merit.

Initially it should be noted Crim. R. 35 provides the basis upon which a new trial can be granted. It is incumbent upon the moving party to identify the basis for his motion and provide support for the allegation by material of evidential quality.

In *Toledo* v. *Stuart* (1983), 11 Ohio App. 3d 292, the court in the syllabus held:

> "1. Motions for new trials, made pursuant to Crim. R. 33, are not to be granted lightly. When such a motion is made pursuant to Crim. R. 33(A)(2), in which misconduct by jurors, prosecution witnesses or the prosecuting attorney is alleged, affidavits in support thereof must be submitted with the motion as further required by, and specified in, Crim. R. 33(C). If the defendant fails to produce supporting affidavits, the trial court, in its discretion, may deny the motion summarily without a hearing. (Crim. R. 33[A] [2] and [C], construed.)

> "2. Neither the trial court's ruling on the new trial motion nor its decision on whether to hold a hearing thereon, will be disturbed on appeal in the absence of a clear showing that the court abused its discretion." (Emphasis in original.)

Furthermore, nothing in the Criminal Rules requires that a hearing be held. To the contrary, case law has endorsed the proposition that the decision to grant a hearing rests with

the discretion of the court. This was noted in State v. Williams (1975), 45 Ohio St. 2d 88.

> "'The granting of a motion for a new trial upon the ground of newly discovered evidence is necessarily committed to the wise discretion of the court, and a court of error cannot reverse unless there has been a gross abuse of that discretion. And whether that discretion has been abused must be disclosed from the entire record.' State v. Lopa (1917), 96 Ohio St. 410, 411." Williams, supra, at 93.

This was also noted in United States v. Kearney (C.A. D.C., 1982) 682 F.2d 214.

> "A motion for a new trial may be decided on the basis of affidavits without an evidentiary hearing. ***"

> "***'Moreover, the necessity for a hearing is diminished in cases involving challenged testimony where the trial judge has an opportunity to observe the demeanor and weigh the credibility of the witness at trial.'" Kearney, supra, at 219. (Citations omitted.) (Emphasis in original.)

In the original motion for new trial and the motion to vacate, appellant itemizes a number of reasons for new trial. However, appellant filed only one affidavit in support of the motion, and it was only applicable to one of the bases for new trial. As such, appellant has failed to fulfill the evidential requirements of Crim. R. 33. Therefore, the court did not abuse its discretion in denying the motion without a hearing.

Further, it should be noted appellant's grounds for a new trial, though not in response to the new trial motion, had been considered and reviewed by the trial court. In addition, appellant's theories of innocence have been reviewed by this court and rejected in other assignments of error.

Finally, no error obtains where the evidence is such that the outcome of the trial would not be different. See, e.g., State v. Duling (1970), 21 Ohio St. 2d 13. In this cause, the evidential table is sufficient, even excluding the testimony in question, which was recanted in Vaughn's affidavit, that was filed with the motion to vacate, to support a conviction. Furthermore, the testimony by the witness, in this cause, is not pivotal to appellant's conviction because it has little, if any, probative value in determining his guilt or innocence.

The fifteen assignment is rejected.


ASSIGNMENT # 16

THE TRIAL COURT WAS IMPROPERLY PREVENTED BY (sic) DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT.

Appellant's sixteenth assignment of error alleges that the death penalty statute prevents the court from deciding whether the death penalty is appropriate. He argues because the statute mandates imposition of the death penalty if the

aggravating circumstances outweigh the mitigating factors, the court is not permitted to determine if the death penalty is appropriate. He suggests that the court is "bound by the weighing process and [is] prohibited from deciding whether nevertheless death is inappropriate."

Appellant theorizes that the court is precluded from imposing life imprisonment out of a desire for mercy or simply because it feels the death penalty is inappropriate.

However, this has been rejected in _Jenkins_, _supra_, and _State v. Buell_ (1986), 22 Ohio St. 3d 124. Further the statute provides that the court may consider not only the six specified mitigating factors, but "any other factors that are relevant to the issue of whether the offender should be sentenced to death." R.C. 2929.04(B)(7). As such, the court does have discretion to consider "*** a broad range of specified and unspecified factors in mitigation of the imposition of a death sentence." _Jenkins_, at 174.

This assignment is denied.

### ASSIGNMENT # 17

THE TRIAL COURT FAILED TO CONSIDER ALL OF THE EVIDENCE IN SUPPORT OF MITIGATING A DEATH SENTENCE.

In this assignment, appellant alleges that the court failed to consider all of the mitigating factors in sentencing appellant to be executed. Specifically,

**VOL. 22 - 726**

appellant argues that the court failed to consider the possible brain damage he suffered from injuries, his low mental age, and his good institutional record.

The first two are fairly similar in nature in that the injuries may have contributed to his low intelligence level or low mental age. However, the court clearly did consider this when it noted:

> "The court considered the following factors in possible mitigation:
>
> "***
>
> "2) The low intelligence of the defendant.
>
> "***
>
> "Neither low intelligence nor impaired judgment were given significant weight since no high degree of intelligence was necessary to understand the events of rape, kidnapping, arson and murder as committed on the night of the crime, and to classify participation in such events as poor judgment seems ridiculous."

Generally, the court did consider appellant's low mental age.

Appellant's mother during mitigation also testified that appellant had fallen off a swing and, on another occasion, had been hit by an automobile. However, no express evidence was offered which indicated appellant's retardation was the result of the physical traumas. To the contrary, evidence was offered which suggested that

Vol. 22 - 727

seventy-five percent of the time, the cause of the retardation is unknown. Furthermore, Dr. Crusin indicated that neither of the injury reports indicated brain damage. As such, there was no evidence before the court which it could consider during mitigation on this subject.

Though not specifically identified by the trial court, it had before it the evidence of appellant's good institutional record. At the mitigation hearing, the appellant presented a number of witnesses who testified about appellant's activities at Brinkhaven and TCY. This testimony tended to suggest that appellant was a follower, not a leader. This, too, was considered by the court where it noted:

> "The court considered the following factors
> in possible mitigation:
>
> "***
>
> "6) Whether or not he was a leader or
> follower."

Independently, though the court may not have expressly listed appellant's good institutional record as an item of mitigation, that evidence was before the court. Further, it appears that the court considered it in making its determination. Simply because the court did not identify it specifically is not grounds for reversal. To permit such would open the door for reversal of every sentence because

the courts fail to list and discount every possible mitigating factor. This is clearly unreasonable.

The constitutionality of the weighing process employed by the trial court in this case can be seen by contrast to that employed by the Texas court in Penry (which was found to be constitutionally deficient). Under Texas law, the jury was restricted in its application of mitigation evidence by the statutory requirement which dictated that the jury answer three specific questions. These questions were whether the defendant acted deliberately with the reasonable expectation that death would result; whether there was a probability that the defendant would continue to commit criminal acts of violence; and, whether the conduct of the defendant was unreasonable in response to the provocation. Penry, 492 U.S. ___, 106 L. Ed. 2d at 272.

The Supreme Court held that the Texas statutory scheme was flawed because the jury was not informed that it could give effect to mitigating evidence of petitioner Penry's mental retardation and abused background. Further, a trier of fact who attempted to give effect to petitioner's mitigating evidence of failure to learn from his mistakes, would be forced to conclude that petitioner would continue to commit violent crimes. The court held that the trier of fact must be allowed to express a "reasoned moral response" and remanded the case for resentencing. Penry, 492, U.S.

*Vol. 22 - 729*

___, 106 L. Ed. 2d at 284; see, also; _Lockett_ v. _Ohio_ (1978), 438 Ohio St. 586, 605.

By contrast, R.C. 2929.04(B) allows for the consideration of several mitigating factors, including "any factors that are relevant to the issue of whether the defendant should be sentenced to death." 2929.04(B)(f). Further, the statute dictates that "the defendant shall be given great latitude in the presentation of evidence of the "mitigating factors ***." 2929.04(C). Therefore, it can be seen that, under Ohio law, the trier of fact is not precluded from considering mitigating factors and the weighing process cannot be found to violate due process.

Appellant's seventeenth assignment is without merit.

### ASSIGNMENT # 18

A SENTENCE OF DEATH IS UNCONSTITUTIONAL.

Appellant's eighteenth assignment of error challenges the constitutionality of the death penalty on numerous grounds. However, as he notes, the issues that he raises have been previously addressed and rejected by the Ohio Supreme Court and/or the United States Supreme Court.

First, appellant alleges that the death penalty is cruel and unusual punishment because it is: 1) degrading to the dignity of human beings; 2) arbitrarily, freakishly and discriminatorily inflicted; and 3) applied at the uncontrolled discretion of the prosecutor. These arguments

have been rejected in *Jenkins*, *supra*, and *State* v. *Zuern* (1987), 32 Ohio St. 3d 56.

Second, appellant argues the death penalty violates the due process clause because: 1) it is not the least restrictive means to serve a compelling state interest; 2) it is not an effective deterrent; and 3) incarceration is the more appropriate means.

In *Jenkins*, at 168, the court noted that the United States Supreme Court has repeatedly rejected the "least restrictive means" argument. In *Gregg* v. *Georgia* (1976), 428 U.S. 153, the court rejected the deterrence theory leaving the resolution of that particular issue with the state legislatures. The court in *Spanzio* v. *Florida* (1984), 468 U.S. 447, in rejecting appellant's final position, cited *Gregg*, *supra*, and noted that the death penalty may be the only appropriate sanction for certain criminal acts which are so grievous "an affront to humanity." *Spanzio*, *supra*, at 184.

Appellant next takes issue with the state's statutory framework under which the death penalty may be imposed. The challenges include 1) execution may be had without proof of intent (rejected in *Jenkins*, at 171); 2) failure to establish a stringent standard of proof (rejected in *Jenkins* and *State* v. *Maurer* [1984], 15 Ohio St. 3d 239); 3) the jury is not permitted to consider its own doubt as to the

defendant's guilt (rejected in State v. Roe [1989], 41 Ohio St. 3d 18); 4) the state is not required to prove the absence of mitigating factors (overruled in State v. Lawrence [1989], 44 Ohio St. 3d 24, rev'd. on other grounds); 5) the sentencing scheme requires mandatory imposition of the death penalty (overruled in Buell, supra); 6) the bifurcated process does not sufficiently narrow the category of defendant's eligibility for the death penalty (rejected in Jenkins); and 7) the appellate review process (rejected in Buell and Jenkins).

Fourth, appellant argues that the sentencing hearing conducted before the same body which tried him denies his right to effective assistance of counsel. He maintains defense counsel is unable to fully argue all elements of a case utilizing two separate defenses: one during the guilt phase and a different one during mitigation. The exact argument was rejected in State v. Mapes (1985), 19 Ohio St. 3d 108, at 117, and State v. Hicks (1984), 43 Ohio St. 3d 72.

Next, appellant hypothesizes that the state's capital punishment statutes are unconstitutional because they subject appellant to double jeopardy. In essence, appellant suggests that by permitting the state to use the underlying aggravating felony associated during the sentencing stage violates the Constitutional provision prohibiting double

VOL. 22 - 732

jeopardy. This argument was overruled in _State_ v. _Brown_ (1988), 38 Ohio St. 3d 305, and _State_ v. _Barnes_ (1986), 25 Ohio St. 3d 203.

In the sixth constitutional attack, appellant alleges that the death penalty statutes are overly broad. Appellant's specific challenge was rejected in _Buell_.

The eighteenth assignment is without merit.

### ASSIGNMENT # 19

THIS COURT CANNOT FIND THAT AFTER REVIEWING ALL OF THE FACTORS OF R.C. 2929.05(A) THAT DEATH WAS THE APPROPRIATE SENTENCE FOR DANNY LEE HILL.

The nineteenth assignment essentially is an overview of the mandatory review procedure imposed upon this court by statute.

Initially, appellant suggests that the evidence was insufficient to support the conviction. Appellant attempts to identify the conflicting evidence which would tend to create reasonable doubt as to his guilt. He further suggests that the evidence "is almost entirely circumstantial" and would be insufficient to support the imposition of the death penalty. However, a more thorough review of the evidence which was before the trial court indicates that the evidential table is more than sufficient to permit a finding of guilt.

First, appellant, who voluntarily went to the police station, noted that the victim was choked with his underwear. This information could only have been known then by the investigators and the perpetrators.

Appellant was identified by a witness as the individual who tossed aside an object like a stick in the field. The state's expert identified the stick as the probable cause of the perforation of the rectum and urinary bladder. Further, there is evidence which suggests that the co-defendant was acting as a look out while appellant assaulted the boy.

The state also presented the testimony of a forensic odontologist who stated:

> "It's my professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and the photographs that I had, made the bite marks on [the victim's] penis."

He also "excluded Combs altogether" as the source of the bite marks, concluding, "I'm sure on the exclusion [of Combs] as well as the identification" of Hill as the source of the bite marks. Similarly, appellant's own witness on this subject concluded that it was likely that one of the bite marks belonged to appellant.

Next, appellant alleges that the aggravating circumstances do not outweigh the mitigating factors. Appellant alleges that the mitigating factors which include

VOL. 22 · 734

71

his low I.Q., his family background and his institutional record justify life imprisonment.

However, the trial court's analysis of the aggravating circumstances weighed against the mitigating factors support its conclusion.  The court indicated it considered the underlying facts of each of the specifications in the weighing process.  The evidence of the rape included the biting of the penis, leaving teeth marks; the pulling of the genitalia, bruising the pelvic area; and the penetrating of the anus with the broom stick, perforating the rectum and rupturing the urinary bladder.  The underlying facts regarding the arson indicate the victim was burned about his face and shoulders.  The kidnapping evidence suggested the appellant was tackled off his bicycle, slammed on the bicycle pedal, kicked about and then moved to conceal the other crimes.

Further, appellant, after being involved in these acts, went to the police station to inquire about the reward.  At the same time, appellant was attempting to implicate others to divert attention from himself.  This evidence indicates a lack of remorse, a callous attitude and the heinous nature of his character.  All are appropriately considered by the court and are against the fabric of mitigation.

Appellant suggests that the death penalty is inappropriate and argues that the sentence is the result of

*improperly not proper 2 consideration* {

VOL. 22 - 735

72

passion and prejudice. The record does not reflect this. Rather, the judges listened to the evidence and properly convicted appellant. Then, the court, after the mitigation hearing, determined that the death penalty was appropriate.

Next, appellant maintains that the death penalty is disproportionate to other capital cases. As required by statute, this court is required to compare this case against other aggravated murder cases in this district. To date, in only two other cases *State* v. *Glenn* (Feb. 15, 1985), Portage App. No. 1286, unreported, and *State* v. *Wiles* (June 3, 1988), Portage App. No. 1675, unreported, did this court affirm the imposition of the death penalty.

In *Glenn*, *supra*, the defendant had devised a plan to effectuate the escape of his half-brother from the Mahoning County Jail. During the escape attempt, the defendant shot and killed a reserve deputy sheriff who was transporting the prisoner from the jail to a doctor's office. During mitigation, appellant called two witnesses who testified about the defendant's upbringing and environment. However, the jury recommended the death penalty, finding that the aggravated circumstances outweighed the mitigating factors. *Glenn*, at 1-3.



In *Wiles*, *supra*, the defendant was burglarizing the home of his former employers. He thought that the home was unoccupied but was confronted by the son of the owners. The

defendant proceeded to stab the victim at least eleven times and left the knife in the victim's back.  The victim died as a result of the stab wounds.  This court affirmed the conviction and imposition of the death penalty.

By comparison, the sentence in the present cause is not disproportionate.  The facts in this cause, including the sexual assault and physical beating, the torture, the burning, the strangulation, and method of death, the attempted concealment of the body, and appellant's callous lack of remorse constitute criminal acts which are so grievous an "affront to humanity" to justify the death penalty.  _Spanzio_, at 184.  Further, nothing suggests that this sentence was imposed arbitrarily, capriciously or indiscriminately.  The sentence is appropriate under these circumstances.  See _Jenkins_ and _Zuern_, _supra_.

Pursuant to statutory law, this court is required to weigh the aggravating circumstances against the mitigating factors.  This court in _Glenn_ analyzed the weighing process.

> "From a review of the mitigating factors disclosed by the evidence, it is also shown that the aggravating circumstances outweigh those mitigating factors and, thus, the death penalty was appropriate.  The Ohio Supreme Court has cited with approval the following definition of 'outweigh':
> 'Outweigh.  _To outweigh means to weigh more than, to be more important than. The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating_

V61. 22 - 737

> circumstances outweigh the mitigating
> factors.
>
> 'It is the quality of the evidence
> that must be given primary
> consideration by you. The quality of
> the evidence may or may not be
> commensurate with the quantity of the
> evidence, that is, the number of
> witnesses or exhibits presented in
> this case. (Emphasis added).
> Jenkins, supra, at 172; fn. 9.'"
> Glenn, at 43-44.

Initially, it should be noted that the exact sequence and extent of appellant's actual direct involvement is not specifically detailed in the evidence. However, based upon the direct evidence of the degrees of his actual involvement and the circumstantial evidence implicating appellant in his conjunctive role in the co-defendant's action, we agree with the trial court's verdicts in this cause.

Upon examination of the evidence presented, this court presents its weighing analysis of the aggravating circumstances and mitigating factors in this case.

First, the trial court found beyond a reasonable doubt that appellant committed rape, kidnapping and aggravated arson, each of which is sufficient to constitute the specification for the purposes of aggravated murder under which capital punishment may be imposed. We have previously indicated that we agreed that there was a proper basis for the trial court's verdicts based on the record before us. Each specification shall be analyzed independently.

VOL. 22-738

The evidence which supported the rape conviction indicated that the victim was subjected to a significant amount of force. This is consistant with the relative size and age differences between the appellant and the victim. Initially, the victim was restrained and his mouth covered, but as the various sexual acts were performed, he was rendered unconscious. The physical attacks perpetrated on the deceased caused him to vomit and also cause extensive physical damage. Specifically, during the assault, which lasted approximately forty-five minutes, the victim was repeatedly bitten on the penis, which was evidenced by the bite marks. In addition, the autopsy revealed that the deceased had suffered multiple contusions, abrasions, and lacerations on his back, face, and thigh. Furthermore, his genitalia was pulled with egregious force. He was impaled repeatedly with both the blunt end and sharp end of an instrument which was long enough to perforate the rectum and rupture the victim's urinary bladder. As an apparent result of the agony of the cumulative torture, the victim was heard screaming continuously, for a period of twenty to thirty seconds, by passersby. At this time, witnesses observed Combs on the path behind Valu-King. Additionally, appellant's own statement indicated he remained with the victim while Combs absented himself from the scene, and that he did not go for help. This direct evidence base provides,

at the very least, that appellant was the only other person when the victim was experiencing the pinnacle of excruciating pain from these egregious assaults.

The evidence of the kidnapping discloses that the victim was violently assaulted since he was grabbed from his bicycle, was lifted by his neck and was choked as he dangled in the air.  He was also being stripped of his clothing at this point.  Next, his head and upper torso was slammed against the bicycle pedal.  Apparently, he managed to slip free and run a short distance before being recaptured.  He was slammed to the ground several times.  He was also repeatedly kicked, suffered multiple blows to the body, and he sustained severe head injuries, which resulted in a subdural hemorrhage.  He was strangled with his underwear, almost in a "hanging fashion", as his feet were again lifted off the ground as he was being choked.  This action left ligature marks around the decedent's neck.  Finally, the victim had been assaulted and was left while still alive in a secluded area where early medical attention was not likely.

The testimony at trial likewise reveals the following in relation to the aggravated arson.  After the assailants completed their sexual assaults, the appellant remained with the victim while the co-defendant departed the area and found a container of charcoal lighter fluid at the back

of the Valu King store. When the co-defendant returned to the scene of the crime, the fluid was poured on the victim's face and shoulder. Parts of his clothing were ignited and the victim was set afire. As a result, he suffered third degree burns to his face and neck.

The net effect of this brutalization is that this court has before it three sets of aggravating specifications which include the rape, kidnapping and aggravated arson to weigh against the mitigating factors. Each of these, the arson, the anal penetration and the assualts accompanying the kidnapping could have indepently caused death.

Prior to the imposition of the death penalty, however, R.C. 2929.04 requires the consideration of a number of statutory mitigating factors and mandates that these factors be weighed against the aggravating circumstances. These mitigating factors are as follows:

> "(1) Whether the victim of the offense induced or facilitated it;
>
> "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
>
> "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;



*VOL. 22 - 741*

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and deliquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether th offender should be sentenced to death."

R.C. 2929.04(C) allows a defendant great latitude in the presentation of evidence at the penalty hearing.  The sentencing body must weigh these mitigating factors against the aggravating circumstances; the history, character and background of the perpetrator; and the nature and circumstances of the crime.  R.C. 2929.04(B)

Items one and two are inapposite to the case sub judice. Under no characterization of the evidence can the victim be considered to have induced or facilitated this offense in any way other than by simply being young and helpless and incapable of escape.  The evidential table is similarly devoid of evidence suggesting that the victim provoked appellant or that appellant was under duress to commit or participate in these violent acts.

The record is replete with competent, credible evidence which states that appellant has a diminished mental capacity.

He is essentially illiterate; displays poor word and concept recognition and, allegedly, has deficient motor skills. Appellant is characterized as being mildly to moderately retarded. There is some suggestion that appellant's "mental age" is that of a seven to nine year old boy. Testimony places appellant's I.Q. between 55 and 71, which would cause him to be categorized as mildly to moderately retarded.

Other factors which are demonstrated by the evidence, however, include appellant's ability to conform his conduct to the requirements of the law and appellant's understanding of the criminality of the acts committed. Appellant's own witness, Doctor Darnall, testified that appellant possessed an intellectual understanding of right and wrong and further stated that appellant's crimes cannot be attributed to the fact that he was mentally retarded. Appellant's ability to differentiate between right and wrong can also be gleaned from his statement to Sergeant Stewart during the interview process on September 12, in which appellant indicated that he abstained from participating in the alleged theft of the victim's bicycle because such an act would cause him to return to confinement. This evidence demonstrates that appellant understands the difference between right and wrong and could appreciate that the attacks perpetrated on the victim were "wrong." This knowledge of the distinction between correct and criminal conduct is further demonstrated


actually demonstrates the opposite

in appellant's audio and video taped statements, in which he alleges that he remained uninvolved with the assaults on the victim because he knew such acts carried criminal penalties and that he did not want to return to confinement. Appellant himself further urges that, under proper structured supervision, such as that received at Brinkhaven and TCY, he is capable of conforming his conduct to societal standards.

Consideration of evidence delineating appellant's mental retardation is more properly applied when evaluating his ability to knowingly, intelligently and voluntarily waive his constitutional rights. There is no evidence presented that requires the conclusion that this crime was committed because a mental defect precluded appellant from making the correct moral or legal choice.

The fourth mitigating factor is the age of the defendant. R.C. 2929.03 requires that the death penalty be applied only to persons who were eighteen years of age or older at the time of the commission of the aggravated murder. Appellant was eighteen and one-half years of age at the time of the commission of the offense. Implicit in appellant's mitigation evidence is the argument that appellant's mental age is such that he, de facto (if not de jure) falls below the requisite age limit for imposition of the death penalty.

As previously stated, courts are reluctant to exculpate persons from their wrongful acts on the basis of mental age. The evidence in this case indicates that appellant understood that the acts committed were criminal and further demonstrates that he attempted to shift blame to others through his statements to the police. Appellant's acts of exculpation were calculated, cunning and showed no sign of a childlike intellect. Other evidence presented indicates that appellant is "street-wise" and that, although he is handicapped in formal educational settings, he is slick and functional in his environment. Moreover, this is scarcely appellant's first brush with the criminal justice system. In sum, there is insufficient evidence for this court to conclude that the age of the appellant, mental or chronological, is too young for the imposition of the death penalty.

The fifth mitigating factor to be considered is the lack of criminal convictions and delinquency adjudications appellant has had prior to the present conviction. An examination of appellant's criminal record indicates that this particular factor is of no help to him whatsoever. The record manifests that one year prior to the murder, appellant was convicted of the rapes of two women. These crimes were somewhat reminiscent of the crime which appellant is presently appealing, as all were violent sexual

assaults. Various persons in the trial alluded to other acts of violence in appellant's past, noting that appellant had been arrested ten to fifteen times.

Application of the sixth statutory factor turns on the question of whether the perpetrator of the crime was a participant, rather than a co-principal offender. The trial court, in its review of the mitigation evidence, felt that regardless of which defendant first attacked the victim, both appellant and Timothy Combs engaged in conduct characterized by torture, rape and murder. This court agrees with that assessment. The evidential table indicates the involvement of appellant in the slaying of the victim. Appellant's contention suggesting that he merely observed while co-defendant Timothy Combs tortured and assaulted the victim is overwhelmingly negated by his personal odontological "signature" on the penis of the victim. Again, the record indicates that appellant remained in the field with the victim while Timothy Combs was observed standing on the path. By appellant's own admission, he remained with the victim while Combs procured the lighter fluid. At neither time did appellant seek help for the victim. This mitigating factor is inapplicable in this case.

The final mitigating factor is a "catch-all" factor which assimilates all other mitigating evidence. Appellant

*VOL. 22 - 746*

has adduced several factors for consideration.  The first of these is the poor family environment in which appellant grew up.  Appellant was raised by his mother, who herself is mentally retarded.  He is an illegitimate child.  There has generally been no male authority figure in appellant's household, as each of his siblings was sired by a different father, most of whom did not marry appellant's mother.

This court is cognizant of the difficulties which may arise when growing up in an unstable and impoverished family environment.  However, there is no evidence which suggests a logical nexus between appellant's childhood and this crime.  Incidents of single-parent families in the United States is increasingly common.  However, crimes of this savagery are characterized by a fundamental lack of human decency which does not necessarily arise from the condition of one's family life.  Although no one would argue that an upbringing in this environment is often detrimental, there is no demonstrable connection between appellant's family life and the murder of the victim.  Moreover, the record before this court does not indicate that appellant's home life caused his siblings to perpetrate violent crimes.

Appellant also argues that the state was deleterious in its duties to him while he was under their supervision and care.  The record shows that appellant was sent to several juvenile facilities which were presumably intended to have

*[handwritten margin notes: "Not the best !" and "the sibling argument"]*

84

treatment, educational and penal consequences. Appellant has presented considerable evidence as to the insufficiency of psychological care at these institutions. Nevertheless, appellant maintains that he was making rehabilitative progress at the institutions, progress that was abruptly terminated when appellant was released prematurely. There is testimony from various staff personnel that indicates that appellant was released from the juvenile facilities against the staff's recommendation.

This court notes that it is distressing when someone who is mentally handicapped is not afforded the support necessary to lead a more full and complete lifestyle. Similarly, it is unfortunate that appellant, for whatever reason, was discharged prematurely from the juvenile facility. However, there is no evidence which suggests that appellant would have not committed this crime if he had been afforded further treatment or that the converse would be true. There is no evidence presented which demonstrates that appellant's treatment would have been any more effective had he stayed at Brinkhaven for another year. Perhaps the only real inference that can be drawn from appellant's arguments is that appellant would not have been able to commit the murder had he remained at the institution. If this court accepted that argument, we would be obligated to find the state culpable every time a released criminal

VOL. 22- 769

perpetrated a new offense. Considerations of due process do not permit, nor would society tolerate, life imprisonment for every offense on the grounds that the perpetrator might commit another crime upon release.

Appellant also introduced considerable evidence as to his passive nature. This evidence suggests that appellant is a "follower," easily led (because of his handicap) and influenced by any person with a dominant personality. The inference which appellant intends this court to draw from this evidence is that appellant was misled into the commission of the murder by co-defendant Timothy Combs.

Several factors, however, militate against this inference. First, this court is aware of the two rapes appellant committed one year before the killing of Raymond Fife. These rapes, which were committed by appellant alone, were accompanied by death threats (both rapes were committed at knife point), both contained forced sexual intercourse (in one instance, anal intercourse), and were accompanied by beatings, and, in one attack, the biting of the victim. Clearly, appellant needed no promptings from a "dominant" person in order to engage in savage and bestial behavior. Additionally, appellant is accused of making homosexual advances toward one youth in the Trumbull County Juvenile Center and threatening to do the same to another child while at TCY.

VOL. 22 - 769

Further, appellant demonstrated a functional understanding of right and wrong which is incongruous with the portrayal of him as a mere puppet. Appellant's actions, in going on his own to the police and attempting to implicate other persons in the murder of Raymond Fife, are scarcely those of a person with no independent will. Although this court does not dispute that appellant may have aspects of a "follower" in his personality makeup on occasions, the evidence suggests enough personal will, and a consistent _modus operandi_, which belies the notion that appellant's will was being subsumed by another.

Finally, appellant alleges that a childhood fall caused organic brain trauma which, along with a subsequent bicycle accident, promoted his moral deficiencies, and is a mitigating factor in appellant's behavior. This court notes that almost no evidence of organic brain damage is demonstrated by appellant. Dr. Darnall, who adduced the only credible evidence on this subject, indicated that any evidence of organic brain disease was slight and that no evidence of psychosis was discovered. This court also recognizes that many children fall during childhood and hit their heads. Contrary to appellant's argument, however, the vast majority do not become sadists and murderers.

The evidence as to appellant's mental and physical condition, age, family, treatment history and passive nature

does not outweigh the aggravating circumstances. The record demonstrates that appellant and co-defendant Timothy Combs kidnapped the victim, beat him violently, sexually assaulted him, impaled him with a long wooden instrument, and burned his face and body by pouring lighter fluid on the boy's face and shoulder and igniting it. Appellant's guilt is demonstrated by direct physical evidence, circumstantial evidence, and the appellant's own statements to the police. There is no question as to the appellant's involvement in the murder.

R.C. 2929.05(A) mandates that an appellate court, upon review, is to consider whether the sentence imposed was excessive or disproportionate to the penalty imposed in similar cases. This court has undertaken the weighing of the proportionality in the discussion of appellant's nineteenth assignment of error. In doing so, this court compared this case with State v. Glenn, supra, and State v. Wiles, supra, which were cases from this district in which the death penalty was imposed.

The comparison of the case sub judice with Glenn and Wiles, as indicated, demonstrates that the sentence in the present cause is not disproportionate. The facts of this case indicate that appellant committed acts on the victim, Raymond Fife, that not only go beyond the bounds of

acceptible human behavior, but also move beyond this court's understanding of behavior which is human at all.

An extensive review of each assignment of error manifests that they are without merit. After an independent review of the evidence, we conclude that appellant was found guilty of the specifications of kidnapping, rape, and arson beyond a reasonable doubt; the aggravating circumstances outweigh the mitigating factors; and that imposition of the death penalty is proper. In this case, the death penalty was appropriate as the sentence was not excessive or disproportionate to sentences imposed in similar cases.

Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

A certified copy of this document shall constitute the separate opinion as to findings of the court in this case within the meaning of R.C. 2929.05(A) and the Clerk of this Court shall immediately make and file such certified copy with the Clerk of the Supreme Court of Ohio.

Pursuant to R.C. 2953.07, this court having affirmed the trial court and the date for execution having passed,

this court sets the date of February 26, 1990 for the
execution of the death sentence.

_Donald R. Ford_
JUDGE DONALD R. FORD

CHRISTLEY, P.J., concurs

MAHONEY, J., concurs

No._____

IN THE SUPREME COURT OF THE UNITED STATES

October Term, 1992

DANNY LEE HILL, Petitioner

V.

STATE OF OHIO, Respondent

CERTIFICATE OF SERVICE

I, Roger Warner, a member of the bar of this Court hereby certify that on this 29th day of December, 1992, one copy for certiorari in the above captioned case was mailed, first class postage prepaid, to Dennis J. Watkins, Trumbull County Prosecuting Attorney, 160 High Street, 3rd Floor, Administration Building, Warren, Ohio  44481, counsel for respondent herein.  I further certify that all persons required to be served have been served.

Respectfully submitted:

_Roger Warner_
ROGER WARNER
Counsel of Record
Ohio Reg. No. 0019941
171 East Livingston Avenue
Columbus, Ohio  43215
(614) 221-3821

Attorney for Petitioner

No._____

IN THE SUPREME COURT OF THE UNITED STATES

October Term, 1992

DANNY LEE HILL, Petitioner

v.

STATE OF OHIO, Respondent

AFFIDAVIT OF MAILING PETITION FOR CERTIORARI

Roger Warner being duly sworn and cautioned, deposes and says:
I am a member of the bar of the Supreme Court of the United States.

On December 29, 1992 at approximately 5:00 p.m. I deposited
ten copies of the Petition for Certiorari and Motion to Proceed In
Forma Pauperis with the United States Post Office.


_Roger Warner_
ROGER WARNER
Counsel of Record
Ohio Reg. No. 0019941
171 East Livingston Avenue
Columbus, Ohio  43215
(614) 221-3821

Attorney for Petitioner


ATTESTATION BY NOTARY

Sworn before me, a Notary Public, this 29th day of December,
1992.


_Linda L. Walden_
Notary Public

LINDA L. WALDEN
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES JUNE 7, 1996