99-4317

97 JAN 28 PS 1:47

CLERK
NORTHERN DISTRICT OF OHIO
CLEVELAND

4:96cv 795

STATE OF OHIO

VS.

DANNY LEE HILL

CASE NO. 85-CR-317


TRIAL TRANSCRIPT
(VOLUME 1)



1000177235

INDEX OF WITNESSES (Volume #1):

| State's Witnesses: | Dr. | Cr. | ReDr. | ReCr. |
|---|---|---|---|---|
| Raymond L. Vaughn | Page 38 | 43 | | |
| Miriam Fife | 55 | | | |
| Bill Simmons | 67 | 78 | | |
| Raleigh C. Hughes | 84 | 96 | | |
| Thomas Skoczylas | 101 | 112 | | |
| James Teeple | 117 | 177 | | |
| Joseph Sudimak, M.D. | 169 | 175 | | |
| *Dennis Steinbeck | 199 | 226 | | |

*The testimony of Dennis Steinbeck continues into
  Volume #2.

INDEX OF EXHIBITS (Volume #1):

3

| State's Exhibits: | Marked: | Description: |
|---|---|---|
| Number 1 | Page 40 | One (1) pair of gray trousers belonging to the defendant. |
| Number 2 | 60 | Diagram of the streets in the vicinity of the crime scene |
| Number 3 | 66 | School picture of Raymond Fife |
| Number 4 | 73 | Diagram of the crime scene |
| Number 5 | 77 | Raymond Fife's bike |
| Number 6 | 100 | Burnt underwear of Raymond Fife |
| Number 7 | 100 | Burnt T-shirt of Raymond Fife (Wrangler) |
| Number 8 | 109 | Photograph of the area where Raymond Fife was found |
| Number 9 | 117 | Photo of the crime scene (9/11/85) |
| Number 10 | 117 | Photo of the crime scene (9/11/85) |
| Number 11 | 117 | Photo of the crime scene (9/11/85) |
| Number 12 | 117 | Photo of the crime scene (9/11/85) |
| Number 13 | 117 | Photo of the crime scene (9/11/85) |
| Number 14 | 117 | Photo of the crime scene (9/11/85) |
| Number 15 | 117 | Photo of the crime scene (9/11/85) |
| Number 16 | 117 | Photo of the crime scene (9/11/85) |
| Number 17 | 117 | Photo of the crime scene (9/11/85) |

INDEX OF EXHIBITS (Volume #1) Cont.:                                              4

| State's Exhibits: | Marked: | Description: |
|---|---|---|
| Number 18 | 117 | Photo of crime scene (9/11/85) |
| Number 19 | 117 | Photo of crime scene (9/11/85) |
| Number 20 | 117 | Photo of crime scene (9/11/85) |
| Number 21 | 117 | Photo of crime scene (9/13/85) re: bike and shorts |
| Number 22 | 117 | Photo of crime scene (9/13/85) re: bike and shorts |
| Number 23 | 117 | Photo of crime scene (9/13/85) re: bike and shorts |
| Number 24 | 117 | Photo of crime scene (9/13/85) re: bike and shorts |
| Number 25 | 117 | Photo of crime scene (9/13/85) re: bike and shorts |
| Number 26 | 117 | Photo of crime scene (9/16/85) |
| Number 27 | 117 | Photo of crime scene (9/16/85) |
| Number 28 | 117 | Photo of crime scene (9/16/85) |
| Number 29 | 117 | Photo of crime scene (9/16/85) |
| Number 30 | 117 | Photo of crime scene (9/16/85) |
| Number 31 | 117 | Photo of crime scene (9/16/85) |
| Number 32 | 117 | Burnt charcoal lighter fluid bottle |
| Number 33 | 117 | Photo of crime scene (9/18/86) |

<u>INDEX OF EXHIBITS  (Volume #1) Cont.:</u>                    5

| State's Exhibits: | Marked: | Description: |
|---|---|---|
| Number 34 | 117 | Photo of Raymond Fife's clothing (9/15/85) |
| Number 35 | 117 | Photo of Raymond Fife's clothing (9/15/85) |
| Number 36 | 117 | Photo of Raymond Fife's clothing (9/15/85) |
| Number 37 | 117 | Photo of Raymond Fife's clothing (9/15/85) |
| Number 38 | 117 | Photo of Raymond Fife's sock and of blood appearing on the sock of Tim Combs |
| Number 39 | 117 | Photo of Raymond Fife's sock and of blood appearing on the sock of Tim Combs |
| Number 40 | 117 | Photo of Raymond Fife's sock and of blood appearing on the sock of Tim Combs |
| Number 41 | 117 | Aerial Photo of crime scene (9/25/85) |
| Number 42 | 117 | Aerial Photo of crime scene (9/25/85) |
| Number 43 | 117 | Aerial Photo of crime scene (9/25/85) |
| Number 44 | 117 | Aerial Photo of crime scene (9/25/85) |
| Number 45 | 117 | Aerial Photo of crime scene (9/25/85) |
| Number 46 | 117 | Aerial Photo of crime scene (9/25/85) |
| Number 47 | 117 | Stick/Broom Handle |
| Number 48 | 117 | Raymond Fife's shorts (9/13/85) |
| Number 49A | 151 | Dental impressions/ castings of the mouth of Danny Lee Hill |

INDENT OF EXHIBITS (Volume #1) Cont.:

| State's Exhibits: | Marked: | Description: |
|---|---|---|
| Number 49B | 151 | Dental impressions/ castings of the mouth of Tim Combs |
| Number 50 | 117 | Burnt charcoal lighter fluid container |
| Number 51 | 117 | Search Warrant (Tim Combs blood samples) |
| Number 52 | 117 | Tim Combs' sock |
| Number 53 | 117 | Rag Raymond Fife's father used to wipe Raymond's mouth at the crime scene |
| Number 54 | 117 | Original videotape of Danny Lee Hill taken 9/16/85 |
| Number 55 | 137 | Charcoal lighter fluid plastic bottle pur- chased by Detective Teeple at Valu-King |
| Number 56 | 169 | Coroner's Verdict |
| Number 57 | 199 | Rights Sheet of 9/16/ 85, 1155 hours |
| Number 58 | 199 | Rights Sheet of 9/16/ 85, with the additional language |
| Number 59 | 199 | Rights Sheet of 9/13/ 85, 1010 hours |
| Number 60 | 199 | Voluntary Statement of Danny Lee Hill given to Sergeant Steinbeck 9/13/85 |
| Number 61 | 223 | Cassette recording of statement by Danny Lee Hill 9/16/85 |

Tuesday, January 21, 1986, at 10:20 A.M.   6

JUDGE McLAIN:  All right.  Gentlemen,

we're now ready for opening statements.  Mr. Watkins,

is the State prepared at this time to go forward?

ATTORNEY DENNIS WATKINS:  Yes, Your Honor.

JUDGE McLAIN:  Mr. Lewis?

ATTORNEY JAMES F. LEWIS:  Yes, Your

Honor.

JUDGE McLAIN:  You may begin.

ATTORNEY LEWIS:  Your Honor, at this

juncture, we'd like to make a motion for a separa-

tion of the witnesses in regard to this particular

case.  Any and all people who are going to testify.

JUDGE McLAIN:  Any persons who are pre-

sent in this Courtroom who expect to be witnesses

or even think they might be, until they've talked

to the lawyer in question, they should now remove

themselves from the Courtroom and remain in the

outer hall until called.  That'll be a continuing

order, gentlemen.  I expect you to keep track of

your own witnesses.

ATTORNEY WATKINS:  May it please the

Court.  As the Court is aware, I do have a cold,

so I may -- at times, may have to interrupt myself.

I apologize for any interruption that may occur.

1   I know that as prosecuting attorney, I've

2   been before all three of you in other cases, and

3   this is the second occasion that I have had the op-

4   portunity of giving an opening statement to judges

5   collectively.  Because of my habit, I sometimes will

6   speak the way I would speak to a jury, and I know

7   that the Court knows the law and instructs all

8   lawyers as to the law, and as I go through this

9   opening statement, I think that the Court appreciates,

10  being trained to try jury cases before juries, that

11  you're going to go through the case in a similar

12  fashion, and I intend to do that and still go

13  through the law which I know the Court instructs us

14  as attorneys on.

15  This case comes to the Court because of

16  an indictment against the defendant, Danny Lee Hill.

17  The defendant, as charged in the indictment, has

18  been charged with six counts; the first count of

19  which is Aggravated Murder with four specifications.

20  The State must prove all elements beyond reasonable

21  doubt under the law and the evidence in this parti-

22  cular case.  The State will prove beyond all rea-

23  sonable doubt the case against Danny Lee Hill.  The

24  State will prove this case by way of direct, cir-

25  cumstantial, and physical evidence that provides a

OPENING STATEMENTS

circumstantial basis that the defendant, on or
about September 10th, 1985, was part of a planned,
a systematic annihilation of a young 12-year old
boy in the community.  This case must be one where
the evidence will show the Court; the Judges, that
there was a specific purpose to kill and the
specifications.  The State must show prior calcula-
tion and design if one or more of the specifica-
tions involve the defendant acting as an aider and
abetter.

Like all cases that Court and juries re-
construct, we can't play it on videotape.  The
State submits that this is a classic case of a con-
spiracy of a joint criminal enterprise by two indi-
viduals.  That only two individuals took part in
that conspiracy in that enterprise, and that the
third person who was a part and a witness to that
conspiracy is dead.  By way of reconstruction, we
will show that by way of the duration of the insti-
tution of physical/sexual abuse on Raymond Fife that
day, that you will find by the evidence prior cal-
culation and design.  That the evidence will show
by way of different repeated, constant acts of
violence against the Fife boy, you will find prior
calculation and design.  That is, this case will in-

OPENING STATEMENTS

volve a time span that goes well beyond what the

law requires to show prior calculation and design.

It will also show a multiplicity of acts that go

well beyond under the law that's necessary to show

prior calculation and design, and the facts will

show beyond any reasonable doubt that from beginning

to end, Danny Lee Hill was a participant in the an-

nihilation of Raymond Fife.  A key -- and I think

an important element of the specification and the

separate charge of kidnapping -- and, in fact, it's

one of the elements that's involved in felony mur-

der, the indictment charges the defendant purposely

caused the death of Raymond Fife while in the com-

mission of kidnapping and rape.  In particular, we

submit the evidence will show that the purpose of

the kidnapping was to terrorize and inflict serious

physical harm and death on the young 12-year old

boy, and evidence will show that the little boy

weighed approximately 85 pounds.

Now, we have evidence where the defendant

came to the police station and gave a statement and

ultimately gave statements on September 16th, 1985,

wherein he admitted that he was there from beginning

to end, and I submit -- and this is one thing that

this Court has the privilege of having in getting

OPENING STATEMENTS

1    evidence for any case, we have a videotape of the

2    defendant going through the crime against young

3    Raymond Fife.  He was under oath at that time when

4    he made this statement.  The Court will be able to

5    judge things that ordinarily can't be judged; the

6    reasonableness of his story, the voice tone that

7    he gives, how he appeared when he told this particu-

8    lar story, and we submit many contradictions that

9    are inherently inconsistent.  We believe that the

10   statements of the defendant alone in reconstructing

11   the particular crimes, that one would find that the

12   defendant himself admits to being an aider and

13   abetter; an accomplice in the crimes charged.  In

14   particular, when the systematic destruction of this

15   young man takes place, the defendant, towards the

16   end, in the multiple acts of brutality that the

17   evidence will show, stays with Raymond Fife while

18   his accomplice, Timothy Combs, goes to the Valu-King

19   Store -- in the area of the Valu-King Store and gets

20   charcoal lighter fluid to pour on the face of this

21   helpless and semi-conscious or unconscious young

22   man.  He stays there as the lookout in the final

23   acts perpetrated against the young man.  That's

24   what he admits.

25        Further, importantly, in judging the video-

OPENING STATEMENTS

1    taped statement, admissions made by the defendant,

2    the cassette recording and other statements, there

3    is something very important about the police work

4    in this case.  The details were not released to the

5    public at large, and in any criminal case when you

6    have a person telling he did something, that he was

7    there, he was involved, when he can tell things

8    about the crime that nobody but the actual killer

9    or killers could know, that kind of evidence, we

10   would submit, is compelling.  For example, when

11   Danny Lee Hill told police officers the afternoon

12   of September 16th, 1985, in response to a question

13   about was anything used on the little boy's rear

14   end, Danny Hill describes the stick that was used

15   to invade his private part, and, in fact, the evi-

16   dence will show, perforate his urinary bladder.

17   Danny Hill knew about the noose; his underpants,

18   that evidence will show was used to strangle this

19   young man.  Danny Hill told about the burning.  All

20   this information, Your Honors, was not known to the

21   public.  His rendition is such that just listening

22   to the tape and knowing some of the physical facts,

23   without any question, we submit the State will show

24   complicity.  And, as the law provides, a person,

25   whether he be a principal or an aider or abetter, is

OPENING STATEMENTS

just as guilty.  The only exception here is we must

show prior calculation and design as to the speci-

fications.  We will show prior calculation and de-

sign on all the charges, and we will show that there

were two principal offenders in this particular case;

the defendant and co-defendant Timothy Combs.

I would like in a nutshell to go through

the evidence; the State's view of the evidence:

On or about September 10th, 1985, Raymond

Fife, a 12-year old boy at West Junior High School

in the City of Warren, went to school that day,

came home, had supper.  He lived on Austin Avenue,

S.W.; southwest side of town.  That night at 6:30,

he being a scoutmaster, was to go to the Boy Scouts,

Second Christian Church, west side of Warren.  How-

ever, before going to the Boy Scouts, he was going

over to his friend's house, Billy Simmons, who lives

on Willow, S.W., which is near the Valu-King Store

on Palmyra Road in southwest Warren.  His mother

will testify that approximately 5:15 P.M., young

Raymond Fife left the home to go over to his

friend's house before going to Boy Scouts.  He was

going to help his friend work on a bike.  Normally,

his habit was -- Raymond's habit was -- is to leave

the house and ride a bicycle over to the house.

OPENING STATEMENTS

1          This map does not contain all of the

2    streets involved.  Evidence will show it takes ap-

3    proximately six to seven minutes to ride a bike

4    from Austin over to Willow Drive.  It's the fourth

5    house going west from Hemlock.  The Simmons' resi-

6    dence.  Young Billy Simmons, his friend, will say

7    that many times, he and Raymond ride their bikes

8    on Willow to a dead end which is a dead end street

9    near Hemlock, and as you go east, you go into a

10   field where there are paths.  These paths have been

11   used by dirt bikes.  It's a wooded area.  And then

12   there's some open field, but it's very dense.

13   It's important that -- and I know the Court has

14   gone for a view, that at that particular time,

15   there was heavy growth.  It was very difficult to

16   see any length of distance because of heavy growth

17   of not only trees, but the high underbrush.  But

18   normally, the route would be they would ride their

19   bikes to or from the Fife residence.

20          Obviously, leaving the Simmons' residence,

21   he would ride the bike to the dead end section,

22   proceed on a path that goes towards the Valu-King

23   Store and ride either behind the Valu-King or near

24   the path here (indicating on map) which leads to

25   a -- used to be a road.  It's a dead end.  And ride

OPENING STATEMENTS

1   to Jackson Street down to Austin.  That was the

2   usual route that they would ride.  Obviously, we

3   do not know because nobody was with Raymond exactly

4   what route he took.  We do know, however, that

5   there's only two streets that you really deal with

6   riding a bike to get to this particular area.

7   It's Jackson Street and Palmyra Road as you travel

8   west -- or southwest.  In fact, Palmyra Road is a

9   little bit closer.  Usually, there is much more

10   traffic on Palmyra Road, but in any event, we have

11   Raymond, at 5:15, 17, going to the residence of

12   Billy Simmons which is a six or seven-minute bike

13   ride.

14          In reconstructing the events, we do know

15   one thing for sure; that the Fife boy, Raymond,

16   was seen riding in the -- towards the Valu-King

17   going west by a witness.  That witness will testify.

18   His name is Matthew Hunter.  Matthew Hunter, the

19   young boy who went from Jackson Street -- we don't

20   have all the paths marked.  There are several,

21   but he went from Jackson Street near Hemlock Ave-

22   nue.  That side, there was a path all the way down

23   to the Valu-King.  With his brother and a sister

24   and was going to the store to get some milk and

25   food for his mother.  He doesn't recall exactly

OPENING STATEMENTS

1    the time.  He wasn't paying attention.  But between

2    5:00 and 5:30, they were going to the store.  When

3    they were going into the store -- Matthew will tell

4    the story, that he saw two persons by the Laundro-

5    mat; the defendant and Tim Combs.  Matthew Hunter

6    knew them, so there was no question as to recogni-

7    tion.  He knew both of those persons.  Coming out

8    of the store, they proceed to go home a different

9    route towards Jackson Street going north.  That is,

10   the Valu-King Store, has a record store, a grocery

11   store, and then there's a Laundromat towards the

12   east end.  This is the area that Combs and the de-

13   fendant were at.  They go in several minutes to buy

14   the groceries.  They come out.  Two persons are

15   together still there; the defendant and Combs.  In

16   fact, I believe that more or less, Combs acknow-

17   ledged; you know, what's up, something to Matthew.

18   At that same time, they saw Raymond riding his bike

19   in the Valu-King parking lot.  At that time, we

20   would submit -- which would be somewhere in the

21   vicinity of 5:20 to 5:30, we have Raymond Fife in

22   the Valu-King on a bike and we have this defendant

23   and his friend, the evidence will show, Timothy

24   Combs, together.

25            The defendant will tell you by way of his

OPENING STATEMENTS

1    taped statement that it was Timmy's idea to rob the      16

2    little boy of his bike and that he wasn't going to

3    get into any trouble, so he wasn't going to have

4    anything to do with it.  However, the defendant ad-

5    mits that he and Timmy went behind the store and

6    attacked and seized the little boy.  I'm trying to

7    keep in chronological order.  I'm going to skip

8    ahead a little bit and note a fact.  That the de-

9    fendant, after his statements, took police officers

10   to the scene, and he showed one of them -- and

11   there's some photographs of this where he was

12   pointing to places that he had been.  He took them

13   to the place on the path where the little boy was

14   seized and the bike was thrown.  Danny Hill also led

15   the police officers to where the little boy was

16   finally left.  We submit the evidence will show be-

17   yond a reasonable doubt that there was a taking of

18   this little boy; there was a hiding of this little

19   boy in order to perpetuate sexual acts against him,

20   and with the time period and the purpose, that kid-

21   napping is shown by way of much evidence, especially

22   the duration of the holding, and we submit, torture

23   that was perpetuated.

24           Now, we know that we have the Fife boy

25   riding his bike.  We know that he was seized on the

1    path -- and I think this makes sense.  The evidence

2    will show that it's so thick here that a little boy

3    wouldn't be walking in a field -- he couldn't even

4    carry -- he'd have to put his bike over his head

5    to carry so the -- on the path.

6         Now, "A" is where the bike was found.

7    That's approximately 72 feet from the path.  At

8    5:25 or so, we have the defendant and Combs taking

9    Raymond.  In fact, the defendant describes how he

10   slammed him down on his head, and a lot of things

11   the defendant describes, we'll show happened by way

12   of medical evidence.

13        We have two people together.  We have a

14   little boy taken.  We have two people that next be-

15   come witnesses in this scenario; Darren Ball and

16   Troy Cree, who are students at Western Reserve; were

17   coming from football practice going home, and they

18   say it's approximately 5:30 to 20 to 6:00 that they

19   are walking Hemlock to the dead end section of

20   Willow on the same path that the little boy was

21   seized.  They will tell you -- in fact, Darren Ball

22   knew Tim Combs, and they will tell you that one of

23   the reasons they hurried to walk up because they

24   saw Tim Combs.  They saw Tim Combs right at the

25   bend in the path right behind the Valu-King Store

OPENING STATEMENTS

1  sort of in between Willow and the Valu-King, but

2  more towards the Valu-King. And as they walked

3  around 20 to 6:00, they notice Tim Combs standing

4  on the path by himself. They will also testify

5  that they walk from Willow on the path at this par-

6  ticular period of time and to -- by the Valu-King,

7  home, and they never saw a little boy on a bike, and

8  we know cause Billy will testify, Simmons, that he

9  didn't make it to Willow. As they walk by, Darren

10  Ball will say as he's walking by and he comes up

11  to the concrete behind the Valu-King a few yards

12  by Tim Combs, he hears a little boy scream over

13  his right shoulder. He hears a scream of a young

14  boy. He will say white boy. He's black. He is

15  walking south from this point (indicating on map),

16  and approximately 15, 20 seconds pass, no more than

17  a minute, he hears a scream over his right shoulder

18  in this area (indicating on map) right where the

19  bike was found. Did not see a boy. We will submit

20  that there is an inference that Tim Combs was on the

21  path, and he was on the path, the boys will tell

22  you, with shorts, but he was wearing pants according

23  to other witnesses. We submit that Dan Hill at that

24  time was holding down Fife. Dan Hill admitted that

25  the hand -- the clothing was used over the mouth of

OPENING STATEMENTS

19

the young Fife boy to keep him quiet.  Dan Hill in
his statement said that that's what Tim Combs did.
That's approximately 20 to 6:00.  We know for sure
that at 5:15, that the boy leaves home.  He is not
found until somewhere around 9:30 that night.  The
defendant says that he was with his buddy for three
hours.  We don't believe it was three hours long.
We do believe the evidence would best reconstruct
that somewhere in the vicinity of a half an hour
to 45, 50 minutes because the next witness would
suggest that's the better case of facts in this
matter.

We have at a time period between 5:30 and
6:00 P.M., a ninth grade, tenth grade student from
Warren Western Reserve who was walking -- well, he
lives off of Kenwood.  We have Kenwood, Cranwood,
and Willow.  They run east and west.  He was
walking from his house, which is on the far west
side of Kenwood, to Hemlock towards Willow with his
girlfriend.  Gone to school that day, came home.
He may have had football practice, I don't remember,
but he does recall that somewhere around 5:15 or so,
he took the walk from his house with his girlfriend.
He walked some 15 minutes or so.  He's not sure of
the time, but he says that somewhere between 5:30

OPENING STATEMENTS

20

1    and 6:00, that he ends up on the corner, which is

2    "D" on the diagram here, and as he's walking, he

3    sees four individuals leaving the wooded area going

4    west on Willow Drive coming out of the woods.  Donald

5    Allgood will tell you that Timmy Combs and Danny

6    Hill were leading the way out of the woods.  Allgood

7    knew Tim Combs, knew him by name.  He also knew

8    two of the other individuals by name.  He said Tim

9    Combs was pulling his zipper up.  He also saw some-

10   thing that's very important.  He saw the defendant

11   throw a stick or some object in the woods.  The de-

12   fendant throwing a stick.  The defendant will tell

13   this Court by way of his statements that he didn't

14   leave after the crime with Tim Combs.  That he never

15   had his hands on the stick which he described, and

16   that, in fact, Timmy Combs was running way ahead of

17   him when they left that crime scene.

18            On September 14th, which was a Saturday

19   -- Friday before that, the -- Allgood tells the

20   police about what he saw.  He's brought down to the

21   police station and he makes a prior identification;

22   picks out the picture of the defendant, saying he

23   was the man that was with Tim Combs that threw some-

24   thing in the woods which could have been a stick.

25   On Sunday the 15th, police officers return with

OPENING STATEMENTS

21

Donald Allgood and they go right back -- and this
is the point in time where he tells about did you
see Danny Hill.  He says yeah, he threw something
which he thought was a stick.  The stick is some-
thing around 18 inches long.  It's a broom handle
or a shovel handle that's been broken off.  It's
jagged at one end.  He didn't -- Donald Allgood
didn't get a good look at it.  He just said he
threw something on his right as he's walking out of
the woods like that (demonstrating).

The Warren Police Officers, the next day,
come back and they cut down the thick woods and
brush that's really high.  Jaggers and weeds.
That's cut down so they can go in there and look.
And approximately six feet off the path, 19 feet
from the road, they find a stick.  This stick,
which was taken by Officer -- or Detective Teeple,
was a stick that was not covered with weeds, not im-
planted in the dirt.  It was loosely on the ground.
It was taken at that particular time.  It was sub-
mitted to the lab for blood, and the lab did not
find any blood.  In fact, there is no evidence of
blood in this case, and we feel that it's reasonably
explained.  When I say there is no evidence of
blood, I'm not talking about -- there is a lot of

OPENING STATEMENTS

evidence concerning blood, but there is no blood

test with any object on it that has the defendant

or co-defendant's blood on it.  That's what I was

referring to.  We do have bloody evidence when Ray-

mond was beaten and brutalized.  It started to

rain.  It poured.  In fact, the defendant describes

how a lot of blood -- because of the perforation of

his rectum, he bled anally.  He was beaten severely

on the face.  There was a lot of blood, but the

police, when they came the next day, didn't find

blood.  The rain had washed it away.  That stick

was taken and finally, it was taken to St. Joseph's

Hospital, given to Doctor Adelman.  But I better go

back and show how the stick comes in play, but be-

fore I do that, I want to come up to the point in

time where we have, on the 10th day of September,

these witnesses reconstructing the event.  These

facts known by the police.  But prior to the time

that we have some of the evidence recovered, we

have the defendant, interestingly on September 12th,

a Thursday, going to the police department.

On September 12th, evidence will show the

defendant went to the police department around 7:30

and asked for Morris Hill -- or -- he finally did

see Tom Stewart, and he told him about other people

OPENING STATEMENTS

such as Maurice Lowry who had the bike, and that he 23
was giving information about the crime, about these
other people's involvement.  There's one particular
fact that he told that Thursday that lit up the
chimes for the police officers.  He talked about
the undergarment being used to strangle the Fife
boy.  That led to a second day where he came to the
police station, gave another statement denying his
involvement in the crime.  On Monday, he came down
and then admitted and went into details about the
crime.  He says that Tim Combs did everything.  He
was just there.  He watched while Timmy would leave
at least on one occasion.  He said the he didn't have
any stick, but because he mentioned the stick, it
was plain that that was very important.  You will see
that he talks about how the stick was thrown away
at "E", which is the field where the young boy was
found.  That contradicts what Donald Allgood says.
He also, for the first time, talks about the char-
coal lighter fluid, and that led police officers
back on the scene, and they found a container; a
white container, near the path that was lit and
burned up.  A lot of the evidence, what I'm trying
to say, was learned from Dan Hill on the 16th and
was recovered on the 16th because it wasn't known at

OPENING STATEMENTS

the time, and it was found. Following the discovery

of the crime -- and I think this is where I want to

go into some of the physical evidence. I jumped

a little bit ahead. I'm not trying to be disjointed,

but it's difficult.

JUDGE McLAIN: Mr. Watkins, I think we'll

take one break between now and noon. Is this a

good, logical place within your own argument?

ATTORNEY WATKINS: I think so.

JUDGE McLAIN: All right. Ladies and

Gentlemen, we'll stand in recess for approximately

10 minutes. I should advise you -- I don't think

I said this before, but do not attempt to talk to

the lawyers or any witnesses or attempt to make your

feelings known about this matter to them. As I

indicated before, it's not a question of one being

on one side, one on another. So, stand in recess

for 10 minutes.

(Court in recess at 11:03 A.M.)

(Back in session at 11:15 A.M.)

ATTORNEY WATKINS: Thank you, Your Honor.

Thank you for the break. I should say Your Honors.

Slip of the tongue.

I have tried to put in order some of the

main witnesses on the day in question, September

OPENING STATEMENTS

10th, 1985, where the State has alleged that Danny
Hill committed Aggravated Murder in Warren, Ohio,
Trumbull County.  What I haven't talked about and I
want to go through in detail, young Raymond Fife's
discovery, his injuries because some of those in-
juries are probative of the guilt of the accused.

We know somewhere in the vicinity of 9:30
that day, that Raymond was discovered by his father
unconscious and nude in the field behind the Valu-
King, which is designated as "E".  One of the wit-
nesses, Raleigh Hughes, will tell about the heroic
efforts that were made in trying to save the young
man who lived 42 hours, but to no avail.  He was
taken to the hospital.  St. Joseph's medical records
will be submitted along with the testimony of Doctor
Sudimak, Doctor Adelman, the pathologist at the
hospital, that will show beyond a reasonable doubt
this is a homicide.

The body was nude except Raymond had his
socks on.  That was not a public fact.  That was a
fact that Dan Hill gave in his statement.  He knew
he only had his socks on because he was a part of
it.  Young Raymond, when he went to the hospital,
had a severely beaten face.  Evidence will show
that he had hematomas on the right and left side of

OPENING STATEMENTS

26

his skull.  Left side in particular was severely
hemorrhaging.  Dan Hill will tell you that he was
slammed on the ground and he was punched in the
head.  Dan Hill said Timmy did everything.  The
young boy had burns on his face, on his shoulders,
his neck.  Again, Danny Hill will tell you about
how that happened.

As we go down the body, we go to his neck
and the ligature mark that's distinctly there as
seen in the photographs and in the protocol of the
autopsy that resulted in the strangulation which
caused -- or was one of the causes of his death.
The coroner will tell you that this death was caused
by multiple injuries, many of which could indepen-
dently have caused his death.  Dan Hill will tell
you about the undergarments, his shorts, that were
used to strangle him.

As we go down, we come to the rectum,
the scrotum and penis of the young man, and at the
hospital, the doctor will tell you that the rectum
was severely dilated from penetration.  Dan Hill
will tell you that he was there when anal sex oc-
curred more than once.  Tim Combs did it all.  Dan
Hill also described the stick that I've told you
about that was found that he threw that he said he

OPENING STATEMENTS

had no part of.  That stick, as Dan Hill describes it, as being rammed in the rear end of the young man, was described with particular detail by Dan Hill like a broom handle.  He said it was rigid while one end is jagged.  This is an important piece of evidence.

We submit the evidence will show that stick was taken to Doctor Howard Adelman who is a forensic pathologist who has a great deal of experience in reconstructing the traumas that occur in homicide.  He used to be with the New York Medical Examiners Office.  Dan Hill describes how that stick was rammed in that little boy, and when you look at -- and you look at the photographs, one wouldn't know that because -- you would see lacerations, but how would you know -- the doctors couldn't know how far the penetration was, but once the autopsy occurs, we know.

Doctor Adelman, on the 13th of September, performed the autopsy, and as he did his job, he came to the discovery of why there was so much blood loss rectally because not only was his anus intruded, his rectum intruded, but his urinary bladder was perforated, and he noticed that there were distinctive markings the way the tissue was

OPENING STATEMENTS

1    lacerated, suggesting to him a stick or something

2    with a sharp edge.  Pathologist kept part of the

3    rectal area in order that a comparison could be

4    made if some object would be found.  There was

5    also on the rectal area, a second visible -- excuse

6    me, visible intrusion -- or mark, and it suggested

7    that the stick could have been used by both ends

8    because there was like a blunt mark and there's

9    this jagged urinary wall intrusion of the tissue.

10   That was kept.  The stick that was found on the

11   16th was given to Doctor Adelman.  The doctor will

12   say that in his opinion, the stick and the jagged

13   edge and the way it went in the organ and the mark

14   it left, is entirely consistent with the stick that

15   was recovered by Hemlock that was seen thrown by

16   Dan Hill.

17            Further examination was made and evidence

18   will come in by way of pathology testimony.  The

19   stick, which is made of wood, when it was intruded

20   into the organs of Raymond, left splinters in the

21   rectum, and through microscopic comparisons -- you

22   will see slides.  The rectum -- of the stick in

23   the honeycomb shape of the wood fillings on that

24   stick with the ones that were found in the rectum

25   of the little boy.  We submit that the stick that

OPENING STATEMENTS

29

1   Dan Hill had was the stick used on the little boy.

2   The testimony particularly of Dan Hill describing

3   the stick and talking about how he never touched

4   it and emphasized how he never had this stick in

5   his testimony by way of videotape and how he talked

6   about -- I think at one point in the tape -- well,

7   Tim just threw it behind him.  We submit that Dan

8   Hill clearly from the evidence would have been the

9   person that had the stick.

10       Like all homicides, we don't have a live

11   witness to show every single act that was perpe-

12   trated, and when you have two people -- and I submit

13   from listening to Dan Hill giving how Tim Combs did

14   it, he can't remember exactly what happened because

15   there were so many things done, it might be im-

16   possible to remember in order all the things that

17   were done to this little boy over a half an hour,

18   45 minutes.  Virtually, there is not an area on

19   that body that didn't have an abrasion or some type

20   of injury.

21       I neglected, Your Honors -- this is

22   another independent cause that could have been --

23   the pelvic area and abdominal area was severely

24   bruised and hematoma was present in that area and

25   severe enough that Doctor Adelman could tell you

OPENING STATEMENTS

3

that that could have killed him by itself.  And there were no -- there was no evidence of any knife, any blunt object other than what was used in the rectum, and that is totally consistent with Dan Hill's version of how he was stomped on, punched and slammed about and brutalized.

Doctor Adelman, on the 13th, also saw something else.  He saw on the little boy's penis human bite marks.  Doctor had enough experience that he could recognize, even though he's not an odontologist, bite marks.  He also saw that the scrotum was bruised and it was stretched.  Dan Hill, he'll tell you on his tape of how -- how Tim Combs was pulling on his penis and pulling it off.  Doctor Adelman, when he saw the bite marks, felt there should be follow up work done.  He knew of a forensic odontologist who was nearby by the name of Doctor Curtis Mertz, who is one of the founders of The American Association of Forensic Odontologists, and Doctor Mertz came down with his camera on that Friday to collect evidence, if any could be collected, concerning the bite marks.

Evidence will show that in odontology, that teeth, like fingerprints in a way, leave identifying characteristics which can be compared

OPENING STATEMENTS

1    between human beings.  Doctor Mertz came down and                    31

2    photographed and inspected the bite marks.  Doctor

3    Adelman also took photographs.  As a result of

4    doing that, he suggested to the authorities that he

5    would need evidence to compare bite marks.  Pursuant

6    to that end, the Warren Police Department got search

7    warrants on the 19th day of September for impressions

8    -- dental impressions of the teeth of Dan Hill and

9    Timothy Combs.  Doctor Walton, local doctor in

10   Howland, was available to take those impressions of

11   the teeth of Dan Hill and Timothy Combs.  On or

12   about the 19th day of September, the defendants were

13   taken to the Howland doctor's office to get teeth

14   impressions.  That was done.  Those impressions

15   were given to Doctor Mertz along with photographs

16   of the penis that was magnified one to one, dif-

17   ferent angles, colors, blacks and whites.  Doctor

18   Mertz will tell this Court that in his opinion,

19   with reasonable medical and dental certainty, that

20   the teeth marks on the private part of Raymond Fife

21   were made by Danny Hill, and he will tell you that

22   there's only one way you get teeth marks on a pri-

23   vate part, and that is by way of fellatio, which is

24   a crime of rape in and of itself.

25        Danny Hill has a diastema, a gap between

OPENING STATEMENTS

his teeth.  That's 5% of the population.  His co-
defendant also has diastema, but Danny Hill has
something else.  He has a rotated tooth and a
chipped tooth which is sufficient enough for Doctor
Mertz to come to the conclusion that Danny Hill's
teeth marks are on that young man's penis.  Danny
Hill will tell you that he didn't -- yeah, he will
tell you that he did touch the boy once at the end
to see if he was dead, but he will tell you that
Tim Combs was the only one that was down there by
the young man's penis, but he says he doesn't know
if Tim Combs bit him.  All these things, all these
multiple injuries, I would submit, can make no
better case for premeditated acts of murder.  I
can't think of a better case where -- where persons
would commit such a series of events over such a
long period of time where you have the qualitative
evidence of premeditation.  We feel that you will
find those facts to be true and you will find pre-
meditation on the part of this defendant in all the
crimes charged.

Going on, the defendant, by admitting
the crime or crimes taking place by being present
during the commission or perpetration of all the
crimes, puts in issue his mental state.  Because

OPENING STATEMENTS

-- that's important.  The State is seeking a death
penalty in this case, and his mental state is im-
portant.  It's important no matter what.  It doesn't
matter.  With the death penalty case -- but because
of the death penalty case, it requires the Court to
consider that very carefully, and I'm sure this
body of judges will do so.

    We have victims of prior --

    ATTORNEY LEWIS:  For the record, at this
time, I'd like to object to the statement to the
Court in regard to what Mr. Watkins is going to talk
in regard to the collateral act, just for record
purposes.

    JUDGE McLAIN:  That objection is overruled.
If later on in the trial, the evidence should prove
inadmissible for some reason, it will not be con-
sidered by the panel.  Go ahead.  And that's true
of everything that's said in opening statement.

    ATTORNEY WATKINS:  Thank you, Your Honor.
Dan Hill, the guy who will tell you I never in-
tended to do anything to the rear end of Raymond
Fife; he did it all; that is, Timmy Combs, on two
prior occasions, raped young women in the same
wooded area or in a house nearby the year before.
Those prior acts, one of which lasted one and one

OPENING STATEMENTS

half hours, showed -- or will show or tend to prove 34

the specific premeditated intent of this defendant

in the torture/murder of Raymond Fife, and also will

show his identity.  Under 2945.59, other criminal

acts may be used if they tend to prove a question

in issue.  Mr. Hill's issue put in question is his

intent and his identity by way of his statement.

These victims will testify and identify the defen-

dant's propensity.  The one victim in particular was

penetrated twice in the anus, was bitten on her

breast, and was threatened with a knife to be shoved

up her rear end if she didn't cooperate.  We submit

that the characteristics of this defendant are so

unique that you seldom have people that do these

things, that it's relevant and probative of this

man's identity and intent to commit the crimes in

question.

Lastly, the State will have one witness

that saw Dan Hill on Wednesday and Thursday fol-

lowing the beating of Raymond Fife.  That witness,

his brother, Raymond Vaughn, will tell this Court

that he saw Dan Hill on Wednesday and Thursday on

his knees in the bathroom washing blood -- that

appeared to be blood in his mind, being washed out

of the pants -- the grey pants that this defendant

OPENING STATEMENTS

said he was wearing on the day in question and who

-- other witnesses will identify as being worn. In

fact, those grey pants were seized by the Warren

Police Department on September 16th, and when they

took them from his mother's house that Raymond

Vaughn, his brother, was living with him, they were

the only clean pair of pants in the house that was

owned by Danny Hill.

Your Honors, in a long narrative, I've

tried to outline what we believe the evidence will

show, and it is our belief that with proof beyond

a reasonable doubt, we will show that all the charges

that stand against this defendant will be established.

Thank you.

JUDGE McLAIN: Mr. Lewis.

ATTORNEY LEWIS: Your Honors, Judge

McLain, Judge Shaker, and Judge Nader. Mr.

Watkins --

JUDGE McLAIN: Do you want to use this

map?

ATTORNEY LEWIS: No, that's all right,

Your Honor. Walter, you can move that away. I'm

not going to take a lot of time going through the

scenario of the facts of this case.

Mr. Watkins has given you what his

3

opening statement is supposed to be, the preview

of the case, or at least what the State intends

to prove during the course of the case through

various witnesses and particular exhibits it may

introduce. I note that there is no question that

this is a very unpleasant case. The circumstances

and facts of it are -- easily can arouse the pas-

sions and emotions of anybody, let alone three

judges, the general public as well.

I noted one thing during the course of

opening statement; that some notes were being made

by Your Honors, and I would caution against the

idea that -- and I know you're well aware of it,

is that when they say -- say -- for instance, to

give you an example, they said Mr. Allgood saw the

stick thrown away by Mr. Hill, and I notice the

prosecutor backed up a little bit and said well,

something was thrown away, whatever the case may

be. When you have in mind -- or at least the focus

now is on Danny Hill. He's given you the best evi-

dence he expects to prove, and he's already drawn

the focus on it. Sometimes when you listen and

you've heard that before and you hear the testimony

of that particular witness come on, you just tend

to want to hear or you might be looking for that

OPENING STATEMENTS

37

1    one particular piece that will fit into what the

2    prosecutor says.  I think there's something very

3    important about this case, and I know Your Honors

4    will abide by this, is that we have a presumption

5    of innocence here.  There has been no evidence pro-

6    duced whatsoever, okay!  I would like -- and the

7    reason we picked -- or one of the reasons we chose

8    to have the three judges is that you would be able

9    to keep cool heads and listen to the evidence, all

10   of the evidence because the truth is in that evi-

11   dence.  He sees it one way, the defense sees it

12   another way, but the truth is in that particular

13   evidence.  There are a lot of inconsistencies which

14   he's already brought up in regard to possible a

15   stick.  There was no blood found on the stick and

16   so forth after examination.  Very crucial point.

17   There's a lot of points to be made in this particular

18   case, and I don't think by opening statement, I'm

19   going to run through the scenario.  I think it's

20   easier just to put the evidence on, save the points

21   until final argument, then you'll have heard the

22   evidence, know what's been presented, etcetera, then

23   we can legitimately comment on.  At this juncture,

24   Your Honors, that's it.

25          JUDGE McLAIN:  Mr. Watkins.


          OPENING STATEMENTS

38

1           ATTORNEY WATKINS:  Yeah, I would like two

2    minutes to bring a witness.

3           COURT:  Very well.

4           ATTORNEY WATKINS:  Your Honor, we would

5    call Raymond Vaughn to the witness stand.

6

7           RAYMOND L. VAUGHN

8  being duly sworn, according to law, on his oath, testified,

9  as follows:

10  DIRECT EXAMINATION BY ATTORNEY WATKINS:

11  Q    Raymond, would you give your full name and tell the

12        Court who you are please.

13  A    Raymond Lamont Vaughn.

14  Q    And how old are you, Raymond?

15  A    17.

16  Q    And where do you live?

17  A    1894 Fifth -- 895 Fourth Street.

18  Q    Okay.  You did live on Fifth Street, right?

19  A    Yeah.  What?

20  Q    You lived on Fifth Street before, right?

21  A    Right.

22  Q    Okay.  Just take your time.  You're the brother of Danny

23        Lee Hill?

24  A    Right.

25  Q    And do you see your brother here?

RAYMOND L. VAUGHN

3

1   A    Yeah.

2   Q    And would you point him out, please.

3   A    Right there (indicating).

4                    ATTORNEY WATKINS:   Record reflect he has

5            pointed out the defendant?

6                    JUDGE McLAIN:   Yes, it may so reflect.

7   Q    (By Attorney Watkins)   Raymond, how -- what grade are you

8            in in high school?

9   A    Eleventh.

10  Q    And did you live some time ago in September on -- at a

11           different address?

12  A    Yes.

13  Q    Where did you live?

14  A    1394 Fifth Street.

15  Q    And who lived there?

16  A    My mother.

17  Q    And who else?

18  A    And my two brothers.

19  Q    Including Danny?

20  A    Right.

21  Q    Okay.   And do you recall hearing about a little boy that

22           was beaten and murdered?

23  A    Yes.

24  Q    And do you recall after that -- hearing about that,

25           seeing your brother at home any particular time?

RAYMOND L. VAUGHN

4

1   A   No.

2   Q   Do you remember on September 10th, 1985, a Tuesday,

3       whether or not you were living on Fifth Street at

4       that time you were living --

5   A   Yes.

6   Q   Okay.  And was Danny there at that time?

7   A   Yes.

8   Q   And did you see anything on that Tuesday that belonged to

9       Danny?  Clothing?

10  A   I seen him washing his pants.

11  Q   Okay.  What day did you see him washing his pants?

12  A   That Tuesday night.

13  Q   Okay.  Did you see him wash them any other night?

14  A   Tuesday, Wednesday, and Thursday.

15  Q   He washed those pants three days in a row?

16  A   Right.

17  Q   And what color were the pants?

18  A   They was gray.

19                          (State's Exhibit No. 1 marked
                             for identification.)
20

21  Q   (By Attorney Watkins)  You were shown these before, were

22      you not?

23  A   Right.

24  Q   And that's been marked as Exhibit Number 1.  Would you

25      tell the Court whether or not you recognize those.


                        RAYMOND L. VAUGHN

4

1    A    Yeah, I do.

2    Q    And what are they?  What is that?

3    A    His gray pants.

4    Q    His gray pants (indicating to the defendant)?

5    A    Right.

6    Q    Okay.  Were these the pants that were being washed --

7    A    Right.

8    Q    -- on Tuesday, Wednesday, and Thursday?

9    A    Right.

10   Q    And would you tell the Court where you saw your brother

11        Danny washing his pants.

12   A    Upstairs in the bathtub.

13   Q    In the bathtub?

14   A    Yeah.

15   Q    And would you tell the Court what time you first saw him

16        do it, if you can remember.

17   A    I don't remember what time.

18   Q    Was it late Tuesday night?

19   A    Yeah, it was late.

20   Q    Okay.  And what time did you see him do it on Wednesday?

21   A    It was about -- that evening, about 5:00 o'clock.  It

22        was about 5:00 o'clock.

23   Q    And how about Thursday?

24   A    It was about the same.

25   Q    And did you go to school those days?


RAYMOND L. VAUGHN

4

1   A   Yeah.

2   Q   When did you first tell -- did you tell somebody about

3           Danny washing his pants?

4   A   Yes.

5   Q   Did you tell your grandmother?

6   A   Yes.

7   Q   And where were his pants dirty?  What part of his pants?

8           If I take these out, can you shows us?  Where were

9           his pants dirty at?

10  A   It was up around here (indicating on the pants).

11  Q   On both sides or one side?

12  A   It was one one side.  It was over there (indicating).

13  Q   And what did it look like to you that he was washing

14          out?

15  A   It was something red.

16  Q   And what did it look like to you?

17  A   It looked like blood to me, but it was red.

18  Q   It looked like blood to you?

19  A   Right.

20  Q   Have you seen blood before?

21  A   Yeah.

22  Q   And when he was down there, was he doing anything with

23          these pants to get the stain out?

24  A   He was just washing them.

25  Q   I mean how would he wash them?  Would you just show the

RAYMOND L. VAUGHN

1             Court how -- what he was doing with his hands.

2   A    He was just scrubbing them like that on the scrub board

3             (demonstrating).

4   Q    On the scrub board?

5   A    Yeah.

6   Q    Did you talk to him?

7   A    No.

8   Q    Did you say anything to him about why he was washing

9             his pants three days in a row?

10   A    No.

11   Q    Did he say anything to you?

12   A    No.

13   Q    Did he talk to you about the Raymond Fife murder?

14   A    No.

15   Q    You were subpoenaed here to come today?

16   A    Right.

17   Q    And I know you really didn't want to testify.

18   A    Right.

19   Q    I know.

20             ATTORNEY WATKINS:  Thank you.

21 CROSS EXAMINATION BY ATTORNEY LEWIS:

22   Q    Raymond, how many people were living at the home at the

23             time on September 10th, 1985?

24   A    Four.

25   Q    Four.  Okay.  One was your mother, right?

RAYMOND L. VAUGHN

1    A    (Witness nods head affirmatively.)                            4

2    Q    And who were the other two people?

3    A    Him.

4    Q    Speak up.

5    A    Him and my little brother.

6    Q    Okay.  Him, you're referring to Danny, right?

7    A    Right, Danny.

8    Q    Okay.  And can you tell us do you have any knowledge

9         offhand of how many clothes Danny had at the house

10        at the time?  Did Danny have a very large wardrobe;

11        a lot of clothes, a lot of pants?

12   A    Yes.

13   Q    He did.  Did he have any other pair of pants that are

14        gray in color?

15   A    Yeah.

16   Q    He does?

17   A    Yeah.

18   Q    Let me ask you this:  State's Exhibit 1, how do you know

19        that these are the pants?  When's -- is this the

20        first time you saw these pants?

21   A    No.

22   Q    When's the first time you saw the pants?

23   A    It was a long time ago.

24   Q    A long time ago.  Okay.  Before September 10th --

25   A    Yeah.


                         RAYMOND L. VAUGHN

1   Q   -- 1985?  Does Danny have any other pants that look like

2         these pants?

3   A   Yeah.

4   Q   He does.  Can you tell approximately how many pair, if

5         you know?

6   A   He got about three pair.

7   Q   About three pair.  Okay.  And since the time that you

8         say you saw these pants on September 10th and evi-

9         dentally, September 11th and evidentally, also

10        September 13th, when's the next time you saw these

11        pants other than right here, or is this it?

12   A   This is it.

13   Q   This is it.  Is there any way to tell whether these are

14        actually the pants that you saw on September 10th,

15        11th, or 12th other than Mr. Watkins telling you

16        that they're the pants?

17        ATTORNEY WATKINS:  Your Honor, I didn't

18        tell him those were the pants.

19   Q   (By Attorney Lewis)  Well, other than the fact that he

20        just showed you the pants, do you have any idea

21        that these are exactly the pants?

22   A   Could be and could not be.

23        JUDGE SHAKER:  I didn't hear that.  Get

24        up close to the microphone.

25   A   I said it could be or could not be.


RAYMOND L. VAUGHN

1    Q    (By Attorney Lewis)  Okay.  In other words, can I trans-

2           late and just say you don't know for sure one way or

3           the other?

4    A    Right.  Right.

5    Q    Let me ask you this:  When do you -- when does Danny

6           normally do his washing or clothing?  Do you do the

7           washing at home with a washer and dryer?

8    A    Sometimes.

9    Q    Okay.  Did you have a washer and dryer in the house on

10          September 10th, 1985?

11    A    No.

12    Q    Okay.  What was the normal method in the household in re-

13          gard to maybe washing the clothing?  Did you go to

14          a Laundromat or did you just wash it in the tub or

15          wash it in the sink?

16    A    Both.

17    Q    Okay.  In other words, everybody in the household would

18          do those kind of things normally?

19    A    Right.

20    Q    Okay.  And in regard to -- you indicated the fact that

21          this occurred, to the best of your knowledge, on

22          September 10th, is that right; that Tuesday?

23    A    Right.

24    Q    Okay.  Are you absolutely sure it was on Tuesday night?

25    A    Positive.

RAYMOND L. VAUGHN

1    Q    Okay.  And when did you first come home that night --    4

2    A    It was --

3    Q    -- if you can recall?

4    A    It was about 11:30.

5    Q    Okay.  11:30 P.M.?

6    A    Yeah.

7    Q    Okay.  And had you seen Danny prior -- earlier that day?

8         Can you tell me when the last time you saw him was?

9         Was it early in the morning when you left for school

10        or something like that, or did you see him at all?

11   A    It was that afternoon on Tuesday.

12   Q    Afternoon on Tuesday?

13   A    Right.

14   Q    Okay.  And these particular pants, do you have any idea

15        -- between that afternoon and the time that you came

16        home, do you have any idea where those pants had

17        been or what had been on them or anything else?

18   A    No.

19   Q    Okay.  Let me ask you this:  How was it that -- you in-

20        dicated that you told -- what was it, your grand-

21        mother?  About this?

22   A    Right.

23   Q    Okay.  Do you recall when you told your grandmother about

24        this supposedly?  That's okay.  Go ahead.

25   A    When they picked him up.


                              RAYMOND L. VAUGHN

4

1    Q    When they picked him up?

2    A    Yeah.

3    Q    When Danny was picked up do you mean?

4    A    Right.

5    Q    And how was it that you were contacted in regard to the

6         testimony you're giving here today?  You remember

7         how this occurred?

8    A    No.

9    Q    Well, let me go back.  Do you know Mr. Dennis Steinbeck?

10   A    Yeah, I know him.

11   Q    And who is he to your knowledge?  He's a policeman?

12   A    Right.

13   Q    Okay.  All right.  And did you have an occasion to talk

14        to Mr. Steinbeck at some point in time?

15   A    Yes.

16   Q    Okay.  And how long would you say that was; just approxi-

17        mately, if you know?

18   A    It was about a month ago.

19   Q    About a month ago?

20   A    Right.

21   Q    So, we're talking -- January -- basically -- 21st.  Some

22        time maybe in December?  Would that be fair?  Latter

23        part of December?

24   A    Right.

25   Q    Okay.  And where'd that take place at?


                         RAYMOND L. VAUGHN

4

1    A    At Warren Western Reserve.

2    Q    You were in school at the time?

3    A    Right.

4    Q    And Mr. Steinbeck came to the school to talk to you, is

5           that it?

6    A    Right.

7    Q    Okay.  And did he tell you anything prior to the time

8           that you told him about the pants?  What did he tell

9           you when he arrived there?

10    A    He just asked me about what I saw.

11    Q    Okay.  And how did he -- did he tell you that you had

12           told somebody else supposedly or your uncle had said

13           that you saw this?

14    A    I told my grandmother.

15    Q    Okay.  All right.  Is that the way Mr. Steinbeck told it

16           to you?

17    A    Right.

18    Q    Okay.  And did they take a taped statement of what you

19           said?

20    A    Right.

21    Q    Okay.  And you also indicate that you saw Danny washing

22           a pair of gray pants on Wednesday night, is that

23           correct?

24    A    Right.

25    Q    Okay.  And do you know if it was the same set of pants,

RAYMOND L. VAUGHN

5

```
 1              the same pair of pants?
 2    A    I ain't look at them for -- I ain't look at them from a
 3              close range.
 4    Q    So, it could be a different set of pants?
 5    A    Right.
 6    Q    How about on Thursday night?  Would it be a different
 7              set of pants?
 8    A    Same thing.
 9    Q    Okay.  Let me ask you this:  When you say it looked like
10              blood, okay, you weren't aware of what was for din-
11              ner on Tuesday night, were you, by any chance?
12    A    No.
13    Q    Were you home for dinner?
14    A    No.
15    Q    Let me ask you this:  Taking -- if you can think back and
16              everything else, if you look at it, could that be
17              barbecue sauce?
18    A    It could be.
19    Q    Could it be strawberry jam?
20    A    It could be.
21    Q    And you indicated that you just thought it was blood; it
22              looked like blood?
23    A    Right.
24    Q    Okay.  But as far as you know, it could have been any-
25              thing on it?
```

RAYMOND L. VAUGHN

1   A   Right.

2   Q   And you state that even though you don't know if these

3       are even the pants or not, you state that the blood

4       was somewhere up in here (indicating), in the lap

5       area, the groin area?

6   A   Right.

7   Q   Okay.  Did you have an occasion when the pants were being

8       washed on three different -- I mean how long did you

9       stay on each occasion when he was washing or was it

10      just a matter where you came in the house and just

11      said hello and that was it?  It wasn't important to

12      you?

13  A   It was just about a couple seconds.

14  Q   Just about a couple seconds.  Okay.  And can you tell me

15      -- you indicated that he was using a washboard, is

16      that correct?

17  A   Right.

18  Q   Okay.  Is that what you normally use to wash the clothes

19      in the house with?

20  A   Right.

21  Q   Okay.  And the water itself, do you remember, was it --

22      was he using a soap or was it just water or what

23      was it?

24  A   I didn't pay no attention.

25  Q   You don't know?

RAYMOND L. VAUGHN

5

1   A   Right.

2   Q   All right.  Had you met Mr. Dennis Steinbeck before this

3       particular date than this date about a month ago

4       when he came to talk to you?

5   A   Yeah.

6   Q   You did?

7   A   Yeah.

8   Q   Okay.  Calling your attention back in time, was it

9       shortly after September 10th of 1985, that you saw

10      Mr. Steinbeck?  Do you recall?

11  A   I don't remember.

12  Q   Okay.  Let me ask you this:  Did you have an occasion

13      to be taken to the Warren Police Department shortly

14      after this incident occurred on September 10th,

15      1985?

16  A   I don't remember.

17  Q   Okay.  Do you happen to recall -- did you talk to Dennis

18      Steinbeck at the Warren -- or at the school, Western

19      Reserve High School, shortly after this incident

20      happened on September 10th, which would be basically

21      a Wednesday, Thursday, or a Friday?

22  A   Yes.

23  Q   Okay.  And do you happen to recall which day that was?

24  A   No.

25  Q   Okay.  You recall when Mr. Steinbeck came and what he

RAYMOND L. VAUGHN

5

1    asked you about?

2 A He just asked me where I was at on the night when that

3    happened.

4 Q In other words, he came and asked you --

5 A Right.

6 Q -- personally?  But you don't know exactly -- recall what

7    day that was.  Was it the day after or -- as near

8    as you can pin it down?

9 A I don't know.

10 Q This happened on a Tuesday, September 10th, 1985.  Can

11    you recall to the best of your knowledge?

12 A It was on a Wednesday.

13 Q It was on a Wednesday?

14 A Right.

15 Q Okay.  And during that course of conversation, he asked

16    you where you were on the Tuesday that this happened,

17    is that correct?

18 A Right.

19 Q Okay.  He also asked you about some other people that

20    may have been involved in this?  He was asking you

21    if you knew who was involved in this, didn't he?

22 A Right.

23 Q Did the name Tim Combs come up?

24 A Right.

25      ATTORNEY WATKINS:  Your Honor, I'm going

         RAYMOND L. VAUGHN

1          to object to this.

2  Q   (By Attorney Lewis)  Who brought that up?

3  A   He brought him up.

4              JUDGE McLAIN:  Objection is overruled.

5              ATTORNEY WATKINS:  It's hearsay.

6  Q   (By Attorney Lewis)  Mr. Steinbeck asked you about Tim

7       Combs?

8  A   Yes.

9  Q   Okay.  What was your response in regard to Tim Combs to

10      Mr. Steinbeck?  Do you recall?

11  A   No.

12  Q   Did he ask any other names besides Tim?

13  A   No.

14  Q   Okay.  Okay.  As I understand it then, you say it looked

15      like blood, but you have no idea whether that was

16      blood on his pants or whether it was barbecue sauce

17      or any other material, is that correct?

18  A   Right.

19  Q   You don't even know if that was -- the pants that Mr.

20      Watkins just showed you as State's Exhibit Number 1,

21      you don't know whether these are the pants or are

22      the pants that you saw on any of those particular

23      days, is that right?

24  A   Right.

25              ATTORNEY LEWIS:  I have no further ques-

RAYMOND L. VAUGHN

5

1    tions, Your Honor.  Thank you.

2              ATTORNEY WATKINS:  I have no questions.

3    We would thank the witness.

4              JUDGE McLAIN:  That's all.  You may step

5    down.

6                        (Witness is excused.)

7              JUDGE McLAIN:  All right.  We'll stand in

8    recess until 1:30.  Now, the rest of the audience

9    will remain in place because the defendant is in-

10   carcerated in the County Jail and will be taken by

11   some deputies, so I don't want all you people to

12   intermingle when they take the defendant back.

13                  (Deputies leave with the defendant.)

14             JUDGE McLAIN:  Okay.  Ladies and Gentlemen,

15   you're free to leave.  Thank you.

16                     (Court in recess at 12:08 P.M.)

17                     (Back in session at 1:35 P.M.)

18             ATTORNEY WATKINS:  May it please the

19   Court, we would call Mrs. Miriam Fife.

20

21                     MIRIAM FIFE

22   being duly sworn, according to law, on her oath, testified,

23   as follows:

24   DIRECT EXAMINATION BY ATTORNEY WATKINS:

25   Q    Mrs. Fife, would you please tell the Court your name and


                     MIRIAM FIFE

5

1          place of residence.

2 A   I'm Miriam Fife, 730 Austin, S.W.

3 Q   And how long have you been a resident of Warren?

4 A   Of Warren, 43 years.

5 Q   And Austin, S.W. is in Warren, Ohio?

6 A   Right.

7 Q   And your husband's name?

8 A   Issac.

9 Q   And how many children do you have?

10 A   We have eight altogether. We had eight.

11 Q   And since you've been married to Issac -- how long have

12          you been married to him?

13 A   16 years.

14 Q   And what children did you have with Issac?

15 A   Paula who is 15 and Raymond who will be 13 -- would have

16          been 13 next month.

17 Q   He was your only and youngest son between the two of

18          you?

19 A   Right.

20 Q   What school did he attend?

21 A   West Junior.

22 Q   And what grade was he in?

23 A   Seventh grade.

24 Q   And do you recall back on September 10th of 1985, what

25          day of the week -- do you recall it was a Tuesday?

MIRIAM FIFE

5

1   A   Right.

2   Q   And did he go to school that day?

3   A   Yes, he did.

4   Q   And what time did Raymond get home from school?

5   A   About -- he got out of school at 2:30.  He got home
6       about five minutes later.

7   Q   And did he eat at home?  Did he have supper?

8   A   Yes, he did.

9   Q   And who was present at home?

10  A   My husband and I and Paula, and there was also a friend
11      out in the driveway working on our car.

12  Q   Okay.  And you live on Austin, S.W., and it's on the
13      corner of a particular street?

14  A   On the corner of Oak.

15  Q   Of Oak.  And did Raymond own a bike?

16  A   Yes, he did.

17  Q   And what kind of bike did he have?

18  A   Well, he had painted it a few different times.  The last
19      time it was painted, it was maroon.  It was just
20      kind of a suped up bike he bought and fixed up him-
21      self.

22  Q   And I would take it he would ride around the neighbor-
23      hood as most kids do at the age of 12?

24  A   Right.

25  Q   And did Raymond belong to the Boy Scouts?

MIRIAM FIFE

5

1  A    Yes, he did.

2  Q    And how long had he been a member of the Boy Scouts?

3  A    Well, he started -- I think you're allowed to join in

4        third grade; Cub Scouts.

5  Q    Um-hum.  And did he have any particular position with

6        the Boy Scouts?

7  A    Well, he had just become -- excuse me, quartermaster of

8        his troop.  You take care of the equipment, and he

9        would be the first one to check everything out when

10       they got new stuff.

11 Q    And where did they meet, the Boy Scouts?

12 A    At Second Christian Church.

13 Q    And was it every --

14 A    Every week.

15 Q    Every month?

16 A    Every Tuesday night.

17 Q    Every Tuesday night.  Okay.  And how far is the Second

18       Christian Church from your house?

19 A    About four blocks.

20 Q    And ordinarily, how would he go there?

21 A    When -- in the summertime when it was light, he was al-

22       lowed to ride his bike.  After it started getting

23       dark by the time he would get out of there, then he

24       had to ride.

25 Q    And in September, it was light enough for him to ride

MIRIAM FIFE

1     his bike?

2 A No, not really.

3 Q Okay.

4 A It was starting to get dark, and he was going -- supposed

5     to come back and leave his bicycle at home and go

6     to the meeting from there.

7 Q Okay.  Now, what time was the meeting scheduled?

8 A The meeting starts at 6:30, but sometimes he would go

9     early because he worked with the equipment and

10     that.

11 Q And what time did Raymond eat that day?

12 A It was approximately 4:30.

13 Q And who had supper with him?

14 A His father and his sister Paula and I.

15 Q And what time did he leave the house?

16 A 5:15.

17 Q And did you know where he was going?

18 A Yes, he said -- he asked earlier if he could go to

19     Billy's, that they needed to work on something; on

20     Raymond's or Billy's bicycle, and I had told him he

21     had to wait and eat, and as soon as he was done

22     eating, he went -- he went in and got ready to go

23     to Billy's house.

24 Q And who is Billy?

25 A Billy Simmons, one of his best friends.  He's also in

MIRIAM FIFE

1          the Boy Scout Troop.                                    6

2    Q    Okay.  And how far away did Billy live from your house?

3    A    I'd say five, six blocks.

4    Q    And what street did -- or does Billy live on?

5    A    Willow.

6    Q    And when your son would ride over there on his bicycle,

7          did he take any particular route?

8    A    I think he took different routes, but I know he was told

9          not to go alone through the woods, but sometimes

10         he would go through there.

11   Q    And what would be the streets that he would ride his

12         bicycle on?

13   A    To go through the woods?

14   Q    No -- yeah, to go over to Billy's house.

15   A    He would go down Oak Street to York and down Jackson,

16         and then he'd go into the woods from Jackson Street.

17   Q    And could you go a different route to go to Billy's

18         house if you're riding a bike?

19   A    Yes, you could go up Palmyra Road.

20   Q    I know I haven't shown you this, but you'll be able to

21         recognize it.

22                              (State's Exhibit No. 2 marked
                                      for identification.)
23

24   Q    (By Attorney Watkins)  Okay.  Could you get off the wit-

25         ness stand.


                         MIRIAM FIFE

6

```
1              JUDGE SHAKER:  A little bit this way.

2                        (witness steps off the witness stand
                          and approaches the diagram.)

3

4    Q    (By Attorney Watkins)  Now, you indicate that -- and

5              this is Exhibit Number 2, that you lived on the

6              corner of Oak Street and Austin?

7    A    Yes.

8    Q    And that's -- that would be your house there (indica-

9              ting)?

10   A    Right.

11   Q    And you look at -- you know, if you could just look at

12             the exhibit.

13   A    Um-hum.

14   Q    And does that look familiar to you as far as roads?

15   A    Right, it sure does.

16   Q    And you indicate that he would often travel from the

17             house down Oak Street?

18   A    To York.

19   Q    To York to Jackson?

20   A    On Jackson and into the woods there.

21   Q    And into there and right over to Willow, like that

22             (indicating)?

23   A    Right, um-hum.

24   Q    Okay.  And then you also could go from your house, Au-

25             stin, down to Palmyra Road and to Valu-King, and
```

MIRIAM FIFE

1           then, obviously, over to Willow?

2  A   Right, um-hum.

3  Q   Okay.  You may be seated.

4                      (Witness resumes the stand.)

5  Q   (By Attorney Watkins)  Was there any reason that he would

6        go -- go or not go on Palmyra Road usually?

7  A   Usually he didn't go that way because of the traffic.

8  Q   Okay.  And how long did it take -- would it take Billy

9        to travel that distance from your familiarity with

10       him going over in the past?

11  A   Raymond?

12             JUDGE SHAKER:  Raymond.

13             ATTORNEY WATKINS:  I'm sorry.

14  A   I'd say seven to 10 minutes depending on how fast he was

15       going.

16  Q   (By Attorney Watkins)  And you indicated to the Judges

17       that he left at 5:30 -- I mean 5:15?

18  A   5:15.

19  Q   I'm sorry.  5:15.  Why does 5:15 P.M. stick in your

20       mind?

21  A   Well, Billy had left his Boy Scout book at our house,

22       and I had told Raymond -- I said, "Take Billy's

23       Boy Scout book with you," and he looked up at the

24       clock and he says, "Mom, it's only 5:15.  We'll

25       ride back this way and pick it up."  And then he

MIRIAM FIFE

1          walked out the door.

2     Q    And did there come a time that he didn't return that you

3          had some notice that Billy -- that Raymond was not

4          over Billy's house?

5     A    Well, approximately 10 to 6:00, Billy called up at the

6          house and he asked for Raymond, and I said, "Well,

7          he was on his way to your house," and he said,

8          "Well, he never got here."  So, I wasn't too con-

9          cerned.  Then I thought maybe he got to playing

10         around with someone and hadn't gotten to Billy's.

11         When Billy arrived at my house around 10 after

12         6:00, I was beginning to get a little concerned then.

13         So, Billy left to go to Scouts, and approximately

14         6:30, I called a lady who took her boy to Scouts and

15         I asked her if she had seen Raymond when she dropped

16         her son off, and she said that she had not taken her

17         son because her vehicle was in the garage.  So, I

18         said, "Well, I'm going down there then and check."

19         So, I went to the church, and when I came into the

20         church, I didn't see Raymond's bicycle parked where

21         they park them all, and I then started to get a

22         little worried.  I went upstairs, and the assistant

23         scoutmaster offered to come out and start searching

24         for Raymond with me.  And so he rode around, and I

25         went to one of Raymond's friends on Hamilton Street,

MIRIAM FIFE

6

1       and there was no one home there, so I came home.

2       My daughter got on her bicycle and started -- she

3       went to the pond; Quimby Park pond, and was just

4       asking some of the kids if they had seen Raymond,

5       and she was just going around the neighborhood

6       looking for him, and when Tom Brizzini, who is the

7       assistant scoutmaster, said he did not see Raymond

8       anywhere in the area, then Paula, my daughter, said,

9       "Well, let's ride over there where he cuts across

10      to go to Billy's," and they went through the trail

11      from Jackson Street.  She went on her bike and he

12      walked, and they saw nothing.

13  Q   Okay.  What color was Raymond's bike?

14  A   Kind of a maroon.

15  Q   And what clothes did he have on?

16  A   He had on a pair of gray striped like silky shorts, a

17      black like T-shirt with Wrangler written across the

18      front in white, white sport socks, and baseball

19      tennis shoes.

20  Q   Okay.  Did there come a time that -- that you called

21      the police?

22  A   Yes, around 8:00 o'clock.

23  Q   And did there come a time that your husband went on a

24      search for Raymond?

25  A   After Paula and Tom left -- he was across the street

MIRIAM FIFE

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | working on a lady's garage door, and I went over             |
| 2  |   | and got him, and he started searching.  He rode              |
| 3  |   | everywhere.  Then after the police came to the               |
| 4  |   | house and he -- we told them our story, he left              |
| 5  |   | with flashlights with my son-in-law and they went            |
| 6  |   | searching again.                                             |
| 7  | Q | What time was this?                                          |
| 8  | A | I would say approximately quarter to 9:00, 9:00 o'clock.     |
| 9  | Q | Okay.  And your husband went with your son-in-law?           |
| 10 | A | Right.                                                       |
| 11 | Q | And what is his name?                                        |
| 12 | A | Ray Pontius.                                                 |
| 13 | Q | And did they find your son?                                  |
| 14 | A | Yes, they did.                                               |
| 15 | Q | And who called you and told you that?                        |
| 16 | A | My son-in-law Ray called me.                                 |
| 17 | Q | What time was that?                                          |
| 18 | A | I really couldn't tell you that time.  That was -- I         |
| 19 |   | would say it was approximately 9:30.                         |
| 20 | Q | Okay.  And then what did you do?                             |
| 21 | A | I went across the street to see if I could get someone       |
| 22 |   | to take me to the hospital, and so someone came              |
| 23 |   | over, and I locked up the house and I left.                  |
| 24 | Q | You saw Raymond at the hospital?                             |
| 25 | A | Yes.                                                         |

MIRIAM FIFE

```
1   Q    I asked you today to bring your favorite photograph

2        of Raymond, and you gave me that?

3   A    Yes.

                              (State's Exhibit No. 3 marked
4                                       for identification.)

5

6   Q    (By Attorney Watkins)  I hand you what's been marked as

7        Exhibit Number 3, and would you tell the Court what

8        photograph and when it was taken.

9   A    This was his 84-85 school picture.

10                  ATTORNEY WATKINS:  Okay.  Thank you.

11                  ATTORNEY LEWIS:  Thank you, Mrs. Fife.

12       No questions, Your Honor.

13                  JUDGE McLAIN:  That's all.

14                              (Witness is excused.)

15                  JUDGE McLAIN:  I assume that the last

16       witness is not anticipated that she will be re-

17       called?

18                  ATTORNEY WATKINS:  No, Your Honor.

19                  JUDGE McLAIN:  Mr. Lewis?

20                  ATTORNEY LEWIS:  No, Your Honor, she

21       won't be called.

22

23

24

25
```

MIRIAM FIFE

1        BILL SIMMONS

2   being duly sworn, according to law, on his oath, testified,

3   as follows:

4   DIRECT EXAMINATION BY ATTORNEY WATKINS:

5   Q    Okay.  Billy, you have to speak loudly and you have to

6        talk to the three Judges, okay?

7   A    Um-hum.

8   Q    What's your name and where do you live?

9   A    Bill Simmons.  I live at 2336 Willow Drive.

10  Q    And Bill, what school do you attend?

11  A    Reserve.

12  Q    And what grade are you in?

13  A    Eleventh.

14  Q    And what are you?  About 16-years old?

15  A    Yeah.

16  Q    And you were close friends with Raymond Fife?

17  A    Yes.

18  Q    And Raymond was how old?

19  A    11, I think.

20  Q    Okay.  You belong to the Boy Scouts with Raymond?

21  A    Yeah.

22  Q    And when did you usually -- when did you usually go, or

23        do you go to Boy Scouts still?

24  A    Like what time?

25  Q    Yeah.


BILL SIMMONS

1   A   Quarter after 6:00.

2   Q   And what days of the week do you go?

3   A   Tuesdays.

4   Q   And did you go with Raymond often to the Boy Scouts?

5   A   All the time.

6   Q   Okay.  And how long had you been going on Tuesday nights

7        with Raymond to the Boy Scouts?

8   A   For about a year.

9   Q   Okay.  And where are the Boy Scouts?  Where did they

10       meet?

11   A   The church at Mulberry and Market Street across from

12       Convenient.

13   Q   And that's not too far from your house, right?

14   A   It's a pretty good distance from my house.

15   Q   Okay.  What's the distance?

16   A   A couple miles.

17   Q   Okay.  Now, on Tuesday, September 10th, do you recall

18       talking to Raymond that day?

19   A   Yeah.

20   Q   And what time did you talk to him?

21   A   About 3:30.

22   Q   And was there any discussion with him about whether he

23       would meet you that day?

24   A   Yes.

25   Q   And what did he say to you?


BILL SIMMONS

6

1   A   He told me he was coming over.

2   Q   Okay.  And when you say he's coming over, you meant over

3          to your house at Willow?

4   A   Yes.

5   Q   And what time was he to come over?

6   A   I don't really know.  Some time before 6:00.

7   Q   Okay.  And 6:00 o'clock would be the time he'd be

8          leaving for Boy Scouts?

9   A   Yes.

10   Q   Now, was there any particular reason that he was coming

11          over to see you?

12   A   I thought he was going to come over so we could work on

13          the bikes.

14   Q   Okay.  And you're referring to your bike or his bike?

15   A   Mine.

16   Q   Okay.  What was wrong with your bike?

17   A   The axle was stripped.

18   Q   Um-hum.  And did you say something to Raymond that sug-

19          gested he could help you?

20   A   Yeah.

21   Q   Okay.  Now, what kind of bike did Raymond have?

22   A   I think it's a Schwinn frame.

23   Q   What color?

24   A   Maroon, red.

25   Q   And did you often ride bicycles with Raymond?

BILL SIMMONS

PENGAD/INDY.  MUNCIE, IN  47302

SF-AZ-13

1    A    Yeah, a lot.

2    Q    Okay.  And you would ride to his house and he'd ride to

3         your house?

4    A    Yes.

5    Q    And sometimes you'd ride together --

6    A    Yeah.

7    Q    -- between the two houses?

8    A    Um-hum.

9    Q    Was there any particular way that Raymond would usually

10        go?

11   A    You want the streets?

12   Q    Yeah.

13   A    Down his street, Oak to York Street and down Jackson to

14        the field where we'd also cut up through the field

15        to my street.

16   Q    Now, if you could get up and come on over here and see

17        if you can.

18                         (Witness steps off the witness stand
19                          and approaches the diagram.)

20   Q    (By Attorney Watkins)  Okay.  This is Austin Avenue

21        (indicating).

22   A    Um-hum.

23   Q    And Oak Street (indicating).  Here's Willow, Palmyra

24        Road, Valu-King, Jackson, Oak (indicating).  Can you

25        look at this map and understand the area?


                         BILL SIMMONS

7

1   A   Yes.

2   Q   Okay.  Why don't you take the easel and show the Court

3       how you usually would travel on bikes with Raymond

4       between the two houses.

5   A   Just --

6   Q   Just point it out.

7   A   (Witness indicates on the diagram.)

8   Q   Down Oak to York to Jackson?

9   A   Jackson.  And then this road here (indicating) went

10      around like that.

11  Q   Okay.  Now, as you went from Jackson Street, this little

12      road that goes in --

13  A   Um-hum.

14  Q   -- and you went around like that to Willow (indicating),

15      right?

16  A   (Witness nods head affirmatively.)

17  Q   You lived on Willow -- live on Willow?

18  A   Yes.

19  Q   What house from the corner of Hemlock?

20  A   The fourth one.

21  Q   Would you point that out to the Court whereabouts.

22  A   (Witness indicates on the diagram.)

23  Q   Right about there?

24  A   (Witness indicates on the diagram.)

25  Q   Fourth house.  Now, would you describe to the Judges

BILL SIMMONS

```
 1              what terrain you would cross between the area that's    7
 2              blocked off as a street -- or marked off as a
 3              street as you make that circle as you describe it
 4              when you're riding between the two houses.
 5    A    What do you mean?
 6    Q    What is here?  Is it trees, hills?  Describe how the
 7              ground or land is as you drive your bike between the
 8              two spots.
 9    A    From here to most up around Valu-King (indicating), it's
10              just like more or less a road.  Then when you go
11              down through the field, it's just bumps and trees.
12    Q    And there would be paths?
13    A    Yeah.
14    Q    And was it easy to ride your bike on the path?
15    A    Yeah.
16    Q    Okay.  And how wide would the path be?  Would you -- can
17              you just with your hands some way describe it to
18              the Court?
19    A    It was about this wide (indicating with hands).
20    Q    Okay.  And how would you describe the other side of the
21              path?  What did they have?  Trees, brush, or how
22              -- describe the terrain or the land around the
23              paths once you got off the graveled area.
24    A    Just like little trees and weeds both sides.
25    Q    Okay.  Is there any area in here where they have a lot of
```

BILL SIMMONS

```
1            trees?

2    A    On this side of the path just as you go down through

3            there.

4    Q    Okay.  Now that you've been describing as State's Exhibit

5            2 --

6                                    (State's Exhibit No. 4 marked

7                                         for identification.)

8    Q    (By Attorney Watkins)  You've seen this one before,

9            right?

10   A    Yes.

11   Q    You were with me the other day and we went over it?

12   A    Yeah.

13   Q    Now, this is a condensed version of the other one, right?

14   A    (Witness nods head affirmatively.)

15   Q    And we have Jackson Street and we have York.  Would you,

16            with this particular diagram, show the Court how

17            you would travel.

18   A    Start here (indicating) --

19   Q    Um-hum.

20   A    -- go down Jackson, go down here (indicating).

21   Q    Okay.  So, you would drive right -- ride your bicycles

22            right behind the Valu-King?

23   A    Yes.

24   Q    And this was the old crossed off or blocked off street?

25   A    Um-hum.
```

BILL SIMMONS

1   Q   Now, you testified on the right with the other map, over

2       in this area (indicating), that there were trees?

3   A   (Witness nods head affirmatively.)

4   Q   Can you point out to the Court where the trees are on

5       this particular item which is Exhibit Number 4.

6   A   Right here (indicating).

7   Q   Now, on the day in question here, the Tuesday that Ray-

8       mond was to come over, did there come a time that

9       you decided to leave when he didn't come over?  Did

10      you do anything when he didn't come over that day?

11  A   Did I do anything?

12  Q   Yeah.

13  A   I rode my bike around.

14  Q   You rode your bike around.  Did you ride over to Ray-

15      mond's house?

16  A   Not till about 6:00.

17  Q   You're going to have to speak loudly, son.

18  A   Not till about 6:00.

19  Q   You rode over at 6:00 o'clock, right --

20  A   Yes.

21  Q   -- to Raymond's house?

22  A   Um-hum.

23  Q   And how long did it take you to ride over?

24  A   About five, six minutes.

25  Q   Okay.  And would you tell the Court and show the Court

BILL SIMMONS

1    how you rode your bike.  And I take it when you

2    started at 6:00 -- about 6:00, that you started

3    from your house?

4 A Um-hum.

5 Q Okay.  What path did you take?  What route did you take

6    to go over to Raymond's house on the 6th -- on that

7    Tuesday?

8 A (Witness indicates on the diagram.)

9 Q Okay.  At 6:00 o'clock or thereabouts, did you see any-

10    one as you were driving the path that you took to

11    go to Raymond's house?

12 A Yes.

13 Q Okay.  Where did you see someone?

14 A About right here (indicating).

15 Q Okay.  And was that one person?

16 A Yes.

17 Q And which way was that person walking?

18 A This way towards Valu-King (indicating).

19 Q Walking towards the Valu-King?

20 A Yes.

21 Q When you were riding your bike through this area behind

22    the Valu-King, did you hear anything or see anything

23    unusual?

24 A No.

25 Q Approximately how many times would you have ridden with

BILL SIMMONS

7

1   Raymond this particular path that you took that

2   night?

3 A I don't really know.

4 Q Would it be over 10 times?

5 A Oh, yeah!

6 Q A lot of times?

7 A Yeah.

8 Q Okay.  Now, did you and Raymond at times travel Palmyra

9   Road?

10 A We never traveled Palmyra Road.

11 Q Did you -- at times together, would you go over to the

12   Valu-King and drive in the parking lot?

13 A Yes, sometimes.

14 Q Okay.  And what kind of bike rider was Raymond?  Did he

15   like to ride fast or did he slow up or would he

16   stop at times?  How would he ride his bike when you

17   were with him?

18 A Fast wherever he could.  Where there was an opening.

19 Q Okay.  You may be seated.  Tell me something -- excuse

20   me, one more question.  Billy, I think you said

21   where it's bumpy.  Where is it bumpy that you would

22   slow down?

23 A Around this curb here (indicating).

24 Q Around the curb here (indicating).  You're pointing out

25   where the numbers A and B are?


BILL SIMMONS

7

1   A   Yeah, around there.

2   Q   And how is it bumpy there?

3   A   Just -- it's kind of a sharp turn.  There's a couple

4         bumps.  It'll knock you over.

5   Q   Sometimes you have to stop your bike with your feet if

6         you're not careful?

7   A   Yeah.

8   Q   Okay.  Sit down.

9                          (Witness resumes the stand.)

10   Q   (By Attorney Watkins)  Billy, what time do you recall

11         getting over to the Fife residence?

12   A   About five after 6:00.

13   Q   And you told Mrs. Fife -- or asked for Raymond?

14   A   Yeah, I asked if he was home.

15   Q   What did you do after that?

16   A   I went and picked up another friend that lives on Oak

17         and went to Scouts.

18   Q   You went to Scouts?

19   A   Yeah.

20                   (State's Exhibit No. 5 marked

21                      for identification.)

22   Q   (By Attorney Watkins)  You want to take a look at this

23         or you recognize it?

24   A   Yeah.

25   Q   And would you tell the Court whose bike this was.

BILL SIMMONS

1    A    It's Ray's bike.

2                         JUDGE SHAKER:  What's the number?

3                         ATTORNEY WATKINS:  Exhibit Number 5, Your

4         Honor.

5    Q    (By Attorney Watkins)  It's Raymond Fife's bike?

6    A    Yeah.

7                         ATTORNEY WATKINS:  I think that I'm going

8         to put it over here.  Thank you.

9    CROSS EXAMINATION BY ATTORNEY LEWIS:

10   Q    Billy, as I understand it, you were good friends with

11        Raymond, is that correct?

12   A    Yes.

13   Q    You'd been in the Boy Scouts together?

14   A    Yes.

15   Q    And for approximately how long was that?

16   A    About a year.

17   Q    About a year.  And how about the friendship?  Was it be-

18        fore or after the Boy Scouts or --

19   A    It was before the Boy Scouts.

20   Q    Okay.  So, how many years are we talking about in total,

21        approximately?

22   A    Three or four.

23   Q    Three or four.  And as I understand it, you always went

24        with Billy or Billy came and picked you up to go to

25        the Scout meeting, is that correct?

                         BILL SIMMONS

7

1   A   Yes.

2   Q   And you said for approximately, I think, a year, is that

3       correct?

4   A   Yes.

5   Q   Okay.  And those occurred on Tuesday evenings, is that

6       correct?

7   A   Yes.

8   Q   Okay.  And the timing would be -- I think you indicated

9       about 6:15 is the time that the Scout meetings would

10      start?

11   A   No, they started at 6:30.

12   Q   6:30.  Okay.  So, he would basically try to get over

13      there by 6:15, is that --

14   A   Yes.

15   Q   Okay.  All right.  And calling your attention back to

16      August on the particular Tuesday, which I assume

17      would be about a month back, maybe about August

18      10th or something like that, did you go to the

19      meeting that night with Raymond?

20   A   I probably did.

21   Q   You probably did?

22   A   I don't remember.

23   Q   Okay.  Well, if you can't remember specifically the

24      incidents, is it fair to say that to your recollec-

25      tion, that you always, every month approximately

BILL SIMMONS

8

1      6:15 or 6:30, went to the meetings with Raymond?

2      Would that be a fair statement the best that you can

3      recall?

4  A   Yes.

5  Q   You don't have to be nervous.  Don't be nervous, all

6      right?  Okay.  And the proceeding would be he would

7      come over to get you, I take it, and then both of

8      you would go back through these trails or what --

9      or -- am I wrong about that?

10  A   Sometimes.  Sometimes I'd go to his house first.  He

11      wouldn't come to mine.

12  Q   I see.  Okay.  So, sometimes he wouldn't be going through

13      the trails, but you'd be going over to his house

14      and you both go over to the Christian Church, is

15      that correct?

16  A   Yes.

17  Q   And you indicated that the two different routes being

18      used were the one where it went down -- all the way

19      down -- no, wait a minute!  I take that back.  Yes,

20      that's correct.  There are two different routes,

21      aren't there not?  The one you come up on Jackson

22      Street, come down, there's a barrier down here, and

23      you come down around and go on the partially paved

24      road on the side all the way down, is that correct?

25  A   Yes.


BILL SIMMONS

1    Q    Just say yes as far as I go.  Then you come around the

2         back end of the Laundromat, the Valu-King, then you

3         proceed to go down this particular trial, right?

4    A    Yes.

5    Q    You come in, you make that left-hand turn basically and

6         come out onto Willow, is that correct?

7    A    Yes.

8    Q    And Willow dead ends into that particular woods, does it

9         not?

10   A    Yes.

11   Q    The other possible course would be simply to come down

12        Austin then Palmyra, cut through the parking lot

13        of Valu-King, around Valu-King, and then from there,

14        it's the same trip, is that correct?

15   A    Yes.

16   Q    Okay.  And prior to, say, for instance, six months pre-

17        ceding the date of maybe September 10th or some-

18        thing like that -- you've indicated to Mr. Watkins

19        and the Court here that -- did you have an occasion

20        to ride with Raymond, his bike -- do you have an

21        occasion to be on these trails other times than just

22        on the dates for the Scout meetings?

23   A    Yes.

24   Q    Okay.  Is it kind of a favorite thing to ride over the

25        hills and the holes and so forth and so on with a

                         BILL SIMMONS

1           -- like a trail type bike?

2    A    Yeah.

3    Q    So, you'd have occasion to be back there on many occa-

4           sions, would you not?

5    A    Yes.

6    Q    And in the Valu-King area as well?

7    A    Yes.

8    Q    Can you give me an approximation -- say, for instance,

9           in the six months preceding, just give me a ballpark

10          figure how many times you think you were out there

11          at least with Raymond riding those bikes maybe

12          taking into account the summer and so forth.  Do you

13          have any idea at all?

14   A    No.

15   Q    What if I said a lot?

16   A    Yeah.

17   Q    A lot of times?

18   A    A lot.

19   Q    All right.  Now, as I understand, you rode your bike

20          over to the Fife residence, and that was at 6:00

21          P.M. on that particular Tuesday evening, is that

22          correct?

23   A    Yes.

24   Q    Okay.  And the route you indicated to the Court and the

25          prosecution was that you took the -- went through

                    BILL SIMMONS

1             the dead end at Willow Street, right?

2    A    Yes.

3    Q    Went all the way through the trail on out to the rear of

4             Valu-King, is that correct?

5    A    Yes.

6    Q    Went across the paved area, up the small paved portion

7             of the road, all the way back, right?

8    A    Yes.

9    Q    Toward -- past the barrier and out past Jackson Street,

10            correct?

11   A    Yes.

12   Q    You indicated to Mr. Watkins you saw an individual out

13            here on the partially paved road on the right-hand

14            -- at least on the right-hand side of this diagram,

15            to the field.  Do you happen to recall who that was

16            or do you know?

17   A    I don't know who he was.

18   Q    You didn't pay any attention basically?

19   A    No.

20   Q    Other than that person, you didn't see anybody as you

21            went through there?

22   A    No.

23   Q    That's at 6:00 P.M.  Okay.  Did you happen to notice

24            anything unusual whatsoever when you went through

25            the path?


                        BILL SIMMONS

1   A    No, I didn't.

2   Q    Nothing at all.

3                    ATTORNEY LEWIS:  Okay.  Thank you very

4          much.

5                    ATTORNEY WATKINS:  We thank the witness.

6          No further questions.

7                    JUDGE McLAIN:  That's all.  You may step

8          down.

9                              (Witness is excused.)

10

11                    RALEIGH C. HUGHES

12   being duly sworn, according to law, on his oath, testified,

13   as follows:

14   DIRECT EXAMINATION BY ATTORNEY KONTOS:

15   Q    Mr. Hughes, would you please give your full name and oc-

16          cupation for the record.

17   A    Raleigh C. Hughes, III.  I'm employed as a nationally

18          registered EMT for Med Star Ambulance Service.

19   Q    Okay.  And what exactly is a nationally registered EMT?

20   A    Stands for Emergency Medical Technician.  I work on an

21          ambulance.

22   Q    And what kind of work do you do on the ambulance?

23   A    Whatever type of problems that occur.  I'm trained in

24          all phases of emergency rescue.

25   Q    And how long have you been employed in that capacity?

                    RALEIGH C. HUGHES

1    A    Approximately 11½ years.

2    Q    Okay.  And I want to call your attention back to Septem-

3         ber 10th, 1985.  Did you have an occasion on that

4         day or that evening to be working?

5    A    Yes, I did.

6    Q    Okay.  And on that evening, did you get a call to respond

7         to an address on Jackson Street?

8    A    I did.

9    Q    Okay.  And would you please tell the Court here; the

10        three Judges, what exactly happened, where you were

11        at, and what time you were called.

12   A    We received a phone call from the Warren Fire Department

13        requesting us to respond to 1821 Jackson Street,

14        S.W.  There was a victim of some sort of sexual

15        assault is what the Fire Department dispatcher told

16        us.

17   Q    And what time did you arrive there?  Do you recall?

18   A    Without looking at my notes, I really dont know our exact

19        arrival time, sir.

20   Q    Somewhere around 9:30, would that be fair?

21   A    I would say shortly thereafter.

22   Q    Okay.  And when you got there, where did you proceed to?

23   A    As we arrived, there was a paramedic from the Fire De-

24        partment running in front of the house towards the

25        rear of 1821 Jackson Street to a wooded area, and

RALEIGH C. HUGHES

1          he advised us to follow him, that the child was back

2          in the woods somewhere.

3  Q   And how far in did you go?  Was it a distance or was it

4          close?

5  A   It's quite aways.  Probably at least -- seemed to me pro-

6          bably at least a quarter, half mile.

7  Q   Okay.  Let me ask you this:  What were the weather con-

8          ditions like that evening?

9  A   It had rained prior to the time of the call itself, and

10         upon our arrival, it was like a misting rain.  You

11         know, it was very misty like.

12  Q  And as you were walking to the area, what kind of vege-

13         tation was around you?

14  A  Very dense.  You know, approximately three and a half,

15         four foot.  It was very thick weeds.  There were

16         some trees also in that area.

17  Q  And was the vegetation you're walking through wet?

18  A  Extremely.

19  Q  Okay.  And did there come a time then when you arrived

20         at an area where you saw a victim?

21  A  Yes, I did.

22  Q  Okay.  And describe the area.  Who was there and where

23         the victim was, please.

24  A  Okay.  The Fire Department paramedic and two of the

25         EMTs aboard the Rescue Squad with him arrived first

RALEIGH C. HUGHES

|   |   |   |
|---|---|---|
| 1 |   | prior to myself.  Along with those three people |
| 2 |   | were what I believed to be Mr. Fife and approximately |
| 3 |   | three other people there whose identity I don't know. |
| 4 | Q | When you say "Mr. Fife," you mean the father of the vic- |
| 5 |   | tim? |
| 6 | A | That's correct.  That's how he identified himself to me. |
| 7 | Q | Did you have any conversation with Mr. Fife? |
| 8 | A | I did. |
| 9 | Q | And what did he tell you happened that particular evening? |
| 10 | A | He had stated that approximately 5:30 that evening, his |
| 11 |   | son was reported missing from some sort of Boy Scout |
| 12 |   | function and that they had become concerned because |
| 13 |   | he had not come home.  That they had gone out on |
| 14 |   | these bicycle paths or some sort of paths looking |
| 15 |   | for him because he was known to frequent that area, |
| 16 |   | and that he himself had found him lying there. |
| 17 | Q | Okay.  Did he describe the condition of his son when he |
| 18 |   | first observed him to you? |
| 19 | A | He said that when he arrived at first, that he was not |
| 20 |   | responsive to verbal stimuli and that he was en- |
| 21 |   | gulfed with vomit; you know, he had vomited all |
| 22 |   | over himself. |
| 23 | Q | And when you were there at the scene, did you happen to |
| 24 |   | see this great amount of vomit? |
| 25 | A | No, sir.  He said that he had primarily wiped most of it |

RALEIGH C. HUGHES

8

1               away prior to our arrival.

2   Q   Okay.  And how was the victim positioned?

3   A   Super -- on his back.

4   Q   And what was he wearing?

5   A   He had what I believe was his father's jacket draped over

6             top of him and it covered his upper torso.  From

7             the bottom of -- well, like the waistline down, he

8             was completely naked.

9   Q   Okay.  Did you have an opportunity at that time in your

10            effort to help him, an opportunity to observe the

11            victim's face?

12   A   I did.

13   Q   And did you notice anything with respect to the victim's

14            face; anything unusual?

15   A   It appeared to me that the patient had possibly been

16            burnt, and I asked some people that were working

17            with me, you know, what respect -- you know -- they

18            thought there was a possibility maybe he had been

19            burned somehow, and I was led to believe that he was

20            not.  I, you know, accounted it to poor lighting

21            because there was just a few flashlights.

22   Q   But in your opinion, what did it look like?

23   A   It appeared very much to me that he had been burnt quite

24            severely.

25   Q   Were there any other areas where you observed any

RALEIGH C. HUGHES

8

1               burning or any markings on him?

2  A   It was primarily on the -- like the right cheek, the

3               right side of his neck, and it was down around --

4               just a little bit on his chest the best that I could

5               see.

6  Q   Okay.  And we're talking about a field now at nighttime?

7  A   That's correct.

8  Q   Okay.  Now, did you observe any other kind of markings on

9               his face or his eyes?

10  A   His right eye was completely swollen shut, and it looked

11              like there was a possibility that the right side of

12              his jaw had been broken.  There was some disfigure-

13              ment there.  Also, his left eye was completely what

14              we call fixed and dilated.  There was no response to

15              any light.

16  Q   What does that generally indicate?

17  A   At least some sort of neurological damage.

18  Q   Okay.  Did you notice any other things unusual with re-

19              ference to his face or his ears or his head?

20  A   There was a clearish substance that was outside the

21              right -- you know, it was lying in the ear canal,

22              and at the time, we -- again, I wasn't sure whether

23              there was the remains of vomitus or whether it could

24              have been the cerebral spinal fluid.

25  Q   Did you notice anything else around the neck area?

RALEIGH C. HUGHES

1  A  Well, the right side of his neck was -- had a very severe

2     deviation.  It was -- the left side was normal

3     looking, but the right side had a very severe devia-

4     tion.

5  Q  Okay.  Could you explain to the Court, to the Judges,

6     what you mean by "deviation".  How it looked dif-

7     ferent than the other side of his face.

8  A  It appeared that -- it looked almost like his neck had

9     been broken.  It's not -- I'm not really qualified

10    to say that, you know, something is broken in that

11    context, but there was a folding of the skin, and

12    it had been just pushed in approximately about an

13    inch.  It was folded in (indicating with hands).

14 Q  Okay.  And what was his general condition with respect to

15    whether or not he was able to respond to anything

16    that you did personally for him?

17 A  He was absolutely non-responsive to any verbal or physi-

18    cal stimuli whatsoever.

19 Q  Can you describe him as unconscious then?

20 A  Most definitely.

21 Q  How about his breathing?  How was his breathing?

22 A  Extremely labored.

23 Q  And what do you mean by that?

24 A  His breaths were very shallow and very long and drawn out.

25    It was like almost a gasping type.

RALEIGH C. HUGHES

1   Q   Okay.  Now, were there any other areas of the body while

2       he was lying there that you were able to observe

3       that didn't look normal to you?

4   A   Below the jacket itself, his groin area was somewhat

5       swollen beyond what would appear to be the normal

6       size.

7   Q   Are you talking about the scrotum then?

8   A   That's correct.

9   Q   And was there any discoloration or just swelling?

10  A   It was a bruising.  Hadn't really fully gone -- it was

11      discoloration.

12  Q   Okay.  Did you notice anything unusual about the rectum?

13  A   Also, it would appear that it had been torn.  It was also

14      swollen in that area, too.

15  Q   Okay.  Did you notice any bleeding?

16  A   It could have been that or also there's a possibility it

17      could have been the remains of a bowel movement.  I

18      wasn't sure.

19  Q   And what kind of efforts were made by you and the other

20      EMTs at that time in order to help the victim?

21  A   Initially, we placed the victim on a very high liter

22      concentration of oxygen and oral airway was posi-

23      tioned without any gag reflex which also further

24      constitutes the fact that he was, you know, un-

25      conscious state, to try and keep the tongue from

RALEIGH C. HUGHES

9

1            blocking the airway itself. One of the paramedics

2            that arrived on the scene started an IV lactate

3            ringers and also a life line, you know, that's used

4            at the hospital. They can administer drugs more

5            rapidly and efficiently through the IV source.

6  Q   So, how many people that were qualified as EMTs and

7            emergency people were around him in an effort to

8            save his life?

9  A   Oh, gee! There were three from Warren Fire Department,

10           my partner and myself, and then last on the scene,

11           there were -- there was one EMT and one paramedic

12           from Action Ambulance.

13  Q   All right. And he was ultimately transported from there

14           then?

15  A   That's correct.

16  Q   And what manner was he transported?

17  A   He was transported -- called Signal 5, lights and sirens,

18           to St. Joseph's Hospital.

19  Q   Okay. At that particular time, was it a fast transpor-

20           tation from the area to get him to St. Joseph's?

21  A   Yes, it was.

22  Q   Now, Mr. Hughes, I have here in front of us, in front

23           of the Court, a diagram that has been labeled

24           State's Exhibit Number 4, and if you could just

25           step off of there for a moment.

RALEIGH C. HUGHES

```
 1                              (Witness steps off the witness stand    9
                                 and approaches the diagram.)

 2

 3    Q    (By Attorney Kontos)  Come over this way a little bit.

 4    A    (Complying.)

 5    Q    Now, I want to orient you as to what this depicts here.

 6              This is Jackson Street running this way (indicating)

 7              This is a heavily wooded area over here (indica-

 8              ting).  This is Palmyra Road (indicating).  Going

 9              in this direction, this is the Valu-King, drug

10              store, and a Laundromat, and this is a wooded and

11              fielded area behind there (indicating).  Now, do

12              you recall -- can you point out on what street you

13              ended up parking your ambulance?

14    A    We initially parked our squad approximately right here

15              (indicating).

16    Q    And after that, you were taken by some other individuals

17              in a direction to help you locate where the victim

18              was?

19    A    That's correct.

20    Q    And in this particular area, in light of some of these

21              paths -- I know you probably hadn't seen these be-

22              fore, can you point out approximately the area where

23              the young boy was found?

24    A    I take that back.  We parked over here, right here

25              (indicating), and then we would have come back
```

RALEIGH C. HUGHES

9

1     through here (indicating).   Initially, there's a --
2     like an old dirt road.
3  Q  Okay.   That's over here (indicating).
4  A  Okay.   Ended up walking down through here for a while
5     (indicating), and then we came back through.   This
6     would be the area (indicating).   Right in here is
7     where we found --
8  Q  You think around here then (indicating)?
9  A  That's correct.
10 Q  You didn't go there and measure it and go back any other
11    day?
12 A  Well, we went back the very next day.   As we were working
13    on the patient, I hung the cover for the IV bag on
14    a twig.   You know, try and mark the spot.   And when
15    we went back the next day to try and look for the
16    bicycle, it was still hanging.
17 Q  So, you helped participate in an effort to find the
18    bicycle as well?
19 A  Yes.   I didn't find it, but we were there.
20 Q  Okay.   Go back there.
21                      (Witness resumes the stand.)
22 Q  (By Attorney Kontos)   Mr. Hughes, if you want, just look
23    for a moment to -- take a look at your report just
24    to get -- if you can look through it and see
25    specifically what time you were called and what time

RALEIGH C. HUGHES

```
 1              you actually arrived on the scene.

 2    A    (Complying.)  Okay.  We received -- our initial alarm

 3              time, it was 2126 hours.

 4    Q    Which is what time?

 5    A    26 minutes after 8:00 -- or 9:00, I'm sorry.

 6    Q    After 9:00?

 7    A    9:00 o'clock.

 8    Q    Okay.  And what time did you arrive?

 9    A    We arrived on the scene on Jackson Street -- we arrived

10              there at 33 minutes after.

11    Q    9:33?

12    A    Yes, sir.

13    Q    Is there any indication on there what time you left from

14              there to go to the hospital?

15    A    Yes.  We were enroute to St. Joseph's at 9:58.

16    Q    9:58.  Okay.  Now, Mr. Hughes, let me ask you -- you

17              said you've been in this kind of business for ap-

18              proximately 11½ years; had an opportunity to see a

19              lot of various incidents occur.  Relative to other

20              things that you've seen, how would you describe

21              this victim's condition?

22                        ATTORNEY LEWIS:  Objection.

23                        JUDGE McLAIN:  No.  Objection's overruled.

24                        ATTORNEY LEWIS:  He's already --

25    Q    (By Attorney Kontos)  You may answer.


                        RALEIGH C. HUGHES
```

1    A    Well, this is probably one of the most gruesome things                9

2         I've ever seen.

3                        ATTORNEY KONTOS:  Okay.  No further ques-

4         tions.

5    CROSS EXAMINATION BY ATTORNEY LEWIS:

6    Q    Mr. Hughes, as I understand it, you've been with -- or an

7         EMT for what is it?  11 years now?

8    A    That's correct.

9    Q    And you indicated that you're a certified EMT, and you're

10        certified by what organization?

11   A    We are governed by the state of Ohio through the Trade

12        and Industrial Commission that's called T&I.  The

13        state sets up our guidelines of what classes we

14        take.  So, it's governed through the state.

15   Q    Classes.  I suppose somewhere along the line you take

16        some exams, right?

17   A    That's correct.

18   Q    Are these set up by that particular organization?

19   A    That's correct.

20   Q    Okay.  And you've indicated that you received a call from

21        -- I think it was the Fire Department, is that

22        correct?

23   A    Yes, sir.

24   Q    Okay.  And it was in reference to -- and you said a

25        sexual assault.  Was that the original call as you

                        RALEIGH C. HUGHES

9

1            remember receiving?

2  A    Verbatim. Those were the words verbatim as I recall I

3            got over the phone.

4  Q    Did you take the call personally?

5  A    Yes, I did.

6  Q    You indicated when you arrived out at the scene that Mr.

7            Fife was out there and there were some other people

8            you said there. Other people, whatever. Do you

9            know who those people were?

10  A    I have no idea.

11  Q    Were they in uniform? Were they officers?

12  A    No, sir.

13  Q    Did they look like just citizens or just people in street

14            clothes?

15  A    That's correct, yes.

16  Q    And they were there where the boy was found, is that

17            correct?

18  A    I have no idea of knowing that, sir.

19  Q    Well, what I'm saying is that when you arrived at the

20            location where the boy was, okay, are these people

21            there also?

22  A    That is correct, yes, sir.

23  Q    And in the same vicinity as where the boy was found.

24            Okay. I know it was chaotic at the time and you

25            were concentrating on lifesaving efforts and every-

RALEIGH C. HUGHES

9

1      thing else.  Do you happen to recall any scratches

2      on the boy's face other than -- I'm not talking

3      about the burn.  Did you happen to notice any other

4      scratches in the face, perhaps in the left cheek

5      area?

6  A   No, sir, I didn't.  My positioning to the body -- if --

7      you know, let's say that if the ball of the micro-

8      phone would be the patient's head, I was right

9      here (indicating) working on him, so I was pre-

10     dominantly looking in his right side.

11 Q   Okay.  You indicated the fact that the next day, you

12     came back to look for the bicycle, is that correct?

13 A   Yes, it is.

14 Q   Okay.  We're talking about September 10th, 1985, so

15     that would be September 12th -- I'm sorry, September

16     11th, 1985?

17 A   I believe.

18 Q   In other words, a Wednesday.  Would that be the --

19     Wednesday, the next day?

20 A   Yes.

21 Q   Okay.  And who were you with out there?  Were there other

22     people out there looking for the bike?

23 A   Quite a few.

24 Q   Quite a few.  How many would you say approximately?

25 A   I would say probably a hundred people.


RALEIGH C. HUGHES

9

1  Q  A hundred people.  Okay.  And do you recall what time

2       of day was this on that Tuesday -- or that Wednesday,

3       I'm sorry, that you met out there?

4  A  I believe it was right around 10:00 o'clock in the

5       morning.  I'm not certain.

6  Q  Okay.  And you say there's probably a hundred people.

7       Okay.  Did you have an occasion -- with that hundred

8       people or yourself, did you go through the field,

9       sweep the field in some fashion to find the bike?

10  A  Yes, we -- yes.

11  Q  Okay.  And was the bike found that day?

12  A  Yes, it was.

13  Q  It was.  Okay.  You indicated this is on a Wednesday

14       now, is that correct?

15  A  To the best of my knowledge, sir.

16  Q  To the best of your knowledge.  Could you be mistaken

17       about that?

18  A  Pardon me?

19  Q  Could you be mistaken about that?

20  A  I believe it was the following day.  I could be mistaken.

21  Q  Okay.  In any event, the bike was found, is that correct?

22  A  Yes.

23  Q  Okay.  Were you near the location where the bike was

24       found by any chance?

25  A  I was probably -- I was in the exact place where we were

RALEIGH C. HUGHES

1  working on Raymond the night that, you know, he was   10

2  injured when the bike was found.

3  Q    Okay.  In other words, down this area which they've

4  labeled as "E", which you believe is the area where

5  they found the boy, is that correct?

6  A    Yes.

7  Q    As I understand it, your truck was up here, you came

8  down through here and came down along this partially

9  paved road, and then came across into the field

10  (indicating)?

11  A    That's correct.

12  Q    Okay.  And as far as you know, those were just citizens

13  out there or somebody out there at the time when the

14  boy was found when you were out there at the scene

15  also, is that correct?

16  A    That's correct.

17          ATTORNEY LEWIS:  Okay.  Thank you.

18          ATTORNEY KONTOS:  No further questions.

19          JUDGE McLAIN:  Thank you.  You may step

20  down.

21                              (Witness is excused.)

22          JUDGE McLAIN:  Gentlemen, I think we'll

23  be in recess for about 20 minutes.

24                  (Court in recess at 2:35 P.M.)

25                  (Back in session at 2:55 P.M.)

                  (State's Exhibit Nos. 6 and 7 marked
                                      identification.)
            RALEIGH C. HUGHES

1                            THOMAS SKOCZYLAS                          10

2    being duly sworn, according to law, on his oath, testified,

3    as follows:

4    DIRECT EXAMINATION BY ATTORNEY KONTOS:

5    Q    Please state your full name and occupation.

6    A    My name is Thomas Skoczylas.  I'm a patrolman with the

7              City of Warren Police Department.

8    Q    And Patrolman Skoczylas, how long have you been employed

9              by the Warren Police Department?

10   A    Four years.

11   Q    You're in the same capacity throughout the entire 4-year

12             period?

13   A    Yes, Uniform Division.

14   Q    I want to recall your attention back to September 10th,

15             1985, in the evening.  Were you working that parti-

16             cular evening?

17   A    Yes.

18   Q    Did you have an occasion to respond to a call at Jackson

19             Street?

20   A    Yes.

21   Q    Would you please tell the Court here, the three Judges,

22             what you did when you responded.

23   A    Okay.  I was with a partner that day, Patrolman Kathy

24             Giovanni.  We received a call to meet the paramedics.

25             I don't recall the address on Jackson, but it was at

                            THOMAS SKOCZYLAS

1       the corner of Jackson and I believe Delaware.  Upon   10

2       arrival, there was the paramedic squad there and an

3       ambulance, and people were running toward the back-

4       yard.  There's a wooded area.  And at that time, I

5       followed them in, and I had Patrolman Giovanni drive

6       the car around the block to the Valu-King Store.

7   Q   Okay.  What time did you respond to this call?

8   A   That was approximately 9:40 P.M.

9   Q   Okay.  And this area you talked about on Jackson back in

10      the woods, what city is that in?

11  A   It's in the City of Warren, state of Ohio, Trumbull County.

12  Q   Okay.  And you proceeded to follow the people that were

13      running you say?

14  A   Yes.

15  Q   And where did you end up?

16  A   Okay.  We ended up in a wooded area, I'd say maybe two

17      to three hundred feet behind the apartment -- or

18      Palmyra Road Valu-King.

19  Q   And what were the weather conditions like that evening?

20  A   It was very wet outside.  It was raining.

21  Q   And when you were going through this area, was it all

22      wooded or was there other areas that were brush

23      like?  Do you know?

24  A   It was a lot of high weeds.  It wasn't completely wooded.

25      There was some high weeding.  It was all field type.


                        THOMAS SKOCZYLAS

1  Q   When you finally got to the area that you followed the   10

2        other individuals to, what did you observe there?

3  A   Okay.  I observed paramedics.  There was a Med Star

4        Ambulance crew, I believe an Action Ambulance crew.

5        They were working on a white male, very young.  At

6        the time I arrived, I aided them with my flashlight.

7        The male was lying on his back.  He was covered up

8        with a woven rug that evidentally, they had put over

9        him to keep the rain off of him or whatever.

10  Q   Okay.  And did this totally cover him or just cover a

11       portion of him?

12  A   Just from like his chest down.  They removed it so I

13       could take a look at him.  At that time, I noticed

14       that he had a pair of jockey underwear, black

15       T-shirt around his throat area, and he was -- other

16       than that, he was completely naked except for a pair

17       of socks.

18  Q   He was wearing a pair of socks?

19  A   Yes.

20  Q   And when you said there was underwear and T-shirt around

21       his neck, do you mean lying on his neck or sur-

22       rounding his neck?

23  A   They were around his --

24  Q   Around his neck?

25  A   Yes.


THOMAS SKOCZYLAS

1  Q    Okay.  And do you know if any of his relations were

2       there?

3  A    Yes, I spoke to his father briefly.

4  Q    Okay.  And what conversation did you have with his

5       father?

6  A    Okay.  I asked who had found the boy there, and Mr. Fife

7       replied to me that he had, and I asked him how he

8       came to look for him back there, and he stated that

9       his son rode back that way as a shortcut to a friend

10      of his over on Willow Street.

11 Q    Okay.  Did he mention anything about anything that was

12      lying around the area; any items?

13 A    Well, there was a blue bandana type handkerchief lying

14      there that he stated he had used that was his.  He

15      used it to wipe the vomit from the boy's facial

16      area and clear his mouth out.

17 Q    And he indicated to you that that was not with the boy,

18      but he brought it himself?

19 A    Right, he said it was his.

20 Q    When you were looking at the little boy, did you notice

21      any kind of physical discoloration or anything

22      unusual about his face?

23 A    Yes.  His face was swollen and bruised, and he also had

24      some black marks right around his chest area where

25      the clothing had ended.  The bottom of the clothing.


                    THOMAS SKOCZYLAS

1    Q    Could you notice anything unusual about the clothing at

2         all from observing it?

3    A    Not at that time.

4    Q    Okay.

5    A    It was very wet from the rain.

6    Q    Okay.  Did you notice any other parts of his body that

7         may have been bruised or anything?

8    A    Not at that time.

9    Q    Okay.  As a result of being at that scene, did you have

10        an occasion to gather any evidence?

11   A    Yes, I did.

12   Q    Officer Skoczylas, I'm going to hand you now what's been

13        marked for identification purposes as State's Exhi-

14        bit Number 6, and I'd like for you to take a look

15        at that, please.  You recognize that?

16   A    Yes, sir.

17   Q    Tell the Court what that is, please.

18   A    These are the underwear that I collected at the scene

19        that were around the neck of Raymond Fife.

20   Q    Okay.  And when you collected them, what did you do with

21        them?

22   A    I stuck them in an evidence bag, signed it, and then

23        after I left the scene, I went to the hospital and

24        gave them to Detective Steinbeck.

25   Q    Okay.  Is there any particular marking on that bag that

THOMAS SKOCZYLAS

1           would indicate that you had picked that up?

2   A   Just a signature, Skoczylas to Steinbeck.

3   Q   That's your signature on there?

4   A   It isn't on my bag.  This is not my signature on this

5         bag.  I put both garments in one bag.

6   Q   Does it indicate who the person who picked it up is?

7   A   Yes, Skoczylas.

8   Q   You notice anything unusual about the underwear?

9   A   Yes, they were -- appeared like they had been lit on

10         fire, burned.

11   Q   Okay.  Thank you.  I'm now going to hand you what's been

12         marked for identification purposes as State's Exhi-

13         bit Number 7.  I'd like for you to take a look at

14         that, please.  You recognize that?

15   A   Yes, sir.

16   Q   What is that, please?

17   A   This is the T-shirt that was also around the neck of

18         Raymond Fife.

19   Q   And did you pick that up?

20   A   Yes.

21   Q   And what did you do with it?

22   A   I stuck it in this evidence bag.

23   Q   Is there a place indicating that you were the one who

24         picked that up?

25   A   Yes.  This is my handwriting.  It's signed by me that I

THOMAS SKOCZYLAS

1        recovered it.                                                    10

2    Q   And does it indicate on there who received that from you?

3    A   Detective Steinbeck.

4    Q   You see anything unusual about that item?

5    A   I believe it also -- it's got some vomit stains on it.

6        It also had some burn marks on it.

7    Q   Okay.  Officer Skoczylas, could you please stand up for a

8        minute and come to this exhibit.

9                         (Witness steps off the witness stand
                           and approaches the diagram.)

10

11                  ATTORNEY KONTOS:  Can the Court see it

12       from there?

13                  JUDGE McLAIN:  Yes.

14                  JUDGE NADER:  I'm getting a reflection.

15                  ATTORNEY KONTOS:  This way?

16                  JUDGE McLAIN:  Well, I can't see all the

17       little names you have on there.

18                  ATTORNEY KONTOS:  Down here you mean?

19                  JUDGE McLAIN:  Well, it's not that the

20       print's so small.  It's sort of dull or something.

21       I guess that's all right.

22   Q   (By Attorney Kontos)  Okay.  Officer Skoczylas, this is

23       marked as State's Exhibit Number 4.  It's a diagram

24       of the wooded area and the street surrounding it.

25       Over here is Jackson Street (indicating).  This is


                          THOMAS SKOCZYLAS

1      Nevada, Delaware, Hemlock, and Willow (indicating)     10

2      where it dead ends into the wooded area.  Down here

3      is Palmyra Road (indicating).  This is categorized

4      as a wooded area.  Down here is a main path (indi-

5      cating).  This is the Valu-King Store (indicating)

6      which has attached to it the drug store and the

7      Laundromat.  Now, could you tell us approximately

8      where you first put your cruiser when you responded

9      to the call.

10  A   Okay.  When I first approached, it was up in this area

11      (indicating).  There's a house right here (indica-

12      ting).  I thought it was Delaware, but it's Nevada.

13      We pulled into this area (indicating).  There's a

14      house there, then like a lot that isn't -- there's

15      no house on it.  Another house.  That's where I

16      entered at.

17  Q   And how did you proceed then and in what direction did

18      you go in order to go to the area where the young

19      boy was?

20  A   According to this, it would be in a southerly direction

21      in through -- down this way and across (indicating).

22  Q   Can you point out approximately the area where you saw

23      the boy in this diagram?

24  A   Yes, sir.  It would be the "E" area (indicating).

25  Q   Okay.  Have a seat.


                        THOMAS SKOCZYLAS

```
 1                                 (Witness resumes the stand.)  10

 2                                 (State's Exhibit No. 8 marked
                                      for identification.)
 3

 4    Q    (By Attorney Kontos)  Officer Skoczylas, I'm going to

 5              hand you now what's been marked for identification

 6              purposes as State's Exhibit Number 8.  I want you

 7              to take a look at that.  Tell me if you recognize

 8              what that picture depicts.

 9    A    Yes.  This depicts the area where the boy was found upon

10              my arrival.

11    Q    This is obviously -- is that a day picture or a night

12              picture?

13    A    Well, this is a day picture.

14    Q    It was taken some time after the body was found?

15    A    Yes.

16    Q    Is there an area there that you can point to that would

17              indicate where the boy was, and describe where it's

18              near relative to that picture?

19    A    Yes.  He was right in this area here (indicating).

20    Q    Is there any particular markings or items around there --

21    A    Well --

22    Q    -- that you can point to?

23    A    I can see the -- it appears to the -- the handkerchief

24              that Mr. Fife used to wipe the vomit off and also

25              some papers that were discards from the medical
```

THOMAS SKOCZYLAS

1  crews that were there.

2  Q  When you're looking from that picture, what direction

3  would the large trees be?

4  A  I believe northwest.

5  Q  Would they be this way or would they be this way if

6  you're looking at the --

7  A  They would be (indicating).

8  Q  This way (indicating)?

9  A  North.

10 Q  North.  And possibly slightly east?

11 A  More or less, yes.

12 Q  Does that photograph show the area where the Valu-King

13 and the drug store and Laundromat are at all?

14 A  Yes.

15 Q  Did you gather any other items of evidence that night?

16 A  No.

17 Q  Did you do anything else that evening to help you or

18 assist the police department in gathering any

19 further evidence or explaining where the scene was?

20 A  After they transported the boy, I checked the area

21 briefly the best I could seeing if I could find

22 other evidence, and I didn't find any.  After that,

23 I made a little sketch of the area so if I had to, I

24 could get back to where the boy was, by stepping

25 off from -- I used the corner of the store and --

THOMAS SKOCZYLAS

11

1  Q  Which corner?

2  A  The northwest corner, I guess it would be.

3  Q  The corner nearest the Valu-King or the corner nearest

4     the Laundromat?

5  A  Nearest the Laundromat.

6  Q  And you stepped it back from there to the area where the

7     boy was found?

8  A  Yes.

9  Q  And you did that in terms of paces?

10 A  Yes.  I did that -- from where I was standing, I could

11    see the incinerator smokestack directly in front of

12    me, and there was a wooded area directly in front of

13    me that I kind of used as a straight line just for

14    reference points.

15 Q  Officer Skoczylas, when you arrived at the scene and saw

16    the young boy laying on the ground, what was his con-

17    dition?  Was he responsive or was he unconscious?

18 A  No, he was unconscious.

19 Q  Okay.  And how was he positioned?  Laying which way?

20 A  When I got there, he was laying on his back with his head

21    facing north.  His head was to the north.

22 Q  Up in this direction (indicating)?

23 A  Yes.

24         ATTORNEY KONTOS:  Okay.  I don't have any

25    further questions.


                    THOMAS SKOCZYLAS

1   CROSS EXAMINATION BY ATTORNEY LEWIS:

2   Q   Officer Skoczylas, is that -- I'm going to have trouble

3       with that, I know it.  First name is?

4   A   Tom.

5   Q   Tom.  Is it all right if I call you Tom?

6   A   Sure!

7   Q   Okay.  Thank you.  Tom, do you happen to recall what time

8       it was that you did arrive at the scene out there,

9       to the best of your recollection?

10  A   2140.  9:40 P.M.

11  Q   9:40 P.M.  Okay.  And you indicated that you left your

12      cruiser up here on Jackson Street, is that correct?

13  A   Yes.

14  Q   And you proceeded down through this area and got onto

15      this semi-paved portion over here on the --

16  A   No, I came through.  I didn't hit the paved portion at

17      all.

18  Q   Oh!  You went straight through the field?

19  A   Yes.

20  Q   Okay.  Right straight down into this area (indicating)?

21  A   Yes.

22  Q   And how was it that -- were you following other people

23      that were --

24  A   The crews had ran up in front of me.  I had a basic idea

25      where they were, but I didn't know exactly where

THOMAS SKOCZYLAS

```
 1              they were.  I just ended up that way.  I figured        11
 2              when I got there, I would hear them talking or see
 3              the lights or something.
 4     Q    And when you arrived in this particular area which
 5              you've shown as basically "E" on this diagram and
 6              everything else, how many people were there, or who
 7              was there besides the medics or --
 8     A    Well, there was the -- the paramedics were there from
 9              the Fire Department.  There was a Med Star crew
10              there, an Action Ambulance crew.  Mr. Fife was there
11              and I believe his son-in-law or son possibly.  I
12              don't recall exactly.  And I think there was one or
13              two people from the block watch there also.
14     Q    Okay.  So, just citizen people?
15     A    Yes.
16     Q    You indicated the fact that you removed the two exhibits
17              you were shown, which was the underwear and also
18              the black T-shirt?
19     A    Yes, sir.
20     Q    Can you tell me how did you remove those?
21     A    I did not remove them.  I picked them up.  They were re-
22              moved by one of the attendants that was attending
23              to him, and I just waited until they transported
24              him and picked them up.
25     Q    Okay.  Well, let me ask you this:  When you arrived at
```

THOMAS SKOCZYLAS

1        the scene, where exactly were the underwear at and

2        where exactly was the T-shirt at?

3  A   Around his -- around the throat portion of Raymond.

4  Q   Okay.  And you didn't remove them or you did remove them?

5  A   I did not.

6  Q   Do you know who did remove them?

7  A   No.

8  Q   But they were around his throat, is that correct?

9  A   Yes.

10  Q   Okay.  Did you happen to -- you say you checked the scene

11        briefly after removal of the victim, is that correct?

12  A   Yes.

13  Q   Okay.  Did you find any burn area underneath where his

14        body was at the time?

15  A   No.

16  Q   You didn't see anything like that?

17  A   No.

18  Q   Okay.  You identified State's Exhibit Number 8 which has

19        the date 9/11; September 11, 1985, which is the day

20        after.  It has Officer Teeple on it.  I assume this

21        was taken by Officer Teeple?

22  A   Yes.

23  Q   Were you out at the scene the day this photograph was

24        taken?

25  A   No.

THOMAS SKOCZYLAS

1    Q    Okay. But to the best of your recollection, that's

2         basically the area you remember?

3    A    Yes. It was a large trampled down area.

4    Q    You also indicated, I think, that you paced off the

5         direction or the footage or -- by walking pace from

6         the area right behind the Valu-King out to the area

7         where the boy was found, is that correct?

8    A    Yes. It would have been from the corner of the building.

9    Q    Over here (indicating)?

10    A    Yes.

11    Q    Okay. And how much distance did you get on that?

12    A    I would estimate a hundred and eighteen.

13    Q    A hundred --

14    A    And eighteen.

15    Q    But translated from your pace into feet and yards,

16         what's the approximation of that?

17    A    Maybe 240 to 300 feet, somewhere around there.

18    Q    Maybe a hundred yards would you think?

19    A    Approximately.

20    Q    Okay. Did you go back out the next day? Was Officer

21         Teeple with you any time the next day in regard to

22         looking at the scene?

23    A    No. I didn't return to the scene the next day.

24    Q    Okay. Was anybody else with you in the cruiser that

25         night? Any other officers?

THOMAS SKOCZYLAS

11

1   A   Patrolman Giovanni.

2   Q   Okay.

3   A   She stayed in the car.

4   Q   Okay.  Were there any other officers there before the

5       victim was removed from the area?

6   A   No.

7   Q   There wasn't?

8   A   No.

9           ATTORNEY LEWIS:  Okay.  No further ques-

10      tions.  Thanks, Tom!

11          ATTORNEY KONTOS:  Nothing further, Your

12      Honor.

13                          (Witness is excused.)

14          ATTORNEY WATKINS:  Your Honor -- Your

15      Honors, our next witness in time is James Teeple.

16      We have a lot of exhibits; over 50, that need to be

17      marked.  We expect him to be a long time.  We be-

18      lieve a recess at this time might be appropriate.

19          JUDGE McLAIN:  How long do you think the

20      marking will take?  Will it consume the rest of the

21      day?

22          ATTORNEY WATKINS:  Yes, I think most of

23      it.

24          JUDGE McLAIN:  All right.  We'll stand

25      adjourned then until 9:00 o'clock tomorrow morning.


                    THOMAS SKOCZYLAS

1    ATTORNEY WATKINS:  Thank you, Your Honor.    11

2    ATTORNEY KONTOS:  Thank you.

3    (Court in adjournment at 3:17 P.M.)

4    (State's Exhibit Nos. 9 through 54 marked
     for identification.)

5

6    * * * * * * * * * * * * * * * * * * * * * * * * * *

7    Wednesday, January 22, 1986, at 9:08 A.M.

8    ATTORNEY WATKINS:  May it please the

9    Court, Detective James Teeple will be our first

10   witness this morning.

11

12              JAMES TEEPLE

13   being duly sworn, according to law, on his oath, testified,

14   as follows:

15   DIRECT EXAMINATION BY ATTORNEY WATKINS:

16   Q    Ready?

17   A    Um-hum.

18   Q    Jim, would you give your full name and place of employ-

19        ment.

20   A    My name is James Teeple.  I'm employed by the Warren

21        Police Department.

22   Q    And you've been employed there for some years?

23   A    25.

24   Q    And would you tell the Court your job.

25   A    My job is evidence collection, preservation, transporta-

              JAMES TEEPLE

1          tion, fingerprinting, polygraph; crime lab work.    11

2   Q    Unlike other cases, you have to look to your right rather

3          than to your left in answering my questions, which I

4          know is obvious.  You were at one given time in

5          September, called by the officers involved initially

6          to follow up and investigate the homicide of Raymond

7          Fife?

8   A    Yes, sir.  That was 10:30 P.M. on September the 10th.

9   Q    Okay.  And would you tell the Judges what you did.

10   A    I arrived at the scene and conferred with -- or I arrived

11          at the station and conferred with Sergeant Stein-

12          beck, received some evidence from him; namely, a bag

13          containing a black undershirt -- or a T-shirt with

14          the word Wrangler on it and a pair of undershorts

15          that were knotted and burnt.  After that, I went to

16          the hospital to confer with the doctor and see the

17          nature of injuries.  I was refused any conference

18          with the doctor and refused any possibility of

19          taking any pictures of the victim, Raymond Fife.

20          Then I got a hold of the head nurse, Kathy Kaloutsas,

21          who was in charge at that time, and Sister Kathy,

22          who is in charge of public relations at St. Joseph's

23          Hospital, and made arrangements to have a rape evi-

24          dence kit administered on the boy.

25   Q    And approximately what time did you finish?


JAMES TEEPLE

11

1  A    Approximately 3:00 A.M.

2  Q    Okay.  Now, I'm going to hand you what's been previously

3       marked as Exhibit 6 and 7, and would you look at

4       those and tell the Court whether or not you can

5       identify the exhibits.

6  A    Okay.  This Exhibit Number 6 is what I made reference to

7       as a pair of undershorts that were knotted and

8       burnt given to me by Sergeant Steinbeck who had re-

9       ceived them from Mr. Skoczylas, and in the same bag

10      at that time was the black undershirt with the word

11      Wrangler on it -- or T-shirt.  It was also given to

12      me by Sergeant Steinbeck, and they were in a plas-

13      tic bag similar to this and -- oh, this is the

14      plastic bag that contained it, and they were soaken

15      wet at that time.  It was raining at the time I ar-

16      rived at the station quite hard, and so it's normal

17      to take the material out of the bag and air-dry it

18      immediately to keep it from spoiling and try to

19      preserve any physical evidence that may remain on

20      it.

21 Q    Okay.  And what was done with those items?

22 A    Okay.  They were taken to BCI, and a request was made

23      from BCI to check for accelerants.  BCI informed me

24      that they were unable to do that.  They had some

25      equipment that was broken, and they recommended that

JAMES TEEPLE

1   we take it to the Fire Arson Fire Marshall's Office  12

2   in Columbus, the Arson Crime Lab Division, and we

3   took those down to the Arson Lab at 10:16 -- at

4   1:10 P.M.  Sergeant Carnahan and myself transported

5   them to Columbus where we submitted them as evidence.

6 Q Okay.  And what results, if any, did you receive?

7 A The results from the Ohio State Department of Commerce,

8   Division of State Fire Marshall's Office in Columbus,

9   Ohio, reported the findings as Exhibits 1 and 2,

10   our Exhibit 4, these were negative for any accel-

11   erants.

12     ATTORNEY LEWIS:  Objection, Your Honor.

13   Those were obviously tests that were run by some-

14   boy else.  I don't think Mr. Teeple -- it's all

15   hearsay as far as I'm concerned.

16     JUDGE McLAIN:  Objection sustained.  In

17   addition to that, it was a negative test, is that

18   right?

19     ATTORNEY WATKINS:  That's correct, Your

20   Honor.

21     JUDGE McLAIN:  Well, it's -- that portion

22   of the testimony is stricken.  His findings were

23   hearsay.  Outside of that, it would tend to show the

24   amount of the investigation done by the police.

25 Q (By Attorney Watkins)  The items have been kept in your

JAMES TEEPLE

1        custody?

2 A   Yes, sir.

3 Q   Could you describe the items?  Whether or not you saw

4        anything on the shirt or the underpants.

5 A   The shirt was partially consumed; appeared to be burnt,

6        and also, the undershorts contained the same ob-

7        vious burning of portions of them.

8 Q   Going on to the next day which would be the 11th, would

9        you tell the Court what you did.

10 A   Okay.  The morning of the 11th, I went back to St.

11        Joseph's Hospital to pick up the rape evidence kit

12        as it had already been picked up and taken to the

13        refrigerator by Detective Blevin.  I went back to

14        the station, conferred with the officers a few

15        moments, and went to the scene where I photographed

16        the scene and started my search for evidence.

17 Q   Okay.  And how long were you out at the scene?

18 A   I was there probably till 4:30 that afternoon.

19 Q   Would you tell the Court what you normally do as an in-

20        vestigator for the -- and evidence collector for

21        the Warren Police Department when you go to the

22        scene.

23 A   Well, after reviewing the case with the officers that

24        are initially investigating it, I try to determine

25        what it is that I may be looking for and photograph

JAMES TEEPLE

12

1    the entire scene to preserve it, collect any evi-

2    dence that may or may not be related to the case

3    before anything can happen to it.

4 Q And do other officers assist you in showing you places?

5 A Sergeant Carnahan -- oh, the other officers, yes, they

6    show me if I was not there at the time that the

7    incident -- shortly after the incident occurred when

8    the body -- or the victim was there, why, they show

9    me where these places are.

10 Q Okay.  You said you took photographs that day?

11 A Yes, I did.

12 Q Okay.  What kind of camera did you use?

13 A I believe I used a Canon AE1 program that day.

14 Q These have been marked, and I'll have you go through the

15    photographs, 9 through 20 I believe, and would you

16    go through them from top to bottom and explain what

17    they depict.

18 A Exhibit 9 is a view from Palmyra Road showing the entire

19    Valu-King, Rite Aid, and dry cleaner complex there,

20    and the parking lot area.

21   Exhibit Number 10 is another view showing the wooded

22    area to the east and a portion of the Valu-King and

23    dry cleaner complex.

24   Exhibit Number 11 is a view from the same location,

25    Palmyra Road, showing the west end of the Valu-King

JAMES TEEPLE

1      showing -- the driveway goes around to the left

2      of Valu-King, showing the car wash and the wooded

3      area behind that.

4    Exhibit Number 12 is a view taken from where it was

5      pointed out to me that Raymond Fife was found that

6      evening looking south toward the Valu-King.

7    Exhibit Number 13 is another view taken from where the

8      victim was found looking southwest into the wooded

9      area.

10  Q  By the way, do you mark where you're looking on some of

11     these?

12  A  Yes, I do.

13  Q  Okay.

14  A  Exhibit Number 14 is standing where the victim was

15     found looking north from the scene showing all the

16     high grass and trees, and that's towards the

17     Jackson Street area.  Shows how high the trees

18     were and that.  You can't see houses or anything

19     from that area.

20   Exhibit Number 15 is looking east from where Raymond

21     Fife was found showing the grass and the condition

22     of the area, the tall tree row.

23   Exhibit Number 16 is looking west from where Raymond

24     Fife was showing -- this is over towards the Willow

25     Drive area, and you can just make out some of the

JAMES TEEPLE

1    houses past the tall trees and the high brush.

2  Exhibit Number 17 is a -- at that same location where it

3    was pointed out to me where the victim was found,

4    where a blue and white handkerchief was found by

5    Sergeant Carnahan and myself.  It was photographed.

6    Later, in talking with Mr. Fife, Raymond's father,

7    it was found that this was his handkerchief, and he

8    used it to clear the mouth of Raymond when he found

9    him, and it was collected and preserved as evidence.

10  Exhibit Number 18 is showing the path from the curve

11    looking south towards the Valu-King, one of the

12    heavily used paths in that area behind the Valu-King

13    off of Palmyra Road.

14  Exhibit Number 19 shows an area looking into the wooded

15    area to the west from the path at the same spot that

16    this -- that Exhibit Number 18 was taken.

17  And Exhibit Number 20 is a photograph looking northwest

18    along the path from that curve in the field behind

19    Valu-King.

20  Q  Do all these photographs accurately depict the scene

21     as you saw it --

22  A  Yes, sir, they do.

23  Q  -- on the afternoon of September 11th, 1985?

24  A  Yes, sir, they do.

25  Q  And would you, for the foundation purposes, tell the

JAMES TEEPLE

1        Court where the scene of the crime is located          12

2        geographically.

3    A   The scene of the crime is located to the rear of Valu-

4        King off of Parkman -- off of Palmyra Road, which

5        would be north of Palmyra Road and south of Jackson

6        Street in the southwest section of town.

7    Q   And what city, what county?

8    A   City of Warren, County of Trumbull, state of Ohio.

9    Q   Okay.  Now, did there come a time that you would take

10       other photographs?

11   A   Yes, sir.

12   Q   And would you tell the Court the next time that you take

13       photographs of the scene.  We're staying with the

14       scene.

15   A   I believe it was on the 13th.  Friday the 13th.

16   Q   Okay.  Series of photographs here, and again, as with

17       the exhibits 9 through 20, I would like you to go

18       through 21 in sequence and tell the Court whether

19       or not you recognize them.

20   A   Okay.  Exhibit Number 21 is a view in that same area.

21       It would be to the west of the path leading from

22       the rear of Valu-King, and it's a view of the bi-

23       cycle that was located in a search that was con-

24       ducted on Friday the 13th, and this photograph was

25       taken immediately after the bicycle was found and

JAMES TEEPLE

1    secured.

2    Exhibit Number 22 is just another view of that bicycle

3         a little closer.

4    Exhibit Number 23 is the same date, 9/13, showing the bi-

5         cycle and showing in the background, Ray Messina

6         and his bloodhound Nickle after he had been scented

7         on the bicycle and in the general area where he lo-

8         cated the boy's -- the victim's shorts.

9    Exhibit Number 24, taken 9/13, shows Ray Messina and his

10        bloodhound Nickle and the undershorts matching the

11        description of belonging to Raymond Fife just after

12        he had passed over them and had located them.

13   Exhibit Number 25 was taken immediately after that

14        showing only the shorts in the area, and this is

15        just to the west of the bicycle some 60 feet.

16   Exhibit Number 16 is another view on the path looking

17        toward the Valu-King from the point where you enter

18        to go back west to the bicycle and to where the

19        shorts were found.

20                  ATTORNEY LEWIS:  Excuse me.  That was

21        Number 16 you said, or was it 26?

22   A    I'm sorry.  Number -- Number 26.

23                  ATTORNEY LEWIS:  Thank you.

24   A    Number 26 taken -- okay.  Now, this Exhibit Number 26

25        was taken on the 16th.


                        JAMES TEEPLE

1   Q    (By Attorney Watkins)  Okay.  Why was that taken on the      12

2        16th?  Any particular reason?

3   A    I just elected to take more views of the scene on the

4        16th.  I've taken views in that area there for a

5        couple of weeks.

6   Q    Okay.

7   A    Also on the 16th is just another view of the path area

8        looking north from where Exhibit Number 26 was

9        taken looking in the other direction.

10       On the 16th -- Exhibit Number 28.  It was taken on the

11       16th showing the bend area a little bit better from

12       -- back a little bit further on the path looking

13       north.

14       Exhibit Number 29 was taken on the 16th in the same area

15       showing the same path, another view, looking north-

16       west from another area on the path just -- just

17       north of the bend.

18       Exhibit Number 30 was taken on the 16th showing --

19       showing the path area and including part of the

20       parking lot of the Valu-King looking north toward

21       the path.

22       I think for continuity, possibly we should go into what

23       I did on the 15th in order to --

24  Q    Okay.

25  A    Proper continuity.


                        JAMES TEEPLE

Q   Go ahead.

A   Okay.  On -- the 15th was a Sunday.  I arrived at the
    station and read some of the statements that had
    been taken by the officers in trying to update my-
    self on the case; keep current with it, and found a
    statement by a Donald Allgood, which I read, and he
    described in his statement seeing four men -- or
    four boys exit -- four males exit the path on --
    from the Valu-King area onto Willow Drive; the dead
    end of Willow Drive, and in order to get a little
    better perspective of what he saw, Sergeant Carnahan,
    myself, and Mr. Watkins from the Prosecutor's Office
    went to Donald's house after calling him and asked
    him if he could take us to this location and point
    out exactly what he saw, and when we got to the
    Willow -- end of Willow Drive there, why, he pointed
    out to us where he was standing and where he saw the
    boys exit.  And we put him exactly -- had him point
    out exactly so that I could photograph the area
    and get a little better idea of what he was talking
    about.  And I asked him what the boys were doing,
    or Sergeant Carnahan; I don't know which of us asked
    him what the boys were doing, and he said that they
    were coming out, and I believe it was -- two of
    them were zipping up their zippers.  And he says

                         JAMES TEEPLE

yes, he saw one of them throw a stick into the

woods or throw something into the woods, and I asked

him where he saw this, and he stood where Exhibit

Number 31 is.  It shows Sergeant Carnahan the fol-

lowing day standing pointing in that direction.

Now, this is on the path looking southwest from Willow

Drive -- or southeast from Willow Drive pointing to

the area that Mr. Allgood pointed out.  And I asked

him what it looked like he saw because this was

very heavy underbrush or over brush there, some

trees there, young saplings, eight to 10 feet, and

a lot of large trees.

ATTORNEY LEWIS:  Your Honor, I'm going to

object.  This is all particular hearsay at this

point.  Absolutely, what somebody else told him is

absolutely hearsay.  I've let it go for a while.

ATTORNEY WATKINS:  The purpose is not the

truth --

JUDGE McLAIN:  You're describing what you

saw yourself?

A    Yes, sir.

JUDGE McLAIN:  Objection overruled.

ATTORNEY LEWIS:  If I understand it cor-

rectly, Your Honor, he is saying what Donald All-

good said to him.  That's what he's talking about.

JAMES TEEPLE

1    JUDGE McLAIN:  Some parts of it -- that

2    evidence is accepted.  That's background evidence as

3    to how he happened to be where he was and why he did

4    what he did.  Admitted for that purpose.

5  A  Mr. Allgood said it looked like a stick, and I -- in

6    order to locate any items that were in there, I

7    needed a description of it, and I asked him how long

8    it was, and he told me it looked about this long

9    (indicating with hands), and he demonstrated how it

10   was thrown.  So, on the 16th --

11 Q  (By Attorney Watkins)  Did -- was the direction shown --

12 A  Yes.

13 Q  -- to you?

14 A  He threw it in a northerly direction from the path and

15   pointed out that to us.  So, we took Mr. Allgood

16   back to his house and went back to the station and

17   called Mr. Dick Thomas of the -- superintendent of

18   street departments for the City of Warren, and since

19   it is such heavy, brushy area, we asked could he

20   have a crew come out and help us with this search

21   with some type of equipment, machinery, brush hog

22   or weed cutters or whatever was necessary to clear

23   this brush and search the area at a time.  Monday

24   morning at 8:00 o'clock, we arrived at that loca-

25   tion, and we searched the area for a couple of

JAMES TEEPLE

1         hours and cleared an area probably 50 by a hundred

2         in order that we could locate any items that may be

3         in that area.

4 Q  While we're on that, were items found in that area?

5 A  Yes, sir. There was a stick matching -- or there was a

6         stick of that length found in that area about 19

7         feet off of Willow Drive and about six foot off of

8         the path. That was one of the things found.

9 Q  Were there quite a few items on the ground there?

10 A  Yes, sir, there was.

11 Q  And --

12 A  There was a lot of pop cans --

13 Q  Were there other sticks?

14 A  -- there was -- yes, there was other sticks, but the

15         reason this particular stick caught my eye is be-

16         cause it appeared to have been freshly put. Hadn't

17         been there for a long time. All these other sticks

18         were under grass, were covered with moss, were

19         securely attached or growing there. It was -- it

20         looked like a broom handle, and it was just -- it

21         was not covered with any moss or it was not dirty,

22         it wasn't grown with weeds.

23 Q  Okay.

24 A  Now, the pop cans were rusty. We found a ruler there,

25         broken in an area -- a tape measure, not a ruler.

JAMES TEEPLE

1   Q   I'm going to hand you what's been marked as Exhibit 47.

2       A little out of order.  It's appropriate I think.

3   A   Okay.  47 -- Exhibit Number 47 is the stick that I found

4       -- Sergeant Carnahan and myself found that day,

5       9/16/85, at about 8:45 A.M., just about six feet

6       to the northeast of the path leading off of Willow

7       Drive and about 19 feet off of Willow Drive after

8       clearing some of the brush.

9   Q   Would you tell the Court what was done with the stick

10      after you took it and whether or not it left your

11      possession at any particular time.

12  A   Okay.  Yes, it did.  This stick, according to the chain

13      of possession of evidence, was taken by Sergeant

14      Carnahan to the Ohio BCI Lab on 9/19 and returned to

15      me by Sergeant Carnahan 9/19 at 5:30 P.M.  I myself

16      took it over to Doctor Adelman at St. Joseph's

17      Hospital on the 20th at 8:05 and received it back

18      from Doctor Adelman on the 20th -- on the 23rd.

19      Doctor Adelman signed on the 20th for it.  On the

20      23rd, I went back over and picked it up from Doctor

21      Adelman.  Then on the 4th, it went back to BCI Lab

22      by Sergeant Carnahan and was checked again and

23      brought back that same day.

24  Q   Is that stick in the same condition as it was when you

25      found it?

JAMES TEEPLE

1   A   It appears to be.  It's -- it's approximately the same   13

2           length and it's broken on the end like it was.

3   Q   Why don't you take it out and show the Court what it

4           looks like.

5   A   (Complying.)  Okay.  This is the stick.  It has my

6           initials on this end of it, and it appears to be in

7           the same condition as when I -- when I located it.

8   Q   Okay.  Thank you.

9                  ATTORNEY LEWIS:  Can I see that?

10                (Attorney Lewis examines exhibit.)

11   Q   (By Attorney Watkins)  The photographs that you were going

12           through, I lost my track.  Where were we at as far

13           as number wise?

14   A   We completed the photographs showing Sergeant Carnahan

15           standing at the area where we searched and located

16           the stick prior to the brush being cut.

17   Q   Okay.  Go on.

18   A   Okay.  After we completed that search area, which took

19           the majority of the morning searching that area,

20           why, we returned to the station where someone there

21           said they wanted to take a video statement and asked

22           if -- I believe it was -- I believe it was Sergeant

23           Steinbeck, but I'm not sure, requested that -- okay.

24   Q   We'll come back to the video statement.

25   A   Okay.


                    JAMES TEEPLE

1   Q   Let's go on with the evidence collection as far as the

2       scene.

3   A   Okay.

4   Q   The photographs in particular.

5   A   Okay.  There's two more photographs in this bundle.

6       Exhibit Number 32 shows a close-up view of a portion

7       of a plastic container that is partially consumed

8       with flame back in under the -- under the brush,

9       and this picture was taken a few feet off of the

10      path in the -- between the path and the bicycle a

11      little bit to the north of that.  It would be to the

12      west of the path.

13      And Exhibit Number 33 is the overall area showing kind

14      of a trampled down section in there where the brush

15      had been trampled down and a few burnt items and

16      some burnt leaves in this general area.

17          ATTORNEY LEWIS:  Excuse me.  What date

18      was that picture in regard to the portion of the

19      container?

20  A   9/18.  Both of them.

21          ATTORNEY LEWIS:  9/18.

22  Q   (By Attorney Watkins)  That's the last photograph,

23      correct?

24  A   Yes, sir.

25  Q   All those photographs, like the prior ones, accurately

JAMES TEEPLE

1          and totally depict the scene as you saw it at the    13

2          time taken?

3    A    Yes, sir, they do.

4    Q    Exhibit Number 50 I want to show you and have you identify.

5    A    Okay.  Exhibit Number 50 is the portion of that plastic

6          bottle that was in one of those last two photographs

7          after it was collected and placed in this bag.  It

8          was --

9    Q    Would you -- first, is it in the same condition?

10   A    No, sir, it's not.  The picture shows it in the same con-

11         dition.  There's quite a portion of this missing,

12         and this occurred during the testing at the Arson

13         Crime Lab.  They tested it, and apparently, it was

14         necessary for them to change it.

15   Q    And would you give the dates as far as the chain of evi-

16         dence.

17   A    It was located 9/18/85, and it was taken from Sergeant

18         Carnahan to the lab on the 19th and returned 10/11

19         -- this is 19th of September.  On October 11th, '85,

20         after the equipment at the lab being broken down, it

21         was returned from the lab to Sergeant Carnahan, and

22         then on the 16th, it was taken -- 10/16, it was

23         taken by Sergeant Carnahan and myself to the Arson

24         Lab in -- okay.  I've been saying Columbus, but

25         it's Reynoldsburg, which is just adjacent to Columbus.


                        JAMES TEEPLE

1    I guess the mailing address is Reynoldsburg. Just    13

2    east of Columbus. And from the Arson Lab, why, it

3    was returned by Chief Galgozy, who was down there

4    on other business, 11/7/85 and given to me by Chief

5    Galgozy the morning of the 8th and given to Carnahan

6    11/18 from myself. Carnahan took it to the lab

7    11/18 and returned by Sergeant Carnahan and myself

8    on the 13th of -- January 13th.

9  Q  Okay. Now, would you tell the Court why you went back

10   to the scene and found that?

11 A  The reason I went back is after Danny Hill -- during the

12   videotape of Danny Hill, he described a container

13   that had -- it was plastic, and it was lighter

14   fluid or charcoal fluid or something with a flip top

15   on it that was used to squirt fluid on the victim,

16   and so, we went back in search of that. That's the

17   first I knew of anything like that was after Danny

18   Hill's videotape. And so, we went back, and we

19   didn't locate that until the 18th.

20 Q  Okay. Now, did you smell that particular item?

21 A  Yeah, I did. It smelled -- first of all, it smelled

22   burnt, but it also smelled like -- I don't know,

23   charcoal lighter fluid, kerosene, a cleaning agent;

24   you know, of that thinner type material. And so,

25   that's why we elected to take it to the Reynoldsburg

JAMES TEEPLE

1      Arson Crime Lab to have it tested to determine

2      actually what it was.

3  Q   Okay.  Now, did you at any time look for any other con-

4      tainers, or did you obtain any other containers of

5      lighter fluid or charcoal lighter fluid?

6  A   Yes, I did.  We went to the Valu-King cause Danny Hill

7      said that Tim Combs went to -- in that direction

8      and came back with this bottle that he described

9      in the videotape.  So, I checked all the dumpsters

10     there, and at the time I checked them, they were

11     empty.  We talked to the manager of Valu-King, and

12     he said that it's possible something could be thrown

13     out, and on the shelf, why, we looked around, and

14     this is what we located at the Valu-King for sale,

15     and we purchased a container of it.

16 Q   Okay.

17 A   As a control --

18                     (State's Exhibit No. 55 marked
                           for identification.)
19

20 Q   (By Attorney Watkins)   I'm going to hand you what's been

21     marked as 55, and would you identify that, if you

22     can.

23 A   Okay.  Exhibit Number 55 is the bottle of Topco, T-O-P-

24     C-O, Charcoal Lighter Fluid purchased at Valu-King

25     on Palmyra Road 10/14/85, by myself and Sergeant

                    JAMES TEEPLE

1    Carnahan.  It was taken to the Arson Lab by myself    13

2    and Carnahan 10/16/85; returned by Chief Galgozy

3    -- or -- no, it was returned by myself 10/16/85,

4    the same date.  It was taken to BCI Laboratory on

5    11/18/85 and returned 1/13/86 where it remained in

6    my control.

7  Q  Now, would you show the Court, if you can, where you

8       found similarities between the burnt container and

9       -- would a photograph be better?

10  A  If I may see the photograph.

11  Q  (Complying.)

12  A  I believe the actual evidence shows it better.  In com-

13       paring the two bottles, it appears as though it's

14       a similar type bottle half or partially consumed.

15       If you would imagine this portion being consumed by

16       flame and melted and allowing this bottle to fold

17       in half in this portion and fold over.  This por-

18       tion completely gone, charring around this area

19       (indicating), this portion being melted and allowed

20       to fold over.  It appears to be of some nature to

21       me.

22  Q  Okay.

23  A  This is also another reason it attracted my attention,

24       and I had never seen this type of lighter fluid

25       before, using a gas grill a lot.  It has a flip top

JAMES TEEPLE

1    spout.  You pull a tab up, and that's -- and allow

2    it to squeeze out rather than take the cap off and

3    squeeze it like the old lighter fluid cans.

4 Q And Danny Hill gave you the key?

5 A Danny Hill described this to me, and I was not familiar

6    with this until I found -- I had heard him tell

7    about it, and I found it in the Valu-King Store.

8 Q Now, would you tell the Court where that was located in

9    the store.

10 A Okay.  As you go into the store; Valu-King, you walk in

11    the doors and you walk parallel to the front of the

12    building in a westward fashion.  You go by a blank

13    wall for 10 or 12 feet, and then there's a row of

14    cash registers, and then you can go on in the store.

15    Well, we entered through the -- past the last cash

16    register, and as we -- the first thing that we got

17    to in the store; the first item for sale past the

18    cash registers on the second shelf on the end of

19    what the manage described to me as a column; that's

20    a set of shelves, was a quantity of this lighter

21    fluid.

22 Q So, it was up front?

23 A It was the very first item you could purchase in a

24    store, or one of the very first on the end of the

25    shelves in the Valu-King.


         JAMES TEEPLE

14

1  Q   Okay.  Now, that was done on 9/18?

2  A   Yes, sir.

3  Q   Okay.  And I believe that -- I know that you've described

4      a shirt and underwear that were taken from the neck

5      of Raymond Fife.  I'm going to show you some other

6      photographs, and tell the Court what they are.

7  A   Okay.  Exhibit Number 34 was taken Sunday, 9/15/85, after

8      the clothing had been dried -- air dried, showing

9      the bottom portion of the black T-shirt with the

10     word Wrangler on it, and it depicts some type of

11     substance on the shirt.  I don't know what it is.

12     It's multicolored gook that has dried on there plus

13     it shows how the shirt had been consumed by fire.

14             ATTORNEY LEWIS:  What number was that,

15     Jim?

16  A   34.

17             JUDGE McLAIN:  Just suspend for a moment.

18     I notice there are a few people that want to leave,

19     and we will take that minute now for anyone who

20     wishes to leave, please do so now.  We won't be re-

21     cessing probably until 10:30.

22       (Some members of the audience leave the Courtroom.)

23             JUDGE McLAIN:  Proceed.

24  Q   (By Attorney Watkins)  Okay.  Thank you.  You may con-

25     tinue.


                    JAMES TEEPLE

A    Exhibit Number 35 is a photograph taken 9/15/85 showing,     14

again, another view of the Wrangler shirt, the

burning and whatever matter this happens to be on

the shirt.  It's black with the word Wrangler on it.

Exhibit Number 36, 9/15/85, taken by myself, showing

another view of the bottom portion that had been

partially burnt.

Exhibit Number 37, 9/15/85, shows a close-up view of the

knotted underwear that an exhibit was presented

earlier, and showing a burnt portion of that under-

wear, and the knot's in a close-up detail.

Q    Again, those photographs accurately depict what you saw?

A    Yes, sir, they do.

Q    Thank you.  Now, I believe there came a time that you

took some photographs of some socks?

A    Yes, sir.

Q    And when was that?

A    I don't have that in my notes.  It'll be on the back of

the photographs.

Q    Okay.  I'll hand you what's been marked as Exhibits 38,

39, and 40.

A    Okay.  38 is a photograph taken 9/19/85 by myself; a

close-up view of a sock belonging to Tim Combs

showing a red stain.

Exhibit Number 39, taken 9/19/85, is another photograph


JAMES TEEPLE

14

1         of the same sock showing a little -- not quite as

2         close of a view, and Exhibit Number 9 -- 40, taken

3         9/19/85, another photograph of the same sock.

4 Q  Okay.  Now, when did you come in possession of the sock?

5         Perhaps by looking at 52, this may help you.  I'm

6         handing you what's been marked as Exhibit 52.

7 A  Okay.  Exhibit 52 is the sock described -- or described

8         in the photographs, Exhibit Number 38, 39, and 40,

9         marked as pair of white and red tube socks, TWS,

10        place evidence found 660 Fourth Street, Tim Combs'

11        bedroom, 9/19/85, 1500 hours, given to me by

12        Sergeant Stewart 9/19/85.

13 Q  And did you look at the sock at that time on 9/19?

14 A  I looked at it and photographed it.

15 Q  And what did you notice on it?

16 A  I observed a red stain that I described in the photograph.

17 Q  Okay.  Continue.

18 A  And there, it was placed in -- back in the evidence bag

19        after photographing it and sent to the laboratory

20        at BCI.

21 Q  And when was it sent to the laboratory and when was it

22        returned and by whom?

23 A  Okay.  It was taken to the laboratory 9/30/85 at 9:45

24        A.M.  It was taken there by Sergeant Carnahan, and

25        it was returned 10/11,85 at 9:30 by Sergeant

JAMES TEEPLE

1          Carnahan.                                                  14

2    Q    That's the Brecksville lab?

3    A    Richfield.

4    Q    Richfield?

5    A    Richfield.  Ohio BCI Laboratory.

6    Q    Now, there did come a time you took other photographs of

7         the scene?

8    A    Yes, sir, there did.  I took aerial photographs on the

9         25th of September.

10   Q    And would you tell the Court what you did and how this

11        was done.

12   A    Okay.  This had been arranged for on the 15th with

13        Joe Riffle of Riffle Photography who owns an air-

14        plane and was a former police sergeant.  I contacted

15        Mr. Riffle and told him that we desired to have

16        some aerial photographs of the scene.  He agreed

17        to help us; however, it wasn't until the 25th until

18        the weather cleared and the rain dissipated so we

19        could actually go up.  At 10:30 A.M., I met Mr.

20        Riffle out at the Warren Airport along with Al

21        Weekly, his pilot, and the three of us flew over

22        the area and photographed several views of the

23        area of Valu-King and the crime scene area.

24   Q    Okay.  Would you go through these and identify them,

25        and perhaps take a little bit more time to describe


                        JAMES TEEPLE

1         them.

2   A   Okay.  Exhibit Number 41 is a photograph taken by Mr.

3         Riffle showing the area, and it encompasses the

4         tree line the tree line to the west of that field.

5         It shows Palmyra Road, it shows the entire dead end

6         area of Willow Drive and some of the other streets

7         in that complex.  It shows Jackson Street, and from

8         that view, it's a lot easier to see all the path

9         areas, and you can see the area of where it's grown

10         over with large trees.  You can see the areas it's

11         smaller, and you can see the areas it's just tall

12         weeds.  And it gives you a better perspective of the

13         area.

14   Q   Could you see any tracks of vehicles?

15   A   Yes, you can see tracks of vehicles.  You can also see

16         the path.  There was a track -- what appears to be

17         a track of a vehicle coming from the rear of Valu-

18         King on the west side -- or correction, the east

19         side of the store running in a northerly direction

20         going to the area where the victim, Raymond Fife,

21         was found.

22   Q   Okay.  Continue.

23   A   Exhibit Number 43, dated 9/25, taken by myself.  This

24         shows a little closer view of the area of the

25         Valu-King and the path leading from Valu-King over

JAMES TEEPLE

1            to Willow Drive, some of the houses, and the field         14

2            area where Raymond Fife was found.

3      Exhibit Number 44, 9/25/85, taken by myself, showing an

4            aerial view a little bit closer showing a portion

5            of the parking lot of Valu-King looking north behind

6            Valu-King, and it shows the path over to the Willow

7            Drive area.  It also shows the area where the boy

8            was found.  It shows several paths in the area and

9            all the trees and everything.

10     Exhibit Number 45, 9/25/85, is an aerial view showing a

11           large portion of the streets in that area and the

12           center portion, the crime scene area, Palmyra Road.

13           This view is looking east to west.

14     Exhibit Number 46, 9/25/85, is another view showing

15           clear over to and including Austin Avenue and of

16           the Valu-King.  This is looking in a north to south

17           -- or correction, south to north area showing the

18           Valu-King, the entire crime scene area, and all the

19           surrounding streets from a greater altitude in order

20           to get perspective.

21  Q   Now, you mentioned finding shorts by a bicycle?

22  A   Yes, sir, on 9/13.

23  Q   I show you what's been marked as Exhibit Number 48.

24  A   Okay.  Exhibit Number 48 is a pair of gray and white

25           shorts found in the field behind the Valu-King,


                        JAMES TEEPLE

14

1    Palmyra Road, 9/13/85, by myself and Detective

2    Sines and Ray Messina and his dog Nickle.   These

3    were located after I had been informed that the bi-

4    cycle had been located.   There was a search con-

5    ducted 9/13, and when the bicycle had been located,

6    they secured the area, and the dog was brought to

7    that area, and he located those shorts about 60 some

8    feet to the west of the bicycle.

9  Q   Okay.  Were those shorts identified by anyone?

10 A   They were identified by Mr. Fife as belonging to Raymond;

11    however, I did not conduct that identification.

12 Q   Okay.  I hand you what's been marked as 53.

13 A   Okay.  53 is a blue and white handkerchief that was lo-

14    cated at the area where the boy was found and photo-

15    graphed and described previously in photographs by

16    myself in the field behind Valu-King, and it was

17    also sent to the laboratory for testing.

18 Q   Okay.  Very good.  Did there come a time that you ob-

19    tained a search warrant in this case?

20 A   Okay.  Sergeant Stewart obtained the search warrant, and

21    I accompanied him to the Trumbull County Jail where

22    it was executed.

23 Q   Well, there were several.

24 A   Okay.  I obtained a search warrant for blood from Timmy

25    Combs, and that was 10/15.


JAMES TEEPLE

1   Q   Okay.  Let's take that up now.  Here's Exhibit Number

2       51.  Would you -- search warrant.

3   A   Okay.  Exhibit Number 51 is the copy of the search

4       warrant and return.  Search warrant was issued to

5       myself by the Honorable David F. McLain, and the

6       search warrant is for blood samples of Timothy

7       Combs.  Attached to the search warrant is the af-

8       fidavit.

9   Q   Okay.  Did you obtain blood samples?

10  A   Yes, I did.

11  Q   And would you describe how that was done.

12  A   Okay.  Tris M. Rogers from St. Joseph's Hospital had been

13      contacted and agreed to take blood samples, and

14      after the search warrant was issued, why, we con-

15      tacted Mr. Rogers, and he met us at the Juvenile

16      Justice Center at 2:00 P.M. on October the 15th,

17      along with Sergeant Carnahan and Mr. James Materitz

18      of the Juvenile Justice Center.  Three viles of

19      blood were drawn from the arm of Timothy Combs,

20      marked and taken by myself to Ohio BCI Laboratories

21      after.  After the search warrant was executed, a

22      receipt was given to Mr. Combs for the three viles

23      of blood and a return was filed with Judge McLain.

24  Q   Okay.  Now, the three viles of blood, you were present

25      when they were taken?

JAMES TEEPLE

1    A    Yes, sir, I was.

2    Q    And you took custody of the viles?

3    A    Immediately.

4    Q    And you took them to the BCI Lab?

5    A    Yes, sir.

6    Q    And would you tell us where they are today.

7    A    They are at the BCI Laboratory.

8    Q    Okay.  Did you have an occasion to take custody or con-

9        trol or your Department take custody or control of

10       blood belonging to the victim?

11   A    Yes, sir.  Blood belonging to the victim was taken at

12       the autopsy and was also taken to Ohio BCI Labora-

13       tory on 9/17/85 at 10:10 A.M. and by Sergeant

14       Carnahan.

15   Q    And again, who took the blood for the defendant Combs

16       to the lab?

17   A    Sergeant Carnahan and myself.

18   Q    And is that blood still there; the samples, whatever re-

19       mains?

20   A    Yes, sir.

21   Q    Okay.  Now, did there come a time that another search

22       warrant was issued for teeth impressions or dental

23       impressions of the defendant and Timothy Combs?

24   A    Yes, sir.  That was on 9/19.  A search warrant was ob-

25       tained by Sergeant Stewart.  I accompanied him at

JAMES TEEPLE

1     6:30 P.M. along with Detective -- or Patrolman

2     Brzezinski and Bolin to the Trumbull County Jail

3     where Danny Lee Hill was seized and transported

4     by Brzezinski and Bolin to Doctor Walton's office

5     in Howland on Old Route 82 and where the impressions

6     named in the search warrant were obtained.

7   Q   You were present?

8   A   Yes, sir, I was.

9   Q   And would you tell how -- do you see the defendant that

10     was taken to Doctor Robert Walton?

11  A   Yes, sir.

12  Q   You see the defendant present?

13  A   Yes, sir.  Danny Lee Hill is seated at the end of the

14     table there.

15         ATTORNEY WATKINS:  Would the record re-

16     flect the defendant has been pointed out?

17         JUDGE McLAIN:  Yes.

18  Q   (By Attorney Watkins)  And he went on the 19th about what

19     time?

20  A   6:30 P.M. is the time I have.  I believe that's the

21     time he was seized.

22  Q   And what was done that you saw?

23  A   Okay.  He took dental X-rays.  Doctor Walton took X-rays.

24     He took a complete history like he would when you go

25     to the dentist for the first time.  He took dental

JAMES TEEPLE

1      X-rays, he took two sets of impressions like you

2      would when you have false teeth, and he took some

3      bite impressions. During that time, Doctor Adelman

4      and myself photographed before, during, and after

5      the procedure. Complete photographs were taken

6      showing the teeth before and showing them after.

7   Q  Did you take photographs of the teeth?

8   A  Yes, sir, I did.

9   Q  And who else was present?

10  A  Doctor Adelman, Doctor Walton, Sergeant Stewart, Patrol-

11     man Brzezinski and Bolin, and Danny Lee Hill.

12  Q  Okay.

13  A  At one time, there was -- just before the procedure

14     started, there was a receptionist or dental assis-

15     tan belonging to Doctor Walton, but she left before

16     the procedure started.

17  Q  Now, did there come a time that Timothy Combs was taken

18     there?

19  A  Yes, sir. Immediately after that, after -- after Mr.

20     Hill was returned at 8:15, Mr. Combs was brought.

21     I did not go with Sergeant Stewart to get Mr. Combs.

22     I stayed there and photographed throughout the

23     procedure of Danny Hill, and then he was taken back

24     and Timothy Combs was brought there, and the same

25     procedure was done to him.

JAMES TEEPLE

1   Q   Okay.  And Doctor Walton did teeth -- or dental impres-

2           ssions?

3   A   Two sets of each individual.

4   Q   Did there come a time that Doctor Walton gave you any

5           impressions?

6   A   Okay.  The following day on the 24th -- I'm sorry, the

7           23rd, at 2:15 P.M., I went to Doctor Walton's of-

8           fice, and I picked up the impressions, X-rays, and

9           the things that he had, and signed for them, gave

10          Doctor Walton a receipt for those items.

11   Q   Okay.

12                (State's Exhibit Nos. 49A and 49B marked

13                  for identification.)

14   Q   (By Attorney Watkins)  Jim, I'm going to hand you what's

15          been marked as 49A and 49B.

16   A   Exhibit 49A is the box marked by myself on 9/23 and

17          marked by Doctor Walton as Daniel Hill, 9/19/85,

18          Robert A. Walton, DDS, Number 1M, upper and lower

19          impressions.  This box contains -- wrapped in plas-

20          tic, upper -- or two plastic -- or whatever the

21          material is, marked Daniel Hill, Number 1, lower,

22          9/19/85, which has -- is a casting of teeth, or

23          appears to be a casting of teeth.  The other one is

24          marked Number 1, 9/19/85, Daniel Hill.

25   Q   Okay.  Were those -- how do you know those were the

JAMES TEEPLE

1         items you took that next day?

2 A   I saw him mark them.

3 Q   You saw him mark them?

4 A   And place them in the box.

5 Q   And did you initial the box?

6 A   I initialed the box, placed it in there and sealed it.

7         I did not touch the teeth impressions.

8 Q   And were both items preserved until you gave them to

9         someone else?

10 A   Yes, sir, they were.  They were sealed when I received

11         them from Doctor Walton, and they remained sealed

12         until I gave them to someone else.

13 Q   Okay.  And referring to 49A and B, when did you give

14         them to somebody else?

15 A   Okay.  I have not identified 49B.  Do you want that?

16 Q   Yeah.  I'm sorry.

17 A   49B is marked with my initials 9/23/85.  It's marked

18         Timothy Combs, 9/19/85, upper and lower impressions,

19         Number 1M, Robert A. Walton, dentist, and this con-

20         tains teeth impressions marked Timothy Combs, Number

21         1, lower, 9/19/85, and some initials.  I don't know

22         whose initials they are.  I can't make them out.

23         They're not mine.  This is also marked Timothy

24         Combs, 9/19/85, Number 2, a red number 1 on there

25         also, and these are wrapped in plastic, and these

JAMES TEEPLE

15

1           are the ones -- I saw Doctor Walton put that infor-

2           mation on the back, wrap them, and seal them up in

3           this envelope, and that's when -- some of the items

4           that I signed for from him, and I kept them in my

5           possession locked in the safe at the police depart-

6           ment until 9/24.  The following day at 9:30 A.M.,

7           I personally transported the items to Doctor Curtis

8           Mertz in -- what was it?  Ashtabula or Painesville.

9           On Elm Avenue.  4605 Elm Avenue in Ashtabula,    o.

10          He gave me a receipt for all of the items I ga   t

11          him including these items here.

12  Q    List all the items that you did give to Doctor Mert

13  A    Doctor Mertz.  Okay.  "At about 9:30 A.M., Mr. Teepl

14          arrived at my office with evidence from Raymond

15          Fife homicide.  Received miscellaneous photograp

16          one set of upper and lower model of Timothy Comb

17          and Daniel Hill, and wax bite records and X-rays

18          of the above two subjects.  Time 9:57.  Curtis A.

19          Mertz."  That's the items that I transported to --

20  Q    Okay.  Now, in the course of your work on the Fife case

21          -- by the way, were these returned to you at any

22          time?  They remained in the box?

23  A    Wait!  These are -- these the ones that went to Mertz?

24  Q    Yeah.

25  A    Okay.  Because we have two sets of them, and these sets

JAMES TEEPLE

1        were also then -- they were -- I can't account for

2        what happend to them between the time I took them

3        to Doctor Mertz.

4  Q  And how they got here?

5  A  And how they got here.

6  Q  Okay.  One more photograph here, Number 8.

7  A  Number 8, taken 9/11/85; this is the first photograph I

8        took -- or one of the first photographs I took of

9        the scene showing the area where it was pointed out

10       to me that Raymond Fife, the victim, was found.

11       It also shows the medical apparatus around the area,

12       the blue handkerchief, my camera case, the grass

13       trampled down, and it's looking in a south --

14       southerly direction.

15  Q  When was that particular photograph taken?

16  A  This was taken early morning hours 9/11/85.

17  Q  Okay.  Again, it's accurate and a complete reproduction

18       of the scene?

19  A  Yes, it is.

20  Q  Okay.  Now, did there come a time that you got involved

21       with any diagrams?

22  A  Yes, sir, on 10/11/85.

23  Q  Why don't you come over here, Jim, so you can easily go

24       through the diagram, if you can identify it.

25                 (Witness steps off the witness stand
                      and approaches the diagram.)

JAMES TEEPLE

1    Q    (By Attorney Watkins)   That's the best position for the      15

2         Court.   Let's move it.

3                        ATTORNEY WATKINS:   Your Honors, that okay?

4    A    This is the diagram on 10/11/85 that the measurements

5         were taken for.   It was actually prepared by Rick

6         Dailey of the Weathersfield Police Department.   I

7         accompanied him to the area.   We measured the scene

8         with a wheel that is calibrated, and I gave him the

9         information that I asked him to place on the map.

10        We obtained scale maps from the City of Warren where

11        we could get those measurements accurately without

12        taking it.   He has informed me it is to scale, and

13        these items were by my -- my measurements were re-

14        layed to him and pointed out to him where I wanted

15        to --

16   Q    Now, as you go through this diagram and point out, I'd

17        like you to point out, for example, sites that were

18        -- the red dots, and tell the Court whether or not

19        the prior photographs you have taken would depict

20        certain areas and do depict certain areas.

21   A    Okay.   The prior photographs do depict certain areas.

22        The aerial photograph is good in a lot of cases be-

23        cause it encompasses this whole area (indicating),

24        and you can see down there.   Now, this area's

25        heavily wooded here (indicating), and by standing

JAMES TEEPLE

1    here photographing to here (indicating), you could    15

2    not see this point (indicating), or by standing

3    here photographing this area (indicating), you could

4    not see this point (indicating).

5  Q  Would you explain why.

6  A  Because of the trees.  It's heavily overgrown.  Some of

7    the brush at that time -- I don't know what the con-

8    dition of it was when they visited the scene, but

9    the time -- I believe I even have a photograph

10   showing some people hidden because I didn't realize

11   they were there, but the grass was so tall that you

12   could only see portions of their head.

13 Q  By the way --

14 A  Sergeant Carnahan is six foot tall, and I think in one

15   of the pictures, we saw his eyes.

16 Q  By the way, how would the condition today compare if we

17   went out to the scene, say, yesterday?  Is there any

18   difference?

19 A  Okay.  Unfortunately, I didn't go to the scene yesterday,

20   but I assume that the leaves are gone and that the

21   visibility would be better, but I can't say for

22   sure.  I haven't been to the scene for -- I don't

23   believe I've been to the scene since 10/11.

24 Q  Okay.

25 A  "This area "A", or the portion marked "A', is where the

JAMES TEEPLE

bicycle was found, and it's 72 feet from this path    15

in a westerly direction -- or a southwesterly direc-

tion; here being Valu-King (indicating).  I think

it's self-explanatory.  Palmyra Road, Jackson Street,

Market Street (indicating).  Up here, for perspec-

tive, is Quimby Park, there (indicating).

Area "B" is where the dog located the shorts, and that

was a total of a hundred and 39 feet from that, or

67 feet from the bicycle.

Now, "E" is measured and referenced to this easement

(indicating).  There's -- a big sewer drain runs

through there, and there's some pipes and stuff

coming up underground, and we reference everything

to that easement on the map for simplicity purposes.

Item "E" is the victim -- where the victim was

found, and it's a hundred and 34 feet from the ease-

ment back there, and also, this is almost true from

this point of division in the path (indicating).

Which area, I can't recall.  Photographs show very

well where this portion is.

Now, we get back in here (indicating), and this is rather

clear and uphill, and this area starts the wooded

area.  This is -- "C" is where the stick was found

some 19 feet back from the dead end of Willow off

of the path to the north of the path, and "D" is

JAMES TEEPLE

15

1  where Donald Allgood stood and told me he was

2  standing with a lady friend when he saw four people

3  exit the path, and that's where he described them

4  as being when he saw one of them throw a stick.

5  This is a roadway coming back from the residential area

6  of Jackson Street (indicating).  This is Nevada

7  (indicating), and it is -- it dead ends.  There's

8  a barricade across there, and you can walk down

9  along there, and this is all blacktop area.  You

10  cannot drive a car there because they have dammed

11  up the area or put piles of dirt there to prevent

12  people from driving a car, and there's no connec-

13  tion between here and here (indicating).  Roadway

14  no longer -- this used to be a baseball park area,

15  and it's no longer kept up.  It's all grown up.

16  There are trees, very high trees.  From this point

17  (indicating), you can no longer see the rest of the

18  area there.  There's trees all along in here to

19  prevent that.  There's high weeds, a lot of briar

20  bushes, things of this nature.  This is the most

21  heavily traveled, this one (indicating).  There are

22  other paths here that have been used enough to

23  create an actual path, and this one also is the

24  same as these (indicating), but this is bare and

25  worn down completely from heavy usage.  This is

JAMES TEEPLE

1          not (indicating).  The area where the bottle was

2          found is not marked on here; however, it was right

3          here (indicating) just to the north of a straight

4          line from here to here (indicating) and just off of

5          the path approximately six feet.

6   Q   The burnt --

7   A   The burnt bottle and the burned area, and this burned

8          area is about six feet in diameter, and it was right

9          there (indicating).

10  Q   Okay.  Do you have photographs of position "C"?

11  A   No, sir, I don't.  I have a photograph showing Sergeant

12         Carnhan standing there --

13  Q   Okay.

14  A   -- taken from here, yes.

15  Q   And the path area that leads between Willow and Valu-King,

16         are there photographs in exhibit to show that area?

17  A   Photographs show that area.  There's several photographs

18         that show this area, and the aerial view, it takes

19         two or three to see the entire path because of the

20         high, high bushes.  You see a portion of the path,

21         and they're -- looking at several aerial photographs,

22         you can make continuity along with the map.

23  Q   If I understand you correctly, between "C" and the

24         Valu-King, that the worn down path is the one that

25         goes to the shortest way to the Valu-King?


JAMES TEEPLE

1   A   It's -- yes.  Yes, if you were to take any path, that

2          would be the path shortest to the Valu-King.

3   Q   Did you photograph those paths?

4   A   Okay.  They were just areas that were walked, and we

5          don't know whether they were walked down by medical

6          personnel, police officers that night.  They were

7          not -- mud worn paths.  We don't know when they

8          were worn out.

9   Q   Did you trace the mud worn path?

10   A   The mud -- some places, it's as wide as four feet; most

11         places, it's a foot, is this path coming to the

12         rear of Valu-King going north, turning west, going

13         up a little bit of a grade and into the woods and

14         out on Willow Drive (indicating).

15   Q   Do you have the distance between "A" and the Valu-King

16         parking lot?

17   A   The Valu-King parking lot and "A" is 116 feet from the

18         edge of the parking lot to point "A".

19   Q   Okay.  What other measurements do you have that you

20         haven't gone over?

21   A   Okay.  275 feet is the overall length of this path.

22   Q   Okay.

23   A   This is -- this is 72 feet from the path, 67 feet from

24         the bicycle to the shorts, and 72 feet from the

25         bicycle to the path again (indicating) if you were

JAMES TEEPLE

16

1     to exit in this way because of the bend.  This

2     area here (indicating), I believe I covered a hun-

3     dred and 34 feet from the easement, and the Valu-

4     King is 200, and the parking lot is 237 feet long.

5 Q Okay.  Could you see the bike from the path?

6 A No, you certainly cannot.  It -- in order to get in

7     there, you actually had to walk in, walk around,

8     and back over because of the trees and the brush.

9     You could, however, see from the bicycle to the

10     shorts.

11 Q Okay.  Continue.  Anything further?

12 A Okay.  I don't believe there's anything further that I

13     can point out on this diagram.

14       JUDGE McLAIN:  Is this to scale at all?

15 A Yes, it is.  Mr. Dailey informed me that it is to scale.

16       JUDGE McLAIN:  How about the markings

17     showing the pertinent information?

18 A Yes, sir, they're measured.

19       JUDGE McLAIN:  That doesn't look -- if

20     that's 270 feet, that doesn't look like 70 feet to

21     me.

22 A 275 feet overall.  70 feet.  Not, it does not.  Mr.

23     Dailey informed me it was one inch equals 15 feet.

24       JUDGE McLAIN:  Did he make all those

25     marks on there?  Do you know?


         JAMES TEEPLE

1    A    He did, yes.                                                    16

2                    JUDGE McLAIN:  Okay.  Thank you.  I think

3         we're going to recess at this time until 11:00

4         o'clock.

5                         (Court in recess at 10:35 A.M.)

6                         (Back in session at 11:00 A.M.)

7                    ATTORNEY WATKINS:  Thank you, Your Honor.

8    CONTINUING DIRECT EXAMINATION BY ATTORNEY WATKINS:

9    Q    Jim, I believe you want to make some corrections?

10   A    Yes, sir, I do.

11   Q    Go ahead up and do it.

12                         (Witness steps off the witness stand
                            and approaches the diagram.)

13

14   A    After -- during recess, I refigured my distance.  What I

15        originally said was 275 feet for this well worn

16        path.  Is in fact 395 feet from the edge of the

17        Valu-King to the start of the woods.  So, that puts

18        the scale in a little better arrangement.  And this

19        is the only heavily worn path where points of it

20        are mud and some points are three and four feet

21        wide.  These are -- you could see where somebody

22        had been walking there, and this, in fact, continued

23        on out to there , but it was not a very comfortable

24        path to walk through (indicating).  This is a little

25        more of a used path, and it actually continued on

                              JAMES TEEPLE

1            out here, winding around out to an open field            16

2            here to Jackson Street (indicating).

3    Q    Okay.  By the way, from the path to "A", could one ride

4            their bike here?

5    A    No, I wouldn't -- well, I couldn't.

6    Q    Okay.  In other words, it's pretty rough terrain?

7    A    It's rough, and you could not go direct.  You have to

8            walk around, and there's like hills and little

9            mounds.  There are a lot of trees and underbrush.

10   Q    Now, you described how thick it was to see short dis-

11           tances prior in your testimony.  I'll show you 18,

12           and would you look at 18.

13   A    (Complying.)  Okay.  18 is taken 9/11/85.  It's a photo-

14           graph that I alluded to, and it was at the thing

15           there; standing at the point where the bicycle --

16           dotted line exits the path, and I'm looking towards

17           the Valu-King, and Sergeant Carnahan is well over

18           six feet.  All I can see is about this portion

19           (indicating).  He's standing off the path just a

20           few feet, and that's not exactly the highest brush

21           that's in the area there.  It was pretty high and

22           pretty secluded back there.

23   Q    Okay.  That photograph, like all the photographs you've

24           identified today, are totally accurate reproductions

25           of what you saw on all the days testified to?


                    JAMES TEEPLE

1    A    Yes, sir.

2    Q    Now, going back in time, there was a time that -- give

3         me a minute so I can see -- okay.  That a video-

4         taped statement, testimony, was taken from the

5         defendant?

6    A    Yes, sir.  That was 9/16 at 1:30 or 1330 hours.

7    Q    Okay.  And would you, in your own narrative fashion, tell

8         what happened, what you saw, what you did.

9    A    Okay.  Well, when I arrived back at the station from

10        clearing the brush and locating the stick, I was re-

11        quested by -- and I'm not sure who it was.  It was

12        possibly Sergeant Steinbeck, that they wanted to

13        take a videotaped statement of Danny Hill and asked

14        if I would please set up the videotape equipment

15        and prepare the room, which I did, and after the

16        equipment was set up and determined to be functional

17        and everything was set, all the settings were set,

18        why, they brought Danny Hill in, and I set him down

19        at the end of the table.  Sergeant Steinbeck,

20        Sergeant Stewart, Detective Hill and myself were

21        present where a videotape statement was taken of

22        the defendant, Danny Hill.

23   Q    And would you describe his physical and mental condition

24        as you saw it at that time.

25   A    I'd describe him as comfortable and cooperative.  I be-

JAMES TEEPLE

16

1    lieve he was drinking a can of pop, and I think he

2    was smoking a cigarette. He seemed to be at ease,

3    and he was talking. He knew all three of the people

4    he was being interviewed by. Referred to Sergeant

5    Stewart as "Stew". I'm probably the only one in the

6    room that he didn't know prior to that day.

7 Q Okay. And what time did you begin the videotape?

8 A The videotape was actually started at 1:30 or 1330 hours.

9 Q And how long did it last?

10 A It lasted one hour and eight minutes. 1438 I believe is

11    the time.

12 Q And would you tell the Court what kind of equipment you

13    used and whether you have a knowledge of that equip-

14    ment.

15 A Okay. That equipment was Minolta. It's just a home

16    video camera with a character generator built in

17    and recorder and tuner assembly, and it was running

18    off a hundred and ten and operating fine. I've used

19    it in the past a number of times. It belongs to

20    the Trumbull County Homicide Squad.

21 Q And did -- I'll hand you what's been marked as Exhibit

22    54, and would you identify it.

23 A Okay. Exhibit 54 is the case and the original videotape

24    taken of Danny Hill on 9/16/85, 1330 hours, 1439,

25    reference Raymond Fife homicide, and I took this,

JAMES TEEPLE

1        marked it, and have kept it in my possession until     16

2        just now.

3   Q    And have you played it recently?

4   A    I just played it just a few minutes ago to make sure it

5        was -- I played it night before last, and it is

6        fine.  It's unedited.  Nothing has changed since the

7        time it was taken from what I can determine.

8   Q    You're saying that you listened to the tape, and the tape

9        that you will play -- or can play is a total repro-

10       duction of what happened on September 16th at 1:30

11       P.M.?

12  A    That's correct.

13  Q    And where was this tape taken again?

14  A    It was taken at the Warren Police Department in the Line-

15       up Room.  It's a room we use for things of this

16       nature and just a -- kind of a general purpose room.

17  Q    And that's a VHS unit?

18  A    VHS is the format.

19  Q    And you have tested the tape on this particular device

20       that the Court has?

21  A    Yes, I have.  It functions properly.

22            ATTORNEY WATKINS:  If it would please the

23       Court, we'd like to play the tape in its entirety.

24            JUDGE McLAIN:  Just to clear this matter

25       up, is this the same tape that was previously sub-


JAMES TEEPLE

1       mitted to this Court?                                        16

2   A   No, sir.  This is the original.  The previous submitted

3       tape was a duplicate; exact duplicate of this tape.

4               JUDGE McLAIN:  You're able to swear

5       that there's no significant difference between what

6       the copy and the original --

7   A   Only possibly a lack of quality due to duplication, but

8       the content is the same.

9               JUDGE McLAIN:  Thank you.  Very well.

10  Q   (By Attorney Watkins)  Go ahead, Jim.

11              ATTORNEY WATKINS:  I would suggest that

12      the lights be --

13  A   Okay.  Where --

14              ATTORNEY WATKINS:  Is it going to be left

15      there, Your Honor?

16              JUDGE McLAIN:  Well, I don't know.  I

17      think we ought to -- seems to be unnecessarily too

18      far away for most of us.

19              ATTORNEY WATKINS:  Yes, I would think so.

20              JUDGE McLAIN:  Ladies and Gentlemen, I

21      don't know how many people will be able to be ac-

22      comodated by seeing this; perhaps none at all, but

23      let's try to turn it on, if you would.  We'll see

24      how far -- turn it without blocking out any of the

25      view of the Judges.  It may not be any good.  I


                    JAMES TEEPLE

1    don't know.

2           JUDGE McLAIN:  I believe this is an item

3    we may well review at the end of the case.

4           All right.  As far as the press is con-

5    cerned, they can do what physically they're able to

6    do.  I guess we'll give them a couple minutes to do

7    that.  And I think that also, since this is a pub-

8    lic trial, could we have some name pickup on this,

9    obviously, for Court format?

10  A   I'm not familiar with the audio system.  It's an audio

11    outlet.  There is an audio outlet on it.

12           JUDGE McLAIN:  I don't mean for --

13  A   I think we can enough volume out of the set itself.

14           JUDGE McLAIN:  I think so.  Okay.

15       (State's Exhibit No. 54 played at 11:08 A.M.)

16    (Playing of State's Exhibit No. 54 ended at 12:22 P.M.)

17           JUDGE McLAIN:  Court will now stand in

18    recess until 1:30.

19               (Court in recess at 12:22 P.M.)

20               (Back in session at 1:35 P.M.)

21           ATTORNEY WATKINS:  If it would please the

22    Court, we are finished with direct examination of

23    Mr. Teeple, and with the consent of Attorney Lewis,

24    we would like to call Doctor Sudimak out of order

25    since he'll be very, very short.

JAMES TEEPLE

1      JUDGE McLAIN:  Thank you.  You may call
2   in Doctor Sudimak.

3                  (State's Exhibit No. 56 marked
                        for identification.)
4

5             DOCTOR JOSEPH SUDIMAK, JR.

6   being duly sworn, according to law, on his oath, testified,

7   as follows:

8   DIRECT EXAMINATION BY ATTORNEY KONTOS:

9   Q   Good afternoon!  For the record, would you please state

10      your name and occupation.

11  A   Doctor Joseph Sudimak, Jr.  I'm a physician and the

12      Trumbull County Coroner.

13  Q   And how long have you been the Trumbull County Coroner?

14  A   For 25 years.

15  Q   Doctor Sudimak, would you briefly go into your educa-

16      tional background for us.

17  A   I received my bachelor's degree at Ohio State University,

18      my master's degree in microbiology at the Ohio State

19      University and graduated from the medical school at

20      the Ohio State University.  I went to Philadelphia,

21      and I interned at Lankenau Hospital, L-A-N-K-E-N-A,

22      Hospital in Phildelphia.  After that, I entered the

23      service, returned to Warren at a later date.  I com-

24      pleted a mini-residency at the University of

25      Cincinnati in occupational medicine, and as a re-

                  DOCTOR JOSEPH SUDIMAK, JR.

17

```
 1        sult, am now a diplomat of the American Board of

 2        Preventative Medicine since certified -- board cer-

 3        tified in occupational medicine.

 4   Q    You a member of any associations?

 5   A    Yes, sir.  Well, the usual professional organizations;

 6        The AMA, The Ohio State Medical Association, the

 7        county societies, all of the preventative medicine

 8        societies as well as the occupational medicine

 9        associations, and I'm past president of the State of

10        Ohio, Trumbull -- not Trumbull.  The State of Ohio

11        Coroner's Association.

12   Q    Okay.  And coroner, that's an elected position?

13   A    Yes, sir.

14   Q    All right.  And what are your basic responsibilities as

15        coroner of this county?

16   A    The coroner's responsibilities are to investigate all

17        sudden, unexpected, and violent deaths including

18        homicides, suicides, and so forth.

19   Q    And are you the individual who's responsible for ordering

20        an autopsy to be done in a given situation?

21   A    Yes, sir, the Coroner's Office or myself is, yes, sir.

22   Q    And you have to make a -- rulings after that's investi-

23        gated?

24   A    Yes, sir.

25   Q    And what are the possible rules you might make?
```

DOCTOR JOSEPH SUDIMAK, JR.

1   A   The possible rulings made by the office are, as follows:

2       natural deaths where somebody might die from a heart

3       attack; accidental death where somebody might be --

4       might fall down the stairs, be killed by a vehicle;

5       suicides, self-inflicted death; and homicide where

6       a person dies from the result of being injured or

7       harmed by another one.

8   Q   I want to draw your attention to Raymond Fife.  Was there

9       an autopsy ordered to be done on Raymond Fife?

10  A   Yes, sir, I did order an autopsy on Raymond Fife.

11  Q   And do you recall when the autopsy was performed?

12  A   When it was performed?

13  Q   Yes, if you recall.

14  A   Approximately September 13th.

15  Q   Okay.  And was there a member of your office represented

16      there at the autopsy?

17  A   Yes, sir.

18  Q   And do you happen to know who actually performed the

19      autopsy?

20  A   Yes.  Doctor Howard Adelman, the pathologist at St.

21      Joseph's Riverside Hospital.

22  Q   And do you know who from your office was there to per-

23      form the autopsy?

24  A   Yes, sir.  Mrs. JoAnn Fowler.

25  Q   All right.  After an autopsy was performed, would the

DOCTOR JOSEPH SUDIMAK, JR.

1        pathologist make a protocol?

2   A   Yes, sir, he reports his findings to our office.

3   Q   And did you have an opportunity to look at the findings

4        of the pathologist?

5   A   Yes, sir, I did.

6   Q   Okay.  And did you make a ruling in this particular case?

7   A   Yes, sir, I did.

8   Q   And what was that?

9   A   My ruling was that of homicide.

10  Q   Do you have a Coroner's Verdict with that particular

11       ruling?

12  A   I --

13  Q   Did you make one?

14  A   I've made one, and it was filed with the Clerk of Courts,

15       yes, sir.

16  Q   Doctor Sudimak, I'm going to hand you what's been marked

17       for identification purposes as State's Exhibit Num-

18       ber 56.  You recognize that?

19  A   Yes, sir.  This is my Coroner's Verdict in the case of

20       one Raymond Fife, deceased.

21  Q   Okay.  And on there, do you list what the causes of death

22       were?

23  A   Yes, sir.

24  Q   And what were the causes?

25  A   Cause of death was cardio respiratory arrest secondary

DOCTOR JOSEPH SUDIMAK, JR.

1    to asphyxiation and sub-dural hematoma and multiple    17

2    trauma.

3  Q    Now, when you say "secondary to asphyxiation," what does

4    that exactly mean?

5  A    Secondary to asphyxiation means that he was -- had his

6    oxygen, his air cut off and was asphyxiated, choked,

7    if you will, to death.  Sub-dural hematoma refers

8    to a hemorrhage in the brain that occurs after

9    trauma or injury to the brain, and multiple trauma

10    is -- basically, covers the other multiple bruises

11    and contusions about the person as well as the

12    damage to his rectal bladder area; internal trauma

13    that he received.

14  Q    Okay.  And you also list there various body wounds, do

15    you not?

16  A    Yes, sir.

17  Q    Could you please go through the ones that you got listed.

18  A    Listed, we have multiple burns, we have ecchymosis of

19    shoulders and upper chest, which is black and blue

20    marks of the shoulders and chest.  We mention in

21    this particular instance, penile wounds, which were

22    bite marks of his penis.  We have also listed

23    ecchymosis of the peri-rectal area, which means

24    black and blue marks around the rectal area.

25  Q    Okay.  Now, let me ask you this, Doctor:  Would the

DOCTOR JOSEPH SUDIMAK, JR.

1      asphyxiation that you talked about previously, would

2      that in and of itself independently could have

3      caused the death of Raymond Fife?

4  A  Yes, sir, it could have.

5  Q  How about the sub-dural hematoma?

6  A  Yes, sir, the brain damage and sub-dural hematoma could

7      have caused his death.

8  Q  What about the penetration to the rectal bladder area?

9  A  Yes, sir.  This was of sufficient nature of injury and

10     trauma to cause the death by itself and --

11  Q  And how about just the other injuries?  How would you

12     characterize those?

13  A  Serious, but not death causing.

14  Q  Okay.  Since 1960, how many cases has your office inves-

15     tigated, approximately?

16  A  Two to three hundred cases a year.

17  Q  So that without going into any multiplication, thousands

18     of cases?

19  A  Yes, sir.

20  Q  And of those thousands of cases that your office has in-

21     vestigated, have you ever had any cases where rectal

22     bladder penetration was the cause of death?

23  A  No, sir.

24  Q  Is this the only one you've ever had?

25  A  Yes, sir.

DOCTOR JOSEPH SUDIMAK, JR.

1                ATTORNEY KONTOS:  Thank you.

2  CROSS EXAMINATION BY ATTORNEY LEWIS:

3  Q    Good afternoon, Doctor Sudimak!

4  A    Hi, Mr. Lewis!

5  Q    As I understand it, okay, you didn't actually view the

6         body of Mr. Fife?

7  A    Not -- no, sir.

8  Q    Okay.  And your representative there was a gal by the

9         name of JoAnn Fowler, is that correct?

10  A    That's correct.

11  Q    And basically, you arrived at your conclusion in regard

12         to the Coroner's Verdict by virtue of the protocol

13         that was given to you by Doctor Adelman or prepared

14         by Doctor Adelman?

15  A    Yes, that's correct, and the police reports.

16  Q    And the police reports.  And what you're saying is that

17         -- could you go over those injuries one more time --

18         or let me see what you're reading from, if I could.

19         Oh!  I saw this.  Oh!  I'm sorry!

20  A    That's what we referred to.

21  Q    Okay.  Okay.  Cardio respiratory arrest secondary -- you

22         got asphyxiation?

23  A    Yes, sir.

24  Q    Sub-dural hematoma?

25  A    Yes, sir.

PENGAD/INDY  MUNCIE, IN  47302

SF-AZ-13

1   Q   And the multiple trauma?

2   A   Yes, sir.

3   Q   And the multiple trauma is the inclusive group involving

4          perforation of the anal cavity and what other items,

5          if you recall?

6   A   And the burns about his face and neck.  He had other con-

7          tusions, black and blue marks.  Superficial con-

8          tusions and abrasions.

9   Q   Okay.  And in regard to the questions asked by Mr. Kontos,

10         he was asking you if possibly any one of the major

11         things you talked about just now could be the cause

12         of death, and you indicated it possibly could, is

13         that correct?

14   A   Yes, sir.

15   Q   Okay.  On the other hand, it could be just the multi-

16         plicity of all of them working together, is that

17         correct?

18   A   I guess I could best say that any one of them or the

19         combination thereof would be the cause of death,

20         yes, sir.

21   Q   That's what I was asking.  Okay.  Do you actually have

22         the protocol by Doctor Adelman with you?

23   A   Not present, no, sir.

24            ATTORNEY LEWIS:  Okay.  No -- thank you.

25         No further questions.

DOCTOR JOSEPH SUDIMAK, JR.

1     ATTORNEY KONTOS:  Nothing further.

2     JUDGE McLAIN:  That's all.  Thank you.

3        (Witness is excused.)

4      JAMES TEEPLE

5 having previously been sworn, according to law, on his oath,

6 testified, as follows:

7 CROSS EXAMINATION BY ATTORNEY LEWIS:

8 Q As I understand it, Mr. Teeple, you were called into this

9    case on September 10th, 1985, at approximately 10:30

10    P.M.  Would that be correct?  I think that's what

11    you testified to earlier.

12 A Yes, sir.

13 Q And your preliminary steps were you conferred with Of-

14    ficer Steinbeck, I believe, is that correct?

15 A Yes, sir.

16 Q Okay.  And was that at the hospital or was that --

17 A No, that was at the HQ, the headquarters.

18 Q The headquarters.  And you also conferred with the doc-

19    tor at the hospital?

20 A I attempted to, but was unable.

21 Q When was the first time you got to the crime scene?

22 A 9/11, the following morning, about 8:00 o'clock, 8:30.

23 Q Okay.  Is there any reason why you didn't go to the crime

24    scene before that time?  In other words, that same

25    evening, by any chance?

        JAMES TEEPLE

1    A    Because of the rain and the darkness and the area, and it

2         was about 3:30 by the time I completed with all the

3         others and elected to start fresh the next morning

4         soon after daybreak.

5    Q    Okay.  Was the crime scene in any way -- was it preserved

6         in a sense?  Was anybody out there to watch it over-

7         night or anything else?

8    A    No, sir.

9    Q    Nobody whatsoever?

10   A    No, sir.

11   Q    And you got out there at 9/11 the next morning, is that

12        correct, approximately?

13   A    Yes, 9/11 was the day I got out there.

14   Q    I'm sorry.  Okay.

15   A    Shortly after daybreak, 7:30 -- 8:30.

16   Q    Okay.  And what were the first steps you took -- was any-

17        body with you, let me ask you that question?

18   A    Sergeant Steinbeck and Sergeant Carnahan was with me,

19        Sergeant Steinbeck showing me the area and where the

20        boy was found, and Sergeant Carnahan works with me.

21   Q    Okay.  And as I understand it, you proceeded to take

22        some photographs, is that correct?

23   A    Yes, sir.

24   Q    Okay.  And you also looked at the areas which seemed to

25        be pertinent at the time, is that correct?


JAMES TEEPLE

1   A   We attempted to look the entire area over.

2   Q   Let's get to the area.  May I have the easel.

3                      (The easel and diagram set up.)

4   Q   (By Attorney Lewis)  Drawing your attention to the dia-

5          gram which has been labeled as State's Exhibit Num-

6          ber 4, you had an occasion to examine the area which

7          is labeled "E", which, presumably, is the place

8          where the victim was found, is that correct?

9   A   May I come up there where I can see better?

10   Q   Sure!  By all means.

11                  (Witness steps off the witness stand

12                  and approaches the diagram.)

13   A   Which area?

14   Q   (By Attorney Lewis) "E".

15   A   That's the first place I was taken where the victim was

16          found.

17   Q   Okay.  And to your knowledge, did anybody else examine

18          that area prior to the time that you were out there

19          that morning with Officer Carnahan and Officer

20          Steinbeck?

21   A   I don't know.

22   Q   Okay.  And what did you find precisely?

23   A   Okay.  I found a blue handkerchief, I found medical

24          apparatus, I found bits of charred clothing and

25          trampled grass.

JAMES TEEPLE

1    Q    Okay.  Charred clothing.  Did you preserve that?

2    A    Yes, sir.

3    Q    Has that been labeled as any exhibits in this case?

4    A    No.

5    Q    It has not?

6    A    No.

7    Q    What was that charred clothing?  Do you have it?

8    A    Not here.  I have it, but it's not with me.

9    Q    Okay.

10    A    I received your subpoena for the 24th for the remaining

11           exhibits.

12    Q    Okay.  What kind of clothing is it?  Can you briefly

13           describe it to me?

14    A    It's white material.

15    Q    White material.  Do you have any idea what kind of --

16    A    No.

17    Q    -- product that it was?

18    A    No.

19    Q    A handkerchief or anything?  You have no knowledge.

20           Okay.  You say it was charred, though, is that

21           correct?

22    A    Yes, sir.

23    Q    Okay.  Now, when you examined the area, in the area, did

24           you find anything else?

25    A    Not to my knowledge.


JAMES TEEPLE

1   Q   Okay.  Did you find any burned area?                               18

2   A   No, not till -- well, we didn't -- didn't find the burned

3           area until -- I believe it was the 18th.  18th is

4           the first time I located the burned area.

5   Q   Okay.  Which burned area are we talking about?

6   A   I'm talking about the area just off of the path prior to

7           the bend going from Valu-King past the dotted line

8           to the left --

9   Q   Okay.

10  A   -- about six feet.

11  Q   So, if I could back up for a moment, as far as the area

12          "E" where the victim was found and everything else,

13          you found no evidence of burning on the ground or

14          anything else; brush or anything else?

15  A   No.

16  Q   Now, getting back to what you're talking about, the

17          burned area you found was off to the left of the

18          path, is that correct?

19  A   Yes sir.

20  Q   Possibly just off the line that comes across?

21  A   Yes, sir.

22  Q   How far was that off the path?

23  A   Six to 10 feet.

24  Q   Six to 10 feet.  Okay.  What else did you find there?

25  A   I found -- there was some charred sticks.  There was a

JAMES TEEPLE

|   |   |   |
|---|---|---|
| 1 |   | piece of wood that was charred and some burnt |
| 2 |   | leaves -- or leaves that were -- turned colors and |
| 3 |   | looks like the tips may have been charred. |
| 4 | Q | Okay.  And did you find anything else in that area? |
| 5 | A | That plastic bottle that I earlier submitted as evidence. |
| 6 | Q | Okay.  And that was done on 9/18? |
| 7 | A | 18, yes, sir. |
| 8 | Q | Okay.  You say it was approximately six feet off the |
| 9 |   | path? |
| 10 | A | Six -- I believe the bottle was 10 feet off, and the area |
| 11 |   | began about six feet.  It was about a 4-foot wide |
| 12 |   | area. |
| 13 | Q | Okay.  And you also took a number of photographs which |
| 14 |   | you've identified as exhibits here, is that correct? |
| 15 | A | Yes, sir. |
| 16 | Q | Okay.  Was anybody else out there besides yourself, |
| 17 |   | Officer Carnahan, and Officer Steinbeck that day? |
| 18 | A | That -- the 18th or the -- |
| 19 | Q | No, no, no!  I'm going back.  I'm sorry!  I'm going back. |
| 20 | A | Back to the 11th? |
| 21 | Q | Yes. |
| 22 | A | Not to my knowledge. |
| 23 | Q | Did you examine the area up by the Valu-King?  Did you |
| 24 |   | look in garbage cans or dumpsters or anything of |
| 25 |   | that nature? |

JAMES TEEPLE

1    A    Not at that time, no.

2    Q    Not at that time.  Okay.  Did you stick pretty close to

3         the paths then, basically?  Is that the idea?

4    A    Well, we started at where the victim was found and worked

5         our way in a circle outward and then --

6    Q    Like this (indicating)?

7    A    Yeah.  Worked our way around and worked our way north

8         clear to Jackson Street and worked our way west

9         clear to Willow Drive.

10   Q    Okay.  At that time, were you specifically looking for

11        anything; say, for instance, the bike?  The bike

12        was, at that time, known to be missing.

13   A    The bike was missing.  That was one of the things we were

14        looking for.

15   Q    Did you have any occasion to go back over in this area

16        on this side (indicating)?

17   A    I was up in that area, but not extensively, but I was in

18        that area.

19   Q    Okay.  When was it that the bike was actually found?

20   A    The 13th.  Friday the 13th.

21   Q    And how did that come about?

22   A    Someone organized a volunteer search party, and it was

23        located during that time.

24   Q    Do you know precisely who located it by any chance?

25   A    Lieutenant Marchio called it to my attention.  I don't

JAMES TEEPLE

18

1           personally know who located it.

2  Q   But then you proceeded over to that area and photographed

3           it, is that right?

4  A   Yes, sir.  I was at Willow Drive -- at the end of Willow

5           Drive when Lieutenant Marchio notified me on the

6           radio, and I walked the path there to the area.

7  Q   Okay.  Other than the course of the time that you walked

8           over just moments after they found it and took the

9           photograph, to your knowledge, did anybody know

10         where that bike was from September 10th to that

11         date?

12  A   No.

13  Q   The underwear and the Wrangler black T-shirt, that was

14         sent off later on to the BCI laboratories, was it?

15  A   Yes, sir.

16  Q   Was it also sent off to the Arson Crime Lab?

17  A   Yes, sir.

18  Q   And you received some results in regard to that, did you

19         not?

20  A   Yes, sir.

21  Q   The rape evidence kit that was taken on that date, was

22         that taken -- offhand, I don't recall.  Do you re-

23         call?

24  A   That was taken -- it would have been 9/11 by the time it

25         was taken.  It was taken some time --

JAMES TEEPLE

1   Q   Wednesday?

2   A   Yeah, some time Wednesday morning.

3   Q   Okay.  That was subsequently also sent off to the BCI

4       laboratories?

5   A   Yes, sir.

6   Q   Did you receive any results in regard to that as well?

7   A   Yes, sir.

8   Q   The bike -- the bike itself was also sent off to the BCI

9       laboratories?

10  A   Yes, sir.

11  Q   The purpose for that was to identify -- or to try to find

12      what?

13  A   Latent fingerprints.

14  Q   Okay.  Do you know if it was tested for anything else?

15  A   Not to my knowledge.

16  Q   For blood or anything of that nature?

17  A   Not to my knowledge.

18  Q   How were the -- I think "B" stands for the gray pinstripe

19      shorts, do they not?  This item "B" over here

20      (indicating).  I'm sorry.

21  A   That's the gray -- yes.

22  Q   And that was found by virtue of -- what was it?  Nickles

23      the dog or --

24  A   Yes, sir.

25  Q   Okay.  The dog picked up the scent from?

JAMES TEEPLE

18

1    A    The bicycle.

2    Q    The bicycle.  Okay.  And you indicated the fact the bi-

3         cycle, "A" here, was approximately how far off the

4         path, if you recall?

5    A    The bicycle was 72 feet from the path.

6    Q    Okay.  And then how far back was --

7    A    67 feet to the shorts.

8    Q    67 feet to the shorts.  Okay.  Did you find -- when the

9         shorts were located, did you find any matted down

10         area or anything of that nature?

11   A    No.

12   Q    Did you examine the area where the shorts were?

13   A    Yes.  No, it wasn't matted down.  The pictures will show

14         that.

15   Q    You didn't find anything either in "A" or "B" other than

16         those particular items?

17   A    "A", there was a matted down area just to the north of

18         the bicycle.

19   Q    Okay.  Just to the north of it?

20   A    Yeah.  You'll see that in the photographs also.

21   Q    Okay.  And referring to the stick, which is "C", which

22         is right here (indicating), I think it's photo-

23         graphed, or at least the approximate location is

24         photographed in State's Exhibit Number 31.

25   A    Okay.  This shows Sergeant Carnahan pointing in the

JAMES TEEPLE

1    direction that Donald Allgood showed us that he saw    18

2    someone throw a stick.

3  Q  And Bill's standing right on the pathway?

4  A  He's standing 19 feet -- or in the -- be around 19 feet

5    from the Willow Drive area on the path.

6  Q  Okay.  And how tall is Mr. Carnahan, just offhand?  Is he

7    a 6-foot man?

8  A  Yes.  He's six foot one, six foot two.

9  Q  In other words, if we were to look at that photograph

10    and lay Mr. Carnahan right down, it would be down

11    back -- basically, that far down in the thicket?

12  A  Yes.

13  Q  What stuff was taken?  In order to go out there, you in-

14    dicated you had a Warren City work crew or somebody

15    go out?

16  A  Um-hum.

17  Q  Tell us about it.

18  A  I contacted -- on the 15th, I contacted Dick Thomas,

19    the superintendent of the Street Department, and

20    asked him if he could be of any assistance with

21    equipment.  I initially wanted to just borrow some --

22  Q  Clippers?

23  A  Whatever you call them.

24  Q  Whatever, yeah.

25  A  And he said that he would gladly provide a crew that

JAMES TEEPLE

1       would help us there because it was so thick, and we

2       went out there.  I think there was about four men,

3       a truck, and some big weed whackers only they had

4       blades on them.  I don't know what you call them.

5       And we cleared the area.

6   Q   Okay.  The area just adjacent to where Mr. Carnahan's

7       pointing, is that correct?

8   A   We cleared the area just beyond the cement where the

9       cement patch is.  This white area depicts a cement

10      patch here (indicating), and we cleared the area

11      from there east.  Probably a hundred foot by a

12      hundred foot, maybe a hundred foot by 75 foot, some-

13      where in that area.  I'm not real good with dimen-

14      sions; estimating, but it was a rather large area.

15      We was there quite a long time.

16  Q   Okay.  How is it that you came about -- or upon the

17      stick then if it was only six feet off the pathway?

18      You say a hundred foot by a hundred foot.

19  A   We didn't clear it all at once.  We cleared a little bit,

20      take a handful of brush out, and then we'd search,

21      clear a little more, search, and we worked in --

22      Sergeant Carnahan and myself worked in that -- that

23      method, each one working in separate areas.

24  Q   Okay.  I presume then -- did you start from the path and

25      just move on in?

JAMES TEEPLE

18

1   A   Yes, sir.

2   Q   Okay.  And six foot in, you found it?

3   A   Um-hum.

4   Q   Okay.  And, obviously, it was not visible before they cut

5       the brush down, is that correct?

6   A   No, nothing was visible from the path.  It was thick.

7   Q   Do we have a photograph here showing the stick?

8   A   No, sir, we don't.

9   Q   You didn't take a photograph that day?

10  A   No, I didn't.

11  Q   Okay.  Was the stick -- when you recovered it, was it

12      dirty, or how was it?

13  A   It was just exactly as you see it there.

14  Q   Just exactly as it is here?

15  A   With the exception of the marks that are on it, that's

16      the way I remember it as being.

17  Q   Let me ask you this:  Was it laying on the ground?

18  A   No, it was laying at a bit of an angle.

19  Q   Up against something, evidentally?

20  A   Propped up against some brush or something.

21  Q   Did you look in the area for any other sticks?

22  A   Yes, I did.

23  Q   Okay.  The entire area?

24  A   Um-hum.

25  Q   Well, you mentioned already you didn't look in garbage,

JAMES TEEPLE

1         garbage cans, or anything else, did you?     19

2 A   No.

3 Q   Did you check the area behind the Valu-King?

4 A   No.

5 Q   Did you check the area -- any other area besides this

6       area for any other sticks?

7 A   Yeah, we checked two areas.  One from where the location

8       where the body is, we had our Special Weapons Team

9       go out, and they walked and checked the area of a

10      large, thick brush pile just south of the location

11      where the body is at a later date, and also, we

12      checked the area where the bicycle was found from

13      the bicycle to the location where the shorts were

14      found and checked in a southerly direction there.

15 Q   Okay.  But you didn't find anything?

16 A   Everything we found appeared to have been there for a

17      considerable length of time.

18 Q   Considerable length of time.  In other words, it was

19      dirty or --

20 A   Dirty, moss growing -- well, more than dirty.  Moss

21      growing on it, grass growing over it, attached to

22      the ground with roots.

23 Q   Okay.  The stick was sent off to BCI also for analysis,

24      was it not?

25 A   Yes, sir.


JAMES TEEPLE

1  Q  And they did analyze it for what?  What were they looking

2        for?

3  A  I believe they were looking for blood.  To determine if

4        human blood was present.  That was the request.

5  Q  How about fingerprints?

6  A  No.

7  Q  There was no request for fingerprints?

8  A  No.

9  Q  You got results back in regard to the blood, is that

10       correct?

11  A  Yes, sir.

12  Q  Okay.  Was this end -- okay.  In other words, you're

13       saying this is as clean as you recall when you

14       picked it up?

15  A  Yeah.

16  Q  No dirt or anything?

17  A  I have not touched it, and that's the way I remember it

18       being.

19  Q  Did you find any other evidence out in the area upon

20       examination of any other acclerants or potential

21       accelerants?

22  A  Found a can on the path of -- an aerosol can just couple

23       feet off of the path in the same general area as the

24       stick.  It was starter fluid.

25  Q  Okay.  You said up in this area up here (indicating)?

JAMES TEEPLE

1  A    Yes, sir, just -- just a little bit past that from

2       Willow Drive past that.  It was located just off of

3       the path.

4  Q    Okay.  I noticed on the beginning of the videotape we

5       just viewed, that at the very beginning, there is

6       an interruption in the tape.  Did you see that?

7  A    I don't recall that, no.

8  Q    Well, when the time come -- I think the date comes on

9       first.  Okay.

10 A    Okay.

11 Q    And it's very quick.

12 A    Okay.  That's possibly to change the mode from date to

13      time.  I'm not sure.  That's prior to the time

14      anybody's talking?

15 Q    Right.

16 A    And there's a silence there?

17 Q    Right.

18 A    It's -- possibly shut it down in order to get the

19      character mode from the time to the date.  I don't

20      know.

21 Q    And the camera would not have been running at that

22      particular time, evidentally not?

23 A    It would have been a momentary stop to change the

24      character mode.

25 Q    Okay.  You also had an occasion to make a tape -- or

                        JAMES TEEPLE

1        videotape of one Timothy Anthony Combs, did you not?

2  A  Yes, sir.

3  Q  That happened later on Monday, September 16th, 1985?

4  A  Um-hum.

5  Q  Okay. And you were the one who took that tape, did you

6        not?

7  A  Yes, sir.

8  Q  Okay. You had a good look at Mr. Combs that particular

9        day for that time?

10  A  Yes, sir.

11  Q  Do you recall what Mr. Combs -- did Mr. Combs wear any

12        jewelry that day? Do you recall?

13  A  I don't recall.

14  Q  Okay. That tape, though, that would be an accurate re-

15        production of how he looked on September 16th,

16        1985, is that correct?

17  A  Yes, sir.

18  Q  Do you happen to recall whether he wore an earring or

19        not?

20  A  I don't recall.

21  Q  You don't recall. Okay. So, as I understand it, there

22        was no burned area in the area of "E" where the

23        victim was found, is that correct?

24  A  Correct.

25  Q  The shorts, the Wrangler T-shirts -- the undershorts, the

JAMES TEEPLE

19

```
 1              underwear, and the Wrangler T-shirt, they were not
 2              all consumed, is that correct?  In other words, we
 3              have the residue here, is that correct?
 4    A    That's correct.
 5    Q    Let me ask you this, Officer Teeple:  You know Danny Hill?
 6              Have you known him for a long time?
 7    A    No, I haven't.  I think my first contact with Danny Hill
 8              was the day of the videotape; however, he said that
 9              he remembered me from another time, but I personally
10              don't recall him.
11    Q    Okay.  And during the time that you observed him during
12              the videotape -- of course, you're right at the
13              other end of the table, is that correct?
14    A    I'm five or six feet from the end of the table.
15    Q    How long was the table?
16    A    The table's probably six feet.
17    Q    So, you're about 12, 13 feet away, approximately?
18    A    Approximately.
19    Q    Okay.  In other words, he made reference, I think, to
20              you.  He said, "Over there to him."  Is that re-
21              ferring to you in the tape, if you recall?
22    A    I remember him referring a distance.
23    Q    Okay.  And how -- would you give me an opinion, just your
24              own lay opinion, in regard to Danny's intelligence
25              from what you saw in the tape.
```

JAMES TEEPLE

1   A   I saw him for an hour and eight minutes plus the time
2       that I fingerprinted him and got his -- some pubic
3       hair samples from him.  Didn't have any trouble --
4       well, I saw him the next day.  Didn't have any
5       trouble communicating with him what little I talked
6       with him.
7   Q   Well, you heard him on the tape, did you not?
8   A   Um-hum.
9   Q   Just give me -- do you have any opinion in regard to
10      his level of intelligence?
11  A   No.
12  Q   Nothing whatsoever?
13  A   An opinion of his intelligence?
14  Q   Yeah.  Basically, would you say he had a normal intelli-
15      gence, lower intelligence, higher intelligence?
16  A   I really don't think I'm qualified to give that type of
17      opinion.  He seemed okay to me.  He seemed --
18  Q   Totally normal?
19  A   Well, what is normal?
20  Q   All right.  What is normal.  Okay.  You also indicated
21      that you secured some tube -- white socks -- white
22      tube socks as they're called?
23  A   Right.
24  Q   And those were secured from the house, I think, of
25      Timothy Combs?

JAMES TEEPLE

19

1   A   Given to me by Sergeant Stewart.

2   Q   And those, we've had them marked as an exhibit, or have

3          we not?

4   A   Yes, sir.

5   Q   And those were sent out to BCI laboratories for analysis,

6          were they not?

7   A   Yes, sir.

8   Q   And you've also seen some results in regard to those

9          socks, have you not?

10   A   Yes, sir.

11   Q   Incidentally, the color of -- let me ask you this:  Were

12          you able to detect or able to visibly see the blood

13          on the socks?

14   A   Yes, yes, I was, and I photographed it, and it's in one

15          of the exhibits also.

16   Q   Okay.  And how would you describe the color?  Was it a

17          bright, general red or dull red, or what would you

18          call it?

19   A   A brown to a dull red.

20   Q   That's blood when it dries; it kind of goes down to a

21          dull brownish color?

22   A   Not always.

23   Q   Not always?

24   A   No.

25   Q   Generally, that's the color, isn't it, on the clothing?

JAMES TEEPLE

1   A   No.   There's -- it goes from bright red to brown.

2   Q   Right.   Exactly.   I'm saying in the dried state.

3   A   No.   No, it's -- there's varying degrees of color in the

4       dried state.

5   Q   Um-hum.   Okay.   The gray pinstriped shorts, those are in-

6       tact, are they not, or are they ripped?

7   A   No, they're intact.

8   Q   Where you found the container; plastic container, off the

9       path approximately six feet a little bit to the

10      north of the line going over to area "A" where the

11      bicycle was found, there was a burned area there?

12  A   There was some burnt.   There wasn't a large burned area.

13      There was some burned items there, one being the

14      plastic bottle, and there was some leaves that ap-

15      peared as though they may have been scorched.

16  Q   Okay.   The container that you've brought in here; the

17      Topco Charcoal Lighter Fluid, were you able to de-

18      termine whether the -- the plastic container we

19      have marked as an exhibit, the portion of it and

20      everything else, is the same size bottle?   Do you

21      know?

22  A   No.

23  Q   You don't have any idea?

24  A   It appears to be from what I've been able to look visibly,

25      but I have no laboratory results indicating that.


JAMES TEEPLE

1  Q   Okay. All right. Did anybody to your knowledge ever go

2           up and look at any of the dumpsters or anything back

3           behind the Valu-King and anything of that nature?

4  A   Um-hum.

5  Q   And who would that be?

6  A   I did that one of the several days that we were out

7           there, and they were empty.

8  Q   They happened to be empty that day?

9  A   They certainly were.

10           ATTORNEY LEWIS: Okay. I have no further

11       questions -- excuse me. One minute, Your Honor.

12  Q   (By Attorney Lewis) Let me ask you one question, Officer

13           Teeple. Going back to the additional clothing you

14           found, or the piece of fabric out in the area of --

15           I think it was "E", you didn't send that off for

16           analysis?

17  A   Yes, it went for analysis.

18  Q   Oh! It went for analysis, too?

19  A   Yes.

20           ATTORNEY LEWIS: Okay. Thank you very

21       much. That's all, Your Honor.

22           ATTORNEY WATKINS: No other questions.

23       Thank you.

24           JUDGE McLAIN: Thank you.

25               (Witness is excused.)


JAMES TEEPLE

ATTORNEY KONTOS:  Dennis Steinbeck.

19

(State's Exhibit Nos. 57 through 60 marked
for identification.)

DENNIS STEINBECK

being duly sworn, according to law, on his oath, testified,

as follows:

DIRECT EXAMINATION BY ATTORNEY KONTOS:

Q    For the record, would you please state your name and your

occupation.

A    Dennis Steinbeck, Sergeant with the Warren Police Depart-

ment.

Q    And how long have you worked for the Warren Police De-

partment?

A    11 years.

Q    And how long have you worked in the capacity of sergeant?

A    Since '81.

Q    What particular department in the police department

would you work for?

A    I'm assigned to the Juvenile Division.

Q    What are some of your responsibilities as a sergeant in

the Juvenile Division?

A    To investigate crimes committed by juveniles and against

juveniles in the City of Warren.

Q    All right.  And were you working on September 10th, 1985?

A    I was working from 3:00 in the afternoon till 11:00 at

DENNIS STEINBECK

20

1    night.

2 Q Did you get any kind of call reference to a young boy

3    missing that evening?

4 A Yes.

5 Q And when was that, please?

6 A I received a call around 7:30 or 8:00 that night.

7 Q Who did you receive the call from?  Do you recall?

8 A From the Fife family.

9 Q What was it in reference to?

10 A That their son hadn't made it to a scout meeting that

11    evening.

12 Q Did they indicate to you what time that he was missing

13    from?

14 A Yes.  He left his house around 5:00, 5:15 and hadn't been

15    seen since.

16 Q Did there come a point in time later that you were aware

17    that the boy was found?

18 A Yes.

19 Q And when was that?

20 A After I been looking for the boy myself for a while, I

21    heard over the police radio that the boy had been

22    found behind the Valu-King on Palmyra Road and that

23    the -- there was an officer at the scene, and also,

24    am ambulance had been dispatched to the scene.

25 Q Had you gone to the scene yourself?

DENNIS STEINBECK

1    A    Yes, I went there.  I didn't actually go to where Raymond

2            was found, but I was behind the Valu-King, and I

3            was -- I told the officer at the scene that I would

4            meet the ambulance at the hospital, and I left that

5            area and went to St. Joe's.

6    Q    Okay.  Were you able to get a view at all of the child?

7    A    I was there when they brought Raymond in from the ambu-

8            lance.

9    Q    Did you get a chance to get a good look at him or were

10          they rushing him in?

11    A    He was on a cot when they brought him in, and he was

12          pretty much covered when I saw him.

13    Q    Did you have any discussions with any of the officers

14          that were there as to any evidence that may have

15          been gathered?

16    A    Yes, I spoke with Officer Skoczylas at the hospital.  He

17          was the one that was at the scene behind the Valu-

18          King.

19    Q    And did he give you any items of evidence?

20    A    He gave me a T-shirt; Raymond's T-shirt, and Raymond's

21          underwear.

22    Q    Okay.  Sergeant, let me show you what's been marked as

23          State's Exhibit 6 and State's Exhibit 7.  Take a

24          look at these, will you please.

25    A    (Complying.)


DENNIS STEINBECK

1   Q   Recognize those?   20

2   A   These are the articles I was talking about that

3         Skoczylas gave to me at the hospital.

4   Q   Is there any indication on there that you marked it or

5         that they were given to you?

6   A   Yes.  They were given to me.  I, in turn, gave them to

7         Detective Teeple.

8   Q   Okay.  Did you do anything else that evening in reference

9         to the investigation of this case?

10   A   Other than type reports, no, not that night.

11   Q   Okay.  How about the following couple of days, did you?

12   A   Yes.

13   Q   What were you doing basically the next few days?

14   A   Myself along with some other officers from the Warren

15         Police Department were assigned to investigate the

16         assault of Raymond Fife.

17   Q   And did you become aware as to when Raymond Fife expired?

18   A   I believe it was Thursday night.

19   Q   Okay.  Were you aware at all of what type of injuries

20         were caused to him?

21   A   I was.

22   Q   And when did you know about these injuries?

23   A   From the days after the assault to when he had died.

24   Q   Okay.  Now, let me draw your attention back to Friday

25         the 13th, 1985, early in the morning.  Did anything

DENNIS STEINBECK

1    happen that day that caused you to have further in-  20

2    vestigation?

3 A That morning when I went to work, I was given a note

4    from Sergeant Stewart who had worked afternoon turn

5    that Thursday night, and the note stated that Danny

6    Hill had come down to the police station to talk

7    with Sergeant Stewart; that he had some information

8    about the Fife homicide.

9 Q Do you recall what some of the details that he had given

10    Sergeant Stewart?

11 A Danny had said that -- to Sergeant Stewart, that he be-

12    lieved Maurice Lowry and Andre McCain had been in-

13    volved with the incident somehow, and that possibly

14    Tim Combs had been involved, and he wanted to dis-

15    cuss these matters with Sergeant Stewart.

16 Q Okay.  What did you do as a result of getting informa-

17    tion from the report from Sergeant Stewart?

18 A That Friday morning, I went out to Danny's house to ask

19    him if he'd come back to the station with me on

20    Friday so we could discuss this a little further.

21 Q Okay.  What time did you go over there?

22 A Between 9:30 and 10:00 that morning.

23 Q Did you go with anybody else or were you alone?

24 A I was alone.

25 Q Was anybody else at the house other than Danny that

DENNIS STEINBECK

20

1        you're aware of?

2   A   I don't know.  I wasn't asked in.  I knocked on the door,

3        and Danny answered me from an upstairs bedroom win-

4        dow.

5   Q   And what did you basically tell him?

6   A   I told him that Sergeant Stewart had told me that you

7        were talking with him last night, and I wondered if

8        you'd come to the station with me so we could talk

9        some more about this.

10   Q   What was his response to you?

11   A   He told me he would get dressed and be right down.

12   Q   Did you tell him that he was under arrest?

13   A   No.

14   Q   Did you tell him that he had to come down?

15   A   No.

16   Q   Where was he sitting when you transported him to the

17        police station?

18   A   Next to me.

19   Q   Was he handcuffed?

20   A   No.

21   Q   When you took him down to the station, was he booked or

22        fingerprinted?

23   A   No.

24   Q   Where did he go when he was taken down to the station?

25   A   We went into an interview room.

DENNIS STEINBECK

1   Q   Had you had an opportunity to talk with this defendant    20

2         on any prior occasions?

3   A   Yes, I know Danny.  I've known him for probably six years.

4   Q   And what did you tell him the purpose for you having him

5         in that interview room was?

6   A   So he could discuss the things he talked to Sergeant

7         Stewart about.

8   Q   And did you advise him of his rights?

9   A   Yes.

10   Q   Was that orally or on a written waiver sheet?

11   A   I read to him a written waiver sheet.

12   Q   You read all the rights to him?

13   A   Yes.

14   Q   Sergeant Steinbeck, I hand you now what's been marked for

15         identification purposes as State's Exhibit Number 59.

16         Take a look at that, please, and tell me what that

17         is.

18   A   This is the Constitutional Rights Waiver that I read to

19         Danny Hill on Friday the 13th.

20   Q   Is there a place on that particular sheet that indicates

21         what time this occurred?

22   A   Yes, 1010 hours.  That would be 10:10 in the morning.

23   Q   Is there a place for a person to put his signature?

24   A   There is.

25   Q   And is there a signature on that?

DENNIS STEINBECK

20

1   A   Yes.  Danny signed it, and I signed it as a witness.

2   Q   And you personally saw the defendant sign that?

3   A   Yes.

4   Q   Did he indicate he understood his rights?

5   A   Yes.

6   Q   Had you ever given him his rights before?

7   A   Yes.

8   Q   In a written form?

9   A   Yes.

10   Q   And had he signed them before on other occasions?

11   A   Yes.

12   Q   How many times?

13   A   I've dealt with Danny approximately four or five times

14        in the past.

15   Q   Have you ever had any trouble communicating with the de-

16        fendant?

17   A   Never.

18   Q   Seem to understand and respond to your questioning?

19   A   Yes.

20   Q   That day when he came down to the station on the 13th,

21        in your mind, based on your knowledge of him, did

22        he appear to be intoxicated?

23   A   No.

24   Q   Did he appear to be under the influence of any drugs?

25   A   No.


DENNIS STEINBECK

1  Q  Was he coherent to the questions you were asking him?

2  A  Yes.

3  Q  How long were you questioning him on that particular day

4     when you brought him to the station?

5  A  We talked for three hours or more.

6  Q  And why so long?

7  A  Danny contradicted himself many times during our conver-

8     sations about his whereabouts, about other people's

9     whereabouts on the day of the Fife homicide and the

10    days directly after.

11 Q  While you were interviewing him, was he able to get up

12    and get something to drink or go to the restroom if

13    he wanted to?  Do you know?

14 A  I believe he used the restroom a couple times.

15 Q  Okay.  Did you happen to get any typed statement from

16    him that day?

17 A  I did.

18 Q  And do you recall approximately what time that statement

19    was taken?

20 A  I believe it started at 1:15.

21 Q  And when was it over?

22 A  1400 hours, 2:00 o'clock.

23 Q  Okay.  And on that particular statement, was that a ver-

24    batim account of what he said to you that day?

25 A  I would ask him questions, and he would answer them.  I

DENNIS STEINBECK

20

1          would type down what he answered.

2    Q    You'd omit the areas where you're doing the questioning?

3    A    I did not type down my questions.

4    Q    After you finished typing this, did he read it or did you

5          read it to him?

6    A    I believe I read it to him.  I can't remember.

7    Q    Okay.  And do you know if he signed it that particular

8          day?

9    A    No, he didn't sign it that day.

10   Q    Did any other members of his family come to the station

11         that day?

12   A    Danny's mother.

13   Q    Okay.  What time did she get there?  Do you know?

14   A    It was around 1:30, quarter to 2:00.

15   Q    Did you have an opportunity to talk with her at all?

16   A    Yes.

17   Q    And what was the conversation you had with her?

18   A    I told Danny's mother why I was talking with him; that I

19         felt he had something to do with the Fife homicide

20         or knowledge of it.

21   Q    And what was her response?

22   A    She told me that Danny couldn't have been involved with

23         any of the things that I talked to her about be-

24         cause he had been home all day long and that he

25         didn't get out of bed that day until 7:00 o'clock

DENNIS STEINBECK

20

1   in the evening.

2 Q After that conversation, what happened to Danny's mother

3   and Danny?

4 A After I talked with Vera for a few more minutes, I went

5   in and finished my discussion with Danny, finished

6   the statement, and then I told him that they could

7   go home, and Danny left the police department with

8   his mother.

9 Q Okay.  Now, going over the weekend on Saturday and Sun-

10   day, did you have an opportunity to do any investi-

11   gating over that period?

12 A I came into the police station for an hour or so on

13   Sunday afternoon.

14 Q And what was the purpose of coming in on Sunday?

15 A I was called at home and told to come in; that some other

16   information had been discovered in the Fife homicide,

17   and I discussed this matter with Sergeant Massucci

18   and Evans and Captain Lozinski, and they told me

19   that there has been some other witnesses that had

20   given statements to the fact of seeing Danny and

21   Tim Combs at the Valu-King the afternoon of the

22   homicide.

23 Q Would that be near the time period that the Raymond Fife

24   boy was missing?

25 A Yes.

DENNIS STEINBECK

1    Q    Now, when was the next time that you saw the defendant?

2    A    Monday morning, the 16th.

3    Q    Okay.  What time was that?

4    A    Between 9:30 and 10:00.

5    Q    And where did you see him?

6    A    At his home again.  Detective Morris Hill and myself went

7        out to the apartment again Monday morning and asked

8        Danny if he would come down to the police station.

9    Q    Who was there that morning?

10    A    His mother Vera.

11    Q    Okay.  And where was Danny when you arrived at the house?

12    A    I believe he was in bed.  He was upstairs.

13    Q    Did you initially -- you or Detective Hill personally

14        talk to the defendant or was the communication

15        through his mother?

16    A    Through his mother.

17    Q    And what was the indication that you received from Danny

18        as to whether or not he wanted to come down?

19    A    We asked him if he wanted to come down; that I had for-

20        gotten to have him sign the statement from Friday,

21        and that we wanted him to ride along with his

22        mother because we also wanted to get a statement

23        from her.

24    Q    Anything else you wanted to do that day?

25    Q    We wanted to talk to Danny further about the things he

DENNIS STEINBECK

1        discussed Friday.

2  Q    Did his mother say anything to Danny to encourage him to

3        come down with him?

4  A    I believe Danny said that he didn't want to come along

5        with us, and at that point, his mother yelled up-

6        stairs for him to come downstairs and get dressed;

7        to come along with us because he didn't have any-

8        thing to hide.

9  Q    Now, where did he ride on that particular day when he

10        came down to the station?

11  A    Detective Morris Hill and myself were in the front seat,

12        and his mother and Danny were in the back.

13  Q    Okay.  Did you tell Danny or his mother, either one, that

14        they were under arrest?

15  A    No.

16  Q    Did you tell him that -- either one of them that they had

17        to come down to the station?

18  A    No.

19  Q    Were either one of them handcuffed?

20  A    No.

21  Q    Were either one of them booked or fingerprinted when they

22        got downtown?

23  A    No.

24  Q    On that particular day when Danny was transported to the

25        police station, did you notice whether or not he was

DENNIS STEINBECK

21

| | | |
|---|---|---|
| 1 | | intoxicated? |
| 2 | A | He was not. |
| 3 | Q | Could you tell if he was under the influence of any drugs? |
| 4 | A | Not that I could tell. |
| 5 | Q | Okay.  Did he appear to be coherent to you? |
| 6 | A | Yes. |
| 7 | Q | When he was taken down to the station, what was the first |
| 8 | | thing that happened when he got there? |
| 9 | A | Detective Hill verbally gave Danny his Miranda Warning |
| 10 | | again, and then we read the statement to Danny that |
| 11 | | he had given me Friday and asked him to sign that |
| 12 | | statement, and he signed it. |
| 13 | Q | Sergeant Steinbeck, I'm going to hand you now what's been |
| 14 | | marked for identification purposes as State's Exhi- |
| 15 | | bit Number 60.  I want you to take a look at that, |
| 16 | | please. |
| 17 | A | (Complying.)  This is the statement that I typed Friday |
| 18 | | afternoon. |
| 19 | Q | And is there a place for signatures? |
| 20 | A | Yes. |
| 21 | Q | And whose signatures are on that statement? |
| 22 | A | Danny Hill, Detective Morris Hill, and mine. |
| 23 | Q | And what day was that actually signed? |
| 24 | A | It was actually signed on the 16th. |
| 25 | Q | Okay.  And could you please read that statement to us. |

DENNIS STEINBECK

A    "I would like to tell Sergeant Steinbeck what I did last

week starting with the night that I baby-sat for

Ella Henderson.  I got out of bed Monday at 2:00

o'clock in the afternoon.  Monday, I went to the

Highland Homes and visited my cousin.  His name is

Donald Williamson.  I ate supper at home Monday.

We had hamburgers.  After I got done eating, I laid

on the floor, and Ella knocked on the door.  She

asked my mother was I home.  Then she looked on the

floor and said, 'There he is.'  Then I took her in

the kitchen to show her my mother's table.  Then

we went to her house because she asked me to baby-

sit for her.  I watched Monday Night Football while

she was gone.  She came home about 3:00.  Then I

went home about 3:30.  I finished watching a movie

at my house and then went to bed.

"I slept all day on Tuesday.  I didn't get up for lunch,

and I slept until 7:00 o'clock in the evening.  When

I got up, I put on a red short sleeve sweat shirt

and some gray pants.  Then I walked to the south-

west park.  I didn't eat at home.  My mom was home

when I woke up, and she said that she thought I was

going to sleep all day.  I walked through southwest

park by myself.  I got to the shelter area behind

the fire station, and there wasn't anybody there

DENNIS STEINBECK

21

when I got there.  Then some black guy that I don't
know came, and we sat for just a minute, and then
B. Caldwell came.  The dude I don't know said he
only had two dollars, and then he asked if anybody
had some change to get two forties.  Then the three
of us walked through Thomas' and got a 40 ounce,
and then we went to B. Caldwell's and drank it.
There was no one else at B. Caldwell's.  I stayed
there for a while and then I went home.  I knocked
on the door, and my brother Raymond answered the
door.  It was about 11:00 o'clock.  And then I went
to bed.  When I was on the way home from Caldwell's,
I was by Jefferson School, and I saw a bunch of
boys on bikes, and one of the boys was Maurice
Lowery.  I just kept walking and went home.

"Then on Wednesday, I slept till about 2:00 o'clock.
Then I went back up to the park.  Then I went back
home for supper.  Then I stayed home all night on
Wednesday.  I was watching something on Cinemax.
I don't remember what time I woke up yesterday.  It
was around 3:00 or 4:00 o'clock.  And I went up to
the park again.  There were two white boys in a
Caddy, and they drove me to Westlawn.  I saw Maurice
Lowery riding the bike again in Westlawn.  It was
a shiny bike with reflectors.  I didn't talk with

DENNIS STEINBECK

1      him.  Then I went to the white girl's house, and

2      Virgil Lowery was there.  The news was on, and they

3      said the boy died.  Virgil said that the police had

4      come to Reserve asking if Recie had the bike.  I

5      said that I saw Maurice riding the bike, and I said

6      that I would tell the police, and Virgil said that

7      narcs get killed.  Then I walked down here and

8      talked with Sergeant Stewart.  I told him that I

9      saw Recie on the bike.  My mom told that the boy

10      got beat up Wednesday when I was home.  I haven't

11      seen Smoo since he went to jail.  I haven't been

12      at the Palmyra Road Valu-King."

13    And that is the end of the interview.

14          JUDGE McLAIN:  All right.  Mr. Kontos,

15      we're going to take a recess.

16          ATTORNEY KONTOS:  Okay.

17          JUDGE McLAIN:  Stand in recess until 3:00

18      o'clock.

19               (Court in recess at 2:42 P.M.)

20               (Back in session at 3:00 P.M.)

21  CONTINUING DIRECT EXAMINATION BY ATTORNEY KONTOS:

22  Q    Sergeant Steinbeck, I believe we left off after you read

23      the statement of the 13th that was signed on the

24      16th, and what happened after you finished reading

25      that to him and he signed it?  What kind of ques-

DENNIS STEINBECK

PENGAD/INDY. MUNCIE IN 47302

SF-AZ-13

1    tioning was involved after that?

2    A    We asked him some more about the things we talked about

3          on Friday.

4    Q    What location were you when you were asking him these

5          questions?

6    A    The same interview room that we had been in on Friday.

7    Q    And who was in there during the questioning other than

8          yourself?

9    A    Danny Hill and Detective Morris Hill.

10   Q    Anybody else join in?

11   A    Sergeant Stewart came in a little while after we had be-

12         gun.

13   Q    What was the gist of the conversation and questioning?

14   A    We talked about the same things that we had discussed

15         on Friday, and during the course of the interview,

16         Danny would contradict himself as he did on Friday,

17         and we told him we believed that he was holding

18         something back from us, that he wasn't telling us

19         the exact truth and that we wanted him to tell us

20         the truth about what took place that Tuesday; if

21         you were there or knew something about it, to tell

22         us.

23   Q    Did there come a point in time during this interview

24         between you and Sergeant Stewart and Detective Hill

25         that happened to cause the defendant to tell you a

DENNIS STEINBECK

21

1           different story?

2  A  At one point, he acknowledged that yes, he had been lying

3           to us.

4  Q  And how did that happen?

5  A  After we discussed the same things, I just said -- we

6           said, "You're holding something back, aren't you,"

7           and you acknowledged that he was, and one of us --

8           I'm not sure which of the three, asked Danny if it

9           would be easier for him to talk about this with just

10         one of us.  If he wanted to talk to me alone, Ser-

11         geant Stewart, or to Detective Hill.  If it will be

12         easier for him to talk about this if there was only

13         one person in the room, and he said that yes, he

14         wanted to be alone with his uncle, Detective Morris

15         Hill.

16  Q  And did you oblige him?

17  A  Yes.  Sergeant Stewart and myself left the room.

18  Q  How long were they in the room together?

19  A  Only a couple minutes.

20  Q  What happened after they were in there for a couple

21         minutes?

22  A  Detective Hill came out of the room and stated to me that

23         Danny had been there and had seen the whole thing

24         that Tuesday evening.

25  Q  What did you do as a result of hearing that?

DENNIS STEINBECK

21

1   A   Detective Hill stated to me that for me to go back in

2         there.  That Danny wanted to start telling the

3         truth about what took place Tuesday.  So, I went

4         back in the interview room, got out some statement

5         forms and started typing another statement from

6         Danny, this time having him telling me the truth.

7         And at that time, Sergeant Stewart came in, and he

8         had a tape recorder with him, and he said that we

9         would -- asked Danny if we could put it on tape in-

10        stead of having it typed, and Danny agreed, and we

11        started the interview again, only this time on tape

12        recording.

13   Q   And who was present at the beginning of this tape re-

14         corded interview?

15   A   Danny, Sergeant Stewart, and myself.

16   Q   Okay.  Now, this was Monday, September 16th, is that

17         correct?

18   A   Yes.

19   Q   Up till that time, what kind of information had the

20         Warren Police Department released to the media, to

21         the papers, and the television?

22   A   About?

23   Q   What kind of details?

24   A   Only that there had been a beating of Raymond Fife and

25         that he died of those injuries.

DENNIS STEINBECK

|  |  |  |
|---|---|---|
| 1 | Q | Any mention of a stick or burning or anything like that? |
| 2 | A | No. |
| 3 | Q | Okay.  Do you know if the defendant was advised of his |
| 4 |  | rights or reminded of his rights at the beginning |
| 5 |  | of that tape recorded statement? |
| 6 | A | Yes, he was, by Sergeant Stewart. |
| 7 | Q | And did there come a time within that statement that |
| 8 |  | there was in interruption for written waiver of |
| 9 |  | right forms? |
| 10 | A | Yes.  The tape was stopped, and we read Danny a rights |
| 11 |  | form and had him sign it. |
| 12 | Q | Did there come a point in time when the tape was started |
| 13 |  | up again and it was read to him on tape as well? |
| 14 | A | His Miranda Warnings? |
| 15 | Q | Yes. |
| 16 | A | Yes, they were read on the tape when the tape was started |
| 17 |  | again. |
| 18 | Q | Anybody else come into the room other than the defendant, |
| 19 |  | yourself, and Sergeant Stewart? |
| 20 | A | No. |
| 21 | Q | Detective Morris Hill come in the room? |
| 22 | A | Oh, yes!  There was three policemen.  Myself, Sergeant |
| 23 |  | Stewart, and Detective Hill. |
| 24 | Q | And who read the rights to him? |
| 25 | A | Detective Hill. |

DENNIS STEINBECK

1   Q   Did you witness or observe the defendant sign the right

2        forms?

3   A   Yes.

4   Q   And who signed as witnesses?

5   A   Detective Hill, Detective Stewart.

6   Q   And you witnessed those yourself?

7   A   Yes.

8   Q   Sergeant Steinbeck, I'm handing you now what's been

9        marked for identification purposes State's Exhibit

10       57, State's Exhibit 58, and look at these one at a

11       time, please, and tell me what they are.

12   A   (Complying.)  These are the rights waivers that were

13       read to Danny Hill.

14   Q   Okay.  Start with Number 57, please.  Is there a place

15       there where there's a signature line and witness

16       lines?

17   A   Yes.

18   Q   And is it signed?

19   A   Yes.

20   Q   Whose signature is that?

21   A   Danny Hill.

22   Q   You observed that personally?

23   A   Yes.

24   Q   And who were the witnesses on that sheet?

25   A   Detective Morris Hill and Sergeant Thomas Stewart.

DENNIS STEINBECK

1    Q    You observed them signing that?

2    A    Yes.

3    Q    What time is indicated on there?

4    A    1155 hours.

5    Q    Now, look to State's Exhibit 58, please.

6    A    (Complying.)

7    Q    And is there a place there for a signature?

8    A    Yes.

9    Q    And what signature is on there?

10   A    Danny Hill.

11   Q    Did you personally observe him signing that?

12   A    Yes.

13   Q    And is there a place for witnesses to sign?

14   A    Yes.

15   Q    And whose signature is affixed?

16   A    Detective Morris Hill, Sergeant Thomas Stewart.

17   Q    And did you personally see those two individuals sign

18        that as witnesses?

19   A    Yes, yes.

20   Q    Is that form different than the form in State's Exhibit

21        57?

22   A    It is.

23   Q    And what is the difference in that, please?

24   A    This contains a paragraph where the subject that you're

25        interviewing is not under arrest.


                        DENNIS STEINBECK

22

1   Q   And that was read to him?

2   A   Correct.

3   Q   And did the defendant acknowledge that he understood?

4   A   Yes, he did.

5   Q   What time was the tape concluded?  Do you know?

6   A   The tape was concluded at 1210 hours.

7   Q   And it began at what time?

8   A   1130 hours.

9   Q   What happened to that tape after it was over?

10   A   It was given to me.

11   Q   And have you kept that tape the entire time?

12   A   Yes, it's been in my desk at the Juvenile Division the

13      entire time.

14   Q   Did there come a point where it may have been taken for

15      purposes of duplication?

16   A   Detective Teeple took it a couple of times to make copies

17      for the prosecutor.

18   Q   Give it back to you?

19   A   Yes.

20   Q   Have you listened to that tape since that time?

21   A   Yes.

22   Q   When was the last time you listened to it?

23   A   Today.

24   Q   And to the best of your recollection, is that identical

25      to the events that occurred that particular day,

DENNIS STEINBECK

1          Monday, September 16th, 1985, when the tape was

2          being recorded?

3  A   Yes.

4                     (State's Exhibit No. 61 marked

                          for identification.)

5

6  Q   (By Attorney Kontos)  Sergeant Steinbeck, it's been

7          marked as State's Exhibit 61, and tell me, if you

8          can, if there's any place on this tape that indi-

9          cates when the tape was made and who was present.

10  A   Yes.  When it was given to me, I wrote on it:  Danny Lee

11          Hill statement/September 16th, '85/Sergeant Stewart,

12          Steinbeck, Detective Hill.

13  Q   Okay.  Thank you.  Side A first?

14  A   I believe so.

15                 (State's Exhibit No. 61 played at 3:10 P.M.

                     and concluded at 4:15 P.M.)

16

17  Q   (By Attorney Kontos)  Sergeant Steinbeck, after that tape

18          was over, what happened next?

19  A   We discussed what had taken place with Prosecutor

20          Watkins.

21  Q   And who's "we"?

22  A   Myself, Detective Hill, and Detective Stewart.

23  Q   And what was the discussion about?

24  A   We asked Danny if he wanted to tell us the same thing on

25          videotape, and he agreed to it.  So, we took a few

DENNIS STEINBECK

22

1     minutes' break, and Detective Teeple set the room

2     up for the videotape, and we went over the same

3     story again on videotape.

4 Q This tape recorded statement was taken first, and then

5     afterwards, the videotape was taken?

6 A Yes.

7 Q The videotape more detailed --

8 A Yes.

9 Q -- than the -- was there any other items that were

10     talked about in the videotape that weren't indicated

11     in the tape recorded statement?

12 A Yes.  Danny talked about the stick that was used on Ray-

13     mond Fife during the videotape.

14 Q Were there any other contradictions as to -- in the

15     statement that he gave on tape?

16 A I believe there was.

17 Q Do you recall what time that statement took place, the

18     videotape?

19 A It started at 1330 hours and concluded at 1438.

20 Q And what time would that be?

21 A 1:30 to 2:38.

22 Q And who was involved in that particular videotape?

23 A The interview was conducted by myself, Sergeant Stewart,

24     and Detective Hill.  Danny Hill was in the room,

25     and Detective Teeple ran the video machine.

DENNIS STEINBECK

1  Q    Did you do anything else in reference to this case after     22

2       that tape was completed?

3  A    Not as far as Danny Hill was concerned, no.

4  Q    Do you see Danny Hill in the Courtroom here today?

5  A    He's sitting there (indicating).

6                  ATTORNEY KONTOS:  May the record reflect

7       that the witness has pointed out the defendant?

8                  JUDGE McLAIN:  Yes.

9                  ATTORNEY KONTOS:  One moment.

10                  JUDGE McLAIN:  Mr. Lewis, how long do you

11      anticipate being with this witness?

12                  ATTORNEY LEWIS:  A long time, Your Honor.

13                  JUDGE McLAIN:  Well, I think rather than

14      interrupt you --

15                  ATTORNEY KONTOS:  I'll ask one more ques-

16      tion.

17  Q    (By Attorney Kontos)  Listening to that tape recorded

18       cassette that we just had, can you identify all the

19       voices that were in it?

20  A    Yes.

21  Q    And who were the voices?

22  A    Myself, Danny Hill, Morris Hill, Tom Stewart.

23                  ATTORNEY KONTOS:  Okay.  Thank you.

24                  JUDGE McLAIN:  Court is now adjourned un-

25       til 9:00 o'clock tomorrow morning.


                        DENNIS STEINBECK

1          (Court in adjournment at 4:28 P.M.) 22

2   * * * * * * * * * * * * * * * * * * * * * * * * * *

3                Thursday, January 23, 1986, at 9:05 A.M.

4                ATTORNEY KONTOS:  Your Honor, the State

5        would ask leave to ask one more question for purposes

6        of clarification before cross examination starts.

7                JUDGE McLAIN:  Very well.  Go ahead.

8   CONTINUING DIRECT EXAMINATION BY ATTORNEY KONTOS:

9   Q    Sergeant Steinbeck, yesterday in going over the tape

10            and listening to it, were you able to make a de-

11            termination as to the length of the tape recorded

12            statement?

13  A    Yes.

14  Q    And what was that length?

15  A    It's approximately an hour in length.

16  Q    And so, it's approximately an hour in length as opposed

17            to the 40-minute as you previously testified to?

18  A    Correct.

19                ATTORNEY KONTOS:  Thank you.

20  CROSS EXAMINATION BY ATTORNEY LEWIS:

21  Q    Officer Steinbeck, how are you this morning?

22  A    Fine, thank you.

23  Q    Officer Steinbeck, how long have you been on the Warren

24            Police Department?

25  A    11 years.


                    DENNIS STEINBECK

1    Q    Okay.  And of those 11 years, what were your duties when    22

2        you initially started?  What were your duties?

3    A    As a road patrolman.

4    Q    And you subsequently became a detective?

5    A    Yes.

6    Q    And when was that?

7    A    November of '78.

8    Q    And what particular division do you work in?

9    A    Juvenile Division.

10    Q    Okay.  And that was since what time --

11    A    November --

12    Q    -- approximately?

13    A    November of '78.

14    Q    November of '78.  So, you've been in there approximately

15        six, seven years, is that correct?

16    A    (Witness nods head affirmatively.)

17    Q    Okay.  And calling your attention back to the date of

18        September 10th, 1985, you first got involved in this

19        case by virtue of taking a Missing Persons Report,

20        is that correct?

21    A    Yes.

22    Q    Do you recall the approximate time that was taken?

23    A    I think I was called to the house somewhere around 8:00

24        that evening.

25    Q    8:00 o'clock P.M.  All right.  And did you take that re-

DENNIS STEINBECK

22

1        port from the Fife family?

2   A    Yes, I did.

3   Q    Okay.  And you subsequently had an occasion, I think, to

4        go to the St. Joseph Hospital, did you not?

5   A    Yes.

6   Q    And approximately what time was that?

7   A    It was after Mr. Fife had found his son, and I'm -- it's

8        around 9:30 I believe.

9   Q    Okay.  And did you have a conference or confer with any

10       of the doctors at the hospital?

11  A    No, I didn't.

12  Q    Okay.  When was the first time you found out that this

13       may have involved a sexual assault of some nature?

14  A    At the hospital that night.

15  Q    At the hospital that night.  Okay.  Then can you tell me

16       who you found out that information from?

17  A    From one of the ambulance attendants.

18  Q    Okay.  And as a result of that, what was the next thing

19       you did?

20  A    That night?

21  Q    That night.

22  A    I received some evidence from one of our officers at the

23       scene.

24  Q    Okay.  And what evidence was that?

25  A    That was Raymond's underwear and Raymond's shirt.


                        DENNIS STEINBECK

22

1   Q   Okay.  And you subsequently turned that over to another

2       officer, did you not?

3   A   Detective Teeple.

4   Q   Okay.  And who was assigned to investigate this case?

5   A   It was assigned to the Juvenile Division which consisted

6       of myself, Sergeant Massucci, and Sergeant Evans.

7   Q   And as a result of what you'd learned at that point, did

8       you have any inkling or any idea in your mind who

9       would be possible suspects in regard to this parti-

10      cular crime?

11  A   Yes.

12  Q   And who were those people?

13  A   There was a number of suspects.  We had Danny Hill, Tim

14      Combs, George Richards, Andre Ervin.  There's a few

15      other names that I can't think of at this time.

16  Q   And why did you come to the conclusion that these were

17      possible suspects?

18  A   Sex crimes.

19  Q   Sex crimes.  Okay.  And in regard specifically to Tim

20      Combs, why specificially Mr. Combs?  The sex crimes?

21  A   He had been arrested for sex crimes before.

22  Q   Okay.  And arrested for what particular type of crime,

23      involving what particular individuals, what particu-

24      lar age?

25  A   Juvenile males.


DENNIS STEINBECK

23

1  Q  Juvenile males. All right. In other words, you're

2       saying young males?

3  A  Yes, teenagers.

4  Q  Okay. And I assume that when you went back to check out

5       these potential suspects or try to draw -- you were

6       trying to find an MO, were you not, or something

7       along that line? When you say "sex crimes," you

8       try to be more definitive? Try to pin it down to

9       who possibly might have been involved with the boy?

10  A  Correct.

11  Q  And you had an occasion to review, I take it, all the

12       police reports you may have on file in regard to

13       Timmy Combs, is that correct?

14  A  Well, I have files on Tim Combs, yes. Past arrests.

15  Q  All right. And did you have an occasion to review those?

16  A  I pulled out his arrest record, if that's what you mean.

17  Q  Okay. So, at that particular point in time, then, Tim

18       Combs was a logical suspect in regard to this par-

19       ticular crime, was he not?

20  A  Among other people, correct.

21  Q  And you also indicated the fact that Danny Hill was a

22       suspect in the crime at that particular point in

23       time, at least in your mind?

24  A  Yes.

25  Q  Okay. And when was it that you first -- since Tim Combs

DENNIS STEINBECK

1         was a possible suspect, when was it the first time   23

2         that you attempted or Mr. Massucci or Mr. Evans

3         attempted to get a hold of Mr. Combs?

4  A   After the statement we received from Danny.

5  Q   Oh! Okay. That statement was taken on what? That was

6         Monday, September 16th?

7  A   Right.

8  Q   Okay. And if I understand you correctly, even as of

9         September 10th, which is a Tuesday when this hap-

10        pened, your idea in your mind was that Tim Combs was

11        a logical suspect, is that correct?

12  A   Yes.

13  Q   But you didn't attempt to contact him whatsoever until

14        after the statement was given by Danny?

15  A   Correct.

16  Q   Okay. Can you tell me any logical reason for that or

17        what the reason was you didn't attempt to secure Mr.

18        Combs?

19  A   At that time, we had no probable cause to pick him up

20        other than him being a suspect in our minds.

21  Q   Well, you're allowed to pursue or to interrogate -- let's

22        say you're allowed to contact an individual and in-

23        terrogate them without having necessarily probable

24        cause. Not for arrest, of course, but you can talk

25        to them, is that correct?

DENNIS STEINBECK

23

1   A   Yes.

2   Q   In fact, in this case, you did with Danny Hill on Friday,

3         September 13th, right?

4   A   There was other reasons we talked to Danny.

5   Q   Well, no.  Let's get back to Friday, September 13th, okay?

6         You didn't have probable cause at that particular

7         time to make an arrest or anything of that nature,

8         did you?

9   A   No.

10   Q   You just had him in for questioning, right?

11   A   He had been seen by a witness at the scene.

12   Q   Well, wait a minute now!  Let's go -- we're talking

13         about Friday the 13th?

14   A   Correct.

15   Q   Okay.  What witness identified Danny Hill being at the

16         scene by Friday morning, the 13th?

17   A   Matthew Hunter.

18   Q   Matthew Hunter?

19   A   Yes.

20   Q   Okay.  So, you brought Danny in for interrogation, right?

21   A   Right.

22   Q   Did anybody else identify Mr. Combs as being at the scene

23         or near the location near the time that this oc-

24         curred?

25   A   I don't believe.

DENNIS STEINBECK

23

1   Q   You don't believe what?

2   A   I don't believe they did.

3   Q   They didn't?

4   A   I may be mistaken.

5   Q   Well, let me ask you this:  Did you discuss this case

6       with Sergeant Stewart?

7   A   Yes.

8   Q   Okay.

9   A   No!  I got a memo from him.  I didn't see him in person.

10  Q   You got a memo from him.  All right.  And that memo was

11      in regard to what?

12  A   To Danny coming down to the station on Thursday night

13      and talking with Sergeant Stewart.

14  Q   And also, did you happen to read the -- go over the

15      Daily Reports, Investigation Reports compiled up

16      until that time from other officers?

17  A   I suppose I did.

18  Q   Okay.  And did you happen to have a look at the investi-

19      gative report dated 9/12, which was Thursday, and

20      it was compiled by Officer Stewart in regard to

21      what you're talking about?  In other words, it

22      talks about Danny.

23  A   Right.

24  Q   Okay.  Did you have a look at that report?

25  A   That's the one I'm talking about.


DENNIS STEINBECK

1   Q   That's the one you're talking about.  Okay.  And did you  23

2           notice anything else on that report?

3   A   There was a lot of things in the report.  Can you be more

4           specific?

5   Q   Okay.  Let me ask you this:  Was there any reference in

6           there to Tim Combs?

7   A   Yes.

8   Q   And do you recall what reference or how he was referred

9           to?

10   A   Danny said that he might have been involved with it along

11           with, I believe, Maurice Lowry and Andre McCain.

12   Q   Okay.  Do you recall anything else in the report?  Would

13           you like to read it to refresh your memory?

14   A   I remember a lot of things in the report.  Is there some-

15           thing you want specifically brought out?

16   Q   Well, is there anything in there in reference to Tim

17           Combs other than Danny Hill talking about Tim Combs?

18   A   You mean where Sergeant Stewart asked him about Tim

19           Combs?

20   Q   Yeah, other than that.

21   A   Well, I don't understand what you mean, so if you've got

22           something in mind, why don't you point it out for

23           me.

24   Q   All right.  I'll do that.  It says:  "At 1645 hours, we

25           went to the home of Troy Cree on Sweetbrier to


DENNIS STEINBECK

1          question him about being in the field the day of          23

2          the beating."  Down below, it says we took a state-

3          ment from Troy at 1815 hours, and he told all that

4          took place on Tuesday that he had seen.  "Showed

5          Cree photos of Greg Allen, Dozie Blackman, Tim Combs,

6          Joe Cofield and unknow.  He I.D.'d Combs."

7     A    Okay.

8     Q    All right.  Now, you can read as well as I can, can't

9          you?

10    A    Yes.

11    Q    Okay.  Then did you read it that night?

12    A    Yes.

13    Q    Okay.  So, he I.D.'d Tim Combs basically as of Thursday?

14    A    Okay.

15    Q    There was an I.D. that Tim Combs was out in that area at

16         the time of the crime?

17    A    No.  It just says he I.D.'d him as knowing the picture,

18         not as seeing him at the scene.

19    Q    Okay.  So, Troy Cree, you're saying, is -- didn't iden-

20         tify Tim Combs as being anywhere near the scene?

21         Is that what you're saying?

22    A    Wait!  I read it here he was shown pictures of some

23         people, and he recognized Tim Combs' picture.

24    Q    Okay.  And that was your interpretation?  You didn't

25         interpret any farther or ask anybody else whether he

DENNIS STEINBECK

1         ID'd as -- Tim Combs as possibly being out there?          23

2    A    No.  Like I said, I didn't get a chance to talk to

3         Sergeant Stewart as he was working night turn, and

4         when I read this in the morning, he wasn't on duty.

5    Q    Let me ask you this going back to this point:  When --

6         you thought Tim Combs was a logical suspect in this

7         even as of Tuesday, September 10th, when the crime

8         occurred, is that correct?

9    A    Yes.

10   Q    Okay.  And the reason you didn't pursue or try to find

11        Tim Combs was what exactly?

12   A    We didn't -- I needed more probable cause just other than

13        having an ID in my mind that he did it.

14   Q    Was there anything wrong with just questioning him?

15   A    No.

16   Q    Okay.  Did you try to question him?

17   A    No.

18   Q    You didn't try to find him?

19   A    No.

20   Q    Okay.  Coming to -- did Officer -- to your knowledge, did

21        Officer Stewart try to find Mr. Combs and talk to

22        him?

23   A    From what I read there, Danny took Sergeant Stewart to

24        where Tim Combs was supposed to have lived --

25   Q    Yeah.


                         DENNIS STEINBECK

23

1   A   -- that night.

2   Q   Are you aware of whether Sergeant Stewart tried to pursue

3         or try to find Tim Combs to talk to him?

4   A   No.

5   Q   Are you aware of Mr. Massucci attempting to talk to Tim

6         Combs?

7   A   No.

8   Q   How about Mr. Evans from the Juvenile Division?

9   A   No.

10   Q   Okay.  So, is it fair to say that Tim Combs wasn't sought

11         for questioning in regard to this entire crime until

12         after the crime occurred, being September 10th,

13         1985, until September 16th, 1985, at which time you

14         had a tape of the statement given by Danny Hill?

15   A   Correct.

16   Q   Okay.  And do you happen to recall -- do you know how Mr.

17         Combs was apprehended that day or taken into cus-

18         tody?

19   A   He was at school.

20   Q   Okay.  And when the officers arrived at the school, do

21         you happen to know what happened?  Did they just

22         ask him to come down for questioning or what hap-

23         pened?

24   A   They told him he was under arrest.

25   Q   Under arrest.  Okay.  So, obviously, there was a thought

DENNIS STEINBECK

1          that there was probable cause and they initiated an    23

2          immediate arrest on him, is that correct?

3    A    Yes.

4    Q    Okay.  To your knowledge, were you in the interviews

5          with Tim Combs?

6    A    Yes.

7    Q    Okay.  Did Tim Combs immediately admit any involvement in

8          this crime?

9    A    No.

10   Q    Okay.  Now, going back to September 10th, were any of

11         these other suspects talked to?

12   A    Yes.

13   Q    The ones you mentioned?

14   A    Yes.

15   Q    They were?

16   A    Yes.

17   Q    And can you recall how many and who they were?

18   A    Maurice Lowry was talked to.  I spent a day looking for

19         a fellow named Tim Collins.  I spent another day

20         looking for a fellow named Hershel Wimbish.  And

21         most of these suspects either had alibis or through

22         our investigation, we found out that they were not

23         in the area or involved.

24   Q    Okay.  But nobody went and talked to Tim Combs?

25   A    No.  We didn't want to talk to Tim Combs until we had

                        DENNIS STEINBECK

23

1              some better probable cause to question him with.

2  Q    Okay.  Well, let me ask you this:  By the statement you

3              just made, did you have a feeling in your own mind

4              that Tim Combs was probably the number one suspect;

5              that actually, he was the one responsible for this?

6  A    I wouldn't say "number one."  I'd say from the beginning

7              when the thing happened, I thought he might be in-

8              volved.

9  Q    Because Tim Combs was involved in sex crimes, right?

10  A    Correct.

11  Q    Sex crimes of maybe 10, 12-year old boys, right?

12  A    Yes.

13  Q    Okay.  What did you do on Tuesday?  Anything in reference

14              to this particular case?  That would be Tuesday,

15              September 11th.

16  A    Tuesday, September 10th.

17  Q    I'm sorry!  Tuesday, September 10th.  Wednesday, Septem-

18              ber 11th.  I'm sorry!

19  A    That's the day we interviewed people in reference to

20              this Tim Collins and this Hershel Wimbish I believe.

21  Q    Okay.

22  A    And we also checked the area around Quimby Park for a

23              fellow, Andre Ervin, that we thought was possibly

24              involved.

25  Q    Okay.  And how about Thursday, September 12th?  Do you

DENNIS STEINBECK

24

1        happen to recall what you did that day?

2  A   The same type of investigative work.

3  Q   And as of -- what did you do on Friday, September 13th

4        in regard to this particular case?

5  A   After reading Sergeant Stewart's note, I went out to

6        Danny Hill's house and asked him if he would come

7        to the police station and discuss with me what he

8        had discussed with Sergeant Stewart the previous

9        night.

10  Q   Okay.  And was Danny alone at the house?

11  A   I don't know.  I wasn't invited in.

12  Q   Okay.  And as I understand, you stood outside and he

13        talked to you from an upstairs window, is that

14        correct?

15  A   Right.

16  Q   And you told him that you'd like to talk to him in re-

17        gard to what he had told Sergeant Stewart the night

18        before?

19  A   Yes.

20  Q   Okay.  And he subsequently went with you downtown, is

21        that correct?

22  A   Yes.

23  Q   And approximately what time did you arrive at the police

24        department, if you know?

25  A   It's around 10:00 o'clock that morning.

DENNIS STEINBECK

1    Q    Around 10:00 o'clock.  Okay.  And did you give him his            24

2         rights at that particular time?

3    A    Yes, I did.

4    Q    Let me ask you this, Sergeant Steinbeck:  How long have

5         you know Danny Hill?

6    A    Approximately five or six years.

7    Q    Okay.  And have you had an occasion before September

8         12th of 1985 to talk to Danny Hill?

9    A    Yes.

10   Q    Okay.  How many times have you seen him approximately?

11   A    I've seen Danny a lot of times socially, or, say, on

12        the street when he was not a suspect in a crime,

13        and also, when I've arrested him before.

14   Q    Okay.  And on that Friday, September 13th, you indicated

15        that you got him down to the police station around

16        9:30, 10:00 o'clock possibly?

17   A    Right.

18   Q    And you gave him his rights?

19   A    Yes.

20   Q    Okay.  And that would be State's Exhibit Number 59, is

21        that correct?

22   A    Right.

23   Q    Okay.  And State's Exhibit Number 59, what is that

24        really?  What is it?

25   A    His Constitutional Rights.


DENNIS STEINBECK

24

1   Q   Okay.  And in regard to that particular Constitutional

2         Rights form, there was another form used later on

3         on Monday, September 16th, was there not?

4   A   Right.

5   Q   Okay.  That particular form has a little bit different

6         wording in it, is that correct?

7   A   Correct.

8   Q   Okay.  And that wording appears right below the time

9         frame, does it not?

10   A   Yes.

11   Q   Would you read that additional language for us.

12   A   "Further I have been advised that I am not under arrest

13         and I am free to leave at anytime.  I have volun-

14         tarily agreed, however, to accompany police officers

15         to the Warren Police Department to give a statement.

16   Q   Okay.  And that particular form was used; the additional

17         language, for what reason?  Do you know the reason?

18   A   To notify the -- to notify Danny Hill that he was free

19         to leave at any time, I suppose.

20   Q   Okay.  So, let's go back to Friday, September 13th now.

21         You hadn't arrested Danny, had you?

22   A   No.

23   Q   Okay.  He accompanied you to the Warren Police Depart-

24         ment, is that correct?

25   A   Yes.


DENNIS STEINBECK

1   Q   Just for general interview, conference, or interrogation, 24

2       right?

3   A   Right.

4   Q   Okay.  So, you gave him his rights?

5   A   Yes.

6   Q   And used the form without the language that he wasn't

7       under arrest and so forth, right?

8   A   Correct.

9   Q   But he wasn't under arrest, is that correct?

10  A   He was not.

11  Q   Can you give me the reason why you didn't use the updated

12      form which was used when somebody's not under ar-

13      rest?

14  A   No.  The office I was in, in the desk drawer -- that was

15      the Miranda Rights that was in the desk drawer and

16      that's the one I used.

17  Q   Okay.  And when you testified at the Suppression Hearing

18      back in December, I think you indicated in your

19      testimony that edict had come down from the depart-

20      ment heads indicating the fact that you should use

21      the revised form, and that was back -- when was that

22      time?

23  A   I thought it was in February.

24  Q   February of '85?

25  A   I believe so.


                    DENNIS STEINBECK

1  Q   So, you were aware of it?                                      24

2  A   Yes.

3  Q   Okay.  But in this particular case, on Friday, September

4      the 13th, you used the old form, is that correct?

5  A   Correct.

6  Q   Now, how exactly did you give him his rights?

7  A   I read that to him.  I asked him if he understood it.

8      He said he did.  I asked him if he would sign his

9      rights waiver.

10 Q   Okay.

11 A   He signed it.  I signed it as a witness, and I conducted

12     an interview.

13 Q   So, you read through the form completely, is that correct?

14 A   Yes.

15 Q   And you asked him if he understood what you had read to

16     him, is that correct?

17 A   Yes.

18 Q   Okay.  And did he read the form?

19 A   I can't remember.

20 Q   Well, down below, it has phraseology to the effect that

21     "I have read this statement of my Constitutional

22     Rights..."  Now, if you want to follow the language,

23     your normal procedure is to give the form to the

24     individual and let them read it, is that not correct?

25 A   Yes, I read that paragraph to him.


DENNIS STEINBECK

24

1  Q    You read that paragraph to him?

2  A    Yes.

3  Q    Okay.  I understand that.  What I'm asking you is this:

4       Did you give it to Danny to read?

5  A    I can't recall if he read it when he signed it or he just

6       signed it, but he was handed the piece of paper.

7  Q    Okay.  What I'm getting to, Officer Steinbeck, is this:

8       When it says "I have read this..." isn't -- your nor-

9       mal procedure is to maybe read the rights to him,

10      also, give him the form so they can read it per-

11      sonally so when they sign an acknowledgement that

12      they've --

13  A   I asked him if would, and I handed it to him as such.  I

14      don't know if he read it as such, but I know he had

15      the document in his hand and he signed it.

16  Q   Let me ask you this:  You indicated you knew Danny for

17      six years, is that correct?

18  A   Yes.

19  Q   You seen him out socially and you had contact with him

20      on an -- official business?

21  A   Yes.

22  Q   At any time with that prior contact from an official

23      status as an investigator, in this particular in-

24      stance, did you ever ask Danny if he could read?

25  A   I can't recall.


DENNIS STEINBECK

1  Q   You can't recall.  Let me ask you this:  When you advise     24

2      somebody of their rights and everything else, do you

3      have an occasion to ever ask them if they can read?

4  A   Yes.

5  Q   Would there be any reason why you didn't ask Danny this

6      particular time --

7  A   No.

8  Q   -- or any time?

9  A   No.

10 Q   Okay.  And did you in any way explain what the rights

11     are or -- let me ask you this:  After you read a

12     statement you have the right to remain silent, did

13     you ever ask the defendant tell me what it means

14     to you to get an idea if they really knew what you

15     were talking about?

16 A   I asked him if he understands he does not have to talk

17     to me if he didn't want to.  He said he did.  I

18     asked him if he wanted to talk to a lawyer before

19     we started.  He said --

20 Q   Well, wait a minute!  No.  You told me just before you

21     read the rights form to him, you asked if he under-

22     stood, and he said yes, and you had him sign it.

23     Why are you backing up now?

24              ATTORNEY WATKINS:  Your Honor, I object.

25     He's not necessarily backing up.  Let him explain

                         DENNIS STEINBECK

24

1        it.

2  Q   (By Attorney Lewis)  In other words, you went on further

3        to try to explain it?

4  A   That's what I meant when I asked if he understood.

5  Q   Are you positive?  Remember you testified back in December,

6        the 16th and 17th?  Are you positive now that --

7  A   To the best of my knowledge, I asked him if he wanted an

8        attorney.  He said no.  I asked him if he under-

9        stood he did not have to speak with me.  He said he

10       understood that.

11  Q   Okay.  Do you know if Danny can write?

12  A   He signed his name.

13  Q   He signed his name.  Do you know if he could write any

14       other word besides his name?

15  A   No, sir.

16  Q   Subsequent to the time that is dated for, Friday, Septem-

17       ber 13th -- and the time is 1010, is that correct?

18  A   Right.

19  Q   That's 10:10 in the morning.  Okay.  What happened after

20       that 1010?  What happened after he signed the rights

21       form?

22  A   The interview started, and I asked Danny what he had done

23       Tuesday, Monday, during the week.

24  Q   Okay.  During the week.  Okay.  Monday, Tuesday, Wednes-

25       day, Thursday?


DENNIS STEINBECK

1   A   I tried to cover every day --

2   Q   Okay.

3   A   -- including when he talked with Sergeant Stewart at the

4          police department.

5   Q   Okay.  And what'd he tell you about what he did?

6   A   Which day do you want me to start with?

7   Q   Well, Monday.

8   A   You want me to read this or do you want me to tell you

9          from my memory of what he told me about Monday?

10   Q   Okay.  Do it from memory if you want to.

11   A   I believe he told me he went to the Southwest Park on

12          Monday, watched Monday Night Football at Ella

13          Henderson's house, babysat for her.

14   Q   Do you know Ella Henderson?

15   A   Yes.

16   Q   Did you interview her in this case?

17   A   Yes.

18   Q   Okay.  Does she have any children?

19   A   Yes.

20   Q   How many children does she have?

21   A   Six.

22   Q   Six children.  Do you happen to know their ages?

23   A   Not offhand.

24   Q   Okay.  But Danny was babysitting for her?

25   A   A couple nights.

DENNIS STEINBECK

24

1   Q   A couple nights.  In reality, that was confirmed?

2   A   I believe so.

3   Q   Okay.  All right.  Go ahead.  What else did he tell you?

4   A   About which night?

5   Q   Okay.  That was Monday night, right?  How about Tuesday?

6   A   Tuesday, he told me at one time, he slept all day Tues-

7         day.  Another time, he told me he was at Southwest

8         Park on Tuesday.  He told me he babysat for Ella,

9         told me about seeing some kids playing in certain

10        areas, and then he told me that he saw the same

11        kids playing at different areas or different times.

12   Q   Okay.  That's basically what happened.  How about Wednes-

13        day?

14   A   Same thing.  He told me he got up and hung around South-

15        west Park for a while, met a couple guys and drank

16        some beer.

17   Q   And -- well, Friday, he's in the police station, right?

18   A   Yeah.

19   Q   Okay.  And that took -- well, maybe three, four minutes

20        just now, right?

21   A   Yeah.

22   Q   Is that correct?  Now, when was it that you took the

23        statement which is labeled as Defendant's Exhibit --

24        60?  What time did you start that statement?

25   A   At quarter after 1:00.

DENNIS STEINBECK

1    Q    Quarter after 1:00.  Okay.  So, Danny was at the depart-

2          ment originally at about -- well, right sheet's

3          signed at 1010, right?

4    A    Right.

5    Q    Okay.  And you asked Danny what he had done for Monday,

6          Tuesday, Wednesday, and Thursday, and you just told

7          me in approximately four minutes what he told you.

8          Whatever time it would take to read that statement.

9          What was done for the other three hours?

10    A    Well, it took a little longer to interview Danny than

11          what I just talked to you about.

12    Q    Why did it take longer?

13    A    He contradicted himself so many times; told me so many

14          different stories, that it took that long to find

15          out exactly what was going on.

16    Q    Okay.  What other stories did he tell you then?

17    A    Well, I said that he told me he saw different people at

18          different times, places.  Even his own whereabouts

19          he was confused.  I felt he was keeping something

20          from me about where he was and what he did in those

21          time periods of those different days.

22    Q    Okay.  Let me ask you this, Mr. Steinbeck:  You've known

23          Danny for six years.  You know him, you said, on a

24          social basis; potentially, also, on an official

25          basis and everything else.  How would you describe

DENNIS STEINBECK

25

1          his level of intelligence?

2  A   Slow.

3  Q   Slow?

4  A   (Witness nods head affirmatively.)

5  Q   Is that the way you described it on December 16th in this

6          Courtroom?

7  A   Maybe I said normal.

8  Q   Yeah, maybe.  Okay.  Are you having trouble remembering,

9          too?

10  A   No, I'm perfectly all right.

11  Q   Let's go with normal because that's what you said, "nor-

12          mal intelligence".  So, you classify Danny as a

13          normally intelligent person?

14  A   (Witness nods head affirmatively.)

15  Q   Okay.  But today, you said slow?

16  A   (Witness nods head affirmatively.)

17  Q   Why'd you change your mind today?

18  A   No reason.

19  Q   No reason?

20  A   (Witness shakes head negatively.)

21  Q   Do you think in reality he's slow?

22  A   I believe so.

23  Q   Okay.  So, when you're talking to -- when you described

24          slow, what do you mean by slow in your own words?

25  A   When I think of that, I put it in the context of how the

DENNIS STEINBECK

1          schools would describe it as being in a slow learner 25

2          class possibly, and that's how I would think of it.

3  Q    Okay.  And have you met other people that you would con-

4          sider slow?

5  A    Yes.

6  Q    Okay.  And do you think any of these slow people -- or

7          do you think they have any problem with memory?

8          In other words, to remember events or times?

9  A    I would suppose.

10  Q    Okay.  All right.  Let me ask you this:  You thought in

11          your mind because he contradicted himself, that he

12          was lying about something?

13  A    Yes.

14  Q    Okay.  May have well just have been he was just confused

15          and can't remember the exact events?

16  A    I didn't feel so.

17  Q    You didn't feel so.  Is that possible?

18  A    I felt he was trying to keep something from me.

19  Q    Okay.  What I'm saying -- that's what you felt.  What

20          I'm saying is the abstract.  Is it possible he's

21          just confused and doesn't remember the exact times,

22          dates or when he was with certain people?

23  A    That may have also been true.

24  Q    Like today, you indicated he was slow, and back on

25          December 16th, you called him normal intelligence?

DENNIS STEINBECK

25

1   A   Correct.

2   Q   You simply forgot, right?

3   A   Right.

4   Q   Okay.  So, you talked to him for a period of about three

5       -- three hours and fifteen minutes before you took

6       the statement?

7   A   Yes.

8   Q   Okay.  And what was the technique which you used in re-

9       gard to taking the statement?

10  A   I asked Danny questions.  He would answer the questions

11      and I would type what he told me.

12  Q   Okay.

13  A   And I'd have to tell him to, you know, stop or slow down

14      as I typed.

15  Q   You're not a speeder; great typist?

16  A   No, not a very good secretary.

17  Q   All right.  Looking at State's Exhibit Number 60, is that

18      the statement that Danny gave you and the one you

19      typed?

20  A   Yes.

21  Q   Okay.  And the wording up on top of that particular

22      statement, did you also read that to Danny?

23  A   No.

24  Q   You didn't?

25  A   No.


DENNIS STEINBECK

25

1  Q  Okay.

2  A  I had already advised him of his rights, and this is

3     basically the same thing.

4  Q  Okay.  And the narrative statement, or at least the

5     statement there, is a result of technique by ques-

6     tion and then answer, right?

7  A  Right.

8  Q  The thing we're missing, though, is the question on that,

9     right?

10 A  Right.

11 Q  All we have is the answers?

12 A  Right.

13 Q  And is there any profanity used in there offhand?

14 A  I don't believe so.

15 Q  Okay.  Did you ever have trouble communicating with

16    Danny without profanity?

17 A  Pardon me?

18 Q  Did you ever have trouble communicating with Danny with-

19    out profanity?

20 A  No.

21 Q  You had no problem?

22 A  No.

23 Q  Okay.  Let me ask you this.  We heard a tape yesterday;

24    a tape recording.  We also saw a videotape.  There's

25    a lot of profanity in both of those items, is there

DENNIS STEINBECK

25

```
 1              not?
 2    A    Yes, there is.
 3    Q    And to your surprise -- it wouldn't surprise you if --
 4              the bulk of that is -- really comes from Officer
 5              Steinbeck, Officer Stewart, and Officer Hill, is
 6              that correct?
 7    A    Yes.
 8    Q    Okay.  Did you feel that -- what was the reason for the
 9              use of that profanity?  There must have been a
10              reason at least in your own mind for your own use
11              of the words.  Why?
12    A    I -- like I told you before, I've known Danny for a long
13              time.  That's the way Danny talks.  That's the way
14              I've communicated with Danny in the past.  And one
15              of the first things you learn as an interrogator,
16              you want the person you're interrogating to be able
17              to understand what you're talking about and for me
18              to understand what he's talking about, and we had
19              no problem communicating the entire day.
20    Q    Okay.  So, let's take what you just said:  "That's the
21              way Danny talks."  So, you were coming down to his
22              level, right?
23    A    That's the way Danny talks.
24    Q    Well, you're coming --
25    A    That's the way we communicated.
```

DENNIS STEINBECK

1   Q   That's the way you communicated.  Well, I seem to recall 25

2        on the tape recording statement and also the video-

3        taped statement that the police said the profanity

4        first and said, "Come on, Danny!  Say it!"  Is that

5        -- do you recall some incidents like that on the

6        tapes?

7   A   Yes.

8   Q   And -- in other words, you were enticing him to use the

9        language?

10   A   That wasn't my voice saying that.

11   Q   Oh!  That was Officer -- was that Mr. Stewart?  I think

12        Mr. Stewart did that a lot, too, didn't he?

13   A   Or Mr. Hill.

14   Q   Or Mr. Hill.  Okay.  Going back to Friday, September

15        13th, you started the statement at what time?

16   A   Quarter after 3:00 -- or after 1:00.

17   Q   Okay.  And it was question/answer.  No question appears;

18        only the answers?

19   A   Right.

20   Q   Okay.  Did you have Danny -- did you have an occasion,

21        when taking statements from people, to have them

22        write the statements out?

23   A   I usually stay away from that.  If there's a typewriter

24        around, I try to use a typewriter.

25   Q   Why would you stay away from the handwritten statements?

DENNIS STEINBECK

25

1  A   Well, a lot of time, they're not legible.

2  Q   Okay.  Let me ask you this:  Wouldn't you feel it would

3      be better to have a handwritten statement to show

4      the person actually wrote it as opposed to just a

5      typewritten statement or the name down below?

6  A   I never had any problems in 11 years with any Court pro-

7      ceedings where I typed statements --

8  Q   You never had any problems?

9  A   -- so, I always typed them.

10 Q   You say you never had any problems.  You never had any-

11     body challenge whether in fact what had been typed

12     on there was what the defendant actually said?

13 A   Right.  No one's ever questioned me in Court why I

14     type the statement other than having the defendant

15     write it himself.

16 Q   Okay.  At this particular juncture, of course, we have a

17     typewritten statement, so we don't know if Danny

18     could write and you didn't ask him?

19 A   Right.

20 Q   So, it's question/answer.  We have the answers.  When'd

21     the statement end?

22 A   Around 2:00 o'clock.

23 Q   1:15 to 2:00 o'clock.  Okay.  So, you've already indi-

24     cated to us that you're not a great secretary,

25     right?  So, would the bulk of that time be consumed

DENNIS STEINBECK

25

1       by just typing?  How about chicken scratch?  Do it

2       by memory, chicken scratch or whatever?

3  A  That (indicating).

4  Q  So, it took 45 minutes.  But you previously talked to

5       Danny and gone through the inconsistencies for three

6       hours?

7  A  Right.

8  Q  What happened close to the time that statement ended?

9  A  Are you speaking about when his mother came down?

10  Q  Yeah, I am.  I'm sorry.  Okay.  Did you see Mrs. Williams

11      that day?

12  A  Right.  She came down to the police station.

13  Q  And where was Danny at on Friday the 13th?  Where was he

14      located in the police department?

15  A  In the Interview Room we'd been in all day.

16  Q  Which Interview Room is that?  Do you have them numbered?

17  A  I don't think we have them numbered.  It's the first

18      one closest to the Juvenile Division.  There's four

19      rooms.  He was in the first one.

20  Q  Can you describe the Interview Room?  How large is it?

21  A  Ten by ten.

22  Q  What does it have in it as far as furniture goes?

23  A  One desk, three, four chairs, typewriter.

24  Q  And how about the door?  Does the door lock from the in-

25      side, outside?  How does it lock?

DENNIS STEINBECK

1   A   It's locked from the outside.                   25

2   Q   It's locked from the outside.  Was Danny at any time

3       locked in the room?

4   A   No.

5   Q   Were you with him all the time?

6   A   No.

7   Q   You weren't?

8   A   No.

9   Q   Okay.  Did you tell him he was free to leave at any time

10      during the time he was down there?

11   A   I don't believe I said that.

12   Q   Okay.  So, the statement finished up at -- what was that

13      time again?

14   A   Around 2:00.

15   Q   Okay.  Would that be the time when Mrs. Williams came to

16      the police department?

17   A   I believe so.  She came before the statement was finished.

18   Q   She came before the statement was finished?

19   A   Right.

20   Q   Okay.  And after you finished the statement, you go out

21      and talk to her?

22   A   No.  I talked to her first and then I finished the state-

23      ment.

24   Q   You talked to her first and then you finished the state-

25      ment.  Okay.  And Mrs. Williams, she told you what?

DENNIS STEINBECK

1   A   She told me that Danny couldn't have been involved with        26

2       this because he had been home sleeping all day on

3       Tuesday till 7:00 o'clock.

4   Q   Did that satisfy you --

5   A   Yes.

6   Q   -- at that time?

7   A   Yes.

8   Q   Okay.  So, you're saying that Mrs. Williams said he was

9       home sleeping the entire time, but Danny gave you

10      this total inconsistent story for three hours, and

11      you took the statement -- in your own mind, you

12      didn't really believe that, did you?

13  A   No, I didn't.

14  Q   Mrs. Williams -- I'm sorry.  Did Mrs. Williams get her

15      son out of there immediately?

16  A   No.  I went back in the room.  I told Danny that his

17      mother was there.  That she had told me that he was

18      there till 7:00 o'clock sleeping that day and --

19  Q   Then you went back in the room?

20  A   Back in the room.  I finished typing the statement and

21      told Danny he was free to go and leave with his

22      mom, and he did.

23  Q   Okay.  There's something unusual about the fact he left.

24      Didn't he without doing something?

25  A   Yeah.  I forgot to have him sign the statement.


                    DENNIS STEINBECK

1   Q   You forgot to have him sign the statement.  How many

2       times has that occurred?

3   A   Not too often.

4   Q   Not too often.  Okay.  Would it be fair to say that Mrs.

5       Williams was rather eager to have her son out of

6       there and home?

7   A   Yes.

8   Q   Didn't have a chance to get it signed?  Would that be a

9       fair statement?

10  A   I -- it was an oversight on my -- on my part.

11  Q   So, he didn't sign it.  Did he ever have a chance on

12      Friday the 13th to read it?

13  A   Who?

14  Q   Danny Hill.  The statement.  I'm sorry.  State's Exhibit

15      60.  Did he have a chance to read over what you'd

16      typed?

17  A   Not on Friday I don't believe.

18  Q   Not on Friday.  Okay.  All right.  So, when Mrs. Williams

19      took Danny out of the Warren Police Department, what

20      was your feeling at that particular time in regard

21      to the inconsistent stories he had given you?

22  A   I was confused.

23  Q   No, you weren't confused!  Danny was confused, right?

24  A   No, I was confused also because like I said, I believed

25      he was involved somehow or knew something about it

DENNIS STEINBECK

26

1     and then I've got an alibi, his mother, that he was

2     sleeping till 7:00, so, of course, on my part, there

3     was some confusion.

4   Q   Okay.  But you still feel that he had something to do

5     with it or he might possibly be involved?

6   A   Yes.

7   Q   Okay.  Did you have an occasion -- on the balance of the

8     day on Friday, did you do anything else in regard

9     to the investigation of this case?

10  A   No.

11  Q   Okay.  Let's go to Saturday.  Did you have an occasion

12     to be involved or was that a day off?

13  A   That was a day off.

14  Q   Good!  How about Sunday?  Was that supposed to be a day

15     off?

16  A   Right.

17  Q   Okay.  In fact of reality, did you have an occasion to

18     talk to anybody in the police department?

19  A   Captain Lozinski called me at home on Sunday, and that

20     was the first time I had been made aware that I had

21     forgot to have Danny sign the statement.

22  Q   Okay.  And did you also have an occasion to talk to Mr.

23     Watkins, the Prosecutor?

24  A   Yes.

25  Q   Okay.  And as a result of that conversation, were you in-

DENNIS STEINBECK

26

1      structed -- or at least you knew that you had to go

2      out and get the statement signed?

3  A  Right.

4  Q  Okay.  What else did you have in mind after talking to

5      Mr. Watkins in regard to Danny?  Anything else?

6  A  No.  We received some direction from Mr. Watkins and

7      Captain Lozinski, and I don't recall what all those

8      directions were, but two of them were to have Danny

9      sign that statement Monday morning, if he would,

10     and also, to ask Mrs. Williams, his mother, if she

11     would come in and give a statement as to what took

12     place that Tuesday evening.

13 Q  Okay.  And was there also the intention to further ques-

14     tion Danny?

15 A  Yes.

16 Q  Okay.  There's no question about that?  You wanted to

17     talk to him more, didn't you?

18 A  Sure!

19 Q  Okay.  And you also wanted to do it not at his home.  I

20     assume you wanted to do it at the Warren Police De-

21     partment, did you not?

22 A  If he agreed to come with us, we'd be more than glad to

23     speak with him when he got down there.

24 Q  So, let's go to Monday morning, and do you recall when

25     you came in to work or what you did the first thing?

DENNIS STEINBECK

26

1   A   Monday morning, we arrived at work and had a staff

2          meeting in our office, and Detective Hill and De-

3          tective Stewart were also assigned to us to inves-

4          tigate further.

5   Q   Okay.  And do you happen to recall when Sergeant Stewart

6          was assigned to the case?

7   A   Well, he was working on it the week before to my best --

8   Q   He had been previously assigned?

9   A   Yeah, but I -- officially assigned Monday morning I be-

10         lieve.

11   Q   Officially assigned.  And how about Mr. Morris Hill?

12         Detective Morris Hill.  When was he officially as-

13         signed to this case?

14   A   I believe it was Monday morning also.

15   Q   Monday morning.  And Mr. Morris Hill, what's his relation-

16         ship to the defendant Danny Hill?

17   A   His uncle.

18   Q   His uncle.  So, obviously, Morris knew the defendant very

19         well, and he was assigned as of Monday morning?

20   A   I believe so.

21   Q   And during that staff meeting, was there any conversation

22         in regard to how you might possibly get Danny down

23         to the police department if he wouldn't come on his

24         own?

25   A   No.

DENNIS STEINBECK

1   Q   Okay.  Would it be just pure coincidence that Morris Hill  26

2           was the one that went with you to Danny's house?

3   A   I can't answer that.  That wasn't my decision.

4   Q   But he did, didn't he?  Morris Hill went with you?

5   A   He was assigned to me that morning.

6   Q   What happened when you left the police department to go

7           to Danny's house?

8   A   We went to the home.  We were invited in, and we explained

9           our presence; the reason for our presence, and both

10          subjects left with us.

11   Q   Now, when you were in the house, where was Danny at the

12          time you arrived?

13   A   I believe he was upstairs in bed.

14   Q   Okay.  And who did you initially have a conversation

15          with?

16   A   Vera.

17   Q   Vera.  And what'd you tell Vera?

18   A   Told her that we wanted to have her come down and make a

19          statement about what took place Tuesday and that we

20          wanted to have Danny come down and sign a statement

21          that I took Friday because I forgot to have him sign

22          it.

23   Q   Okay.  So, that's what you told Vera?

24   A   Right.

25   Q   And did Danny indicate that he did not want to go down-

DENNIS STEINBECK

26

1    town?

2  A   He -- I can't remember hearing it, but he said something

3      from the upstairs that he didn't want to go or some-

4      thing like that, and his mother told him to get up

5      and get down here and that he didn't have anything

6      to hide.

7  Q   Okay.  And, of course, Vera, what she knew at that time

8      was that you were going to take a statement from

9      her and you were just going to have Danny sign the

10     statement he'd given on Friday?

11 A   That's what I told her.

12 Q   You didn't mention that you were going to attempt to

13     question him anymore or anything else?

14 A   No.

15 Q   Okay.  Detective Morris Hill, yourself, Vera Williams,

16     the defendant, you go downtown in a police cruiser,

17     I imagine, or detectives' car, I'm sorry?

18 A   Right.

19 Q   Okay.  And when you get downtown to the Warren Police

20     Department, what happens?  What do you do first?

21 A   We walk in, ask Vera to have a seat in one interrogation

22     room, asked Danny to have a seat in the same in-

23     terrogation room he'd been in before.

24 Q   Okay.  And who was it then that went to Vera Williams to

25     get her statement?

DENNIS STEINBECK

26

1    A    No one.

2    Q    No one?

3    A    No one.

4    Q    Okay.  What happened in the interrogation room where

5            Danny was located?

6    A    We read this statement to Danny.  Morris Hill did -- ad-

7            vised him of his rights verbally and asked Danny

8            if he'd sign it, asking him if this is what he had

9            told me after we read it to him, if he remembered if

10           that was the truth and everything.  He said yes.

11           We asked him if he'd sign it.  He signed it.  And

12           then we asked him if he wanted to talk to us some

13           more about the same things we talked about Friday,

14           and he said he was willing to talk to us.

15    Q    Let me back up a minute.  You've indicated now that when

16           you got him down there on Monday, September 16th,

17           that you read this statement to him?

18    A    Detective Hill did.

19    Q    Detective Hill did.  Okay.  If I recall correctly,

20           during your testimony on December 16th and 17th, I

21           don't think you indicated you read that to him.  I

22           think you indicated that you handed it to him and

23           you thought he read it.

24    A    I may be mistaken.

25    Q    But in any event, the statement was signed as soon as you

DENNIS STEINBECK

26

1  got downtown?

2  A  That was the first thing we did, right.

3  Q  Okay.  First thing you did.  Okay.  And your next step

4     was to -- I guess Mr. Hill gave him his Miranda

5     Rights, is that correct?

6  A  Verbally.

7  Q  Verbally.  And that was from memory, is that correct?

8  A  Yes.

9  Q  And what he gave him was basically the substance of

10    State's Exhibit Number 59, would that be correct?

11 A  The upper portion.

12 Q  The upper portion.  Okay.  In other words, the actual

13    rights themselves?

14 A  Right.

15 Q  Okay.  And that wasn't -- didn't have any additional

16    language in it because he had memorized it, ob-

17    viously?

18 A  Correct.

19 Q  And in regard to the lower portion, I don't know that Mr.

20    Hill has memorized it.  I guess he hasn't, right?

21 A  No, I don't think so.

22 Q  So, did he do something of a paraphrasing or something

23    or you just had him sign?

24 A  As far as the bottom portion?

25 Q  Yeah.

DENNIS STEINBECK

26

1    A    That -- alls we did is give him his rights.

2    Q    Okay.

3    A    Just the top portion.

4    Q    Just the top portion.  So, what we're talking about is

5         the before rights, and Morris Hill -- Detective Hill

6         has memorized that?  He gave it to Danny immediately

7         after he signed that statement, is that correct?

8    A    Before.

9    Q    Oh!  He gave the verbalization of the statement before he

10        signed it?

11   A    Maybe not.  I can't recall.  All I know, he was given his

12        rights verbally that morning before we started

13        talking to Danny again.

14   Q    And that's the top portion of the form?

15   A    Right.

16   Q    So, the lower portion of the form was not read -- not

17        given to him because Mr. Hill didn't memorize it,

18        and there's no signature that he waived his rights

19        or anything?

20   A    Correct.

21   Q    But you're indicating the fact that he signed it?  Okay.

22        "I'll go ahead and talk to you"?

23   A    Yes.

24   Q    Okay.  And we're back in the same Interview Room, are we

25        not?


DENNIS STEINBECK

1   A   Yes.

2   Q   And present is yourself, is that correct?

3   A   Yes.

4   Q   Okay.  And Detective Hill?

5   A   Right.

6   Q   Okay.  And momma's not there?  Momma's been separated?

7   A   Vera was in the other room.

8   Q   In the other room.  Okay.  Now, talking about Vera for

9       a moment, you indicated the fact that nobody ever

10       talked to her, is that correct?

11   A   No, we didn't get around to talking to her.  After Danny

12       told us he had been at the scene that day, too many

13       things became important to us to get to her state-

14       ment at that time.

15   Q   Okay.  Well, let me ask you this:  When was it that Danny

16       said for the first time that he was at the scene to

17       the best of your knowledge?  I think that was done

18       with Mr. Hill, was it not?

19   A   Right.

20   Q   And when was that?

21   A   I can't remember the exact time of the morning that was.

22   Q   Well, let me ask you this --

23   A   It was before 11:30 because the tape started at 11:30.

24   Q   Right.  Right.  Would it be shortly before the tape

25       started?

DENNIS STEINBECK

27

1    A    Yes.

2    Q    Okay.  So, what time did you get down there that day?

3    A    Around 10:00.

4    Q    Around 10:00.  So, basically, Danny was in the same in-
5         terrogation room with Officer Hill and yourself for
6         an hour and a half.  Okay.

7    A    Sergeant Stewart.

8    Q    Oh!  Sergeant Stewart was there, also.  Right.  Sergeant
9         Stewart.  Okay.  But nobody went next door to talk
10        to Vera or to get her statement or anything?

11   A    I know the statement wasn't taken, but Sergeant Stewart
12        may have spoken with her and Detective Hill may
13        have spoken with her because Sergeant Stewart and
14        Detective Hill were in and out a couple times, so
15        I believe they had a conversation with Vera that day.

16   Q    But they didn't take a statement?

17   A    No, there was no statement taken.

18   Q    Okay.  So, now, as of about 10:00 o'clock on Monday,
19        September 16th, we have yourself, we have Detective
20        Hill, we have Detective Stewart and Danny Hill in
21        the room, correct?

22   A    Right.

23   Q    Okay.  And what'd you tell Danny Hill?  What are you
24        talking about?

25   A    We're talking about the same things we did Friday,

DENNIS STEINBECK

27

1    telling him we believe he's lying to us.  There's

2    too many inconsistencies in his story.  "We believe

3    you know more than you're telling us.  We think

4    you're involved or know about what took place Tues-

5    day behind the Valu-King."

6  Q  All right.  Okay.  That took about 10 seconds.  What did

7     he say to that?

8  A  He went over his same story again with the contradictions

9     in it.

10  Q  Contradictions.  Okay.  He kept going over it and over

11     it?  It would have to be over and over, right?

12  A  Well, you're trying to get to the point why we were there

13     so long before we started the tape.

14  Q  Yeah.  I'm trying to figure out what transpired up to

15     the time --

16  A  Whatever we talked about took an hour, hour fifteen

17     minutes before Danny realized that we did know more

18     than he was telling us.

19  Q  Well, let me ask you this:  If it took an hour and a

20     half, he was disagreeing -- or he was denying,

21     right?

22  A  Right.

23  Q  Otherwise, it wouldn't have taken an hour and a half,

24     would it?

25  A  Correct.


DENNIS STEINBECK

1  Q  So, there was denials all the way through?

2  A  Yes.

3  Q  Okay.  Did you tell him -- nobody told him he was free to

4     leave or do anything at that time?  Did you?

5  A  No one told him he was free to leave.  We advised him of

6     his rights --

7  Q  Well, in the morning, yeah.

8  A  -- he could have an attorney if he wanted to and he didn't

9     have to talk to us if he didn't want to.

10  Q  But nobody told him he was not under arrest or free to

11     leave or anything of that nature?

12  A  Right.

13  Q  You think if you told him he was free to leave, he pro-

14     bably would have gotten out of there?

15  A  I couldn't answer that.

16  Q  So, an hour and a half goes by and there's denials.  What

17     comes about at approximately 11:30?

18  A  I think it was a little before then.

19  Q  Okay.

20  A  Some time during the interview, around that time, Danny

21     seemed to act like we knew and that he better tell

22     us what was going on.  And Sergeant Stewart described

23     to Danny that we know how hard it is to tell the

24     truth if you're involved with something like that

25     or to tell people when you've been involved with

DENNIS STEINBECK

PENGAD/INDY. MUNCIE. IN  47302

SF-AZ-13

1        such a vicious crime, and we told Danny it would be   27

2        easier for him to talk to somebody alone.  "Would

3        you rather talk to Sergeant Steinbeck, Sergeant

4        Stewart, or Detective Hill?"

5  Q   Okay.

6  A   And Danny said yes, that he would rather talk with his

7        uncle, Detective Hill.  At that time, myself and

8        Sergeant Stewart left the room and Danny talked with

9        his uncle alone.

10  Q   Okay.  And how long would you say -- was the door closed?

11  A   Yes.

12  Q   Okay.  And how long would you say that occurred?

13  A   Two or three minutes at the most.

14  Q   Okay.  And Detective Morris Hill, as far as stature, how

15        would you describe Mr. Morris Hill?  That is --

16  A   He's well built.

17  Q   He's well built.  Or is it something more than just well

18        built?  Does he do anything as a sport or as a side-

19        line?

20  A   Yes.  Morris is a weight lifter.  Power lifter.

21  Q   Would you classify him as a fairly intimidating figure?

22        He's a bulk of a man!

23  A   He doesn't scare me.

24  Q   Well, I know that!  I don't expect Mr. Hill to go out

25        and try to scare you.  Okay.  Besides, you're

DENNIS STEINBECK

1       friends, are you not?

2   A   Yes.

3   Q   Did Morris raise his voice and get his temper up?

4   A   Sure.

5   Q   In fact, in the tapes, there's some indication that

6       Morris even -- when he talks, even his normal tone,

7       is a pretty loud individual, is he not?

8   A   On occasions, he can be.

9   Q   So, Danny was left in the room, and you say for what?

10      Approximately a couple minutes?

11  A   Right.

12  Q   And then what transpired next?

13  A   Morris came out of the room.  He had a tear in his eye,

14      and he told me that Danny was there the entire time

15      on Tuesday evening and that he wanted to tell me

16      the truth about it now.

17  Q   Okay.  And at that moment in time, what did you and

18      Officer Stewart do?

19  A   I was alone at the time.  I went back in the room, saw

20      Danny sitting in the same chair.  He had a tear in

21      his eye also.  I asked him if he was all right; if

22      he wanted to talk to me about it now.  He said he

23      did.  I pulled a piece of paper out of the desk,

24      and I was going to start typing another statement,

25      and at that time, Sergeant Stewart came in the room,

DENNIS STEINBECK

1          said that we'd put it on tape recording instead of   27

2          typing it on paper.

3  Q  So, it was Sergeant Stewart's suggestion that you put it

4          on tape, is that correct?

5  A  Yes, sir.

6  Q  Now, prior to the time -- as I understand it now, Detec-

7          tive Hill walked out of the room and said Danny was

8          there the entire time or something of that nature,

9          is that correct?

10  A  Right.

11  Q  So, you go back in the room.  And was Danny -- you say

12          he had a tear in his eye.  I mean what was his mood

13          at the time?

14  A  I could tell he was emotionally upset from finally ad-

15          mitting to being there and seeing the things that

16          took place and being involved in the things that

17          took place, and he was upset and sad.  Sorry.

18  Q  Okay.  Did you happen to notice -- you've reviewed the

19          tape recording, have you not?

20  A  Yes.

21  Q  Okay.  And, of course, you've also seen the videotape,

22          have you not?

23  A  Yes.

24  Q  The tape recording came before the videotape, did it not?

25  A  It did.

DENNIS STEINBECK

1   Q   Did you notice -- with your own ears, did you notice any

2         difference in the tone of voice of Danny in the tape

3         recorded statement; slowness, or how he was talking

4         as opposed to the videotape?  Did you happen to no-

5         tice any difference yourself?

6   A   No.

7   Q   Okay.  Let's go back now up until the time that Officer

8         Stewart, yourself went in, okay!  When you went in

9         -- let me ask you this question.  Strike that.

10        When you went into the room, Sergeant Stewart -- you

11        were going to take a piece of paper out, go back to

12        the typewriter, play secretary and make up a state-

13        ment.  Officer Stewart comes in and says:  "No!  We

14        should get this on a tape recording."  Is that

15        basically it?

16   A   Right.

17   Q   Okay.  Then he went and got a tape recorder, is that

18        correct?

19   A   Oh, I think he had it when he came in.

20   Q   Okay.  And was it at that point in time that you turned

21        the tape recorder on and you started the statement

22        immediately?

23   A   I think we asked Danny if it was all right with him

24        first if we put it on tape.

25   Q   Okay.  Anything else do you recall?

DENNIS STEINBECK

27

```
 1   A    I don't understand what you're getting at.                    27

 2   Q    Well, no.  I just -- I want to know -- you asked him if

 3             it was all right to put it on tape, okay?

 4   A    Yeah.

 5   Q    And he was going to go along with that and tell you the

 6             story?

 7   A    Right.

 8   Q    So, did you start the tape interview then?

 9   A    I believe so.

10   Q    Okay.  Now, up until the time of the starting of the

11             tape at 11:30 -- approximately 11:30 A.M. that

12             morning, okay, had either Sergeant Stewart or your-

13             self or Detective Hill told Danny anything about

14             this crime; any of the details of this crime?

15   A    No, none.

16   Q    None whatsoever?

17   A    Other than the boy being assaulted, beaten and died of

18             his injuries.

19   Q    Okay.  So, he was assaulted.  Did you describe how he was

20             assaulted?

21   A    No.

22   Q    Did you say he was raped or anything?

23   A    I don't believe so.

24   Q    You don't believe, you say, he was raped?

25   A    No.
```

DENNIS STEINBECK

1   Q   Okay.  And how about -- did you mention anything in re-

2       gard to any of the details such as the underwear,

3       the black Wrangler shirt, the stick, anything like

4       that?

5   A   No.

6   Q   Not whatsoever.  Okay.  Number two, did you ask him be-

7       tween that time of about -- let's see.  What was it?

8       About 10:00 o'clock to 11:30, did you talk anything

9       about Tim Combs?

10  A   Yes.

11  Q   What'd you tell Danny about Tim Combs?

12  A   That we were going to pick up Tim Combs.  That we felt

13      he was involved also.  And we were going to question

14      Tim Combs.

15  Q   Just that he was involved?

16  A   Yes.

17  Q   Is that the way you're phrasing it?

18  A   Yes.

19  Q   Okay.  And you really had in the back of your mind that

20      definitely, Tim Combs was there, right?

21  A   Yes.

22  Q   No question about it.  Okay.  And you're telling the

23      Court today that between the time of 10:00 and

24      11:30, you indicated that you told Danny you felt

25      Tim Combs was involved and "we're going to go out

DENNIS STEINBECK

1    and talk to him"?  Is that basically it?  28

2 A No.  I think we told him we were going to bring him in.

3 Q Did you happen to also push it a little farther?  Did you

4    happen to tell Danny:  "Danny, Tim Combs is going to

5    tell everything on you.  He's going to blame every-

6    thing on you.  You better tell us first" --

7 A Yes.

8 Q -- anything like that?

9 A Yes.

10 Q Okay.  So, the reason for that was what?

11 A We wanted to know what Danny had done, what his involve-

12    ment was.

13 Q Okay.  So, going back for a moment, when you interrogated

14    him initially and asked him about his whereabouts

15    and the inconsistencies in the story there, you got

16    denials, right, for that hour and a half?

17 A Yes.

18 Q Okay.  Then you try a new tactic.  Let's call it a

19    "tactic".  Is it all right to call it a tactic?

20 A Fine.

21 Q Okay.  So, then you say:  "Tim Combs is going to come

22    down here and blame everything on you."  Okay.  Was

23    that his hot button?

24 A It may have been.  I think he knew we had him before

25    that.


DENNIS STEINBECK

| | | |
|---|---|---|
| 1 | Q | Okay. You say you think he knew that you had him before |
| 2 | | that. In other words, he was wearing down, wasn't |
| 3 | | he? |
| 4 | A | He knew we knew he was lying. |
| 5 | Q | Okay. And the fact that Tim Combs -- and you told him |
| 6 | | Tim Combs was "going to come down here and blame |
| 7 | | everything on you. You better tell us first so we |
| 8 | | know who to believe"? |
| 9 | A | Right. |
| 10 | Q | "You better tell us the details"? |
| 11 | A | Correct, we said that. |
| 12 | Q | Sure! My God! That's exactly what any policeman would |
| 13 | | do, I think; use any tactic possible, at least with- |
| 14 | | in the relm of -- |
| 15 | A | Legality. |
| 16 | Q | -- reasonableness. Trickery is all right to get him to |
| 17 | | state how he was involved. |
| 18 | A | Sure! |
| 19 | Q | So, Tim Combs was the hot button. You told him that |
| 20 | | "you better tell us the truth. Give us the details |
| 21 | | now and then we'll know who to believe"? |
| 22 | A | Right. |
| 23 | Q | Okay. So, Morris Hill comes out and says that Danny |
| 24 | | said he was there the whole time, right? |
| 25 | A | Right. |

DENNIS STEINBECK

1    Q    Okay.  Up until that time, you had not given him any of

2         the details of the crime, is that correct?

3    A    Correct.

4    Q    Okay.  You mentioned that there was a beating, there was

5         an assault, I think, and there was some injuries?

6    A    Danny knew a lot about the details from so many rumors

7         flying around the projects, and it wasn't from what

8         I knew or told him.  It was from what he had learned

9         on the street or thought he knew on the street.

10   Q    Thought he knew on the street.  All the rumors flying

11        around.  Do you recall yesterday when Mr. Kontos

12        asked you the question:  "Mr. Steinbeck, did the

13        newspapers or the police release any details of

14        this crime"?  "No."  Let me ask you this:  In all

15        reality, when you were out there investigating, the

16        entire community -- at least that section of town

17        and everything else, had a good idea, and some of it

18        was myth as to what happened to this boy, is that

19        correct?

20   A    Yes, there was a lot of rumors going around.

21   Q    Okay.  And tell us about an organization, if you happen

22        to know, called BLOCK WATCH.  You know about BLOCK

23        WATCH?

24   A    I know it exists.

25   Q    Okay.  And let me ask you this.  Officer Skoczylas

DENNIS STEINBECK

1        testified here the other day.  Were you aware that

2        there was other public citizens, not police or para-

3        medics or anything else, that were out there in the

4        field that saw the victim when he was recovered that

5        evening?

6  A   There probably was.  I can't say for sure.  I wasn't at

7        the scene.

8  Q   So, suffice to say, that the community via the faster

9        network, even faster than the newspaper and every-

10       thing, some fiction, some reality got out in the

11       community as to what the details -- or possibly what

12       some people had seen right there on the scene,

13       right?

14  A   Yes.

15  Q   And that might be the underwear were tied around the

16       neck?

17  A   I can't answer what all the rumors were.

18  Q   Okay.  But suffice to say, that they were out there?

19  A   Yes.

20  Q   Some truth, some fiction?

21  A   Correct.

22  Q   Okay.  Going back now, but you didn't give him any de-

23       tails of the crime?

24  A   No, I didn't.

25  Q   So, Officer Stewart comes in, and then yourself and --

DENNIS STEINBECK

PENGAD/INDY. MUNCIE. IN 47302

SF-AZ-13

1    you use the tape recorder.  Detective Hill is not    28

2    in the room at the time, is that correct?

3  A  Right.

4  Q  Okay.  The tape starts up, right?  Okay.  So, you begin

5    to question Danny?

6  A  (Witness nods head affirmatively.)  On tape.

7  Q  On tape.  Okay.  Now, of course, that morning, you were

8    using Tim Combs as a wedge or a ploy to get Danny to

9    tell you what happened that particular evening,

10    right?

11  A  Right.

12  Q  And this is still -- nobody ever talked to Tim Combs,

13    right?

14  A  Right.

15  Q  Have you talked to Tim Combs before on any other case?

16  A  Yes.

17  Q  Okay.  Was Tim Combs a very cooperative fellow --

18  A  In most --

19  Q  -- in a sense?  Does he confess openly to you?

20  A  He's basically the same as Danny.  He'll deny until he

21    knows we have the goods on him, then he'll come

22    clean.

23  Q  In this particular case, however, it turns out that

24    Danny Hill ends up walking in on Thursday night,

25    and the note's given to you, and that's when you

DENNIS STEINBECK

28

1           pursue Danny Hill?  Is that basically it?

2  A    Yes.

3  Q    Okay.  But moment in time on September 10th, 1985, you

4           have Timothy Combs as a prime suspect because this

5           is his MO?

6                 ATTORNEY KONTOS:  Objection, Your Honor!

7           I don't know if he ever said he was a prime suspect.

8           He said there were numerous people that they had in

9           mind.

10                JUDGE McLAIN:  That's a possible inference.

11           Objection sustained.

12  Q    (By Attorney Lewis)  But nobody from the police depart-

13           ment attempts to contact or interrogate Mr. Combs

14           until finally there's a statement secured from

15           Danny Hill on tape?

16  A    Right.

17  Q    Okay.  Once you have that taped statement of Danny Hill,

18           Officers -- I think it was Massucci and Evans,

19           right, went to the Western Reserve High School?

20  A    No.

21  Q    I'm sorry.  Who was it that went to the Western Reserve

22           High School and arrested him?

23  A    Sergeant Massucci, Lieutenant Marchio, and I believe

24           Detective Sines.

25  Q    Okay.  They went, and the first thing they did is -- they

DENNIS STEINBECK

28

1   did is -- they didn't even ask to come down and

2   interrogated him.  They arrested him, right?

3  A  I believe.  I wasn't there.  I can't answer for sure.  I

4   don't know what conversation took place.  Whether he

5   was asked to come down and wouldn't come or asked to

6   come down and did come.  All I know, he was told he

7   was under arrest.

8  Q  He was brought to the station, and he finally gave a

9   statement as a result of the playing of the tape

10   recorded statement of Danny Hill?

11  A  No, I don't believe he confessed because of the tape re-

12   cording.

13  Q  Oh!  You don't believe so?

14  A  I don't believe so.

15  Q  Okay.  As far as you know, it didn't play any part in it?

16  A  I know he heard parts of that tape, but I don't think

17   that's the reason why he told us everything he knew.

18  Q  Were you interviewing Mr. Combs?

19  A  Yes.

20  Q  Okay.  Up until the tape was played, was he denying or

21   giving you other stories?

22  A  Yes.

23  Q  Okay.  After the tape was played to him, did he subse-

24   quently end up giving you a different statement in-

25   volving himself in the crime?


DENNIS STEINBECK

28

A    Yes.

Q    Okay.  That's fair enough.  All right.  The tape recorded
     statement starts up -- up and you question Danny in
     regard to the crime, is that correct, on 11:30 --
     I'm sorry, approximately 11:30 Monday morning,
     September 16th?

A    Right.

Q    Officer Stewart, yourself were in the room, correct?
     Morris Hill is not in the room?

A    No.

Q    Subsequently, Morris Hill comes back in the room, is that
     correct?

A    Right.

Q    And what transpires during the course of the tape?  Any-
     thing unusual?

A    We stopped the tape, advised Danny of his rights again.
     We wanted to have something on paper; his signature
     on paper that he had been advised of his rights.
     Detective Hill brought in a rights sheet, read it to
     him.  There was also another rights sheet like the
     one from Friday.  It was also signed, and the in-
     vestigation continued -- the interview continued.

Q    Okay.  Whose idea was it to interrupt the tape and to
     give Danny his rights in written form, or at least
     formally signed?

DENNIS STEINBECK

1   A   Detective Stewart or Detective Hill.  One of those two.

2   Q   Okay.  So, the tape's interrupted, and Detective Hill is

3         the voice you hear on the tape recorded statement,

4         is that correct?

5   A   Yes.

6   Q   Okay.  And you indicate that there were two rights sheets

7         that were actually signed at the same time; 1155

8         hours?

9   A   Right.

10   Q   Okay.  Now, this occurred on September 16th, which is a

11         Monday, 1985, right?

12   A   (Witness nods head affirmatively.)

13   Q   Okay.  You came to a Suppression Hearing in December,

14         which is December 16th, 1985, is that correct?  You

15         testified in this Courtroom --

16   A   Right.

17   Q   -- in that chair?  Okay.  And do you recall what you

18         testified to on that particular Monday in regard to

19         State's Exhibit 57?

20   A   No.

21   Q   You don't?

22   A   Well, you're going to have to be more specific.

23              ATTORNEY WATKINS:  Your Honor, I'm going

24         to object.  We're not here to tell what he said on

25         Monday in December.  We're here to go over whatever

28

1          the questions he has about --

2                 ATTORNEY LEWIS: It goes to the credibility,

3          Your Honor. He was under oath at the time.

4                 JUDGE McLAIN: Objection overruled.

5  Q  (By Attorney Lewis) Mr. Steinbeck, if I can refresh

6          your recollection, on Monday, December 16th, in re-

7          sponse to the prosecutor's question, Number 57 was

8          identified as the rights sheet, the one and only

9          rights sheet at that time that was read and signed

10         by Danny Hill at 11:55 A.M., September 16th, 1985.

11         Do you recall testifying to that? It's --

12  A  Right.

13  Q  Okay. And, of course, you were under oath at the time?

14  A  Right.

15  Q  You were testifying to the best of your recollection, as

16         in reality, is what you were testifying to, right?

17  A  That's right.

18  Q  Did there come a time very shortly after that; say, for

19         instance, within a day, the next morning, that be-

20         cause of some additional language in the tape, that

21         there appeared to be something that was amiss?

22  A  Yes. I had forgotten that there was two right sheets

23         that day.

24  Q  Okay. And when'd you find that rights sheet?

25  A  It was during the Suppression Hearing I believe.

DENNIS STEINBECK

29

1   Q   Oh!  The next day?

2   A   I thought it was that day.

3   Q   No, it wasn't that day.

4   A   It was the next day?

5   Q   Yeah.

6   A   Okay.

7   Q   I called you back on the stand.  That's when it was intro-

8         duced.

9   A   Okay.

10   Q   And that's actually State's Exhibit 58?

11   A   Correct.

12   Q   Okay.  So, is it fair to say that as of December -- or

13         rather December 16th, 1985, you were under the im-

14         pression there was only one rights sheet, and you

15         identified it in Court, which was the only rights

16         sheet, as the one that was read and signed by Danny

17         Hill?

18   A   Correct.

19   Q   The next day, you came back under oath and stated that

20         in fact, the old rights sheet was signed, dated for

21         the same time, and also, the other sheet was the one

22         that was actually read to Danny Hill, also signed

23         by Danny Hill and also at the same time, 1155 hours.

24   A   Exactly.

25   Q   And that is simply a result of -- I wouldn't say it was

DENNIS STEINBECK

1          lying.  I would say it was a matter of recollection   29

2          or memory.  I would hope so.  Is that correct?

3    A    Right.

4    Q    Now, would you state positively today, under oath, un-

5          equivocally -- unequivocally, that it was State's

6          Exhibit 58 that was read by Morris Hill and signed

7          by the defendant at 1155 hours on 9/16/85?

8    A    Sure!  After listening to the tape again, this is the

9          document that Morris Hill --

10   Q    No question about it?

11   A    -- read.  Right.

12   Q    Positive?  Positive?

13   A    Yes.

14   Q    Okay.

15                    ATTORNEY LEWIS:  I have a transcript.

16        Do you have a transcript, Dennis?

17                    ATTORNEY WATKINS:  Yes.

18                         (A discussion was held at the bench.)

19                    JUDGE McLAIN:  We'll stand in recess for

20        about 20 minutes.

21                              (Court in recess at 10:17 A.M.)

22                              (Back in session at 10:40 A.M.)

23   CONTINUING CROSS EXAMINATION BY ATTORNEY LEWIS:

24   Q    Officer Steinbeck, I believe when -- we left off at the

25          juncture where you indicated to the Court that in


                     DENNIS STEINBECK

1            regard to State's Exhibit Number 58, that you're    29

2            absolutely, unequivocally positive that that is the

3            statement that was read to Danny Hill on September

4            16th, 1985, at 1155 hours, is that correct?

5    A   Right.

6    Q   Okay.  Of course, you also indicated in the prior hearing,

7            which you thought you were positive about, was that

8            the other rights form was read to him, is that

9            correct?

10   A   Right.

11   Q   Now, in regard to that particular form, it was read by

12           whom?

13   A   Detective Hill.

14   Q   Okay.  And would you please read for the Court the

15           language right below where I think it has the time.

16           Yeah.  Read it slow.

17   A   "Further, I have been advised that I am not under arrest

18           and I am free to leave at any time.  I have volun-

19           tarily agreed, however, to accompany police officers

20           to the Warren Police Department to give a state-

21           ment."

22   Q   Now, do you recall, is that the exact phraseology that

23           appears on the tape recorded statement to your know-

24           ledge?

25   A   I believe that's the way Detective Hill read it.


                    DENNIS STEINBECK

1  Q    Okay.  I'll hand you, Mr. Steinbeck, a transcript which  29

2          was prepared by the Prosecutor's Office in regard to

3          the tape recorded statement.  Would you please read

4          from where it says "time 11:55".

5  A    "Further, I have been advised of my rights.  I have been

6          advised that I am not under arrest.  I am free to

7          leave at any time.  I give this voluntary statement

8          to the police officers of the Warren Police Depart-

9          ment."

10  Q    Okay.  That's it.  Now, would you compare that wording to

11          the wording you just read from State's Exhibit Num-

12          ber 38 -- or 58, I'm sorry.

13  A    It's similar, but not exactly the same.

14  Q    Not exactly the same.  What are the differences in that

15          one sentence?

16  A    It contains --

17  Q    Read the one sentence again from the tape recording.

18          The one we're talking about.

19  A    Oh!  Which one are you --

20  Q    Right there.

21  A    "I give this voluntary statement to the police officers

22          of the Warren Police Department."

23  Q    Now, read the statement that's contained on the rights

24          form that was read, in fact, from which that tape

25          was taken.  It was reading from --

DENNIS STEINBECK

29

1    A    "I have voluntarily agreed, however, to accompany police

2           officers to the Warren Police Department to give a

3           statement."

4    Q    Do you see what the differences are?

5    A    Yes, it's different.

6    Q    It is different, isn't it?

7    A    (Witness nods head affirmatively.)

8    Q    Okay.  Do you have any knowledge as to why that would be

9           different?

10    A    Possibly --

11    Q    You were there, of course!

12    A    Possibly, Detective Hill was confused in his reading.

13    Q    Confused in his reading?

14    A    Yeah.

15    Q    Let's -- okay.  Would it help if you listen to the tape?

16    A    Sure.

17    Q    Okay.

18                        (Tape played at 10:46 A.M. and

19                             concluded at 10:49 A.M.)

20    Q    (By Attorney Lewis)  You heard Detective Hill read that

21           particular statement, did you not?

22    A    (Witness nods head affirmatively.)

23    Q    And that statement differs substantially from the state-

24           ment -- or the one sentence in the form, does it

25           not?

DENNIS STEINBECK

A    Morris messed up his reading.  I don't think he maybe

could pronounce the word correctly or whatever the

problem was, but this is what he was reading from,

but he just made a mistake in his reading.

Q    You say he made a mistake in the reading at that juncture,

but he read everything else fine?

A    I'm taking a guess.  I can't answer why the difference

absolutely as it is.

Q    Well, let me ask you this:  Is it possible that State's

Exhibit Number 57, which is the old rights form

without the language, was the actual rights form

from which Mr. Hill read and also Danny Hill signed

at 1155 hours in conjuncture with that?  Is it

possible that Mr. Hill was reading from a piece of

paper that somebody else had written down for him

the other language in order to incorporate it and

advise Danny that he was not under arrest and free

to leave at the time?

A    I don't remember any other piece of paper being entered

in the room as a note or whatever was said.  To the

best of my knowledge, Detective Morris Hill read

from this document.

Q    Okay.  And you're saying -- let me ask you this:  Is it

possible that State's Exhibit 57, which is the old

form, that Detective Hill didn't really have this

DENNIS STEINBECK

29

```
1        form in front of him when he was reading it and he
2        simply, from memory, tried to remember what the ad-
3        ditional language was?
4   A    No, I believe this was -- this document was in the room
5        and this is what it was read from.
6   Q    So, the way he totally misread that particular statement,
7        you just think it was his fault; he couldn't read
8        at that point?
9   A    I'm not saying he can't read.  I'm saying --
10  Q    No!  I understand.
11  A    I'm saying he made a mistake when he was reading.  I can
12       only guess.
13  Q    So, you're not saying it's possible then that in -- the
14       fact of reality is that perhaps Mr. Hill was reading
15       from a handwritten or some form other than the
16       rights form and that the other rights form with the
17       additional language in it was secured later on, it
18       was signed and dated for the same time, even though
19       it fell in line with what was on the tape?
20  A    This was handed to me after it was read.  Danny had
21       signed it, Detective Hill had signed it, and Ser-
22       geant Stewart signed it.  This was also handed to
23       me at the time it was signed.  Detective Hill and
24       Danny are sitting across from me.  Sergeant Stewart's
25       next to me.  They handed me both of these pieces of
```

DENNIS STEINBECK

1      paper in front of me like this (indicating).  The      29

2      interview starts up again.  I look down and I no-

3      tice that they didn't put the time at the bottom.

4      I put 1155 hours down there on this document.  So, I

5      know that this is the piece of paper that was read

6      that day.

7  Q   Okay.  So, you're absolutely, unequivocally positive that

8      that's the way it happened and Detective Hill just

9      simply misread the statement?

10 A   Correct.  Although in the Suppression Hearing, I had for-

11     got that there was two rights forms.

12 Q   Along with the Suppression Hearing that you forgot that

13     there were actually two rights forms read?

14 A   Yes, sir.

15 Q   So, I'll ask you again --

16             ATTORNEY KONTOS:  Your Honor, I'm going

17     to object here again.  This is about the sixteenth

18     time he's asked the same question:  Are you positive,

19     unequivocal that it happened this way.  Now, he's

20     answered it all 16 times.  I don't think it's

21     necessary for him to repeat it.  We have other

22     things we can go on to.

23             JUDGE McLAIN:  Well, be a little more

24     specific, if you could.

25 Q   (By Attorney Lewis)  Specifically this:  Since it was

DENNIS STEINBECK

1    possible -- it became reality that you had forgotten 29

2    that there was actually two rights forms -- there

3    was only on according to your testimony on December

4    16th, and then you discovered that there actually

5    were two forms and that was not the form that was

6    read.   You produced the other form.

7  A   Correct.

8  Q   Are you telling me now that it's impossible that it could

9    have occurred other than what you're testifying to

10   or would you say that it's possible only because

11   the other one was possible and did occur?

12 A   May I explain how that occurred?

13 Q   Sure!

14 A   The entire case jacket on this case was kept in my desk

15   in the Juvenile Division.   Some time after the in-

16   vestigation started, the arrests were made.   Dennis

17   Watkins asked for me to make a copy of every docu-

18   ment, entire piece of paper we had, to give to

19   you.   At that time, I did, and during the Suppression

20   Hearings, I thought that everything we had had been

21   copied and given to Dennis Watkins.

22 Q   I understand.

23 A   And it was an oversight on my part.   But anyway --

24 Q   That's what I'm saying.

25 A   -- the other document which was left in the case jacket

DENNIS STEINBECK

1      had not been copied.  Dennis didn't know I still had 29

2      it and you didn't know I still had it, and I had

3      completely forgotten about it.

4  Q  We knew there was additional language and it came from

5      someplace.  That's how it cropped up, right?  Mr.

6      Watkins asked you about it, and all of a sudden, it

7      cropped up?

8  A  Right.

9  Q  All I'm asking you is a fair statement.  From what you

10     told, is it possible now that it didn't happen the

11     way you said it?  It's possible it happened some

12     other way?  Or you're saying you're crystal clear

13     as to what occurred?

14  A  No, sir.  It was read that day.

15  Q  So, we've resolved ourselves that Mr. Morris Hill just

16     didn't read the statement correctly?

17  A  As far as in my mind, I would have to answer yes.

18  Q  Okay.  Getting into the tape, you indicated the fact

19     that Danny Hill was not given any of the details of

20     this particular crime by either yourself, Sergeant

21     Stewart, or Detective Hill on the morning of

22     September 16th, 1985, is that correct?

23  A  I don't believe he was.

24  Q  Well, wait a minute!  You told me earlier that he was not

25     given any details of the crime.

DENNIS STEINBECK

1  A    I said I don't believe he was.

2  Q    Okay.  If you're equivocal about it --

3               ATTORNEY KONTOS:  Your Honor, I'm going to

4          object.  Can he be more specific as to whether he

5          gave him details or -- there's three officers in-

6          volved there.  Who is he asking about?

7  Q    (By Attorney Lewis)  When you were present --

8               JUDGE McLAIN:  I don't think that's a

9          proper objection.  It's suggestive of the way this

10         witness should answer the question.  He's questioning

11         him now.  If you think that should be cleared up,

12         you can do it later.  Objection overruled.

13  Q    (By Attorney Lewis)  When you were present and Officer

14         Hill was present and Officer Stewart and you were

15         all together, okay --

16  A    Right.

17  Q    Let me ask you this:  Were you in the room with Danny

18         from the entire time of 10:00 o'clock approximately

19         on September 16th, 1985 to 11:30 other than the few

20         moments that Detective Hill was alone in the room?

21  A    I think I left the room one other time.

22  Q    Okay.  Do you know if anything was discussed or any of

23         the officers told him any details?  Did they tell

24         you that?

25  A    They didn't tell me that, and they may have.


                    DENNIS STEINBECK

30

1  Q  They may have?

2  A  While I was out of the room.  How can I answer that?

3  Q  They'll be testifying.  But you didn't personally?

4  A  I don't believe I did, no.

5  Q  That wouldn't really be -- when you're involved in in-
6       terrogation -- let me ask you this question:  When
7       you're involved in interrogation and somebody is
8       giving you a statement about a crime, in order to
9       figure out possibly if they really committed it,
10      do you ever put red herrings in it?  In other words,
11      do you ever state something in there that didn't ac-
12      tually happen to see if somebody says yes to it?

13  A  Yes.

14  Q  So, you put red herrings in there to find out if they
15      really know what they're talking about?

16  A  (Witness nods head affirmatively.)

17  Q  Okay.  And in this particular case, you said basically
18      that Danny knows too many details as a result of
19      this tape recorded statement, right, and the video-
20      tape?

21  A  Well, from him coming down voluntarily Thursday, I felt
22      he knew more than he was telling us.

23  Q  When he came down Thursday, what was the information you
24      had in regard to what Danny knew about this crime?
25      What was that piece of information?

DENNIS STEINBECK

```
 1   A   That Maurice Lowery was seen on the bike and Andre McCain   30
 2           had the underwear.
 3   Q   Okay.  Let me stop right there.  Did you ever find out
 4           if Maurice Lowery had the bike whatsoever?
 5   A   I questioned Maurice Lowery.
 6   Q   When'd you question him?
 7   A   Thursday.  Must have been Thursday.
 8   Q   Okay.  So, if Danny said Maurice Lowery had the bike and
 9           you questioned Maurice, did you question him about
10           the bike specifically?
11   A   Yes.
12   Q   He didn't have it?
13   A   No.
14   Q   Okay.  So, that wouldn't be a detail that Danny would
15           know about the crime.  That's just something that
16           you know is a lie, right?
17   A   Something that I know was a lie?
18   Q   Yeah.  You presumed Danny was lying when he said Maurice
19           had the bike?
20   A   Yeah.
21   Q   Or Maurice Lowery was lying?  One or the other, right?
22   A   Right.
23   Q   You also indicated -- what was the other -- oh!  McCain.
24           Okay.  And you interviewed Mr. McCain?
25   A   Yes.
```

DENNIS STEINBECK

1    Q    And did you feel that -- that Danny told the truth about    30

2         that?  I mean did McCain know anything about this

3         case?

4    A    Well, I don't believe he did, no.  He knew the same thing

5         about the case that other people in the neighborhood

6         knew.

7    Q    Okay.  Once again, we're back to fact and fiction floating

8         around the community about what occurred and what

9         people saw out there that evening?

10   A    Right.

11   Q    Okay.  So, what was the other item that Danny supposedly

12        knew about the details of the crime that you thought

13        was important?

14   A    I don't recall.

15   Q    You don't recall?

16   A    The only thing I mentioned today was the bicycle and the

17        underwear, and that's all I can remember at this

18        point.

19   Q    Okay.  The underwear.  And where was the underwear

20        supposed to be?

21   A    I believe Danny said at one point that Andre McCain took

22        the underwear home with him or Andre McCain had the

23        underwear.

24   Q    Okay.  Now, going to the tape -- tape recorded statement

25        as well as the video, your thoughts were during the

DENNIS STEINBECK

1      course of that time -- you tell me if I'm correct,   30

2      is that Danny knew too much of the details -- the

3      actual details of this and he must be involved in

4      the crime, is that correct?

5  A  Right.

6  Q  Okay.  And what specific details would we be talking

7      about?  Do you know offhand?

8  A  Well, you mean when he came down voluntarily Thursday?

9  Q  No, no, no!  I'm talking about actual details of the

10     crime.  Thursday.  Okay.  It turned out that McCain,

11     as far as you know, wasn't involved, right?

12  A  Right.

13  Q  Okay.  Maurice Lowery said that he never did have the

14     bike or whatever, so that's a negative, right?

15  A  Right.

16  Q  I mean Danny doesn't know you're saying that's not a

17     fact of the crime?

18  A  Right.

19  Q  That's the reverse, right?

20  A  Yes.

21  Q  Okay.  So, the only other thing we're talking about is

22     well, McCain supposedly had underwear, not where it

23     was located or anything else, right?

24  A  Sure.

25  Q  Once you got into the tape recorded statement, once you

DENNIS STEINBECK

1   got into the videotape -- or just the tape recorded  30

2   statement when you were questioning him and he told

3   you these things -- it's on the tape?

4 A Right.

5 Q You felt that these were details of the crime that no-

6   body else would know or he had to be involved?

7 A Yes.

8 Q Okay.  Now, who was it that first mentioned the details

9   of the crime?

10 A It was quite a few details.

11 Q That's right!

12 A I believe Danny was the first one that mentioned the

13   burning.

14 Q Mentioned the burning?

15 A I believe so.

16 Q Okay.  Did he mention anything about the underwear --

17 A Yes.

18 Q -- anywhere?  Being around the neck?

19 A And being burned.

20 Q Now, who mentioned the underwear being around the neck

21   first?  Do you recall by any chance?

22 A No, I don't.

23 Q Okay.  Would it surprise you if you were the first one

24   -- or the police were the first ones?

25 A Not a bit.


DENNIS STEINBECK

1   Q   Okay.  The location of the underwear, as you understood

2          it, was located where on the victim?

3   A   Around his neck.

4   Q   Around his neck.  Okay.

5               ATTORNEY LEWIS:  Dennis, do you have a

6          transcript?

7   Q   (By Attorney Lewis)  I'm sorry.  Okay.  Start where it

8          says "SERGEANT STEWART," right there (indicating),

9          and read, and I'll tell you when to stop.  Read

10         aloud for the Court if you will.  That's the prose-

11         cutor's transcript of the tape recorded statement.

12   A   Starting with "SERGEANT STEWART"?

13   Q   Yeah.

14   A   "What was he trying?  Was -- what was he trying?"

15         "To pull his dick off his body."

16         "Did he do anything else to him?  I want you to think

17         hard.  What did he do with the boy's underwear?"

18         "Set them on fire."

19         "How?"

20         "With a brown lighter.  He had a brown lighter.  One of

21         those Bic lighters."

22         "Where was the underwear when he lit them up?"

23         "By the side of him.  He took the boy's underwear off

24         and lit 'em."

25         You want me to continue?

DENNIS STEINBECK

1   A   "Now, how did the underwear get around the boy's neck?"   30

2       "He lifted him up in the air like this.  He had him up

3       in the air like this."

4       "Did he tie them around his neck with a knot?"

5       "Yes.  Just like -- just like this with them.  At first,

6       he had him just like this."

7   Q   Okay.  From the reading you just did, who was the first

8       one that mentioned -- or let me ask you this:  Where

9       did Danny place the underwear?

10   A   At his side.

11   Q   First at his side, right?  Okay.  Who was it that first

12       mentioned that the underwear was around the victim's

13       neck?

14   A   As it reads here, Sergeant Stewart.

15   Q   Okay.  And what did Danny finally do in regard to what

16       Sergeant Stewart said about it being around the

17       neck?

18   A   Well, evidentally, the underwear did end up around the

19       neck.

20   Q   Yeah!

21   A   All Danny said the first time he saw them burned, they

22       were at his side.

23   Q   Okay.  On his side?

24   A   Sure.

25   Q   And then Sergeant Stewart says:  "Well, how did the under-

DENNIS STEINBECK

30

1              wear get around the boy's neck?"

2   A   Right.

3   Q   And Danny gives a response as to "he was choking him like

4              this or whatever."  As far as Danny knew, before it

5              was mentioned that it was around his neck, he

6              thought it was on the ground -- lit on the ground,

7              right?

8   A   Yes.

9   Q   Okay.  So, the police are the first ones who mentioned

10             -- or Sergeant Stewart is the first one that men-

11             tioned that the underwear was around the victim's

12             neck, is that correct?

13   A   Right.

14   Q   Okay.  Then Danny proceeds to say how it finally got

15             there in some sense of the manner, right?

16   A   Right.

17   Q   Okay.  Let me ask you about Danny.  Is he a very sug-

18             gestive type person?  I mean is he easily led, sug-

19             gestive?  In other words, you can suggest things to

20             him and then he'll say yes, or would you call him

21             suggestive or very easily led?

22   A   As long as the suggestions are keeping him out of

23             trouble, yes.

24   Q   As long as the suggestion will keep him out of trouble?

25   A   He's not going to agree to anything that's going to get

DENNIS STEINBECK

30

1          him in trouble.

2  Q    So, you're saying he'll easily agree with things that

3          won't get him in trouble?

4  A    Correct.

5  Q    Okay.  So, in regard to the underwear now, the statement

6          about the underwear being around the neck was placed

7          in the mind first of Danny by Sergeant Stewart,

8          right?

9  A    Right.

10 Q    In fact, Danny had the underwear in the wrong place!  He

11         had it on the ground beside him first!

12 A    The underwear could have been in many places during that

13         day.

14 Q    No.  Wait a minute!  According to the statement -- I'm

15         not talking about actual -- I'm talking about the

16         statement.  Danny puts the underwear on the ground,

17         right?

18 A    At the side.

19 Q    Has it lit at the side.  Okay.  "SERGEANT STEWART:  How'd

20         the boy's underwear get around his neck?"  And then

21         Danny proceeds to go ahead and give an explanation

22         or how it supposedly got around --

23 A    Okay.

24 Q    Okay.  Prior to that time in that statement, do you re-

25         call when Danny was saying how the boy was choked?

DENNIS STEINBECK

1   A   In an arm lock or something like that I believe.

2   Q   Yes.  And what else did he say?

3   A   That the boy was slammed on the ground.

4   Q   Yes, he also said that, but I mean how else was he

5       choked?  How was Tim Combs choking him?  With the

6       hands?  Do you recall that?

7   A   No, I don't recall that.

8   Q   All right.  Let me give you something else from the tape.

9       Do you recall how Danny described how the victim was

10      kept quiet as far as not being able to yell or

11      scream?

12  A   Yes.

13  Q   And how did he describe that?

14  A   He described that Tim Combs was at the rear of Raymond

15      and that he had his hand over Raymond's mouth.

16  Q   He was talking about hands, right?

17  A   Hands?

18  Q   Tim Combs had his hand or hands over his mouth?

19  A   He said hand.

20  Q   He didn't talk about any Wrangler T-shirt or the under-

21      shirt or anything of that nature?

22  A   I believe he described Raymond as being naked at the time.

23  Q   Okay.  As far as intelligence goes, on the tape, do you

24      recall when Sergeant Stewart was asking Danny how

25      long a football field was?


                          DENNIS STEINBECK

1   A   Yes, sir.

2   Q   And what was Danny's response to that?

3   A   He wasn't quite sure how long a football field was.

4   Q   His indication was it was 90 yards, right?

5   A   Right.

6   Q   Okay.  Okay.  Do you recall in the tape this particular

7       phraseology occurs:

8       "Now, when he pulled his shorts off, they were blue

9        shorts, yellow?  What color?  They were yellow?"

10      That's Thomas Stewart talking.

11      Answer by Danny:

12      "Yeah, they was something.  They was yellow."

13      "The shorts were yellow?  Are you sure?"

14      "Yeah, because they looked like some Reserve colors.

15       Like they was gym shorts."

16      "Now, Danny, that's not right.  You told us earlier they

17       were grey"?

18  A   I remember that.

19  Q   All right.  So, the statement was -- they were asking

20      him if the shorts were yellow, right?

21  A   (Witness nods head affirmatively.)

22  Q   And he went along with it?

23  A   (Witness nods head affirmatively.)

24  Q   And then you corrected him --

25  A   Right.


                    DENNIS STEINBECK

1    Q    -- because you knew the shorts weren't yellow?

2    A    Right.

3    Q    But he went for it.  Who was it that first mentioned some-

4           thing about Tim Combs wanting to take the bike?

5    A    I believe one of the three officers asked Danny if there

6           was any mention about stealing a bike.

7    Q    Yeah.  Phraseology.  Well, didn't Combs -- up until this

8           time -- this is like page 21, but up until this

9           time, Danny never mentioned anything about Combs

10          wanting to take the bike or anything!

11   A    There's a lot of things Danny didn't mention in that

12         tape, and that was one of them.

13   Q    But when it was suggested to him, he says yes!

14   A    He's only going to tell us what we think we know.

15   Q    Okay.  That's your impression?

16   A    That's my impression.

17   Q    What happened when you were talking on the tape and you

18         you were talking about -- one of the officers said:

19         "Was the boy's penis pulled off?"  What did Danny

20         do on that one?

21   A    He said yes.

22   Q    He bit for it, right?

23   A    Yes.

24   Q    Okay.  In fact of reality, that wasn't true?

25   A    Correct.

DENNIS STEINBECK

1  Q   Okay.  And he mentioned it -- you know how many times he   31

2         mentioned it in the same -- he was asked again about

3         it.

4  A   No, I don't know the exact number.

5  Q   But I notice in that, you never did correct him and say

6         "no, it wasn't," do you, on the tape?

7  A   Well, that could possibly been because at that time, I

8         didn't have that fact either.

9  Q   This is on Monday, September 16th?

10  A   Correct.  I never knew about the teeth marks on the boy's

11        penis until after the videotape started.  I never

12        knew about the stick until the videotape started.

13        And so, as far as the penis being pulled off, I

14        didn't know about that either.  There was some things

15        that were kept from me also by the pathologist and

16        by Detective Teeple.

17  Q   I see.  Okay.  So, you didn't know whether the penis was

18        pulled off or not, but when it was mentioned by the

19        officer -- he said, "Was the boy's penis pulled

20        off?"  In other words, the substance was given.  You

21        answer yes or no.  He went for it.  He said yes.

22  A   Yes.

23  Q   In fact, everything you mentioned in the tape -- when you

24        asked him in substance was the boy's penis pulled

25        off, he goes yes, and then Sergeant Stewart says:


DENNIS STEINBECK

31

1       "Well, did Timmy Combs say anything to you like

2       let's steal the bike or let's screw this boy," and

3       all of a sudden, Danny says, "Oh, yeah," and then

4       he goes through it, did you ever notice in the tape

5       when you asked him questions like how did this hap-

6       pen, that he comes up with a story, too?

7  A   Yes.

8  Q   Now, how it happened story would be something like how

9       he set him on fire, right, if you recall that?

10  A   Well, of course, we'd have to ask him to find out about

11       it.

12  Q   Exactly.  It was an open-ended question?

13  A   Yes.

14  Q   There was no answer including the question?

15  A   Yes.

16  Q   Then he goes on about the charcoal lighter fluid, right?

17  A   Right.

18  Q   Okay.  He's the one that comes up with that.  Okay.

19       Again, in regard to intelligence, do you remember

20       the -- Detective Hill asking him about why he

21       touched him on the neck?

22  A   Yes, I do.

23  Q   Okay.  And what was Danny's response to that?

24  A   To see if the boy was alive.

25  Q   See if he was breathing?

DENNIS STEINBECK

31

1    A    Right.

2    Q    Yeah.  Okay.  Do you remember the reaction of Mr. Hill

3           and Mr. Stewart in regard to that?

4    A    I think they were shocked that he went over there and did

5           that.

6    Q    No, not shocked.  You mean shocked about he went over and

7           touched him to find out if he was breathing or

8           shocked to find out the fact he touched his neck to

9           see if he was breathing?

10    A    Right.

11    Q    Didn't seem to make too much sense, did it?

12    A    I don't think they thought Danny was capable of finding

13           out of -- if a person was alive or dead or not.

14    Q    Why would they think --

15                 ATTORNEY KONTOS:  Objection, Your Honor.

16           He'd have to ask them why he thinks he's capable of

17           that.

18                 ATTORNEY LEWIS:  It's an impression he

19           has.

20                 ATTORNEY KONTOS:  No, they can answer as

21           to what they think.

22    Q    (By Attorney Lewis)  Why wouldn't they -- why wouldn't

23           -- would you think he'd know how to check to see if

24           somebody's breathing?

25    A    No, I wouldn't.  I don't think Danny's had any medical

DENNIS STEINBECK

1          training.

2  Q    What else?  What else?  Anything more than medical

3          training?

4  A    He probably wouldn't know how to do that?

5  Q    How about the black shirt?  Who first mentioned about

6          the black shirt?

7  A    Mr. Fife.

8  Q    No.  I'm sorry.  In the tape.  In the tape.  In this

9          tape, do you recall who mentioned the black shirt

10         first?

11  A    No, I can't.

12  Q    Okay.  And where was the black shirt found?

13  A    Mr. Fife told me it was found under Raymond.

14  Q    Under Raymond.  Okay.  From the tape:

15       "Where was the boy's black shirt?  When you turned him

16       over -- now, this is very important.  Think hard."

17       Okay.  Now, did you give the answer?  Is there an answer

18         in that what I just asked you?  You just said

19         where's the shirt, right?

20  A    Right.

21  Q    Danny's response:  "I didn't see it."

22       "Danny, when the boy was found, his shirt was right

23       underneath him.  Now, you would have to see that shirt."

24       "I didn't see it unless Tim Combs had it up under his

25       clothes or something because I didn't see the shirt."

DENNIS STEINBECK

PENGAD/INDY. MUNCIE. IN. 47302

SF-AZ-13

1  A  Right.

2  Q  So, Danny didn't know where the shirt was?

3  A  That's right.

4  Q  And the way the question was phrased, it didn't give him

5      the answer, did it?

6  A  No, it didn't, no, sir.

7  Q  So, he just said, "I didn't see it," right?  Then the

8      officer says -- in fact, yourself, you tell him

9      where it is.  It's right underneath the victim.

10  A  Correct.

11  Q  So, then, Danny tries to say well, maybe Tim Combs got it

12      or something.

13  A  (Witness nods head affirmatively.)

14  Q  Okay.  Up until that time, you didn't know if the victim's

15      penis was actually pulled off?

16  A  I don't believe I was told that until after the tape was

17      made.

18  Q  So, he was never corrected on the tape about that because

19      you didn't know whether it was a fact or not a fact?

20  A  I believe so.

21  Q  Okay.  At first, the question was asked whether it was

22      pulled off, and Danny said yes.  Do you recall that?

23  A  Right.

24  Q  Okay.  Then later on, questioning comes back, and one of

25      the officers, Thomas Stewart:  "Well, what did he

DENNIS STEINBECK

1          do with the dick when he had it in his hand?  Did he  31

2          have the dick in his hand?  Part of it or all of it?"

3     "It looked like he had it in his hand."

4     The question -- the question gave the answer, didn't it?

5          Penis was in the hand.  What'd Danny say?  It was in

6          the hand.  Intelligence again.  The defendant was

7          asked how long he was back there in the woods when

8          this occurred.  Do you recall what he said?

9  A   Three hours.

10 Q   Three hours.  Did that kind of surprise you?

11 A   No.

12 Q   It didn't?

13 A   No.

14 Q   At this time on Monday the 16th, did you have a good idea

15         of what the time frame of this particular crime was?

16 A   Yes.

17 Q   Okay.  And what was that time frame basically?

18 A   Probably 45 minutes to a half hour, in around that area.

19 Q   Okay.  And he said three hours?

20 A   Correct.

21 Q   But that didn't surprise you?

22 A   No, it doesn't.

23 Q   Did it surprise anybody else that was listening to it?

24 A   It may have.

25 Q   Mr. Hill, right?  Morris Hill that is.  Do you recall


                    DENNIS STEINBECK

31

1        that?

2   A   I can't answer that.

3   Q   Cause he said, "Danny, it wasn't three hours.  It couldn't

4        have been three hours."

5   A   I don't know if it surprised him or not.  He may have

6        said that.

7   Q   Okay.  Mr. Stewart seized upon the suggestive powers.

8        If you recall this:  "You know, Danny, it seems like

9        everything we suggest to you, you agree with us,

10       right?  Isn't that the way it seems to you?  What --

11       now, if we suggest something to you, it seems that

12       you agree with us.  In other words, about the

13       cigarette lighter.  I suggested he was looking for

14       it.  You agree with it.  Now, if I was to suggest

15       to you that, say, the boy sucked your pee pee, would

16       you agree with that?"  Danny said no.  Okay.  So,

17       he didn't go along with that suggestion, right?

18   A   Correct.

19   Q   Was Mr. Stewart right, though, in regard to this idea

20       that Danny -- every time he suggested something to

21       Danny, he'd go along with it?

22   A   No, not always.

23   Q   Not always?

24   A   There was a lot of things that Danny did that we asked

25       him about and he wouldn't have -- wouldn't say that

DENNIS STEINBECK

PENGAD/INDY.  MUNCIE, IN  47302    SF-AZ-13

1

2

3

4

5

6

7

8

9

10

11          TESTIMONY CONTINUED IN VOLUME NUMBER 2

12

13

14

15

16

17

18

19

20

21

22

23

24

25