99-4317

4:96cv 795

STATE OF OHIO

VS.

DANNY LEE HILL

CASE NO. 85-CR-317

TRIAL TRANSCRIPT
(VOLUME 2)



1000197297



90-177

| | |
|---|---|
| 1 | STATE OF OHIO ) IN THE COURT OF COMMON PLEAS |
| | )SS. |
| 2 | COUNTY OF TRUMBULL ) CASE NO. 85-CR-317 |

**FILED**
COURT OF APPEALS        $CA$  #3720

DEC 17 1986

| 4 | STATE OF OHIO, |
| 5 | Plaintiff ) DEFENDANT'S TRANSCRIPT OF THE |

TRUMBULL COUNTY, OHIO
TRIAL TO COURT ON APPEAL AND

| 6 | -vs- VIOLET CAMPANA WHITMAN, Clerk EXHIBITS |

FILED

| 7 | DANNY LEE HILL, ) (Volume 2) |
| 8 | Defendant ) |

MAR 0 9 1990

MARCIA J MENGEL CLERK
DISTRICT COURT OF APPEALS

| 10 | APPEARANCES: ON BEHALF OF THE STATE OF OHIO; |
| 11 | DENNIS WATKINS, PROSECUTING ATTORNEY |
| | and |
| 12 | PETER J. KONTOS, ASS'T. PROSECUTING ATTORNEY |
| | TRUMBULL COUNTY |
| | WARREN, OHIO |
| 13 | |
| 14 | ON BEHALF OF THE DEFENDANT, DANNY LEE HILL; |
| | JAMES F. LEWIS, ATTORNEY AT LAW |
| 15 | OHIO PUBLIC DEFENDER'S OFFICE |
| | TRUMBULL COUNTY BRANCH |
| 16 | NILES, OHIO |
| | and |
| 17 | SCOTT KINNEY, ATTORNEY AT LAW |
| | OHIO PUBLIC DEFENDER'S OFFICE |
| 18 | COLUMBUS, OHIO |

19    BE IT REMEMBERED, that at the trial of the

20 above entitled case, in the Court of Common Pleas, Trumbull

21 County, Ohio, commencing on the 21st day of January, 1986, and

22 continuing thereafter as hereinafter noted, before THE

23 HONORABLE DAVID F. McLAIN, THE HONORABLE ROBERT A. NADER, and

24 THE HONORABLE MITCHELL F. SHAKER, the above appearances having

25 been made, the following proceedings were had:

MARY KAY ROSE
OFFICIAL COURT REPORTER

INDEX OF EXHIBITS (Volume #2):

| State's Exhibits: | Marked: | Description: |
|---|---|---|
| Number 62 | Page 343 | Photo taken during the autopsy of Raymond Fife |
| Number 63 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 64 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 65 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 66 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 67 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 68 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 69 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 70 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 71 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 72 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 73 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 74 | 343 | Photo taken during the autopsy of Raymond Fife |
| Number 75 | 343 | Photo of stick and rectum of Raymond Fife |
| Number 76 | 353 | Photo of stick and rectum of Raymond Fife |
| Number 77 | 343 | Photo of stick and rectum of Raymond Fife |
| Number 78 | 343 | Photo of stick and rectum of Raymond Fife |
| Number 79 | 343 | Photo of stick and rectum of Raymond Fife |

INDEX OF EXHIBITS (Volume #2) Cont.:

| State's Exhibits: | Marked: | Description: |
|---|---|---|
| Number 80 | Page 343 | Photo of stick and rectum of Raymond Fife |
| Number 81 | 343 | Photo of stick and rectum of Raymond Fife |
| Number 82 | 343 | Photo of stick and rectum of Raymond Fife |
| Number 83 | 343 | Photo of stick and rectum of Raymond Fife |
| Number 84 | 343 | Photo of stick and rectum of Raymond Fife |
| Number 85 | 343 | Photo of test done on stick |
| Number 86 | 343 | Photo of test done on stick |
| Number 87 | 343 | Photo of test done on stick |
| Number 88 | 343 | Photo of test done on stick |
| Number 89 | 343 | Photo of autopsy, re: rectum & mouth of Raymond Fife |
| Number 90 | 343 | Photo of autopsy, re: rectum & mouth of Raymond Fife |
| Number 91 | 343 | Photo of autopsy, re: rectum & mouth of Raymond Fife |
| Number 92 | 343 | Photo of Danny Lee Hill's mouth taken at Dr. Walton's office |
| Number 93 | 343 | Photo f Tim Comb's mouth taken at Dr. Walton's of-fice |
| Number 94 | 350 | Autopsy Protocol |
| Number 95 | 356 | Diagram from medical book of the urinary bladder, re: showing how stick was used and how injuries were caused |
| Number 96 | 356 | Diagram from medical book of the urinary bladder, re: showing how stick was used and how injuries were caused |

PENGAD/INDY  MUNCIE, IN  47302

SF-AZ-13

INDEX OF EXHIBITS (Volume #2) Cont.:

| State's Exhibits: | Marked: | Description: |
|---|---|---|
| Number 97 | Page 356 | Diagram from medical book of the urinary bladder, re:  showing how stick was used and how injuries were caused |
| Number 98 | 356 | Diagram from medical book of the urinary bladder, re:  showing how stick was used and how injuries were caused |
| Number 99 | 368 | Medical records from St. Joseph's Hospital re: Raymond Fife |
| Number 100 | 389 | 3 slides of the cellular structure of the stick |
| Number 101 | 512 | Investigation report of Thomas Stewart 9/12/85 |
| Number 102 | 523 | Permission to Search the residence of Vera Williams (defendant's mother) |
| Number 103 | 533 | Photo of defendant at the crime scene with police officers 9/16/85 |
| Number 104 | 533 | Photo of defendant at the crime scene with police officers 9/16/85 |
| Number 105 | 533 | Photo of defendant at the crime scene with police officers 9/16/85 |
| Number 106 | 533 | Photo of defendant at the crime scene with police officers 9/16/85 |
| Number 107 | 533 | Photo of defendant at the crime scene with police officers 9/16/86 |
| Number 108 | 533 | Photo of defendant at the crime scene with police officers 9/16/85 |
| Number 109 | 533 | Photo of defendant at the crime scene with police officers 9/16/85 |

1

<u>INDEX OF EXHIBITS (Volume #2) Cont.:</u>

2   <u>State's Exhibits:</u>          <u>Marked:</u>        <u>Description:</u>

3   Number 110        Page 547         Search Warrant

4   Number 111             548         Receipt for dental im-
                                       pressions & photographs
                                       of teeth
5
6   Number 112             593         2 vials of blood from Tim
                                       Combs

7   Number 113             594         Vial of Raymond Fife's
                                       blood

8   Number 114             598         Ohio BCI Laboratory Report
                                       re:  blood

9   Number 116             604         Findings/Ohio BCI Labora-
                                       tory report, re:  blood

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11                    VOLUME  #2
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32

1          he was involved with, but we know now that he is.

2  Q   He wouldn't admit to committing the act for which he's

3          accused right now, the actual act, right?

4  A   Correct.

5  Q   But when it came to details whereabouts was the penis,

6          which you didn't know, he went along with the idea

7          it was pulled off and it was in Tim Combs' hand?

8  A   I believe so.

9  Q   The black shirt doesn't mean anything.  He couldn't figure

10         out where the black shirt was at, and you ended up

11         telling him, right?

12  A   Right.

13  Q   He didn't know where the underwear was.  You ended up

14         telling him where it was.

15  A   At one time, he said it was at Andre McCain's house.

16  Q   Did you tell Danny before and during the tape at any

17         time that Tim Combs -- or what you had told him --

18         well, let me -- prior to the tape starting, you in-

19         dicated to Danny that you better hear it from him

20         first.  You better hear the details so you can tell

21         whether he's telling the truth or not --

22  A   Yes.

23  Q   -- right?  So, when you told him that he better give you

24         details, Danny wanted to give you details because

25         then you'd think you'd believe him, right?

DENNIS STEINBECK

32

1  A  Right.

2  Q  Okay. So, there's a number of occasions throughout the
3         tape -- I'll get to more of them with the other
4         officers, that the suggestion's made or given in the
5         statement and Danny goes along with it, right?

6  A  Right.

7  Q  The red herring. It turns out that you didn't know where
8         -- if the penis was pulled off or not, but that was
9         like a red herring. He didn't know. He went along.
10        He said yeah, it was pulled off.

11  A  Correct.

12  Q  Okay. The thing about the breathing; in other words,
13        checking the neck to see if somebody breathes --

14  A  Yes.

15  Q  -- the football field being 90 yards, what would you say
16        Danny's intelligence was today? Let's forget what
17        you said, "normal intelligence," on the 16th.

18  A  Sure.

19  Q  What do you think now?

20              ATTORNEY KONTOS: Object.

21              JUDGE McLAIN: He may answer if he thinks
22        there's a difference.

23  Q  (By Attorney Lewis) Do you have a different opinion?

24  A  Earlier in the day, I described him as being slow.

25  Q  Do you recall who mentioned the rape itself?


DENNIS STEINBECK

32

1    A    It would have to be us.

2    Q    Okay.

3    A    He's not asking us any questions.

4    Q    Let me ask you this.  At the very beginning, Officer

5        Stewart says:  "Go ahead, Danny.  Just tell us all

6        the details," and he told a very short narrative,

7        but he didn't get into anything, did he?

8    A    No.

9    Q    So, it had to go on a questioning basis, right?

10    A    Right.

11    Q    Okay.  In other words, he didn't give you any details in

12        the short portion.  I think basically what he told

13        you was that Tim Combs knocked him off the bike,

14        picked him up, choked him with his hands, slammed

15        him down on the bike, had anal intercourse, which

16        is the rape you told him about before, and that was

17        about the size of it, right?  That's actually where

18        he stopped.  Do you recall that?

19    A    He didn't volunteer any information, correct.

20    Q    Then you had to question him?

21    A    (Witness nods head affirmatively.)

22    Q    All right.  Do you -- from looking at the tape recorder

23        -- rather, listening to the videotape, and also

24        listening to the tape recorded statement and every-

25        thing else, did you have a problem communicating

DENNIS STEINBECK

32

1          with Danny?

2     A    No.

3     Q    Okay.  What was the reason for the profanity; the use of

4          the profanity then?

5     A    I think I described that earlier in the day that I know

6          Danny to talk that way.  That he understands that

7          communication.  He never asked me one time what I

8          was talking about or he didn't understand, and

9          that's the reason for it.

10    Q    Well, what I'm asking you is this:  Before any profanity

11         comes out --

12    A    We're talking about a sex crime!  We're not talking about

13         the theft of a stereo!  And I didn't ask him if the

14         stereo was stolen.  I asked him if a boy was fucked

15         in the ass, and that's why I used that kind of

16         language.

17    Q    Okay.  And you made him say it, right?

18    A    I didn't make him say it, no.

19    Q    Well, on the tape, you say:  "Yeah, go ahead and say it."

20         There's a number of occasions in there where the

21         officers say:  "Yeah, go ahead and say it."

22    A    I believe that is in there because -- this is my own

23         belief, that, you know, he was afraid to use that

24         kind of language in front of his Uncle Morris.  He's

25         afraid his uncle would look down upon him for using

DENNIS STEINBECK

32

1       that type of language in his presence.

2  Q  Do you think he -- he likes his uncle?  At least respects

3       him or something along that line?

4  A  I can't answer that.

5  Q  Well, you just told me, though, you felt he didn't want

6       to use the bad language in front of his uncle.  That

7       means there must be some relationship or some re-

8       spect or something.

9  A  Correct.

10  Q  But you wouldn't know other than that what the relation-

11       ship would be?

12  A  Correct.

13  Q  Do you recall talking to Raymond Vaughn?

14  A  Yes, I do.

15  Q  Okay.  And do you recall you talked to him -- did you

16       talk to him the week of September 9th?  In other

17       words, did you talk to him perhaps the day after on

18       a Wednesday, September 10th -- I'm sorry, September

19       11th --

20  A  Yes.

21  Q  -- 1985?

22  A  Him and a few other boys were suspects.

23  Q  And why were they suspects?

24  A  We received a phone call or some information that a group

25       of boys attending Reserve High School, the Omega

DENNIS STEINBECK

32

1     Boys, had something to do with the homicide.

2 Q And in response to that, you naturally went to the Western

3     Reserve High School, you talked to Raymond and you

4     also talked to somebody else.  Was that Ludlow or

5     somebody of that nature?

6 A Correct.

7 Q And during that conversation, you brought up the name

8     Tim Combs, did you not --

9 A I --

10 Q -- with Raymond?

11 A I can't remember the entire conversation, but I --

12 Q Okay.  Just offhand, from your own knowledge or your own

13     review or what, Officer Massucci and Evans, when you

14     talked about this case and everything else, how many

15     sexual assaults do you think or do you have a record

16     of in regard to Tim Combs, if you recall?

17 A Well, I know he was sent away the last time for a sexual

18     assault, so I know of one.

19 Q At least one?

20 A And there may be another.

21 Q There may be another.  Incidentally, do you happen to

22     know -- when did Tim Combs -- when was he released

23     from the institution?  Did you check on that?  Do

24     you know?

25 A Yeah.  I believe it was 30 or 38 days before the homicide.

DENNIS STEINBECK

32

1   Q   About 38 days before the homicide?

2   A   I may be wrong about that, but I thought it was around

3           that time.

4   Q   About August 7 or 8th, something like that?

5   A   (Witness nods head affirmatively.)

6   Q   And Danny Hill was incarcerated, was he not --

7   A   For rape.

8   Q   -- at one time?  Do you recall when he was released?

9   A   He told me --

10  Q   Well, let me ask you this:  Would it be --

11  A   It was three months before the homicide I believe.

12  Q   That's what he told you.  Do you have any knowledge of

13          knowing that was in April of '85?

14  A   I don't know the exact date Danny was released.

15  Q   You're just recalling what Danny said, and he said three

16          months?

17  A   Yeah.

18  Q   It could have been in April of '85 --

19  A   Right.

20  Q   -- right?  Did you also participate in the videotape of

21          Timothy Combs?

22  A   Yes, sir.

23  Q   And in regard to that particular videotape, can you tell

24          me -- can you recall -- have you seen it recently,

25          let me ask you that question?


DENNIS STEINBECK

1 A Of Tim Combs?

2 Q Yes.

3 A I haven't seen it for quite a -- I think I viewed it be-

4    fore the Suppression Hearing was the last time I saw

5    it.

6 Q Do you recall what Mr. Combs had on as far as jewelry?

7     ATTORNEY KONTOS:  I'm going to object,

8    Your Honor, as to what the relevancy of what Tim

9    Combs was wearing is.

10     ATTORNEY LEWIS:  It's relevant.  I'm going

11    somewhere.

12      (A discussion was held at the bench.)

13     JUDGE McLAIN:  Objection overruled.

14 Q (By Attorney Lewis)  Mr. Steinbeck, we were talking about

15    you were involved in the videotape of one Timothy

16    Anthony Combs, is that correct?

17 A Yes.

18 Q And you've had an occasion --

19     JUDGE SHAKER:  The date?

20     ATTORNEY LEWIS:  I'm sorry.

21 Q (By Attorney Lewis)  September 16th, 1985?

22 A Yes.

23 Q And you had an occasion to observe Mr. Combs that day?

24 A Yes, I did.

25 Q Okay.  Did you also see him outside the videotape session?

DENNIS STEINBECK

```
 1   A   Yeah.  I talked to him before the videotape started.        32

 2   Q   Do you recall whether he wears any kind of jewelry in his

 3           ear?

 4   A   I think he has a pierced ear.

 5   Q   Pierced ear.  What is in the ear?  Is there anything in

 6           there jewelry wise?

 7   A   An earring.

 8   Q   Do you recall what it looked like?

 9   A   No.

10   Q   Okay.  Did he happen to wear anything else that particu-

11           lar day that you recall?

12   A   I recall him having on a blue shirt typical of the one

13           I have on today.

14   Q   Okay.

15   A   I believe he had on blue jeans, and I believe he had on

16           penny loafers.

17   Q   Did he have any other jewelry if you recall?

18   A   Not that I can remember.

19   Q   Okay.  Let me ask you this, Officer Steinbeck:  During

20           the course of your investigation, would it be a fair

21           statement to say that you thought that Tim Combs

22           was definitely involved in this particular crime?

23           Would that be a fair statement, from the outset?

24   A   Especially after talking with Danny.

25   Q   Especially after talking with Danny.  Okay.  And you know
```

DENNIS STEINBECK

1           Tim Combs, right?

2    A    Yes.

3    Q    And you know Danny?

4    A    Yes.

5    Q    Okay.  Was it true that the reason you went after Danny

6           was that he would be the easier one to target to

7           try to question?

8    A    No.

9    Q    No?

10   A    No.

11   Q    Okay.  Is there any reason why you didn't pursue Mr.

12          Combs then until after you had the statement from

13          Danny?

14   A    Yes.

15   Q    Okay.  And what was the reason again?

16   A    Four people saw him the day of the murder at the Valu-

17          King.

18   Q    Four people saw him the day of the murder at the Valu-

19          King?

20   A    Yes.

21   Q    Did four people also see Tim Combs?

22   A    Yes.

23   Q    Okay.  Well, that's what I'm saying.

24   A    Okay.

25   Q    Why didn't your pursue --

                            DENNIS STEINBECK

1    A    Well, I started with Danny on Friday and I finished up          33

2         with him on Monday.

3    Q    Okay.  So, you had no intention of going out and getting

4         Mr. Combs until --

5    A    Well, we would have brought Tim Combs in, yes.

6    Q    Okay.  Was there any coincidence in the fact that

7         Detective Morris Hill, the defendant's uncle, went

8         out on that Monday?

9              ATTORNEY KONTOS:  Objection, Your Honor.

10        He already asked that two or three times.  He got an

11        answer to that before.  He testified as to what the

12        reason he went --

13             JUDGE McLAIN:  I don't recall.  I think --

14        I know what you're driving at, and I think you can

15        shorten it up a little bit.

16   Q    (By Attorney Lewis)  Let me ask you this, Mr. Stewart,

17        very direct:  Was Mr. Hill out there that day only

18        possibly because this is the nephew and also Vera

19        is the sister?  That he could possibly talk her in-

20        to or possibly get Danny down to the station easier

21        than he could with you?

22   A    I can't answer that.  The decision why he was assigned

23        to me that day was an administrative decision by

24        Captain Lozinski, not on my part.

25   Q    But in any event, he was there, and your statement to

DENNIS STEINBECK

33

1   Vera was that you're going to have Danny sign the

2   statement and you were going to take her statement?

3 A Yes, sir.

4 Q In fact of reality, you did want to talk to Danny more,

5   but you didn't tell him at the time at the house?

6 A Like I stated earlier, if Danny wanted to talk with me,

7   I'd be more than glad to talk to him again.

8 Q You did not tell them at the house?

9 A I didn't tell him that.

10 Q When you got down to the station, the mother was separated;

11   put in a room?

12 A Correct.

13 Q And you had Danny in the Interrogation Room.  Do you re-

14   call on the tape -- the videotape, that is, where

15   you told Danny that you didn't think he committed

16   murder and he wasn't guilty of murder?  Do you re-

17   call that language?

18 A Yes.

19 Q And were you aware or not aware at the time that he was

20   under arrest or at least being detained?  He wasn't

21   going to be able to walk out of that room?

22 A Well, I know now that he was told he was going to be de-

23   tained, and I believe that was by Sergeant Stewart.

24   At that time, I did not.  At the time of the video-

25   tape, I did not know that.  Sergeant Stewart had

DENNIS STEINBECK

1          told him that he was going to be detained.    33

2  Q  Okay.  So, the statement in regard to Danny:  "You're

3          not guilty of murder," that was just --

4  A  Interrogative tactic.  I was trying to gain his confi-

5          dence.

6  Q  Right.  Okay.  The Prosecutor was at the Warren Police

7          Department on that Monday, September 16th, was he

8          not?

9  A  Yes, sir.

10  Q  Do you recall if after the tape recorded statement was

11         taken, that that was played for the Prosecutor or

12         was it gone over?

13  A  The tape?

14  Q  Tape recorded statement before the videotaped statement.

15  A  I don't believe so.

16  Q  You indicated that you did not know whether for a fact

17         that the boy's penis was pulled off or anything

18         about the stick.  Who was it that informed you be-

19         tween the two -- the tape recorded statement and

20         the videotaped statement about those details?

21  A  Detective Teeple.

22  Q  Danny never mentioned anything about a stick or anything

23         during the --

24  A  Tape recording?

25  Q  -- tape recorded statement?

DENNIS STEINBECK

1  A    (Witness shakes head negatively.)

2  Q    And who brought it up in the videotape?

3  A    I believe I did after being told by Detective Teeple.

4                   ATTORNEY LEWIS:  Okay.  I have no further

5         questions of this witness.

6  RE-DIRECT EXAMINATION BY ATTORNEY KONTOS:

7  Q    Sergeant Steinbeck, I have a few questions left.  In his

8         cross examination, Mr. Lewis was asking you about

9         various suspects from the beginning of the incident,

10        and you enumerated five or six of them.  Of those

11        suspects that were enumerated, how many voluntarily

12        came down to the station and gave -- turned out to

13        be a false statement?

14  A    None.

15  Q    Was there one that did?

16  A    One.

17  Q    And who was that?

18  A    Danny Hill.

19  Q    Okay.  Now, there was a few things mentioned about his

20        rights given that day at approximately 11:55.  That

21        initially, in your suppression, you believed that

22        there was only one, and as it turned out, you tes-

23        tified that there were in fact two, and the one that

24        was read was the one that was stated as State's

25        Exhibit Number 58, is that correct?

                        DENNIS STEINBECK

1   A   Yes.                                                                   33

2   Q   Okay.  Now, I have a transcript here of the tape recorded

3       statement, and I have page 19.  Page 19, at the top

4       of it is where the entire waiver -- his entire

5       rights are advised to him and he was not under ar-

6       rest and free to leave.  Then down here -- you were

7       present for that, by the way, were you not?

8   A   Yes.

9   Q   Okay.  Now, I want you to read over here what Sergeant

10      Stewart said to him after Detective Hill advised

11      him of his rights.

12  A   "Let the record indicate that Danny Hill signed his rights

13      sheets."

14  Q   Does it say rights sheet or rights sheets?

15  A   Plural, sheets.

16  Q   And that was a transcript of the tape recorded statement

17      as of the day it was taken, is it not?

18  A   Yes, sir.

19  Q   So, that would be more accurate of your recollection than

20      the 16th of December when you were first questioned

21      about this at the Suppression Hearing, is it not?

22  A   Yes.

23  Q   So, it was in fact two sheets?

24  A   Correct.

25  Q   The fact of the matter was, though, he was advised of all

DENNIS STEINBECK

1          his rights and the fact he was not under arrest and

2          that he was free to leave, was he not?

3    A    Yes, he was.

4    Q    Could have been on Moe Hill's shirt sleeve, and he would

5          have been advised of his rights?

6                    ATTORNEY LEWIS:  Objection, Your Honor.

7          Let the witness testify, not Mr. Kontos.

8                    JUDGE McLAIN:  This is your witness.  I

9          don't understand the point.  Are you trying to say

10         -- there was a suggestion that there were two sheets,

11         that they necessarily refer to the sheets marked 56,

12         58, whatever they are, signed at 11:55?

13                   ATTORNEY KONTOS:  Those were the two that

14         were signed that day according to the testimony.

15                   JUDGE McLAIN:  Are you trying to make a

16         point, at some time earlier -- did that take place

17         on the video statement?

18                   ATTORNEY KONTOS:  No, the tape recorded

19         statement.  11:55.  That's what it says right on

20         there.  I'm suggesting that there were two sheets

21         and that is more accurate than somebody's memory

22         months later.

23                   JUDGE McLAIN:  Well, I think you're sug-

24         gesting an argument.  I mean it's totally an im-

25         proper question for your own witness.


                        DENNIS STEINBECK

1    Q    (By Attorney Kontos)  One point.  Mr. Lewis asked you who    33

2         first suggested about the underwear around the neck,

3         and that particular statement that he was reading

4         from was from the tapes of September 16th.  Now, do

5         you recall reading the synopsis from Thursday by

6         Sergeant Stewart?  Remember reading that?

7    A    Yes.

8    Q    Now, without reading all of it, please read the first

9         paragraph or two on the second page.  That's Thurs-

10        day, September 12th.

11   A    "The way Danny Hill was acting was very strange.  He was

12        confused about Collins and about Combs.  He tried

13        to say a lot about Lowery and McCain doing it to

14        Fife.  Could not figure out why he was passing the

15        two off, and at times, Collins and Combs.  He knew

16        a lot about the bike and about the underwear around

17        the boy's neck."

18   Q    He knew a lot about the bike and the underwear around the

19        boy's neck?

20   A    Yes.

21   Q    So, when was the first time if you'd read this statement

22        that anything around -- about the underwear being

23        around the boy's neck was brought up?

24   A    When Danny volunteered it to Sergeant Stewart Thursday

25        night.


                         DENNIS STEINBECK

33

1   Q     So, the first time wasn't on the 16th?

2                 JUDGE McLAIN:  This is a totally improper

3          -- were you there at the time?

4   A     Thursday night?

5                 JUDGE McLAIN:  Yes.

6   A     No, sir.

7                 JUDGE McLAIN:  Are you trying to make him

8          a witness to something when he wasn't there?

9                 ATTORNEY KONTOS:  No, Your Honor.  I'm

10         trying to say the first time it was brought up.

11                JUDGE McLAIN:  He doesn't know that's

12         true.  He doesn't know the transcript's accurate.

13         He wasn't there.

14                ATTORNEY KONTOS:  Okay.

15                ATTORNEY LEWIS:  We'll object for the

16         record, Your Honor.  I'm sure Mr. Stewart's coming

17         on.  They can go through this.

18  Q     (By Attorney Kontos)  Let me ask you a few things that

19         were on the record.  Now, Mr. Lewis asked you in the

20         videotape when you were reading part of the tran-

21         script as to the color of the underwear, and he read

22         you a portion that said that they were yellow and

23         they were -- then Sergeant Stewart's trying to say

24         well, weren't they in fact grey, and he was saying

25         to you that that was suggested to him by you, is

DENNIS STEINBECK

33

1          that correct?

2 A   Yes, I think that was what was suggested to him.

3 Q   Now, let me show you page 3 of the transcript of the tape

4          recorded statement; that was the one taken prior

5          to the video, and ask you to read Sergeant Stewart's

6          question and Danny Hill's response as to the shorts.

7 A   "We want to know the truth about everything, all right?

8          What was the boy wearing and what kind of clothes

9          did he have on?"

10    "Some grey shorts, and his bike was maroon with some gum

11          wall like tires."

12 Q   Danny Hill said they were grey shorts?

13 A   Yes.

14 Q   Also, when asked by Mr. Lewis about who brought up the

15          stick first, I want you to read from page 19 of the

16          transcript of the videotape, starting with --

17 A   Starting with Detective Stewart?

18    "What if Timmy said you stuck something up the boy's

19          ass?"

20    "Huh-uh.  I didn't."

21    "SERGEANT STEWART:  Somebody did.  Somebody stuck some-

22          thing up his ass.  Tim Combs?  What did he stick

23          up his ass other than his penis?"

24    "A stick.  Like a broom handle thing, but it was kind of

25          bigger.  Like that."

DENNIS STEINBECK

33

1  Q    So, who brought up the stick first?

2  A    Danny Hill.

3                 ATTORNEY KONTOS:  That's all.

4  RE-CROSS EXAMINATION BY ATTORNEY LEWIS:

5  Q    Mr. Steinbeck, just a couple more questions.  You've al-

6       ready indicated that he made reference to the under-

7       wear around the neck.  You already indicated there

8       was a lot of street talk, a lot of information that

9       was out there, some fact, some fiction, and every-

10      thing else, in regard to this long before --

11                 ATTORNEY KONTOS:  I'm going to object,

12      Your Honor.  He wasn't there for that either.  As

13      to what he may have known.

14                 ATTORNEY LEWIS:  He testified that there

15      was a lot of information out there.

16                 JUDGE McLAIN:  That's true.  Objection's

17      overruled.

18  Q    (By Attorney Lewis)  Did the people know?  I mean a lot

19       of people in the area have a good idea of what hap-

20       pened, some fact, some fiction?

21  A    Yes.  Like I stated earlier, there was a lot of rumors

22       flying around the southwest side of town.

23  Q    Okay.  And in regard to -- do you recall in the tape

24       recorded statement about -- you were asking Danny

25       the location of the grey shorts.  Do you recall that

DENNIS STEINBECK

1    -- what his answer was in regard to that?  This was    34

2    specifically by yourself.

3    A    (No response.)

4    Q    Okay.  Let me just read it, okay!

5    "All right.  While the boy was laying on the ground, he

6    just picked up the bike and threw it."

7    Question:

8    "DENNIS STEINBECK:  You didn't touch the bike.  The boy

9    had on grey shorts.  Did he leave with the grey

10   shorts?  Did Tim Combs walk with the grey shorts?"

11   "Yeah.  He had them under his shirt.  He had them under

12   his shirt, and I seen him the next day.  He was

13   heading right back there.  That's when I was looking.

14   And he hid the bike up under some weeds like and

15   threw the shorts up under there."

16   "So, you saw Tim Combs come back to the field and -- the

17   very next day carrying the boy's shorts, and he hid

18   the shorts and he hid the bike?"

19   "Yes."

20   Is that fact or fiction, according to what you know about

21   where the shorts were located and also the bike?

22   A    I -- I think the bike was found in one portion of the

23   field and the underwear found a few yards away

24   from it.

25   Q    A number of yards in actuality.  Did you see any diagrams?

DENNIS STEINBECK

34

1   A   Yeah, but I can't recall right now.

2   Q   So, the shorts weren't located underneath or on top of

3       the bike as far as you know.  Do you know when the

4       shorts were recovered?

5   A   I believe the same day the bike was recovered.

6   Q   The same day the bike was recovered?

7   A   I think so.

8   Q   One more item in reference to the bike:

9       "I was coming straight down, and I turned up Valu-King,

10      and that's when I seen him sticking the bike in some

11      bushes and throw them shorts on top of the bike."

12      "That ain't true now.  We have got to find out exactly

13      what you did with them shorts.  That ain't true,

14      Danny.  That part is not true."

15      "He threw them shorts on top of the bike."

16      "The shorts were not found by the bike.  Tell us the

17      truth."

18      You recall that?

19  A   Yes.

20  Q   Okay.  When they were asking about the shorts, they

21      didn't tell him where the shorts were, did they,

22      in the first couple of sentences?  Understand what

23      I'm saying?

24  A   I think that was more red herring, as you put it.  I'm

25      not sure.

DENNIS STEINBECK

34

1   Q   You didn't give him the answer?

2   A   Yeah.  I don't believe at the time we were interviewing

3           him that the underwear and the bike had been found.

4           I believe the BLOCK WATCH, our police officers were

5           out looking for it at the time.  We're talking

6           Friday or Monday?

7   Q   The bike was recovered on Friday now.

8   A   Okay.

9   Q   This is Monday.  This is the tape recorded statement.

10   A   All right.

11   Q   The point simply is, in the first statement there when

12           you were talking about the shorts, you didn't give

13           him an idea in substance of the question where the

14           shorts were, right?  You said, "Where were the

15           shorts?  Where were they," right?

16   A   Right.

17   Q   Danny's response was he placed them on the bike, and

18           that would be incorrect?

19   A   Right.

20   Q   Okay.  In fact, do you recall in the tape where Danny

21           also says that the shorts were taken out of the

22           field by Tim Combs and placed under his shirt?

23   A   Yes.

24   Q   Do you recall that?

25               ATTORNEY LEWIS:  Okay.  No further ques-

DENNIS STEINBECK

1    tions.                                                             34

2                    ATTORNEY KONTOS:  Nothing further.

3                    JUDGE McLAIN:  That's all.  Thank you.

4                              (Witness is excused.)

5                    JUDGE McLAIN:  All right.  Gentlemen, be-

6    cause the next witness is Doctor Adelman, it would

7    be a, presumably, rather long witness.  We will not

8    attempt to start him now, but we will recess only

9    until 1:00 o'clock.  Mr. Lewis?

10                   ATTORNEY LEWIS:  Yes, Your Honor?

11                   JUDGE McLAIN:  1:00 o'clock?

12                   ATTORNEY LEWIS:  1:00 o'clock's fine.

13                             (Court in recess at 11:55 A.M.)

14                             (State's Exhibit Nos. 62 through 93
                                 marked for identification.)

15                             (Back in session at 1:03 P.M.)

16

17                   ATTORNEY WATKINS:  We would call Doctor

18   Howard Adelman.

19

20                    DOCTOR HOWARD ADELMAN

21   being duly sworn, according to law, on his oath, testified,

22   as follows:

23   DIRECT EXAMINATION BY ATTORNEY WATKINS:

24   Q    You've had a little bit of a wait.  Sorry!  Doctor,

25        would you for the benefit of the Court give your


                        DOCTOR HOWARD ADELMAN

34

1          full name and occupation.

2  A    My name is Doctor Howard Adelman, and I'm a pathologist.

3          I am the co-director at the St. Joseph Hospital

4          Laboratory.

5  Q    And that is here -- located here in Warren?

6  A    In Warren.

7  Q    And would you briefly go through your educational back-

8          ground.

9  A    Okay.  I graduated medical school in 1963.  I went to the

10         University of Basel in Basel, Switzerland.  Prior to

11         that, I graduated from Gettysburg College with a

12         Bachelor's Degree.  Upon completion of my residency

13         -- my medical school, I went to serve an internship

14         at Germantown Hospital in Philadelphia.  I stayed

15         there for one year, and the next four years of my

16         residency were done -- first year was done at

17         Cleveland Metropolitan General Hospital, and the

18         next three years were in New York at the City

19         Hospital Center, Elmhurst, and Mount Sinai Hospital

20         of New York.  At that time, I rotated through the

21         Chief Medical Examiner's Office of New York, and

22         I've worked under Doctor Milton Halpern.

23     Following completion of my residency, I spent two years

24         in the Army where I was the Director of the U.S.

25         Army Hospital at Fort Devens, Massachusetts.  After

DOCTOR HOWARD ADELMAN

34

1    leaving the Army, I became pathologist for three

2    hospitals in New York.  In Nassau County, there were

3    Massapequa General Hospital, Central General Hospi-

4    tal, and Hempstead General Hospital.  One year after

5    I took this position, I went to the Suffolk County

6    Medical Examiner's Office where I spent the next

7    eight years, and I was the Deputy Chief Medical

8    Examiner at Suffolk County prior to coming to

9    Warren about six years ago.

10   Q    What year did you receive your medical degree?

11   A    1963.

12   Q    And what total time has your career involved pathology

13        as far as determining causes of death?  How many

14        years?

15   A    How many years?  During my four years of residency, I

16        was involved with determining the cause of death

17        plus the eight years that I was the Deputy Chief

18        Medical Examiner in New York.  That's 14.  My in-

19        ternship is one.  That's 15.  And then I've been

20        here for approximately six years.

21   Q    So, you've been involved with that discipline about 21

22        years?

23   A    (Witness nods head affirmatively.)

24   Q    Doctor, did you take any tests for board certification,

25        and if you have, would you tell the Court when and

DOCTOR HOWARD ADELMAN

1          in what field or sub-specialties?                          34

2    A    I'm board certified in Anatomic Pathology and in Clinical

3          Pathology by the American Board of Pathology and

4          passed the exams in 1971.

5    Q    And did you have to take a test for that?

6    A    Yes.

7    Q    And when you talk about "clinical pathology," what does

8          that mean?

9    A    Okay.  Hospital pathology in the laboratory is generally

10         divided into two segments.  One is called anatomic

11         pathology.  Anatomic pathology deals with the analy-

12         sis of tissues, performing autopsies, examination of

13         sitology specimens, blood smears, bone marrows, and

14         so forth.  Clinical pathology deals with the analy-

15         sis of body fluids such as blood and urine and other

16         fluids taken from the body, microbiology, chemistry,

17         enzymes, things of this sort.

18   Q    Okay.  When you were in Suffolk County, New York, you

19         indicated that you were with the Medical Examiner's

20         Office?

21   A    Yes.

22   Q    How large of a county is that in New York?

23   A    That encompasses -- I think it was once calculated almost

24         a thousand square miles or more.  May be 10 times

25         that.  I don't remember.  Its population is well

DOCTOR HOWARD ADELMAN

34

1          over a million.

2  Q   A million people.  It's right in New York City or near

3          New York City?

4  A   Yeah, it's outside of New York.

5  Q   And I would assume that with a million people in that

6          area, that you would get a lot of pathology for the

7          Medical Examiner's Office?

8  A   Yes.

9  Q   And during the eight years you were in New York, did you

10         have occasions to be involved with determining

11         causes of death in homicides?

12  A   Yes.

13  Q   And would you tell the Court approximately how many

14         cases you've been involved in.

15  A   I've performed autopsies in almost 3,000 cases, and I've

16         supervised probably double or triple or more of

17         that number.

18  Q   Okay.  Approximately how many times have you been called

19         to Court to testify concerning causality and death

20         of individuals?

21  A   I can't give you an exact number.

22  Q   Any particular cases in New York that stick out in your

23         mind that you were involved with?

24  A   There were many cases.  Probably the most famous -- or

25         infamous of all of them was the Amityville Horror

DOCTOR HOWARD ADELMAN

34

1           case which was the death of the DeFeo family of six

2           who were murdered on Long Island.

3  Q   And you testified in Court in that case?

4  A   Yes, I did.

5  Q   And as -- when you came to Warren -- I believe you said

6           six years ago?

7  A   Approximately six years ago.

8  Q   You continued to work on homicide cases?

9  A   Yes.

10  Q   And directing your attention to September 13th, 1985, do

11           you recall investigating the cause of death of a

12           Raymond Fife?

13  A   Yes, I do.

14  Q   And would you tell the Court in your own words when that

15           occurred and what you were doing and what you did.

16  A   Okay.  The autopsy took place at approximately 9:00

17           o'clock that morning, and the autopsy consisted of

18           a very thorough examination of the body; the ex-

19           ternal features of the body as well as the internal

20           features of the body.

21  Q   And exactly what do you do in an autopsy?

22  A   An autopsy -- the main purpose of an autopsy is to de-

23           termine -- the main purpose of a forensic autopsy

24           is to determine not only the cause of death, but

25           also the manner of death.  In other words, the medi-

DOCTOR HOWARD ADELMAN

34

1        cal cause of death and the manner of death, whether

2        it is classified as a suicide, homicide, or a

3        natural or undetermined cause of death.  Manner of

4        death.

5  Q    And you indicate in the early morning hours you began?

6  A    Yes.

7  Q    And would you describe what you saw.

8  A    I saw the body of approximately a 12-year old boy, and

9        there were multiple injuries visible externally.

10       He had been burned especially about the face.  There

11       were multiple contusions and abrasions and lacera-

12       tions, blunt force type of injuries.  He had a

13       ligature mark around the neck in addition to the

14       burning and other injuries that he had around the

15       neck and the face, and he had bled profusely from

16       the rectal area.

17  Q    What did you do, Doctor Adelman?  And feel free to talk

18       to the Judges because they're really the jury in

19       this case.  I'll get over here.  It'd be easier.

20       You have direct contact better with them.

21  A    Okay.  I examined the external portions of the body,

22       evaluated all of the injuries, took measurements,

23       and we photographed the body extensively; I did,

24       and present at the autopsy was Sergeant Carnahan

25       who also took photographs during the autopsy, and

DOCTOR HOWARD ADELMAN

35

1          described all of my findings as I performed the

2          autopsy, and the autopsy was later transcribed onto

3          an autopsy protocol.

4   Q   Do you have that protocol with you, Doctor?

5   A   Yes, I do.

6                           (State's Exhibit No. 94 marked

7                              for identification.)

8   Q   (By Attorney Watkins)  I hand you what's been marked as

9          Exhibit Number 94, and would you identify it for the

10         record.

11   A   Yes.  This is a copy of my autopsy protocol.

12   Q   And what is a protocol?

13   A   Protocol is the written findings of the autopsy; the hard

14          copy, if you will, of my dictation of the autopsy

15          as I performed the autopsy.

16   Q   And as you described, you perform a lot of autopsies?

17   A   Yes.

18   Q   And, therefore, writing down what you see, what you de-

19          termine is necessary?

20   A   Yes.  It's done in the ordinary course of doing an

21          autopsy.

22   Q   As a matter of fact, it's required as a matter of prac-

23          tice of medicine?

24   A   Yes.

25   Q   And how many pages are there in that particular protocol?

DOCTOR HOWARD ADELMAN

1   A   In this particular protocol, there are 11.

2   Q   Okay.  Is there a page that deals with gross findings?

3   A   Yes.

4   Q   And what exactly is that?

5   A   Okay.  At the conclusion of the autopsy, all of the

6       findings are summarized in the gross diagnosis; that

7       is, the diagnosis that is made after examination

8       with the naked eye.  Just the initial findings.

9       This is followed by examination of the tissues under

10      the microscope, and this enhances the examination

11      because things are -- can be seen under the micro-

12      scope that are not isually apparent with the naked

13      eye.  And so, the findings that were made at the

14      time of autopsy are appraised in light of the

15      findings that are made under the microscope, and

16      this leads to the final diagnosis.

17  Q   Which is found on the front page?

18  A   Which is found on the front page.

19  Q   Okay.  How long did it take to perform the autopsy on

20      young Raymond Fife?

21  A   It took many hours.

22  Q   Well --

23  A   I would say approximately six or more.

24  Q   Okay.  Now, would you in detail go through that autopsy

25      and your significant findings.

DOCTOR HOWARD ADELMAN

35

1   A   Okay.  I just wanted to qualify that.  It took approxi-

2       mately six or more hours to perform the gross part

3       of the autopsy.  That's the visual part of the

4       autopsy.  And then it took several days after that

5       to examine the tissues under the microscope and

6       prepare them for study.

7   Q   And I believe you did some other things in this case that

8       were unusual, did you not?

9   A   Yes.

10  Q   And we'll get to those, but we'd like -- at this time,

11      I would appreciate it if we could go through -- I

12      think maybe you've summarized some of the injuries,

13      but I'd like you to go through in detail every

14      single injury that was visible to you on that ini-

15      tial day on September 13th, 1986.

16  A   Okay.  The injuries are summarized in the final diagno-

17      sis sheet, and they were listed as being multiple

18      and extensive injuries.  The first injury that's

19      listed here is a subdural hemorrhage, left.  This

20      is a hemorrhage between the main or the thick

21      covering of the brain and the brain itself.  This

22      is usually caused by a blunt force or a violent in-

23      jury to the head.  This is called a subdural hemor-

24      rhage.  The second injury --

25  Q   Okay.  Let's take that first injury, if we may.  Did you

DOCTOR HOWARD ADELMAN

35

```
 1                    indicate both sides of the head?

 2    A    I examined both sides of the head.  The subdural was

 3              found only on the left side.

 4    Q    What was on the right?

 5    A    Nothing.

 6    Q    Okay.  And you indicate a blunt force?

 7    A    Yes.

 8    Q    Would fists be a blunt force?

 9    A    Fist or any other kind of object would be considered a

10              blunt force injury.

11    Q    Would a person who will fall on the ground, hit his

12              head, be blunt force injury?

13    A    That could be a blunt force injury also.

14    Q    Okay.  Continue.

15    A    The second injury that's listed are the retroperitoneal

16              and abdominal contusions.  These were rather severe

17              contusions that were noted in the form of hemorr-

18              hages that extended in the connective tissues of

19              the mesentery and in the omentum.  These are the

20              tissues that hold the intestines together.  There

21              were large areas of hemorrhage showing a fairly

22              severe type of injury.

23    Q    And perhaps you can define the area more in lay terms.

24    A    That's in the abdominal region, and it's the abdominal

25              organs.  These are the tissues that hold the small
```

DOCTOR HOWARD ADELMAN

1          and large intestines.                                    35

2    Q    Be down here (indicating)?

3    A    Down in the abdomen.

4    Q    Near the pelvis?

5    A    Near the pelvis and above to approximately the mid-

6          abdominal region.

7    Q    And what causality did you find in hemorrhaging there?

8    A    This is also a blunt force injury.  This can be caused

9          by a blow to the abdomen by either an object, a

10         fist, kicking, something of that nature.

11   Q    Are there degrees of hemorrhaging as far as cases go?

12         How would you describe this as far as severity?

13   A    This was a severe injury, and it was severe enough that

14         it would probably indicate more than one blunt force

15         injury.

16   Q    Repeated blows?

17   A    Probably a repetitive to cause this extent of injury.

18   Q    Okay.  And how large of an area of the abdominal area

19         are we talking about?  Could you show the Court

20         with your hands maybe?

21   A    Almost the entire underside of the abdomen from the

22         umbilicus down to the pelvicular area was involved.

23   Q    Would the right side and left side of the boy be in-

24         volved?

25   A    It was both sides involved.


                    DOCTOR HOWARD ADELMAN

1   Q   Continue.

2   A   The next injury was a penetration and perforation of the

3          anus, the rectum and the urinary bladder with ex-

4          tensive hemorrhage found in the abdomen.

5   Q   Would you in lay terms again go through and try to de-

6          scribe that.

7   A   Yes.  This type of injury is usually seen in someone

8          who has been impaled with an object.  The object

9          penetrated through.  Was inserted into the anus,

10         penetrated through the rectum and into the urinary

11         bladder, which is just in front of the rectum.

12  Q   Okay.  And when you say "impaled," would you -- what do

13         you mean by that?

14  A   Impaled infers an -- an object placed into the rectum

15         which cuts and penetrates the tissues.

16  Q   And how far did that object go in?

17  A   The object went in approximately six to eight inches.

18  Q   And it went in the rectum and then it perforated other

19         organs or tissues?

20  A   Yes.  It perforated through the rectum, through the rec-

21         tal wall and penetrated into the urinary bladder

22         and then went right through the posterior wall of

23         the urinary bladder.  It apparently did not touch

24         the front wall.  It stopped at the -- after pene-

25         trating the back wall of the urinary bladder.

DOCTOR HOWARD ADELMAN

35

1  Q   Did this involve a lot of pain for any human being?

2  A   Terrible amount of pain.

3  Q   I believe you afforded me some diagrams, have you not?

4  A   Yes, I did.

5  Q   And I'm going to have these marked.

6                        (State's Exhibit Nos. 95 through 98
7                         marked for identification.)

8  Q   (By Attorney Watkins)  Doctor, I'm going to go out of

9          order, but -- 95 through 98, and if you would,

10         please, would you tell the Judges why you gave me

11         these diagrams and what purpose they have.

12 A   Certainly.  These are anatomic diagrams that I photo-

13         copied from a standard textbook.  One is from

14         Sobotta's Textbook of Anatomy Atlas and the other

15         is from a collection of drawings from the Sobotta

16         Collection by Frank Netter.  These are anatomic

17         drawings to demonstrate the exact path of the object

18         that was inserted into the anal-rectal area and the

19         course that it took and how it punctured the organs

20         that I've mentioned, and it shows the relationship

21         of the rectum to the urinary bladder to make it more

22         evident to somebody who is unfamiliar with human

23         anatomy.

24 Q   Would you go through each individually and identify them

25         by number and what they depict.


                    DOCTOR HOWARD ADELMAN

35

1   A    Okay.  In essence, they show the same -- oh, first --

2   Q    You're going to have to refer to each number and then

3           tell the Judges what each one shows.

4   A    Okay.  The first number is Exhibit Number 97.  These are

5           all very similar charts, and the explanation for one

6           is the same as the explanation for all of them.  I

7           listed on the top -- or I wrote B and W on the top

8           of this exhibit, which stands for black and white

9           anatomic drawing, as it stood in the textbook, was

10          in black and white.  I drew the path of the object,

11          which I labeled stick, and how it passed through

12          the rectum, through the anus, which is the outside

13          opening of the rectum, and into the rectum, through

14          the rectum, through the adjacent connective tissues

15          and into the bladder.  So, I drew the path of this

16          in red.

17       The next drawing also demonstrates the same thing.  It's

18          a slightly different drawing, but --

19   Q    What number?

20   A    This is Number 98.  And here again, it shows the relation-

21          ships of the various organs, and I drew the arrow in

22          red showing the path of the object, again, which I

23          labeled stick.

24       The other two exhibits; 96 and 95, were taken from the

25          Sobotta Collection, Doctor Frank Netter, who is the

DOCTOR HOWARD ADELMAN

1      artist, and again, it shows another view of the same 35

2      anatomic study that is -- that I showed in the pre-

3      vious exhibits.  Here again, it shows the relation-

4      ships on both 96 and 95 between the rectum, the anus,

5      and the urinary bladder and the probable path of the

6      object as it penetrated these organs.  The path is

7      listed on Exhibit 96.  Exhibit 95 is the drawing

8      just by itself without my sketching in the pathway.

9      This is just a plain photocopy.  This was originally

10     in color.  I put color on each of these two exhibits.

11     This Exhibit 95 is as it appears in the textbook

12     minus the color.  96 is the same figure as it appears

13     in the textbook with my marking on it to show the

14     path of injury.

15  Q  Now, the object that went into the anus, when it went in,

16     was it a -- do you have an opinion as to how thick

17     it was?

18  A  Yes.

19  Q  And would you tell us why you have an opinion and what

20     that opinion is.

21  A  In my examination of the rectum, I found not only the

22     perforation, but I found a circular mark which was

23     an imprint where the rectum itself had not been

24     penetrated.  This was adjacent -- immediately adja-

25     cent to the area where it had been penetrated, and

DOCTOR HOWARD ADELMAN

1            it was a circular mark.  May I refer to my notes?    35

2    Q    Sure.

3    A    (Witness refers to his notes.)  It was approximately two

4            centimeters in diameter.  It was a round mark.  Two

5            centimeters is just slightly less than one inch in

6            diameter.  2.5.  And two and a half centimeters make

7            an inch, so this was just slightly under an inch in

8            diameter, this round mark.  It had to be -- from my

9            examination of this round mark, I thought it was

10           probably a circular object.  It had to be approxi-

11           mately that size, which was enough to pass through,

12           with great difficulty, through the anus and the anal

13           sphincter.

14   Q    Any lacerations on the outside?

15   A    Yes.  The anus had a great number of lacerations, which

16           are tears and contusions, which demonstrated the

17           difficulty of inserting this object.  The object did

18           stretch muscles surrounding the anus as it went in

19           and made this imprint on the wall of the rectum.

20           This was in an area where it did not penetrate.

21           After examining the area where it did penetrate,

22           it did have the appearance of a sharp pointed ob-

23           ject.  Because of the penetration, it had to have

24           had a pointed type of end in order to cut through

25           the tissues the way it did.  The object that made

DOCTOR HOWARD ADELMAN

36

1          the round circular imprint did not penetrate.

2          Probably did not have the cutting edge to it.

3   Q   Are you saying that there were more than one penetration

4          of this young man's anus?

5   A   Yes.  There were at least two, possibly more.

6   Q   And the two different types of objects with two different

7          types of ends were inserted?

8   A   They made two different marks.  They were similar marks

9          inasmuch as they penetrated areas.  Also had a cir-

10          cular rim around it showing that it was partially

11          circular, and it was approximately the same size as

12          the circular area that did not penetrate.

13   Q   How much force would have had to be used to get that far

14          in the young man?

15   A   This would have required a great deal of force to pene-

16          trate through the sphincter and tear the tissues the

17          way it did.

18   Q   Okay.  Would you describe the amount of bleeding that

19          would occur and how serious that type of bleeding

20          is.

21   A   The sear -- the hemorrhage itself could be a fatal hemor-

22          rhage.  There was -- even to the time when I made my

23          examination of the body, the blood gushed out of the

24          anus when I -- I just spread the buttocks to examine

25          the anus.  The blood just gushed out of there as

DOCTOR HOWARD ADELMAN

36

1  though it were under pressure.

2  Q   Let's go on.

3  A   I listed next visceral pallor.  This means that the or-

4  gans generally in the body were pale, which is a

5  sign of a depleting type of hemorrhage.  A large

6  amount of hemorrhage would tend to make the organs

7  have a pale appearance.

8  Q   And can you explain that more thoroughly in lay terms?

9  A   There was a great deal of blood loss involved in the

10  death of this boy, and the amount of blood loss

11  tended to make the organs themselves look very pale,

12  and that's what's meant by visceral pallor.  The

13  organs had a pale appearance.

14  Q   Continue, Doctor.

15  A   There were -- the next included the external contusions,

16  the abrasions, lacerations, and burns both of second

17  and third degree burns.  These were particularly

18  around the neck, the head, the face, the upper

19  portions of the shoulders.  These were extensive

20  injuries.  Most of the third degree burning areas

21  were found around the neck region and on the right

22  side of the face.

23  Q   Do you have an opinion as to the nature of the burns as

24  to what would be possible causes?

25  A   Yes.  Third degree burns are caused either by a flame or

DOCTOR HOWARD ADELMAN

1    by a hot or molten type of object.  Something that's 36

2    very hot.  Boiling water, for example, would not

3    necessarily cause a third degree burn.  It would

4    cause a second degree burn.  It's only when there

5    is charring of the tissues that it's a third degree

6    burn.

7  Q  How about gasoline?

8  A  Ignited gasoline would definitely cause a third degree

9    burn.

10  Q  Charcoal lighter fluid?

11  A  Definitely.

12  Q  How serious would you describe -- and you said third de-

13    gree.  Is there anything more serious than third

14    degree burns?

15  A  No, that's the most serious.

16  Q  Would you describe the burns as a whole.  How life en-

17    dangering were they?

18  A  The burns themselves could have been life endangering if

19    they were left untreated.  Even if they were treated,

20    they would probably require skin grafting and a

21    great deal of treatment to make sure that no infec-

22    tion ensued, and they could -- in themselves, could

23    be life endangering.

24  Q  That is, the burns alone possible would have killed him?

25  A  Just the burns alone.

DOCTOR HOWARD ADELMAN

36

Q     Okay.   Continue, Doctor.

A     The contusions and abrasions of the peritoneum and the
      penis.   The scrotum area had a great -- had a promi-
      nent area of contusion.   That's a large black and
      blue area.   And there were contusions and abrasions
      around the penis area.   These abrasions had the
      appearance of a bite mark.   They had a fairly
      patterned appearance.

Q     Okay.   What type of bite mark, if you have an opinion?

A     A human bite mark.

Q     And have you seen human bite marks before?

A     Yes, I have.

Q     And did you do anything once you found or saw the human
      bite marks on the young man's penis?

A     Yes.

Q     What did you do?

A     I told Miss Fowler of the Coroner's Office that -- that
      the case should be evaluated; the bite marks, by an
      expert in forensic odontology.   That's the sub-
      specialty of dentistry that deals with such things
      as dental identification in persons who cannot be
      identified visually either because of burning of the
      body or because the body is mutilated or cannot be
      identified by visual means.   Forensic odontologists
      are also experts in determining and evaluating bite

DOCTOR HOWARD ADELMAN

36

1   mark evidence.  Bite mark evidence -- a bite mark

2   can be as specific as a fingerprint.

3  Q  Now, did you recommend anybody in particular?

4  A  Yes.  I knew Doctor Curtis Mertz.  I had met him on

5     several occasions at several national meetings.

6     American Academy of Forensic Sciences.  We are both

7     members of this organization and because I knew he

8     lived in Ashtabula and that he was a highly quali-

9     fied consultant, I suggested that we contact him.

10  Q  Okay.  And subsequently, he came down, is that correct?

11  A  Yes, he came down that evening.

12  Q  Okay.  We'll get to that.  Before that, I would like to

13     ask you -- you indicated that the scrotum of the

14     young man was --

15  A  Contused.

16  Q  Contused?

17  A  Yes.

18  Q  Is that ecchymosis?

19  A  Ecchymosis.  Black and blue.

20  Q  Is there any evidence of stretching of the scrotum?

21  A  The black and blue mark, or the contusion, could be

22     caused by a stretching injury.  It could be caused

23     by a blunt force injury.  Anything that would have

24     occasioned bleeding in the area.

25  Q  So, pulling on the scrotum could cause that?

DOCTOR HOWARD ADELMAN

36

1   A    Definitely.

2   Q    Now, would you go on to the other injuries that you

3        found on the body.

4   A    Yes.  In addition to the burn marks around the neck and

5        the contusions around the neck and the face, there

6        was also a ligature mark around the neck.  There

7        was -- in conjunction with the ligature mark, there

8        were hemorrhages that I found in the conjunctiva of

9        the eyes.  That's the membrane inside the eyelid.

10       This -- these hemorrhages and the congestion of

11       the petrosal bones, which are bones in the base of

12       the skull, are significant in cases of asphyxia due

13       to strangulation.  So, in this case, there was also

14       strangulation involved by ligature.

15  Q    And as you described ligature, would you have an opinion

16       as to the severity of the strangulation in this

17       case because of the evidence you found?

18  A    Yes.  This was fairly severe strangulation.  The bones

19       of the larynx, the hyoid bone, was not broken in

20       this case.  In children -- in adults, the hyoid bone

21       is usually broken or very often broken in these

22       cases, but in children, there's a flexibility be-

23       cause the bones are not yet completely hardened, but

24       there were extensive hemorrhages in the membranes of

25       the larynx which offered proof of strangulation.


                    DOCTOR HOWARD ADELMAN

36

1   Q   Now, would -- taking Exhibit 7, Exhibit 6, which are

2         underwear and shirt, would those types of items, if

3         tied around a young man's neck, cause ligature?

4   A   Yes.

5   Q   Okay.  Going on, Doctor, were there other wounds or

6         abrasions or cuts that you found on the face?

7   A   There were cuts and abrasions around the arms, and there

8         were scratches and abrasions on the left cheek.

9   Q   Were there any abrasions or scratches on his feet or

10        legs?

11   A   May I consult my notes?

12   Q   Sure.

13   A   (Witness refers to his notes.)  There were scratches and

14        abrasions on the ankles and the thighs and the legs,

15        yes.

16   Q   And how about the young man's mouth and teeth and

17        tongue?

18   A   The tongue had hemorrhages in the muscular portion of the

19        tongue.  The tongue was removed and also examined

20        showing injury to the tongue.

21   Q   And do you have some explanations for the injury to the

22        tongue?

23   A   The injuries to the tongue were probably caused by a

24        biting effect when it got caught between the teeth

25        possibly -- or probably from a blow to the chin area

DOCTOR HOWARD ADELMAN

36

1      or a fall on the chin area where the tongue got

2      caught between the teeth and caused these injuries.

3  Q  Okay.  How about his teeth, or did you leave that to

4      Doctor Mertz?

5  A  No, I examined the teeth.  The teeth were in good repair.

6      There were no injuries to the teeth, but there were

7      extensive injuries to the lips.  There were hemor-

8      rhages and swelling on the mucosal or the inner and

9      outer aspects of the lips.  Again, these are mani-

10     festations of a blunt force type of beating injury.

11 Q  How about his eyes?  Were they closed shut?

12 A  The eyes revealed petechial hemorrhage on the conjunc-

13     tiva, which I mentioned those are the inner mem-

14     branes.  More of a sign of strangulation.  Asphyxia-

15     tion which went along with the ligature strangula-

16     tion.  There were no other injuries to the eyes.

17 Q  How about the nose?

18 A  The nose had an area of burning on it.  It had the

19     charred area which extended from the right cheek.

20 Q  Okay.  How big of a young man was Raymond Fife?

21 A  Raymond Fife was approximately five inches -- five feet

22     in length, and he weighed approximately 85 -- 86

23     pounds.

24 Q  You know how old he was?

25 A  He was 12.


DOCTOR HOWARD ADELMAN

1    Q    Did you look at the hospital records, and can you tell us  36

2         how long he was alive before he expired on the 12th,

3         I believe?

4    A    He was comatose and in an apparent vegetative state for

5         approximately two days prior to his being pronounced

6         as dead.

7    Q    And what diagnostic work was done at the hospital to de-

8         termine his condition?

9    A    There were various blood tests performed, and the final

10        test that was performed was an electroencephalogram

11        which showed no brain activity.

12   Q    And was there a CAT scan?

13   A    There were CAT scans performed.  These are fairly so-

14        phisticated X-rays of the head using a computer.

15                          (State's Exhibit No. 99 marked
                                     for identification.)

16

17                     ATTORNEY WATKINS:  Mr. Lewis, you've been

18        provided a copy of the medical records?

19                     ATTORNEY LEWIS:  Yes.

20   Q    (By Attorney Watkins)  I'll show you what's been marked

21        as Exhibit 99.  Would you look at that particular

22        document and tell the Court whether or not you re-

23        cognize it.

24   A    Yes.  This is the -- excuse me, the hospital record from

25        St. Joseph Riverside Hospital on Raymond Fife.


                         DOCTOR HOWARD ADELMAN

```
1   Q   And are those copies of the records that you inspected in 36

2       this case?

3   A   Yes, they are.

4   Q   And would those records indicate how long 12-year old

5       Raymond Fife lived?

6   A   Yes, it would.

7   Q   And how long did he live?

8   A   He died on September 12th at 4:30 P.M., and he was ad-

9       mitted on September 11th at, I believe, 1:50.

10  Q   He was in the Emergency Room before then?

11  A   He was in the Emergency Room, yes.  Oh, on the 10th.

12      He was seen in the Emergency Room on the 10th at

13      8:00 -- almost 9:00 o'clock in the evening on the

14      10th.

15  Q   10:00 o'clock, right?

16  A   2152.  Yeah, 10:00 o'clock.

17  Q   Okay.  You don't use military time either!

18  A   Yeah.

19  Q   Okay.  Now, during the time that Raymond Fife was living,

20      what affect would it have on the injuries that

21      you've named?

22  A   Well, the injuries would have tended to repair and heal

23      during the time that life still persists.  Not all

24      of the tissues in the body die at the same time.

25      As a matter of fact, the death can occur to the en-
```

DOCTOR HOWARD ADELMAN

37

1    tire patient, and yet, the tissues themselves will

2    go on living, and this is the basis of performing

3    transplant operations and so forth so the tissues

4    still living would tend to repair themselves and

5    heal.

6  Q  Okay.  Was he brain dead when he was brought to the

7    hospital?

8  A  I believe he was at the time.

9  Q  And how many of the causes that you have listed, the

10    multiple trauma that resulted in Raymond's death,

11    how many would independently, in medical proba-

12    bility, cause his death or could have?

13  A  The subdural hemorrhage could well have caused his death

14    in and of itself.  The penetration and perforation

15    of the rectum and the urinary bladder in and of it-

16    self certainly is a valid cause of death.  The

17    ligature strangulation is a valid cause of death

18    in and of itself, and the burns and the contusions

19    showing the beating, they could have caused death.

20  Q  Abdominal area?

21  A  The abdominal area and the burns around the face.

22  Q  You indicate that during that Friday, that photographs

23    were taken?

24  A  Yes.

25  Q  And who took the photographs initially?  Forget about

DOCTOR HOWARD ADELMAN

37

1    Doctor Mertz for the time being.

2 A Okay.  I took the initial photographs, and as I was per-

3    forming the autopsy, I was helped by Sergeant

4    Carnahan.

5 Q Starting with the first photograph, which is that way

6    -- there's a small one there, would you go through

7    each one, and you'll have to look at the number,

8    Doctor, and describe what you see and whether or not

9    it's an accurate photograph of what you saw that

10    morning.

11 A Okay.  These are enlargements of the photographs that

12    were taken at the morgue.  Exhibit Number 62 shows

13    the side and the face of Raymond Fife.  This demon-

14    strates the third degree burns on the side of his

15    face, on the top of his shoulder, on the top of his

16    chest, and on the neck and his nose.  It also de-

17    picts a plastic tube which is protruding from his

18    mouth.  This is an airway that was inserted when he

19    came into the hospital to help him breathe.

20 Q Who took that particular photograph?

21 A I believe I took this photograph.

22 Q And it accurately, totally depicts what you saw?

23 A Yes.

24 Q All the photographs do?

25 A Yes, all the photographs.


       DOCTOR HOWARD ADELMAN

Q    Now, go through the next number, and you have to go

through each individually.  I know you've gone

through these before.

A    Yes, sir.

Q    Lay them to the side when you're done.

A    Okay.  Exhibit Number 63 is a similar view to Exhibit

Number 62, and it depicts the same injuries from a

slightly different angle.  This also shows an

electrocardiogram which is on the right shoulder.

All of these -- these pictures were taken prior to

the autopsy.

The next number, Exhibit Number 64, shows Raymond Fife.

This is the left side of the upper portion of his

body from approximately the mid abdomen to the top

of his head.  This shows the injuries to his -- to

the right cheek.  It also shows the plastic airway

in place, and there's a nasal gastric tube in place.

This photograph also demonstrates not only the burns,

but it also demonstrates the ligature mark around

the neck and several of the abrasions and contusions

about the shoulder.

Exhibit Number 65 is a photograph of the penis, the en-

tire sexual organs of the deceased.  The brown tube

which is protruding from the penis is a Foley

Catheter which is used to drain urine because he was

DOCTOR HOWARD ADELMAN

unable to void himself in the hospital.  The photo-
graph shows a contusion on the right-side of the
shaft of the penis.

Exhibit Number 66 is again a photograph of the genitalia.
In this picture, the Foley Catheter has been removed,
and the underside of the penis has been photographed
with the two marks which resemble bite marks on the
bottom surface of the glans portion of the penis.
In all of these photographs, there is a ruler iden-
tifying not only the measurements both in centi-
meters and in inches, but also the date and the num-
ber of the autopsy.

JUDGE SHAKER:  Whose writing is on the
back of that?

A    I don't know.  The next exhibit number, 67, is a photo-
graph again showing the upper portion of the left
side of Raymond Fife, and again, it demonstrates the
plastic airway that's in place and the feeding tube
and the burns and the contusions and the injuries
about the neck and shoulders.

Exhibit Number 68 is a photograph of the anus of the
patient.  This is the initial photograph that was
taken upon examination where I spread the buttocks
and blood just gushed out of the anus, and this is
that photograph.

DOCTOR HOWARD ADELMAN

1    Exhibit Number 69 is another photograph of the anus after

2         the blood had been cleaned.  The anus was rephoto-

3         graphed, and in this photograph, one can see the

4         lacerations and the contusions, the dilation of the

5         anal orifice; the opening, and the injuries about

6         the anus.

7    Exhibit Number 70 also shows another view of the anus

8         showing the hemorrhages and tears of the tissue, the

9         dilation of the opening.  This Exhibit Number 70

10        that I just referred to, shows the injury, predomi-

11        nately the left wall of the anus, showing the

12        severity of the injuries.  It's a slightly closer

13        view.

14   Exhibit Number 73 is another close-up view of the anus

15        showing all of the injuries to all of the walls on

16        the top, the bottom, and the sides.  It's an over-

17        all view.

18   The last exhibit, the small photograph labeled Number 74,

19        is an overall view of the body prior to the autopsy

20        which I took.  This shows the entire body from head

21        to toe; mainly, from the right side.

22   Q    (By Attorney Watkins)  We'll go out of order.  I'm going

23        to hand you 89, 90, and 91.

24   A    Okay.  Exhibit Number 89 -- I -- red -- the red code

25        that's State's Exhibit 89 is a close-up -- enlarged

DOCTOR HOWARD ADELMAN

37

1           photo of the penis.  This is a photograph of the

2           marks -- the bite marks on the penis.  I believe

3           these were taken by Doctor Mertz.

4 Q   Were you there when they were taken?

5 A   Yes, I was.

6 Q   And does it accurately, totally depict what you saw?

7 A   Yes.  This was taken after the autopsy, and the picture

8           also shows the autopsy sutures in place; the sutures

9           that closed the body after the completion of the

10           autopsy.

11           Exhibit Number 90.  Again, this is a photograph taken by

12           Doctor Mertz; I believe taken by Doctor Mertz,

13           showing the contusion.  The black and blue mark on

14           the scrotum.

15           Exhibit Number 91.  This is a picture of the mouth of the

16           patient, and it shows the condition of the teeth and

17           the lips.  This again, I believe, was taken by

18           Doctor Mertz.

19 Q   What number was that?

20 A   This is 91.

21 Q   Okay.  And again, those are all accurate?

22 A   Yes.

23 Q   Now, you indicated, Doctor, that a blunt object with a

24           pointed end, at least one occasion, penetrated the

25           anus of the young man, and you had an opinion as to

DOCTOR HOWARD ADELMAN

37

1      the size of that object.  During the autopsy, did

2      you make any decisions -- you already told the Court

3      that you decided that an odontologist should be

4      brought in.  Did you make any decisions to keep any

5      of the tissues or organs of the body for further

6      forensic work?

7  A   Yes.  As in all autopsies, samples of each organ are re-

8      tained for microscopic study.  I did save the organs

9      which were injured, especially the one in -- the

10     entire organs that were injured, especially the

11     anus, the rectum, and the urinary bladder.  I took

12     samples from the sites of the injury of each one

13     of these tissues in addition to the sections that I

14     took of the other organs and tissues for micro-

15     scopic study.

16  Q  And what forensic purpose would there be for keeping

17     those particular organs, if any?

18  A  These tissues and organs have to be evaluated under the

19     microscope.  The microscope adds details to the

20     examination that are not or may not be visible to

21     the naked eye.  It concerns the microstructure of

22     these tissues, and one can see the cells of that

23     makeup.  These tissues, the cells, and the connec-

24     tive tissues.

25  Q  Could they be of assistance in determining what object

DOCTOR HOWARD ADELMAN

37

1           penetrated the young man's anus?

2   A    Yes.

3   Q    And would you explain how they could be of assistance.

4   A    Yes.  After examining the microscopic sections of the

5           tissues which were removed which were taken from the

6           injuries in the bladder and the rectum, under the

7           microscope, there were plant cells.  They would form

8           a foreign body type reaction in these tissues with

9           hemorrhage.  That was seen.  These plant cells are

10          readily recognizable under the microscope.

11  Q    Did there come a time that the Warren Police Department

12          submitted any object for your consideration?

13  A    Yes, they did.

14  Q    And would you tell when that was and what the purpose was.

15  A    The object was submitted to me for evaluation as possibly

16          being the object that penetrated the rectum and the

17          bladder in this case.  I don't recall the exact time

18          that I examined it, but I did mark the object.

19  Q    And this is Exhibit 47.

20  A    Yes, this is the object that they submitted to me.  I

21          examined the object, and I photographed the object

22          fairly extensively, and I also took small splinters

23          from the tip of the object.  It has one pointed end

24          and one round end.  I took samples of the splinters

25          and processed them for microscopic examination, and

DOCTOR HOWARD ADELMAN

1          I examined these splinters under the microscope.    37

2          The wood of this is of plant material, and it would

3          contain the same type of cells.  The examination did

4          show that the same type of cells present in the

5          stick were very similar to the plant cells that

6          were found in the tissues.

7    Q     Okay.  How long did you have the stick?

8    A     I believe I had it several days.

9    Q     Okay.  And did you make any effort to determine whether

10         it was the right size?

11   A     Yes, I took measurements of the diameter of the stick.

12   Q     And did you compare the stick to any part or any organ

13         that you kept?

14   A     Yes, I did.

15   Q     And would you tell the Court what was that?

16   A     I took the specimens that I had retained from the autopsy,

17         the specimens of the rectum that was penetrated, the

18         anus, and the urinary bladder, and I compared the

19         size of the penetration, the opening through these

20         tissues, with the tip of this object, and I photo-

21         graphed them.

22   Q     And did you come to any opinion?

23   A     Yes.  I found that the -- this object is very consistent

24         with the object that could have made these penetra-

25         tions.


                        DOCTOR HOWARD ADELMAN

37

1  Q  Starting with 75, again, go -- would you please go

2     through --

3  A  Starting with 75?

4  Q  Right.

5  A  Okay.  These are photographs that I took at the labora-

6     tory in St. Joseph Hospital of the stick -- this

7     stick.  Number 75 -- Exhibit Number 75, again, with

8     the ruler to show the size, is a photograph of the

9     blunt end of the stick.  I'm running out of space.

10    Exhibit Number 76 is a close-up photograph of the sharp

11    end of the stick.  This is the inner end where it

12    was apparently broken.

13 Q  By the way, how long is the stick?

14 A  I don't recall.

15 Q  Okay.  Thank you.  Continue.

16 A  Exhibit Number 77 is another photograph of the blunt end

17    of the stick.

18    Exhibit Number 78 is a photograph of the outer portion

19    of the sharp end of the stick.  That's the rounded

20    outer portion of the stick of the pointed end.

21    Exhibit Number 79 is an overall picture of the entire

22    stick from the point to the -- from one end to the

23    other.

24    Exhibit Number 80 is a photograph of the -- of the rectum

25    which was saved from the autopsy and the sharp end

DOCTOR HOWARD ADELMAN

38

1      of the stick.  Both are separate and showing the re-

2      lationship -- or a view of both at the same time.

3  Q   Would you show those photographs closely.  I would like

4      the Court to -- if the Court would entertain looking

5      at these.  I think it's important evidence.

6          ATTORNEY LEWIS:  We're going to object,

7      Your Honor.  I don't think it's really, at this

8      stage, necessary, and I don't think -- the Doctor's

9      only testifying to the fact it could be consistent

10     with.  He's not saying --

11         JUDGE McLAIN:  Well, there's a matter I

12     wish to discuss with the other Judges.  We'll stand

13     in recess for about 20 minutes.

14                         (Court in recess at 2:17 P.M.)

15                         (Back in session at 2:42 P.M.)

16         JUDGE McLAIN:  All right.  Mr. Watkins,

17     with respect to your request that we view the pic-

18     tures, we all feel unanimously that we will honor

19     that request, but only after cross examination and

20     a proffer of the pictures as evidence.  Keep this

21     witness on the stand, you'll be able to ask him any-

22     thing you want regardless of the scope of the cross

23     examination, but I want -- we want to have a ruling.

24     They haven't been admitted into evidence before.

25         ATTORNEY WATKINS:  Fine.


              DOCTOR HOWARD ADELMAN

CONTINUING DIRECT EXAMINATION BY ATTORNEY WATKINS:

Q    Okay.  Doctor, would you go to the photographs that you
     were on.  I think you're going through all of them,
     right?

A    Right.

Q    And would you go through them and describe again what
     they depict and how accurate they are.

A    Okay.  The remaining photographs here?

Q    Right.

A    Okay.  Exhibit 84 is an additional photograph that I took
     at the laboratory at St. Joseph Hospital.  This is a
     photograph showing the area of penetration through
     the urinary bladder, and I placed the stick -- the
     pointed end of the stick next to the penetration to
     show the relationship of the size.

     Exhibit Number 83 is a photograph just of the urinary
     bladder that I retained showing the area of penetra-
     tion.

     Number -- Exhibit Number 82 is a photograph showing the
     anus which I excised from the autopsy showing the
     injuries to the mucosa and coverings as well as the
     stick placed next to it; the pointed end.

     The last of these photographs, Number 81, is another one
     that I took, and here, I placed -- this depicts the
     rectum from the autopsy and the stick, and in this

                    DOCTOR HOWARD ADELMAN

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | photograph, I held the stick up against the opening, 38              |
| 2  |   | the penetration, to see the size relationships of                    |
| 3  |   | the penetration and of the stick.                                    |
| 4  | Q | Okay.  And when you took the stick and the urinary blad-             |
| 5  |   | der, the rectum as you've described in photographs,                  |
| 6  |   | I believe, 81 through 85, you were doing that at St.                 |
| 7  |   | Joseph's Hospital?                                                    |
| 8  | A | Yes.                                                                 |
| 9  | Q | And you had in possession State's Exhibit 47?                        |
| 10 | A | Yes, I did.                                                          |
| 11 | Q | And you had those organs of young Raymond Fife?                     |
| 12 | A | Yes, they were retained from the autopsy.                           |
| 13 | Q | And would you tell the Court what you did physically.               |
| 14 |   | If you can, show with your hands.  And what type                    |
| 15 |   | of conclusion you came to more or less.                              |
| 16 | A | With the stick?                                                     |
| 17 | Q | Right.                                                              |
| 18 | A | I held the stick -- in the last picture, I held the stick          |
| 19 |   | up against the opening in this fashion (indicating)                 |
| 20 |   | to show the relationship of the size of the point                   |
| 21 |   | and the opening through the rectum, and I held it                   |
| 22 |   | and photographed it at the same time.                               |
| 23 | Q | And what was your forensic conclusion?                              |
| 24 | A | The size and shape of the point of the stick were very             |
| 25 |   | compatible with the size and shape of the opening.                  |

DOCTOR HOWARD ADELMAN

1   Q   And how would you describe the fit, if there's any way

2           you could describe it?

3   A   It was very similar to a key in a lock.

4   Q   Key in a lock.  Now, you testified that there was a blunt

5           wound on the -- was it the rectum?

6   A   On the rectum, yes.

7   Q   And that gave you reason to say that there is at least

8           two penetrations with two types of ends?

9   A   Yes.

10   Q   And is there anything about the end of that stick -- and

11           feel free to take the stick out, that would suggest

12           anything to you?

13   A   Yes.  The sharp end of the stick is -- would have made

14           the penetration through the rectum and the urinary

15           bladder that I've described.  The blunt end of the

16           stick would have made the mark on the rectum that

17           did not penetrate; just a contusion, and the size

18           relationships are quite consistent.

19   Q   You're saying that the dimensions themselves are consis-

20           tent?

21   A   Quite consistent, yes.

22   Q   Okay.  Did there come a time -- come a time that you

23           looked at the stick under microscope?

24   A   Yes, I did.

25   Q   And would you tell the Court what you found, if anything.

DOCTOR HOWARD ADELMAN

A    Yes.  I took the sharp end of the stick, which is rather    38

jagged and splintery, and I picked off a -- several

little splinters, and I processed them for micro-

scopic study the way we process tissue for micro-

scopic study, and I examined the microscopic cells

of that.  The form of the stick.

ATTORNEY LEWIS:  Your Honor, I'll object

at this point.  I'd like to approach the bench with

counsel.

(A discussion was held at the bench.)

JUDGE McLAIN:  Go ahead.

Q    (By Attorney Watkins)  Howard -- Doctor Adelman, before

I go into the comparisons you've made, would you

tell the Court whether or not you feel qualified

through training and experience to make a comparison

of the substance or the foreign material in the

urinary tract and the rectum with the substance that

is found on the wood -- the wood itself?

A    Yes.  I examined foreign bodies under the microscope as

a part of my medical examiner procedures throughout

the entire time I was with the Medical Examiner's

Office.  Excuse me.  I'm often called upon to

examine foreign bodies which are found in the

tissues that are removed at surgery and at St.

Joseph's Hospital and at other hospitals where I've

DOCTOR HOWARD ADELMAN

38

1          worked during my career.  So, I have examined

2          foreign material which includes both organic and in-

3          organic material.

4  Q   And would it include wood?

5  A   It would include wood as an organic material.

6  Q   And how many years have you been doing that?

7  A   Throughout my entire career.

8  Q   So, you feel that these comparisons that you're talking

9          about are something that you're eminently qualified

10         because of your experience and training?

11  A   Yes.

12  Q   Thank you.

13            ATTORNEY LEWIS:  We'll still interpose an

14          objection on the record, Your Honor, in regard to

15          the forthcoming testimony.

16  Q   (By Attorney Watkins)  Okay.  Would you continue.

17            JUDGE SHAKER:  Just a minute.

18            ATTORNEY WATKINS:  I'm sorry.

19            JUDGE McLAIN:  Objection is overruled.

20            ATTORNEY WATKINS:  Okay.  Thank you.

21  Q   (By Attorney Watkins)  Again, in your own words, tell the

22          Court what you did, and do you recall when it was

23          that you did this?

24  A   It was during the time that I had the stick in my po-

25          session, and that was approximately September 20th,

DOCTOR HOWARD ADELMAN

38

1    1985.

2    Q    Okay.  Okay.  Continue with your microscopic comparison.

3    A    Yes.  I examined the wood from the splinters which I

4         took from the stick under the microscope, and I

5         could see very clearly the plant cellular outlines

6         of the wood which formed lines in octagonal shapes

7         of the plant cells.  I compared these with the

8         foreign bodies; the plant cells that I described

9         which were found in the tissues from the autopsy,

10        and they were quite similar.

11   Q    Okay.  I'm going to hand you photographs marked 85

12        through 88 as exhibits for the State, and would you

13        go through those photographs and tell the Court --

14                   JUDGE SHAKER:  Just a minute.  Did you say

15        85?

16                   ATTORNEY WATKINS:  Yes.  Is it 85?

17                   JUDGE SHAKER:  What's the last number?

18   A    85 through -- 85 --

19                   JUDGE SHAKER:  The last number on the ones

20        he just did.

21   A    88, Your Honor.

22                   JUDGE SHAKER:  The ones he just did be-

23        fore.  I mean what's the last number?  81?

24                   ATTORNEY WATKINS:  84.

25                   JUDGE SHAKER:  Okay.


                        DOCTOR HOWARD ADELMAN

| | |
|---|---|
| 1 | Q    (By Attorney Watkins)   85 through 88.  Would you go indi- |
| 2 | vidually -- go 85 first.  Tell the Court what |
| 3 | exactly it is and the date that photograph was taken. |
| 4 | A    Exhibits 85 through 88 are Polaroid pictures which I took |
| 5 | from the microscopic examination of these structures. |
| 6 | Exhibit 85 shows, at 400 magnification, the stick.  This |
| 7 | is a micropho -- photomicrograph of the fibers and |
| 8 | cells of the stick which I took under the micro- |
| 9 | scope. |
| 10 | Exhibit Number 86 again shows a view of the stick, the |
| 11 | wood of the stick at 200 magnification. |
| 12 | Exhibit Number 87 is a photograph of the foreign material |
| 13 | that I found in the urinary bladder of the -- Ray- |
| 14 | mond Fife at 400 magnification demonstrating the |
| 15 | foreign material that I found. |
| 16 | And Number 88 -- Exhibit Number 88 is a Polaroid picture |
| 17 | of the foreign plant material that I found in the |
| 18 | sections of the rectum from the autopsy specimen of |
| 19 | Raymond Fife at 200 magnification. |
| 20 | Q    And what can you tell between the two? |
| 21 | A    They have a very similar appearance.  Each one has a |
| 22 | pattern of lines and octagonal forms for the cellu- |
| 23 | lar outlines.  There is a kind of microscopic grain |
| 24 | visible, and the photographs are very similar |
| 25 | showing the relationship between the foreign ma- |

DOCTOR HOWARD ADELMAN

38

1   terial that I found in the tissues and the stick.

2   Q   And the foreign tissue -- the foreign material that were

3       found in the tissues, what are you saying that is?

4   A   Is wood.

5   Q   And did the splinters come off readily off that stick

6       when you did this?

7   A   With some picking, they came off fairly readily, yes.

8   Q   Now, did you look at the stick under microscope as a

9       whole?

10  A   No.

11  Q   Okay.  Was there anything else that you saw under a

12      microscope on the stick at any time?

13  A   Under the microscope, in one of the areas of the stick

14      examination, there were small red structures which

15      looked like degenerated red blood cells.

16          ATTORNEY LEWIS:  Objection!  Objection,

17      Your Honor.  May we approach the bench?

18              (A discussion was held at the bench.)

19          JUDGE McLAIN:  All right.  The defense

20      objection is sustained.

21  Q   (By Attorney Watkins)  Doctor, we'll continue on.  Did

22      there come a time -- you've already described photo-

23      graphs now -- strike that.  I believe that you did

24      have some slides made?

25  A   Yes, I did.


                    DOCTOR HOWARD ADELMAN

1   Q    Do you have them with you?           38

2   A    Yes.

3   Q    How many are there here?

4   A    Three, I believe.

5   Q    Okay.  I'll mark these as one exhibit.

6                         (State's Exhibit No. 100 marked

7                              for identification.)

8   Q    (By Attorney Watkins)  Exhibit Number 100.  Would you

9          please identify those three items.

10  A    Yes.  These are slides that I just received on Monday.

11          I had taken these photographs under the microscope;

12          the same photographs as I've previously described

13          of the stick and of the foreign bodies in the

14          tissues.  These are Kodachrome slides, and I took

15          these at half frame so that I could show a compari-

16          son between the microscopic appearances of the

17          stick as opposed to the microscopic appearances of

18          the foreign material which was found in the tissues

19          on the same slide.

20  Q    It would be -- this would be similar with the other photo-

21          graphs if you were going to explain them to somebody

22          in detail that would have the viewer and show the

23          person?

24  A    Yes.

25  Q    Okay.  We'll just leave it go for now.  Now, there came

DOCTOR HOWARD ADELMAN

```
 1              a time that Doctor Curtis Mertz was brought in as a          39

 2              consultant?

 3   A   Yes.

 4   Q   And when was that?

 5   A   That was on the evening of the same day that the autopsy

 6              had been performed.

 7   Q   And approximately how long was he there?

 8   A   Several hours.  Approximately two, three.

 9   Q   Um-hum.  And who took the photographs?

10   A   He did.

11   Q   Okay.  And you were present?

12   A   Yes, I assisted.

13   Q   And did there come a time that you assisted another

14              doctor in some photography of the teeth?

15   A   Yes.

16   Q   And when was that?

17   A   I'm not exactly sure of the date.

18   Q   Okay.  Was it the same month, September?

19   A   I believe it was.

20   Q   Okay.  And would you tell the Court what you did.

21   A   Yes.  This was at Doctor Walton's office.  Doctor Walton

22              is a dentist in Howland, and we examined -- he

23              examined the teeth and made imprints of Timothy

24              Combs and Daniel Hill.

25   Q   And what did you do?
```

DOCTOR HOWARD ADELMAN

39

1   A   I assisted.

2   Q   And did you --

3   A   I assisted and observed and took photographs.

4   Q   Okay.  Exhibit 92 and 93.

5   A   Okay.  Exhibit 93 is a photograph of Combs -- Timothy

6       Combs, the appearance of his teeth with a ruler in

7       the foreground, and that's my handwriting on the

8       ruler.  And Exhibit Number 92 is a photograph of

9       the teeth of Daniel Hill at that time.

10  Q   Okay.  They're accurate reproductions of what you saw?

11  A   Yes.

12  Q   Was anybody else taking photographs that time?

13  A   Yes, there was.  Sergeant Teeple.

14  Q   Yeah.  I believe his name is on these photographs, but

15      you know who took these photographs?

16  A   I'm not sure whether he did or I did.

17  Q   You both took some photographs?

18  A   We both took very similar photographs.

19  Q   Okay.  But the main point is that you were there and it

20      accurately reflects what you saw at that time?

21  A   Yes.

22  Q   Do you see Danny Hill in the Courtroom today?

23  A   Yes, I do.

24  Q   Would you point him out, please.

25  A   With the blue tie and the white shirt.


                    DOCTOR HOWARD ADELMAN

1          ATTORNEY WATKINS:  Would the record re-

2          flect he's pointed out the defendant?

3          JUDGE McLAIN:  Yes.

4  Q  (By Attorney Watkins)  Now, Doctor, I briefly would like

5         to ask a couple more questions before I leave you

6         for cross, and feel free to look at any of the

7         photographs.  I have a question of whether or not

8         any injury that you found on the body would be con-

9         sistent with some foreign object other than the

10        rectum that would cause an abrasion or a cut?

11  A  Any of the scratches or abrasions that I've described

12        could have been done by a foreign object scraping

13        the skin.

14  Q  Assume that there was a bicycle involved --

15  A  Yes.

16  Q  -- Doctor, and assume that the young man was thrown on

17        a bicycle pedal.  Was there anything that you found

18        on the body that would be consistent with a young

19        man hitting a bicycle pedal by his torso or his

20        head?

21  A  Yes.  There was one injury on the shoulder -- on the left

22        shoulder which could have been made by a bicycle

23        pedal.

24  Q  And would you try to find that for us.

25  A  (Complying.)  This is shown on Exhibit Number 64, and

DOCTOR HOWARD ADELMAN

1          it's the injury just above the right-side of the                39

2          ruler.

3    Q    Doctor, in your years of experience in the determination

4          of causes of death in homicides, how would this case

5          compare with what you've done over the years as far

6          as severity of --

7                    ATTORNEY LEWIS:  I'm going to object,

8          Your Honor.  I don't think there's any purpose for

9          this really.

10                   JUDGE McLAIN:  Finish your question.

11   Q    (By Attorney Watkins)  During your years as a pathologist,

12         how would you compare the death of Raymond Fife as

13         to other deaths in homicide cases regarding the

14         severity of the number of injuries?

15                   JUDGE SHAKER:  Sustained.

16                   JUDGE McLAIN:  The defendant's objection

17         is sustained.

18                   ATTORNEY WATKINS:  Okay.  Thank you.

19   CROSS EXAMINATION BY ATTORNEY LEWIS:

20   Q    Doctor Adelman, if you care to, freely go to the gross

21         autopsy protocol, okay?  I'm going to ask you -- you

22         indicated the fact in your protocol that there were

23         a number of criss-cross scratch-like abrasions.  Can

24         you tell me exactly where you found those on the

25         body and are there photographs in here indicating

                    DOCTOR HOWARD ADELMAN

1          what we're talking about?

2  A    Yes.  Exhibit Number 64 would show the scratch-like

3          abrasions on the cheek.  This whole area here

4          (indicating).

5  Q    Okay.

6  A    Also Exhibit Number 67.

7  Q    Okay.  And you're saying -- is it these items right

8          here?

9  A    Yes.

10  Q    Okay.  Did you find linear scratches?  Are -- those are

11          linear scratches there as well?

12  A    Yes.  They're in Exhibit Number 65.  There are linear

13          scratches.

14  Q    Okay.  Are there any linear scratches on the face itself

15          or in the area where the -- let's say the scratches.

16          Can you describe those scratches for the Court,

17          please?  What we're talking about here.

18  A    Yes.  The -- there was some areas of linear scratches

19          around the face on the left side of the cheek as

20          I've mentioned on this photograph, Exhibit Number

21          65.  There are some linear scratches on the thigh.

22          Here again is another exhibit, Number 66.  Another

23          view of some linear scratches on the thigh.  There's

24          linear scratches in Exhibit 64 on the cheek and on

25          the left shoulder.  There are linear lacerations in-

DOCTOR HOWARD ADELMAN

39

1     side the rectum.

2  Q  Just on the external part of the body?

3  A  Just on the external?

4  Q  Yeah.

5  A  Those are the main ones.

6  Q  Okay.  Doctor, give me your impression -- you've got

7     linear scratches or in a criss-cross fashion.  You've

8     got abrasions with ecchymosis and blood and so forth.

9     Can you give me an idea what would cause those?

10    Are we talking about a sharp object scratching the

11    surface of the skin?  What are we talking about?

12 A  Those -- a sharp object could be caused by fingernails,

13    could be caused by such things as rocks scraping on

14    the skin.

15 Q  Okay.  Let me ask you this:  Some of the deeper scratches,

16    more scratched-type -- or let's put it this way.

17    The linear or the scratch-type as opposed to the

18    abrasions with ecchymosis and everything else,

19    would it be a sharper object than what we're

20    talking about?  Would it cut the skin cleanly?

21 A  An abrasion is more of a superficial scratch as opposed

22    to a laceration which is a deeper scratch, and the

23    abrasion could be caused by a sharper -- a sharp

24    object which scratches the skin.

25 Q  And how about some of the lacerations as well?  Would a

DOCTOR HOWARD ADELMAN

39

1         sharp object also cause that?

2  A   A sharp object could cause lacerations.  Lacerations

3         could also be caused by tears by stretching the

4         skin.

5  Q   Okay.  And this criss-cross type fashion scratches and

6         abrasions, you've located those in a number of the

7         exhibits here.  Can you just tell us right now --

8         point to your own body, if you will, for the Court,

9         where exactly those were located at.

10  A   These were located on the left cheek (indicating).

11  Q   Left cheek.  Okay.

12  A   On the -- I believe it was the thigh.  Right on the legs.

13         There were extensive scratches.

14  Q   The right thigh.  Would that be the dorsal anterior or

15         midline?

16  A   The anterior.

17  Q   On top?

18  A   On top, anterior, and on the side.

19  Q   On the side.  Anywhere else you recognize -- I notice

20         you referred to a number of times here.  Any others?

21  A   May I refer to my notes?

22  Q   Sure.

23  A   (Witness refers to his notes.)  There were scratch-like

24         area abrasions on the top of the left shoulder and

25         along the left clavicular bone area.  Some of these

DOCTOR HOWARD ADELMAN

39

| 1 | | had a criss-cross type of pattern.  There were |
| 2 | | abrasions that I noted on the penis; marks.  On the |
| 3 | | upper left thigh.  On the upper left thigh and on |
| 4 | | the anterior -- right anterior and also on the an- |
| 5 | | terior. |
| 6 | Q | Front of the body? |
| 7 | A | On the anterior aspect of the right angle.  On the inner |
| 8 | | side of the -- oh!  No, that's not it.  I believe |
| 9 | | those are all. |
| 10 | Q | Yeah.  Okay.  So, the left cheek, the shoulder -- |
| 11 | A | Shoulder, the thigh. |
| 12 | Q | The clavicle and the left anterior thigh? |
| 13 | A | Right. |
| 14 | Q | Okay.  And let me ask you this.  We're talking about |
| 15 | | potentially a sharp type object in some sense of |
| 16 | | the manner?  Something that would rip the skin? |
| 17 | A | Yes. |
| 18 | Q | If it came into contact with the skin, it was pulled |
| 19 | | across it? |
| 20 | A | Right. |
| 21 | Q | In regard to the ligature mark, did that go completely |
| 22 | | around the neck? |
| 23 | A | May I refer to my notes? |
| 24 | Q | Sure.  Use it.  Use it. |
| 25 | A | (Witness refers to his notes.)  No, it -- I couldn't de- |

DOCTOR HOWARD ADELMAN

39

1    termine whether it went all the way around the

2    neck because of the burns on the side of the neck,

3    but it was present around the left side of the neck.

4  Q    Left side.  Okay.  And your response to the prosecutor's

5    question is that that could have been caused by the

6    underwear or the Wrangle T-shirt being tied around

7    the victim's neck, is that correct?

8  A    Could have been caused by that, yes.

9  Q    Would you be able to detect -- would it be left by any-

10    body using their hands to choke the victim?

11  A    No.

12  Q    It would not?

13  A    No.

14  Q    Okay.  In regard to the exhibits 98, 97, 96, and 95,

15    okay, those were, once again, here to indicate or

16    portray the path or the direction of travel of the

17    object that was placed in the boy's rectum, is that

18    correct?

19  A    Correct.

20  Q    Okay.  And in regard to those particular diagrams, in re-

21    ference to the body as it stands vertically and

22    everything else, is the stick going in at a right

23    angle, at a bleak angle, or is it vertical in a

24    sense with the body?  Understand what I'm talking

25    about?

DOCTOR HOWARD ADELMAN

39

1   A   Yeah.

2   Q   Okay.

3   A   The stick is going in at an upward and an anterior or a

4       forward direction.

5   Q   Okay.  In other words, from the midline of the body, it's

6       going in, and it's going towards the anterior or

7       the front part of the body, so actually, it's going

8       down in a small line?

9   A   Slightly and upward, yes.

10  Q   Slightly.

11  A   Upward.

12  Q   Slightly upward.

13  A   Up through the anus and slightly forward.

14  Q   Okay.  If I can understand -- well, just using the dia-

15      gram, let me -- if I understand what you're

16      saying --

17  A   I guess the analogy would be of a rectal thermometer.  A

18      little more forward and deeper.

19  Q   Okay.  If you put the body in a prone position with the

20      anterior portion of the body, front section of the

21      body, on the ground, okay, and the stick were to be

22      inserted, what angle are we talking about?  Go ahead

23      and use the stick if you want to.  Do you have any

24      idea?

25  A   If the body were facing down on the ground?

DOCTOR HOWARD ADELMAN

40

1  Q  If the body were facing down on the ground.

2  A  It probably would be in this fashion (indicating).

3  Q  All right.  So, the angle of the stick is -- what would

4     you say the angle of that stick was basically?

5  A  About 45 degrees depending on the position of the body.

6  Q  Okay.  Of course, if the body were on the ground, you

7     wouldn't be in an upward position.  You'd be down,

8     is that correct?  In other words, if a human was

9     standing or sitting or squating behind, and the body

10    was on the ground, the human would be far above

11    that, right?

12 A  He would be above it, yes.

13 Q  What I'm asking you is if it's in a prone position; the

14    body's on the ground, okay, does it make any sense

15    that the movement would be over on top going

16    straight down?

17 A  If --

18 Q  Do you understand the question?

19 A  It would depend on the position of the buttock.  If the

20    buttock was -- if the knees were flexed and the

21    buttock were pointed upward, it could be fairly

22    straight motion.

23 Q  That's a possibility, of course, but let me go back to

24    the position -- I have him in the prone position.

25 A  Yes.


                    DOCTOR HOWARD ADELMAN

1    Q    The victim's in the prone position laying on the ground.    40

2         Would an overhead like this (indicating), would

3         that make any sense in regard to this particular

4         hypothetical I just gave you in a prone position

5         anterior down on the ground?

6              ATTORNEY WATKINS:   Your Honor, I'll ob-

7         ject.   None of it makes sense.

8              JUDGE McLAIN:   Objection's overruled.

9              ATTORNEY LEWIS:   It makes sense to me.

10   Q    (By Attorney Lewis)   Do you understand what I'm talking

11        about, Doctor?   If the body's flat on the ground --

12   A    Yes.

13   Q    Okay.   And the stick were to be inserted at the angle you

14        indicated, would it be like this (indicating)?   Or

15        we're talking about an angle like this (indicating),

16        are we not?

17   A    It would be an angle as I have demonstrated it.

18   Q    Okay.   All right.

19   A    It would also depend on which side of the body the person

20        inserting the stick would be placed.   If he were

21        placed at the feet, it would be with perhaps this

22        type of movement (indicating).   If he were facing

23        the feet, it would be perhaps with this type of

24        movement (indicating).

25   Q    Okay.   But in any event, regardless of the position of

DOCTOR HOWARD ADELMAN

40

1    where the person was located, side to side, wherever
2    the person would be, if he's in a prone position, he
3    would have to put it in a particular angle to match
4    the angle you're talking about, right?

5 A  Right.

6 Q  Do you still have the wood fragments you've testified to
7    here in Court --

8 A  I --

9 Q  -- that were foreign objects as you called them that were
10   found in the tissue?  Do you still have those?

11 A  I have them at the hospital, but I don't have them in
12   Court with me.

13 Q  Okay.  I just wanted to make sure you still had them.

14 A  Yes.

15 Q  You've indicated that under power of microscopes, the
16   200 and 400, so forth, you determined that first
17   off, the foreign bodies were plant material, right?

18 A  Yes.

19 Q  And you've also indicated that they appear to you to be
20   wood?

21 A  Yes.

22 Q  Okay.  And, of course, the wood stick we have in front of
23   us, which is State's Exhibit 47, of course, that's
24   a wood material, is it not?

25 A  Yes.


                    DOCTOR HOWARD ADELMAN

40

1    Q    Tell me, Doctor, do you know what type of wood you were

2         looking at?  What foreign body, what type of wood?

3         Is that the foreign body you were looking at?

4    A    I'm not sure of the type of wood.

5    Q    Oak, maple, pine, cherry, mahogany?

6    A    It could be.

7    Q    No idea?

8    A    No idea.

9    Q    Wood's wood, is that it?  Is that what you're really

10        saying?  It looks like wood material period?

11   A    It's wood material, yes.

12   Q    Be the same wood material that would be in -- or not the

13        same wood material, but just a wood material that

14        you would find in any, if you want to call it, broom

15        handle, or whatever you want to call this, you'd

16        find in any store for mopping, sweeping, for any-

17        thing, right?

18   A    Right.

19   Q    In fact, there's millions of those out there probably the

20        same size as that, is there not?

21   A    I have no idea.

22   Q    Okay.  You indicated in your testimony that -- that this

23        object, if this was the object, or whatever object

24        was inserted, okay, and penetrated the walls that

25        you're talking about; the urinary bladder and the

DOCTOR HOWARD ADELMAN

40

1         rectum and so forth, that there would be a profuse

2         amount of bleeding, is that correct?

3  A   Yes, that's correct.

4  Q   In other words, when the instrument -- or when the object

5         went in, bleeding would occur immediately upon its

6         penetration to the nearest wall?

7  A   Probably, yes.

8  Q   Okay.  And as it went in further, there would also be

9         more profuse bleeding, would there not?

10  A   Yes.

11  Q   And upon its taking out; the object, presumably, there

12         would be blood on the object, would there not?

13  A   Could be, yes.

14  Q   Okay.  Doctor, wood is wood; a porous material?

15  A   Yes.

16  Q   Okay.  In other words, if it comes in contact -- say,

17         for instance, the blood came in contact with wood

18         such as that.  Generally, wood -- would the wood

19         tend to absorb it or would it go in the cellular

20         structure?  Would it go in the wood?

21  A   Yes.

22  Q   It could or would?

23  A   Probably would.

24  Q   And you've indicated, of course, that you had an occasion

25         to examine other substances like -- foreign material

DOCTOR HOWARD ADELMAN

40

1         like on maybe steel?  Blood on steel or something

2         like that, or blood on wood or whatever?

3  A  Right.

4  Q  Has it been your experience that if blood comes into con-

5         tact with wood, that it will be absorbed?

6  A  Yes.

7  Q  Okay.

8  A  With --

9  Q  Go ahead.  It's all right.

10  A  But -- it can be absorbed, but it -- as anybody who has

11         wooden floors knows, it could be washed off also.

12  Q  Be washed off.  If the blood were in there, okay; wooden

13         floors, you mean just non-treated wooden floors or

14         are you talking about totally porous wood?

15  A  Treated wooden floors.

16  Q  Treated wooden floors?

17  A  Right.

18  Q  So, they have some kind of a covering that actually pro-

19         tects them from the intrusion of foreign material,

20         right?

21  A  Right.

22  Q  If you come along and try to wash blood off, sometimes

23         you need a detergent or something, don't you?

24  A  Yes.

25  Q  Blood's very difficult to get off, isn't it, most objects?

DOCTOR HOWARD ADELMAN

1          For instance, wood?                                          40

2    A    Not in a fresh state.  Cold water will take it off.

3    Q    Is blood -- how long would you assume -- if blood were

4          placed on a piece of steel that's non-porous, how

5          long do you think it would dry or does most of it

6          evaporate?

7    A    The fluid part would evaporate, and I'm not sure how

8          long it would take, but you would have a reside of

9          the dried portion of the blood.

10   Q    Okay.

11   A    Cellular portion.

12   Q    Cellular portion.  The residue, right?  Now, let's direct

13         our attention to wood, particularly this material.

14         In fact, not even the treated outside portion of

15         the stick, but the internal portion, the splintered

16         portion.  Now, if blood came into contact with that,

17         how long do you think it would take before the blood

18         would go into the cellular structure of the wood?

19   A    It would probably be absorbed right away.

20   Q    Right away.  Okay.  Doctor, I'll hand you what's been

21         labeled as State's Exhibit -- let's do two of them,

22         72 and 73.  The black discoloration around the

23         anal of -- the anus, is that the ecchymosis, the

24         contusion?  Is that what --

25   A    Yes.


                    DOCTOR HOWARD ADELMAN

1  Q  -- you're talking about?

2  A  That's what it is, and the lacerations.

3  Q  About those lacerations, how many lacerations are there

4     in the area of the anus itself?

5  A  In the total area?

6  Q  Of any major -- you know, other than little scratches.

7     There are two --

8  A  Other than the smaller scratches?

9  Q  Yes, other than the smaller.

10 A  Approximately two or three large tears.  Lacerations.

11 Q  Okay.  And in regard to the path of this stick, can you

12    tell me -- since we determined wood's wood, okay,

13    you've got a sharp point which you say is every con-

14    sistent -- is that what you're saying -- basically,

15    your testimony is it's consistent with the anus?

16 A  Right.  The perforation.

17 Q  The perforation's consistent.  Are you just saying con-

18    sistent to the extent it's a sharp object and it's

19    about that size?

20 A  About that size, yes.

21 Q  Okay.  Could an object -- say -- for instance, let's

22    take a tree limb of a fairly sharp -- that was

23    splintered off.  You'd have wood.  And say, for in-

24    stance, it had two protruding sides or some little

25    branches coming off, and if that were inserted,

DOCTOR HOWARD ADELMAN

1          would that leave the lacerations you see there at          40

2          the anus if it was put in to that extent?  Is that

3          possible?

4   A   It would -- could.

5   Q   Could.  Okay.  Let me ask you this:  Is there any way to

6          determine whether it was a straight object such as

7          this?  This is not really straight, but I mean

8          pretty straight.  Or could it have been a branch?

9   A   The -- the imprint that I found inside the anus was a

10         round circular imprint, and it would correspond more

11         to the circular pattern of the blunt end of the

12         stick than to a branch.  A branch wouldn't tend to

13         have a very smooth, rounded end that could make a

14         blunt imprint like this.  A broken branch would tend

15         to cut because it was broken irregular.

16  Q   Okay.  In other words, you're saying because of the blunt

17         surface, you're assuming, or at least saying, that

18         it's more probable we're talking about a broomstick

19         or something of this nature?

20  A   That's correct.

21  Q   Did you find -- you indicated, I think, that the object

22         we're talking about perforated to the extent of

23         what was six to eight inches?

24  A   Approximately.

25  Q   Approximately.  Did you find -- when you examined --

DOCTOR HOWARD ADELMAN

40

1        when you looked for the foreign material, did you

2        find foreign material -- a circumference type in

3        all areas where the particular object penetrated

4        through?  In other words, what I'm asking you is

5        this:  If the object penetrated through, did you

6        look for splintered material all the way around?

7  A  No, I just took random sections of the area of injury.

8        I did not take extensive areas from all quadrants.

9        I just took one random section of the rectum, one

10       random section of the bladder, and it was in those

11       random sections that I found --

12  Q  Okay.  So, what I'm asking, basically, is this:  That

13       you got a portion of this particular stick, which

14       is a smooth surface.  Do you think any of the

15       splintered material came off the smooth surface?

16  A  No.  I believe most of the material came off the point

17       and the splintered end.

18  Q  The point on the splintered end.

19  A  The point --

20  Q  In other words -- how about along --

21  A  And along the cut end or the broken end.

22  Q  On the smooth side, would you say?

23  A  Probably not, except for the point over here (indicating).

24  Q  The point itself.  In other words, when you examined,

25       you did not take an entire circumference to find out

DOCTOR HOWARD ADELMAN

41

1    if there were wood foreign bodies or the particles

2    of wood all the way around.  If the particles of

3    foreign material were all the way around, would that

4    tell you something possibly about this?

5  A  No.  I would even expect them to be all the way around

6    because of the point that went in would probably

7    deposit them all the way around.

8    JUDGE McLAIN:  We'll suspend for just a

9    moment, Doctor.  All right.  Ladies and Gentlemen,

10    there's an awful lot of movement in the Courtroom.

11    It's been pretty well controlled so far, but I see

12    now -- it's all right.  You can go.  So, I'll ask,

13    please, if any of you are planning to leave before

14    4:00 o'clock, please do so now instead of having a

15    continuing flow of people leaving.

16    Go ahead.

17  Q  (By Attorney Lewis)  Doctor Adelman, you've indicated

18    that the burns were located exactly where on the

19    victim?  The burned area.

20  A  The burned areas as seen on the State's Exhibit Number 62,

21    most of the burning was seen on the nose and on the

22    right-side of the face, the right shoulder and the

23    neck region, and around the eye also.  The right eye.

24  Q  Right eye.  Okay.  There was no burning -- let me get

25    another photograph.  Do you have another photograph,

DOCTOR HOWARD ADELMAN

41

1    please?  There was no burning on the left side, is

2    that correct?  Oh, here!

3  A   No.  Just along the top of the nose.

4  Q   Top of the nose.  Okay.  But the burn does go all the

5    way -- it appears all the way around the neck, is

6    that right?

7  A   Right around the neck.

8  Q   Your best estimation is that the object that was used

9    was a little bit less than an inch, basically, in

10    diameter?  I think it's what you testified to.

11  A   Yes, approximately.

12  Q   Approximately an inch.  Okay.  And your testimony also is

13    the fact that if this object were inserted -- well,

14    strike that.  From your own forensic examination

15    and the pathology work, when this instrument was

16    intruded and taken out, your expectation would be

17    there would be blood on that particular stick, would

18    there not?

19  A   Yes.

20  Q   Okay.  You've also indicated that under the microscopic

21    examination, conclusion you're coming to is that the

22    foreign bodies that were found are simply wood, is

23    that correct?

24  A   That's correct.

25  Q   Okay.  So, you're really not saying that wood came -- the

DOCTOR HOWARD ADELMAN

41

1             foreign bodies came from that particular stick,

2             State's Exhibit 47? You're not saying it came from

3             State's Exhibit 47? You're saying it could cause

4             it's wood, right?

5 A     It's wood with a very similar appearance to the wood of

6             this object.

7 Q     Let me ask you this, Doctor: Could a -- you talked about

8             a blunt contusion inside the anus, is that correct?

9 A     Yes.

10 Q     Okay. How far in would that approximately be?

11 A     May I check?

12 Q     Yes, go ahead.

13 A     (Witness refers to his notes.) Okay. The penetration

14             from the anus to the rectum was approximately seven

15             centimeters, which would be approximately three

16             plus inches divided by 2.5.

17 Q     Okay. Let me ask you this, Doctor: Could the contusion

18             you're talking about with the round end, could that

19             be a man's penis causing that damage?

20 A     No.

21 Q     No?

22 A     No.

23 Q     Why wouldn't it be?

24 A     The penis is too soft to make the contusion of this na-

25             ture. A great deal of hemorrhages in the area and

DOCTOR HOWARD ADELMAN

41

1             the tissue destruction.  It was more than what we

2             find with a penis.

3 Q    In other words, the blunt -- what you're saying is that

4             the blunt area -- let me ask you this question:  Did

5             the stick in the sharp end, when it went in, did it

6             follow the same course as the blunt?

7 A    Almost.  It was very close to the blunt, but separate

8             from it.

9 Q    Okay.  Well, if the stick is approximately about an

10            inch, let me ask you about the blunt part.  How

11            are you telling us that there was a blunt portion

12            of damage inside the anus?  I mean what was left to

13            determine that if the stick followed the same course

14            when the sharp end was put in?

15 A    It hit in two different portions of the rectum.  In the

16            blunt injury, they were separated.  They were very

17            close to each other, and the blunt portion hit in

18            one portion, and the sharp portion went through just

19            next to it.

20 Q    Okay.  Are you saying --

21 A    So, there were two.

22 Q    They were kept completely separate?

23 A    Separate but close together.

24 Q    Separate but close together?

25 A    Right.

DOCTOR HOWARD ADELMAN

41

Q   And you're saying that in your opinion, a penis, an
    erection, whatever, this would not cause that kind
    of bruising internally?

A   Would not cause that kind of damage.

Q   Could some of the linear abrasions or some of the linear
    scratches -- when you're talking about a sharp ob-
    ject, would they be made by an object -- say, for
    instance, a rhinestone type of object or an object
    with sharp edges such as an earring of some sort?

A   Which abrasions?

Q   Well, the linear scratches we're talking about and the
    abrasions possibly if the object was placed up
    against the skin and rubbed around in a fashion?

A   Rubbed around?

Q   Yeah.  In other words, if one object -- if the object --
    an earring was placed between one human side and
    another, and there was force and there was movement
    between the two and it was caught there and it moved
    around, would that cause some of the abrasions we're
    talking about?

A   It would have to be moved in one direction rather than
    in a circular direction.  It would have to be moved
    in a linear direction.

Q   Let's forget the circle for a minute.

A   Okay.


                    DOCTOR HOWARD ADELMAN

1    Q    If the earring was here and a body was here (indicating)    41

2         and you put the two together and they moved in one

3         direction or another, would it cause abrasions?

4    A    Yes, it could cause an abrasion.

5    Q    Ecchymosis and so forth.

6              ATTORNEY LEWIS:  I have no further ques-

7         tions, Your Honor.  The only thing I'd like to do

8         is we'd just like to reserve him for recall possibly.

9         Not that he's going to stay here, but we may call

10        him later on in the case.  Thank you, Doctor, very

11        much.

12   RE-DIRECT EXAMINATION BY ATTORNEY WATKINS:

13   Q    Doctor, these linear scratches on the anterior thigh and

14        the ankle and a couple other places, you're saying

15        they could be made by wooden sticks, by fingernails,

16        by rocks on the ground or rocks in a hand --

17   A    That's correct.

18   Q    -- as well as possibly an earring?

19   A    Correct.

20   Q    Numerous items could cause those?

21   A    Numerous items.

22   Q    Okay.  Now, the stick which -- you had the history in

23        this case when you made the comparison, right?

24   A    Yes.

25   Q    Now, you indicate that there would be bleeding, correct?


                    DOCTOR HOWARD ADELMAN

41

1    A    Yes.

2    Q    Now, would the amount of bleeding be relative to how

3         long the stick was put in there?

4    A    How long it stayed in there?

5    Q    Yes, how long it stays in there.  I mean if it's like

6         this and out (indicating).

7    A    Yes, it would.  The longer it stayed, the more time it

8         would have to accumulate more blood.

9    Q    Okay.  My question is:  Can you give -- give a qualifi-

10        cation?  I know he's gone.  Is it possible it was

11        in there for a short period of time, there'd be

12        little or no blood?

13   A    Yes.

14   Q    And if the blunt area were used first, that it might not

15        cause bleeding with that blunt --

16   A    The blunt area would probably have caused some bleeding.

17   Q    Okay.  Not as much?

18   A    Not as much as the sharp.

19   Q    But if it went in quickly and came out, it's possible

20        there wouldn't be blood on this end?

21   A    It's quite likely that there wouldn't be.

22   Q    Quite likely?

23   A    Yes.

24   Q    And if this end was rammed up real fast and back out?

25   A    There would be, yes, but there would be more blood under

DOCTOR HOWARD ADELMAN

41

1    those circumstances.

2  Q  And also would be relevant as to whether or not blood

3    would stay on.  And I notice it is kind of -- it's

4    a dirty stick.  Like it was -- there's some dirt

5    there.  You see the dirt?

6  A  Yes.

7  Q  One could just -- say, just rammed it in the ground;

8    it's raining, and pull it out or wipe it off?

9  A  That could easily remove the blood.

10  Q  You don't know?

11    JUDGE McLAIN:  Whose business is this?

12    ATTORNEY WATKINS:  The State's, Your

13    Honor.  I would like to, Your Honor, if I may --

14    I forgot to ask a line of questions.  I'd ask leave

15    -- very short, and -- thank you.  That is, I have no

16    more re-direct.

17  Q  (By Attorney Watkins)  Doctor, are you familiar with

18    homicides caused by asphyxiation, strangulation?

19  A  Yes.

20  Q  I take it that's been part of your work in determining

21    what happens when a person's strangled?

22  A  Yes.

23  Q  And would strangulation have an effect on muscular --

24    ATTORNEY LEWIS:  Objection, Your Honor.

25    Can we approach the bench one moment here?


DOCTOR HOWARD ADELMAN

1                         (A discussion was held at the bench.) 41

2                   JUDGE McLAIN:  Well, the Court will let

3        you go forward at this time subject to motion to

4        strike.

5 Q   (By Attorney Watkins)  Okay.  Doctor, would you explain

6        through your medical training and studies and

7        pathologies, what effect strangulation can have on

8        a person's penis.

9 A   There are many people who use asphyxia as a sexual over-

10        tone and use asphyxiation to enhance their sexual

11        orgasms.  It's know that asphyxia can cause

12        erections, and in legal hangings, it's been de-

13        scribed that there are erections and ejaculations

14        that occur.

15 Q   And would you explain in medical terms how that happens.

16 A   I'm not exactly sure of the mechanism, but it just occurs.

17        It's a reflection.

18 Q   And you say in hangings, there have been cases -- foren-

19        sic cases that you're familiar with?

20 A   Yes, of erections and ejaculations.

21 Q   Have you read any other legal articles -- not legal, but

22        medical articles concerning this?

23 A   There have been some, yes.

24           ATTORNEY WATKINS:  Okay.  Thank you.  One

25        other question.  I forgot this.  At this time, we'd

DOCTOR HOWARD ADELMAN

41

1    like to move to admit exhibits --

2              JUDGE McLAIN:  You're talking about the

3    pictures?

4              ATTORNEY WATKINS:  The photographs that

5    were subject to cross examination and the slides.

6              JUDGE McLAIN:  Do you wish to make an

7    objection?

8              ATTORNEY LEWIS:  Yeah.  We're making an

9    objection, Your Honor, for the record as to the

10   introduction of --

11             JUDGE McLAIN:  Objection's overruled.

12   They may be admitted.

13   Q    (By Attorney Watkins)  Doctor, would you get the photo-

14        graphs of the stick that we were talking about.

15   A    These?

16   Q    Yes.  And I'd like --

17             ATTORNEY WATKINS:  How would the Court

18   like to do this?

19             JUDGE McLAIN:  Well, that's up to you.

20   The Court feels that perhaps the easiest way to

21   keep the testimony contemporaneous with the Doctor,

22   that the Doctor come down to this microphone and

23   hold up the picture in question.

24             ATTORNEY WATKINS:  Can he bring the slides

25   up also?

                DOCTOR HOWARD ADELMAN

42

1    JUDGE McLAIN:  Yes.

2    ATTORNEY WATKINS:  Do you know you're

3    going to go with the microphone to show --

4    JUDGE McLAIN:  I don't know what form of

5    the slides -- is that something we have to view?

6    ATTORNEY WATKINS:  Yes, he would put them

7    in and show them to each Judge.

8    (Witness approaches the bench.)

9  A    Your Honors.

10    JUDGE McLAIN:  Are you just going to let

11    him testify explaining what the pictures are?

12    ATTORNEY WATKINS:  Yes.  Go ahead, Doctor.

13    JUDGE McLAIN:  Follow in sequence or --

14  A    No.  I'll identify each photograph as I show them, Your

15    Honor.

16    Exhibit Number 80.  This depicts the inside of the rec-

17    tum and the stick which is right next to it.  This

18    is the area of penetration inside the rectum, and

19    this is the stick.  This is the area of the circu-

20    lar imprint which is adjacent to the penetration.

21    This is Exhibit Number 96.  This is the anatomic diagram

22    showing the relationship of the rectum and the

23    urinary bladder and the direction of penetration.

24    This would be the urinary bladder.  This is the anus

25    and the rectum, and the direction is according to

DOCTOR HOWARD ADELMAN

42

the arrow.

Exhibit Number 97 is a similar anatomic drawing showing
the relationships of the anus, the rectum, the pene-
tration into the urinary bladder.

I think these are repetitious.

ATTORNEY WATKINS:  Okay.

A  Exhibit Number 93 is a photograph of the urinary bladder
opened from the front, and this would be the area
of the prostate, and this is the posterior wall or
the back wall of the urinary bladder.  This is the
urinary bladder.  This would be the urethra where
the urine exits the body, and the prostate would be
in this area.  On the posterior wall, the back wall,
of the urinary bladder is this penetration.  Urinary
bladder has been opened from the front.

JUDGE SHAKER:  Where -- would the imple-
ment come there?

A  The implement came through from the back of this
direction.

JUDGE SHAKER:  Okay.

A  This is Exhibit Number 82, and this is the photograph
showing the stick and this is the excised segment
of the anus, and here are the lacerations that were
done.  This is a portion of the rectum from the anus.
Exhibit Number 84 shows the relationship between the point

DOCTOR HOWARD ADELMAN

42

1    of the stick and the opening as far as size is con-
2    cerned, and they're both placed next to each other.
3    The last exhibit, Number 81, shows the pointed end of
4    the stick placed at the opening of the penetration
5    in the rectum showing how it fits with the size and
6    the shape.

7            JUDGE NADER:  From these pictures, you
8    removed all of the outer thing?

9  A   Yes.  These are the excised areas of the rectum.  I re-
10   moved these from the body.  These are after the
11   removal.  They were taken at the hospital labora-
12   tory in the photographic area.

13           ATTORNEY WATKINS:  You want to go to the
14   slides now.

15 A   Yeah.  It's labeled underneath.  On the left side of the
16   picture is labeled instrument.  On the right side,
17   it's labeled bladder.  These are the microscopic
18   photographs showing the stick labeled instrument and
19   the comparison of the honeycomb pattern with the
20   honeycomb pattern seen in the tissue section on the
21   right of the urinary bladder.  In the center, it
22   has a shiny look to it.

23           JUDGE SHAKER:  The little squares in
24   there?

25 A   That's the foreign material.


                    DOCTOR HOWARD ADELMAN

1          JUDGE SHAKER:  Is that what you call     42

2     honeycomb?

3  A    Yes, the little square like patterns.

4          JUDGE McLAIN:  Doctor, before you go on,

5     I think all of us have a little question about

6     these microscopic exhibits, and it's this:  Do you

7     believe that any ordinary person should be able to

8     look at those two things side by side and say that

9     they were similar imprints or is this, in part, a

10    matter of your expertise with the microscope and

11    your knowledge of tissue?

12 A    It's, in part, a little of both, Your Honor.

13         JUDGE McLAIN:  Well, I mean -- so, this

14    is not just your particular field?  You know fre-

15    quently that in ballistics and fingerprints, the

16    expert may say it's -- the bullet came from a suspect

17    gun, but to the naked eye, frequently, it's a test

18    bullet.  Do you understand what I'm saying.  Naked

19    eye couldn't tell.  The expert comes in and says

20    yes, it is from that same gun.  Is that what -- do

21    we have to rely a little bit on you, I assume, or

22    is it just the naked eye?

23 A    It could be a little of both, Your Honor.  May I show

24    the other ones?  It may be a little more evident.

25         JUDGE McLAIN:  Sure.


                    DOCTOR HOWARD ADELMAN

42

A    On the right here is the instrument, and the left -- I
     mean on the left is the instrument, and on the right
     is the rectum -- section of the rectum.  Is that
     clearer?

          JUDGE SHAKER:  You're telling us, with an
     explanation from you, we ought to be able to see
     it?  Is that the idea?

A    I hope.

          ATTORNEY LEWIS:  Could the defense see
     that, Your Honor?  We weren't privy to this before.
     Okay.

A    And the last of these photographs, Your Honors, shows
     the instrument again on the left and the foreign
     material found on the right, and here, rather than
     the honeycomb pattern, we have the linear wood
     grain, if you will, type of pattern you can see
     microscopically.

          JUDGE SHAKER:  That's a little tougher,
     isn't it?

          JUDGE McLAIN:  Go ahead.

A    On the Polaroid pictures, I can perhaps point it out a
     little better.  They are labeled.  This is the
     stick.  This is Exhibit Number 85 showing the stick
     and Exhibit Number 87 showing the urinary bladder
     here.  May I borrow a pen?  Thank you.  Here is the

                    DOCTOR HOWARD ADELMAN

42

1   honeycomb pattern of which I spoke, and here is

2   the honeycombed effect here.  And this is under

3   lower power.  This is the stick.  The lower power

4   with the honeycomb effect.

5               JUDGE McLAIN:  All right.  And that honey-

6   comb effect does not occur naturally in the body?

7   A    No, no.  This occurs in plant material such as wood in

8        the stick.

9               ATTORNEY WATKINS:  Your Honor, we have no

10       other questions.

11  RE-CROSS EXAMINATION BY ATTORNEY LEWIS:

12  Q    Doctor Adelman, in regard to the comparison, the photo-

13       graphs you just showed the Judges with the stick,

14       and your conclusions about it, what were those con-

15       clusions again?  If I recall correctly, the first

16       words you said were they were comparable?  Was that

17       a term that you used?

18  A    Yes.

19  Q    And I think you also used a term called consistent?

20  A    Consistent, yes.

21  Q    And then Mr. Watkins elicited something like it was a

22       key to a lock?  Like a key fits in a lock?

23  A    Yes.

24               ATTORNEY WATKINS:  That dealt -- I'll ob-

25       ject.  That deals with two different issues.

DOCTOR HOWARD ADELMAN

42

1      ATTORNEY LEWIS:  No, it doesn't.

2      ATTORNEY WATKINS:  The key in the lock

3      dealt with the feel of the stick.  The pattern

4      dealt with the cell patterns themselves.

5      ATTORNEY LEWIS:  Wait a minute.

6   Q  (By Attorney Lewis)  The key to the lock referred to

7      what, Doctor?  Do you recall?

8   A  Yes.  The fit of the point of the stick to the penetra-

9      ting opening in the rectum.

10  Q  So, when you use the phraseology key to the lock, okay

11     -- I've got metal keys in my pocket.  You got metal

12     keys.  They're not going to open the same doors.

13     Are you going to tell me that is the stick that

14     caused this injury?

15  A  No.  I'm saying it fit as closely as a key in a lock

16     and they were that similar.

17  Q  Okay.  Is it also fair to say, to go back to your origi-

18     nal terminology, comparable and consistent with the

19     injury?

20  A  Would be quite similar, yes.

21  Q  Key to the lock may be a little bit extreme, would it

22     not?  Like a fingerprint you're saying?

23  A  No.  It would be also very consistent with, very close

24     to.

25  Q  Wait a minute!  The terminology fingerprint, no two

DOCTOR HOWARD ADELMAN

42

1            person's fingerprints are alike in this world, all

2            right, and I've already asked you questions in re-

3            gard -- it could be any stick.  I could go out and

4            get 10 broom handles, come in here and splinter

5            them, and you can't tell me if they're similar to

6            that, to any one of them?  You're not saying they're

7            comparable to those?  Those are the terminologies

8            we're using here, right?

9  Q   Okay.

10  A   I'm saying that the tip of the stick fit very closely

11           to the size of the opening.

12  Q   Fit very closely.  There's no way you can tell us that

13           that is the stick that caused the injury?

14  A   Not that that is the particular stick.

15  Q   Okay.  And in regard to the honeycomb formation of the

16           cells, that's found in plant material, right?

17  A   Yes.

18  Q   Okay.  Wood's wood, is that what you're saying?

19  A   Yes.

20  Q   Okay.  So, it could be any piece of wood?

21  A   Right.

22          ATTORNEY LEWIS:  Okay.  Thank you.

23          ATTORNEY WATKINS:  Your Honor, we would

24       call our next witness.  May I approach the bench?

25            (A discussion was held at the bench.)

DOCTOR HOWARD ADELMAN

42

JUDGE McLAIN:  We're going to be in re-
cess for about five minutes.  The Court may wish
to ask some questions, but we're going to try to
get a consensus of what's appropriate here.

(Court in recess at 4:15 P.M.)

(Back in session.)

JUDGE McLAIN:  Doctor, we have one ques-
tion that might develop along the same line.  It's
a -- really an attempt to determine what you're
saying about the similarity of the matter about
foreign objects found inside the body compared to
the stick that you have in front of you over there,
and I'd like to put it this way and give -- maybe
this will appeal to you, maybe it won't.  If I had
10 yardsticks here and broke them in two and
brought the 10 halves to you and then brought you
a splinter from one of the 10 yardsticks, would you
be able to match those up?

A     Just from the microscopic examination of the splinter?

JUDGE McLAIN:  Well, by any means.  By
any means at your disposal.  I asked if you could do
it.

A     If you broke yardsticks?

JUDGE McLAIN:  Yes.  One half here, one
half -- 10 halves in two.  Then I bring you a

DOCTOR HOWARD ADELMAN

1    splinter from one of the other halves that are

2    in the room.

3  A    If it was large enough and it could fit as a piece of

4    a puzzle, Your Honor, I could.

5        JUDGE McLAIN:  Okay.  No, I'm talking

6    about from its granular character.  Something th

7    you could see.

8        JUDGE SHAKER:  Honeycomb.

9        JUDGE McLAIN:  I'm not asking you to fi

10    it in ballistically.  I'm asking you to look at i

11    under the microscope and say yes, this little

12    splinter goes with this thing because it has the

13    same granular character or whatever.  Characteris-

14    tics.

15  A    No, I don't think I could do that, Your Honor.

16

17        JUDGE McLAIN:  And that's not -- why

18    you're not relying on the fact that -- in any way,

19    that because of wood inside that, it necessarily

20  A    No.    goes with that stick?

21

22        JUDGE McLAIN:  From that standpoint you

23  A    From that standpoint, no.    mean?

24

25        JUDGE McLAIN:  From the standpoint of the

    markings you had?


            DOCTOR HOWARD ADELMAN

SF-AZ-13    PENGAD/INDY.  MUNCIE  IN  47302

43

1    A    No, it would indicate, Your Honor, that it was a

2         wooden object.

3                        JUDGE McLAIN:   Okay.   Thank you.

4                                       (Witness is excused.)

5                        JUDGE McLAIN:   We'll stand adjourned

6         until 9:00 o'clock tomorrow.

7                        (Court in adjournment at 4:25 P.M.)

8  * * * * * * * * * * * * * * * * * * * * * * * * * * * *

9                        Friday, January 24, 1986, at 9:10 A.M.

10                       ATTORNEY WATKINS:   Thank you, Your Honor.

11        We would call Donald Allgood.

12

13                       DONALD E. ALLGOOD

14  being duly sworn, according to law, on his oath, testified,

15  as follows:

16  DIRECT EXAMINATION BY ATTORNEY WATKINS:

17   Q    Donald, would you give your full name and residence,

18        please, to the Court.

19   A    Donald E. Allgood, 2501 Kenwood Drive.

20   Q    Because of the volume of the room, it'll be necessary to

21        speak fairly loudly, okay?   Don, you do attend

22        school in Warren?

23   A    Yes, I do.

24   Q    And what grade are you in?

25   A    Tenth.


                        DONALD E. ALLGOOD

43

| | | |
|---|---|---|
| 1 | Q | And at what school did you go? |
| 2 | A | Warren Western Reserve. |
| 3 | Q | And how old are you? |
| 4 | A | 16. |
| 5 | Q | And would you describe to the Court how close you're to |
| 6 | | the Valu-King on Palmyra Road. |
| 7 | A | It's not that far.  Only right around the corner. |
| 8 | Q | Okay.  Now, Don, would you get off the witness chair and |
| 9 | | come over here, please. |
| 10 | | (Witness steps off the witness stand |
| 11 | | and approaches the diagram.) |
| 12 | | ATTORNEY WATKINS:  Is that satisfactory, |
| 13 | | Judges? |
| 14 | | JUDGE McLAIN:  Yes. |
| 15 | Q | (By Attorney Watkins)  Now, this is Exhibit Number 2.  I |
| 16 | | want you -- what street do you live on? |
| 17 | A | Kenwood. |
| 18 | Q | Okay.  You see the map?  Would you show the Court with |
| 19 | | the easel where you live, if you can, with the map. |
| 20 | A | About right there (indicating). |
| 21 | Q | On the corner of Kenwood and -- |
| 22 | A | Woodview. |
| 23 | Q | Speak close into the microphone.  Kenwood and Woodview? |
| 24 | A | Yes. |
| 25 | Q | Where would Woodview be? |

DONALD E. ALLGOOD

43

1    A    It would be the street right here (indicating).

2    Q    And it runs in what direction?

3    A    North and south.

4    Q    Okay.  And where's the Valu-King Store?

5    A    The Valu-King Store is about right here (indicating).

6    Q    Now, on September 10th, 1985 -- do you recall that day?

7    A    Yes, I do.

8    Q    And what day was it?

9    A    It was Tuesday.

10   Q    And did you take a walk that day?

11   A    Yes, I did.

12   Q    And what time was it?

13   A    Around 5:30, 6:00.

14   Q    And where did you walk?

15   A    We had walked -- me and a friend of mine had walked down

16        Kenwood, then we had turned right onto Hemlock.

17        After we got on Hemlock, at the point of Hemlock, we

18        had walked up Willow.

19   Q    Okay.  And would you just point then -- I'm going to get

20        you on the bench so you can look at the Judges.

21        Just point the area you walked that day, if you can.

22   A    (Witness indicates on the map.)

23   Q    Down Kenwood to Hemlock to Willow.  And then where'd you

24        go from Willow?

25   A    Right there (indicating).


                    DONALD E. ALLGOOD

43

1   Q   Right back home?

2   A   Yeah.

3   Q   And that was between 5:30 and 6:00?

4   A   Yeah.

5   Q   Okay.  Be seated.

6                               (Witness resumes stand.)

7   Q   (By Attorney Watkins)   Now, did you attend school that

8           Tuesday?

9   A   Yes, I did.

10  Q   And what time did you get home?

11  A   It was around 4:30.

12  Q   Is that the normal time school gets out?

13  A   I got off football practice.

14  Q   You play for the football team?

15  A   Yes, I do.

16  Q   Okay.  And did you eat that day?

17  A   Yes, I did.

18  Q   And who's the friend that you told the Court about?

19  A   Terry Schellman.

20  Q   And Terry Schellman, is it a girl or a boy?

21  A   It's a girl.

22  Q   And how old is she?

23  A   16.

24  Q   And she came over your house?

25  A   Yes, she did.

DONALD E. ALLGOOD

43

1   Q   And you proceeded to leave the house?

2   A   Yes.

3   Q   And walked the route that you indicated to the Court?

4   A   Yes.

5   Q   And that was somewhere between 5:30 and 6:00?

6   A   Yes.

7   Q   Now, would you describe the weather conditions at that

8           time.

9   A   It was kind of chilly outside.

10  Q   Was it daylight?

11  A   Yes, it was daylight outside.

12  Q   You could see well?

13  A   Yes.

14  Q   Did anything occur that was unusual as you made that walk

15          that day?

16  A   When we had saw Tim and Danny and two other people coming

17          out of the field.

18  Q   Okay.  Now, I think that you're going to have to indicate

19          by full names who you're talking about and where you

20          saw this.

21  A   It was Tim Combs, Danny Hill.  They was walking out of

22          the field coming from Valu-King.

23  Q   Okay.  With -- and who was together as far as -- you

24          said there were two other individuals.  Did they

25          line up as they came out of the field?


                        DONALD E. ALLGOOD

43

1   A   They came -- Tim Combs, then Danny Hill, then the two

2          other people was behind them.

3   Q   Okay.  Now, would you tell the Judges how were they

4          walking and what kind of pace were they walking at.

5   A   They weren't walking at a very fast pace, but Danny was

6          standing behind Tim just a little bit, couple feet,

7          and then the other two people, they was right be-

8          hind them walking just about the same way.

9   Q   Okay.  And when they walked out of the woods -- what

10        woods are you talking about?

11   A   The woods behind Valu-King.

12   Q   And what street would that be near?

13   A   It'd be on Willow.

14   Q   Okay.  And are you familiar with the woods and the path

15        between Valu-King and Willow?

16   A   Yes, I am.

17   Q   Have you walked it many times?

18   A   Yes.

19   Q   And what way did they proceed after coming out of the

20        woods?

21   A   Well, they went down -- they had walked down Hemlock.

22        They had turned right and walked down Hemlock.

23   Q   Did you pay attention to them as they walked down?

24   A   No.

25   Q   Okay.  Would you get up once more, please.

DONALD E. ALLGOOD

43

1              (Witness steps off the witness stand
2                 and approaches the diagram.)

3    Q    (By Attorney Watkins)   I think you've seen this before,
4            have you not?

5    A    Yes.

6    Q    And would you, if you can, point where you were at when
7            you saw them walk out of the woods.

8    A    (Witness indicates on the map.)

9    Q    At point "D"?

10   A    Yes.

11   Q    And that would be where?

12   A    On the corner of Willow and Hemlock.

13   Q    You have to speak loudly.

14   A    On the corner of Willow and Hemlock.

15   Q    And which side of the corner of the street of Willow
16           would be --

17   A    On the right-hand side.

18   Q    As you were walking?

19   A    Yes.

20   Q    And you were walking what direction?

21   A    South.

22   Q    Okay.   You were walking south, and you were right on the
23           corner of Woodlock and Hemlock -- I mean Willow
24           and Hemlock?

25   A    Yes.


                    DONALD E. ALLGOOD

43

1   Q   Okay.  And where did you see Tim Combs and Danny Hill

2         come from?

3   A   Coming out of the field right here (indicating).

4   Q   Okay.  And would you describe what we have here as far

5         as Willow Drive and the woods.  Would you describe

6         what it looks like.

7   A   Well, it's just woods on both sides, and then, you know,

8         there's houses over on this side, houses over here

9         (indicating).

10   Q   And Willow is what kind of street?

11   A   A dead end.

12   Q   Okay.  And is there an open area between the woods and

13         the path between the woods and the street?

14   A   Just a little bit.

15   Q   Okay.  And did you see at any time anyone throw anything?

16   A   Yes, I did.

17   Q   And would you tell the Court what you saw.

18   A   Well, when I was looking, Danny had -- was walking.  With

19         a little flick of his wrist, he threw a stick to his

20         right.

21   Q   A stick to his right with a little -- how'd you say?

22   A   Flick of the wrist.

23   Q   Flick of the wrist.  And whereabouts did he throw it?

24   A   To his right into the woods.

25   Q   Okay.  And can you point on the map whereabouts that

DONALD E. ALLGOOD

43

1          would be?

2     A    (Witness indicates on the map.)

3     Q    Around in there where "C" is?

4     A    Yes.

5     Q    Okay.  Did you see anybody else throw anything at that

6          time?

7     A    No, I didn't.

8                                    (Witness resumes stand.)

9     Q    (By Attorney Watkins)  Okay.  Would you describe the

10         wooded area for the Judges as far as its denseness.

11    A    It's heavily wooded.

12    Q    And at the time that you saw these four individuals, did

13         you see what they were wearing?

14    A    No.  I saw what Tim had on.  A leather jacket.

15    Q    Okay.  And how about his pants?

16    A    He had on blue jeans.

17    Q    Were they long pants?

18    A    Yes.

19    Q    Okay.  Are you sure about that?

20    A    Yes.

21    Q    And you don't recall what the others had on particularly?

22    A    No, I don't.

23    Q    Okay.  And you indicated to the Court that you noticed

24         Danny Hill and Tim and the two other individuals,

25         correct?


                    DONALD E. ALLGOOD

43

1  A    Yes.

2  Q    Did you notice Tim do anything in particular?

3  A    He was pulling up his zipper.

4  Q    He was what?

5  A    Pulling up his zipper.

6  Q    Okay.  When you saw this happen -- you mentioned the

7       name Tim Combs right off the bat.

8  A    Yes.

9  Q    Did you know him personally by name at that time?

10  A    Yes, I did.

11  Q    And was there a visual contact with him?  I mean did you

12       look at him?

13  A    Yes, I did.

14  Q    And how did he look or appear when you were looking at

15       him?

16  A    Well, when he had saw me, he had put his head down.

17  Q    Put his head down?

18  A    Yes.

19  Q    Like -- would you show the Court.

20  A    I saw him.  He put his head down like that (demonstrating).

21  Q    How about Danny Hill?

22  A    Danny, he was walking behind him.

23  Q    Okay.  And the two other individuals?

24  A    They was walking, too.

25  Q    Now, at the time, did you know Danny Hill's name?

DONALD E. ALLGOOD

44

1   A    No, I didn't.

2   Q    Okay.  Did there come a time that you learned about the

3        little boy being beaten up?

4   A    Yes, I did.

5   Q    And did there come a time you told people what you saw

6        somewhere between 5:30 and 6:00 that day?

7   A    My mother just asked me what I did that day, and that's

8        -- I told her what I did and everything, and that

9        was it.

10  Q    Um-hum.  Did you ever tell any school students about the

11       same thing?

12  A    No, I didn't.

13  Q    Okay.  Did there come a time that the police came to your

14       house?

15  A    Yes, they did.

16  Q    And did there come a time that you went down to the

17       police station?

18  A    Yes, I did.

19  Q    And what day of the week was that?

20  A    It was a Saturday.

21  Q    And was that the Saturday after September 10th?

22  A    Yes, it was.

23  Q    And what did you do there?

24  A    Well, I identified some pictures.

25  Q    Okay.  Now, at the time that you saw -- by the way, do

DONALD E. ALLGOOD

44

1    you see Danny Hill in the Courtroom today?

2         ATTORNEY LEWIS:  Your Honor, I'm going to

3    object.  Obviously, we have identification by

4    photographic line-up here which we were not aware

5    of.  The prosecutor never informed us there was any

6    photographic line-up whatsoever taken in this par-

7    ticular case.

8         ATTORNEY WATKINS:  Well, he's a witness.

9             (A discussion was held at the bench.)

10         JUDGE McLAIN:  All right.  The objection

11    is overruled, and Mr. Watkins will continue with the

12    Court -- the Court will reconsider that at the con-

13    clusion of the testimony.

14  Q  (By Attorney Watkins)  Don, going back to Saturday, you

15    recall going down to the Warren Police Department?

16  A  Yes, I do.

17  Q  And what officers did you see?

18  A  Massucci and Evans.

19  Q  And what did you do?

20  A  I identified some pictures.

21  Q  Okay.  Now, when you first gave a statement on that

22    Saturday, before looking at the photographs, had you

23    seen Danny Hill before?

24  A  I've seen him, but I didn't know him.

25  Q  You didn't know his name?

DONALD E. ALLGOOD

44

1   A   Yes.

2   Q   And where had you seen him before?

3   A   Like around school.  When I went walking around places

4       and stuff like that.

5   Q   He was a familiar face?

6   A   Yes, he was.

7   Q   Okay.  Now, how many photographs were you shown?

8   A   Eight.

9   Q   And who did you pick out?

10  A   Tim and Danny.

11  Q   Okay.  You also saw Tim Combs' picture?

12  A   Yes, I did.

13  Q   Okay.  At this time, do you see in this Courtroom the

14      person that flipped the stick to the right-hand side

15      of the woods as he walked out of the woods on

16      September 10th, 1985?

17  A   Yes, I do.

18  Q   And would you point him out, please.

19  A   Sitting right there (indicating to the defendant.)

20               ATTORNEY WATKINS:  May the record reflect

21      the defendant has been pointed out?

22               JUDGE McLAIN:  It may so reflect.

23  Q   (By Attorney Watkins)  Now, at the time, which was

24      Saturday, did there come another occasion that you

25      went with the Warren Police Department?


                    DONALD E. ALLGOOD

44

1   A   Yes, there was.

2   Q   And would you tell the Court when that was and what

3        happened.

4   A   It was the following day.  They picked me up, and they

5        took me to the scene of the crime.

6   Q   The scene of the crime?

7   A   Where it happened at.  Around in that area.

8   Q   Okay.  Did they take you where the body was?

9   A   No.

10   Q   What area did they take you to?

11   A   Just in to the first part so I could show them where I

12        seen him throw the stick.

13   Q   And who were the people that came?

14   A   Teeple and Carnahan.

15   Q   Okay.  And was anybody else there?

16   A   You were.

17   Q   Okay.  And would you tell the Court what happened, what

18        you did at that time.

19   A   I just showed them which way he had threw the stick over

20        in one area.

21   Q   Okay.  And would -- asked the question about whether or

22        not anything was thrown, when was that first asked

23        of you?

24   A   They didn't ask me.  They just asked if I seen anything

25        else.  Then I told them I see the stick being thrown

DONALD E. ALLGOOD

1    Q    And who did you tell that to?                          44

2    A    It was Teeple and Carnahan.  They were standing there.

3    Q    Okay.

4                    ATTORNEY WATKINS:  Your Honor, we're

5              looking for a particular photograph.  We're having

6              a difficult time.

7                    Your Honor, we would request to reserve

8              the right to re-ask the question and let Mr. Lewis

9              proceed.  I don't want to hold up things.

10                   JUDGE SHAKER:  What number are you looking

11             for?

12                   ATTORNEY KONTOS:  We're missing 31.

13                   JUDGE McLAIN:  Are you through with the

14             questioning then, Dennis, subject to that?

15                   ATTORNEY WATKINS:  Yes, Your Honor.

16                   JUDGE McLAIN:  Mr. Lewis.

17   CROSS EXAMINATION BY ATTORNEY LEWIS:

18   Q    Donald, how are you today?

19   A    Okay.

20   Q    Are you nervous?

21   A    Not really.

22   Q    Okay.  Good.  All right.  What's your current age?

23   A    16.

24   Q    Okay.  And you attend Western Reserve High School, is

25             that correct?


                         DONALD E. ALLGOOD

44

1   A   Yes.

2   Q   And what grade are you in?

3   A   Tenth.

4   Q   Okay.  And what subjects are you taking right now?

5   A   What subjects?

6   Q   Yeah.

7   A   English, math, science, history, and art.

8   Q   Okay.  And how are you doing grade wise?

9   A   I'm average.

10  Q   Average.  Okay.  And you've indicated -- let me ask you

11      this very quickly, Donald:  Did you give a statement

12      to the Warren Police Department, handwritten state-

13      ment, or did they have something typed out for you?

14  A   It was typed out when I told them.

15  Q   Okay.

16          ATTORNEY LEWIS:  Your Honor, I'd like to

17      examine that statement if the prosecution's got it.

18          ATTORNEY WATKINS:  Your Honor, we have it,

19      and are we going to have an in camera inspection?

20          JUDGE McLAIN:  Are you through with the

21      questioning?

22          ATTORNEY LEWIS:  No.  It's -- prior to

23      questioning, Your Honor, I'm allowed -- if a state-

24      ment was given, I'm allowed to examine it prior to

25      questioning, not after questioning.  I'm sorry.


                    DONALD E. ALLGOOD

1       Okay.                                                        44

2                    ATTORNEY WATKINS:   It shouldn't have been

3       made at this time, but I don't have any objection to

4       it.

5                    JUDGE McLAIN:   You mean you want to show

6       him the statement?

7                    ATTORNEY WATKINS:   I think the Court has

8       to inspect it with the defense counsel.

9                    ATTORNEY LEWIS:   Yeah.   This would be --

10                   JUDGE McLAIN:   Well, all right.   All

11      right.   The Court will retire to chambers in order

12      to review that document.

13                       (Court retires to chambers at 9:40 A.M.)

14                       (Back in session at 10:10 A.M.)

15                   JUDGE McLAIN:   All right.   Before you be-

16      gin, Mr. Lewis, Ladies and Gentlemen of the tele-

17      vision news media, due to inadvertence -- this wit-

18      ness was asked, as always, whether he had an objec-

19      tion to being photographed.   He does have such an

20      objection.   He did and was not asked the question

21      through inadvertence.   So, I ask that you not con-

22      tinue any further photography or ask that you not

23      use any prior photography.   That's the video that's

24      already been taken.   He does not object to having

25      his voice recorded by electrical means.

                          DONALD E. ALLGOOD

44

1          Mr. Watkins, have you found what you were

2     missing?

3               ATTORNEY WATKINS:  Yes, Your Honor.

4     Jim Teeple --

5               JUDGE McLAIN:  Are you finished?

6               ATTORNEY WATKINS:  I could after Mr.

7     Lewis.

8               JUDGE McLAIN:  Go ahead, Mr. Lewis.

9               ATTORNEY LEWIS:  Okay.

10   CONTINUING CROSS EXAMINATION BY ATTORNEY LEWIS:

11   Q     Donald, I think we were at the juncture where you indi-

12         cated some of the subjects you were taking and also

13         some of the grades you got which you said were

14         average, is that correct?  Okay.  Would it be C's

15         we're talking about?

16   A     Yes.

17   Q     And how long have you lived at that particular address

18         on Kenwood?

19   A     For about five years.

20   Q     Five years.  Okay.  And do you know one Timothy Anthony

21         Combs?

22   A     Yes, I know him.

23   Q     Okay.  And how well do you know him?

24   A     I know him well.

25               JUDGE McLAIN:  You talk right in the

DONALD E. ALLGOOD

44

1           microphone.

2 A   I know him pretty good.

3 Q   (By Attorney Lewis) You know him pretty good. Was he

4           a friend, a social acquaintance of yours?

5 A   I talked to him a couple of times.

6 Q   And let me ask you this: Has he ever tried to do any-

7           thing with you?

8 A   No.

9 Q   He hasn't. Okay. And calling your attention back to

10          the --

11               ATTORNEY WATKINS: Your Honor, I'm going

12        to object to that type of questioning.

13              JUDGE McLAIN: Overruled. Go ahead.

14              ATTORNEY LEWIS: Thank you.

15 Q   (By Attorney Lewis) Going back to the date of September

16          10th, 1985 -- and that was -- do you recall what

17          day that was?

18 A   It was Tuesday.

19 Q   Okay. And you indicated the fact that -- what time was

20          it you got home from school?

21 A   About 4:30.

22 Q   Okay. And that's a result of being -- practicing foot-

23          ball, is that correct?

24 A   Yes.

25 Q   Okay. And what did you do when you first got home?

DONALD E. ALLGOOD

44

1   A   Took a shower.

2   Q   And after you took a shower?

3   A   Called a friend of mine.

4   Q   And who was that?

5   A   Terry Schellman.

6   Q   Terry Schellman?

7   A   Yes.

8   Q   Okay.  And is that your girlfriend?

9   A   No.  She's a friend of mine.

10  Q   Friend of yours.  Okay.  And then what'd you proceed to

11      do?

12  A   I ate.

13  Q   Okay.  And then what?

14  A   She had came over, and we took a walk.

15  Q   Okay.  Now, do you recall what time that was?

16  A   It was about 5:30.

17  Q   About 5:30.  Okay.  And do you recall -- okay.  About

18      5:30.  And can you tell us once again the direction

19      of travel?  Was it down Kenwood, down Hemlock?

20  A   Yes, it was.

21  Q   North then west on Willow?

22  A   Yes.

23  Q   Okay.  And where was the place where you were at the time

24      when you first saw the individuals coming out of

25      the woods?


                        DONALD E. ALLGOOD

45

1    A    On the corner of Hemlock and Willow.

2    Q    Hemlock and Willow.  In other words, right in this area

3             right here (indicating on the map)?

4    A    Yes.

5    Q    Okay.  And was Toshona with you at the time?  I'm sorry.

6             Terry.  Terry.

7    A    Yes, she was.

8    Q    She was.  Okay.  And tell me exactly what you saw.

9    A    I saw them -- Tim and Danny and two other people walking

10            out of the field.

11   Q    Do you know who the other two people are or one of the

12            other people?

13   A    Andre McCain.  I saw him later on.

14   Q    You saw him later on?

15   A    Yes.

16   Q    Do you know Andre McCain?

17   A    Yeah, I know him.

18   Q    Okay.  Did you tell the police?  Remember giving state-

19            ments?

20   A    Yes, I do.

21   Q    Okay.  If you knew it was Andre McCain, is there any

22            reason why you didn't tell the police in your first

23            statement it was Andre McCain?

24   A    I didn't know him at first.

25   Q    You didn't know him at first.  When you say you didn't

DONALD E. ALLGOOD

45

1    know him at first, you mean you knew him by face

2    but not name?

3  A    By face, yes.

4  Q    When did you first know it was Andre McCain?

5  A    When I saw him on the street, I asked a friend who it

6    was.

7  Q    And when was that?

8  A    It was the following Wednesday -- no, it wasn't even

9    that.  It was about the Saturday -- same Saturday

10    that the police was talking to me.

11  Q    The same Saturday the police were talking to you.  Okay.

12    Let me ask you this:  When -- you say you asked a

13    friend and they told you the name of Andre McCain?

14  A    Yes.

15  Q    Well, did that mean that both of you were out there and

16    saw Andre McCain or who -- did the individual know

17    it was Andre McCain?

18  A    It was later on that day when we was walking around.  We

19    were playing football, and we were coming back from

20    football.

21  Q    Okay.  Wait a minute!  Maybe I'm getting confused.  What

22    day was it?  Okay.  You saw this on September 10th,

23    which is a Tuesday, is that correct?

24  A    Yeah.

25  Q    Okay.  You indicated the fact that you had seen Andre

DONALD E. ALLGOOD

45

```
1              McCain at least face wise.  You knew him face wise
2              at least before this?
3    A    Yes.
4    Q    Okay.  When was the day that somebody told you that it
5              was Andre McCain?
6    A    That Saturday night.
7    Q    That Saturday night?
8    A    Yes.
9    Q    Okay.  That'd be September -- I think the same day you
10             went out in the field?
11   A    No, the day before.
12   Q    The day before.  Okay.  You recall what day it was you
13             went out in the field?
14   A    With the police?
15   Q    Yeah.
16   A    It was Sunday.
17   Q    It was Sunday.  Okay.  So, on that Saturday.  Okay.
18             Who was it you were talking to that told you it was
19             Andre McCain?
20   A    His name was Kendall.
21   Q    What?
22   A    His name was Kendall.
23   Q    Kendall.  And what's his last name?
24   A    Thomas.
25   Q    Kendall Thomas?
```

DONALD E. ALLGOOD

45

1   A   Yes.

2   Q   How did Kendall Thomas -- did you see Andre McCain at

3           that point in time with Kendall Thomas?

4   A   I was with Kendall.  Andre was walking down the street.

5           He had a radio in his hand.

6   Q   Okay.  All right.  So, you asked him -- Kendall Thomas

7           who he was, is that correct?

8   A   Yes.

9   Q   Okay.  And he told you it was Andre McCain?

10  A   Yes.

11  Q   Okay.  So, he was one of the individuals that was walking

12          out of the woods that day?

13  A   Yes.

14  Q   Do you recall -- you've indicated earlier that you saw

15          Tim Combs and Tim Combs had on -- was it a leather

16          jacket?  Is that correct?

17  A   Yes.

18  Q   Okay.  And what kind of pants?

19  A   They was blue jeans.

20  Q   Blue jeans.  Okay.  Do you recall the clothing of any

21          other individuals?

22  A   Andre had on some -- they was either black or dark blue

23          slacks with a T-shirt on.

24  Q   Okay.  And how about the other individuals?  You remember

25          the clothing they had on?


                        DONALD E. ALLGOOD

45

| | | |
|---|---|---|
| 1 | A | No, I don't. |
| 2 | Q | Okay.  Was Andre McCain doing anything unusual when he |
| 3 | | was coming out of the woods? |
| 4 | A | No. |
| 5 | Q | Okay.  You saw Tim Combs, though, pull up his zipper, |
| 6 | | is that correct? |
| 7 | A | Yes. |
| 8 | Q | Did you ever indicate to the police that there was two |
| 9 | | people pulling up their zippers? |
| 10 | A | Yes, I do. |
| 11 | Q | And who was that?  Who was the other individual? |
| 12 | A | I couldn't identify him. |
| 13 | Q | Okay.  Let me ask you this:  Was it Danny Hill? |
| 14 | A | No, it wasn't. |
| 15 | Q | It wasn't Danny Hill? |
| 16 | A | No. |
| 17 | Q | Okay.  So, we have accounted for Andre McCain.  So, he |
| 18 | | wasn't pulling up his zipper, right? |
| 19 | A | No. |
| 20 | Q | We've accounted for Tim Combs who was pulling up his |
| 21 | | zipper? |
| 22 | A | Right. |
| 23 | Q | Danny Hill wasn't pulling up his zipper, right? |
| 24 | A | Right. |
| 25 | Q | That leaves one other person, right?  What did that other |

DONALD E. ALLGOOD

45

1        person have on?

2    A   He had on blue jeans.

3    Q   Had you ever seen him before?

4    A   No.

5    Q   You never saw him before at all?

6    A   No.

7    Q   So, he wasn't a familiar face to you?

8    A   Huh-uh.

9    Q   Okay.  And can you tell us the order in which they were

10       coming out of the woods?

11   A   It was Tim, Danny behind him, Andre and that other guy

12       I didn't know.

13   Q   The other guy.  Okay.  And you indicated this was at

14       5:30?

15   A   Around in that area.

16   Q   Around in that area some time.  Okay.  Are you absolutely

17       sure of the time frame?

18   A   Yes -- I'm not absolutely sure of the time, but it was

19       around in that area.

20   Q   Okay.  You gave a statement to the police.  I think it

21       was on -- what day was it?  A Saturday?

22   A   Yes.

23   Q   Okay.  And you subsequently went out to the area on

24       Sunday, is that correct?

25   A   Yes.


                    DONALD E. ALLGOOD

45

1  Q   Okay.  And do you recall what you stated in your state-

2        ment on Saturday?

3  A   I told them that when I came home from football practice,

4        I took a shower, called a friend of mine, sat down

5        and ate.  She had came over, and we walked around

6        the block.  And I told them that I saw Tim and

7        them coming out of the field, and we just turned

8        and walked up the street and went home.

9  Q   Okay.  Did the police ask you when you made the statement

10       and everything else, did they ask you questions and

11       tell you to say everything you saw at the time?

12  A  They told me to say everything that I saw.

13  Q  Okay.  I notice that you also made a statement -- or at

14       least -- let me ask you this.  Strike that.  Okay.

15       So, you gave the statement on Saturday, right?

16  A  Yes.

17  Q  Was that everything you thought you saw?

18  A  Everything.

19  Q  Or everything you saw?

20  A  That's everything I thought I saw.

21  Q  Everything you thought you saw.  Okay.  How did it come

22       about that you ended up at the location at the dead

23       end on Willow on Sunday?  Can you tell me about

24       that?

25  A  Well, Teeple and Carnahan had came over, and -- and Mr.

DONALD E. ALLGOOD

Watkins, and they had asked me if I had saw anything 45
else, seen him do anything else, and I told him he
-- Danny had threw a stick, and they took me back
there to show them what area it was I saw him throw
the stick.

Q   Is there any reason why you didn't say that on Saturday?

A   I didn't think it was important.

Q   You didn't think it was important.  Do you recall what
kind of stick it was?

A   It was 12 or more inches.  I don't recall what kind it
was.

Q   Okay.  And the line of order of the people coming out of
the woods, once again, was Danny second?

A   Yes.

Q   Okay.  And describe how the stick was thrown.

A   With the flick of the wrist.

Q   Okay.  I notice -- did the police ask you how it was
thrown?

A   Yes, they did.

Q   Okay.  And it was on that Sunday when you were out there?

A   Yes.

Q   Okay.  How long were you out there?

A   About five minutes.

Q   About five minutes?

A   If that long.


DONALD E. ALLGOOD

45

1   Q   If that long.  All right.  And when you were first con-

2          tacted on Sunday, who were you contacted by?

3   A   Teeple, Carnahan, Mr. Watkins.

4   Q   Okay.  And did they all come out together to your house?

5   A   Yes, they did.

6   Q   Okay.  And did they specifically -- what was the gist of

7          the conversation, if you recall?  Were they going

8          to ask you something?

9   A   They just asked me if I had seen anything else.

10   Q   They just asked you if you saw anything else?

11   A   Yes.

12   Q   Did they ask you any questions about if you saw anything

13          else?  In other words, did they ask you any specific

14          questions what else you saw?

15   A   That was it.

16   Q   That was it.  Okay.  And then you happened to think about

17          the stick?

18   A   Yes.

19   Q   Is there anything else that you recall that you didn't

20          include in your statement on Saturday?

21   A   No.

22   Q   Okay.  There's nothing else whatsoever?

23   A   Not that I can think of.

24   Q   Okay.  Earlier in your direct testimony, you indicated

25          the fact that you weren't aware of what clothing

DONALD E. ALLGOOD

45

1  the other people were wearing, but I notice in your

2  statement on the Saturday that you knew pretty well

3  what the clothing was, is that correct --

4  A  Yes.

5  Q  -- of the individuals?

6  A  I knew some of the clothing.

7  Q  You knew some of the clothing.  Okay.  And your indica-

8  tion is that it was the individual that you can't

9  identify that was pulling up his zipper, is that

10  correct?

11  A  Yes.

12  Q  Then you got Tim Combs pulling up his zipper, is that

13  correct?

14  A  Yes.

15  Q  And when the individuals came out of the woods, it was

16  Tim Combs who turned his head down?

17  A  Yes.

18  Q  What Danny do?

19  A  He just kept on walking.

20  Q  He just kept on walking.  Okay.  I -- I notice in your

21  statement of September 20th, which is probably three

22  four days after the time you were out at the loca-

23  tion on Sunday -- did they ask you to make a state-

24  ment that day by any chance?

25  A  They asked me to tell them what I saw.


DONALD E. ALLGOOD

46

1  Q   Tell them what you saw.  Okay.  So, did you take them

2      back to the location of where you saw what was

3      thrown in the woods?

4  A   Yes.

5  Q   Okay.  I notice in that statement you don't say how the

6      stick was thrown.  You use the term "flick of the

7      wrist".  Is that something you're just using today

8      or is it something that -- I notice you didn't use

9      it in your statement of the 20th.

10 A   That's how it was thrown.

11 Q   That was how it was thrown.  Did the police ask you when

12     they were out there on Sunday how the stick was

13     thrown?

14 A   No.  They just asked me if -- which way it was thrown.

15     About how hard.

16 Q   About how hard, right?

17 A   Yeah.

18 Q   Okay.  And you said a flick of the wrist?

19 A   Yes.

20 Q   Okay.  And can you describe the stick?  Did they ask you

21     to describe the stick?

22 A   Yes, they did.

23 Q   Okay.  And what it looked like?

24 A   It was about 12 inches long.

25 Q   Okay.  And what's the distance would you say between the

DONALD E. ALLGOOD

46

1       corner of the location where you were at and the

2       location of where the stick was actually thrown?

3   A   About 30 yards.

4   Q   About 30 yards.  Okay.  And how about Terry?  Did Terry

5       see this?

6   A   Yes, she did.

7   Q   She did.  Okay.  And does Terry know the individuals that

8       came out of the woods?

9   A   She knew Tim.

10  Q   She knew Tim.  Okay.  Can you describe the stick any

11      better than it was 12 inches long or it looked like

12      about 12 inches long?

13  A   It was about 12 inches long.

14  Q   Could it have been a conventional wood stick, a branch?

15  A   It could have been.

16  Q   Okay.  All you know the approximate length from 30 yards,

17      right?

18  A   Yes.

19  Q   Okay.  You never included that, however, in your state-

20      ment on Saturday, is that correct?

21  A   Yes.

22  Q   Okay.  Your feeling was, at the time, it wasn't impor-

23      tant?

24  A   Yes.

25  Q   Okay.  The police did ask you, though, to tell everything

DONALD E. ALLGOOD

46

1     you knew, right?

2 A Yes.

3 Q Okay.  You testified earlier -- just indicated it was

4     one person that was pulling their zipper up, and

5     that was Tim, right?

6 A No.

7 Q I mean on direct examination earlier.  When you just --

8     you testified earlier, you just indicated it was

9     one person that --

10        ATTORNEY WATKINS:  I'm going to object.

11    I didn't ask that question as he's phrasing it.

12        ATTORNEY LEWIS:  He asked if Tim did.  He

13    didn't ask who did or how many did.

14        JUDGE McLAIN:  Well, I think nevetheless

15    that was his testimony.  You asked him what he saw.

16        ATTORNEY WATKINS:  I think I asked him

17    what Tim did, Your Honor.

18        ATTORNEY KONTOS:  He asked him a specific

19    question.

20        ATTORNEY WATKINS:  Specific question as to

21    what Tim did.

22        (A discussion was held at the bench.)

23        JUDGE McLAIN:  Objection to the form of

24    the question sustained.

25 Q (By Attorney Lewis)  Donald, in response to a question

DONALD E. ALLGOOD

46

```
 1              asked by the prosecutor, he asked you if you saw Tim
 2              Combs do anything unusual when he was coming out of
 3              the woods, right?
 4   A    Yes.
 5   Q    And in response to that, you said pull up the zipper,
 6              right?
 7   A    Yes.
 8   Q    And did you have any conversation with Terry when you saw
 9              these individuals come out of the woods?
10   A    No.
11   Q    No?  Did you think that anything was unusual at the time
12              when they -- all four came out of the woods?
13   A    No.
14   Q    Okay.  And as a result of what transpired -- or what you
15              learned later on, how was it that you ended up
16              talking to the police?
17   A    Someone had gave him my name.
18   Q    And did you tell anybody in regard to what you had seen
19              that particular day before the police contacted you?
20   A    No.
21   Q    You hadn't told anybody?  How was it the police contacted
22              you?  Do you know who gave your name to the police?
23   A    No, I don't.
24   Q    You don't have any idea.  Okay.  In other words, you
25              didn't go in to volunteer any information, is that
```

DONALD E. ALLGOOD

46

1          right?

2  A   That's right.

3  Q   What?

4  A   Yes, that's right.

5  Q   That's right you didn't go in to volunteer information,

6          right?

7  A   Right.

8  Q   Okay.  And when you got down to the station on Saturday,

9          you were talking to which officers?  Do you recall?

10  A   Evans and Massucci.

11  Q   Evans and Massucci?

12  A   Yes.

13  Q   Do you know Cliff Evans or Mark Massucci?

14  A   I know them.

15  Q   And how well do you know them?

16  A   I know them from the day they came over to the house.

17  Q   The day they came over to the house.  Which day was that?

18  A   Saturday.

19  Q   That was Saturday.  So, this statement was taken at the

20          house or did you --

21  A   No.

22  Q   -- go downtown?

23  A   I went downtown.

24  Q   You went downtown.  Okay.  And you indicated that you

25          looked at some photographs, is that correct?

DONALD E. ALLGOOD

46

1   A   Yes.

2   Q   Okay.  And whose photographs were there?  Who were the

3       persons in the photograph?

4   A   Tim and Danny.

5   Q   Tim and Danny.  Was there anybody else in that group of

6       photographs that you recognized?

7   A   No.

8   Q   Okay.  Was Andre McCain's picture in that particular

9       group of photographs?

10  A   No.

11  Q   Okay.  So, when Officer Massucci and Evans talked to you,

12      did you have a conversation before you gave them the

13      statement?

14  A   No.

15  Q   What?

16  A   We -- no.

17  Q   You didn't?

18  A   They just asked me to tell them what I saw.  That was it.

19  Q   You have to speak up a little bit.

20  A   They asked me to tell them what I saw, and that was it.

21  Q   Okay.  They just asked you to tell them a statement?

22  A   Yeah.

23  Q   And this is all you discussed then what was typewritten

24      right here?

25  A   Yes.


                        DONALD E. ALLGOOD

1   Q    Okay.  They didn't ask you any questions or ask you be-    46

2        fore if you were out there or anything of that

3        nature?

4   A    They just asked me what I did that day.

5   Q    Okay.  Well, when -- they came to your house.  Okay.

6        You didn't go to the police, is that right?

7   A    I didn't go to them.

8   Q    How'd they contact you?

9   A    They came over to the house.

10  Q    They just appeared on Saturday?

11  A    Yes.

12  Q    Okay.  What time?

13  A    I don't know what time it was.

14  Q    You don't have any idea what time it was?

15  A    I was outside playing basketball.

16  Q    You were outside playing basketball.  Was it morning,

17       afternoon?

18  A    It was in the morning.

19  Q    It was in the morning.  Okay.  And obviously, they ap-

20       proached you.  You were outside.  Right?

21  A    Yes.

22  Q    And what did they ask you at that point?

23  A    They asked me to come downtown to make a statement of

24       what I saw.  They got my name from somebody else.

25  Q    That's what I'm getting to.  I mean they discuss -- they

DONALD E. ALLGOOD

46

1         say:  "Well, so and so said you were out there," or

2         you saw something, or whatever?  What was the dis-

3         cussion?

4 A  They said that somebody had gave them my name about some-

5         thing that I had saw, and then they asked me to come

6         downtown and make a statement about it.

7 Q  Saw what?  Did they talk about what incident they were

8         talking about?

9 A  What I saw; them coming out of the field, and stuff like

10         that I saw them that day.

11 Q  Wait a minute!  They asked you specifically about what

12         you saw when the boys were coming out of the field?

13         Is that what you're saying?

14 A  They -- they didn't -- asked me what I did that day and

15         what had happened.  What I did because somebody told

16         them that I was walking around that day.

17 Q  Okay.  In other words, they were talking about -- there

18         had to be some reference, right, to this incident?

19 A  I guess.

20 Q  Okay.  So, then, did they explain why they wanted to take

21         you downtown or why they wanted you to give a state-

22         ment?

23 A  Afterwards.

24 Q  Afterwards.  So, you went downtown, and they proceeded

25         to take the statement from you?

DONALD E. ALLGOOD

46

1   A   Yes.

2   Q   Did they ask you to tell them everything you saw that

3         day?

4   A   Yes.

5   Q   Okay.  And you're indicating that -- the statement itself

6         is pretty detailed, or at least it's detailed as

7         possibly could be.  You talk about clothes, you talk

8         about heights, weights.  You talk about the indivi-

9         duals you know, you talk about the unusual aspects

10        in regard to two people pulling up zippers.  That's

11        pretty detailed, is it not?

12   A   Yes.

13   Q   Okay.  What happened to the stick?

14   A   He threw it.

15   Q   That's pretty detailed, too.  Why didn't you tell about

16        the stick?

17               ATTORNEY WATKINS:  Your Honor, I'm ob-

18        jecting.  He's already answered the question.

19               JUDGE McLAIN:  Overruled.

20   Q   (By Attorney Lewis)  Donald, why didn't you talk about

21        the stick?

22   A   I didn't think the stick was important.

23   Q   Okay.  Did anybody ask you what the people were wearing --

24   A   Yes.

25   Q   -- when you were giving this statement?


DONALD E. ALLGOOD

1   A   Yes, they asked.

2   Q   Okay.  So, that's where you started putting the clothing

3          on the people, right?

4   A   Yes.

5   Q   Did they ask you to give a description of the individuals

6          by weight, height, and so forth?

7   A   Yes.

8   Q   Okay.  Did they ask you:  "Tell me exactly what they did.

9          Did they do anything unusual," or anything like

10         that?  Is that where the thing about the zippers

11         come out?

12   A   Yes.

13   Q   Okay.  Why didn't you tell them about the stick if they

14         asked you --

15   A   They didn't ask me about the stick that day.

16   Q   Did they ask you about the zippers?

17   A   Not that day.

18   Q   But you told them about the zippers, right?

19   A   They asked me if I seen anything unusual.

20   Q   Right.  And you told them about the zippers?

21   A   Yes.

22   Q   And you just didn't think that the stick was important?

23   A   Nope.

24   Q   Okay.  When Officer Carnahan, Officer Teeple, and Mr.

25         Watkins came to your house on Sunday, what time was

DONALD E. ALLGOOD

47

1           that?

2 A   It was around 10:00 o'clock.  9:00, 10:00 o'clock.

3 Q   Okay.  And which person did you talk to directly out of

4           those three individuals?

5 A   I talked to all of them.

6 Q   Were they all in the house at the same time?

7 A   No.  I was already outside.

8 Q   You were already outside.  Okay.  And do you know Officer

9           Teeple and Carnahan very well?

10 A   Yes, I know them.

11 Q   Okay.  You know Mr. Evans and Mr. Massucci, don't you?

12 A   Yes.

13 Q   How do you know all the police?

14 A   Them's the police that got in contact with me.

15 Q   Would this be the first time?

16 A   Yes.

17 Q   Okay.  In other words, you -- what you're saying -- it

18           sounds like you know these people from before this

19           incident.  That's all I'm saying.  Have you ever met

20           them before?

21 A   No.

22 Q   Okay.  All right.  Good enough.  And -- okay.  So,

23           Officer Teeple's there, Officer Carnahan's there,

24           and Mr. Watkins.  Are they -- all three present,

25           and you're there?

DONALD E. ALLGOOD

47

1    A    Yes.

2    Q    And what was the conversation?  Who talked, do you re-

3         call, out of those three individuals?

4    A    Carnahan talked.

5    Q    Okay.  And what did he ask you specifically?

6    A    He asked me to come back to show him where I seen --

7         seen them throw the stick.

8    Q    They asked you to go back and show them where he threw

9         the stick?

10   A    Yes.

11   Q    Donald, they didn't know Danny threw a stick!  You didn't

12        tell them!

13   A    Go ahead.

14   Q    Did somebody suggest to you that somebody threw something

15        or there has to be something else you saw, something

16        else, or whatever?

17   A    They asked me if I seen him do anything else.

18   Q    Okay.  And how long did it take to figure out you were

19        talking about a stick?

20   A    I didn't know it at first.

21   Q    Okay.  Was it the first thing you said?

22   A    It wasn't the first thing I said.

23   Q    What else did you say?

24   A    First, I said not that I know of, then I remembered that

25        he threw a stick.


                    DONALD A. ALLGOOD

47

1  Q    Okay.  Did you think of anything else that you didn't

2       include in either the statement or -- about the

3       stick?

4  A    No.

5  Q    There was nothing else whatsoever?

6  A    No.

7  Q    Okay.  Well, let me ask you this:  This was on a Sunday,

8       right?

9  A    Yes.

10 Q    Okay.  And you indicated the fact that -- weren't you

11      talking to Kendall Thomas on Saturday?  Was it that

12      Saturday?

13 A    Saturday night.  Later that day.

14 Q    Okay.  And Kendall Thomas told you who that other indivi-

15      dual was; Andre McCain?

16 A    Yes.

17 Q    Okay.  And the prosecutor's there, Teeple's there, Mr.

18      Carnahan's there on Sunday.  Okay.  You gave a

19      statement before saying:  "I only know two of the

20      individuals."  On Saturday, you knew who the third

21      individual was, Mr. McCain, there there Sunday.

22      They said, "Do you remember anything else?  Do you

23      know anything else?"  You don't tell them it's Mr.

24      McCain.  You knew on Saturday.  You found out who

25      the third individual was.  Why didn't you tell them?

DONALD E. ALLGOOD

47

1   A   Hum-um.

2   Q   Did they ask you any specific questions other than -- I

3       mean -- you know, anything -- other specific ques-

4       tions?

5   A   No.

6   Q   Okay.  Did they ask you the address for Terry?  Did they

7       go talk to her?

8   A   Yes, they did.

9   Q   Do you know if they talked to her?

10  A   Yes, they talked to her.

11  Q   Okay.  How long were you out there on Saturday -- Saturday

12      with the police?  That's Carnahan and Teeple?

13                  ATTORNEY KONTOS:  What's that?

14  Q   (By Attorney Lewis)  I'm sorry.  Saturday's when you went

15      out to the location?

16  A   Sunday.

17  Q   Sunday.  I'm sorry.  Saturday was the statement, Sunday

18      is the location, right?

19  A   Yes.

20                  ATTORNEY WATKINS:  Your Honor, I'm going

21          to object.  He already answered that.

22                  JUDGE McLAIN:  No.  I'll give him latitude

23          on cross examination.  Go ahead.

24  Q   (By Attorney Lewis)  On Sunday, Mr. Watkins was there?

25  A   Yes.


                    DONALD E. ALLGOOD

47

1  Q  Okay.  Did Mr. Watkins ask you any questions?

2  A  No.

3  Q  He didn't ask you any questions at all?

4  A  He was just talking to me.

5  Q  What was he talking about?

6  A  He asked me how I'm doing and everything like that.

7  Q  Okay.  When you went out to the location, okay, did you

8     go over and show exactly where the stick -- you call

9     it a stick, was supposedly thrown?

10 A  In the area.

11 Q  In the area.  Okay.  And can you tell me in reference to

12    that area, about how far is it off the end of --

13    dead end part of Willow?  Do you know offhand?

14 A  About six feet.

15 Q  About six feet?

16 A  Six or seven foot.

17 Q  Six or seven foot.  Okay.  And the stick was thrown how?

18 A  With the flick of the wrist.

19 Q  Did you tell the police officers that?

20 A  Yes, I did.

21 Q  Okay.  Did they ask you how it was thrown when you gave

22    a statement on the 20th?

23 A  No, they didn't.

24 Q  Okay.  So, you didn't put it in the statement, is that

25    right?

DONALD E. ALLGOOD

47

1   A   Right.

2   Q   Okay.  Did they ask you approximately how far you thought

3         the stick went?

4   A   No.

5   Q   Wait a minute!  They didn't ask you -- it was thrown with

6         the flick of the wrist.  They didn't ask you how far

7         it was thrown or if you saw how far it was thrown?

8   A   I didn't pay attention to how far it was thrown.

9   Q   What you told them was a flick of the wrist?

10   A   Yes.

11   Q   Okay.  Show me how.  The flick of the wrist.

12   A   It would be like that (demonstrating).

13   Q   It was overhanded?

14   A   Just like that (demonstrating).

15   Q   Overhanded, right?

16   A   Yes.

17   Q   Okay.  How long did you stay out there?

18   A   About five minutes, if it was that long.

19   Q   Five minutes.  Okay.  What were the officers doing,

20         Mr. Teeple and Carnahan, and Mr. Watkins when you

21         were out there?  Were they looking for the stick?

22   A   Officer Carnahan, he just stepped back there to see if he

23         could see anything, and he came back out cause he

24         couldn't get back in there.  There was a lot of

25         weeds and stuff.


DONALD E. ALLGOOD

47

1    Q    Okay.  So, he went back in to look for it?

2    A    Just a step in.  It wasn't that far.

3    Q    Just a step in.  Okay.  And where did the four individuals

4         go after they came out of the woods?

5    A    They walked down Willow -- Hemlock I mean.  They walked

6         down Hemlock.

7    Q    They went up this direction (indicating on the map)?

8    A    Yes.

9    Q    Okay.  And you kept on walking this direction (indicating

10        on the map)?

11   A    Yes.

12   Q    And how close would you say you got to those four indi-

13        viduals after they came out of the woods and you're

14        still located on the corner?

15   A    About --

16             ATTORNEY KONTOS:  He didn't say he was

17        still standing on the corner.

18             ATTORNEY LEWIS:  I'm sorry.

19   Q    (By Attorney Lewis)  Did you continue straight?

20   A    Yes.

21   Q    Did you continue walking or did you stop?

22   A    We continued walking.

23   Q    Okay.  You never actually stopped then?

24   A    No.

25   Q    You were just rounding the corner?


                    DONALD E. ALLGOOD

47

1  A   Yes.

2  Q   Okay.  So, you're coming down, you make the right-hand

3        turn, and evidentally, it was right at the point of

4        the corner, basically, that you saw these indivi-

5        duals coming out?

6  A   Just before the corner.

7  Q   Just before the corner.  Okay.  And you looked over, and

8        you knew Tim, is that correct?

9  A   Yes.

10  Q   Okay.  And Tim put his head down?

11  A   Yes.

12  Q   Okay.  And you just continue walking?

13  A   Yes.

14  Q   And how about Terry?  Does she walk with you?

15  A   Yes.

16  Q   How far would you say it was again between the corner

17        and the area where you saw the item thrown?

18  A   About 30 yards.

19  Q   About 30 yards.  Okay.  So, about 90 feet, right?

20  A   Yes.

21  Q   Okay.  Did you have a clear view of it?

22  A   Yes, it was a clear view back there.

23  Q   Any obstructions?

24  A   No, not -- you can see a good distance back there.

25  Q   Okay.  And how were these people walking out of the woods?

DONALD E. ALLGOOD

```
 1              Were they in single file?                    47
 2   A    No, they weren't.
 3   Q    They weren't?
 4   A    No.
 5   Q    Were they walking abreast?
 6   A    Like there was Tim, and then Danny was like a little bit
 7             behind him off to the side a little bit.
 8   Q    Which side?
 9   A    Off to his left.
10   Q    Off to the left side?
11   A    Yes.
12   Q    And then where was Andre?
13   A    He was right behind Danny.
14   Q    Okay.  And there was the third individual you don't know?
15   A    Yes.
16   Q    Okay.  And Tim was up in front.  You saw him pull up his
17             zipper?
18   A    Yes.
19   Q    And you also indicated the fact that -- where did you see
20             Tim pull up his zipper?  Where was Tim at when he
21             did that?
22   A    Walking out of the field.
23   Q    Walking out of the field.  Was he out -- how far was he
24             away from the dead end of Willow?
25   A    About -- I don't know.  About 10 feet.  Something like
```

DONALD E. ALLGOOD

47

1          that.

2      Q   About 10 feet.  Okay.  Had he come out of the wooded

3          portion?

4      A   It was still wooded, but you could see back there.

5      Q   Still wooded.  And the fourth individual, you indicated,

6          was also pulling up his zipper?

7      A   Yes.

8      Q   That would be the fourth guy in line behind, right?

9      A   Yes.

10     Q   Okay.  Let me ask you this:  Is it possible that anybody

11         else threw that stick?

12     A   No.

13     Q   It's not possible at all?

14     A   No.

15     Q   Okay.  Let me ask you this:  You've got Tim walking in

16         front.  You've got -- can I have the other diagram?

17         Come on over here, Donald, if you can.

18                        (Witness steps off the witness stand
19                         and approaches the diagram.)

20     Q   (By Attorney Lewis)  If I understand, you're "D" right

21         here on the corner of Hemlock and Willow Drive --

22     A   Yes.

23     Q   -- is that correct?

24     A   Yes.

25     Q   Okay.  And you're looking directly over here, is that


                        DONALD E. ALLGOOD

1          correct (indicating)?          48

2 A   Yes.

3 Q   Okay.  And the boys are -- the four individuals are

4          coming out directly at you, basically, is that

5          correct?

6 A   They was walking towards the sidewalk at an angle like

7          this (indicating).

8 Q   Okay.  Well, pretty close directly on target for you.

9          You mean sidewalk on this side (indicating)?

10 A   Hum?

11 Q   Is there any sidewalk on this side (indicating)?

12 A   Yes, there is.

13 Q   Were they walking over in that direction?

14 A   Yes.

15 Q   Okay.  You indicate that Tim Combs was the first one?

16 A   Yes.

17 Q   Okay.  And you saw him pull up his zipper.  And where was

18          that at approximately off the dead end of Willow?

19          Just give us an idea.  Off the dead end portion of

20          the pavement?

21 A   He was still in the path.

22 Q   Okay.  How far back do you think it was?

23 A   About 10 feet.

24 Q   About 10 feet.  Had the stick been thrown by that time?

25 A   No.


DONALD E. ALLGOOD

48

1    Q    It hadn't been thrown?

2    A    No.

3    Q    Okay.  And you indicated the fact that the fourth indi-

4         vidual was pulling up his zipper, is that correct?

5    A    Yes.

6    Q    Okay.  The way you positioned the people -- if I'm

7         correct, we've got Tim up in front, you've got Danny

8         behind him off to the left over here (indicating)?

9    A    Um-hum.

10   Q    Okay.  Then you've got the other individual right behind

11        him and then the fourth individual off the left?

12                   ATTORNEY WATKINS:  You have to repeat

13        that.

14                   JUDGE SHAKER:  Put the microphone in front

15        of him.

16   Q    (By Attorney Lewis)  Speak in the microphone, Donald.

17                   JUDGE SHAKER:  Move it closer.  Take it

18        in your hand.

19   Q    (By Attorney Lewis)  So, let me go one more time.  Tell

20        me if I'm right.  You've got Tim Combs up in front,

21        Danny behind him off to the left?

22   A    Yes.

23   Q    Okay.  Then you've got Andre McCain who is third, right?

24   A    Yes.

25   Q    And then the fourth individual, he's back, but he's a


                        DONALD E. ALLGOOD

48

1           little bit to the left, too?

2  A    Yes.

3  Q    And they're walking out, and they're going to go,

4           basically, a little bit to the right at an angle

5           to you right towards the sidewalk over here

6           (indicating)?

7  A    Yes.

8  Q    Tim Combs is zipping up his zipper about 10 feet from

9           the dead end portion of the pavement, is that

10          correct?

11  A    Yes.

12  Q    All right.  And the stick hadn't been thrown yet?

13  A    No.

14  Q    Okay.  When did Danny throw the stick?  How close -- if

15          he was right behind Tim and Tim was about 10 feet

16          from the pavement, when was the stick finally

17          thrown?

18  A    When they got almost to the end.  About six feet before

19          into the path.

20  Q    Okay.  And show me again.  It was overhand?

21  A    Flick of the wrist, yeah.

22  Q    Flick of the wrist.  And was it off to the side to the

23          right?

24  A    Yes, it was off to the side.

25  Q    Did the fourth individual, Andre McCain, was he doing

DONALD E. ALLGOOD

48

1  anything?  Did you notice anything unusual he was

2  doing?

3  A  He was just walking.

4  Q  He was just walking.  All right.  Thanks, Donald.

5                          (Witness resumes the stand.)

6                  JUDGE McLAIN:  Gentlemen, while we've

7  been in chambers, the rest of the audience hadn't

8  really had a recess, and we'll stand in recess now

9  until 11:15.

10                          (Court in recess at 10:53 A.M.)

11                          (Back in session at 11:15 A.M.)

12  CONTINUING CROSS EXAMINATION BY ATTORNEY LEWIS:

13  Q  Donald, I just have a few more questions.  The statements

14     you gave, one of which was on September 14th, which

15     was the Saturday, I believe, right?

16  A  Yes.

17  Q  And the statement which you gave on September 20th, which

18     was five or six days afterwards, is that correct?

19     Remember the other statement you gave to the

20     police?

21  A  I only gave one other one.

22  Q  Can you speak up, please?

23  A  I gave two statements.

24  Q  You gave two statements.  And did you have an occasion

25     to look at those statements since you gave them?

DONALD E. ALLGOOD

48

1   A   Yes.

2   Q   And when was that?

3   A   When they called me back down to the police station to

4       look at them, to tell them what I knew.  Everything.

5   Q   When they called you back to the police station?

6   A   They came to the school, and I had to record what I said

7       on a tape.

8   Q   You had to record what you said on a tape?  When was this?

9   A   It was at school.  I don't remember the date.

10  Q   It was in school?  You don't remember the date?  Was it

11      three months ago, two months ago, a month ago?

12  A   I don't remember.

13  Q   You don't remember, but you did give them a tape re-

14      cording?

15  A   Yes.

16  Q   Was it after these statements?

17  A   Yes.

18  Q   Okay.  You don't have any idea what the date was?  Would

19      it be September, if you know?

20  A   I don't remember.

21  Q   Who was it that came and took a tape recorded statement

22      from you?

23  A   It was Mr. Massucci and Evans.

24  Q   Massucci and Evans.  Okay.  And at the time you gave the

25      tape recorded statement, did you have these two

DONALD E. ALLGOOD

48

```
 1              statements?
 2    A    Yes, I did.
 3    Q    You had them and you read them?
 4    A    Yes.
 5    Q    Okay.  And then they had you make a tape recorded state-
 6              ment?
 7    A    I read them into the tape recording.
 8    Q    You read them into the tape recorder?
 9    A    Yes.
10    Q    Okay.  Did you say anything else in the tape recording
11              other than just reading them in the tape recording?
12    A    No.
13    Q    Did they ask you -- did they tell you why they were there
14              to do it in that fashion or have you read those in
15              the tape recorder?
16    A    No.
17    Q    You didn't ask?
18    A    Nope.
19    Q    Okay.  How'd they ask you to do it?
20    A    They just told me that they would like for me to put it
21              on tape.
22    Q    Put it on tape.  Okay.  Did any of the officers -- let
23              me ask you this:  You indicated that you didn't --
24              you didn't volunteer this information originally,
25              did you, about what you're talking -- testifying to
```

DONALD E. ALLGOOD

48

1         today, right?

2  A  Not until they came and asked me about it.

3  Q  Why was it that you volunteered the information?

4  A  They asked me about it.

5  Q  No.  Why didn't you go down and tell the police?

6  A  Cause I didn't think it was important till then.

7  Q  You didn't think it was important?

8  A  Until they came and asked me about it.

9  Q  No, no, no.  I'm backing up.  This was before any con-

10     tact with the police.  You see these events about

11     the time this occurred?  Did you read the newspapers?

12  A  No.

13  Q  Okay.  Was anybody talking about this in school?

14  A  Yeah.

15  Q  Was there a lot of talk about this in school?

16  A  Yeah.

17  Q  Okay.  Did you have an idea about what time this crime

18     occurred?

19  A  No.

20  Q  You had no idea when it occurred?

21  A  No.

22  Q  Okay.  So, you just didn't think that anything you saw

23     out there was important, so you didn't go to the

24     police?

25  A  Right.


DONALD E. ALLGOOD

48

1  Q   They had come to you?

2  A   Yeah.

3  Q   Okay.  You don't know who it was that you told this in-

4       formation to that had the police come to you, is

5       that right?

6  A   Right.

7  Q   And you didn't tell anybody else other than your mother,

8       is that correct?

9  A   Right.

10  Q   Okay.  Did they tell you who told that you knew something

11       about it?

12  A   They didn't say who told them.

13  Q   Okay.  Did they come there to question you -- did they

14       have an idea of what you saw or what you were sup-

15       posed to have seen or did they come to question you

16       about the crime itself as a suspect?

17  A   They came to question me about what I saw.

18  Q   Okay.  In your statements -- okay.  You gave a tape re-

19       corded statement.  Basically, you read both state-

20       ments then, is that correct?

21  A   Yes.

22  Q   Did they ask you anything else on that tape recording?

23  A   No.

24  Q   Okay.  And you don't recall exactly when that was?

25  A   No.


DONALD E. ALLGOOD

48

1  Q   Okay.  Have you since gone over the statements and the
2      tape recording since that time?
3  A   No.
4  Q   Okay.  Did you have a chance to talk with either one of
5      these prosecutors within the last couple of days?
6  A   Yes, I talked to them.
7  Q   And when was that?
8  A   Talked to them yesterday, and I believe it was the day
9      before that.
10 Q   Yesterday and the day before that?
11 A   Yes.
12 Q   Okay.  Did you look at the statements?
13 A   No.
14 Q   Okay.  Did you listen to the tape recording?
15 A   No.
16 Q   And did you discuss what you were going to testify to
17      here today about --
18 A   Yes.
19 Q   Okay.  They show you any photographs?
20 A   A couple.
21 Q   A couple photographs?
22 A   Yes.
23 Q   What type of photographs were they?
24 A   Where Officer Carnahan was standing where I said that
25      he had threw the stick.

                    DONALD E. ALLGOOD

48

1  Q  Where he threw the stick?

2  A  Yeah.

3  Q  Were you out there when Officer Carnahan was in the

4     picture?

5  A  I wasn't out there.

6  Q  Were you out there when that picture was taken?

7  A  No.

8  Q  You weren't?  Okay.  What'd he ask you about that picture?

9  A  They just asked me if that's about where it was.

10 Q  About where it was?

11 A  Yes.

12 Q  But you weren't out there when Mr. Carnahan was in the

13    photograph, is that correct?

14 A  That's right.

15 Q  Okay.  So, how did you identify the location?

16 A  I just know where it's at.

17 Q  Now, you indicated -- what's Terry Schellman's -- the

18    girl you know, what's her address?  Do you know?

19 A  No, I don't know her address.

20 Q  You don't know her address?

21 A  No.  I told them where she lived at.

22 Q  Okay.  Does she go to school?

23 A  She lives in Youngstown.  She goes to school.

24 Q  What school does she go to?

25 A  I don't know which one.

DONALD E. ALLGOOD

1    Q    You don't know which one.  Do you have a phone number for 49

2         her?

3    A    No.

4    Q    How is it that she came about coming to your house on

5         September 10th?  Did you call her?  You don't have

6         an address, you don't have a phone.  How'd she get

7         over there?

8    A    She was over her aunt's house.

9    Q    She was over her aunt's house.  Where's her aunt's house

10        located at?

11   A    On Lener Street.

12   Q    On Lener?

13   A    Yes.

14   Q    Okay.  Is that on the southwest side?

15   A    Yes, sir.

16   Q    Okay.  Do you know the specific address?

17   A    No.

18   Q    What's her aunt's name?

19   A    I don't know.

20   Q    You don't know her aunt's name?

21   A    No.

22   Q    How good a friend is Terry?

23   A    Hum?

24   Q    How good a friend is Terry to you?

25   A    She's a good friend.


                        DONALD E. ALLGOOD

49

1  Q  How often do you see her?

2  A  A couple times a week.

3  Q  And you always see her over her aunt's house or she come

4     to your house?

5  A  She came to my house sometimes.

6  Q  Did you ever have an occasion to take her home to Youngs-

7     town?

8  A  No.

9  Q  Okay.  In your first statement, you indicate the fact

10    that the time frame was 5:00 to -- 5:30 to 6:00, and

11    the second statement, you indicated it's 5:00 to

12    5:30.  Can you recall which -- which would be the

13    best time or are you in doubt as to the time?

14 A  It was around -- I know it's in between 5:00 and 6:00

15    o'clock, around in that area.

16 Q  5:00 and 6:00 o'clock.  Okay.  Can you give me an idea

17    how far Danny was from the dead end of Willow Street?

18              ATTORNEY WATKINS:  I'm going to object,

19    Your Honor.  He's gone over that at least two or

20    three times.

21              ATTORNEY LEWIS:  No, I haven't.  Not

22    with Danny.  I didn't get to it.

23              JUDGE McLAIN:  Overruled.

24 Q  (By Attorney Lewis)  How far was Danny away from the

25    dead end portion of Willow Street when he flicked

DONALD E. ALLGOOD

49

```
 1                    the stick?
 2   A   About six feet.
 3   Q   About six feet.  Okay.  Okay.  What was Danny wearing
 4                    that day?  Do you recall?
 5   A   No.
 6   Q   Okay.  You do recall, though, what the other three indi-
 7                    viduals were wearing, is that correct?
 8   A   Other two.
 9   Q   The other two.  Okay.  You've accounted for Tim.  Two of
10                    the other guys had blue jeans on?
11   A   Two -- except one of the thinner guys was wearing black
12                    pants or blue jeans.
13   Q   Okay.  You already told me that Tim Combs had blue jeans
14                    on, leather shirt.  Okay.
15   A   Leather jacket.
16   Q   Leather jacket, right.  And the other two individuals had
17                    black pants or black jeans on?
18   A   Yes.
19   Q   Okay.  And what else were they wearing?  What kind of
20                    shirts were they wearing?
21   A   One of them had on a T-shirt.
22   Q   Okay.  And you have no recollection whatsoever as to what
23                    Danny was wearing?
24   A   No.
25   Q   Shirt wise, pants wise, anything?
```

DONALD E. ALLGOOD

49

```
 1   A   Blue jeans.  That's what I saw with him.  Most of them
 2       had on blue jeans except for the one who had on the
 3       black pants or black jeans, whatever they were.
 4   Q   Blue jeans.  Okay.  Did you ever have an occasion, other
 5       than testifying here today, to indicate that the
 6       third individual you've now identified -- or you
 7       knew who he was on Saturday, was Andre McCain?  Did
 8       you ever have an occasion to tell the police that
 9       at all?
10   A   When I put it in the statement.
11   Q   Okay.  Did the prosecutors ever ask you about Mr. McCain
12       at all after it was put in that statement?
13   A   No.
14   Q   They didn't ask you anything about it?
15   A   No.
16   Q   Okay.  Did they ask you how you identified him?
17   A   Not that I remember.
18   Q   They didn't ask you how it came about that you recognized
19       him in the second statement and you didn't recognize
20       him in the first?
21   A   Not that I remember.
22   Q   No questions.  You indicated the fact you've seen Danny
23       Hill before, is that correct?
24   A   Yes.
25   Q   Okay.  Can you give me an approximation of time when you
```

DONALD E. ALLGOOD

49

1      saw him?

2   A  No.

3   Q  You have no idea?  How many times would you say you've

4      seen him?

5   A  A couple times.

6   Q  Couple times.  Okay.  Do you have any idea of the -- five

7      years ago, four years ago, two years ago, one year

8      ago?

9   A  It was this summer.

10  Q  It was this summer.  Okay.  Any other time?

11  A  No.

12  Q  Are you a member -- have you ever heard of the Omega

13     Gang?

14  A  Yes.

15  Q  Are you a member of the Omega Gang by any chance?

16  A  No.

17  Q  What is the Omega Gang?

18  A  It's boys.  Omega boys.

19  Q  Omega boys?  I'm sorry?

20  A  Just a group of boys.

21  Q  Just a group of boys.  You don't know anything about

22     what the Omega boys are?  You have no idea?

23  A  Nope.

24  Q  Do any of them go to Western Reserve High School?

25  A  Yes.

DONALD E. ALLGOOD

1    Q    How many would you say go to Western Reserve High School? 49

2              ATTORNEY WATKINS:  Your Honor, I'm going

3         to object on relevance.

4              JUDGE McLAIN:  What's the relevance of

5         some organization about?  He doesn't know anything

6         about --

7              ATTORNEY LEWIS:  Well, the question is

8         whether he knows anything about it.

9              JUDGE SHAKER:  He doesn't.

10             ATTORNEY LEWIS:  Well, just -- I want to

11        pursue it.  If all the members that -- go to Western

12        Reserve High School.  All right.  Strike the ques-

13        tion.

14   Q    (By Attorney Lewis)  Okay.  So, you don't know.  Just a

15        group of boys?  The Omega boys, right?

16   A    Yes.

17   Q    Okay.  And you had all the information which you testi-

18        fied to here today in regard to -- that was Satur-

19        day.  The first statement talked about the zippers,

20        talked about everything else, but you didn't tell

21        them about the stick --

22   A    Right.

23   Q    -- because you didn't think it was important --

24   A    Right.

25   Q    -- right?  And you never volunteered any information to

                    DONALD E. ALLGOOD

```
1              the police originally, right?  They had come to you? 49
2    A    Yes.
3    Q    Okay.  They also took you out to the scene?
4                   ATTORNEY WATKINS:  Your Honor, I'm going
5              to object.  How many times are we going to go over
6              this?
7                   JUDGE McLAIN:  Yes.  I think most of
8              these questions now have been answered several times.
9    Q    (By Attorney Lewis)  Do you know if you had an occasion
10             to see Danny anywhere between, say, April of '84 to
11             April of '85?  Did you ever see him then?
12   A    I've seen him in '85, that summer.  The summer of '85.
13                  ATTORNEY LEWIS:  Okay.  Thank you.
14   RE-DIRECT EXAMINATION BY ATTORNEY WATKINS:
15   Q    Don, we've talked several times about your testimony,
16             right?
17   A    Yes.
18   Q    And we reviewed your statements together?
19   A    Yes.
20   Q    And I've asked you questions, correct?
21   A    Yes.
22   Q    And when you were out to the scene where you saw the
23             defendant, Danny Hill, throw the stick, did you at
24             any time take measurements as to feet and distance?
25   A    No.


                         DONALD E. ALLGOOD
```

1   Q   So, when you give answers regarding six feet or seven    49

2       feet, that's your estimate?

3   A   Yes.

4   Q   Okay.  Now, would you tell the Court how many days of

5       school you've missed this year.

6   A   About two or three.

7   Q   And why did you miss school?

8   A   Cause I had to come to Court.

9   Q   Other than coming to Court, you've been in school at

10      Western Reserve every single day?

11  A   Yes.

12  Q   Have you ever been involved with the Warren Police De-

13      partment as far as arrests or in any trouble?

14  A   No.

15  Q   And did you know any of the Warren Police Department

16      members that investigated this case and asked ques-

17      tions?

18  A   Not before.  Not before it happened.

19  Q   I'm going to show you what's been marked as 47, which is

20      the stick.  Could this be the stick that Danny Hill

21      threw?

22  A   Yes.

23                  ATTORNEY LEWIS:  Objection.

24                  JUDGE McLAIN:  Well, the answer may re-

25          main.  It's not very probative.  For what it's


                        DONALD E. ALLGOOD

49

1           worth.

2    Q    (By Attorney Watkins)   That is, was it of that size ap-

3           proximately?

4    A    Approximately.

5    Q    Now, when you went out to the scene and showed the area

6           where you saw the defendant flip the stick -- and

7           you said you saw some photographs?

8    A    Yes.

9    Q    I'm going to hand you what's been marked as Exhibit 31,

10          and you will see a gentleman, a Mr. Carnahan, you've

11          described pointing on a path, and I want you to tell

12          the Court whether or not you recognize the area

13          that's found in this photograph and whether it is

14          accurate as to that area as you know it, okay?

15   A    Yes.

16   Q    And would you tell the Court what that area is.

17   A    It's about six feet or more into -- as you walk into the

18          field from Willow Street.

19   Q    And where is the person pointing in that photograph?

20   A    He's pointing over into the bushes.   Pointing north.

21   Q    And did you ever point those bushes out to the police?

22   A    Yes.

23   Q    And what day did you point those bushes out?

24   A    Sunday.

25   Q    And why'd you point those bushes out?


                        DONALD E. ALLGOOD

1   A    Just -- because that's where I saw him throw the stick.   49

2                    ATTORNEY WATKINS:   Thank you.   I have no

3             other questions.

4   RE-CROSS EXAMINATION BY ATTORNEY LEWIS:

5   Q    Mr. Allgood, let me ask you a question.   If I recall

6             correctly, I asked you how far he threw the stick.

7             Your response was you didn't know how far, was that

8             correct?

9   A    Yes.

10  Q    You didn't have any idea how far he threw the stick?

11  A    No.

12  Q    The prosecutor just mentioned six feet to you.   Where'd

13            you get this figure six foot?

14  A    He said how far was it into the field where he was

15            standing when he threw the stick.

16  Q    Wait a minute!   Back up.   How far was he -- how far was

17            he standing from where?

18  A    From the edge of the street.

19  Q    Okay.   Six foot then.   All right.   Danny was six foot

20            from the edge --

21  A    Of the street.

22  Q    But the end of Willow, right?

23  A    Yes.

24  Q    And that's where he threw the stick?

25  A    Yes.


                         DONALD E. ALLGOOD

50

1  Q   But you didn't know how far he threw it or where he

2      threw it?

3  A   No.

4  Q   It was just a flick of the wrist?

5  A   Yes.

6  Q   Mr. Watkins just asked you that he talked to you many

7      times and reviewed your statement.  I asked you did

8      you review those statements with Mr. Watkins earlier,

9      and you said no.  Statements -- those statements.

10  A   I didn't go over those -- I talked about them, but we

11      didn't -- I didn't read the statements.

12  Q   You talked about them?

13  A   Yes.

14  Q   You mean like the prosecutor -- did he hold the state-

15      ments and ask you questions about the statements or

16      have you say what you saw?

17  A   He had them in a folder, and he asked me if I remember

18      what I put in the statement.

19  Q   Okay.  And when you went over it, did you forget anything

20      at the time?

21  A   No.

22  Q   You never forgot anything about what's in those state-

23      ments?  You memorized them verbatim?

24  A   Not word for word, but I remember.

25  Q   Did he ask you any questions then?  "Do you remember

DONALD E. ALLGOOD

50

1         this you said in your statement?" Any questions

2         like that?

3 A   Yes.

4 Q   So, by the time you got finished, did you end up going

5         over all what was in the statement?

6 A   Just about.

7 Q   Okay. And that was brought out by the prosecutor if you

8         didn't recall it, right?

9 A   Yes.

10           ATTORNEY LEWIS: No further questions.

11           ATTORNEY WATKINS: No other questions.

12   We thank the witness.

13           JUDGE McLAIN: That's all.

14                     (Witness is excused.)

15           ATTORNEY LEWIS: We'll reserve the right

16   to recall Mr. Allgood.

17           ATTORNEY WATKINS: Thomas Stewart.

18           ATTORNEY LEWIS: Excuse me, one minute.

19   Your Honor, can we approach the bench?

20             (A discussion was held at the bench.)

21           JUDGE McLAIN: All right. For the folks

22   in the visual media, this witness asked that he not

23   be photographed. He does not mind if his voice is

24   recorded.

25         Go ahead.

            DONALD E. ALLGOOD

1        THOMAS W. STEWART

2  being duly sworn, according to law, on his oath, testified,

3  as follows:

4  DIRECT EXAMINATION BY ATTORNEY WATKINS:

5  Q    Would you for the record, Sergeant Stewart, give your full

6            name and occupation.

7  A    My name's Thomas W. Stewart.  I'm a sergeant on the

8            Warren Police Department.

9  Q    And Sergeant, how long have you been employed by the

10            Warren Police Department?

11 A    I'm in my 21st year.

12 Q    And what division do you work?

13 A    Narcotics.

14 Q    And how long have you been in Narcotics?

15 A    Since 1972 off and on.

16 Q    Okay.  And on or about September 10th, or subsequent to

17            that date, did you get involved in any way with

18            the investigation of the Fife homicide?

19 A    No, sir, not at that particular date.  I was just

20            working that night.

21 Q    I said any subsequent time.  What time --

22 A    Yes.

23 Q    -- did you get involved?

24 A    September 12th was when I first became involved in the --

25 Q    Okay.  And would you tell the Court what happened and

THOMAS W. STEWART

50

```
1                    time, place, and event.

2    A    When I came to work that particular day on September

3             12th, Captain Lozinski, who's the commander of the

4             Juvenile Division, asked me if I would assist some

5             of his officers in taking statements in regards to

6             the Raymond Fife assault.

7    Q    Okay.  And you did do that, I take it?

8    A    Yes, sir, I did.

9    Q    And did you have an occasion to have someone walk into

10            your police department in the evening of September

11            12th?

12   A    Yes, sir.  On the -- September 12th, after I completed

13            my assignments that I was assigned to by Captain

14            Lozinski, I was downstairs in Uniform Division.  I

15            was getting copies of some teletypes; I don't recall

16            exactly what I was doing, and I noticed Danny Hill

17            was in the lobby when I came downstairs.

18   Q    Okay.  You noticed Danny Hill was in the Log Room?

19   A    Yeah.  In the lobby.  He was standing by the Desk

20            Sergeant's area.

21   Q    Where's that located?

22   A    In the Warren Police Department.  It's on the ground

23            floor by the pop machines.  In that area there.

24   Q    And did you know Danny Hill?

25   A    Yes, I did.
```

THOMAS W. STEWART

1    Q    And would you tell the Court how long you have known him.    50

2    A    I've known Danny Hill approximately since he was six

3         years old, seven years old.

4    Q    And have you talked to him on occasions in the past?

5    A    Yes, I have.

6    Q    Would they be numerous?

7    A    Well, not numerous, but I've talked to him on many oc-

8         casions.

9    Q    And how did you find his intelligence and his ability to

10        communicate with you?

11   A    I've never had no problems communicating with Danny what-

12        soever as far as talking to him.  Intelligence, okay.

13        Fine.

14   Q    Okay.  Now, what happened down in the police station?

15        What time was it?

16   A    It was approximately 7:15; in and around there.  7:20.

17        He was talking to -- I believe it was Sergeant Hicks

18        at the time, and then he noticed me, and then

19        Sergeant Hicks noticed me.  Then Danny came over to

20        talk to me, and I says, "How you doing, Danny?  How's

21        things going?"  He said, "Okay."  And I said, "Can

22        I help you with anything?"  He says, "Yeah, man!

23        I got some information about that boy that was beat

24        up."  And I says, "Well, stay here.  Wait.  I'll go

25        do what I have to do, and then we'll go upstairs in

THOMAS W. STEWART

50

1           the office and talk."  That's what I did.  I picked

2           up my teletypes, records, whatever it was, and we

3           went upstairs in the Narcotics Room.

4 Q    And what time would that be you got up there?

5 A    Probably around 7:30, in and around there.

6 Q    And would you go through, in your own words, what trans-

7           pired between the two of you and where that conver-

8           sation took place.

9 A    Okay.  Our office, it's off the -- in the side -- you got

10          to go through the Traffic Division to get to our

11          offices for the security; concealing informants and

12          that, and we went back, we had a seat, and I asked

13          him again:  "How's things been going?"  And he says,

14          "Fine."  "So, what do you know about this, if any-

15          thing?  What'd you got to tell me?"  And he said,

16          "Well, I had just seen Reecie Lowery riding the

17          boy's bike that was beat up."  And I said, "Reecie

18          Lowery?"  And he says, "Yeah, Maurice Lowery."  And

19          I asked him:  "Where'd you see him ride the bike

20          at?"  He says, "Over by Westlawn."  And he kept

21          elaborating.  I said, "What'd the bike look like?"

22          He said knob -- nub wheels at the time, like a dirt

23          bike.  He was relaying all this to me.  And I said,

24          "Could you show me where at in Westlawn?"  He says,

25          "Well, I was over -- " "you go up the side street.

THOMAS W. STEWART

1    One way street."  He tried to explain where it was.  50

2    And we went a little bit further, and I says, "How

3    do you know it was the boy's bike?"  He said, "Well,

4    I know it was the boy's bike."  I said, "Well, do

5    you think he still has it?"  He says, "Well, man, he

6    might have put it back in the woods by now."

7    So, we kept on going, and there wasn't too much said.

8    There was some other stuff.  We didn't talk about

9    the beating after that too much.  Then he started

10    talking about where the boy was beat up at.  You

11    know.  He said, "I know he was beat up in, you know,

12    that field back there."  And:  "I bet -- " he kept

13    getting nervous.  He kept saying:  "I bet Reecie

14    put the bike back by then."

15    My partner wasn't there, Lieutenant Fisher, to take him

16    out to go find the bike.  He was in the other office.

17    We just kept talking.  Then I said, "Well, do you

18    know anything about it other than the fact that

19    Reecie's riding the bike?"  He says, Yeah, man."

20    He says, "That morning, man, I seen him and Andre

21    McCain coming through the field by the Ham House,"

22    which is called the Hampshire House.  They call it

23    the Ham House.  I says --

24  Q    And what time would that be?

25  A    Well, he said it was approximately 1:00 o'clock in the

THOMAS W. STEWART

50

1         morning.  That would be the 13th.

2 Q    The 13th?

3 A    Right.  And I asked him -- I said, "What time was it?"

4         He said, "It was like 1:00 o'clock."  I said wasn't

5         it kind of unusual you'd be looking out the window

6         and see McCain and Reecie coming out of the field at

7         1:00 o'clock in the morning.  He said, "Well, that's

8         what they were doing."

9 Q    Where was he talking from?

10 A    He was talking from his house.  From his apartment.

11 Q    And where's Danny's house?

12 A    Danny lives on Fifth Street.  He lives in the Hampshire

13         House, and his unit is up against that wooded area

14         where you come off the wooded field.

15 Q    Can you come up here and show the Court?

16                    (Witness steps off the witness stand

17                        and approaches the diagram.)

18 Q    (By Attorney Watkins)  I know it's not here, but I want

19         you to probably explain, if you can do this with

20         Exhibit Number 2, where is the Hampshire House that

21         Danny Hill lived at?

22 A    Hampshire House is way back down here (indicating).  Go

23         up, down Orleans into Colt back up in the projects,

24         and it's way back here (indicating).

25 Q    Approximately what distance would be involved?

THOMAS W. STEWART

50

1   A   Probably a mile.

2   Q   And where was he talking about these two individuals

3         with the bike or the one individual with the bike?

4   A   He says -- this unit would like -- his unit would be

5         like this area here (indicating) in comparison with

6         the woods, you know, and they would have to come

7         down through here, in through this thicket, up this

8         way, and come down by this parking lot, his resi-

9         dence where he lives (indicating).

10   Q   So, he was talking about the woods by his house?

11   A   Yeah.  They would have to come out of a thicket, more or

12         less, it looks like in that particular area where

13         Danny lives.  The path that leads up into this area

14         here (indicating) isn't that neat and clear.  It's

15         all thicket up in this area.

16   Q   Okay.  So, when he talked about a bike at 1:00 o'clock in

17         the morning, it was an area about a mile away or

18         more?

19   A   Well, he didn't mention the bike.  He just said he seen

20         them walking through.

21   Q   Okay.

22                        (Witness resumes the stand.)

23   Q   (By Attorney Watkins)  Where did he say he saw the Lowery

24         boy on the bike?

25   A   He said he seen Reecie ride the bike in Westlawn.


THOMAS W. STEWART

50

1  Q   And that's in a different direction?

2  A   That's in a different direction.

3  Q   And how far would that be from the Valu-King Store area?

4  A   The area where he said, probably a half a mile, maybe a

5         little bit better than that.

6  Q   Okay.  Continue as to what this conversation was about.

7  A   I kept questioning him on the fact about, you know,

8         seeing them boys walk through the field.  He in-

9         sisted they were walking through, so I said okay.

10        At that point, I didn't have that many details about

11        the bike or anything anyway, so then I asked him if

12        he knew a subject by the name of Tim Collins, and

13        he says, "Yeah, I know him."  He says, "He could

14        have done it.  He could have done it.  He's been in-

15        volved in that stuff before."  And I said, "What

16        stuff are you talking about?"  "You know, doing

17        things to white boys and stuff."  So, I said well,

18        okay.  Then I -- let's see.  I asked him -- Tim

19        Combs' name came up.  Okay.  And I believe I might

20        have asked him about Tim Combs, and he says, "Yeah,

21        I know him," he says.  He says, "He likes to do

22        that to white boys, too.  He likes to, you know,

23        mess with them in the butt, but," he says, "I ain't

24        seen Timmy since he's been out the joint."

25  Q   That's what he told you?  Danny Hill told you that he had

THOMAS W. STEWART

51

1             not seen --

2    A    Since he'd been out the joint. We talked a little bit

3             further, and a little bit -- about a half hour, 20

4             minutes, I said well, we had other things to do.

5             We wasn't -- we had one more kid we had to take a

6             statement from. We couldn't find him earlier. So,

7             I said, "How'd you get down here?" He says, "Well,

8             I'll need a ride home." I said, "We'll give you a

9             ride home. You want to go by and see where the

10            bike was? See if we could see Reecie's riding the

11            bike?" So, we got in the car. He took us up in the

12            Westlawn area. We rode around there where he said

13            he was at, came down Delaware Road, up close to the

14            field. We went back out. On coming around Jackson,

15            we went back down Palmyra Road. It was a bad night.

16            It was raining. Visibility was poor anyway. No-

17            body was riding no bikes. So, then, he says, "I'm

18            going to show you where Tim Combs be staying at.

19            I'm going to show you where his grandmother lives

20            at and where Combs lives at." So, we went down

21            Timmy Combs' house on Fourth Street. We pulled up

22            in the driveway, and there was a bike sitting out

23            in front, and I says, "Is that the bike?" He said,

24            "No, man! That's not the bike. This bike had

25            knob wheels." And he described it as being -- the

THOMAS W. STEWART

51

```
 1              color was more of a reddish/maroon type bike.  We
 2              pulled out of there, went to his grandmother's.
 3              He showed me where his grandmother lives, and I took
 4              him back to his Mom's house on Fifth Street.
 5    Q   Did he tell you where he was on Tuesday night?
 6    A   He said he was sleeping.  He says he wasn't up.  He said
 7              he didn't get up until late, and that was about the
 8              extent of it.  I didn't really get anything about
 9              his whereabouts.
10    Q   We're talking about what day that he was sleeping?
11    A   That was the 10th.  Would be the 10th.
12    Q   Okay.  And did he say what time he was sleeping till?
13    A   At that time, no, I don't recall him mentioning anything
14              about what times he was sleeping.
15    Q   Okay.  Did you make a written summary of what he said
16              to you, a narrative summary?
17    A   Yeah, I made a narrative as to what Danny had related to
18              me.  I made a narrative statement I took from
19              another individual in regards to him being in that
20              area, and then I attached a note to that with some
21              thoughts that I might had had about --
22    Q   Okay.  Now, did he talk to you about any other article
23              of clothing or item that was involved in the crime?
24    A   Yes, sir, he did.  I don't know -- I can't recall if it
25              was in the car or in the thing.  He mentioned the
```

THOMAS W. STEWART

1              fact about -- I says, "Are you sure about the bike?"  51

2              You know, talking back and forth.  And he mentioned

3              the fact about the underwear.  He says the boy was

4              choked with some underwear, he said, and at that

5              time, I didn't really know any of the details in

6              regards to the assault to that degree, anyway.

7  Q    You didn't know how the boy was killed?

8  A    No.  And the boy just expired prior to -- earlier that

9              afternoon, I was notified that the boy expired.

10  Q    Okay.

11                              (State's Exhibit No. 101 marked

12                                  for identification.)

13  Q    (By Attorney Watkins)  This has a prior exhibit number,

14              and it has 101, and I'm going to show you that

15              document, and would you tell the Court what it is.

16  A    Yes.  This is an Investigative Report -- excuse me, that

17              we fill out, and on the top of it, it tells when I

18              first came in, I met with Captain Lozinski and

19              another detective, which would be the Juvenile's, in

20              regard to the Fife case, and that's when he gave me

21              this assignment.

22  Q    When was that made?  When did you execute --

23  A    I made that --

24  Q    -- that document?

25  A    I made it that night prior to getting off work.


THOMAS W. STEWART

1    Q    And when you made it, tell the Court how you did make

2         that document.  What'd you do?

3    A    I just -- basically, 1645 hours entry, I put down that

4         I had talked to the person that I was supposed to

5         take a statement from and what was done there, and

6         then it also tells about Sergeant Hicks, that the

7         Fife boy had expired, and my entry at 1815 hours

8         when I took the statement and then at 1930 hours

9         when I talked to Danny.

10   Q    When you quote Danny Hill in there, do you quote him in

11        there; in the summary, what he said to you?  Parts

12        of it --

13   A    Yeah, there's some things.

14   Q    And those were made right after the time that Danny told

15        you those things, correct?

16   A    Yeah, right.  I -- you know, I got --

17   Q    Would that document be more accurate perhaps than your

18        memory as to what was said to you at that particular

19        time?

20   A    Yes.

21   Q    And was that document made in the ordinary course of

22        business as a police officer?

23   A    Yes, sir.

24   Q    Is that required to be made by you?

25   A    Yes, sir.  They -- a crime of this magnitude, we follow

51

THOMAS W. STEWART

51

1           up.  The officers pick it up from there anything

2           that we have on the reports.

3 Q  Okay.  Now, looking at that document, is there a time

4           that Danny Hill gives you as to when he slept or

5           when he got up on Tuesday the 10th?  Just take your

6           time.  Go through it.

7 A  Yes.  The note that I left for Captain Lozinski -- who-

8           ever did the follow up, in the last sentence,

9           there's an indication that -- what Danny said he

10          was doing.  You want me to read it?

11 Q  Yes.

12 A  "He stated to us that he didn't leave the house Tuesday

13          until 1900 hours."

14 Q  Which is?

15 A  7:00 o'clock.

16 Q  Now, did it turn out to be that you did other things in

17          this particular case?

18 A  Yes.  I came to work the 13th, which is a Friday.  I

19          asked them if they had gotten my information.  They

20          says yeah, and they had talked to Danny, and I

21          didn't see Danny again till the following Monday,

22          which would be the 16th.

23 Q  Let's go to the 16th.  Would you tell the Court in your

24          own words when you first saw Danny and what hap-

25          pened.


THOMAS W. STEWART

51

A    Okay.  I came to work on the 16th.  Earlier in the day,
     we had some prior things we had to do as far as nar-
     cotics goes, and around quarter after 10:00, in
     around there; somewhere between 10:15, 10:30, I had
     a chance to go back over to the Juvenile section,
     and I was confronted by one of the Juvenile officers
     or Captain Lozinski, I don't recall; it might have
     even been Sergeant Steinbeck, when they advised me
     they had Danny Hill in the Interrogation Room and
     they were talking to him, and I says, "Who's
     talking to him?"  And then Sergeant Steinbeck and
     Detective Hill were interviewing.  That was approxi-
     mately 10:30.

Q    Continue.

A    They came out of the room several times.  I did some
     things I had to do.  Quarter to 11:00, I talked to
     Detective Hill and asked him how things were going,
     and he just -- "So-so."  I seen Danny's mother was
     walking around, and I talked to her; how she been
     doing, how's things going.  She didn't have too much
     to say.  She came in the room one time.  She came
     back and walked into the room, and I asked her why,
     you know, she was allowed to go into the room.  It's
     not customary, you know, to let people come into
     the room who are not involved in a case, and they

                    THOMAS W.  STEWART

51

1    said well, she wanted to talk to her son.  There was

2    no problem with that.  So, she went back out, and I

3    went out and talked to her a little more in the

4    Waiting Room area when you come into the Records

5    Room.  I talked to her a little while longer, came

6    back through, talked to Morris, and then I went in

7    and talked to Danny with Morris to see what was

8    going on, left the room again, talked to Sergeant

9    Steinbeck.  Morris went in the room by himself, and

10   several minutes later -- the time, I don't recall,

11   Morris came back and says, "Danny wants to tell us

12   about it."

13  Q    About what?

14  A    About what had happened.

15  Q    And did you go back in the room?

16  A    Yes.  Sergeant Steinbeck and I went back into the room,

17       talked to Danny briefly, and he says he was going

18       to tell everything that he knew and what had hap-

19       pened, and I said, "Do you mind us putting this on

20       tape?  Taping it," and he says no, there's no prob-

21       lem with that.  So, that was approximately 11:30

22       we started the taping of what Danny had to tell us.

23  Q    And who ran the tape recorder?

24  A    I did.

25  Q    And in your own words -- did there come a time that the

THOMAS W. STEWART

51

1          tape recording was stopped?

2  A  We started taking a statement from Danny; the oral state-

3          ment.  We had an interruption one time.  It was

4          stopped.  And I think twice during the whole course

5          of the interview, it was stopped like two times.

6  Q  What was the purpose to stop the tape recorder?

7  A  Once, we went off the record.  I don't recall what that

8          was for.  Once when Detective Hill came back in the

9          room.  Detective Hill entered the room.  There was

10         an interruption, a knock on the door, but I don't

11         think we stopped it then.  I just told them we can't

12         be interrupted.

13  Q  Okay.  And how long did the whole taping take?

14  A  Approximately 45 to 50 minutes, in and around there.

15  Q  When -- the tape recording could have been longer than

16         that?

17  A  It's possible.

18  Q  Okay.  I'm going to show you what's been marked as 61,

19         and tell us whether or not you can recognize it.

20  A  Yeah.  This is the tape -- two-sided tape of Danny Hill

21         9/16/85 with Sergeant Stewart, Sergeant Steinbeck,

22         and Detective Hill.

23  Q  Now, what happened to this tape after it was completed?

24  A  After we got done with it, I took it into Detective

25         Teeple's office.


THOMAS W. STEWART

1   Q   Okay.  Did Detective Steinbeck get this tape at any

2          particular time?

3   A   Yes, he accompanied me in there.

4   Q   Okay.  Have you listened to the tape since the time you

5          recorded it?

6   A   Not too long after the -- that 16th; I don't know if it

7          was the following day or a few days later, I listened

8          to the tape, and I've listened to it about a week or

9          so ago.

10   Q   Is it a total and accurate depiction as to what occurred

11         between 11:30 and somewhere near 12:30 that day on

12         September 13th?

13   A   Yes, sir.

14   Q   16th rather.

15   A   Yes, sir.

16   Q   And who are the speakers that you hear on that tape?

17         Who are the people that are involved in being re-

18         corded?

19   A   In the beginning, Sergeant Steinbeck and myself, and

20         then Detective Hill came in, and Danny Hill.

21   Q   And would you describe the condition of Danny Hill that

22         day as far as his physical and mental shape is con-

23         cerned.

24   A   He seemed -- he seemed okay with me.  When I first went

25         in the room, he had some tears in his eye, you know,

51

THOMAS W. STEWART

```
 1              before we started the interview.  Other than that,    51
 2              he was normal.
 3   Q   And did he appear to be intoxicated, drinking?
 4   A   No.
 5   Q   No problems in communication?
 6   A   No.
 7   Q   Make any complaints?
 8   A   None whatsoever.  Only thing, he said he was hungry.
 9   Q   Okay.  Now, do you see Danny Hill in the Courtroom today?
10   A   Yes, sir, I do.
11   Q   Would you point him out, please.
12   A   Seated right here in the blue coveralls with Mr. Lewis
13              and another gentleman.  I don't know his name.
14                   ATTORNEY WATKINS:  Would the record re-
15              flect the defendant has been pointed out?
16                   JUDGE McLAIN:  Yes.
17                   ATTORNEY WATKINS:  Thank you.
18   Q   (By Attorney Watkins)  Now, during the statement that
19              Danny Hill gave -- it's recorded and marked as an
20              exhibit, did you at any time sign any documents or
21              witness any events?
22   A   Yes.  During the course of the taped interview with
23              Danny, Detective Hill read his rights to Danny, and
24              I signed the document.
25   Q   Okay.  I hand you what's been marked as 57 and 58.
```

THOMAS W. STEWART

52

1   A   Yes, sir.  You want me to identify these?

2   Q   Yes, please.

3   A   These are rights forms we use down at the police station;

4       Constitutional Rights Forms that we have the person

5       read.  If they understand, they sign it.  And also

6       witnessed.

7   Q   Okay.  And would you tell the Court what Number 57 is.

8   A   Number 57 is the Rights Sheet, Warren Police Department.

9       The date is 9/16/85, time is 1155 hours.  It's a

10      Miranda Waiver of Rights signed by Danny Hill, wit-

11      nessed by Detective Morris Hill and Sergeant

12      Stewart.

13  Q   Okay.  And Number 58.

14  A   Number 58 is also another Constitutional Rights Form.

15      Location is the same, the date's the same, the time,

16      and it's also signed by Danny Hill and witnessed

17      by Detective Hill and myself, Sergeant Stewart.

18  Q   Now, would you explain why there were two sheets.

19  A   Well, I can honestly -- I don't know why there was two

20      sheets.  I don't remember, you know, signing two

21      sheets.  I remember signing one, but like I said in

22      the earlier hearings, I signed two.  One statement

23      -- one rights sheet comes in with the regular

24      Miranda.  The second rights sheet could have been

25      the first one at that time that advises the person

THOMAS W. STEWART

52

```
1              that he is not under arrest and he's free to leave
2              at any time.
3    Q    Okay.  Now, were the words -- the exact words that were
4              given Danny Hill, were they recorded?
5    A    Yes.  Detective Hill read them to him.
6    Q    Okay.  And did he read them all to him?
7    A    Yes, sir.
8    Q    And after hearing the words, is there anything that's
9              found on the tape recording that verbally indicates
10             that Danny Hill understood his rights?
11   A    Yes, he indicated that he understands them, and he signed
12             them.
13   Q    That was the first occasion that you were involved with
14             the rights given to Danny Hill?
15   A    I questioned him prior to the beginning of the tape.  I
16             did some outline on the tape where we were located
17             at, the time --
18   Q    Prior to tape recording?
19   A    No, on -- during the tape.
20   Q    Okay.
21   A    That was the first thing I asked him as far as rights
22             goes.
23   Q    And to your knowledge, what was --
24   A    I asked Danny he's been advised of his rights prior to
25             this taping.  "Are you aware of your rights?"  And
```

THOMAS W. STEWART

52

1             he says, "Yes, I was advised of them.  I -- " you

2             know, "know what my rights are."

3   Q   Now, following the tape recording, what occurred?

4   A   Following the tape recording of Danny, I felt that --

5             that we were going to have to detain him.  I told

6             Danny:  "We're going to have to keep you here.

7             Place you under arrest.  As far as, you know, what

8             you told us, your part, what you seen."  And we

9             came out of the room.  That's when we decided to

10            have the videotape of his statement.

11  Q   What time did the video start?

12  A   I think the video started around 1330, if I'm not mis-

13           taken.  1:30.  In and around there.

14  Q   Okay.  And were you involved in it?

15  A   Yes.  I sat in on it, yes, sir.

16  Q   And how long did that take?

17  A   Over an hour it was taken.

18  Q   And would you describe Danny Hill's alertness and at-

19           titude at that time.

20  A   His composure never changed.  He was cooperative.  We

21           took him into the room where we do the video.  I

22           advised him of his rights once again, I placed him

23           under oath, made sure he understood what he was

24           doing.  We sat down.  We started questioning him

25           again.

THOMAS W. STEWART

52

1    Q    Did you get him anything to eat?

2    A    Yeah, he had two sandwiches.  I don't think he ate them,

3          though.  It was jail food.  He didn't like it.

4    Q    What time would that be?

5    A    I can't -- it had to be right after the cassette.  After

6          the taped statement, we had to bring him up a couple

7          sandwiches from the jail, if I'm not mistaken.

8    Q    Did there come a time that -- Officer, there did come a

9          time it was completed and you went on to other

10         things?

11    A    The video?

12    Q    Yeah.

13    A    Yes, sir.

14    Q    And did you get involved in any taking or receiving of

15         evidence in this case?

16    A    Yes, sir.

17    Q    And would you tell the Court when that was on the 16th.

18    A    Well, I got consent to search form from Danny's mother,

19         Vera, to go out and search the residence.  I had her

20         sign the waiver that she was in control of the house,

21         had access to the rooms, and she was at liberty to

22         travel freely within the house as she wished.  She

23         signed the waiver.  She also signed the consent to

24         search the premises.

25                         (State's Exhibit No. 102 marked
                             for identification.)

THOMAS W. STEWART

1  Q  (By Attorney Watkins)  I'm going to hand you what's been
2         marked as 102.  Would you tell the Court what that
3         is.
4  A  Yes.  Exhibit 102 is a Permission To Search to search
5         the premises of a house.  It's addressed to Vera
6         Williams.  Sergeant Thomas Stewart, Warren Police
7         Department.  Gives the location, the residence to
8         be searched, 1394 Number Fifth Street, Apartment
9         Number 8.  Describes the building.  It's an 8-unit,
10        2-story brick building, front door, rear door, four
11        bedrooms, living room, kitchen, and utility room.
12        And --
13 Q  What were you looking for?
14 A  Well, we were looking for trousers and items worn by
15        Danny Hill.
16 Q  What items, if any, did he tell you he was wearing when
17        he was taped?
18 A  He told us he had a white jersey on; football jersey on,
19        grey trousers, tennis shoes.
20 Q  Okay.  What time did you go out to the house, and what's
21        the address again of the house?
22 A  The address is 1394 Number Fifth Street.
23 Q  And that's in Warren?
24 A  Yes, sir.  And we went out to the house approximately
25        1500 hours.  We searched the upstairs.

THOMAS W. STEWART

52

Q   Did you make a thorough search?

A   Yes, sir.

Q   And was the mother there?

A   Yeah, she accompanied us.

Q   And would you go in detail as to all the rooms you
    searched and all the clothing you went through.

A   All right.  We searched two rooms and also a bathroom.
    Vera, Danny's mother's room was locked.  They had
    a padlock on it.  Nobody was allowed in or out of
    there.  So, we had no reason to go in there.  And we
    went through the room --

Q   How many rooms were there altogether in the house?

A   Two bedrooms upstairs, a bath, and Vera's room, which is
    three bedrooms.

Q   So, you went through the two rooms and the bath?

A   Yes.

Q   Except for the mother's room?

A   Yes.

Q   And did you -- how did you search the rooms?  In your
    own words, each room.

A   Well, we go in one room at a time.  We go through all
    the clothing trying to pick out some clothing that
    he said that he wore Tuesday that day.

Q   And you were looking at that time for grey pants?

A   Yeah, grey pants.


                    THOMAS W. STEWART

52

1  Q    Okay.  Would you tell the jury, after going through all

2       the rooms but the mother's, how many pairs of grey

3       pants you found in the house.

4  A    We found a pair of grey trousers.  The only pair that I

5       had seen was in the bathroom.  They were washed,

6       hanging up.

7  Q    He had only one pair of grey trousers?

8  A    Those were the only ones I seen in the house, yes, sir.

9  Q    Did you have an opportunity to see all the clothing in

10      those rooms?

11 A    Yes, sir.  Those were the only grey ones in that room.

12      The only ones we found.

13 Q    The day he was arrested, what color pants did he have on?

14 A    The day he -- I don't recall.

15 Q    Were they grey?

16 A    No, sir.

17 Q    Did you take the grey pants?

18 A    Yes, we took the grey pants and several other items.

19 Q    And would you describe the condition of the clothing as

20      far as cleanliness as you went through the two rooms

21      and the bathroom.

22 A    Dirty.  Everything was diry.  There was no clean clothes

23      at all in the upstairs that we could see.

24 Q    Did you happen to find anything clean?

25 A    The only thing that we found clean was the grey pair of

THOMAS W. STEWART

52

1    trousers.

2 Q And where were the grey pair of trousers found?

3 A In the bathroom hanging up.  They were drying.

4 Q Handing you what's been marked as Exhibit Number 1 --

5 A Yes, these are the grey trousers that I recovered from

6    the house, 1394 Number Fifth Street.

7 Q And those were turned over to whom?

8 A Detective Teeple.

9 Q How many other trousers did you find that were his size?

10 A There was a few, not many.  His mother relayed that he

11    didn't have that many clothes.

12 Q Was his mother pointing out his clothes to you?

13 A Yes, she was.

14 Q She very cooperative?

15 A Yes, she was.

16 Q You knew his mother?

17 A Yes.

18 Q You know the Hill family pretty well, don't you?

19 A For 20 years -- over 20 years.

20 Q You've known Danny's mother for how long?

21 A 20 years.

22 Q Did you give a receipt?

23 A Yes, I gave her -- excuse me, an inventory of the pro-

24    perty, and I received a receipt for that.

25 Q Okay.  And is that part of this exhibit?

THOMAS W. STEWART

52

1   A   Yes, sir.

2   Q   And these both are original documents?

3   A   Yes, sir.

4   Q   And I notice that Mrs. Williams' signature is on there

5       and you and Sergeant Steinbeck as witnesses?

6   A   Yes, she's on there, and she's also on the waiver.

7   Q   Okay.  I think it would be important to go through that

8       waiver.  This is an additional thing you did, right?

9   A   Yes.

10   Q   And would you read that waiver.

11   A   "I, Vera Williams, living at 1394 Fifth Street, Apart-

12       ment Number 8, known as the Hampshire House, do

13       hereby swear to Sergeant Thomas W. Stewart that I

14       live in the apartment and pay all the bills and the

15       rent that goes towards the apartment.  Also living

16       in the apartment with me are Danny L. Hill, Ernest

17       Hill, who is in the County Jail and has been in

18       jail since June of 1985.  Also Raymond who is 16,

19       Damon Williams.  There are four bedrooms in the

20       apartment.  My son Danny has his own room.  The room

21       is under my control.  I have the right and my sons

22       have the right to go into the room.  The door has

23       no locks.  Only my room has the locks.  I will

24       also permit Sergeant Stewart and other members of

25       the police department to search Danny's room for any

THOMAS W. STEWART

52

1   clothing or evidence that they might need as such."

2   She signed and I witnessed.

3   Q   You indicate that you -- that there were two brothers

4       that were still living at the residence; Raymond

5       and Damon?

6   A   Those are Danny's half brothers, yes.

7   Q   Now, would you -- size wise, I want to talk about -- how

8       big of persons are they, if you know?

9   A   None of them's bigger as far as weight goes as Danny.

10      Ernie -- Poochie, he's tall.  Poochie's tall, maybe

11      six three, six four.  Raymond and Damon, I don't

12      know them too well.

13  Q   But Danny's a different size than his brothers?

14  A   Yeah, he's bulkier.

15  Q   How did you determine that the grey pants were Danny's

16      and not his brothers?

17  A   His mother told me they were his.

18  Q   Okay.  And the grey pants, the pants you were looking

19      for, did you go through the clothing of the

20      brothers, too?

21  A   Yes.  Yes, sir.  We recovered some underwear and stuff

22      that Danny's mother said they were Poochie's, who

23      is Ernie.  We took them also.

24  Q   Did you find any clothing that Danny had that was pointed

25      out that had been washed recently other than the

THOMAS W. STEWART

53

1      pants?

2  A   No, there was nothing else.

3  Q   Okay.  Approximately what time did you go down to the

4      station again with those items?

5  A   We recovered them 1510 hours.  1600 hours, I turned them

6      over to Detective Teeple, which is 4:00 o'clock.

7  Q   Okay.  Did you have an occasion to take Danny Hill out

8      to the scene of the homicide?

9  A   Yes, sir.  I took him out on the 16th after the video was

10     completed.

11 Q   And had you talked to him about going out there?

12 A   Detective Teeple talked to him about going out and

13     showing us around the area where -- the crime scene,

14     yes, sir.

15 Q   To point out places?

16 A   Yes, sir.

17 Q   And you went along?

18 A   Yes, sir.

19 Q   And there were some photographs taken of that?

20 A   Yes, sir, there were.

21 Q   And did Danny Hill point out any particular areas to

22     you?

23 A   Yes, sir, he did.

24 Q   And would you tell the Court what areas he took you to.

25 A   He took us to the area where the bike was, he took us

THOMAS W. STEWART

53

1      to the area where Raymond was found, he took us to

2      the area near Valu-King where the solvent was; what-

3      ever it was, to burn him.  We walked the path a

4      little ways, and he pointed out how he exited the

5      woods.  He pointed towards Jackson Street.

6   Q  Did he offer very much information other than what you've

7      talked about?

8   A  Other than what was stated earlier, he showed us about

9      where the bike was and how the boy was taken off the

10     bike.  Walking out, he showed us how the boy was

11     laying.  Raymond was laying in the field.  Which

12     way his head was pointing, how he was laying.  He

13     pointed out to us where he was standing during the

14     course of the events.

15  Q  Okay.  One moment, Officer.  I may have taken the small

16     photographs.

17              ATTORNEY WATKINS:  May I have a moment,

18     Your Honor.

19              JUDGE McLAIN:  Do you have many more ques-

20     tions?

21              ATTORNEY WATKINS:  I do have some.  We

22     have search warrants, and we'll be a while.

23              JUDGE McLAIN:  All right.  The Court will

24     be in recess until 1:30.

25                      (Court in recess at 12:18 P.M.)


                        THOMAS W. STEWART

1    (Back in session at 1:37 P.M.) 53

2              ATTORNEY WATKINS:   May I proceed, Your

3        Honor?

4    CONTINUING DIRECT EXAMINATION BY ATTORNEY WATKINS:

5    Q    Sergeant Stewart, I believe that we discussed the re-

6              trieving of the grey pants --

7    A    Yes, sir.

8    Q    -- from Danny Hill's Fifth Street address.

9    A    Yes, sir.

10   Q    I referred to it as taking place on September 17th.

11   A    No, you referred to it as taking place on the 16th.

12   Q    Okay.  We'll make the correction now.

13   A    17th.

14   Q    Okay.  That is, the events that you described, going out

15             to the house of Danny Hill with his mother --

16   A    Yes, sir.

17   Q    -- and going through the rooms occurred on the --

18   A    17th.

19   Q    -- 17th, which would be a Tuesday?

20   A    Yes, sir.

21   Q    Okay.  Now, did there come a time on the 16th after the

22             videotape, that you went back to the -- or went to

23             the scene of the crime?

24   A    Yes, sir.

25   Q    And would you tell the Court when that was and who was

                        THOMAS W. STEWART

53

1               involved with that.

2  A   After we were finished with the video statement of Danny,

3          Detective Teeple, Sergeant Carnahan, Detective Hill,

4          Sergeant Massucci and myself went back out to the

5          scene of the crime.

6  Q   Okay.  And who went out there other than the officers?

7  A   Danny Hill went out there.

8  Q   And what was the purpose?

9  A   The purpose was for Danny to show us the areas which he

10         was in and show us the area where the bike was and

11         where the victim was laying.

12  Q   And who asked him whether or not he would do that?

13  A   Detective Teeple.

14               (State's Exhibit Nos. 103 through 109
                      marked for identification.)

15

16  Q   (By Attorney Watkins)  I'm going to hand you, Tom, what's

17         been marked as Exhibits 103 to 109.  Now, I want

18         you to go through them quickly and just identify

19         them in your own mind, and then if there's a se-

20         quence that will help you to go through what happened

21         and -- by the way, before we go through them and

22         go through the sequence, was somebody at the scene

23         that afternoon that had a camera?

24  A   Yes, sir, Sergeant Carnahan.

25  Q   Okay.  And photographs were taken of you and the other

THOMAS W. STEWART

53

1           individuals --

2 A  Yes, sir.

3 Q  -- including Danny Hill?

4 A  Yes, sir.

5 Q  Now, what time did you arrive there?

6 A  It was approximately 3:30, quarter to 4:00, in around

7       there somewhere.

8 Q  Okay.  Now, go through the exhibits and just look at

9       them, please.

10 A  (Complying.)  Yes, these are photos of us behind the

11       Valu-King in the field.

12 Q  Do they accurately represent the scene as you saw it on

13       that Monday?

14 A  Yes, sir.

15 Q  Okay.  Now, take your time and pick out each photograph

16       and then refer by number and just what you did and

17       what's being depicted in the photograph.  If you

18       can, go from beginning to end.

19 A  Photo 106 is a photo of Danny, myself, Detective Hill,

20       and Sergeant Massucci on the path.  Now, this is

21       the area where Danny told us that the boy's bike

22       was where Timmy was supposed to have first taken

23       Raymond off the bike, and the bike was put in the

24       wooded area.

25           ATTORNEY LEWIS:  Excuse me, one minute,

THOMAS W. STEWART

53

1        Mr. Stewart.  May we approach the bench?

2               (A discussion was held at the bench.)

3        JUDGE McLAIN:  Okay.  Mr. Lewis, you have

4        an objection to the testimony about these photo-

5        graphs.  State it briefly for the record.

6        ATTORNEY LEWIS:  Yes.  The objection, for

7        the record, Your Honor, is that the defense was

8        first informed of the existence of these particular

9        photographs as of Monday, I think the 20th of

10       January.  Up until that time, the defense was not

11       aware of the existence of these particular photo-

12       graphs, and they were not revealed to the defense

13       in regard to the existence of the same.

14       ATTORNEY WATKINS:  Your Honor, I -- we

15       received the photographs within the last couple

16       weeks.  I've been sick, as the Court is aware, and

17       I believe I talked to Jim on the phone within the

18       last couple weeks.  I know he didn't see them until

19       Monday, but we did not know about these particular

20       photographs until within the last couple weeks.

21       ATTORNEY LEWIS:  Your Honor, I'll state

22       for the record that Mr. Watkins did not inform me

23       of the existence of these particular photographs

24       until I came down on Monday, January 21st.  There

25       was no discussion at a prior time as to the existence

THOMAS W. STEWART

if these particular photographs whatsoever, and he 53

indicated everything he had for discovery was with

Mr. Teeple.

JUDGE McLAIN:  The objection is overruled,

Mr. Lewis, which is subject to the following.  May

I have your attention?

ATTORNEY LEWIS:  Yes, Your Honor.

JUDGE McLAIN:  Subject to the following:

That is, if in some way, you can show the Court that

you need extra time to prepare a part of the defense

or prepare for cross examination of this witness,

that will be fully given to you by the Court.  Or

any other -- if you can show any prejudice from

not knowing about this ahead of time which can be

solved by, you know, giving you some time do it it,

then that's the way we'll handle it.  So, the objec-

tion's overruled.

ATTORNEY LEWIS:  Excuse me, Your Honor.

May we approach the bench?

(A discussion was held at the bench.)

ATTORNEY LEWIS:  Your Honor, excuse me.

One more thing.

(A discussion was held at the bench.)

JUDGE McLAIN:  All right.  Mr. Lewis,

you further made a record objection to the fact that

THOMAS W. STEWART

1     you believe the testimony about to be elicited will   53

2     include some statements or perhaps verbal acts by

3     the defendant to which you were not notified, is

4     that --

5         ATTORNEY LEWIS:  That's correct, Your

6     Honor.  We filed a specific motion in regard to

7     discovery of any summaries of any oral statements

8     that were given by the defendant, and that does

9     include even if they weren't transcribed or put to

10     paper at the time.

11         JUDGE McLAIN:  It is within the Court's

12     discretion of the discovery rules as to what the

13     remedy of that is, and the Court feels the same

14     as it does with this objection as the other one.

15     That is, if you need extra time to prepare for cross

16     examination of any witness, if you need it -- if you

17     wish to, for example, pass on cross examination of

18     Mr. Stewart when he's through and wait till such

19     time as you feel you're ready, the Court will allow

20     that.  In other words, the Court will basically al-

21     low you time to do anything which the Court thinks

22     that you could have done at an earlier time, and if

23     you can show that in some way that you've been de-

24     prived totally of an opportunity to do something by

25     reason of the delay, the Court will reconsider and

THOMAS W. STEWART

1    strike the evidence, but at this time, I think we'll 53

2    proceed, giving you, again, time for continuance to

3    study the photographs before cross examination.

4         ATTORNEY LEWIS:  I would like the opportu-

5    nity, Your Honor, if you frame it in that particular

6    -- I would like to go ahead and cross examine Mr.

7    Stewart, but also reserve the right to recall Mr.

8    Stewart to bring this matter in.

9         JUDGE McLAIN:  Very well.

10         ATTORNEY WATKINS:  Thank you, Your Honor.

11   Q    (By Attorney Watkins)  Okay.  Sergeant Stewart, would you

12        go through the photographs, and again -- perhaps

13        you better start over again.

14   A    Okay.  Photo 106 is a photo of Danny Hill and myself,

15        Detective Hill and Sergeant Massucci.  There's a

16        pathway leading into the field behind Valu-King.

17        This is the area where there's a bend in the path

18        where Danny Hill indicated that Timmy first grabbed

19        Raymond off the bike and took the bike off Raymond

20        in that area.

21   Q    Would you get off the stand for a moment.

22                            (Witness steps off the witness stand
                               and approaches the diagram.)

23

24   Q    (By Attorney Watkins)  And I want you to look at the

25        diagram.  Look at Exhibit Number 4.  And are you

THOMAS W. STEWART

53

1        familiar with the map?

2   A    Yes.  This is the Valu-King, this area here (indicating).

3        This is the pathway leading in the field (indicating),

4        and here's the bend right about here (indicating)

5        where Danny pointed and indicated where Timmy first

6        took Raymond and the bike back through that area

7        there.

8   Q    And did he point?

9   A    Yes, he pointed in this area here (indicating).

10  Q    Okay.  How did you go?  I mean when you were walking,

11       who was leading the way?

12  A    Danny was in front.

13                        (Witness resumes the stand.)

14  Q    (By Attorney Watkins)  Now, go on to the next photograph.

15  A    Photograph 107 is a picture of Sergeant Massucci, Danny

16       Hill and myself.  This is the same area of the bend.

17       Danny Hill is now pointing to the area where Raymond

18       was -- ran from the bike into the area where he was

19       found.  That's photo 107.

20  Q    107 is the area that he ran from where the bike was?

21  A    Yeah.

22  Q    Okay.

23  A    Photo 108 is a photo where we walked the trail.  Just

24       going over the trail looking in that area there.

25       And Danny's pointing along with Detective Teeple and

THOMAS W. STEWART

54

1    myself, and Danny -- in the photo, Danny Hill is

2    pointing to an area which he exited the woods that

3    particular day, which he's indicating -- he's

4    pointing towards Jackson Street.

5    Photo 103 is a photo of Detective Teeple, Danny Hill and

6    myself in the area where Raymond Fife's body was

7    found.  Danny Hill's showing us this is the area

8    where Raymond was.

9  Q  Is he doing anything with his hands in that photo?

10 A  No.  In this particular photo, he's just looking down at

11   the ground.

12 Q  Okay.  And continue.

13 A  Photo 109 is a picture of Danny Hill and myself, and

14   Danny Hill is pointing at the ground in a direction

15   that Raymond Fife's head was facing.

16 Q  Okay.  When he did that, was that done automatically?

17   Would you describe that situation as to how he was

18   answering the question.

19 A  He was asked which way was the boy's head pointing; if

20   he could remember which way it was pointing, and he

21   pointed down on the ground --

22 Q  Okay.

23 A  -- whereabouts it was located.

24 Q  Okay.  Continue.

25 A  Photo 104 is a photo -- you can barely see.  I'm not in

THOMAS W. STEWART

54

```
 1            the photo, but Detective Hill, Danny Hill is in the
 2            photo.  Danny -- this is on our way back out of the
 3            path after we'd been in the field that Danny's
 4            pointing at an area where there's some wood there
 5            where he's supposedly have to taken a board he was
 6            going to hit Timmy with.
 7            Photo 105 is after he had exited the wooded area, and we
 8            were ready to leave, and Danny took us behind a
 9            dumpster behind the Valu-King where Danny told us
10            that Timmy was supposed to have gone and got fluid
11            to ignite Raymond.  That's 105.
12   Q   At any time, did he indicate to you different answers or
13            unresponsive answers?
14   A   He started getting -- right before we was walking into
15            the crime scene area where Raymond was found, he
16            started like taking us on a little walk first.
17            When we got to the crime scene, he was a little
18            hesitant of everything.  You know, he -- like a
19            little reluctant to point, and then finally, he
20            would point, and then he wasn't sure which way the
21            head was and stuff of that nature.
22   Q   You mean where the body was found?
23   A   Yeah.  He looked like he was -- if you'd look in this
24            photo, 103, I think at this point, I got a little
25            disgusted with the way he was taking us around, and
```

THOMAS W. STEWART

54

1          that's what he indicated to me.  He started to give

2          us the runaround after that.

3    Q    As far as where the head was facing, did he -- when you

4          went to where the body was found, who led the way?

5    A    Danny did.

6    Q    And who stopped him?

7    A    Danny stopped himself.

8    Q    And would you come up to the map again.

9                              (Witness steps off the witness stand
                                and approaches the diagram.)

10

11   Q    (By Attorney Watkins)  And point out to the Court how he

12         traveled.

13   A    Okay.  He traveled -- after he got up to this area here

14         (indicating), he came back into this clearing

15         (indicating).  From this point on, he came in this

16         area here (indicating).  He stopped.  A little

17         hesitant in there.  He came back into the area where

18         he had first pointed.  This indicates a trail here

19         (indicating).  He did not take this trail.  We went

20         through some brush in this area here (indicating),

21         up along some big sewage drains, holes there, and I

22         asked him was anything thrown into this area there.

23         He says no.  And then he led me right up into this

24         area (indicating), Letter E, the red indication

25         there.  That's where he showed us Raymond was at.

THOMAS W. STEWART

1        JUDGE McLAIN:  Mr. Stewart, while you're

2      there, a couple of us don't know exactly what you

3      meant when you said -- indicated exit to Jackson

4      Street.  Was that a specific -- where was he when he

5      said that?

6  A  It was right over here near Willow (indicating).  His

7      first thought that he had went out onto Willow

8      Street.  This is Willow here (indicating).  There's

9      another exit out of the woods and into the woods,

10     and when we got to that area, I asked him -- I said,

11     "Danny, is this the way you went out of the woods,"

12     and he indicated to me:  "No.  I went out to Jack-

13     son's house."  And he mentioned a subject's name,

14     that he lived on Jackson Street, that he knew.

15        JUDGE SHAKER:  You didn't actually walk up

16     there?

17  A  No, sir.  This is a thicket here.  This area's hard to

18     get through.

19        JUDGE McLAIN:  You did walk along the

20     trail close up from Valu-King to Willow Street?

21  A  Yes, sir.

22        JUDGE McLAIN:  And then he pointed up.

23     There's a trail through there?

24  A  No.  Right in this area where he pointed, it's a clearing.

25     There's an area that's clear there where the kids

THOMAS W. STEWART

```
1          evidentally play.  They goof around in that area        54

2          there, but after you get to this area here (indi-

3          cating), it's --

4                    JUDGE McLAIN:  He indicated that's the

5          way?

6     A    He told me "that's the way I went out.  I went out

7          Jackson Street."

8                    JUDGE NADER:  Did he indicate from which

9          point he started?

10    A    No, he never -- excuse me, Your Honor.  He did.  When he

11         left the boy here (indicating), he walked up

12         Jackson Street.

13                   JUDGE NADER:  That's from point "E"?

14    A    Point "E" is when he exited, and he said he walked

15         towards Willie's house.  A subject he knew as Willie.

16    Q    (By Attorney Watkins)  And this is 108 that you can see

17         Willow in the background?

18    A    Yeah.  He's pointing the other way.  He did not go out

19         that way.

20                   JUDGE SHAKER:  What was the number of that

21         exhibit?

22                   ATTORNEY WATKINS:  108.

23    Q    (By Attorney Watkins)  How long did this exercise take?

24    A    That we were out there?

25    Q    Yeah.
```

THOMAS W. STEWART

1   A   A half hour, maybe a little longer.

2   Q   Okay.  There came a time that you obviously brought him

3           back to the jail?

4   A   Yes, sir.

5   Q   And did there come a time that you seized some clothing

6           from Timothy Combs' possession or house?

7   A   Timothy Combs?  Yes, sir.

8   Q   Okay.  Would you tell the Court when that was and how

9           you did that.

10  A   That was on the 19th of September.  We had a search

11          warrant signed by Judge McLain to search Timothy

12          Combs' residence on Fourth Street.

13  Q   And was anyone present when you went on the 19th to the

14          Combs residence?

15  A   Yes.  Sergeant Evans was with me.  We executed the

16          warrant.

17  Q   Okay.  And pursuant to a warrant, did you take some

18          clothes?

19  A   Yes, we took several items from Timmy's bedroom.

20  Q   And would you tell the Court what you took.

21  A   Well, we took socks, shorts, trousers, shirts, pair of

22          gym shoes, pair of sunglasses.

23  Q   Okay.

24  A   Several pairs of shorts, underwear and gym shorts.

25  Q   I'm going to hand you what's been marked as Exhibit 52,

THOMAS W. STEWART

```
 1              and would you look at it and tell us whether you can  54
 2              identify it.
 3    A    Yes.  These are a pair of white socks with red trim; tube
 4              socks they're commonly called.  We recovered this
 5              from the bedroom of Timmy Combs, 660 Number Fourth
 6              Street.
 7    Q    What was done with them?
 8    A    Well, we took them out.  I inventoried them there, and I
 9              brought them in and gave them to Detective Teeple
10              approximately 1600 hours.
11    Q    And what date was that?
12    A    That was on the 19th.
13    Q    Did you also get another search warrant on the 19th?
14    A    Yes, sir.  I got two more search warrants.
15    Q    And would you tell the Court what they were for.
16    A    Search warrants were for dental impressions, saliva
17              tests, X-rays, photos, photo X-rays, and photos of
18              both Danny Hill and Timothy Combs.
19    Q    Okay.
20    A    Excuse me.  Also, Donny got a third search warrant.  We
21              got a search warrant for the Juvenile Justice
22              Center to search Timmy's locker to get a pair of
23              trousers that was in there also.
24    Q    Okay.  I want to refer to the search warrant that you re-
25              ceived, and what Judge gave you the search warrant?
```

THOMAS W. STEWART

1    A    Judge McLain.

2                  (State's Exhibit No. 110 marked

                     for identification.)

3

4    Q    (By Attorney Watkins)  I hand you what's been marked as

5          State's Exhibit 110.  Look at that.

6    A    Yes.  This is a search warrant, an affidavit for search

7          warrant under Criminal Rule 41.

8    Q    And pursuant to that search warrant, what did you do?

9          And I'm interested with just that search warrant and

10        not the other search warrants.

11   A    After we obtained the search warrant from the Judge, we

12        went to -- approximately 1800 hours; 6:00 o'clock

13        that evening, Detective Teeple and I went over to

14        the Trumbull County Jail and we served the warrant

15        on Danny.  We served the warrant on him, gave a

16        copy of the search warrant, and we had a uniform

17        car take him out to Doctor Walton's office in

18        Howland to meet with Doctor Adelman for a -- dental

19        impressions.  Photos by Detective Teeple, also.

20   Q    And were you present at that time?

21   A    Yes, sir, I was.

22   Q    And what time approximately were you dealing with that

23        Doctor Walton did anything?

24   A    Well, we got -- we picked up Danny around 6:00 o'clock.

25        15-minute drive.  We started -- we started around

54

1          6:30 till maybe around 8:00 o'clock.  I don't know

2          what time exactly he was done with him.

3    Q    Okay.  Did you give any receipt to the defendant?

4    A    Yes, I give him an inventory receipt of his mouth of the

5              stuff that was done to him and receipt for the

6              photos that were taken also.

7    Q    The defendant cooperate in this particular activity?

8    A    Yes, sir, very cooperative.

9                          (State's Exhibit No. 111 marked
                                for identification.)

10

11   Q    (By Attorney Watkins)   Showing you what's been marked

12             as Exhibit 111 --

13   A    Yeah, this is inventory that we leave with the person

14             or -- property or the person that is being searched,

15             and in this instance, Danny Hill, address where the

16             search was conducted at, 8003 East Market Street,

17             Doctor Walton, Doctor Adelman, on the 19th.  Danny

18             was given a receipt and this inventory for a quan-

19             tity of photo X-rays, photos, transparencies, and

20             print negative photos taken by Doctor Adelman,

21             Detective Teeple, and Doctor Walton.  Upper dental

22             impressions by Doctor Walton, castings, and lower

23             dental impressions of Doctor Walton by Doctor Walton

24             of Danny.  I gave him this inventory at 1920 hours,

25             which is 7:20.


                        THOMAS W. STEWART

```
 1   Q    And did you file a return of the search warrant with the    54
 2        Common Pleas Court?
 3   A    Yes, sir.
 4   Q    When was that return made?
 5   A    The following day.
 6   Q    With a copy of the receipt given to the defendant?
 7   A    Yes, sir.
 8             ATTORNEY WATKINS:  Thank you.  You may
 9        inquire.
10   CROSS EXAMINATION BY ATTORNEY LEWIS:
11   Q    Officer Stewart, how long have you been on the Warren
12        Police Department?
13   A    I'm in my 21st year.
14   Q    In your 21st year.  And how long have you said that
15        you've known the defendant, Danny Hill?
16   A    Since he was approximately 6 or 7-years old.
17   Q    He's 18 now.  Eleven years, maybe 12 years, something
18        like that?
19   A    Right.
20   Q    And how would you know him?
21   A    From working with Morris.  Detective Hill.
22   Q    Detective Hill.  Okay.  Any relationship between Detec-
23        tive Hill and Danny is what?
24   A    Morris is his uncle.
25   Q    Okay.  And what kind of association have you had with
```

THOMAS W. STEWART

1          Danny over the years?  Tell us under what circum-  55

2          stances you would see Danny possibly?

3   A   Times that I've seen Danny was usually going by his

4          grandmother's house or seeing him on the street or

5          something of that nature.

6   Q   Okay.  Did you ever go over to maybe his grandmother's

7          house and he'd be over there?

8   A   Over there all the time and eat on the holidays, yes, sir.

9   Q   And Morris would be over there?

10  A   We'd be together, yes, sir.

11  Q   And would you talk to Danny about things?

12  A   How you doing, stuff like that.  That would be --

13          basically, that was it.

14  Q   Maybe watch football games, maybe things like that?

15  A   No.  Usually, I would eat there and I would leave.  I

16          wouldn't stick around that long.

17  Q   So, are you saying that most of the conversation you ever

18          had is:  Hi!  How are you?  How are things?

19  A   That's about all.

20  Q   That would be it?

21  A   Yes, sir.

22  Q   No more than five or six words?

23  A   I don't know five or six words, but there wasn't a lot

24          of conversation, no, sir.

25  Q   Let me ask you this:  If you didn't talk to him, did you

THOMAS W. STEWART

55

1    ever hear him talk in a conversation or talk at the

2    dinner table or anything with anybody else?

3  A  No, sir, never paid no attention to him.

4  Q  Never paid no attention to him?

5  A  No.

6  Q  Okay.  All right.  Getting to the date of September 10th

7    of 1985, were you at the scene of the -- out in back

8    of the Valu-King?

9  A  Yes, sir, I was.

10  Q  Can you give us an idea what time?

11  A  Approximately quarter to 9:00, somewhere around there.

12    9:00 o'clock.

13  Q  Okay.  And can you tell us what you did out there that

14    day?

15    ATTORNEY WATKINS:  Excuse me.  The date?

16    ATTORNEY LEWIS:  September 10th.

17  A  September 10th.

18  Q  (By Attorney Lewis)  The time frame you're talking about

19    is 9:00, 9:15?

20  A  In around there.

21  Q  Okay.  Who were you with that evening?

22  A  Lieutenant Fisher.

23  Q  Okay.  And you're in which division of the police depart-

24    ment?

25  A  Narcotics.


THOMAS W. STEWART

1  Q  Narcotics.  Okay.  And who were the officers in the

2        Juvenile Division?

3  A  The officers in the Juvenile Division?

4  Q  Yeah.

5  A  Sergeant Steinbeck, Sergeant Evans, Sergeant Massucci,

6        Lieutenant Smith, and Captain Lozinski's the com-

7        manding officer.

8  Q  Captain Lozinski.  All right.  And you're with Lieutenant

9        Fisher that night, right?

10  A  Yes, sir.

11  Q  And what'd you do out at the scene?  Did you do anything

12        specific?  Collect evidence, talk to anybody?  What

13        specifically were you out there for?

14  A  No, sir.  The only thing that we did -- we just heard

15        there was a boy that was found in the woods that was

16        beat up.  We rode out there to see what was going

17        on, and that was the extent of it.

18  Q  Tell me where you were.  How far back in the field -- did

19        you get back in the field?

20  A  No.  The only -- at one point, I walked to the path

21        behind Valu-King and not even that far.  They were

22        coming out of a different area.

23  Q  They were coming out of a different area.  You walked

24        back there or back to the back of Valu-King (indi-

25        cating on the map)?

THOMAS W. STEWART

55

1   A   Go northeast.  A little bit that way.  There you go!

2          Right down in there.  Right there where you just

3          pointed last.

4   Q   And did you have any conversation with any of the other

5          officers out there?

6   A   No -- I believe I talked to Officer Vingle who was

7          sitting in the car, and he didn't go any further

8          than that either.  As a matter of fact, it was

9          raining out.

10   Q   Okay.  And Officer Vingle's a uniform officer, is that

11         correct?

12   A   Yes, sir.

13   Q   And is that the extent of what you knew about it at that

14         particular time and who you talked to?

15   A   Yes, sir, that's all we knew.  There was a boy beat up.

16         That's all we knew.

17   Q   Let's go to the next day, September 11th.  All right.

18         Wednesday.

19   A   Yes, sir.

20   Q   Okay.  Did you find out anything about the particular

21         incident by talking to any other officers or any-

22         thing at that time?

23   A   No.  The only thing -- we -- we were busy with narcotics

24         investigations.  The only thing they said that the

25         young boy was beat up pretty bad, and that was

THOMAS W. STEWART

1          mostly the extent.  Didn't really have nothing to go 55

2          on at that point.

3    Q    Nothing going at that point?

4    A    No, sir, as far as they told me.

5    Q    You didn't talk to Officer Steinbeck at all on that

6          Wednesday?

7    A    No, sir.

8    Q    Officer Massucci or Officer Evans?

9    A    No, sir.

10   Q    Moving on to Thursday, September 12th.  Now, you came on

11         duty at what time?

12   A    I got there approximately 3:00 o'clock -- 3:30.

13   Q    Okay.  And what was the first thing you did that day?

14   A    I walked over -- came in to see what we had to do in the

15         narcotics, any messages.  Typical daily thing.

16   Q    What else happened?

17   A    Then I walked over to Juvenile Division to see what was

18         going on as far as the boy being beat up.

19   Q    Okay.  And what happened as a result of that?

20   A    Well, it was close to 1600 hours by that time, which is

21         4:00 o'clock.  It was time for them to go home.

22         Captain Lozinski asked me if I would assist his

23         division in taking a few statements from some people.

24   Q    Okay.  And was there any meeting of the officers involved?

25         Say, for instance, did you see Officer Steinbeck

THOMAS W. STEWART

1          there at the time, Officer Evans or Officer Massucci?55

2  A    Yes, sir, they were all there.  To the best of my recol-

3          lection, they were still in the office.

4  Q    And they asked you to take a couple of statements, is

5          that correct?

6  A    Yes, sir.

7  Q    And do you recall who the statements were from?

8  A    Yes.  They wanted me to take a statement from Troy Cree

9          and Darren Ball.

10 Q    Okay.  And did you discuss generally some of the facts of

11         the case or what the case was about?

12 A    No.  I checked on the boy's condition a little bit.  They

13         told me that they haven't found the bike.  He was

14         riding a bike at the time.  He left the house with

15         the bike, and they haven't found it at that point.

16         They mentioned -- oh, they mentioned where Troy

17         Cree and Darren Ball was supposed to have been at

18         the time, and that was why it was important they

19         have some statements from them.

20 Q    And did they have any information in regard to what you

21         were supposed to ask Mr. Cree or Mr. Ball?

22 A    Yes.  I was supposed to ask them questions of where they

23         were at, do they know who they seen, do they know

24         the subjects and whereabouts did they see them in

25         the field.


                    THOMAS W. STEWART

1   Q   Okay.  The subjects and everything else, did they give

2       you any idea who they might be talking about at

3       that point?

4   A   No, they didn't.  Detective Seese was in the Interview

5       Room, came back through the Juvenile Bureau and

6       mentioned the fact if anybody knew a subject by the

7       name of Smoo.  I didn't know Smoo.

8   Q   Did anybody else know Smoo?

9   A   Steinbeck knew Smoo.

10   Q   Okay.  And Smoo's real name is what?

11   A   Timothy Combs.

12   Q   And did any further conversation go on at that point

13       about Smoo, or Timothy Combs?

14   A   I think, if I can recall correctly, Steinbeck just asked

15       them if they know who he is or if they had other

16       information pertaining to him at that time.

17   Q   Okay.  In other words, asked the witnesses, Mr. Ball and

18       Mr. Cree, right, if this can be witnesses?

19   A   Yes, sir.

20   Q   So, the name Timothy Combs had come up.  You didn't know

21       Smoo, or Timothy Combs, before that, but you were

22       supposed to ask specifically Mr. Darren Ball and

23       Mr. Troy Cree about Tim Combs then, right?

24   A   No, I wasn't specifically asked about Tim Combs.  They

25       wanted to know who was coming out of the field.


THOMAS W. STEWART

55

```
 1            If they could identify anybody coming out of the
 2            field.
 3   Q   How were they going to identify?  Did you take anything
 4            with you to identify them with?
 5   A   No, I didn't.
 6   Q   Did you have a time subsequent to that time to take any-
 7            thing to identify them with?
 8   A   Yes, when Troy came into the station.
 9   Q   Okay.  Let's back up a minute.  You went up -- or I
10            guess you went out to the address of Mr. Cree, is
11            that correct?
12   A   Yes, sir.
13   Q   And who was home at the time?
14   A   His father.  He was still at football practice.
15   Q   And was some arrangement made in regard to Mr. Cree
16            coming down to the police department?
17   A   Well, I told the father -- I said, "When he comes home
18            from football practice, how about notifying us so
19            we can come out and talk to him.  We want to talk
20            to him about Raymond Fife being beat up."  They were
21            aware of that.  Okay.  So, I went back down to the
22            station.  In the meantime, football apparently
23            gotten over with, and his mother brought him down
24            to the station to us.
25   Q   So, he was down at the police department, right?
```

                        THOMAS W. STEWART

1    A    Yes, sir.

2    Q    And that was on September 12th.  Can you give me an idea

3         of what time?  You can refer to the summary.

4    A    I think it's approximately 1800 hours; 6:00 o'clock.

5    Q    About 6:00 o'clock?

6    A    Yes, sir.

7    Q    And did you have an occasion to have him -- excuse me.

8         I'll show you what's been labeled as State's Exhibit

9         101, and is that the summary of the event that took

10        place, the duties you performed on September 12th?

11   A    Yes.  As it indicates here, 1815, we took the statement

12        from Troy.

13   Q    And that was taken at the Warren Police Department?

14   A    Yes, sir.

15   Q    You took that personally?

16   A    Yes, sir.

17   Q    Okay.  And did you also show him some photographs?

18   A    Yes, sir, I did.

19   Q    Okay.  Who were the photographs of?

20   A    Greg Allen, Dozie Blackman, Tim Combs, Joe Cofield, and

21        another unknown subject.  There was no name on the

22        photo.

23   Q    And prior to that time, did he indicate that he recog-

24        nized anybody?  What did Mr. Cree say?  Did he see

25        anybody come out of the field or anybody around that

THOMAS W. STEWART

55

1     area in his statement?

2 A You just asked me two questions.

3 Q I'm sorry.  Did he identify anybody out of the photo-

4     graphs?

5 A Yes.

6 Q Okay.  And who'd he identify?

7 A Tim Combs.

8 Q And what was it that Tim Combs was supposed to have done

9     according to Mr. Cree?  Was he seen by Mr. Cree?

10 A Yes, he was.

11 Q Where was he seen at?

12 A Mr. Cree related to me that when him and Darren were

13     coming around the bend before you come out into

14     Valu-King, they seen Timmy walking into the field.

15     He was walking from the blacktop into the -- into

16     the path, okay, and he indicated to me that Darren

17     Ball made the comment to Troy that that's Smoo.

18 Q Okay.  Wait a minute!  Come on over to the map here

19     a minute.

20          (Witness steps off the witness stand

21           and approaches the diagram.)

22 Q (By Attorney Lewis)  Do you happen to recall what time

23     this was that Mr. Cree said this happened?

24 A He says after football practice.  So, we're assuming it

25     was around 10 after 5:00.


THOMAS W. STEWART

1          ATTORNEY WATKINS:  Your Honor, I'm going

2     to object.  We're going to have Mr. Cree.  This is

3     all hearsay as to what he's learning from another

4     witness.  He's going to be a witness!

5          ATTORNEY LEWIS:  I just want some indica-

6     tion of what the police knew at the particular time

7     that we're talking about as of this particular date.

8          JUDGE McLAIN:  I think it's all right to

9     examine their investigative procedures.  Go ahead.

10    Overruled.

11  Q    (By Attorney Lewis)  Just give me an indication of where

12        Mr. --

13  A    Okay.  The way Troy Cree explained to me, it was approxi-

14        mately 10 after 5:00 and 5:30, whenever football

15        time is over.  They said they were just walking out

16        in the blacktop area, which is the parking lot of

17        the Valu-King, and they seen Smoo go into the

18        path (indicating).

19  Q    Okay.  You're saying the rear of the parking lot area

20        (indicating)?  In other words, behind the store?

21  A    Right.  Just behind the store.

22          JUDGE McLAIN:  Mr. Lewis, I don't know

23    about anybody else, but you keep pointing to the

24    map with a 2-pronged item; with your glasses.  I

25    can't tell --


                    THOMAS W. STEWART

56

1    A    This is the area right here (indicating) where Troy said

2         that him and Darren Ball seen Smoo going into the

3         -- into the pathway into the field.

4    Q    (By Attorney Lewis)   Smoo is going into the pathway?

5    A    Yes, sir.

6    Q    Where was Darren Ball and Troy Cree located at when they

7         saw them?

8    A    A few feet away from them.

9    Q    They were coming out of the path and Smoo was going in?

10   A    Yes, sir.

11   Q    Okay.  All right.  So, at that point, you were aware of

12        the fact that -- or at least you personally were

13        aware of the fact that Mr. Combs had been identified

14        as being in the particular location at the particu-

15        lar time we're all talking about, right?

16   A    Yes, sir.

17   Q    And in regard to this particular report, is this the re-

18        port that you had Mr. Steinbeck take a look at on

19        the next day, Friday?  The report right there?

20   A    Yes, sir.  The note and the summary, yes, sir.

21   Q    The note and the summary?

22   A    Yes.

23   Q    So, as far as you're aware, did Officer Steinbeck review

24        that particular summary on that Friday?

25   A    Yes, sir.


THOMAS W. STEWART

56

1  Q  Okay.  In fact, you indicated that you had talked to him

2        later that afternoon, right?

3  A  Friday?

4  Q  Yeah.

5  A  Yeah, when I came -- no!  I came to work early.  I

6        talked to him, yeah.  I talked to him later on

7        Friday, yes, sir.

8  Q  And when you talked to him, you talked about -- I think

9        it was Danny, of course, right?

10  A  Yes, sir.

11  Q  Okay.  And did you talk about -- or did he note the

12        fact that Mr. Combs was identified as going into

13        that path --

14  A  Yes, sir.

15  Q  -- at that particular time?

16  A  Yes, sir.  It was indicated on the report.

17  Q  So, let's talk about, basically, as of Friday when he

18        first saw, some time in the morning -- he's on

19        morning shift, isn't he?

20  A  Yes, sir.

21  Q  So, he would have known about Tim Combs being in the area

22        at approximately the time we're talking about?

23  A  Yes, sir.

24  Q  Okay.  Did you ever have an occasion after this particu-

25        lar date to go out and talk to Tim Combs?

THOMAS W. STEWART

| | | | |
|---|---|---|---|
| 1 | A | I never talked to Timmy Combs. | 56 |
| 2 | Q | Did you have any knowledge of anybody who did go out and | |
| 3 | | talk to Tim Combs? | |
| 4 | A | On the 16th? | |
| 5 | Q | Before the 16th. | |
| 6 | A | Before the 16th?  I have no knowledge of that, no, sir. | |
| 7 | Q | All right.  In the summary in regard to what Danny was | |
| 8 | | talking about, I notice in the summary he was also | |
| 9 | | asked about Tim Combs.  Was it -- did you bring up | |
| 10 | | Tim Combs? | |
| 11 | A | Yes, sir. | |
| 12 | Q | Okay.  And Danny was down there at approximately -- let's | |
| 13 | | see.  What time was it he was down there?  At 1930 | |
| 14 | | hours, right? | |
| 15 | A | Yes, sir. | |
| 16 | Q | And Mr. Cree had been down there at 1850 hours, is that | |
| 17 | | right? | |
| 18 | A | 1815. | |
| 19 | Q | 1815? | |
| 20 | A | Quarter after 6:00. | |
| 21 | Q | Quarter after 6:00.  All right.  And he'd already made | |
| 22 | | an identification of Tim Combs as being out in the | |
| 23 | | area at the time, right? | |
| 24 | A | Troy did, yes, sir. | |
| 25 | Q | Yeah, right.  Okay.  Was that the reason you brought it | |

THOMAS W. STEWART

56

| | | |
|---|---|---|
| 1 | | up and asked Danny about Tim Combs? |
| 2 | A | Taking that into consideration and the fact that Smoo's |
| 3 | | name was mentioned earlier, yes, sir. |
| 4 | Q | Did anybody tell you about Smoo? |
| 5 | A | The only thing, his name was mentioned; Smoo. |
| 6 | Q | Did anybody ask:  Well, what about him?  What'd he do? |
| 7 | | Or why would we be looking for -- |
| 8 | A | We wasn't looking for him. |
| 9 | Q | You weren't looking for him? |
| 10 | A | Huh-uh. |
| 11 | Q | Did you talk to Officer Steinbeck in regard to Smoo be- |
| 12 | | fore that Friday? |
| 13 | A | No.  Just -- |
| 14 | Q | Tim Combs? |
| 15 | A | No.  Just his name came up. |
| 16 | Q | Just his name came up.  Okay.  So, then, you asked Danny |
| 17 | | about Tim Combs, right? |
| 18 | A | Yes, sir. |
| 19 | Q | Okay.  And what was the other information he gave you? |
| 20 | A | As far as -- |
| 21 | Q | Danny, that is.  Yes, the defendant. |
| 22 | A | He mentioned the fact he seen Reecie Lowery on the boy's |
| 23 | | bike. |
| 24 | Q | Let's stop right there.  He said he saw Reecie Lowery on |
| 25 | | the boy's bike, is that correct? |

THOMAS W. STEWART

56

```
 1   A   Um-hum.

 2   Q   When was the bike found?  Do you recall?

 3   A   I think it was recovered Friday.  I'm not sure.

 4   Q   Okay.  So, on Thursday night when Danny was down there

 5           talking about Maurice having the bike, the bike

 6           hadn't been recovered yet?

 7   A   No, sir.

 8   Q   But you were all looking for the bike, right?

 9   A   I wasn't involved in that, sir.  I can't answer that.

10   Q   Well, let me ask you this:  Were you aware of the fact

11           that the police department, they were looking for

12           this bike?

13   A   The bike was missing, yes, sir.

14   Q   Okay.  Well, they wanted to find it, right?

15   A   Yes, sir.

16   Q   Okay.  And at this particular point in time, he said,

17           "I saw Reecie on the bike," and the bike hadn't

18           been found?

19   A   Yes, sir.

20   Q   And you didn't think that was important, or you just

21           thought that was Danny telling stories?

22   A   It was important for us to take a ride out and see if we

23           could find him on the bike.

24   Q   Okay.  All right.

25   A   He gave us a description of the bike.
```

THOMAS W. STEWART

56

1   Q   Okay.  So, you went out, and he basically -- he showed
2       you where Maurice lived or what?  Is that it?
3   A   No, he didn't show me where Maurice lived.  I knew where
4       Maurice lived.  He just showed us where he seen him
5       on the bike.
6   Q   And what else did you do when you were in the car?  Where
7       else did you go?
8   A   We went over to Timmy Combs' mother's house.
9   Q   Why would you go over Timmy Combs' mother's house?
10  A   He wanted to show us where he lived.
11  Q   You were interested in that?
12  A   Yes.  After he mentioned it, yes, I was.
13  Q   Well, let me ask you this.  You had Troy Cree in there
14      before, maybe about two hours, and he identified
15      Mr. Combs as the individual he saw out there that
16      particular day at that particular time.  All right.
17      Weren't you kind of interested in talking to Mr.
18      Combs or maybe seeing where he lived?
19  A   No, sir.
20  Q   You didn't?
21  A   Was I interested you're asking me?
22  Q   You weren't interested?
23  A   Not at the present time, no, sir.
24  Q   Not at the present time.  Okay.  So, at the conclusion
25      of the day, you type up this basic summary of what


THOMAS W. STEWART

56

1        occurred, right?

2  A   Yes, sir.

3  Q   All right.  And your feeling was that because Danny told

4        you different stories or talked about Maurice or

5        whatever, your feeling was that he wasn't telling

6        the truth and there was something wrong?

7  A   True.

8  Q   Okay.  So, that that's the -- basically, the thrust, is

9        it, of what you left for Officer Steinbeck?  Right?

10  A   Yes, sir.

11  Q   What'd you think about Tim Combs?

12  A   I didn't have no -- I don't understand the question.  What

13        I think about him?

14  Q   Here's what I'm getting at.  It's simple.  Danny Hill

15        comes in, and not identified by anybody being any-

16        where, talks about a bike possibly that's missing.

17        You know it's missing.  You're looking for -- hadn't

18        been found yet.  Okay.  You go out and you cruise

19        around.  You happen to go by Tim Combs' place.  It

20        just so happens that a person identifies Tim Combs

21        as coming out of the path at that particular time.

22        There's more emphasis on Danny than Tim.

23  A   We didn't happen to go by Tim's house.

24  Q   He showed you.

25  A   He wanted to take us by Tim's house.  I had no interest

THOMAS W. STEWART

56

```
 1            in going by Tim's house.
 2    Q   You didn't think anything about this thing about Tim
 3            Combs being identified or anything?
 4    A   At that point, no, sir.
 5    Q   Nothing?
 6    A   No, sir.
 7    Q   But earlier that day, one of the officers came through
 8            and talked about Tim Combs, or Smoo, but you didn't
 9            ask why anybody would be interested in him?
10    A   No.   They just said his name was mentioned; Smoo, as
11            being around there.   That's all that was said.
12    Q   But nobody told you about Smoo or anything about him?
13    A   No, sir.
14    Q   Okay.   Now, going to -- I think the next time you -- let
15            me ask you this question:   Did you work on this case
16            on Saturday?
17    A   No, sir.
18    Q   Okay.   Did you work on it Sunday?
19    A   No, sir.
20    Q   Okay.   Getting to Monday, okay --
21    A   Yes, sir.
22    Q   -- the 16th.   All right.   What time did you first see
23            Danny that morning?
24    A   Approximately 10:30, quarter to 11:00.
25    Q   10:30, quarter to 11:00.   Okay.   And where was he at when
```

THOMAS W. STEWART

1    you saw him?

2 A Interview Room Number 1.

3 Q Okay.  And who else was in the room beside -- who else

4    was in the room, let's put it that way, besides

5    yourself?

6 A I wasn't in the room.

7 Q Well, when you got -- did you go into the room?

8 A Later on, yes, sir.

9 Q Okay.

10 A When I arrived there, Detective Hill and Sergeant Stein-

11    beck were with Danny.

12 Q They were with Danny --

13 A Yes, sir.

14 Q -- in Interview Room Number 1?

15 A Yes, sir.

16 Q And did you go in at that time or did you stay outside?

17 A I stayed outside, sir.

18 Q Okay.  And any other officers that were involved in this

19    case, were they around at the time?  Mr. Evans,

20    Mr. Massucci, anybody else?

21 A If I can recall, I don't believe Massucci was there.

22    They were out on the road doing something.  What,

23    I don't know.

24 Q Okay.  And you didn't go into the room at the time?

25 A No, sir.


       THOMAS W. STEWART

1    Q    Okay.  But you're aware of the fact that Officer Hill and 57

2         Officer Steinbeck were in the room with Danny?

3    A    Yes, sir.

4    Q    Could you hear any of the conversation?

5    A    No, sir.

6    Q    Was the door locked?

7    A    No, sir.

8    Q    But they were inside?

9    A    Yes, sir.

10   Q    Did you happen to see Vera Williams down there?

11   A    Yes, sir, I did.

12   Q    And how long have you known Vera?

13   A    As long as I've know Morris; 21 years.

14   Q    Okay.  And where was Vera at?

15   A    When I first seen her, she was coming up the hallway

16        into the interrogation area.  It's a long hallway.

17   Q    Up the interrogation --

18   A    Yes, sir.

19   Q    The hallway by the interrogation rooms?

20   A    Yes, sir.

21   Q    Did you have any conversation with her?

22   A    I said, "Hi, Vera!  How you doing?"  She said, "All

23        right."

24   Q    Okay.  She say anything to you?

25   A    No.

THOMAS W. STEWART

57

1  Q   Nothing at all?

2  A   Huh-uh.

3  Q   Nothing about Danny?

4  A   Huh-uh.

5  Q   Nothing.  Okay.  Did you see her later on at any time

6      that day?

7  A   Yes, sir.  She went to the back.  She went in and she

8      talked to Danny for a while.  She came back, and

9      she went back out in the area where most people

10     usually stay that are not supposed to be in that

11     area.  Restricted area.  And then I went out and

12     talked to her for a while.

13 Q   Okay.  Were you aware -- or did you know -- was Vera ever

14     taken in the back and placed in an Interrogation

15     Room back there?

16 A   She talked to Danny in a room.

17 Q   Okay.  Was that the room he was in with Morris Hill and

18     Detective Steinbeck?

19 A   At first, she was in that room, and I believe she went

20     into Room Number 2.  So, she had a seat in there.

21     That's my recollection, yes, sir.

22 Q   Okay.  How long were Officer Hill -- Officer Hill and

23     Steinbeck in the room before they came out and you

24     were aware they were in there?  In other words,

25     you wait around five, 10 minutes?

THOMAS W. STEWART

1  A   Yes.  It wasn't too long after I was there that they had   57
2          came out of the room.
3  Q   And Danny was left in the room?
4  A   Yes, sir.
5  Q   And what did you three officers talk about?  Talk about
6          anything?
7  A   That's when they left the door open and that's when I
8          seen Vera coming down the hall.  She went in the
9          room, and I questioned "how come you're letting her
10         in there if he's being interviewed?"  And then she
11         went back to the second room, then she went out.
12         And then I asked them if they were talking to him.
13         They were asking him some questions in regard to
14         Friday.  And then they went back into the room.
15 Q   Okay.  So, you questioned why Vera was let into the
16         room --
17 A   Yes, sir.
18 Q   -- because an interview was going on --
19 A   Yes, sir.
20 Q   -- or whatever?
21 A   Whatever they were doing.
22 Q   Was she ushered out?
23 A   No.  When they were ready to go back in the room, they
24         asked her if she would step in the room, and she
25         did.


                    THOMAS W. STEWART

1    Q    Step in the same room?

2    A    Room 2.

3    Q    Room 2?

4    A    Yes, sir.

5    Q    Did anybody go in there to talk to her?

6    A    I don't recall if anybody went in there and --

7    Q    Did Officer Hill instruct you to go in and take a state-

8          ment from Vera?

9    A    Me take a statement?  No, sir.

10    Q    Did Officer Steinbeck tell you:  "When you're out there,

11          take a statement from Vera.  She's here for that"?

12    A    No, sir.

13    Q    She was just placed in the second room, is that correct?

14    A    Yes, sir.

15    Q    So, you all three go back in the room, is that right?

16    A    No, sir.  I didn't go in there at that time yet.  Stein-

17          beck and Hill, they made one more attempt.  They

18          went back in again.

19    Q    Made one more attempt at what?

20    A    I don't know.  Whatever they were trying to do.  Talking

21          to him.

22    Q    Okay.  All right.  So, when is it that you finally did

23          go in?

24    A    I went in approximately quarter after 11:00.

25    Q    Prior to that time, when you were all outside; Officer

THOMAS W. STEWART

57

1     Hill and Officer Steinbeck, and you talked to them,

2     what were they talking about?

3  A  We were never all out of the room at one time talking to

4     each other.  The first time all three of us talked

5     together at all was the time right before Morris

6     went back into the room.  The last time Morris came

7     out of the room and Denny came out of the room, we

8     stood there for a few minutes.  Then Danny -- then

9     Morris went back in with Danny.

10  Q  Alone?

11  A  Alone.

12  Q  I'm getting the time frame right.  All right.  Let me

13     ask you this:  You weren't in there before that

14     time with Officer Steinbeck or Officer Hill?

15  A  No.  I never had no occasion to be in there with all

16     three of us at one time prior to that, no, sir.

17  Q  Are you positive of that?

18  A  I might have stood by the doorway when they opened the

19     doors.  That's the only thing I can think.

20  Q  Let me ask you this:  Do you recall testifying on Decem-

21     ber 16th -- or the 17th -- 16th -- December 16th.

22     Okay.  You remember testifying possibly that Officer

23     -- you came in later, but Officer Hill, Officer

24     Steinbeck and yourself were all in the room, okay,

25     at one particular point in time?  Some time went by.

THOMAS W. STEWART

57

1  You were questioning, interviewing him, whatever,
2  and then the decision was made that Steinbeck and
3  yourself would leave the room, and Morris was alone.
4  In other words, were you in the room?

5  A  I don't recall testifying to that.  I recall that we were
6  there.  As far as any questioning or anything going
7  on, I don't think we questioned him.  Morris made
8  the decision to go int the room by himself.  When he
9  came out of the room, I might have been at the door-
10  way or something of that nature.  As far as sitting
11  down and actually interviewing Danny, no.

12  Q  So, you took no part in the interview of Danny prior to
13  the time that Morris Hill was left alone in the
14  room --

15  A  No, sir.

16  Q  -- with Danny?

17  A  None whatsoever.

18  Q  Okay.  All right.  Okay.  At the time -- then there did
19  come a time when Morris was left in the room alone
20  with Danny?

21  A  Yes, sir, there was.

22  Q  Prior to that time, what was the demeanor of Danny?  I
23  mean was he -- describe how he was?

24  A  I didn't spend that much time with him, only like a brief
25  moment.  Seemed all right to me.

THOMAS W. STEWART

57

1   Q   Was he crying before --

2   A   No, sir.

3   Q   -- you left him or anything?

4   A   No, sir.

5   Q   All right.  In fact, you made him pretty comfortable,

6       didn't you?

7   A   Yes, sir, we did.

8   Q   I mean if he wanted pop or if he wanted cigarettes or he

9       wanted to eat some sandwiches and everything else?

10      Made him as comfortable as possible, right?

11  A   Yes, sir, we did.

12  Q   Okay.  And, of course, you've known Danny for -- what was

13      it now?  Twelve years, something like that?

14  A   Yes, sir.

15  Q   Okay.  About 13 years.  Morris knew him all his life?

16  A   Yes, sir.

17  Q   Okay.  Did he feel pretty good around you guys cause he

18      knew you?

19  A   Danny?

20  Q   Yeah.  Did he feel comfortable --

21              ATTORNEY WATKINS:  I'm going to object.

22      I don't know how he could know how Danny feels.

23              JUDGE McLAIN:  Oh, I think that's common

24      sense impression.  Objection's overruled.

25  Q   (By Attorney Lewis)  Did you get along well with Danny?


                    THOMAS W. STEWART

57

1    A    Yes, sir.

2    Q    And did Morris get along well with him?  I mean treat him

3         kindly and so forth and so on?

4    A    Yes, sir.

5    Q    And you gave him all the amenities?

6    A    Yes, sir.

7    Q    So -- and, of course -- let me ask you this.  Just so

8         happens you happen to know this defendant for many

9         years, and so does Mr. Hill, but any defendant you

10        get in there, isn't one of the things to make them

11        as comfortable as possible?  Be nice to them, show

12        them some amenities; develop some kind of a trust,

13        right?

14   A    Yes, sir.

15   Q    So, Danny was taken care of as far as that goes plus he

16        knew you for years; he knows Morris, of course --

17   A    Yes, sir.

18   Q    -- all of his life?  All right.  So, Morris is in alone.

19        He comes out.  And what does he say?

20   A    "Danny wants to tell us what went on."

21   Q    "Danny wants to tell us what went on."

22   A    His part of it.

23   Q    Okay.  His part of it?

24   A    Yes, sir.

25   Q    Okay.  So, then, you proceed back into the room, is that

THOMAS W. STEWART

57

```
1           correct?
2    A   Yes, sir.
3    Q   Okay.  And Officer Steinbeck goes back in the room?
4    A   Yes, sir.
5    Q   Okay.  Detective Hill did not, though, is that correct?
6    A   No, sir.
7    Q   He stayed outside.  All right.  What was it that Detec-
8            tive Steinbeck and yourself told Danny or what hap-
9            pened when you got back in the room?
10   A   I says -- I asked Danny how he was feeling.  He said,
11           "I'm cool."  I said, "You want to tell us -- "
12           "You indicated to Morris that you want to tell us
13           what happened on that day."  He says, "Yeah.  Okay."
14           I said, "Do you mind if we tape it?"  He says, "No.
15           That's all right.  Go ahead."
16   Q   He said everything's cool.  Describe his demeanor after
17           Morris left the room and you went back in the room.
18   A   Well, he was crying a little bit.
19   Q   Crying a little bit?
20   A   Yes, sir.  I mean it wasn't a lot.  There was some indi-
21           cation he had been crying.  There was some tears.
22           Morris wasn't in the room that long.
23   Q   Was his speech slower, I mean, than he was previously or
24   A   No.  He -- he recovered after I asked him do you know --
25           do you want to tell us what happened, his part, and
```

THOMAS W. STEWART

57

1     he seemed to be all right after that.

2 Q Okay.  So, as soon as Mr. Hill came out and says he wants

3     to tell you about it, you go in, and the first thing

4     you do -- you really don't talk about the case at

5     all or any of the facts, right?

6 A No.  As a matter of fact, I patted Danny on the shoulder.

7     I said, "How you doing, Danny?  Are you okay?"  He

8     said, "I'm okay."

9 Q He's okay.  Coming from a person he knows for 12 years,

10     right?

11 A That's right.

12 Q All right.  So, then, you asked him if he wanted to put

13     it on tape, right?

14 A Yes, sir.

15 Q And you started a taped statement, is that correct?

16 A Yes, sir.

17 Q And how did that taped statement go?  Do you recall

18     about the first -- have you had a chance to look

19     at -- excuse me.  Have you had a chance to look at

20     the transcript of what was on the tape?

21 A I studied it briefly during the week, yes, sir.

22 Q Earlier this week?

23 A Yes, sir.

24 Q Listened to it and also read the prosecutor's transcript?

25 A Yes, sir.


THOMAS W. STEWART

1  Q  So, you're very familiar with it?                           58

2  A  I don't know about very, but I'm familiar with it, yes,

3         sir.

4  Q  Okay.  All right.  The first three or four pages of that

5         particular tape, is it basically Danny doing most

6         of the talking?

7  A  Yes.  We let him -- as I indicated to him, on his own

8         words.  His own words.  Danny, tell me, you know,

9         what happened on that date.

10 Q  Okay.

11 A  And that's what he started to do.

12 Q  Okay.  So, basically, maybe for three, four pages, some-

13        thing like that, it's basically all Danny talking

14        about what happened --

15 A  Yes, sir.

16 Q  -- in narrative type form?

17 A  Yes, sir.

18 Q  Then it gets into a question and answer type situation --

19 A  Yes, sir.

20 Q  -- right?  Now, during the course of that tape, what was

21        the interruption that came about?  Do you recall

22        the first interruption?

23 A  There was a knock on the door.  The knock on the door was

24        the first one.  It might have been the first one

25        we said we don't want to be interrupted.


                        THOMAS W. STEWART

58

1   Q   Okay.   That's correct.

2   A   Is that one?

3   Q   Yeah, you're right.

4   A   And the second one is we went off the record, and I --

5       I was trying to figure out why that was, and the

6       only thing I can assume is that Detective Steinbeck

7       might have left the room and came back in, and we

8       was -- that was the second time, and, I think, the

9       only times.

10  Q   Okay.   And immediately upon going off the record and per-

11      haps Mr. Steinbeck leaving, coming back to the room,

12      you went back on the record, is that correct?

13  A   Yes, sir.

14  Q   And during the time that -- between the start of the tape

15      and that last interruption we're talking about,

16      Morris Hill came into the room, did he not?

17  A   Yes, sir.

18  Q   Okay.   So, all three of you were in the room along with

19      Danny, and you went off the record, Steinbeck came

20      back in, and then there was the recitation of the

21      rights?

22  A   Yes.   Detective Hill came back in a few minutes before

23      the rights were read to him.

24  Q   Okay.   And in regard to the particular -- Officer

25      Stewart, in regard to State's Exhibit 58 and also

THOMAS W. STEWART

1    57, can you give us the best recollection you have    |58

2    as to how the particular situation arose you've been

3    talking about here?

4  A    You're talking about why this was done the way it was?

5  Q    Why we have two.  I remember on Direct Examination, you

6    indicated that you just recall one sheet being

7    signed at the time, and that was your honest belief,

8    right?

9  A    Yes, that was my honest belief, yes, sir.  And I --

10  Q    In fact, you came in here on December 16th and testified

11    that it was actually State's Exhibit 57, what we'll

12    call as the old rights form without the additional

13    language, that was the one read to Danny and that

14    was the one signed by Morris and the one witnessed

15    by --

16  A    Myself.

17  Q    -- yourself, and Danny signed it, and that was the rights

18    sheet --

19  A    Yes, sir.

20  Q    -- right?  Okay.  And the next day, however, you came

21    back in since another rights sheet was found.  You

22    testified that it was actually State's Exhibit 58

23    with the additional language.  That was also read

24    to him, signed by you, signed by Morris at the same

25    exact time, 1155 hours.


THOMAS W. STEWART

58

1   A   Yes, sir.

2   Q   What's your best recollection of how that occurred?

3   A   What I can remember was at this particular time when

4          Morris started reading him his rights, he told

5          Danny that -- we got -- we was that far along where

6          we started reading him his rights sheet, and I re-

7          member indicating on the -- during the course of

8          the signing:  "Let the record indicate that Danny

9          Hill signed the right sheets," and that's the best

10         that I can recall of that --

11  Q   Okay.

12  A   -- that particular day is Morris reading this verbatim

13         over the interview -- over the cassette.

14  Q   Okay.  Reading verbatim.  Okay.  The additional language

15         up there, are you aware that the second sentence

16         "I have voluntarily agreed, however, to accompany

17         police officers to the Warren Police Department to

18         give a statement," okay, that particular statement

19         there, do you think or do you know that that appears

20         the same way in the tape?

21  A   I will say it probably appears the same way or should be

22         the same way, yes, sir, cause he read it.

23  Q   Should be the same way.  Okay.  Would it surprise you if

24         I told you it doesn't?

25  A   Would it surprise me?

THOMAS W. STEWART

58

1    Q    Yeah.

2    A    Yes, sir, it would surprise me.

3    Q    Okay.  What I'm asking is as far as you know, Mr. --

4        Detective Hill -- of course, he reads the entire

5        statement and everything else?  He doesn't have any

6        difficulty reading as far as you know?

7    A    As far as I know, he doesn't.

8    Q    And if that sentence was significantly different than

9        the sentence that appears there, would you have any

10        idea of how that would come about?

11    A    The only thing I would say is he was just reading.

12        Didn't take his time to read it.  That's the only

13        thing I can think of.  The only reason why that

14        would be like that.

15    Q    Let me show you a transcript and show you the language

16        if you recall, right there (indicating).

17    A    Okay.  Read it?

18    Q    See the difference?

19    A    (Witness reads the transcript.)  Yes, I do.

20    Q    Okay.  I think it's a rather significant difference.

21        It's not just one word, is it?

22    A    No.  It's a -- probably a sentence and a half maybe.

23    Q    Right.  Okay.

24    A    Yes, sir.

25    Q    Let me ask you this:  Is it possible that the old rights

THOMAS W. STEWART

58

1       sheet was actually read and signed and somebody,

2       possibly Mr. Hill, was reading that from something

3       else that somebody had written down and that this

4       sheet was brought in later on, signed and everything

5       else?  Is it possible?

6  A  At that exact time?

7  Q  Not that exact time.  What I'm asking you is this.  What

8       I'm saying is that you have State's Exhibit Number

9       57, okay, which is signed by Danny for 11:55.

10  A  Yes, sir.

11  Q  Then you have another statement which you happened to

12       find on December 16th that has some additional

13       language.

14  A  Yes, sir.

15  Q  Unfortunate part is the additional language doesn't match

16       up with what's actually on the tape --

17  A  Yes, sir.

18  Q  -- right?  So, what I'm asking you:  Is it possible

19       actually State's Exhibit 57, that was read, signed

20       at exactly 11:55, but this was read by Mr. Hill

21       from some other document, not the rights sheet?

22  A  I can't answer that.  It could be possible, but I can't

23       answer positively.

24  Q  That's a fair answer.  Thank you very much.  I appreciate

25       that.  Okay.  During the course -- okay.  When those

THOMAS W. STEWART

58

1          rights were given, okay, from the transcript, Mr.

2          Hill just reads those rights straight through,

3          doesn't he?

4  A    Yes, sir.

5  Q    Okay.  There's no interruption.  The only time they asked

6          Danny if he understood is after the entire top of

7          the rights form, right?

8  A    Yes, sir.

9  Q    Okay.  Then the waiver is read entirely through, is it

10         not?

11 A    Yes, sir.

12 Q    Then the only question after that is do you understand?

13 A    Yes, sir.

14 Q    Okay.  And at the beginning of the tape, it says to the

15         effect, basically, "Danny, do you know your rights,"

16         and his acknowledgement is a yes or a yeah, or what-

17         ever it was.

18 A    No, sir.

19 Q    Okay.  At the beginning of the tape --

20 A    At the beginning of the tape, I asked him:  "You were

21         advised of your rights, were you not?"  I didn't

22         ask if he knew what his rights -- I asked:  "You

23         were advised of your rights, Danny," and he said,

24         "Yes, I was advised of my rights."

25 Q    Okay.  And -- what I'm saying is, basically, you didn't

THOMAS W. STEWART

58

1          go through his rights at that time?

2    A    No.   I thought it already had been read to him when I

3          asked him do you know your rights.   He said, "I've

4          been told my rights.   I know what they are."   I

5          don't know if that's word for word, but similar to

6          that.

7    Q    "Okay.   Danny, you know why you're down here.   You've

8          been advised of your rights by Sergeant Steinbeck,

9          and you know what your rights are, but -- is that

10         true?"

11        "Yes."

12        "Detective Hill advised you of the rights this morning

13         before you started talking also."

14        "Yes."

15        But you really don't go through the rights themselves?

16   A    No, sir.   He was already advised as far as I was con-

17         cerned.

18   Q    He was fully advised and everything else.   Okay.   Did

19         anybody, prior to that time -- we've already heard

20         from Officer Steinbeck.   Did you ever ask Danny if

21         he could read or write?   Did you ever see him read

22         anything or did you ever ask him if he could write

23         or anything like that?

24   A    No, I never asked him that, no, sir.

25   Q    Okay.   Your description of Danny is a man of normal

THOMAS W. STEWART

1    intelligence?  I think that's what you testified to   |58

2    on the 16th.

3  A  Yes.

4  Q  Normal intelligence.  Normally, when you have suspects

5    in there or you're having them write statements or

6    give statements, or at least their Miranda Rights,

7    did you ever ask them if they could read?

8  A  Yes, I always do.

9  Q  You always do?

10  A  Yes, sir.

11  Q  Okay.  So, why didn't anybody ask Danny if he could read?

12    ATTORNEY KONTOS:  Objection.  He's asking

13    -- if he's asking why he did something when he takes

14    a statement -- he can't answer as to what -- why

15    somebody else did or didn't do something.  They can

16    speak for themselves.

17    ATTORNEY LEWIS:  No.  I was asking Mr.

18    Stewart.

19  Q  (By Attorney Lewis)  Mr. Stewart, let me --

20    ATTORNEY LEWIS:  I'm sorry, Judge.  Go

21    ahead.

22    ATTORNEY KONTOS:  The evidence --

23    JUDGE McLAIN:  The way the question is

24    phrased implies that he knows the activity of every

25    police officer that came into contact with Danny

THOMAS W. STEWART

1    Hill.                                                    58

2                   ATTORNEY LEWIS:  I didn't mean it that way,

3        Your Honor.

4    Q   (By Attorney Lewis)  Mr. Stewart, when you advise some-

5             body of their rights -- the language of the form

6             says:  "I have read the rights."  The waiver part

7             down below, doesn't it?

8    A   Yes, sir.

9    Q   So, the procedure is you give them the form and have

10            them read it?

11   A   Yes, sir.

12   Q   Okay.  Now, a very important point to find out is if the

13            person can read?

14   A   Yes, sir.

15   Q   And you just indicated, I think, that personally, you

16            always try to find out if they can read?

17   A   Yes, sir.

18   Q   Okay.  Did you ask Danny if he could read or see if he

19            could read anything?

20   A   No, sir.

21   Q   Okay.  Is there any special reason for that?  I mean is

22            there --

23   A   Yes, sir.  I assumed that that was already done.

24   Q   You assumed that was already done?

25   A   Yes, sir.

                         THOMAS W. STEWART

59

Q    Okay.  And during the course of the rights, to your
     knowledge, did anybody ever ask Danny what anything
     in those documents meant?  Ask him -- Danny to tell
     you what it meant?

A    The only thing, Morris kept indicating to him that you
     realize -- you know that -- you know about your
     rights and that, and he went over that numerous
     times, and he kept saying yes.

               JUDGE McLAIN:  Mr. Lewis, we're going to
     recess for about 20 minutes at this time.

                         (Court in recess at 2:50 P.M.)

                         (Back in session at 3:10 P.M.)

               JUDGE McLAIN:  Mr. Watkins.

               ATTORNEY WATKINS:  Your Honor, we would
     request at this time, with the consent of defense
     counsel, that Mr. Stewart be dismissed and that Mr.
     James Wurster from Richfield, Ohio, testify because
     of the time of day and the length of cross examina-
     tion left for this witness.

               ATTORNEY LEWIS:  Yes, Your Honor, the de-
     fense will agree to that.

               JUDGE McLAIN:  Very well.  Mr. Stewart,
     you're excused until Monday morning at 9:00 o'clock.
     Thank you.

                         (Witness is excused.)


                    THOMAS W. STEWART

JAMES W. WURSTER 59

being duly sworn, according to law, on his oath, testified,

as follows:

DIRECT EXAMINATION BY ATTORNEY KONTOS:

Q    For the record, would you please state your name and
          place of employment.

A    My name is James W. Wurster, W-U-R-S-T-E-R.  I'm employed
          by the Ohio Bureau of Criminal Identification and
          Investigation located in Richfield, Ohio.

Q    And how long have you been working there?

A    A little over seven years.

Q    What is your employment there?

A    I'm a criminalist assigned to the Trace Evidence Section
          of our laboratory.

Q    What exactly do you mean by "trace evidence"?

A    Trace evidence is the section of the laboratory that en-
          compasses those things that are deposited at the
          scene of a crime and removed at the scene of the
          crime.  It's part of my duties to compare one object
          or one scene to another object or another scene.

Q    Part of this trace evidence, would this include blood?

A    Yes.

Q    And what percentage of the work that you do involves
          serology or blood work?

A    About 90%

JAMES W. WURSTER

1   Q   And I mentioned serology.  Could you explain to the        59

2       Court what exactly that terminology means.

3   A   For the purposes of this Court, forensic serology would

4       be more of a proper term in that we're using hemo-

5       logical techniques as they pertain to the detection

6       of crime.

7   Q   Could you please briefly tell the Court a little bit

8       about your background, your education.

9   A   I have a bachelor of science in biology, a master of

10      science in biology.  I have attended the Blood Stain

11      Institute, a course taught by Walter McCrone in

12      forensic microscopy.  I've attended the FBI Academy

13      for hair and fibers.  I also attended the FBI

14      Academy for chromatography, the Serological Research

15      Institute and Advanced Serological Research Shop.

16  Q   All right.  And when you do these examinations, pri-

17      marily serology, with blood, how many have you done

18      since you've worked at BCI?

19  A   Hundreds.

20  Q   And how many occasions have you had to come into Court

21      and testify about those matters?

22  A   Approximately 75 times.

23  Q   Mr. Wurster, have you written any articles about your

24      areas of expertise?

25  A   Yes.


                        JAMES W. WURSTER

59

1  Q  Can you give us an example?

2  A  I co-authored an article that was published in the

3      Journal of Forensic Science in October of 1983.

4  Q  Let me just refer you now to the instant case; the case

5      of Raymond Fife as the victim.  Are you familiar

6      with that case?

7  A  Yes.

8  Q  Did you have any items brought to the lab for you to

9      look at in reference to the Fife case?

10  A  Yes, I did.

11  Q  Okay.

12            (State's Exhibit No. 112 marked
13              for identification.)

14  Q  (By Attorney Kontos)  Mr. Wurster, I'm going to hand you

15      what's been marked for identification purposes as

16      State's Exhibit Number 112.  I'd like for you to

17      take a look at that, please.  You recognize that?

18  A  Yes, I do.

19  Q  What is that, please?

20  A  It's one clear bag containing two glass viles of blood

21      from Timothy Combs.

22  Q  Okay.  Do you have anywhere recorded when that was

23      brought to you?

24  A  The blood from Timothy Combs was submitted to our

25      laboratory on 10/16/85.  I returned it to the

JAMES W. WURSTER

59

1              Prosecutor's Office this afternoon.

2    Q    Okay.  When it was brought up to BCI, what is the stan-

3              dard practice by which the material or evidence is

4              submitted to the lab?

5    A    This material -- this blood was submitted as an addition

6              to the original articles concerning Raymond Fife.

7              It was given the designation 85-32806.  Those ar-

8              ticles that do not need refrigerated are placed in

9              a secured area.  Articles such as blood or rape

10             kits are placed in a refrigerator until such time

11             as I can work on them.

12   Q    And is there any way that you indicate by some kind of

13             marking that you in fact did see those particular

14             items?

15   A    I have both my markings across the top of the clear

16             bag.  I have my markings on the vile of blood on

17             a piece of masking tape.  I also have my markings

18             on a piece of scotch tape that was used to seal the

19             bag.

20   Q    Okay.

21                              (State's Exhibit No. 113 marked
22                                   for identification.)

23   Q    (By Attorney Kontos)  Mr. Wurster, I'm now going to hand

24             you what's been marked for identification purposes

25             as State's Exhibit Number 113.  I'd like for you to

                         JAMES W. WURSTER

59

1          take a look at that, please, and tell me if you

2          recognize that.

3  A  Yes, I do.

4  Q  Please tell the Court what that is.

5  A  It's one glass vile containing a sample of blood from

6          a Raymond Fife.

7  Q  And do you have an indication from your notes or report

8          when that was submitted to you?

9  A  That material was submitted on 9/17/85.

10  Q  And do you know how long it was in the custody of BCI?

11  A  It was returned to the Warren Police Department on 10/11/

12          85.

13  Q  And is there any specific markings that you placed on

14          there to identify it?

15  A  I have my markings next to the name Fife, and I also have

16          my markings on the piece of scotch tape that sur-

17          rounds the rubber stopper.

18  Q  Okay.  I'm going to hand you what's been marked as

19          State's Exhibit Number 52.  I'd like for you to take

20          a look at that, please.  You recognize that?

21  A  Yes, I do.

22  Q  Would you tell the Court what that is, please.

23  A  It's one clear bag containing a pair of red and white

24          tube socks.

25  Q  And do you have any indication from your records when

JAMES W. WURSTER

59

1            that was submitted to you?

2   A   That was submitted on 9/30/85.

3   Q   And is there a record as to when that was returned?

4   A   It was returned to the Warren Police Department on

5            10/11/85.

6   Q   Now, Mr. Wurster, I'm going to hand you what's been

7            marked as State's Exhibit Number 1.  I'd like for

8            you to take a look at that, please.  You recognize

9            that?

10  A   Yes, I do.

11  Q   And could you tell the Court what that is, please.

12  A   One clear bag containing one pair of grey trousers.

13  Q   And do you have a record as to when that was submitted

14           to BCI?

15  A   That was submitted on 9/19/85.

16  Q   And do you have any record when that was returned?

17  A   This was returned on 10/11/85.

18  Q   Okay.  And could you please tell the Court what type

19           of test you ran on these items.

20  A   This article of clothing was examined by the naked eye

21           for the presence of blood stains.  Also, for any

22           microscopic debris that might be adherent to it.

23  Q   Okay.  How about that exhibit that contains the socks,

24           Number 52?  Was that examined?

25  A   Yes, it was.


JAMES W. WURSTER

59

1  Q    And what kind of tests were done on those socks?

2  A    A stain was found on one of the socks.  A presumptive

3        chemical test was performed, which is an indication

4        that blood is present, and a test for human blood

5        was performed, and then a series of further refine-

6        ments were produced.

7  Q    Before you conducted those particular tests on the sock,

8        did you do any testing on the blood that was sub-

9        mitted?

10  A    Yes, I did.

11  Q    And what type of tests were performed with the blood

12        from known samples?

13  A    The blood was typed for the basic ABO blood groupings

14        and for a series of enzymes.

15                    ATTORNEY KONTOS:  May we approach the

16        bench for one minute?

17                         (A discussion was held at the bench.)

18  Q    (By Attorney Kontos)  Mr. Wurster, do you have an ori-

19        ginal of the diagram that lists Item 1, Item 6, and

20        Number 1 that refers to known blood samples and

21        blood on the sock?

22  A    Yes, I do.

23  Q    Okay.  May I have that?

24  A    Are you going to submit it?

25  Q    Yeah.


                        JAMES W. WURSTER

59

1  A    That's the only one we have.

2              ATTORNEY KONTOS:  Would it be all right

3      if we submit a copy?

4              ATTORNEY LEWIS:  Yes, yes.

5                    (State's Exhibit No. 114 marked

6                      for identification.)

7  Q    (By Attorney Kontos)  Mr. Wurster, I'm going to hand you

8      what's been marked as State's Exhibit Number 114.

9      Please tell the Court what that is.

10  A    It's a copy that summarizes the results of my blood

11      typing.

12  Q    Okay.  Is that an accurate copy of the report that you

13      have in front of you?

14  A    Yes.

15  Q    And what I'd like for you to do is go through each of

16      the items and the categories across the top and ex-

17      plain to the Court what it is that you tested and

18      what the results were in reference to all the three

19      items.

20  A    First column, the known blood for Raymond Fife was not

21      tested for human blood.  The blood found on the

22      sock from Timothy Combs was tested for human blood.

23      It was positive.  The known blood from Timothy

24      Combs was not tested for human blood.  The ABO

25      grouping for the known blood for Raymond Fife, the

JAMES W. WURSTER

59

1         sock -- the blood on the sock, and the known blood

2         of Timothy Combs is all type A.

3 Q   Okay. ABO, what does that stand for?

4 A   ABO is merely a shorthand that describes the four basic

5         ABO blood group; A, B, AB, and type O.

6 Q   And all were type A?

7 A   Correct.

8 Q   Okay. And go on to the next column, please.

9 A   The second column is an enzyme, abbreviated ESD, of

10        Raymond Fife. He's a type 1. The -- there is no

11        activity on the sock. Timothy Combs is a type 1.

12 Q   Okay. And what would -- what does that mean when you

13        say it's a "type 1"?

14 A   The enzymes are designated by three basic groups. A 1,

15        a 2-1, or a 2; 1 indicating the most common factor,

16        the 2-1 the next most common, and the 2 the least

17        common.

18 Q   And the NA for the blood on the sock of what was Timothy

19        Combs, what does that stand for?

20 A   It stands for no activity in that one examined on the

21        electrophoresis plate. There was no visible ac-

22        tivity.

23 Q   What could be the reason for that?

24 A   These enzymes will break down or degrade at different

25        rates, and esterase, not one of the harder enzymes,

JAMES W. WURSTER

1          it will break down sooner than the PGM or ADA.          60

2  Q    The next category is PGM.

3  A    It stands for phosphoglucomutase.  Raymond Fife is 2-1.

4  Q    Okay.  You want to explain --

5  A    The first three enzymes are all typed simultaneously on

6          the same electrophoresis plate.  There's a dif-

7          ference between the blood in this factor between

8          Raymond Fife and Timothy Combs.  Through further

9          refinement, we can also -- we'll mention the next

10         category, you can also take that same enzyme and

11         subdivide it into 10 additional groups.

12  Q    Okay.  So, what you came up with was Item Number 1, the

13         known blood was a 2-1, Item Number 6, blood on the

14         sock of Timothy Combs, was a 2-1, and the known

15         blood of Timothy Combs was a 1?

16  A    Correct.

17  Q    What's the next category?

18  A    Next category is an enzyme.  It's abbreviated GLO-I.  It

19         stands for glyoxalase.  Raymond Fife is a type 2.

20         There was no activity on the sock.  Timothy Combs

21         is a 2-1.

22  Q    There's a difference between Timothy Combs and the known

23         blood type of Raymond Fife?

24  A    Correct.

25  Q    And there was an NA for Item Number 6, and what could be

JAMES W. WURSTER

60

1       the reason for that?

2  A   That the enzyme is degraded or broken down.

3  Q   Okay.  Go on to the next category.

4  A   The next column is PGM subtype.  Raymond Fife is a 2+1+.

5       Blood on the sock is a 2+1+.  Known blood from

6       Timothy Combs is a 1+1-.

7  Q   Once again, Item Number 1 and Number 6 were the same,

8       and Item Number 1 at the bottom, meaning Timothy

9       Combs, was different?

10  A   Correct.

11  Q   Okay.  Next category.

12  A   The enzyme is abbreviated EAP.  Raymond Fife is a BA.

13       The sock was an inconclusive, and the known blood

14       from Timothy Combs is an A.

15  Q   And what could be the reason for an inconclusive on

16       that particular enzyme test?

17  A   That it degrades.

18  Q   Okay.  Next column.

19  A   ADA.  Raymond Fife is a type 1.  The blood from the sock

20       was inconclusive.  Known blood of Timothy Combs is

21       a type 1.

22  Q   So, those are identical?

23  A   Correct.

24  Q   And Item 6, inconclusive, could be for the same reason?

25  A   Correct.

JAMES W. WURSTER

1    Q    Next column, AK.                                                60

2    A    Raymond Fife is a type 1.  Blood on the sock is a type 1.

3              The blood from Timothy Combs is a type 1.

4    Q    Okay.  Next category.

5    A    Hb, which stands for hemoglobin.  The -- Raymond Fife is

6              type A.  Blood from the sock was inconclusive.  The

7              blood from Timothy Combs was type A.

8    Q    And inconclusive as a result of --

9    A    Degradation.

10   Q    Next column.

11   A    Abbreviated PEPA.  Raymond Fife is a type 1.  Blood from

12             the sock is inconclusive.  Known blood from Timothy

13             Combs is type 1.

14   Q    And inconclusive for the same reason as the previous?

15   A    Correct.

16   Q    Next column.

17   A    CA, a roman numeral II.  Raymond Fife is a type 1.

18             Blood from the sock was inconclusive.  Blood from

19             Timothy Combs was a type 1.

20   Q    Okay.  Once again, the inconclusive for the same reason?

21   A    Yes.

22   Q    Okay.  Next category.

23   A    Final category is PGD.  Raymond Fife is a type A.  Sock

24             was type A.  The blood from Timothy Combs is type A.

25   Q    Is that the extent of the test that you ran with respect

JAMES W. WURSTER

1    to the known blood samples submitted to you and the

2    blood that was found on the sock that was submitted?

3 A Yes.

4 Q Okay.  And as a result of the testing that you did, did

5    you formulate an opinion?

6 A Yes, I did.

7 Q Okay.  And with reasonable scientific certainty, what

8    was the opinion that you formulated as a result of

9    the testing?

10 A That the combination of genetic markers found on the

11    sock from Timothy Combs, which would be State's

12    Exhibit 52, and common to the blood of Raymond Fife

13    are found in approximately 14% of the Caucasian popu-

14    lation, or approximately one in every seven indi-

15    viduals, thereby eliminating approximately 86% of

16    the population as being a possible source of the

17    blood.  Timothy Combs is PGM 1+1- and can be elimi-

18    nated as a source of the blood on the sock.  Ray-

19    mond Fife cannot be eliminated, and, therefore,

20    could be the source of the blood found on the sock.

21 Q So, you're saying with reasonable scientific certainty,

22    that the blood on the sock in State's Exhibit Number

23    52 cannot be that of Timothy Combs?

24 A Correct.

25 Q And that it is consistent with the blood of Raymond Fife?

JAMES W. WURSTER

60

1  A  Those markers that compared.

2  Q  Those markers that compared?

3  A  Yes.

4  Q  There were none that were inconsistent, were there?

5  A  No.

6  Q  Okay.

7                                    (State's Exhibit No. 115 marked
                                          for identification.)
8

9  Q  (By Attorney Kontos)  Mr. Wurster, I'm now going to hand

10        you what's been marked for identification purposes

11        as State's Exhibit Number 115, and I'd like for you

12        to take a look at that, please, and can you tell us

13        what that is, please?

14  A  This is a copy of my report.

15  Q  Is that a true and accurate copy of the report that you

16        have before you?

17  A  Yes, it is.

18  Q  Okay.  Let's go back to State's Exhibit Number 1.  Tell

19        the Court, once again, when that was submitted to

20        you.

21  A  That article was submitted to our laboratory on 9/19/85.

22  Q  And when was it tested?

23  A  It was opened by myself on 10/3/85.

24  Q  When was it returned?

25  A  It was returned on 10/11/85.


                        JAMES W. WURSTER

60

```
1   Q   And did you do testing on there to examine to see if
2           there was blood on it?
3   A   Yes.
4   Q   And what was the results of the test that you did?
5   A   I did not find any blood.
6   Q   No blood was found?
7   A   That's correct.
8   Q   Are there a variety of reasons why blood may or may not
9           be found on an item?
10  A   May have never been there in the first place.
11                 ATTORNEY LEWIS:  I'm going to object,
12          Your Honor.
13                 JUDGE McLAIN:  Yeah.  The question makes
14          little sense to me.  Why the reason is why every-
15          thing isn't somewhere.
16                 ATTORNEY KONTOS:  What's wrong with
17          asking?
18                 JUDGE McLAIN:  Well, it's a waste of time
19          as I see it.  If you want to argue the point -- what
20          you've said is are there a variety of reasons why
21          blood isn't somewhere.  Of course!  There's many
22          reasons.
23                 ATTORNEY KONTOS:  There's a lot of ques-
24          tions that are probably a waste of time, Your Honor.
25                 JUDGE McLAIN:  I suggest you stop arguing
```

JAMES W. WURSTER

1        about it right now and ask the proper question!        60

2                    ATTORNEY KONTOS:  I'd like to give the

3        witness a hypothetical, if I may.

4   Q    (By Attorney Kontos)  Mr. Wurster, I'm going to give you

5        a hypothetical, and I'd like for you to respond

6        after I've given you the facts behind it.  Let's

7        assume that there was an item of clothing that had

8        received some blood on it, and let's assume within

9        hours of receiving blood on that item of clothing,

10       that that item was washed, and let's assume that

11       the very next day, that item was once again washed,

12       and let's assume that four or five days later, that

13       item was found hanging in a bathroom drying, and

14       that two or three days after that, that item was

15       submitted to you in order for you to determine

16       whether or not there was blood on it.  Now, with

17       all those variables, in your opinion, is it likely

18       that the blood may have washed off?

19                    ATTORNEY LEWIS:  Objection, Your Honor.

20       We're talking about --

21                    JUDGE McLAIN:  Well, the phrase "likely"

22       may have washed off, what does that mean exactly?

23       It's likely there is a possibility?  If you ask

24       if there's a possibility -- what you asked now is

25       it likely a possibility.  I don't understand the


                        JAMES W. WURSTER

60

1      question.

2  Q  (By Attorney Kontos)  Well, how about this:  Can the

3      blood wash off and not be detectable?

4  A  Yes.

5  Q  Could you explain what effect washing and time might have

6      on a blood stain that might be on an item of

7      clothing.

8  A  Depending upon the amount of blood present on an article,

9      any article -- in this case, we'll assume clothing.

10     The amount of washing, the methods used in washing,

11     it's going to remove little or all of the blood.

12  Q  Mr. Wurster, I'm going to hand you now what's been marked

13     as State's Exhibit Number 47.  You recognize that

14     item?

15  A  Yes, I do.

16  Q  And could you tell the Court when that item was submitted

17     to you.

18  A  It was submitted to our laboratory on 9/19/85.

19  Q  And did you analyze or test that particular item?

20  A  Yes, I did.

21  Q  And when was that?

22  A  I completed my examination of the broom handle on 10/4/

23     85.

24  Q  And what were you testing the broom handle for?

25  A  The presence of blood.


JAMES W. WURSTER

1    Q    Were you able to find any blood on it?                    60

2    A    No.

3                   ATTORNEY KONTOS:  I'd like to ask another

4          hypothetical, if I might?

5                   JUDGE McLAIN:  You're allowed to ask

6          hypotheticals.  Go ahead.

7    Q    (By Attorney Kontos)  If that stick -- or if a stick --

8                   ATTORNEY LEWIS:  Excuse me, Your Honor.

9          Before he gets to the hypothetical, I'll object

10         for the record.

11                  JUDGE McLAIN:  You can't object to a

12         hypothetical question because you don't know what

13         the content of it is.  Go ahead.

14   Q    (By Attorney Kontos)  If that stick were stuck into a

15         human being, into their rectal area, perforated

16         into the urinary bladder and was quickly removed

17         and discarded --

18                  ATTORNEY LEWIS:  Objection, Your Honor.

19                  JUDGE McLAIN:  Well --

20                  ATTORNEY LEWIS:  We're talking about

21         medically --

22                  JUDGE McLAIN:  I think what you're saying

23         is essentially in evidence except for the word

24         "quickly," which is a possibility.  That would

25         not make that question inadmissible.  It would go

                        JAMES W. WURSTER

1    to its weight.  If you choose to state one matter      60

2    as a possibility, which is not --

3              ATTORNEY KONTOS:  Okay.  I will go, Your

4    Honor, with the rest of the hypothetical.  The parts

5    that I believe may have not been firmed up as evi-

6    dence.  I'll use the word possibility.

7  Q  (By Attorney Kontos)  That was possibly removed quickly

8    from the rectal area and discarded and possibly

9    wiped or possibly stuck into the ground, and within

10   a relatively short time, possibly an hour, it had

11   rained heavily, and this particular item was then

12   seen being discarded in another area and found five

13   or six days later.  What effect could the rain have

14   on that particular item in reference to blood?

15             ATTORNEY LEWIS:  Objection at that point.

16             ATTORNEY KONTOS:  I could break down the

17   question.

18             JUDGE SHAKER:  Just a minute.

19             JUDGE McLAIN:  The Court feels that the

20   question has named so many facts which are only

21   possibilities that any answer to it will not be

22   probative.  Objection is sustained.

23             ATTORNEY KONTOS:  Could I ask indivi-

24   dualized questions?

25             JUDGE SHAKER:  Ask the next question.


                    JAMES W. WURSTER

61

1      JUDGE McLAIN:  You can ask questions in

2          accordance to what they individually may affect an

3          item, but you may not ask a long question if all

4          these things happened, then what would be the con-

5          dition of the stick.

6   Q   (By Attorney Kontos)  Would wiping the stick have an

7          effect on the amount of blood or if blood would be

8          present on it when you would test it?

9   A   If there were blood on it?

10  Q   If there were blood on it.

11  A   And subjected to various mechanical procedures to remove

12         it?

13  Q   Yes.

14  A   Yes, it's possible to remove blood.

15  Q   If the stick were to be stuck into the ground and there

16         had been blood on it previously and then removed,

17         what effect would that have on it or could have on

18         it?

19  A   It could be removed.

20  Q   What if the stick had been left in an area where heavy

21         amount of rain could have poured on it, what effect

22         would that have on it?

23  A   It could be removed.

24      ATTORNEY KONTOS:  No further questions.

25


JAMES W. WURSTER

61

CROSS EXAMINATION BY ATTORNEY LEWIS:

Q   Is it Mr. Wurster?

A   Wurster, correct.

Q   Okay.  And in regard -- or evidentally -- or let me ask
    you this question.  State's Exhibit Number 41, the
    stick, what type of wood is that?

A   I have no idea.

Q   You don't know what type of wood that is?

A   No.

Q   What kind of test -- tell us about the test that you run
    in order to determine whether blood was on that
    stick or not.

A   This item was examined microscopically with a Steer micro-
    scope.  Those areas that had a discoloration, such
    as this area (indicating), which may have been
    blood, were given a presumptive chemical test for
    blood.  In addition, I -- although that was nega-
    tive, I even performed a test for human blood.  It,
    in fact, was negative from the end of the handle to
    the broken area.

Q   You can take that portion off.  Go ahead.

         JUDGE McLAIN:  What do you mean to the
    broken end?

A   To the broken end of it.

         JUDGE McLAIN:  You tested both ends?

                    JAMES W. WURSTER

61

1  A   There are areas from -- you can see they're outlined in

2      black magic marker.  Three here, one on the end,

3      and there was also one on the tip that was tested.

4      They were all negative.

5              JUDGE McLAIN:  You do that all at the

6      same time?

7  A   They were done sequentially.  This was examined under

8      microscope.  Areas were outlined, swabbed --

9              JUDGE McLAIN:  All simultaneously?

10 A   Okay.

11             JUDGE McLAIN:  You mean within the same

12     hour?

13 A   Yes.

14 Q   (By Attorney Lewis)  You're saying you examined it

15     microscopically, is that correct?

16 A   That's correct.

17 Q   And you also tested it for blood in what other fashion?

18 A   They tested it for -- with a presumptive chemical test,

19     and samples were removed for human blood testing.

20 Q   Okay.  Presumptive human blood testing.  How is that

21     done?  Is that done chemically?

22 A   Yes.

23 Q   Let me ask you first about the stick itself, about wood.

24     Is wood a porous material?

25 A   Yes.  In some conditions, yes.

JAMES W. WURSTER

61

1  Q    In some conditions.  Okay.  And if you were to -- if you
2       were to have some blood right now and just pour that
3       on that particular stick and everything else, would
4       it have a porous effect before it dried?  Would some
5       of it go into the internal part of the stick?  In
6       other words, go below the surface?

7  A    I would expect with a broken area, if a volume of blood
8       were placed upon it, by capillary reaction, it would
9       seep up into the cracks and remain.

10 Q    Like a sponge?  Put water on top -- not necessarily that
11      fast --

12 A    It's a good analogy.

13 Q    It's a good analogy?

14 A    Fair analogy.

15 Q    It would go into the stick?

16 A    Correct.

17 Q    And the faster it would go into the stick or go into the
18      cellular structure, it would dry itself out, right?
19      In other words, it would be --

20 A    Not really.

21 Q    Go ahead.

22 A    Because it's not exposed to the air.  It will dry at a
23      slower rate than if it were on the surface exposed
24      to dry air.

25 Q    So, on the surface, it would dry quicker, correct?


                    JAMES W. WURSTER

61

1   A   Correct.

2   Q   As it went internally into the stick, it would dry slowly

3       because it doesn't have access to oxygen and so

4       forth?

5   A   Correct.

6   Q   Once it went past the surface of the stick, if you wiped

7       it off with a piece of cloth, would you get what's

8       underneath?

9   A   I don't think so.

10  Q   Okay.  If you stuck it in the ground and pulled it back

11      out, would you get what's underneath?

12  A   You might.

13  Q   You might.  Okay.  If it were to -- okay.  Rain, for in-

14      stance.  And it rained maybe two hours, three hours

15      afterwards, okay, would it presumptively wash all

16      the blood off?

17  A   Yes.

18  Q   It would?

19  A   I believe so, yes.

20  Q   Ironically, through all the stick?

21  A   Yes.

22  Q   The cells, too?

23  A   Yes.

24  Q   On what basis would you come to that conclusion?

25  A   I've seen articles of clothing, I've seen knives that

JAMES W. WURSTER

61

1            have been subjected to rain --

2 Q   No.   Well, no, no, Mr. Wurster.   I'm not talking about

3         that.

4                  ATTORNEY KONTOS:   Let him answer the

5         question!

6 Q   (By Attorney Lewis)   Let's talk about clothing.

7 A   I've seen objects subjected to washing.   Even a car wash.

8         I know that water, under certain conditions, can

9         ruin absolutely everything, and yet, I've seen

10        blood on a truck go through a car wash that was

11        never touched.   You never really know.   The only

12        adequate way you can really try to determine some-

13        thing like this is try and test it.   You'd have to

14        take sticks and put blood on them and dry them

15        under various conditions.   That obviously was not

16        done.   Anything else of those -- that material that

17        I did not find, and the reasons why it did not ap-

18        pear is really speculative.   It's based upon other

19        objects I've seen and other events I've seen, but

20        it is not based upon any actual test that I've per-

21        formed.

22 Q   Can we distinguish clothing, though, from the wood --

23 A   Sure.

24 Q   -- as the object or the material itself?

25 A   Sure.


               JAMES W. WURSTER

61

1   Q   Okay. And, of course, we can distinguish that between

2         steel of a knife, right?

3   A   Correct.

4   Q   Non-porous material. And your analysis of that was that

5         you found no blood whatsoever?

6   A   Correct.

7   Q   That was under chemical testing as well as microscopic?

8   A   Correct.

9   Q   They gave you the hypothetical in regard to the washing

10       of pants. Can clothes be washed and blood still

11       remain after they've been washed?

12   A   If it's not done properly, yes.

13   Q   Okay. If you put them in a washer and run them around

14       for about two, three hours with a lot of suds and

15       a lot of good hard soap, would that do it? Probably

16       take the blood out?

17   A   If it hasn't been set, if it's still somewhat still in

18       the process of drying, yes.

19   Q   How long -- give me an opinion in regard to if there

20       was blood on a piece of clothing on the outside, how

21       long it would take for something like that to dry

22       the blood? Just give you a temperature of about --

23       oh, 75 degrees, 70 degrees, with not a great excess

24       of humidity. How long do you think it would take

25       for the blood --

JAMES W. WURSTER

1    A    Large volume?  Small splatters?

2    Q    Say small splatters first.

3    A    I would not expect it would take very long to dry.

4    Q    Okay.  Well, let's go -- give me some time.  You say not

5         a large amount of time.  What are we talking about?

6    A    If I placed blood on a cotton thread in my laboratory,

7         that material would be dried within an hour, and

8         that's saturating a piece of cotton fabric or cotton.

9    Q    Does that mean all the blood is dried at that point?

10   A    It's dried enough to preserve the enzymes and that ma-

11        terial for my testing purposes.

12   Q    Okay.  All right.  And how about a large amount of blood?

13   A    It would take considerably longer, but I don't know the

14        volume or anything like that.

15   Q    Have you had cases where articles had been washed or --

16        well, when you explained that with the car wash

17        theory, you've had occasions where things have been

18        washed and you still found the blood?

19   A    Yes.

20   Q    So, there's no predictability to it, is that basically --

21   A    Absolutely correct.

22   Q    In other words, if that thing was covered with blood,

23        you could stick it in -- in the ground 50 times,

24        pull it out, you may still find the blood on it?

25   A    Correct.


                    JAMES W. WURSTER

Q    Let me ask you this:  If you were to preserve -- or

     hypothetically, I were to tell you that that was

     -- it would have been covered with blood up to about

     this point (indicating) for at least -- say, for

     instance, a minute -- a minute or two --

                    ATTORNEY KONTOS:  Your Honor, I would

     object unless he uses possibilities as well.

                    JUDGE McLAIN:  Well, I think he may

     answer.  I'll decide what weight to give to all

     these possibilities.  I mean the question is really

     argumentative.

Q    (By Attorney Lewis)  Let me ask you this:  Is there any

     reason why you didn't take and go ahead and put

     some blood on the stick other than you had to find

     the blood, but put some blood on the stick and test

     it that way to find out if it would hold it?

A    If I placed blood on this stick, I, in effect, would be

     contaminating or destroying evidence that might be

     used for other purposes.

Q    You're right.  Okay.  Some of the stuff that you took

     off of it, did you subject it to any blood?

A    Yes, I did.

Q    Some of the particles?

A    Yes.

Q    You subjected it to blood?

                    JAMES W. WURSTER

1    A    No, no, no!  I'm sorry.  I removed particles and sub-

2         jected them to tests.

3    Q    And you found zero?

4    A    That's correct.

5    Q    And you didn't find anything on the pants whatsoever?

6         No indication of blood whatsoever?

7    A    Correct.

8    Q    You didn't have anything to do with, basically, any of

9         the materials as far as accelerants or anything of

10        that nature?  You don't get involved in that?

11   A    No.

12   Q    The substance -- exactly what you're saying is that you

13        found no indication whatsoever that State's Exhibit

14        Number 41 had any human blood or any blood of any-

15        thing on it, is that correct?

16   A    Correct.

17   Q    Okay.  The same with State's Exhibit Number -- I think

18        it's 1?

19   A    Correct.

20   Q    No blood whatsoever.

21                  ATTORNEY LEWIS:  That's all.

22                  ATTORNEY KONTOS:  Just a couple questions.

23   RE-DIRECT EXAMINATION BY ATTORNEY KONTOS:

24   Q    Mr. Wurster, the -- would the amount of blood on an ob-

25        ject initially have anything to do with whether or

JAMES W. WURSTER

62

1    not later on you might be able to test and find

2    any -- in other words, if -- hypothetically, a

3    great deal over a large portion of the stick as op-

4    posed to a small amount in any given area?

5 A  Yes.

6 Q  And would the length of time that blood was on a stick

7    prior to possibly it being removed by some other

8    force, would that have anything to do with whether

9    or not you'd be able to find any of that?  Would

10    that have any effect?

11 A  Yes.

12 RE-CROSS EXAMINATION BY ATTORNEY LEWIS:

13 Q  Mr. Wurster, do you recall, is this the condition that

14    the stick was in when you received it --

15 A  Yes.

16 Q  -- if you recall?

17 A  Yes.

18 Q  Okay.  And there's a little bit of -- what is this?

19    What is that?

20 A  It appears to be soil and discoloration.

21 Q  So -- rub your hand over it -- or your finger over it.

22 A  (Complying.)

23 Q  Take a look at your finger.  Is it dirty at all?

24 A  There's a small amount of dirt.

25 Q  Small amount of dirt.  The rain didn't wash that off!

JAMES W. WURSTER

1          ATTORNEY LEWIS:  Thank you.                          62

2          ATTORNEY KONTOS:  No other questions.

3          JUDGE SHAKER:  Just a moment.

4          JUDGE McLAIN:  Sir, could you tell me how

5     you arrived at the figure 14% of the population as

6     having these characteristics?

7  A   The figures that I used were provided by the Department

8        of Justice, and the factors were multiplied.

9          JUDGE McLAIN:  Two factors were what?

10 A   If I understand the correct -- question correctly, why

11       -- how I arrived at 14%, I multiply the incidents of

12       type A blood types, the incidents of PGM, esterase

13       1 times 2+1+1, and those factors arrived at the 14%.

14         JUDGE McLAIN:  Well, were you multiplying

15       whole numbers?

16 A   We're multiplying percentages.

17         JUDGE McLAIN:  Okay.  And you just use

18       the ones in which?  Two PGM columns, is that right?

19 A   The figure 14% was arrived at by utilizing all those

20       factors that I could identify in the blood of Ray-

21       mond Fife that were common to those factors that I

22       could identify on the sock.  So, it's really the

23       combination of factors only on the sock that pro-

24       duce that 14%.

25         JUDGE McLAIN:  Is that much -- that's not


                    JAMES W. WURSTER