# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **DANNY LEE HILL,** | : **CASE  NO. 4:96 CV 00795** |
| | : |
| **Petitioner,** | : |
| | : **JUDGE JOHN R. ADAMS** |
| **vs.** | : |
| | : |
| **CARL ANDERSON, Warden,** | : |
| | : **MEMORANDUM OF OPINION** |
| **Respondent.** | : |

This matter is before the Court upon Petitioner Danny Lee Hill's ("Hill" or "Petitioner")

Amended Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254.  Through this

petition, Hill challenges the constitutionality of his death sentence, rendered by an Ohio court,

under *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment forbids the

execution of intellectually disabled offenders.[1]  (ECF No. 94.)  The Respondent, Warden Carl

Anderson ("Respondent"), filed a Supplemental Return of Writ Regarding Atkins Claim.  (ECF

No. 98.)  Hill filed a Traverse and Supplement to Traverse.  (ECF Nos. 102 and 103,

respectively.)  For the following reasons, the Amended Petition for Writ of Habeas Corpus is

denied.

---

[1]     This Court will use the term "intellectual disability" in place of the term "mental
retardation" in this opinion.  The designation intellectually disabled, or "ID," is now widely used
by the medical community, educators and others, since the label mentally retarded long has
carried a painful stigma.  The terms are synonymous.  *See* American Association on Intellectual
and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of
Support* 12 (11th ed. 2010) ("[T]he term ID covers the same population of individuals who were
diagnosed previously with mental retardation.").  *See also Hall v. Florida*, slip op. at 2 (U.S. May
27, 2014).

## I.      Factual History

On February 28, 1986, a three-judge panel sentenced Hill to death for the aggravated

murder of twelve-year-old Raymond Fife ("Fife").  The Supreme Court of Ohio set out the

following account of Hill's crime, as adduced by the evidence presented at trial, and judicial

proceedings upon considering Hill's direct appeal of his conviction and sentence:

> On September 10, 1985, at approximately 5:15 p.m., twelve-year-old Raymond Fife left home on his bicycle to visit a friend, Billy Simmons. According to Billy, Raymond would usually get to Billy's residence by cutting through the wooded field with bicycle paths located behind the Valu-King store on Palmyra Road in Warren.
>
>  Matthew Hunter, a Warren Western Reserve High School student, testified that he went to the Valu-King on the date in question with his brother and sister shortly after 5:00 p.m. Upon reaching the front of the Valu–King, Hunter saw Tim Combs and defendant-appellant, Danny Lee Hill, walking in the parking lot towards the store. After purchasing some items in the Valu–King, Hunter observed defendant and Combs standing in front of a nearby laundromat. Combs greeted Hunter as he walked by. Hunter also saw Raymond Fife at that time riding his bike into the Valu–King parking lot.
>
> Darren Ball, another student at the high school, testified that he and Troy Cree left football practice at approximately 5:15 p.m. on September 10, and walked down Willow Street to a trail in the field located behind the Valu–King. Ball testified that he and Cree saw Combs on the trail walking in the opposite direction from the Valu–King. Upon reaching the edge of the trail close to the Valu–King, Ball heard a child's scream, "like somebody needed help or something."
>
> Yet another student from the high school, Donald E. Allgood, testified that he and a friend were walking in the vicinity of the wooded field behind the Valu–King between 5:30 p.m. and 6:00 p.m. on the date in question. Allgood noticed defendant, Combs and two other persons "walking out of the field coming from Valu–King," and saw defendant throw a stick back into the woods. Allgood also observed Combs pull up the zipper of his blue jeans. Combs "put his head down" when he saw Allgood.
>
> At approximately 5:50 p.m. on the date in question, Simmons called the Fife residence to find out where Raymond was. Simmons then rode his bicycle to the Fifes' house around 6:10 p.m. When it was apparent that Raymond Fife's whereabouts were unknown, Simmons continued on to a Boy Scouts meeting, while members of the Fife family began searching for Raymond.

2

At approximately 9:30 p.m., Mr. Fife found his son in the wooded field behind the Valu–King. Raymond was naked and appeared to have been severely beaten and burnt in the face. One of the medics on the scene testified that Raymond's groin was swollen and bruised, and that it appeared that his rectum had been torn. Raymond's underwear was found tied around his neck and appeared to have been lit on fire.

Raymond died in the hospital two days later. The coroner ruled Raymond's death a homicide. The cause of death was found to be cardiorespiratory arrest secondary to asphyxiation, subdural hematoma and multiple trauma. The coroner testified that the victim had been choked and had a hemorrhage in his brain, which normally occurs after trauma or injury to the brain. The coroner also testified that the victim sustained multiple burns, damage to his rectal-bladder area and bite marks on his penis. The doctor who performed the autopsy testified that the victim sustained numerous external injuries and abrasions, and had a ligature mark around his neck. The doctor also noticed profuse bleeding from the victim's rectal area, and testified that the victim had been impaled with an object that had been inserted through the anus, and penetrated through the rectum into the urinary bladder.

On September 12, 1985, defendant went downtown to the Warren Police Station to inquire about a $5,000 reward that was being offered for information concerning the murder of Raymond Fife. Defendant met with Sergeant Thomas W. Stewart of the Warren Police Department and told him that he had "just seen Reecie Lowery riding the boy's bike who was beat up." When Stewart asked defendant how he knew the bike he saw was the victim's bike, defendant replied, "I know it is." Defendant then told Stewart, "If you don't go out and get the bike now, maybe [Lowery will] put it back in the field." According to Stewart, the defendant then stated that he had seen Lowery and Andre McCain coming through the field at around 1:00 that morning. In the summary of his interview with defendant, Stewart noted that defendant "knew a lot about the bike and about the underwear around the [victim's] neck." Also, when Stewart asked defendant if he knew Tim Combs, defendant replied, "Yeah, I know Tim Combs. * * * I ain't seen him since he's been out of the joint. He like boys. He could have done it too."

On September 13, 1985, the day after Stewart's interview with defendant, Sergeant Dennis Steinbeck of the Warren Police Department read Stewart's summary of the interview, and then went to defendant's home and asked him to come to the police station to make a statement. Defendant voluntarily went to the police station with Steinbeck, whereupon defendant was advised of his *Miranda* rights and signed a waiver-of-rights form. Defendant made a statement that was transcribed by Steinbeck, but the sergeant forgot to have defendant sign the statement. Subsequently, Steinbeck discovered that some eyewitnesses had seen defendant at the Valu–King on the day of the murder.

On the following Monday, September 16, Steinbeck went to defendant's

3

house accompanied by defendant's uncle, Detective Morris Hill of the Warren Police Department. Defendant again went voluntarily to the police station, as did his mother. Defendant was given his *Miranda* rights, which he waived at that time as well. After further questioning by Sergeants Stewart and Steinbeck and Detective Hill, defendant indicated that he wanted to be alone with his uncle, Detective Hill. Several minutes later, defendant stated to Hill that he was "in the field behind Valu-King when the young Fife boy got murdered."

Defendant was given and waived his *Miranda* rights again, and then made two more voluntary statements, one on audiotape and the other on videotape. In both statements, defendant admitted that he was present during the beating and sexual assault of Raymond Fife, but that Combs did everything to the victim. Defendant stated that he saw Combs knock the victim off his bike, hold the victim in some sort of headlock, and throw him onto the bike several times. Defendant further stated that he saw Combs rape the victim anally and kick him in the head. Defendant stated that Combs pulled on the victim's penis to the point where defendant assumed Combs had pulled it off. Defendant related that Combs then took something like a broken broomstick and jammed it into the victim's rectum. Defendant also stated that Combs choked the victim and burnt him with lighter fluid. While defendant never admitted any direct involvement in the murder, he did admit that he stayed with the victim while Combs left the area of the attack to get the broomstick and the lighter fluid used to burn the victim.

Upon further investigation by authorities, defendant was indicted on counts of kidnapping, rape, aggravated arson, felonious sexual penetration, aggravated robbery and aggravated murder with specifications.

On December 16, 1985, a pretrial hearing was held on defendant's motion to suppress statements made to police officers both orally and on tape. On January 17, 1986, the court of common pleas concluded as follows:

"It is the opinion of this Court that no Fourth Amendment violation was shown because [defendant] was at no time 'seized' by the police department, but rather came in either voluntarily, or as in the case of September 16th because of his mother's demands.

" * * *

"Defendant's Fifth Amendment Rights were clearly protected by the numerous *Miranda* Warnings and waivers. Though this Court believes that the defendant could not have effectively read the rights or waiver forms, the Court relies on the fact that at any time he was given a piece of paper to sign acknowledging receipt of the *Miranda* Warnings and waiving his rights, the paper was always read to him before he affixed any of his signatures.

"Though defendant is retarded, he is not so seriously impaired as to have been incapable of voluntarily and knowingly given the statements which the

4

defendant now seeks to suppress. The Court reaches this conclusion after seeing and listening to the defendant at the Suppression Hearing and listening to and watching the tape recording and videotaped statements of the defendant. The Court concludes that the statements were made voluntarily, willingly, and knowingly."

Meanwhile, on January 7, 1986, defendant appeared before the trial court and executed a waiver of his right to a jury trial.

On January 21, 1986, defendant's trial began in front of a three-judge panel. Among the voluminous testimony from witnesses and the numerous exhibits, the following evidence was adduced:

Defendant's brother, Raymond L. Vaughn, testified that he saw defendant wash his gray pants on the night of the murder as well as on the following two days. Vaughn identified the pants in court, and testified that it looked like defendant was washing out "something red. * * * It looked like blood to me * * *."

Detective Sergeant William Carnahan of the Warren Police Department testified that on September 15, 1985 he went with eyewitness Donald Allgood to the place where Allgood stated he had seen defendant and Combs coming out of the wooded field, and where he had seen defendant toss "something" into the woods. Carnahan testified that he returned to the area with workers from the Warren Parks Department, and that he and Detective James Teeple found a stick about six feet from the path where Allgood saw defendant and Combs walking.

Dr. Curtis Mertz, a forensic odontologist, stated that: "It's my professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and the photographs that I had, made the bite on Fife's penis."

The defense called its own forensic odontologist, Dr. Lowell Levine, who stated that he could not conclude with a reasonable degree of certainty as to who made the bite marks on the victim's penis. However, Levine concluded: "What I'm saying is either Hill or Combs, or both, could have left some of the marks but the one mark that's consistent with the particular area most likely was left by Hill."

Doctor Howard Adelman, the pathologist who performed the autopsy of the victim's body, testified that the size and shape of the point of the stick found by Detective Carnahan was "very compatible" with the size and shape of the opening through the victim's rectum. Adelman described the fit of the stick in the victim's rectum as "very similar to a key in a lock."

*State v. Hill*, 64 Ohio St. 3d 313, 313-17, 595 N.E.2d 884, 886-89 (Ohio 1992).

5

## II.    Procedural History[2]

### A.    State-Court Proceedings

The Trumbull County Grand Jury indicted Hill for the aggravated murder of Raymond Fife on September 10, 1985.[3]  (App. to Return of Writ, Ex. A.)  Hill's intellectual disabilities quickly surfaced as a central issue in Hill's defense when his counsel, Attorney James Lewis of the Ohio Public Defender's Office, filed a motion to suppress Hill's statements to police.  Hill argued that because he was intellectually disabled, the police were able to coerce him into signing a waiver of his right to counsel, which he could not read and did not understand, and confessing to his role in the crime.  The court conducted a three-day hearing on the suppression motion beginning on December 16, 1985, at which numerous witnesses testified, including Hill and a clinical psychologist who opined that Hill was mildly intellectually disabled.  (ECF Nos. 28, 29.) The trial court denied Hill's motion.  On January 7, 1986, Hill again appeared before the trial court and executed a waiver of his right to a jury trial.  (ECF No. 30.)

---

[2]    The procedural history of Hill's direct appeals, post-conviction proceedings, and initial habeas proceedings is more fully set forth in this Court's Memorandum of Opinion and Order dated September 29, 1999.  (ECF No. 54.)  The Court includes here only the procedural history relevant to the claims pending before the Court, as asserted in Hill's Amended Petition for Writ of Habeas Corpus.  (ECF No. 94.)

[3]    The first count of the Indictment charged Hill with aggravated murder in violation of Ohio Rev. Code § 2941.14.  The murder count included four capital felony murder specifications under Ohio Rev. Code § 2929.04(A)(7), charging Hill with murder while committing kidnapping, rape, aggravated arson and aggravated robbery.  Hill also was indicted separately for:  kidnapping, in violation of Ohio Rev. Code § 2905.01; rape, in violation of Ohio Rev. Code § 2907.02; aggravated arson, in violation of Ohio Rev. Code § 2909.02; aggravated robbery, in violation of Ohio Rev. Code § 2911.01; and felonious sexual penetration in violation of Ohio Rev. Code § 2907.12(A)(1)(3).  (App. to Return of Writ, Ex. A.)

Hill's trial began on January 21, 1986, before a three-judge panel. At the close of trial, on January 31, 1986, the panel of judges deliberated for five hours and unanimously found Hill guilty on all counts, except the aggravated robbery count and the specification of aggravated robbery to the aggravated murder count. (ECF No. 27.) The court held a mitigation hearing beginning on February 26, 1986, at which three psychologists testified that Hill was intellectually disabled. The panel considered the following factors in possible mitigation:

> (1) The age of [Hill]; (2) The low intelligence of [Hill]; (3) The poor family environment; (4) The failure of the State or society to prevent this crime; (5) [Hill's] impaired judgment; (6) Whether or not he was a leader or follower.

The panel concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Two days later, on February 28, 1986, the panel sentenced Hill to ten to twenty-five years' imprisonment for both aggravated arson and kidnapping, life imprisonment for rape and felonious sexual penetration, and the death penalty for aggravated murder with specifications.[4] (ECF No. 24.)

Hill appealed his conviction and sentence to the Eleventh District Court of Appeals and the Ohio Supreme Court. He maintained throughout his direct appeals that he was intellectually disabled, and that because of this condition his constitutional rights were violated during the police interrogation and trial. He claimed, for example, that his Sixth Amendment right to counsel and Fourteenth Amendments rights were violated because, as an intellectually disabled person, he could not knowingly, voluntarily, and intelligently waive his right to counsel during

---

[4]     Timothy Combs also was charged and convicted in a separate trial as a principal offender in Fife's murder. *See State v. Combs,* No. 1725, 1988 WL 129449 (Ohio Ct. App. Dec. 2, 1988).

7

custodial interrogation.  *Hill*, 64 Ohio St. 3d at 318-19, 595 N.E.2d at 890-91.  He further argued that his statements to the police were not voluntary, because they were induced by psychological tactics designed to take advantage of an intellectually disabled person who was essentially illiterate.  *Id*. at 318-19, 595 N.E.2d at 890-91.  He also claimed that, given his intellectual disability, the police did not properly advise him of his *Miranda* rights, nor did he knowingly, voluntarily and intelligently waive such rights.  *Id*. at 319, 595 N.E.2d at 891.  Finally, Hill asserted that the trial court failed to consider all of the evidence of his intellectual disability as mitigating evidence when determining his sentence.  *Id*. at 333-35, 595 N.E.2d at 901-02.

In discussing Hill's claims, both the Eleventh District Court of Appeals and the Ohio Supreme Court acknowledged Hill's intellectual disability.  The Ohio Supreme Court stated, "[W]e find that [Hill's] mental retardation is a possible mitigating factor."  *Id*. at 335, 595 N.E.2d at 901.  It summarized the testimony of the psychologists who testified during the mitigating phase of Hill's trial, stating:

> Dr. Douglas Darnall, a psychologist, testified that defendant had an I.Q. of 55 and that his intelligence level according to testing fluctuates between mild retarded and borderline intellectual functioning, and that he is of limited intellectual ability. Dr. Darnall did state, however, that defendant was able to intellectually understand right from wrong.
>
> Dr. Nancy Schmidtgoessling, a clinical psychologist, testified that defendant had a full scale I.Q. of 68, which is in the mild range of mental retardation, and that the defendant's mother was also mildly retarded. Dr. Schmidtgoessling also testified that defendant's moral development level was "primitive," a level at which "one do[es] things based on whether you think you'll get caught or whether  it feels good. [T]hat's essentially wherereabout [*sic*] a 2–year old is."
>
> Dr. Douglas Crush, another psychologist, testified that defendant had a full-scale I.Q. of 64, and that his upper level cortical functioning indicated very poor efficiency.

8

Other mitigation testimony on behalf of defendant indicated that he was a follower and not a leader, who had to be placed in group homes during his youth.

*Id*. at 334-35, 595 N.E.2d at 901.  Similarly, the court of appeals concluded that Hill

admittedly suffers from some mental retardation (although the evidence presented is divergent as to the severity of the handicap) and has had concommitant difficulties in language comprehension throughout his formal education.  [Hill] is categorized as being mildly to moderately retarded.  Evidence was presented which indicates that [Hill] is illiterate . . . .

*State v. Hill*, Nos. 3720, 3745, 1989 WL 142761, at *6 (Ohio Ct. App. Nov. 27, 1989).  It also found,

The record is replete with competent, credible evidence which states that [Hill] has a diminished mental capacity.  He is essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient motor skills.  [Hill] is characterized as being mildly to moderately retarded.  There is some suggestion that [Hill's] "mental age" is that of a seven to nine year old boy.  Testimony places [Hill's] I.Q. between 55 and 71, which would cause him to be categorized as mildly to moderately retarded.

*Id*. at *32.

The Ohio courts, however, denied Hill's claims based on his intellectual disability and did not find his disability to be a significant mitigating factor.  The Ohio Supreme Court noted that "there are various levels of mental retardation, and a person must be viewed individually as to the degree of retardation."  *Hill*, 64 Ohio St. 3d at 335, 595 N.E.2d at 901.  It ultimately found "a very tenuous relationship between the acts he committed and his level of mental retardation.  As several of the experts pointed out, [Hill] did not suffer from any psychosis, and he knew right from wrong."  *Id*.  The court also found that based on legal precedent and Hill's "prior dealings with the criminal process as a juvenile, [Hill's] mental aptitude did not undercut the voluntariness of his statements or his waiver of *Miranda* rights."  *Id*. at 318, 595 N.E.2d at 890.

9

The court of appeals, in rejecting Hill's *Miranda* claim, concluded,

> However, from the record here, particularly during the suppression hearing, this court is also aware (as was the trial court below) of the long and multifaceted exposure [Hill] has had with the state's criminal justice system. The evidential table in this case also demonstrates that [Hill] exhibited a functional capacity to understand [his *Miranda*] rights, including the right to appointed counsel. . . .

> Moreover, the behavior of [Hill] during the police investigation belies the notion that he was no more than a malleable victim of police suggestion. [Hill] possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, [Hill] qualified and corrected the police officers's [*sic*] misstatements of the factual scenario which he had related to them. He was also able to follow "verbal concepting," displaying an understanding of the officers [*sic*] direction of questioning and the dialogue utilized during the interrogation.

*Hill*, 1989 WL 142761, at *6. It also discounted Hill's low intelligence and impaired judgment as mitigating factors, stating,

> Consideration of evidence delineating [Hill's] mental retardation is more properly applied when evaluating his ability to knowingly, intelligently and voluntarily waive his constitutional rights. There is no evidence presented that requires the conclusion that this crime was committed because a mental defect precluded [Hill] from making the correct moral or legal choice.

*Id*. at *32.

The Ohio courts affirmed Hill's conviction and sentence on direct appeal. *State v. Hill*, Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27, 1989); *State v. Hill*, 64 Ohio St. 3d 313, 595 N.E.2d 884 (Ohio 1992), *reh'g denied*, 65 Ohio St. 3d 1421, 598 N.E.2d 1172 (Ohio 1992). Hill then sought review from the United States Supreme Court. One of the questions he presented to the Court was,

> Whether a conviction and sentence of death may stand when statements are elicited from a mentally retarded, essentially illiterate accused through misconduct of law enforcement officials, coercion by psychological tactics, and promises of leniency in violation of the Fourth, Sixth and Fourteenth Amendments.

10

(App. to Return of Writ, Ex. T, 2.)  The Supreme Court denied certiorari on March 29, 1993.  *Hill v. Ohio*, 507 U.S. 1007 (1993).

Hill continued to assert claims related to his intellectual disability in state post-conviction proceedings, including claims related to the trial court's weighing of mitigating factors, his waiver of his right to counsel and to a jury, and ineffectiveness of trial counsel for not properly investigating and presenting evidence of his intellectual disability.  He attached to his petition affidavits of two experts in the field of intellectual disability, each of whom averred that Hill was intellectually disabled.  (App. to Return of Writ, Ex. Y.)  The trial court denied Hill's post-conviction petition on July 18, 1994, specifically finding the two expert opinions "unpersuasive and insufficient to establish substantive grounds for relief ."  (*Id.*, Exs. FF; GG, 11.)  The Eleventh District Court of Appeals affirmed the trial court's decision on July 16, 1995.  *State v. Hill*, No. 94-T-5116, 1995 WL 418683 (Ohio Ct. App. June 16, 1995).  The Ohio Supreme Court declined further review of that decision on November 15, 1995.  *State v. Hill*, 74 Ohio St.3d 1456, 656 N.E.2d 951 (Ohio 1995) (Table).

### B.    Initial Habeas Proceedings

Hill filed a Notice of Intent to File a Petition for Writ of Habeas Corpus with this Court on April 18, 1996.  (ECF No. 1.)  He was represented by Attorneys Patricia Milhoff and George Pappas Jr.  In his habeas petition, Hill reasserted his constitutional claims relating to his intellectual disability, arguing that the Ohio courts' rulings on those claims were contrary to, or an unreasonable application of, established federal law, or an unreasonable determination of the facts.  (ECF No. 18.)  Another judge on this Court denied Hill's petition on September 29, 1999.  (ECF No. 54.)

11

Hill appealed the decision to the Sixth Circuit Court of Appeals.  While his appeal was

pending, the Supreme Court decided *Atkins v. Virginia,* 536 U.S. 304 (2002), which barred the

execution of intellectually disabled offenders.  Less than two months later, on August 13, 2002,

the Sixth Circuit returned Hill's case to this Court with instructions to remand Hill's unexhausted

*Atkins* claim to state court and stay his remaining claims pending resolution of the *Atkins* claim.

*Hill v. Anderson*, 300 F.3d 679, 683 (6th Cir. 2002).  The court explained that it did not dismiss

Hill's "mixed petition" of exhausted and unexhausted claims, as it is authorized to do under

AEDPA's § 2254(b)(2), because "Hill's new claim should first be heard by a state court," and

because the issue of Hill's intellectual disability raised "a serious question" regarding the

voluntariness of his confession.  *Id*. at 680, 682.  The court noted that "the state of Ohio has not

formally conceded that [Hill] is retarded," but that "Ohio courts reviewing his case have

concluded that Danny Hill is retarded, *see, e.g., Hill,* 595 N.E.2d at 901, and voluminous expert

testimony supported this conclusion, J.A. at 3264-67, 3332-25, 3379-80 . . . ."  *Id*. at 682.  It

further observed,

> A suspect's "mental condition is surely relevant to an individual's
> susceptibility to police coercion."  *Colorado v. Connelly*, 479 U.S. 157, 165, 107
> S. Ct. 515, 93 L.Ed.2d 473 (1986).  State courts, including the Ohio Supreme
> Court, have clearly stated that Hill is retarded.  *See Hill,* 595 N.E.2d at 901.  The
> retarded have, "by definition . . . diminished capacities to understand and process
> information, to communicate, to abstract from mistakes and learn from experience,
> to engage in logical reasoning, to control impulses, and to understand the reactions
> of others."  *Atkins,* 536 U.S. at —, 122 S. Ct. at 2250. . . .

*Id.* at 683.  The court remarked that Hill's interactions with his uncle, Detective Morris Hill, was

"of special concern."  *Id*. at 682-83.

In accordance with the Sixth Circuit's remand instructions, on August 20, 2002, this

12

Court dismissed Hill's *Atkins* claim and stayed his remaining claims pending exhaustion of his state-court remedies.  (ECF No. 60.)

**C.     State *Atkins* Proceedings**

Hill filed a petition to vacate his death sentence with the Trumbull County Court of Common Pleas on November 27, 2002, and an amended petition to vacate on January 17, 2003. (Supp. App., Disc 1, 31-32.)  In his petition, he asserted that his intellectual disability is "a fact of record in his case" and that the state is thereby "barred by the doctrine of collateral estoppel from any attempt to relitigate the proven fact that [he] is a person with mental retardation."  In the alternative, Hill argued the trial court should take judicial notice of the fact that he is a person with intellectual disability and/or hold a hearing on the issue of his intellectual disability.  (*Id*. at 103-08.)  The court appointed Attorneys James Lewis, Anthony Consoldane, and Gregory Meyers of the Ohio Public Defender's Office to represent him.  (*Id*. at 32.)

The Eleventh District Court of Appeals, in reviewing Hill's *Atkins* claims on appeal from the trial court, provided this account of Hill's state-court *Atkins* proceedings:

> On April 4, 2003, the trial court ruled that Hill's petition stated "substantive ground for relief sufficient to warrant an evidentiary hearing." The court granted the state's and Hill's requests to retain their own experts in the field of mental retardation. Over Hill's objection, the court determined to retain its own expert to evaluate Hill "pursuant to his *Atkins* claim." The court denied Hill's request to have a jury empanelled [*sic*] to adjudicate his *Atkins* claim.
>
> The state retained as its expert Dr. J. Gregory Olley, a professor at the University of North Carolina at Chapel Hill and a director of the university's Center for the Study of Development and Learning. Hill retained as his expert Dr. David Hammer, a professor at the Ohio State University and the director of psychology services at the university's Nisonger Center. The court, through the Forensic Center of Northeast Ohio, retained Dr. Nancy Huntsman, of the Court Psychiatric Clinic of Cleveland.

13

In April 2004, Drs. Olley, Hammer, and Huntsman evaluated Hill at the Mansfield Correctional Institution for the purposes of preparing for the Atkins hearing. At this time, Hill was administered the Wechsler Adult Intelligence Scale ("WAIS–III") IQ test, the Test of Mental Malingering, the Street Survival Skills Questionnaire, and the Woodcock–Johnson–III. The doctors concurred that Hill was either "faking bad" and/or malingering in the performance of these tests. As a result, the full scale IQ score of 58 obtained on this occasion was deemed unreliable, and no psychometric assessment of Hill's current adaptive functioning was possible. Thus, the doctors were forced to rely on collateral sources in reaching their conclusions, such as Hill's school records containing evaluations of his intellectual functioning, evaluations performed at the time of Hill's sentencing and while Hill was on death row, institutional records from the Southern Ohio Correctional Institution and the Mansfield Correctional Institution, interviews with Hill, corrections officers, and case workers, and prior court records and testimony.

The evidentiary hearing on Hill's *Atkins* petition was held on October 4 through 8 and 26 through 29, 2004, and on March 23 through 24, 2005. Doctors Olley and Huntsman testified that in their opinion, Hill is not mentally retarded. Doctor Hammer concluded that Hill qualifies for a diagnosis of mild mental retardation.

In the course of the trial, an issue arose regarding the interpretation of the results of the Vineland Social Maturity Scale test, a test designed to measure adaptive functioning and performed on Hill four times prior to the age of 18. Hill presented the testimony of Sara S. Sparrow, Ph.D., professor emerita of Yale University, to rebut certain opinions expressed by Dr. Olley. In turn, the state called Timothy Hancock, Ph.D., executive director of the Parrish Street Clinic, in Durham, North Carolina, as a surrebuttal witness to Dr. Sparrow.

The following lay persons also testified at the hearing regarding Hill's functional abilities: corrections officer John Glenn, death row case manager Greg Morrow, death row unit manager Jennifer Sue Risinger, and corrections officer Steven Black.

On November 30, 2005, Hill filed a petitioner's supplemental authority and renewed double jeopardy motion, in which he asserted that the state is barred by the doctrine of collateral estoppel and the Double Jeopardy Clause from relitigating the issue of his mental retardation.

On February 15, 2006, the trial court issued its judgment entry denying Hill's petition for postconviction relief in which he claimed to be a person with mental retardation and rejecting his arguments regarding double jeopardy/collateral estoppel.

14

On March 15, 2006, Hill filed a timely notice of appeal to this court.

On August 21, 2006, Hill, acting pro se, filed a motion to withdraw the merit brief filed by counsel and a request that this court would order a competency hearing to determine whether Hill is competent to waive all appeals and proceedings in this matter. The basis for the motion is that appointed counsel had filed a merit brief in this appeal without properly investigating Hill's "'*Atkins*' claims and/or constitutional violations."

On October 27, 2006, this court issued the following judgment entry: "The trial court is directed to promptly hold an evidentiary hearing to determine Appellant's competency to make decisions regarding his counsel and possible waiver of the right to appeal. Depending upon the outcome of that determination, the trial court shall further determine whether Appellant has actually decided to waive his right to proceed in the appeal; and whether that decision has been made voluntarily, knowingly and intelligently."

The trial court appointed Thomas Gazley, Ph.D., with the Forensic Psychiatric Center of Northeast Ohio, to evaluate Hill. Dr. Gazley interviewed Hill on two occasions in November 2006. On December 7, 2006, a hearing was held on the competency issue.

On December 8, 2006, the trial court issued a judgment entry finding that Hill is "competent to make a decision whether or not to pursue an appeal" and has, "in open court," expressed his desire to pursue an appeal from the adverse decision of the trial court on the issue of mental retardation.

On February 1, 2007, this court overruled Hill's motion to withdraw the merit brief filed by counsel, and request that this court would order a competency hearing as moot.

*State v. Hill*, 177 Ohio App. 3d 171, 178-80, 894 N.E.2d 108, 113-15 (Ohio Ct. App. 2008).

On appeal to the Eleventh District Court of Appeals, Hill raised the following

assignments of error:

1.  The trial court erred in failing to apply double jeopardy and res judicata doctrines to prevent renewed litigation of Mr. Hill's status as a person with mental retardation.

2.  The trial court erred in denying Mr. Hill a jury determination of his mental retardation status and not imposing the burden of proof on the State of Ohio to

15

prove the absence of mental retardation beyond a reasonable doubt.

3.     The trial court erred in finding that Mr. Hill was not a person with mental retardation.

4.     The trial court erred in determining Mr. Hill was competent to proceed with this appeal.

(Supp. App., Disc 1, 4004-49.)

The Ohio court of appeals affirmed the trial court's decision on July 11, 2008.  *Hill*, 177 Ohio App. 3d at 195, 894 N.E.2d at 127.  One member of the three-judge panel, Judge Colleen Mary O'Toole, dissented from the majority's conclusion that the trial court did not err in finding that Hill was not intellectually disabled.  *Id*. at 195-201, 894 N.E.2d at 127-31.  She stated,

> Based on *Atkins*, executing a person with mental retardation status, regardless of context, violates the Eighth Amendment.  Here, I believe the trial court abused its discretion in finding that [Hill] was not a person with mental retardation, because he met the three *Lott* criteria for classification as mentally retarded.

*Id*. at 201, 894 N.E.2d at 131.  The Ohio Supreme Court declined to review the case on August 26, 2009, with two justices dissenting.  *State v. Hill*, 122 Ohio St. 3d 1502, 912 N.E.2d 107 (Ohio 2009) (Table).

### D.     Resumed Habeas Proceedings

After Hill had exhausted his state-court remedies, both parties promptly moved this Court to reopen Hill's habeas action, which this Court granted on October 1, 2009.  (ECF Nos. 63, 65, 68, respectively.)  Attorneys Mark Vander Laan and Christopher McDowell represented Hill.  On October 22, 2009, Hill moved to substitute Attorneys Vander Laan and McDowell with Attorney Dennis Sipe.  (ECF No. 69.)  In a telephone conference with the Court a week later, Hill withdrew his request, and the Court deemed his motion moot.  (ECF No. 75.)  On November 10,

2009, Hill filed a motion pro se "to stop all proceedings." (ECF No. 77.) The Court conducted a telephone conference with all parties on November 20, 2009, during which Hill withdrew his motion to dismiss his habeas action and requested the Court substitute the Ohio Federal Public Defender's Office as his counsel. The Court granted Hill's motion to substitute counsel and denied his motion to dismiss his case. (ECF No. 85.)

On February 24, 2010, Hill moved for an extension of time until March 15, 2010, in which to file an amended habeas petition, which the Court granted. (ECF Nos. 89, 90.) On March 4, 2010, Hill filed an affidavit with the Court, asking it again "to stop all proceedings." He explained that he believed his counsel were not ready to file an amended habeas petition before the approaching deadline and they were not following his instructions. (ECF No. 91.) Hill's counsel filed a response four days later, explaining their client's confusion. (ECF No. 92.) Hill then filed another motion to stop the proceedings on March 12, 2010, without providing any basis for the motion. (ECF No. 93.) The Court denied the motion on March 24, 2010, noting Hill's frequent, and disruptive, attempts to substitute counsel and dismiss his appeals. (ECF No. 96.)

On March 15, 2010, Hill filed an Amended Petition for Writ of Habeas Corpus in this Court. In it, he asserts three claims: 1) that the death sentence imposed against him violates the Eighth Amendment under *Atkins* due to his intellectual disability; 2) that counsel assigned to represent him at the state *Atkins* hearing rendered ineffective assistance of counsel by failing to investigate and to present compelling and relevant evidence in support of the *Atkins* claim; and 3) that he is actually innocent of the death penalty because he is mentally retarded. (ECF No. 94.) Respondent filed a Supplemental Return of Writ Regarding Atkins Claim on April 30, 2010.

17

(ECF No. 98.)  After requesting and receiving an extension of time, Hill filed a Traverse on August 2, 2010, and a Supplement to Traverse on August 5, 2010.  (ECF Nos. 102 and 103, respectively.)

On September 9, 2010, Hill requested an extension of time to file motions.  (ECF No. 114.)  Respondent opposed the motion, and the Court denied it on September 13, 2010.  (ECF Nos. 115 and 116, respectively.)  Hill then filed several motions with the Court on September 20, 2010.  He sought to expand the record with various declarations supporting his *Atkins* claims.  (ECF Nos. 119 and 120.)  Hill also requested discovery to support his *Atkins* claims and his *Atkins*-related ineffective-assistance claim.  (ECF No. 117.)  And he sought an evidentiary hearing on his *Atkins* claims.  (ECF No. 118.)  On October 4, 2010, Hill filed a motion to supplement his motions for evidentiary hearing and expansion of the record.  (ECF No. 129.)  Respondent opposed all motions.  (ECF Nos. 123, 125, 131.)

This Court ruled on Hill's motions on December 14, 2010.  It denied Hill's motion to expand the record, concluding that "Petitioner cannot show that he was not at fault for failing to develop the record" at the state *Atkins* hearing and therefore did not satisfy 28 U.S.C. § 2254(e)(2)'s requirements that a petitioner demonstrate that the factual predicates of his claim could have been previously discovered through the exercise of due diligence, and that he is actually innocent.  (ECF No. 132, 13.)  The Court also denied Hill's discovery request concerning his *Atkins*-related ineffective-assistance claim during post-conviction proceedings, because "Petitioner is not entitled to effective assistance of counsel during post-conviction proceedings and the issue cannot be heard on habeas review."  (*Id*. at 15.)  It granted discovery relating to the *Atkins* claims generally, however, as the information, if fully developed, may entitle Hill to relief.

18

(*Id*. at 16.)  Finally, it denied without prejudice Hill's motion for an evidentiary hearing because, again, Hill did not meet the criteria of § 2254(e)(2).  (*Id*. at 17.)

Hill notified the Court that he had completed discovery on April 13, 2011.  (ECF No. 135.)  On April 27, 2011, Hill moved to expand the record with the discovery obtained, which the Court granted "for the sole purpose of determining whether an evidentiary hearing is appropriate in this matter."  (ECF Nos. 140 and 145, respectively.)

On May 23, 2012, Hill requested that the Court reconsider its December 14, 2010, ruling regarding his requests for discovery and to expand the record "in relation to" his ineffective-assistance claim in light of the recent United States Supreme Court decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).  (ECF No. 146, 1.)  The Court denied Hill's request on July 10, 2012.  (ECF No. 148.)

### III.   Petitioner's Grounds for Relief

Hill asserts three grounds for relief.  They are:

1.   Mr. Hill is mentally retarded and thus ineligible for the death penalty.  Mr. Hill's sentence of death violates his right to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

2.   Court appointed *Atkins* counsel rendered ineffective assistance to Mr. Hill, and the trial court allowed for the continued representation of *Atkins* counsel in spite of knowing that there was a complete and absolute breakdown in the attorney-client relationship, thereby denying Hill his right to counsel in violation of his Sixth, Eighth and Fourteenth Amendment Rights.

3.   Because Mr. Hill is mentally retarded, he is innocent of the death penalty.

(ECF No. 94, *passim*.)

### IV.   Standard of Review

Hill's Amended Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), since it was filed after the Act's effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio,* 551 F.3d 485, 493 (6th Cir. 2009).  AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting (*Michael) Williams v. Taylor*, 529 U.S. 362, 436 (2000)).  As the United States Supreme Court recently explained, the Act "recognizes a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*.

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in § 2254(d).  That provision forbids a habeas court from granting relief with respect to a "claim that was adjudicated on the merits in State court proceedings" *unless* the state-court decision either:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original).

A state-court decision is contrary to "clearly established federal law" under § 2254(d)(1)

20

only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Id.* at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407.  As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). Review under this clause, as its plain language indicates, also is limited to "the evidence presented in the State court proceeding."  Furthermore, the petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).  This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome

by clear and convincing evidence.[5]  28 U.S.C.  § 2254(e)(1).  The Supreme Court repeatedly has

declined to define the "precise relationship" between § 2254(d)(2) and § 2254(e)(1).  *Burt*, 134 S.

Ct. at 15; *see also Wood v. Allen*, 558 U.S. 290, 300 (2010).   It has explained, however, that it is

> incorrect . . ., when looking at the merits, to merge the independent requirements
> of § 2254(d)(2) and (e)(1).  AEDPA does not require a petitioner to prove that a
> decision is objectively unreasonable by clear and convincing evidence.  The clear
> and convincing evidence standard is found in § 2254(e)(1), but that subsection
> pertains only to state-court determinations of factual issues, rather than decisions.

*Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).  "[A] decision adjudicated on the merits in a

state court and based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the sate-court proceeding." *Id*. at

340.  In addition, "it is not enough for the petitioner to show some unreasonable determination of

fact; rather, the petitioner must show that the resulting state court decision was 'based on' that

unreasonable determination." *Rice,* 660 F.3d at 250.  And, as Supreme Court has cautioned, "'a

state-court factual determination is not unreasonable merely because the federal habeas court

would have reached a different conclusion in the first instance.'" *Burt*, 134 S. Ct. at 15 (quoting

*Wood*, 558 U.S. at 301).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by

AEDPA, is an intentionally demanding standard, affording great deference to state-court

adjudications of federal claims.  In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme

Court held that as long as "fairminded jurists could disagree on the correctness of the state court's

---

[5]      Section 2254(e)(1) provides: "In a proceeding instituted by an application for a
writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be presumed to be correct.  The
applicant shall have the burden of rebutting the presumption of correctness by clear and
convincing evidence." 28 U.S.C. § 2254(e)(1).

decision," then relief is precluded under that provision.  *Id*. at 786 (internal quotation marks

omitted).  The Court admonished that a reviewing court may not "treat[] the reasonableness

question as a test of its confidence in the result it would reach under de novo review," and that

"even a strong case for relief does not mean the state court's contrary conclusion was

unreasonable."  *Id*. at 785.  Rather, § 2254(d) "reflects the view that habeas corpus is a guard

against extreme malfunctions in the state criminal justice systems" and does not function as a

"substitute for ordinary error correction through appeal."  *Id*. (internal quotation marks omitted).

Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement."  *Id*. at 786-87.  This is a very high standard, which the Court readily

acknowledges:  "If this standard is difficult to meet, that is because it is meant to be."  *Id.* at 786.

Nevertheless, the Supreme Court recognized in *Harrington* that AEDPA "stops short of

imposing a complete bar on federal court relitigation of claims already rejected in state

proceedings."  *Id.* at 786.  "[E]ven in the context of federal habeas, deference does not imply

abandonment or abdication of judicial review.  Deference does not by definition preclude relief."

*Miller-El*, 537 U.S. at 340.  Rather, "under AEDPA standards, a federal court can disagree with a

state court's factual determination and 'conclude the decision was unreasonable or that the factual

premise was incorrect by clear and convincing evidence.'"  *Baird v. Davis*, 388 F.3d 1110, 1123

(7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.).

In addition to § 2254(d)'s limitations, AEDPA precludes habeas review of some claims

that have not been properly exhausted before the state courts, or were procedurally barred by the

state courts.  Section 2254(b)(1) provides that a federal court may not award habeas relief to an

applicant in state custody "unless it appears that – the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  Thus, exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).

In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).  To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

Also, even where a state prisoner exhausts available state-court remedies, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure."  *Wainwright*, 433 U.S. at 87.  If a

24

> state prisoner has defaulted his federal claims in state court pursuant to an
> independent and adequate state procedural rule, federal habeas review of the
> claims is barred unless the prisoner can demonstrate cause for the default and
> actual prejudice as a result of the alleged violation of federal law, or demonstrate
> that failure to consider the claims will result in a fundamental miscarriage of
> justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and

the state courts' application of it "must rely in no part on federal law."  *Fautenberry v. Mitchell*,

No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001) (citing *Coleman*, 501

U.S. at 732-33).  To be adequate, a state procedural rule must be "'firmly established and

regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53,

60 (2009).  If a petitioner fails to fairly present any federal habeas claims to the state courts but

has no remaining state remedies, then the petitioner has procedurally defaulted those claims.

*O'Sullivan*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

    The Court will address the issues of exhaustion and procedural default presented in this

case when it reviews Hill's individual claims.

**V.**       **Analysis of Petitioner's Grounds for Relief**

    **A.**     *First Ground for Relief:*  **Atkins** *Claim*

    Hill's first claim for relief is that he is intellectually disabled pursuant to *Atkins v.*

*Virginia*, 536 U.S. 304 (2002), and therefore ineligible for execution.  Hill raised this claim on

post-conviction and appealed it to the Eleventh District Court of Appeals and the Ohio Supreme

Court.  This claim is therefore preserved for federal habeas review.

       **1.**     **Legal Standards:** *Atkins* **and** *Lott*

In *Atkins v. Virginia*, the United States Supreme Court held that, in light of "our evolving

standards of decency," executing the intellectually disabled violates the Eighth Amendment's ban

on cruel and unusual punishment.  *Atkins*, 536 U.S. at 321.  The Court recognized a national

consensus that intellectually disabled persons are "categorically less culpable than the average

criminal."  *Id*. at 316.  It explained,

> Mentally retarded persons frequently know the difference between right and wrong
> and are competent to stand trial.  Because of their impairments, however, by
> definition they have diminished capacities to understand and process information,
> to communicate, to abstract from mistakes and learn from experience, to engage in
> logical reasoning, to control impulses, and to understand the reactions of others.
> There is no evidence that they are more likely to engage in criminal conduct than
> others, but there is abundant evidence that they often act on impulse rather than
> pursuant to a premeditated plan, and that in group settings they are followers
> rather than leaders.  Their deficiencies do not warrant an exemption from criminal
> sanctions, but they do diminish their personal culpability.

*Id*. at 318.  The Court also found intellectually disabled offenders at "special risk of wrongful

execution."  *Id*. at 320.  It pointed to the possibility of false confessions; the defendant's difficulty

in persuasively showing mitigation, providing meaningful assistance to counsel, and testifying;

and his or her demeanor, which may create an unwarranted impression of lack of remorse.  *Id*. at

320-21.  The Court concluded that given the impairments of intellectually disabled individuals,

executing them would not "measurably advance the deterrent or the retributive purpose of the

death penalty."  *Id*. at 321.

The *Atkins* Court acknowledged the difficulties inherent in defining intellectual disability.

It stated,

> To the extent there is serious disagreement about the execution of mentally
> retarded offenders, it is in determining which offenders are in fact retarded. . . .
> Not all people who claim to be mentally retarded will be so impaired as to fall
> within the range of mentally retarded offenders about whom there is a national
> consensus.

*Id*. at 317.  But it did not define the condition.  Instead, as it did in the context of mental competency, the Court entrusted the states with "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'"  *Id*. (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

The Court did, however, point states to the clinical definitions of intellectual disability promulgated by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").[6]  *Id*. at 308 n.3 (citing AAMR, *Mental Retardation:  Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) (hereinafter, "AAMR 1992 Manual") and APA, *Diagnostic and Statistical Manual of Mental Disorders* 41-43 (4th ed. 2000) (hereinafter, "DSM-IV-TR")).  It explained that those criteria "require not only subaverage

---

[6]      The Court observed:

   The American Association on Mental Retardation (AAMR) defines intellectual disability as follows:  "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." . . .

   The American Psychiatric Association's definition is similar:  The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." . . .  "Mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.

*Id*. at 308 n.3 (citations omitted).

intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id*. at 318.  It noted that "[existing state] statutory definitions of mental retardation are not identical, but generally conform to [those] clinical definitions . . . ."[7]  *Id*. at 317 n.22.  In its recent decision in *Hall v. Florida*, the Supreme Court explained that these clinical definitions of intellectual disability "were a fundamental premise of *Atkins*."  *Hall v. Florida*, slip op. at 18 (U.S. May 27, 2014). The Court stressed in *Hall* that a court's legal determination of the condition, "although distinct from a medical diagnosis," must be "informed" by "the views of medical experts" and "the medical community's diagnostic framework."  *Id*. at 19-20.

_____

[7]      The AAMR has cautioned, however, that "[t]he field of mental retardation is currently in a state of flux regarding not just a fuller understanding of the condition of mental retardation, but also the language and process used in naming, defining, and classifying" the condition.  AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* xiii (10th ed. 2002) (hereinafter, "AAMR 2002 Manual").  At the heart of this evolving field is the very definition of intellectual disability, which has been revised nine times since 1908.  *Id*. at 20-23.  Since *Atkins* was decided, the AAMR has updated its manual twice:  a tenth edition was published in 2002, and an eleventh edition in 2010.  AAMR 2002 Manual; AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Support* (11th ed. 2010) (hereinafter, "AAMR 2010 Manual").  The APA published a fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (hereinafter, "DSM-V") in 2013.  Many of the most recent changes to the clinical definitions of intellectual disability, as articulated in these updated guidelines, concern the criteria for adaptive behavior, which the Court will examine in more detail below.

        In addition, as already noted, mental retardation is now commonly referred to as intellectual disability.  *See supra* n.1.  *See also* AMMR 2002 Manual, 5 ("The history of the condition we now know as mental retardation is replete with name changes, including feebleminded, mental defective, mentally deficient, and others.  These new names arose as new theoretical frameworks appeared and older names came to signal stigma and distorted power relationships.").  The AAMR has changed its name accordingly, to the American Association on Intellectual and Developmental Disabilities ("AAIDD"), although the Court will refer to the organization as AAMR throughout this opinion for consistency.

Soon after *Atkins* was decided, the Ohio Supreme Court established the "substantive standards and procedural guidelines" for Eighth Amendment intellectual disability claims in Ohio in *State v. Lott*, 97 Ohio St. 3d 303, 305, 779 N.E.2d 1011, 1014 (Ohio 2002).  The court adhered to the clinical definitions cited with approval in *Atkins*, holding that to prevail on an *Atkins* claim, the defendant must prove that he or she:  (1) suffers from "significantly subaverage intellectual functioning," (2) experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) manifested "onset before the age of 18." *Id*.  The court noted, however, that "[w]hile IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue." *Id*.  It therefore held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *Id*.

Because Lott's trial occurred before *Atkins* was decided, the Ohio Supreme Court determined that his *Atkins* hearing would be conducted before the trial court pursuant to Ohio's post-conviction procedures. *Id*.  It further held that the trial court should conduct a de novo review of the evidence, "rely[ing] on professional evaluations of Lott's mental status, and consider[ing] expert testimony, appointing experts if necessary, in deciding this matter." *Id.* at 306, 779 N.E.2d at 1015.  The court also held that the trial court, not a jury, would decide if a petitioner is intellectually disabled, and the petitioner bears the burden of  proving his or her intellectual disability by a preponderance-of-the-evidence standard. *Id*.

**2.  § 2254(d)(1):  Reasonableness of Ohio court's application of Supreme Court precedent**

Hill asserts, "To the extent that the state procedures themselves used to render the factual findings of the mental retardation clinical components contributed to and fostered inaccurate and unreliable factfinding by the trial court, the procedures violated clearly established federal law of" *Ford v. Wainwright*, 477 U.S. 399 (1986), *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Atkins* under § 2254(d)(1).  (ECF No. 94, 15.)  In *Ford* and *Panetti*, the Supreme Court held that state proceedings used to determine capital inmates' competency for execution must provide procedural due process protections.  *See Ford*, 477 U.S. at 411-12; *Panetti*, 551 U.S. at 949.  This argument lacks merit.

First, Hill does not clearly identify which state procedures violated these principles in his case.  But even so, there is no "clearly established Federal law, as determined by the Supreme Court" on this issue, and § 2254(d)(1) does not apply.  *See Williams v. Mitchell*, No. 1:09 CV 2246, 2012 WL 4505774, at **22- 28 (N.D. Ohio Sept. 28, 2012) (Nugent, J.).  The Supreme Court has not addressed whether or to what extent *Ford*'s due process requirements extend to state-court determinations of intellectual disability under *Atkins*.[8]  To the contrary, in *Bobby v. Bies*, 556 U.S. 825 (2009), the Court continued to emphasize that states themselves are responsible for "developing appropriate ways to enforce [*Atkins*'] constitutional restriction," and

---

[8]      The Sixth Circuit has not addressed this issue either.  Other circuit courts are split on the issue.  *Compare Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) (noting that "[e]ven though *Atkins* did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence"), *and Ochoa v. Workman*, 669 F.3d 1130, 1143 (10th Cir. 2012) (finding that Fourteenth Amendment due process protections are applicable in *Atkins* hearings, at least with respect to Oklahoma's decision to provide a right to a jury in such hearings); *with Hill v. Humphrey*, 662 F.3d 1335, 1360 (11th Cir. 2011) (distinguishing *Ford* and *Panetti* and holding that "[h]ere, by contrast, *Atkins* established only a substantive Eighth Amendment right for the mentally retarded, not any minimum procedural due process requirements for bringing that Eighth Amendment claim").

30

implicitly approved of Ohio's standard for intellectual disability claims.  *Id*. at 831 (quoting

*Atkins*, 536 U.S. at 317).  *See also Schriro v. Smith*, 546 U.S. 6, 9 (2005) ("States, including

Arizona, have responded to that challenge by adopting their own measures for adjudicating

claims of mental retardation.  While those measures *might*, in their application, be subject to

constitutional challenge, Arizona had not even had a chance to apply its chosen procedures when

the Ninth Circuit preemptively imposed its jury trial condition.") (emphasis added).

Moreover, even assuming that *Ford* and *Panetti* do apply here, this Court finds that the

Ohio courts' adjudication of Hill's *Atkins* claim comported with the due process right to a "fair

hearing" guaranteed in *Ford*.  *See Ford*, 477 U.S. at 424 (Powell, J., concurring).  Hill, assisted

by appointed counsel and two appointed expert witnesses, conducted substantial briefing and

discovery regarding his claim.  (*See* Supp. App., Disc 1, 1-33.)  The trial court, in accordance

with the procedures established in *Lott*, held a twelve-day hearing, at which Hill submitted more

than 500 pages of evidence.  (*See id.* at 486-1013.)  At its conclusion, the trial court issued an 84-

page opinion, which thoroughly examined the evidence and explained its decision.  (*See id.* at

3399-3483.)  Hill then was provided with appointed counsel to appeal this decision to two higher

state courts.  (*See id.* at 3496-4517.)  Thus, Hill was provided a full and fair opportunity to

develop and present his *Atkins* claim in state court, and this claim fails.

### 3.  § 2254(d)(2):  Reasonableness of Ohio court's factual determinations regarding Hill's intellectual disability

As Hill concedes in his Traverse, his *Atkins* claim is more appropriately addressed as it

relates to the Ohio appellate court's factual analysis under § 2254(d)(2).  (ECF No. 102, 47.)

Hill's primary argument under *Atkins* is that the "historical data and uncontroverted evidence

31

demonstrated that Mr. Hill meets the criteria established under psychological terms and under state law." (ECF No. 94, 20.) Respondent, in his six-page Return of Writ, counters Hill's claim simply by referring the Court to the "wealth of evidence" in the state-court record, the trial court's opinion, and audio and video recordings of Hill speaking to the trial court judge and a newspaper reporter. (ECF No. 98, 5.)

The Court first must determine the standards that govern its review of Hill's claim under § 2254(d)(2). Respondent, in his Return of Writ's only well-developed argument, contends that the Supreme Court decision in *Wood v. Allen*, 558 U.S. 290 (2010), "can fairly be read to say" that under § 2254(d)(2), a state-court finding is reasonable "if there is evidence in the State court record to support it." (*Id*. at 4.) The Court disagrees.

In *Wood*, the Court held that, "[r]eviewing all of the evidence, . . . even if it is debatable," a state court's conclusion that the petitioner's counsel made a strategic decision not to investigate further into, or present to the jury, information contained in a report about the petitioner's mental deficiencies was not unreasonable under § 2254(d)(2). *Wood*, 558 U.S. at 303. In doing so, the Court addressed the standard of review under § 2254(d)(2). It declined to reach the question of whether the "arguably more deferential" clear-and-convincing-evidence standard of § 2254(e)(1) "applies in every case presenting a challenge under § 2254(d)(2)," because its "view of the reasonableness of the state court's factual determination in this case [did] not turn on any interpretive difference regarding the relationship between these provisions." *Id*. at 300-01. But it "assume[d] for the sake of argument that the factual determination at issue should be reviewed . . . only under § 2254(d)(2) and not under § 2254(e)(1)." *Id*. at 301. The Court also acknowledged that "[t]he term 'unreasonable' is no doubt difficult to define." *Id*. at 301 (quoting *Williams,* 529

U.S. at 410)).  But it stressed:  "It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Id*.  The Court explained,

> In *Rice* [*v. Collins*, 546 U.S. 333, 339 (2006)], for example, in which we assumed, *arguendo*, that only § 2254(d)(2) and not § 2254(e)(1) applied, . . . we rejected the Ninth Circuit's conclusion that a state-court factual determination was unreasonable.  We noted that even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that *does not suffice* to supersede the trial court's . . . determination." [*Id*. at 341-42.]

*Id*. (emphasis added).  The Court also observed, "As for any evidence that may plausibly be read as inconsistent with the [state-court] finding that counsel made a strategic decision, we conclude that *it does not suffice* to demonstrate that the finding was unreasonable."  *Id*. at 302-03 (emphasis added).

Thus, the Court in *Wood* did not state, as Respondent argues, that a state-court factual determination is reasonable if *any evidence* exists to support it.  Rather, it reiterated that a habeas court, after reviewing *all of the evidence*, must find *sufficient* evidence of unreasonableness to warrant relief under § 2254(d)(2), and that is more evidence than would make the state-court decision merely debatable or would lead the habeas court to a different result.  Respondent's interpretation of *Wood*, though offering bright-line clarity, would render § 2254(d)(2)'s standard virtually insurmountable, extending deference nearly to the point of "abandonment or abdication of judicial review."  *Miller-El*, 537 U.S. at 340.

In this case, then, under § 2254(d)(2), the Court must review "the evidence presented in the State court proceeding" to determine whether the state court's adjudication of Hill's *Atkins* claim "was based on an unreasonable determination of the facts."  The state-court decision at

issue is from the Eleventh District Court of Appeals, which was the last Ohio court to render an explained judgment regarding Hill's claim.  *Ylst*, 501 U.S. at 805.  Hill bears the burden of rebutting that court's particular factual *findings* "by clear and convincing evidence."  *Burt*, 134 S. Ct. at 15; *Rice,* 660 F.3d at 250.  The Court is limited in its review to "the evidence presented in the State court proceeding."[9]  28 U.S.C. § 2254(d)(2).  "[I]t is not enough for [Hill] to show some unreasonable determination of fact; rather, [he] must show that the resulting state court decision was 'based on' that unreasonable determination."  *Rice,* 660 F.3d at 250.  Ultimately, Hill must show that the *decision as a whole* was unreasonable.  *Miller-El*, 537 U.S. at 341; *see also Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011).  And "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood*, 558 U.S. at 301.

The Court now examines the Ohio court of appeals' review of the state trial court's ruling that Hill had not met his burden of proving, by a preponderance of the evidence, that he was intellectually disabled, as defined by:  (1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills; and (3) onset before the age of 18.  *Lott*, 97 Ohio St. 3d at 305.

### a.    significant subaverage intellectual functioning

The Ohio court of appeals agreed with the trial court that Hill met the first criterion for intellectual disability under *Lott*.  The court stated,

> With respect to the first criterion, significantly subaverage intellectual functioning is clinically defined as an IQ below 70. FN2

---

[9]    The Court, therefore, will not consider any of the new evidence Hill submitted in support of his petition.

FN2. More precisely, significantly subaverage intellectual functioning is defined as two standard deviations below the mean for the general population, i.e. an adjusted score of 100 on a standardized test. A single deviation is considered 15 points. Two deviations means a score of 70 or lower. It should also be noted that an IQ score below 70 is not determinative of a diagnosis of mental retardation. Cf. *Lott*, 97 Ohio St.3d 303, 2002-0hio-6625, 779 N.E.2d 1011, at 12 (holding "that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70").

Hill's IQ was measured nine times between 1973, when he was six years old, and 2000, when he was 33 years old. The scores range from 48 to 71, with the mean being 61.12. In April 2004, Hill scored a 58 on the Wechsler Adult Intelligence Scale. Drs. Hammer, Olley, and Huntsman all agreed that this result was unreliable due to Hill's intentionally trying to obtain a low score.

*Hill*, 177 Ohio App. 3d at 188-89, 894 N.E.2d at 121.  Neither Hill nor Respondent challenges this determination.  (*See* ECF No. 94, 21; ECF No. 98, 1.)

### b.    adaptive skills deficit

The Ohio appellate court also agreed with the trial court that Hill failed to meet, by a preponderance of the evidence, the second criterion for intellectual disability under *Lott*, which requires the offender to demonstrate "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."  *Lott*, 97 Ohio St. 3d at 305, 779 N.E.2d at 1014.  It found "abundant competent and credible evidence" supporting the trial court's decision.  *Hill*, 177 Ohio App. 3d at 194, 894 N.E.2d at 126.

Hill argues that the state appellate court's factual determination regarding his adaptive behavior was unreasonable.  (ECF No. 94, 21.)  In particular, he complains that the court failed to properly apply the clinical guidelines, and that, in the absence of reliable test results regarding adaptive functioning, the court "engaged in its own analysis of anecdotal evidence of Mr. Hill's deficits in adaptive behavior . . ., contrary to the record . . . ."  (*Id*. at 37.)

35

The Supreme Court has defined "adaptive behavior" as "an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so." *Hall*, slip op. at 3. *See also* AAMR 2010 Manual, 43 (AAMR defining adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives"); DSM-V, 37 (APA defining it as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background"). The concept of adaptive behavior is considered "one of the most subjective essential elements of mental retardation," and was not added to the AAMR definition until 1959. *Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1329 (N.D. Ala. 2006); *see also* AAMR 1992 Manual, 38. It, like the definition of intellectual disability itself, has undergone many revisions.

In its 1992 manual, the AAMR assessed adaptive behavior based on ten skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. AAMR 1992 Manual, 38. In 2002, the AAMR grouped these adaptive skills into three general categories: conceptual, social, and practical. "Conceptual skills" include language, reading and writing, money concepts, and self-direction. "Social skills" include interpersonal relationships, personal responsibility, self-esteem, gullibility and naivete, following rules, obeying laws, and avoiding victimization. And "practical skills" include daily activities such as eating, personal hygiene, dressing, meal preparation, housekeeping, transportation, taking medication, money management, and telephone use, as well as occupational skills and maintaining a safe environment. AAMR 2002 Manual, 82. Under this standard, a significant deficit in only one of these groups satisfied the adaptive behavior criteria

36

for intellectual disability.  *Id*. at 78.  The AAMR did not change its definition of adaptive

behavior in the 2010 edition of its manual.  *See* AAMR 2010 Manual, 43.

In the DSM-IV-TR, the APA also measured adaptive behavior based on various skill

areas:  communication, self-care, home living, social/interpersonal skills, use of community

resources, self-direction, functional academic skills, work, leisure, health, and safety.  DSM-IV-

TR, 41.  It revised the criteria in the DSM-V, closely following the AAMR's new construct of

three broad skill groups.  It now provides,

> Adaptive functioning involves adaptive reasoning in three domains:  conceptual,
> social, and practical.  The *conceptual (academic) domain* involves competence in
> memory, language, reading, writing, math reasoning, acquisition of practical
> knowledge, problem solving, and judgment in novel situations, among others.
> The *social domain* involves awareness of others' thoughts, feelings, and
> experiences; empathy; interpersonal communication skills; friendship abilities;
> and social judgment, among others.  The *practical domain* involves learning and
> self-management across life settings, including personal care, job responsibilities,
> money management, recreation, self-management of behavior, and school and
> work task organization, among others.

DSM-V, 37.

In this case, the Ohio court of appeals quoted *Lott*'s standard for adaptive limitations –

"significant limitations in two or more adaptive skills, such as communication, self-care, and

self-direction" – under the definition of intellectual disability derived from the AAMR 1992

Manual and the DSM-IV-TR.  *Hill*, 177 Ohio App. 3d at 189, 894 N.E.2d at 121.  The court also

cited the AAMR 2002 Manual's revised definition of adaptive functioning.  *Id*. at n.3.  It did not,

however, identify which of these standards it was applying.  And there is no precedent in Ohio

law or from the Sixth Circuit regarding which definition of adaptive behavior should be applied

in this context.  Nevertheless, despite minor differences between the standards,[10] courts generally have not distinguished between them.  *See, e.g., Wiley v. Epps*, 625 F.3d 199, 216 n.13 (5th Cir. 2010) (noting that the two definitions "look at the same adaptive behavior"); *United States v. Davis*, 611 F. Supp. 2d 472, 490 (D. Md. 2009) (finding these classifications "essentially measure the same skills"); *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1314-15 (N.D. Ala. 2009) (observing that the 1992 and 2002 AAMR definitions "share a common conceptual linkage").  This Court finds that, although the later guidelines provide useful clarification, the experts engaged in Hill's case most often referenced the 1992 AAMR standard for adaptive behavior cited in *Atkins* and *Lott*.  *See Wiley*, 625 F.3d at 216; *Thomas*, 614 F. Supp. 2d at 1315.  By that standard, therefore, Hill was required to show by a preponderance of the evidence deficits in at least two out of the ten skill areas of adaptive behavior listed above.

Significantly, the Ohio courts assessed Hill's adaptive skills as they existed at the time of the hearing.  Hill had filed a pretrial motion with the trial court arguing that the correct time frame in which to analyze his intellectual disability for purposes of his *Atkins* claim was at the time of the offense.  (Supp. App., Disc 1, 228-37.)  The State countered that the court should focus on Hill's present mental status.  (*Id*. at 217-23.)  The court, in ruling on the matter, noted that neither *Atkins* nor *Lott* addresses the time frame at which a finding of metal retardation is relevant.  It decided that it would determine whether Hill was intellectually disabled "at the time

---

[10]    The experts in this case agreed that the AAMR 2002 Manual provided a slightly more stringent standard of adaptive deficiencies than the AAMR 1992 Manual.  (Supp. App., Disc 1, Tr., 592-93; 1509-10.)

[he] filed [his] claim,"[11] although it stated that it would not "totally disregard, or even preclude testimony concerning [Hill's] mental status at the time of the offense . . . or . . . as to his childhood and adolescent development." (*Id*. at 249-50.)  The state court of appeals did not address the temporal issue at all, and considered evidence from Hill's entire life.  Hill does not contest the trial court's decision regarding this issue.  (*See* ECF No. 94, 15.)

### (1)        adaptive skills testing

The Ohio court of appeals began its analysis of Hill's adaptive behavior by discussing the results of tests used to assess Hill's adaptive skills, both those performed during his childhood and those performed pursuant to his *Atkins* proceedings.  *Hill*, 177 Ohio App. 3d at 189-91, 894 N.E.2d at 122-24.  Indeed, the AAMR prefers that practitioners use standardized testing to assess adaptive skills, which measure the subject's functioning against the general population.  AAMR 2002 Manual, 76.  The court, however, rejected the results of the tests as unreliable.  The experts retained to evaluate Hill agreed that the results of the tests they performed were unreliable, because, as Dr. Olley reported, Hill "did not give his best effort to the tests or . . . he made a planned effort to score low."  (Supp. App., Disc 1, 1224.)  They also agreed, and Hill concedes, that Hill's earlier test results were not valid.[12]  (*See, e.g.,* ECF No. 94, 21.)  Two psychologists tested Hill's adaptive functioning when he was a child, but deemed the results unreliable because

---

[11]        As noted above, Hill filed his *Atkins* claim in state court on January 17, 2003. (Supp. App., Disc 1, 31-32.)  He was 36 years old.  The hearing on his claim took place about two years later, beginning on October 4, 2004, and concluding on July 15, 2005.  (*Id*. at 132, 1791.)

[12]        This renders moot Hill's argument that the court of appeals incorrectly held that the trial court did not abuse its discretion in rejecting the rebuttal testimony of Dr. Sparrow that Hill's older adaptive test scores could be recalculated to reflect updated scores that would place him within the intellectually disabled range.  (*Id*. at 33-35.)

the informant was Hill's mother, who also was intellectually disabled and, they believed, overstated Hill's abilities.  (*Id*. at 515, 522, 527.)  And Drs. Olley and Hammer agreed that the other early adaptive skills tests also were unreliable because the informant was not identified. (*Id*., Tr., 309, 431, 1779.)

The appellate court noted, therefore, that the trial court "[a]lternatively" favored "the more credible testimony of the other experts who concluded that Hill's adaptive capabilities are greater than those of a person with mental retardation."  *Hill,* 177 Ohio App. 3d at 191, 894 N.E.2d at 123.  But before it addressed the expert testimony, the court summarized the anecdotal evidence presented at Hill's hearing.

**(2)  anecdotal evidence**

In reviewing the anecdotal evidence of Hill's adaptive functioning, the Ohio court first explained,

> Apart from the problematic standardized measurements of Hill's adaptive skills, the trial court and the expert witnesses had to rely on collateral, largely anecdotal evidence to determine the level of Hill's adaptive functioning.  The trial court acknowledged that such evidence constituted a "thin reed" on which to make conclusions about Hill's diagnosis, but also recognized that this situation was the result of Hill's failure to cooperate with the experts retained to evaluate him.FN5  This court further emphasizes that the burden was on Hill to demonstrate that he is mentally retarded, not on the state to prove that he is not mentally retarded.
>
> FN5. Hill's own expert, Dr. Hammer, testified that the results of Hill's performance on the Test of Memory Malingering ("TOMM") "casts doubt on all the testing information collected from Mr. Hill during the evaluation process."

*Id*.

As a preliminary matter, the Court points out that the state-court record was hardly a "thin reed."  At well over 6,000 pages, it was voluminous.  The experts agreed that it was larger than

40

those in most capital cases in which intellectual disability is at issue.  (*See* Supp. App., Disc 1,

Tr., 468-69 (Hammer test.); 833-34 (Olley test.); 1196 (Huntsman test.); 1429-30 (testimony of

Sara S. Sparrow, Ph.D. (hereinafter, "Sparrow test.")).)  And while it is true that the record

contains many subjective, "anecdotal" observations of Hill's academic performance, conduct,

and behavior, much of that anecdotal information was provided in reports prepared by, and

testimony of, both private- and public-sector psychiatrists, psychologists, social workers, and

educators to support their professional opinions.

This is precisely the type of information that experts are supposed to rely on in the

absence of reliable test scores.  The Supreme Court in *Hall* described the "substantial and

weighty evidence" of adaptive functioning that courts should consider in determining intellectual

disability as "including medical histories, behavioral records, school tests and reports, and

testimony regarding past behavior and family circumstances." *Hall*, slip op. at 9.  It noted that

"the medical community accepts that all of this evidence can be probative of intellectual

disability . . . ." *Id*.  Indeed, the AAMR recognizes that some situations call for a retrospective

diagnosis, in which "formal assessment is less than optimal."  AAIDD, *User's Guide*, 17-18

(10th ed. 2007) (hereinafter, "AAIDD User's Guide").[13]  It directs practitioners in those

situations to conduct a thorough review of the subject's social history and school records, as the

experts and court did here.  AAIDD User's Guide, 18-20.

In fact, as will be explained in more detail below, the true "thin reed" in this case was the

---

[13]     None of the experts who testified in this case explicitly referred to the AAIDD
User's Guide, but their reports and testimony substantially adhere to the AAMR/AAIDD
guidelines.

information that was available concerning Hill's adaptive functioning at the time he filed his

*Atkins* claim, the focus of the evaluation.  Although Hill's malingering during the testing

certainly contributed to this lack of evidence, it was the fact that Hill had been on death row for

more than seventeen years, according to the experts, that made their evaluation particularly

"unusual" and "challenging."[14]  (*See, e.g.*, Supp. App., Disc 1, Tr., 647 (Olley test.) ("Our task is

an unusual and a challenging one because the standards of our profession make no explicit

statement about how to evaluate a person who has been in prison for a long time.").)  *See also*

AAMR 2002 Manual, 85 ("Observations made outside the context of community environments

typical of the individual's age peers and culture warrant severely reduced weight.").

Nevertheless, the appellate court found "abundant competent and credible evidence"

supporting the trial court's decision that Hill had not met his burden of proving that he possessed

the requisite adaptive deficits to qualify as intellectually disabled.  And, despite certain weak

evidence and flawed analysis, this Court cannot say that the appellate court's determination was

so clearly erroneous or unreasonable as to satisfy AEDPA's exacting standards.

      **(a)**      **Hill's adaptive functioning during childhood:
school and juvenile court records**

---

    [14]    Moreover, even if Hill had cooperated with the experts' testing, under AAMR standards, the tests should not have been dispositive anyway, since Hill was being used as his own informant regarding his functioning.  The AAMR advises,

> Those who use most current adaptive behavior scales to gather information about typical behavior rely primarily on the recording of information obtained from a third person who is familiar with the individual being assessed.  [T]he respondent [should be] a parent, teacher, or direct-service provider rather than from direct observation . . . or from self-report of typical behavior.

AAMR 2002 Manual, 85.  The experts and court, therefore, would have had to review evidence from other sources in any event.

In summarizing the trial court's findings regarding Hill's adaptive behavior during childhood, the Ohio appellate court stated:

> *Public School Records.* Hill's public school records amply demonstrate a history of academic underachievement and behavioral problems. Hill is often described as a lazy, manipulative, and sometimes violent youth. Although there are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone. Hill knew how to write and was described by at least one of his special education teachers as "a bright, perceptive boy with high reasoning ability."

*Hill*, 177 Ohio App. 3d at 192, 894 N.E.2d at 124.

This characterization of Hill's school and juvenile court records is troubling.  First, the state court cites evidence here that is irrelevant under the clinical guidelines.  It implies that evidence of Hill's weak academic and other adaptive functioning as a child reflects only Hill's indolence and poor behavior, excluding intellectual disability as a cause or at least casting doubt on it.  But the AAMR  advises that "adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning."  AAIDD User's Guide, 20.  "Underachievement," therefore – whatever its cause – is irrelevant to adaptive functioning.  Similarly, the AAMR cautions that "adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum."  *Id.  See also* DSM-IV-TR, 42 ("Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social or vocational opportunities, and the mental disorders and general medical conditions that may coexist with mental retardation.").  Therefore, as the experts explained at Hill's hearing, the presence of a conduct disorder or other mental illness does not contradict a diagnosis of intellectual disability; intellectually disabled persons can, and often do, suffer from mental

43

illness.[15]  (*See* Supp. App., Disc 1, Tr.,  473 (Hammer test.); 1102 (Huntsman test.); 1537 (Sparrow test.).)  *See also Black*, 664 F.3d at 99 ("[M]ental retardation and other mental disorders are not mutually exclusive. . . .  Rather, mental retardation and any number of other factors may coexist as comorbid causes of a defendant's deficient adaptive functioning." (internal citations omitted)); *Holladay*, 463 F. Supp. 2d at 1345 ("This court rejects the argument that willful and [] anti-social behavior excludes a mental retardation determination.  To the contrary, it suggests that a person whose IQ tests strongly indicate mental retardation has not adapted.").

Furthermore, the court's finding that Hill "underachieved" academically or in any other adaptive skill as a child is squarely contradicted by the record.  This Court could not find one reference in Hill's school records by a teacher, school administrator, psychologist, psychiatrist, or anyone else suggesting that Hill was capable of performing at a substantially higher level but chose not to.[16]  And the experts all agreed that there is no evidence in the school records that Hill

---

[15]     The AAMR states that mental health disorders are "much more prevalent" among intellectually disabled persons than the general population.  AAMR 2002 Manual, 172.  The DSM-IV-TR states, "Individuals with mental retardation have a prevalence of comorbid mental disorder that is estimated to be three to four times greater than in the general population."  DSM-IV-TR, 45.

[16]     The Court found only one express statement in the record that Hill could have performed better academically than he actually did.  A teacher wrote in a "Progress Report" in 1980 that, according to Hill's IQ test results that year, he "should be reading at a mid-second grade level," but had "only demonstrated the ability to read on a first grade level."  She speculated, "Possibly this is due to Danny's need for glasses, and his dislike for reading."  (Supp. App., Disc 1, 568.)  Whatever the cause for Hill's problems in reading that year, a year that he experienced serious difficulties across the board, a seventh grader's failure to read at a second-grade rather than a first-grade level does not qualify as the type of "underachievement" the Ohio court suggests, such that Hill could have read at a significantly higher level but chose not to.  Even if Hill had read at a second-grade level when he was thirteen years old, he still would have been seriously impaired.

malingered, or pretended to be slower than he was.[17]  (Supp. App., Disc 1, Tr., 272-73 (Hammer

test.); 856 (Olley test.); 1110 (Huntsman test.); 1541 (Sparrow test.).)  As Dr. Hammer noted,

children normally do not wish to be placed in special education programs or to be labeled

intellectually disabled because of the stigma attached.  (*Id*. at 225-26, 231, 298.)  In fact, if Hill's

academic or other adaptive limitations could have been attributed to Hill's laziness or deception,

as the court suggests, Drs. Hammer and Olley agreed that school psychologists would have

reported that fact and Hill would not have been placed in special education programs and

programs for intellectually disabled students.  Both the social bias and the law at that time

favored mainstreaming children in school as much as possible over the risk of stigmatizing them

by labeling them intellectually disabled.[18]  (*Id*. at 151, 218, 472 (Hammer test.); 828-34 (Olley

test.).)

     The Ohio court also discounted the repeated references in the school records to Hill

being easily led by others[19] with the fact that Hill committed two rapes and other crimes on his

own.  Evidence of Hill's crimes, however, should be given little, if any, weight in determining

---

    [17]    Dr. Huntsman did speculate in her report, however, without citing any evidentiary support, that the early formal assessments of Hill's cognitive abilities were invalid because "Mr. Hill has always been an unmotivated test taker, I think, since there have always been rewards associated with poor performance in the forms of attention and an easier curriculum.  He had little academic interest for years . . . ."  (Supp. App., Disc 1, 1140.)

    [18]    In elementary school, Hill was mainstreamed only in gym and music class.  (Supp. App., Disc 1, 247-48, 554.)  In junior high school, he also was mainstreamed in art and practical arts.  (*Id*. at 558.)

    [19]    The court's acknowledgment that "there are references to Hill's being easily led or influenced by others" is a gross understatement.  Psychologists, social workers and teachers almost uniformly commented on this trait, describing Hill, for example, as a "follower," "easily influenced," or "highly suggestible."  (*See*, *e.g.*, Supp. App., Disc 1, 515, 519, 522, 527, 532, 533, 537, 557, 1976.)

his adaptive skills.  The AAMR directs, "Do not use past criminal behavior . . . to infer level of adaptive behavior or about having MR/ID . . . .  First, there is not enough available information; second, there is a lack of normative information."  AAIDD User's Guide, 17-20.  Isolated acts of criminal behavior, after all, contradict the essential meaning of adaptive behavior.  In *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Supreme Court recognized that a defendant could be intellectually disabled and have sufficient insight and planning ability to deliberately kill a rape victim to avoid detection.  Such acts, it found, may exemplify a reduced ability to control one's impulses and evaluate the consequences of one's conduct, rather than undermine a diagnosis of intellectual disability.  *Id*. at 322.  Numerous other courts also have acknowledged the problematic nature of this evidence.  *See, e.g., Brumfield v. Cain*, 854 F. Supp. 2d 366, 395-96 (E.D. La. 2012) ("In assessing the weight to be given to criminal facts, this Court lends great credence to the clinical admonitions that using those facts to determine adaptive skills is at best a haphazard and risky business."); *Holladay*, 463 F. Supp. 2d at 1344 n.28 (rejecting argument that ability to commit crime and temporarily avoid capture forecloses a determination of intellectual disability and stating, "The State has repeatedly referred to Petitioner's crimes as 'complicated.' Apparently he came to harm, even kill, his ex-wife and killed all who were present.  It was not 'complicated.'  It was, perhaps, at least partly impulsive.  The Respondent refers to Petitioner's 'criminal acumen.'  He always got caught.").

Finally, this Court is most troubled by the Ohio court's finding that "Hill knew how to write and was described by 'at least' one of his special education teachers as 'a bright, perceptive boy with high reasoning ability.'"  As to Hill's writing skills, the Court finds no evidence in the record that Hill could write much more than his name during his school years, and struggled even

with that.  At eight years old, a school psychologist reported that Hill's motor-visual skills were so poor that he could not copy a diamond.  She also noted, "[w]hen Danny printed his name, the reproduction was very poor and he spelled his last name Hlli."  (Supp. App., Disc 1, 493.)  At thirteen years old, a school psychologist reported Hill's weakness in "reproduc[ing] symbols using phchomotor [*sic*] speed and coordination" and that his handwriting was "immature for his chronological age."  (*Id*. at 522; *see also id*. at 519 ("written expression is weak").)  A teacher wrote that year that Hill could write "simple sentences . . . with assistance," but had "a great deal of difficulty thinking of sentences to accompany pictures."  (*Id*. at 569.)  At fourteen years old, Hill's teacher wrote that one of her goals for Hill was for him to "write [his] own signature."  (*Id*. at 578.)  One of Hill's counselors testified at Hill's mitigation hearing that when Hill was fifteen years old he could not read or write.  (ECF No. 28, 78.)

In addition, the court's observation that "at least" one teacher found Hill to be "bright" and "perceptive," with "high reasoning ability," is almost cynical in its selective misrepresentation of the facts.  *See, e.g., Holladay*, 463 F. Supp. 2d at 1343 ("It is important, in determining whether a person is or is not mentally retarded, not to pick and choose so as to over-emphasize certain characteristics.").  This Court could not find one other reference to Hill as "bright," "perceptive" or in any way intellectually or academically talented from any educator or anyone else involved in Hill's education.  Indeed, the experts all agreed that Hill's school records indicated significant limitations in functional academics.  (*See* Supp. App., Disc 1, Tr., 69, 230 (Hammer test.); 783 (Olley test.); 1112 (Huntsman test.).)  Moreover, the comment is belied by the document itself.  It was written by a special education teacher at Fairhaven, a school for intellectually disabled children, on an individual educational plan ("IEP") form when Hill was

47

fourteen years old.  (Supp. App., Disc 1, 578-79.)  The teacher notes that Hill was reading at the first-grade level and doing math at the third-grade level.  Among the goals she listed for Hill were:  "develop appropriate behavior," such as "work[ing] without being disruptive[,] touch[ing] others in a manner suitable to school[, and] play[ing] cooperatively"; and "develop necessary self help [*sic*] skills," such as "shower[ing] regularly[,] us[ing] deodorant regularly[,] maintain[ing] a clean, neat appearance, mend[ing] torn clothing before wearing in public, eat[ing]/drink[ing] in a manner appropriate to school."  (*Id*. at 578.)  The teacher, by calling Hill "bright" and "perceptive," perhaps was attempting to set a positive tone for a student at a school for intellectually disabled children, but her goals for Hill clearly show that he was struggling to achieve academically and to behave appropriately and productively.

In fact, Hill's school and juvenile court records, which number hundreds of pages, are replete with evidence of Hill's limitations in adaptive functioning.  They tell the story of a child who was raised primarily by an intellectually disabled mother, diagnosed as intellectually disabled in kindergarten, and identified and treated as such throughout his childhood.  Hill was placed in special education classes for intellectually disabled students from the first grade on.  At age thirteen, he was sent to a school for intellectually disabled children, and was transferred to another, similar school at fifteen because of poor academic achievement and behavior.  At seventeen years old, after being  arrested for, and pleading guilty to, two felony rape charges, the juvenile court placed Hill in a facility that housed mentally ill youth offenders.

Hill was born on January 6, 1967, in Warren, Ohio, to 18-year-old Vera Hill.[20]  (*Id*. at

---

[20]       Hill was Vera's maiden name.  She later assumed the surnames of two husbands, Vaugn and Williams.

1973.)  Hill's mother was intellectually disabled (*id*. at 515, 522, 527; ECF No. 31, 256-57), had

attended school only through the eighth grade (ECF No. 31, 8), and lived primarily on public

assistance while Hill was a child (*id*. at 9).  Hill had no contact with his father.  (*Id*. at 9-10.)  He

lived with his mother and three brothers, each from different fathers.  He was second oldest.  (*Id*.

at 7.)  Hill also lived for several years with a stepfather, Charles Williams, and for a period of

time with three of Mr. Williams' children, until Mr. Williams died in 1985.[21]  (*Id*. at 10-11.)  Mr.

Williams was kind to the children, but he abused alcohol and worked long hours, so he was not

actively involved in parenting.  (*Id*. at 12-13, 256.)  Hill's mother testified that all four of her

sons were "slow" in school, and they all had records of behavioral problems.  (*Id*. at 12, 257-58.)

She also testified that Hill was well-behaved at home, but he had few friends and stayed home

most of the time.  (*Id*. at 18-20.)

   Hill entered kindergarten in the Warren City Schools in the fall of 1972, at the age of five.

That spring, the school psychologist, Karen Weiselberg, evaluated Hill at the request of his

kindergarten teacher, who was concerned about Hill's "present level of intellectual functioning,"

as he "appear[ed] to be very immature in comparison to the other students."  (Supp. App., Disc 1,

489.)  Dr. Weiselberg wrote that Hill's IQ score was 70, placing him in the third percentile of the

general population.  (*Id*. at 490.)  He did not know his correct age (he thought he was nine) or his

address, and his classmates "often pick[ed] on him."  (*Id*. at 489.)  He could not count dots, read

numbers, or show a certain number of fingers when asked.  And he could not match most letters

of the alphabet.  Dr. Weiselberg concluded that he possessed the visual-motor coordination of a

---

[21] Hill's mother's previous marriage, to James Vaugn, ended in divorce, and it is
unclear from her testimony whether Mr. Vaugn ever lived with her and her children.  (*Id*. at 11.)

three-year-old and, overall, was functioning at the level of a four-year-old.  (*Id*. at 490.)  She recommended to the principal that Hill be placed in special education classes for "educable mentally retarded" ("EMR") children.  (*Id*.)

Dr. Weiselberg tested Hill again at the beginning of third grade, in September of 1975; he was eight years and eight months old at the time.  (*Id.* at 492-94.)  She reported that Hill's IQ was 62, placing him within the first percentile of the general population.  (*Id*. at 492.)  His basic skills in reading, spelling and arithmetic ranged from mid-kindergarten to beginning first-grade level.  For example, on a sight recognition word test, Hill could not read any words, and on the arithmetic subtest, he could not read double digit numbers or complete any simple addition or subtraction problems.  (*Id*. at 493.)  She advised that Hill "will be limited in his ability to generalize, to transfer learning from one situation to another, to do abstract reasoning or to do much self evaluation."  Dr. Weiselberg again diagnosed Hill as falling within the EMR classification, and found his functioning at the level of a five-year-old.  (*Id*.)

In November of 1977, Hill again was placed in a special education class for fifth grade.  (*Id*. at 554-55.)  His goals for the year included "us[ing] the short a and short I vowel sounds to sound out words," and "[g]iven multiple choice, [to] be able to choose the main idea of the story."  (*Id*. at 554.)  The following year, in sixth grade, Hill was "introduced to addition . . . ."  (*Id*. at 561.)

In 1980, when Hill was thirteen years old and in seventh grade, he again was evaluated by a school psychologist, Annette Campbell, because he was "unable to achieve academically and [had] been having behavioral problems in the school."  (*Id*. at 520.)  Hill had an F in his special-education classroom work.  (*Id*.)  His IQ score was 49.  (*Id*. at 521.)  Dr. Campbell reported that

Hill did not know his address or phone number, and that she observed during the testing

behaviors such as "an immature pencil grip, making noises, being restless and tired, rolling his

eyes back into his head, making faces when he talks, [and] working with his pencil hanging

straight out of his mouth."  (*Id*. at 520.)  But she stated that he "did cooperate and accepted all

tasks presented to him."  (*Id*.)  Dr. Campbell diagnosed Hill as intellectually disabled, finding

weaknesses in "not being able to recall everyday information, do abstract thinking, perform

mental arithmetic, perceive a total social situation, perceive patterns, and to reproduce symbols

using phychomotor [*sic*] speed and coordination."  (*Id*. at 522.)  She also reported that Hill

exhibited "a great deal of impulsivity."  She explained,

> This means Danny does not think before he acts or speaks.  Giving few responses
> is typical of mentally retarded children.  He seems to feel tension and anxiety in
> trying to handle his environment.  The school environment is extremely
> frustrating to Danny.  Basically, testing shows that he is an affectionate child, not
> overtly aggressive.  The fighting he has been in in school is usually cases where
> he is led into it by others.

(*Id*.)  She concluded, "Danny is a child who is not functioning academically in his present

placement.  He also is extremely immature and is easily led by others into trouble around

school."  (*Id*.)  Dr. Campbell recommended that Hill be placed in the smaller, more confined

"Behavioral Improvement" unit where he would receive more individualized help "both

academically and socially."  And if that did not work, she recommended he be placed in the

Fairhaven Program in Niles, Ohio, for the trainable mentally retarded ("TMR").  She also

recommended a neurological examination to "help to explain the continuous drop in I.Q. points."

(*Id*.)

Dr. Campbell repeated Hill's testing less than four months later.  This time, Hill's IQ was

51

48.  (*Id*. at 513.)  She now recommended placement in the Fairhaven Program.  (*Id*. at 515.)

Hill's academic and social functioning continued to deteriorate that year.  One of his teachers

wrote that his "academic ability seems to be at a first grade level, as do his social skills."  (*Id.* at

568.)  She explained,

> Danny usually is very sleepy and has fallen asleep in class.  He is always
> unprepared for class (without paper and pencil), and when these are provided for
> him, he usually looses [*sic*] them between classes.  Often Danny wanders through
> the halls and for this reason is late for classes.
>
> Danny is unable to complete his lessons, which are on a first grade level,
> without assistance.  If Danny is left unattended, he strays from his task and begins
> to display immature behaviors, or falls asleep.  These behaviors include making
> noises, throwing small objects, verbally antagonizing others, taking things that do
> not belong to him, and wandering around the class room.
> . . .
>
> Danny is a very affectionate child.  He often expresses the desire to be
> hugged and will often rest his head on the teachers [*sic*] shoulder.  On occassion
> [*sic*], Danny has kissed the teacher indicating a desire to receive attention.

(*Id*.)  Hill was just beginning to learn subtraction and had "a great deal of difficulty subtracting

with numbers larger than 10."  (*Id*.)  That May, Dr. Campbell completed a psychological

evaluation form for the County Board of Mental Retardation to request Hill's placement at

Fairhaven School.  (*Id*. at 516-19.)  She listed his "developmental disability areas" as

"communication and self-help general."  (*Id*. at 516.)  Her "special instructional

recommendations" were: "1. Teach address and phone number. 2. Teach functional words in

reading. 3. Teach telling time."  (*Id*.)  Regarding Hill's academic skills, she wrote: "First and

second grade levels academically, extremely immature and dependent, responds like a five year

old . . . needs constant supervision."  (*Id*. at 519.)  Regarding his adaptive behavior, she wrote:

"He is weak in communication and self-help general.  Observations show weaknesses in

socialization and fine-motor skills." (*Id*.)

Hill attended the Fairhaven Program for the 1980/81 and 1981/82 school years, but he continued to struggle academically and socially.  Hill's mother testified at his mitigation hearing that the Fairhaven students teased Hill, "call[ing] him dumb and stuff like that," and Hill often skipped school because of that.  (ECF No. 31, 15.)  His reading skills remained at the first-grade level, and his math skills advanced only to the third-grade level.  (*Id*. at 575, 578.)  The program also continued to work with him on self-help skills, such as personal hygiene, and social skills, such as controlling his temper and respecting authority.  (*Id*.)  In April 1982, Dr. Campbell again evaluated Hill.  (*Id*. at 511-12.)  His IQ score was 63.  (*Id*. at 511.)  Her testing indicated a social maturity of a twelve-year-old, with "much impulsivity" and  "much hostility and aggression." (*Id*.)  She further noted that Hill "seem[ed] to feel insecure, immature, and inadequate needing much emotional support," had "severe problems" at school that year, and exhibited "weaknesses in the areas of communications, self-direction, socialization and occupation."  (*Id*. at 511-12.)

At this time, Hill began to get into trouble with the police, mainly for theft-related crimes and truancy.  In August 1982, the court placed him in a group home in a rural, farm setting operated by Brinkhaven Enterprises, Inc. ("Brinkhaven"), in North Lawrence, Ohio.  (*Id*. at 526.) Hill did well there.  (*Id*. at 524, 1973.)  In January of 1983, Brinkhaven's court liaison officer wrote of Hill, "Dan is improving in his personal hygiene.  While he needs constant reminder[s] to shower, brush his teeth, etc., he does attempt to do a [more] thorough job than when he first came to the program."  He also noted that "Dan receives tutoring in basic skills, as well as requiring a lot of one-on-one teaching within the classroom itself."  (*Id*. at 524.)  His tutor at Brinkhaven reported that Hill worked at the first-grade level in reading and the second-grade level in math.

53

(*Id*. at 525.)  Mark Brink, one of Hill's youth workers, and later the vice president and court liaison officer at Brinkhaven, testified at Hill's mitigation hearing that Hill needed twenty-four hour supervision, because:

> everything you wanted Danny to do, you explained it to him.  If you wanted him – you know, you had to tell him every day: "Danny, comb your hair, brush your teeth, take a shower."  Chores, you had to follow up to make sure they're done properly.  You needed to supervise him while he was doing them a lot of times.

(ECF No. 31, 87.)  He also commented that Hill often was teased for being heavy and "one of the slower kids that we had there," and was a follower.  (*Id*. at 84-86.)  Hill left Brinkhaven in February of 1983 because of a lack of funds at the county level.  (*Id*. at 83; Supp. App., Disc 1, 526.)  He enrolled in the tenth grade at Warren Western Reserve High School.  (Supp. App., Disc 1, 1973.)

Hill rarely attended school, however, and continued to get into trouble.  By December 1983, Hill had amassed four felony and eight misdemeanor juvenile convictions, all related to theft.  (*Id*. at 1936-38, 1947-69.)  Hill told a Department of Youth Services employee that he did not attend school because students there repeatedly threatened to hurt him.  (*Id*. at 532.)  His mother told the same employee that she blamed Hill's troubles on three boys and "some adults" who threatened him and "got Danny to steal for them.  What they told him he would do."  (*Id*.)  Hill was expelled from school for the remainder of the year in February 1984.  Neither Hill nor his mother attended the expulsion hearing.  (*Id*. at 618, 1973.)

In January 1984, the juvenile court asked psychologist Douglas Darnall to evaluate Hill for a bind over proceeding.  Dr. Darnall reported to the court that Hill fell in the "mildly retarded range."  (*Id*. at 527.)  His IQ was 55.  (*Id*.)  Dr. Darnall discounted the adaptive skills test because

Hill's mother served as the informant, and wrote, "it is reasonable to conclude that Danny's overall functioning is within the mildly retarded range." He opined that Hill's level of adaptive functioning was "[v]ery [p]oor." He explained, "His judgement [*sic*] is poor and he does not think of consequences. He is highly suggestible." He also stated, "Danny does not comprehend the seriousness of his offenses." (*Id*.) Dr. Darnall did not recommend bind over to an adult facility. He felt Hill would not benefit from rehabilitation in an adult facility and was "likely to be exploited" because of his "passivity and limited intellectual ability." (*Id*. at 528.) Although Dr. Darnall considered Hill's prognosis "poor regardless of where [Hill was] placed," he recommended that if convicted, Hill "be placed in a juvenile facility that is highly structured and can provide programming for mentally retarded youth." (*Id*.) He "further anticipate[d] that Danny will in time need to live in an adult halfway house which would be able to provide both social as well as vocational habilitation." (*Id*.) The Probation Department agreed with Dr. Darnell and recommended that Hill be returned to Brinkhaven, where he would get the "intensive, individual attention" he needed, rather than an adult facility, where "he would only be exploited by older, more hardened criminals." (*Id*. at 529.) The bind over was denied on March 5, 1984, and Hill was again committed to Brinkhaven. (*Id*. at 1952.)

Three days later, however, Hill was back in court, this time charged with two counts of rape. (*Id*. at 1923, 1936, 1975.) He pleaded guilty to both counts and was sentenced to serve a minimum of one year and a maximum period not to exceed Hill's twenty-first birth date at the Training Center for Youth ("TCY"), a secure facility for youth offenders with psychological problems. (*Id*. at 531, 1939.) On April 25, 1984, Hill was evaluated by the head psychologist at TCY, R.W. Jackson. (*Id*. at 530.) Hill's IQ was 65. (*Id*.) Dr. Jackson wrote that Hill was an

"[i]ntellectually limited, socially constricted youth with very few interpersonal coping skills. Rather immature and self-centered with needs for attention and approval of others." (*Id*.) A TCY social worker stated in a treatment plan that Hill was "a very limited, mildly retarded youth who has no insight into the seriousness of his delinquent activities.  He shows no remorse for his victims nor . . . shame . . . ." (*Id*. at 1975-76.)  She further stated that Hill was "very easily influenced or intimidated by more mature and aggressive youths," and "appear[ed] to be becoming a very dangerous youth if not rehabilitated or given the proper amount of structure, supervision, and guidance." (*Id*. at 1976.)

TCY employees testified at Hill's mitigation hearing that the older boys frequently beat Hill, so he was moved to a smaller unit with younger, less "hostile" boys.  (ECF No. 31, 100, 122, 150, 166-67.)  They all agreed that Hill was a "loner" and a "follower" while there.  (*Id*. at 105, 122, 124, 147, 151, 166.)  One youth worker testified that "with [Hill] being so limited," he would often forget her instructions.  She added, "And so, when you tell Danny to do something, then you would have to follow him through that.  You just couldn't say, 'Well, Danny, I want you to go and mop the bathroom,' because he wouldn't do it." (*Id*. at 172-73.)

Hill completed the ninth grade in special education classes while at TCY in January 1985, at age eighteen.  (*Id*. at 533.)  He was released from TCY that March, and returned to high school in Warren.[22]  (*Id*. at 537.)  The goal was for him to "stay away from negative peers" because he

---

[22]    The record relating to Hill's release from TCY is chilling.  An employee of the Ohio Department of Youth Services wrote in an admission report when Hill entered TCY,

Because of his limited ability to control his behavior and [because he] follows the dictates of those with whom he chooses to associate[,] Danny's prognosis would appear to be quite guarded.  In a well-structured program, Danny could no doubt function quite well.  The area to which he will return is not at all

"continues to be a follower," and enroll in vocational training and attend community counseling

after completing high school.  (*Id.*)  Fife's murder occurred six months later.

(b)  **Hill's adaptive functioning at the time of the offense:  police and court records**

The state appellate court summarized the trial court's findings concerning Hill's adaptive

skills at the time of the offense as follows:

> *Hill's Trial for the Murder of Raymond Fife.* The trial court observed that the record of Hill's murder trial provided evidence of Hill's ability concerning self-direction and self-preservation. In particular, the court noted Hill's initiative in coming to the police in order to misdirect the focus of the investigation by implicating others and Hill's ability to adapt his alibi to changing circumstances in the course of police interrogation. This last point was also noted by Dr. Olley in his hearing testimony:  Hill "stood his ground during that interrogation very, very strongly. * * * He not only modified his story a little bit when he was faced with evidence that couldn't possibly have avoided. * * * That to me is a kind of thinking and planning and integrating complex information that is a higher level than I have seen people with mental retardation able to do."

*Hill*, 177 Ohio App. 3d at 192, 894 N.E.2d at 124.

---

> conducive to his making a positive adjustment.  No doubt the community would have some very strong reactions to his return because of the nature of his offenses. Yet in view of the fact that he will be 18 years of age at the time his sentence terminates, and the mother wants him home, placement will be made with her.

(Supp. App., Disc 1, 532.)  And Cheryl West, Hill's youth leader at TCY, testified at Hill's mitigation hearing that when Hill was released,

> he wasn't ready to leave. I brought it to quite a few people's attention. One in particular was Mrs. Ann Swilger. At the time, she was the deputy superintendent. And I brought it to her attention that Danny was not ready to be released. And Danny was standing there with me, and Danny said, "I would prefer to go to a group home until I get myself together.  And now you're going to send me home, and if I go back home, I'm going to get in more trouble."  Mrs. Swilger at that time said, "Danny, you're a hopeless case.  We're going to release you as a hopeless case.  Hopefully, you'll get in more trouble and you'll just do more time."

(ECF No. 31, 173.)

This Court also questions these findings.  "Self-preservation" is not among the adaptive skills measured under the clinical definitions of intellectual disability.  (*See supra* Section V.A.3.b.)  And neither is it clear that this evidence demonstrates a strength in "self-direction" under the clinical guidelines, which define "self-direction" as more than a volitional act of self-interest.  The AAMR defines it as:

> skills related to making choices; learning and following a schedule; initiating activities appropriate to the setting, conditions, schedule, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems confronted in familiar and novel situations; and demonstrating appropriate assertiveness and self-advocacy skills.

AAMR 1992 Manual, 40.  Hill's decision to go to the police voluntarily two days after committing a murder to try to collect a reward for information about the crime is not an example of "appropriate assertiveness and self-advocacy," or an activity "appropriate to the setting" or his "personal interests"; nor is lying about, or blaming others for, your own transgressions to avoid getting into trouble – a classic tactic employed by even the youngest of children.

In fact, one could argue that Hill's actions were quite the opposite of adaptive.  Instead of helping to "resolve his problems," Hill's choices consistently worked against him.  Going to the police with information about the murder succeeded only in immediately drawing the police's attention to himself.  Sgt. Steinbeck testified at Hill's trial that it was only after Hill showed up at the police station and told Sgt. Stewart details about the murder that most people did not know, that the police began to "pursue" Hill as a suspect.  (ECF No. 24, 285-86, 301.)  And Hill's confused and outlandish stories about other suspects made him appear even more guilty.  For example, when Hill first went to the police, he told Sgt. Stewart that he saw a boy named Maurice Lowery riding Fife's bicycle.  When Sgt. Stewart asked him if Lowery still had the

58

bicycle, he said Lowery "might have put it back in the woods by now."  Then a bit later in their

conversation, Hill added that he had seen Lowery and another boy from his apartment window at

one o'clock in the morning "coming through the field," even though it was dark and that area was

at least a mile away.  (ECF No. 25, 504-08.)  Similarly, Hill readily lead the police to his

accomplice, Tim Combs.  When Sgt. Stewart asked Hill if he knew Tim Combs, Hill replied that

he knew him and he also might have assaulted Fife, since "'[h]e likes to do that to white boys,

too.'"  Hill then literally lead Sgt. Stewart right to Combs' door.  (*Id*. at 509-11.)

After carefully reviewing the transcript of Hill's final statement to police and the trial

testimony of the police officers involved, the Court finds that during the police interrogations,

Hill did in fact stand his ground, but otherwise, his performance was childlike, confused, often

irrational, and primarily self-defeating.  Hill's second interrogation took place the day after he

voluntarily went to the police.  This time, Sgt. Steinbeck went to Hill's house and Hill agreed to

accompany him back to the station for further questioning.  (ECF No. 24, 204.)  During the three-

hour interrogation, Hill repeatedly changed his story, but not in a way that skillfully hid his part

in the crime.  Sgt. Steinbeck testified at Hill's trial,

> He contradicted himself so many times; told me so many different stories, that it
> took that long to find out exactly what was going on. . . .  Well, I said that he told
> me he saw different people at different time, places.  Even his own whereabouts
> he was confused.  I felt he was keeping something from me about where he was
> and what he did in those time periods of those different days.

(*Id.* at 250.)  Hill also agreed to go to the police station with Sgt. Steinbeck and Det. Hill, his

uncle, for his third and final interrogation, at which he confessed to being at the scene of the

crime after an hour and a half of questioning and gave a recorded statement without counsel

present.  Again, Hill's stories were confusing and contradictory.  Sgt. Steinbeck testified,

We're talking about the same things we did Friday, telling him we believe he's lying to us.  There's too many inconsistencies in his story.  "We believe you know more than you're telling us.  We think you're involved or know about what took place Tuesday behind the Valu-King."

(*Id*. at 271-72.)

Hill also often changed or embellished his statement at the slightest suggestion by the police, even when the information at issue was irrelevant or incriminating.  At trial, Sgt. Stewart recalled saying to Hill, "'Everytime [*sic*] we suggest something to you, you have a tendency to agree with us.'" (ECF No. 26, 646.)  During Hill's statement, for example, Hill first said that Fife's shorts were gray.  (Supp. App., Disc 1, 2459.)  Later, Sgt. Stewart asked him, "Now when he pulled his shorts off, they were blue shorts, they were yellow."  Hill replied, "They were yellow."  Sgt. Stewart asked, "The shorts were yellow, are you sure?"  Hill answered, "Yea, because they looked like Reserve color like . . . gym shorts."  When the police told Hill he had previously said the shorts were gray, Hill then claimed he did not know the color of the shorts at all; he saw only Fife's underwear.  (*Id*. at 2473-74.)[23]  While making his statement to the police, Hill more often seemed to be making things up as he went along to conform to the police's questions and expectations than adroitly hiding information or planting false information to

---

[23]     Other examples of Hill's extemporaneous changes to his story at the suggestion of the police officers include telling the police:  first Combs threw all the physical evidence "in the field," then Combs took the can of lighter fluid with him out of the field (*id*. at 2501-02); first they left Fife on his stomach, then Hill turned Fife over on his back to see if he was breathing (by checking his neck), then he turned him over twice, putting him back onto his stomach again to help him (*id*. at 2466-67, 2510-11); first he saw Combs twice since Combs was released from the penitentiary, then only once (*id*. at 2479); alternating between Combs throwing Fife's bicycle into the bushes and placing it in the bushes (*id*. at 2463, 2467-68, 2503); first Combs threw his cigarette lighter into the bushes and came back later to find it, then he kept it with him, then he left it at the scene and used matches to light a cigarette after the murder (*id*. at 2503).

protect himself.

Indeed, although he never admitted to harming Fife, Hill often changed his story during the interrogations and his statement in a way that only further incriminated himself.  The best example of this is that after admitting to police that he was at the scene of the crime, his proximity to, and involvement in, the assault increased with each account.  His descriptions of the events did not always flow logically, and they often contained language that is difficult to decipher, but a summary of Hill's different versions of how the murder occurred is as follows:

At first, Hill told police that after he and Combs had a general conversation near the Valu King store, he saw Combs walk into the woods.  He did not follow Combs, but a short time later hid behind some bushes in the woods and watched Combs murder Fife from a distance.  Combs didn't say anything to Hill; he ran away when he noticed Hill watching him.  Hill said he also ran away after Combs left to get lighter fluid from the back of the store, returned, and Hill saw "some smoke." (*Id*. at 2457-60, 2462.)  In his next account, Hill saw Combs grab Fife off his bicycle from a hill that overlooked the field.  He then went to the Valu King parking lot and grabbed a board to hit Combs and get him off Fife.  He walked up to Combs and Fife, but Combs told him to get back up the hill or he would blame him for the crime.  (*Id*. at 2469-71.)  In Hill's final account, he told the officers that he ran into Combs a short distance from Valu King, and he and Combs walked to the back of Valu King together.  There, they saw Fife coming up the path through the woods on his bicycle, and Combs told Hill he wanted to steal Fife's bike.  Combs asked Hill to help him, but Hill refused.  Hill then followed Combs into the woods.[24]  (*Id*. at

---

[24]  At this point Hill's story gets confused and convoluted in a way that was typical of Hill during his statement.  Hill first said, "So then I seen him go back there in the path way so I started coming around and around about that time that's when I seen him knock the boy off the

2480-83.)  Hill said he was just about ten feet away from Combs during the assault, but did

nothing to stop it.  (*Id*. at 2485-86, 2490.)  He remained there even when Combs left to get the

lighter fluid.  (*Id*. at 2492.)  Hill told police that when Combs returned, however, he was back up

the hill.  He said he "had looked down there [Combs] had already seen me and [Hill] said now

look what you done."  (*Id*.)  And when Combs lit the "cloth," he "had came down there" and

"was trying to sneak up on him and hit him with the board."  (*Id*. at 2492-93.)  Combs told him to

get back up the hill, and Hill says he took the board back behind the store.  (*Id*. at 2943.)

He then followed Combs out of the field.  (*Id*. at 2499.)

Finally, far from being "planned" and "complex," many of the stories Hill concocted for

the police appeared spontaneous, and were completely unbelievable.  This exchange

demonstrates the confused, ad hoc nature of Hill's statement:

| | |
|---|---|
| Sgt. Steinbeck: | . . . [D]id Tim Combs walk with the gray shorts? |
| Danny: | Yea.  Yea he had them up under his own shirt, he had them up under his shirt and the next day, and I seen him the next day, he was hurrying right back there and then that's when he was looking, he had threw, he had pinned the bike up under some weeds like and threw them shorts up under there. |
| Sgt. Steinbeck: | So you say Tim Combs come back to the field the very next day carrying the boy's shorts and he hid the shorts and he hid the bike.  Yes? |
| Danny: | Yes. |

bike."  (*Id*. at 2481.)  When asked to clarify, he said he did not follow Combs but "walked to the
other side.  Like there is this side street that you can go down."  And then, because he "kn[ew]
how Tim Coomb's [*sic*] is," he "circled back" to where Combs was with Fife, and Combs "had
the little boy on the ground." When asked, "Did you see him knock him off the bike?" Hill
responded, "He had him in a headlock."  (*Id*. at 2482-83.)  Later, Hill said he did see Combs
knock Fife off his bike.  (*Id*. at 2488.)

62

| | |
|---|---|
| Sgt. Steinbeck: | Have you talked to Tim Combs about this after, since it happened? |
| Sgt. Stewart: | Not at all? |
| Danny: | I ain't even seen him. |
| Sgt. Steinbeck: | Danny, you said the next day you saw him bring the shorts back, how did it happen that you and him would be at the same place, at the same time the very next day? |
| Danny: | Because he came past the house and like where my house is at you can, you know, look right down there by the field when the door is open, so you saw him go past the door. |
| Sgt. Steinbeck: | You saw him walking past. |
| Danny: | Past my door. |
| Sgt. Steinbeck: | So you walked with him? |
| Danny: | No I waited until he went down the hill and I circled, I took this other path when he came down and walked down towards there he was going across the street.  Around about the time he went down across the street towards that pathway where that little boy was laying, I was coming straight down there and I turned up in Valu King building and that's when I seen him stick the bike up in some bushes and he threw those shorts up on top of the bike. |
| Det. Hill: | That ain't true now, you got to find exactly what he did with those shorts? |
| Sgt. Steinbeck: | That ain't true man. |

(*Id*. at 2467-68.)  Hill also claimed that the attack occurred over two hours (*id*. at 2496), and that garbage men may have removed some evidence left in the woods (*id*. at 2521).

Perhaps most troubling, and also in contravention of the clinical guidelines, the Ohio court emphasized Hill's strength in the one area of "self-direction" while ignoring the significant

63

evidence from the time of the crime demonstrating Hill's adaptive deficits.  The Ohio Supreme

Court has recognized that an overriding consideration in assessing adaptive skills is that "one

must focus on those adaptive skills the person lacks, not on those he possesses."  *State v. White*,

118 Ohio St. 3d 12, 22, 885 N.E.2d 905, 914 (Ohio 2008).  *See also Black v. Bell*, 664 F.3d 81,

99 (6th Cir. 2011) ("[A] court reviewing whether a defendant is mentally retarded 'must focus on

Defendant's deficits, not his abilities.'" (quoting *United States v. Lewis*, No. 1:08 CR 404, 2010

WL 5418901, at *30 (N.D. Ohio Dec. 23, 2010))); *Sasser v. Hobbs*, 735 F.3d 833, 848 (8th Cir.

2013) (the adaptive skills prong of the clinical intellectual disability definition "does not involve

balancing strengths against limitations.  It simply requires deciding whether the evidence

establishes significant limitations in two of the listed skill areas.").  The AAMR stresses that

"[w]ithin any individual, limitations often coexist with strengths," an assumption "essential to

the application" of the intellectual disability definition.  AAMR 1992 Manual, 1.  It explains,

> This means that people with mental retardation are complex human beings who
> likely have certain gifts as well as limitations.  Like all people, they often do some
> things better than other things. Individuals may have capabilities and strengths
> that are independent of their mental retardation.  These may include strengths in
> social or physical capabilities, strengths in some adaptive skill areas, or strengths
> in one aspect of an adaptive skill in which they otherwise show an overall
> limitation.

*Id*. at 8-9.  "Thus, in the process of diagnosing [intellectual disability], significant limitations in

conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in

some adaptive skills."  *Id*. at 47.  For example, some mildly intellectually disabled persons can

read up to the fifth-grade level (Supp. App., Disc 1, Tr., 1783 (testimony of J. Gregory Olley,

Ph.D. (hereinafter, "Olley test.")))), hold a job with limited responsibilities (*id*. at 871 (Olley

test.)), play cards (*id*. at 1136 (testimony of Nancy J. Huntsman, Ph.D. (hereinafter, "Huntsman

64

test.")), or obtain a driver's license (*id*. at 375 (testimony of David Hammer, Ph.D. (hereinafter, "Hammer test.")))).

This assumption arises from the concern that if evaluators accord dispositive weight to perceived strengths, rather than focusing on actual limitations, their findings will "reflect the stereotypical view [of] mentally retarded individuals [as] utterly incapable of caring for themselves."  P. White, *Treated Differently in Life But Not in Death: The Execution of the Intellectually Disabled After Atkins v. Virginia*, 76 Tenn. L. Rev. 685, 703 (2009) (internal citations and quotation marks omitted).  As Dr. Hammer testified, "When most people think of mental retardation they tend to think more of the moderate, severe and profound," (Supp. App., Disc 1, Tr., 185), but persons with mild intellectual disability "are not very obvious" (*id*. at 188).  Dr. Sparrow explained it this way:

> I think one of the fallacies . . . in the general public is that you can tell by talking to somebody or looking at them that they have mental retardation and you cannot. In mild mental retardation often you cannot tell by talking to somebody or looking at somebody that they have mild mental retardation.  That's why we have to have tests.

(*Id*. at 1627.)

Indeed, three psychologists testified at Hill's mitigation hearing that Hill was intellectually disabled at that time and had extremely poor adaptive functioning.  (ECF No. 31, 194-96 (Dr. Darnell opining that Hill's adaptive functioning was "very poor"); 263-66, 278-79, 283 (Dr. Schmidtgoessling testifying to Hill's "incapability of managing life more effectively"); 303, 336 (Dr. Crush finding "severe impairment," including functioning).)  Significantly, although they rejected his claims based upon his mental status, the Ohio Supreme Court and Eleventh District Court of Appeals found these psychologists' testimony credible and concluded

that Hill was intellectually disabled.  *See Hill*, 64 Ohio St. 3d at 335, 595 N.E.2d at 901 ("[W]e

find that [Hill's] mental retardation is a possible mitigating factor."); *Hill*, 1989 WL 142761, at

**6, 32 (Hill "admittedly suffers from some mental retardation . . . ."; "The record is replete with

competent, credible evidence which states that [Hill] has a diminished mental capacity.  He is

essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient

motor skills.  [Hill] is characterized as being mildly to moderately retarded.  There is some

suggestion that [Hill's] "mental age" is that of a seven to nine year old boy.").

   The psychologists noted Hill's adaptive deficits particularly in functional academics and

social skills.  As discussed above, Hill's school and juvenile court records from the time period

shortly before his arrest reflect his significant limitations in academic functioning.  Moreover,

there was considerable testimony at both the suppression hearing and the mitigation hearing that

Hill could not read and could only write his name.  Hill himself testified at the suppression

hearing that he could not read and could write only his name.  (ECF No. 29, 358-59.)  Dr.

Schmidtgoessling testified at that hearing that Hill could not read and still did not consistently

spell his name correctly.  (*Id*. at 482, 507.)  Dr. Crush also testified at the mitigation hearing that

Hill was "illiterate."  (ECF No. 31, 308.)  Mark Brink, the vice president of Brinkhaven, testified

at the mitigation hearing that Hill could not read or write while he was at the institution and

needed special, individual tutoring.  (*Id*. at 78.)  In addition, shortly after Hill's trial, the prison

psychiatrist and social workers were concerned about Hill's "illiteracy" and resulting difficulties.

Similarly, the social program specialist at Hill's prison wrote to the director of the Education

Department a year after Hill was convicted that Hill was "illiterate" and needed "remedial

action."  (Supp. App., Disc 1, 1512.)

The psychologists also testified about Hill's lack of social skills.  Dr. Darnall spoke of

Hill's poor self-esteem, inability to interpret social situations and create positive relationships,

and that he was easily influenced by people, gravitated toward an antisocial peer group, and did

not respond appropriately to authority figures.  (ECF No. 31, 189-90, 192, 197-98.)  Dr.

Schmidtgoessling explained that Hill

> doesn't realize the impact that he has on other people.  I think because he's not
> reflective, because he can't examine his own life, because he really can't
> appreciate how other people feel, yeah, if he had those feelings, then it would – it
> would inhibit.  That's what we mean by a lack of internal controls.

(*Id*. at 281.)

      **(c)**  **Hill's adaptive functioning at the time he filed
his *Atkins* claim:  prison records and statements
to reporter and court**

The Ohio court of appeals next discussed the trial court's findings regarding Hill's mental

status near the time he filed his *Atkins* claim in January 2003, when Hill was 36 years old and

had been on death row for seventeen years.  It stated:

> *Death Row Records*. At the time of the evidentiary hearing, Hill had been
> incarcerated on death row for 20 years. From this period of time, the trial court
> considered audiotaped interviews of Hill by Warren's Tribune Chronicle reporter
> Andrew Gray in the year 2000. These interviews were arranged on Hill's initiative
> in order to generate publicity for his case. The trial court found Hill's performance
> on these tapes demonstrated a high level of functional ability with respect to Hill's
> use of language and vocabulary, understanding of legal processes, ability to read
> and write, and ability to reason independently.
>
>   The trial court considered the evidence of the various prison officials who
> testified at the evidentiary hearing. These witnesses consistently testified that Hill
> was an "average" prisoner with respect to his abilities in comparison with other
> death row inmates. They testified that Hill interacted with the other inmates,
> played games, maintained a prison job, kept a record of the money in his
> commissary account, and obeyed prison rules. Prison officials offered further
> testimony in their interviews with the expert psychologists. One official opined

that Hill began to behave differently after *Atkins* was decided, and he believed that Hill was "playing a game" to make others think he is retarded. Another official reported that Hill's self-care was "poor but not terrible" and that Hill had to be reminded sometimes about his hygiene.

*Hill's Appearances in Court.* The trial court stated that it had "many opportunities" to observe Hill over an extended period of time and, as a lay observer, did not perceive anything about Hill's conduct or demeanor suggesting that he suffers from mental retardation.

*Hill*, 177 Ohio App. 3d at 192-93, 894 N.E.2d at 124-25.

### (I)  Hill statements and reading

The Court finds, after reviewing Hill's taped interviews with Gray, that Hill did indeed demonstrate certain verbal skills, and he clearly read with a certain speed, accuracy and emphasis.  (*See* Supp. App., Disc. 5.)  Hill's statements in court displayed similar strengths.  This excerpt from the transcript of a pre-trial hearing held on April 15, 2004, illustrates Hill's assertiveness and composure, as well as his articulateness, measured by the fluidity of his prose, the organization of his story, the sophistication of the vocabulary, the complexity of his sentence structure, and the level of detail.  Hill stated to the Judge:

> I'm gonna tell you exactly what happened, Your Honor.  Dennis Watkins used to come over to my aunt's house, which is my Uncle Morris Hill's wife.  Her name is Q.T. Hill.  My uncle had a patio that was built onto the back of the house. I guess the police department or whoever allowed him to store evidence in the back of this patio.  Every weekend, either Saturday or Sunday, it would either be Dennis Watkins, Peter Kontos or James Teeples that would come and inventory the stuff that was inside of this patio.  Morma [*sic*] Fife's son, me, Timothy Combs and his brother broke into my aunt's house.  We went in through the patio area of the house.  We took money, drugs and guns from out of the boxes that was inside of the patio.  A week or two later, Morma [*sic*] Fife's son came to me.  He was supposed to give me some bullets for the guns that he helped us put together. He told me that some police officers came to him, asked him about the break-in of my aunt's house.  He told me that they used a night stick on him and told me, "Well, you're gonna need these.  You're gonna need these bullets."

Later on, I found out that he hung himself in the basement of her house and that her husband was accused of assaultin' him.  When I told this to Maridee Costanzo, she told me that she had heard a lot of rumors circulating around about my case and that one of those rumors was about Morma [*sic*] Fife's son.  I never thought that the affidavit that I gave Maridee Costanzo said everything in there.  I told her to give it to the FBI so that the FBI could see it.  My uncle, from what I know about, was placed up under investigation for money laundering.  He was suspected as being involved in organized crime, which led to him being demoted from a police narcotics officer to a traffic cop.  And I guess now he's an investigator for their office, the Public Defender's Office.  Maridee, as Greg Meyers know, sat there and told him that she knew these people and that she remembered these different things.  And she said that she was going to file an actual innocence claim in my case because of it.  All I know was that the reason why they tricked me to sign that waiver was so that Greg Meyers could come on to be my attorney. . . .  And when I told my attorney, my federal attorney what happened, this is what he said, the papers here.  Would you give this to him?

(Supp. App., Disc 1, Tr. 59-61.)

Nevertheless, the Court again is troubled by some of the state court's conclusions regarding this evidence.  First, the court once more improperly focuses on an apparent adaptive strength of Hill's rather than analyzing his limitations as required.  As noted above, intellectually disabled individuals can read up to a fifth-grade level.  Furthermore, the AAMR admonishes, "Do not use . . . verbal behavior to infer level of adaptive behavior or about having [intellectual disability]."  AAIDD User's Guide, 22.  As Dr. Sparrow testified, the size or sophistication of a person's vocabulary, or the "quality" of one's language, relates to cognitive, rather than adaptive, skills under the intellectual disability definition.  She explained,

Size of vocabulary is definitely intellectual – the adaptive behavior measures say nothing about how good your language is in terms of how many words you know or how complicated the words you know.  It just says, can you take the words you know and communicate effectively? . . .  Adaptive behavior communication does not measure level of vocabulary in any way.

(Supp. App., Disc 1, Tr., 1530.)

69

Moreover, the experts agreed that Hill's explanation of his "actual innocence" claim, whether to Gray, to the trial court during his *Atkins* proceedings, or to them directly, although articulate, was neither logical nor plausible.  Dr. Olley testified, "It did not strike me as being entirely plausible . . . ."  (*Id*. at 744.)  He also stated, "This was a very long and I have to say rambling story.  Because I was writing for all I was worth but I was still having quite a hard time following it all."  (*Id*. at 771.)  Dr. Hammer testified,

> It was quite rambling and incoherent in many places.  He jumped around.  And I admit that . . . the examiners kind of looked at each other and . . . shook our heads like we couldn't follow what was being said. . . .  And we tried to communicate that to Danny, but he was not able to kind of change the course or back up and explain or anything like that.  He just kind of started this.  And in fact it was, it wasn't based on something we asked him.  He just kind of started into it.

(*Id*. at 412.)  Dr. Huntsman wrote in her report that after listening to the first fifteen to twenty minutes of Hill's explanation of his "actual innocence" claim, she "revealed [her] utter confusion."  (Supp. App., Disc 1, 1131.)  She testified that Hill's account of the claim was "incredibly complex," but had no "logic to it."  (Supp. App., Disc 1, Tr., 1031.)  Dr. Sparrow opined, "The fact that it was very difficult to follow him and figure out what it was he was trying to say and where he was going means he was not doing a very good job of communicating, although he was using very nice words to do that."  (*Id*. at 1532.)  *See Holladay v. Allen*, 555 F.3d 1346, 1363 (11th Cir. 2009) (rejecting expert's opinion that petitioner's testimony at trial and in deposition was inconsistent with mild intellectual disability due to his vocabulary and "advanced" memory because the testimony was implausible and showed poor judgment).

It is possible that Hill had almost memorized his "actual innocence" story and was "parroting" it, like a well-rehearsed script, for the reporter and court.  (*See id.* at 92-93 (Hammer

70

test.).)  When interviewing Hill, Dr. Olley noted that Hill's account of his claim was "very similar" to the "soliloquy" Hill made in court.  (*Id*. at 770.)  He testified, "With the ability to look back upon the tape that we just heard a few moments ago, I could see that he was recounting basically the same story spontaneously." (*Id*. at 771.)  At the same time, Dr. Olley conceded that he did not know if Hill's story was true or fantasy (*id*. at 923); if Hill understood the meaning of the legal terms he used (*id*. at 925-26); or how often Hill had told that story (*id*. at 926).  Dr. Hammer testified that intellectually disabled persons often develop a strong skill like this as a "cloak of competence" to hide their limitations.  He explained,

> The cloak of competence is, is a concept that is talked about primarily with people with mild retardation. The idea is that many people with mild retardation are quite aware of their deficits in learning and functioning and are somewhat worried that other people will find that also. So they oftentimes will develop certain skill areas that they can hold out as indicating they have a competence in a certain area and, therefore, are trying to mask . . . what their deficits actually are[,] . . . wishing to avoid that stigmatization.

(*Id*. at 191-92.)

### (ii)    Hill's prison behavior

The evidence the Ohio court cites from Hill's prison records and the testimony of prison officials also is problematic.  The AAMR prohibits the assessment of adaptive skills in atypical environments like prison.  Its 2002 Manual instructs, "Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture."  AAMR 2002 Manual, 13.  It explains, "This means that the standards against which the individual's functioning must be measured are typical community-based environments, not environments that are isolated or segregated by ability." *Id*. at 8.  Death row is a segregated, highly structured and regulated environment.  The prison officials' description of Hill as an

71

"average" death row inmate illustrates the problem with this evidence:  what does average in this context even mean, and how does that assessment relate to the clinical definition of intellectual disability?

The experts agreed that evidence of adaptive functioning in prison, particularly death row, is of limited value because the highly structured environment limits inmates' opportunities to gain new skills or demonstrate weaknesses in existing skills.  Dr. Olley wrote in his report, "Evidence of adaptive behavior in prison is limited by the confined nature of prison life.  It is impossible to assess all of Mr. Hill's adaptive behavior while he is in prison."  (Supp. App., Disc 1, 1124.)  He testified, "Our task is an unusual and a challenging one because the standards of our profession make no explicit statement about how to evaluate a person who has been in prison for a long time."  (*Id*., Tr., 647.)  Dr. Huntsman testified that formal assessments of adaptive behavior under the AAMR guidelines are "just not relevant to [the prison] setting."  (*Id*. at 1130.)  Dr. Hammer testified, "[Y]ou need to assess adaptive skills relative to the person functioning within the community . . . .  And in this case he's obviously not functioning within the community and hasn't been functioning within the community for 20 years."  (*Id*. at 407-08.)

Federal courts similarly have discounted this type of evidence as an unreliable measurement of adaptive functioning.  *See, e.g., Holladay*, 55 F.3d at 1358 n.16 ("Both experts agreed that Holladay's adaptive functioning cannot be accurately assessed now because he has spent over 17 years in prison, a highly restricted and restrictive environment."); *Thomas*, 614 F. Supp. 2d at 1284 n.67 ("The constraints of a maximum-security prison environment also limit the diagnostician's ability to assess the subject's adaptive skills consistently within the AAMR definition."); *Rodriguez v. Quarterman*, No. Civ. SA-05-CA-659-RF, 2006 WL 1900630, at *11

(W.D. Tex. 2006) ("there is considerable debate within the professional literature over whether it

is even possible to perform an adaptive skills deficit evaluation in a prison setting").

Moreover, courts have questioned the credibility and veracity of testimony offered by

prison employees regarding a death row inmate's intellectual disability.  In *Hall v. Quarterman*,

534 F.3d 365 (5th Cir. 2008), the Fifth Circuit observed,

> These witnesses, given the nature of their job and its accompanying dangers, may
> not be inclined to volunteer evidence of mental retardation to state prosecutors.
> Additionally, . . . the guards demonstrated only vague and largely irrelevant
> understandings of mental retardation while simultaneously asserting that Hall
> appeared normal.

*Id*. at 395.  Commentators have noted particularly that prison officials may feel bias against

inmates or pressured by peers or supervisors to report a high level of functioning.  *See, e.g.,* John

M. Fabian, *Life, Death, and IQ; It's Much More Than Just a Score: The Dilemma of the Mentally*

*Retarded on Death Row*, 5(4) J. Forensic Psychol. 13-14 (2005) (noting problems with

correctional staff as source of information about adaptive functioning because they "may be

plagued by certain biases for or against the defendant," "officers may have their own lay opinions

on what retardation is and may also not believe these defendants are retarded because they are

criminals and function fairly well in some areas," and some officers are "more likely to have

experienced conflicts with the defendants which may cause bias against the defendant in an

evaluative setting").[25]

---

[25]     For this reason, it is worth questioning whether any inmate who asserts an *Atkins*
claim after being incarcerated for a long period of time can prevail on the claim once a court
chooses to evaluate the petitioner's current rather than past intellectual abilities, assessing
adaptive behavior while on death row and according great weight to the testimony of prison
officials.

Aside from potential biases, the prison officials' testimony at Hill's hearing was rife with contradictions, with themselves and each other.  Risinger told the experts during her interview that she saw Hill print out kites, or internal communications between prison inmates and employees, "with speed one to two times."  (Supp. App., Disc 1, 1113; *see also id.* at 1123, 1137.)  But she admitted during her testimony at the hearing that she did not actually see Hill write any kites.  (Supp. App., Disc 1, Tr., 1339, 1347.)  Risinger also acknowledged on cross-examination that the handwriting in Hill's kites varied and may have been written by other inmates, which was a common practice.  (*Id*. at 1348-50.)  Similarly, Morrow testified first that Hill could read and write his kites, but later admitted that he had never seen Hill write a kite.  (*Id*. at 1254, 1265.)

Regarding Hill's hygiene, the appellate court cited Risinger's observation that Hill's self-care was "poor but not terrible," but also that Hill had to be reminded at times about his hygiene.  (Supp. App., Disc 1, 1113.)  However, Spicer reported that Hill "didn't like to shower or clean his cell."  (*Id*. at 1114.)  Morrow described Hill's hygiene as "poor" during his interview but later testified that Hill never had a "hygiene issue" and kept his cell "clean."  (*Id*. at 1114, 1123; Tr., 1251.)

As to Hill's card playing, Spicer believed that the other inmates might have let Hill play cards with them because he would lose money to them.  (Supp. App., Disc 1, 1114.)  Risinger also said that Hill lost money playing cards.  (*Id*. at 1123.)  Dr. Huntsman reported that Glenn said Hill "augmented his monthly earnings by winning at card games."[26]  (*Id*. at 1138.)  But

---

[26]     Interestingly, Dr. Hammer reported that Glenn stated that "Danny wasn't exploited [at cards] and he never lost that much."  (*Id*. at 1115.)  Dr. Olley did not mention Glenn's observation of Hill's card playing at all.

Glenn testified at the hearing that he did not observe the betting and could not prove the inmates were even betting at all. (Supp. App., Disc 1, Tr., 789-90.)

Also contrary to the guidelines, aside from noting Risinger's observation about Hill's "poor but not terrible" hygiene, the court again focused exclusively on the prison officials' observations of Hill's adaptive strengths rather than limitations. Furthermore, their testimony that Hill "interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules" does not describe behaviors that are necessarily inconsistent with intellectual disability. As explained above, intellectually disabled persons can "interact" with others, play simple games, perform menial jobs, keep track of a small amount of money, and obey clear rules. There was no evidence that Hill's relationships with other inmates were anything more than superficial, or that the games he played required any skill. The prison officials acknowledged that his prison job required minimum skills, the prison rules were clear and straightforward, and that he never had more than a minimal amount of money to keep track of in his account at any given time.[27] (Supp. App., Disc 1, 1115, 1123; Tr., 1207, 1272, 1273. ) *See also* DSM-IV-TR, 43 ("During their adult years, [mildly intellectually disabled persons] usually achieve social and vocational skills adequate for minimum self-support.").

---

[27]    Hill's prison jobs included emptying trash cans and distributing color-coded cleaning supplies to inmates' cells. (Supp. App., Disc 1, Tr., 1340, 1372-33, 1381, 1265, 810-12.) Spicer and Morrow noted that Hill needed simple and specific instructions to perform even these duties. (Supp. App., Disc 1, 1114.) As to Hill's account with the cashier's office, he received between $3 and $16 monthly pay and rarely had more than a small amount in his account at any given time. (*Id*. at 1556, 1559, 1560, 1568, 1570, 1571, 1575, 1577; Tr., 1207-09.) Morrow's example of Hill's skill dealing with his account is that Hill realized a mistake was made when he received $3 instead of the $16 in monthly wages – hardly a sophisticated observation of a complex financial transaction. (*Id*. at 1114; Tr., 1252-53.)

This Court's review of Hill's prison records indicates that Hill struggled to adjust to life

on death row and exhibited adaptive deficits during his early years in prison.  A prison

psychiatrist wrote less than a year after Hill was convicted:

> Hill is not doing too well.  He has a hard time putting up with all the
> aggravation and teasing and threatening that goes on on K-4. . . .  He is very
> difficult to follow and apparently has some serious identity problems in that he
> doesn't know who his kin is and then also has some strange beliefs, as when he
> tells me that various so-called kin have told him things and subsequently died and
> he somehow establishes a connection between the two.  He isn't hearing from
> anybody, is not getting any visitors, cannot read or write, so has had no contact
> with his lawyer and is very concerned that he should have been in a mental
> hospital . . .
>
> All in all, it is a very confusing situation . . . .

(Supp. App., Disc 1, 996.)  This psychiatrist considered Hill intellectually disabled during this

time.  (*Id*. at 992, 998-99.)  He wrote in his notes on April 9, 1987,

> We did get the report in from TCY which shows [Hill] to be actually retarded.  I
> plan to call Dennis Watkins in Warren to see if he has more information because
> it is rather puzzling that somebody with his retardation would end up on death
> row.

(*Id*. at 998-90.)

Hill routinely requested help with his commissary account and was confused about its

balance and the status of checks sent to him from family members.  (Supp. App., Disc 1, 1484,

1485, 1556, 1557, 1560, 1571, 1565, 1568.)  He repeatedly violated prison rules.  (*See id*. at

1343, 1351-1425.)  There also is ample evidence that Hill's social skills were poor.  Prison

records show that Hill was "passive" and "easily led," harassed by other inmates, found

unsuitable to share a cell, was afraid of other inmates and frequently requested to move to

another cell to avoid them, and often fought with other inmates.  (Supp. App., Disc 1, 980, 1318,

76

1343, 1389, 1390, 1393, 1394, 1419, 1462, 1465, 1466-68, 1482-84, 1557, 1567.)  And the records show that Hill was reprimanded for refusing to take a shower and often had to be provided a toothbrush and toothpaste.  (Supp. App., Disc 1, 1396, 1573, 1568.)  A prison sergeant reported in 1988 that Hill "[s]eems dull and unintelligent, . . . [s]luggish and drowsy," "[t]ries, but cannot seem to follow directions," "[c]ontinually asks for help from staff," and "[n]eeds constant supervision." (*Id*. at 1343.)

But the evidence also demonstrates that Hill's adaptive skills improved by 1994.  A mental health evaluation form from 2001 stated that Hill's institutional adjustment was "[p]oor at first but appears to have adjusted well after 1994."  (Supp. App., Disc 1, 1005.)  Also in 2001, a psychiatrist also noted that Hill's "conversation to [him] was very brief but [he] noted no gross abnormalities.  His speech was simple but clear, logical and coherent." (*Id*. at 993.)  After 1994, Hill was charged with only one offense in prison, stemming from a fight with another inmates in 1996. (*Id*. at 1352-54.)  He also received good evaluations on his job performance from 1992 to 1994. (*Id*. at 1328-32.)  One evaluator reported, "Inmate Hill does an excellent job on keeping the range clean.  He didn't need to have [*sic*] told what to do he would just do it." (*Id*. at 1332.)

Notably, Hill told the experts that Officer Glenn, who supervised Hill and other death row inmates for seven years, knew him best. (*Id*., Tr., 786, 1042.)  And Officer Glenn testified that Hill performed his job as a material handler well with minimal assistance and no modifications, handled his money well, sought medical care when he needed it, kept track of his time allotted with his attorneys, and that "Danny [was] slow when he want[ed] to be slow." (*Id*. at 787-89, 792, 793, 794-95, 815.)  Except for his account of Hill's card playing, as noted above, Officer Glenn's testimony was similar to the other prison officials and to his interview with the experts.

77

He found Hill "typical in most areas of skills compared to other inmates" (Hammer report, Supp. App., Disc 1, 1155); "social with other inmates" (Huntsman report, *id*. at 1138); and "better than most" at keeping track of his commissary (*id*.).

The clinical guidelines account for such improvements in adaptive behavior, acknowledging that it is possible for an intellectually disabled person to improve in adaptive skills such that the diagnosis will no longer apply, although it is rare and generally occurs with considerable interventions and supports.  The APA explains,

> After early childhood, the disorder is generally lifelong, although severity levels may change over time. . . .  Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood.  In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate. . . .  Diagnostic assessments must determine whether improved adaptive skills are the result of a stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate).

DSM-V, 39.  *See also* AAMR 2002 Manual, 9 (although intellectual disability is a static condition, improved functioning in adulthood is expected "with appropriate personalized supports over a sustained period").

### (3)    expert opinions

The court of appeals stressed that the trial court ultimately was persuaded by the State's expert, Dr. Olley, and the independent expert, Dr. Huntsman.  The court explained:

> Finally, the trial court relied on the expert opinions of Drs. Olley and Huntsman that, with reasonable psychological certainty, Hill's adaptive skill deficiencies do not meet the second criterion for mental retardation set forth in *Lott*. Both doctors relied, in part, on the same anecdotal evidence considered by the trial court. The doctors also conducted interviews with Hill and particularly noted Hill's memory of events surrounding Fife's murder 20 years before and his

78

ability to recount the narrative of the events and the complex legal history of his
case since that time.

*Hill*, 177 Ohio App. 3d at 193, 894 N.E.2d at 125.

As already discussed, both the United States and Ohio supreme courts have emphasized

the critical role the medical community and its clinical standards play in defining and

determining intellectual disability when considering eligibility for the death penalty.  In *Hall v.*

*Florida*, the Supreme Court explained,

> That this Court, state courts, and state legislatures consult and are
> informed by the work of medical experts in determining intellectual disability is
> unsurprising.  Those professionals use their learning and skills to study and
> consider the consequences of the classification schemes they devise in the
> diagnosis of persons with mental or psychiatric disorders or disabilities.  Society
> relies upon medical and professional expertise to define and explain how to
> diagnose the mental condition at issue.  And the definition of intellectual
> disability by skilled professionals has implications far beyond the confines of the
> death penalty: for it is relevant to education, access to social programs, and
> medical treatment plans.  In determining who qualifies as intellectually disabled, it
> is proper to consult the medical community's opinions.

*Hall*, slip op. at 7-8.  And Ohio's highest court expressly mandated in *Lott* that courts "rely on

professional evaluations of [a defendant's] mental status, and consider expert testimony,

appointing experts if necessary, in deciding this matter."  *Lott*, 97 Ohio St. 3d at 306, 779 N.E.2d

at 1015.

The AAMR, in turn, emphasizes the importance of the practitioner's critical judgment in

assessing intellectual disability.  It states, "Judgments made by conscientious, capable, and

objective individuals can be an invaluable aid in the assessment process."[28]  AAMR 2002

---

[28]     It also cautioned, "Inaccurate, biased, subjective judgment can be misleading at
best and harmful at worst."  *Id.*  Clinical judgment must not be "(a) a justification for abbreviated
evaluations, (b) a vehicle for stereotypes or prejudices, (c) a substitute for insufficiently explained
questions, (d) an excuse for incomplete or missing data, or (e) a way to solve political problems."

Manual, 94 (internal quotation marks and citations omitted).  It defines clinical judgment as "a special type of judgment that emerges directly from extensive data and is rooted in a high level of clinical expertise and experience. . . .  [I]ts use enhances the precision, accuracy, and integrity of the clinician's decisions and recommendations."  AAIDD User's Guide, 23.  And notes that "it is crucial that clinicians conduct a thorough social history and align data and data collection to the critical question(s) at hand."  *Id*.

Thus, habeas courts must defer to state-court determinations of the credibility of expert witnesses in determining intellectual disability under *Atkins* – especially in such a highly subjective area as adaptive behavior.  The Sixth Circuit, in denying a habeas petitioner's *Atkins* claim, recently concluded that two expert opinions

> provided a basis for the state court to reasonably determine that O'Neal does not suffer from significantly subaverage intellectual functioning.  And without clear and convincing evidence undermining the credibility of [those experts], we are not persuaded by O'Neal's attempts to emphasize solely the portions of [his expert's] testimony that support his claim.  For better or worse, as a habeas court, we are not in a position to pick and choose which evidence we think is best so long as the presumption of correctness remains unrebutted. *See* 28 U.S.C. § 2254(e)(1).

*O'Neal v. Bagley*, 743 F.3d 1010, 1022 (6th Cir. 2013).  The court stressed, "With expert testimony split, as it often is, the state court chose to credit [the two experts] over [petitioner's expert], and we cannot say from this vantage that it was unreasonable to do so." *Id*. at 1023.

### (a)    Drs. Olley and Huntsman's opinions

As explained above, three psychologists provided opinions on Hill's mental status for the

─────────────────────

AAIDD User's Guide, 23.

state trial court:  Dr. Olley for Respondent, Dr. Hammer for Hill, and Dr. Huntsman, who was

appointed by the court.[29]  At the time of the hearing, Dr. Olley was a psychologist and associate

director of the Clinical Center for the Study of Development and Learning and clinical professor

in the Department of Allied Health Sciences at the University of North Carolina at Chapel Hill.

He had been a clinical psychologist for more than thirty years and affiliated with the university

for about twenty-five of those years.  He had worked almost exclusively in the specialty of

intellectual and related disabilities and was a fellow of the American Association on Mental

Retardation.  (Supp. App., Disc 1, Tr., 636-37.)  Dr. Olley had testified in nine capital cases

regarding defendants' intellectual abilities, each time on behalf of the defendant.  (*Id*. at 643-44.)

Dr. Hammer had similarly impressive credentials.  He was a clinical psychologist, director of

psychology services at the Nisonger Center of The Ohio State University, and an adjunct

associate professor of psychology at that university.  He had been a clinical psychologist for

about twenty years, specializing in the area of intellectual disability.  (*Id*. at 142-44.)  Dr.

Huntsman was a forensic psychologist at the Forensic Psychiatric Center of Northeast Ohio, Inc.

Her primary focus was on court-ordered evaluations for competency, which are not performed

under the AAMR or APA guidelines.  (*Id*. at 992-94.)  When she did evaluate for intellectual

disability, she testified that she relied only on IQ scores, and had assessed adaptive skills only

"maybe a handful of times."  (*Id*. at 980-81.)

     The three experts agreed on the procedures to be followed in evaluating Hill, and

observed each other's interviewing and test administration.  (*Id*. at 929; Supp. App., Disc 1,

---

     [29]    Two additional psychologists testified at the hearing, Drs. Sparrow and Hancock.
Their testimony, however, was admitted only to clarify issues related to adaptive skills testing.

1118.)  They each tested Hill, interviewed Hill and others, visited the prison, and reviewed Hill's

school, court and prison records.  Dr. Olley testified that it was the "most thorough examination

of a death row inmate that [he had] been involved with."  (Supp. App., Disc 1, Tr., 773.)

The trial court found the opinions of Drs. Olley and Huntsman most persuasive.  They

both testified that, *at the time of the hearing*, which was the focus of their evaluations, Hill did

not demonstrate the requisite level of adaptive limitations to meet the standard of intellectual

disability.  Dr. Olley was circumspect in his opinion, careful to note the limited amount of

information regarding Hill's present adaptive functioning.  He wrote in his report, "The available

information on Mr. Hill's current functioning does not allow a diagnosis of mental retardation."[30]

(Supp. App., Disc 1, 1124-25.)  Dr. Huntsman was more categorical.  She opined, "Mr. Hill's

level of adaptive behavior certainly exceeds the level expected of a mildly mentally retarded

individual."  (*Id*. at 1141.)

Drs. Olley and Huntsman both found Hill's statements to the court and interviews with

the reporter and themselves to be very significant.  Dr. Olley specifically was impressed by Hill's

ability to recall details of past events and "to express a complex explanation of the crime in order

to support his claim of innocence."  (*Id*. at 1125.)  He testified that Hill's reading during his Gray

interview "sounded substantially above the abilities that I would associate with a person with

---

[30]     Dr. Olley elaborated on stand:
I stated earlier that any evaluation that involves retrospective information is not perfect.
And in order to compensate for missing information or partial information it's important to gather
information from as many sources as possible over as many years as possible.
So with that caution in mind, I felt that my conclusion was that since in this format the
burden is upon the defense to show that mental retardation exists, that I had not seen sufficient
information in, particularly in the areas of adaptive behavior to find that I could support a
diagnosis of mental retardation.
(*Id*., Tr., 774.)

mental retardation" because he read with speed, accuracy and intonation. (App. Supp., Disc 1, Tr., 1764.) He also stated that he did not believe an intellectually disabled person could recite that much information from memory, particularly when he spoke for such a long period of time. (*Id*.) He explained that Hill's ability "to put the emphasis on just the right word to make a point effectively, that I have not seen in people with mental retardation who memorize things or have, say things because they've said it many times before." (*Id*. at 1783.) He testified that Hill's reading and recitation of his innocence claim just "hit[ him] between the eyeballs that this is not a man with mental retardation. So it's just a judgment." (*Id*. at 1785.) Similarly, Dr. Huntsman testified that Hill's statements displayed "energy and organization and directedness in terms of having a story to tell." (*Id*. at 1027.) She also described her interview with Hill as "remarkable for how rich in content it was and rich in the use of language and rich in the memory for people and events. And also rich in the sense . . . of the way he volunteered and initiated giving me, you know, he didn't just say a sentence and stop. He kept going. It was incredibly spontaneous." (*Id*. at 1032.)

Both experts also cited the testimony of the prison officials as persuasive, although Dr. Olley was careful to acknowledge the limitations of assessing adaptive behavior in prison. (App. Supp., Disc 1, 1124.) They placed significance on the fact that the six prison officials reported consistent information about Hill's behavior on death row, and each witness described Hill as an "average" inmate. (*Id*. at 1124, 1141; *see also* Supp. App., Disc 1, Tr., 772-73.)

Finally, both experts stressed that Hill's malingering on their tests and during their interviews was an important factor in forming their opinions. Dr. Olley testified, "[I]n my experience I had never encountered a person with mental retardation who was able to malinger or

83

fake bad as consistently as Mr. Hill did in the evaluation that we performed . . . ." (Supp. App., Disc 1, Tr., 781; *see also* Supp. App., Disc 1, 1124-25, 1140 .)

As to Hill's adaptive functioning in childhood and at the time of the offense, Dr. Olley stated in his report that "[t]oo little information is available about adaptive behavior in childhood to make a confident retrospective diagnosis of mental retardation." (Supp. App., Disc 1, Tr., 780, 783.)  He conceded on stand that Hill "did function low in academic skills" and "his school personnel regarded him as a person with mental retardation and labeled him as such," but explained that educators had an interest in diagnosing intellectual disability to obtain benefits for children as well as an interest in avoiding the possible stigma of labeling them.  (*Id*. at 783, 828-29.)

Dr. Huntsman did not provide an opinion as to whether Hill was intellectually disabled during those time periods in her report, but testified at the hearing that he "probably" was not. (*Id*. at 1052-53.)  Although she acknowledged on cross-examination that Hill's school records showed academic deficits and some limitations in communication, self-direction and social skills, she agreed with Dr. Olley that there was insufficient information from which to draw a conclusion about Hill's adaptive behavior during those time periods.  (*Id*. at 1098-1100, 1112.) Dr. Huntsman specifically discounted the diagnoses of Hill rendered by school and juvenile court psychologists because the tests were conducted for a different purpose and the psychologists' "tendency of diagnostic overinclusion." (*Id*. at 1046, 1105.)

Dr. Olley acknowledged that Hill presented a "close call." (*Id*. at 861.)  He testified that Hill's case may be one of the rare instances of a person's skills improving in adulthood to such a degree that he or she does not meet the second prong of adaptive behavior and no longer can be

84

diagnosed as intellectually disabled.  (*Id*. at 861-62.)

### (b)    *State v. White*

The Ohio appellate court finished its analysis of Hill's adaptive skills by distinguishing

Hill's case from the Ohio Supreme Court case *State v. White*, 118 Ohio St. 3d 12, 885 N.E.2d

905 (Ohio 2008).  It explained:

> It is important to note that the trial court's use of anecdotal evidence in the present case is distinguishable from the use of such evidence in *White*, 118 Ohio St.3d 12, 2008-0hio-1623, 885 N.E.2d 905. In *White*, the Ohio Supreme Court reversed a trial court's finding that an *Atkins* petitioner is not mentally retarded where the trial court had relied on anecdotal evidence, such as the fact that the petitioner had a driver's license and could play video games, to support its finding that the petitioner did not demonstrate significant deficits in adaptive skills.

> In the present case and in *White*, the trial court relied upon its own perceptions and other lay testimony that the petitioner appeared to function normally. The Supreme Court held that this reliance constituted an abuse of discretion in light of expert testimony that "retarded individuals 'may look relatively normal in some areas and have * * * significant limitations in other areas.'" (Emphasis sic.) *Id*. at ¶ 69.

> The difference between the two cases lies in the fact that in the present case, two of the expert psychologists considered the same anecdotal evidence as the trial court and concluded that Hill was not mentally retarded. The trial court's conclusions were consistent with and supported by the expert opinion testimony. In *White*, the two psychologists who examined the petitioner concluded that there were significant deficiencies in two or more areas of adaptive functioning. *Id*. at ¶ 21. Thus, the trial court in *White* had substituted its judgment for that of the qualified experts. "While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of law witnesses or of the court's own expectations of how a mentally retarded person would behave. Doing so takes an arbitrary, unreasonable attitude to the evidence before the court and [results] in an abuse of discretion." *Id*. at ¶ 74.

> Another difference is that in *White*, the experts were able to administer the SIB-R to the petitioner and obtain a psychometrically reliable measurement of his adaptive functioning. *Id*. at ¶ 14-20. In the present case, the only qualitative measurement of Hill's adaptive functioning, the Vineland I test administered when Hill was 17, indicated that Hill functioned at a level above that of the

mentally retarded. Apart from this test, the trial court in the present case had no choice but to rely on anecdotal evidence and/or Drs. Olley and Sparrow's doubtful extrapolations of Hill's adaptive ability.

*Hill*, 177 Ohio App. 3d at 193-94, 894 N.E.2d at 125-26.

Hill claims that the court ignored *White*'s holding "when it substituted its own judgment based on its own observations for the overwhelming historical data available regarding Danny Hill's mental retardation."  (ECF No. 94, 21.)  But that argument fails, since the court here did rely on facts from the record to support its conclusion.  Moreover, as the court of appeals stated, the trial court here also relied on the expert opinions of Drs. Olley and Huntsman.

### (4)    conclusion

The Ohio appellate court concluded, "In light of the foregoing, there is abundant competent and credible evidence to support the trial court's conclusion that Hill does not meet the second criterion for mental retardation." *Id*. at 194, 894 N.E.2d at 126.  Based on its review of the entire record, this Court finds that Hill has not carried his burden of rebutting by clear and convincing evidence the presumed correctness of the Ohio appellate court's decision.  The court's conclusion regarding Hill's adaptive behavior *at the time he filed his* Atkins *claim* was supported by sufficient credible evidence and, most importantly, the opinions of two experts.  Although "[r]easonable minds reviewing the record might disagree" about some of the Ohio court's findings on this issue, and certain "evidence . . . may plausibly be read as inconsistent with the [state-court] finding," for this Court, "on habeas review[,] that does not suffice to supersede the trial court's . . . determination." *Wood*, 558 U.S. at 301-02 (internal quotation marks and citations omitted).

### c.    onset before age 18

Finally, the state court of appeals agreed with the trial court that Hill did not meet the

third criterion for intellectual disability under *Lott*.  It stated:

> With respect to the third criterion, the trial court found that Hill had failed
> to demonstrate the onset of mental retardation before the age of 18.  The trial
> court's conclusion mirrors its findings under the first two criteria:  Hill
> demonstrated, by a preponderance of the evidence, significantly subaverage
> intellectual functioning prior to the age of 18, but failed to demonstrate significant
> limitations in two or more adaptive skills.  The evidence supporting the trial
> court's conclusions is discussed above.

*Hill*, 177 Ohio App. 3d at 194, 894 N.E.2d at 126.  As noted above, a reasonable trial-court judge

may have concluded that, based on the record, Hill had severe adaptive deficits in childhood and

therefore met this prong of the intellectual disability definition.  But the state court did not so

determine in this case, and Hill has not met his burden of proving that the state court's

determination was erroneous or unreasonable.

### 4.    Conclusion

*Atkins* holds that "the mentally retarded should be categorically excluded from

execution," and that "death is not a suitable punishment for a mentally retarded criminal."

*Atkins*, 536 U.S. at 318, 321.  But the Supreme Court also repeatedly has made it clear that

AEDPA imposes a "formidable barrier to federal habeas relief for prisoners whose claims have

been adjudicated in state court."  *Burt*, 134 S. Ct. at 15.  Although the Court recognizes that a

reasonable trial-court judge may have come to a different conclusion based on the evidence

presented at Hill's *Atkins* hearing, given the extremely deferential standard for relief under

AEDPA, this Court cannot hold that Hill has rebutted with clear and convincing evidence the

presumed correctness of the Ohio appellate court's factual determination that Hill is not

intellectually disabled.  *See* 28 U.S.C. § 2254(e)(1).  Nor can this Court conclude that the state-

court decision denying Hill's *Atkins* claim was unreasonable "beyond any possibility for

fairminded disagreement." *Harrington*, 131 S. Ct. at 787. Accordingly, this claim is denied.

### B. *Second Ground for Relief: Ineffective Assistance of* Atkins *Counsel*

Hill's second claim for relief is that he was deprived of his constitutional right to the

effective assistance of counsel in his post-conviction *Atkins* hearing. Respondent argues that this

claim is not cognizable on habeas and lacks merit. (ECF No. 98, 6.) Hill counters that his

*Atkins*-related ineffective-assistance claim should be recognized based on the United States

Supreme Court's Sixth and Fourteenth Amendment jurisprudence. (ECF Nos. 94 and 102.)

### 1. Procedural Posture

Respondent contends that Hill's *Atkins*-related ineffective-assistance claim is

unexhausted. (ECF No. 98, 6.) Hill replies that it is not, because no mechanism exists in Ohio

for such a claim. Hill explains that, because *Atkins* was decided after his trial, under *Lott*, he had

to raise his *Atkins* claim for the first time on post-conviction, and Ohio limits post-conviction

relief to constitutional claims, which does not include ineffective assistance of post-conviction

counsel. (ECF No. 102, 23-24.) The Court agrees. A habeas court need not wait for exhaustion

if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th

Cir. 2001).

### 2. Viability of *Atkins*-related ineffective-assistance claims in habeas corpus

Respondent's stronger argument is that Hill's ineffective-assistance claim is barred by

AEDPA's § 2254(I). It provides: "The ineffectiveness or incompetence of counsel during

Federal or State collateral post-conviction proceedings shall not be a ground for relief in a

proceeding arising under section 2254." 28 U.S.C. § 2254(I).  This provision is grounded in the well-settled rule that the constitutional right to appointed counsel extends to the first appeal of right and no further.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  Accordingly, there is no constitutional right to appointed counsel in habeas cases, *McCleskey v. Zant*, 499 U.S. 467, 494 (1991), or during state post-conviction collateral review, *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991).  And, as there is no constitutional right to an attorney in post-conviction proceedings, a habeas petitioner cannot claim unconstitutional deprivation of effective assistance of counsel in such proceedings.  *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 425 (6th Cir. 2003) (citing *Coleman*, 501 U.S. at 752-53).

Hill strenuously argues that, in accordance with his Sixth Amendment right to effective representation and his Fourteenth Amendment rights to due process and equal protection, he should have the same opportunity to assert an ineffective-assistance claim related to representation during an *Atkins* hearing held post-conviction under *Lott*, as a defendant does who was convicted and sentenced after *Atkins* was decided and therefore could assert his *Atkins* claim at trial.  (ECF No. 102, 23-47.)  As support, he points to the Tenth Circuit's decision in *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012).  (ECF No. 149.)  In that case, the court held that there is a constitutional right to effective assistance of counsel in *Atkins* proceedings.  It grounded its decision in the Sixth and Fourteenth Amendments, and further concluded that "the right to counsel flows directly from, and is a necessary corollary to, the clearly established law of *Atkins*."  *Id*. at 1184.  The Tenth Circuit did not address § 2254(I) at all, however, or identify any other court that reached the same decision.  Nor does Hill identify any court that has followed *Hooks*.  Indeed, another judge in this district and a judge in the Southern District of Ohio

89

expressly have rejected these arguments.  *See Bays v. Warden, Ohio State Penitentiary*, No. 3:08 CV 076, 2014 WL 29564, at **3-4 (S.D. Ohio Jan. 3, 2014) (Rose, J.); *Williams v. Mitchell*, No. 1:09 CV 2246, 2012 WL 4505774, at **22- 28 (N.D. Ohio Sept. 28, 2012) (Nugent, J.).

Despite the equitable appeal of Hill's arguments, there is no Supreme Court or Sixth Circuit authority holding that § 2254(I) is unconstitutional or otherwise not controlling in this case.  *See Post v. Bradshaw*, 422 F.3d 419, 423-24 (6th Cir. 2005) (finding § 2254(I) "clear" and "expansive in its prohibition" and holding that Rule 60(b) cannot therefore be used to bring claims of ineffective assistance of habeas counsel).  Section 2254(I), therefore, bars Hill's *Atkins*-related ineffective-assistance claim.

### 3.  Merits

Even if Hill's ineffective-assistance claim were cognizable in habeas, it would fail.  Hill claims that his counsel:

1. failed to argue or bring to the court's attention material and substantive facts from the record that established adaptive skill deficits;

2. failed to intervene or object when Detective James Teeples ("Teeples") videotaped Hill's *Atkins* testing;

3. failed to properly investigate by not contacting school and prison psychologists and death row inmates;

4. failed to object to the proceedings on competency grounds;

5. "was forced to" proceed despite his antagonistic relationship with Hill; and

6. failed to object to "the fanatical prosecution" of Hill's claim.

(ECF No. 94, 50-51.)  Respondent replies, without any support or analysis, that the claim should be "denied as without merit . . . and frivolous, where Hill's trial counsel Meyers demonstrated a

national level performance that few, if any, career capital defenders could meet, and none could exceed."  (ECF No. 98, 6.)

### a.     legal standards

To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness."  *Id.* at 688.  It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id*. at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors.  To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id*. at 693 (citation omitted).  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail.  *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).  The Supreme Court recently explained, "Surmounting *Strickland*'s high bar is never an easy task. . . .  An ineffective-assistance claim can function as a way to escape rules of

91

waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must

be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very

adversary process the right to counsel is meant to serve."  *Harrington v. Richter,* 131 S. Ct. 770,

788 (2011) (citations and internal quotation marks omitted).

Thus, as the Supreme Court often has repeated, "[j]udicial scrutiny of a counsel's

performance must be highly deferential'" and "every effort [must] be made to eliminate the

distorting effects of hindsight . . . ."  *Strickland*, 466 U.S. at 689.  The Court recently

emphasized, "*Strickland* specifically commands that a court 'must indulge [the] strong

presumption' that counsel 'made all significant decisions in the exercise of reasonable

professional judgment,'" recognizing "the constitutionally protected independence of counsel and

. . . the wide latitude counsel must have in making tactical decisions."  *Cullen v. Pinholster*, 131

S. Ct. 1388, 1406-07 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

Under AEDPA, a habeas court is limited to determining whether a state-court decision

regarding an ineffective-assistance claim was contrary to, or an unreasonable application of,

clearly established federal law.  28 U.S.C. § 2254(d)(1); *Mitchell v. Mason*, 325 F.3d 732, 737-38

(6th Cir. 2003) (holding ineffective assistance of counsel is mixed question of law and fact to

which the unreasonable application prong of § 2254(d)(1) applies).  The Supreme Court recently

observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so

that in applying them together, "review is 'doubly' so."  *Harrington*, 131 S. Ct. at 788.

Therefore, "the question is not whether counsel's actions were reasonable.  The question is

whether there is any reasonable argument that counsel satisfied *Strickland's* deferential

standard."  *Id*.

b.    analysis

(1)    failure to investigate and present evidence

Hill claims that his *Atkins* counsel was ineffective for failing to investigate and present material evidence that established his adaptive skills deficits.  (ECF No. 94, 52-60.)  Specifically, he asserts that his counsel should have contacted school psychologists Karen Weiselberg and Annette Campbell, prison psychiatrist John Vermeulen, a psychologist who tested Hill for the prison in 2000, and other death row inmates.  He also argues that counsel should have presented the testimony of Hill's family members, such as his mother and "other aunts and uncles who lived in the area."  The Court disagrees.

A defendant's attorney is responsible for making tactical decisions of trial strategy.  A petitioner claiming ineffective counsel, therefore, must show that his or her counsel's actions were not supported by a reasonable strategy.  *Strickland*, 466 U.S. at 689.  The Supreme Court has made clear, however, that merely labeling an attorney's decision "trial strategy" does not end the inquiry; the strategic decision itself must be the product of a reasonable investigation.  The *Strickland* Court set forth this duty to investigate, explaining:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91.  The Sixth Circuit has found ineffective assistance in numerous cases where counsel failed to conduct an adequate investigation, including interviewing potentially important witnesses, or did not present important testimony or evidence at trial.  *See,*

93

*e.g., Ramonez v. Berghuis*, 490 F.3d 482, 491 (6th Cir. 2007) (finding ineffectiveness where counsel decided not to interview three potential witnesses who could have corroborated defendant's testimony and contradicted complaining witness' testimony); *Towns v. Smith*, 395 F.3d 251 (6th Cir. 2005) (finding ineffectiveness where counsel decided not to interview a potentially important witness); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (finding ineffectiveness where counsel failed to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Groseclose v. Bell*, 130 F.3d 1161, 1170 (6th Cir. 1997) (finding ineffectiveness where counsel had no strategy and conducted no investigation at all).

Nevertheless, the Supreme Court has stated that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  It further has instructed, "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  Accordingly, the Sixth Circuit repeatedly has concluded that an attorney's pretrial investigation and decisions in presenting evidence and testimony was reasonable given the circumstances.  *See, e.g., Landrum v. Mitchell*, 625 F.3d 905, 921-22 (6th Cir. 2010) (finding no ineffective assistance where petitioner failed to show prejudice resulting from trial counsel's failure to conduct proper investigation or interview potential witnesses, and present important lay and expert testimony); *Austin v. Bell*, 126 F.3d

843, 848 (6th Cir. 1997) (finding no ineffective assistance where counsel did not call witnesses with credibility and reliability problems).

Here, the Court finds neither deficient representation nor prejudice.  First, it is clear from the hearing transcript that Hill's counsel's strategy was to rely on the expert testimony of Dr. Hammer and to have Dr. Hammer interpret the facts in the record for the court in light of the clinical guidelines.  He explained to the court, in objecting to the prison guards' testimony as inadmissible lay opinion, that it is more appropriate for "a psychologist to filter factual data relative to Prong II . . . than from factual anecdotal being delivered directly to this Court."  (Supp. App., Disc 1, Tr., 1245; *see also id.* at 560-72.)

This strategy accords with the Ohio Supreme Court's emphasis in *Lott* and *White* on expert testimony in *Atkins* proceedings.  In *Lott*, the court instructed trial courts to "rely on professional evaluations of [a defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter."  *Lott,* 97 Ohio St. 3d at 306, 779 N.E.2d at 1015.  The court added in *White*,

> While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave. Doing so shows an arbitrary, unreasonable attitude toward the evidence before the court and constitutes an abuse of discretion.

*White*, 118 Ohio St. 3d at 24, 885 N.E.2d 915-16.

Second, the testimony of Drs. Weiselberg-Ross, Campbell, and Vermeulen would have been cumulative, since their notes, reports, and letters were admitted into evidence and discussed at length by both parties' experts.  Similarly, Hill's mother and grandmother testified at Hill's mitigation hearing, and the transcripts of their testimony also were admitted into evidence at the

95

*Atkins* hearing.  (*See* Supp. App., Disc 1, 1104.)

Third, it is not reasonably probable that the result of Hill's *Atkins* hearing would have been different had Dr. Spindler, other family members, and death row inmates testified.  Hill admits that Dr. Spindler "does not recall Danny Hill or why he administered the test to him." (ECF No. 94, 57.)  The testimony of additional family members and other death row prisoners would have been equally weak.

These sub-claims are meritless.

### (2)    failure to challenge Hill's competency

Hill argues that his counsel should have objected to the entire *Atkins* hearing on competency grounds.  (*Id*. at 60-63.)  The trial court did, however, hold a hearing on Hill's competency on December 7, 2006, less than ten months after it issued its opinion on Hill's *Atkins* claim.  The Eleventh District Court of Appeals remanded the case to the trial court for the competency hearing after Hill's counsel filed a motion to withdraw from the case because Hill no longer wished to pursue his appeal and wanted them to withdraw as his counsel.  (Supp. App., Disc 1, Tr., 1926-28.)  After hearing testimony from a psychologist, the court found that Hill was competent to make decisions about his appeal.  (*Id*. at 1954.)  There is no evidence that the outcome would have been any different if such a hearing had taken place in the proceeding two years, before or during Hill's *Atkins* hearing.  This sub-claim fails as speculative.

### (3)    failure to object to Teeples videotaping Hill

For this sub-claim, Hill argues that his *Atkins* counsel should have objected when Detective Teeples videotaped Hill's testing related to his *Atkins* hearing.  Teeples also was present during Hill's final interrogation by police at which he confessed to being present at the

crime, and Hill believed Teeples was part of a conspiracy to falsely hold him responsible for the murder.  Hill claims Teeples' presence during the testing contributed to his difficulty with the testing.  (ECF No. 94, 50.)

This sub-claim also lacks merit.  Hill has offered no evidence to show when, if ever, his counsel was aware of this issue, and whether or not he could have objected in time.  Moreover, it is pure speculation to suggest that Hill's performance on the test would have been different had Teeples not been videotaping it.

### (4)  being "forced to" proceed with representation

Hill argues that his *Atkins* counsel should not have allowed himself to be "forced to" continue to represent him when their relationship had deteriorated.  (*Id*. at 63-80.)  As Hill acknowledges, his counsel twice filed motions to withdraw from the case, both of which were denied.  (*Id*. at 65.)  There was nothing more counsel could do.  This claim is meritless.[31]

### (5)  failure to object to "the fanatical prosecution"

Hill finally claims that his counsel was ineffective because he did not object to "the fanatical prosecution."  (ECF No. 94, 80.)  To the contrary, the Court notes that, after reviewing the entire record, it is apparent that Hill's counsel represented him skillfully and ardently.  Hill offers no evidence to support this claim, and it fails.

---

[31]     Hill also appears to frame this sub-claim as an error of the trial court in denying the motions to withdraw.  He fails to develop that argument, however, and it is waived.  *See United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address Cosgrove's general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

Accordingly, Hill's claim for ineffective assistance of *Atkins* counsel is denied.

**C.**  ***Third Ground for Relief:  Actual Innocence***

Hill claims for his third ground for relief that he is actually innocent of the death penalty because he is intellectually disabled.  Respondent counters that this claim is a "reiteration" of his *Atkins* claim "and fails for the same reason." (ECF No. 98, 6.)

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court explained that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Id.* at 404.  The Court stated in dicta, however, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional" regardless of whether any constitutional violation occurred during trial.  *Id*. at 417.

The Supreme Court has never applied such a claim, however, and recently declined to resolve whether a "free-standing" actual innocence claim is cognizable on federal habeas review. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).  The Sixth Circuit also has held that such a claim is not a valid ground for habeas relief.  *See, e.g., Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007); *Thomas v. Perry*, No. 13-1681, 2014 WL 128153, at *2 (6th Cir. Jan. 15, 2014). Moreover, the *Herrera* Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high."  *Herrera,* 506 U.S. at 417; *see also House v. Bell*, 547 U.S. 518, 520 (2006).

Because this claim has not yet been recognized by the Supreme Court or the Sixth Circuit, relief on this claim is denied.

98

## VI.  CERTIFICATE OF APPEALABILITY ANALYSIS

This Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Hill's grounds for relief.  The Sixth Circuit has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Hill presented in his Amended Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to AEDPA's enactment.

99

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  *Id*. at 483.  Thus, the Court determined,

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id*. at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id*. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id*.

After taking the above standards into consideration, the Court finds that it will issue a COA for Hill's *Atkins* claim, his first ground for relief.  Reasonable jurists could debate this Court's conclusion on the merits of this claim.  The Court will not issue a COA for Hill's second

100

ground for relief (ineffective assistance of *Atkins* counsel) or third ground for relief (actual innocence), as neither is a cognizable ground for federal habeas relief.  No jurist of reason would debate the Court's conclusions on these claims.

## VII.    CONCLUSION

Accordingly, this Court finds that Petitioner Danny Lee Hill's Amended Petition for Writ of Habeas Corpus is denied.  The Court further certifies, pursuant to 29 U.S.C. § 1915(a)(3), that an appeal from this decision as to Hill's first ground for relief can be taken in good faith.

IT IS SO ORDERED.

    */s/ John R. Adams*
JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE

June 25, 2014